**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| OLEAN WHOLESALE GROCERY COOPERATIVE, INC., et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>AGRI STATS, INC. et al.,<br><br>        Defendants. | No. 19-cv-08318<br><br>Hon. Virginia M. Kendall |

**MEMORANDUM IN SUPPORT OF**
**CERTAIN DEFENDANTS' JOINT MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ALLEGED .............................................................. 3

LEGAL STANDARD ......................................................................................... 6

ARGUMENT ....................................................................................................... 8

I.     PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED AN ANTICOMPETITIVE INFORMATION EXCHANGE .......................................................................... 8

     A.     Plaintiffs Fail to Allege Anticompetitive Effects ................................... 10

          1.     Plaintiffs Do Not Plausibly Allege Agri Stats Reports Resulted In Coordinated Action to Raise Prices or Reduce Output ........................... 10

               a.     No Allegations of Coordinated Behavior ..................................... 12

               b.     No Allegations of Individual Defendants Taking Actions to Decrease Supply or Increase Prices .............................................. 14

               c.     No Allegations of Acts Against Self Interest ................................ 15

               d.     The Complaint's Few Defendant-Specific Allegations Describe Wholly Lawful Behavior ............................................... 16

          2.     Plaintiffs' Industry-Wide Statistics Do Not Plausibly Show Coordinated Conduct Tied to the Use of Agri Stats ................................ 19

               a.     Complaint Figure 1 ...................................................................... 20

               b.     Complaint Figure 2 ...................................................................... 22

               c.     Complaint Figures 3 and 4 ........................................................... 23

               d.     Plaintiffs' Regression Model ....................................................... 24

     B.     Plaintiffs Fail to Allege a Plausible and Relevant Market ..................... 27

     C.     Plaintiffs Do Not Allege An Agreement ................................................ 30

II.    PLAINTIFFS CANNOT CONVERT THEIR RULE OF REASON CLAIM INTO A *PER SE* CLAIM .......................................................................................... 33

III.   PLAINTIFFS' CLAIMS ARE SUBSTANTIALLY BARRED BY THE STATUTE OF LIMITATIONS ...................................................................... 35

     A.     Plaintiffs Cannot Recover Damages For Injuries Before December 19, 2015 ....................................................................................................... 35

     B.     Plaintiffs Have Not Pleaded Fraudulent Concealment ......................... 36

CONCLUSION .................................................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
    683 F.3d 328 (7th Cir. 2012) .................................................................................9, 10, 27

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................ *passim*

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999) ..............................................................................................11

*Bank of Am., N.A. v. Knight*,
    725 F.3d 815 (7th Cir. 2013) ..............................................................................................7

*Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*,
    377 F.3d 682 (7th Cir. 2004) ............................................................................................37

*In re Beef Indus. Antitrust Litig.*,
    907 F.2d 510 (5th Cir. 1990) ............................................................................................12

*Bell Atl. Corp v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................ *passim*

*Black v. JP Morgan Chase & Co.*,
    No. 10-848, 2011 WL 4102802 (W.D. Pa. Aug. 10, 2011) ....................................................11

*In re Broiler Chicken Antitrust Litig.*,
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ......................................................................34, 38, 39

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ........................................................................................................28

*Burtch v. Millberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011) ..............................................................................................9

*Cada v. Baxter Healthcare Corp.*,
    920 F.2d 446 (7th Cir. 1990) ............................................................................................37

*Car Carriers, Inc. v. Ford Motor Co.*,
    745 F.2d 1101 (7th Cir. 1984) ..........................................................................................33

*Cement Mfrs. Protective Ass'n v. United States*,
    268 U.S. 588 (1925) ........................................................................................................11

*Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n,*
  95 F.3d 593 (7th Cir. 1996) ........................................................................10

*City of Los Angeles. v. Lyons,*
  461 U.S. 95 (1983) ......................................................................................35

*In re Copper Antitrust Litig.,*
  436 F.3d 782 (7th Cir. 2006) ......................................................................37

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.,*
  767 F. Supp. 2d 880 (N.D. Ill. 2011) .........................................................28

*E.I. du Pont de Nemours & Co. v. FTC,*
  729 F.2d 128 (2d Cir. 1984)...............................................................19, 31

*Ennenga v. Starns,*
  677 F.3d 766 (7th Cir. 2012) ......................................................................26

*Erie Cty., Ohio v. Morton Salt, Inc.,*
  702 F.3d 860 (6th Cir. 2012) ........................................................................8

*Flegel v. Christian Hosp.,*
  4 F.3d 682 (8th Cir. 1993) ..........................................................................28

*Gen. Elec. Capital Corp. v. Lease Resolution Corp.,*
  128 F.3d 1074 (7th Cir. 1997) ....................................................................26

*Great Escape, Inc. v. Union City Body Co.,*
  791 F.2d 532 (7th Cir. 1986) ......................................................................10

*Havoco of Am., Ltd. v. Shell Oil Co.,*
  626 F.2d 549 (7th Cir. 1980) ......................................................................33

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.,*
  602 F.3d 237 (3d Cir. 2010)........................................................................32

*In re ICE LIBOR Antitrust Litig.,*
  No. 19-cv-439, 2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020)............8, 24

*Int'l Equip. Trading, Ltd. v. AB Sciex LLC,*
  No. 13 C 1129, 2013 WL 4599903 (N.D. Ill. Aug. 29, 2013)............7, 28

*Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.,*
  61 F.3d 1250 (7th Cir. 1995) ......................................................................28

*Jung v. Ass'n of Am Med. Colls.,*
  300 F. Supp. 2d 119 (D.D.C. 2004) ...........................................................13

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) .........................................................................16

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)..........................................................................................36

*Kotteakos v. United States*,
    328 U.S. 750 (1946)..........................................................................................32

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    588 F.3d 908 (6th Cir. 2009) ...........................................................................30

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)........................................................................................8, 9

*Limestone Dev. Corp. v. Vill. of Lemont*,
    520 F.3d 797 (7th Cir. 2008) .............................................................................7

*Logan v. Wilkins*,
    644 F.3d 577 (7th Cir. 2011) .....................................................................35, 37

*Maple Flooring Mfrs. Ass'n v. United States*,
    268 U.S. 563 (1925)......................................................................................11, 14

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
    952 F.3d 832 (7th Cir. 2020) ...........................................................................32

*McCauley v. Chicago*,
    671 F.3d 611 (7th Cir. 2011) ...........................................................................26

*In re Milk Prods. Antitrust Litig.*,
    84 F. Supp. 2d 1016 (D. Minn. 1997) ..............................................................37

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) .........................................................................32

*Naperville Smart Meter Awareness v. City of Naperville*,
    69 F. Supp. 3d 830 (N.D. Ill. 2014) ...................................................................7

*Nat'l Black Expo v. Clear Channel Broad., Inc.*,
    No. 03 C 2751, 2007 WL 495307 (N.D. Ill. Feb. 8, 2007).................................37

*Nucap Indus., Inc. v. Robert Bosch LLC*,
    273 F. Supp. 3d 986 (N.D. Ill. 2017) ................................................................28

*In re Pork Antitrust Litig.*,
    No. 18-cv-1776, 2019 WL 3752497 (D. Minn. Aug. 8, 2019)...................... *passim*

iv

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997).....................................................................................28

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Illinois, Inc.*,
    412 F. Supp. 3d 941 (N.D. Ill. 2019) .......................................................................29

*Reifert v. S. Cent. Wis. MLS Corp.*,
    450 F.3d 312 (7th Cir. 2012) ....................................................................................28

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) ....................................................................................28

*Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*,
    87 F. Supp. 3d 874 (N.D. Ill. 2015) .........................................................................28

*Rohlfing v. Manor Care*,
    172 F.R.D. 330 (N.D. Ill. 1997).................................................................................28

*S. Collision & Restoration, LLC v. State Farm Mut. Auto. Ins.*,
    173 F. Supp. 3d 1293 (M.D. Fla. 2016) ...................................................................17

*Safari Childcare Inc. v. Penny*,
    No. 17 C 8547, 2018 WL 4144637 (N.D. Ill. Aug. 30, 2018)...................................7

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ....................................................................................26

*Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*,
    786 F.2d 1400 (9th Cir. 1986) ...........................................................................15, 16

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006)....................................................................................................8, 9

*Tichy v. Hyatt Hotels Corp.*,
    376 F. Supp. 3d 821 (N.D. Ill. 2019) .......................................................................17

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001).................................................................10, 12, 14, 28

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ....................................................................................32

*United States v. Citizens & S. Nat'l Bank*,
    422 U.S. 86 (1975)......................................................................................................9

*United States v. Container Corp. of Am.*,
    393 U.S. 333 (1969)...................................................................................10, 12, 14

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978) ................................................................................10, 16, 33

*Valspar Corp. v. E.I. du Pont de Nemours & Co.*,
   873 F.3d 185 (3d Cir. 2017) ................................................................................21

*Vill. of DePue, Ill. v. Viacom Int'l Inc.*,
   713 F. Supp. 2d 774 (C.D. Ill. 2010) ..................................................................26

*Wash. Cty. Health Care Auth. v. Baxter Int'l, Inc.*,
   328 F. Supp. 3d 824 (N.D. Ill. 2018) .............................................................26, 31

*Wash. Cty. Health Care Auth. v. Baxter Int'l Inc.*,
   No. 16-CV-10324, 2020 WL 1666454 (N.D. Ill. April 3, 2020) ..........................15, 17, 31, 35

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
   372 F.3d 899 (7th Cir. 2004) .........................................................................35, 36

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   401 U.S. 321 (1971) .............................................................................................35

**Statutes**

15 U.S.C. § 1 ..........................................................................................3, 15, 17, 30

15 U.S.C. § 15b .........................................................................................................35

**Other Authorities**

Fed. R. Civ. P. 8 ..........................................................................................................7

Fed. R. Civ. P. Rule 9(b) ...........................................................................................37

2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320c7 (4th ed.
   2014) .......................................................................................................................36

## INTRODUCTION

The Complaint alleges a single claim that eighteen turkey processors violated the Sherman Act by using benchmarking reports provided by Agri Stats. Plaintiffs claim that, from 2010 through January 1, 2017, the turkey processors exchanged information about their operations through Agri Stats in order to suppress turkey production and increase turkey prices. Plaintiffs do not come close to pleading the factual allegations necessary to support that claim.[1]

In antitrust law, some restraints of trade are *per se* unlawful, but most are analyzed under the rule of reason. Information exchanges are not *per se* unlawful, so Plaintiffs' only option is to claim that Defendants' conduct violates the rule of reason. That is a daunting task; as the Supreme Court has explained, information exchanges generally are pro-competitive, not anti-competitive.

To plead a rule of reason claim, Plaintiffs must allege that Defendants agreed to exchange information through Agri Stats, causing anticompetitive effects that outweigh the pro-competitive benefits of the exchange in an appropriately defined, relevant market. The Complaint alleges none of those required elements. And the Complaint has other serious flaws, including that Plaintiffs' claims are substantially barred by the statute of limitations.

**No Anticompetitive Effects**: Plaintiffs do not tie Defendants' alleged information exchange to any anticompetitive effects. They do not plead that any Defendant—individually or in coordination with any other Defendant—took any actions to decrease supply or increase prices during the time period at issue. Instead, Plaintiffs rely entirely on aggregated, industry-wide data they claim shows supply decreases and price increases in the turkey industry, and they ask this Court to infer that each Defendant acted consistently with that data. That kind of group pleading is not enough to state a Sherman Act claim.

---

[1] All Defendants other than Kraft join this motion.

Further, the industry-wide data does not even support Plaintiffs' claim. Plaintiffs' theory is that Defendants began sharing information through Agri Stats in 2010 in order to decrease production and increase prices. Yet the industry-wide data shows production *increased*—not decreased—during three of the seven years alleged (2011, 2012, and 2016). And production levels varied in the years before and after the 2010-2016 time period, which undermines Plaintiffs' theory that everything changed in 2010. Plaintiffs also allege *no* facts suggesting that any Defendant's use of Agri Stats led to increased prices or decreased production for any turkey product. Plaintiffs do not attempt to show an effect on pricing or production by, for example, comparing data from before and after Defendants began using Agri Stats.

**Flawed Market Definition**: Plaintiffs are required to allege a plausible, relevant market. They also must allege that Defendants both had market power and used that power to harm competition in that market. For market definition, all Plaintiffs say is that "[t]here is a single market for turkey for meat consumption." Compl. ¶ 90. That bare assertion does not plausibly allege a relevant market. Turkey products come from male toms and female hens, and there are many different products, from whole Thanksgiving birds, to turkey hot dogs, to deli meat, and others. Each bird and product has its own supply and demand conditions, distribution channels, geographical boundaries, and competition from other products. Plaintiffs do not account for any of these factors in their market definition.

**No Allegations of Agreement**: The Complaint does not even plausibly allege that the turkey processors *agreed* to exchange data through Agri Stats. All Plaintiffs allege is that each Defendant individually signed up to receive benchmarking reports from Agri Stats. At best, that is an allegation of a separate vertical agreement between each turkey processor and Agri Stats—

not a horizontal agreement among turkey processors to exchange information through Agri Stats. Without a plausibly alleged agreement among Defendants, Plaintiffs' claim necessarily fails.

**Statute of Limitations**:  Plaintiffs cannot recover damages based on injuries that supposedly occurred before December 19, 2015, because a four-year statute of limitations applies to their lawsuit.  In order to try to escape the statute of limitations, Plaintiffs assert fraudulent concealment.  But they do not come close to satisfying the heightened pleading standard for fraud. Plaintiffs do not even allege the basic elements of fraudulent concealment—that Defendants took actions to conceal the relevant facts, and that Plaintiffs acted diligently to discover their claims. In fact, Plaintiffs' Complaint is inconsistent with their claim of fraudulent concealment, because it relies almost entirely on public information that was available to Plaintiffs years ago.

For all of these reasons, the Court should dismiss Plaintiffs' Complaint.

## STATEMENT OF FACTS ALLEGED

Plaintiffs assert a single cause of action—"Violation of Section 1 of the Sherman Act for Conspiracy to Exchange Competitive Information, 15 U.S.C. § 1." Compl. ¶¶ 146-63.  They allege that Defendants "each entered into an agreement from at least 2010 to January 1, 2017, to exchange sensitive information through Agri Stats regarding their production and sales of turkey." *Id.* ¶ 3.

Agri Stats provides benchmarking information to "a variety of agricultural sectors." *Id.* ¶ 2.  It collects data from turkey processors, standardizes and anonymizes this data, and "produces customized reports and graphs" for its subscribers—in this case, turkey processors. *Id.* ¶ 4.  Agri Stats, however, is not the only source of turkey production and pricing information; the Complaint itself relies upon published USDA production and pricing data, along with reports filed by publicly traded companies. *See id.* ¶¶ 110-12, 115.  The USDA publishes turkey pricing and volume data

both daily and weekly.[2]  Despite the USDA's near real-time publication of that data, Plaintiffs claim that Agri Stats "monthly" reports with data that was "less than six weeks old" were "current and forward-looking." *Id*. ¶ 29.[3]

Plaintiffs acknowledge that Agri Stats aggregated all pricing information.  The most a Defendant could do is compare its prices "against the national average net price, and against the national top 25 percent average price." *Id*. ¶ 79.  Plaintiffs do not claim that Agri Stats reported the prices that individual customers paid, or the prices that different Defendants charged in different locations for different products.

The Complaint never explains how the turkey processor Defendants used Agri Stats information to coordinate output.  All the Complaint alleges is that the turkey processor Defendants used Agri Stats reports to improve their own, *individual* positions.  Specifically, the Complaint alleges that "[i]ndustry participants relied on Agri Stats reports in their analysis of their business operations"—that is, that each Defendant used Agri Stats to improve its own performance "against peers in the turkey industry." *Id*. ¶¶ 12-13.  For example, one Defendant allegedly used Agri Stats

---

[2] *See* USDA, Agricultural Market Service, *Daily Young Turkey Parts* (updated daily), *available at* https://www.ams.usda.gov/mnreports/nw_py029.txt (reflecting prices and volumes of turkey products tracked by the USDA); *see also* USDA, Agricultural Market Service, *Weekly National Fresh and Frozen Whole Young Turkeys*, https://www.ams.usda.gov/mnreports/pywturkey.pdf; USDA, Agricultural Market Service, *Weekly Turkeys Slaughtered*, https://www.ams.usda.gov/mnreports/nw_py021.txt; USDA, Agricultural Market Service, *Weekly Advertised Prices for Turkey to Consumers*, https://www.ams.usda.gov/mnreports/pywretailturkey.pdf; USDA, Agricultural Market Service, *Turkey Market News Reports*, https://www.ams.usda.gov/market-news/turkey-market-news-reports.

[3] The USDA also relies on Agri Stats.  *See* USDA, *Final Report for the 2014-2015 Outbreak of Highly Pathogenic Avian Influenza (HPAI) in the United States* at 41 (rev. Aug. 11, 2016), *available at* https://www.aphis.usda.gov/animal_health/emergency_management/downloads/hpai/2015-hpai-final-report.pdf (stating "[c]ost and productivity information are annual data from Agri Stats, a benchmarking company with expertise in poultry").

information to "optimize [its] supply chain" in order to improve its "relative industry position." *Id.* ¶ 12.

The Complaint relies on three confidential witnesses—a former sales executive at Butterball, a former accountant at Cooper Farms, and a former employee of Cargill. Compl. ¶¶ 13-19. None of the witnesses describes any unlawful conduct. Witness 1 says that Butterball used Agri Stats data to "see how Butterball ranked against peers in the turkey industry" and to make its own position more competitive in the market. *Id.* ¶ 13 ("The company used the information to evaluate—by item, item group, price, distribution—where we stood against other turkey companies."). Witness 2 says that Cooper Farms received Agri Stats information; that individuals discussed it within the company and with representatives of Agri Stats; and that the company used advice from Agri Stats to "improve its returns per pound." *Id*. ¶¶ 14-18. Witness 3 says that Cargill received information from Agri Stats, but says nothing about how the company used that information. *Id.* ¶ 19.

Plaintiffs claim antitrust violations between January 1, 2010 and January 1, 2017. Compl. ¶ 67. But Plaintiffs also allege that Defendants shared information with, and received information from, Agri Stats well before 2010. For example, Plaintiffs allege that, by 2009, "about 95% of the turkey industry [was] participating" in Agri Stats. *Id.* ¶ 7 (internal quotation marks omitted). Yet according to Plaintiffs, there was some drastic change in 2010, and Defendants began using Agri Stats to decrease supply and increase prices. Plaintiffs never explain what supposedly changed.

Plaintiffs rely on aggregated industry data to try to make out a Sherman Act claim. First, they rely on yearly USDA turkey slaughter data. That data shows fluctuations before, during, and after the relevant period—it does not show a steady decrease in supply during the relevant period. *See* pp. 20-21, *infra* (discussing Figure 1).

5

Second, Plaintiffs provide yearly pricing data for wholesale hens, one of the many types of turkey products tracked by the USDA. That data shows that prices have been on an overall upward trajectory since 2003 (years before the alleged anticompetitive information exchange began), and that prices actually *decreased* at points during the time period alleged. *See* pp. 21-23, *infra* (discussing Figure 2).

Third, Plaintiffs attempt to compare prices to costs, citing what they describe as "assumed" data for one Defendant. Compl. ¶ 111 n.12. They cite Hormel Foods' enterprise-wide data (which includes data about a variety of non-turkey products) and purport to extrapolate the proportion of that data that they say would apply to Hormel Foods' Jennie-O Turkey Store ("JOTS") subsidiary. *Id.* Plaintiffs then claim there was a divergence between revenues and costs for *all* turkey processor Defendants based on their "assumed" data about JOTS. *See* pp. 23-24, *infra* (discussing Figures 3 & 4). That data is made up—Plaintiffs are not relying on any actual JOTS data. And there is no reason to treat data about Hormel Foods' many unrelated products as representative of JOTS's turkey data. Nor does data from Hormel Foods say anything about the other Defendants.

Finally, Plaintiffs provide a regression analysis purporting to show "the relationship between the price of turkey hens and the price of turkey feed, which is the primary input cost for turkeys." Compl. ¶ 117. But that analysis does not account for other obvious factors that explain any divergence between prices for turkey hens and feed costs, such as the Highly Pathogenic Avian Influenza (Avian Influenza) outbreak, which began in 2014. *See* n. 3, *supra* (USDA, *Final Report* at v). The USDA described the Avian Influenza outbreak as "arguably the most significant animal health event in U.S. history." *Id.*

## LEGAL STANDARD

To withstand a motion to dismiss, Plaintiffs must plead "sufficient factual matter" that—if "accepted as true"—"state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)); *see* Fed. R. Civ. P. 8. This standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. A complaint that "pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

"For complaints involving complex litigation, like this antitrust case, a fuller set of factual allegations may be necessary to show that plaintiff's claims are plausible." *Int'l Equip. Trading, Ltd. v. AB Sciex LLC*, No. 13 C 1129, 2013 WL 4599903, at *2 (N.D. Ill. Aug. 29, 2013) (citing *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008)). *Twombly* "teaches that a defendant should not be forced to undergo costly discovery unless the complaint contains enough detail, factual or argumentative, to indicate that the plaintiff has a substantial case." *Limestone Dev. Corp.*, 520 F.3d at 802-03. And a court will not presume unlawful conduct when there are obvious alternative (and lawful) explanations for the alleged conduct. *Iqbal*, 556 U.S. at 682; *see Naperville Smart Meter Awareness v. City of Naperville*, 69 F. Supp. 3d 830, 841-42 (N.D. Ill. 2014).

Plaintiffs also cannot group plead their way to a plausible claim. Group pleading "without any details about who did what" "is inadequate" because "[l]iability is personal." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013); *see Safari Childcare Inc. v. Penny*, No. 17 C 8547, 2018 WL 4144637, at *2 (N.D. Ill. Aug. 30, 2018) ("Vague references to a group of defendants, without specific allegations tying the individual defendants to the alleged [misconduct] are insufficient.") (internal quotation marks omitted).

In particular, Plaintiffs cannot meet their burden by pleading industry-wide trends and asking a court to assume that the Defendants were responsible for those trends. *See In re Pork*

*Antitrust Litig.*, No. 18-cv-1776, 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019) ("Without specific information regarding each Defendant, the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted to reduce the supply of pork."); *Erie Cty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012) (aggregated market-wide data are "simply descriptions of the market, not allegations of anything that the defendants did"). It is "inappropriate for Plaintiffs to rely upon aggregate data to demonstrate how an entire group of Defendants" allegedly acted. *In re ICE LIBOR Antitrust Litig.*, No. 19-cv-439, 2020 WL 1467354, at *6 (S.D.N.Y. Mar. 26, 2020) (*ICE LIBOR*) (plaintiffs' pleading of aggregated data and lack of academic sources to back-up their claims about statistical allegations was "unreliable and dubious," resulting in complaint's dismissal).

## ARGUMENT

## I. PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED AN ANTICOMPETITIVE INFORMATION EXCHANGE

In antitrust law, courts generally use two different rules to analyze alleged anticompetitive restraints: the "*per se*" rule and the "rule of reason." "*Per se* liability is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (internal quotations omitted). Certain conduct among horizontal competitors—like price fixing or bid rigging—is *per se* unlawful. If a plaintiff proves the defendant engaged in that conduct, the court need not analyze the effects in the relevant market. *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).

Other conduct is analyzed under the rule of reason, which considers the alleged anticompetitive effects of the conduct against its pro-competitive benefits. *Id.* Courts "presumptively appl[y] rule of reason analysis" and require "antitrust plaintiffs [to] demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Texaco Inc.*, 547 U.S. at 5.

The Supreme Court has held that information exchanges are evaluated under the rule of reason. *See United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975) ("the dissemination of . . . information is not itself a *per se* violation of the Sherman Act"); *see* pp. 10-12, *infra*. Plaintiffs acknowledge that Agri Stats reports are "exactly the type of information exchange that the Supreme Court" said must be analyzed "under a rule of reason analysis." Compl. ¶ 10. "[T]he mere exchange of . . . information" alone "does not violate the Sherman Act." *Burch v. Millberg Factors, Inc.*, 662 F.3d 212, 218, 222 (3d Cir. 2011).

To state a rule of reason claim, Plaintiffs must allege facts that plausibly establish that Defendants entered into an agreement, causing anticompetitive effects that outweigh any pro-competitive benefits in a relevant market. *See Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). Plaintiffs assert that by subscribing to Agri Stats, the Defendants "entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations." Compl. ¶ 147. Plaintiffs further state that the exchange of information through Agri Stats resulted in supply cuts, and "had the effect of (1) reducing and suppressing competition among defendants in the market for turkey in the United States and (2) inflating the prices of turkey during the Class Period." *Id.* ¶ 160.

Despite these conclusory statements, Plaintiffs' Complaint fails to plead any of the necessary elements of a rule of reason claim. Plaintiffs (1) fail to allege anticompetitive effects;

(2) fail to allege a properly defined, relevant market; and (3) fail to allege any agreement among the turkey processors to exchange information through Agri Stats. *Agnew*, 683 F.3d at 335.

### A.  Plaintiffs Fail to Allege Anticompetitive Effects

Information exchanges often "increase economic efficiency and render markets more, rather than less, competitive." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). To plausibly plead a violation of the antitrust laws, Plaintiffs must allege that Defendants' use of Agri Stats reports caused anticompetitive effects. *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 539 (7th Cir. 1986) ("Under the rule of reason the plaintiff must allege and prove anticompetitive effects.").  That is because "[t]he core question in antitrust is output," and "[u]nless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem." *Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996).

Plaintiffs fail to allege anticompetitive effects for two separate reasons.  First, they do not allege facts suggesting that any Defendant's use of Agri Stats resulted in coordinated action with another Defendant to reduce supply or increase prices.  Second, Plaintiffs' industry-wide statistics do not show coordinated conduct by Defendants.

### 1.  Plaintiffs Do Not Plausibly Allege Agri Stats Reports Resulted In Coordinated Action to Raise Prices or Reduce Output

Plaintiffs must allege that the exchange of information through Agri Stats facilitated *coordinated action* by the Defendants that harmed competition.  *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (citing *United States v. Container Corp. of Am.*, 393 U.S. 333, 334 (1969)).[4]  Exchanging information to facilitate better individual decision making does not violate

---

[4] Although *Todd* is sometimes cited in information exchange cases, it predates and must be read with regard to *Twombly*, which requires "allegations plausibly suggesting (not merely consistent with)" illegality. *Twombly*, 550 U.S. at 557, 562-63 (rejecting the "no set of facts" pleading standard used in *Todd*).

the Sherman Act.  *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999) (rule of reason information exchange claim requires proof of "consciously parallel" conduct).

The Supreme Court consistently has distinguished between exchanges that allow rivals to make more informed but independent choices (which do not violate the antitrust laws) and exchanges that facilitate coordinated actions and result in anticompetitive effects (which may violate the antitrust laws).  In *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563 (1925), the Supreme Court held that trade association members' exchange of information about flooring prices did not violate the antitrust laws, even though that exchange "tend[ed] to bring about uniformity in prices through the operation of economic law."  *Id.* at 567.  The Court explained that the "dissemination of pertinent information" about a trade or business naturally "tends . . . to produce uniformity of price [and] prevent overproduction," and that effect by itself "can hardly be deemed a restraint of commerce . . . or in any respect unlawful."  *Id.* at 582; *see also Black v. JP Morgan Chase & Co.*, No. 10-848, 2011 WL 4102802, at *21 (W.D. Pa. Aug. 10, 2011) (noting the continued widespread application of this principle).

The Court made the same point in *Cement Mfrs. Protective Ass'n v. United States*, 268 U.S. 588 (1925).  In that case, the Court upheld an exchange of customer-specific credit information because the exchange did not lead to any coordinated interaction on credit decisions.  *Id.* at 599-600.  The Court emphasized that no evidence showed an "understanding on the basis of which credit was to be extended," "any co-operation [that] resulted from the distribution of [the] information," or "any consequences" except those that "would naturally ensue from the exercise of the individual judgment of manufacturers in determining, on the basis of available information, whether to extend credit."  *Id.* at 600.

11

The Supreme Court applied those principles to a different type of information exchange in *United States v. Container Corp. of America*, 393 U.S. 333 (1969). There, the Court held that bilateral exchanges about particular customer prices *did* violate the antitrust laws because the defendants used the exchanges to coordinate prices. *Id.* at 337. The defendants were competitors in specific bidding contests. They exchanged information about the prices they were willing to pay, *id.* at 335, and "once a defendant had this information," "he quoted substantially the same price as the competitor." *Id.* at 339 (Fortas, J., concurring). The Court acknowledged that "[p]rice information exchanged in some markets may have no effect on a truly competitive price," but determined that it could infer that the *Container Corp.* defendants exchanged information in a coordinated way to achieve anticompetitive prices. 393 U.S. at 337; *see also Todd*, 275 F.3d at 212 (explaining that "exchanges . . . that identify particular parties, transactions, and prices are seen as potentially anticompetitive because they may be used to police a secret or tacit conspiracy to stabilize prices").

Here, Plaintiffs do not allege the coordination necessary to plead a rule of reason claim.

### a.    *No Allegations of Coordinated Behavior*

Plaintiffs do not allege that Defendants engaged in any coordinated activity using Agri Stats reports, such as parallel pricing or production moves. The failure to allege coordinated parallel action dooms their claim. *See, e.g.*, *In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 514 (5th Cir. 1990) (to prevail on information-sharing claim, plaintiff "must first demonstrate that the defendants' actions were parallel").

Plaintiffs claim that even though Agri Stats reports are anonymized, former employees could "usually figure out who was who" based on public knowledge about processor operations. Compl. ¶ 18 (internal quotation marks omitted). Yet Plaintiffs do not allege that any Defendants informed each other about the identity of companies on particular reports, encouraged Agri Stats

to weaken its confidentiality protocols, or refused to subscribe to Agri Stats unless the data could be decoded. *See id.* ¶¶ 13-19. And even if one processor sometimes could guess the identity of another, that would not establish that Defendants (collectively) used de-anonymized data to coordinate their output. Allegations of imperfect encryption do not suggest anticompetitive effects. *Jung v. Ass'n of Am Med. Colls.*, 300 F. Supp. 2d 119, 168-69 (D.D.C. 2004) (conclusory allegations concerning AMA's exchange of disaggregated, employer-specific data were not enough to survive a motion to dismiss).

Plaintiffs' conclusory claim that certain features of Agri Stats reports show that they *could* be used for collusive activity is also not enough to plead a Sherman Act violation. Compl. ¶ 67. Instead, Plaintiffs must plausibly allege Defendants' use of Agri Stats reports resulted in coordinated reductions in output. *See Iqbal*, 556 U.S. at 678.

Plaintiffs also fail to explain *how* Defendants allegedly used Agri Stats reports to coordinate pricing or supply decisions. Plaintiffs assert that "Agri Stats reports are far different from lawful industry reports." Compl. ¶ 4. They then suggest that certain characteristics of the reports make them more likely to be used to cause anticompetitive effects. For example, Plaintiffs claim that Agri Stats provided information on "industry-wide supply levels." *Id.* ¶¶ 16-17. Yet Plaintiffs never allege how that data enabled Defendants to "keep[] . . . supply in check," *id.* ¶ 20, or that any Defendant used that data for this purpose.

Plaintiffs say coordination can be inferred because Agri Stats reports allegedly provide, "[o]n a monthly basis," price and production information that was "less than six weeks old," creating an *opportunity* for Defendants to compare their prices against the national average. *Id.* ¶¶ 4-5, 10-11, 29, 78. They conclude based on their allegations that Agri Stats reports are "current and forward-looking." *Id.* ¶ 4. But Plaintiffs ignore that the USDA publishes turkey volume and

price data in near real time—daily and weekly—well in advance of the monthly Agri Stats reports with 6-week old information. *See* n. 2, *supra.* And Plaintiffs do not claim that Defendants were receiving actual customer-specific price information through Agri Stats—they claim the information was aggregated and provided as a national average. Compl. ¶¶ 11, 79. There is nothing unlawful about that. "Courts prefer that information be aggregated in the form of industry averages, thus avoiding transactional specificity." *Todd*, 275 F.3d at 212 (citing *Container Corp.*, 393 U.S. at 334–38 and *Maple Flooring*, 268 U.S. at 573-74). Moreover, there is not a single well-pled allegation that any Defendant coordinated pricing with any other Defendants, based on Agri Stats reports or otherwise.

### b. *No Allegations of Individual Defendants Taking Actions to Decrease Supply or Increase Prices*

Not only do Plaintiffs fail to allege coordinated action, but they also fail to allege that any Defendant individually took action to decrease supply or increase prices for any turkey products. The Complaint does not allege which Defendants cut production, or when, or by how much, or for how long they purportedly did so. Nor does the Complaint allege that any Defendant increased prices, when they did so, by how much, and to whom.

The only allegation in the Complaint about any Defendant's output or pricing decisions is that one Defendant made a statement *before* the supposed anticompetitive information exchange began in 2010. Plaintiffs allege that, in 2008, Hormel Foods announced and then implemented production cuts to "clean[] up [the] inventories that we had on hand." Compl. ¶ 24 (internal quotation marks omitted). There is nothing unlawful about that. *See Twombly*, 550 U.S. at 554 (allegations merely "in line with a wide swath of rational and competitive" behavior are insufficient). And that one statement cannot be considered an anticompetitive effect from

Defendants' use of Agri Stats, both because it predates the alleged agreement to exchange information, and because it involves one Defendant.

"Without specific information regarding each Defendant, the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted to reduce the supply of [turkey]." *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *8. And where there are no allegations of individual production cuts or price increases by any Defendant, the Complaint should be dismissed. *See Wash. Cty. Health Care Auth. v. Baxter Int'l Inc.*, No. 16-CV-10324, 2020 WL 1666454, at *7 (N.D. Ill. April 3, 2020) (dismissing Section 1 complaint with prejudice where "plaintiffs have not sufficiently alleged *any* output restricti[on]" because "an inference cannot be drawn from a vacuum. . . . there must be fact allegations from which [an] inference [of illegal conduct] can be drawn").

Plaintiffs' three confidential witnesses likewise do not discuss supply or price actions by any Defendant. Compl. ¶¶ 13-19. Each witness describes a Defendant's individual use of Agri Stats—none of the witnesses claims knowledge of coordinated prices or production. And all the witnesses say is that the three Defendants each obtained information from a benchmarking service, which is perfectly lawful. If any of the witnesses had anything more to say, Plaintiffs surely would have included it in their Complaint. *See Wash. Cty. Health Care Auth.*, 2020 WL 1666454, at *5 (dismissing claim based, in part, on quote from confidential witness suggesting nothing but unilateral, lawful conduct).

### c. *No Allegations of Acts Against Self Interest*

Plaintiffs claiming an antitrust violation based on an information exchange must allege not only coordinated action, but also that each Defendant's acts "were against [its] self-interest" and were "not based on a good faith business judgment." *Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1407 (9th Cir. 1986). Exchanging information does not

show an "illegal agreement" if the exchange simply enables "reasonable business behavior." *Id.* Courts should not infer unlawful conduct when the conduct alleged could "just as easily suggest rational, legal business behavior by the defendants." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008).

Here, Plaintiffs allege only rational business behavior, and they fail to plausibly allege that any Defendant took actions against its own interests. As the Supreme Court's cases show, it is perfectly legal for businesses to attempt to reduce costs, improve performance, and otherwise gain a competitive edge by subscribing to a third-party benchmarking service. *See* pp. 10-12, *supra*. The Complaint here concedes that Defendants used Agri Stats for legitimate purposes.

For example, the Complaint alleges that Defendants "relied on Agri Stats reports in their analysis of their business operations" to help them "optimize [their] supply chain." Compl. ¶ 12 (internal quotation marks omitted). Each Defendant independently used Agri Stats information to improve its own performance "*against* peers in the turkey industry." *Id.* ¶ 13 (emphasis added). In short, the Complaint itself undercuts any inference that Defendants shared information through Agri Stats for anticompetitive purposes or engaged in acts against self-interest. Instead, the Complaint essentially admits Defendants took unilateral actions to "increase economic efficiency and render markets more, rather than less, competitive." *Gypsum*, 438 U.S. at 441 n.16.

### d. *The Complaint's Few Defendant-Specific Allegations Describe Wholly Lawful Behavior*

The only specific allegations in the Complaint directed at the turkey processor Defendants describe legitimate unilateral conduct, rather than any coordinated activity. None of those allegations come even close to supporting Plaintiffs' theory.

Beyond defining the parties and alleging each Defendant subscribed to Agri Stats, the Complaint says some Defendants participated in trade associations, and that each Defendant had

market share, ranging from 1% to 18%. *See, e.g.*, Compl. ¶¶ 22, 98, 125-130.[5] Yet trade association membership and market share allegations do not show coordinated action.

First, there is nothing unlawful about participating in trade organizations. *Twombly*, 550 U.S. at 567 n.12; *see Wash. Cty. Health Care Auth.*, 2020 WL 1666454, at *10 (allegations of conference attendance "add[s] nothing . . . to push past the possible to the plausible"); *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *8 (so-called opportunities to conspire without allegations of parallel conduct are insufficient). Plaintiffs never allege (as they must) facts suggesting that the trade association meetings were linked to any supply or pricing actions. *See Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 841 (N.D. Ill. 2019) (dismissing Section 1 claim where "Plaintiffs' allegations concerning the timing between industry conferences and parallel conduct [did] not raise suspicions").

Second, simply noting a Defendant's market share also does not suggest unlawful conduct. *See, e.g.*, *S. Collision & Restoration, LLC v. State Farm Mut. Auto. Ins.*, 173 F. Supp. 3d 1293, 1300 (M.D. Fla. 2016) (dismissing Section 1 claims and finding that "the mere (collective) possession of market share is not suggestive of collusion").

For a number of Defendants, including Farbest Foods, Foster Farms, HRF, and Perdue, Plaintiffs allege nothing more than some combination of the fact that each company subscribed to Agri Stats, participated in a trade association, and/or had some amount of market share. This paucity of allegations alone warrants dismissal.

---

[5] Plaintiffs do not allege that House of Raeford, Inc. (HRF) participated in any trade association. As to HRF, apart from asserting it held 1% market share, Plaintiffs make only a single allegation—that HRF participated in Agri Stats in 2010 or before. Compl. ¶¶ 8-9, 98. That allegation does not show any unlawful act by HRF. And Plaintiffs cannot allege any such act by HRF within the four-year statute of limitations period, because HRF shut down its turkey operations in 2013. *See* n. 14, *infra*.

The Complaint's few remaining allegations directed at the other turkey processor Defendants are completely benign—they do not support an inference that Defendants used Agri Stats to coordinate supply cuts or increase prices. Those allegations (some of which have already been discussed) are collected here:

Butterball

- Butterball used data from Agri Stats' monthly reports "to see how Butterball ranked against peers in the turkey industry." Compl. ¶ 13.

- Butterball used Agri Stats data "to assess costs and returns." *Id.* "[C]osts were an important factor in determining how Butterball set its prices." *Id.*

Cargill

- "[M]onthly Agri Stats turkey reports went directly to Cargill finance executives." *Id.* ¶ 19.

Cooper Farms

- Cooper Farms executives "regularly met with" and "received advice from Agri Stats" to help it "improve its returns per pound." *Id.* ¶¶ 14-15 (internal quotation marks omitted).

- Cooper Farms "submitted cost information to Agri Stats every month." *Id.* ¶ 14.

- A former Cooper Farms employee (CW2) claimed "he could determine the identity of companies in Agri Stats reports" based on industry knowledge. *Id.* ¶ 18.

Hormel Foods

- In June 2009—before the relevant period—Hormel Foods was "closely monitoring the overall level of production in the market," *id.* ¶ 24, and publicly stated that it was making production cuts it had announced "over a year ago," in order "to work off inventories," *id.* (internal quotation marks omitted).

- Over a year later, in August 2010, Hormel Foods publicly stated that it did not "have any major expansion plans" for its turkey business and had not heard about other expansion plans. *Id.* ¶ 25 (internal quotation marks omitted).

- The next year, in May and August 2011, Hormel Foods stated that "the amount of product going to market will support solid pricing on a commodity basis," *id.* ¶ 26, and that "[t]he industry as a whole has shown a little better discipline, perhaps, than the other poultry side of the ledger," *id.* ¶ 27.

- In 2011, Hormel Foods stated that it had "optimize[d]" its supply chain and improved its "relative industry position," referencing Agri Stats. *Id.* ¶ 12.

- Hormel Foods' JOTS subsidiary allegedly had a "break in revenues and costs" around the start of the alleged conspiracy period in 2010, but based only on Plaintiffs' assumption about Hormel Foods' turkey product costs as a share of enterprise-wide costs. *Id.* ¶¶ 111-12.

Tyson
- Tyson acquired Hillshire Brands in 2014. *Id.* ¶ 9.

- Tyson dismissed its CEO in late 2016, "shortly after" the filing of the *Broilers* litigation. *Id.* ¶ 31.

None of these allegations suggests any type of coordinated activity. And the Complaint alleges no other specific conduct by any of the turkey processor Defendants to support Plaintiffs' claim. Taken as a whole, the allegations fall far short of suggesting any coordinated supply cuts or price increases.

### 2. Plaintiffs' Industry-Wide Statistics Do Not Plausibly Show Coordinated Conduct Tied to the Use of Agri Stats

Plaintiffs try to sidestep the absence of coordinated conduct by pointing to aggregated, industry-wide statistics that (they say) show decreased output and increased prices during the period alleged. Plaintiffs allege only that their statistics are "*consistent with* an anticompetitive effect on turkey output facilitated by the information exchange through Agri Stats." Compl. ¶ 115 (emphasis added). That is not sufficient. Plaintiffs must show a "*clear nexus* between the challenged conduct" and market prices. *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 141 (2d Cir. 1984); *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *9. Allegations that are merely consistent with anticompetitive effects are not enough to state a Sherman Act claim. *Twombly.* 550 U.S. at 557.

And Plaintiffs' aggregated statistics are not even consistent with anticompetitive effects anyway.

a. ***Complaint Figure 1***

First, Plaintiffs contend that Defendants shared information through Agri Stats and "acted in a concerted way to decrease turkey supply" through slaughter reductions. Compl. ¶ 108. They rely upon publicly available data from the USDA about turkey slaughter from 2000 to 2018, shown below in Figure 1:



Compl. ¶ 108. The relevant period is enclosed by red lines.

Plaintiffs point to a decline in slaughter numbers in 2009—before the supposed anticompetitive information exchange began—and assert that that reduction, and each reduction in the next seven years, must have been caused by information sharing through Agri Stats. *Id*. ¶ 108. But the chart shows variations in heads slaughtered before, during, and after the relevant period. And slaughter numbers *increased* in 2011, 2012, and 2016, and *decreased* after 2016. That is not even consistent with—much less probative of—Plaintiffs' claim of coordinated production suppression from 2010 to the end of 2016.

If slaughter numbers increased and decreased before, during, and after the relevant period, that just shows that industry-wide slaughter levels regularly fluctuate. It does not suggest that Defendants suddenly started to use Agri Stats reports in 2010 to coordinate production. Moreover, Plaintiffs make no attempt to link the receipt of information from Agri Stats to any change in any Defendant's behavior. In short, nothing here suggests coordinated action. *See Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 873 F.3d 185, 198 (3d Cir. 2017) ("A change in industry practices must be radical, or abrupt to create an inference of a conspiracy.") (internal quotations omitted).

Figure 1 has an additional problem: It uses heads slaughtered rather than weight to measure industry-wide production. In the past several decades, turkey weights have increased due to "genetic selection, technical advancements, and better production management."[6] That trend continued through the relevant period: The average live weight of turkeys slaughtered during 2010 was 29.11 pounds, and the average live weight in 2017 was 30.91 pounds.[7] So even though fewer heads were slaughtered in some years, the total weight of turkeys slaughtered in the United States (and hence the total volume of product) increased during the conspiracy period—from 7.06 billion pounds in 2010 to 7.469 billion pounds in 2017. 2018 Report at 5; 2011 Report at 5. Plaintiffs do not account for the increase in average weight. Figure 1 does not show that *production* changed from 2010-2016 based on unlawful conduct by Defendants.

---

[6] USDA, National Agricultural Statistics Service (NASS), *Turkey Industry Overview, 2008-2013*, at 1 (Apr. 2014), *available at* https://www.nass.usda.gov/Publications/Highlights/2014/2013_Turkey_Industry/2013%20Turkeys%20Highlights.pdf

[7] USDA, NASS, *Poultry Slaughter 2017 Summary* at 5 (Feb. 2018) ("2018 Report"), *available at* https://downloads.usda.library.cornell.edu/usdaesmis/files/pg15bd88s/br86b638d/4f16c564f/PoulSlauSu-02-26-2018.pdf; USDA, NASS, *Poultry Slaughter 2010 Summary* at 5 (Feb. 2011) ("2011 Report"), *available at* https://www.nass.usda.gov/Publications/Todays_Reports/reports/psla0311.pdf

### b. *Complaint Figure 2*

The USDA-sourced pricing data Plaintiffs cite likewise does not show anticompetitive effects. In Figure 2, Plaintiffs purport to show the average wholesale price for a single turkey product (wholesale hens) from 2000 to 2019:

**Figure 2: Average Turkey Wholesale Prices in Cents per lbs., 2000-2018**



Compl. ¶ 110. Prices are not adjusted for inflation.

According to Plaintiffs, this figure shows an "unprecedented increase in turkey prices" from 2010 through 2016. *Id.* ¶ 110. In reality, Figure 2 shows that prices increased in some years before, during, and after the relevant period, which refutes the suggestion that there was something unique about the time period Plaintiffs have chosen for this lawsuit. And the alleged price changes during 2010-2016 are less than the price changes that occurred in the years before Defendants' alleged anticompetitive information sharing began. For example, Figure 2 shows that between 2003 and 2008, prices increased year-over-year at an average of 7.2%. But from 2010 to 2016, year-over-year price increases averaged only 5.9%. The chart shows neither an "unprecedented" price increase nor any other plausible anticompetitive effect, much less one resulting from information sharing.

22

In addition, this data is limited to one specific product, so it does not show any trend in the so-called "market" for all turkey products. *Id.* ¶ 89. Plaintiffs offer no allegations about prices for the many other products in the claimed market, such as turkey breasts, ground turkey, cooked turkey products, and wholesale toms (the larger male turkeys from which many processed turkey products are made). Plaintiffs also ignore the Avian Influenza epidemic, which is an obvious explanation for any increase in aggregate prices from at least 2014 through 2016. *See* p. 26, *infra*.

### c.    *Complaint Figures 3 and 4*

Plaintiffs also purport to compare prices to costs, relying solely on *assumptions* about revenue and costs for a subsidiary of just one of the eighteen Defendants, the JOTS subsidiary of Hormel Foods.



Compl. ¶ 112.

According to Plaintiffs, Figure 3 shows a "divergence" between JOTS's revenues and costs beginning in 2010. *Id.* ¶¶ 109-13. But there is no reason to believe that it reflects JOTS's actual costs, much less the revenues and costs of any other Defendants. Plaintiffs assume that JOTS's "costs are [in] the same proportion to Hormel Foods' overall costs as [JOTS's] revenues are to

Hormel's overall revenues." *Id.* ¶ 111 n.12. However, Hormel Foods is a diversified global Fortune 500 food company that manufactures products ranging from SPAM® to guacamole, as noted in Hormel Foods' Q3 2011 earnings call that Plaintiffs cite in the Complaint. *Id.* ¶ 27; *see also* Hormel Foods, Brands, https://www.hormelfoods.com/brands/ (last visited June 15, 2020). Plaintiffs do not account for any of these other products when attributing Hormel Foods' overall costs to JOTS.

Even if their statistics accurately reflected JOTS's costs and revenue, Plaintiffs have not pleaded facts sufficient to justify extrapolating this data to all Defendants. Plaintiffs do not provide actual pricing data for any product sold by any Defendant, let alone pricing data for multiple Defendants that could show any kind of trend. It would be wildly speculative to attribute assumed cost numbers to a subsidiary of one Defendant, and to then assert that those assumed costs show a relationship between prices and costs for *all* Defendants.

Plaintiffs' Figure 4 then purports to calculate the "spread" between JOTS's revenue and its "costs." Compl. ¶ 113. Once again, this figure reflects assumed data from just one company, and it cannot be used as a proxy for all Defendants. At the end of the day, Figures 3 and 4 are far removed from any actual data that might plausibly show "anticompetitive effects of defendants' information exchange." *Id.*

### d. *Plaintiffs' Regression Model*

Plaintiffs' regression analysis purports to model feed costs (only) and turkey prices to show alleged anticompetitive effects. Compl. ¶ 117. At the outset, the Court should not credit the allegations about this model because Plaintiffs plead no facts that could lead a court to conclude that it is reliable. *See, e.g.*, *ICE LIBOR*, 2020 WL 1467354, at *6 (dismissing complaint, and finding plaintiffs' statistical analysis "unreliable and dubious because they simply assert that there

24

should be certain, specific relationships [between certain metrics] . . . but do not cite to any empirical or academic sources").

Further, Plaintiffs' model does not even demonstrate anticompetitive effects. Plaintiffs purport to depict changes in hen prices:



Comp. ¶ 31. The dark and light orange lines allegedly represent actual hen prices, with the dark line representing a smoothed out, rolling average of price and the lighter line representing smaller time increments. The blue lines represent a "predicted" hen price based on feed costs.[8] *See also id.* ¶¶ 32, 117 (showing same chart).

This depiction shows substantial variability between feed cost and hen price, with similarly sized spreads between the actual and predicted prices of hens both before and during the time

---

[8] The regression analysis assumes that feed costs are the only relevant costs. Yet the article upon which Plaintiffs rely to support their analysis (Compl. ¶ 116) notes that feed accounts for 60-70% of costs, but also identifies many other costs and market factors that influence prices. Paul Sullivan, *In the Labyrinth of Turkey Pricing, a Reason Under Every Giblet*, N.Y. Times, Nov. 18, 2011, at B5, *available at* https://www.nytimes.com/2011/11/19/your-money/a-primer-to-calculate-turkey-prices.html. The failure to account for other costs and factors illustrates why no reasonable inference of anticompetitive effects can be drawn from Plaintiffs' regression analysis. *See* Compl. ¶ 117 (regression equation specifying "FeedPrice" as the only variable purportedly affecting "HenPrice").

period alleged. For example, the difference between actual and modeled price from 2005 to 2008 during the so-called "competitive" Epoch 1 appears to be the same as the variation from 2010 to 2013, during the so-called "anticompetitive" Epoch 2. *Id.* ¶ 31.

Plaintiffs say that a critical change occurred in 2010. They allege that, "[b]eginning in 2010, the turkey industry showed . . . price increases for the average turkey whole [bird] price unexplained by increases in costs," suggesting a "break between pricing prior to 2010 and pricing after 2010." *Id.* ¶ 109. But the chart accompanying paragraphs 31, 32, and 117 of the Complaint show no significant divergence between actual prices and predicted prices until 2014, four years after the relevant period began, and during the historic Avian Influenza outbreak. The fact that actual hen prices and prices "predicted" by feed costs closely track each other from 2008 until 2014 undermines Plaintiffs' allegation that anticompetitive effects began in 2010.

Plaintiffs point to a larger-than-usual disparity between hen price and feed costs between 2014 and 2016 as evidence of anticompetitive effects. *Id.* ¶¶ 31, 117. The Avian Influenza epidemic, which required many turkey growers to destroy and repopulate their flocks, provides an "obvious alternative explanation" for any purported disparity. *Twombly*, 550 U.S. at 567; *see McCauley v. Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) ("If the allegations give rise to an obvious alternative explanation . . . then the complaint may stop short of the line between possibility and plausibility." (internal quotation marks and alterations omitted)); *Somers v. Apple, Inc.*, 729 F.3d 953, 965 (9th Cir. 2013) (antitrust causation not adequately pleaded if there are "obvious alternative explanations"). USDA reports chronicle the devastating impact of Avian Influenza.[9]

---

[9] The Court may consider these government reports on a motion to dismiss. *See Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997); *Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012); *Wash. Cty. Health Care Auth., Inc. v. Baxter Int'l, Inc.*, 328 F. Supp. 3d 824, 828 n.2 (N.D. Ill. 2018); *Vill. of DePue, Ill. v. Viacom Int'l Inc.*, 713 F. Supp. 2d 774, 776 n.2 (C.D. Ill. 2010).

During the 2014-2015 outbreak—the "largest [Avian Influenza] outbreak ever recorded in the United States"—"[a]pproximately 7.4 million turkeys . . . died from the disease or were depopulated as part of the response." *See* n. 3 at v.  The USDA Final Report on the Avian Influenza outbreak states, "it was the most expensive animal health incident recorded in U.S. history." *Id.* at vi.  Yet Plaintiffs ignore those costs—costs that certainly would narrow the spread presented in the Figure between the actual price of turkey hens and the price "predicted" by feed costs alone. If Plaintiffs can ignore those kinds of obvious alternative explanations, then any industry experiencing a disturbance could be subject to an antitrust lawsuit.[10]

*        *        *

Plaintiffs do not allege any anticompetitive effects that would support their claim.  They fail to allege any parallel supply cuts or price increases by any Defendants—in fact, they do not allege that any Defendant cut supply or raised prices during the relevant period.  And the few factual allegations that are directed at specific Defendants describe only lawful behavior. Furthermore, Plaintiffs' industry-wide statistics do not even support their allegations, and they are insufficient to state a claim against any Defendant in any event.

### B.        Plaintiffs Fail to Allege a Plausible and Relevant Market

Plaintiffs' claim fails for the additional reason that they do not allege a plausible, relevant market.  Market definition is a threshold requirement in rule of reason cases.  *See Agnew*, 683 F.3d at 335 (Plaintiffs must allege that a challenged conduct "has an anticompetitive effect on a given market within a given geographic area").  The purpose of defining the market is "to aid in

---

[10] Additionally, HRF shut down its turkey processing in 2013, *see* n. 14, *infra*, so any inference Plaintiffs assert from a supposed price/cost disparity from 2014 forward could not apply to HRF.  This simply underscores the fundamental problem with Plaintiffs' group pleading through industry-wide data.

identifying any ability to raise price by curtailing output." *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1252 (7th Cir. 1995).

"To establish a relevant market, a plaintiff must define both a geographic market and a product market." *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1011 (N.D. Ill. 2017); *see Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004); *Flegel v. Christian Hosp.*, 4 F.3d 682, 688-89 (8th Cir. 1993). Plaintiffs do not state a claim by merely asserting the existence of a market. *See, e.g.*, *AB Sciex LLC*, 2013 WL 4599903, at *3 (holding that courts will not "blindly accept a market definition proposed in a complaint"). Instead, Plaintiffs must plausibly explain "why a market should be limited in a particular way." *Id.* (quoting *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011)).

In particular, Plaintiffs must plead facts that allow the Court to evaluate the plausibility of an alleged market, including facts showing the "boundaries of the relevant market," such as "'the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 886 (N.D. Ill. 2015) (quoting *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2012)); *see Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (same); *Todd*, 275 F.3d at 199 (explaining that analyzing market power in a clearly defined market is an "important factor" to assess in a "data exchange case"). When a complaint fails to allege those facts, it is "legally insufficient" and should be dismissed. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997); *Rohlfing v. Manor Care*, 172 F.R.D. 330, 345-46 (N.D. Ill. 1997).

Here, the Complaint makes no effort to plead basic facts to define a plausible product or geographic market. All Plaintiffs claim about the market is the following:

> There is a single market for turkey for meat consumption. Prices for turkey sold in the United States are quoted generally in disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

Compl. ¶ 90.

The Complaint offers no basis for the Court to accept that market definition. A market limited to "turkey for meat consumption" is facially under-inclusive. The Complaint contains no allegations explaining *why* the market is limited to "turkey." Turkey is just one type of protein. There are many animal-based substitutes, including beef, pork, and fish, as well as non-animal proteins. Turkey bacon and ground turkey are marketed as substitutes for pork bacon and ground beef or ground pork. Plaintiffs' allegations about market power, market concentration, product fungibility, and turkey supply are meaningless without a properly bounded market establishing that Defendants' turkey products do not compete in a broader protein market. *See, e.g., Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Illinois, Inc., 412 F. Supp. 3d 941, 953 (N.D. Ill. 2019)* (rejecting claim that amateur hockey league was a plausible market because plaintiffs did not account for substitutes: "other sports, other states, other ways to play hockey").

Similarly, Plaintiffs' proposed "single market" across the country for turkey is over-inclusive. Although the Complaint claims that "turkey" is priced based on disassembled parts incorporating value added through processing, it also claims that "whole turkeys" purchased for Thanksgiving are fungible. *Compare* Compl. ¶ 90 *with id.* ¶ 103. The Complaint fails to explain how or whether whole turkeys compete with processed turkey products, such as turkey bacon, sliced turkey sold for food service or in the deli case, or turkey dogs. In fact, the Complaint does not even allege which Defendants produced which types of turkey products.

Rather than allege facts that would support their market definition, Plaintiffs skip that requirement and instead claim high barriers to entry rendered the "turkey market" susceptible to

collusion.  Compl. ¶¶ 92-97.  Such allegations are "unpersuasive" if used to "*define* . . . a market."

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 919 (6th Cir. 2009).

The failure to define a plausible market is alone enough to dismiss the Complaint.  It also undermines Plaintiffs' other allegations.  The gravamen of Plaintiffs' claim is that Agri Stats allowed Defendants to share pricing and production information, creating anticompetitive effects.  But the Complaint does not even attempt to account for the various types of turkey products or explain how Agri Stats allowed Defendants to compare production or prices for these numerous products in different regions, much less coordinate action to reduce supply across such a broad putative market.

### C.     Plaintiffs Do Not Allege An Agreement

Even if the Complaint included well-pleaded allegations of anticompetitive effects in a plausible market (and it does not), the Complaint would have a separate problem—lack of any agreement among Defendants.

Section 1 of the Sherman Act does not prohibit "independent decision" making.  *Twombly,* 550 U.S. at 553.  Plaintiffs must plausibly allege that Defendants entered into an unlawful agreement with each other.  *Id.*  That is, Plaintiffs must plead direct or circumstantial evidence that, if true, would tend to exclude the possibility that Defendants acted unilaterally.  *Id.* at 554.  The Complaint fails to plausibly allege any agreement among the Defendant turkey processors to exchange information through Agri Stats for any reason, much less to coordinate on output or prices.

Plaintiffs claim that the turkey processor Defendants agreed "to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations."  Compl. ¶ 147.  They claim that "Defendants' regular information exchanges through Agri Stats

reflected *concerted action between horizontal competitors* in the market for turkey." *Id.* ¶ 155 (emphasis added).  These are nothing but bare assertions, and Plaintiffs allege no facts to support them.  Plaintiffs do not supply any facts showing that turkey processors agreed with each other to exchange data through Agri Stats.  Plaintiffs allege only that each Defendant *individually* subscribed to Agri Stats.  *Id.* ¶ 4.  At most, that shows only separate vertical relationships between Agri Stats and each subscriber—and that is not enough to survive a motion to dismiss.  *See Wash. Cty. Health Care Auth.*, 328 F. Supp. 3d at 843 (dismissing complaint because plaintiffs did not allege "vows of cooperation among competitors" or that competitors "exploited the opportunities for collusion"); *see also E. I. du Pont de Nemours*, 729 F.2d at 140, 141 (antitrust laws do not reach "facilitating practices" unless there is "evidence of anticompetitive intent or purpose on the part of the producer[s] charged").

Plaintiffs ask the Court to infer that there was an agreement among Defendants because each contributed data to Agri Stats with the "understanding that it would be reciprocated" by the other turkey processor Defendants.  Compl. ¶ 156.  That claim is speculative and completely unsupported.  None of Plaintiffs' confidential witnesses states facts to support this speculation.  *See Wash. Cty. Health Care Auth.*, 2020 WL 1666454, at *4 (dismissing conspiracy claims, finding that even if defendants each made similar decisions, "there remains no evidence that would allow an inference of [an] agreement").

Further, Plaintiffs' allegations of an agreement also cannot be reconciled with their claim that coordination began in 2010.  Plaintiffs admit that Agri Stats was widely in use before 2010, Compl. ¶ 7, and Plaintiffs do not allege that Defendants changed the way they used Agri Stats in 2010.  Nor do Plaintiffs allege changes in 2010 to the data submitted by Defendants, the confidentiality of the data maintained by Agri Stats, the level of detail in Agri Stats reports, or the

services provided by Agri Stats to subscribers. Plaintiffs provide no reason for this Court to infer that in 2010, abruptly and without explanation, an established benchmarking service transformed into a vehicle for anticompetitive conduct.

Nor do Plaintiffs' allegations suggest a "hub-and-spokes" arrangement, in which each turkey processor reached an agreement with each other, with Agri Stats acting as the "hub." That theory still requires an agreement among the so-called spokes (here, the turkey processors). *Kotteakos v. United States*, 328 U.S. 750, 755 (1946). A "rimless" conspiracy is not viable, even if the "spokes" each knew the others were receiving services from the "hub." *Compare Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) (allegations "sprinkled throughout the amended complaint" that the hub "made clear to each [spoke] that every other [spoke] was . . . required to agree to the same [challenged] agreement, and that every other [spoke] had so agreed" fail to plausibly allege a rim to the conspiracy), *with Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000) (inferring horizontal agreement because there was "direct evidence of communications" among manufacturers, the conduct was "an abrupt shift from the past," and manufacturers "deprive[d]" themselves "of a profitable sales outlet," acting against their individual self-interest).

Courts routinely dismiss complaints when plaintiffs fail to show coordination among the supposed spokes. *See, e.g., Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020) (affirming dismissal of conspiracy claims, finding that companies' identical agreements with a manufacturer to purchase medical devices failed to show a hub-and-spokes conspiracy because plaintiffs did not "show that similarly situated members of the conspiracy coordinated  . . . with each other"); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d

1186, 1192 (9th Cir. 2015) (mere knowledge that others are adopting a practice is insufficient to suggest an agreement). This Court should do the same.

## II. PLAINTIFFS CANNOT CONVERT THEIR RULE OF REASON CLAIM INTO A *PER SE* CLAIM

After focusing on a rule of reason claim for nearly all of their Complaint, Compl. ¶¶ 3, 5, 10, 28-30, 67, 108-09, 117, 135, Plaintiffs allege in a single conclusory sentence that "[t]he alleged contract, combination, or conspiracy is also a *per se* violation of the federal antitrust laws," *id.* ¶ 163. That mere allegation—without more—is insufficient to make out a claim as a matter of law. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1108 (7th Cir. 1984) ("plaintiffs' attachment of the *per se* label is simply inadequate . . . to sustain the complaint"); *Iqbal*, 556 U.S. at 678; *Gypsum*, 438 U.S. at 441 n.16. Plaintiffs do not allege any actions that fall within the narrow categories of conduct that are subject to the *per se* rule. *Car Carriers*, 745 F.2d at 1108; *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 555 (7th Cir. 1980) (*per se* rule applies only to narrow categories of conduct, such as horizontal price fixing, market allocation agreements, and certain group boycotts).[11]

Plaintiffs cite allegations against broiler chicken and pork processors, claiming that those allegations—brought by some of the same attorneys representing Plaintiffs here—support their claims. *See, e.g.*, Compl. IV.A. Not only do those unproven allegations fail to support Plaintiffs' claims in this litigation, but they affirmatively demonstrate why Plaintiffs cannot make out a *per se* claim here.

---

[11] The Complaint refers to "fixed" prices, *see* Compl. ¶¶ 141, 143, 149, but it does not allege that Defendants actually agreed to set prices. Rather, it alleges—with no supporting factual allegations—that "fixed" prices resulted when Defendants used Agri Stats reports.

First, the plaintiffs' claims in *Pork*—that pork processors agreed with one another to reduce pork supply, signaling each other about their intentions through public statements—were *dismissed* because the court found that plaintiffs failed to allege parallel conduct. *See In re Pork Antitrust Litig.*, 2019 WL 3752497, at *10.[12]

Second, the *Broilers* claims survived a motion to dismiss, but those claims are quite unlike the information-exchange claim here. In denying those defendants' motion to dismiss, the *Broilers* court found that plaintiffs' complaint plausibly alleged an agreement to fix prices, supported by alleged price index manipulation and specific alleged parallel supply cuts by certain defendants occurring after executives made public statements and attended specific industry meetings. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 781-83 (N.D. Ill. 2017). For example, the *Broilers* court pointed to allegations that there was a significant change beginning in 2007, when several different defendants allegedly cut production near in time to one another. *Id.* The court also noted the complaint's allegation that "[a]fter the International Poultry Expo held January 24–26, 2011 . . . [s]even defendants and two other producers cut production, closed facilities, or delayed planned construction of new facilities." *Id.* at 783. Indeed, the *Broilers* court said that the plaintiffs in that case had alleged that "each defendant . . . either cut production or took action to restrain production at some point during the relevant time period." *Id.* at 803.

Here, by contrast, Plaintiffs do not allege that the turkey processor Defendants ever agreed with each other to do anything, or that any processor Defendant took any specific coordinated

---

[12] The *Pork* court granted plaintiffs leave to amend their complaint to add allegations of parallel supply cuts. But the amended complaints still do not include those allegations. The *Pork* defendants' motions to dismiss the amended complaints are pending. *See, e.g.*, *In re Pork Antitrust Litig.*, Mem. in Supp. of Defs.' Joint Mot. to Dismiss 1-2, Dkt. 439. One set of plaintiffs belatedly resorted to a rule of reason claim in their amended complaint following dismissal, Indirect Purchaser Am. Compl., Section IV, Dkt. 392, but motions to dismiss are now pending as to that claim as well, *see* Mem. in Supp. of Defs.' Joint Mot. to Dismiss 41-52, Dkt. 439; Joint Reply at 20-26, Dkt. 481.

action based on information from Agri Stats reports.  In fact, Plaintiffs allege only lawful, pro-competitive conduct—that Agri Stats reports allowed Defendants to "optimize" their own supply chains.  Compl. ¶ 12.  On its face, then, the Complaint fails to plead the facts required to assert a *per se* claim.  *See* Wash. Cty. Health Care Auth., 2020 WL 1666454, at *7 (distinguishing *Broilers* and dismissing complaint with prejudice where, as here, "plaintiffs [did] not sufficiently allege[] *any* output restrict[ions]").[13]

## III.  PLAINTIFFS' CLAIMS ARE SUBSTANTIALLY BARRED BY THE STATUTE OF LIMITATIONS

As demonstrated above, this Court should dismiss Plaintiffs' claims in their entirety.  But if it does not, the Court nonetheless should dismiss the claims that fall outside the statute of limitations.  Although the statute of limitations is an affirmative defense, a district court may dismiss claims that are indisputably barred on the face of the complaint.  *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004); *see* *Logan v. Wilkins*, 644 F.3d 577, 582 (7th Cir. 2011) ("[W]hen the allegations of the complaint reveal that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim.").

### A.  Plaintiffs Cannot Recover Damages For Injuries Before December 19, 2015

A four-year statute of limitations applies to all Sherman Act claims, and it starts to run when a defendant commits an act causing a plaintiff economic harm.  *See* 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).  Here, Plaintiffs allege that they were harmed as early as January 1, 2010—nearly *ten years* before they filed this lawsuit—and that the conduct continued until January 1, 2017.  *See* Compl. ¶ 147.  Yet Plaintiffs did not file

---

[13] The Court should also dismiss Plaintiffs' claim for injunctive relief.  Compl. ¶¶ 167-68.  The Complaint's introductory paragraph acknowledges that the relevant period ended by January 1, 2017.  An injunction "is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again."  *City of Los Angeles, v. Lyons*, 461 U.S. 95, 111 (1983).  Plaintiffs make no such allegations.

this lawsuit until December 19, 2019.  Applying the four-year statute of limitations, Plaintiffs cannot recover damages for acts that occurred before December 19, 2015.[14]

Plaintiffs claim they were harmed each time they paid higher prices due to the Defendants' alleged anticompetitive use of Agri Stats beginning in 2010.  Compl. ¶¶ 67, 143.  In these circumstances, the statute of limitations bars recovery for injuries outside the four-year limitations period, even if plaintiffs can still recover for injuries *within* the limitations period.  *See Xechem, 372 F.3d at 902*.  Just because Plaintiffs allege similar acts within the limitations period, that "does not permit [them] to recover for the injury caused by old overt acts outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997); *see* 2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320c7 (4th ed. 2014) (explaining that a plaintiff's damages will be limited to those acts of an alleged cartel that caused injury within four years prior to the lawsuit irrespective of when they discovered their claim).

### B.      Plaintiffs Have Not Pleaded Fraudulent Concealment

Plaintiffs claim that the statute of limitations has been tolled by Defendants' "fraudulent concealment" of their activities.  *See* Compl. ¶¶ 118-23.  To plausibly allege fraudulent concealment, Plaintiffs must allege facts showing "efforts by the defendant[s]—above and beyond

---

[14] As noted above (n. 5), Plaintiffs make only a single (group) allegation as to HRF, *i.e.*, that it participated in Agri Stats in 2010 or before (Compl. ¶¶ 8-9), nothing more.  Plaintiffs cannot allege any acts by HRF within the four-year statute of limitations period, because HRF shut down its turkey processing plant in 2013, over six years before the Complaint was filed.  *See* USDA, *Grain Inspection, Packers and Stockyards Admin., Packers and Stockyards Program 2013 Annual Rpt.*, p. 35 ("House of Raeford Farms announced in March 2013 that it would close its Raeford, North Carolina turkey slaughter plant and turkey growing operations over a 4–6 month period."), https://www.gipsa.usda.gov/psp/publication/ar/2013_psp_annual_report.pdf; N. C. Dep't of Commerce, WARN Act Notices No. 2013246800, 2013246900 (May 10, 2013), https://www.nccommerce.com/data-tools-reports/labor-market-data-tools/workforce-warn-reports, http://pulse.ncpolicywatch.org/wp-content/uploads/2013/05/House-of-Raeford-Farms-Inc-5-13-13.pdf ("[HRF]" will permanently close its turkey processing facility. . . This will result in termination of 1060 employees and is a complete shut-down of these facilities . . . [HRF] expects the plant closing to take place between July 13, 2013 and July 27, 2013.").  The Court may take judicial notice of these published government reports.  *See* n. 9, *supra*.

the wrongdoing upon which the plaintiff's claim is founded—to prevent the plaintiff from suing in time." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990). That is, Plaintiffs must show that Defendants made an "[a]ffirmative effort to prevent the[m] . . . from suing." *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 689 (7th Cir. 2004).

Plaintiffs also must allege that they used due diligence in attempting to uncover the relevant facts. *In re Copper Antitrust Litig.*, 436 F.3d 782, 791 (7th Cir. 2006); *see In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997). And Plaintiffs must meet the heightened pleading standard for both elements under Rule 9(b), meaning that they must plead the "who, what, when, where, and how" of the alleged concealment and their diligence. *See Nat'l Black Expo v. Clear Channel Broad., Inc.*, No. 03 C 2751, 2007 WL 495307, at *6 (N.D. Ill. Feb. 8, 2007) ("[F]raudulent concealment must be pled with particularity in compliance with Fed. R. Civ. P. 9(b).").

Plaintiffs have not alleged either concealment or due diligence. On concealment, Plaintiffs simply assert that Defendants stopped them from discovering their claim. Compl. ¶ 118. The Court cannot credit that mere assertion without supporting factual allegations. *See Logan*, 644 F.3d at 582-83 (citing *Iqbal*, 556 U.S. at 662) ("[I]f the facts pleaded in the complaint establish that a claim is time barred, as they do here, a bare allegation of fraudulent concealment, without more, will not save the claim."). The Complaint plainly does not meet the heightened pleading standard; it includes *no* allegations suggesting that any Defendant affirmatively took steps to hide its Agri Stats subscription, or to prevent Plaintiffs from learning of their claims.

Further, the Complaint's allegations contradict any claim of concealment, because Plaintiffs allege that use of Agri Stats was well known. Plaintiffs, for example, allege that a "senior executive at Agri Stats, publicly stated in 2009 that 'about 95% of the turkey industry [is]

37

participating' in Agri Stats."  Compl. ¶ 7.  Plaintiffs also rely on public information about how Agri Stats was used, noting that at its 2011 Investor Day, one Defendant discussed how optimizing "the supply chain" can "improve your relative industry position (Agri Stats)."  *Id.* ¶ 12 (internal quotation marks omitted).  And Plaintiffs rely entirely on publicly available USDA data and other public data (in Figures 1 through 4) to try to show that supply decreased and prices increased during the period alleged.  *See* pp. 19-24, *supra*.  Plaintiffs claim that these publicly available "facts" are sufficient to state a claim in 2019, but do not explain how Defendants prevented them from discovering their existence earlier.

Plaintiffs likewise do not plead facts to show due diligence.  They assert (Compl. ¶ 121) that they could not have known about their claims until "recently," when an amended complaint was filed in the *Broilers* litigation on February 7, 2018, but they say nothing about what inquiry they made and when they did it.  And Plaintiffs' assertion that they could not discover the facts giving rise to their claim before the limitations period is facially implausible because the Complaint principally relies on public information pre-dating the limitations period.  Further, Plaintiffs' mere assertion that they lacked knowledge of their claim is belied by the fact that Plaintiff John Gross and some of Plaintiffs' attorneys filed lawsuits in the *Broilers* litigation in September *2016*, and alleged that chicken producers were using Agri Stats as a mechanism to police a price fixing conspiracy.  *See In re Broiler Chicken Antitrust Litig.*, No. 16-cv-8637, Compl. (Dkt. 1); Mot. to Reassign at 2 (Dkt. 20) (seeking to reassign the *Gross* action).  The *Broilers* court said those plaintiffs knew of their claims about the use of Agri Stats between February 18, 2014, and January 18, 2016. *Broilers*, 290 F. Supp. 3d at 808-09.  Plaintiffs' counsel in this case also claim they conducted a thorough investigation of the use of Agri Stats years ago on behalf of John Gross and others.  *See* Mem. in Supp. of Mot. to Appoint Lead Class Counsel at

6 (Dkt. 133). Thus, Plaintiffs plainly had notice of their claims years before the date they allege in their Complaint, and they cannot claim diligence such that they could toll the running of the statute of limitations.[15]

Accordingly, the Court should dismiss Plaintiffs' claims for damages before December 19, 2015.

## CONCLUSION

This Court should dismiss Plaintiffs' Complaint in its entirety.

Dated: June 16, 2020                          Respectfully submitted,

**Counsel for Butterball LLC**                **Counsel for Cargill, Incorporated and Cargill Meat Solutions Corporation**

/s/ Christopher E. Ondeck                     /s/ Britt M. Miller
Christopher E. Ondeck                         Britt M. Miller
Colin R. Kass                                 Robert E. Entwisle
Stephen R. Chuk                               MAYER BROWN LLP
PROSKAUER ROSE LLP                            71 South Wacker Drive
1001 Pennsylvania Avenue NW, Suite 600        Chicago, IL 60606
Washington, DC 20004                          (312) 782-0600
(202) 416-6800                                bmiller@mayerbrown.com
Condeck@proskauer.com                         rentwisle@mayerbrown.com
CKass@proskauer.com
SChuk@proskauer.com                           Mark W. Ryan
                                              MAYER BROWN LLP
Rucha A. Desai                                1999 K Street NW
PROSKAUER ROSE LLP                            Washington, DC 20006
Eleven Times Square                           (202) 263-3000
New York, NY 10036                            mryan@mayerbrown.com
(212) 969-3000
RDesai@proskauer.com                          Kathryn N. Hibbard

---

[15] In *Broilers*, the court held that the discovery rule tolled those plaintiffs' claims because "the complaints do not contain factual information indicating that any plaintiff had or should have discovered a totality of evidence sufficient to have enabled them to state a claim." *Broilers*, 290 F. Supp. 3d at 808-09. This case is fundamentally different. Unlike *Broilers*, here Plaintiffs do not allege a purported secret price-fixing conspiracy that they only learned about through media reports and regulatory investigations. All of the facts underlying their claim that use of Agri Stats reports by turkey producers led to anticompetitive effects were publicly known and have been for years before they filed this lawsuit in December 2019.

Marc E. Rosenthal
PROSKAUER ROSE LLP
70 West Madison, Suite 3800
Chicago, IL 60602 (312) 962-3530
Mrosenthal@proskauer.com

**Counsel for Cooper Farms, Inc.**

/s/ Jennifer A.L. Battle
Michael L. McCluggage
Daniel D. Birk
EIMER STAHL LLP
224 South Michigan Ave, Suite 1100
Chicago, IL 60604
(312) 660-7600
Mmcluggage@eimerstahl.com
Dbirk@eimerstahl.com
Joshua Goldberg
CARPENTER, LIPPS & LELAND LLP
180 North LaSalle Street, Suite 2105
Chicago, IL 60601
(312) 777-4825
Goldberg@carpenterlipps.com

Jennifer A.L. Battle
David J. Barthel
Theodore M. Munsell
Jill Rogers Spiker
Joel E. Sechler
CARPENTER, LIPPS & LELAND LLP
280 North High Street, Suite 1300
Columbus, OH 43215
(614) 365-4100)
Battle@carpenterlipps.com
Barthel@carpenterlipps.com
Munsell@carpenterlipps.com
Spiker@carpenterlipps.com
Sechler@carpenterlipps.com

GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-8346
khibbard@greeneespel.com

**Counsel for Farbest Foods, Inc.**

/s/ Michael K. Sciaccotta
Michael K. Sciaccotta
DENTONS US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL 60606
(312) 876-8000
michael.sciaccotta@dentons.com

Gaspare J. Bono
Claire M. Maddox
Leslie A. Barry
DENTONS US LLP 1900 K Street NW
Washington, DC 20006
(202) 496-7500
gap.bono@dentons.com
claire.maddox@dentons.com
leslie.barry@dentons.com

**Counsel for Hormel Foods Corporation
and Hormel Foods, LLC**

/s/ Colby Anne Kingsbury
Colby Anne Kingsbury
FAEGRE DRINKER BIDDLE &
REATH LLP
311 South Wacker Drive, #4300
Chicago, IL 60606
(312) 212-6500
Colby.Kingsbury@faegredrinker.com

Richard A. Duncan
Craig S. Coleman
Emily E. Chow
Isaac B. Hall
FAEGRE DRINKER BIDDLE &
REATH LLP

*Counsel for Foster Farms, LLC, and*
*Foster Poultry Farm*

/s/ Carmine R. Zarlenga
Carmine R. Zarlenga
William Stallings
Stephen M. Medlock
Oral Pottinger
MAYER BROWN LLP
1999 K Street NW
Washington DC 20009
(202) 263-3000
czarlenga@mayerbrown.com
wstallings@mayerbrown.com
smedlock@mayerbrown.com
opottinger@mayerbrown.com

90 S. Seventh Street, Ste. 2200
Minneapolis, MN 55402
(612) 766-7000
Richard.Duncan@faegredrinker.com
Craig.Coleman@faegredrinker.com
Emily.Chow@faegredrinker.com
Isaac.Hall@faegredrinker.com

Christopher A. Kreuder
FAEGRE DRINKER BIDDLE &
REATH LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309
(515) 248-9000
Christopher.Kreuder@faegredrinker.com

*Counsel for House of Raeford Farms, Inc.*

/s/ Gregory G. Wrobel
Gregory G. Wrobel
VEDDER PRICE P.C.
222 North LaSalle Street
Chicago, Illinois 60601
(312) 609-7500
gwrobel@vedderprice.com

Henry W. Jones, Jr.
JORDAN PRICE WALL GRAY JONES &
CARLTON, PLLC
1951 Clark Avenue
Raleigh, North Carolina 27605
(919) 828-2501
hjones@jordanprice.com

*Counsel for Perdue Foods LLC and*
*Perdue Farms, Inc.*

/s/ J. Douglas Baldridge
Kirstin B. Ives
FALKENBERG IVES LLP
230 West Monroe Street, Suite 2220
Chicago, IL 60606
(312) 566-4803
kbi@falkenbergives.com

J. Douglas Baldridge
Lisa Jose Fales
Danielle R. Foley
Andrew T. Hernacki
VENABLE LLP
600 Massachusetts Ave., NW
Washington, DC 20001
(202) 344-4000
jbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com
athernacki@venable.com

*Counsel for The Hillshire Brands Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc., and Tyson Prepared Foods, Inc.*

/s/ Jordan Matthew Tank
Jordan Matthew Tank
Sahrish Moyeed
LIPE LYONS MURPHY NAHRSTADT & PONTIKIS
230 West Monroe Street, Suite 2260
Chicago, IL 60606
(312) 702-0586
Jmt@lipelyons.com
Sm@lipelyons.com

Tiffany Rider Rohrbaugh
Rachel J. Adcox
Lindsey Strang Aberg
AXINN, VELTROP & HARKRIDER LLP
950 F Street, N.W.
Washington, DC 20004
(202) 469-3550
Trider@axinn.com
Radcox@axinn.com
Lstrang@axinn.com

*Counsel for Agri Stats, Inc.*

/s/ Jacob D. Koering
Jacob D. Koering
MILLER, CANFIELD, PADDOCK & STONE, PLC
225 West Washington Avenue, Suite 2600
Chicago, IL 60606
(312) 460-4272
koering@millercanfield.com

William L. Monts III (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on June 16, 2020, a copy of the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send notification of the filing to all counsel of record.

By: _/s/ Britt M. Miller_