**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| OLEAN WHOLESALE GROCERY COOPERATIVE, INC., et al., | |
| Plaintiffs, | No. 19-cv-08318 |
| v. | Hon. Virginia M. Kendall |
| AGRI STATS, INC. et al., | |
| Defendants. | |

## REPLY IN SUPPORT OF CERTAIN DEFENDANTS' JOINT MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I.   PLAINTIFFS DO NOT ALLEGE ACTUAL ANTICOMPETITIVE EFFECTS.............1

    A.   The Alleged "Potential" For Anticompetitive Effects is Insufficient to State a Claim ................................................................................................... 1

    B.   Allegations About Market Structure and the Contents of Agri Stats Reports Do Not Allege Anticompetitive Effects .................................................... 4

        1.   The Market Structure Allegations Are Implausible, and Say Nothing About Anticompetitive Effects .................................................... 4

        2.   The Alleged Contents of Agri Stats Reports Do Not Show Anticompetitive Effects ........................................................................ 5

    C.   Plaintiffs' Industry-Wide Analysis Does Not Allege Anticompetitive Effects ................................................................................................................. 8

        1.   Complaint Figure 1 (Total Heads Slaughtered) ........................................ 9

        2.   Complaint Figure 2 (Wholesale Turkey Prices) ..................................... 10

        3.   Complaint Figures 3-4 (Speculation About Revenues and Costs)........... 11

        4.   Plaintiffs Admit Their Regression Ignores The Most Important Real World Event ................................................................................. 12

II.  PLAINTIFFS' OPPOSITION CONFIRMS THE FAILURE TO ALLEGE AN APPROPRIATELY DEFINED, RELEVANT MARKET ............................................. 13

    A.   Plaintiffs Must Allege A Plausible, Relevant Market ......................................... 13

    B.   The Complaint Fails to Allege a Plausible, Relevant Market ............................ 14

III. PLAINTIFFS DO NOT EVEN ALLEGE AN AGREEMENT ..................................... 17

IV.  BENCHMARKING IS GENERALLY PROCOMPETITIVE, AND PLAINTIFFS ALLEGE ONLY LAWFUL CONDUCT BY SPECIFIC DEFENDANTS ................... 19

V.   PLAINTIFFS CANNOT PRESERVE THEIR DEFICIENT PER SE CLAIM ............. 20

VI.  THE STATUTE OF LIMITATIONS PARTIALLY BARS PLAINTIFFS' CLAIMS ....................................................................................................................... 20

    A.   Plaintiffs' Claims Prior To December 19, 2015, Are Indisputably Time Barred ................................................................................................................. 20

    B.   Plaintiffs' Tolling Arguments Are Conclusory and Refuted By Their Own Allegations ................................................................................................. 21

        1.   Plaintiffs Do Not Plead Fraudulent Concealment.................................... 21

        2.   Plaintiffs Have Known About Their Claims for Years............................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agnew v. NCAA*,
  683 F.3d 328 (7th Cir. 2012) .................................................................................13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................................11, 12

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985).................................................................................................3

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................13

*Brown v. Visa U.S.A., Inc.*,
  674 F. Supp. 249 (N.D. Ill. 1987) .........................................................................1

*Car Carriers, Inc. v. Ford Motor Co.*,
  745 F.2d 1101 (7th Cir. 1984), *cert. denied,* 470 U.S. 1054 (1985)...........................2, 16, 20

*Choiceparts, LLC v. General Motors Corp.*,
  No. 01 C 0067, 2005 WL 736021 (N.D. Ill. Mar. 30, 2005) ...................................20

*City of Rockford v. Mallinckrodt ARD, Inc.*,
  360 F. Supp. 3d 730 (N.D. Ill. 2019) .....................................................................3

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
  433 U.S. 36 (1977).................................................................................................17

*Cook Inc. v. Boston Scientific Corp.*,
  No. 01 C 9479, 2002 WL 335314 (N.D. Ill. Feb. 28, 2002).....................................4

*In re Copper Antitrust Litig.*,
  436 F.3d 782 (7th Cir. 2006) .................................................................................21

*DSM Desotech Inc. v. 3d Sys. Corp.*,
  No. 08 CV 1531, 2009 WL 174989 (N.D. Ill. Jan. 26, 2009)...................................14

*E.I. du Pont de Nemours & Co. v. FTC*,
  729 F.2d 128 (2d Cir. 1984).................................................................................18

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007).................................................................................10

*Erie Cty., Ohio v. Morton Salt, Inc.*,
    702 F.3d 860 (6th Cir. 2012) ..................................................................8

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*,
    788 F. Supp. 1042 (D. Minn. 1992) ........................................................2

*In re Graphics Processing Units Antitrust Litigation*,
    540 F. Supp. 2d 1085 (N.D. Cal. 2007) ..................................................9

*Greenhaw v. Lubbock County Beverage Association*,
    721 F.2d 1019 (5th Cir. 1983) ..............................................................19

*In re ICE LIBOR Antitrust Litigation*,
    No. 19-cv-439, 2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020)...........8, 13

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)..................................................................19

*Jamsports & Ent't, LLC v. Paradama Prods., Inc.*,
    No. 02 C 2298, 2003 WL 1873563 (N.D. Ill. Apr. 15, 2003)..................14

*Jung v. Ass'n of Am Med. Colls.*,
    300 F. Supp. 2d 119 (D.D.C. 2004) ........................................................9

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)..............................................................................20

*Kline v. Coldwell, Banker & Co.*,
    508 F.2d 226 (9th Cir. 1974), *cert. denied*, 421 U.S. 963 (1975).........19

*MacCausland v. Uber Tech., Inc.*,
    312 F. Supp. 3d 209 (D. Mass. 2018) ...................................................11

*Marion Healthcare LLC v. Becton Dickinson*,
    952 F.3d 842 (7th Cir. 2020) ................................................................18

*Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*,
    877 F.2d 1333 (7th Cir. 1989) ..............................................................12

*In re Musical Instruments & Equipment Antitrust Litigation*,
    798 F.3d 1186 (9th Cir. 2015) ..............................................................18

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018)..........................................................................14

*In re Plasma-Derivative Protein Therapies Antitrust Litigation*,
    764 F. Supp. 2d 991 (N.D. Ill. 2011) ....................................................12

*In re Pork Antitrust Litigation*,
    No. 18-cv-1776, 2019 WL 3752497 (D. Minn. Aug. 8, 2019) ................................................. 2

*Reading International, Inc. v. Oaktree Capital Management LLC*,
    317 F. Supp. 2d 301 (S.D.N.Y. 2003) ...................................................................................... 20

*Robertson v. Sea Pines Real Estate Companies*,
    679 F.3d 278 (4th Cir. 2012) ..................................................................................................... 7

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020) ................................................................................................... 16

*In re Sulfuric Acid Antitrust Litig.*,
    743 F. Supp. 2d 827 (N.D. Ill. 2010) ...................................................................................... 21

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ............................................................................................ *passim*

*United States v. Charlotte-Mecklenburg Hosp. Auth.*,
    248 F. Supp. 3d 720 (W.D.N.C. 2017) ..................................................................................... 3

*United States v. Container Corp.*,
    393 U.S. 333 (1969) ......................................................................................................... 4, 5, 6

*United States v. Masonite Corp.*,
    316 U.S. 265 (1942) ................................................................................................................ 17

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ..................................................................................................... 3

## INTRODUCTION

None of the arguments in Plaintiffs' Opposition overcomes the fact that Plaintiffs simply did not plead sufficient facts in the Complaint to support their claim for antitrust violations under the rule of reason. *First*, the Complaint lacks allegations showing any anticompetitive effects traceable to the turkey processor Defendants and Agri Stats reports. Plaintiffs try to sidestep this problem by asserting the *potential* for anticompetitive effects, but that is not enough to establish a plausible claim. *Second*, Plaintiffs do not allege a plausible, relevant market, and they must do that before their lawsuit can proceed. *Third*, Plaintiffs do not allege a horizontal agreement to restrain trade; all they claim is that each turkey processor subscribed to Agri Stats. Those three failings doom the rule of reason claim. And Plaintiffs have not plausibly alleged a *per se* antitrust claim. Finally, Plaintiffs' claims before December 19, 2015, are facially time barred. The Complaint should be dismissed.

## ARGUMENT

## I.     PLAINTIFFS DO NOT ALLEGE ACTUAL ANTICOMPETITIVE EFFECTS

### A.     The Alleged "Potential" For Anticompetitive Effects is Insufficient to State a Claim

Plaintiffs do not allege that any Defendant cut supply or raised prices as a result of the alleged information sharing through Agri Stats. Instead, they claim the Complaint shows the "potential" for anticompetitive effects from receipt of Agri Stats reports. *See, e.g.*, Opposition 2, 5, 11, 13, 15 (Dkt. 155) ("Opp.") The *potential* for anticompetitive effects is not enough to plead a rule of reason claim. *See* Def's Br. 14 (Dkt. 145) ("Br."). The law is clear on this point: "[H]ypothetical anticompetitive effect[s] are not enough to sustain [a] complaint"; when plaintiffs are merely "speculating about the effect of th[e] alleged 'conspiracy' on the marketplace," the "complaint is defective for failure to allege an anticompetitive effect." *Brown v. Visa U.S.A., Inc.*,

674 F. Supp. 249, 252 (N.D. Ill. 1987). Plaintiffs claim (Opp. 8) that courts do not dismiss complaints for failure to allege anticompetitive effects, but they are wrong. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir. 1984) ("The fatal flaw in these pleadings is the absence of any allegation, either direct or inferential, of an anticompetitive effect."), *cert. denied*, 470 U.S. 1054 (1985); *see also, e.g.*, *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1054 (D. Minn. 1992) (dismissing complaint in part for failure to allege anticompetitive effects).

The Complaint does not connect Plaintiffs' abstract observations about the potential for anticompetitive effects with the allegations necessary to state a plausible claim. For example, Plaintiffs cite *Todd v. Exxon Corp.*, 275 F.3d 191, 208 (2d Cir. 2001) (Opp. 10), for the proposition that courts consider whether a market's structure renders it susceptible to anticompetitive effects from an information exchange. Yet they ignore that the *Todd* court pointed to specific allegations of anticompetitive effects. *Id.* ("Exxon has supposedly used the information . . . to reduce its salaries 4.1% between 1987 and 1994 . . . ."). Here, there are no allegations that any Defendant cut supply or raised prices, alone or in combination with another Defendant, during the relevant time period. Br. 12-15. That is reason alone to dismiss the Complaint. *See In re Pork Antitrust Litigation*, No. 18-cv-1776, 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019) ("Without specific information regarding each Defendant, the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted to reduce the supply of pork.").[1]

---

[1] Plaintiffs cite one alleged supply cut, arguing that "Hormel . . . signaled the start of the coordinated output with publicly announced production cuts in 2009[.]" Opp. 38. But the underlying allegation in the Complaint refers to a production cut by Hormel Foods "over a year ago," in 2008, a time which Plaintiffs claim was part of the competitive "epoch." Compl. ¶¶ 24, 31. And even if that alleged cut had occurred during the relevant period, no other Defendant is alleged to have cut production based upon or contemporaneous with Hormel Foods' statement. Br. 14-15.

Plaintiffs rely on cases far afield from the information exchange "conspiracy" they claim here, and those cases do not help them. For example, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605-10 (1985) (cited in Opp. 7), says nothing about the elements needed to prove an unlawful information exchange; there, the Court addressed a monopolist's refusal to deal with competitors. The same is true for *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020) (cited in Opp. 7, n.20). Plaintiffs also point to *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 744 (N.D. Ill. 2019) (cited in Opp. 7), but that was another monopolization case, and it actually undermines Plaintiffs' position, because there the plaintiffs alleged a "1,310% [price] increase in the span of a month," and here Plaintiffs do not allege any price increases by any Defendants. Finally, *United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720, 729 (W.D.N.C. 2017) (cited in Opp. 9, n.25), challenged steering restrictions in contracts—it had nothing to do with an information exchange. That case also undermines Plaintiffs' allegations because it says that it is insufficient to plead certain conduct "could," "might," or may "potentially" cause harm. *Id.*

Plaintiffs not only urge the Court to consider irrelevant authority, but they also try to convince the Court to ignore the very relevant authority Defendants cited. They claim (Opp. 8) the Court should completely disregard most of Defendants' information exchange cases because those decisions were not motion-to-dismiss rulings. But the cases are relevant because they apply

the rule of reason to information exchanges, and Plaintiffs do not quarrel with any of the holdings.[2] Plaintiffs then go on to say the Court also should disregard all of the additional cases that demonstrate their allegations are insufficient because those cases are *per se* antitrust conspiracies decided at the pleading stage. Opp. 8, n.23. But this is a case at the pleading stage, and Plaintiffs purport to bring a *per se* antitrust claim. *Id.* at 4. Plaintiffs offer no reason for the Court to reject any of the relevant authority.

### B. Allegations About Market Structure and the Contents of Agri Stats Reports Do Not Allege Anticompetitive Effects

#### 1. The Market Structure Allegations Are Implausible, and Say Nothing About Anticompetitive Effects

Plaintiffs argue there is potential for anticompetitive effects because the "turkey market" is highly concentrated, and "turkey" is a "fungible" commodity product. Opp. 10. Such purported market features are no replacement for alleging *actual* anticompetitive effects. *See Todd*, 275 F.3d at 213-14; *United States v. Container Corp.*, 393 U.S. 333, 336-37 (1969). Plaintiffs' market feature arguments also fail because their market definition is flawed. Br. 27; *see also* Section II, *infra*. And Plaintiffs do not even allege a concentrated market that could be "susceptible to tacit coordination." *Todd*, 275 F.3d at 211. Plaintiffs allege that Defendants, together, "controlled an average of 77% of the market from 2010-2018." Compl. ¶ 98. But 18 processors make up that 77%, and many others make up the remaining 23%. *See, e.g.*, *id.* ¶ 8. In a "market" with dozens

---

[2] Plaintiffs claim that *Cook Inc. v. Boston Scientific Corp.*, No. 01 C 9479, 2002 WL 335314, at *2 (N.D. Ill. Feb. 28, 2002), teaches that a rule of reason claim can never be dismissed at the pleading stage. Opp. 8-9. *Cook* did not purport to announce a new rule immunizing rule of reason claims from motions to dismiss; it simply held that dismissal was not appropriate in that case. *Cook* is also a pre-*Twombly* decision that relied on the now-rejected standard requiring a defendant to show "beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 2002 WL 335314, at *2. Further, *Cook* involved allegations directed at a single defendant, with no issue about who was responsible for the alleged conduct. Here, in contrast, Plaintiffs do not allege specific conduct with respect to *any* of the 18 processor Defendants during the relevant time.

of participants, coordinated action based solely on each Defendant's subscription to Agri Stats is an untenable hypothesis, and there are no actual allegations of coordinated acts involving any Defendants.

Plaintiffs rely on *Container Corp.* to assert that a "market" with so many participants can be susceptible to tacit collusion, but that case was very different.  Opp. 11.  There, the Supreme Court held that allegations of bilateral exchanges of customer-specific pricing information were sufficient to show tacit collusion among firms because the information allowed some defendants to match each other's prices on particular bids.  *Container Corp.*, 393 U.S. at 336-37.  All of those critical facts—bilateral exchanges between firms, customer-specific information, and actual price matching—are missing here.  Indeed, the Complaint itself acknowledges that Agri Stats reports used national averages, not customer-specific information.  Compl. ¶¶ 79-80.

### 2. The Alleged Contents of Agri Stats Reports Do Not Show Anticompetitive Effects

Plaintiffs also say (Opp. 13) that the contents of Agri Stats reports made them "likely" to cause anticompetitive effects.  But, again, that is not enough—Plaintiffs must allege *actual* anticompetitive effects.  Br. 10-12.

Regardless, the Complaint's allegations do not even support Plaintiffs' arguments. Plaintiffs assert that Agri Stats reports contained "current" price information, but the Complaint only says that Agri Stats reports provided, "[o]n a monthly basis," price information that was "less than six weeks old."  Compl. ¶¶ 4-5, 10-11, 29, 78.  That information cannot be considered "current" in an industry where the USDA publishes turkey volume and price data both daily and weekly.  *See* Br. 14.  Plaintiffs do not address the USDA's real-time publication of pricing data in

their Opposition when arguing Agri Stats reports contain "current" information.[3]

Plaintiffs next claim (Opp. 20) that Agri Stats reports are the equivalent of "direct interseller price verification," but their own allegations refute that claim, because Plaintiffs admit that Agri Stats reports contain aggregated information that could only be compared against the national average. Compl. ¶¶ 79-80. They do not allege, as they insinuate (Opp. 13-14), that Agri Stats provided some deanonymized "rank[ing]" of Defendants or their facilities according to their prices. Aggregated information does not create the potential for anticompetitive effects, as "[c]ourts prefer that information be aggregated in the form of industry averages, thus avoiding transactional specificity." _Todd_, 275 F.3d at 212 (citing _Container Corp._, 393 U.S. at 334-38, and _Maple Flooring Mfrs.' Ass'n v. United States_, 268 U.S. 563, 573-74 (1925)); _see also, e.g._, _Container Corp._, 393 U.S. at 334-35 (in that case, "[t]here was . . . an exchange of information concerning specific sales to identified customers, not a statistical report on the average cost to all members, without identifying the parties to specific transactions"). Further, the Complaint contains no allegations about price moves by any Defendant, and certainly no allegations that support an inference of price matching. Plaintiffs concede that "the Supreme Court does make [the] distinction" between "exchanges that allow rivals to make more informed but independent choices. . . and exchanges that facilitate coordinated actions and result in anticompetitive effects." Opp. 16. Here, Plaintiffs have not pleaded facts showing that any Defendants engaged in coordinated actions, so the Complaint falls on the deficient side of the line drawn by the Supreme

---

[3] That Agri Stats allegedly provided aggregated price information that was 6 weeks old, when pricing information is already published daily by the USDA distinguishes _Haff Poultry_, because those plaintiffs alleged that grower compensation information was not otherwise publicly available. _See_ Opp. at 13; Berman Decl., Ex. B. at 50. Moreover, in _Haff_ the court primarily focused on the allegations that could support circumstantial evidence of a conspiracy and plus factors, allegations that are absent here. _Id._ (citing alleged movement of executives between companies and tours of competitor facilities taken by the defendants). Nor did _Haff_ analyze whether specific defendants were responsible for alleged anticompetitive effects, but that issue is central to Defendants' motion.

Court. Br. 11-12.

Plaintiffs rely heavily on *Robertson v. Sea Pines Real Estate Companies*, 679 F.3d 278, 291 (4th Cir. 2012), claiming that they do not need to allege "any specific examples of Defendants raising prices in response to Agri Stats reports." Opp. 14, n.41. But that is not what *Robertson* says. *Robertson* did not even involve an information exchange; it involved allegations that Multiple Listing Service rules excluded certain "lower cost" real estate brokerages from the market, causing an increase in costs. 679 F.3d at 289, 291. The Fourth Circuit said it was not necessary to allege specific prices for real estate brokerage services before, during, and after the class period because the allegations about the exclusionary rules and increased costs permitted a plausible inference that the rules affected price and output. *Id.* Here, Plaintiffs challenge an information exchange, which can only be unlawful if it results in coordinated prices or output, and they allege neither. Br. 12-14.

Plaintiffs also say Agri Stats reports created information asymmetry, such that turkey purchasers had no access to price data. Opp. 15. Plaintiffs' assertion is belied by the fact that the public *did* have access to turkey price data published by the USDA on a *daily* basis. Br. 13-14. And Plaintiffs concede (Opp. 17) that in *Maple Flooring*, the Supreme Court pointed to the public dissemination of information through the Department of Commerce as a factor that mitigates against any putative information asymmetry. Yet Plaintiffs completely ignore the USDA publication of turkey price data in their Opposition.

Finally, Plaintiffs rely on a brief statement from one confidential witness. This witness is a former employee of one Defendant who stated that, based on his industry knowledge, he could sometimes guess the identity of other participants in Agri Stats reports. Opp. 18, 20. From that brief statement, Plaintiffs claim that they pleaded "widespread deanonymization" of Agri Stats

reports that allowed Defendants to uncover "the specific financial details of their closest competitors." *Id.* at 1, 19. The Complaint does not support that argument; all it includes is the one limited alleged statement by one anonymous source. Further, as Defendants explained, none of Plaintiffs' three anonymous witnesses say anything about coordinated price or supply decisions; they describe only benign use of Agri Stats reports, and no inference of anticompetitive effects can be drawn from those comments. Br. 5, 15. And in any event, if Agri Stats' encryption is imperfect, as Plaintiffs allege (and Defendants take as true for purposes of this motion only), that does not show anticompetitive effects. Br. 13 (citing *Jung v. Ass'n of Am Med. Colls.*, 300 F. Supp. 2d 119, 168-69 (D.D.C. 2004)).

### C. Plaintiffs' Industry-Wide Analysis Does Not Allege Anticompetitive Effects

Plaintiffs' industry-wide analysis cannot plausibly allege that *these* Defendants committed antitrust violations. Aggregated market-wide data are "simply descriptions of the market, not allegations of anything that the defendants did." *Erie Cty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012). That kind of data do not explain what actions any individual Defendant took, and so it is "inappropriate for Plaintiffs to rely upon aggregate data to demonstrate how an entire group of Defendants" allegedly acted. *In re ICE LIBOR Antitrust Litigation*, No. 19-cv-439, 2020 WL 1467354, at *5 (S.D.N.Y. Mar. 26, 2020) (*ICE LIBOR*).

Here, far from demonstrating how any Defendant allegedly acted, two examples show how Plaintiffs' reliance on industry-wide data obscures differences among individual Defendants. First, House of Raeford Farms ("HRF") ceased turkey operations in 2013. Br. 36, n.14. But by relying on industry-wide data, the Complaint alleges that HRF engaged in purported price increases during years when it was not even selling turkey products. *Id.* Second, Plaintiffs' data hides a 70% increase in Farbest's capacity during the relevant period, and a 36% increase in capacity for Cooper Farms, both the antithesis of a coordinated effort to restrict supply. *See*

8

Farbest's Supp. Br. 6 (Dkt. 151); Cooper Farms' Supp. Br. 3 (Dkt. 149).

Plaintiffs cite (Opp. 19) *Jung*, 300 F. Supp. 2d at 165-69, but they completely ignore that *Jung* criticized the exact tactic Plaintiffs use here. In that case, the plaintiffs' "use of the term 'defendants' to refer to multiple defendants situated very differently from one another in the context of general and global allegations [wa]s insufficient" because the plaintiffs had the "burden of alleging that *each defendant* participated in or agreed to join the conspiracy." *Id.* at 163.

Further, Plaintiffs are wrong when they argue their statistical analysis is immune from scrutiny. Opp. 23. The decision they rely upon, *In re Graphics Processing Units Antitrust Litigation*, 540 F. Supp. 2d 1085, 1094 (N.D. Cal. 2007), says nothing of the kind. In fact, it discusses allegations of specific conduct by individual defendants—"lockstep" product launches and price increases. That is exactly the type of factual enhancement that is missing from *this* Complaint.

Even if the Court considers Plaintiffs' industry-wide allegations, those allegations do not actually support Plaintiffs' contentions, as explained below. Plaintiffs' Opposition sets up strawman arguments, claiming that Defendants raise factual disputes that must await a later stage of the case and that Defendants have submitted "their own statistical analyses." Opp. 2. Neither is true. Defendants rely entirely on the Complaint and the data referenced in it to demonstrate why Plaintiffs' industry-level allegations are implausible.

## 1. Complaint Figure 1 (Total Heads Slaughtered)

Figure 1 depicts regular fluctuations before, during, and after the alleged conspiracy period, with slaughter numbers *increasing* in three of the seven years, thereby undercutting Plaintiffs' claim of coordinated supply reductions during that time. Br. 20. Plaintiffs' only response is that "slaughter capacity" was "consistently" higher during 2000-2008 than during 2010-2017. Opp. 23. That does not change the fact that, according to Plaintiffs' own allegations, the turkey industry

increased slaughter in three of the relevant years, and Plaintiffs have no explanation for how those increases plausibly show a coordinated, industry-wide effort to reduce production.[4]

Plaintiffs point to the *Broilers* case, Opp. 24, but that case does not help them. Defendants are not engaging in a factual dispute or arguing these "statistics may not be what they seem." *Id.* Rather, Defendants have explained that Plaintiffs' statistics, taken at face value, do not support their allegations, because they show increases in slaughtered heads—not coordinated supply reduction. Br. 20. And Defendants do not submit competing statistics—as Plaintiffs assert— merely by alerting the Court that Figure 1 does not show that *production* decreased from 2010- 2016, given the substantial increase in turkey weights during the same period. Br. 21.[5]

### 2. Complaint Figure 2 (Wholesale Turkey Prices)

Figure 2 is unhelpful on its face because Plaintiffs look at only one turkey product (wholesale hens) and do not account for the myriad other turkey products encompassed by their market definition. Br. 22. Further, as Defendants explained, Figure 2 shows that prices increased in some years before, during, and after the relevant period—thereby refuting that there was something unique about the 2010-2016 time period Plaintiffs chose for this lawsuit. *Id.* Plaintiffs assert that prices were "largely flat" from 2000-2009, Opp. 24, but Figure 2 contradicts that claim, because it shows a strong upward trend starting in 2003, one that was even larger than the trend during the so-called "anticompetitive" period. Br. 22. In light of that trend, Plaintiffs cannot rely

---

[4] Moreover, Plaintiffs do not link the receipt of information from Agri Stats to any change in any Defendant's behavior. In fact, they claim that 95% of the industry was already using Agri Stats by 2009, Compl. ¶ 7, so even if "capacity" was consistently higher during 2000-2008, there is no reason to believe that in 2010, Agri Stats inexplicably transformed into a vehicle for anticompetitive conduct.

[5] Further, as Defendants have shown, the allegations in *Broilers* are very different from the allegations in this case. Br. 34. The Court should reject Plaintiffs' attempts to compensate for their Complaint's deficiencies by pointing to *Broilers*. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (allegations that "if it happened there, it could have happened here" are insufficient to state a claim).

on Figure 2 to plausibly claim that Agri Stats reports were being used by Defendants to coordinate on turkey prices starting in 2010.

Plaintiffs also point to their figure depicting supply/demand dynamics, Opp. 24, but all that figure purports to show is a divergence between supply and demand during the relevant period that is—at most—merely "consistent" with anticompetitive effects. That is not enough to plausibly allege antitrust violations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And anyway, the chart says nothing about how individual Defendants actually behaved. Compl. ¶ 115.

### 3.     Complaint Figures 3-4 (Speculation About Revenues and Costs)

Plaintiffs' allegations about revenues and costs are not plausible. Br. 24. Plaintiffs try to extrapolate turkey revenues and costs from Hormel Food's publicly reported data, but that data includes irrelevant products ranging from SPAM® to guacamole, not just turkey products. *Id*. Further, there is no basis to extrapolate Plaintiffs' misleading data about Hormel Foods' Jennie-O Turkey Store subsidiary to all of the other turkey processors named in this lawsuit. *Id*.

Plaintiffs do not even attempt to defend the merit of using such obviously defective data. Instead, they claim the Court should accept such speculation because it was the only information they could find, and other Defendants are private companies that do not publicly report financial results. Opp. 25. But speculative assertions about a public company's reported costs does not provide accurate data as to that company (Hormel Foods) or any proxy for other companies' costs. The absence of public data also is not an excuse for Plaintiffs' failure to meet their pleading burden. *MacCausland v. Uber Tech., Inc.*, 312 F. Supp. 3d 209, 213 (D. Mass. 2018) (holding, in context of a motion to dismiss an antitrust case, that "although plaintiff correctly notes that '[the defendant] is a privately-held company that [does] not disclose relevant financial and market information,'

that fact does not absolve plaintiff from meeting the required pleading standard").[6]

### 4. Plaintiffs Admit Their Regression Ignores The Most Important Real World Event

Plaintiffs claim to have modeled "turkey" prices against costs using a regression analysis. (In reality, Plaintiffs analyze only hen data, not all turkey prices, Compl. ¶ 32.) Plaintiffs' "regression" need not be taken as true because it is not an alleged fact, but simply the opinion of unidentified "experts." *Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) (noting that "experts" are not "fact witness[es]" and stating that the provision of an expert's bottom-line opinion without reasoning or foundation "supplies nothing of value to the judicial process"); *Iqbal*, 556 U.S. at 679-81 (only well-pleaded factual allegations assumed to be true on a Rule 12 motion).

Moreover, Plaintiffs' allegations about the regression analysis show no significant divergence between actual hen prices and predicted prices until 2014, four years *after* the relevant period began. Br. 26.[7] So those allegations do not support the claim that anticompetitive effects began from the use of Agri Stats in 2010.

Further, Plaintiffs' depiction of a divergence in price completely ignores the Avian Influenza, "the most expensive animal health incident recorded in U.S. history" according to the USDA. Br. 27. Defendants' point is not—as Plaintiffs argue—that they must conclusively exclude all alternative explanations at the pleading stage. Opp. 27. Defendants' point is simply

---

[6] Plaintiffs rely on *In re Plasma-Derivative Protein Therapies Antitrust Litigation*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011), and note that complaint allegations are typically pieced together from publicly available data. Such allegations still must be plausible, and in that case the court was considering competing explanations for parallel conduct—allegations that are absent here. Opp. 25, n.69.

[7] Plaintiffs claim Defendants made a "basic error" because they say their regression appears in the chart at Compl. ¶ 32. Plaintiffs' contention is inaccurate—Defendants addressed both Compl. ¶¶ 31-32, and in any event, there is no material distinction because both charts depict the same price curve. Br. 25-26.

that Plaintiffs' complete failure to even consider the most important and obvious explanation for the hen price divergence they depict renders implausible their speculation that use of Agri Stats reports caused the change in prices starting in 2014. Plaintiffs say (*id.*) that courts only consider obvious alternative explanations in connection with parallel conduct, but *Twombly* did not limit its application to parallel conduct allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007). Here, the failure to even account for Avian Influenza underscores the serious problem with the inference Plaintiffs seek.[8]

Further, the regression analysis is obviously incomplete because it relies solely on purported feed costs to predict hen prices, even though, according to Plaintiffs' own source (Compl. ¶ 116), feed accounts for just more than half of the relevant costs of growing a hen. Opp. 25. The analysis asserts that there should be a simple one-to-one relationship between feed costs and price and ignores the other relevant costs. No inference can be drawn from such an incomplete and unreliable analysis. *See, e.g.*, *ICE LIBOR*, 2020 WL 1467354, at *6 (plaintiffs' aggregated data and lack of academic sources to back-up their claims about statistical allegations was "unreliable and dubious," resulting in complaint's dismissal).

## II.  PLAINTIFFS' OPPOSITION CONFIRMS THE FAILURE TO ALLEGE AN APPROPRIATELY DEFINED, RELEVANT MARKET

### A.  Plaintiffs Must Allege A Plausible, Relevant Market

A plaintiff in every rule of reason case must plausibly allege an appropriately defined, relevant market. *See, e.g.*, *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012). The case law makes this clear. In *Todd*, for example, the court engaged in a thorough evaluation of those plaintiffs' allegations and assessed whether the alleged market was plausible. 275 F.3d at 201-04.

---

[8] Plaintiffs argue (Opp. 28) that the Avian Influenza would have affected feed prices too, but that claim appears nowhere in the Complaint, and they do not support that bald assertion with any facts or analysis.

In *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2285 (2018), the Supreme Court reiterated that "courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market," because "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition" (internal quotation omitted). *See also* Br. 28 (collecting cases analyzing market definition at the pleading stage). Thus, Plaintiffs cannot avoid the consequences of failing to plead an appropriately defined, relevant market by relying on their industry-wide data allegations. Opp. 29-30, n.84.[9]

### B. The Complaint Fails to Allege a Plausible, Relevant Market

Plaintiffs' market definition—"a single market for turkey for meat consumption"—is facially over- and under-inclusive. Br. 29. And Plaintiffs fail to plead even the basic components of a plausible product market, including facts about reasonable interchangeability of products, product substitutability, and cross elasticity of demand with substitute products. *See, e.g.*, *Todd*, 275 F.3d at 200 ("To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand.") (internal quotation marks omitted); *accord* *DSM Desotech Inc. v. 3d Sys. Corp.*, No. 08 CV 1531, 2009 WL 174989, at *8 (N.D. Ill. Jan. 26, 2009); *Jamsports & Ent't, LLC v. Paradama Prods., Inc.*, No. 02 C 2298, 2003 WL 1873563, *5 (N.D. Ill. Apr. 15, 2003) ("[M]arkets are defined by reference to cross elasticity of demand and reasonable interchangeability with other products.").

The Complaint says nothing about product interchangeability, substitution, or cross-elasticity of demand. And the single allegation of *inelastic* demand again refers only to whole

---

[9] None of Plaintiffs' cited cases excuses them from pleading a plausible market, or even considered that issue. Opp. 30, n.84.

turkeys, without assessing how price changes in turkey products impact demand for substitute products and proteins. Compl. ¶ 106.[10] Plaintiffs also argue that "turkey" is fungible, but the Complaint alleges only that whole Thanksgiving turkeys from different manufacturers are fungible, while ignoring that a whole bird is not fungible with, for example, turkey bacon. *Compare* Opp. 1 *with* Compl. ¶ 103. And Plaintiffs rely on allegations about whole turkeys that they concede are predominantly consumed only once a year (on the Thanksgiving holiday) to assert there are no substitutes whatsoever for any of the other turkey products consumed every other day of the year. Opp. 3, 12, 34. The problems with Plaintiffs' "market" are glaring—the market definition suggests that Americans might, for example, look forward to carving the Thanksgiving turkey dog in response to increased prices for whole turkeys.

Plaintiffs claim that their market definition is appropriate because Agri Stats groups turkey products together. *Id*. at 30. But the only inference from that allegation is that recipients of the reports found it useful to obtain information about products produced from turkeys, not that there is "a single market for turkey for meat consumption." Compl. ¶ 90. And the allegation that Agri Stats offered separate turkey, chicken, and pork reports, *see* Opp. 34, says nothing about how various turkey products are marketed and sold in competition with other protein products, or about how consumers substitute among those products. Plaintiffs also point (Opp. 32) to a market pleaded by Foster Farms in an unrelated case, but the market alleged in that case shows differentiated turkey products: "browned, smoked turkey breast" as a "relevant submarket of the

---

[10] Plaintiffs allude to their allegation about inelasticity of demand for turkey, *see* Opp. 31; Compl. ¶ 106, but that does not save their Complaint. Market definition entails assessing *cross-elasticity* of demand— that is, the extent to which demand shifts between products in response to price changes. *See Todd*, 275 F.3d at 200. Plaintiffs plead nothing about cross-elasticity, for example, the extent to which consumers switch between whole turkey and ham or chicken, or between sliced deli turkey and sliced deli ham in response to price changes. And even if one were to accept that demand for whole turkeys is relatively inelastic, there are no allegations that would support including whole turkeys in the same market as processed turkey products, or deli turkey.

pre-cooked turkey breast market." Berman Decl., Ex. F, at 6. Here, Plaintiffs allege a single, undifferentiated "turkey" market.

Plaintiffs cite *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911 (7th Cir. 2020), and suggest they could allege a market made-up of "product clusters." Opp. 32-33. However, Plaintiffs do not allege any "product clusters" in their Complaint, and their "product cluster" theory has no application here. *Sharif Pharmacy* said that all prescription drugs— irrespective of their uses—might be included in a plausible "cluster" market when assessing demand for retail pharmacies, because prescription drugs collectively might be an object of consumer demand in those circumstances. 950 F.3d. at 918. No such allegations appear in the Complaint, and Plaintiffs make no plausible allegations that demand exists for all forms of turkey meat as a "cluster" of products, to the exclusion of other proteins. In a similar vein, Plaintiffs say that turkey might be a "submarket" within a broader market for all proteins. Opp. 33-34. Once again, that is not what Plaintiffs alleged, and Plaintiffs cannot amend their Complaint in their Opposition. *See Car Carriers*, 745 F.2d at 1107.

Finally, Plaintiffs' industry-wide pricing data underscores the problems with their market definition. Plaintiffs provide data on a single turkey product—wholesale hens—not the Complaint's amorphous "single market for turkey for meat consumption." *See, e.g.*, Compl. ¶¶ 30, 32, 90, 110. An alleged increase in the price of wholesale hens is not evidence of anticompetitive effects for any and all turkey products. At the very least, Plaintiffs would need to include plausible allegations that consumers either would not turn to other turkey products (*e.g.*, those manufactured from male tom turkeys), or substitute proteins (*e.g.*, that consumers would not purchase more sliced ham if deli turkey prices increased). Plaintiffs have done neither.

Further, the limited focus on just wholesale hens, while disregarding all other turkey

products, also undermines Plaintiffs' market concentration allegations, because they depend on a clearly defined market to calculate market shares. *See, e.g.*, Opp. 1; Compl. ¶ 102 ("The 'turkey market' is concentrated . . . ."); Compl. ¶ 98 ("Defendants and their co-conspirators controlled an average of 77% of the market . . ."). The Complaint's reliance only on wholesale hen data undermines their claim of a monolithic turkey market that purportedly includes all turkey products produced in the U.S., and nothing else.

## III.    PLAINTIFFS DO NOT EVEN ALLEGE AN AGREEMENT

Plaintiffs have not alleged that Defendants reached any agreement with each other to do anything, let alone to engage in unlawful conduct. Plaintiffs merely allege that "all [Defendants were] Agri Stats subscribers." Opp. 35; Compl. ¶ 74. But doing business with a common vendor is not an alleged horizontal agreement *between and among the processor Defendants* to restrain trade. Plaintiffs' Opposition makes clear that they do not allege anything other than unilateral conduct by each Defendant.

Paraphrasing from *United States v. Masonite Corp.*, 316 U.S. 265 (1942), Plaintiffs claim that the processor Defendants each "accept[ed] an invitation" to use Agri Stats, and that is enough to establish a horizontal agreement. It is not, and *Masonite* makes that clear. Opp. 35, n.112. There, *all* of the defendants were horizontal competitors, with one of them—Masonite—acting as the hub. Because Masonite competed with other defendants, there was no need to prove a "rim" of the hub-and-spokes conspiracy.[11] Plaintiffs do not contend that Agri Stats competes against any of the turkey processor Defendants, nor do Plaintiffs allege a hub-and-spokes conspiracy, which requires allegations of agreements between those Defendants (the rim to the wheel).

---

[11] Also, *Masonite* is of questionable continuing vitality because it is from an era when vertical and horizontal agreements were treated essentially the same. *See Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977) (overruling *per se* treatment for vertical non-price restraints).

Plaintiffs do not deny that the only agreements here are vertical—separate agreements between each turkey processor and Agri Stats. To turn those vertical agreements into a horizontal conspiracy, Plaintiffs must satisfy the pleading standards for a hub-and-spokes conspiracy. It does not matter whether the anticompetitive conduct alleged involves subscription to a common information service, knowing participation in identical distribution agreements (as in *Marion Healthcare LLC v. Becton Dickinson*, 952 F.3d 832 (7th Cir. 2020)), or something else (as in *In re Musical Instruments & Equipment Antitrust Litigation*, 798 F.3d 1186 (9th Cir. 2015)).

Plaintiffs get no further with their assertion that it is "basic hornbook law" (Opp. 36) that participating in an information exchange is sufficient to establish an agreement. In support of this supposed maxim, Plaintiffs cite a section of the Hovenkamp treatise that discusses "Interfirm Contact as Agreement." *Id.* But that section focuses on meetings between alleged conspirators where information could be exchanged. The Complaint does not include well pled facts of any meetings, communications, or anything of the kind. Plaintiffs say that information was exchanged "through Agri Stats," not through any meeting or other "interfirm contact." Opp. 36. In other words, Defendants paid for a service, received anonymized reports from that service, and then utilized the reports to "identify opportunities" where Defendants could become more profitable. Compl. ¶ 10. That Defendants "[knew] of each other's participation in Agri Stats" (Opp. 36) is not enough to establish an agreement to exchange information. *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 136, 140 (2d Cir. 1984).[12]

Plaintiffs argue that a horizontal agreement can be inferred because each subscriber had to agree to provide its own information to get information in return. But there is nothing anomalous

---

[12] Plaintiffs also rely on the *Haff Poultry* transcript and argue a mere subscription to Agri Stats constitutes a horizontal agreement (Opp. 36), but as Defendants demonstrated, the allegations in that case are easily distinguished. *Haff Poultry* does not help them. *See* n.3, *supra*.

about that. Agri Stats has its own interest in collecting data; that does not create an inference of a horizontal conspiracy. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 331 (3d Cir. 2010) ("allegations that each insurer knew about the [services] purchased by the other insurer-partners manifestly do not 'describe[ ] . . . a horizontal conspiracy' to unreasonably restrain trade").

Plaintiffs cite *Greenhaw v. Lubbock County Beverage Association*, 721 F.2d 1019, 1031 (5th Cir. 1983), claiming that "active exchange of information establishes participation in an agreement or conspiracy." Opp. 36. In *Greenhaw*, a jury found a conspiracy by members of the Lubbock County Beverage Association to fix the retail price of liquor. *Greenhaw* involved not only the simple exchange of information, but also defendants' joint negotiation of liquor prices. The court specifically distinguished the "active exchange" at issue in *Greenhaw* from the conspiracy alleged in another case, *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226 (9th Cir. 1974), *cert. denied*, 421 U.S. 963 (1975), where "mere receipt of the [fee] schedule and continued membership in the association did not *per se* make any individual broker a member of a conspiracy." *Greenhaw*, 721 F.2d at 1031. Here, Plaintiffs' allegations are akin to those in *Kline*, not *Greenhaw*. Defendants' mere receipt of anonymized pricing and production information, and continued subscription to Agri Stats, is insufficient to show an agreement. *Greenhaw* recognized that. *Id.* at 1030.

## IV. BENCHMARKING IS GENERALLY PROCOMPETITIVE, AND PLAINTIFFS ALLEGE ONLY LAWFUL CONDUCT BY SPECIFIC DEFENDANTS

Plaintiffs argue (Opp. 29) that Defendants offer factual disputes in the form of "procompetitive justifications" for subscribing to Agri Stats when it was not in their interests to do so. That mischaracterizes Defendants' argument. Defendants' point is that the Supreme Court long ago held that benchmarking often is a procompetitive endeavor, one that "increase[es] economic efficiency and renders markets more, rather than less, competitive." Br. 10 (citing

19

*United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)). Plaintiffs plead no facts that suggest otherwise here. Moreover, Defendants showed that the specific allegations directed at particular Defendants allege only lawful conduct, not acts that can be characterized as against self-interest. Br. 15-18 (collecting Complaint's specific allegations as to each Defendant).

## V.    PLAINTIFFS CANNOT PRESERVE THEIR DEFICIENT *PER SE* CLAIM

Plaintiffs' *per se* claim cannot be "preserved" merely because they say there may be facts to support it someday. Opp. 38-40. Plaintiffs have not pleaded a *per se* claim, and the "attachment of the *per se* label is simply inadequate in itself to sustain the complaint." *Car Carriers, Inc.*, 745 F.2d at 1108. Plaintiffs' argument (Opp. 39) that price fixing can be achieved by different mechanisms is beside the point, because they have not alleged facts that would support any of those theories, and an alleged information exchange is not *per se* unlawful. Br. 9-12.[13]

## VI.   THE STATUTE OF LIMITATIONS PARTIALLY BARS PLAINTIFFS' CLAIMS

### A.    Plaintiffs' Claims Prior To December 19, 2015, Are Indisputably Time Barred

Plaintiffs say (Opp. 41) that it would be "irregular" to dismiss any of their claims based on the statute of limitations. But dismissing facially time barred claims is appropriate at the pleading stage. Br. 35. And Plaintiffs misstate the law when they argue (Opp. 42) that alleged acts within the purported conspiracy period can resurrect stale claims. Absent fraudulent concealment, alleging similar acts within a limitations period "does not permit [plaintiffs] to recover for the injury caused by old overt acts outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997); *see also* Br. 36. All claims based on acts that occurred more than four years

---

[13] The cases cited by Plaintiffs do not help their cause. *Choiceparts, LLC v. General Motors Corp.*, No. 01 C 0067, 2005 WL 736021, at *5 (N.D. Ill. Mar. 30, 2005), involved an issue not present here: "[k]ey facts that would determine the applicable legal rule [we]re in dispute" because "the parties contest[ed] whether or not they [we]re actually competitors." *Reading International, Inc. v. Oaktree Capital Management LLC*, 317 F. Supp. 2d 301 (S.D.N.Y. 2003), involved an alleged group boycott, which, unlike an information exchange claim, could have been subject to either the *per se* rule or the rule of reason. *Id.* at 318.

before the lawsuit was filed are time barred. And of course, any purported claim against HRF is time barred for the separate reason that HRF shut down its turkey processing operations in 2013. Br. 36, n.14.

### B. Plaintiffs' Tolling Arguments Are Conclusory and Refuted By Their Own Allegations

#### 1. Plaintiffs Do Not Plead Fraudulent Concealment

Plaintiffs concede that Rule 9(b) applies to their fraudulent concealment claim. Opp. 45; *see* Br. 37. Fraudulent concealment "denotes efforts by the defendant—above and beyond the wrongdoing upon which the plaintiff's claim is founded—to prevent the plaintiff from suing in time." *In re Copper Antitrust Litig.*, 436 F.3d 782, 791 (7th Cir. 2006) (internal citations and quotations omitted). Those allegations are missing here. The best Plaintiffs can do is argue that Agri Stats did not advertise its services and assert that Defendants were "secretly exchanging" information and "making sure only they knew about Agri Stats or the information they shared." Opp. 43, 46. Even if that were true, that would not be enough. "Failure to actively disclose illegal conduct, or mere denial of wrongdoing, does not qualify as an affirmative act of concealment." *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 854 (N.D. Ill. 2010). And anyway, Plaintiffs' Complaint admits that they knew how Agri Stats was used, as demonstrated below.

#### 2. Plaintiffs Have Known About Their Claims for Years

Plaintiffs argue that the discovery rule tolls their claims. Opp. 41. But according to the Complaint, all of the facts Plaintiffs say show an unlawful information exchange were publicly known for years before they filed this lawsuit in December 2019. Br. 37-38 & n.15. Plaintiffs' own allegations refute that they could have remained ignorant of their claim until 2018. Compl. ¶ 7 (Agri Stats publicly stated in 2009 that it was used by 95% of the turkey industry); *id.* ¶ 12 (defendant publicly discussed using Agri Stats to optimize supply chain in 2011). The use of Agri

Stats in the turkey industry is well known—it is even cited in USDA reports. *See* Br. 4, n.3. Further, the *Broilers* action was filed more than three years before Plaintiffs got around to filing this case, and the *Broilers* court has already found that those plaintiffs (which include Plaintiff John Gross and Company) were on notice of their claims as early as February 2014—almost six years before this lawsuit was filed. *Id.* at 38. Plaintiffs have no response on that point.

Plaintiffs also give the Court no reason to credit their conclusory assertion that they did not discover they had been injured until 2018. Instead, they simply suggest that they had no duty to look. Opp. 44. That is not the law. Br. 37. And Plaintiffs' assertion that they remained ignorant of their claim after they filed the *Broilers* litigation all the way until an amended complaint was filed in that case in 2018 makes no sense. Opp. 45. Plaintiffs do not explain how—as they put it— "the full scope of confidential services Agri Stats provides to its *broiler industry clients*" told them anything that they did not already know in 2014 because *Broilers* involves chickens, not turkey. *Id.* (emphasis added). Plaintiffs' claims prior to December 19, 2015, should be dismissed.

## CONCLUSION

The Court should dismiss Plaintiffs' Complaint in its entirety.

Dated: August 7, 2020

**Counsel for Butterball LLC**

/s/ Christopher E. Ondeck
Christopher E. Ondeck
Colin R. Kass
Stephen R. Chuk
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue NW, Suite 600
Washington, DC 20004
(202) 416-6800
Condeck@proskauer.com
CKass@proskauer.com
SChuk@proskauer.com

Respectfully submitted,

**Counsel for Cargill, Incorporated and Cargill Meat Solutions Corporation**

/s/ Britt M. Miller
Britt M. Miller
Robert E. Entwisle
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
rentwisle@mayerbrown.com

Kathryn N. Hibbard

22

Rucha A. Desai
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969-3000
RDesai@proskauer.com

Marc E. Rosenthal
PROSKAUER ROSE LLP
70 West Madison, Suite 3800
Chicago, IL 60602 (312) 962-3530
Mrosenthal@proskauer.com

*Counsel for Cooper Farms, Inc.*

/s/ Jennifer A.L. Battle
Michael L. McCluggage
Daniel D. Birk
EIMER STAHL LLP
224 South Michigan Ave, Suite 1100
Chicago, IL 60604
(312) 660-7600
Mmcluggage@eimerstahl.com
Dbirk@eimerstahl.com

Joshua Goldberg
CARPENTER, LIPPS & LELAND LLP
180 North LaSalle Street, Suite 2105
Chicago, IL 60601
(312) 777-4825
Goldberg@carpenterlipps.com

Jennifer A.L. Battle
David J. Barthel
Theodore M. Munsell
Jill Rogers Spiker
Joel E. Sechler
CARPENTER, LIPPS & LELAND LLP
280 North High Street, Suite 1300
Columbus, OH 43215
(614) 365-4100
Battle@carpenterlipps.com
Barthel@carpenterlipps.com
Munsell@carpenterlipps.com
Spiker@carpenterlipps.com
Sechler@carpenterlipps.com

GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-8346
khibbard@greeneespel.com

*Counsel for Farbest Foods, Inc.*

/s/ Michael K. Sciaccotta
Michael K. Sciaccotta
DENTONS US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL 60606
(312) 876-8000
michael.sciaccotta@dentons.com

Gaspare J. Bono
Claire M. Maddox
Leslie A. Barry
DENTONS US LLP 1900 K Street NW
Washington, DC 20006
(202) 496-7500
gap.bono@dentons.com
claire.maddox@dentons.com
leslie.barry@dentons.com

*Counsel for Foster Farms, LLC, and
Foster Poultry Farm*

/s/ Carmine R. Zarlenga
Carmine R. Zarlenga
William Stallings
Stephen M. Medlock
Oral Pottinger
MAYER BROWN LLP
1999 K Street NW
Washington DC 20009
(202) 263-3000
czarlenga@mayerbrown.com
wstallings@mayerbrown.com
smedlock@mayerbrown.com
opottinger@mayerbrown.com

*Counsel for Hormel Foods Corporation and
Hormel Foods, LLC*

/s/ Colby Anne Kingsbury
Colby Anne Kingsbury
FAEGRE DRINKER BIDDLE & REATH
LLP
311 South Wacker Drive, #4300
Chicago, IL 60606
(312) 212-6500
Colby.Kingsbury@faegredrinker.com

Richard A. Duncan
Craig S. Coleman
Emily E. Chow
Isaac B. Hall
FAEGRE DRINKER BIDDLE & REATH
LLP
90 S. Seventh Street, Ste. 2200
Minneapolis, MN 55402
(612) 766-7000
Richard.Duncan@faegredrinker.com
Craig.Coleman@faegredrinker.com
Emily.Chow@faegredrinker.com
Isaac.Hall@faegredrinker.com

Christopher A. Kreuder
FAEGRE DRINKER BIDDLE & REATH
LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309
(515) 248-9000
Christopher.Kreuder@faegredrinker.com

***Counsel for House of Raeford Farms, Inc.***

*/s/ Gregory G. Wrobel*
Gregory G. Wrobel
VEDDER PRICE P.C.
222 North LaSalle Street
Chicago, Illinois 60601
(312) 609-7500
gwrobel@vedderprice.com

Henry W. Jones, Jr.
JORDAN PRICE WALL GRAY JONES &
CARLTON, PLLC
1951 Clark Avenue
Raleigh, North Carolina 27605
(919) 828-2501
hjones@jordanprice.com

***Counsel for Perdue Foods LLC and
Perdue Farms, Inc.***

*/s/ J. Douglas Baldridge*
Kirstin B. Ives
FALKENBERG IVES LLP
230 West Monroe Street, Suite 2220
Chicago, IL 60606
(312) 566-4803
kbi@falkenbergives.com

J. Douglas Baldridge
Lisa Jose Fales
Danielle R. Foley
Andrew T. Hernacki
VENABLE LLP
600 Massachusetts Ave., NW
Washington, DC 20001
(202) 344-4000
jbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com
athernacki@venable.com

*Counsel for The Hillshire Brands Company,*
*Tyson Foods, Inc., Tyson Fresh Meats, Inc.,*
*and Tyson Prepared Foods, Inc.*

*/s/ Jordan Matthew Tank*
Jordan Matthew Tank
Sahrish Moyeed
LIPE LYONS MURPHY NAHRSTADT &
PONTIKIS
230 West Monroe Street, Suite 2260
Chicago, IL 60606
(312) 702-0586
Jmt@lipelyons.com
Sm@lipelyons.com

Tiffany Rider Rohrbaugh
Rachel J. Adcox
Lindsey Strang Aberg
AXINN, VELTROP & HARKRIDER LLP
950 F Street, N.W.
Washington, DC 20004
(202) 469-3550
Trider@axinn.com
Radcox@axinn.com
Lstrang@axinn.com

*Counsel for Agri Stats, Inc.*

*/s/ Jacob D. Koering*
Jacob D. Koering
MILLER, CANFIELD, PADDOCK &
STONE, PLC
225 West Washington Avenue, Suite 2600
Chicago, IL 60606
(312) 460-4272
koering@millercanfield.com

William L. Monts III (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

26

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on August 7, 2020, a copy of the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send notification of the filing to all counsel of record.

By:   _/s/ Britt M. Miller_