**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| OLEAN WHOLESALE GROCERY ) <br> COOPERATIVE, INC., JOHN GROSS ) <br> AND COMPANY, INC., and on behalf of ) <br> a putative class, ) <br> ) <br> *Plaintiffs*, ) <br> ) <br> v. ) <br> ) <br> AGRI STATS, INC., *et al.*, ) <br> ) <br> *Defendants*. ) | | No. 19 C 8318 <br><br> Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

This is an antitrust case brought by direct purchasers of turkey products against several turkey wholesalers and a company that produces statistical reports about the agricultural industry. The Complaint alleges that Defendants conspired, in violation of Section 1 of the Sherman Act, to exchange competitively sensitive information and that this exchange caused Plaintiffs to pay more for turkey than they would have under normal market conditions. Defendants now move to dismiss the Complaint for failure to state a claim. For the reasons set forth below, the Joint Motion (Dkt. 144) is largely denied, Kraft's Motion (Dkt. 146) is granted, Farbest's Motion (Dkt. 150) is denied, and Cooper's Motion (Dkt. 148) is denied.

### BACKGROUND

**I.    The Parties**

Plaintiff Olean Wholesale Grocery Cooperative, Inc. ("Olean") is a retailers' cooperative, the members of which are independent, family-owned supermarkets located in New York, Pennsylvania, and Ohio. (Dkt. 1 ¶ 38.) Olean purchased turkey from one or more of the Turkey

1

Defendants[1] during the Class Period.[2] (*Id.*) John Gross and Company, Inc. ("John Gross") is a food distributor located in Pennsylvania that purchased turkey directly from one or more of the Turkey Defendants during the Class Period. (*Id.* ¶ 39.)

The Turkey Defendants are the leading suppliers of turkey in the United States, together controlling approximately 80% of the country's wholesale turkey market. (*Id.* ¶ 1.) Defendant Agri Stats is a company that provides "secretive information exchange services" to companies in a variety of agricultural sectors, including the turkey sector. (*Id.* ¶ 2.) Plaintiffs allege that the Turkey Defendants entered into an agreement between 2010 and 2017 to exchange competitively sensitive information—namely, production and sales data. (*Id.* ¶ 3.) They exchanged this data with one another through Agri Stats. (*Id.*)

According to slides from a 2010 Agri Stats presentation, each Turkey Defendant (or brands associated with each of them), provided data to Agri Stats, which Agri Stats used to produce industry reports. (*Id.* ¶¶ 8–9.) The data provided to Agri Stats was "current and forward-looking." (*Id.* ¶ 10.) Agri Stats identified the participants that provided data for each report, so Turkey Defendants understood which companies contributed data to the reports. (*Id.* ¶ 81.) Although Agri Stats reports do not specifically connect particular data sets to individual producers, the data was sufficiently detailed such that each Turkey Defendant could infer the company to which each data set referred. (*Id.* ¶ 18.) The reports provide information specific to each turkey producer as to profits, prices, costs, and production levels. (*Id.* ¶ 10.) One confidential witness explained that one company had five separate facilities listed in an Agri Stats report, which made it simple to

---

[1] The Court uses the term "Turkey Defendants" to refer collectively to: Butterball LLC ("Butterball"), Cargill, Inc. and Cargill Meat Solutions Corp. (together, "Cargill"), Cooper Farms, Inc. ("Cooper"), Farbest Foods, Inc. ("Farbest"), Hormel Foods Corp and Hormel Foods, LLC (collectively, "Hormel"), House of Raeford Farms, Inc. ("Raeford"), Kraft Heinz Foods Company and Kraft Foods Groups Brands, LLC (collectively, "Kraft"), Perdue Farms, Inc. and Perdue Foods, LLC (collectively, "Perdue"), and Tyson Foods, Inc., the Hillshire Brands Company, Tyson Fresh Meats, Inc., and Tyson Prepared Foods, Inc. (collectively, "Tyson").
[2] The Class Period is January 1, 2010 through January 1, 2017. (Dkt. 1 at 4.)

2

determine the identity of that company even though the report did not specifically state the name of the company. (*Id.* ¶ 18.)

Agri Stats marketed its reports as giving the Turkey Defendants the ability to improve their profitability. (*Id.* ¶ 11.) Its reports identified opportunities for the Turkey Defendants to raise prices to meet those of their competitors. (*Id.*)

Agri Stats reports were only made available to turkey producers and not to any buyers in the market. (*Id.* ¶ 10.) In order to receive the reports, Agri Stats its clients charged "hefty fees." (*Id.*) The information in the reports was not otherwise publicly available. (*Id.*) Agri Stats only allowed a company to access the data in its reports if the company contributed its own data to the report, thus ensuring that only the Turkey Defendants and similarly situated producers would have access to the data. (*Id.* ¶ 29.) Producers that comprise ninety-five percent of the turkey market used Agri Stats's turkey reports during the Class Period. (*Id.* ¶ 74.) Turkey Defendants received monthly detailed reports and graphs from Agri Stats that allowed each of them to compare their performance, prices, and costs to those of other Turkey Defendants. (*Id.* ¶ 76.) Agri Stats also issued reports regarding live operations, processing, further reprocessing, feed costs, and sales. (*Id.*) The sales data contained in those reports was less than six weeks old. (*Id.* ¶ 78.)

Industry participants relied on Agri Stats reports in the analysis of their business operations. (*Id.* ¶ 12.) Hormel, for example, stated in a 2011 presentation that "Jennie-O Turkey Store[3] is consistently one of the top companies in operating profits (Agri Stats)." (*Id.*) A confidential witness who was a sales executive at Butterball explained that Butterball used the Agri Stats reports to "evaluate—by item, item group, price, distribution—where we stood against other turkey companies" and that the reports played an important role in Butterball's price-setting

---

[3] Jennie-O is a Hormel turkey brand. (Dkt. 1 ¶ 9.)

process. (*Id.* ¶ 13.) A confidential witness who was an accountant at Cooper explains that Cooper executives met with Agri Stats representatives every six months and that information received from Agri Stats helped Cooper improve its returns per pound. (*Id.* ¶¶ 14–15.)

In the chicken industry, Agri Stats's reports contain data on "the number of broilers placed, chick mortality by week and percentage, chick cost, days between flocks provided to contract farmers, feed conversion rates, and average daily weights. (*Id.* ¶ 17.) The information provided in reports for the turkey industry is substantially similar. (*Id.*) Having access to this data enabled the Turkey Defendants to monitor industry-wide supply levels. (*Id.*)

In the pork industry, Agri Stats's reports enable subscribers to compare the prices they charge against the national average net price and against the national top 25 percent average price. (*Id.* ¶ 79.) These details enabled subscribers to see how much more they could charge if they charged the national average or a top-25-percent price. (*Id.*) The information provided in Agri Stats's turkey reports—the uses to which the information can be put—is substantially similar in the turkey market. (*Id.*)

The Agri Stats turkey reports served to improve Turkey Defendants' profitability. (*Id.* ¶ 83.) The reports accomplish this by ranking the companies by profitability and providing each subscriber with its variance from the average profitability. (*Id.*) A confidential witness explains that Agri Stats gave live presentations to Turkey Defendants to explain to them how to use the reports to compare themselves against competitors. (*Id.* ¶ 87.)

Throughout the Class Period, the number of turkeys slaughtered remained relatively stable, but prices increased dramatically. (*Id.* ¶¶ 20–21, 30, 108.)[4] In other words, demand appeared to rise, but turkey production did not rise to meet that demand. (*Id.* ¶ 21.)

---

[4] The Complaint says that "industry supply decreased significantly from 2009 to 2015, but Figure 1 shows that the market experienced small rates of changes year-over-year in terms of heads slaughtered. (*Id.* ¶ 108.)

4

During earnings calls during the Class Period, Hormel repeatedly discussed the industry's success in cutting production and maintaining industry-wide production discipline. (*Id.* ¶ 23.)

In addition to contributing to Agri Stats's reports, the Turkey Defendants had frequent opportunities to communicate because they were members of various trade associations. (*Id.* ¶ 22.) The National Turkey Federation held annual meetings during the Class Period; these meetings were widely attended by executives of the Turkey Defendants. (*Id.* ¶¶ 22, 126.) These meetings gave industry participants regular, informal opportunities to meet in-person and discuss pricing and production in the turkey industry. (*Id.* ¶ 126.) Butterball, Cargill, Foster, Tyson, and Perdue all have representatives on the Board of Directors of the U.S. Poultry & Egg Association, and that Board holds quarterly meetings. (*Id.* ¶ 129.) Butterball, Cargill, Hormel, and Tyson also have representatives on the North American Meat Institute (NAMI), an organization that represents 70% of the turkey industry and which holds annual summits. (*Id.* ¶ 130.)

Plaintiffs allege that the turkey industry has several characteristics that make it likely that information exchanges will cause anticompetitive effects; namely, the product is fungible, the market has price-based competition, demand for turkey is relatively inelastic, and the market features a trend toward price uniformity. (*Id.* ¶¶ 28, 103–07.)

Beginning in 2010, the turkey industry experienced upward price movements that cannot be explained by increased costs. (*Id.* ¶ 109.) Jennie-O Turkey for example, began experiencing a divergence between revenue and costs in or around 2010. (*Id.* ¶ 111–13.) At this same time, prices for turkey began to increase across the market, but production did not increase accordingly. (*Id.* ¶ 115.)

Following the commencement of the litigation in the *Broiler Chickens* case,[5] which also involved the sharing of information via Agri Stats, the price of turkey dropped precipitously. (*Id.* ¶ 31.) Immediately preceding the commencement of that litigation, turkey prices had risen to "unprecedented levels." (*Id.*) Indeed, immediately prior to the Broiler Chicken litigation, the gap between feed costs and turkey prices was significant. (*Id.* ¶ 32.) In prior eras, movement in feed costs closely tracked the cost of turkey. (*Id.*) Regression models illustrate that beginning in or about 2010, the price of turkey feed and the price of a turkey hen began to diverge in unprecedented ways. (*Id.* ¶117.) According to Plaintiffs, that the prices did not track the historical trend during the Class Period is a direct result of the information exchange facilitated by Agri Stats. (*Id.* ¶ 33.)

The relevant market for this antitrust claim is turkey for consumption market in the United States. (*Id.* ¶ 89.) There is a single nationwide market for turkey for consumption in the United States. (*Id.* ¶ 90.)

The U.S. turkey market has high barriers to entry. (Id. ¶ 92–93.) A new entrant would face costly and lengthy start-up costs, including multi-million-dollar costs for research and development, equipment, energy, transportation, distribution, labor, regulatory approvals, etc. (*Id.* ¶ 93.)

The market also has experienced increased consolidation over the past several decades. (*Id.* ¶ 95.) In the 1970s, for example, the turkey market contained dozens of competitors who worked with independent farmers. (*Id.*) Today, by contrast, four corporations—Cargill, Hormel, Butterball, and Farbest—produce more than half of the turkey in the United States, and the market is more vertically integrated, meaning that single companies control all phases of production. (*Id.* ¶¶ 95–97.)

---

[5] 16 CV 8637 (N.D. Ill.).

Plaintiffs allege that these market dynamics make it particularly likely that information exchanges of the type facilitated through Agri Stats will have negative effects on competition in the market. (*Id.* ¶ 99.) That the market has relatively few sellers[6] enhances the deleterious effect of information exchanges. (*Id.* ¶ 101.)

Agri Stats and Turkey Defendants concealed their information exchange from Plaintiffs making it impossible for them to discover, even through reasonable diligence, the Defendants' scheme at an earlier time. (*Id.* ¶ 118.) Indeed, Agri Stats is an intentionally secretive company. (*Id.* ¶ 119.) As the President of the company stated, "There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do." (*Id.*) Plaintiffs were not made aware of the information exchange facilitated by Agri Stats until the filing of the complaint in *Broiler Chickens* on February 7, 2018. (*Id.* ¶ 121.) To this day, it remains unknown how many companies receive Agri Stats's reports. (*Id.* ¶ 123.)

Olean and John Gross bring this action on behalf of themselves and a putative Class that, subject to certain exclusions, consists of: "All persons and entities who directly purchased turkey from Defendants or co-conspirators[7] for personal use in the United States during the Class Period." (*Id.* ¶ 131.)

**LEGAL STANDARD**

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint. *Berger v. National Collegiate Athletic Association*, 843 F.3d 285, 289–90 (7th Cir. 2016). When considering a motion to dismiss under

---

[6] Collectively, the nine Turkey Defendants control eighty percent of the turkey production and processing market. (*Id.* ¶ 102.)
[7] Co-conspirators are Circle S-Ranch, Prestage Farms, and West Liberty Foods. (*Id.* ¶¶ 64–66.)

7

Rule 12(b)(6), the Court must construe the complaint "in a light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in the non-moving party's favor." *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016). The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This statement must give the defendant fair notice of what the claim is and the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). A party need not plead "detailed factual allegations," but "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twonbly,* 550 U.S. 544, 555 (2007). A complaint must contain sufficient factual matter that when "accepted as true . . . 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

## DISCUSSION

To state a claim for a violation of § 1 of the Sherman Act, Plaintiffs must allege "'(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury.'" *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)). Courts evaluate § 1 information-exchange claims under the "rule of reason." *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive. For this reason, we have held that such exchanges of information do not constitute a *per se* violation of the Sherman Act."); *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975) (explaining that "the dissemination of price information is not itself a *per*

8

*se* violation of the Sherman Act"); Kenneth Khoo & Jerold Soh, *The Inefficiency of Quasi*-Per Se *Rules: Regulating Information Exchange in EU and U.S. Antitrust Law*, 57 Am. Bus. L.J. 45, 47 (2020) ("[U]nder the U.S. antitrust regime, most forms of information exchange are subject to a "rule of reason" analysis that places the burden of establishing anticompetitive effects on the party alleging illegality."). Stating a rule of reason claim requires alleging that Defendants entered into an agreement that causes anti-competitive effects and that those anti-competitive effects outweigh any pro-competitive benefits. *Agnew*, 683 F.3d at 335. The rule of reason also requires Plaintiffs to plead that the exchange had an anti-competitive effect on a given market in a given geographical area. *Reifert v. S. Cent. Wis. MLS Corp.,* 450 F.3d 312, 321 (7th Cir. 2006).

All Defendants, with the exception of Kraft, together filed a Joint Motion to Dismiss for Failure to State a Claim. Kraft filed its own Motion to Dismiss, which no other defendants joined. Farbest and Cooper, both of which participated in the Joint Motion, filed supplemental Motions to Dismiss, alleging that the allegations specific to them are insufficient to state claims against them. The Court addresses each of these Motions in turn.

**I.      Joint Motion to Dismiss**

The Joint Motion to Dismiss (Dkt. 144) seeks dismissal of the Complaint on the grounds that Plaintiff fails: (1) to allege any agreement among the Turkey Defendants to exchange information, (2) to allege any anti-competitive effects stemming from the alleged information exchange, and (3) to allege a properly defined market.

**A.      Allegations of an Agreement**

Plaintiffs allege that the Turkey Defendants agreed to "regularly exchange detailed, timely, competitively sensitive and non-public information about their operations" via Agri Stats. (Dkt. 1 ¶ 147.) Each Turkey Defendant contributed data to Agri Stats with the "understanding that

9

it would be reciprocated" by other Turkey Defendants. (*Id.* ¶ 156.) Turkey Defendants knew of each other's participation in the information exchange because Agri Stats listed its participants in the report. (*Id.* ¶ 81.) Moreover, although Agri Stats ostensibly anonymized the data in the reports, the data was so detailed that Turkey Defendants were able to infer which data corresponded to which Defendant. (*Id.* ¶ 18.)

These allegations are sufficient to allege a hub-and-spoke conspiracy among the Turkey Defendants and Agri Stats. Defendants suggest that the alleged conspiracy is at best a "rimless"[8] conspiracy (*i.e.*, a conspiracy wherein the spokes do not agree with one another to participate in the conspiracy), but Plaintiffs allege enough to suggest agreements both among the spokes (Turkey Defendants) and between the spokes and the hub (Agri Stats). Given that Turkey Defendants allegedly knew that each of them were participating in the information exchange and could decipher the data pertaining to each producer—and because executives of the Turkey Defendants allegedly had regular opportunities to meet and discuss production targets at various trade association meetings—Plaintiffs have alleged enough to plausibly suggest the existence of a hub-and-spoke conspiracy among the Turkey Defendants to exchange competitively sensitive information with one another through Agri Stats.

### B. Allegations of Anti-Competitive Effects

Plaintiffs adequately allege an anti-competitive effect—namely, price increases and slowed production—resulting from the information exchanged through Agri Stats. The chart in paragraph 115 of the Complaint, which shows that prices and production began diverging in a dramatic fashion around or before the beginning of the Class Period, supports a plausible inference that the

---

[8] Even if the Court found that this was a rimless conspiracy, the authority Defendants cite for the proposition that rimless conspiracies are not cognizable is not so clear. *See Howard Hess Dental Labs, Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 256 (3d Cir. 2010) (specifically declining to decide whether an allegation of a rimless conspiracy is "legally viable or even relevant" to the case).

information exchange occurring simultaneously caused industry-wide shifts in output and pricing. This divergence allegedly occurred in a market with characteristics that make it particularly likely that an information exchange will have anticompetitive effects. *See United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969) (explaining that information exchanges in markets that have (1) fungible products, for which competition is price-based, (2) inelastic demand, and (3) relatively few sellers are especially likely to cause anti-competitive effects). Indeed, Plaintiffs adequately allege that each of the three relevant characteristics exist in the turkey market. Specifically, Plaintiffs allege that turkey products are fungible, such that competition among sellers is primarily price-based. (Dkt. 1 ¶ 103.) Of course, Agri Stats reports are valuable to Turkey Defendants specifically because their products are so fungible. (*Id.* ¶ 104.) Plaintiffs also allege that demand for turkey is relatively inelastic; Americans gobble up turkey on Thanksgiving regardless of price-per-pound fluctuations. (*Id.* ¶ 106.) Finally, Plaintiffs allege that the turkey market is relatively concentrated among a small group of sellers; the nine Turkey Defendants control eighty percent of the market. (*Id.* ¶ 102.) In *Container Corp. of Am.*, the Supreme Court deemed a market in which eighteen sellers controlled ninety percent of the market to be sufficiently concentrated to give rise to an inference that the exchange of information will have anti-competitive effects. 393 U.S. at 337, 342. The turkey industry is sufficiently concentrated to suggest a plausible causal connection between the information exchange and the divergence between prices and production during the Class Period. Defendants do not allege any procompetitive benefit of the information exchange that would supersede these alleged anti-competitive effects.

      Defendants point to a variety of explanations for why Plaintiffs' allegations do not actually suggest anticompetitive effects. For example, they posit that the divergence between prices and

production shown in the chart attached to paragraph 115 of the Complaint can be explained by an avian influenza outbreak. Whether the alleged divergence was actually caused by some exogenous phenomenon or was instead the result of the information exchange is a question of fact that is not appropriate for the Court to resolve at this juncture. The same goes for Defendants' suggestion that Plaintiffs improperly characterize changes in production by considering heads slaughtered rather than total pounds produced. The only relevant consideration at this juncture is whether Plaintiffs allege a plausible causal relationship between the information exchange and the alleged changes in pricing and output. Plaintiffs have met that burden.

## C. Allegations of Market Definition

The relevant market for a Sherman Act claim is the area of effective competition, which is the arena within which substantial substitution in consumption and production occurs. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018). Plaintiffs allege that the relevant market for purposes of this case is the market for turkey meat for consumption in the United States. Of course, the Court does not "blindly accept a market definition proposed in a complaint" and an antitrust claim lacks merit when a plaintiff "fails even to attempt a plausible explanation as to why a market should be limited in a particular way." *Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, 13 CV 1129, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013). Courts are generally hesitant, however, to dismiss Sherman Act claims for failure to allege a relevant product "[b]ecause market definition is a deeply fact-intensive inquiry." *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001).

According to the Complaint, "[t]here is a single market for turkey meat consumption. Prices for turkey sold in the United States are quoted generally in disassembled parts, with adjustments for transportation, product form . . ., and packaging at the time of sale." (Dkt. 1 ¶ 90.) Defendants quarrel with this definition, suggesting that it is under-inclusive because it excludes

other proteins and over-inclusive because it does not differentiate between different turkey products like turkey bacon and whole turkeys. Again, this is an attempt to have the Court resolve a factual dispute, which would be improper at this juncture. Plaintiffs allege that the market for turkey is a single market for disassembled parts, that this market is separate and apart from markets for other proteins, and that although turkey products appear in different forms on store shelves, they are generally originally sold in a market for disassembled parts. (*Id.* ¶ 90.) Plaintiffs allege that there is a single market for disassembled turkey products. Whether that is the reality of the market is not a question for the Court to decide at this stage of the litigation. Plaintiff alleges the existence of a single turkey market, and that allegation is plausible.

### D. Statute of Limitations

Sherman Act claims are subject to a four-year statute of limitations. 15 U.S.C. § 15b. "While a statute of limitations defense is not normally part of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), when the allegations of the complaint reveal that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim." *Logan v. Wilkins*, 644 F.3d 577, 582 (7th Cir. 2011). The Court may only dismiss a claim on statute of limitations grounds at the motion to dismiss stage where it is clear from the face of the complaint that it is "hopelessly time-barred." *Cancer Found, Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). The alleged anti-competitive conspiracy here took place between January 1, 2010 and January 1, 2017. (Dkt. 1 at 4.) Plaintiffs filed this action on December 19, 2019. Thus, were the Court to apply the statute of limitations, the Court would limit the Class Period to December 19, 2015 through January 1, 2017.

Plaintiffs suggest two reasons why the statute of limitations should not preclude any claims at this stage: 1) the anti-competitive conduct alleged between December 19, 2015 and January 1,

13

2017 is part of a continuing conspiracy dating back to 2010, and 2) the Court should toll the statute of limitations because Plaintiffs did not and could not have known through reasonable diligence about Defendants' anti-competitive conduct at an earlier juncture. Plaintiff's continuing conspiracy rationale is flawed. "[C]ommission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Specifically in the antitrust context, plaintiffs cannot use "independent, new predicate act[s] as a bootstrap to recover for injuries caused by other earlier predicate acts the took place outside the limitations period." *Id.* at 190. Plaintiffs are potentially entitled, however, to have the Court toll the statute of limitations. To be entitled to tolling, Plaintiffs must demonstrate that Defendants' engaged in fraudulent concealment, which "'is satisfied only if the plaintiff shows that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense.'" *Id.* at 194 (quoting 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 338, p. 152 (rev. ed.1995)). The Complaint is full of allegations that suggest the secretive nature of Agri Stats, and the Complaint explains that Agri Stats only makes its reports available to industry participants who contribute their own data. (Dkt. 1 ¶¶ 2, 10, 29, 118, 119.) These allegations suffice to make it at least possible that Plaintiffs could not, through reasonable diligence, have known sooner about the alleged information exchange. Accordingly, Defendants have not met their high burden at this stage to dismiss claims on statute of limitations grounds.

    **E.**    *Per Se* **& Rule of Reason Allegations**

As detailed above, courts evaluate claims of unlawful information exchanges under the rule of reason. Throughout most of the Complaint, plaintiffs acknowledge this (*see* Dkt. 1 ¶ 10) and allege facts that support that theory. Then, in a conclusory paragraph, Plaintiffs state that "[t]he alleged contract, combination, or conspiracy is also a *per se* violation of the federal antirust laws."

14

(*Id.* ¶ 163.) This is not a plausible allegation; courts evaluate information exchange claims under the rule of reason, so the *per se* allegation is dismissed without prejudice.

**II.     Kraft's Motion to Dismiss**

Kraft filed an independent Motion to Dismiss, seeking dismissal on the basis that Kraft is not a turkey producer and as such cannot be a member of the alleged conspiracy. (Dkt. 146.) Indeed, Kraft explains that it is a turkey purchaser, rather than a producer, such that supply cuts and price increases would only hurt Kraft's bottom line. Plaintiffs do not dispute that Kraft does not raise its own turkeys, but this is not a fatal admission. The alleged relevant market is the turkey market as a whole, which includes processed turkey products, not just live, whole turkeys. Kraft admittedly purchases turkey from growers and then sells processed turkey products. According to the Complaint, the information exchanged through Agri Stats reports contains prices for various turkey products. (Dkt. 1 ¶ 14.) By alleging that Kraft participated in the exchange of information related to processed turkey products, Plaintiffs allege plausible anti-competitive acts on Kraft's part. Indeed, it is possible that different defendants used Agri Stats's report to further different goals, and that each Defendant's use of the reports caused anti-competitive effects with respect to the particular turkey products that each Defendant sells.

Notwithstanding the plausibility of Plaintiffs' market allegations, Plaintiffs still fail to state a claim against Kraft because the only price and cost data alleged are prices and costs associated with whole turkeys. For example, in paragraph 108 of the Complaint, Plaintiffs chart the data on the total number of heads slaughters. In paragraph 111, Plaintiffs chart the increases in prices per pound for hens over the Class Period. Likewise, Plaintiffs' regression model in paragraph 116 only charts the relationship between the cost of feed and the cost of hens. None of this data says anything about the portion of the turkey market in which Kraft competes. There is no price information in

15

the Complaint for processed turkey products like deli meat that Kraft sells. Plaintiffs have alleged an information exchange and a relevant market, but they have failed to allege that the information exchange had any anti-competitive impact on the output or prices of Kraft's products. Without those allegations, Plaintiffs fail to state a claim against Kraft. Accordingly, Kraft's Motion to Dismiss (Dkt. 146) is granted and the claim against Kraft is dismissed without prejudice.

### III.     Farbest's Supplemental Motion to Dismiss

Farbest moves to dismiss the claim against it on the grounds that: (1) Farbest increased its production during the Class Period and (2) there are no allegations specific to Farbest that it participated in the alleged conspiracy. (Dkt. 150.)

Plaintiffs allege an information exchange that produced two results for the co-conspirators: lower outputs and higher prices. In support of its contention that the Complaint fails to allege that Farbest did not produce lower outputs, Farbest asks the Court to consider a variety of facts that do not appear within the four corners of the Complaint. For example, Farbest informs the Court that it spent $70 million on a turkey processing plant in 2013 in order to scale up its production. Farbest goes on to explain that its production actually increased during the Class Period, which the Court could determine by sifting through the underlying sources of data from which Plaintiff's data comes. The Court has no basis for considering the information about Farbest's new processing plant because it appears nowhere in the Complaint, nor does the Complaint specifically refer to that information. The Court also does not find it appropriate to consider the data Farbest provides pertaining to its output because the Complaint does not specifically refer to the source of the data and the incorporation-by-reference doctrine does not extend that far. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("[T]he incorporation-by-reference doctrine provides that if a plaintiff mentions a document in his complaint, the defendant may then

16

submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment."). Even if the Court were to consider this data, it is not dispositive of the matter; that Farbest's outputs may have actually increased over the Class Period does not mean that it did not also benefit from the information exchange in that it enabled Farbest to raise its prices in lockstep with its competitors.

Farbest also suggests that the pricing allegations against it are insufficient because the only prices alleged are hen prices and Farbest only produces toms. Whether Farbest only produces one sex of turkey is a question of fact, and the Court has no basis for taking judicial notice of the fact that Farbest only produces toms. In any event, the Complaint alleges that turkey products are fungible. Whole turkeys, regardless of their sex, are likely especially fungible such that price allegations about hens apply equally to allegations about toms.

Farbest's attempts to introduce outside evidence are not appropriate at this stage of the litigation. The Complaint states a claim against Farbest, so Farbest's Motion to Dismiss (Dkt. 150) is denied.

## IV.     Cooper's Supplemental Motion to Dismiss

Cooper separately moves to dismiss the claim against it on the grounds that the Complaint contains no allegations of anti-competitive activity specific to Cooper. (Dkt. 148.)[9] Plaintiff alleges that Cooper, along with the rest of the Turkey Defendants shared and received competitively sensitive information through Agri Stats (Dkt. 1 ¶¶ 8–9, 14) and that this information exchange caused anti-competitive effects in the form of decreased outputs and increased prices. (*Id.* ¶¶ 20, 108–10.) Cooper, according to the allegations, participated in the exchange and benefited from the

---

[9] Cooper also explains that it, like Farbest, only produces toms. This contention fails for the reasons discussed above. (*See supra* Sec. III.)

exchange, to the detriment of Plaintiffs.[10] Viewing the allegations in the light most favorable to Plaintiff, this is enough to state a claim under § 1 of the Sherman Act. Cooper's Motion to Dismiss (Dkt. 148) is denied.

## CONCLUSION

For the foregoing reasons, the Court denies the Joint Motion to Dismiss [144], except with respect to the *per se* allegations. Plaintiffs have only adequately alleged a Sherman Act violation under a rule of reason analysis. The Court also grants Kraft's Motion to Dismiss [146] and denies Farbest's [150] and Cooper's [148] Motions to Dismiss.

Virginia M. Kendall
United States District Judge

Date: October 19, 2020

---

[10] Citing *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013), Cooper contends that this is a case of group pleading, such that Cooper is not on notice of the allegations specific to it. This contention does not hold water because the deficiency of the allegations in *Knight* was that the members of the alleged conspiracy could not decipher "who did what." Here, the allegations are clear that Cooper participated in the conspiracy by sharing and receiving competitively sensitive information through Agri Stats and that that exchange resulted in decreased outputs and higher prices.