**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| OLEAN WHOLESALE GROCERY COOPERATIVE, INC. et al., <br><br> Plaintiffs, <br><br> v. <br><br> AGRI STATS, INC., et al., <br><br> Defendants. | Case No. 1:19-cv-08318 <br><br> Honorable Virginia M. Kendall |

## DEFENDANTS HORMEL FOODS CORPORATION AND HORMEL FOODS, LLC'S ANSWER TO PLAINTIFFS' CLASS ACTION COMPLAINT

Defendants Hormel Foods Corporation and Hormel Foods, LLC (collectively, "Hormel Foods") hereby answer the Plaintiffs' Class Action Complaint ("Complaint")—the paragraph allegations of which are reproduced in italicized font preceding Hormel Foods' response[1]—as follows:

### I.    NATURE OF ACTION

*1.    The turkey integrator defendants are the leading suppliers of turkey in an industry with approximately $5 billion in annual commerce. The turkey industry is highly concentrated, with a small number of large producers in the United States controlling supply. Defendants and their co-conspirators collectively control approximately 80 percent of the wholesale turkey market in the United States. The turkey integrator defendants are Butterball LLC (Butterball); Cargill Inc. and Cargill Meat Solutions Corporation, (together and separately, Cargill); Cooper Farms,*

---

[1] Footnote 1 in the Complaint appears before any paragraph allegations, and thus is not reproduced herein. The remaining footnotes from the Complaint have been reproduced in italicized font below.

*Inc. (Cooper Farms); Farbest Foods, Inc., (Farbest); Foster Farms LLC and Foster Poultry Farms (together and separately, Foster Farms); Hormel Foods Corporation and Hormel Foods LLC (together and separately, Hormel); House of Raeford Farms, Inc., (House of Raeford); Kraft Heinz Foods Company and Kraft Foods Group Brands LLC (together and separately, Kraft Foods), Perdue Farms, Inc. and Perdue Foods LLC (together and separately, Perdue); Tyson Foods, Inc., The Hillshire Brands Company, Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. (together and separately, Tyson).*

1.      In response to the allegations set forth in paragraph 1, Hormel Foods admits only that a wholly owned subsidiary of Hormel Foods Corporation—Jennie-O Turkey Store, Inc. ("JOTS")—produces and supplies turkey products in the United States, and that the "turkey integrator defendants" other than Kraft Heinz Foods Company and Kraft Foods Group Brands LLC have been named as Defendants in the Complaint. Hormel Foods specifically denies that Hormel Foods, LLC is a turkey producer or supplier, and states that Hormel Foods, LLC holds the intellectual property of Hormel Foods Corporation and has no operations relevant to this litigation. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 1, and therefore denies them.

2.      *Defendant Agri Stats is a company that provides secretive information exchange services to companies in a variety of agricultural sectors, including pork, chicken, and turkey.*

2.      In response to the allegations set forth in paragraph 2, Hormel Foods admits only that Agri Stats provided benchmarking services to companies in a variety of agricultural sectors, including pork and turkey. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 2, and therefore denies them.

US.129806071.10

3.      *The turkey integrator defendants each entered into an agreement from at least 2010 to January 1, 2017, to exchange sensitive information through Agri Stats regarding their production and sales of turkey.*

3.      In response to the allegations set forth in paragraph 3, Hormel Foods admits only that JOTS maintained a subscription to Agri Stats' turkey reports for a period of time. Hormel Foods specifically denies any implication that JOTS's subscription to Agri Stats constituted an illegal information exchange. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 3, and therefore denies them.

4.      *Agri Stats reports are far different from lawful industry reports. Agri Stats gathers detailed financial and production data from each of the turkey integrators, standardizes this information, and produces customized reports and graphs for the co-conspirators. On a monthly basis, Agri Stats provides the turkey integrators with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information).*

4.      In response to the allegations set forth in paragraph 4, Hormel Foods admits only that, for a period of time, JOTS provided certain historical data to Agri Stats and received periodic turkey reports from Agri Stats with standardized and anonymized data. Hormel Foods specifically denies that Agri Stats reports are unlawful and that any of the information provided by Agri Stats was "current" or "forward-looking," and further denies any implication that JOTS received any "sensitive" information regarding individual "turkey integrators." Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 4, and therefore denies them.

US.129806071.10

5.      *The United States Supreme Court has long recognized that "exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects."[2] Agri Stats' sales reports prove the truth of that maxim. Agri Stats prepared monthly reports for defendants regarding their sales of turkey that identified, on a specific product by product level, the prices and returns that each defendant was obtaining on their sales of turkey. These reports, unavailable to anybody besides Agri Stats subscribers, allowed the integrator defendants to easily identify potential opportunities where their prices for turkey products were significantly lower than their competitors.*

5.      In response to the allegations set forth in paragraph 5, Hormel Foods admits only that *United States v. U.S. Gypsum Co.* contains, among other things, the language selectively excerpted, and that, as an Agri Stats subscriber, JOTS received periodic turkey reports from Agri Stats. Hormel Foods specifically denies any implication that the Agri Stats reports received by JOTS contained any "current price information," and denies the remaining allegations.

6.      *Turkey is the relevant product market and the geographic market is the continental United States. Defendants collectively possess market power in the market for turkey. Defendants and co-conspirators collectively possessed approximately 80 percent of the overall market share for turkeys during the Class Period.*

6.      Hormel Foods denies the allegations set forth in paragraph 6 because they rest upon an improper market definition, and denies the characterization of "market power" because it constitutes a legal conclusion. Additionally, Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of allegations related to Defendants' and purported coconspirators' collective "market share for turkeys" during the alleged Class Period, and therefore

---

[2] *United States v. U.S. Gypsum Co., 438 U.S. 422, 443 (1978).*

US.129806071.10

denies them.

      *7.    Blair Snyder, a senior executive at Agri Stats, publicly stated in 2009 that "about 95% of the turkey industry [is] participating" in Agri Stats, and that for "turkey participants, pretty much it's a list of who's who in the turkey business." This is a comparable portion to the percentage of broiler chicken industry participating in Agri Stats reports, with Mr. Snyder stating that "we've got high 90 percentage of both broilers and turkeys."*

      7.    Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 7, and therefore denies them.

      *8.    Each one of the defendants and co-conspirators entered into an agreement to exchange information through Agri Stats. Each defendant's agreement to exchange information regarding turkey production is shown in the below 2010 excerpt from an Agri Stats presentation that lists the participants in Agri Stats' turkey reports.*



*Turkey Participants*

- ✓ Ag Forte
- ✓ Butterball
- ✓ Cargill Turkey
- ✓ Carolina Turkeys
- ✓ Carroll's
- ✓ Circle-S Ranch
- ✓ Cooper's
- ✓ Farbest Foods
- ✓ Foster Farms
- ✓ Goldsboro Milling
- ✓ House of Raeford
- ✓ Jennie-O
- ✓ Lilydale
- ✓ Louis Rich
- ✓ Moroni
- ✓ Northern Pride Turkey
- ✓ Perdue Farms
- ✓ Pilgrim's Pride
- ✓ Prestage Farms
- ✓ Sara Lee
- ✓ Tarheel
- ✓ West Liberty Foods
- ✓ Willmar Poultry
- ✓ Willow Brook

{DATE}
n = 24

8.     In response to the allegations set forth in paragraph 8, Hormel Foods admits only that, for a period of time, JOTS maintained a subscription to Agri Stats' turkey reports. Paragraph 8 purports to characterize the contents of an excerpt of an Agri Stats presentation, which speaks for itself. To the extent a response is required, Hormel Foods admits only that "Jennie-O" is listed as a "Turkey Participant[]," and denies the remaining allegations.

*9.     This 2010 presentation slide shows that each of the defendant integrator and Co-Conspirator Integrators entered into an agreement to exchange information regarding their turkey operations through Agri Stats during the conspiracy period. The document directly identifies defendants Butterball, Cargill, Cooper's, Farbest, Foster Farms, House of Raeford and Perdue Farms, as participants in Agri Stats's reports on turkey. The document directly identifies Co-Conspirators Circle-S Ranch, Prestage Farms, and West Liberty Foods as participants in Agri Stats' reports on turkey. Jennie-O is the brand name for Hormel's turkey operations and thus Hormel participated in Agri Stats' reports on turkey. The document also identifies Louis Rich, a Kraft Foods brand that produces turkey, as receiving Agri Stats reports, and thus Kraft Foods participated in Agri Stats' reports on turkey. Sara Lee's turkey operations, Hillshire Brands, was subsequently acquired by Tyson in 2014 and thus Tyson participated in Agri Stats' reports on turkey.*

9.     In response to the allegations set forth in paragraph 9, Hormel Foods admits only that "Jennie-O" is a brand name of turkey products manufactured by JOTS—a wholly owned subsidiary of Hormel Foods Corporation—and that, for a period of time, JOTS maintained a subscription to Agri Stats' turkey reports. Paragraph 9 purports to characterize the contents of an excerpt of an Agri Stats presentation, which speaks for itself. To the extent a response is required, Hormel Foods admits only that "Jennie-O" is listed as a "Turkey Participant[]." Hormel Foods

6

specifically denies that Hormel Foods Corporation or Hormel Foods, LLC subscribed to Agri Stats' turkey reports, and denies the remaining allegations.

10.    *The information exchange by the defendant integrators through Agri Stats is exactly the type of information exchange that the Supreme Court has recognized is likely to have anticompetitive effects under a rule of reason analysis. First, the data is current and forward-looking – which courts consistently hold has "the greatest potential for generating anticompetitive effects."[3] Second, information contained in Agri Stats reports is specific to the turkey producers, including information on profits, prices, costs and production levels. Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the defendant integrators to pay hefty fees over the Class Period – far in excess of any other pricing and production indices and to agree to volunteer their own data. "Public dissemination is a primary way for data exchange to realize its pro-competitive potential."[4] Agri Stats ensured that its detailed, sensitive business information was available only to the co- conspirators and not to any buyers in the market. Thus, for example, buyers on the market could not use Agri Stats data in Agri Stats sales reports to negotiate lower prices; instead, only defendants could use it as a way to identify opportunities to raise their prices.*

10.    In response to the allegations set forth in paragraph 10, Hormel Foods admits only that *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001), contains the language selectively excerpted, and that Agri Stats' services were subscription-based. Hormel Foods specifically denies that Agri Stats reports had anticompetitive effects and that any of the information provided by Agri Stats

---

[3] *Todd v. Exxon Corp., 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting United States v. Gypsum Co., 438 U.S. 422, 441 n.16 (1978)).*

[4] *Id. at 213.*

was "current" or "forward-looking." Paragraph 10 purports to characterize the contents of Agri Stats' turkey reports, which speak for themselves. Hormel Foods denies the remaining allegations.

11.    *Indeed, Agri Stats specifically marketed itself to potential participants as a way that they could "improve profitability" rather than engage in competition through production increases. Agri Stats was good to its word; its sales reports specifically identified opportunities for defendants where defendants' products were lower than that of the industry average and where defendants could consequently raise prices to meet that of their competitors.*

11.    Paragraph 11 purports to characterize the contents of Agri Stats marketing and sales reports, which speak for themselves. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 11, and therefore denies them.

12.    *Industry participants relied on Agri Stats reports in their analysis of their business operations. For example, Hormel, at its 2011 Investor Day, stated in its presentation that "when you optimize the supply chain" you "improve your relative industry position (Agri Stats)." Hormel also touted that "Jennie-O Turkey Store is consistently one of the top companies in operating profits (Agri Stats)."*

12.    In response to the allegations set forth in paragraph 12, Hormel Foods admits only that its 2011 Investor Day presentation contains the language selectively excerpted. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 12, and therefore denies them.

13.    *Confidential Witness 1 (CW1) is a former sales executive at Butterball involved in the pricing of turkeys. CW1 was employed at Butterball during the entire Class Period. CW1 stated that Butterball relied on the monthly reports issued by Agri Stats: "The company used the*

8

*information to evaluate — by item, item group, price, distribution — where we stood against other turkey companies." CW1 stated that he and other sales personnel looked at Agri Stats data to see how Butterball ranked against peers in the turkey industry. CW1 stated that he personally looked at the Agri Stats data to assess costs and returns. CW1 stated that costs were an important factor in determining how Butterball set its prices.*

13.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 13, and therefore denies them.

*14.     Confidential Witness 2 (CW2) is a former accountant at Cooper Farms. CW2 stated that Cooper Farms received monthly reports from Agri Stats. In addition, Agri Stats representatives met with Cooper Farms executives every six months. CW2 stated that Cooper Farms submitted cost information to Agri Stats every month. CW2 explained that Agri Stats reports grouped data into various types of turkey products, including deli meat and smoked meat.*

14.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 14, and therefore denies them.

*15.     CW2 stated that Agri Stats representatives regularly met with the Cooper Leadership Management Group, which included top management and executives from Cooper Farms. CW2 stated that "the upper group received advice" from Agri Stats. CW2 stated that the advice from Agri Stats helped Cooper Farms improve its returns per pound.*

15.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 15, and therefore denies them.

*16.     Agri Stats reports also contained detailed information on industry-wide supply levels. For example, a job description of an Agri Stats employee stated that they analyzed Turkey "breeder flock and hatchery data" as well Turkey "growout flocks."*

9

16. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 16, and therefore denies them.

17. *Based on publicly available information filed in a February 7, 2018, complaint in the Broiler Chicken Antitrust Litigation,[5] Agri Stats data on growout flocks contained information such as the number of broilers placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (aka, "down time"), feed conversion rate (pounds of feed per pound of broiler), and average daily weight. On information and belief, the growout data that Agri Stats compiled for the turkey industry contained similar levels of data. This type of data allowed defendants to monitor industry-wide supply levels.*

17. In response to the allegations set forth in paragraph 17, Hormel Foods states that neither it nor JOTS is involved in the broiler-chicken industry, nor is either a defendant in the *In re Broiler Chicken Antitrust Litigation*. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 17, and therefore denies them.

18. *Although Agri Stats reports are nominally anonymous, defendant integrators were often able to deanonymize the reports to identify the data of specific companies based on their industry knowledge. CW2 stated that he could determine the identity of companies in Agri Stats reports because "you could usually figure out who was who because they have a certain cooked meat, or if they were browning and running it through an oven." CW2 further stated that "we could sit there and discuss it, because a lot of us knew what the other plants in the big areas, what they did." For example, CW2 stated that one competitor company had five separate facilities*

---

[5] *In re Broiler Chicken Antitrust Litigation, Case No. 1:16-cv-08637 (N.D. Ill.) (ECF No. 710).*

*included in the Agri Stats reports, and that therefore, it was easy to determine the identity of that company.*

18.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 18, and therefore denies them.

*19.     Confidential Witness 3 (CW3) is a former employee of Cargill during the conspiracy period. CW3 stated that Cargill received monthly reports from Agri Stats on turkey. CW3 stated that the monthly Agri Stats turkey reports went directly to Cargill finance executives.*

19.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 19, and therefore denies them.

*20.     Throughout the conspiracy period, defendant integrators were able to exercise a remarkable level of industry-wide restraint in keeping the growth of turkey supply in check, causing turkey prices to rise. Thus, Agri Stats had the anticompetitive effect of allowing defendants to engage in collusion to restrain the supply of turkey by facilitating information exchange about supply levels throughout the industry. The industry-wide cuts in turkey production during the conspiracy period are shown in the following chart:*



20.     In response to the allegations set forth in paragraph 20, Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS engaged in collusion to restrain the supply of turkey; and further denies that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in any agreement that was unlawful or had an anticompetitive effect. Hormel Foods also denies that the chart in paragraph 20 shows "industry-wide cuts in turkey production during the conspiracy period." Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 20, and therefore denies them.

21.     *In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should correspond to falling prices. However, in the turkey market during the conspiracy period, production, measured through USDA data, remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly. These observed price and output dynamics, shown in the below analysis performed by plaintiffs' experts, indicate that it was not falling demand that caused a decline in supply during the conspiracy period.*

US.129806071.10



21.     In response to the allegations set forth in paragraph 21, Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 21, and therefore denies them.

*22.     In addition to their participation in Agri Stats, defendant integrators had frequent opportunities to communicate, in conjunction with formal meetings of various trade associations. In particular, the National Turkey Federation each year held regular meetings, including the NTF Annual Convention and the NTF Leadership conference, which were widely attended by the defendant integrators. CW3 stated that senior Cargill executives, including Cargill's CEO and CFO, attended National Turkey Federation meetings. For example, CW2 stated that Cooper Farms leadership were involved in the National Turkey Federation, for example Cooper Farms COO Gary Cooper served as immediate past chairman of the NTF board in 2014.*

22.     In response to the allegations set forth in paragraph 22, Hormel Foods admits only that JOTS maintained a subscription to Agri Stats for a period of time, and that certain JOTS employees have, at times, attended some National Turkey Federation meetings. Hormel Foods

lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 22, and therefore denies them.

23.    *Collectively, Hormel, Cargill, and Butterball control approximately 50 percent of the turkey market. Hormel is the only publicly traded company among these three. In its earnings calls during the conspiracy period, Hormel repeatedly discussed the industry-wide success in executing production cuts and maintaining industry-wide production discipline during the Class Period.*

23.    In response to the allegations set forth in paragraph 23, Hormel Foods admits only that Hormel Foods Corporation is a publicly traded company and that it holds quarterly earnings calls. Paragraph 23 purports to characterize the contents of earnings calls, which speak for themselves. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 23, and therefore denies them.

24.    *On June 2, 2009, Hormel emphasized that it was making production cuts in response to an alleged oversupply in the market and closely monitoring the overall level of production in the market, showing the importance of the kind of information exchanged through Agri Stats:*

> *There is an oversupply of turkey. There continues to be perhaps more production as well as cold storage stocks than the demand would warrant. We have been very deliberate about making the appropriate production cuts. We announced them over a year ago. And we have even exceeded the amount we expected to reduce. We have seen the placements and indicators of forward looking supply come down, so that was as expected, and we expected the second half of 2009 to be a little kinder in the turkey side of the business, but there is still a lot of storage, cold storage stocks to go through, we feel comfortable that we've cleaned up our inventories that we had on hand. Our production cuts were more than the decrease in our sales because we did work off inventories. I had a feeling the industry will rebound. It's going to take a work through of the excess inventories as well as those production cuts hitting the marketplace.*

14

24. Paragraph 24 purports to characterize a statement attributed to a Hormel Foods Corporation employee—which statement speaks for itself. To the extent a response is required, Hormel Foods admits only that the quoted statement was selectively excerpted from a transcription and was made in response to a question posed by an analyst at a June 2, 2009 investment conference. Hormel Foods denies the remaining allegations in paragraph 24.

25. *On August 20, 2010, Hormel stated, "We think the turkey business has reached a good equilibrium, and we don't have any major expansion plans and have not heard others in that mode, so I think those conditions should remain favorable into next year."*

25. In response to the allegations set forth in paragraph 25, Hormel Foods admits only that, according to a transcription, an employee of Hormel Foods Corporation made the quoted statement—which speaks for itself—in response to a question posed by an analyst during an August 20, 2010 earnings call.

26. *On May 25, 2011, Hormel stated that the turkey industry was maintaining solid pricing based on the information that Hormel was receiving about industry-wide turkey production levels: "We certainly see egg set and poultry placement numbers that take us through the end of this year and a little bit into next fiscal year. But right now, on the basis of those numbers, on the basis of what we see in terms of production in the industry and on the basis of cold storage numbers, coupled with still strong demand on the export side, we feel that the amount of product going to market will support solid pricing on a commodity basis."*

26. Paragraph 26 purports to characterize a statement attributed to an employee of Hormel Foods Corporation, but misquotes the transcription. The statement speaks for itself. To the extent a response is required, Hormel Foods admits only that the (mis)quoted statement was selectively excerpted from a transcription and was made in response to a question posed by an

15

analyst during a May 25, 2011 earnings call. Hormel Foods denies the remaining allegations in paragraph 26.

27.     *On August 25, 2011, Hormel stated that the turkey industry was maintaining better discipline than the poultry industry: "The industry as a whole has shown a little better discipline, perhaps, than the other poultry side of the ledger." This statement is notable because the chicken industry is currently the subject of multiple civil lawsuits as well as a DOJ investigation of potential antitrust violations during this period of time.*

27.     Paragraph 27 purports to characterize a statement attributed to an employee of Hormel Foods Corporation—which speaks for itself. To the extent a response is required, Hormel Foods admits only that the quoted statement was selectively excerpted from a transcription and was made in response to a question posed by an analyst during an August 25, 2011 earnings call. Hormel Foods further states that neither it nor JOTS is involved in the broiler-chicken industry. Hormel Foods denies the remaining allegations in paragraph 27.

28.     *Furthermore, the turkey market has all of the characteristics of a market where information exchange is likely to have anticompetitive effects. Turkey is a fungible product, the market for turkey has price-based competition, the demand for turkey is relatively inelastic, and the turkey market features a trend towards price uniformity.*

28.     In response to the allegations set forth in paragraph 28, Hormel Foods denies that the Complaint correctly characterizes a relevant market for antitrust analysis or accurately describes the products at issue. The characteristics of the market and the products at issue will likely be subject to discovery. Accordingly, Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28, and therefore denies them. Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel

16

Foods, LLC; and/or JOTS participated in any agreement that was unlawful or had an anticompetitive effect.

29. *The information exchange through Agri Stats did not have the kind of characteristics that would produce procompetitive effects sufficient to outweigh the anticompetitive harms. The information exchange involved current and forward-looking data. Agri Stats regularly prepared monthly reports that contained data that was less than six weeks old. Agri Stats also only allowed companies to access the data if they themselves shared the data, thus ensuring that only defendants and other similarly situated turkey integrators who received the Agri Stats reports were able to use the data.*

29. In response to the allegations set forth in paragraph 29, Hormel Foods admits only that JOTS received periodic turkey reports from Agri Stats—which speak for themselves—and that Agri Stats' services were subscription-based. Hormel Foods specifically denies any implication that the Agri Stats reports are unlawful or anticompetitive and that any of the data provided by Agri Stats was "current" or "forward-looking." Hormel Foods denies the remaining allegations in paragraph 29.



US.129806071.10

30.    *During the conspiracy period, the price of turkey spiked dramatically, driven by the anticompetitive effects of the information exchange through Agri Stats regarding turkey production that helped facilitate defendants [sic] restraint over the growth in the supply of turkey.*

30.    Hormel Foods denies the allegations set forth in paragraph 30. Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in any agreement that was unlawful or had an anticompetitive effect.

31.    *The information exchange through Agri Stats in fact had anticompetitive effects on the market. Prior to the conspiracy, turkey prices closely tracked the underlying cost of feed, which is the primary input cost in the production of turkey. Beginning in 2009-2010, prices of turkey spiked to an unprecedented level, showing the anticompetitive effects of defendants' information exchange through Agri Stats. Remarkably, as demonstrated in the analysis performed by plaintiffs' experts, shown in the below chart, prices of turkey quickly returned to match underlying feed costs after litigation was filed in late 2016 in the broiler industry that centered on the anticompetitive use of Agri Stats. Defendants clearly changed their behavior after the commencement of the Broilers litigation, as Tyson dismissed their CEO, Donnie Smith, in late 2016, shortly after the first civil lawsuits were filed.*

US.129806071.10



31.     In response to the allegations set forth in paragraph 31, Hormel Foods denies that any information that JOTS provided to or received from Agri Stats had any anticompetitive effect on a relevant market. The allegations appear to be based upon an analysis not attached to the Complaint or otherwise provided to Hormel Foods. Hormel Foods therefore lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 31, and therefore denies them. Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in any agreement that was unlawful or had an anticompetitive effect.

32.     *Feed accounts for approximately 60-70% of the cost of raising a turkey. Plaintiffs' experts constructed a regression model based on the underlying feed cost that models what the "but for" price of turkey would have been if the historical relationship between feed and turkey costs had continued during the conspiracy period. The model demonstrates that the anticompetitive information exchange of data regarding turkey production through Agri Stats*

19

*caused anticompetitive effects in the market for turkey.*



32.     In response to the allegations set forth in paragraph 32, Hormel Foods admits only that feed is one of the costs associated with raising a turkey. Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS entered into any agreement that was unlawful or had an anticompetitive effect. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 32, and therefore denies them.

33.     *As a result of defendants' unlawful conduct, plaintiffs and the Class paid artificially inflated prices for turkey during the Class Period. Such prices exceeded the amount they would have paid if the price for turkey had been determined by a competitive market. Thus, plaintiffs and class members were injured by defendants' agreement to exchange information through Agri Stats regarding the turkey market.*

33.     Hormel Foods denies the allegations set forth in paragraph 33.

US.129806071.10

## II.     JURISDICTION AND VENUE

*34.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure compensatory damages and injunctive relief against defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs seek to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by defendants' conduct in restricting the supply of turkey and increasing the price of turkey. Plaintiffs seek damages in excess of $5,000,000. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.*

34.     Paragraph 34 contains only conclusions of law and characterizations of the Complaint to which no response is required. To the extent a response is required, Hormel Foods avers that the Court has subject-matter jurisdiction, and denies that Plaintiffs have suffered any damages.

*35.     Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because both Kraft Foods and Hillshire Brands are headquartered in the District, and one or more defendants transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.*

35.     Paragraph 35 contains conclusions of law and characterizations of the Complaint to which no response is required. To the extent a response is required, Hormel Foods does not contest venue in this District. Further, as Kraft has been dismissed from this action, allegations related to it are irrelevant for the legal analysis of venue.

*36.     This Court has personal jurisdiction over each defendant because, inter alia, each defendant: (a) transacted business throughout the United States, including in this District;*

21

*(b) manufactured, sold, shipped, and/or delivered substantial quantities of turkey throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.*

36.     Paragraph 36 contains only conclusions of law to which no response is required. To the extent a response is required, Hormel Foods does not contest personal jurisdiction in this action.

37.     *The activities of the defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.*

37.     Hormel Foods denies the allegations set forth in paragraph 37.

### III.     PARTIES

**A.     Plaintiffs**

38.     *Plaintiff Olean Wholesale Grocery Cooperative, Inc. (Olean Wholesale) is a retailers' cooperative located in Olean, New York. Its members are independent, family-owned supermarkets. Olean has served supermarkets in Western and Central New York, Western Pennsylvania, and Northeastern Ohio since 1922. Olean Wholesale is a New York corporation with its principal place of business in Olean, New York, and purchased turkey directly from one or more defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.*

38.     In response to the allegations set forth in paragraph 38, Hormel Foods denies that Olean Wholesale suffered any antitrust injury. Hormel Foods lacks knowledge or information

US.129806071.10

sufficient to form a belief as to the truth of the remaining allegations in paragraph 38, and therefore denies them.

*39.    John Gross and Company, Inc. (John Gross) is a full line food distributor located in Mechanicsburg, Pennsylvania. Founded in 1950, the company has been owned and operated by the Gross family for four generations. John Gross is a Pennsylvania corporation with its principal place of business in Mechanicsburg, Pennsylvania, and purchased turkey directly from one or more defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.*

39.    In response to the allegations set forth in paragraph 39, Hormel Foods specifically denies that Plaintiff John Gross and Company, Inc. ("John Gross") purchased turkey directly from Hormel Foods or JOTS during the alleged Class Period, and further denies that John Gross suffered any antitrust injury. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 39, and therefore denies them.

**B.    Defendants**

*40.    Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana. Throughout the Class Period, Agri Stats acted as a co-conspirator of the turkey integrator defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among defendants and their co-conspirators.*

40.    In response to the allegations set forth in paragraph 40, Hormel Foods specifically denies that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in the alleged conspiracy. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 40, and therefore denies them.

*41.    Butterball, LLC is a privately held North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class*

23

*Period, Butterball and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

41. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 41, and therefore denies them.

*42. Cargill, Inc. is a privately held Delaware corporation headquartered in Minnetonka, Minnesota. During the Class Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

42. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 42, and therefore denies them.

*43. Cargill Meat Solutions Corporation is a Delaware corporation that operates as a subsidiary of Cargill, Incorporated. During the Class Period, Cargill Meat Solutions and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

43. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 43, and therefore denies them.

*44. Defendants Cargill, Inc. and Cargill Meat Solutions are collectively referred to as "Cargill."*

44. Paragraph 44 fails to assert any allegations, and thus no response is required.

*45. Cooper Farms, Inc. is a privately held Ohio corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Cooper*

US.129806071.10

*Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

45.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 45, and therefore denies them.

*46.     Farbest Foods, Inc. is a privately held Indiana corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Farbest and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

46.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 46, and therefore denies them.

*47.     Foster Farms LLC is a privately held California corporation headquartered in Modesto, California. During the Class Period, Foster Farms LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

47.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 47, and therefore denies them.

*48.     Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms LLC. During the Class Period, Foster Poultry Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or*

US.129806071.10

*marketing of turkey, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

48.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 48, and therefore denies them.

*49.     Defendants Foster Farms LLC and Foster Poultry Farms are collectively referred to as "Foster Farms."*

49.     Paragraph 49 fails to assert any allegations, and thus no response is required.

*50.     Kraft Heinz Foods Company (Kraft Heinz), an Illinois corporation with headquarters in Pittsburgh, Pennsylvania, and Chicago, Illinois, is engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Kraft Heinz and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

50.     Kraft Heinz Foods Company has been dismissed from this action, and allegations related to it are irrelevant to the claims in this case. To the extent that a response is required to paragraph 50, Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth therein, and therefore denies them.

*51.     Kraft Foods Group Brands LLC is an Illinois corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Kraft Heinz and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

US.129806071.10

51. Kraft Foods Group Brands LLC has been dismissed from this action, and allegations related to it are irrelevant to the claims in this case. To the extent that a response is required to paragraph 51, Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth therein, and therefore denies them.

*52. Defendants Kraft Heinz Foods Company and Kraft Foods Brands LLC are collectively referred to as "Kraft Foods."*

52. Paragraph 52 fails to assert any allegations, and thus no response is required.

*53. Hormel Foods Corporation is a Delaware corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

53. Hormel Foods admits the allegations set forth in paragraph 53.

*54. Hormel Foods LLC is a limited liability corporation headquartered in Austin, Minnesota. It is a wholly owned subsidiary of Hormel Foods Corporation. Hormel is engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Hormel Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

54. In response to the allegations set forth in paragraph 54, Hormel Foods admits only that Hormel Foods, LLC is a limited liability corporation with its principal executive office address in Austin, Minnesota, and that Hormel Foods, LLC is a wholly owned subsidiary of Hormel Foods Corporation. Hormel Foods specifically denies that Hormel Foods, LLC "is engaged in the

27

production of meat and food products, and the marketing of these products." Hormel Foods, LLC holds the intellectual property of Hormel Foods Corporation and has no operations relevant to this litigation, and no predecessor, wholly owned or controlled subsidiary, or wholly owned or controlled affiliates of Hormel Foods, LLC sold turkey in the United States during the alleged Class Period. Hormel Foods denies the remaining allegations.

55. *House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. During the Class Period, House of Raeford operated in part through a division referred to as "Columbia Farms," which is a group of broiler facilities and operations originally named Columbia Farms, Inc. and Columbia Farms of Georgia, Inc. when purchased by House of Raeford in 1998. During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

55. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 55, and therefore denies them.

56. *Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland. During the Class Period, Perdue Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

56. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 56, and therefore denies them.

57. *Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods LLC is a subsidiary of Perdue Farms, Inc.*

US.129806071.10

*During the Class Period, Perdue Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

57.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 57, and therefore denies them.

*58.     Defendants Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to as "Perdue."*

58.     Paragraph 58 fails to assert any allegations, and thus no response is required.

*59.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. It wholly owns and controls two subsidiaries, Tyson Prepared Foods, Inc. and Tyson Fresh Meats Inc. that slaughter and sell turkey products. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

59.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 59, and therefore denies them.

*60.     Tyson Fresh Meats Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Fresh Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

60.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 60, and therefore denies them.

US.129806071.10

61.     *Tyson Prepared Foods, Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

61.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 61, and therefore denies them.

62.     *The Hillshire Brands Company (Hillshire Brands) is a Maryland corporation headquartered in Chicago, Illinois. Hillshire Brands operates as a subsidiary of Tyson Foods that sells turkey products. During the Class Period, Hillshire Brands and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

62.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 62, and therefore denies them.

63.     *Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc., and Hillshire Brands are collectively referred to as "Tyson."*

63.     Paragraph 63 fails to assert any allegations, and thus no response is required.

C.     **Co-Conspirators**

64.     *Co-Conspirator Circle S-Ranch, Inc. is a North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Circle S-Ranch and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

30

64.     In response to the allegations set forth in paragraph 64, Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS conspired in any way with Circle S-Ranch, Inc. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 64, and therefore denies them.

65.     *Co-Conspirator Prestage Farms is a North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Prestage Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

65.     In response to the allegations set forth in paragraph 65, Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS conspired in any way with Prestage Farms. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 65, and therefore denies them.

66.     *Co-Conspirator West Liberty Foods LLC (West Liberty) is an Iowa corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, West Liberty and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.*

66.     In response to the allegations set forth in paragraph 66, Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS conspired in any way with West Liberty Foods LLC. Hormel Foods lacks knowledge or

31

information sufficient to form a belief as to the truth of the allegations in paragraph 66, and therefore denies them.

## IV.    FACTUAL ALLEGATIONS

67.    *Starting no later than January 1, 2010, and continuing at least until January 1, 2017, defendants entered into an agreement to exchange information regarding their production and sale of turkey through Agri Stats. The information exchange through Agri Stats provided defendants an opportunity to obtain and monitor critical and competitively sensitive business information regarding each other's production and sales. The information exchange through Agri Stats had anticompetitive effects, as prices for turkey soared and defendants engaged in an industry-wide series of production cuts during the period. Notably, the information exchanged through Agri Stats was not available to purchasers of turkey, ensuring that the information exchange would not have procompetitive effects.*

67.    In response to the allegations set forth in paragraph 67, Hormel Foods admits only that, for a period of time, JOTS maintained a subscription to Agri Stats' turkey reports, provided certain historical data to Agri Stats, and received periodic turkey reports from Agri Stats with standardized and anonymized data. Hormel Foods specifically denies any implication that JOTS received any "sensitive" information regarding individual Defendants, and further denies that information exchange through Agri Stats had any anticompetitive impact. Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in any agreement that was unlawful or had an anticompetitive effect. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 67, and therefore denies them.

32

A.    **Agri Stats' information exchange services began in the broiler industry, where it has been used to facilitate widespread collusion.**

68.    *Agri Stats has played a central role in other industries, including collusion in the broiler industry.[6] As alleged in the In re Broiler Chicken Antitrust Litigation, No. 16-cv-08637 (N.D. Ill.) litigation, the broiler producers used Agri Stats as a part of their conspiracy to restrain production and inflate prices.*

68.    In response to the allegations set forth in paragraph 68, Hormel Foods states that neither it nor JOTS is involved in the broiler-chicken industry, nor is either a defendant in the *In re Broiler Chicken Antitrust Litigation*. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 68, and therefore denies them.

69.    *In the broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and the co- conspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, Express Markets, Inc. or EMI. Agri Stats collected data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.*

---

[6] *Broilers are chickens raised to be slaughtered before the age of 13 weeks.*

69.     In response to the allegations set forth in paragraph 69, Hormel Foods states that neither it nor JOTS is involved in the broiler-chicken industry, nor is either a defendant in the *In re Broiler Chicken Antitrust Litigation*. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 69, and therefore denies them.

70.     *The detail of these reports ensured that competitors could quickly decode the information of their purported competitors. The Broiler complaints allege it was common knowledge among producers that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes. The broiler reports, in part, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.*

70.     In response to the allegations set forth in paragraph 70, Hormel Foods states that neither it nor JOTS is involved in the broiler-chicken industry, nor is either a defendant in the *In re Broiler Chicken Antitrust Litigation*. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 70, and therefore denies them.

71.     *In the broiler industry, it is also alleged that Agri Stats – known to its co-conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing*

US.129806071.10

*them to continue to act in concert to ensure they did. Agri Stats' own statements in the broiler industry facilitated the implementation of the agreement to restrict supply – where Agri Stats would transmit the intentions of the broiler producers to restrict supply.*

71.     In response to the allegations set forth in paragraph 71, Hormel Foods states that neither it nor JOTS is involved in the broiler-chicken industry, nor is either a defendant in the *In re Broiler Chicken Antitrust Litigation*. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 71, and therefore denies them.

72.     *In a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the broiler industry, it was reported:*

> *"Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant- by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. **That is what creates stability for a cartel**."*

72.     In response to the allegations set forth in paragraph 72, Hormel Foods states that neither it nor JOTS is involved in the broiler-chicken industry, nor is either a defendant in the *In re Broiler Chicken Antitrust Litigation*. Paragraph 72 purports to characterize a February 15, 2017 Bloomberg article, which speaks for itself. To the extent a response is required, Hormel Foods admits that the article contains, among other things, the language selectively excerpted in paragraph 72, and denies the remaining allegations.

35

73.     *The district court noted, in denying the motions to dismiss in the In re Broiler Chicken Antitrust Litigation that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which suggests high antitrust concerns.[7]*

73.     In response to the allegations set forth in paragraph 73, Hormel Foods states that neither it nor JOTS is involved in the broiler-chicken industry, nor is either a defendant in the *In re Broiler Chicken Antitrust Litigation*. Paragraph 73 purports to characterize a court order, which speaks for itself. To the extent a response is required, Hormel Foods admits only that an order was issued on November 20, 2017 in the *In re Broiler Chicken Antitrust Litigation* at docket number 541.

**B.     Defendants entered into an agreement to exchange information through Agri Stats regarding their production and sales of turkey.**

74.     *Each member of the conspiracy, including the integrator defendants and co-conspirators, were all Agri Stats subscribers. Agri Stats publicly stated that 95% of the turkey market used Agri Stats reports.*

74.     In response to the allegations set forth in paragraph 74, Hormel Foods admits only that, for a period of time, JOTS maintained a subscription to Agri Stats' turkey reports. Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in the alleged conspiracy. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 74, and therefore denies them.

---

[7] *Memorandum Opinion and Order at 11, In re Broiler Chicken Antitrust Litigation, No. 16- cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.*

36

75. *Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison and perform the monthly audits. Each company's financial data is reconciled to its general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations, so all company numbers are calculated the same way. CW2 stated that he was involved during the conspiracy period in the monthly transmission of cost data from Cooper Farms to Agri Stats.*

75. In response to the allegations set forth in paragraph 75, Hormel Foods admits only that, for a period of time, JOTS provided certain historical data to Agri Stats. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 75, and therefore denies them.

76. *Participants in the scheme received monthly detailed reports and graphs that allow them to compare their performance, sales prices, and costs to other participants. Agri Stats issues separate reports in the turkey industry to the integrator defendants regarding live operations, processing, further reprocessing, feed costs, and sales.*

76. In response to the allegations set forth in paragraph 76, Hormel Foods admits only that, for a period of time, JOTS received periodic turkey reports from Agri Stats with standardized and anonymized data—which speak for themselves. Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in the alleged conspiracy. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 76, and therefore denies them.

77. *Agri Stats provided the integrator defendants with an unparalleled ability to share critical and proprietary information concerning key business metrics, such as sales, production levels and short and long-term production capacity.*

US.129806071.10

77. Hormel Foods denies the allegations set forth in paragraph 77.

*78. Perhaps most egregiously, Agri Stats provided monthly sales reports to defendants. One of Agri Stats' subsidiaries is Express Markets, Inc. (aka, "EMI"). On EMI's publicly available webpage Amanda Martin, an Express Markets economist states that Agri Stats "audited turkey and broiler sales and product mix data, and worked with processing and further reprocessing reports.'" On information and belief, the Agri Stats turkey sales reports contained sales data that was less than six weeks old.*

78. In response to the allegations set forth in paragraph 78, Hormel Foods admits only that, for a period of time, JOTS provided certain historical data to Agri Stats and received periodic turkey reports from Agri Stats with standardized and anonymized data. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 78, and therefore denies them.

*79. As detailed in the recently filed amended complaint in the Pork Antitrust Litigation, No. 18-cv-1776 (JRT/HB) (D. Minn. Nov. 06, 2019), ECF No. 392, Agri Stats allowed subscribers to its pork sales reports to compare their prices for individual products against the national average net price, and against the national top 25 percent average price. Notably, Agri Stats identified opportunities for the Pork Integrators to raise prices. For instance, for each product, Agri Stats specifically broke out the variance between the company's price and the national average price, as well as the economic impact of the variance. This allowed co- conspirators to see how much more they could charge if they charged either the national average price or the average of the top 25% national average price.*

79. Paragraph 79 purports to characterize a pleading from another case—which speaks for itself. To the extent a response is required, Hormel Foods admits only that a pleading was filed

US.129806071.10

in the *In re Pork Antitrust Litigation* on November 6, 2019 at docket number 392, and denies the remaining allegations.

80.     *Agri Stats provided similar services to the integrator defendants regarding their production and sale of turkey. According to CW1, Agri Stats ranked the integrator defendants in their reports based on the returns (i.e. prices) that the integrator defendants received.*

80.     In response to the allegations set forth in paragraph 80, Hormel Foods admits only that, for a period of time, JOTS received periodic turkey reports from Agri Stats—which speak for themselves. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 80, and therefore denies them.

81.     *As detailed in the Pork and Broilers complaints, for each of its reports, Agri Stats identified the list of participants who were contributing data or information to the reports. CW1 confirmed that the reports Agri Stats prepared for the integrator defendants identified the participants that provided data for each report, which allowed defendants to understand which of their competitors were participating for each report. CW2 confirmed that the Agri Stats reports identified each of the turkey production facilities that were participating in the reports.*

81.     In response to the allegations set forth in paragraph 81, Hormel Foods admits only that the turkey reports received by JOTS identified participants but provided anonymized data, and that complaints have been filed in the *In re Broiler Chicken Antitrust Litigation* and the *In re Pork Antitrust Litigation*. To the extent that paragraph 81 purports to characterize pleadings from other cases, those pleadings speak for themselves. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 81, and therefore denies them.

US.129806071.10

82.      One presentation from Agri Stats shows the level of detail provided to competitors regarding profits in the swine market. On information and belief, similar levels of detail were provided to defendants who received Agri Stats reports in the turkey market.

**Top 25% in Profit - Variances to Average Company - 2009-2007**

|  | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

35,001,089 Pigs Finished

| **2008** | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

30,785,319 Pigs finished

| **2007** | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |

22,306,500 Pigs finished

82.      Paragraph 82 purports to characterize an excerpt of an Agri Stats presentation regarding "Pigs finished," which speaks for itself, and the contents of Agri Stats' turkey reports, which speak for themselves. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 82, and therefore denies them.

83.      The purpose of these reports was not to provide better prices to consumers or to lower the costs of production. Instead, the clear purpose was to improve the profitability of the co-conspirators. The particular Agri Stats report referenced above shows the ranking of each company in profitability and compares the company to its competitors by providing the variance from the average. The Agri Stats report actually circulated to competitors contained even further

40

*detail. This underlines that the purpose of these reports was not to allow consumers to save more money through lower prices and more efficient production – in fact, the opposite was true, the purpose was the profitability of the defendant companies and the impact was higher sales prices for consumers.*

83. Paragraph 83 purports to characterize an excerpt of an Agri Stats presentation regarding "Pigs finished," which speaks for itself, and the contents of Agri Stats' turkey reports, which speak for themselves. Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in the alleged conspiracy. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 83, and therefore denies them.

84. *Much of the information shared by Agri Stats and the co-conspirators was unnecessary to achieve any benefits for consumers. Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.*

84. In response to the allegations set forth in paragraph 84, Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in the alleged conspiracy, and further denies that JOTS provided or exchanged any "current data" to or through Agri Stats. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 84, and therefore denies them.

85. *Agri Stats knew that it played a central role in facilitating this anticompetitive information exchange. One presentation from Agri Stats regarding the swine industry spoke directly on this point, pointing out to industry participants that they could not undertake such a detailed cost analysis between competitors without Agri Stats auditing and standardizing the data:*

41

## *Data Integrity*

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



85.    Paragraph 85 purports to characterize an excerpt of an Agri Stats presentation, which speaks for itself and is unrelated to the Agri Stats turkey reports at issue in this litigation. Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in the alleged conspiracy. Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in any agreement that was unlawful or had an anticompetitive effect. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 85, and therefore denies them.

86.    *Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine **tolerance and outlier status and enforce**," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, "[e]ach participant has to*

42

*commit."*

86.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 86, and therefore denies them.

*87.     According to CW1, Agri Stats gave live presentations to defendant integrators to explain to them how to use the reports that Agri Stats prepared on the turkey industry and how to compare themselves against their competitors: during the presentations, Agri Stats said, "if you are number one priced out of 13, that meant the return was so much versus the other companies."*

87.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 87, and therefore denies them.

*88.     It is the standard policy of Agri Stats that it will only grant access to Agri Stats reports to similarly situated companies that themselves share data with Agri Stats. This ensures that data from Agri Stats is only available to one side of the market – the integrator defendants. The other side of the market, purchasers of turkey, is not allowed to access the Agri Stats data, and thus cannot use Agri Stats data to negotiate lower prices. Thus, Agri Stats reports function as a one-way ratchet that can be used for anticompetitive purposes by defendants but not for procompetitive purposes by purchasers.*

88.     Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in any agreement that was unlawful or had an anticompetitive effect. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 88, and therefore denies them.

US.129806071.10

**C.  Defendants possess market power in the market for turkey and turkey is the type of product for which information exchange is particularly likely to have anticompetitive effects.**

**1.  Defendants have market power in the market for turkey.**

*89.  One tool that courts use to assess the competitive effects of concerted action is defining a relevant market – the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). The case concerns the sale of turkey for meat consumption in the United States.*

89.  In response to the allegations set forth in paragraph 89, Hormel Foods admits only that some allegations in the Complaint concern the sale of turkey for meat consumption in the United States. The remaining allegations in paragraph 89 contain only conclusions of law to which no response is required.

*90.  There is a single market for turkey for meat consumption. Prices for turkey sold in the United States are quoted generally in disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.*

90.  Hormel Foods denies the allegations set forth in paragraph 90.

*91.  The relevant geographic market is the United States.*

91.  Paragraph 91 contains conclusions of law to which no response is required. To the extent a response is required, Hormel Foods denies the allegations set forth in paragraph 91.

**2.  There are high barriers to entry in the market for turkey for meat consumption.**

*92.  The existence of high barriers to entry is one factor which makes markets susceptible to collusion. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the*

*supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel. High barriers to entry in the turkey processing market exist, precluding other entrants or would-be competitors from entering the market for turkeys raised for consumption.*

92.     Paragraph 92 contains conclusions of law to which no response is required. To the extent a response is required, Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 92, and therefore denies them.

*93.     During the Class Period and continuing today, substantial barriers impede entry into the turkey market. A new entrant into the market would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, equipment, energy, transportation. Distribution, infrastructure (aka "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, long- standing customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.*

93.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 93, and therefore denies them.

*94.     The price of construction of a new integrated turkey processing complex is relatively high. For example, the cost for a current market participant, Virginia Poultry Growers Cooperative, to construct a new turkey processing in 2015 was $62 million.[8]*

---

[8] *Virginia Poultry Growers Cooperative Plans Turkey Processing Facility in Hinton, Virginia, Area Development (July 22, 2015), available at https://www.areadevelopment.com/newsItems/7-22-2015/virginia-poultry-growers-cooperative- processing-facility-hinton-virginia565489.shtml.*

US.129806071.10

94.     Paragraph 94 purports to characterize a news article, which speaks for itself. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 94, and therefore denies them.

95.     *The turkey market has been subject to steadily increasing consolidation over the last several decades. In the 1970s, the turkey market was defined by competition among dozens of companies that worked with independent farmers.[9] But now, just four corporations – Cargill, Hormel, Butterball, and Farbest – produce more than half of the turkey in the United States.*

95.     Paragraph 95 purports to characterize a news article, which speaks for itself. Hormel Foods states that a wholly owned subsidiary of Hormel Foods Corporation—JOTS—produces turkey in the United States. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 95, and therefore denies them.

96.     *The turkey market also has high levels of vertical integration that constitute a barrier to entry. The National Turkey Federation states that "turkey companies are vertically integrated, meaning they control or contract for all phases of production."[10]*

96.     Paragraph 96 purports to characterize a website, which speaks for itself. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 96, and therefore denies them.

---

[9] *Christopher Leonard, That Turkey on Your Plate Could Use Some More Industry Competition, The Washington Post (Nov. 22, 2013), available at https://www.washingtonpost.com/opinions/that-turkey-on-your-plate-could-use-some-more-industry-competition/2013/11/22/045fc470-5177-11e3-a7f0-b790929232e1_story.html.*

[10] *Industry Structure, National Turkey Federation, https://www.eatturkey.org/industry-structure/ (last visited Dec. 16, 2019).*

46

97.      *For example, Butterball has over 175 farms that they own, as well as contracts with numerous independent farmers. Jennie-O owns over 100 commercial growing farms. Cargill owns around 700 farms. Farbest has more than 200 contract growers.*

97.      In response to the allegations set forth in paragraph 97, Hormel Foods admits that JOTS owns over 100 commercial growing farms. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 97, and therefore denies them.

**3.      The defendants have market power in the market for turkey for meat consumption.**

98.      *The integrator defendants possess market power in the market for turkey for consumption. Defendants and their co-conspirators controlled an average of 77% of the market from 2010-2018.*



Average Market Share of Processors (2010 - 2018)

US.129806071.10

98.     In response to the allegations set forth in paragraph 98, Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in unlawful or anticompetitive conduct. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 98, and therefore denies them.

**D.     The market for turkey is the type of market where the information exchanges orchestrated by Agri Stats are likely to harm competition.**

*99.     Competition is likely to be harmed when competitors with market power in concentrated markets, such as the market at issue, directly exchange strategic information about current and forward-looking plans for prices and supply. The strategic information exchanged between the defendants was competitively sensitive and a material factor in negotiations. Price, capacity, supply and costs are crucial aspects of competition. When defendants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects of sales of turkey.*

99.     In response to the allegations set forth in paragraph 99, Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in the alleged conspiracy. The allegations make legal conclusions for which no response is required. To the extent that a response is required, Hormel Foods denies the allegations in paragraph 99.

*100.     The information exchange took place in private settings and involved the exchange of confidential, non-public information.*

100.     In response to the allegations set forth in paragraph 100, Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS

48

participated in the alleged conspiracy. The allegations make legal conclusions for which no response is required. To the extent that a response is required, Hormel Foods denies the allegations.

*101.    The market for turkey is characterized by numerous attributes that mean the type of information exchange facilitated by Agri Stats are particularly likely to have anticompetitive effects. In particular, the market for turkey features relatively few sellers, a fungible product, price-based competition, inelastic demand, and a trend toward price uniformity.*

101.    In response to the allegations set forth in paragraph 101, Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in any agreement that was unlawful or had an anticompetitive effect. The allegations make legal conclusions for which no response is required. To the extent that a response is required, Hormel Foods denies the allegations.

**1.    The turkey market features few sellers.**

*102.    The turkey market is concentrated, with relatively few sellers. The defendants and co-conspirators control approximately 80 percent of turkey production and processing. The presence of few companies supports the inference that a conspiracy to exchange information had the intended effect of restraining competition.*

102.    In response to the allegations set forth in paragraph 102, Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in the alleged conspiracy. The allegations make legal conclusions for which no response is required. To the extent that a response is required, Hormel Foods denies the allegations.

**2.    Turkey is a fungible market.**

*103.    One of the distinct characteristics of the turkey industry is its fungibility, also known as the ability to be freely exchangeable or replaceable in whole or in part. Common sense*

*indicates at Thanksgiving that a consumer can substitute a whole turkey produced by Butterball with a whole turkey produced by Cargill.*

103.    Hormel Foods denies the allegations set forth in paragraph 103.

*104.    Indeed, the Agri Stats reports themselves show that turkey is fungible because they aggregate data across defendants for particular types of turkey products and allow defendants to compare detailed information on prices for the same fungible product. CW1 confirmed that the Agri Stats reports were organized by specific item of turkey product.*

104.    Paragraph 104 purports to characterize the Agri Stats turkey reports, which speak for themselves. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 104, and therefore denies them.

**3.    The turkey market features price-based competition.**

*105.    Turkey is a commodity market that faces price-based competition.*

105.    Hormel Foods denies the allegations set forth in paragraph 105.

**4.    Demand for turkey is relatively inelastic.**

*106.    Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[11] A PED value between 0 and -1 indicates there is inelastic demand for the good or service – i.e., a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. The USDA has estimated that the average PED estimate for the turkey market is -0.58 – meaning the demand for turkey is*

---

[11] *See, e.g., Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson, et al., Price Elasticity of Demand (Nov. 13, 1997), https://scholar.harvard.edu/files/alada/files/price_elasticity_of_demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects, 33 J. Academy Mktg. Science 66-78 (2005), available at http://www.math.tau.ac.il/~fibich/Manuscripts/elasticity_JAMS.pdf.*

*inelastic. Indeed, most American consumers eat turkey at Thanksgiving, not pork or chicken, illustrating that there is no substitute for one of the key demand drivers of turkey.*

106.    Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 106, and therefore denies them.

### 5.    The turkey market features a trend towards price uniformity.

*107.    Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. For example, whole turkey products are produced on a commercial scale and sold in supermarkets. Whole turkeys are virtually indistinguishable, with similar nutritional values, branding and packaging.*

107.    Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence of paragraph 107, and therefore denies them. Hormel Foods denies the remaining allegations in paragraph 107.

### E.    Industry-wide production cuts during the Conspiracy Period were facilitated through the information exchange conducted through Agri Stats.

*108.    As demonstrated in the following chart, the turkey integrators acted in a concerted way to decrease turkey supply in 2009, 2013, 2014, and 2015. Overall, industry supply decreased significantly from 2009 to 2015, before rebounding in 2016. The information exchange through Agri Stats facilitated the ability of defendants to monitor total industry levels of supply.*

US.129806071.10

*Figure 1: U.S. Turkey Total Heads Slaughtered*



108.    Hormel Foods denies the allegations set forth in paragraph 108.

**F.    Abnormal pricing during the Class Period demonstrates the anticompetitive effects of the exchange of turkey information conducted through the Agri Stats sales reports.**

*109.    Beginning in 2010, the turkey industry showed abnormal price movements, i.e., price increases for the average turkey whole price unexplained by increases in costs. All of these pricing measurements show a significant break between pricing prior to 2010 and pricing after 2010, supporting the plausibility of anticompetitive effects on the turkey market from the information exchange conducted through Agri Stats. Plaintiffs have measured the various abnormal pricing movements in a number of ways, including: (i) the average turkey price, (ii) the turkey integrators' margin during the Class Period;(iii) the variation between feed and turkey prices before and during the Class Period; and (iv) a regression analysis that models the relationship between turkey prices and feed prices.*

109.    In response to the allegations set forth in paragraph 109, Hormel Foods denies the plausibility of any anticompetitive effects on a putative turkey market from the Agri Stats turkey reports, and further denies any implication that Hormel Foods Corporation; Hormel Foods, LLC;

and/or JOTS participated in any agreement that was unlawful or had an anticompetitive effect. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 109, and therefore denies them.

    1.    **The average turkey wholesale price experienced an unprecedented increase beginning in 2009.**

    *110.    According to aggregate prices published by the USDA, the average wholesale price per pound for turkey hens was between $0.55 and $0.85 every year from 2000 to 2009, before steadily increasing to $1.15 by 2016. Following initiation of the Broilers litigation, the price of turkey then quickly returned to the price at which it was prior to the conspiracy. The following graph shows the unprecedented increase in turkey prices beginning in 2009, and staying elevated through the end of 2016.*

**Figure 2: Average Turkey Wholesale Prices in Cents per lbs., 2000-2018**



    110.    In response to the allegations in paragraph 110, Hormel Foods specifically denies any implication that JOTS's wholesale prices for turkey hens were informed by the initiation of the *In re Broiler Chicken Antitrust Litigation*. To the extent that the allegations rely on USDA

data, that data speaks for itself. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 110, and therefore denies them.

### 2. Beginning in 2009, defendants' revenues radically diverged from their costs.

*111. Plaintiffs' experts examined the spread between turkey revenue and turkey-related costs (costs of goods sold + operating costs) for Jennie-O Turkey, the only one of the three largest turkey integrator defendants with public earnings, as a proxy for measuring the spread between a defendant's price of wholesale turkey and their turkey costs.[12] This measurement accounts for defendant-specific operating costs. This analysis confirms the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the Class Period in 2009.*

111. In response to the allegations set forth in paragraph 111, Hormel Foods specifically denies that "the spread between turkey revenue and turkey-related costs . . . for Jennie-O Turkey" can be calculated—or even approximated—using Hormel Foods Corporation's publicly filed financial information, and further denies any allegations based upon this Plaintiffs-manufactured "spread." Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 111, and therefore denies them.

*112. The following chart shows a break in revenues and costs around the start of the Class Period in 2010 for Hormel's Jennie-O turkey brand:*

---

[12] *Hormel does not make any data publicly available on Jennie-O's costs. Therefore, plaintiffs have assumed for the purposes of this analysis that Jennie-O's costs are the same proportion to Hormel's overall costs as Jennie-O's revenues are to Hormel's overall revenues.*

US.129806071.10

**Figure 3: Jennie-O's Revenues vs Costs, March 2001 to March 2018**



112.     Hormel Foods denies the allegations set forth in paragraph 112.

*113.     The anticompetitive effect of defendants' information exchange is seen in the dramatic increase in Jennie-O Turkey's spread between revenue and costs after the start of the conspiracy period.*

US.129806071.10

**Figure 4: Jennie-O Turkey's spread: Revenue minus Cost 2001-2018**



113. Hormel Foods denies the allegations set forth in paragraph 113.

*114. These analyses of the spread between costs and prices confirm one essential fact – that rising costs do not explain the increases in price seen during the Class Period.*

114. In response to the allegations set forth in paragraph 114, Hormel Foods specifically denies that "the spread between costs and prices" for JOTS can be calculated—or even approximated—using Hormel Foods Corporation's publicly filed financial information, and further denies any allegations based upon this Plaintiffs-manufactured "spread" and the purported analyses thereof. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 114, and therefore denies them.

**3. During the conspiracy period, prices rose but production failed to rise to match demand, indicating an anticompetitive restraint on supply in the market for turkey facilitated by the information exchange through Agri Stats.**

*115. In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should*

*correspond to falling prices. However, in the turkey market during the conspiracy period,*

*production, measured through USDA data, remained artificially restrained even as demand,*

*captured by higher per capita expenditures on turkey, rose significantly. These observed price and*

*output dynamics, shown in the below chart, are consistent with an anticompetitive effect on turkey*

*output facilitated by the information exchange through Agri Stats.*



115.     Hormel Foods denies the allegations in paragraph 115. The conclusions drawn in

the allegations will be subject to expert testimony and the analysis purportedly forming the basis

of the allegations has not been disclosed to Hormel Foods.  Hormel Foods specifically denies any

implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in any

agreement that was unlawful or had an anticompetitive effect.

**4.     During the conspiracy period, prices of turkey radically diverged from the costs of underlying feed.**

116.     *Feed is the primary driver of turkey costs, accounting for approximately 60-70%*

*of the overall cost of raising turkeys for sale according to the New York Times.[13] Prior to the conspiracy period, there was a tight relationship between the price of feed and the price of turkey, as would be expected in a competitive commodity market that was pricing its product based on its primary input cost. However, during the conspiracy period, the relationship between the price of feed and the price of turkey diverged dramatically, as would be expected as an anticompetitive effect of the information exchange that allowed the integrator defendants to charge more than was justified by their input costs. The divergence is illustrated in the below chart:*



116.     Paragraph 116 purports to characterize a news article, which speaks for itself. To the extent a response is required, Hormel Foods admits only that feed is one of the costs associated with raising a turkey. Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in any agreement that was unlawful or had an anticompetitive effect. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 116, and therefore denies them.

---

[13] Paul Sullivan, *In the Labyrinth of Turkey Pricing, a Reason Under Every Giblet*, *supra.*

US.129806071.10

*5.* **A regression model demonstrates the anticompetitive effects on the price of turkey caused by the information exchange conducted through Agri Stats.**

*117.* *To demonstrate the anticompetitive effects of defendants' information exchange on the market for turkey, plaintiffs' experts have done a regression model based on the relationship between the price of turkey hens and the price of turkey feed, which is the primary input cost for turkeys. The formula of the regression is the following:* $(HenPrice)=\alpha+\beta(FeedPrice)t+\varepsilon t$. *As shown below, the regression shows a significant elevation in the prices of turkey during the conspiracy period, showing the effects of the information exchange through Agri Stats:*



117.    In response to the allegations set forth in paragraph 117, Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in the alleged conspiracy. Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in any agreement that was unlawful or had an anticompetitive effect. Hormel Foods has not been provided with the referenced expert analysis to assess the validity of the allegations or the truthfulness of any

numbers provided. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 117, and therefore denies them.

**G.    Defendants actively concealed the extent of their information exchange and plaintiffs did not and could not have discovered defendants' anticompetitive conduct.**

*118.    Plaintiffs and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this complaint. Defendants engaged in a secret information exchange that did not reveal facts that would put plaintiffs or the Class on inquiry notice that there was an anticompetitive agreement to exchange information regarding the market for turkey. Throughout the Class Period, defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from plaintiffs and class members.*

118.    Hormel Foods denies the allegations set forth in paragraph 118.

*119.    In 2009, the President of Agri Stats, Bryan Snyder, commented on how secretive the true nature of Agri Stats was when he stated:*

> *Agri Stats has always been kind of a quiet company. **There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background**, and really our specialty is working directly with companies about their opportunities and so forth.*

119.    Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 119, and therefore denies them.

*120.    At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not*

*going to display the actual bottom line to the group here just because of the confidential[] nature of the information."*

120.    Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 120, and therefore denies them.

*121.    Not until recently was the extent of the information exchange conducted through Agri Stats widely known or reported. Only after the filing of a February 7, 2018 Second Consolidated and Amended Complaint by the End User Plaintiff Class in the In re Broiler Chicken Antitrust Litigation, Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the confidential services that Agri Stats provides to its clients in the broiler industry.*

121.    Hormel Foods denies the allegations set forth in paragraph 121.

*122.    The filing of that amended complaint collectively disclosed the likelihood that the turkey industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.*

122.    Hormel Foods denies the allegations set forth in paragraph 122.

*123.    Defendants concealed the extent of their information exchange through Agri Stats. Indeed, to this day, it is not publicly known the number of companies that receive Agri Stats reports regarding turkey. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of defendants' turkey prices before these recent events.*

123.    Hormel Foods denies the allegations set forth in paragraph 123

## H.    Defendants had numerous opportunities to collude.

*124.    Defendant integrators are members of several turkey-related trade associations and other forums, which they used to facilitate their conspiratorial conduct. Turkey producers*

61

*have numerous regular events through which they can communicate in person with one another. Regular and frequent attendance by defendants' CEOs and top-level executives at trade-association meetings is the norm rather than the exception.*

124.     In response to the allegations set forth in paragraph 124, Hormel Foods admits only that JOTS is a member of turkey-related trade associations. Hormel Foods specifically denies any implication that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in the alleged conspiracy. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 124, and therefore denies them.

*125.     Nearly every defendant integrator's CEO has representatives on the board of directors or executive committee of these trade associations.*

125.     Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 125, and therefore denies them.

*126.     The National Turkey Federation is a national advocate for turkey farmers and processors; members include growers, processors, hatchers, breeders, distributors, allied services, and state associations. High-ranking executives of Butterball, Jennie-O Turkey Store (Hormel), Cargill, Tyson, Farbest, and Perdue currently serve as officers or on the executive committee; and nearly all of the defendants have membership in this trade association. In addition to regular board and executive committee meetings, the federation holds an annual convention in February and an annual leadership conference in July where these executives gather and discuss turkey-related information.*

126.     In response to the allegations set forth in paragraph 126, Hormel Foods admits only that JOTS's president currently serves on the executive committee of NTF; that JOTS is a member of NTF; and that NTF holds regular board and executive committee meetings, an annual

US.129806071.10

convention, and a leadership conference. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 126, and therefore denies them.

127.     *Upon information and belief, the top-level executives from defendants discuss topics with one another relating to pricing, production, and other non-public proprietary information outside of the National Turkey Federation's formal meetings. These regular, informal, and in-person opportunities to discuss pricing and production in the turkey industry gives CEOs and top-level executives comfort that their competitors remain committed to a plan to artificially restrict turkey production.*

127.     Hormel Foods denies the allegations set forth in paragraph 127.

128.     *The United States Poultry & Egg Export Council (USAPEEC) has its home office in Stone Mountain, Georgia. Defendants are all members of the council. USAPEEC has a network of international offices and consultants in key export markets. The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world. The council has evolved into an advocate for the industry on trade-policy issues. USAPEEC has about 200 member companies and organizations. The council holds Board of Directors meetings quarterly and includes executives from all or nearly all defendants.*

128.     In response to the allegations set forth in paragraph 128, Hormel Foods admits only that JOTS was a member of the U.S. Poultry & Egg Export Council during the alleged Class Period. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 128, and therefore denies them.

129.     *The U.S. Poultry & Egg Association (U.S. Poultry) describes itself as the world's largest and most active poultry organization. U.S. Poultry's members include producers and*

*processors of broilers, turkeys, ducks, eggs, and breeding stock, as well as allied companies. Many of the defendants are members of U.S. Poultry. U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall. Butterball, Cargill, Foster, Tyson, and Perdue have representation on the Board of Directors.*

129. In response to the allegations set forth in paragraph 129, Hormel Foods admits only that JOTS was a member of U.S. Poultry & Egg Association during the alleged Class Period. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 129, and therefore denies them.

*130. The North American Meat Institute (NAMI) represents companies that process 95% of red meat and 70% of turkey products in the United States and their suppliers throughout the country. NAMI hosts the Meat Industry Summit in April each year. Additionally, it hold regular Board of Director meetings. Butterball, Cargill, Hormel, and Tyson have representation on the NAMI Board.*

130. In response to the allegations set forth in paragraph 130, Hormel Foods admits only that Hormel Foods Corporation is a member of the North American Meat Institute ("NAMI"); that NAMI holds an annual Meat Industry Summit; and that Hormel Foods Corporation currently has representation on the NAMI Board. Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 130, and therefore denies them.

## V. CLASS ACTION ALLEGATIONS

*131. Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking compensatory damages and injunctive relief pursuant to federal law on behalf of the members of the following class:*

*All persons and entities who directly purchased turkey from Defendants or co-conspirators for personal use in the United States during the Class Period.*

US.129806071.10

*Specifically excluded from this Class are the Defendants and co-conspirators; the officers, directors or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant or co-conspirator. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.*

131.    Paragraph 131 contains conclusions of law to which no response is required. To the extent a response is required, Hormel Foods admits only that Plaintiffs seek to bring this action on behalf of a putative class, and denies the remaining allegations in paragraph 131.

132.    *Class Identity: The above-defined class is readily identifiable and is one for which records should exist.*

132.    Paragraph 132 contains conclusions of law to which no response is required. To the extent a response is required, Hormel Foods denies the allegations set forth in paragraph 132.

133.    *Numerosity: Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of defendants, retailers, resellers and other entities in the supply chain of turkey. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.*

133.    Paragraph 133 contains conclusions of law to which no response is required. To the extent a response is required, Hormel Foods lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 133, and therefore denies them.

134.    *Typicality: Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs purchased turkey directly from one or more of the defendants for personal use, and therefore plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.*

US.129806071.10

134. Paragraph 134 contains conclusions of law to which no response is required. To the extent a response is required, Hormel Foods denies the allegations set forth in paragraph 134.

135. *Common Questions Predominate: There are questions of law and fact common to the Class, including, but not limited to:*

    A. *Whether defendants and their co-conspirators engaged in an information exchange agreement that reduced or suppressed competition in the market for turkey;*

    B. *The identity of the participants of the alleged agreement;*

    C. *The duration of the agreement alleged herein and the acts performed by defendants and their co-conspirators in furtherance of the agreement;*

    D. *Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the plaintiffs and the other members of the Class;*

    E. *The effect of defendants' alleged conspiracy on the prices of turkey sold in the United States during the Class Period; and*

    F. *The appropriate class-wide measure of damages.*

*These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.*

135. Paragraph 135 contains conclusions of law to which no response is required. To the extent a response is required, Hormel Foods denies the allegations set forth in paragraph 135.

136. *Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class in that plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class who directly purchased turkey from defendants and plaintiffs have retained counsel*

66

*competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.*

136.    Paragraph 136 contains conclusions of law to which no response is required. To the extent a response is required, Hormel Foods denies the allegations set forth in paragraph 136.

*137.    Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.*

137.    Paragraph 137 contains conclusions of law to which no response is required. To the extent a response is required, Hormel Foods denies the allegations set forth in paragraph 137.

*138.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.*

138.    Paragraph 138 contains conclusions of law to which no response is required. To the extent a response is required, Hormel Foods denies the allegations set forth in paragraph 138.

US.129806071.10

*139.    Plaintiffs bring the action on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that directly purchased one or more turkey products that a defendant or co-conspirator produced during the respective class periods.*

139.    Paragraph 139 contains conclusions of law to which no response is required. To the extent a response is required, Hormel Foods admits only that Plaintiffs seek to bring this action on behalf of a putative class, and denies the remaining allegations in paragraph 139.

*140.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.*

140.    Paragraph 140 contains conclusions of law to which no response is required. To the extent a response is required, Hormel Foods denies the allegations set forth in paragraph 140.

## VI.    ANTITRUST INJURY

*141.    Defendants' anticompetitive conduct had the following effects, among others:*

*A.    Price competition has been restrained or eliminated with respect to turkey;*

*B.    The prices of turkey have been fixed, raised, stabilized, or maintained at artificially inflated levels;*

*C.    Direct purchasers of turkey have been deprived of free and open competition; and*

*D.    Direct purchasers of turkey, including plaintiffs, paid artificially inflated prices.*

141.    Hormel Foods denies the allegations set forth in paragraph 141.

*142.    Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge paid by the direct purchasers. Thus, the economic harm to plaintiffs and the class members can be quantified.*

142.    Hormel Foods denies the allegations set forth in paragraph 142.

US.129806071.10

*143.    The purpose of the conspiratorial conduct of defendants and their co-conspirators was to raise, fix, or maintain the price of turkey and, as a direct and foreseeable result, plaintiffs and the Class paid supra-competitive prices for turkey during the Class Period.*

143.    Hormel Foods denies the allegations set forth in paragraph 143.

*144.    By reason of the alleged violations of the antitrust laws, plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for turkey than they would have paid in the absence of defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.*

144.    Hormel Foods denies the allegations set forth in paragraph 144.

*145.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.*

145.    Hormel Foods denies the allegations set forth in paragraph 145.

## VII.    CAUSE OF ACTION

## VIOLATION OF THE SHERMAN ACT

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**FOR CONSPIRACY TO EXCHANGE COMPETITIVE**
**INFORMATION 15 U.S.C. § 1**
**(ON BEHALF OF NATIONWIDE CLASS FOR**
**INJUNCTIVE AND EQUITABLE RELIEF AND**
**DAMAGES)**

*146.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

146.    Hormel Foods incorporates and reasserts, as though fully set forth herein, each and every response and answer set forth in the preceding paragraphs of this Answer.

*147.    Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 2010, and continuing at least until January 1, 2017, the exact dates being unknown to plaintiffs,*

*defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.*

147.    Hormel Foods denies the allegations set forth in paragraph 147.

*148.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of defendants' affairs.*

148.    Hormel Foods denies that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS participated in any way in a "combination" or "conspiracy" prohibited by law, and therefore denies the allegations set forth in paragraph 148.

*149.    Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for turkey throughout the United States.*

149.    Hormel Foods denies that Hormel Foods Corporation; Hormel Foods, LLC; and/or JOTS engaged in any anticompetitive acts, and therefore denies the allegations set forth in paragraph 149.

*150.    The relevant product market is turkey and the relevant geographic market is the continental United States.*

150.    Hormel Foods denies the allegations set forth in paragraph 150.

*151.    Defendant integrators possess market power in the Relevant Market. Defendant integrators and their co-conspirators controlled approximately 80 percent of the Relevant Market. Defendant integrators' collective market power includes the power to artificially deflate the*

*amount of turkey produced in the United States below competitive levels and to artificially inflate the price plaintiffs pay for turkey above competitive levels.*

151.     Paragraph 151 contains conclusions of law to which no response is required. To the extent a response is required, Hormel Foods denies the allegations in paragraph 151.

*152.     Defendants could impose an increase in the price of turkey collectively without causing many consumers to switch their purchases to another product. Turkey constitutes a unique product market.*

152.     Hormel Foods denies the allegations set forth in paragraph 152.

*153.     Defendants view the turkey products as fungible. Turkey products are generally interchangeable, permitting defendant integrators to readily to compare and match each other's pricing.*

153.     Hormel Foods denies the allegations set forth in paragraph 153.

*154.     The information regularly exchanged by defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public information about current supply, production and pricing plans regarding turkey. The information exchanges specifically included the exchange through Agri Stats of weekly and monthly reports regarding defendants' turkey operations, including weekly sales data that allowed defendants to compare their prices with their competitors and raise prices that were lower.*

154.     Hormel Foods denies the allegations set forth in paragraph 154.

*155.     Defendants' regular information exchanges through Agri Stats reflected concerted action between horizontal competitors in the market for turkey.*

155.     Hormel Foods denies the allegations set forth in paragraph 155.

US.129806071.10

*156.    Each defendant integrator furnished competitively sensitive information to other defendant integrators with the understanding that it would be reciprocated. Agri Stats enforced this understanding by requiring defendants to share data in order to receive comparable data.*

156.    Hormel Foods denies the allegations set forth in paragraph 156.

*157.    The agreement to regularly exchange detailed and non-public information about current production, supply, and pricing suppressed competition between the defendants. Agri Stats specifically identified for defendants the instances where their pricing was lower than other defendants and where they could raise their prices to match.*

157.    Hormel Foods denies the allegations set forth in paragraph 157.

*158.    When defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly, defendants used the data obtained through Agri Stats to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the turkey market. This strategic information was a material factor in defendant integrators' decisions to inflate the prices that plaintiffs paid for turkey during the Class Period.*

158.    Hormel Foods denies the allegations set forth in paragraph 158.

*159.    Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.*

159.    Hormel Foods denies the allegations set forth in paragraph 159.

US.129806071.10

*160.    The information-exchange agreement has had the effect of (1) reducing and suppressing competition among defendants in the market for turkey in the United States and (2) inflating the prices of turkey during the Class Period.*

160.    Hormel Foods denies the allegations set forth in paragraph 160.

*161.    As a result of defendants' unlawful conduct, plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for turkey.*

161.    Hormel Foods denies the allegations set forth in paragraph 161.

*162.    As a direct and proximate result of defendants' anticompetitive conduct, plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for turkey than they would have paid and will pay in the absence of the conspiracy.*

162.    Hormel Foods denies the allegations set forth in paragraph 162.

*163.    The alleged contract, combination, or conspiracy is also a per se violation of the federal antitrust laws.*

163.    In response to the allegations set forth in paragraph 163, Hormel Foods states that any claim for a *per se* violation of federal antitrust laws has been dismissed by the Court. To the extent that a response is required, Hormel Foods denies the allegations in paragraph 163.

## VIII.   REQUEST FOR RELIEF

In response to Plaintiffs' request for relief as set forth in paragraphs 164 through 171, Hormel Foods denies that Plaintiffs are entitled to any relief on any of their claims, and request that Plaintiffs take nothing from Hormel Foods by this litigation.

US.129806071.10

## IX.    JURY TRIAL DEMANDED

Pursuant to the Federal Rules of Civil Procedure 38, Hormel Foods demands a trial by jury on all claims so triable.

## AFFIRMATIVE DEFENSES

1.      Plaintiffs' claims and the claims of any putative class members fail to state a claim upon which relief may be granted.

2.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because the conduct of Hormel Foods was procompetitive, reasonable, and permissible, and was based upon independent, legitimate, and self-interested business and economic justifications.

3.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because Plaintiffs have not suffered any injury in fact and/or any injury cognizable under the antitrust laws, and lack standing to bring this action against Hormel Foods.

4.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because any alleged injuries and damages were not legally or proximately caused by any acts or omissions of Hormel Foods and/or were caused, if at all, solely and proximately by the conduct of Plaintiffs or third parties including, without limitation, the prior, intervening or superseding conduct of such Plaintiffs or third parties.

5.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because Plaintiffs failed to mitigate any damages they may have suffered.

6.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of estoppel, laches, and waiver.

US.129806071.10

7.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because the applicable statute of limitations has lapsed with respect to such claims. Plaintiff filed this action on December 19, 2019. Plaintiff has not pled any event that would toll any applicable limitations period. As such, the statutory time limitation applicable to some or all of Plaintiffs' claims has passed, and Plaintiffs' claims are thus time-barred.

8.      Plaintiffs' claims and the claims of any putative class members for injunctive relief or other equitable relief are barred, in whole or in part, by the doctrine of unclean hands.

9.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of accord and satisfaction.

10.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, based on their ratification of, and consent to, the conduct of Hormel Foods.

11.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, to the extent that they have agreed to arbitration or chosen a different forum for the resolution of their claims.

12.      Plaintiffs' claims, and the claims of any putative class members, are barred, in whole or in part, to the extent that Plaintiffs entered into cost-plus contracts with parties who purchased from Plaintiffs before Plaintiffs began paying any purported overcharge.

13.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, to the extent Plaintiffs seek to impose liability on Hormel Foods based on the exercise of any person's or entity's right to petition federal, state and local legislative and administrative bodies, because such conduct was immune from antitrust claims under the *Noerr-Pennington* doctrine and/or privileged under the First Amendment to the U.S. Constitution.

US.129806071.10

14. Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because to the extent Plaintiffs suffered any injury or incurred any damages as alleged in the Complaint—which Hormel Foods denies—any such injury or damage was caused and brought about by intervening or superseding events, factors, occurrences, conditions, or acts of others, including forces in the marketplace or avian diseases, and not by the alleged wrongful conduct on the part of Hormel Foods.

15. Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the right of Hormel Foods to set off any amounts paid to Plaintiffs by any Defendants other than Hormel Foods who have settled, or do settle, Plaintiffs' claims against them in this action.

16. Plaintiffs' claims and claims of any putative class members are barred, in whole or in part, to the extent they seek improper multiple damage awards, and damage awards duplicative of those sought in other actions, in violation of antitrust law and the Due Process guarantees of the Fifth and Fourteenth Amendments of the United States Constitution.

17. Plaintiffs' claims and claims of any putative class members are barred, in whole or in part, because the alleged damages, if any, are too speculative, uncertain, and not of the nature or to the extent alleged.

18. Hormel Foods adopts and incorporates by reference any and all other defenses asserted by any other Defendant to the extent that the defense would apply to Hormel Foods.

19. Hormel Foods reserves the right to assert and rely upon such additional affirmative defenses as may become available or apparent as discovery commences and progresses in this litigation, or in the event of any future change in the nature and scope of this litigation.

76

Dated: December 4, 2020.

        */s/ Emily E. Chow*

Colby A. Kingsbury
FAEGRE DRINKER BIDDLE & REATH LLP
311 S. Wacker Dr., #4300
Chicago, IL 60606
Telephone: (312) 212-6500
Facsimile: (312) 212-6501
Email: Colby.Kingsbury@Faegredrinker.com

Richard A. Duncan *(Pro Hac Vice)*
Craig S. Coleman *(Pro Hac Vice)*
Emily E. Chow *(Pro Hac Vice)*
Isaac B. Hall *(Pro Hac Vice)*
FAEGRE DRINKER BIDDLE & REATH LLP
90 S. Seventh Street, Ste. 2200
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
Emails:
Richard.Duncan@Faegredrinker.com
Craig.Coleman@Faegredrinker.com
Emily.Chow@Faegredrinker.com
Isaac.Hall@Faegredrinker.com

Christopher A. Kreuder *(Pro Hac Vice)*
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309
Telephone: (515) 248-9000
Facsimile: (515) 248-9010
Email: Christopher.Kreuder@Faegredrinker.com

*Attorneys for Hormel Foods Corporation and
Hormel Foods, LLC*

US.129806071.10

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 4, 2020, the foregoing Defendants Hormel Foods Corporation and Hormel Foods, LLC's Answer to Class Action Complaint was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record in this matter.

*/s/ Emily E. Chow*
Emily E. Chow

US.129806071.10