## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

OLEAN WHOLESALE GROCERY
COOPERATIVE, INC. and JOHN GROSS
AND COMPANY, INC.

                         Plaintiffs,

    v.

AGRI STATS, INC., BUTTERBALL LLC,
CARGILL, INC., CARGILL MEAT
SOLUTIONS CORPORATION, COOPER
FARMS, INC., FARBEST FOODS, INC.,
FOSTER FARMS, LLC, FOSTER
POULTRY FARMS, THE HILLSHIRE
BRANDS COMPANY, HORMEL FOODS
CORPORATION, HORMEL FOODS, LLC,
HOUSE OF RAEFORD FARMS, INC.,
KRAFT HEINZ FOODS COMPANY,
KRAFT FOODS GROUP BRANDS LLC,
PERDUE FARMS, INC., PERDUE FOODS
LLC, TYSON FOODS, INC., TYSON
FRESH MEATS, INC. AND TYSON
PREPARED FOODS, INC.,

                         Defendants.

Case No. 1:19-cv-08318
Honorable Virginia M. Kendall

## AGRI STATS, INC'S ANSWER AND DEFENSES TO
## OLEAN WHOLESALE GROCERY COOPERATIVE, INC. &
## <u>JOHN GROSS AND COMPANY, INC.'s COMPLAINT</u>

Defendant Agri Stats, Inc., by its attorneys, Hogan Lovells US LLP, as and for their Answer and Affirmative Defenses to Olean Wholesale Grocery Cooperative, Inc. & John Gross And Company, Inc.'s Complaint (the "Complaint"), state as follows:

## I.    NATURE OF ACTION

1.      The turkey integrator defendants are the leading suppliers of turkey in an industry with approximately $5 billion in annual commerce. The turkey industry is highly concentrated, with a small number of large producers in the United States controlling supply. Defendants and their co-conspirators collectively control approximately 80 percent of the wholesale turkey market in the United States. The turkey integrator defendants are Butterball LLC (Butterball); Cargill Inc. and Cargill Meat Solutions Corporation, (together and separately, Cargill); Cooper Farms, Inc. (Cooper Farms); Farbest Foods, Inc., (Farbest); Foster Farms LLC and Foster Poultry Farms (together and separately, Foster Farms); Hormel Foods Corporation and Hormel Foods LLC (together and separately, Hormel); House of Raeford Farms, Inc., (House of Raeford); Kraft Heinz Foods Company and Kraft Foods Group Brands LLC (together and separately, Kraft Foods), Perdue Farms, Inc. and Perdue Foods LLC (together and separately, Perdue); Tyson Foods, Inc., The Hillshire Brands Company, Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. (together and separately, Tyson).

## ANSWER:

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 1 of the Complaint, and therefore denies the same.

2.      Defendant Agri Stats is a company that provides secretive information exchange services to companies in a variety of agricultural sectors, including pork, chicken, and turkey.

## ANSWER:

Agri Stats admits that it offers procompetitive benchmarking services to pork, chicken, and turkey companies. Agri Stats denies that its services are "secretive."

3.      The turkey integrator defendants each entered into an agreement from at least 2010 to January 1, 2017, to exchange sensitive information through Agri Stats regarding their production and sales of turkey.

## ANSWER:

Agri Stats denies the allegations contained in Paragraph 3 of the Complaint.

4.      Agri Stats reports are far different from lawful industry reports. Agri Stats gathers detailed financial and production data from each of the turkey integrators, standardizes this

information, and produces customized reports and graphs for the co-conspirators. On a monthly basis, Agri Stats provides the turkey integrators with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information).

**ANSWER:**

Agri Stats admits that it receives data from its subscribers regarding their Turkey business and that it uses that data in the reports it produces. Agri Stats denies that the information in its reports is not the kind of information that would be disclosed in lawful industry reports. Agri Stats denies the remaining allegations contained in Paragraph 4 of the Complaint.

5.     The United States Supreme Court has long recognized that "exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects." [1] Agri Stats' sales reports prove the truth of that maxim. Agri Stats prepared monthly reports for defendants regarding their sales of turkey that identified, on a specific product by product level, the prices and returns that each defendant was obtaining on their sales of turkey. These reports, unavailable to anybody besides Agri Stats subscribers, allowed the integrator defendants to easily identify potential opportunities where their prices for turkey products were significantly lower than their competitors.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 5 of the Complaint.

6.     Turkey is the relevant product market and the geographic market is the continental United States. Defendants collectively possess market power in the market for turkey. Defendants and co-conspirators collectively possessed approximately 80 percent of the overall market share for turkeys during the Class Period.

**ANSWER:**

Paragraph 6 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

7.     Blair Snyder, a senior executive at Agri Stats, publicly stated in 2009 that "about 95% of the turkey industry [is] participating" in Agri Stats, and that for "turkey participants, pretty much it's a list of who's who in the turkey business." This is a comparable portion to the percentage of broiler chicken industry participating in Agri Stats reports, with Mr. Snyder stating that "we've got high 90 percentage of both broilers and turkeys."

**ANSWER:**

---

[1] United States v. U.S. Gypsum Co., 438 U.S. 422, 443 (1978).

To the extent the allegations in Paragraph 7 purport to describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies any remaining allegations in Paragraph 7.

8. Each one of the defendants and co-conspirators entered into an agreement to exchange information through Agri Stats. Each defendant's agreement to exchange information regarding turkey production is shown in the below 2010 excerpt from an Agri Stats presentation that lists the participants in Agri Stats' turkey reports.



**Turkey Participants**

- ✓ Ag Forte
- ✓ Butterball
- ✓ Cargill Turkey
- ✓ Carolina Turkeys
- ✓ Carroll's
- ✓ Circle-S Ranch
- ✓ Cooper's
- ✓ Farbest Foods
- ✓ Foster Farms
- ✓ Goldsboro Milling
- ✓ House of Raeford
- ✓ Jennie-O
- ✓ Lilydale
- ✓ Louis Rich
- ✓ Moroni
- ✓ Northern Pride Turkey
- ✓ Perdue Farms
- ✓ Pilgrim's Pride
- ✓ Prestage Farms
- ✓ Sara Lee
- ✓ Tarheel
- ✓ West Liberty Foods
- ✓ Willmar Poultry
- ✓ Willow Brook

(DATE)
n = 24

**ANSWER:**

Agri Stats admits that it receives data from its subscribers regarding their Turkey business and that it uses that data in the reports it produces. To the extent the allegations in the last sentence of Paragraph 8 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

9. This 2010 presentation slide shows that each of the defendant integrator and Co-Conspirator Integrators entered into an agreement to exchange information regarding their turkey operations through Agri Stats during the conspiracy period. The document directly identifies defendants Butterball, Cargill, Cooper's, Farbest, Foster Farms, House of Raeford and Perdue Farms, as participants in Agri Stats's reports on turkey. The document directly identifies Co-Conspirators Circle-S Ranch, Prestage Farms, and West Liberty Foods as participants in Agri Stats' reports on turkey. Jennie-0 is the brand name for Hormel's turkey operations and thus Hormel participated in Agri Stats' reports on turkey. The document also identifies Louis Rich, a Kraft Foods brand that produces turkey, as receiving Agri Stats reports, and thus Kraft Foods participated in Agri Stats' reports on turkey. Sara Lee's turkey operations, Hillshire Brands, was subsequently acquired by Tyson in 2014 and thus Tyson participated in Agri Stats' reports on turkey.

**ANSWER:**

Agri Stats denies that the alleged defendant integrators and alleged co-conspirators integrators agreed to exchange information with one another through Agri Stats. To the extent the allegations in Paragraph 9 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies the remaining allegations contained in Paragraph 9 of the Complaint.

10. The information exchange by the defendant integrators through Agri Stats is exactly the type of information exchange that the Supreme Court has recognized is likely to have anticompetitive effects under a rule of reason analysis. First, the data is current and forward-looking — which courts consistently hold has "the greatest potential for generating anticompetitive effects."[2] Second, information contained in Agri Stats reports is specific to the turkey producers, including information on profits, prices, costs and production levels. Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the defendant integrators to pay hefty fees over the Class Period — far in excess of any other pricing and production indices and to agree to volunteer their own data. "Public dissemination is a primary way for data exchange to realize its pro-competitive potential."[3] Agri Stats ensured that its detailed, sensitive business information was available only to the co¬conspirators and not to any buyers in the market. Thus, for example, buyers on the market could not use Agri Stats data in Agri Stats sales reports to negotiate lower prices; instead, only defendants could use it as a way to identify opportunities to raise their prices.

---

[2] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

[3] Id. at 213.

**ANSWER:**

Paragraph 10 of the Complaint contains legal assertions as to which no response is required.

To the extent a response is required, Agri Stats denies the allegations.

11.     Indeed, Agri Stats specifically marketed itself to potential participants as a way that they could "improve profitability" rather than engage in competition through production increases. Agri Stats was good to its word; its sales reports specifically identified opportunities for defendants where defendants' products were lower than that of the industry average and where defendants could consequently raise prices to meet that of their competitors.

**ANSWER:**

To the extent the allegations in Paragraph 11 purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies the remaining allegations contained in Paragraph 11 of the Complaint.

12.     Industry participants relied on Agri Stats reports in their analysis of their business operations. For example, Hormel, at its 2011 Investor Day, stated in its presentation that "when you optimize the supply chain" you "improve your relative industry position (Agri Stats)." Hormel also touted that "Jennie-0 Turkey Store is consistently one of the top companies in operating profits (Agri Stats)."

**ANSWER:**

To the extent the allegations contained in Paragraph 12 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in Paragraph 12 purport to relate to Agri Stats, Agri Stats denies the same.

13.     Confidential Witness 1 (CW1) is a former sales executive at Butterball involved in the pricing of turkeys. CW1 was employed at Butterball during the entire Class Period. CW1 stated that Butterball relied on the monthly reports issued by Agri Stats: "The company used the information to evaluate — by item, item group, price, distribution — where we stood against other turkey companies." CW1 stated that he and other sales personnel looked at Agri Stats data to see how Butterball ranked against peers in the turkey industry. CW1 stated that he personally looked at the Agri Stats data to assess costs and returns. CW1 stated that costs were an important factor in determining how Butterball set its prices.

**ANSWER:**

To the extent the allegations contained in Paragraph 13 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in Paragraph 13 purport to relate to Agri Stats, Agri Stats denies the same.

14. Confidential Witness 2 (CW2) is a former accountant at Cooper Farms. CW2 stated that Cooper Farms received monthly reports from Agri Stats. In addition, Agri Stats representatives met with Cooper Farms executives every six months. CW2 stated that Cooper Farms submitted cost information to Agri Stats every month. CW2 explained that Agri Stats reports grouped data into various types of turkey products, including deli meat and smoked meat.

**ANSWER:**

Agri Stats admits that it receives data from its subscribers regarding their Turkey business and that it uses that data in the reports it produces. Agri Stats admits that it offers a service to meet with its clients to discuss client's reports. Agri Stats denies the remaining allegations contained in Paragraph 14 of the Complaint.

15. CW2 stated that Agri Stats representatives regularly met with the Cooper Leadership Management Group, which included top management and executives from Cooper Farms. CW2 stated that "the upper group received advice" from Agri Stats. CW2 stated that the advice from Agri Stats helped Cooper Farms improve its returns per pound.

**ANSWER:**

Agri Stats admits that it offers a service to meet with its clients to discuss client's reports. Agri Stats denies the remaining allegations contained in Paragraph 15 of the Complaint.

16. Agri Stats reports also contained detailed information on industry-wide supply levels. For example, a job description of an Agri Stats employee stated that they analyzed Turkey "breeder flock and hatchery data" as well as Turkey "growout flocks."

**ANSWER:**

To the extent the allegations in Paragraph 16 purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any

characterization or description that is inconsistent therewith or taken out of context. Agri Stats

lacks knowledge or information sufficient to form a belief concerning the truth of the remaining

allegations contained in Paragraph 16 of the Complaint, and therefore denies the same.

17. Based on publicly available information filed in a February 7, 2018, complaint in the *Broiler Chicken Antitrust Litigation,*[4] Agri Stats data on growout flocks contained information such as the number of broilers placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (aka, "down time"), feed conversion rate (pounds of feed per pound of broiler), and average daily weight. On information and belief, the growout data that Agri Stats compiled for the turkey industry contained similar levels of data. This type of data allowed defendants to monitor industry-wide supply levels.

**ANSWER:**

To the extent the allegations in Paragraph 17 of the Complaint purport to characterize or

describe documents or other sources, Agri Stats states that such documents speak for themselves

and denies any characterization or description that is inconsistent therewith or taken out of

context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the remaining allegations contained in Paragraph 17 of the Complaint, and therefore denies the

same.

18. Although Agri Stats reports are nominally anonymous, defendant integrators were often able to deanonymize the reports to identify the data of specific companies based on their industry knowledge. CW2 stated that he could determine the identity of companies in Agri Stats reports because "you could usually figure out who was who because they have a certain cooked meat, or if they were browning and running it through an oven." CW2 further stated that "we could sit there and discuss it, because a lot of us knew what the other plants in the big areas, what they did." For example, CW2 stated that one competitor company had five separate facilities included in the Agri Stats reports, and that therefore, it was easy to determine the identity of that company.

**ANSWER:**

Agri Stats admits that it anonymizes the reports. Agri Stats denies the remaining

allegations contained in Paragraph 18 of the Complaint.

---

[4] *In re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.) (ECF No. 710)

19.    Confidential Witness 3 (CW) is a former employee of Cargill during the conspiracy period. CW3 stated that Cargill received monthly reports from Agri Stats on turkey. CW3 stated that the monthly Agri Stats turkey reports went directly to Cargill finance executives.

**ANSWER:**

Agri Stats admits that it receives data from its subscribers regarding their Turkey business

and that it uses that data in the reports it produces. Agri Stats lacks knowledge or information

sufficient to form a belief concerning the truth of the remaining allegations contained in Paragraph

19 of the Complaint, and therefore denies the same.

20.    Throughout the conspiracy period, defendant integrators were able to exercise a remarkable level of industry-wide restraint in keeping the growth of turkey supply in check, causing turkey prices to rise. Thus, Agri Stats had the anticompetitive effect of allowing defendants to engage in collusion to restrain the supply of turkey by facilitating information exchange about supply levels throughout the industry. The industry-wide cuts in turkey production during the conspiracy period are shown in the following chart:



**ANSWER:**

To the extent the allegations in Paragraph 20 of the Complaint purport to characterize or

describe documents or other sources, Agri Stats states that such documents speak for themselves

and denies any characterization or description that is inconsistent therewith or taken out of

context.  Agri Stats denies the remaining allegations contained in Paragraph 20 of the Complaint.

21.    In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should correspond

to falling prices. However, in the turkey market during the conspiracy period, production, measured through USDA data, remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly. These observed price and output dynamics, shown in the below analysis performed by plaintiffs' experts, indicate that it was not falling demand that caused a decline in supply during the conspiracy period.



**ANSWER:**

Paragraph 21 of the Complaint contains legal assertions as to which no response is required.

To the extent a response is required, Agri Stats denies the allegations.

22.    In addition to their participation in Agri Stats, defendant integrators had frequent opportunities to communicate, in conjunction with formal meetings of various trade associations. In particular, the National Turkey Federation each year held regular meetings, including the NTF Annual Convention and the NTF Leadership conference, which were widely attended by the defendant integrators. CW3 stated that senior Cargill executives, including Cargill's CEO and CFO, attended National Turkey Federation meetings. For example, CW2 stated that Cooper Farms leadership were involved in the National Turkey Federation, for example Cooper Farms COO Gary Cooper served as immediate past chairman of the NTF board in 2014.

**ANSWER:**

To the extent the allegations in Paragraph 22 of the Complaint relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a believe concerning the truth of the allegations, and therefore denies the same. To the extent the remaining allegations in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

23.    Collectively, Hormel, Cargill, and Butterball control approximately 50 percent of the turkey market. Hormel is the only publicly traded company among these three. In its earnings calls during the conspiracy period, Hormel repeatedly discussed the industry-wide success in

executing production cuts and maintaining industry-wide production discipline during the Class Period.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 23 of the Complaint, and therefore denies the same.

24.     On June 2, 2009, Hormel emphasized that it was making production cuts in response to an alleged oversupply in the market and closely monitoring the overall level of production in the market, showing the importance of the kind of information exchanged through Agri Stats:

> There is an oversupply of turkey. There continues to be perhaps more production as well as cold storage stocks than the demand would warrant. We have been very deliberate about making the appropriate production cuts. We announced them over a year ago. And we have even exceeded the amount we expected to reduce. We have seen the placements and indicators of forward looking supply come down, so that was as expected, and we expected the second half of 2009 to be a little kinder in the turkey side of the business, but there is still a lot of storage, cold storage stocks to go through, we feel comfortable that we've cleaned up our inventories that we had on hand. Our production cuts were more than the decrease in our sales because we did work off inventories. I had a feeling the industry will rebound. It's going to take a work through of the excess inventories as well as those production cuts hitting the marketplace.

**ANSWER:**

To the extent the allegations in Paragraph 24 of the Complaint purport to characterize or

describe documents or other sources, Agri Stats states that such documents speak for themselves

and denies any characterization or description that is inconsistent therewith or taken out of context.

To the extent the allegations in Paragraph 24 of the Complaint relate to other Defendants and/or

third parties to this action, Agri Stats lacks knowledge or information sufficient to form a believe

concerning the truth of the allegations, and therefore denies the same.  To the extent the remaining

allegations in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

25.     On August 20, 2010, Hormel stated, "We think the turkey business has reached a good equilibrium, and we don't have any major expansion plans and have not heard others in that mode, so I think those conditions should remain favorable into next year."

**ANSWER:**

To the extent the allegations in Paragraph 25 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent the allegations in Paragraph 25 of the Complaint relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a believe concerning the truth of the allegations, and therefore denies the same. To the extent the remaining allegations in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

26.     On May 25, 2011, Hormel stated that the turkey industry was maintaining solid pricing based on the information that Hormel was receiving about industry-wide turkey production levels: "We certainly see egg set and poultry placement numbers that take us through the end of this year and a little bit into next fiscal year. But right now, on the basis of those numbers, on the basis of what we see in terms of production in the industry and on the basis of cold storage numbers, coupled with still strong demand on the export side, we feel that the amount of product going to market will support solid pricing on a commodity basis."

**ANSWER:**

To the extent the allegations in Paragraph 26 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent the allegations in Paragraph 26 of the Complaint relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a believe concerning the truth of the allegations, and therefore denies the same. To the extent the remaining allegations in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

27.     On August 25, 2011, Hormel stated that the turkey industry was maintaining better discipline than the poultry industry: "The industry as a whole has shown a little better discipline, perhaps, than the other poultry side of the ledger." This statement is notable because the chicken

industry is currently the subject of multiple civil lawsuits as well as a DOJ investigation of potential antitrust violations during this period of time.

**ANSWER:**

To the extent the allegations in Paragraph 27 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent the allegations in Paragraph 27 of the Complaint relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a believe concerning the truth of the allegations, and therefore denies the same. To the extent the remaining allegations in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

28.     Furthermore, the turkey market has all of the characteristics of a market where information exchange is likely to have anticompetitive effects. Turkey is a fungible product, the market for turkey has price-based competition, the demand for turkey is relatively inelastic, and the turkey market features a trend towards price uniformity.

**ANSWER:**

Paragraph 28 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

29.     The information exchange through Agri Stats did not have the kind of characteristics that would produce procompetitive effects sufficient to outweigh the anticompetitive harms. The information exchange involved current and forward-looking data. Agri Stats regularly prepared monthly reports that contained data that was less than six weeks old. Agri Stats also only allowed companies to access the data if they themselves shared the data, thus ensuring that only defendants and other similarly situated turkey integrators who received the Agri Stats reports were able to use the data.



**ANSWER:**

Paragraph 29 of the Complaint contains legal assertions as to which no response is required.

To the extent a response is required, Agri Stats denies the allegations.

30.     During the conspiracy period, the price of turkey spiked dramatically, driven by the anticompetitive effects of the information exchange through Agri Stats regarding turkey production that helped facilitate defendants restraint over the growth in the supply of turkey.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 30 of the Complaint.

31.     The information exchange through Agri Stats in fact had anticompetitive effects on the market. Prior to the conspiracy, turkey prices closely tracked the underlying cost of feed, which is the primary input cost in the production of turkey. Beginning in 2009-2010, prices of turkey spiked to an unprecedented level, showing the anticompetitive effects of defendants' information exchange through Agri Stats. Remarkably, as demonstrated in the analysis performed by plaintiffs' experts, shown in the below chart, prices of turkey quickly returned to match underlying feed costs after litigation was filed in late 2016 in the broiler industry that centered on the anticompetitive use of Agri Stats. Defendants clearly changed their behavior after the commencement of the Broilers litigation, as Tyson dismissed their CEO, Donnie Smith, in late 2016, shortly after the first civil lawsuits were filed.



**ANSWER:**

Agri Stats denies the allegations contained in the first sentence of Paragraph 31 of the Complaint. To the extent the allegations contained in Paragraph 31 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

32.     Feed accounts for approximately 60-70% of the cost of raising a turkey. Plaintiffs' experts constructed a regression model based on the underlying feed cost that models what the "but for" price of turkey would have been if the historical relationship between feed and turkey costs had continued during the conspiracy period. The model demonstrates that the anticompetitive information exchange of data regarding turkey production through Agri Stats caused anticompetitive effects in the market for turkey.



**ANSWER:**

Agri Stats denies the allegations contained in the last sentence of Paragraph 32 of the Complaint. To the extent the allegations contained in Paragraph 32 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

33.     As a result of defendants' unlawful conduct, plaintiffs and the Class paid artificially inflated prices for turkey during the Class Period. Such prices exceeded the amount they would have paid if the price for turkey had been determined by a competitive market. Thus, plaintiffs and class members were injured by defendants' agreement to exchange information through Agri Stats regarding the turkey market.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 33 of the Complaint.

## II.     **JURISDICTION AND VENUE**

34.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure compensatory damages and injunctive relief against defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs seek to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by defendants' conduct in restricting the supply of turkey and increasing the price of turkey. Plaintiffs seek damages in excess of $5,000,000. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

**ANSWER:**

Paragraph 34 of the Complaint contains legal assertions as to which no response is required.

To the extent a response is required, Agri Stats denies the allegations.

35. Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because both Kraft Foods and Hillshire Brands are headquartered in the District, and one or more defendants transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

**ANSWER:**

Paragraph 35 of the Complaint contains legal assertions as to which no response is required.

To the extent a response is required, Agri Stats denies the allegations.

36. This Court has personal jurisdiction over each defendant because, inter alia, each defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of turkey throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

**ANSWER:**

Paragraph 36 of the Complaint contains legal assertions as to which no response is required.

To the extent a response is required, Agri Stats denies the allegations.

37. The activities of the defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 37 of the Complaint.

### III. PARTIES

**A.** Plaintiffs

38. Plaintiff Olean Wholesale Grocery Cooperative, Inc. (Olean Wholesale) is a retailers' cooperative located in Olean, New York. Its members are independent, family-owned supermarkets. Olean has served supermarkets in Western and Central New York, Western Pennsylvania, and Northeastern Ohio since 1922. Olean Wholesale is a New York corporation with its principal place of business in Olean, New York, and purchased turkey directly from one

or more defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in this Paragraph of the Complaint, and therefore denies the same.

39. John Gross and Company, Inc. (John Gross) is a full line food distributor located in Mechanicsburg, Pennsylvania. Founded in 1950, the company has been owned and operated by the Gross family for four generations. John Gross is a Pennsylvania corporation with its principal place of business in Mechanicsburg, Pennsylvania, and purchased turkey directly from one or more defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in this Paragraph of the Complaint, and therefore denies the same.

**B. Defendants**

40. Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana. Throughout the Class Period, Agri Stats acted as a co-conspirator of the turkey integrator defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among defendants and their co-conspirators.

**ANSWER:**

Agri Stats admits that it is an Indiana corporation headquartered in Fort Wayne, Indiana.

Agri Stats denies the remaining allegations contained in Paragraph 40 of the Complaint.

41. Butterball, LLC is a privately held North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Butterball and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 41 of the Complaint, and therefore denies the same.

42.     Cargill, Inc. is a privately held Delaware corporation headquartered in Minnetonka, Minnesota. During the Class Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 42 of the Complaint, and therefore denies the same.

43.     Cargill Meat Solutions Corporation is a Delaware corporation that operates as a subsidiary of Cargill, Incorporated. During the Class Period, Cargill Meat Solutions and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 43 of the Complaint, and therefore denies the same.

44.     Defendants Cargill, Inc. and Cargill Meat Solutions are collectively referred to as "Cargill."

**ANSWER:**

Paragraph 44 contains Plaintiffs' explanation of a defined term used in their Complaint, to

which no response is required.

45.     Cooper Farms, Inc. is a privately held Ohio corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Cooper Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 45 of the Complaint, and therefore denies the same.

46.     Farbest Foods, Inc. is a privately held Indiana corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Farbest and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold

turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 46 of the Complaint, and therefore denies the same.

47.     Foster Farms LLC is a privately held California corporation headquartered in Modesto, California. During the Class Period, Foster Farms LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 47 of the Complaint, and therefore denies the same.

48.     Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms LLC. During the Class Period, Foster Poultry Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of turkey, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 48 of the Complaint, and therefore denies the same.

49.     Defendants Foster Farms LLC and Foster Poultry Farms are collectively referred to as "Foster Farms."

**ANSWER:**

Paragraph 49 contains Plaintiffs' explanation of a defined term used in their Complaint, to

which no response is required.

50.     Kraft Heinz Foods Company (Kraft Heinz), an Illinois corporation with headquarters in Pittsburgh, Pennsylvania, and Chicago, Illinois, is engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Kraft Heinz and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 50 of the Complaint, and therefore denies the same.

51.     Kraft Foods Group Brands LLC is an Illinois corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Kraft Heinz and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 51 of the Complaint, and therefore denies the same.

52.     Defendants Kraft Heinz Foods Company and Kraft Foods Brands LLC are collectively referred to as "Kraft Foods."

**ANSWER:**

Paragraph 52 contains Plaintiffs' explanation of a defined term used in their Complaint, to

which no response is required.

53.     Hormel Foods Corporation is a Delaware corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 53 of the Complaint, and therefore denies the same.

54.     Hormel Foods LLC is a limited liability corporation headquartered in Austin, Minnesota. It is a wholly owned subsidiary of Hormel Foods Corporation. Hormel is engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Hormel Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 54 of the Complaint, and therefore denies the same.

55.     House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. During the Class Period, House of Raeford operated in part through a division referred to as "Columbia Farms," which is a group of broiler facilities and operations originally named Columbia Farms, Inc. and Columbia Farms of Georgia, Inc. when purchased by House of Raeford in 1998. During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**<u>ANSWER:</u>**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 55 of the Complaint, and therefore denies the same.

56.     Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland. During the Class Period, Perdue Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**<u>ANSWER:</u>**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 56 of the Complaint, and therefore denies the same.

57.     Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**<u>ANSWER:</u>**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 57 of the Complaint, and therefore denies the same.

58.     Defendants Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to as "Perdue."

**<u>ANSWER:</u>**

Paragraph 58 contains Plaintiffs' explanation of a defined term used in their Complaint, to which no response is required.

59. Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. It wholly owns and controls two subsidiaries, Tyson Prepared Foods, Inc. and Tyson Fresh Meats Inc. that slaughter and sell turkey products. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 59 of the Complaint, and therefore denies the same.

60. Tyson Fresh Meats Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Fresh Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 60 of the Complaint, and therefore denies the same.

61. Tyson Prepared Foods, Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 61 of the Complaint, and therefore denies the same.

62. The Hillshire Brands Company (Hillshire Brands) is a Maryland corporation headquartered in Chicago, Illinois. Hillshire Brands operates as a subsidiary of Tyson Foods that sells turkey products. During the Class Period, Hillshire Brands and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 62 of the Complaint, and therefore denies the same.

63.     Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc., and Hillshire Brands are collectively referred to as "Tyson."

**ANSWER:**

Paragraph 63 contains Plaintiffs' explanation of a defined term used in their Complaint, to which no response is required.

64.     Co-Conspirator Circle S-Ranch, Inc. is a North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Circle S-Ranch and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 64 of the Complaint, and therefore denies the same.

65.     Co-Conspirator Prestage Farms is a North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Prestage Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 65 of the Complaint, and therefore denies the same.

66.     Co-Conspirator West Liberty Foods LLC (West Liberty) is an Iowa corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, West Liberty and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 66 of the Complaint, and therefore denies the same.

## IV.   FACTUAL ALLEGATIONS

67.    Starting no later than January 1, 2010, and continuing at least until January 1, 2017, defendants entered into an agreement to exchange information regarding their production and sale of turkey through Agri Stats. The information exchange through Agri Stats provided defendants an opportunity to obtain and monitor critical and competitively sensitive business information regarding each other's production and sales. The information exchange through Agri Stats had anticompetitive effects, as prices for turkey soared and defendants engaged in an industry-wide series of production cuts during the period. Notably, the information exchanged through Agri Stats was not available to purchasers of turkey, ensuring that the information exchange would not have procompetitive effects.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 67 of the Complaint.

68.    Agri Stats has played a central role in other industries, including collusion in the broiler industry.[5] As alleged in the *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill.) litigation, the broiler producers used Agri Stats as a part of their conspiracy to restrain production and inflate prices.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 68 of the Complaint.

69.    In the broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and the co-conspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, Express Markets, Inc. or EMI. Agri Stats collected data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.

**ANSWER:**

Agri Stats admits that it receives data from clients regarding production of Broiler chickens.  Agri Stats admits that it audits the data received.  Agri Stats admits that it uses the audited data to create individual reports for each client.  To the extent the allegations in Paragraph

---

[5] Broilers are chickens raised to be slaughtered before the age of 13 weeks.

69 of the Complaint purport to characterize or describe documents or other sources, Agri Stats

states that such documents speak for themselves and denies any characterization or description

that is inconsistent therewith or taken out of context.

70.     The detail of these reports ensured that competitors could quickly decode the
information of their purported competitors. The *Broiler* complaints allege it was common
knowledge among producers that the detail of the Agri Stats reports allowed any reasonably
informed producer to discern the identity of the competitors' individual broiler complexes. The
broiler reports, in part, contained so few producers participating that the identities were obvious.
Other reports contained such detailed data that it could be matched with the publicly stated
aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats
purposefully circulated this information to top executives to facilitate agreement on supply,
constraints, and price.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 70 of the Complaint.

71.     In the broiler industry, it is also alleged that Agri Stats — known to its co-
conspirators to be a willing and informed conduit for illicit information exchanges — used public
and semi-public forums to convey messages to industry participants that furthered the purposes of
the conspiracy by reassuring conspirators that production cuts would continue, and by inducing
them to continue to act in concert to ensure they did. Agri Stats' own statements in the broiler
industry facilitated the implementation of the agreement to restrict supply — where Agri Stats
would transmit the intentions of the broiler producers to restrict supply.

**ANSWER:**

Agri Stats admits that its employees periodically host and present at chicken industry

events and conferences.  Agri Stats denies the remaining allegations contained in Paragraph 71 of

the Complaint.

72.     In a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the broiler
industry, it was reported:

> "Peter Carstensen, a law professor at the University of Wisconsin and
> former Justice Department antitrust lawyer who has studied Agri Stats while
> researching the modern poultry industry, casts the level of plant-by-plant
> detail in the company's reports as "unusual." He explains that information-
> sharing services in other industries tend to deal in averaged-out aggregated
> data—for example, insurance rates in a given state. Such services run afoul
> of antitrust law, he says, when they offer projections or provide data so
> detailed that no competitor would reasonably share it with another. Getting

detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "***That is what creates stability for a cartel***."

**ANSWER:**

Agri Stats denies the allegation in Paragraph 72 that Agri Stats information was used to "create[] stability for a cartel." To the extent the remaining allegations in this Paragraph purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent Paragraph 72 purports to allege legal conclusions, no response is required. To the extent a response is required, Agri Stats denies the allegations.

73. The district court noted, in denying the motions to dismiss in the *In re Broiler Chicken Antitrust Litigation* that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which suggests high antitrust concerns.[76]

**ANSWER:**

To the extent the remaining allegations in this Paragraph purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent Paragraph 73 purports to allege legal conclusions, no response is required. To the extent a response is required, Agri Stats denies the allegations.

74. Each member of the conspiracy, including the integrator defendants and co¬conspirators, were all Agri Stats subscribers. Agri Stats publicly stated that 95% of the turkey market used Agri Stats reports.

**ANSWER:**

---

[6] Memorandum Opinion and Order at 11, In re Broiler Chicken Antitrust Litigation, No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.

Agri Stats denies the existence of any "conspiracy." Agri Stats admits that the parties identified have participated in its turkey reports. To the extent the remaining allegations in this Paragraph purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

75. Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison and perform the monthly audits. Each company's financial data is reconciled to its general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations, so all company numbers are calculated the same way. CW2 stated that he was involved during the conspiracy period in the monthly transmission of cost data from Cooper Farms to Agri Stats.

**ANSWER:**

Agri Stats admits that it receives data from clients regarding production of Turkey. Agri Stats admits that it audits the data received. To the extent the allegations in Paragraph 75 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

76. Participants in the scheme received monthly detailed reports and graphs that allow them to compare their performance, sales prices, and costs to other participants. Agri Stats issues separate reports in the turkey industry to the integrator defendants regarding live operations, processing, further reprocessing, feed costs, and sales.

**ANSWER:**

Agri Stats admits that it receives data from its subscribers regarding their Turkey business and that it uses that data in the reports it produces. Agri Stats admits that the Turkey reports contained live operations, processing, further processing, feed costs, and sales reports. To the extent the allegations in Paragraph 76 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

77.     Agri Stats provided the integrator defendants with an unparalleled ability to share critical and proprietary information concerning key business metrics, such as sales, production levels and short and long-term production capacity.

**ANSWER:**

Agri Stats admits that it receives data from its subscribers regarding their Turkey business and that it uses that data in the reports it produces. Agri Stats denies the remaining allegations contained in Paragraph 77 of the Complaint. Perhaps most egregiously, Agri Stats provided monthly sales reports to defendants.

78.     One of Agri Stats' subsidiaries is Express Markets, Inc. (aka, "EMI"). On EMI's publicly available webpage Amanda Martin, an Express Markets economist states that Agri Stats "audited turkey and broiler sales and product mix data, and worked with processing and further reprocessing reports." On information and belief, the Agri Stats turkey sales reports contained sales data that was less than six weeks old.

**ANSWER:**

Agri Stats admits that it receives data from its subscribers regarding their Turkey business and that it uses that data in the reports it produces. Agri Stats admits that it audits the data received. Agri Stats admits that it uses the audited data to create individual reports for each client. To the extent the allegations in the last sentence of Paragraph 78 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies the remaining allegations contained in Paragraph 78 of the Complaint.

79.     As detailed in the recently filed amended complaint in the *Pork Antitrust Litigation,* No. 18-cv-1776 (JRT/HB) (D. Minn. Nov. 06, 2019), ECF No. 392, Agri Stats allowed subscribers to its pork sales reports to compare their prices for individual products against the national average net price, and against the national top 25 percent average price. Notably, Agri Stats identified opportunities for the Pork Integrators to raise prices. For instance, for each product, Agri Stats specifically broke out the variance between the company's price and the national average price, as well as the economic impact of the variance. This allowed coconspirators to see how much more they could charge if they charged either the national average price or the average of the top 25% national average price.

**ANSWER:**

28

Agri Stats admits that it receives data from its subscribers regarding their Pork business and that it uses that data in the reports it produces. To the extent the allegations in the last sentence of Paragraph 79 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

80.     Agri Stats provided similar services to the integrator defendants regarding their production and sale of turkey. According to CW1, Agri Stats ranked the integrator defendants in their reports based on the returns (i.e. prices) that the integrator defendants received.

**ANSWER:**

Agri Stats admits that it receives data from its subscribers regarding their Turkey business and that it uses that data in the reports it produces. To the extent the allegations in the last sentence of Paragraph 80 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

81.     As detailed in the *Pork* and *Broilers* complaints, for each of its reports, Agri Stats identified the list of participants who were contributing data or information to the reports. CW1 confirmed that the reports Agri Stats prepared for the integrator defendants identified the participants that provided data for each report, which allowed defendants to understand which of their competitors were participating for each report. CW2 confirmed that the Agri Stats reports identified each of the turkey production facilities that were participating in the reports.

**ANSWER:**

Agri Stats admits that it receives data from its subscribers regarding their Turkey, Pork, or Broiler business and that it uses that data in the reports it produces. To the extent the allegations in the last sentence of Paragraph 81 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

82.    One presentation from Agri Stats shows the level of detail provided to competitors regarding profits in the swine market. On information and belief, similar levels of detail were provided to defendants who received Agri Stats reports in the turkey market.

### Top 25% in Profit - Variances to Average Company - 2009-2007

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed Ston | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -38.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 60.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.89 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 101.89 | 107.27 | 98.93 | |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

36,001,069 Pigs Finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed Ston | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.48 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

30,765,319 Pigs finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed Ston | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |

22,306,500 Pigs finished

## ANSWER:

To the extent the allegations in Paragraph 82 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

83.    The purpose of these reports was not to provide better prices to consumers or to lower the costs of production. Instead, the clear purpose was to improve the profitability of the co-conspirators. The particular Agri Stats report referenced above shows the ranking of each company in profitability and compares the company to its competitors by providing the variance from the average. The Agri Stats report actually circulated to competitors contained even further detail. This underlines that the purpose of these reports was not to allow consumers to save more money through lower prices and more efficient production — in fact, the opposite was true, the purpose was the profitability of the defendant companies and the impact was higher sales prices for consumers.

## ANSWER:

To the extent the allegations in the first and second sentence of Paragraph 83 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations in the first and second sentence of Paragraph 83 purport to relate to Agri

Stats, Agri Stats denies the same. To the extent the remaining allegations in Paragraph 83 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

84. Much of the information shared by Agri Stats and the co-conspirators was unnecessary to achieve any benefits for consumers. Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 84 of the Complaint.

85. Agri Stats knew that it played a central role in facilitating this anticompetitive information exchange. One presentation from Agri Stats regarding the swine industry spoke directly on this point, pointing out to industry participants that they could not undertake such a detailed cost analysis between competitors without Agri Stats auditing and standardizing the data:

*Data Integrity*

- Benchmarking is very important but it is hard to make sure data is comparable across companies.

- Even if all companies include the same costs the costs can be calculated differently.

- Lots of variation in cost accounting in industry.

- Companies can select key metrics, common calculations and implement an effective benchmarking program.



**ANSWER:**

To the extent the remaining allegations in Paragraph 85 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies the remaining allegations contained in Paragraph 85 of the Complaint.

86.     Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine *tolerance and outlier status and enforce,"* they must "[Nave an administrator to compile the data and enforce procedures," and most importantly, *"Mach participant has to commit."*

**ANSWER:**

To the extent the allegations in Paragraph 86 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

87.     According to CW1, Agri Stats gave live presentations to defendant integrators to explain to them how to use the reports that Agri Stats prepared on the turkey industry and how to compare themselves against their competitors: during the presentations, Agri Stats said, "if you are number one priced out of 13, that meant the return was so much versus the other companies."

**ANSWER:**

Agri Stats admits that it offers a service to meet with its clients to discuss client's reports.

Agri Stats denies the remaining allegations contained in Paragraph 87 of the Complaint.

88.     It is the standard policy of Agri Stats that it will only grant access to Agri Stats reports to similarly situated companies that themselves share data with Agri Stats. This ensures that data from Agri Stats is only available to one side of the market — the integrator defendants. The other side of the market, purchasers of turkey, is not allowed to access the Agri Stats data, and thus cannot use Agri Stats data to negotiate lower prices. Thus, Agri Stats reports function as a one-way ratchet that can be used for anticompetitive purposes by defendants but not for procompetitive purposes by purchasers.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 88 of the Complaint.

89.     One tool that courts use to assess the competitive effects of concerted action is defining a relevant market — the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). The case concerns the sale of turkey for meat consumption in the United States.

**ANSWER:**

Paragraph 89 of the Complaint contains legal assertions as to which no response is required.

To the extent a response is required, Agri Stats denies the allegations.

90.     There is a single market for turkey for meat consumption. Prices for turkey sold in the United States are quoted generally in disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

**ANSWER:**

Paragraph 90 of the Complaint contains legal assertions as to which no response is required.

To the extent a response is required, Agri Stats denies the allegations.

91.     The relevant geographic market is the United States.

**ANSWER:**

Paragraph 91 of the Complaint contains legal assertions as to which no response is required.

To the extent a response is required, Agri Stats denies the allegations.

92.     The existence of high barriers to entry is one factor which makes markets susceptible to collusion. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel. High barriers to entry in the turkey processing market exist, precluding other entrants or would-be competitors from entering the market for turkeys raised for consumption.

**ANSWER:**

Paragraph 92 of the Complaint contains legal assertions as to which no response is required.

To the extent a response is required, Agri Stats denies the allegations. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in Paragraph 92 of the Complaint, and therefore denies the same.

93.     During the Class Period and continuing today, substantial barriers impede entry into the turkey market. A new entrant into the market would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, equipment, energy, transportation. Distribution, infrastructure (aka "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, long-standing customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.

**ANSWER:**

Paragraph 93 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in Paragraph 93 of the Complaint, and therefore denies the same

94. The price of construction of a new integrated turkey processing complex is relatively high. For example, the cost for a current market participant, Virginia Poultry Growers Cooperative, to construct a new turkey processing in 2015 was 562 million.[7]

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 94 of the Complaint, and therefore denies the same.

95. The turkey market has been subject to steadily increasing consolidation over the last several decades. In the 1970s, the turkey market was defined by competition among dozens of companies that worked with independent farmers.[8] But now, just four corporations — Cargill, Hormel, Butterball, and Farbest produce more than half of the turkey in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 95 of the Complaint, and therefore denies the same.

96. The turkey market also has high levels of vertical integration that constitute a barrier to entry. The National Turkey Federation states that "turkey companies are vertically integrated, meaning they control or contract for all phases of production."[9]

**ANSWER:**

---

[7] *Virginia Poultry Growers Cooperative Plans Turkey Processing Facility in Hinton,* Virginia, Area Development (July 22, 2015), *available at* haps ://www. areadevelopment.cominewsItems/7-22-2015/virginia-poultry-growers -c oop erative -processing- facility-hinton-virginia565489.shtmL

[8] Christopher Leonard, *That Turkey on Your Plate Could Use Some More Industry Competition,* The Washington Post (Nov. 22, 2013), *available at* https://www.washingtonpost.com/opinions/that-turkey-on-your-plate-could-use-some-more-industry-competition/2013/11/22/045fc470-5177-11e3-a7f0-b790929232el_story.html.

[9] *Industry Structure,* National Turkey Federation, https://www.eatturkey.org/industry-structure/ (last visited Dec. 16, 2019).

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 96 of the Complaint, and therefore denies the same.

97. For example, Butterball has over 175 farms that they own, as well as contracts with numerous independent farmers. Jennie-0 owns over 100 commercial growing farms. Cargill owns around 700 farms. Farbest has more than 200 contract growers.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 97 of the Complaint, and therefore denies the same.

98. The integrator defendants possess market power in the market for turkey for consumption. Defendants and their co-conspirators controlled an average of 77% of the market from 2010-2018.



**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth

of the allegations contained in Paragraph 98 of the Complaint, and therefore denies the same.

99. Competition is likely to be harmed when competitors with market power in concentrated markets, such as the market at issue, directly exchange strategic information about current and forward-looking plans for prices and supply. The strategic information exchanged between the defendants was competitively sensitive and a material factor in

negotiations. Price, capacity, supply and costs are crucial aspects of competition. When defendants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects of sales of turkey.

**ANSWER:**

The allegations contained in Paragraph 99 of the Complaint contain legal conclusions to which no response is required. To the extent a response is needed Agri Stats denies the allegations in Paragraph 99 of the Complaint.

100. The information exchange took place in private settings and involved the exchange of confidential, non-public information.

**ANSWER:**

Agri Stats admits that it receives data from its subscribers regarding their Turkey business and that it maintains the confidentiality of the information it receives from its subscribers.

101. The market for turkey is characterized by numerous attributes that mean the type of information exchange facilitated by Agri Stats are particularly likely to have anticompetitive effects. In particular, the market for turkey features relatively few sellers, a fungible product, price-based competition, inelastic demand, and a trend toward price uniformity.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 101 of the Complaint.

102. The turkey market is concentrated, with relatively few sellers. The defendants and co-conspirators control approximately 80 percent of turkey production and processing. The presence of few companies supports the inference that a conspiracy to exchange information had the intended effect of restraining competition.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 102 of the Complaint, and therefore denies the same.

103. One of the distinct characteristics of the turkey industry is its fungibility, also known as the ability to be freely exchangeable or replaceable in whole or in part. Common sense indicates at Thanksgiving that a consumer can substitute a whole turkey produced by Butterball with a whole turkey produced by Cargill.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 103 of the Complaint, and therefore denies the same.

104.    Indeed, the Agri Stats reports themselves show that turkey is fungible because they aggregate data across defendants for particular types of turkey products and allow defendants to compare detailed information on prices for the same fungible product. CW1 confirmed that the Agri Stats reports were organized by specific item of turkey product.

**ANSWER:**

To the extent the allegations in Paragraph 104 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 104 of the Complaint, and therefore denies the same.

105.    Turkey is a commodity market that faces price-based competition.

**ANSWER:**

Paragraph 105 of the Complaint contains legal assertions as to which no response is required.  To the extent a response is required, Agri Stats denies the allegations.

106.    Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[10] A PED value between 0 and -1 indicates there is inelastic demand for the good or service — i.e., a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. The USDA has estimated that the average PED estimate for the turkey market is -0.58 — meaning the demand for turkey is inelastic. Indeed, most American consumers eat turkey at Thanksgiving, not pork or chicken, illustrating that there is no substitute for one of the key demand drivers of turkey.

**ANSWER:**

---

[10] *See, e.g.,* Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson, et al., *Price Elasticity of Demand* (Nov. 13, 1997), https://scholar.harvard.edu/files/alada/files/price_ elasticity of demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, *The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects,* 33 J. Academy Mktg. Science 66-78 (2005), *available at* http://www.math.tau.ac.ili—fibich/Manuscripts/elasticityJAMS.pdf.

Paragraph 106 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations. To the extent the allegations in Paragraph 106 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

107. Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. For example, whole turkey products are produced on a commercial scale and sold in supermarkets. Whole turkeys are virtually indistinguishable, with similar nutritional values, branding and packaging.

**ANSWER:**

Paragraph 107 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

108. As demonstrated in the following chart, the turkey integrators acted in a concerted way to decrease turkey supply in 2009, 2013, 2014, and 2015. Overall, industry supply decreased significantly from 2009 to 2015, before rebounding in 2016. The information exchange through Agri Stats facilitated the ability of defendants to monitor total industry levels of supply.



Figure 1: U.S. Turkey Total Heads Slaughtered

**ANSWER:**

To the extent the allegations in the first sentence of Paragraph 108 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient

to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations in the first sentence of Paragraph 108 purport to relate to Agri Stats, Agri Stats denies the same. To the extent the remaining allegations in Paragraph 108 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

109.    Beginning in 2010, the turkey industry showed abnormal price movements, *i.e.,* price increases for the average turkey whole price unexplained by increases in costs. All of these pricing measurements show a significant break between pricing prior to 2010 and pricing after 2010, supporting the plausibility of anticompetitive effects on the turkey market from the information exchange conducted through Agri Stats. Plaintiffs have measured the various abnormal pricing movements in a number of ways, including: (i) the average turkey price, (ii) the turkey integrators' margin during the Class Period;(iii) the variation between feed and turkey prices before and during the Class Period; and (iv) a regression analysis that models the relationship between turkey prices and feed prices.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 109 of the Complaint.

110.    According to aggregate prices published by the USDA, the average wholesale price per pound for turkey hens was between $0.55 and $0.85 every year from 2000 to 2009, before steadily increasing to $1.15 by 2016. Following initiation of the *Broilers* litigation, the price of turkey then quickly returned to the price at which it was prior to the conspiracy. The following graph shows the unprecedented increase in turkey prices beginning in 2009, and staying elevated through the end of 2016.



**ANSWER:**

To the extent the allegations in Paragraph 110 purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in this Paragraph, and therefore denies the same.

111.     Plaintiffs' experts examined the spread between turkey revenue and turkey-related costs (costs of goods sold + operating costs) for Jennie-0 Turkey, the only one of the three largest turkey integrator defendants with public earnings, as a proxy for measuring the spread between a defendant's price of wholesale turkey and their turkey costs.[11] This measurement accounts for defendant-specific operating costs. This analysis confirms the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the Class Period in 2009.

**ANSWER:**

To the extent the allegations in the remaining sentences relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the remaining allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

112.     The following chart shows a break in revenues and costs around the start of the Class Period in 2010 for Hormel's Jennie-0 turkey brand:

---

[11] Hormel does not make any data publicly available on Jennie-O's costs. Therefore, plaintiffs have assumed for the purposes of this analysis that Jennie-O's costs are the same proportion to Hormel's overall costs as Jennie-O's revenues are to Hormel's overall revenues.



**ANSWER:**

To the extent the allegations contained in Paragraph 112 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in Paragraph 112 purport to relate to Agri Stats, Agri Stats denies the same.

113. The anticompetitive effect of defendants' information exchange is seen in the dramatic increase in Jennie-0 Turkey's spread between revenue and costs after the start of the conspiracy period.

**Figure 4: Jennie-O Turkey's spread: Revenue minus Cost 2001-2018**



**ANSWER:**

To the extent the allegations contained in Paragraph 113 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in Paragraph 113 purport to relate to Agri Stats, Agri Stats denies the same.

114. These analyses of the spread between costs and prices confirm one essential fact that rising costs do not explain the increases in price seen during the Class Period.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 114 of the Complaint, and therefore denies the same.

115. In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should correspond to falling prices. However, in the turkey market during the conspiracy period, production, measured through USDA data, remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly. These observed price and output dynamics, shown in the below chart, are consistent with an anticompetitive effect on turkey output facilitated by the information exchange through Agri Stats.



**ANSWER:**

To the extent the allegations contained in Paragraph 115 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in Paragraph 115 purport to relate to Agri Stats, Agri Stats denies the same.

116. Feed is the primary driver of turkey costs, accounting for approximately 60-70% of the overall cost of raising turkeys for sale according to the New York Times.[12] Prior to the conspiracy period, there was a tight relationship between the price of feed and the price of turkey, as would be expected in a competitive commodity market that was pricing its product based on its primary input cost. However, during the conspiracy period, the relationship between the price of feed and the price of turkey diverged dramatically, as would be expected as an anticompetitive effect of the information exchange that allowed the integrator defendants to charge more than was justified by their input costs. The divergence is illustrated in the below chart:

---

[12] Paul Sullivan, *In the Labyrinth of Turkey Pricing, a Reason Under Every Giblet, supra*.



**ANSWER:**

To the extent the allegations in Paragraph 116 purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in this Paragraph, and therefore denies the same.

117. To demonstrate the anticompetitive effects of defendants' information exchange on the market for turkey, plaintiffs' experts have done a regression model based on the relationship between the price of turkey hens and the price of turkey feed, which is the primary input cost for turkeys. The formula of the regression is the following:

*(HenPrice)=a-1 fl(FeedPrice)t-I-Et.* As shown below, the regression shows a significant elevation in the prices of turkey during the conspiracy period, showing the effects of the information exchange through Agri Stats:



**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 117 of the Complaint.

118.    Plaintiffs and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this complaint. Defendants engaged in a secret information exchange that did not reveal facts that would put plaintiffs or the Class on inquiry notice that there was an anticompetitive agreement to exchange information regarding the market for turkey. Throughout the Class Period, defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from plaintiffs and class members.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 118 of the Complaint.

119.    In 2009, the President of Agri Stats, Bryan Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company. *There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background*, and really our specialty is working directly with companies about their opportunities and so forth.

**ANSWER:**

To the extent the allegations in Paragraph 119 purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies the remaining allegations in Paragraph 119 of the Complaint.

120. At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidiantiall] nature of the information."

**ANSWER:**

To the extent the allegations in Paragraph 120 purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies the remaining allegations in Paragraph 120 of the Complaint.

121. Not until recently was the extent of the information exchange conducted through Agri Stats widely known or reported. Only after the filing of a February 7, 2018 Second Consolidated and Amended Complaint by the End User Plaintiff Class in the *In re Broiler Chicken Antitrust Litigation,* Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the confidential services that Agri Stats provides to its clients in the broiler industry.

**ANSWER:**

To the extent the allegations in Paragraph 121 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies the remaining allegations in Paragraph 121 of the Complaint

122. The filing of that amended complaint collectively disclosed the likelihood that the turkey industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 122 of the Complaint.

123.     Defendants concealed the extent of their information exchange through Agri Stats. Indeed, to this day, it is not publicly known the number of companies that receive Agri Stats reports regarding turkey. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of defendants' turkey prices before these recent events.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 123 of the Complaint.

124.     Defendant integrators are members of several turkey-related trade associations and other forums, which they used to facilitate their conspiratorial conduct. Turkey producers have numerous regular events through which they can communicate in person with one another. Regular and frequent attendance by defendants' CEOs and top-level executives at trade-association meetings is the norm rather than the exception.

**ANSWER:**

To the extent the allegations contained in Paragraph 124 relate to other Defendants and/or

third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief

concerning the truth of the allegations, and therefore denies the same.

125.     Nearly every defendant integrator's CEO has representatives on the board of directors or executive committee of these trade associations.

**ANSWER:**

To the extent the allegations contained in Paragraph 125 relate to other Defendants and/or

third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief

concerning the truth of the allegations, and therefore denies the same.

126.     The National Turkey Federation is a national advocate for turkey farmers and processors; members include growers, processors, hatchers, breeders, distributors, allied services, and state associations. High-ranking executives of Butterball, Jennie-0 Turkey Store (Hormel), Cargill, Tyson, Farbest, and Perdue currently serve as officers or on the executive committee; and nearly all of the defendants have membership in this trade association. In addition to regular board and executive committee meetings, the federation holds an annual convention in February and an annual leadership conference in July where these executives gather and discuss turkey-related information.

**ANSWER:**

Agri Stats admits that it is a member of the National Turkey Federation. To the extent the allegations in Paragraph 126 of the Complaint relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations purport to relate to Agri Stats, Agri Stats denies the same.

127. Upon information and belief, the top-level executives from defendants discuss topics with one another relating to pricing, production, and other non-public proprietary information outside of the National Turkey Federation's formal meetings. These regular, informal, and in-person opportunities to discuss pricing and production in the turkey industry gives CEOs and top-level executives comfort that their competitors remain committed to a plan to artificially restrict turkey production.

**ANSWER:**

To the extent the allegations in Paragraph 127 of the Complaint relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations purport to relate to Agri Stats, Agri Stats denies the same.

128. The United States Poultry & Egg Export Council (USAPEEC) has its home office in Stone Mountain, Georgia. Defendants are all members of the council. USAPEEC has a network of international offices and consultants in key export markets. The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world. The council has evolved into an advocate for the industry on trade-policy issues. USAPEEC has about 200 member companies and organizations. The council holds Board of Directors meetings quarterly and includes executives from all or nearly all defendants.

**ANSWER:**

Agri Stats admits that it is a member of the United States Poultry & Egg Export Council ('USAPEEC'). Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in this Paragraph, and therefore denies the same.

129. The U.S. Poultry & Egg Association (U.S. Poultry) describes itself as the world's largest and most active poultry organization. U.S. Poultry's members include producers and processors of broilers, turkeys, ducks, eggs, and breeding stock, as well as allied companies. Many of the defendants are members of U.S. Poultry. U.S. Poultry holds regular Board of Directors

meetings each quarter during January, March, June, and each fall. Butterball, Cargill, Foster, Tyson, and Perdue have representation on the Board of Directors.

**ANSWER:**

Agri Stats admits that it is a member of the U.S. Poultry & Egg Association ("U.S. Poultry") and that some of its employees have attended U.S. Poultry meetings at various points in time. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in this Paragraph, and therefore denies the same.

130. The North American Meat Institute (NAMI) represents companies that process 95% of red meat and 70% of turkey products in the United States and their suppliers throughout the country. NAMI hosts the Meat Industry Summit in April each year. Additionally, it hold regular Board of Director meetings. Butterball, Cargill, Hormel, and Tyson have representation on the NAMI Board.

**ANSWER:**

Agri Stats admits that it is a member of the North American Meat Institute. To the extent the allegations in Paragraph 130 of the Complaint relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in this Paragraph, and therefore denies the same.

V.     **CLASS ACTION ALLEGATIONS**

131. Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking compensatory damages and injunctive relief pursuant to federal law on behalf of the members of the following class:

> All persons and entities who directly purchased turkey from Defendants or co-conspirators for personal use in the United States during the Class Period. Specifically excluded from this Class are the Defendants and co-conspirators; the officers, directors or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant or co-conspirator. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate

family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

**ANSWER:**

Paragraph 131 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

132. Class Identity: The above-defined class is readily identifiable and is one for which records should exist.

**ANSWER:**

Paragraph 132 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

133. Numerosity: Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of defendants, retailers, resellers and other entities in the supply chain of turkey. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

**ANSWER:**

Paragraph 133 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

134. Typicality: Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs purchased turkey directly from one or more of the defendants for personal use, and therefore plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

**ANSWER:**

Paragraph 134 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

135. Common Questions Predominate: There are questions of law and fact common to the Class, including, but not limited to:

A. Whether defendants and their co-conspirators engaged in an information exchange agreement that reduced or suppressed competition in the market for turkey;

      B.      The identity of the participants of the alleged agreement;

      C.      The duration of the agreement alleged herein and the acts performed by defendants and their co-conspirators in furtherance of the agreement;

      D.      Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the plaintiffs and the other members of the Class;

      E.      The effect of defendants' alleged conspiracy on the prices of turkey sold in the United States during the Class Period; and

      F.      The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

**ANSWER:**

Paragraph 135 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

136.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class in that plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class who directly purchased turkey from defendants and plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

**ANSWER:**

Paragraph 136 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

137.    <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

**ANSWER:**

Paragraph 137 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

138. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

**ANSWER:**

Paragraph 138 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

139. Plaintiffs bring the action on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that directly purchased one or more turkey products that a defendant or co-conspirator produced during the respective class periods.

**ANSWER:**

Paragraph 139 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

140. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**ANSWER:**

Paragraph 140 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

## VI.    ANTITRUST INJURY

141. Defendants' anticompetitive conduct had the following effects, among others:

    A.    Price competition has been restrained or eliminated with respect to turkey;

    B.    The prices of turkey have been fixed, raised, stabilized, or maintained at artificially inflated levels;

    C.    Direct purchasers of turkey have been deprived of free and open competition; and

    D.    Direct purchasers of turkey, including plaintiffs, paid artificially inflated prices.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 141 of the Complaint.

142.    Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge paid by the direct purchasers. Thus, the economic harm to plaintiffs and the class members can be quantified.

**ANSWER:**

Paragraph 142 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

143.    The purpose of the conspiratorial conduct of defendants and their co-conspirators was to raise, fix, or maintain the price of turkey and, as a direct and foreseeable result, plaintiffs and the Class paid supra-competitive prices for turkey during the Class Period.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 143 of the Complaint.

144.    By reason of the alleged violations of the antitrust laws, plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for turkey than they would have paid in the absence of defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 144 of the Complaint.

145.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 145 of the Complaint.


**VII.    CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT**

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR**
**CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION**
**15 U.S.C. § 1**
**(ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND**
**EQUITABLE RELIEF AND DAMAGES)**

146.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**<u>ANSWER:</u>**

Paragraph 146 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

147.    Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 2010, and continuing at least until January 1, 2017, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**<u>ANSWER:</u>**

Agri Stats denies the allegations contained in Paragraph 147 of the Complaint.

148.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of defendants' affairs.

**<u>ANSWER:</u>**

Agri Stats denies the allegations contained in Paragraph 148 of the Complaint.

149.    Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for turkey throughout the United States.

**<u>ANSWER:</u>**

Agri Stats denies the allegations contained in Paragraph 149 of the Complaint.

150.    The relevant product market is turkey and the relevant geographic market is the continental United States.

**<u>ANSWER:</u>**

Paragraph 150 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

151.    Defendant integrators possess market power in the Relevant Market. Defendant integrators and their co-conspirators controlled approximately 80 percent of the Relevant Market. Defendant integrators' collective market power includes the power to artificially deflate the amount of turkey produced in the United States below competitive levels and to artificially inflate the price plaintiffs pay for turkey above competitive levels.

**ANSWER:**

To the extent the allegations in Paragraph 151 of the Complaint relate to other Defendants and/or third parties, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

152.    Defendants could impose an increase in the price of turkey collectively without causing many consumers to switch their purchases to another product. Turkey constitutes a unique product market.

**ANSWER:**

Paragraph 152 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

153.    Defendants view the turkey products as fungible. Turkey products are generally interchangeable, permitting defendant integrators to readily to compare and match each other's pricing.

**ANSWER:**

Paragraph 153 of the Complaint contains legal assertions as to which no response is required.

154.    To the extent a response is required, Agri Stats denies the allegations. The information regularly exchanged by defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public information about current supply, production and pricing plans regarding turkey. The information exchanges specifically included the exchange through Agri Stats of weekly and monthly reports regarding defendants' turkey operations, including weekly sales data that allowed defendants to compare their prices with their competitors and raise prices that were lower.

**ANSWER:**

Agri Stats admits that it receives data from its subscribers regarding their broiler business and that it uses that data in the reports it produces. To the extent the allegations in Paragraph 154 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations in the first sentence of Paragraph 154 purport to relate to Agri Stats, Agri Stats denies the same.

155.    Defendants' regular information exchanges through Agri Stats reflected concerted action between horizontal competitors in the market for turkey.

**ANSWER:**

To the extent the allegations in Paragraph 155 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations in  Paragraph 155 purport to relate to Agri Stats, Agri Stats denies the same.

156.    Each defendant integrator furnished competitively sensitive information to other defendant integrators with the understanding that it would be reciprocated. Agri Stats enforced this understanding by requiring defendants to share data in order to receive comparable data.

**ANSWER:**

To the extent the allegations in Paragraph 156 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations in the first sentence of Paragraph 156 purport to relate to Agri Stats, Agri Stats denies the same.

157.    The agreement to regularly exchange detailed and non-public information about current production, supply, and pricing suppressed competition between the defendants. Agri Stats specifically identified for defendants the instances where their pricing was lower than other defendants and where they could raise their prices to match.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 157 of the Complaint.

158.     When defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly, defendants used the data obtained through Agri Stats to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the turkey market. This strategic information was a material factor in defendant integrators' decisions to inflate the prices that plaintiffs paid for turkey during the Class Period.

**ANSWER:**

To the extent the allegations in Paragraph 158 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations in the first sentence of Paragraph 158 purport to relate to Agri Stats, Agri Stats denies the same.

159.     Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 159 of the Complaint.

160.     The information-exchange agreement has had the effect of (1) reducing and suppressing competition among defendants in the market for turkey in the United States and (2) inflating the prices of turkey during the Class Period.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 160 of the Complaint.

161.     As a result of defendants' unlawful conduct, plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for turkey.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 161 of the Complaint.

162.     As a direct and proximate result of defendants' anticompetitive conduct, plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for turkey than they would have paid and will pay in the absence of the conspiracy.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 162 of the Complaint.

163.    The alleged contract, combination, or conspiracy is also a *per se* violation of the federal antitrust laws.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 163 of the Complaint.

## VIII.  **REQUEST FOR RELIEF**

WHEREFORE, plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully requests judgment against defendants as follows:

164.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

165.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 165 of the Complaint.

166.    Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgments in favor of plaintiffs and the members of the Class be entered against defendants in an amount to be trebled to the extent such laws permit;

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

167.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

168.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

169.     Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

170.     Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

171.    Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

## IX.    **JURY TRIAL DEMANDED**

172.    Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

## <u>AFFIRMATIVE DEFENSES</u>

Without assuming any burden that it would not otherwise bear, Agri Stats asserts the following avoidances and defenses to Plaintiffs' claims. Federal Rule of Civil Procedure 8 sets forth the avoidances and defenses that must be affirmatively stated in a pleading. *See* Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: [identified affirmative defenses]."). To the extent necessary, Agri Stats alleges Plaintiffs' claims are barred because the acts Plaintiffs allege Agri Stats undertook in furtherance of the alleged conspiracy were in Agri Stats' unilateral business interest. Agri Stats reserves the right to assert additional avoidances and defenses as they become known during discovery and based on the record as it develops, up to and including the time of trial.

### <u>FIRST DEFENSE</u>

1. Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

2. The statute of limitations for Plaintiffs' federal claims is four years. 15 U.S.C. § 15(b). Thus, Plaintiffs' claims are barred unless Plaintiffs establish that they could not have discovered such claims within the limitations period exercising reasonable diligence.

3. Plaintiffs cannot satisfy this burden: the challenged conduct occurred more than four ago.

4. Moreover, the facts Plaintiffs cite in support of their claims were made public more than four years ago.

5. Plaintiffs' reliance on the doctrine of fraudulent concealment recycles the Complaint's underlying allegations and asserts fraudulent concealment in a conclusory fashion.

Plaintiffs cannot establish any concealment of their claims, much less fraudulent concealment of their claims.

6.    Accordingly, Plaintiffs' Complaint is time-barred.

**SECOND DEFENSE**

7.    Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have suffered neither any injury in fact nor any injury cognizable under the antitrust laws.

8.    Plaintiffs' alleged harm lies in their speculation that a conspiracy among many companies colluded seamlessly over almost a decade resulting in their harm. In essence, Plaintiffs complain about the impact of naturally unpredictable changes in the market conditions that exist in a global economy.

9.    To the extent that Plaintiffs maintain that they were injured by these events, such an injury is not cognizable under the antitrust laws.

**THIRD DEFENSE**

10.    Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to exercise reasonable care to mitigate any damages they may have suffered.

11.    The facts Plaintiffs cite in support of their claims were made public years ago. Agri Stats hereby incorporates Paragraph 4 above in support of this defense.

12.    To the extent Plaintiffs believed that Defendants agreed to cut turkey production and that such agreement had the effect of raising prices above competitive levels, Plaintiffs had an obligation to mitigate their damages by seeking other sources of supply, including from other producers.

13.    Plaintiffs' failure to exercise reasonable care to mitigate damages was the complete or partial cause of any damages Plaintiffs may have suffered.

**FOURTH DEFENSE**

14.     Plaintiffs' claims are barred, in whole or in part, because any alleged injuries and damages either were not legally or proximately caused by any acts or omissions of Defendants or were caused, if at all, solely and proximately by Plaintiffs' conduct or by the conduct of third parties including, without limitation, the prior, intervening or superseding conduct of Plaintiffs or such third parties.

**FIFTH DEFENSE**

15.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

16.     The facts Plaintiffs cites in support of their claims were made public more than four years ago.  Agri Stats hereby incorporates Paragraph 4 above in support of this defense.

17.     Plaintiffs' continued purchases of turkey at what they now allege are prices above the competitive level manifest an intention to waive any right to bring this suit and are inconsistent with any other intention.

18.     Plaintiffs, by their actions, accepted the benefits of an ongoing relationship with defendant producers and relinquished their rights to bring suit.

**SIXTH DEFENSE**

19.     Plaintiffs' claims are barred by the equitable doctrine of laches.

20.     Under the laches doctrine, "those who sleep on their rights[ ] lose them." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999).  Specifically, laches will bar relief in the face of: "(1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom." *Id.* (citing *Cannon v. Univ. of Health Sciences/Chi. Med. Sch.*, 710 F.2d 351, 359 (7th Cir. 1983)).

21.     Agri Stats hereby incorporates Paragraph 4 above in support of this defense. Plaintiffs demonstrated an unreasonable lack of diligence in bringing its claims.  As set forth in support of Agri Stats statute of limitations defense, the challenged conduct that underlies Plaintiffs' claims occurred more than four years ago.  Likewise, the specific facts Plaintiffs cites in support of its claims were publicly available long ago.  This unreasonable lack of diligence in raising its claims now bars them.

**SEVENTH DEFENSE**

22.     Plaintiffs' claims are barred, in whole or in part, due to the ratification of, and consent to, the conduct of Agri Stats.

23.     Agri Stats hereby incorporates Paragraph 4 above in support of this defense.

24.     Plaintiffs' Complaint relies on publicly available information—much of which has been available for years—thereby demonstrating its long-standing ratification of and consent to the complained-of conduct.

25.     For example, Plaintiffs have known for more than a decade that certain turkey producers participate in and receive reports from Agri Stats.  Some Plaintiffs have also received and continue to receive information from Express Markets, Inc., which includes, among other things, market analysis and long-term production and pricing forecasts.

26.     Accordingly, because Plaintiffs has been aware for years of the very same conduct it now challenges—much of which has provided Plaintiffs a direct benefit—Plaintiffs' claims are barred by the doctrine of ratification.

**EIGHTH DEFENSE**

27.     Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs seeks to impose liability on Defendants based on the exercise of any person or entity's right to petition

federal, state and local governmental bodies, including through public statements, because such conduct was immune under the *Noerr-Pennington* doctrine and privileged under the First Amendment to the U.S. Constitution.

## NINTH DEFENSE

28.     Plaintiffs' claims are barred, in whole or in part, to the extent the sales contracts pursuant to which Plaintiffs purchased turkey contain arbitration clauses or clauses providing a different forum for the resolution of their claims.  *See, e.g.*, *Cont'l Ins. Co. v. M/V Orsula*, 354 F.3d 603 (7th Cir. 2003); *West Shore Pipe Line Co. v. Associated Electric & Gas Ins. Services, Ltd.*, 791 F. Supp. 200 (N.D. Ill. 1992).

## TENTH DEFENSE

29.     Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims are barred, in whole or in part, by non-settling Defendants' right to set off any amounts paid to Plaintiffs by any Defendants who have settled, or do settle, Plaintiffs' claims against them in this action.

## ELEVENTH DEFENSE

30.     Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs entered into cost-plus contracts with parties who purchased from Plaintiffs before Plaintiffs began paying any purported overcharge.

## TWELFTH DEFENSE

31.     Plaintiffs' claims are barred, in whole or in part, to the extent they seek improper multiple damage awards, and damage awards duplicative of those sought in other actions, in

violation of the Due Process guarantees of the Fifth and Fourteenth Amendments of the United States Constitution and of the Eighth Amendment of the United States Constitution.

**THIRTEENTH DEFENSE**

32.     Plaintiffs' claims are barred, in whole or in part, by the Plaintiffs' active and knowing acquiescence, equal involvement and participation in the creation and origination of the restraints of trade alleged in the Complaint.

**FOURTEENTH DEFENSE**

33.     Upon information and belief, Plaintiffs' claims are barred, in whole or in part, by Agri Stats' right to set off any amount paid to Plaintiffs by damages attributable to Plaintiffs' conduct to the extent Plaintiffs unlawfully coordinated regarding the purchase price of turkeys, including by communicating and sharing competitively sensitive information.

**FIFTEENTH DEFENSE**

34.     Agri Stats adopts and incorporates by reference any and all other defenses asserted by any other Defendant to the extent that the defense would apply to Agri Stats.

**SIXTEENTH DEFENSE**

35.     Defendant reserves the right to assert other defenses as this action proceeds up to and including the time of trial.


**PRAYER FOR RELIEF**

WHEREFORE, Defendant Agri Stats respectfully requests that judgment be entered in favor of Agri Stats and the other Defendants and against Plaintiffs, dismissing the Complaint in its entirety with prejudice.  Defendant Agri Stats further requests that this Court award Agri Stats (i) their costs and disbursements, and (ii) such other and further relief as the Court deems proper.

Dated: December 4, 2020

Respectfully submitted,

*/s/ Justin W. Bernick*
Justin W. Bernick (Pro Hac Vice)
William L. Monts III (Pro Hac Vice)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
justin.bernick@hoganlovells.com
william.monts@hoganlovells.com

Jacob D. Koering
Jeffrey M. Drake
MILLER, CANFIELD, PADDOCK, AND
STONE P.L.C.
225 West Washington Street, Suite 2600
Chicago, IL 60606
Tel: (312) 460-4272
Fax: (312) 460-4201
koering@millercanfield.com

*Attorneys for Defendant Agri Stats, Inc.*

## CERTIFICATE OF SERVICE

Justin W. Bernick, an attorney, hereby certifies that on December 4, 2020 he caused a true and correct copy of the foregoing **Agri Stats, Inc.'s Answer and Defenses to Olean Wholesale Grocery Cooperative, Inc. et al.'s Complaint** to be filed electronically with the Court's CM/ECF system, and that notice of this filing was sent by electronic mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to receive electronic filings as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Justin W. Bernick*