## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

OLEAN WHOLESALE GROCERY
COOPERATIVE, INC. and JOHN
GROSSAND COMPANY, INC.

|                                   | No.1:19-cv-08318 |
|---|---|

Plaintiffs,

v.

AGRI STATS, INC., BUTTERBALL LLC,
CARGILL, INC., CARGILL MEAT
SOLUTIONS CORPORATION, COOPER
FARMS, INC., FARBEST FOODS, INC.,
FOSTER FARMS, LLC, FOSTER POULTRY
FARMS, THE HILLSHIRE BRANDS
COMPANY, HORMEL FOODS
CORPORATION, HORMEL FOODS, LLC,
HOUSE OF RAEFORD FARMS, INC.,
KRAFT HEINZ FOODS COMPANY, KRAFT
FOODS GROUP BRANDS LLC, PERDUE
FARMS, INC., PERDUE FOODS LLC,
TYSON FOODS, INC., TYSON FRESH
MEATS, INC. AND TYSON PREPARED
FOODS, INC.,

Defendants.

**ANSWER AND AFFIRMATIVE
DEFENSES OF DEFENDANT
FARBEST FOODS, INC. TO CLASS
ACTION COMPLAINT**

DEMAND FOR JURY TRIAL

Farbest Foods, Inc. ("Farbest") submits its Answer and Affirmatives Defenses to the Class Action Complaint ("Complaint") of Direct Purchaser Plaintiffs ("Plaintiffs"), filed on December 19, 2019, as set forth below.

Farbest denies the allegations in the Complaint except as specifically admitted, denies any allegations as to which there is no specific response, denies all titles, headings, footnotes, subheadings, and any other material not contained in numbered paragraphs, and denies that it violated the antitrust laws in any way. Farbest further states that this Answer is solely on behalf of Farbest Foods, Inc., and Farbest is answering allegations only as to it. Farbest lacks knowledge or information to form a belief about the truth of the allegations in the Complaint that are directed toward other Defendants and on that basis denies all such allegations.

## I.   NATURE OF ACTION

1.      The turkey integrator defendants are the leading suppliers of turkey in an industry with approximately $5 billion in annual commerce. The turkey industry is highly concentrated, with a small number of large producers in the United States controlling supply. Defendants and their co-conspirators collectively control approximately 80 percent of the wholesale turkey market in the United States. The turkey integrator defendants are Butterball LLC (Butterball); Cargill Inc. and Cargill Meat Solutions Corporation, (together and separately, Cargill); Cooper Farms, Inc. (Cooper Farms); Farbest Foods, Inc., (Farbest); Foster Farms LLC and Foster Poultry Farms (together and separately, Foster Farms); Hormel Foods Corporation and Hormel Foods LLC (together and separately, Hormel); House of Raeford Farms, Inc., (House of Raeford); Kraft Heinz Foods Company and Kraft Foods Group Brands LLC (together and separately, Kraft Foods), Perdue Farms, Inc. and Perdue Foods LLC (together and separately, Perdue); Tyson Foods, Inc., The Hillshire Brands Company, Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. (together and separately, Tyson).

**ANSWER:** Farbest denies the conspiracy alleged in the Complaint. Farbest admits that it is a supplier of turkey products and that Plaintiffs purport to identify "turkey integrator defendants." As to the remaining allegations in Paragraph 1, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

2.     Defendant Agri Stats is a company that provides secretive information exchange services to companies in a variety of agricultural sectors, including pork, chicken, and turkey.

**ANSWER:** Farbest denies the allegations in Paragraph 2 to the extent they relate to Farbest.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 2 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

3.     The turkey integrator defendants each entered into an agreement from at least 2010 to January 1, 2017, to exchange sensitive information through Agri Stats regarding their production and sales of turkey.

**ANSWER:** Farbest denies the conspiracy allegations in Paragraph 3.  Farbest admits that it submitted certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes.  Farbest denies the remaining allegations in Paragraph 3 to the extent they relate to Farbest.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 3 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

4.     Agri Stats reports are far different from lawful industry reports.  Agri Stats gathers detailed financial and production data from each of the turkey integrators, standardizes this information, and produces customized reports and graphs for the co-conspirators.  On a monthly basis, Agri Stats provides the turkey integrators with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information).

**ANSWER:**  To the extent the allegations in Paragraph 4 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest admits that it submitted

certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest denies the remaining allegations in Paragraph 4 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 4 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

5. The United States Supreme Court has long recognized that "exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects."[1] Agri Stats' sales reports prove the truth of that maxim. Agri Stats prepared monthly reports for defendants regarding their sales of turkey that identified, on a specific product by product level, the prices and returns that each defendant was obtaining on their sales of turkey. These reports, unavailable to anybody besides Agri Stats subscribers, allowed the integrator defendants to easily identify potential opportunities where their prices for turkey products were significantly lower than their competitors.

**ANSWER**: To the extent the allegations in Paragraph 5 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest admits that it submitted certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest denies the remaining allegations in Paragraph 5 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 5 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

6. Turkey is the relevant product market and the geographic market is the continental United States. Defendants collectively possess market power in the market for turkey. Defendants

---

[1] *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 (1978).

and co-conspirators collectively possessed approximately 80 percent of the overall market share for turkeys during the Class Period.

**ANSWER:** Farbest denies the conspiracy allegations in Paragraph 6. The allegations of Paragraph 6 set forth characterizations of Plaintiffs' claims and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. As to the remaining allegations in Paragraph 6, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

7. Blair Snyder, a senior executive at Agri Stats, publicly stated in 2009 that "about 95% of the turkey industry [is] participating" in Agri Stats, and that for "turkey participants, pretty much it's a list of who's who in the turkey business." This is a comparable portion to the percentage of broiler chicken industry participating in Agri Stats reports, with Mr. Snyder stating that "we've got high 90 percentage of both broilers and turkeys."

**ANSWER:** To the extent the allegations in Paragraph 7 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest admits that it submitted certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. As to the remaining allegations in Paragraph 7, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

8.     Each one of the defendants and co-conspirators entered into an agreement to exchange information through Agri Stats. Each defendant's agreement to exchange information regarding turkey production is shown in the below 2010 excerpt from an Agri Stats presentation that lists the participants in Agri Stats' turkey reports.



**ANSWER:** Farbest denies the conspiracy allegations in Paragraph 8. To the extent the allegations or chart in Paragraph 8 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest admits that it submitted certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest denies the remaining allegations in Paragraph 8 to the extent they relate to Farbest. Farbest lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 8 to the extent

they relate to other Defendants and/or third parties and, therefore, denies those allegations.


9.     This 2010 presentation slide shows that each of the defendant integrator and Co-Conspirator Integrators entered into an agreement to exchange information regarding their turkey operations through Agri Stats during the conspiracy period.  The document directly identifies defendants Butterball, Cargill, Cooper's, Farbest, Foster Farms, House of Raeford and Perdue Farms, as participants in Agri Stats's reports on turkey.  The document directly identifies Co-Conspirators Circle-S Ranch, Prestage Farms, and West Liberty Foods as participants in Agri Stats' reports on turkey.  Jennie-O is the brand name for Hormel's turkey operations and thus Hormel participated in Agri Stats' reports on turkey.  The document also identifies Louis Rich, a Kraft Foods brand that produces turkey, as receiving Agri Stats reports, and thus Kraft Foods participated in Agri Stats' reports on turkey.  Sara Lee's turkey operations, Hillshire Brands, was subsequently acquired by Tyson in 2014 and thus Tyson participated in Agri Stats' reports on turkey.

**ANSWER**:  Farbest denies the conspiracy allegations in Paragraph 9.  To the extent the

allegations in Paragraph 9 characterize, quote, or describe documents or other sources, such

sources speak for themselves, and Farbest denies any characterization or description that is

inconsistent therewith.  Farbest admits that it submitted certain information to Agri Stats and that

it received Agri Stats reports containing anonymized information regarding certain turkey

complexes for pro-competitive benchmarking purposes.  Farbest denies the remaining allegations

in Paragraph 9 to the extent they relate to Farbest.  Farbest lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 9 to the extent

they relate to other Defendants and/or third parties and, therefore, denies those allegations.


10.     The information exchange by the defendant integrators through Agri Stats is exactly the type of information exchange that the Supreme Court has recognized is likely to have anticompetitive effects under a rule of reason analysis.  First, the data is current and forward-looking – which courts consistently hold has "the greatest potential for generating anticompetitive effects."[2] Second, information contained in Agri Stats reports is specific to the turkey producers,

---

[2] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

including information on profits, prices, costs and production levels. Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the defendant integrators to pay hefty fees over the Class Period – far in excess of any other pricing and production indices and to agree to volunteer their own data. "Public dissemination is a primary way for data exchange to realize its pro-competitive potential."[3] Agri Stats ensured that its detailed, sensitive business information was available only to the coconspirators and not to any buyers in the market. Thus, for example, buyers on the market could not use Agri Stats data in Agri Stats sales reports to negotiate lower prices; instead, only defendants could use it as a way to identify opportunities to raise their prices.

**ANSWER**: The allegations of Paragraph 10 set forth characterizations of Plaintiffs' claims, allegations subject to the expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. To the extent the allegations in Paragraph 10 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest admits that it submitted certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest denies the remaining allegations in Paragraph 10 to the extent they relate to Farbest. As to the remaining allegations in Paragraph 10, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

11.     Indeed, Agri Stats specifically marketed itself to potential participants as a way that they could "improve profitability" rather than engage in competition through production increases. Agri Stats was good to its word; its sales reports specifically identified opportunities for defendants where defendants' products were lower than that of the industry average and where defendants could consequently raise prices to meet that of their competitors.

---

[3] *Id.* at 213.

**ANSWER**:  To the extent the allegations in Paragraph 11 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest admits that it submitted certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest denies the remaining allegations in Paragraph 11 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 11 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

12.     Industry participants relied on Agri Stats reports in their analysis of their business operations.  For example, Hormel, at its 2011 Investor Day, stated in its presentation that "when you optimize the supply chain" you "improve your relative industry position (Agri Stats)." Hormel also touted that "Jennie-O Turkey Store is consistently one of the top companies in operating profits (Agri Stats)."

**ANSWER**:  To the extent the allegations in Paragraph 12 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest admits that it submitted certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest denies the remaining allegations in Paragraph 12 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 12 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

13.     Confidential Witness 1 (CW1) is a former sales executive at Butterball involved in the pricing of turkeys.  CW1 was employed at Butterball during the entire Class Period.  CW1 stated that Butterball relied on the monthly reports issued by Agri Stats: "The company used the information to evaluate — by item, item group, price, distribution — where we stood against other turkey companies."  CW1 stated that he and other sales personnel looked at Agri Stats data to see how Butterball ranked against peers in the turkey industry.  CW1 stated that he personally looked at the Agri Stats data to assess costs and returns.  CW1 stated that costs were an important factor in determining how Butterball set its prices.

**ANSWER**:  To the extent the allegations in Paragraph 13 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  As to the remaining allegations in Paragraph 13, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

14.     Confidential Witness 2 (CW2) is a former accountant at Cooper Farms.  CW2 stated that Cooper Farms received monthly reports from Agri Stats.  In addition, Agri Stats representatives met with Cooper Farms executives every six months.  CW2 stated that Cooper Farms submitted cost information to Agri Stats every month.  CW2 explained that Agri Stats reports grouped data into various types of turkey products, including deli meat and smoked meat.

**ANSWER**:  To the extent the allegations in Paragraph 14 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  As to the remaining allegations in Paragraph 14, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

15.     CW2 stated that Agri Stats representatives regularly met with the Cooper Leadership Management Group, which included top management and executives from Cooper Farms.  CW2 stated that "the upper group received advice" from Agri Stats.  CW2 stated that the advice from Agri Stats helped Cooper Farms improve its returns per pound.

**ANSWER**:  To the extent the allegations in Paragraph 14 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  As to the remaining allegations in Paragraph 15, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

16.     Agri Stats reports also contained detailed information on industry-wide supply levels.  For example, a job description of an Agri Stats employee stated that they analyzed Turkey "breeder flock and hatchery data" as well as Turkey "growout flocks."

**ANSWER**:  To the extent the allegations in Paragraph 16 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest admits that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes.  As to the remaining allegations in Paragraph 16, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

17.     Based on publicly available information filed in a February 7, 2018, complaint in the *Broiler Chicken Antitrust Litigation*,[4] Agri Stats data on growout flocks contained information such as the number of broilers placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (aka, "down time"), feed conversion rate (pounds of feed per pound of broiler), and average daily weight.  On information and belief, the growout data that Agri Stats compiled for the turkey industry contained similar levels of data.  This type of data allowed defendants to monitor industry-wide supply levels.

---

[4] *In re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.) (ECF No. 710)

**ANSWER**:  To the extent the allegations in Paragraph 17 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest admits that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes.  As to the remaining allegations in Paragraph 16, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

18.     Although Agri Stats reports are nominally anonymous, defendant integrators were often able to deanonymize the reports to identify the data of specific companies based on their industry knowledge.  CW2 stated that he could determine the identity of companies in Agri Stats reports because "you could usually figure out who was who because they have a certain cooked meat, or if they were browning and running it through an oven." CW2 further stated that "we could sit there and discuss it, because a lot of us knew what the other plants in the big areas, what they did." For example, CW2 stated that one competitor company had five separate facilities included in the Agri Stats reports, and that therefore, it was easy to determine the identity of that company.

**ANSWER**:  To the extent the allegations in Paragraph 18 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest admits that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes.  Farbest denies the remaining allegations in Paragraph 18 to the extent they relate to Farbest.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 18 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

19.     Confidential Witness 3 (CW3) is a former employee of Cargill during the conspiracy period.  CW3 stated that Cargill received monthly reports from Agri Stats on turkey.  CW3 stated that the monthly Agri Stats turkey reports went directly to Cargill finance executives.

**ANSWER**:  To the extent the allegations in Paragraph 19 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  As to the remaining allegations in Paragraph 19, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

20.     Throughout the conspiracy period, defendant integrators were able to exercise a remarkable level of industry-wide restraint in keeping the growth of turkey supply in check, causing turkey prices to rise.  Thus, Agri Stats had the anticompetitive effect of allowing defendants to engage in collusion to restrain the supply of turkey by facilitating information exchange about supply levels throughout the industry.  The industry-wide cuts in turkey production during the conspiracy period are shown in the following chart:



**ANSWER**:  Farbest denies the conspiracy allegations in Paragraph 20.  The allegations of Paragraph 20 set forth characterizations of Plaintiffs' claims and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations.  To the extent the chart in Paragraph 20 describes documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest denies that the chart accompanying paragraph 20 is accurate or accurately reflects Farbest's production.  Farbest denies the remaining allegations in Paragraph 20 to the extent they relate to Farbest.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 20 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

21.    In a competitive market, production generally matches demand.  More demand will lead to more supply.  Conversely, a drop in production caused by falling demand should correspond to falling prices.  However, in the turkey market during the conspiracy period, production, measured through USDA data, remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly.  These observed price and output dynamics, shown in the below analysis performed by plaintiffs' experts, indicate that it was not falling demand that caused a decline in supply during the conspiracy period.



**ANSWER**:  Farbest denies the conspiracy allegations in Paragraph 21.  The allegations of Paragraph 21 set forth characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies those allegations.  To the extent the allegations in Paragraph 21 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest denies that the chart accompanying paragraph 21 is accurate or accurately reflects Farbest's pricing or production. Farbest lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 21 and, on this basis, denies those allegations.

22.    In addition to their participation in Agri Stats, defendant integrators had frequent opportunities to communicate, in conjunction with formal meetings of various trade associations. In particular, the National Turkey Federation each year held regular meetings, including the NTF Annual Convention and the NTF Leadership conference, which were widely attended by the defendant integrators.  CW3 stated that senior Cargill executives, including Cargill's CEO and CFO, attended National Turkey Federation meetings.  For example, CW2 stated that Cooper Farms

leadership were involved in the National Turkey Federation, for example Cooper Farms COO Gary Cooper served as immediate past chairman of the NTF board in 2014.

**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 22. Farbest admits that at times it has been a member and attended meetings of certain legitimate trade associations, including the National Turkey Federation. Farbest denies the remaining allegations in Paragraph 22 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 22 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

23. Collectively, Hormel, Cargill, and Butterball control approximately 50 percent of the turkey market. Hormel is the only publicly traded company among these three. In its earnings calls during the conspiracy period, Hormel repeatedly discussed the industry-wide success in executing production cuts and maintaining industry-wide production discipline during the Class Period.

**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 23. To the extent the allegations in Paragraph 23 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. As to the remaining allegations in Paragraph 23, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

24. On June 2, 2009, Hormel emphasized that it was making production cuts in response to an alleged oversupply in the market and closely monitoring the overall level of production in the market, showing the importance of the kind of information exchanged through Agri Stats:

> There is an oversupply of turkey. There continues to be perhaps more production as well as cold storage stocks than the demand would warrant. We have been very deliberate about making the appropriate production cuts.

15

We announced them over a year ago. And we have even exceeded the amount we expected to reduce. We have seen the placements and indicators of forward looking supply come down, so that was as expected, and we expected the second half of 2009 to be a little kinder in the turkey side of the business, but there is still a lot of storage, cold storage stocks to go through, we feel comfortable that we've cleaned up our inventories that we had on hand. Our production cuts were more than the decrease in our sales because we did work off inventories. I had a feeling the industry will rebound. It's going to take a work through of the excess inventories as well as those production cuts hitting the marketplace.

**ANSWER**: To the extent the allegations in Paragraph 24 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. As to the remaining allegations in Paragraph 24, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

25. On August 20, 2010, Hormel stated, "We think the turkey business has reached a good equilibrium, and we don't have any major expansion plans and have not heard others in that mode, so I think those conditions should remain favorable into next year."

**ANSWER**: To the extent the allegations in Paragraph 25 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. As to the remaining allegations in Paragraph 25, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

26. On May 25, 2011, Hormel stated that the turkey industry was maintaining solid pricing based on the information that Hormel was receiving about industry-wide turkey production levels: "We certainly see egg set and poultry placement numbers that take us through the end of this year and a little bit into next fiscal year. But right now, on the basis of those numbers, on the

basis of what we see in terms of production in the industry and on the basis of cold storage numbers, coupled with still strong demand on the export side, we feel that the amount of product going to market will support solid pricing on a commodity basis."

**ANSWER**: To the extent the allegations in Paragraph 26 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. As to the remaining allegations in Paragraph 26, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

27.     On August 25, 2011, Hormel stated that the turkey industry was maintaining better discipline than the poultry industry: "The industry as a whole has shown a little better discipline, perhaps, than the other poultry side of the ledger." This statement is notable because the chicken industry is currently the subject of multiple civil lawsuits as well as a DOJ investigation of potential antitrust violations during this period of time.

**ANSWER**: To the extent the allegations in Paragraph 27 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. As to the remaining allegations in Paragraph 27, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

28.     Furthermore, the turkey market has all of the characteristics of a market where information exchange is likely to have anticompetitive effects. Turkey is a fungible product, the market for turkey has price-based competition, the demand for turkey is relatively inelastic, and the turkey market features a trend towards price uniformity.

**ANSWER**: The allegations of Paragraph 28 set forth characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no

response is required, but if a response is required, Farbest denies such allegations.  Farbest denies

the remaining allegations in Paragraph 28.


29.     The information exchange through Agri Stats did not have the kind of
characteristics that would produce procompetitive effects sufficient to outweigh the
anticompetitive harms.  The information exchange involved current and forward-looking data.
Agri Stats regularly prepared monthly reports that contained data that was less than six weeks old.
Agri Stats also only allowed companies to access the data if they themselves shared the data, thus
ensuring that only defendants and other similarly situated turkey integrators who received the Agri
Stats reports were able to use the data.



**ANSWER**:  The allegations Paragraph 29 set forth characterizations of Plaintiffs' claims,

allegations subject to proof by expert testimony, and/or legal conclusions to which no response is

required, but if a response is required, Farbest denies such allegations.  To the extent the allegations

in Paragraph 29 characterize or describe documents or other sources, such sources speak for

themselves, and Farbest denies any characterization or description that is inconsistent therewith.

Farbest denies that the chart accompanying paragraph 110 is accurate or accurately reflects

Farbest's pricing.  Farbest denies selling hens.  As to the remaining allegations in Paragraph 6,

including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

30. During the conspiracy period, the price of turkey spiked dramatically, driven by the anticompetitive effects of the information exchange through Agri Stats regarding turkey production that helped facilitate defendants restraint over the growth in the supply of turkey.

**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 30. The allegations of Paragraph 30 set forth characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. Farbest denies the remaining allegations in Paragraph 30 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 30 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

31. The information exchange through Agri Stats in fact had anticompetitive effects on the market. Prior to the conspiracy, turkey prices closely tracked the underlying cost of feed, which is the primary input cost in the production of turkey. Beginning in 2009-2010, prices of turkey spiked to an unprecedented level, showing the anticompetitive effects of defendants' information exchange through Agri Stats. Remarkably, as demonstrated in the analysis performed by plaintiffs' experts, shown in the below chart, prices of turkey quickly returned to match underlying feed costs after litigation was filed in late 2016 in the broiler industry that centered on the anticompetitive use of Agri Stats. Defendants clearly changed their behavior after the commencement of the Broilers litigation, as Tyson dismissed their CEO, Donnie Smith, in late 2016, shortly after the first civil lawsuits were filed.



**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 31. The allegations of Paragraph 31 set forth characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. To the extent the allegations in Paragraph 31 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest denies that the chart accompanying paragraph 31 is accurate or accurately reflects Farbest's pricing or costs. Farbest denies that it sells hens. Farbest denies the remaining allegations in Paragraph 31 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 31 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

32.     Feed accounts for approximately 60-70% of the cost of raising a turkey. Plaintiffs' experts constructed a regression model based on the underlying feed cost that models what the

"but for" price of turkey would have been if the historical relationship between feed and turkey costs had continued during the conspiracy period. The model demonstrates that the anticompetitive information exchange of data regarding turkey production through Agri Stats caused anticompetitive effects in the market for turkey.



**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 32. The allegations of Paragraph 32 set forth characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. To the extent the allegations in Paragraph 32 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest denies that the chart accompanying paragraph 32 is accurate or accurately reflects Farbest's pricing. Farbest denies that it sells hens. Farbest lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 32 and, on this basis, denies those allegations.

33.     As a result of defendants' unlawful conduct, plaintiffs and the Class paid artificially inflated prices for turkey during the Class Period. Such prices exceeded the amount they would

have paid if the price for turkey had been determined by a competitive market. Thus, plaintiffs and class members were injured by defendants' agreement to exchange information through Agri Stats regarding the turkey market.

**ANSWER**: Farbest denies the allegations in Paragraph 33.

## II.    JURISDICTION AND VENUE

34.    Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure compensatory damages and injunctive relief against defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs seek to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by defendants' conduct in restricting the supply of turkey and increasing the price of turkey. Plaintiffs seek damages in excess of $5,000,000. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

**ANSWER**: Farbest admits that Plaintiffs purport to bring their case under Section 16 of

the Clayton Act (15 U.S.C. § 26) and Section 1 of the Sherman Act (15 U.S.C. § 1), and purport

to seek damages in excess of $5,000,000. Farbest further admits that this Court has jurisdiction

for purposes of this matter only. Farbest denies the remaining allegations in Paragraph 34.

35.    Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because both Kraft Foods and Hillshire Brands are headquartered in the District, and one or more defendants transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

**ANSWER**: Farbest admits that venue is proper in this district for purposes of this matter

only. Farbest denies the remaining allegations in Paragraph 35 to the extent they relate to Farbest.

Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 35 to the extent they relate to other Defendants and/or third parties and,

therefore, denies those allegations.

36.     This Court has personal jurisdiction over each defendant because, inter alia, each defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of turkey throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

**ANSWER**: Farbest does not contest that it is subject to the personal jurisdiction of this Court for purposes of this matter only. Farbest denies the remaining allegations in Paragraph 36 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 36 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

37.     The activities of the defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

**ANSWER**: Farbest admits that it sells turkey products in interstate commerce of the United States. Farbest denies the remaining allegations in Paragraph 37 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 37 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

### III.     PARTIES

**A.     Plaintiffs**

38.     Plaintiff Olean Wholesale Grocery Cooperative, Inc. (Olean Wholesale) is a retailers' cooperative located in Olean, New York. Its members are independent, family-owned supermarkets. Olean has served supermarkets in Western and Central New York, Western Pennsylvania, and Northeastern Ohio since 1922. Olean Wholesale is a New York corporation with its principal place of business in Olean, New York, and purchased turkey directly from one or more defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 and, on this basis, denies those allegations.

39. John Gross and Company, Inc. (John Gross) is a full line food distributor located in Mechanicsburg, Pennsylvania. Founded in 1950, the company has been owned and operated by the Gross family for four generations. John Gross is a Pennsylvania corporation with its principal place of business in Mechanicsburg, Pennsylvania, and purchased turkey directly from one or more defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and, on this basis, denies those allegations.

**B.      Defendants**

40. Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana. Throughout the Class Period, Agri Stats acted as a co-conspirator of the turkey integrator defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among defendants and their co-conspirators.

**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 40. Farbest admits that it submitted certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest denies the remaining allegations in Paragraph 40 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 40 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

41. Butterball, LLC is a privately held North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Butterball and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41 and, on this basis, denies those allegations.

42.     Cargill, Inc. is a privately held Delaware corporation headquartered in Minnetonka, Minnesota.  During the Class Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 and, on this basis, denies those allegations.

43.     Cargill Meat Solutions Corporation is a Delaware corporation that operates as a subsidiary of Cargill, Incorporated.  During the Class Period, Cargill Meat Solutions and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43 and, on this basis, denies those allegations.

44.     Defendants Cargill, Inc. and Cargill Meat Solutions are collectively referred to as "Cargill."

**ANSWER**:  Paragraph 44 consists of Plaintiffs' explanation of a defined term, to which no response is required, but if a response is required, Farbest admits that Plaintiffs use the phrase "Cargill" in the Complaint as set forth in Paragraph 44.

45.     Cooper Farms, Inc. is a privately held Ohio corporation engaged in the production of meat and food products, and the marketing of these products.  During the Class Period, Cooper Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 and, on this basis, denies those allegations.

46.     Farbest Foods, Inc. is a privately held Indiana corporation engaged in the production of meat and food products, and the marketing of these products.  During the Class Period, Farbest and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest admits that Farbest Foods, Inc. is a privately held Indiana corporation engaged in the production of raw, fresh, and frozen turkey products from male turkeys, called "toms."  Farbest further admits that it has sold turkey products to purchasers in the United States. Farbest denies the remaining allegations in Paragraph 46.

47.     Foster Farms LLC is a privately held California corporation headquartered in Modesto, California.  During the Class Period, Foster Farms LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 and, on this basis, denies those allegations.

48.     Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California.  Foster Poultry Farms is a related entity of Foster Farms LLC.  During the Class Period, Foster Poultry Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of turkey, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 and, on this basis, denies those allegations.

49.     Defendants Foster Farms LLC and Foster Poultry Farms are collectively referred to as "Foster Farms."

**ANSWER**: Paragraph 49 consists of Plaintiffs' explanation of a defined term, to which no response is required, but if a response is required, Farbest admits that Plaintiffs use the phrase "Foster Farms" in the Complaint as set forth in Paragraph 49.

50.     Kraft Heinz Foods Company (Kraft Heinz), an Illinois corporation with headquarters in Pittsburgh, Pennsylvania, and Chicago, Illinois, is engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Kraft Heinz and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 and, on this basis, denies those allegations.

51.     Kraft Foods Group Brands LLC is an Illinois corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Kraft Heinz and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 and, on this basis, denies those allegations.

52.     Defendants Kraft Heinz Foods Company and Kraft Foods Brands LLC are collectively referred to as "Kraft Foods."

**ANSWER**: Paragraph 52 consists of Plaintiffs' explanation of a defined term, to which no response is required, but if a response is required, Farbest admits that Plaintiffs use the phrase "Kraft Foods" in the Complaint as set forth in Paragraph 52.

53.     Hormel Foods Corporation is a Delaware corporation engaged in the production of meat and food products, and the marketing of these products.  During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 53 and, on this basis, denies those allegations.


54.     Hormel Foods LLC is a limited liability corporation headquartered in Austin, Minnesota.  It is a wholly owned subsidiary of Hormel Foods Corporation.  Hormel is engaged in the production of meat and food products, and the marketing of these products.  During the Class Period, Hormel Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 54 and, on this basis, denies those allegations.


55.     House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina.  During the Class Period, House of Raeford operated in part through a division referred to as "Columbia Farms," which is a group of broiler facilities and operations originally named Columbia Farms, Inc. and Columbia Farms of Georgia, Inc. when purchased by House of Raeford in 1998.  During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 55 and, on this basis, denies those allegations.


56.     Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland.  During the Class Period, Perdue Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 56 and, on this basis, denies those allegations.

57.     Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland.  Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 57 and, on this basis, denies those allegations.

58.     Defendants Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to as "Perdue."

**ANSWER**: Paragraph 58 consists of Plaintiffs' explanation of a defined term, to which  no response is required, but if a response is required, Farbest admits that Plaintiffs use the phrase "Perdue" in the Complaint as set forth in Paragraph 58.

59.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas.  It wholly owns and controls two subsidiaries, Tyson Prepared Foods, Inc. and Tyson Fresh Meats Inc. that slaughter and sell turkey products.  During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59 and, on this basis, denies those allegations.

60.     Tyson Fresh Meats Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc.  During the Class Period, Tyson Fresh Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60 and, on this basis, denies those allegations.

61.     Tyson Prepared Foods, Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc.  During the Class Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61 and, on this basis, denies those allegations.

62.     The Hillshire Brands Company (Hillshire Brands) is a Maryland corporation headquartered in Chicago, Illinois.  Hillshire Brands operates as a subsidiary of Tyson Foods that sells turkey products.  During the Class Period, Hillshire Brands and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62 and, on this basis, denies those allegations.

63.     Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc., and Hillshire Brands are collectively referred to as "Tyson."

**ANSWER**: Paragraph 63 consists of Plaintiffs' explanation of a defined term, to which  no response is required, but if a response is required, Farbest admits that Plaintiffs use the phrase "Tyson" in the Complaint as set forth in Paragraph 63.

## C.    Co-Conspirators

64.     Co-Conspirator Circle S-Ranch, Inc. is a North Carolina corporation engaged in the production of meat and food products, and the marketing of these products.  During the Class Period, Circle S-Ranch and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 64. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 64 and, on this basis, denies those allegations.

65.     Co-Conspirator Prestage Farms is a North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Prestage Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 65. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 65 and, on this basis, denies those allegations.

66.     Co-Conspirator West Liberty Foods LLC (West Liberty) is an Iowa corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, West Liberty and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 66. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 66 and, on this basis, denies those allegations.

## IV.     FACTUAL ALLEGATIONS

67.     Starting no later than January 1, 2010, and continuing at least until January 1, 2017, defendants entered into an agreement to exchange information regarding their production and sale of turkey through Agri Stats. The information exchange through Agri Stats provided defendants an opportunity to obtain and monitor critical and competitively sensitive business information regarding each other's production and sales. The information exchange through Agri Stats had anticompetitive effects, as prices for turkey soared and defendants engaged in an industry-wide series of production cuts during the period. Notably, the information exchanged through Agri Stats was not available to purchasers of turkey, ensuring that the information exchange would not have procompetitive effects.

**ANSWER:** Farbest denies the conspiracy allegations in Paragraph 67. Farbest admits that it submitted certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest denies the remaining allegations in Paragraph 67 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 67 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

A. **Agri Stats' information exchange services began in the broiler industry, where it has been used to facilitate widespread collusion.**

68. Agri Stats has played a central role in other industries, including collusion in the broiler industry.[5] As alleged in the *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill.) litigation, the broiler producers used Agri Stats as a part of their conspiracy to restrain production and inflate prices.

**ANSWER**: To the extent the allegations in Paragraph 68 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 68 (including footnote 5 referenced therein), and, on this basis, denies those allegations.

69. In the broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and the coconspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, Express Markets, Inc. or EMI. Agri Stats collected

_____

[5] Broilers are chickens raised to be slaughtered before the age of 13 weeks.

data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.

**ANSWER**:  To the extent the allegations in Paragraph 69 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 69 and, on this basis, denies those allegations.

70.     The detail of these reports ensured that competitors could quickly decode the information of their purported competitors.  The *Broiler* complaints allege it was common knowledge among producers that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes.  The broiler reports, in part, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson.  The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

**ANSWER**:  To the extent the allegations in Paragraph 70 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 70 and, on this basis, denies those allegations.

71.     In the broiler industry, it is also alleged that Agri Stats – known to its coconspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did.  Agri Stats' own statements in the broiler industry facilitated the implementation of the agreement to restrict supply – where Agri Stats would transmit the intentions of the broiler producers to restrict supply.

**ANSWER**: To the extent the allegations in Paragraph 71 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 71 and, on this basis, denies those allegations.

72.     In a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the broiler industry, it was reported:

> "Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "*That is what creates stability for a cartel*."

**ANSWER**: To the extent the allegations in Paragraph 72 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. The allegations of Paragraph 72 also set forth characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 72 and, on this basis, denies those allegations.

73. The district court noted, in denying the motions to dismiss in the *In re Broiler Chicken Antitrust Litigation* that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which suggests high antitrust concerns.[6]

**<u>ANSWER</u>**: To the extent the allegations in Paragraph 73 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 73 and, on this basis, denies those allegations.

**B.** **Defendants entered into an agreement to exchange information through Agri Stats regarding their production and sales of turkey.**

74. Each member of the conspiracy, including the integrator defendants and co-conspirators, were all Agri Stats subscribers. Agri Stats publicly stated that 95% of the turkey market used Agri Stats reports.

**<u>ANSWER</u>**: Farbest denies the conspiracy allegations in Paragraph 74. Farbest admits that it subscribed to Agri Stats. Farbest further admits that it submitted certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest denies the remaining allegations in Paragraph 74 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 74 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

75. Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison and perform the monthly

---

[6] Memorandum Opinion and Order at 11, *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.

audits. Each company's financial data is reconciled to its general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations, so all company numbers are calculated the same way. CW2 stated that he was involved during the conspiracy period in the monthly transmission of cost data from Cooper Farms to Agri Stats.

**ANSWER**: Farbest admits that it submitted certain information to Agri Stats. Farbest

lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 75 and, on this basis, denies those allegations.

76. Participants in the scheme received monthly detailed reports and graphs that allow them to compare their performance, sales prices, and costs to other participants. Agri Stats issues separate reports in the turkey industry to the integrator defendants regarding live operations, processing, further reprocessing, feed costs, and sales.

**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 76. To the extent the

allegations in Paragraph 76 characterize or describe documents or other sources, such sources

speak for themselves, and Farbest denies any characterization or description that is inconsistent

therewith. Farbest admits that it received Agri Stats reports containing anonymized information

regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest denies

the remaining allegations in Paragraph 76 to the extent they relate to Farbest. Farbest lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

Paragraph 76 to the extent they relate to other Defendants and/or third parties and, therefore, denies

those allegations.

77. Agri Stats provided the integrator defendants with an unparalleled ability to share critical and proprietary information concerning key business metrics, such as sales, production levels and short and long-term production capacity.

**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 77. To the extent the

allegations in Paragraph 77 characterize or describe documents or other sources, such sources

speak for themselves, and Farbest denies any characterization or description that is inconsistent

therewith. Farbest admits that it submitted certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest denies the remaining allegations in Paragraph 77 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 77 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

78.     Perhaps most egregiously, Agri Stats provided monthly sales reports to defendants. One of Agri Stats' subsidiaries is Express Markets, Inc. (aka, "EMI"). On EMI's publicly available webpage Amanda Martin, an Express Markets economist states that Agri Stats "audited turkey and broiler sales and product mix data, and worked with processing and further reprocessing reports.'" On information and belief, the Agri Stats turkey sales reports contained sales data that was less than six weeks old.

**ANSWER**: To the extent the allegations in Paragraph 78 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest admits that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 78 and, on this basis, denies those allegations.

79.     As detailed in the recently filed amended complaint in the *Pork Antitrust Litigation*, No. 18-cv-1776 (JRT/HB) (D. Minn. Nov. 06, 2019), ECF No. 392, Agri Stats allowed subscribers to its pork sales reports to compare their prices for individual products against the national average net price, and against the national top 25 percent average price. Notably, Agri Stats identified opportunities for the Pork Integrators to raise prices. For instance, for each product, Agri Stats specifically broke out the variance between the company's price and the national average price, as well as the economic impact of the variance. This allowed coconspirators to see how much more they could charge if they charged either the national average price or the average of the top 25% national average price.

**ANSWER**:  To the extent the allegations in Paragraph 79 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 79 and, on this basis, denies those allegations.

80.     Agri Stats provided similar services to the integrator defendants regarding their production and sale of turkey.  According to CW1, Agri Stats ranked the integrator defendants in their reports based on the returns (i.e. prices) that the integrator defendants received.

**ANSWER**: To the extent the allegations in Paragraph 80 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest admits that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes.  Farbest denies the remaining allegations in Paragraph 80 to the extent they relate to Farbest.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 80 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

81.     As detailed in the *Pork* and *Broilers* complaints, for each of its reports, Agri Stats identified the list of participants who were contributing data or information to the reports.  CW1 confirmed that the reports Agri Stats prepared for the integrator defendants identified the participants that provided data for each report, which allowed defendants to understand which of their competitors were participating for each report.  CW2 confirmed that the Agri Stats reports identified each of the turkey production facilities that were participating in the reports.

**ANSWER**: To the extent the allegations in Paragraph 81 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest admits that it submitted

certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest denies the remaining allegations in Paragraph 81 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 81 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

82.     One presentation from Agri Stats shows the level of detail provided to competitors regarding profits in the swine market. On information and belief, similar levels of detail were provided to defendants who received Agri Stats reports in the turkey market.

**Top 25% in Profit - Variances to Average Company - 2009-2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

35,001,089 Pigs Finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

30,785,319 Pigs finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |

22,306,500 Pigs finished

**ANSWER**: To the extent the allegations in Paragraph 82 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest admits that it submitted

certain information to Agri Stats and that it received Agri Stats reports containing anonymized

information regarding certain turkey complexes for pro-competitive benchmarking purposes.

Farbest denies the remaining allegations in Paragraph 82 to the extent they relate to Farbest.

Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 82 to the extent they relate to other Defendants and/or third parties and,

therefore, denies those allegations.

83. The purpose of these reports was not to provide better prices to consumers or to lower the costs of production. Instead, the clear purpose was to improve the profitability of the co-conspirators. The particular Agri Stats report referenced above shows the ranking of each company in profitability and compares the company to its competitors by providing the variance from the average. The Agri Stats report actually circulated to competitors contained even further detail. This underlines that the purpose of these reports was not to allow consumers to save more money through lower prices and more efficient production – in fact, the opposite was true, the purpose was the profitability of the defendant companies and the impact was higher sales prices for consumers.

**ANSWER**: To the extent the allegations in Paragraph 83 characterize or describe

documents or other sources, such sources speak for themselves, and Farbest denies any

characterization or description that is inconsistent therewith. Farbest admits that it submitted

certain information to Agri Stats and that it received Agri Stats reports containing anonymized

information regarding certain turkey complexes for pro-competitive benchmarking purposes.

Farbest denies the remaining allegations in Paragraph 83 to the extent they relate to Farbest.

Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 83 to the extent they relate to other Defendants and/or third parties and,

therefore, denies those allegations.

84. Much of the information shared by Agri Stats and the co-conspirators was unnecessary to achieve any benefits for consumers. Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.

**ANSWER**: To the extent the allegations in Paragraph 84 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest admits that it submitted certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest denies the remaining allegations in Paragraph 84 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 84 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

85.     Agri Stats knew that it played a central role in facilitating this anticompetitive information exchange. One presentation from Agri Stats regarding the swine industry spoke directly on this point, pointing out to industry participants that they could not undertake such a detailed cost analysis between competitors without Agri Stats auditing and standardizing the data:

## *Data Integrity*

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



**ANSWER**: To the extent the allegations in Paragraph 85 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 85 and, on this basis, denies those allegations.

86. Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine *tolerance and outlier status and enforce*," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, "*[e]ach participant has to commit*."

**ANSWER**: To the extent the allegations in Paragraph 86 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest denies the remaining allegations in Paragraph 86 to the extent they relate to Farbest. Farbest lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 86 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

87.     According to CW1, Agri Stats gave live presentations to defendant integrators to explain to them how to use the reports that Agri Stats prepared on the turkey industry and how to compare themselves against their competitors: during the presentations, Agri Stats said, "if you are number one priced out of 13, that meant the return was so much versus the other companies."

**ANSWER**:  To the extent the allegations in Paragraph 87 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest admits that Agri Stats gave live presentations to Farbest from time to time.  Farbest denies the remaining allegations in Paragraph 87 to the extent they relate to Farbest.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 87 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

88.     It is the standard policy of Agri Stats that it will only grant access to Agri Stats reports to similarly situated companies that themselves share data with Agri Stats.  This ensures that data from Agri Stats is only available to one side of the market – the integrator defendants. The other side of the market, purchasers of turkey, is not allowed to access the Agri Stats data, and thus cannot use Agri Stats data to negotiate lower prices.  Thus, Agri Stats reports function as a one-way ratchet that can be used for anticompetitive purposes by defendants but not for procompetitive purposes by purchasers.

**ANSWER**:  Farbest denies the conspiracy allegations in Paragraph 88.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88 and, on this basis, denies those allegations.

**C.      Defendants possess market power in the market for turkey and turkey is the type of product for which information exchange is particularly likely to have anticompetitive effects.**

**1.      Defendants have market power in the market for turkey.**

89.      One tool that courts use to assess the competitive effects of concerted action is defining a relevant market – the zone of competition among the agreeing rivals in which the agreement may affect competition.  A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market").  The case concerns the sale of turkey for meat consumption in the United States.

**ANSWER**:  The allegations of Paragraph 89 set forth characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations.  Farbest admits that Plaintiffs purport to bring a case that "concerns the sale of turkey for meat consumption in the United States."  To the extent Paragraph 89 contains any other factual allegations, Farbest denies them.

90.      There is a single market for turkey for meat consumption.  Prices for turkey sold in the United States are quoted generally in disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

**ANSWER**:  Paragraph 90 contains characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations.  Farbest denies the remaining allegations in Paragraph 90.

91.      The relevant geographic market is the United States.

**ANSWER**:  Paragraph 91 contains characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required,

but if a response is required, Farbest denies such allegations. To the extent Paragraph 91 contains

factual allegations, Farbest denies them.

### 2. There are high barriers to entry in the market for turkey for meat consumption.

92. The existence of high barriers to entry is one factor which makes markets susceptible to collusion. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel. High barriers to entry in the turkey processing market exist, precluding other entrants or would-be competitors from entering the market for turkeys raised for consumption.

**ANSWER**: Paragraph 92 contains characterizations of Plaintiffs' claims, allegations

subject to proof by expert testimony, and/or legal conclusions to which no response is required,

but if a response is required, Farbest denies such allegations. To the extent Paragraph 92 contains

factual allegations, Farbest denies them.

93. During the Class Period and continuing today, substantial barriers impede entry into the turkey market. A new entrant into the market would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, equipment, energy, transportation. Distribution, infrastructure (aka "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, longstanding customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.

**ANSWER**: Paragraph 93 contains characterizations of Plaintiffs' claims, allegations

subject to proof by expert testimony, and/or legal conclusions to which no response is required,

but if a response is required, Farbest denies such allegations. To the extent Paragraph 93 contains

factual allegations, Farbest denies them.

94.     The price of construction of a new integrated turkey processing complex is relatively high.  For example, the cost for a current market participant, Virginia Poultry Growers Cooperative, to construct a new turkey processing in 2015 was $62 million.[7]

**ANSWER**:  Paragraph 94 contains allegations subject to proof by expert testimony, to which no response is required, but if a response is required, Farbest denies such allegations.  To the extent the allegations in Paragraph 94 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest denies the remaining allegations in Paragraph 94 to the extent they relate to Farbest.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 94 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

95.     The turkey market has been subject to steadily increasing consolidation over the last several decades.  In the 1970s, the turkey market was defined by competition among dozens of companies that worked with independent farmers.[8] But now, just four corporations - Cargill, Hormel, Butterball, and Farbest - produce more than half of the turkey in the United States.

**ANSWER**:  Paragraph 95 contains allegations subject to proof by expert testimony, to which no response is required, but if a response is required, Farbest denies such allegations.  To the extent the allegations in Paragraph 95 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description

---

[7] *Virginia Poultry Growers Cooperative Plans Turkey Processing Facility in Hinton*, Virginia, Area Development (July 22, 2015), *available at* https://www.areadevelopment.com/newsItems/7-22-2015/virginia-poultry-growers-cooperative-processing-facility-hinton-virginia565489.shtml.

[8] Christopher Leonard, *That Turkey on Your Plate Could Use Some More Industry Competition*, The Washington Post (Nov. 22, 2013), *available at* https://www.washingtonpost.com/opinions/that-turkey-on-your-plate-could-use-some-more-industry-competition/2013/11/22/045fc470-5177-11e3-a7f0-b790929232e1_story.html.

that is inconsistent therewith. Farbest denies the remaining allegations in Paragraph 95 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 95 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

96.     The turkey market also has high levels of vertical integration that constitute a barrier to entry. The National Turkey Federation states that "turkey companies are vertically integrated, meaning they control or contract for all phases of production."[9]

**ANSWER**:  Paragraph 96 contains allegations subject to proof by expert testimony, to which no response is required, but if a response is required, Farbest denies such allegations. To the extent the allegations in Paragraph 96 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest denies the remaining allegations in Paragraph 96 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 96 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

97.     For example, Butterball has over 175 farms that they own, as well as contracts with numerous independent farmers. Jennie-O owns over 100 commercial growing farms. Cargill owns around 700 farms. Farbest has more than 200 contract growers.

**ANSWER**:  Farbest admits that at the time of this Answer, it has more than 200 contract turkey growers, but Farbest denies that it had more than 200 contract turkey growers across the

---

[9] *Industry Structure*, National Turkey Federation, https://www.eatturkey.org/industry-structure/ (last visited Dec. 16, 2019).

entire time period 2010 to 2017.  Farbest denies the remaining allegations in Paragraph 97 to the extent they relate to Farbest.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 97 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

### 3. The defendants have market power in the market for turkey for meat consumption.

98.    The integrator defendants possess market power in the market for turkey for consumption.  Defendants and their co-conspirators controlled an average of 77% of the market from 2010-2018.



**ANSWER**:  Farbest denies the conspiracy allegations in Paragraph 98.  The allegations of Paragraph 98 also set forth characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations.  To the extent the allegations in Paragraph 98 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 98 and, on this basis, denies these allegations.

### D.     The market for turkey is the type of market where the information exchanges orchestrated by Agri Stats are likely to harm competition.

99.     Competition is likely to be harmed when competitors with market power in concentrated markets, such as the market at issue, directly exchange strategic information about current and forward-looking plans for prices and supply.  The strategic information exchanged between the defendants was competitively sensitive and a material factor in negotiations.  Price, capacity, supply and costs are crucial aspects of competition.  When defendants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects of sales of turkey.

**ANSWER**:  Farbest denies the conspiracy allegations in Paragraph 99.  The allegations of Paragraph 72 also set forth characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations.  Farbest denies the remaining allegations in Paragraph 99 to the extent they relate to Farbest.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 99 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

100. The information exchange took place in private settings and involved the exchange of confidential, non-public information.

**ANSWER**: Farbest admits that it submitted certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest denies the remaining allegations in Paragraph 100 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 100 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

101. The market for turkey is characterized by numerous attributes that mean the type of information exchange facilitated by Agri Stats are particularly likely to have anticompetitive effects. In particular, the market for turkey features relatively few sellers, a fungible product, price-based competition, inelastic demand, and a trend toward price uniformity.

**ANSWER**: Paragraph 101 sets forth allegations subject to proof by expert testimony and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. To the extent Paragraph 101 contains factual allegations, Farbest denies them.

### 1. The turkey market features few sellers.

102. The turkey market is concentrated, with relatively few sellers. The defendants and co-conspirators control approximately 80 percent of turkey production and processing. The presence of few companies supports the inference that a conspiracy to exchange information had the intended effect of restraining competition.

**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 102. Paragraph 102 sets forth allegations subject to proof by expert testimony and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. Farbest lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and on that basis, denies those allegations.

### 2. Turkey is a fungible market.

103.    One of the distinct characteristics of the turkey industry is its fungibility, also known as the ability to be freely exchangeable or replaceable in whole or in part.  Common sense indicates at Thanksgiving that a consumer can substitute a whole turkey produced by Butterball with a whole turkey produced by Cargill.

**ANSWER**: Paragraph 103 sets forth allegations subject to proof by expert testimony and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 103, and on that basis, denies those allegations.

104.    Indeed, the Agri Stats reports themselves show that turkey is fungible because they aggregate data across defendants for particular types of turkey products and allow defendants to compare detailed information on prices for the same fungible product.  CW1 confirmed that the Agri Stats reports were organized by specific item of turkey product.

**ANSWER**:  To the extent the allegations in Paragraph 104 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 104, and on that basis, denies those allegations.

### 3. The turkey market features price-based competition.

105.    Turkey is a commodity market that faces price-based competition.

**ANSWER**:  Farbest denies the allegations in Paragraph 105.

### 4. Demand for turkey is relatively inelastic.

106. Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[10] A PED value between 0 and -1 indicates there is inelastic demand for the good or service – i.e., a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. The USDA has estimated that the average PED estimate for the turkey market is -0.58 – meaning the demand for turkey is inelastic. Indeed, most American consumers eat turkey at Thanksgiving, not pork or chicken, illustrating that there is no substitute for one of the key demand drivers of turkey.

**ANSWER**: Paragraph 106 sets forth allegations subject to proof by expert testimony and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. To the extent the allegations in Paragraph 106 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 106, and on that basis, denies those allegations.

### 5. The turkey market features a trend towards price uniformity.

107. Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. For example, whole turkey products are produced on a commercial scale and sold in supermarkets. Whole turkeys are virtually indistinguishable, with similar nutritional values, branding and packaging.

**ANSWER**: Paragraph 107 sets forth allegations subject to proof by expert testimony and/or legal conclusions to which no response is required, but if a response is required, Farbest

---

[10] *See, e.g.*, Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson, et al., *Price Elasticity of Demand* (Nov. 13, 1997), https://scholar.harvard.edu/files/alada/files/price_elasticity_of_demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, *The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects*, 33 J. Academy Mktg. Science 66-78 (2005), *available at* http://www.math.tau.ac.il/~fibich/Manuscripts/elasticity_JAMS.pdf.

denies such allegations. Farbest admits that whole turkey products can be produced on a commercial scale and sold in supermarkets. To the extent Paragraph 107 contains any other factual allegations, Farbest denies them.

### E. Industry-wide production cuts during the Conspiracy Period were facilitated through the information exchange conducted through Agri Stats.

108. As demonstrated in the following chart, the turkey integrators acted in a concerted way to decrease turkey supply in 2009, 2013, 2014, and 2015. Overall, industry supply decreased significantly from 2009 to 2015, before rebounding in 2016. The information exchange through Agri Stats facilitated the ability of defendants to monitor total industry levels of supply.



**Figure 1: U.S. Turkey Total Heads Slaughtered**

**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 108. To the extent the allegations in Paragraph 108 characterize, quote, or describe documents or other sources, such

sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest denies that the chart accompanying Paragraph 108 is accurate or accurately reflects Farbest's turkey supply over the years identified. As to the remaining allegations in Paragraph 108, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

### F. Abnormal pricing during the Class Period demonstrates the anticompetitive effects of the exchange of turkey information conducted through the Agri Stats sales reports.

109. Beginning in 2010, the turkey industry showed abnormal price movements, *i.e.*, price increases for the average turkey whole price unexplained by increases in costs. All of these pricing measurements show a significant break between pricing prior to 2010 and pricing after 2010, supporting the plausibility of anticompetitive effects on the turkey market from the information exchange conducted through Agri Stats. Plaintiffs have measured the various abnormal pricing movements in a number of ways, including: (i) the average turkey price, (ii) the turkey integrators' margin during the Class Period;(iii) the variation between feed and turkey prices before and during the Class Period; and (iv) a regression analysis that models the relationship between turkey prices and feed prices.

**ANSWER**: Paragraph 109 contains characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. To the extent the allegations in Paragraph 109 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest denies that it showed "abnormal pricing." As to the remaining allegations in Paragraph 109, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

1.      **The average turkey wholesale price experienced an unprecedented increase beginning in 2009.**

110.    According to aggregate prices published by the USDA, the average wholesale price per pound for turkey hens was between $0.55 and $0.85 every year from 2000 to 2009, before steadily increasing to $1.15 by 2016.  Following initiation of the *Broilers* litigation, the price of turkey then quickly returned to the price at which it was prior to the conspiracy.  The following graph shows the unprecedented increase in turkey prices beginning in 2009, and staying elevated through the end of 2016.

**Figure 2: Average Turkey Wholesale Prices in Cents per lbs., 2000-2018**



**ANSWER**:  Farbest denies the conspiracy allegations in Paragraph 110.  Paragraph 110 sets forth allegations subject to proof by expert testimony and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations.  To the extent the allegations in Paragraph 110 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest denies that the chart accompanying paragraph 110 is accurate or accurately reflects Farbest's pricing.  Farbest denies that it sells hens.  As to the remaining allegations in

Paragraph 110, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

### 2.     Beginning in 2009, defendants' revenues radically diverged from their costs.

111.    Plaintiffs' experts examined the spread between turkey revenue and turkey-related costs (costs of goods sold + operating costs) for Jennie-O Turkey, the only one of the three largest turkey integrator defendants with public earnings, as a proxy for measuring the spread between a defendant's price of wholesale turkey and their turkey costs.[11] This measurement accounts for defendant-specific operating costs.  This analysis confirms the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the Class Period in 2009.

**ANSWER**:  Paragraph 111 sets forth allegations subject to proof by expert testimony and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations.  Farbest denies the remaining allegations in Paragraph 111 to the extent they relate to Farbest.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 111 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

112.    The following chart shows a break in revenues and costs around the start of the Class Period in 2010 for Hormel's Jennie-O turkey brand:

---

[11] Hormel does not make any data publicly available on Jennie-O's costs. Therefore, plaintiffs have assumed for the purposes of this analysis that Jennie-O's costs are the same proportion to Hormel's overall costs as Jennie-O's revenues are to Hormel's overall revenues.

**Figure 3: Jennie-O's Revenues vs Costs, March 2001 to March 2018**



**ANSWER**: Paragraph 112 sets forth allegations subject to proof by expert testimony and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. To the extent the allegations in Paragraph 112 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest denies the remaining allegations in Paragraph 112 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 112 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

113. The anticompetitive effect of defendants' information exchange is seen in the dramatic increase in Jennie-O Turkey's spread between revenue and costs after the start of the conspiracy period.

**Figure 4: Jennie-O Turkey's spread: Revenue minus Cost 2001-2018**



**ANSWER**:  Farbest denies the conspiracy allegations in Paragraph 113.  Paragraph 113

sets forth allegations subject to proof by expert testimony and/or legal conclusions to which no

response is required, but if a response is required, Farbest denies such allegations.  To the extent

the allegations in Paragraph 113 characterize, quote, or describe documents or other sources, such

sources speak for themselves, and Farbest denies any characterization or description that is

inconsistent therewith.  Farbest denies the remaining allegations in Paragraph 113 to the extent

they relate to Farbest.  Farbest lacks knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 113 to the extent they relate to other Defendants

and/or third parties and, therefore, denies those allegations.


114.    These analyses of the spread between costs and prices confirm one essential fact –
that rising costs do not explain the increases in price seen during the Class Period.

**ANSWER**: Paragraph 114 sets forth allegations subject to proof by expert testimony and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. Farbest denies the remaining allegations in Paragraph 114 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 114 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

3. **During the conspiracy period, prices rose but production failed to rise to match demand, indicating an anticompetitive restraint on supply in the market for turkey facilitated by the information exchange through Agri Stats.**

115. In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should correspond to falling prices. However, in the turkey market during the conspiracy period, production, measured through USDA data, remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly. These observed price and output dynamics, shown in the below chart, are consistent with an anticompetitive effect on turkey output facilitated by the information exchange through Agri Stats.



**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 115.  Paragraph 115 sets forth allegations subject to proof by expert testimony and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations.  To the extent the allegations in Paragraph 115 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest denies that the chart accompanying paragraph 115 is accurate or accurately reflects Farbest's pricing or production.  Farbest denies the remaining allegations in Paragraph 115 to the extent they relate to Farbest.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 115 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

4. **During the conspiracy period, prices of turkey radically diverged from the costs of underlying feed.**

116.    Feed is the primary driver of turkey costs, accounting for approximately 60-70% of the overall cost of raising turkeys for sale according to the New York Times.[12] Prior to the conspiracy period, there was a tight relationship between the price of feed and the price of turkey, as would be expected in a competitive commodity market that was pricing its product based on its primary input cost.  However, during the conspiracy period, the relationship between the price of feed and the price of turkey diverged dramatically, as would be expected as an anticompetitive effect of the information exchange that allowed the integrator defendants to charge more than was justified by their input costs.  The divergence is illustrated in the below chart:



**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 116.  Paragraph 116 sets forth allegations subject to proof by expert testimony and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations.  To the extent the allegations in Paragraph 116 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest denies that the chart accompanying Paragraph 116 is accurate or accurately reflects Farbest's pricing or costs.  Farbest denies that it sells hens.  Farbest denies the

---

[12] Paul Sullivan, *In the Labyrinth of Turkey Pricing, a Reason Under Every Giblet*, *supra* note **Error! Bookmark not defined.**

remaining allegations in Paragraph 12 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 12 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

### 5. A regression model demonstrates the anticompetitive effects on the price of turkey caused by the information exchange conducted through Agri Stats.

117. To demonstrate the anticompetitive effects of defendants' information exchange on the market for turkey, plaintiffs' experts have done a regression model based on the relationship between the price of turkey hens and the price of turkey feed, which is the primary input cost for turkeys. The formula of the regression is the following: $(HenPrice) = \alpha + \beta(FeedPrice)t + \varepsilon t$. As shown below, the regression shows a significant elevation in the prices of turkey during the conspiracy period, showing the effects of the information exchange through Agri Stats:



**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 117. Paragraph 117 contains characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony,

and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. To the extent the allegations in Paragraph 117 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest denies that the chart accompanying Paragraph 117 is accurate or accurately reflects Farbest's pricing or costs. Farbest denies that it sells hens. Farbest denies the remaining allegations in Paragraph 117 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 117 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

### G.   Defendants actively concealed the extent of their information exchange and plaintiffs did not and could not have discovered defendants' anticompetitive conduct.

118.   Plaintiffs and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this complaint. Defendants engaged in a secret information exchange that did not reveal facts that would put plaintiffs or the Class on inquiry notice that there was an anticompetitive agreement to exchange information regarding the market for turkey. Throughout the Class Period, defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from plaintiffs and class members.

**ANSWER**: Farbest denies the conspiracy allegations in Paragraph 118. Paragraph 118 contains characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. Farbest denies the remaining allegations in Paragraph 118.

119.   In 2009, the President of Agri Stats, Bryan Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

Agri Stats has always been kind of a quiet company. ***There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background***, and really our specialty is working directly with companies about their opportunities and so forth.

**ANSWER**: To the extent the allegations in Paragraph 119 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. As to the remaining allegations in Paragraph 119, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

120. At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidential[] nature of the information."

**ANSWER**: To the extent the allegations in Paragraph 120 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. As to the remaining allegations in Paragraph 120, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

121. Not until recently was the extent of the information exchange conducted through Agri Stats widely known or reported. Only after the filing of a February 7, 2018 Second Consolidated and Amended Complaint by the End User Plaintiff Class in the *In re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the confidential services that Agri Stats provides to its clients in the broiler industry.

**ANSWER**:  To the extent the allegations in Paragraph 121 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  As to the remaining allegations in Paragraph 121, including but not limited to the extent those allegations relate to other Defendants and/or third parties, Farbest lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies those allegations.

122.    The filing of that amended complaint collectively disclosed the likelihood that the turkey industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

**ANSWER**:  Farbest denies the conspiracy allegations in Paragraph 122.  To the extent the allegations in Paragraph 122 characterize, quote, or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest denies the remaining allegations in Paragraph 122 to the extent they relate to Farbest.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 122 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

123.    Defendants concealed the extent of their information exchange through Agri Stats. Indeed, to this day, it is not publicly known the number of companies that receive Agri Stats reports regarding turkey.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of defendants' turkey prices before these recent events.

**ANSWER**: Farbest denies the allegations in paragraph 123.

**H.    Defendants had numerous opportunities to collude.**

124.    Defendant integrators are members of several turkey-related trade associations and other forums, which they used to facilitate their conspiratorial conduct.  Turkey producers have numerous regular events through which they can communicate in person with one another. Regular and frequent attendance by defendants' CEOs and top-level executives at trade-association meetings is the norm rather than the exception.

**ANSWER**:  Farbest denies the conspiracy allegations in Paragraph 124.  Farbest admits

that at times it has been a member and attended meetings of certain legitimate trade associations.

Farbest denies the remaining allegations in Paragraph 124 to the extent they relate to Farbest.

Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 124 to the extent they relate to other Defendants and/or third parties and,

therefore, denies those allegations.

125.    Nearly every defendant integrator's CEO has representatives on the board of directors or executive committee of these trade associations.

**ANSWER**:  Farbest admits that at times it has been a member of certain legitimate trade

associations and that personnel of Farbest have at times held positions in such legitimate trade

associations, including on the Board of Directors for and Executive Committee of the National

Turkey Federation at certain points during the time period 2010-2017.  Farbest denies the

remaining allegations in Paragraph 125 to the extent they relate to Farbest.  Farbest lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

Paragraph 125 to the extent they relate to other Defendants and/or third parties and, therefore,

denies those allegations.

126.    The National Turkey Federation is a national advocate for turkey farmers and processors; members include growers, processors, hatchers, breeders, distributors, allied services,

and state associations.  High-ranking executives of Butterball, Jennie-O Turkey Store (Hormel), Cargill, Tyson, Farbest, and Perdue currently serve as officers or on the executive committee; and nearly all of the defendants have membership in this trade association.  In addition to regular board and executive committee meetings, the federation holds an annual convention in February and an annual leadership conference in July where these executives gather and discuss turkey-related information.

**ANSWER**:  Farbest admits that at times it has been a member of certain legitimate trade associations, including the National Turkey Federation, and that personnel of Farbest have at times held positions in such legitimate trade associations, including on the Board of Directors for and Executive Committee of the National Turkey Federation at certain points during the time period 2010-2017.  Farbest further admits that the National Turkey Federation has held conventions and conferences from time to time.  Farbest denies the remaining allegations in Paragraph 126 to the extent they relate to Farbest.  Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 126 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

127.    Upon information and belief, the top-level executives from defendants discuss topics with one another relating to pricing, production, and other non-public proprietary information outside of the National Turkey Federation's formal meetings.  These regular, informal, and in-person opportunities to discuss pricing and production in the turkey industry gives CEOs and top-level executives comfort that their competitors remain committed to a plan to artificially restrict turkey production.

**ANSWER**: Farbest denies the allegations in Paragraph 127.

128.    The United States Poultry & Egg Export Council (USAPEEC) has its home office in Stone Mountain, Georgia.  Defendants are all members of the council.  USAPEEC has a network of international offices and consultants in key export markets.  The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world.  The council has evolved into an advocate for the industry on trade-policy issues.  USAPEEC has about 200 member companies and organizations.  The council holds Board of Directors meetings quarterly and includes executives from all or nearly all defendants.

**ANSWER**: Farbest admits that it is a member of and previously had personnel on the Board of Directors for the USAPEEC. Farbest denies the remaining allegations in Paragraph 128 to the extent they relate to Farbest. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 128 to the extent they relate to other Defendants and/or third parties and, therefore, denies those allegations.

129.    The U.S. Poultry & Egg Association (U.S. Poultry) describes itself as the world's largest and most active poultry organization. U.S. Poultry's members include producers and processors of broilers, turkeys, ducks, eggs, and breeding stock, as well as allied companies. Many of the defendants are members of U.S. Poultry. U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall. Butterball, Cargill, Foster, Tyson, and Perdue have representation on the Board of Directors.

**ANSWER**: Farbest admits that it has previously been a member of the U.S. Poultry & Egg Association. Farbest lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 129, and on that basis, denies those allegations.

130.    The North American Meat Institute (NAMI) represents companies that process 95% of red meat and 70% of turkey products in the United States and their suppliers throughout the country. NAMI hosts the Meat Industry Summit in April each year. Additionally, it hold regular Board of Director meetings. Butterball, Cargill, Hormel, and Tyson have representation on the NAMI Board.

**ANSWER**: Farbest lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 130, and on that basis, denies those allegations.

## V.    CLASS ACTION ALLEGATIONS

131.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking compensatory damages and injunctive relief pursuant to federal law on behalf of the members of the following class:

> All persons and entities who directly purchased turkey from Defendants or co-conspirators for personal use in the United States during the Class

Period. Specifically excluded from this Class are the Defendants and co-conspirators; the officers, directors or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant or co- conspirator. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

**ANSWER**: Paragraph 131 contains characterizations of Plaintiffs' claims and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. To the extent Paragraph 131 contains characterization or description of provisions of the Federal Rules of Civil Procedure, the provisions referenced in or underlying Paragraph 131 speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest further denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. To the extent Paragraph 131 contains factual allegations, Farbest denies those allegations.

132. <u>Class Identity</u>: The above-defined class is readily identifiable and is one for which records should exist.

**ANSWER**: Paragraph 132 contains characterizations of Plaintiffs' claims and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. Farbest denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. To the extent Paragraph 132 contains factual allegations, Farbest denies those allegations.

133. <u>Numerosity</u>: Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of defendants, retailers, resellers and other

entities in the supply chain of turkey. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

**ANSWER**: Paragraph 133 contains characterizations of Plaintiffs' claims and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. Farbest denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. To the extent the remainder of Paragraph 133 contains factual allegations, Farbest denies those allegations.

134. Typicality: Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs purchased turkey directly from one or more of the defendants for personal use, and therefore plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

**ANSWER**: Paragraph 134 contains characterizations of Plaintiffs' claims and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. Farbest denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. To the extent Paragraph 134 contains factual allegations, Farbest denies those allegations.

135. Common Questions Predominate: There are questions of law and fact common to the Class, including, but not limited to:

A. Whether defendants and their co-conspirators engaged in an information exchange agreement that reduced or suppressed competition in the market for turkey;

B. The identity of the participants of the alleged agreement;

C. The duration of the agreement alleged herein and the acts performed by defendants and their co-conspirators in furtherance of the agreement;

D.      Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the plaintiffs and the other members of the Class;

E.      The effect of defendants' alleged conspiracy on the prices of turkey sold in the United States during the Class Period; and

F.      The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

**ANSWER**:  Paragraph 135 contains characterizations of Plaintiffs' claims and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations.  Farbest denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise.  To the extent Paragraph 135 contains factual allegations, Farbest denies those allegations.

136.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class in that plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class who directly purchased turkey from defendants and plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

**ANSWER**:  Paragraph 136 contains characterizations of Plaintiffs' claims and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations.  Farbest denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise.  To the extent Paragraph 136 contains factual allegations, Farbest denies those allegations.

137.    Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the

Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

**ANSWER**: Paragraph 137 contains characterizations of Plaintiffs' claims and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. Farbest denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. To the extent Paragraph 137 contains factual allegations, Farbest denies those allegations.

138. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

**ANSWER**: Paragraph 138 contains characterizations of Plaintiffs' claims and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. Farbest denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. To the extent Paragraph 138 contains factual allegations, Farbest denies those allegations.

139. Plaintiffs bring the action on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that directly purchased one or more turkey products that a defendant or co-conspirator produced during the respective class periods.

**ANSWER**: Paragraph 139 contains characterizations of Plaintiffs' claims and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such

allegations. To the extent Paragraph 139 contains characterization or description of provisions of the Federal Rules of Civil Procedure, the provisions referenced in or underlying Paragraph 139 speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith. Farbest denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. To the extent Paragraph 139 contains factual allegations, Farbest denies those allegations.

140. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**ANSWER**: Paragraph 140 contains characterizations of Plaintiffs' claims and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. Farbest denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. To the extent Paragraph 140 contains factual allegations, Farbest denies those allegations.

## VI. ANTITRUST INJURY

141. Defendants' anticompetitive conduct had the following effects, among others:

A. Price competition has been restrained or eliminated with respect to turkey;

B. The prices of turkey have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C. Direct purchasers of turkey have been deprived of free and open competition; and

D. Direct purchasers of turkey, including plaintiffs, paid artificially inflated prices.

**ANSWER**: Farbest denies the allegations in Paragraph 141.

142.     Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge paid by the direct purchasers. Thus, the economic harm to plaintiffs and the class members can be quantified.

**ANSWER**:  Paragraph 142 contains characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations. To the extent Paragraph 142 contains factual allegations, Farbest denies those allegations.

143.     The purpose of the conspiratorial conduct of defendants and their co-conspirators was to raise, fix, or maintain the price of turkey and, as a direct and foreseeable result, plaintiffs and the Class paid supra-competitive prices for turkey during the Class Period.

**ANSWER**: Farbest denies the allegations in Paragraph 143.

144.     By reason of the alleged violations of the antitrust laws, plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for turkey than they would have paid in the absence of defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

**ANSWER**: Farbest denies the allegations in Paragraph 144.

145.     This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**ANSWER**: Farbest denies the allegations in Paragraph 145.

## VII.    CAUSE OF ACTION

## VIOLATION OF THE SHERMAN ACT

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR**
**CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION**
**15 U.S.C. § 1**
**(ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND**
**EQUITABLE RELIEF AND DAMAGES)**

146.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER**:     Farbest incorporates by reference its answers to each preceding and succeeding paragraph, as if fully set forth herein in response to Paragraph 146 of the Complaint.

147.     Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 2010, and continuing at least until January 1, 2017, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations.  This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER**:  Farbest denies the allegations in Paragraph 147.

148.     Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of defendants' affairs.

**ANSWER**:  Farbest denies the allegations in Paragraph 148.

149.     Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for turkey throughout the United States.

**ANSWER**:  Farbest denies the allegations in Paragraph 149.

150.    The relevant product market is turkey and the relevant geographic market is the continental United States.

**ANSWER**:  Paragraph 150 contains characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations.  To the extent Paragraph 150 contains factual allegations, Farbest denies those allegations.

151.    Defendant integrators possess market power in the Relevant Market.  Defendant integrators and their co-conspirators controlled approximately 80 percent of the Relevant Market. Defendant integrators' collective market power includes the power to artificially deflate the amount of turkey produced in the United States below competitive levels and to artificially inflate the price plaintiffs pay for turkey above competitive levels.

**ANSWER**:  Paragraph 151 contains characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations.  To the extent Paragraph 151 contains factual allegations, Farbest denies those allegations.

152.    Defendants could impose an increase in the price of turkey collectively without causing many consumers to switch their purchases to another product.  Turkey constitutes a unique product market.

**ANSWER**:  Paragraph 152 contains characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations.  To the extent Paragraph 152 contains factual allegations, Farbest denies those allegations.

153.     Defendants view the turkey products as fungible.  Turkey products are generally interchangeable, permitting defendant integrators to readily to compare and match each other's pricing.

**ANSWER**:  Paragraph 152 contains characterizations of Plaintiffs' claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required, but if a response is required, Farbest denies such allegations.  To the extent Paragraph 152 contains factual allegations, Farbest denies those allegations.

154.     The information regularly exchanged by defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public information about current supply, production and pricing plans regarding turkey.  The information exchanges specifically included the exchange through Agri Stats of weekly and monthly reports regarding defendants' turkey operations, including weekly sales data that allowed defendants to compare their prices with their competitors and raise prices that were lower.

**ANSWER**: To the extent the allegations in Paragraph 154 characterize or describe documents or other sources, such sources speak for themselves, and Farbest denies any characterization or description that is inconsistent therewith.  Farbest admits that it submitted certain information to Agri Stats and that it received Agri Stats reports containing anonymized information regarding certain turkey complexes for pro-competitive benchmarking purposes. Farbest denies the remaining allegations in Paragraph 154.

155.     Defendants' regular information exchanges through Agri Stats reflected concerted action between horizontal competitors in the market for turkey.

**ANSWER**:  Farbest denies the allegations in Paragraph 155.

156.     Each defendant integrator furnished competitively sensitive information to other defendant integrators with the understanding that it would be reciprocated.  Agri Stats enforced this understanding by requiring defendants to share data in order to receive comparable data.

**ANSWER**: Farbest denies the allegations in Paragraph 156.

157.    The agreement to regularly exchange detailed and non-public information about current production, supply, and pricing suppressed competition between the defendants. Agri Stats specifically identified for defendants the instances where their pricing was lower than other defendants and where they could raise their prices to match.

**ANSWER**: Farbest denies the allegations in Paragraph 157.

158.    When defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly, defendants used the data obtained through Agri Stats to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the turkey market. This strategic information was a material factor in defendant integrators' decisions to inflate the prices that plaintiffs paid for turkey during the Class Period.

**ANSWER**: Farbest denies the allegations in Paragraph 158.

159.    Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

**ANSWER**: Farbest denies the allegations in Paragraph 159.

160.    The information-exchange agreement has had the effect of (1) reducing and suppressing competition among defendants in the market for turkey in the United States and (2) inflating the prices of turkey during the Class Period.

**ANSWER**: Farbest denies the allegations in Paragraph 160.

161.    As a result of defendants' unlawful conduct, plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for turkey.

**ANSWER**: Farbest denies the allegations in Paragraph 161.

162.     As a direct and proximate result of defendants' anticompetitive conduct, plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for turkey than they would have paid and will pay in the absence of the conspiracy.

**ANSWER**: Farbest denies the allegations in Paragraph 162.

163.     The alleged contract, combination, or conspiracy is also a *per se* violation of the federal antitrust laws.

**ANSWER**: Farbest denies the allegations in Paragraph 163.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully requests judgment against defendants as follows:

164.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

**ANSWER**:  Paragraph 164 contains no factual assertions to which a response is required.

Paragraph 164 further states legal conclusions and Plaintiffs' characterizations of this action, with

which Farbest disagrees and to which no response is required.  To the extent Paragraph 164 may

be deemed to require a response, it is denied.  Farbest denies that Plaintiffs are entitled to any of

the relief requested in Paragraph 164.

165.     The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

**ANSWER**:  Paragraph 165 contains no factual assertions to which a response is required.

Paragraph 165 further states legal conclusions and Plaintiffs' characterizations of this action, with

which Farbest disagrees and to which no response is required.  To the extent Paragraph 165 may

be deemed to require a response, it is denied.  Farbest denies that Plaintiffs are entitled to any of

the relief requested in Paragraph 165.

166.     Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgments in favor of plaintiffs and the members of the Class be entered against defendants in an amount to be trebled to the extent such laws permit;

**ANSWER**:  Paragraph 166 contains no factual assertions to which a response is required.

Paragraph 166 further states legal conclusions and Plaintiffs' characterizations of this action, with

which Farbest disagrees and to which no response is required.  To the extent Paragraph 166 may

be deemed to require a response, it is denied.  Farbest denies that Plaintiffs are entitled to any of

the relief requested in Paragraph 166.

167.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

**ANSWER**:  Paragraph 167 contains no factual assertions to which a response is required.

Paragraph 167 further states legal conclusions and Plaintiffs' characterizations of this action, with

which Farbest disagrees and to which no response is required.  To the extent Paragraph 167 may

be deemed to require a response, it is denied. Farbest denies that Plaintiffs are entitled to any of the relief requested in Paragraph 167.

168.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

**ANSWER**:  Paragraph 168 contains no factual assertions to which a response is required. Paragraph 168 further states legal conclusions and Plaintiffs' characterizations of this action, with which Farbest disagrees and to which no response is required.  To the extent Paragraph 168 may be deemed to require a response, it is denied.  Farbest denies that Plaintiffs are entitled to any of the relief requested in Paragraph 168.

169.     Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

**ANSWER**:  Paragraph 169 contains no factual assertions to which a response is required. Paragraph 169 further states legal conclusions and Plaintiffs' characterizations of this action, with which Farbest disagrees and to which no response is required.  To the extent Paragraph 169 may be deemed to require a response, it is denied.  Farbest denies that Plaintiffs are entitled to any of the relief requested in Paragraph 169.

170.     Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

**ANSWER**:  Paragraph 170 contains no factual assertions to which a response is required. Paragraph 170 further states legal conclusions and Plaintiffs' characterizations of this action, with which Farbest disagrees and to which no response is required.  To the extent Paragraph 170 may be deemed to require a response, it is denied.  Farbest denies that Plaintiffs are entitled to any of the relief requested in Paragraph 170.

171.    Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

**ANSWER**:  Paragraph 171 contains no factual assertions to which a response is required. Paragraph 171 further states legal conclusions and Plaintiffs' characterizations of this action, with which Farbest disagrees and to which no response is required.  To the extent Paragraph 171 may be deemed to require a response, it is denied.  Farbest denies that Plaintiffs are entitled to any of the relief requested in Paragraph 171.

## IX.    JURY TRIAL DEMANDED

172.    Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**ANSWER**:  Paragraph 172 contains no factual assertions to which a response is required. To the extent Paragraph 172 is deemed to require a response, Farbest also demands a jury trial as set forth below.

## ADDITIONAL ALLEGATIONS AND GENERAL DENIAL

Farbest denies all allegations in the Complaint unless Farbest has expressly admitted those allegations herein.  Where an allegation in the Complaint is directed at another Defendant or a party that is not affiliated with Farbest, then except as otherwise expressly stated, Farbest denies

the allegations set forth in the Complaint on the basis that it lacks the knowledge or information sufficient to form a belief concerning the truth of such allegations. Further, unless otherwise expressly admitted, Farbest denies any allegations in the headings, footnotes or in other places in the Complaint, to the extent that any such allegations require a response. Any headings, subheadings or similar text that Farbest has included in this Answer are for the convenience of the Court and the parties, and are not intended to be nor shall they be construed as an admission of any fact by Farbest.

## AFFIRMATIVE DEFENSES

Without assuming any burden that it otherwise would not bear, and reserving the right to assert additional defenses as those defenses become known during discovery, Farbest asserts the following separate and additional defenses. Farbest also reserves all affirmative defenses under Federal Rule of Civil Procedure 8(c) and any other defenses at law or equity that may exist now or in the future. Farbest adopts by reference any additional applicable defenses plead by any defendant in this action.

## GENERAL DEFENSES

## FIRST DEFENSE

1.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part because the applicable statute of limitations has lapsed with respect to such claims.

2.      The statute of limitations for Plaintiffs' claims is four years. 15 U.S.C. § 15(b). Thus, their claims must be dismissed unless Plaintiffs can sufficiently allege that they could not have discovered the claimed offense within the limitations period exercising reasonable diligence.

3.      Plaintiffs cannot satisfy this burden because the challenged conduct occurred more than ten years ago. *See* Compl. ¶¶ 7-9 (Plaintiffs allege that Agri Stats made a public statement in 2009 that "'about 95% of the turkey industry [is] participating" in Agri Stats," that Agri Stats used a presentation slide in 2010 that named 24 turkey producers who participated in Agri Stats, and that the "slide shows that each of the defendant integrators and Co-Conspirator Integrators entered into an agreement to exchange information regarding their turkey operations through Agri Stats during the conspiracy period."); Compl.¶¶ 12, 24 (Plaintiffs allege public statements by one Defendant in 2009 and 2011 about the use and importance of Agri Stats benchmarking data for business operations).

4.      The public disclosure of the facts alleged by Plaintiffs about the use of Agri Stats benchmarking data for business operations occurred outside the applicable statute of limitation time period. The existence of these disclosures triggered Plaintiff's duty to investigate at least as far back as 2009, which Plaintiff failed to do. Plaintiff's attempt to justify its delay fails because they merely recycled its underlying allegations and then conclusively asserted fraudulent concealment. Compl. ¶¶ 118-123. Plaintiff's claims are similarly barred, in whole or in part, to the extent it agreed to contractual limitations periods during which it must have brought its claims, but failed to do so. Accordingly, Plaintiff's Complaint is time-barred.

## SECOND DEFENSE

5.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of laches.

6.      The laches doctrine dictates that those who sleep on their rights, lose them. Specifically, laches will bar relief where a party shows an unreasonable lack of diligence by the party against whom the defense is asserted and prejudice arising therefrom.

7.      Farbest hereby incorporates the  above Paragraphs 1-4 in support of this defense. Plaintiffs demonstrated an unreasonable lack of diligence in bringing their claims because the challenged conduct that underlies Plaintiffs' claims occurred more than ten years ago. Yet, Plaintiff sat on its rights until the end of 2019, prejudicing Farbest.

8.      Accordingly, the equitable principles embodied in the laches doctrine bars Plaintiffs from seeking relief.

**THIRD DEFENSE**

9.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of estoppel.

10.      The precise set of facts Plaintiffs cite in support of their claims were made public more than four years ago. Farbest hereby incorporates Paragraphs 1-5 in support of this defense.

11.      Farbest relied in good faith, and to its detriment, on Plaintiffs' actions in continuing to purchase Turkey without complaint.

12.      Farbest had no knowledge of Plaintiffs' alleged complaints or means to discover these complaints.

13.      Plaintiffs' claims are therefore estopped.

**FOURTH DEFENSE**

14.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of waiver.

15.      The precise set of facts Plaintiff cites in support of its claims were made public more than four years ago. Farbest hereby incorporates Paragraphs 1-4 in support of this defense.

16.     Plaintiffs' conduct in continuing to purchase turkey products at what it now alleges are inflated prices is evidence of an intention to waive any right to bring this suit and was inconsistent with any intention other than to waive its right to bring suit.

17.     Plaintiffs, by their actions, accepted the benefits of an ongoing relationship with Farbest and relinquished their rights to bring this suit.

## FIFTH DEFENSE

18.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because Plaintiffs have not suffered any injury in fact and/or any injury cognizable under the antitrust laws.

19.     Plaintiffs' alleged harm lies in their speculation that a conspiracy among many companies colluded seamlessly over almost a decade resulting in their harm. In essence, Plaintiffs complain about the impact of naturally unpredictable changes in the market conditions that exist in a global economy.

20.     To the extent that Plaintiffs maintain that they were injured by these events, such an injury is not cognizable under the antitrust laws.

## SIXTH DEFENSE

21.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because Plaintiffs failed to exercise reasonable care to mitigate any damages they may have suffered.

22.     The precise set of facts Plaintiffs cite in support of their claims were made public years ago. Farbest hereby incorporates Paragraphs 1-4 in support of this defense.

23.     To the extent Plaintiffs believed that Farbest had unfairly increased the price of turkey products, Plaintiff had an obligation to mitigate its damages by seeking other sources

of supply, including from other producers. To the extent Plaintiff alleges that the price of turkey products was unfairly manipulated through the use of indices, Plaintiff had an obligation to renegotiate contracts to use different indices or no index at all in pricing.

24.     Plaintiffs' failure to exercise reasonable care to mitigate damages was the complete or partial cause of any damages Plaintiffs may have suffered.

### SEVENTH DEFENSE

25.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because any alleged injuries and damages were not legally or proximately caused by any acts or omissions of Farbest or were caused, if at all, solely and proximately by Plaintiffs' conduct or by the conduct of third parties including, without limitation, the prior, intervening or superseding conduct of Plaintiffs or such third parties.

### EIGHTH DEFENSE

26.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, due to the ratification of, and consent to, the conduct of Farbest.

27.     Farbest hereby incorporates Paragraphs 1-4 above in support of this defense.

28.     Plaintiffs' Complaint relies on publicly available information—much of which has been available for years—thereby demonstrating its long-standing ratification of and consent to the complained-of conduct.

29.     For example, Plaintiffs have known for more than a decade that certain turkey producers participate in and receive reports from Agri Stats. Rather than complain of turkey producers' use of Agri Stats reports, Plaintiffs silently reaped the benefits of the reports' pro-competitive effects for years. Specifically, Plaintiff reaps the benefits of increased competition, lower cost product, and more efficiently produced turkey products.

30.     Plaintiff also benefits from Defendants' participation in trade association and other industry events. These meetings and events promote, among other issues, lobbying efforts, regulations, industry safety, animal health, and training and education.

31.     Accordingly, because Plaintiff has been aware for years of the very same conduct it now challenges—much of which has provided Plaintiffs a direct benefit—Plaintiffs' claims are barred by the doctrine of ratification.

## NINTH DEFENSE

32.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, to the extent the sales contracts pursuant to which Plaintiffs purchased turkey contain arbitration clauses or clauses providing a different forum for the resolution of their claims. *See, e.g.*, *Cont'l Ins. Co. v. M/V Orsula*, 354 F.3d 603 (7th Cir. 2003); *West Shore Pipe Line Co. v. Associated Electric & Gas Ins. Services, Ltd.*, 791 F. Supp. 200 (N.D. Ill. 1992).

## TENTH DEFENSE

33.     Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by Farbest's right to set off any amounts paid to Plaintiffs by any Defendants other than Farbest who have settled, or do settle, Plaintiffs' claims against them in this action.

## ELEVENTH DEFENSE

34.     Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, to the extent that Plaintiffs entered into cost-plus

contracts with parties who purchased from Plaintiffs before Plaintiffs began paying any purported overcharge.

## TWELFTH DEFENSE

35.     Plaintiffs' claims and claims of any putative class members are barred, in whole or in part, to the extent they seek improper multiple damage awards, and damage awards duplicative of those sought in other actions, in violation of the Due Process guarantees of the Fifth and Fourteenth Amendments of the United States Constitution.

## THIRTEENTH DEFENSE

36.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because the damages alleged are too speculative and remote, and because of the impossibility of the ascertainment and allocation of such alleged damage.

## FOURTEENTH DEFENSE

37.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because Plaintiffs have failed to state a claim upon which relief can be granted.

## FIFTEENTH DEFENSE

38.     Farbest adopts and incorporates by reference any and all other defenses asserted by any other Defendant to the extent that the defense would apply to Farbest.

## SIXTEENTH DEFENSE

39.     Farbest reserves the right to assert other defenses as this action proceeds up to and including the time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Farbest respectfully requests that judgment be entered in favor of Farbest and the other Defendants and against Plaintiffs, dismissing the Complaint in its entirety with

prejudice. Farbest further requests that this Court (i) award Farbest its costs and disbursements, and (ii) award such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to the Federal Rules of Civil Procedure 38, Farbest demands a trial by jury on all claims and defenses upon which it is entitled to a jury trial.

Dated: December 4, 2020      Respectfully submitted,

            /s/Gaspare J. Bono
            Gaspare J. Bono (*Pro Hac Vice*)
            Claire M. Maddox (*Pro Hac Vice*)
            Leslie A. Barry (*Pro Hac Vice*)
            DENTONS US LLP
            1900 K Street NW
            Washington, DC 20006
            (202) 496-7500
            gap.bono@dentons.com
            claire.maddox@dentons.com
            leslie.barry@dentons.com

            /s/ Michael K. Sciaccotta
            Michael K. Sciaccotta
            DENTONS US LLP
            233 S. Wacker Drive, Suite 5900
            Chicago, IL 60606
            (312) 876-8000
            michael.sciaccotta@dentons.com

            *Counsel for Farbest Foods, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Michael K. Sciaccotta, an attorney, hereby certify that on December 4, 2020, I caused a true and correct copy of the foregoing to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all persons by operation of the court's electronic filing system.

By: <u>/s/ Michael K. Sciaccotta</u>