**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| |
|---|
| *In re Turkey Antitrust Litig.* |

No. 1:19-cv-08318

## <u>BUTTERBALL'S ANSWER</u>

## TABLE OF CONTENTS[*]

**Page**

I.    NATURE OF ACTION ................................................................................ 1

II.   JURISDICTION AND VENUE .............................................................. 15

III.  PARTIES ................................................................................................ 16

     A.    Plaintiffs .................................................................................. 16

     B.    Defendants ............................................................................... 17

     C.    Co-Conspirators ...................................................................... 22

IV.  FACTUAL ALLEGATIONS .................................................................. 23

     A.    Agri Stats' information exchange services began in the broiler industry, where it has been used to facilitate widespread collusion. ................................... 24

     B.    Defendants entered into an agreement to exchange information through Agri Stats regarding their production and sales of turkey. ................................... 26

     C.    Defendants possess market power in the market for turkey and turkey is the type of product for which information exchange is particularly likely to have anticompetitive effects. .......................................................... 33

          1.    Defendants have market power in the market for turkey........................ 33

          2.    There are high barriers to entry in the market for turkey for meat consumption. ............................................................................ 33

          3.    The defendants have market power in the market for turkey for meat consumption. ............................................................................ 35

     D.    The market for turkey is the type of market where the information exchanges orchestrated by Agri Stats are likely to harm competition. ................. 36

          1.    The turkey market features few sellers. ................................... 36

          2.    Turkey is a fungible market. ................................................... 36

          3.    The turkey market features price-based competition. .............................. 37

---

[*] **_Butterball Answer_**: To the extent any heading requires an answer, Butterball denies each and every heading in the Complaint.

## TABLE OF CONTENTS
(cont'd)

**Page**

4. Demand for turkey is relatively inelastic. ................................... 38

5. The turkey market features a trend towards price uniformity.................. 38

E. Industry-wide production cuts during the Conspiracy Period were facilitated through the information exchange conducted through Agri Stats. ............................................................................................ 38

F. Abnormal pricing during the Class Period demonstrates the anticompetitive effects of the exchange of turkey information conducted through the Agri Stats sales reports. ................................................. 39

1. The average turkey wholesale price experienced an unprecedented increase beginning in 2009. ...................................................... 39

2. Beginning in 2009, defendants' revenues radically diverged from their costs. ............................................................................... 40

3. During the conspiracy period, prices rose but production failed to rise to match demand, indicating an anticompetitive restraint on supply in the market for turkey facilitated by the information exchange through Agri Stats. .................................................... 42

4. During the conspiracy period, prices of turkey radically diverged from the costs of underlying feed. ............................................ 43

5. A regression model demonstrates the anticompetitive effects on the price of turkey caused by the information exchange conducted through Agri Stats. .................................................................... 44

G. Defendants actively concealed the extent of their information exchange and plaintiffs did not and could not have discovered defendants' anticompetitive conduct. ................................................................... 45

H. Defendants had numerous opportunities to collude............................. 47

V. CLASS ACTION ALLEGATIONS ................................................. 49

VI. ANTITRUST INJURY ................................................................ 52

VII. CAUSE OF ACTION  VIOLATION OF THE SHERMAN ACT................... 53

VIII. REQUEST FOR RELIEF ............................................................ 55

IX. JURY TRIAL DEMANDED ......................................................... 57

Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class consisting of all persons and entities who purchased turkey directly from a defendant or co-conspirator in the United States beginning at least as early as January 1, 2010 through January 1, 2017 (Class Period).[1] Plaintiffs bring this action for treble damages and injunctive relief under Section 1 of the Sherman Act. Plaintiffs demand a trial by jury.

**Answer:**  This paragraph does not contain any factual allegations, and as such, no response is required.  To the extent a response is required, Butterball denies that it is liable, denies that plaintiffs can satisfy the requirements of Federal Rule of Civil Procedure 23, and denies that plaintiffs are entitled to any relief.

## I.  NATURE OF ACTION

1.  The turkey integrator defendants are the leading suppliers of turkey in an industry with approximately $5 billion in annual commerce. The turkey industry is highly concentrated, with a small number of large producers in the United States controlling supply. Defendants and their co-conspirators collectively control approximately 80 percent of the wholesale turkey market in the United States. The turkey integrator defendants are Butterball LLC (Butterball); Cargill Inc. and Cargill Meat Solutions Corporation, (together and separately, Cargill); Cooper Farms, Inc. (Cooper Farms); Farbest Foods, Inc., (Farbest); Foster Farms LLC and Foster Poultry Farms (together and separately, Foster Farms); Hormel Foods Corporation and Hormel Foods LLC (together and separately, Hormel); House of Raeford Farms, Inc., (House of Raeford); Kraft Heinz Foods Company and Kraft Foods Group Brands LLC (together and separately, Kraft Foods), Perdue Farms, Inc. and Perdue Foods LLC (together and separately, Perdue); Tyson Foods, Inc., The Hillshire Brands Company, Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. (together and separately, Tyson).

**Answer to Paragraph 1:**  Butterball admits that it processes and sells turkeys. Butterball denies that the turkey industry is "highly concentrated" or that it is proper to "collectively" aggregate the shares of the various defendants to this action.  Butterball further denies that it has "conspired" with any other defendant.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

---

[1]For purposes of this complaint, turkey includes turkey meat purchased fresh or frozen, and either uncooked or cooked. **Answer to Complaint Footnote 1:**  This footnote is definitional, and therefore does not require a response.  To the extent a response is required, Butterball notes that different turkey products are different, are produced by different companies, are bought by different customers, and face different supply and demand characteristics.

2.      Defendant Agri Stats is a company that provides secretive information exchange services to companies in a variety of agricultural sectors, including pork, chicken, and turkey.

**Answer to Paragraph 2:**      Butterball admits that Agri Stats provided certain reports to Butterball from time to time.  Butterball denies that Agri Stats is an "information exchange service," that the information is "secretive," and that the information is competitively sensitive.  Butterball lacks sufficient knowledge or information to form a belief about the services that Agri Stats provides to entities other than Butterball, and therefore, denies the same.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

3.      The turkey integrator defendants each entered into an agreement from at least 2010 to January 1, 2017, to exchange sensitive information through Agri Stats regarding their production and sales of turkey.

**Answer to Paragraph 3:**      Denied.

4.      Agri Stats reports are far different from lawful industry reports. Agri Stats gathers detailed financial and production data from each of the turkey integrators, standardizes this information, and produces customized reports and graphs for the co-conspirators. On a monthly basis, Agri Stats provides the turkey integrators with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information).

**Answer to Paragraph 4:**      Butterball avers that Agri Stats reports are lawful and procompetitive.  Butterball denies that Agri Stats reports are meaningfully different from other lawful industry reports.  Butterball admits that it has submitted certain information to Agri Stats, and that Agri Stats has provided Butterball with certain reports from time to time.  Butterball denies that the reports it receives contain "current or forward-looking sensitive information."  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

5.      The United States Supreme Court has long recognized that "exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects."[2] Agri Stats' sales reports prove the truth of that maxim. Agri Stats prepared monthly reports for defendants regarding their sales of turkey that identified, on a specific product by product level, the prices and returns that each defendant was obtaining on their sales of turkey. These reports,

---

[2]*United States v. U.S. Gypsum Co.,* 438 U.S. 422, 443 (1978).

unavailable to anybody besides Agri Stats subscribers, allowed the integrator defendants to easily identify potential opportunities where their prices for turkey products were significantly lower than their competitors.

**Answer to Paragraph 5:**     The first sentence of this paragraph constitutes legal argument and does not require a response.  To the extent a response is required, the quote is incomplete, taken out of context, and as phrased does not reflect the current state of the law. Butterball denies the second and third sentences of paragraph 5.  Butterball admits that Agri Stats reports are available to any subscribers who purchase those reports from Agri Stats.  Butterball denies that Agri Stats reports gave Butterball any ability to coordinate prices or output with any other turkey producer.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

6.     Turkey is the relevant product market and the geographic market is the continental United States. Defendants collectively possess market power in the market for turkey. Defendants and co-conspirators collectively possessed approximately 80 percent of the overall market share for turkeys during the Class Period.

**Answer to Paragraph 6:**     The first sentence is definitional and/or a legal conclusion to which no response is required.  To the extent a response is required, Butterball denies the allegations.  Butterball denies that it, any other defendant, or defendants collectively possess market power.  Butterball denies that it is proper to "collectively" aggregate the shares of the various defendants to this action.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

7.     Blair Snyder, a senior executive at Agri Stats, publicly stated in 2009 that "about 95% of the turkey industry [is] participating" in Agri Stats, and that for "turkey participants, pretty much it's a list of who's who in the turkey business." This is a comparable portion of the percentage of broiler chicken industry participating in Agri Stats reports, with Mr. Snyder stating that "we've got high 90 percentage of both broilers and turkeys."

**Answer to Paragraph 7:**     Butterball lacks sufficient knowledge or information to form a belief about the accuracy or authenticity of the purported (selective) and uncited quotes in this

paragraph, or the truth of the matter asserted, and therefore denies the same. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

8.     Each one of the defendants and co-conspirators entered into an agreement to exchange information through Agri Stats. Each defendant's agreement to exchange information regarding turkey production is shown in the below 2010 excerpt from an Agri Stats presentation that lists the participants in Agri Stats' turkey reports.



**Answer to Paragraph 8:**     Butterball denies the first two sentences of paragraph 8. Butterball lacks sufficient knowledge or information to form a belief as to whether plaintiffs have accurately reproduced an excerpt from an Agri Stats presentation, or as to the truth of the matter asserted in such excerpt, and therefore denies the same. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

9.     This 2010 presentation slide shows that each of the defendant integrator and Co-Conspirator Integrators entered into an agreement to exchange information regarding their turkey operations through Agri Stats during the conspiracy period. The document directly identifies defendants Butterball, Cargill, Cooper's, Farbest, Foster Farms, House of Raeford and Perdue Farms, as participants in Agri Stats's reports on turkey. The document directly identifies Co-Conspirators Circle-S Ranch, Prestage Farms, and West Liberty Foods as participants in Agri Stats' reports on turkey. Jennie-O is the brand name for Hormel's turkey operations and thus Hormel participated in Agri Stats' reports on turkey. The document also identifies Louis Rich, a

Kraft Foods brand that produces turkey, as receiving Agri Stats reports, and thus Kraft Foods participated in Agri Stats' reports on turkey. Sara Lee's turkey operations, Hillshire Brands, was subsequently acquired by Tyson in 2014 and thus Tyson participated in Agri Stats' reports on turkey.

**Answer to Paragraph 9:**    Butterball denies the first sentence of paragraph 9. Butterball further avers that the slide purportedly excerpted in paragraph 8 (and referred to in paragraph 9) does not show any agreement between Butterball and any other entity. Butterball lacks sufficient knowledge or information to form a belief as to whether plaintiffs have accurately reproduced an excerpt from an Agri Stats presentation, or as to the truth of the matter asserted in such excerpt, and therefore denies the same. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

10.    The information exchange by the defendant integrators through Agri Stats is exactly the type of information exchange that the Supreme Court has recognized is likely to have anticompetitive effects under a rule of reason analysis. First, the data is current and forward-looking - which courts consistently hold has "the greatest potential for generating anticompetitive effects."[3] Second, information contained in Agri Stats reports is specific to the turkey producers, including information on profits, prices, costs and production levels. Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the defendant integrators to pay hefty fees over the Class Period - far in excess of any other pricing and production indices and to agree to volunteer their own data. "Public dissemination is a primary way for data exchange to realize its pro-competitive potential."[4] Agri Stats ensured that its detailed, sensitive business information was available only to the co-conspirators and not to any buyers in the market. Thus, for example, buyers on the market could not use Agri Stats data in Agri Stats sales reports to negotiate lower prices; instead, only defendants could use it as a way to identify opportunities to raise their prices.

**Answer to Paragraph 10:**    Denied.

11.    Indeed, Agri Stats specifically marketed itself to potential participants as a way that they could "improve profitability" rather than engage in competition through production increases. Agri Stats was good to its word; its sales reports specifically identified opportunities for defendants where defendants' products were lower than that of the industry average and where defendants could consequently raise prices to meet that of their competitors.

---

[3]*Todd v. Exxon Corp*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

[4]*Id.* at 213.

**Answer to Paragraph 11:**     Denied.

12.     Industry participants relied on Agri Stats reports in their analysis of their business operations. For example, Hormel, at its 2011 Investor Day, stated in its presentation that "when you optimize the supply chain" you "improve your relative industry position (Agri Stats)." Hormel also touted that "Jennie-O Turkey Store is consistently one of the top companies in operating profits (Agri Stats)."

**Answer to Paragraph 12:**     Butterball admits that, from time to time, certain Butterball

employees may have received or considered Agri Stats reports, which contained non-competitively

sensitive information, for legitimate pro-competitive purposes.  To the extent a further response is

required, Butterball avers that the first sentence of paragraph 12 is vague and does not identify

which "industry participants" or analyses are being referred to, or how such reports were

supposedly relied upon, to what extent, or for what purpose.  Butterball also avers that the second

sentence of paragraph 12 does not relate to Butterball.  To the extent not expressly admitted,

Butterball denies all other allegations of this paragraph.

13.     Confidential Witness 1 (CW1) is a former sales executive at Butterball involved in the pricing of turkeys. CW1 was employed at Butterball during the entire Class Period. CW1 stated that Butterball relied on the monthly reports issued by Agri Stats: "The company used the information to evaluate — by item, item group, price, distribution — where we stood against other turkey companies." CW1 stated that he and other sales personnel looked at Agri Stats data to see how Butterball ranked against peers in the turkey industry. CW1 stated that he personally looked at the Agri Stats data to assess costs and returns. CW1 stated that costs were an important factor in determining how Butterball set its prices.

**Answer to Paragraph 13:**     Butterball admits that, from time to time, certain Butterball

employees may have received or considered Agri Stats reports, which contained non-competitively

sensitive information, for legitimate pro-competitive purposes.  Butterball notes that plaintiffs have

chosen not to identify the individual referenced in this paragraph, or to provide any transcript,

recording, or declaration reflecting the hearsay statements supposedly made by this person.

Butterball, therefore, lacks sufficient knowledge or information to form a belief as to the accuracy

or authenticity of the purported quotes or statements contained in paragraph 13, or as to the truth

of the matters asserted, and therefore, denies the same. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

14. Confidential Witness 2 (CW2) is a former accountant at Cooper Farms. CW2 stated that Cooper Farms received monthly reports from Agri Stats. In addition, Agri Stats representatives met with Cooper Farms executives every six months. CW2 stated that Cooper Farms submitted cost information to Agri Stats every month. CW2 explained that Agri Stats reports grouped data into various types of turkey products, including deli meat and smoked meat.

**Answer to Paragraph 14:** Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

15. CW2 stated that Agri Stats representatives regularly met with the Cooper Leadership Management Group, which included top management and executives from Cooper Farms. CW2 stated that "the upper group received advice" from Agri Stats. CW2 stated that the advice from Agri Stats helped Cooper Farms improve its returns per pound.

**Answer to Paragraph 15:** Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

16. Agri Stats reports also contained detailed information on industry-wide supply levels. For example, a job description of an Agri Stats employee stated that they analyzed Turkey "breeder flock and hatchery data" as well as Turkey "growout flocks."

**Answer to Paragraph 16:** Butterball notes that the first sentence of paragraph 16 is vague and does not identify the specific information contained in Agri Stats reports. To the extent a further response is required, Butterball avers that Agri Stats reports only contained industry information that was not competitively sensitive and could not be used to coordinate prices or output among turkey producers. With respect to the second sentence, Butterball notes that plaintiffs have not produced the document that they supposedly quote, and in any event, the sentence does not appear to refer to Agri Stats reports. To the extent a further response is required, Butterball avers that it lacks sufficient knowledge or information concerning the content of Agri Stats employee job descriptions to form a belief as to the truth or accuracy of the allegations, and

therefore, denies the same. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

17.     Based on publicly available information filed in a February 7, 2018, complaint in the *Broiler Chicken Antitrust Litigation*,[5] Agri Stats data on growout flocks contained information such as the number of broilers placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (aka, "down time"), feed conversion rate (pounds of feed per pound of broiler), and average daily weight. On information and belief, the growout data that Agri Stats compiled for the turkey industry contained similar levels of data. This type of data allowed defendants to monitor industry-wide supply levels.

    **Answer to Paragraph 17:**     With respect to the first sentence of paragraph 17, Butterball notes that any substantiated allegation made in another case involving different products and different defendants is not relevant to the claims asserted. To the extent a further response is required, Butterball states that it lacks sufficient knowledge or information about the content of Agri Stats reports relating to irrelevant and unrelated products, including chickens, and therefore, denies the allegations. With respect to the second sentence of paragraph 17, Butterball notes that the characterization that Agri Stats provided "similar levels of data" is vague. To the extent a further response is required, Butterball notes that certain Agri Stats reports provided high-level, non-competitively sensitive information concerning certain aspects of turkey operations that, to the extent considered at all, could help reduce costs, enhance output, or improve efficiency. Butterball denies that there was any agreement to coordinate or "monitor industry-wide supply levels." To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

18.     Although Agri Stats reports are nominally anonymous, defendant integrators were often able to deanonymize the reports to identify the data of specific companies based on their industry knowledge. CW2 stated that he could determine the identity of companies in Agri Stats reports because "you could usually figure out who was who because they have a certain cooked meat, or if they were browning and running it through an oven." CW2 further stated that "we could sit there and discuss it, because a lot of us knew what the other plants in the big areas, what they

---

[5]*In re Broiler Chicken Antitrust Litigation,* Case No. 1:16-cv-08637 (N.D. Ill.) (ECF No. 710)

did." For example, CW2 stated that one competitor company had five separate facilities included in the Agri Stats reports, and that therefore, it was easy to determine the identity of that company.

**Answer to Paragraph 18:** Butterball denies the first sentence of paragraph 18. With respect to the remainder of paragraph 18, Butterball notes that the person plaintiffs chose to name "CW2" is not a Butterball employee, and plaintiffs have not provided any evidence concerning the hearsay statements CW2 supposedly made. As such, Butterball lacks sufficient knowledge or information to form a belief as to the accuracy or authenticity of the alleged quotes or statements set forth in paragraph 18, or the truth of the matters asserted, and therefore denies the same. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

19. Confidential Witness 3 (CW3) is a former employee of Cargill during the conspiracy period. CW3 stated that Cargill received monthly reports from Agri Stats on turkey. CW3 stated that the monthly Agri Stats turkey reports went directly to Cargill finance executives.

**Answer to Paragraph 19:** Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

20. Throughout the conspiracy period, defendant integrators were able to exercise a remarkable level of industry-wide restraint in keeping the growth of turkey supply in check, causing turkey prices to rise. Thus, Agri Stats had the anticompetitive effect of allowing defendants to engage in collusion to restrain the supply of turkey by facilitating information exchange about supply levels throughout the industry. The industry-wide cuts in turkey production during the conspiracy period are shown in the following chart:



**Answer to Paragraph 20:**     Denied.

21.     In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should correspond to falling prices. However, in the turkey market during the conspiracy period, production, measured through USDA data, remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly. These observed price and output dynamics, shown in the below analysis performed by plaintiffs' experts, indicate that it was not falling demand that caused a decline in supply during the conspiracy period.



**Answer to Paragraph 21:**     Denied.

22.     In addition to their participation in Agri Stats, defendant integrators had frequent opportunities to communicate, in conjunction with formal meetings of various trade associations. In particular, the National Turkey Federation each year held regular meetings, including the NTF Annual Convention and the NTF Leadership conference, which were widely attended by the defendant integrators. CW3 stated that senior Cargill executives, including Cargill's CEO and CFO, attended National Turkey Federation meetings. For example, CW2 stated that Cooper Farms leadership were involved in the National Turkey Federation, for example Cooper Farms COO Gary Cooper served as immediate past chairman of the NTF board in 2014.

**Answer to Paragraph 22:**     Butterball admits that the NTF held meetings from time to time, and that certain Butterball employees may have attended one or more meetings.  Butterball lacks knowledge or information concerning non-Butterball employees who may have attended meetings of the NTF.  Butterball denies that it discussed any competitively sensitive information, or reached any agreement, with any competitor at any NTF meeting.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

23.     Collectively, Hormel, Cargill, and Butterball control approximately 50 percent of the turkey market. Hormel is the only publicly traded company among these three. In its earnings calls during the conspiracy period, Hormel repeatedly discussed the industry-wide success in executing production cuts and maintaining industry-wide production discipline during the Class Period.

**Answer to Paragraph 23:**     Butterball admits that it is not a publicly traded company. Butterball also admits that Hormel is a publicly traded company. Butterball denies that it, any other defendant, or defendants collectively possess market power. Butterball denies that it is proper to aggregate the shares of various defendants to this action. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

24.     On June 2, 2009, Hormel emphasized that it was making production cuts in response to an alleged oversupply in the market and closely monitoring the overall level of production in the market, showing the importance of the kind of information exchanged through Agri Stats:

> There is an oversupply of turkey. There continues to be perhaps more production as well as cold storage stocks than the demand would warrant. We have been very deliberate about making the appropriate production cuts. We announced them over a year ago. And we have even exceeded the amount we expected to reduce. We have seen the placements and indicators of forward looking supply come down, so that was as expected, and we expected the second half of 2009 to be a little kinder in the turkey side of the business, but there is still a lot of storage, cold storage stocks to go through, we feel comfortable that we've cleaned up our inventories that we had on hand. Our production cuts were more than the decrease in our sales because we did work off inventories. I had a feeling the industry will rebound. It's going to take a work through of the excess inventories as well as those production cuts hitting the marketplace.

**Answer to Paragraph 24:**     Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

25.     On August 20, 2010, Hormel stated, "We think the turkey business has reached a good equilibrium, and we don't have any major expansion plans and have not heard others in that mode, so I think those conditions should remain favorable into next year."

**Answer to Paragraph 25:**     Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

26.     On May 25, 2011, Hormel stated that the turkey industry was maintaining solid pricing based on the information that Hormel was receiving about industry-wide turkey production levels: "We certainly see egg set and poultry placement numbers that take us through the end of this year and a little bit into next fiscal year. But right now, on the basis of those numbers, on the basis of what we see in terms of production in the industry and on the basis of cold storage numbers, coupled with still strong demand on the export side, we feel that the amount of product going to market will support solid pricing on a commodity basis."

**Answer to Paragraph 26:**     Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

27.     On August 25, 2011, Hormel stated that the turkey industry was maintaining better discipline than the poultry industry: "The industry as a whole has shown a little better discipline, perhaps, than the other poultry side of the ledger." This statement is notable because the chicken industry is currently the subject of multiple civil lawsuits as well as a DOJ investigation of potential antitrust violations during this period of time.

**Answer to Paragraph 27:**     Butterball lacks sufficient knowledge or information to form a belief about the accuracy and authenticity of the purported quote in the first sentence of paragraph 27, or the truth of the matters asserted, and therefore, denies the same.  Butterball further notes allegations or investigations concerning unrelated products, including chickens, are not relevant to this case, and in any event, Butterball lacks sufficient knowledge or information concerning the "chicken industry" to form a belief as to the truth of the allegations in this paragraph.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

28.     Furthermore, the turkey market has all of the characteristics of a market where information exchange is likely to have anticompetitive effects. Turkey is a fungible product, the market for turkey has price-based competition, the demand for turkey is relatively inelastic, and the turkey market features a trend towards price uniformity.

**Answer to Paragraph 28:**     Butterball admits that, as with all products, price may be a factor, among many others, that some customers may at times consider in some way when making purchasing decisions.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

29.     The information exchange through Agri Stats did not have the kind of characteristics that would produce procompetitive effects sufficient to outweigh the

anticompetitive harms. The information exchange involved current and forward-looking data. Agri Stats regularly prepared monthly reports that contained data that was less than six weeks old. Agri Stats also only allowed companies to access the data if they themselves shared the data, thus ensuring that only defendants and other similarly situated turkey integrators who received the Agri Stats reports were able to use the data.

**Answer to Paragraph 29:** Butterball denies the first sentence of paragraph 29. Butterball avers that the Agri Stats reports it received provided only non-competitively sensitive information that, to the extent considered at all, could help reduce costs, enhance output, or improve efficiency. Butterball admits that it provided certain data to Agri Stats, and received Agri Stats reports from time to time. Butterball denies that there is anything anticompetitive about Agri Stats' terms of service as between Butterball and Agri Stats. Butterball lacks sufficient knowledge or information concerning the terms of service Agri Stats may have agreed upon with, or proposed to, other actual or potential Agri Stats customers, and therefore, denies the last sentence of paragraph 29. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

30.     During the conspiracy period, the price of turkey spiked dramatically, driven by the anticompetitive effects of the information exchange through Agri Stats regarding turkey production that helped facilitate defendants restraint over the growth in the supply of turkey.



**Answer to Paragraph 30:**     Denied.

31.     The information exchange through Agri Stats in fact had anticompetitive effects on the market. Prior to the conspiracy, turkey prices closely tracked the underlying cost of feed, which is the primary input cost in the production of turkey. Beginning in 2009-2010, prices of turkey spiked to an unprecedented level, showing the anticompetitive effects of defendants' information exchange through Agri Stats. Remarkably, as demonstrated in the analysis performed by plaintiffs' experts, shown in the below chart, prices of turkey quickly returned to match underlying feed costs after litigation was filed in late 2016 in the broiler industry that centered on the anticompetitive use of Agri Stats. Defendants clearly changed their behavior after the commencement of the Broilers litigation, as Tyson dismissed their CEO, Donnie Smith, in late 2016, shortly after the first civil lawsuits were filed.



**Answer to Paragraph 31:**     Denied.

32.     Feed accounts for approximately 60-70% of the cost of raising a turkey. Plaintiffs' experts constructed a regression model based on the underlying feed cost that models what the "but for" price of turkey would have been if the historical relationship between feed and turkey costs had continued during the conspiracy period. The model demonstrates that the anticompetitive information exchange of data regarding turkey production through Agri Stats caused anticompetitive effects in the market for turkey.

- 14 -



**Answer to Paragraph 32:** Denied.

33. As a result of defendants' unlawful conduct, plaintiffs and the Class paid artificially inflated prices for turkey during the Class Period. Such prices exceeded the amount they would have paid if the price for turkey had been determined by a competitive market. Thus, plaintiffs and class members were injured by defendants' agreement to exchange information through Agri Stats regarding the turkey market.

**Answer to Paragraph 33:** Denied.

## II.    JURISDICTION AND VENUE

34. Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure compensatory damages and injunctive relief against defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs seek to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by defendants' conduct in restricting the supply of turkey and increasing the price of turkey. Plaintiffs seek damages in excess of $5,000,000. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

**Answer to Paragraph 34:** Butterball does not contest this Court's subject matter jurisdiction over this action at this time. Butterball denies that plaintiffs have pled a valid claim under the statutes cited.

35.     Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because both Kraft Foods and Hillshire Brands are headquartered in the District, and one or more defendants transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

**Answer to Paragraph 35:**     Butterball does not contest venue in this Court over this action at this time.

36.     This Court has personal jurisdiction over each defendant because, inter alia, each defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of turkey throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

**Answer to Paragraph 36:**     Butterball does not contest personal jurisdiction.

37.     The activities of the defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

**Answer to Paragraph 37:**     Because Butterball denies the description of the alleged "activities of defendants" and supposed "co-conspirators," Butterball denies the allegations of this paragraph.

### III.     PARTIES

#### A.     Plaintiffs

38.     Plaintiff Olean Wholesale Grocery Cooperative, Inc. (Olean Wholesale) is a retailers' cooperative located in Olean, New York. Its members are independent, family-owned supermarkets. Olean has served supermarkets in Western and Central New York, Western Pennsylvania, and Northeastern Ohio since 1922. Olean Wholesale is a New York corporation with its principal place of business in Olean, New York, and purchased turkey directly from one or more defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**Answer to Paragraph 38:**     Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

39.     John Gross and Company, Inc. (John Gross) is a full line food distributor located in Mechanicsburg, Pennsylvania. Founded in 1950, the company has been owned and operated by the Gross family for four generations. John Gross is a Pennsylvania corporation with its principal place of business in Mechanicsburg, Pennsylvania, and purchased turkey directly from one or more defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**Answer to Paragraph 39:**     Butterball lacks sufficient knowledge or information to form

a belief about the truth of the allegations in this paragraph and therefore denies them.

**B.     Defendants**

40.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana. Throughout the Class Period, Agri Stats acted as a co-conspirator of the turkey integrator defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among defendants and their co-conspirators.

**Answer to Paragraph 40:**     Butterball lacks sufficient knowledge or information to form

a belief about the truth of the allegations in the first sentence of this paragraph, and therefore denies

the allegations.  Butterball denies the second sentence of paragraph 40.  To the extent not expressly

admitted, Butterball denies all other allegations of this paragraph.

41.     Butterball, LLC is a privately held North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Butterball and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 41:**     Butterball admits that Butterball, LLC is a North Carolina

limited liability company headquartered in North Carolina.  Butterball admits that it sold one or

more turkey products in the United States.

42.     Cargill, Inc. is a privately held Delaware corporation headquartered in Minnetonka, Minnesota. During the Class Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 42:**     Butterball lacks sufficient knowledge or information to form

a belief about the truth of the allegations in this paragraph and therefore denies them.

43. Cargill Meat Solutions Corporation is a Delaware corporation that operates as a subsidiary of Cargill, Incorporated. During the Class Period, Cargill Meat Solutions and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 43:**     Butterball lacks sufficient knowledge or information to form

a belief about the truth of the allegations in this paragraph and therefore denies them.

44. Defendants Cargill, Inc. and Cargill Meat Solutions are collectively referred to as "Cargill."

**Answer to Paragraph 44:**     Butterball lacks sufficient knowledge or information to form

a belief about the truth of the allegations in this paragraph and therefore denies them.

45. Cooper Farms, Inc. is a privately held Ohio corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Cooper Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 45:**     Butterball lacks sufficient knowledge or information to form

a belief about the truth of the allegations in this paragraph and therefore denies them.

46. Farbest Foods, Inc. is a privately held Indiana corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Farbest and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 46:**     Butterball lacks sufficient knowledge or information to form

a belief about the truth of the allegations in this paragraph and therefore denies them.

47. Foster Farms LLC is a privately held California corporation headquartered in Modesto, California. During the Class Period, Foster Farms LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 47:**     Butterball lacks sufficient knowledge or information to form

a belief about the truth of the allegations in this paragraph and therefore denies them.

48.     Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms LLC. During the Class Period, Foster Poultry Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of turkey, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

        **Answer to Paragraph 48:**     Butterball lacks sufficient knowledge or information to form

a belief about the truth of the allegations in this paragraph and therefore denies them.

49.     Defendants Foster Farms LLC and Foster Poultry Farms are collectively referred to as "Foster Farms."

        **Answer to Paragraph 49:**     This paragraph is definitional, and therefore, no response is

required.  To the extent a further response is required, Butterball lacks sufficient knowledge or

information to form a belief about the truth of the allegations in this paragraph and therefore denies

them.

50.     Kraft Heinz Foods Company (Kraft Heinz), an Illinois corporation with headquarters in Pittsburgh, Pennsylvania, and Chicago, Illinois, is engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Kraft Heinz and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

        **Answer to Paragraph 50:**     Kraft has been dismissed and is not a party to the case, and

therefore, no response is required.  To the extent a further response is required, Butterball lacks

sufficient knowledge or information to form a belief about the truth of the allegations in this

paragraph and therefore denies them.

51.     Kraft Foods Group Brands LLC is an Illinois corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Kraft Heinz and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

        **Answer to Paragraph 51:**     Kraft has been dismissed and is not a party to the case, and

therefore, no response is required.  To the extent a further response is required, Butterball lacks

sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

52.     Defendants Kraft Heinz Foods Company and Kraft Foods Brands LLC are collectively referred to as "Kraft Foods."

**Answer to Paragraph 52:**     Kraft has been dismissed and is not a party to the case, and therefore, no response is required.  This paragraph is also definitional, and therefore, no response is required.  To the extent a further response is required, Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

53.     Hormel Foods Corporation is a Delaware corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 53:**     Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

54.     Hormel Foods LLC is a limited liability corporation headquartered in Austin, Minnesota. It is a wholly owned subsidiary of Hormel Foods Corporation. Hormel is engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Hormel Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 54:**     Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

55.     House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. During the Class Period, House of Raeford operated in part through a division referred to as "Columbia Farms," which is a group of broiler facilities and operations originally named Columbia Farms, Inc. and Columbia Farms of Georgia, Inc. when purchased by House of Raeford in 1998. During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 55:** Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

56. Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland. During the Class Period, Perdue Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 56:** Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

57. Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 57:** Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

58. Defendants Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to as "Perdue."

**Answer to Paragraph 58:** This paragraph is definitional, and therefore, no response is required. To the extent a further response is required, Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

59. Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. It wholly owns and controls two subsidiaries, Tyson Prepared Foods, Inc. and Tyson Fresh Meats Inc. that slaughter and sell turkey products. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 59:** Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

60. Tyson Fresh Meats Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Fresh Meats and/or its predecessors, wholly

owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 60:** Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

61. Tyson Prepared Foods, Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 61:** Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

62. The Hillshire Brands Company (Hillshire Brands) is a Maryland corporation headquartered in Chicago, Illinois. Hillshire Brands operates as a subsidiary of Tyson Foods that sells turkey products. During the Class Period, Hillshire Brands and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 62:** Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

63. Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc., and Hillshire Brands are collectively referred to as "Tyson."

**Answer to Paragraph 63:** This paragraph is definitional, and therefore, no response is required. To the extent a further response is required, Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

## C.    Co-Conspirators

64. Co-Conspirator Circle S-Ranch, Inc. is a North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Circle S-Ranch and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 64:** Butterball denies that there is any conspiracy involving Butterball, or that Circle S-Ranch is a co-conspirator. Butterball lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

65. Co-Conspirator Prestage Farms is a North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Prestage Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 65:** Butterball denies that there is any conspiracy involving Butterball, or that Prestage Farms is a co-conspirator. Butterball lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

66. Co-Conspirator West Liberty Foods LLC (West Liberty) is an Iowa corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, West Liberty and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 66:** Butterball denies that there is any conspiracy involving Butterball, or that West Liberty is a co-conspirator. Butterball lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

## IV. FACTUAL ALLEGATIONS

67. Starting no later than January 1, 2010, and continuing at least until January 1, 2017, defendants entered into an agreement to exchange information regarding their production and sale of turkey through Agri Stats. The information exchange through Agri Stats provided defendants an opportunity to obtain and monitor critical and competitively sensitive business information regarding each other's production and sales. The information exchange through Agri Stats had anticompetitive effects, as prices for turkey soared and defendants engaged in an industry-wide series of production cuts during the period. Notably, the information exchanged through Agri Stats was not available to purchasers of turkey, ensuring that the information exchange would not have procompetitive effects.

- 23 -

**Answer to Paragraph 67:**     Denied.

A.     **Agri Stats' information exchange services began in the broiler industry, where it has been used to facilitate widespread collusion.**

68.     Agri Stats has played a central role in other industries, including collusion in the broiler industry.[6] As alleged in the *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill.) litigation, the broiler producers used Agri Stats as a part of their conspiracy to restrain production and inflate prices.

**Answer to Paragraph 68:**     Denied.

69.     In the broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and the coconspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, Express Markets, Inc. or EMI. Agri Stats collected data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.

**Answer to Paragraph 69:**     Butterball notes that the allegations in this paragraph relate solely to irrelevant and unrelated products, including chickens.   Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

70.     The detail of these reports ensured that competitors could quickly decode the information of their purported competitors. The *Broiler* complaints allege it was common knowledge among producers that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes. The broiler reports, in part, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

---

[6]Broilers are chickens raised to be slaughtered before the age of 13 weeks.  **Answer to Complaint Footnote 7:**  This footnote is definitional, and so no answer is required.

**Answer to Paragraph 70:**    Butterball notes that the allegations in this paragraph relate solely to unsubstantiated allegations concerning irrelevant and unrelated products, including chickens.  Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

71.    In the broiler industry, it is also alleged that Agri Stats - known to its coconspirators to be a willing and informed conduit for illicit information exchanges - used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the broiler industry facilitated the implementation of the agreement to restrict supply - where Agri Stats would transmit the intentions of the broiler producers to restrict supply.

**Answer to Paragraph 71:**    Butterball notes that the allegations in this paragraph relate solely to unsubstantiated allegations concerning irrelevant and unrelated products, including chickens.  Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

72.    In a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the broiler industry, it was reported:

> "Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. ***"That is what creates stability for a cartel."***

**Answer to Paragraph 72:**    Butterball lacks sufficient knowledge or information concerning the authenticity of the purported quote, and therefore, denies the allegations.  Butterball also notes that the quote attributed to Peter Carstensen (a plaintiffs' lawyer) is not a factual

allegation, and therefore, no response is required. To the extent a response is required, Butterball denies the allegations of this paragraph.

73. The district court noted, in denying the motions to dismiss in the *In re Broiler Chicken Antitrust Litigation* that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which suggests high antitrust concerns.[7]

**Answer to Paragraph 73:** Butterball notes that the allegations in this paragraph relate solely to irrelevant and unrelated products, including chickens. Butterball also denies plaintiffs have properly characterized the court's order in the Broiler case, which speaks for itself, or that the *In re Broiler Chicken Antitrust Litigation* court could, or did, make any factual finding or render an opinion on the veracity or accuracy of plaintiffs' allegations on the referenced motion to dismiss. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

**B.     Defendants entered into an agreement to exchange information through Agri Stats regarding their production and sales of turkey.**

74. Each member of the conspiracy, including the integrator defendants and co-conspirators, were all Agri Stats subscribers. Agri Stats publicly stated that 95% of the turkey market used Agri Stats reports.

**Answer to Paragraph 74:** Butterball denies that there is any conspiracy, or that Butterball is a "member" of it. Butterball admits that, at certain times, it subscribed to Agri Stats for certain services. Butterball lacks sufficient knowledge or information to form a belief about that accuracy or authenticity of the uncited hearsay statement attributed to Agri Stats, or the truth of the matter asserted, and therefore, denies the same. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

---

[7]Memorandum Opinion and Order at 11, *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.

75.     Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison and perform the monthly audits. Each company's financial data is reconciled to its general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations, so all company numbers are calculated the same way. CW2 stated that he was involved during the conspiracy period in the monthly transmission of cost data from Cooper Farms to Agri Stats.

**Answer to Paragraph 75:**     Butterball admits that Agri Stats is an information service, and that it collected and processed certain data.  Butterball lacks sufficient knowledge or information about the internal processes Agri Stats uses to ensure the reliability of its information services, and therefore, denies the second, third, and fourth sentences of paragraph 75.  With respect to the remainder of paragraph 75, Butterball notes that the person plaintiffs chose to name "CW2" is not a Butterball employee, and plaintiffs have not provided any evidence concerning the hearsay statements CW2 supposedly made.  As such, Butterball lacks sufficient knowledge or information to form a belief as to the accuracy or authenticity of any statement CW2 may have made, or the truth of the matters asserted.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

76.     Participants in the scheme received monthly detailed reports and graphs that allow them to compare their performance, sales prices, and costs to other participants. Agri Stats issues separate reports in the turkey industry to the integrator defendants regarding live operations, processing, further reprocessing, feed costs, and sales.

**Answer to Paragraph 76:**     Butterball denies that there is any "scheme" or that Butterball participated in it.  Butterball admits that, from time to time, certain Butterball employees may have received or considered Agri Stats reports, which contained non-competitively sensitive information, for legitimate pro-competitive purposes.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

77.     Agri Stats provided the integrator defendants with an unparalleled ability to share critical and proprietary information concerning key business metrics, such as sales, production levels and short and long-term production capacity.

**Answer to Paragraph 77:**     Denied.

- 27 -

78.     Perhaps most egregiously, Agri Stats provided monthly sales reports to defendants. One of Agri Stats' subsidiaries is Express Markets, Inc. (aka, "EMI"). On EMI's publicly available webpage Amanda Martin, an Express Markets economist states that Agri Stats "audited turkey and broiler sales and product mix data, and worked with processing and further reprocessing reports.'" On information and belief, the Agri Stats turkey sales reports contained sales data that was less than six weeks old.

**Answer to Paragraph 78:**     Butterball admits that, from time to time, certain Butterball

employees may have received or considered Agri Stats reports, which contained non-competitively

sensitive information, for legitimate pro-competitive purposes.  Butterball denies that it received

monthly sales reports containing any competitively sensitive information from Agri Stats or EMI.

Butterball lacks sufficient knowledge or information concerning the purported quote on EMI's

website describing Ms. Martin's prior job responsibilities, while not employed by EMI, or about

her role in Agri Stats' internal data processing procedures, and therefore, denies the same.  To the

extent not expressly admitted, Butterball denies all other allegations of this paragraph.

79.     As detailed in the recently filed amended complaint in the *Pork Antitrust Litigation,* No. 18-cv-1776 (JRT/HB) (D. Minn. Nov. 06, 2019), ECF No. 392, Agri Stats allowed subscribers to its pork sales reports to compare their prices for individual products against the national average net price, and against the national top 25 percent average price. Notably, Agri Stats identified opportunities for the Pork Integrators to raise prices. For instance, for each product, Agri Stats specifically broke out the variance between the company's price and the national average price, as well as the economic impact of the variance. This allowed coconspirators to see how much more they could charge if they charged either the national average price or the average of the top 25% national average price.

**Answer to Paragraph 79:**     Butterball notes that the allegations in this paragraph relate

solely to unsubstantiated allegations concerning irrelevant and unrelated products, including pork.

Butterball lacks sufficient knowledge or information to form a belief about the truth of the

allegations in this paragraph and therefore denies them.

80.     Agri Stats provided similar services to the integrator defendants regarding their production and sale of turkey. According to CW1, Agri Stats ranked the integrator defendants in their reports based on the returns (i.e. prices) that the integrator defendants received.

**Answer to Paragraph 80:**     Denied.

81.     As detailed in the *Pork* and *Broilers* complaints, for each of its reports, Agri Stats identified the list of participants who were contributing data or information to the reports. CW1 confirmed that the reports Agri Stats prepared for the integrator defendants identified the participants that provided data for each report, which allowed defendants to understand which of their competitors were participating for each report. CW2 confirmed that the Agri Stats reports identified each of the turkey production facilities that were participating in the reports.

**Answer to Paragraph 81:**     To the extent that paragraph 81 relates to Agri Stats reports

for chicken or pork products, Butterball lacks sufficient knowledge or information to form a belief

about the truth of those allegations and therefore denies them.  Butterball admits that certain Agri

Stats reports identified the data sources that Agri Stats used in compiling the report.  With respect

to the second sentence of paragraph 81, plaintiffs have chosen not to identify the individual

referenced as "CW1," or to provide any transcript, recording, or declaration reflecting the hearsay

statements supposedly made by this person.  Butterball, therefore, lacks sufficient knowledge or

information to form a belief as to the accuracy or authenticity of any purported statement by CW1,

or the truth of the matters asserted, and therefore, denies the same.  With respect to the remainder

of paragraph 81, Butterball notes that the person plaintiffs chose to name "CW2" is not a Butterball

employee, and plaintiffs have not provided any evidence concerning the hearsay statements CW2

supposedly made.  As such, Butterball lacks sufficient knowledge or information to form a belief

as to the accuracy or authenticity of any statement CW2 may have made, or the truth of the matters

asserted.  To the extent not expressly admitted, Butterball denies all other allegations of this

paragraph.

82.     One presentation from Agri Stats shows the level of detail provided to competitors regarding profits in the swine market. On information and belief, similar levels of detail were provided to defendants who received Agri Stats reports in the turkey market.

**Top 25% in Profit - Variances to Average Company - 2009-2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

35,001,089 Pigs Finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

30,785,319 Pigs finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |

22,306,500 Pigs finished

**Answer to Paragraph 82:**    Butterball notes that the first sentence of paragraph 82, and the purported documentary excerpt, relates solely to irrelevant and unrelated products, including pork.  Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.  Butterball further notes that the excerpt shows only comparisons to industry averages and does not appear to contain any competitively sensitive information.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

83.    The purpose of these reports was not to provide better prices to consumers or to lower the costs of production. Instead, the clear purpose was to improve the profitability of the co-conspirators. The particular Agri Stats report referenced above shows the ranking of each company in profitability and compares the company to its competitors by providing the variance from the average. The Agri Stats report actually circulated to competitors contained even further detail. This underlines that the purpose of these reports was not to allow consumers to save more money through lower prices and more efficient production - in fact, the opposite was true, the purpose was the profitability of the defendant companies and the impact was higher sales prices for consumers.

**Answer to Paragraph 83:**    Denied.

84.     Much of the information shared by Agri Stats and the co-conspirators was unnecessary to achieve any benefits for consumers. Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.

**Answer to Paragraph 84:**     Denied.

85.     Agri Stats knew that it played a central role in facilitating this anticompetitive information exchange. One presentation from Agri Stats regarding the swine industry spoke directly on this point, pointing out to industry participants that they could not undertake such a detailed cost analysis between competitors without Agri Stats auditing and standardizing the data:

*Data Integrity*

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



**Answer to Paragraph 85:**     Butterball denies the first sentence of paragraph 85.  With respect to the second sentence and the purported document excerpt, Butterball notes that the allegations relate solely to unrelated and irrelevant products, including pork.  Butterball lacks sufficient knowledge or information to form a belief about the truth of those allegations and therefore denies them.  Butterball further avers that it is not anticompetitive for an information service to take steps to process data it receives from multiple independent sources.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

86.     Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine ***tolerance and outlier status and enforce,***" they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, ***"[e]ach participant has to commit."***

**Answer to Paragraph 86:**     Butterball notes that plaintiffs have not produced or identified the document from which they purportedly quote.  Butterball lacks sufficient knowledge

or information to form a belief about the accuracy or authenticity of the purported quotes, or the truth of the matters asserted, and therefore denies the same. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

87.     According to CW1, Agri Stats gave live presentations to defendant integrators to explain to them how to use the reports that Agri Stats prepared on the turkey industry and how to compare themselves against their competitors: during the presentations, Agri Stats said, "if you are number one priced out of 13, that meant the return was so much versus the other companies."

**Answer to Paragraph 87:**     Butterball admits that there may have been one or more meetings in which a Butterball employee had discussions with an Agri Stats employee concerning the services that Agri Stats provided or offered. Butterball denies that it met with Agri Stats and other defendant integrators in any live presentation concerning Agri Stats reports. With respect to the statements supposedly made by CW1, plaintiffs have chosen not to identify this individual, or to provide any transcript, recording, or declaration reflecting the hearsay statements supposedly made by this person. Butterball, therefore, lacks sufficient knowledge or information to form a belief as to the accuracy or authenticity of any purported statement by CW1, and therefore, denies the same. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

88.     It is the standard policy of Agri Stats that it will only grant access to Agri Stats reports to similarly situated companies that themselves share data with Agri Stats. This ensures that data from Agri Stats is only available to one side of the market - the integrator defendants. The other side of the market, purchasers of turkey, is not allowed to access the Agri Stats data, and thus cannot use Agri Stats data to negotiate lower prices. Thus, Agri Stats reports function as a one-way ratchet that can be used for anticompetitive purposes by defendants but not for procompetitive purposes by purchasers.

**Answer to Paragraph 88:**     Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations concerning Agri Stats' so-called "standard policy," and therefore denies them. Butterball further denies that any requirement by an information service, such as Agri Stats, to require subscribers who possess relevant data to submit such data is designed

to limit access to such data. Butterball further denies that the so-called "other side" of the market sought access to the information, was denied access to the information, and would have found that information useful. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

## C. Defendants possess market power in the market for turkey and turkey is the type of product for which information exchange is particularly likely to have anticompetitive effects.

### 1. Defendants have market power in the market for turkey.

89.    One tool that courts use to assess the competitive effects of concerted action is defining a relevant market - the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). The case concerns the sale of turkey for meat consumption in the United States.

**Answer to Paragraph 89:**    The first two sentences of paragraph 89 contain legal principles or conclusions, and therefore, do not require a response. To the extent a response is required, Butterball admits that market definition is necessary in this case, and that it includes both a product and geographic dimension. Butterball denies that there is a well-defined antitrust market for the "sale of turkey for meat consumption in the United States."

90.    There is a single market for turkey for meat consumption. Prices for turkey sold in the United States are quoted generally in disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

**Answer to Paragraph 90:**    Denied.

91.    The relevant geographic market is the United States.

**Answer to Paragraph 91:**    Denied.

### 2. There are high barriers to entry in the market for turkey for meat consumption.

92.    The existence of high barriers to entry is one factor which makes markets susceptible to collusion. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are

less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel. High barriers to entry in the turkey processing market exist, precluding other entrants or would-be competitors from entering the market for turkeys raised for consumption.

**Answer to Paragraph 92:**     Denied.

93.     During the Class Period and continuing today, substantial barriers impede entry into the turkey market. A new entrant into the market would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, equipment, energy, transportation. Distribution, infrastructure (aka "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, longstanding customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.

**Answer to Paragraph 93:**     Denied.

94.     The price of construction of a new integrated turkey processing complex is relatively high. For example, the cost for a current market participant, Virginia Poultry Growers Cooperative, to construct a new turkey processing in 2015 was $62 million.[8]

**Answer to Paragraph 94:**     Butterball lacks sufficient knowledge or information to form

a belief about the truth of the allegations in this paragraph and therefore denies them.

95.     The turkey market has been subject to steadily increasing consolidation over the last several decades. In the 1970s, the turkey market was defined by competition among dozens of companies that worked with independent farmers.[9] But now, just four corporations - Cargill, Hormel, Butterball, and Farbest - produce more than half of the turkey in the United States.

**Answer to Paragraph 95:**     Butterball lacks sufficient knowledge or information to form

a belief about the truth of the allegations in this paragraph and therefore denies them.

96.     The turkey market also has high levels of vertical integration that constitute a barrier to entry. The National Turkey Federation states that "turkey companies are vertically integrated, meaning they control or contract for all phases of production."[10]

---

[8]*Virginia Poultry Growers Cooperative Plans Turkey Processing Facility in Hinton,* Virginia, Area Development (July 22, 2015), *available at* https://www.areadevelopment.com/newsItems/7-22-2015/virginia-poultry-growers-cooperative-processing-facility-hinton-virginia565489.shtml.

[9]Christopher Leonard, *That Turkey on Your Plate Could Use Some More Industry Competition,* The Washington Post (Nov. 22, 2013), *available at* https://www.washingtonpost.com/opinions/that-turkey-on-your-plate-could-use-some-more-industry-competition/2013/11/22/045fc470-5177-11e3-a7f0-b790929232e1_story.html.

[10]*Industry Structure,* National Turkey Federation, https://www.eatturkey.org/industry-structure/ (last visited Dec. 16, 2019).

**Answer to Paragraph 96:**    Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.

97.    For example, Butterball has over 175 farms that they own, as well as contracts with numerous independent farmers. Jennie-O owns over 100 commercial growing farms. Cargill owns around 700 farms. Farbest has more than 200 contract growers.

**Answer to Paragraph 97:**    Butterball admits that it owns approximately 80 farms, and that it has contracted with other growers, to obtain a source of supply for its processing facilities. Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations relating to Jennie-O, Cargill, and Farbest and therefore denies them.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

### 3.    The defendants have market power in the market for turkey for meat consumption.

98.    The integrator defendants possess market power in the market for turkey for consumption. Defendants and their co-conspirators controlled an average of 77% of the market from 2010-2018.

**Average Market Share of Processors (2010 - 2018)**



- 35 -

**Answer to Paragraph 98:** Butterball denies the two sentences of paragraph 98. Butterball lacks sufficient knowledge or information concerning the accuracy of the data presented in the pie chart, and therefore, denies the same.

**D.    The market for turkey is the type of market where the information exchanges orchestrated by Agri Stats are likely to harm competition.**

99.    Competition is likely to be harmed when competitors with market power in concentrated markets, such as the market at issue, directly exchange strategic information about current and forward-looking plans for prices and supply. The strategic information exchanged between the defendants was competitively sensitive and a material factor in negotiations. Price, capacity, supply and costs are crucial aspects of competition. When defendants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects of sales of turkey.

**Answer to Paragraph 99:** Paragraph 99 is an unsupported and generalized lay opinion of plaintiffs' counsel, and does not consist of factual allegations. As such, no response is required. To the extent a response is required, Butterball denies the allegations.

100.    The information exchange took place in private settings and involved the exchange of confidential, non-public information.

**Answer to Paragraph 100:** Denied.

101.    The market for turkey is characterized by numerous attributes that mean the type of information exchange facilitated by Agri Stats are particularly likely to have anticompetitive effects. In particular, the market for turkey features relatively few sellers, a fungible product, price-based competition, inelastic demand, and a trend toward price uniformity.

**Answer to Paragraph 101:** Denied.

**1.    The turkey market features few sellers.**

102.    The turkey market is concentrated, with relatively few sellers. The defendants and co-conspirators control approximately 80 percent of turkey production and processing. The presence of few companies supports the inference that a conspiracy to exchange information had the intended effect of restraining competition.

**Answer to Paragraph 102:** Denied.

**2.    Turkey is a fungible market.**

103.    One of the distinct characteristics of the turkey industry is its fungibility, also known as the ability to be freely exchangeable or replaceable in whole or in part. Common sense indicates at Thanksgiving that a consumer can substitute a whole turkey produced by Butterball with a whole turkey produced by Cargill.

**Answer to Paragraph 103:**   Denied.

104.    Indeed, the Agri Stats reports themselves show that turkey is fungible because they aggregate data across defendants for particular types of turkey products and allow defendants to compare detailed information on prices for the same fungible product. CW1 confirmed that the Agri Stats reports were organized by specific item of turkey product.

**Answer to Paragraph 104:**   Butterball denies the first sentence of paragraph 104. Butterball lacks sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph and therefore denies them.  With respect to the second sentence, plaintiffs have chosen not to identify the individual referenced in this paragraph, or to provide any transcript, recording, or declaration reflecting the hearsay statements supposedly made by this person.  Butterball, therefore, lacks sufficient knowledge or information to form a belief as to the accuracy or authenticity of the purported quotes, or as to the truth of the matter asserted, and therefore, denies the same.

**3.    The turkey market features price-based competition.**

105.    Turkey is a commodity market that faces price-based competition.

**Answer to Paragraph 105:**   Butterball denies that all turkey products are "commodity" products.  Butterball admits that, as with all products, price may be a factor, among many others, that some customers may at times consider in some way when making purchasing decisions.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

### 4. Demand for turkey is relatively inelastic.

106.    Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[11] A PED value between 0 and -1 indicates there is inelastic demand for the good or service - i.e., a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. The USDA has estimated that the average PED estimate for the turkey market is -0.58 - meaning the demand for turkey is inelastic. Indeed, most American consumers eat turkey at Thanksgiving, not pork or chicken, illustrating that there is no substitute for one of the key demand drivers of turkey.

**Answer to Paragraph 106:**  Butterball specifically avers that there are many substitutes

for turkey products, and that demand for turkey products is elastic.  Butterball lacks sufficient

knowledge or information to form a belief as to the accuracy or authenticity of the estimates

ascribed to the USDA, and therefore denies the same.  To the extent not expressly admitted,

Butterball denies all other allegations of this paragraph.

### 5. The turkey market features a trend towards price uniformity.

107.    Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. For example, whole turkey products are produced on a commercial scale and sold in supermarkets. Whole turkeys are virtually indistinguishable, with similar nutritional values, branding and packaging.

**Answer to Paragraph 107:**  Denied.

### E. Industry-wide production cuts during the Conspiracy Period were facilitated through the information exchange conducted through Agri Stats.

108.    As demonstrated in the following chart, the turkey integrators acted in a concerted way to decrease turkey supply in 2009, 2013, 2014, and 2015. Overall, industry supply decreased significantly from 2009 to 2015, before rebounding in 2016. The information exchange through Agri Stats facilitated the ability of defendants to monitor total industry levels of supply.

---

[11]*See, e.g.,* Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson, et al., *Price Elasticity of Demand* (Nov. 13, 1997),

https://scholar.harvard.edu/files/alada/files/price_elasticity_of_demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, *The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects,* 33 J. Academy Mktg. Science 66-78 (2005), *available at* http://www.math.tau.ac.il/~fibich/Manuscripts/elasticity_JAMS.pdf.

**Figure 1: U.S. Turkey Total Heads Slaughtered**



**Answer to Paragraph 108:**   Denied.  Butterball further avers that the Court has already rejected plaintiffs' allegations.  *See* ECF No. 173 ("The Complaint says that 'industry supply decreased significantly from 2009 to 2015,' but Figure 1 shows that the market experienced small rates of changes year-over-year in terms of heads slaughtered.").

**F.    Abnormal pricing during the Class Period demonstrates the anticompetitive effects of the exchange of turkey information conducted through the Agri Stats sales reports.**

109.    Beginning in 2010, the turkey industry showed abnormal price movements, i.e., price increases for the average turkey whole price unexplained by increases in costs. All of these pricing measurements show a significant break between pricing prior to 2010 and pricing after 2010, supporting the plausibility of anticompetitive effects on the turkey market from the information exchange conducted through Agri Stats. Plaintiffs have measured the various abnormal pricing movements in a number of ways, including: (i) the average turkey price, (ii) the turkey integrators' margin during the Class Period;(iii) the variation between feed and turkey prices before and during the Class Period; and (iv) a regression analysis that models the relationship between turkey prices and feed prices.

**Answer to Paragraph 109:**   Denied.

**1.    The average turkey wholesale price experienced an unprecedented increase beginning in 2009.**

- 39 -

110.    According to aggregate prices published by the USDA, the average wholesale price per pound for turkey hens was between $0.55 and $0.85 every year from 2000 to 2009, before steadily increasing to $1.15 by 2016. Following initiation of the *Broilers* litigation, the price of turkey then quickly returned to the price at which it was prior to the conspiracy. The following graph shows the unprecedented increase in turkey prices beginning in 2009, and staying elevated through the end of 2016.

**Figure 2: Average Turkey Wholesale Prices in Cents per lbs., 2000-2018**



**Answer to Paragraph 110:**   Plaintiffs have not produced the specific USDA reports that they are relying upon for paragraph 110.   As such, Butterball lacks sufficient knowledge or information to form a belief as to the accuracy of the statements attributed to the USDA, or the truth of the matter asserted.   To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

**2.      Beginning in 2009, defendants' revenues radically diverged from their costs.**

111.    Plaintiffs' experts examined the spread between turkey revenue and turkey-related costs (costs of goods sold + operating costs) for Jennie-O Turkey, the only one of the three largest turkey integrator defendants with public earnings, as a proxy for measuring the spread between a defendant's price of wholesale turkey and their turkey costs.[12] This measurement accounts for

---

[12]Hormel does not make any data publicly available on Jennie-O's costs. Therefore, plaintiffs have assumed for the purposes of this analysis that Jennie-O's costs are the same proportion to Hormel's overall costs as Jennie-O's revenues are to Hormel's overall revenues.

defendant-specific operating costs. This analysis confirms the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the Class Period in 2009.

**Answer to Paragraph 111:** Butterball lacks sufficient knowledge or information concerning the analyses that plaintiffs' litigation experts may have performed, and therefore, denies all allegations based on such analyses. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

112. The following chart shows a break in revenues and costs around the start of the Class Period in 2010 for Hormel's Jennie-O turkey brand:

**Figure 3: Jennie-O's Revenues vs Costs, March 2001 to March 2018**



**Answer to Paragraph 112:** Denied.

113. The anticompetitive effect of defendants' information exchange is seen in the dramatic increase in Jennie-O Turkey's spread between revenue and costs after the start of the conspiracy period.

---

**Answer to Complaint Footnote 12:** Butterball lacks knowledge or information sufficient to form a belief about Hormel's data availability, and therefore, denies the first sentence of this footnote. Butterball denies that plaintiffs' assumption is valid, and therefore, denies the remainder of footnote 12.

**Figure 4: Jennie-O Turkey's spread: Revenue minus Cost 2001-2018**



**Answer to Paragraph 113:**   Denied.

114.    These analyses of the spread between costs and prices confirm one essential fact – that rising costs do not explain the increases in price seen during the Class Period.

**Answer to Paragraph 114:**   Denied.

3.    **During the conspiracy period, prices rose but production failed to rise to match demand, indicating an anticompetitive restraint on supply in the market for turkey facilitated by the information exchange through Agri Stats.**

115.    In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should correspond to falling prices. However, in the turkey market during the conspiracy period, production, measured through USDA data, remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly. These observed price and output dynamics, shown in the below chart, are consistent with an anticompetitive effect on turkey output facilitated by the information exchange through Agri Stats.



**Answer to Paragraph 115:**   Denied.

**4.     During the conspiracy period, prices of turkey radically diverged from the costs of underlying feed.**

116.     Feed is the primary driver of turkey costs, accounting for approximately 60-70% of the overall cost of raising turkeys for sale according to the New York Times.[13] Prior to the conspiracy period, there was a tight relationship between the price of feed and the price of turkey, as would be expected in a competitive commodity market that was pricing its product based on its primary input cost. However, during the conspiracy period, the relationship between the price of feed and the price of turkey diverged dramatically, as would be expected as an anticompetitive effect of the information exchange that allowed the integrator defendants to charge more than was justified by their input costs. The divergence is illustrated in the below chart:

---

[13]Paul Sullivan, *In the Labyrinth of Turkey Pricing, a Reason Under Every Giblet, supra* note **Error! Bookmark not defined**.[sic]**.**



**Answer to Paragraph 116:**  Denied.

### 5.    A regression model demonstrates the anticompetitive effects on the price of turkey caused by the information exchange conducted through Agri Stats.

117.    To demonstrate the anticompetitive effects of defendants' information exchange on the market for turkey, plaintiffs' experts have done a regression model based on the relationship between the price of turkey hens and the price of turkey feed, which is the primary input cost for turkeys. The formula of the regression is the following: *(HenPrice)=a+P(FeedPrice)t+Et.* As shown below, the regression shows a significant elevation in the prices of turkey during the conspiracy period, showing the effects of the information exchange through Agri Stats:



**Answer to Paragraph 117:** Butterball lacks sufficient knowledge or information concerning the analyses that plaintiffs' litigation experts may have performed, and therefore, denies all allegations based on such analyses. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

## G. Defendants actively concealed the extent of their information exchange and plaintiffs did not and could not have discovered defendants' anticompetitive conduct.

118. Plaintiffs and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this complaint. Defendants engaged in a secret information exchange that did not reveal facts that would put plaintiffs or the Class on inquiry notice that there was an anticompetitive agreement to exchange information regarding the market for turkey. Throughout the Class Period, defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from plaintiffs and class members.

**Answer to Paragraph 118:** Butterball denies that plaintiffs lacked actual or constructive knowledge of the facts forming the basis of plaintiffs' claims for relief, or that plaintiffs could not

have discovered such facts through the exercise of reasonable diligence. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

119. In 2009, the President of Agri Stats, Bryan Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company. There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background, and really our specialty is working directly with companies about their opportunities and so forth.

**Answer to Paragraph 119:** Butterball denies the first sentence of paragraph 119. Butterball lacks sufficient knowledge or information concerning the accuracy or authenticity of the statement purportedly attributed to an Agri Stats employee, or the truth of the matter asserted, and therefore, denies the same. Butterball avers that Agri Stats, and the nature of its services, was well known to many people, including plaintiffs' lawyers, for over a decade. To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

120. At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidential[] nature of the information."

**Answer to Paragraph 120:** Butterball lacks sufficient knowledge or information concerning the accuracy or authenticity of the statement purportedly attributed to an Agri Stats employee, or the truth of the matter asserted, and therefore, denies the same.

121. Not until recently was the extent of the information exchange conducted through Agri Stats widely known or reported. Only after the filing of a February 7, 2018 Second Consolidated and Amended Complaint by the End User Plaintiff Class in the *In re Broiler Chicken Antitrust Litigation,* Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the confidential services that Agri Stats provides to its clients in the broiler industry.

**Answer to Paragraph 121:** Denied.

122.    The filing of that amended complaint collectively disclosed the likelihood that the turkey industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

**Answer to Paragraph 122:**  Denied.

123.    Defendants concealed the extent of their information exchange through Agri Stats. Indeed, to this day, it is not publicly known the number of companies that receive Agri Stats reports regarding turkey. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of defendants' turkey prices before these recent events.

**Answer to Paragraph 123:**  Denied.

**H.    Defendants had numerous opportunities to collude.**

124.    Defendant integrators are members of several turkey-related trade associations and other forums, which they used to facilitate their conspiratorial conduct. Turkey producers have numerous regular events through which they can communicate in person with one another. Regular and frequent attendance by defendants' CEOs and top-level executives at trade-association meetings is the norm rather than the exception.

**Answer to Paragraph 124:**  Butterball admits that it is a member of one or more trade associations, and that one or more of its employees may have attended one or more meetings of such trade associations.  Butterball denies that it discussed competitively sensitive information with any competitor at such meetings.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

125.    Nearly every defendant integrator's CEO has representatives on the board of directors or executive committee of these trade associations.

**Answer to Paragraph 125:**  Butterball admits that it is a member of one or more trade associations, and that, from time to time, it may have had a representative on the board of directors or executive committee of one or more trade associations.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

126.    The National Turkey Federation is a national advocate for turkey farmers and processors; members include growers, processors, hatchers, breeders, distributors, allied services, and state associations. High-ranking executives of Butterball, Jennie-O Turkey Store (Hormel), Cargill, Tyson, Farbest, and Perdue currently serve as officers or on the executive committee; and

nearly all of the defendants have membership in this trade association. In addition to regular board and executive committee meetings, the federation holds an annual convention in February and an annual leadership conference in July where these executives gather and discuss turkey-related information.

**Answer to Paragraph 126:** Butterball admits that, from time to time, one or more of its employees served on the National Turkey Federation executive committee. Butterball lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

127. Upon information and belief, the top-level executives from defendants discuss topics with one another relating to pricing, production, and other non-public proprietary information outside of the National Turkey Federation's formal meetings. These regular, informal, and in-person opportunities to discuss pricing and production in the turkey industry gives CEOs and top-level executives comfort that their competitors remain committed to a plan to artificially restrict turkey production.

**Answer to Paragraph 127:** Denied.

128. The United States Poultry & Egg Export Council (USAPEEC) has its home office in Stone Mountain, Georgia. Defendants are all members of the council. USAPEEC has a network of international offices and consultants in key export markets. The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world. The council has evolved into an advocate for the industry on trade-policy issues. USAPEEC has about 200 member companies and organizations. The council holds Board of Directors meetings quarterly and includes executives from all or nearly all defendants.

**Answer to Paragraph 128:** Butterball admits that it is a member of the USAPEEC. Butterball lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

129. The U.S. Poultry & Egg Association (U.S. Poultry) describes itself as the world's largest and most active poultry organization. U.S. Poultry's members include producers and processors of broilers, turkeys, ducks, eggs, and breeding stock, as well as allied companies. Many of the defendants are members of U.S. Poultry. U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall. Butterball, Cargill, Foster, Tyson, and Perdue have representation on the Board of Directors.

**Answer to Paragraph 129:** Butterball admits that, from time to time, it has had a representative sit on the Board of Directors for U.S. Poultry. Butterball lacks sufficient knowledge

or information to form a belief about the truth of the allegations in this paragraph and therefore

denies them.

130.    The North American Meat Institute (NAMI) represents companies that process 95% of red meat and 70% of turkey products in the United States and their suppliers throughout the country. NAMI hosts the Meat Industry Summit in April each year. Additionally, it hold regular Board of Director meetings. Butterball, Cargill, Hormel, and Tyson have representation on the NAMI Board.

**Answer to Paragraph 130:**  Butterball admits that, from time to time, it has had a

representative sit on the Board of Directors for NAMI.  Butterball also admits that NAMI has

hosted an event called the Meat Industry Summit, usually in April, each year that it has been in

existence.  Butterball lacks sufficient knowledge or information to form a belief about the truth of

the remaining allegations in this paragraph and therefore denies them.

## V.    CLASS ACTION ALLEGATIONS

131.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking compensatory damages and injunctive relief pursuant to federal law on behalf of the members of the following class:

> All persons and entities who directly purchased turkey from Defendants or co-conspirators for personal use in the United States during the Class Period. Specifically excluded from this Class are the Defendants and co-conspirators; the officers, directors or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant or coconspirator. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

**Answer to Paragraph 131:**  This paragraph is definitional and does not require a

response.  To the extent a response is required, Butterball denies that the alleged class meets the

requirements of Rule 23.  To the extent not expressly admitted, Butterball denies all other

allegations of this paragraph.

132.    <u>Class Identity</u>: The above-defined class is readily identifiable and is one for which records should exist.

**Answer to Paragraph 132:** Denied.

133. <u>Numerosity</u>: Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of defendants, retailers, resellers and other entities in the supply chain of turkey. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

**Answer to Paragraph 133:** Butterball lacks sufficient knowledge or information to form

a belief about the truth of the allegations in this paragraph and therefore denies them.

134. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs purchased turkey directly from one or more of the defendants for personal use, and therefore plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

**Answer to Paragraph 134:** Denied.

135. <u>Common Questions Predominate</u>: There are questions of law and fact common to the Class, including, but not limited to:

A. Whether defendants and their co-conspirators engaged in an information exchange agreement that reduced or suppressed competition in the market for turkey;

B. The identity of the participants of the alleged agreement;

C. The duration of the agreement alleged herein and the acts performed by defendants and their co-conspirators in furtherance of the agreement;

D. Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the plaintiffs and the other members of the Class;

F. The effect of defendants' alleged conspiracy on the prices of turkey sold in the United States during the Class Period; and

G. The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

**Answer to Paragraph 135:** Butterball denies that common questions predominate.

Butterball also denies that all of the items listed in subparts A through G are questions of law and

fact common to the class. To the extent not expressly admitted, Butterball denies all other allegations in this paragraph.

136.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class in that plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class who directly purchased turkey from defendants and plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

**Answer to Paragraph 136:**  Denied.

137.    Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

**Answer to Paragraph 137:**  Denied.

138.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

**Answer to Paragraph 138:**  Denied.

139.    Plaintiffs bring the action on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that directly purchased one or more turkey products that a defendant or co-conspirator produced during the respective class periods.

**Answer to Paragraph 139:** This paragraph is definitional and does not require a response.  To the extent a response is required, Butterball denies that the alleged class meets the requirements of Rule 23.  To the extent not expressly admitted, Butterball denies all other allegations of this paragraph.

140.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**Answer to Paragraph 140:**  Denied.

## VI.    ANTITRUST INJURY

141.    Defendants' anticompetitive conduct had the following effects, among others:
A.     Price competition has been restrained or eliminated with respect to turkey;
B.     The prices of turkey have been fixed, raised, stabilized, or maintained at artificially inflated levels;
C.     Direct purchasers of turkey have been deprived of free and open competition; and
D.     Direct purchasers of turkey, including plaintiffs, paid artificially inflated prices.

**Answer to Paragraph 141:**  Denied.

142.    Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge paid by the direct purchasers. Thus, the economic harm to plaintiffs and the class members can be quantified.

**Answer to Paragraph 142:**  Denied.

143.    The purpose of the conspiratorial conduct of defendants and their co-conspirators was to raise, fix, or maintain the price of turkey and, as a direct and foreseeable result, plaintiffs and the Class paid supra-competitive prices for turkey during the Class Period.

**Answer to Paragraph 143:**  Denied.

144.    By reason of the alleged violations of the antitrust laws, plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for turkey than they would have paid in the absence of defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

**Answer to Paragraph 144:**  Denied.

145.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**Answer to Paragraph 145:**  Denied.

## VII.    CAUSE OF ACTION

## VIOLATION OF THE SHERMAN ACT

### FIRST CLAIM FOR RELIEF
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR
### CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION
### 15 U.S.C. § 1
### (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND
### EQUITABLE RELIEF AND DAMAGES)

146.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 146:**  Butterball incorporates and re-alleges each preceding answer.

147.    Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 2010, and continuing at least until January 1, 2017, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer to Paragraph 147:**  Denied.

148.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of defendants' affairs.

**Answer to Paragraph 148:**  Denied.

149.    Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for turkey throughout the United States.

**Answer to Paragraph 149:**  Denied.

150.    The relevant product market is turkey and the relevant geographic market is the continental United States.

**Answer to Paragraph 150:**  Denied.

151.    Defendant integrators possess market power in the Relevant Market. Defendant integrators and their co-conspirators controlled approximately 80 percent of the Relevant Market. Defendant integrators' collective market power includes the power to artificially deflate the

amount of turkey produced in the United States below competitive levels and to artificially inflate the price plaintiffs pay for turkey above competitive levels.

**Answer to Paragraph 151:**  Denied.

152.    Defendants could impose an increase in the price of turkey collectively without causing many consumers to switch their purchases to another product. Turkey constitutes a unique product market.

**Answer to Paragraph 152:**  Denied.

153.    Defendants view the turkey products as fungible. Turkey products are generally interchangeable, permitting defendant integrators to readily to compare and match each other's pricing.

**Answer to Paragraph 153:**  Denied.

154.    The information regularly exchanged by defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public information about current supply, production and pricing plans regarding turkey. The information exchanges specifically included the exchange through Agri Stats of weekly and monthly reports regarding defendants' turkey operations, including weekly sales data that allowed defendants to compare their prices with their competitors and raise prices that were lower.

**Answer to Paragraph 154:**  Denied.

155.    Defendants' regular information exchanges through Agri Stats reflected concerted action between horizontal competitors in the market for turkey.

**Answer to Paragraph 155:**  Denied.

156.    Each defendant integrator furnished competitively sensitive information to other defendant integrators with the understanding that it would be reciprocated. Agri Stats enforced this understanding by requiring defendants to share data in order to receive comparable data.

**Answer to Paragraph 156:**  Denied.

157.    The agreement to regularly exchange detailed and non-public information about current production, supply, and pricing suppressed competition between the defendants. Agri Stats specifically identified for defendants the instances where their pricing was lower than other defendants and where they could raise their prices to match.

**Answer to Paragraph 157:**  Denied.

158.    When defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly, defendants used the data obtained through Agri Stats to reduce the uncertainty that they each should have faced from not

knowing what their competitors were offering and providing in the turkey market. This strategic information was a material factor in defendant integrators' decisions to inflate the prices that plaintiffs paid for turkey during the Class Period.

**Answer to Paragraph 158:** Denied.

159.    Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

**Answer to Paragraph 159:** Denied.

160.    The information-exchange agreement has had the effect of (1) reducing and suppressing competition among defendants in the market for turkey in the United States and (2) inflating the prices of turkey during the Class Period.

**Answer to Paragraph 160:** Denied.

161.    As a result of defendants' unlawful conduct, plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for turkey.

**Answer to Paragraph 161:** Denied.

162.    As a direct and proximate result of defendants' anticompetitive conduct, plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for turkey than they would have paid and will pay in the absence of the conspiracy.

**Answer to Paragraph 162:** Denied.

163.    The alleged contract, combination, or conspiracy is also a *per se* violation of the federal antitrust laws.

**Answer to Paragraph 163:** This claim has been dismissed by the court, and thus, no response is required. To the extent a further response is required, Butterball denies the allegations in this paragraph.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully requests judgment against defendants as follows:

164.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

165.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

166.    Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgments in favor of plaintiffs and the members of the Class be entered against defendants in an amount to be trebled to the extent such laws permit;

167.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

168.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

169.    Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

170.    Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

171.    Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

**Answer to Paragraphs 164-71**: Paragraphs 164-71 do not contain any factual allegations, and as such, no response is required.  To the extent a response is required, Butterball denies that it is liable, denies that plaintiffs can satisfy the requirements of Federal Rule of Civil Procedure 23, and denies that plaintiffs are entitled to any relief.

### IX.    JURY TRIAL DEMANDED

172.    Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**Answer to Paragraph 172:**  Paragraph 172 does not contain factual allegations, and therefore does not require a response.

### AFFIRMATIVE DEFENSES

Butterball asserts the following affirmative defenses.  In doing so, Butterball does not assume any burden of proof, persuasion, or production with respect to an issue where the applicable law places the burden upon plaintiffs.

### *First Affirmative Defense (Statute of Limitations)*

1.    Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.  Plaintiffs' claims are barred because they are based on conduct that entirely predates the limitation period.  Even if plaintiffs alleged more recent activity, any claim for damages incurred more than four years ago is barred.  Plaintiffs' claims are not saved by the fraudulent concealment doctrine since the relevant allegations have been circulating for years, and defendants have not engaged in any fraudulent concealment.

2.    The Complaint alleges that the alleged conspiracy ended sometime in 2016, when *In re Broiler Chicken Antitrust Litigation* was first filed.  Compl. ¶ 31.  As such, plaintiffs do not allege that any claim accrued during the most recent three out of four years pre-dating the filing of the Complaint.  Plaintiffs also cannot show that any claim accrued between December 19, 2015, the start of the four year period, and "late 2016, shortly after" *In re Broiler Chicken Antitrust Litigation* was filed and defendants allegedly "***clearly*** changed their behavior."  *See* Compl. ¶ 31 (emphasis added).

3.     Plaintiffs cannot show, nor have there been, any anticompetitive use of Agri Stats data during the relevant statute of limitations period.  The Complaint contains no allegations of any *conduct* in 2016.  For example, plaintiffs do not allege any plant closures or coordination of production in 2016.  And to the extent industry-wide statistics are even relevant, production actually went up in 2016.  Compl. ¶ 20.  Thus, by plaintiffs' own logic, the Agri Stats service was procompetitive in 2016.

4.     Regardless of whether plaintiffs have a claim for injuries sustained during the limitations period, any claim for *damages* prior to December 19, 2015 is time-barred.

5.     Plaintiffs cannot show that they neither knew nor, in the exercise of due diligence, could reasonably have known of the alleged offense.  Virtually ***all*** of the information that forms the basis of their complaint consists of public information pre-dating the limitations period. Plaintiffs allege that a "senior executive at Agri Stats[] publicly stated in ***2009*** that 'about 95% of the turkey industry [is] participating' in Agri Stats."  Compl. ¶ 7.  Plaintiffs also cite a separate ***2010*** Agri Stats presentation that identified the individual participants in Agri Stats, including each of the defendants.  *Id*. ¶ 8.  Plaintiffs also rely on old public information about how Agri Stats was used, noting that at its ***2011*** Investor Day, Hormel discussed how optimizing "the supply chain" can "improve your relative position (Agri Stats)."  *Id*. ¶ 12.  Plaintiffs' production-reduction allegations are also based on pre-limitations information, including a statement from Hormel in ***2009*** discussing the "very deliberate" "production cuts" that forms the basis of plaintiffs' allegations, as well as the *sole* defendant-specific allegation of such cuts.  *Id*. ¶ 24.  Similarly, plaintiffs rely on Hormel's ***2011*** public comment on "industry-wide" supply and demand conditions, including the effect of "egg set and poultry placement numbers," among other factors,

on expected pricing. *Id.* ¶ 26. Moreover, all of plaintiffs' industry statistics, including production levels, prices, and costs, were publicly available prior to the limitations period.

6.    Unfounded allegations by plaintiff-side lawyers and commentators relating to the anticompetitive potential of Agri Stats data have been floating around for almost a decade. For example, a 2010 public report for the U.S. Department of Justice and U.S. Department of Agriculture, which was co-authored by Robert Taylor, an economist, and David Domina, a noted plaintiff-side "trial lawyer with significant agriculture-related experience," alleged that "[m]ost poultry integrators participate in a common private reporting service, known as AgriStats" and that "we think the reports are so detailed that an insider could identify other company's … information." *See* Taylor and Domina, *Restoring Economic Health to Contract Poultry Production* (May 13, 2010).

7.    Plaintiffs have not alleged, and cannot show, that Butterball or defendants actively concealed the conduct alleged in the Complaint.

8.    Plaintiffs knew, or should have known, and were on inquiry notice, of the nature of their claims and could have, with the exercise of due diligence, filed a claim substantially similar to the claims set forth in the Complaint.

### *Second Affirmative Defense (Procompetitive Justifications)*

1.    Plaintiffs' claims must be dismissed because Butterball has a procompetitive justification for its conduct.

2.    Butterball has submitted certain information to Agri Stats, and Agri Stats has provided Butterball with certain reports from time to time. Agri Stats reports provided high-level, non-competitively sensitive information concerning certain aspects of turkey operations that, to the extent considered at all, could help reduce costs, enhance output, or improve efficiency.

3.     The procompetitive effects of Butterball's conduct outweigh any anticompetitive effects.

### *Third Affirmative Defense (Laches)*

4.     Plaintiffs' claims are barred by the equitable doctrine of laches.

5.     Butterball repeats and re-alleges, as if fully set forth herein, the allegations set forth in Butterball's First Affirmative Defense.

6.     Plaintiffs failed to exercise reasonable diligence in pursing their alleged claims, resulting in prejudice to Butterball.

### *Fourth Affirmative Defense (Arbitration)*

7.     Plaintiffs' claims are barred, in whole or in part, to the extent the contracts governing plaintiffs' commercial relationships with Butterball contain arbitration clauses or clauses providing a different forum for the resolution of their claims.

### *Fifth Affirmative Defense (Set Off)*

8.     Plaintiffs' claims are barred, in whole or in part, by non-settling defendants' right to set off any amounts paid to plaintiffs by any defendants who have settled, or do settle, plaintiffs' claims against them in this action.

### *Sixth Affirmative Defense (Incorporation)*

9.     Butterball adopts and incorporates by reference any and all other defenses asserted by any other defendant to the extent Butterball may share in such defenses.

### PRAYER FOR RELIEF

WHEREFORE, Butterball respectfully requests that judgment be entered against plaintiffs, and that Butterball be awarded costs of suit and such other relief this Court deems equitable and just, as provided by law.

## JURY TRIAL DEMANDED

Butterball demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: December 4, 2020            Respectfully submitted,

                    */s/ Colin R. Kass*

Christopher E. Ondeck
Colin R. Kass
Stephen R. Chuk
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004
(202) 416-6800
condeck@proskauer.com
ckass@proskauer.com
schuk@proskauer.com

Rucha A. Desai
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969-3000
rdesai@proskauer.com

Marc E. Rosenthal
PROSKAUER ROSE LLP
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL 60602
(312) 962-3530
mrosenthal@proskauer.com

*Attorneys for Defendant Butterball, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 4, 2020, a copy of the foregoing was filed via the Court's

ECF system.  Notice of this filing will be sent to the attorneys of record by operation of the ECF

system.  Parties may access this filing through the Court's system.

/s *Colin R. Kass*

Colin R. Kass
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004
(202) 416-6800
ckass@proskauer.com

*Attorney for Defendant Butterball, LLC*

Dated: December 4, 2020