**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

OLEAN WHOLESALE GROCERY
COOPERATIVE, INC., *et al.,*

Plaintiffs,

v.

AGRI STATS, INC., *et al.,*

Defendants.

No. 19-cv-08318

Hon. Virginia M. Kendall

**DEMAND FOR JURY TRIAL**

**DEFENDANTS CARGILL, INCORPORATED AND
CARGILL MEAT SOLUTION CORPORATION'S
ANSWER TO COMPLAINT**

Defendants Cargill, Incorporated ("Cargill"), and Cargill Meat Solutions Corporation ("CMS"), by and through their counsel of record, respond as follows to the corresponding numbered allegations in Olean Wholesale Grocery Cooperative, Inc., et al.'s Complaint ("Complaint") while reserving their right to file any motions permitted by the Rules or by this Court. Except as expressly stated below, and in accordance with Federal Rule of Civil Procedure 8(b)(3), Cargill and CMS deny all allegations in the Complaint not specifically admitted. Solely for the reader's convenience, Cargill and CMS have organized this Answer to correspond with the headings, subheadings, and numbering used within the Complaint. In doing so, Cargill and CMS do not admit that the headings or subheadings are factually accurate, and to the extent that any heading can be read to contain factual allegations, each and every one of them is denied.

# ANSWER

## I. NATURE OF ACTION

1.    The turkey integrator defendants are the leading suppliers of turkey in an industry with approximately $5 billion in annual commerce. The turkey industry is highly concentrated, with a small number of large producers in the United States controlling supply. Defendants and their co-conspirators collectively control approximately 80 percent of the wholesale turkey market in the United States. The turkey integrator defendants are Butterball LLC (Butterball); Cargill Inc. and Cargill Meat Solutions Corporation, (together and separately, Cargill); Cooper Farms, Inc. (Cooper Farms); Farbest Foods, Inc., (Farbest); Foster Farms LLC and Foster Poultry Farms (together and separately, Foster Farms); Hormel Foods Corporation and Hormel Foods LLC (together and separately, Hormel); House of Raeford Farms, Inc., (House of Raeford); Kraft Heinz Foods Company and Kraft Foods Group Brands LLC (together and separately, Kraft Foods), Perdue Farms, Inc. and Perdue Foods LLC (together and separately, Perdue); Tyson Foods, Inc., The Hillshire Brands Company, Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. (together and separately, Tyson).

**ANSWER TO PARAGRAPH 1:**    Paragraph 1 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS admit that Cargill and CMS are named as defendants in this matter. Cargill and CMS deny the remaining allegations in Paragraph 1 of the Complaint.

2.    Defendant Agri Stats is a company that provides secretive information exchange services to companies in a variety of agricultural sectors, including pork, chicken, and turkey.

**ANSWER TO PARAGRAPH 2:**    Cargill and CMS deny the allegations in Paragraph 2 of the Complaint.

3.    The turkey integrator defendants each entered into an agreement from at least 2010 to January 1, 2017, to exchange sensitive information through Agri Stats regarding their production and sales of turkey.

**ANSWER TO PARAGRAPH 3:**    Cargill and CMS deny the allegations in Paragraph 3 of the Complaint.

4.    Agri Stats reports are far different from lawful industry reports. Agri Stats gathers detailed financial and production data from each of the turkey integrators, standardizes this information, and produces customized reports and graphs for the co-conspirators. On a monthly basis, Agri Stats provides the turkey integrators with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information).

**ANSWER TO PARAGRAPH 4:** Paragraph 4 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 4 of the Complaint.

5.　　The United States Supreme Court has long recognized that "exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects." Agri Stats' sales reports prove the truth of that maxim. Agri Stats prepared monthly reports for defendants regarding their sales of turkey that identified, on a specific product by product level, the prices and returns that each defendant was obtaining on their sales of turkey. These reports, unavailable to anybody besides Agri Stats subscribers, allowed the integrator defendants to easily identify potential opportunities where their prices for turkey products were significantly lower than their competitors.

**ANSWER TO PARAGRAPH 5:** Paragraph 5 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 5 of the Complaint.

6.　　Turkey is the relevant product market and the geographic market is the continental United States. Defendants collectively possess market power in the market for turkey. Defendants and co-conspirators collectively possessed approximately 80 percent of the overall market share for turkeys during the Class Period.

**ANSWER TO PARAGRAPH 6:** Paragraph 6 of the Complaint states legal conclusions, to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 6 of the Complaint.

7.　　Blair Snyder, a senior executive at Agri Stats, publicly stated in 2009 that "about 95% of the turkey industry [is] participating" in Agri Stats, and that for "turkey participants, pretty much it's a list of who's who in the turkey business." This is a comparable portion to the percentage of broiler chicken industry participating in Agri Stats reports, with Mr. Snyder stating that "we've got high 90 percentage of both broilers and turkeys."

**ANSWER TO PARAGRAPH 7:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of those allegations, and therefore deny them.

8.　　Each one of the defendants and co-conspirators entered into an agreement to exchange information through Agri Stats. Each defendant's agreement to exchange information regarding turkey production is shown in the below 2010 excerpt from an Agri Stats presentation that lists the participants in Agri Stats' turkey reports.

3

**ANSWER TO PARAGRAPH 8:**     Cargill and CMS deny the allegations in Paragraph 8 of the

Complaint.

9.      This 2010 presentation slide shows that each of the defendant integrator and Co-
        Conspirator Integrators entered into an agreement to exchange information regarding their
        turkey operations through Agri Stats during the conspiracy period. The document directly
        identifies defendants Butterball, Cargill, Cooper's, Farbest, Foster Farms, House of
        Raeford and Perdue Farms, as participants in Agri Stats's reports on turkey. The document
        directly identifies Co-Conspirators Circle-S Ranch, Prestage Farms, and West Liberty
        Foods as participants in Agri Stats' reports on turkey. Jennie-O is the brand name for
        Hormel's turkey operations and thus Hormel participated in Agri Stats' reports on turkey.
        The document also identifies Louis Rich, a Kraft Foods brand that produces turkey, as
        receiving Agri Stats reports, and thus Kraft Foods participated in Agri Stats' reports on
        turkey. Sara Lee's turkey operations, Hillshire Brands, was subsequently acquired by
        Tyson in 2014 and thus Tyson participated in Agri Stats' reports on turkey.

**ANSWER TO PARAGRAPH 9:**     Cargill and CMS deny the allegations in Paragraph 9 of the

Complaint to the extent they relate to Cargill or CMS. To the extent the allegations in Paragraph

9 relate to others, Cargill and CMS lack sufficient knowledge or information to form a belief as to

the truth of those allegations, and therefore deny them.

10.     The information exchange by the defendant integrators through Agri Stats is exactly the
        type of information exchange that the Supreme Court has recognized is likely to have
        anticompetitive effects under a rule of reason analysis. First, the data is current and
        forward-looking – which courts consistently hold has "the greatest potential for generating
        anticompetitive effects." Second, information contained in Agri Stats reports is specific to
        the turkey producers, including information on profits, prices, costs and production levels.
        Third, none of the Agri Stats information was publicly available. Agri Stats is a
        subscription service, which required the defendant integrators to pay hefty fees over the
        Class Period – far in excess of any other pricing and production indices and to agree to
        volunteer their own data. "Public dissemination is a primary way for data exchange to
        realize its pro-competitive potential." Agri Stats ensured that its detailed, sensitive business
        information was available only to the co-conspirators and not to any buyers in the market.
        Thus, for example, buyers on the market could not use Agri Stats data in Agri Stats sales
        reports to negotiate lower prices; instead, only defendants could use it as a way to identify
        opportunities to raise their prices.

**ANSWER TO PARAGRAPH 10:**    Paragraph 10 of the Complaint states legal conclusions to

which no response is required. To the extent a response is deemed required, Cargill and CMS deny

the allegations in Paragraph 10 of the Complaint.

11.     Indeed, Agri Stats specifically marketed itself to potential participants as a way that they could "improve profitability" rather than engage in competition through production increases. Agri Stats was good to its word; its sales reports specifically identified opportunities for defendants where defendants' products were lower than that of the industry average and where defendants could consequently raise prices to meet that of their competitors.

**ANSWER TO PARAGRAPH 11:**   Cargill and CMS deny the allegations in Paragraph 11 of the

Complaint.

12.     Industry participants relied on Agri Stats reports in their analysis of their business operations. For example, Hormel, at its 2011 Investor Day, stated in its presentation that "when you optimize the supply chain" you "improve your relative industry position (Agri Stats)." Hormel also touted that "Jennie-O Turkey Store is consistently one of the top companies in operating profits (Agri Stats)."

**ANSWER TO PARAGRAPH 12:**   Cargill and CMS deny the allegations in Paragraph 12 of the

Complaint to the extent they relate to Cargill or CMS. To the extent the allegations in Paragraph

12 relate to others, Cargill and CMS lack sufficient knowledge or information to form a belief as

to the truth of those allegations, and therefore deny them.

13.     Confidential Witness 1 (CW1) is a former sales executive at Butterball involved in the pricing of turkeys. CW1 was employed at Butterball during the entire Class Period. CW1 stated that Butterball relied on the monthly reports issued by Agri Stats: "The company used the information to evaluate — by item, item group, price, distribution — where we stood against other turkey companies." CW1 stated that he and other sales personnel looked at Agri Stats data to see how Butterball ranked against peers in the turkey industry. CW1 stated that he personally looked at the Agri Stats data to assess costs and returns. CW1 stated that costs were an important factor in determining how Butterball set its prices.

**ANSWER TO PARAGRAPH 13:**   Cargill and CMS lack sufficient knowledge or information

to form a belief as to the truth of the allegations in Paragraph 13 of the Complaint, and therefore

deny them.

14.     Confidential Witness 2 (CW2) is a former accountant at Cooper Farms. CW2 stated that Cooper Farms received monthly reports from Agri Stats. In addition, Agri Stats representatives met with Cooper Farms executives every six months. CW2 stated that Cooper Farms submitted cost information to Agri Stats every month. CW2 explained that Agri Stats reports grouped data into various types of turkey products, including deli meat and smoked meat.

**ANSWER TO PARAGRAPH 14:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 14 of the Complaint, and therefore deny them.

15.    CW2 stated that Agri Stats representatives regularly met with the Cooper Leadership Management Group, which included top management and executives from Cooper Farms. CW2 stated that "the upper group received advice" from Agri Stats. CW2 stated that the advice from Agri Stats helped Cooper Farms improve its returns per pound.

**ANSWER TO PARAGRAPH 15:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 15 of the Complaint, and therefore deny them.

16.    Agri Stats reports also contained detailed information on industry-wide supply levels. For example, a job description of an Agri Stats employee stated that they analyzed Turkey "breeder flock and hatchery data" as well as Turkey "growout flocks."

**ANSWER TO PARAGRAPH 16:** Cargill and CMS deny the allegations in Paragraph 16 of the Complaint to the extent they relate to Agri Stats reports. Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations, and therefore deny them.

17.    Based on publicly available information filed in a February 7, 2018, complaint in the *Broiler Chicken Antitrust Litigation*, Agri Stats data on growout flocks contained information such as the number of broilers placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (aka, "down time"), feed conversion rate (pounds of feed per pound of broiler), and average daily weight. On information and belief, the growout data that Agri Stats compiled for the turkey industry contained similar levels of data. This type of data allowed defendants to monitor industry-wide supply levels.

**ANSWER TO PARAGRAPH 17:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of those allegations, and therefore deny them.

18.    Although Agri Stats reports are nominally anonymous, defendant integrators were often able to deanonymize the reports to identify the data of specific companies based on their industry knowledge. CW2 stated that he could determine the identity of companies in Agri Stats reports because "you could usually figure out who was who because they have a certain cooked meat, or if they were browning and running it through an oven." CW2

further stated that "we could sit there and discuss it, because a lot of us knew what the other plants in the big areas, what they did." For example, CW2 stated that one competitor company had five separate facilities included in the Agri Stats reports, and that therefore, it was easy to determine the identity of that company.

**ANSWER TO PARAGRAPH 18:** Cargill and CMS deny the allegations in Paragraph 18 of the Complaint to the extent they relate to Agri Stats reports. Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations about statements attributed to unidentified individuals, and therefore deny those allegations.

19. Confidential Witness 3 (CW3) is a former employee of Cargill during the conspiracy period. CW3 stated that Cargill received monthly reports from Agri Stats on turkey. CW3 stated that the monthly Agri Stats turkey reports went directly to Cargill finance executives.

**ANSWER TO PARAGRAPH 19:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations about statements attributed to unidentified individuals, and therefore deny those allegations.

20. Throughout the conspiracy period, defendant integrators were able to exercise a remarkable level of industry-wide restraint in keeping the growth of turkey supply in check, causing turkey prices to rise. Thus, Agri Stats had the anticompetitive effect of allowing defendants to engage in collusion to restrain the supply of turkey by facilitating information exchange about supply levels throughout the industry. The industry-wide cuts in turkey production during the conspiracy period are shown in the following chart:

**ANSWER TO PARAGRAPH 20:** Paragraph 20 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 20 of the Complaint.

21. In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should correspond to falling prices. However, in the turkey market during the conspiracy period, production, measured through USDA data, remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly. These observed price and output dynamics, shown in the below analysis performed by plaintiffs' experts, indicate that it was not falling demand that caused a decline in supply during the conspiracy period.

**ANSWER TO PARAGRAPH 21:** Paragraph 21 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 21 of the Complaint. Cargill and CMS also lack sufficient knowledge or information to form a belief as to the truth of the allegations about Plaintiffs' expert, and therefore deny those allegations.

22. In addition to their participation in Agri Stats, defendant integrators had frequent opportunities to communicate, in conjunction with formal meetings of various trade associations. In particular, the National Turkey Federation each year held regular meetings, including the NTF Annual Convention and the NTF Leadership conference, which were widely attended by the defendant integrators. CW3 stated that senior Cargill executives, including Cargill's CEO and CFO, attended National Turkey Federation meetings. For example, CW2 stated that Cooper Farms leadership were involved in the National Turkey Federation, for example Cooper Farms COO Gary Cooper served as immediate past chairman of the NTF board in 2014.

**ANSWER TO PARAGRAPH 22:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations about statements attributed to unidentified individuals, and therefore deny those allegations. Cargill and CMS deny the remaining allegations in Paragraph 22.

23. Collectively, Hormel, Cargill, and Butterball control approximately 50 percent of the turkey market. Hormel is the only publicly traded company among these three. In its earnings calls during the conspiracy period, Hormel repeatedly discussed the industry-wide success in executing production cuts and maintaining industry-wide production discipline during the Class Period.

**ANSWER TO PARAGRAPH 23:** Cargill and CMS deny the allegations in Paragraph 23 of the Complaint to the extent they relate to Cargill and CMS. Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations insofar as they are directed at or involve other defendants, and therefore deny those allegations.

24. On June 2, 2009, Hormel emphasized that it was making production cuts in response to an alleged oversupply in the market and closely monitoring the overall level of production in the market, showing the importance of the kind of information exchanged through Agri Stats:

There is an oversupply of turkey. There continues to be perhaps more production as well as cold storage stocks than the demand would warrant. We have been very deliberate about making the appropriate production cuts. We announced them over a year ago. And we have even exceeded the amount we expected to reduce. We have seen the placements and indicators of forward looking supply come down, so that was as expected, and we expected the second half of 2009 to be a little kinder in the turkey side of the business, but there is still a lot of storage, cold storage stocks to go through, we feel comfortable that we've cleaned up our inventories that we had on hand. Our production cuts were more than the decrease in our sales because we did work off inventories. I had a feeling the industry will rebound. It's going to take a work through of the excess inventories as well as those production cuts hitting the marketplace.

**ANSWER TO PARAGRAPH 24:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 24 of the Complaint, and therefore deny them.

25.     On August 20, 2010, Hormel stated, "We think the turkey business has reached a good equilibrium, and we don't have any major expansion plans and have not heard others in that mode, so I think those conditions should remain favorable into next year."

**ANSWER TO PARAGRAPH 25:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 25 of the Complaint, and therefore deny them.

26.     On May 25, 2011, Hormel stated that the turkey industry was maintaining solid pricing based on the information that Hormel was receiving about industry-wide turkey production levels: "We certainly see egg set and poultry placement numbers that take us through the end of this year and a little bit into next fiscal year. But right now, on the basis of those numbers, on the basis of what we see in terms of production in the industry and on the basis of cold storage numbers, coupled with still strong demand on the export side, we feel that the amount of product going to market will support solid pricing on a commodity basis."

**ANSWER TO PARAGRAPH 26:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 26 of the Complaint, and therefore deny them.

27.     On August 25, 2011, Hormel stated that the turkey industry was maintaining better discipline than the poultry industry: "The industry as a whole has shown a little better

discipline, perhaps, than the other poultry side of the ledger." This statement is notable because the chicken industry is currently the subject of multiple civil lawsuits as well as a DOJ investigation of potential antitrust violations during this period of time.

**ANSWER TO PARAGRAPH 27:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 27 of the Complaint, and therefore deny them.

28. Furthermore, the turkey market has all of the characteristics of a market where information exchange is likely to have anticompetitive effects. Turkey is a fungible product, the market for turkey has price-based competition, the demand for turkey is relatively inelastic, and the turkey market features a trend towards price uniformity.

**ANSWER TO PARAGRAPH 28:** Paragraph 28 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 28 of the Complaint.

29. The information exchange through Agri Stats did not have the kind of characteristics that would produce procompetitive effects sufficient to outweigh the anticompetitive harms. The information exchange involved current and forward-looking data. Agri Stats regularly prepared monthly reports that contained data that was less than six weeks old. Agri Stats also only allowed companies to access the data if they themselves shared the data, thus ensuring that only defendants and other similarly situated turkey integrators who received the Agri Stats reports were able to use the data.

**ANSWER TO PARAGRAPH 29:** Paragraph 29 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 29 of the Complaint.

30. During the conspiracy period, the price of turkey spiked dramatically, driven by the anticompetitive effects of the information exchange through Agri Stats regarding turkey production that helped facilitate defendants restraint over the growth in the supply of turkey.

**ANSWER TO PARAGRAPH 30:** Paragraph 30 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 30 of the Complaint.

31.     The information exchange through Agri Stats in fact had anticompetitive effects on the market. Prior to the conspiracy, turkey prices closely tracked the underlying cost of feed, which is the primary input cost in the production of turkey. Beginning in 2009-2010, prices of turkey spiked to an unprecedented level, showing the anticompetitive effects of defendants' information exchange through Agri Stats. Remarkably, as demonstrated in the analysis performed by plaintiffs' experts, shown in the below chart, prices of turkey quickly returned to match underlying feed costs after litigation was filed in late 2016 in the broiler industry that centered on the anticompetitive use of Agri Stats. Defendants clearly changed their behavior after the commencement of the Broilers litigation, as Tyson dismissed their CEO, Donnie Smith, in late 2016, shortly after the first civil lawsuits were filed.

**ANSWER TO PARAGRAPH 31:**  Paragraph 31 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 31 of the Complaint. Cargill and CMS also lack sufficient knowledge or information to form a belief as to the truth of the allegations about Plaintiffs' expert, and therefore deny those allegations.

32.     Feed accounts for approximately 60-70% of the cost of raising a turkey. Plaintiffs' experts constructed a regression model based on the underlying feed cost that models what the "but for" price of turkey would have been if the historical relationship between feed and turkey costs had continued during the conspiracy period. The model demonstrates that the anticompetitive information exchange of data regarding turkey production through Agri Stats caused anticompetitive effects in the market for turkey.

**ANSWER TO PARAGRAPH 32:**  Cargill and CMS deny the allegations in Paragraph 32 of the Complaint. Cargill and CMS also lack sufficient knowledge or information to form a belief as to the truth of the allegations about Plaintiffs' expert, and therefore deny those allegations.

33.     As a result of defendants' unlawful conduct, plaintiffs and the Class paid artificially inflated prices for turkey during the Class Period. Such prices exceeded the amount they would have paid if the price for turkey had been determined by a competitive market. Thus, plaintiffs and class members were injured by defendants' agreement to exchange information through Agri Stats regarding the turkey market.

**ANSWER TO PARAGRAPH 33:**  Paragraph 33 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 33 of the Complaint.

## II.    JURISDICTION AND VENUE

34.    Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure compensatory damages and injunctive relief against defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs seek to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by defendants' conduct in restricting the supply of turkey and increasing the price of turkey. Plaintiffs seek damages in excess of $5,000,000. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

**ANSWER TO PARAGRAPH 34:**    Paragraph 34 of the Complaint states legal conclusions to

which no response is required.

35.    Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because both Kraft Foods and Hillshire Brands are headquartered in the District, and one or more defendants transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

**ANSWER TO PARAGRAPH 35:**    Paragraph 35 of the Complaint states legal conclusions to

which no response is required.

36.    This Court has personal jurisdiction over each defendant because, inter alia, each defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of turkey throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

**ANSWER TO PARAGRAPH 36:**    Paragraph 36 of the Complaint states legal conclusions to

which no response is required.

37.    The activities of the defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

**ANSWER TO PARAGRAPH 37:**    Paragraph 37 of the Complaint states legal conclusions to

which no response is required.

## III.    PARTIES

### A.  Plaintiffs

38.    Plaintiff Olean Wholesale Grocery Cooperative, Inc. (Olean Wholesale) is a retailers' cooperative located in Olean, New York. Its members are independent, family-owned supermarkets. Olean has served supermarkets in Western and Central New York, Western Pennsylvania, and Northeastern Ohio since 1922. Olean Wholesale is a New York corporation with its principal place of business in Olean, New York, and purchased turkey directly from one or more defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**ANSWER TO PARAGRAPH 38:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 38 of the Complaint, and therefore deny them.

39.    John Gross and Company, Inc. (John Gross) is a full line food distributor located in Mechanicsburg, Pennsylvania. Founded in 1950, the company has been owned and operated by the Gross family for four generations. John Gross is a Pennsylvania corporation with its principal place of business in Mechanicsburg, Pennsylvania, and purchased turkey directly from one or more defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**ANSWER TO PARAGRAPH 39:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 39 of the Complaint, and therefore deny them.

### B.  Defendants

40.    Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana. Throughout the Class Period, Agri Stats acted as a co-conspirator of the turkey integrator defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among defendants and their co-conspirators.

**ANSWER TO PARAGRAPH 40:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 40 of the Complaint, and therefore deny them.

41.    Butterball, LLC is a privately held North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Butterball and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates

sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 41:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 41 of the Complaint, and therefore deny them.

42. Cargill, Inc. is a privately held Delaware corporation headquartered in Minnetonka, Minnesota. During the Class Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 42:** Cargill and CMS admit that Cargill, Incorporated is a privately held Delaware corporation headquartered in Minnetonka, Minnesota. Cargill and CMS admit that, during the alleged Class Period, CMS sold certain turkey products in the United States. To the extent not specifically admitted, Cargill and CMS deny the remaining allegations in Paragraph 42 of the Complaint.

43. Cargill Meat Solutions Corporation is a Delaware corporation that operates as a subsidiary of Cargill, Incorporated. During the Class Period, Cargill Meat Solutions and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 43:** Cargill and CMS admit that Cargill Meat Solutions Corporation is a Delaware corporation and wholly owned subsidiary of Cargill, Incorporated. Cargill and CMS further admit that during the alleged Class Period, Cargill Meat Solutions Corporation sold certain turkey products in the United States. To the extent not specifically admitted, Cargill and CMS deny the remaining allegations in Paragraph 43 of the Complaint.

44. Defendants Cargill, Inc. and Cargill Meat Solutions are collectively referred to as "Cargill."

**ANSWER TO PARAGRAPH 44:** In response to Paragraph 44 of the Complaint, Cargill and CMS admit that the Complaint refers to Cargill and CMS collectively as "Cargill," but Cargill and CMS deny that it is appropriate to so refer to them.

45.     Cooper Farms, Inc. is a privately held Ohio corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Cooper Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 45:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 45 of the Complaint, and therefore deny them.

46.     Farbest Foods, Inc. is a privately held Indiana corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Farbest and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 46:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 46 of the Complaint, and therefore deny them.

47.     Foster Farms LLC is a privately held California corporation headquartered in Modesto, California. During the Class Period, Foster Farms LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 47:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 47 of the Complaint, and therefore deny them.

48.     Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms LLC. During the Class Period, Foster Poultry Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of turkey, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 48:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 48 of the Complaint, and therefore deny them.

49.     Defendants Foster Farms LLC and Foster Poultry Farms are collectively referred to as "Foster Farms."

**ANSWER TO PARAGRAPH 49:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 49 of the Complaint, and therefore deny them.

50.     Kraft Heinz Foods Company (Kraft Heinz), an Illinois corporation with headquarters in Pittsburgh, Pennsylvania, and Chicago, Illinois, is engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Kraft Heinz and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 50:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 50 of the Complaint, and therefore deny them.

51.     Kraft Foods Group Brands LLC is an Illinois corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Kraft Heinz and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 51:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 51 of the Complaint, and therefore deny them.

52.     Defendants Kraft Heinz Foods Company and Kraft Foods Brands LLC are collectively referred to as "Kraft Foods."

**ANSWER TO PARAGRAPH 52:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 52 of the Complaint, and therefore deny them.

53.     Hormel Foods Corporation is a Delaware corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or

affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 53:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 53 of the Complaint, and therefore deny them.

54.     Hormel Foods LLC is a limited liability corporation headquartered in Austin, Minnesota. It is a wholly owned subsidiary of Hormel Foods Corporation. Hormel is engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Hormel Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 54:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 54 of the Complaint, and therefore deny them.

55.     House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. During the Class Period, House of Raeford operated in part through a division referred to as "Columbia Farms," which is a group of broiler facilities and operations originally named Columbia Farms, Inc. and Columbia Farms of Georgia, Inc. when purchased by House of Raeford in 1998. During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 55:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 55 of the Complaint, and therefore deny them.

56.     Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland. During the Class Period, Perdue Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 56:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 56 of the Complaint, and therefore deny them.

57.    Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 57:**    Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 57 of the Complaint, and therefore deny them.

58.    Defendants Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to as "Perdue."

**ANSWER TO PARAGRAPH 58:**    Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 58 of the Complaint, and therefore deny them.

59.    Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. It wholly owns and controls two subsidiaries, Tyson Prepared Foods, Inc. and Tyson Fresh Meats Inc. that slaughter and sell turkey products. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 59:**    Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 59 of the Complaint, and therefore deny them.

60.    Tyson Fresh Meats Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Fresh Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 60:**    Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 60 of the Complaint, and therefore deny them.

61.    Tyson Prepared Foods, Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. and/or its

predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 61:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 61 of the Complaint, and therefore deny them.

62.   The Hillshire Brands Company (Hillshire Brands) is a Maryland corporation headquartered in Chicago, Illinois. Hillshire Brands operates as a subsidiary of Tyson Foods that sells turkey products. During the Class Period, Hillshire Brands and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 62:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 62 of the Complaint, and therefore deny them.

63.   Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc., and Hillshire Brands are collectively referred to as "Tyson."

**ANSWER TO PARAGRAPH 63:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 63 of the Complaint, and therefore deny them.

### C. Co-Conspirators

64.   Co-Conspirator Circle S-Ranch, Inc. is a North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Circle S-Ranch and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 64:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 64 of the Complaint, and therefore deny them.

65.   Co-Conspirator Prestage Farms is a North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period,

Prestage Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 65:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 65 of the Complaint, and therefore deny them.

66. Co-Conspirator West Liberty Foods LLC (West Liberty) is an Iowa corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, West Liberty and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER TO PARAGRAPH 66:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 66 of the Complaint, and therefore deny them.

## IV. FACTUAL ALLEGATIONS

67. Starting no later than January 1, 2010, and continuing at least until January 1, 2017, defendants entered into an agreement to exchange information regarding their production and sale of turkey through Agri Stats. The information exchange through Agri Stats provided defendants an opportunity to obtain and monitor critical and competitively sensitive business information regarding each other's production and sales. The information exchange through Agri Stats had anticompetitive effects, as prices for turkey soared and defendants engaged in an industry-wide series of production cuts during the period. Notably, the information exchanged through Agri Stats was not available to purchasers of turkey, ensuring that the information exchange would not have procompetitive effects.

**ANSWER TO PARAGRAPH 67:** Cargill and CMS deny the allegations in Paragraph 67 of the Complaint.

### A. Agri Stats' information exchange services began in the broiler industry, where it has been used to facilitate widespread collusion.

68. Agri Stats has played a central role in other industries, including collusion in the broiler industry. As alleged in the *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill.) litigation, the broiler producers used Agri Stats as a part of their conspiracy to restrain production and inflate prices.

**ANSWER TO PARAGRAPH 68:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 68 of the Complaint, and therefore deny them.

69.     In the broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and the co-conspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, Express Markets, Inc. or EMI. Agri Stats collected data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.

**ANSWER TO PARAGRAPH 69:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 69 of the Complaint, and therefore deny them.

70.     The detail of these reports ensured that competitors could quickly decode the information of their purported competitors. The *Broiler* complaints allege it was common knowledge among producers that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes. The broiler reports, in part, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

**ANSWER TO PARAGRAPH 70:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 70 of the Complaint, and therefore deny them.

71.     In the broiler industry, it is also alleged that Agri Stats – known to its co-conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements

in the broiler industry facilitated the implementation of the agreement to restrict supply – where Agri Stats would transmit the intentions of the broiler producers to restrict supply.

**ANSWER TO PARAGRAPH 71:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 71 of the Complaint, and therefore deny them.

72.    In a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the broiler industry, it was reported:

> "Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "*That is what creates stability for a cartel.*"

**ANSWER TO PARAGRAPH 72:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 72 of the Complaint, and therefore deny them.

73.    The district court noted, in denying the motions to dismiss in the *In re Broiler Chicken Antitrust Litigation* that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which suggests high antitrust concerns.

**ANSWER TO PARAGRAPH 73:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 73 of the Complaint, and therefore deny them.

**B. Defendants entered into an agreement to exchange information through Agri Stats regarding their production and sales of turkey.**

74.     Each member of the conspiracy, including the integrator defendants and co-conspirators, were all Agri Stats subscribers. Agri Stats publicly stated that 95% of the turkey market used Agri Stats reports.

**ANSWER TO PARAGRAPH 74:**  Cargill and CMS admit that during the alleged Class Period CMS subscribed to certain Agri Stats reports related to turkey products. Cargill and CMS deny that during the alleged Class Period Cargill subscribed to Agri Stats reports related to turkey products. Cargill and CMS deny participation in any conspiracy, deny that Plaintiffs' definition of a so-called "turkey market" is appropriate, and lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 74 of the Complaint, and therefore deny those allegations.

75.     Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison and perform the monthly audits. Each company's financial data is reconciled to its general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations, so all company numbers are calculated the same way. CW2 stated that he was involved during the conspiracy period in the monthly transmission of cost data from Cooper Farms to Agri Stats.

**ANSWER TO PARAGRAPH 75:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 75 of the Complaint, and therefore deny them.

76.     Participants in the scheme received monthly detailed reports and graphs that allow them to compare their performance, sales prices, and costs to other participants. Agri Stats issues separate reports in the turkey industry to the integrator defendants regarding live operations, processing, further reprocessing, feed costs, and sales.

**ANSWER TO PARAGRAPH 76:**  Cargill and CMS admit that during the alleged Class Period CMS received reports from Agri Stats, and some of those reports contained information related to turkey operations, processing, reprocessing, feed costs, and sales. Cargill and CMS deny that the reports CMS received from Agri Stats allowed CMS to compare its performance, sales prices, and

costs to other participants. Cargill and CMS deny participation in a "scheme," and lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 76 of the Complaint, and therefore deny those allegations.

77.　Agri Stats provided the integrator defendants with an unparalleled ability to share critical and proprietary information concerning key business metrics, such as sales, production levels and short and long-term production capacity.

**ANSWER TO PARAGRAPH 77:**　Cargill and CMS deny the allegations in Paragraph 77 of the Complaint.

78.　Perhaps most egregiously, Agri Stats provided monthly sales reports to defendants. One of Agri Stats' subsidiaries is Express Markets, Inc. (aka, "EMI"). On EMI's publicly available webpage Amanda Martin, an Express Markets economist states that Agri Stats "audited turkey and broiler sales and product mix data, and worked with processing and further reprocessing reports.'" On information and belief, the Agri Stats turkey sales reports contained sales data that was less than six weeks old.

**ANSWER TO PARAGRAPH 78:**　Cargill and CMS admit that CMS received reports from Agri Stats containing information that related to sales of turkey products during the alleged Class Period. Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 78 of the Complaint, and therefore deny them.

79.　As detailed in the recently filed amended complaint in the *Pork Antitrust Litigation*, No. 18-cv-1776 (JRT/HB) (D. Minn. Nov. 06, 2019), ECF No. 392, Agri Stats allowed subscribers to its pork sales reports to compare their prices for individual products against the national average net price, and against the national top 25 percent average price. Notably, Agri Stats identified opportunities for the Pork Integrators to raise prices. For instance, for each product, Agri Stats specifically broke out the variance between the company's price and the national average price, as well as the economic impact of the variance. This allowed coconspirators to see how much more they could charge if they charged either the national average price or the average of the top 25% national average price.

**ANSWER TO PARAGRAPH 79:**　Paragraph 79 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 79 of the Complaint.

80.     Agri Stats provided similar services to the integrator defendants regarding their production and sale of turkey. According to CW1, Agri Stats ranked the integrator defendants in their reports based on the returns (i.e. prices) that the integrator defendants received.

**ANSWER TO PARAGRAPH 80:**  Cargill and CMS deny the allegations in Paragraph 80 of the Complaint to the extent they relate to Cargill or CMS. Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations about statements attributed to unidentified individuals, and therefore deny those allegations.

81.     As detailed in the *Pork* and *Broilers* complaints, for each of its reports, Agri Stats identified the list of participants who were contributing data or information to the reports. CW1 confirmed that the reports Agri Stats prepared for the integrator defendants identified the participants that provided data for each report, which allowed defendants to understand which of their competitors were participating for each report. CW2 confirmed that the Agri Stats reports identified each of the turkey production facilities that were participating in the reports.

**ANSWER TO PARAGRAPH 81:**  Cargill and CMS deny the allegations in Paragraph 81 of the Complaint to the extent they relate to Agri Stats reports. Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations about statements attributed to unidentified individuals, and therefore deny those allegations.

82.     One presentation from Agri Stats shows the level of detail provided to competitors regarding profits in the swine market. On information and belief, similar levels of detail were provided to defendants who received Agri Stats reports in the turkey market.

**ANSWER TO PARAGRAPH 82:**  Cargill and CMS deny the allegations in Paragraph 82 of the Complaint to the extent they relate to Cargill or CMS. Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations, and therefore deny them.

83.     The purpose of these reports was not to provide better prices to consumers or to lower the costs of production. Instead, the clear purpose was to improve the profitability of the co-conspirators. The particular Agri Stats report referenced above shows the ranking of each company in profitability and compares the company to its competitors by providing the variance from the average. The Agri Stats report actually circulated to competitors contained even further detail. This underlines that the purpose of these reports was not to allow consumers to save more money through lower prices and more efficient production

– in fact, the opposite was true, the purpose was the profitability of the defendant companies and the impact was higher sales prices for consumers.

**ANSWER TO PARAGRAPH 83:** Cargill and CMS deny the allegations in Paragraph 83 of the

Complaint.

84. Much of the information shared by Agri Stats and the co-conspirators was unnecessary to achieve any benefits for consumers. Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.

**ANSWER TO PARAGRAPH 84:** Cargill and CMS deny the allegations in Paragraph 84 of the

Complaint.

85. Agri Stats knew that it played a central role in facilitating this anticompetitive information exchange. One presentation from Agri Stats regarding the swine industry spoke directly on this point, pointing out to industry participants that they could not undertake such a detailed cost analysis between competitors without Agri Stats auditing and standardizing the data:

**ANSWER TO PARAGRAPH 85:** Cargill and CMS lack sufficient knowledge or information

to form a belief as to the truth of the allegations in Paragraph 85 of the Complaint, and therefore

deny those allegations. Cargill and CMS deny participation in an "anticompetitive information

exchange".

86. Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine *tolerance and outlier status and enforce*," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, "*[e]ach participant has to commit*."

**ANSWER TO PARAGRAPH 86:** Cargill and CMS lack sufficient knowledge or information

to form a belief as to the truth of the allegations in Paragraph 86 of the Complaint, and therefore

deny them.

87. According to CW1, Agri Stats gave live presentations to defendant integrators to explain to them how to use the reports that Agri Stats prepared on the turkey industry and how to compare themselves against their competitors: during the presentations, Agri Stats said, "if you are number one priced out of 13, that meant the return was so much versus the other companies."

**ANSWER TO PARAGRAPH 87:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 87 of the Complaint, including allegations about statements attributed to unidentified individuals, and therefore deny those allegations.

88. It is the standard policy of Agri Stats that it will only grant access to Agri Stats reports to similarly situated companies that themselves share data with Agri Stats. This ensures that data from Agri Stats is only available to one side of the market – the integrator defendants. The other side of the market, purchasers of turkey, is not allowed to access the Agri Stats data, and thus cannot use Agri Stats data to negotiate lower prices. Thus, Agri Stats reports function as a one-way ratchet that can be used for anticompetitive purposes by defendants but not for procompetitive purposes by purchasers.

**ANSWER TO PARAGRAPH 88:** Paragraph 88 of the Complaint contains legal argument to which no response is required. To the extent a response is required, Cargill and CMS deny that Cargill or CMS used Agri Stats reports for anticompetitive purposes, and lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations, and therefore deny them.

C. **Defendants possess market power in the market for turkey and turkey is the type of product for which information exchange is particularly likely to have anticompetitive effects.**

1. **Defendants have market power in the market for turkey.**

89. One tool that courts use to assess the competitive effects of concerted action is defining a relevant market – the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). The case concerns the sale of turkey for meat consumption in the United States.

**ANSWER TO PARAGRAPH 89:** Paragraph 89 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 89 of the Complaint.

90. There is a single market for turkey for meat consumption. Prices for turkey sold in the United States are quoted generally in disassembled parts, with adjustments for

transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

**ANSWER TO PARAGRAPH 90:** Cargill and CMS deny the allegations in Paragraph 90 of the Complaint, including Plaintiffs' allegation that there is "a single market for turkey for meat consumption."

91. The relevant geographic market is the United States.

**ANSWER TO PARAGRAPH 91:** Cargill and CMS deny the allegations in Paragraph 91 of the Complaint.

### 2. There are high barriers to entry in the market for turkey for meat consumption.

92. The existence of high barriers to entry is one factor which makes markets susceptible to collusion. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel. High barriers to entry in the turkey processing market exist, precluding other entrants or would-be competitors from entering the market for turkeys raised for consumption.

**ANSWER TO PARAGRAPH 92:** Paragraph 92 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 92 of the Complaint.

93. During the Class Period and continuing today, substantial barriers impede entry into the turkey market. A new entrant into the market would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, equipment, energy, transportation. Distribution, infrastructure (aka "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, longstanding customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.

**ANSWER TO PARAGRAPH 93:** Cargill and CMS deny the allegations in Paragraph 93 of the Complaint.

94.     The price of construction of a new integrated turkey processing complex is relatively high. For example, the cost for a current market participant, Virginia Poultry Growers Cooperative, to construct a new turkey processing in 2015 was $62 million.

**ANSWER TO PARAGRAPH 94:**  Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 94 of the Complaint and therefore deny them.

95.     The turkey market has been subject to steadily increasing consolidation over the last several decades. In the 1970s, the turkey market was defined by competition among dozens of companies that worked with independent farmers. But now, just four corporations – Cargill, Hormel, Butterball, and Farbest – produce more than half of the turkey in the United States.

**ANSWER TO PARAGRAPH 95:**  Cargill and CMS deny the allegations in Paragraph 95.

96.     The turkey market also has high levels of vertical integration that constitute a barrier to entry. The National Turkey Federation states that "turkey companies are vertically integrated, meaning they control or contract for all phases of production."

**ANSWER TO PARAGRAPH 96:**  Cargill and CMS deny the allegations in Paragraph 96 of the Complaint to the extent to they relate to what Plaintiffs' call the "turkey market." Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations, and therefore deny them.

97.     For example, Butterball has over 175 farms that they own, as well as contracts with numerous independent farmers. Jennie-O owns over 100 commercial growing farms. Cargill owns around 700 farms. Farbest has more than 200 contract growers.

**ANSWER TO PARAGRAPH 97:**  Cargill and CMS deny the allegations in Paragraph 97 of the Complaint to the extent they relate to Cargill and CMS. Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 97, and therefore deny them.

### 3. The defendants have market power in the market for turkey for meat consumption.

98. The integrator defendants possess market power in the market for turkey for consumption. Defendants and their co-conspirators controlled an average of 77% of the market from 2010-2018.

**ANSWER TO PARAGRAPH 98:** Cargill and CMS deny the allegations in Paragraph 98.

### D. The market for turkey is the type of market where the information exchanges orchestrated by Agri Stats are likely to harm competition.

99. Competition is likely to be harmed when competitors with market power in concentrated markets, such as the market at issue, directly exchange strategic information about current and forward-looking plans for prices and supply. The strategic information exchanged between the defendants was competitively sensitive and a material factor in negotiations. Price, capacity, supply and costs are crucial aspects of competition. When defendants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects of sales of turkey.

**ANSWER TO PARAGRAPH 99:** Paragraph 99 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 99 of the Complaint.

100. The information exchange took place in private settings and involved the exchange of confidential, non-public information.

**ANSWER TO PARAGRAPH 100:** Cargill and CMS deny the allegations in Paragraph 100 of the Complaint.

101. The market for turkey is characterized by numerous attributes that mean the type of information exchange facilitated by Agri Stats are particularly likely to have anticompetitive effects. In particular, the market for turkey features relatively few sellers, a fungible product, price-based competition, inelastic demand, and a trend toward price uniformity.

**ANSWER TO PARAGRAPH 101:** Cargill and CMS deny the allegations in Paragraph 101 of the Complaint.

### 1. The turkey market features few sellers.

102.     The turkey market is concentrated, with relatively few sellers. The defendants and co-conspirators control approximately 80 percent of turkey production and processing. The presence of few companies supports the inference that a conspiracy to exchange information had the intended effect of restraining competition.

**ANSWER TO PARAGRAPH 102:** Paragraph 102 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 102 of the Complaint.

### 2. Turkey is a fungible market.

103.     One of the distinct characteristics of the turkey industry is its fungibility, also known as the ability to be freely exchangeable or replaceable in whole or in part. Common sense indicates at Thanksgiving that a consumer can substitute a whole turkey produced by Butterball with a whole turkey produced by Cargill.

**ANSWER TO PARAGRAPH 103:** Paragraph 103 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 103 of the Complaint.

104.     Indeed, the Agri Stats reports themselves show that turkey is fungible because they aggregate data across defendants for particular types of turkey products and allow defendants to compare detailed information on prices for the same fungible product. CW1 confirmed that the Agri Stats reports were organized by specific item of turkey product.

**ANSWER TO PARAGRAPH 104:** Paragraph 104 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 104 of the Complaint to the extent they relate to Agri Stats reports, and lack sufficient knowledge or information to form a belief as to the truth of the allegations about statements attributed to unidentified individuals, and therefore deny those allegations.

### 3. The turkey market features price-based competition.

105.     Turkey is a commodity market that faces price-based competition.

**ANSWER TO PARAGRAPH 105:** Cargill and CMS deny the allegations in Paragraph 105 of the Complaint.

### 4.    Demand for turkey is relatively inelastic.

106.    Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price. A PED value between 0 and -1 indicates there is inelastic demand for the good or service – i.e., a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. The USDA has estimated that the average PED estimate for the turkey market is -0.58 – meaning the demand for turkey is inelastic. Indeed, most American consumers eat turkey at Thanksgiving, not pork or chicken, illustrating that there is no substitute for one of the key demand drivers of turkey.

**ANSWER TO PARAGRAPH 106:** Paragraph 106 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 106 of the Complaint.

### 5.    The turkey market features a trend toward price uniformity.

107.    Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. For example, whole turkey products are produced on a commercial scale and sold in supermarkets. Whole turkeys are virtually indistinguishable, with similar nutritional values, branding and packaging.

**ANSWER TO PARAGRAPH 107:** The first sentence of Paragraph 107 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 107 of the Complaint.

### E.    Industry-wide production cuts during the Conspiracy Period were facilitated through the information exchange conducted through Agri Stats.

108.    As demonstrated in the following chart, the turkey integrators acted in a concerted way to decrease turkey supply in 2009, 2013, 2014, and 2015. Overall, industry supply decreased significantly from 2009 to 2015, before rebounding in 2016. The information exchange through Agri Stats facilitated the ability of defendants to monitor total industry levels of supply.

**ANSWER TO PARAGRAPH 108:** Cargill and CMS deny the allegations in Paragraph 108 of the Complaint.

F. **Abnormal pricing during the Class Period demonstrates the anticompetitive effects of the exchange of turkey information conducted through the Agri Stats sales reports.**

109. Beginning in 2010, the turkey industry showed abnormal price movements, *i.e.*, price increases for the average turkey whole price unexplained by increases in costs. All of these pricing measurements show a significant break between pricing prior to 2010 and pricing after 2010, supporting the plausibility of anticompetitive effects on the turkey market from the information exchange conducted through Agri Stats. Plaintiffs have measured the various abnormal pricing movements in a number of ways, including: (i) the average turkey price, (ii) the turkey integrators' margin during the Class Period; (iii) the variation between feed and turkey prices before and during the Class Period; and (iv) a regression analysis that models the relationship between turkey prices and feed prices.

**ANSWER TO PARAGRAPH 109:** Cargill and CMS deny the allegations in Paragraph 109 of the Complaint.

1. **The average turkey wholesale price experience an unprecedented increase beginning in 2009.**

110. According to aggregate prices published by the USDA, the average wholesale price per pound for turkey hens was between $0.55 and $0.85 every year from 2000 to 2009, before steadily increasing to $1.15 by 2016. Following initiation of the *Broilers* litigation, the price of turkey then quickly returned to the price at which it was prior to the conspiracy. The following graph shows the unprecedented increase in turkey prices beginning in 2009, and staying elevated through the end of 2016.

**ANSWER TO PARAGRAPH 110:** Cargill and CMS deny the allegations in Paragraph 110 of the Complaint.

2. **Beginning in 2009, defendants' revenues radically diverged from their costs.**

111. Plaintiffs' experts examined the spread between turkey revenue and turkey-related costs (costs of goods sold + operating costs) for Jennie-O Turkey, the only one of the three largest turkey integrator defendants with public earnings, as a proxy for measuring the spread between a defendant's price of wholesale turkey and their turkey costs. This measurement accounts for defendant-specific operating costs. This analysis confirms the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the Class Period in 2009.

**ANSWER TO PARAGRAPH 111:** Paragraph 111 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS lack

sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 111 of the Complaint, and therefore deny them. Cargill and CMS also lack sufficient knowledge or information to form a belief as to the truth of the allegations about Plaintiffs' expert, and therefore deny those allegations.

112.    The following chart shows a break in revenues and costs around the start of the Class Period in 2010 for Hormel's Jennie-O turkey brand:

**ANSWER TO PARAGRAPH 112:** Paragraph 112 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 112 of the Complaint, and therefore deny them.

113.    The anticompetitive effect of defendants' information exchange is seen in the dramatic increase in Jennie-O Turkey's spread between revenue and costs after the start of the conspiracy period.

**ANSWER TO PARAGRAPH 113:** Paragraph 113 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 113 of the Complaint, and therefore deny them. Cargill and CMS deny that they participated in an "information exchange" that had an "anticompetitive effect."

114.    These analyses of the spread between costs and prices confirm one essential fact – that rising costs do not explain the increases in price seen during the Class Period.

**ANSWER TO PARAGRAPH 114:** Paragraph 114 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 114 of the Complaint, and therefore deny them.

3. **During the conspiracy period, prices rose but production failed to rise to match demand, indicating an anticompetitive restraint on supply in the market for turkey facilitated by the information exchange through Agri Stats.**

115. In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should correspond to falling prices. However, in the turkey market during the conspiracy period, production, measured through USDA data, remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly. These observed price and output dynamics, shown in the below chart, are consistent with an anticompetitive effect on turkey output facilitated by the information exchange through Agri Stats.

**ANSWER TO PARAGRAPH 115:** Paragraph 115 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 115 of the Complaint.

4. **During the conspiracy period, prices of turkey radically diverged from the costs of underlying feed.**

116. Feed is the primary driver of turkey costs, accounting for approximately 60-70% of the overall cost of raising turkeys for sale according to the New York Times. Prior to the conspiracy period, there was a tight relationship between the price of feed and the price of turkey, as would be expected in a competitive commodity market that was pricing its product based on its primary input cost. However, during the conspiracy period, the relationship between the price of feed and the price of turkey diverged dramatically, as would be expected as an anticompetitive effect of the information exchange that allowed the integrator defendants to charge more than was justified by their input costs. The divergence is illustrated in the below chart:

**ANSWER TO PARAGRAPH 116:** Paragraph 116 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 116 of the Complaint.

5. **A regression model demonstrates the anticompetitive effects on the price of turkey caused by the information exchange conducted through Agri Stats.**

117. To demonstrate the anticompetitive effects of defendants' information exchange on the market for turkey, plaintiffs' experts have done a regression model based on the relationship between the price of turkey hens and the price of turkey feed, which is the primary input cost for turkeys. The formula of the regression is the following:

($HenPrice$)=$\alpha$+$\beta$($FeedPrice$)$t$+$\varepsilon t$. As shown below, the regression shows a significant elevation in the prices of turkey during the conspiracy period, showing the effects of the information exchange through Agri Stats:

**ANSWER TO PARAGRAPH 117:** Paragraph 117 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 117 of the Complaint. Cargill and CMS also lack sufficient knowledge or information to form a belief as to the truth of the allegations about Plaintiffs' expert, and therefore deny those allegations.

> **G.** **Defendants actively concealed the extent of their information exchange and plaintiffs did not and could not have discovered defendants' anticompetitive conduct.**

118. Plaintiffs and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this complaint. Defendants engaged in a secret information exchange that did not reveal facts that would put plaintiffs or the Class on inquiry notice that there was an anticompetitive agreement to exchange information regarding the market for turkey. Throughout the Class Period, defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from plaintiffs and class members.

**ANSWER TO PARAGRAPH 118:** Paragraph 118 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 118 of the Complaint.

119. In 2009, the President of Agri Stats, Bryan Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company. *There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background*, and really our specialty is working directly with companies about their opportunities and so forth.

**ANSWER TO PARAGRAPH 119:** Cargill and CMS lack sufficient knowledge or information

to form a belief as to the truth of the allegations in Paragraph 119 of the Complaint, and therefore

deny them.

120.     At the same 2009 presentation, when discussing "bottom line numbers" (a company's net
         earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going
         to display the actual bottom line to the group here just because of the confidential[] nature
         of the information."

**ANSWER TO PARAGRAPH 120:** Cargill and CMS lack sufficient knowledge or information

to form a belief as to the truth of the allegations in Paragraph 120 of the Complaint, and therefore

deny them.

121.     Not until recently was the extent of the information exchange conducted through Agri Stats
         widely known or reported. Only after the filing of a February 7, 2018 Second Consolidated
         and Amended Complaint by the End User Plaintiff Class in the *In re Broiler Chicken
         Antitrust Litigation,* Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive
         presentation of the full scope of the confidential services that Agri Stats provides to its
         clients in the broiler industry.

**ANSWER TO PARAGRAPH 121:** Cargill and CMS deny the allegations in Paragraph 121 of

the Complaint.

122.     The filing of that amended complaint collectively disclosed the likelihood that the turkey
         industry was using Agri Stats to share confidential industry information that could facilitate
         an anticompetitive conspiracy.

**ANSWER TO PARAGRAPH 122:** Paragraph 122 of the Complaint states legal conclusions to

which no response is required. To the extent a response is deemed required, Cargill and CMS deny

the allegations in Paragraph 122 of the Complaint.

123.     Defendants concealed the extent of their information exchange through Agri Stats. Indeed,
         to this day, it is not publicly known the number of companies that receive Agri Stats reports
         regarding turkey. Accordingly, a reasonable person under the circumstances would not
         have been alerted to begin to investigate the legitimacy of defendants' turkey prices before
         these recent events.

**ANSWER TO PARAGRAPH 123:** Paragraph 123 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 123 of the Complaint.

### H. Defendants had numerous opportunities to collude.

124.   Defendant integrators are members of several turkey-related trade associations and other forums, which they used to facilitate their conspiratorial conduct. Turkey producers have numerous regular events through which they can communicate in person with one another. Regular and frequent attendance by defendants' CEOs and top-level executives at trade-association meetings is the norm rather than the exception.

**ANSWER TO PARAGRAPH 124:** Cargill and CMS deny the allegations in Paragraph 124 of the Complaint to the extent they relate to Cargill and CMS, and lack sufficient knowledge or information to form a belief as to the truth of allegations directed at other defendants, and therefore deny them.

125.   Nearly every defendant integrator's CEO has representatives on the board of directors or executive committee of these trade associations.

**ANSWER TO PARAGRAPH 125:** Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth the allegations in Paragraph 125, and therefore deny them.

126.   The National Turkey Federation is a national advocate for turkey farmers and processors; members include growers, processors, hatchers, breeders, distributors, allied services, and state associations. High-ranking executives of Butterball, Jennie-O Turkey Store (Hormel), Cargill, Tyson, Farbest, and Perdue currently serve as officers or on the executive committee; and nearly all of the defendants have membership in this trade association. In addition to regular board and executive committee meetings, the federation holds an annual convention in February and an annual leadership conference in July where these executives gather and discuss turkey-related information.

**ANSWER TO PARAGRAPH 126:** Cargill and CMS admit that certain CMS employees are members of the National Turkey Federation. Cargill further admits that the National Turkey Federal holds an annual convention and an annual leadership conference. To the extent not specifically admitted, Cargill and CMS lack sufficient knowledge or information to form a belief

as to the truth of the remaining allegations in Paragraph 126 of the Complaint, and therefore deny

them.

127.    Upon information and belief, the top-level executives from defendants discuss topics with one another relating to pricing, production, and other non-public proprietary information outside of the National Turkey Federation's formal meetings. These regular, informal, and in-person opportunities to discuss pricing and production in the turkey industry gives CEOs and top-level executives comfort that their competitors remain committed to a plan to artificially restrict turkey production.

**ANSWER TO PARAGRAPH 127:** Cargill and CMS deny the allegations in Paragraph 127 of

the Complaint.

128.    The United States Poultry & Egg Export Council (USAPEEC) has its home office in Stone Mountain, Georgia. Defendants are all members of the council. USAPEEC has a network of international offices and consultants in key export markets. The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world. The council has evolved into an advocate for the industry on trade-policy issues. USAPEEC has about 200 member companies and organizations. The council holds Board of Directors meetings quarterly and includes executives from all or nearly all defendants.

**ANSWER TO PARAGRAPH 128:** Cargill and CMS admit that certain CMS employees have

attended the United States Poultry & Egg Export Council's quarterly Board of Directors meetings.

To the extent not specifically admitted, Cargill and CMS lack sufficient knowledge or information

to form a belief as to the truth of the remaining allegations in Paragraph 128 of the Complaint, and

therefore deny them.

129.    The U.S. Poultry & Egg Association (U.S. Poultry) describes itself as the world's largest and most active poultry organization. U.S. Poultry's members include producers and processors of broilers, turkeys, ducks, eggs, and breeding stock, as well as allied companies. Many of the defendants are members of U.S. Poultry. U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall. Butterball, Cargill, Foster, Tyson, and Perdue have representation on the Board of Directors.

**ANSWER TO PARAGRAPH 129:** Cargill and CMS admit that the U.S. Poultry & Egg

Association holds quarterly Board of Directors meetings. Cargill and CMS further admit that

certain CMS employees have served on the U.S. Poultry & Egg Association Board of Directors.

Cargill and CMS deny that Cargill has representation on the U.S. Poultry & Egg Association Board of Directors. To the extent not specifically admitted, Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 129 of the Complaint, and therefore deny them.

130.    The North American Meat Institute (NAMI) represents companies that process 95% of red meat and 70% of turkey products in the United States and their suppliers throughout the country. NAMI hosts the Meat Industry Summit in April each year. Additionally, it hold regular Board of Director meetings. Butterball, Cargill, Hormel, and Tyson have representation on the NAMI Board.

**ANSWER TO PARAGRAPH 130:** Cargill and CMS deny that Cargill and CMS have representation on the North American Meat Institute Board of Directors. Cargill and CMS lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 130 of the Complaint, and therefore deny them.

## V.    CLASS ACTION ALLEGATIONS

131.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking compensatory damages and injunctive relief pursuant to federal law on behalf of the members of the following class:

> All persons and entities who directly purchased turkey from Defendants or co-conspirators for personal use in the United States during the Class Period. Specifically excluded from this Class are the Defendants and co-conspirators; the officers, directors or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant or co-conspirator. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

**ANSWER TO PARAGRAPH 131:** Paragraph 131 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS admit

that Plaintiffs purport to bring a class action on behalf of the class set forth in Paragraph 131 of

the Complaint, but Cargill and CMS deny that such a class may be properly certified.

132.    <u>Class Identity</u>: The above-defined class is readily identifiable and is one for which
        records should exist.

**ANSWER TO PARAGRAPH 132:** Cargill and CMS deny the allegations in Paragraph 132 of

the Complaint.

133.    <u>Numerosity</u>: Plaintiffs do not know the exact number of class members because such
        information presently is in the exclusive control of defendants, retailers, resellers and other
        entities in the supply chain of turkey. Plaintiffs believe that due to the nature of the trade
        and commerce involved, there are thousands of class members geographically dispersed
        throughout the United States, such that joinder of all class members is impracticable.

**ANSWER TO PARAGRAPH 133:** Cargill and CMS deny the allegations in Paragraph 133 of

the Complaint.

134.    <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the members of the Class
        because plaintiffs purchased turkey directly from one or more of the defendants for
        personal use, and therefore plaintiffs' claims arise from the same common course of
        conduct giving rise to the claims of the Class and the relief sought is common to the
        Class.

**ANSWER TO PARAGRAPH 134:** Cargill and CMS deny the allegations in Paragraph 134 of

the Complaint.

135.    <u>Common Questions Predominate</u>: There are questions of law and fact common to the Class,
        including, but not limited to:

        A.    Whether defendants and their co-conspirators engaged in an information
              exchange agreement that reduced or suppressed competition in the market
              for turkey;

        B.    The identity of the participants of the alleged agreement;

        C.    The duration of the agreement alleged herein and the acts performed by
              defendants and their co-conspirators in furtherance of the agreement;

        D.    Whether the conduct of defendants and their co-conspirators, as alleged in
              this Complaint, caused injury to the business or property of the plaintiffs
              and the other members of the Class;

E.      The effect of defendants' alleged conspiracy on the prices of turkey sold in the United States during the Class Period; and

F.      The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

**ANSWER TO PARAGRAPH 135:** Cargill and CMS deny the allegations in Paragraph 135 of the Complaint.

136.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class in that plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class who directly purchased turkey from defendants and plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

**ANSWER TO PARAGRAPH 136:** Cargill and CMS deny the allegations in Paragraph 136 of the Complaint.

137.    Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

**ANSWER TO PARAGRAPH 137:** Cargill and CMS deny the allegations in Paragraph 137 of the Complaint.

138.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

**ANSWER TO PARAGRAPH 138:** Cargill and CMS deny the allegations in Paragraph 138 of the Complaint.

139.    Plaintiffs bring the action on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that directly purchased one or more turkey products that a defendant or co-conspirator produced during the respective class periods.

**ANSWER TO PARAGRAPH 139:** Paragraph 139 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS admit that Plaintiffs purport to bring a class action on behalf of the class set forth in Paragraph 139 of the Complaint, but Cargill and CMS deny that such a class may be properly certified.

140.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**ANSWER TO PARAGRAPH 140:** Paragraph 140 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 140 of the Complaint.

## VI.    ANTITRUST INJURY

141.    Defendants' anticompetitive conduct had the following effects, among others:

    A.    Price competition has been restrained or eliminated with respect to turkey;

    B.    The prices of turkey have been fixed, raised, stabilized, or maintained at artificially inflated levels;

    C.    Direct purchasers of turkey have been deprived of free and open competition; and

    D.    Direct purchasers of turkey, including plaintiffs, paid artificially inflated prices.

**ANSWER TO PARAGRAPH 141:** Paragraph 141 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 141 of the Complaint.

142.    Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge paid by the direct purchasers. Thus, the economic harm to plaintiffs and the class members can be quantified.

**ANSWER TO PARAGRAPH 142:** Paragraph 142 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 142 of the Complaint.

143.  The purpose of the conspiratorial conduct of defendants and their co-conspirators was to raise, fix, or maintain the price of turkey and, as a direct and foreseeable result, plaintiffs and the Class paid supra-competitive prices for turkey during the Class Period.

**ANSWER TO PARAGRAPH 143:** Paragraph 143 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 143 of the Complaint.

144.  By reason of the alleged violations of the antitrust laws, plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for turkey than they would have paid in the absence of defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

**ANSWER TO PARAGRAPH 144:** Paragraph 144 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 144 of the Complaint.

145.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**ANSWER TO PARAGRAPH 145:** Paragraph 145 of the Complaint states legal conclusions to which no response is required. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 145 of the Complaint.

## VII.   CAUSE OF ACTION

## VIOLATION OF THE SHERMAN ACT

## FIRST CLAIM FOR RELIEF
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR
## CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION
## 15 U.S.C. § 1
## (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND
## EQUITABLE RELIEF AND DAMAGES)

146.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER TO PARAGRAPH 146:** Cargill and CMS incorporate by reference their responses to

Paragraphs 1-145 of the Complaint as though set forth fully herein.

147.   Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 2010, and continuing at least until January 1, 2017, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER TO PARAGRAPH 147:** Cargill and CMS deny the allegations in Paragraph 147 of

the Complaint.

148.   Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of defendants' affairs.

**ANSWER TO PARAGRAPH 148:** Cargill and CMS deny the allegations in Paragraph 148 of

the Complaint.

149.   Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for turkey throughout the United States.

**ANSWER TO PARAGRAPH 149:** Cargill and CMS deny the allegations in Paragraph 149 of

the Complaint.

150.   The relevant product market is turkey and the relevant geographic market is the continental United States.

**ANSWER TO PARAGRAPH 150:** Cargill and CMS deny the allegations in Paragraph 150 of

the Complaint.

151.    Defendant integrators possess market power in the Relevant Market. Defendant integrators
        and their co-conspirators controlled approximately 80 percent of the Relevant Market.
        Defendant integrators' collective market power includes the power to artificially deflate
        the amount of turkey produced in the United States below competitive levels and to
        artificially inflate the price plaintiffs pay for turkey above competitive levels.

**ANSWER TO PARAGRAPH 151:** Cargill and CMS deny the allegations in Paragraph 151 of

the Complaint.

152.    Defendants could impose an increase in the price of turkey collectively without causing
        many consumers to switch their purchases to another product. Turkey constitutes a unique
        product market.

**ANSWER TO PARAGRAPH 152:** Cargill and CMS deny the allegations in Paragraph 152 of

the Complaint.

153.    Defendants view the turkey products as fungible. Turkey products are generally
        interchangeable, permitting defendant integrators to readily to compare and match each
        other's pricing.

**ANSWER TO PARAGRAPH 153:** Cargill and CMS deny the allegations in Paragraph 153 of

the Complaint to the extent they relate to Cargill or CMS, and lack sufficient knowledge or

information to form a belief as to the truth of the allegations directed at other defendants, and

therefore deny them.

154.    The information regularly exchanged by defendants pursuant to the agreement has
        consisted of detailed, competitively sensitive and non-public information about current
        supply, production and pricing plans regarding turkey. The information exchanges
        specifically included the exchange through Agri Stats of weekly and monthly reports
        regarding defendants' turkey operations, including weekly sales data that allowed
        defendants to compare their prices with their competitors and raise prices that were lower.

**ANSWER TO PARAGRAPH 154:** Cargill and CMS deny the allegations in Paragraph 154 of

the Complaint.

155.    Defendants' regular information exchanges through Agri Stats reflected concerted action
        between horizontal competitors in the market for turkey.

**ANSWER TO PARAGRAPH 155:** Cargill and CMS deny the allegations in Paragraph 155 of

the Complaint.

156.    Each defendant integrator furnished competitively sensitive information to other defendant
integrators with the understanding that it would be reciprocated. Agri Stats enforced this
understanding by requiring defendants to share data in order to receive comparable data.

**ANSWER TO PARAGRAPH 156:** Cargill and CMS deny the allegations in Paragraph 156 of

the Complaint.

157.    The agreement to regularly exchange detailed and non-public information about current
production, supply, and pricing suppressed competition between the defendants. Agri Stats
specifically identified for defendants the instances where their pricing was lower than other
defendants and where they could raise their prices to match.

**ANSWER TO PARAGRAPH 157:** Cargill and CMS deny the allegations in Paragraph 157 of

the Complaint.

158.    When defendants that are competing for the same consumers exchange competitive
information, it reduces the incentives to compete on price. Accordingly, defendants used
the data obtained through Agri Stats to reduce the uncertainty that they each should have
faced from not knowing what their competitors were offering and providing in the turkey
market. This strategic information was a material factor in defendant integrators' decisions
to inflate the prices that plaintiffs paid for turkey during the Class Period.

**ANSWER TO PARAGRAPH 158:** Paragraph 158 of the Complaint states legal conclusions to

which no response is required. To the extent a response is deemed required, Cargill and CMS deny

the allegations in Paragraph 145 of the Complaint.

159.    Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic,
timely, and detailed data were not reasonably necessary to further any procompetitive
purpose. The information exchanged between defendants was current, easily traceable to
its source, confidential, and related to a core characteristic of competition between them.

**ANSWER TO PARAGRAPH 159:** Cargill and CMS deny the allegations in Paragraph 159 of

the Complaint.

160.    The information-exchange agreement has had the effect of (1) reducing and suppressing
competition among defendants in the market for turkey in the United States and (2)
inflating the prices of turkey during the Class Period.

**ANSWER TO PARAGRAPH 160:** Cargill and CMS deny the allegations in Paragraph 160 of the Complaint.

161. As a result of defendants' unlawful conduct, plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for turkey.

**ANSWER TO PARAGRAPH 161:** Cargill and CMS deny the allegations in Paragraph 161 of the Complaint.

162. As a direct and proximate result of defendants' anticompetitive conduct, plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for turkey than they would have paid and will pay in the absence of the conspiracy.

**ANSWER TO PARAGRAPH 162:** Cargill and CMS deny the allegations in Paragraph 162 of the Complaint.

163. The alleged contract, combination, or conspiracy is also a per se violation of the federal antitrust laws.

**ANSWER TO PARAGRAPH 163:** Paragraph 163 of the Complaint states legal conclusions to which no response is required, and, moreover, the Court has dismissed Plaintiffs' "per se" antitrust claim. To the extent a response is deemed required, Cargill and CMS deny the allegations in Paragraph 163 of the Complaint.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully requests judgment against defendants as follows:

164. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

**ANSWER TO PARAGRAPH 164:** Cargill and CMS deny that Plaintiffs are entitled to any relief whatsoever, including the relief requested in Paragraph 164 of the Complaint.

165.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

**ANSWER TO PARAGRAPH 165:** Cargill and CMS deny that Plaintiffs are entitled to any relief whatsoever, including the relief requested in Paragraph 165 of the Complaint.

166.    Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgments in favor of plaintiffs and the members of the Class be entered against defendants in an amount to be trebled to the extent such laws permit;

**ANSWER TO PARAGRAPH 166:** Cargill and CMS deny that Plaintiffs are entitled to any relief whatsoever, including the relief requested in Paragraph 166 of the Complaint.

167.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

**ANSWER TO PARAGRAPH 167:** Cargill and CMS deny that Plaintiffs are entitled to any relief whatsoever, including the relief requested in Paragraph 167 of the Complaint.

168.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

**ANSWER TO PARAGRAPH 168:** Cargill and CMS deny that Plaintiffs are entitled to any relief whatsoever, including the relief requested in Paragraph 168 of the Complaint.

169.    Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

**ANSWER TO PARAGRAPH 169:** Cargill and CMS deny that Plaintiffs are entitled to any relief whatsoever, including the relief requested in Paragraph 169 of the Complaint.

170.    Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

**ANSWER TO PARAGRAPH 170:** Cargill and CMS deny that Plaintiffs are entitled to any relief whatsoever, including the relief requested in Paragraph 170 of the Complaint.

171.    Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

**ANSWER TO PARAGRAPH 171:** Cargill and CMS deny that Plaintiffs are entitled to any relief whatsoever, including the relief requested in Paragraph 171 of the Complaint.

## IX.    JURY TRIAL DEMANDED

172.    Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**ANSWER TO PARAGRAPH 172:** Cargill and CMS deny that Plaintiffs are entitled to any relief whatsoever, including the relief requested in Paragraph 172 of the Complaint.

## DEFENSES

Cargill and CMS assert the following defenses in response to Plaintiffs' claims, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein. Cargill and CMS incorporate by reference the admissions, allegations, and denials contained in its Answer, and reserves the right to amend this Answer and to assert other defenses as this action proceeds.[1]

## FIRST DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

---

[1] To the extent the Court's rulings have limited or foreclosed any of these defenses, Cargill and CMS continue to plead the defense to preserve it for appeal.

## SECOND DEFENSE

Cargill and CMS did not engage in any conduct, combination, or conspiracy in restraint of trade. Cargill's and CMS's conduct was pro-competitive, reasonable, and permissible, and was based on independent, legitimate, and self-interested business and economic justifications.

## THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations, and the doctrines of laches, waiver, and estoppel.

The statute of limitations for Plaintiffs' claims is four years. 15 U.S.C. § 15(b). Accordingly, its claims must be dismissed unless Plaintiffs can sufficiently allege that Plaintiffs could not have discovered the claimed offense within the limitations period exercising reasonable diligence. Plaintiffs cannot satisfy this burden because the challenged conduct occurred more than ten years ago. This timing also demonstrates an unreasonable lack of diligence in bringing Plaintiffs' claims.

## FOURTH DEFENSE

Plaintiffs did not suffer injury and were not damaged based on the allegations in the Complaint, particularly with regard to any acts purportedly traceable to Cargill or CMS.

## FIFTH DEFENSE

Plaintiffs' claims are barred because Plaintiffs' alleged injuries and damages were not legally or proximately caused by any acts or omissions by Cargill or CMS and/or were caused, if at all, by the conduct of Plaintiffs and/or third parties over which Cargill and CMS had no authority or control. Cargill and CMS cannot be held liable for loss or damage caused by such third parties, whether or not they are parties to this action.

## SIXTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have no standing or capacity to bring some or all of the claims raised in the Complaint.

## SEVENTH DEFENSE

To the extent any Plaintiffs' claims are subject to mandatory arbitration or other dispute resolution process, those claims are improperly before this Court.

## EIGHTH DEFENSE

Plaintiffs are not entitled to injunctive or other equitable relief because to the extent they could prove their claims (which Cargill and CMS dispute), Plaintiffs have an adequate remedy at law and any injunctive relief would be improper.

## NINTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not suffered, and will not suffer, any antitrust injury or any injury of the type that the relevant statutes were designed to prevent by reason of Cargill's or CMS's conduct as alleged in the Complaint, and Plaintiffs' alleged injuries are too speculative, indirect and remote from the alleged conduct, and cannot be ascertained or apportioned.

## TENTH DEFENSE

Plaintiffs are not entitled to damages because Plaintiffs' damages, if any, are too legally uncertain, remote, indirect, and/or speculative.

## ELEVENTH DEFENSE

Plaintiffs' claims against Cargill and CMS for damages are barred, in whole or in part, because Plaintiffs would be unjustly enriched if allowed to recover any portion of the damages

alleged in the Complaint. Plaintiffs' damages, if any, must therefore be offset against any benefits it received.

## TWELFTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to exercise reasonable care to mitigate any damages they may have suffered. For example, to the extent Plaintiffs believed that Cargill or CMS had unfairly increased the price of turkey products, Plaintiffs had an obligation to mitigate damages by seeking other sources of supply, including from other producers. To the extent Plaintiffs allege that the price of turkey products was unfairly manipulated through the use of indices, Plaintiffs had an obligation to renegotiate contracts to use different indices or no index at all in pricing.

## THIRTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

## FOURTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs seek improper multiple damage awards, and damage awards duplicative of those sought in other actions, in violation of the Due Process guarantees of the Fifth and Fourteenth Amendments of the United States Constitution.

## FIFTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because none of Cargill's or CMS's alleged actions or omissions substantially lessened competition within any properly defined market.

**SIXTEENTH DEFENSE**

Plaintiffs' claims are preempted and barred, in whole or in part, because Cargill's and CMS's alleged conduct has implied or express immunity from the antitrust laws.

**SEVENTEENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because Cargill's and CMS's actions were authorized or permitted under state and/or federal law.

**EIGHTEENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because the Complaint has insufficiently alleged a relevant product market and geographic market.

**NINETEENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because Cargill and CMS do not have market power in a relevant market.

**TWENTIETH DEFENSE**

This action is not properly maintainable as a class action under the Federal Rules of Civil Procedure. Among other things, common issues of fact and law do not predominate over individual issues; a class action is not a superior method for adjudicating the purported claims set forth in the Complaint; adjudication on a class basis would be unmanageable; the interests of the purported class members are in conflict with each other; Plaintiffs are not proper class representatives and their claims are not sufficiently typical of the purported class; and Plaintiffs and/or their counsel will not fairly and adequately represent the purported class.

**TWENTY-FIRST DEFENSE**

Cargill and CMS adopt and incorporate by reference any and all other defenses asserted by any other Defendant to the extent that the defense would apply to Cargill or CMS.

## RESERVATION OF RIGHTS AND DEFENSES

Cargill and CMS have not knowingly or intentionally waived any applicable defenses and reserve the right to amend this Answer to add, supplement, or modify defenses based upon legal theories that may be or will be divulged through clarification of the Complaint, through discovery, or through further factual or legal analysis of Plaintiffs' allegations, contentions and positions in this litigation.

## PRAYER FOR RELIEF

Wherefore, Cargill and CMS request that Plaintiffs' Complaint be dismissed with prejudice, that the Court find that Plaintiffs are not entitled to any judgment or relief, that the Court enter judgment in favor of Cargill and CMS, and that the Court award Cargill and CMS their attorneys' fees, costs and expenses, pre-judgment interest, and such other further relief as the Court deems just and proper.

Dated: December 4, 2020

  s/ Davida Williams
Britt M. Miller
Robert E. Entwisle
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com
rentwisle@mayerbrown.com

Sybil Dunlop
Davida Williams
GREENE ESPEL PLLP
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
sdunlop@greeneespel.com
dwilliams@greeneespel.com

Attorneys for Defendants Cargill, Incorporated and
Cargill Meat Solutions Corporation