UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| OLEAN WHOLESALE GROCERY COOPERATIVE, INC. and JOHN GROSS AND COMPANY<br><br>Plaintiffs,<br><br>v.<br><br>AGRI STATS, INC., BUTTERBALL, LLC, CARGILL, INC., CARGILL MEAT SOLUTIONS CORPORATION, COOPER FARMS, INC., FARBEST FOODS, INC., FOSTER FARMS, LLC, FOSTER POULTRY FARMS, THE HILLSHIRE BRANDS COMPANY, HORMEL FOODS CORPORATION, HORMEL FOODS, LLC, HOUSE OF RAEFORD FARMS, INC., KRAFT HEINZ FOODS COMPANY, KRAFT FOODS GROUP BRANDS LLC, PERDUE FARMS, INC., PERDUE FOODS LLC, TYSON FOODS, INC., TYSON FRESH MEATS, INC. AND TYSON PREPARED FOODS, INC.,<br><br>Defendants. | Case No. 1:19-cv-08318<br><br>Honorable Virginia M. Kendall<br><br>**PERDUE'S ANSWER AND DEFENSES TO THE CLASS ACTION COMPLAINT OF PLAINTIFFS OLEAN WHOLESALE GROCERY COOPERATIVE, INC. AND JOHN GROSS AND COMPANY**<br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

I.     NATURE OF ACTION ................................................................................1

II.    JURISDICTION AND VENUE ...............................................................22

III.   PARTIES .................................................................................................24

     A.    Plaintiffs ...........................................................................................24

     B.    Defendants .......................................................................................24

     C.    Co-Conspirators ..............................................................................30

IV.   FACTUAL ALLEGATIONS ....................................................................31

     A.    Agri Stats' information exchange services began in the broiler industry, where it has been used to facilitate widespread collusion. ...............................31

     B.    Defendants entered into an agreement to exchange information through Agri Stats regarding their production and sales of turkey. ......................................35

     C.    Defendants possess market power in the market for turkey and turkey is the type of product for which information exchange is particularly likely to have anticompetitive effects. ........................................................................44

          1.    Defendants have market power in the market for turkey...................44

          2.    There are high barriers to entry in the market for turkey for meat consumption. ...........................................................................45

          3.    The defendants have market power in the market for turkey for meat consumption...........................................................................48

     D.    The market for turkey is the type of market where the information exchanges orchestrated by Agri Stats are likely to harm competition. ..........49

     E.    Industry-wide production cuts during the Conspiracy Period were facilitated through the information exchange conducted through Agri Stats.................52

     F.    Abnormal pricing during the Class Period demonstrates the anticompetitive effects of the exchange of turkey information conducted through the Agri Stats sales reports. ..............................................................................54

          1.    The average turkey wholesale price experienced an unprecedented increase beginning in 2009. ....................................................54

          2.    Beginning in 2009, defendants' revenues radically diverged from their costs. ....................................................................................56

          3.    During the conspiracy period, prices rose but production failed to rise to match demand, indicating an anticompetitive restraint on supply in the market for turkey facilitated by the information exchange through Agri Stats. ...............................................................................59

          4.    During the conspiracy period, prices of turkey radically diverged from the costs of underlying feed. .........................................................61

i

       5.    **A regression model demonstrates the anticompetitive effects on the prices of turkey caused by the information exchange conducted through Agri Stats.**................................................................62

  G.    **Defendants actively concealed the extent of their information exchange and plaintiffs did not and could not have discovered defendants' anticompetitive conduct.**.........................................................................63

  H.    **Defendants had numerous opportunities to collude.**.................................66

**V.**    **CLASS ACTION ALLEGATIONS** ................................................................68

**VI.**    **ANTITRUST INJURY** ......................................................................................72

**VII.**    **CAUSE OF ACTION** .......................................................................................73

**VIII.**    **REQUEST FOR RELIEF** .................................................................................76

**IX.**    **JURY TRIAL DEMANDED** .............................................................................78

Perdue Farms, Inc., and Perdue Foods LLC ("Perdue") submits its answer and affirmative defenses to the Class Action Complaint ("Complaint") of Plaintiffs, filed on December 19, 2019, as follows. Perdue denies each and every allegation in the Complaint except as expressly admitted below:

## ANSWER

Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class consisting of all persons and entities who purchased turkey directly from a defendant or co-conspirator in the United States beginning at least as early as January 1, 2010 through January 1, 2017 (Class Period). [Footnote 1] Plaintiffs bring this action for treble damages and injunctive relief under Section 1 of the Sherman Act. Plaintiffs demand a trial by jury.

Complaint Footnote 1: For purposes of this complaint, turkey includes turkey meat purchased fresh or frozen, and either uncooked or cooked.

**Answer**: In response to Plaintiffs' opening, unnumbered Paragraph, Perdue admits that Plaintiffs purport to bring this action under Section 1 of the Sherman Act, but denies that Plaintiffs state a claim under Section 1 of the Sherman Act and/or that Plaintiffs are entitled to any of the requested relief. Perdue denies the conspiracy alleged and denies the remaining allegations in this Paragraph. Footnote 1 contains Plaintiffs' explanation of a defined term, to which no response is required. To the extent Footnote 1 requires a response, Perdue admits that Plaintiffs have defined "turkey" as described in Footnote 1. Perdue denies all remaining allegations of Plaintiffs' opening, unnumbered Paragraph.

## I.  NATURE OF ACTION[1]

1.  The turkey integrator defendants are the leading suppliers of turkey in an industry with approximately $5 billion in annual commerce. The turkey industry is highly concentrated, with a small number of large producers in the United States controlling supply. Defendants and their co-conspirators collectively control approximately 80 percent of the wholesale turkey market

---

[1] Perdue notes that this, and any other header in the Complaint is not a factual statement to which any response is required. To the extent a response is required, Perdue denies any allegations contained in Plaintiffs' headers.

in the United States. The turkey integrator defendants are Butterball LLC (Butterball); Cargill Inc. and Cargill Meat Solutions Corporation, (together and separately, Cargill); Cooper Farms, Inc. (Cooper Farms); Farbest Foods, Inc., (Farbest); Foster Farms LLC and Foster Poultry Farms (together and separately, Foster Farms); Hormel Foods Corporation and Hormel Foods LLC (together and separately, Hormel); House of Raeford Farms, Inc., (House of Raeford); Kraft Heinz Foods Company and Kraft Foods Group Brands LLC (together and separately, Kraft Foods), Perdue Farms, Inc. and Perdue Foods LLC (together and separately, Perdue); Tyson Foods, Inc., The Hillshire Brands Company, Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. (together and separately, Tyson).

**Answer to Paragraph 1**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 1 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue admits that it sells turkey products. Perdue lacks knowledge or information sufficient to form a belief as to the precise figures set forth in the first and third sentences of Paragraph 1, and on that basis denies these allegations. To the extent that the allegations in Paragraph 1 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 1.

2.      Defendant Agri Stats is a company that provides secretive information exchange services to companies in a variety of agricultural sectors, including pork, chicken, and turkey.

**Answer to Paragraph 2**: Paragraph 2 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 that relate to other Defendants and/or third parties to this action, and on this basis denies these allegations. To the extent that the allegations in Paragraph 2 purport to relate to Perdue, Perdue denies these allegations.

2

3.     The turkey integrator defendants each entered into an agreement from at least 2010 to January 1, 2017, to exchange sensitive information through Agri Stats regarding their production and sales of turkey.

**Answer to Paragraph 3**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 3 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 that relate to other Defendants and/or third parties to this action, and on this basis denies these allegations. To the extent that the allegations in Paragraph 3 purport to relate to Perdue, Perdue denies these allegations.

4.     Agri Stats reports are far different from lawful industry reports. Agri Stats gathers detailed financial and production data from each of the turkey integrators, standardizes this information, and produces customized reports and graphs for the co-conspirators. On a monthly basis, Agri Stats provides the turkey integrators with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information).

**Answer to Paragraph 4**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 4 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 4 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 4 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to their truth and on this basis denies these allegations.  To the extent that the allegations in Paragraph 4 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing

anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 4.

5. The United States Supreme Court has long recognized that "exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects." [Footnote 2] Agri Stats' sales reports prove the truth of that maxim. Agri Stats prepared monthly reports for defendants regarding their sales of turkey that identified, on a specific product by product level, the prices and returns that each defendant was obtaining on their sales of turkey. These reports, unavailable to anybody besides Agri Stats subscribers, allowed the integrator defendants to easily identify potential opportunities where their prices for turkey products were significantly lower than their competitors.

Complaint Footnote 2: *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 (1978).

**Answer to Paragraph 5**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 5 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 5 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 5 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to their truth and on this basis denies these allegations. To the extent that the allegations in Paragraph 5 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 5.

6. Turkey is the relevant product market and the geographic market is the continental United States. Defendants collectively possess market power in the market for turkey. Defendants and co-conspirators collectively possessed approximately 80 percent of the overall market share for turkeys during the Class Period.

**Answer to Paragraph 6**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 6 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6 that relate to other Defendants and/or third parties to this action, and on this basis denies these allegations. To the extent that the allegations in Paragraph 6 purport to relate to Perdue, Perdue admits that it sells turkey products. Perdue lacks knowledge or information sufficient to form a belief as to the precise figure set forth in the third sentence of Paragraph 6, and on that basis denies these allegations. Perdue denies the remaining allegations in Paragraph 6.

7.      Blair Snyder, a senior executive at Agri Stats, publicly stated in 2009 that "about 95% of the turkey industry [is] participating" in Agri Stats, and that for "turkey participants, pretty much it's a list of who's who in the turkey business." This is a comparable portion to the percentage of broiler chicken industry participating in Agri Stats reports, with Mr. Snyder stating that "we've got high 90 percentage of both broilers and turkeys."

**Answer to Paragraph 7**: To the extent that the allegations in Paragraph 7 characterize or describe documents or other sources, such sources spefak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 7 relate to other Defendants and/or third parties, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 7 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 7.

8.      Each one of the defendants and co-conspirators entered into an agreement to exchange information through Agri Stats. Each defendant's agreement to exchange information

regarding turkey production is shown in the below 2010 excerpt from an Agri Stats presentation that lists the participants in Agri Stats' turkey reports.

## Turkey Participants

- ✓ Ag Forte
- ✓ Butterball
- ✓ Cargill Turkey
- ✓ Carolina Turkeys
- ✓ Carroll's
- ✓ Circle-S Ranch
- ✓ Cooper's
- ✓ Farbest Foods
- ✓ Foster Farms
- ✓ Goldsboro Milling
- ✓ House of Raeford

- ✓ Jennie-O
- ✓ Lilydale
- ✓ Louis Rich
- ✓ Moroni
- ✓ Northern Pride Turkey
- ✓ Perdue Farms
- ✓ Pilgrim's Pride
- ✓ Prestage Farms
- ✓ Sara Lee
- ✓ Tarheel
- ✓ West Liberty Foods
- ✓ Willmar Poultry
- ✓ Willow Brook

{DATE}
n = 24

AGRI STATS

**Answer to Paragraph 8**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 8 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 8 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 8 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 8 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from

Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 8.

9.     This 2010 presentation slide shows that each of the defendant integrator and Co-Conspirator Integrators entered into an agreement to exchange information regarding their turkey operations through Agri Stats during the conspiracy period. The document directly identifies defendants Butterball, Cargill, Cooper's, Farbest, Foster Farms, House of Raeford and Perdue Farms, as participants in Agri Stats' reports on turkey. The document directly identifies Co-Conspirators Circle-S Ranch, Prestage Farms, and West Liberty Foods as participants in Agri Stats' reports on turkey. Jennie-O is the brand name for Hormel's turkey operations and thus Hormel participated in Agri Stats' reports on turkey. The document also identifies Louis Rich, a Kraft Foods brand that produces turkey, as receiving Agri Stats reports, and thus Kraft Foods participated in Agri Stats' reports on turkey. Sara Lee's turkey operations, Hillshire Brands, was subsequently acquired by Tyson in 2014 and thus Tyson participated in Agri Stats' reports on turkey.

**Answer to Paragraph 9**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 9 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 9 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 9 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 9 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 9.

10.     The information exchange by the defendant integrators through Agri Stats is exactly the type of information exchange that the Supreme Court has recognized is likely to have anticompetitive effects under a rule of reason analysis. First, the data is current and forward-looking – which courts consistently hold has "the greatest potential for generating anticompetitive

effects." [Footnote 3] Second, information contained in Agri Stats reports is specific to the turkey producers, including information on profits, prices, costs and production levels. Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the defendant integrators to pay hefty fees over the Class Period – far in excess of any other pricing and production indices and to agree to volunteer their own data. "Public dissemination is a primary way for data exchange to realize its pro-competitive potential." [Footnote 4] Agri Stats ensured that its detailed, sensitive business information was available only to the coconspirators and not to any buyers in the market. Thus, for example, buyers on the market could not use Agri Stats data in Agri Stats sales reports to negotiate lower prices; instead, only defendants could use it as a way to identify opportunities to raise their prices.

Complaint Footnote 3: *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

Complaint Footnote 4: *Id.* at 213.

**Answer to Paragraph 10**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 10 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 10 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 10 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 10 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 10.

11. Indeed, Agri Stats specifically marketed itself to potential participants as a way that they could "improve profitability" rather than engage in competition through production increases. Agri Stats was good to its word; its sales reports specifically identified opportunities for defendants where defendants' products were lower than that of the industry average and where defendants could consequently raise prices to meet that of their competitors.

**Answer to Paragraph 11**: To the extent that the allegations in Paragraph 11 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 11 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 11 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 11.

12.     Industry participants relied on Agri Stats reports in their analysis of their business operations. For example, Hormel, at its 2011 Investor Day, stated in its presentation that "when you optimize the supply chain" you "improve your relative industry position (Agri Stats)." Hormel also touted that "Jennie-O Turkey Store is consistently one of the top companies in operating profits (Agri Stats)."

**Answer to Paragraph 12**: To the extent that the allegations in Paragraph 12 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 12 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 12 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 12.

13.     Confidential Witness 1 (CW1) is a former sales executive at Butterball involved in the pricing of turkeys. CW1 was employed at Butterball during the entire Class Period. CW1 stated that Butterball relied on the monthly reports issued by Agri Stats: "The company used the information to evaluate — by item, item group, price, distribution — where we stood against other turkey companies." CW1 stated that he and other sales personnel looked at Agri Stats data to see how Butterball ranked against peers in the turkey industry. CW1 stated that he personally looked at the Agri Stats data to assess costs and returns. CW1 stated that costs were an important factor in determining how Butterball set its prices.

**Answer to Paragraph 13**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13 and on this basis denies these allegations.

14.     Confidential Witness 2 (CW2) is a former accountant at Cooper Farms. CW2 stated that Cooper Farms received monthly reports from Agri Stats. In addition, Agri Stats representatives met with Cooper Farms executives every six months. CW2 stated that Cooper Farms submitted cost information to Agri Stats every month. CW2 explained that Agri Stats reports grouped data into various types of turkey products, including deli meat and smoked meat.

**Answer to Paragraph 14**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14 and on this basis denies these allegations.

15.     CW2 stated that Agri Stats representatives regularly met with the Cooper Leadership Management Group, which included top management and executives from Cooper Farms. CW2 stated that "the upper group received advice" from Agri Stats. CW2 stated that the advice from Agri Stats helped Cooper Farms improve its returns per pound.

**Answer to Paragraph 15**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 and on this basis denies these allegations.

16.     Agri Stats reports also contained detailed information on industry-wide supply levels. For example, a job description of an Agri Stats employee stated that they analyzed Turkey "breeder flock and hatchery data" as well as Turkey "growout flocks."

**Answer to Paragraph 16**: To the extent that the allegations in Paragraph 16 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 16 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge

or information sufficient to form a belief as to their truth and on this basis denies these allegations.

Perdue denies the remaining allegations in Paragraph 16.

17.     Based on publicly available information filed in a February 7, 2018, complaint in the *Broiler Chicken Antitrust Litigation*, [Footnote 5] Agri Stats data on growout flocks contained information such as the number of broilers placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (aka, "down time"), feed conversion rate (pounds of feed per pound of broiler), and average daily weight. On information and belief, the growout data that Agri Stats compiled for the turkey industry contained similar levels of data. This type of data allowed defendants to monitor industry-wide supply levels.

Complaint Footnote 5: *In re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.) (ECF No. 710).

**Answer to Paragraph 17**: To the extent that the allegations in Paragraph 17 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 17 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to their truth and on this basis denies these allegations. To the extent that the allegations in Paragraph 17 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 17.

18.     Although Agri Stats reports are nominally anonymous, defendant integrators were often able to deanonymize the reports to identify the data of specific companies based on their industry knowledge. CW2 stated that he could determine the identity of companies in Agri Stats reports because "you could usually figure out who was who because they have a certain cooked meat, or if they were browning and running it through an oven." CW2 further stated that "we could sit there and discuss it, because a lot of us knew what the other plants in the big areas, what they did." For example, CW2 stated that one competitor company had five separate facilities included in the Agri Stats reports, and that therefore, it was easy to determine the identity of that company.

**Answer to Paragraph 18**: Perdue denies the conspiracy alleged in the Complaint. To the extent that the allegations in Paragraph 18 characterize or describe documents or other sources,

such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 18 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 18 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 18.

19.     Confidential Witness 3 (CW3) is a former employee of Cargill during the conspiracy period. CW3 stated that Cargill received monthly reports from Agri Stats on turkey. CW3 stated that the monthly Agri Stats turkey reports went directly to Cargill finance executives.

**Answer to Paragraph 19**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 and on this basis denies these allegations.

20.     Throughout the conspiracy period, defendant integrators were able to exercise a remarkable level of industry-wide restraint in keeping the growth of turkey supply in check, causing turkey prices to rise. Thus, Agri Stats had the anticompetitive effect of allowing defendants to engage in collusion to restrain the supply of turkey by facilitating information exchange about supply levels throughout the industry. The industry-wide cuts in turkey production during the conspiracy period are shown in the following chart:



**Answer to Paragraph 20**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 20 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 that relate to other Defendants and/or third parties to this action, and on this basis denies these allegations. To the extent that the allegations in Paragraph 20 or the accompanying chart characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue admits that Plaintiffs purport to depict certain data in the chart accompanying Paragraph 20, but Perdue denies that it accurately depicts Perdue's production. Perdue denies the remaining allegations in Paragraph 20.

21.     In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should correspond to falling prices. However, in the turkey market during the conspiracy period, production, measured through USDA data, remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly. These observed price and output dynamics, shown in the below analysis performed by plaintiffs' experts, indicate that it was not falling demand that caused a decline in supply during the conspiracy period.



**Answer to Paragraph 21**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 21 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 21 or the accompanying chart characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue admits that Plaintiffs purport to depict certain data in the chart accompanying Paragraph 21, but Perdue denies that it accurately depicts Perdue's pricing or production. Perdue denies the remaining allegations in Paragraph 21.

22.     In addition to their participation in Agri Stats, defendant integrators had frequent opportunities to communicate, in conjunction with formal meetings of various trade associations. In particular, the National Turkey Federation each year held regular meetings, including the NTF Annual Convention and the NTF Leadership conference, which were widely attended by the defendant integrators. CW3 stated that senior Cargill executives, including Cargill's CEO and CFO, attended National Turkey Federation meetings. For example, CW2 stated that Cooper Farms leadership were involved in the National Turkey Federation, for example Cooper Farms COO Gary Cooper served as immediate past chairman of the NTF board in 2014.

**Answer to Paragraph 22**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 22 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 that relate to other Defendants and/or third parties to this action, and on this basis denies these allegations. To the extent that the allegations in the first and second sentence of Paragraph 22 purport to relate to Perdue, Perdue admits only that at times it has been a member of certain legitimate trade associations, including the National Turkey Federation, and that such associations have meetings from time to time. Perdue denies the remaining allegations in Paragraph 22.

23.     Collectively, Hormel, Cargill, and Butterball control approximately 50 percent of the turkey market. Hormel is the only publicly traded company among these three. In its earnings calls during the conspiracy period, Hormel repeatedly discussed the industry-wide success in executing production cuts and maintaining industry-wide production discipline during the Class Period.

**Answer to Paragraph 23**: Perdue denies the conspiracy alleged in the Complaint. To the extent that the allegations in Paragraph 23 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23, and on this basis denies these allegations.

24.     On June 2, 2009, Hormel emphasized that it was making production cuts in response to an alleged oversupply in the market and closely monitoring the overall level of production in the market, showing the importance of the kind of information exchanged through Agri Stats:

> There is an oversupply of turkey. There continues to be perhaps more production as well as cold storage stocks than the demand would warrant. We have been very deliberate about making the appropriate production cuts. We announced them over a year ago. And we have even exceeded the amount we expected to reduce. We have seen the placements and indicators of forward looking supply come down, so that was as expected, and we expected the second half of 2009 to be a little kinder in the turkey side of

the business, but there is still a lot of storage, cold storage stocks to go through, we feel comfortable that we've cleaned up our inventories that we had on hand. Our production cuts were more than the decrease in our sales because we did work off inventories. I had a feeling the industry will rebound. It's going to take a work through of the excess inventories as well as those production cuts hitting the marketplace.

**Answer to Paragraph 24**: To the extent that the allegations in Paragraph 24 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24, and on this basis denies these allegations.

25.     On August 20, 2010, Hormel stated, "We think the turkey business has reached a good equilibrium, and we don't have any major expansion plans and have not heard others in that mode, so I think those conditions should remain favorable into next year."

**Answer to Paragraph 25**: To the extent that the allegations in Paragraph 25 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25, and on this basis denies these allegations.

26.     On May 25, 2011, Hormel stated that the turkey industry was maintaining solid pricing based on the information that Hormel was receiving about industry-wide turkey production levels: "We certainly see egg set and poultry placement numbers that take us through the end of this year and a little bit into next fiscal year. But right now, on the basis of those numbers, on the basis of what we see in terms of production in the industry and on the basis of cold storage numbers, coupled with still strong demand on the export side, we feel that the amount of product going to market will support solid pricing on a commodity basis."

**Answer to Paragraph 26**: To the extent that the allegations in Paragraph 26 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue otherwise lacks knowledge or

16

information sufficient to form a belief as to the truth of the allegations in Paragraph 26, and on this basis denies these allegations.

27.     On August 25, 2011, Hormel stated that the turkey industry was maintaining better discipline than the poultry industry: "The industry as a whole has shown a little better discipline, perhaps, than the other poultry side of the ledger." This statement is notable because the chicken industry is currently the subject of multiple civil lawsuits as well as a DOJ investigation of potential antitrust violations during this period of time.

**Answer to Paragraph 27**: To the extent that the allegations in Paragraph 27 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 27 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 27.

28.     Furthermore, the turkey market has all of the characteristics of a market where information exchange is likely to have anticompetitive effects. Turkey is a fungible product, the market for turkey has price-based competition, the demand for turkey is relatively inelastic, and the turkey market features a trend towards price uniformity.

**Answer to Paragraph 28**: Paragraph 28 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 28.

29.     The information exchange through Agri Stats did not have the kind of characteristics that would produce procompetitive effects sufficient to outweigh the anticompetitive harms. The information exchange involved current and forward-looking data. Agri Stats regularly prepared monthly reports that contained data that was less than six weeks old. Agri Stats also only allowed companies to access the data if they themselves shared the data, thus ensuring that only defendants and other similarly situated turkey integrators who received the Agri Stats reports were able to use the data.



**Answer to Paragraph 29**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 29 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 29 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 29 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations, and on this basis denies these allegations. To the extent that the allegations in Paragraph 29 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 29. Perdue notes that the chart following Paragraph 29 is not referenced in the allegations in Paragraph 29 (or the allegations in Paragraph 30). To the extent that any of Plaintiffs' allegations in Paragraph 29 (or Paragraph 30) purport to relate to the chart

following Paragraph 29, Perdue lacks knowledge or information sufficient to form a belief as to the truth of any such allegations, and on this basis denies them.

30.     During the conspiracy period, the price of turkey spiked dramatically, driven by the anticompetitive effects of the information exchange through Agri Stats regarding turkey production that helped facilitate defendants restraint over the growth in the supply of turkey.

**<u>Answer to Paragraph 30</u>**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 30 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 that relate to other Defendants and/or third parties to this action, and on this basis denies these allegations. To the extent the allegations in Paragraph 30 purport to relate to Perdue, Perdue denies the allegations in Paragraph 30.

31.     The information exchange through Agri Stats in fact had anticompetitive effects on the market. Prior to the conspiracy, turkey prices closely tracked the underlying cost of feed, which is the primary input cost in the production of turkey. Beginning in 2009-2010, prices of turkey spiked to an unprecedented level, showing the anticompetitive effects of defendants' information exchange through Agri Stats. Remarkably, as demonstrated in the analysis performed by plaintiffs' experts, shown in the below chart, prices of turkey quickly returned to match underlying feed costs after litigation was filed in late 2016 in the broiler industry that centered on the anticompetitive use of Agri Stats. Defendants clearly changed their behavior after the commencement of the Broilers litigation, as Tyson dismissed their CEO, Donnie Smith, in late 2016, shortly after the first civil lawsuits were filed.



**Answer to Paragraph 31**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 31 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 31 or the accompanying chart characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue admits that Plaintiffs purport to depict certain data in the chart accompanying Paragraph 31, but Perdue denies that it accurately depicts Perdue's pricing or costs. To the extent that the allegations in Paragraph 31 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on this basis denies these allegations. To the extent that the allegations in Paragraph 31 purport to relate to Perdue, Perdue denies these allegations.

32.    Feed accounts for approximately 60-70% of the cost of raising a turkey. Plaintiffs' experts constructed a regression model based on the underlying feed cost that models what the "but for" price of turkey would have been if the historical relationship between feed and turkey costs had continued during the conspiracy period. The model demonstrates that the anticompetitive information exchange of data regarding turkey production through Agri Stats caused anticompetitive effects in the market for turkey.



**Answer to Paragraph 32**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 32 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 32 or the accompanying chart characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue admits that Plaintiffs purport to depict certain data in the chart accompanying Paragraph 32, but Perdue denies that it accurately depicts Perdue's pricing. To the extent that the allegations in Paragraph 32 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information

sufficient to form a belief as to the truth of the allegations, and on this basis denies these allegations. To the extent that the allegations in Paragraph 32 purport to relate to Perdue, Perdue denies these allegations.

33.     As a result of defendants' unlawful conduct, plaintiffs and the Class paid artificially inflated prices for turkey during the Class Period. Such prices exceeded the amount they would have paid if the price for turkey had been determined by a competitive market. Thus, plaintiffs and class members were injured by defendants' agreement to exchange information through Agri Stats regarding the turkey market.

**Answer to Paragraph 33**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 33 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 that relate to other Defendants and/or third parties to this action, and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 33.

## II.     JURISDICTION AND VENUE

34.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure compensatory damages and injunctive relief against defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs seek to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by defendants' conduct in restricting the supply of turkey and increasing the price of turkey. Plaintiffs seek damages in excess of $5,000,000. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

**Answer to Paragraph 34**: Perdue admits that Plaintiffs purport to bring their case under Section 16 of the Clayton Act (15 U.S.C. § 26) and Section 1 of the Sherman Act (15 U.S.C. § 1), and purport to seek certain damages and costs. Perdue admits that this Court has jurisdiction for purposes of this matter only. Perdue denies the remaining allegations of Paragraph 34.

35.     Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because both Kraft Foods and Hillshire Brands are headquartered in the District, and one or more defendants transacted business in this District, is licensed to do business or is doing business in

this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

**Answer to Paragraph 35**: Perdue admits that venue is proper in this District for purposes of this matter only. To the extent that the allegations in Paragraph 35 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 35.

36.     This Court has personal jurisdiction over each defendant because, inter alia, each defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of turkey throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

**Answer to Paragraph 36**: Perdue does not contest that it is subject to the personal jurisdiction of this Court for purposes of this matter only. Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning whether the other Defendants in this District are subject to the personal jurisdiction of this Court and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 36.

37.     The activities of the defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

**Answer to Paragraph 37**: Perdue admits that it sells turkey products in interstate commerce of the United States. Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 as to other Defendants and/or co-conspirators, and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 37.

### III.   PARTIES

#### A.  Plaintiffs

38.     Plaintiff Olean Wholesale Grocery Cooperative, Inc. (Olean Wholesale) is a retailers' cooperative located in Olean, New York. Its members are independent, family-owned supermarkets. Olean has served supermarkets in Western and Central New York, Western Pennsylvania, and Northeastern Ohio since 1922. Olean Wholesale is a New York corporation with its principal place of business in Olean, New York, and purchased turkey directly from one or more defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**Answer to Paragraph 38**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 and on this basis denies these allegations.

39.     John Gross and Company, Inc. (John Gross) is a full line food distributor located in Mechanicsburg, Pennsylvania. Founded in 1950, the company has been owned and operated by the Gross family for four generations. John Gross is a Pennsylvania corporation with its principal place of business in Mechanicsburg, Pennsylvania, and purchased turkey directly from one or more defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**Answer to Paragraph 39**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and on this basis denies these allegations.

#### B.  Defendants

40.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana. Throughout the Class Period, Agri Stats acted as a co-conspirator of the turkey integrator defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among defendants and their co-conspirators.

**Answer to Paragraph 40**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 40 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 that relate to other Defendants and/or third parties to this action, and on this basis denies these allegations.

To the extent that the remaining allegations in Paragraph 40 purport to relate to Perdue, Perdue denies these allegations.

41.     Butterball, LLC is a privately held North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Butterball and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 41**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41 and on this basis denies these allegations.

42.     Cargill, Inc. is a privately held Delaware corporation headquartered in Minnetonka, Minnesota. During the Class Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 42**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 and on this basis denies these allegations.

43.     Cargill Meat Solutions Corporation is a Delaware corporation that operates as a subsidiary of Cargill, Incorporated. During the Class Period, Cargill Meat Solutions and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 43**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43 and on this basis denies these allegations.

44.     Defendants Cargill, Inc. and Cargill Meat Solutions are collectively referred to as "Cargill."

**Answer to Paragraph 44**: Paragraph 44 contains Plaintiffs' explanation of a defined term, to which no response is required.

45.     Cooper Farms, Inc. is a privately held Ohio corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Cooper Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 45**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 and on this basis denies these allegations.

46.     Farbest Foods, Inc. is a privately held Indiana corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Farbest and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 46**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 and on this basis denies these allegations.

47.     Foster Farms LLC is a privately held California corporation headquartered in Modesto, California. During the Class Period, Foster Farms LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 47**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 and on this basis denies these allegations.

48.     Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms LLC. During the Class Period, Foster Poultry Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of turkey, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 48**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 and on this basis denies these allegations.

49.     Defendants Foster Farms LLC and Foster Poultry Farms are collectively referred to as "Foster Farms."

**Answer to Paragraph 49**: Paragraph 49 contains Plaintiffs' explanation of a defined term, to which no response is required.

50.     Kraft Heinz Foods Company (Kraft Heinz), an Illinois corporation with headquarters in Pittsburgh, Pennsylvania, and Chicago, Illinois, is engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Kraft Heinz and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in

interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 50**: Plaintiffs' claims against Kraft Heinz have been dismissed (*see*

ECF No. 173), and thus no response to the allegations in Paragraph 50 is required. To the extent a

response is required, Perdue lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 50 and on this basis denies these allegations.

51.     Kraft Foods Group Brands LLC is an Illinois corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Kraft Heinz and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 51**: Plaintiffs' claims against Kraft Heinz have been dismissed (*see*

ECF No. 173), and thus no response to the allegations in Paragraph 51 is required. To the extent a

response is required, Perdue lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 51 and on this basis denies these allegations.

52.     Defendants Kraft Heinz Foods Company and Kraft Foods Brands LLC are collectively referred to as "Kraft Foods."

**Answer to Paragraph 52**: Plaintiffs' claims against Kraft Heinz have been dismissed (*see*

ECF No. 173), and thus no response to the allegations in Paragraph 52 is required. Further,

Paragraph 52 contains Plaintiffs' explanation of a defined term, to which no response is required.

53.     Hormel Foods Corporation is a Delaware corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 53**: Perdue lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 53 and on this basis denies these allegations.

54.     Hormel Foods LLC is a limited liability corporation headquartered in Austin, Minnesota. It is a wholly owned subsidiary of Hormel Foods Corporation. Hormel is engaged in

27

the production of meat and food products, and the marketing of these products. During the Class Period, Hormel Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 54**: Perdue lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 54 and on this basis denies these allegations.

55.    House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. During the Class Period, House of Raeford operated in part through a division referred to as "Columbia Farms," which is a group of broiler facilities and operations originally named Columbia Farms, Inc. and Columbia Farms of Georgia, Inc. when purchased by House of Raeford in 1998. During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 55**: Perdue lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 55 and on this basis denies these allegations.

56.    Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland. During the Class Period, Perdue Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 56**: Perdue admits that Perdue Farms, Inc. is a privately held

Maryland corporation headquartered in Salisbury, Maryland. Perdue admits that Perdue Farms,

Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold turkey

products, during the purported Class Period, in interstate commerce, directly or through its wholly-

owned or controlled affiliates, to purchasers in the United States.

57.    Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 57**: Perdue admits that Perdue Foods, LLC is a privately held

Maryland limited liability company headquartered in Salisbury, Maryland. Perdue admits that

Perdue Foods, LLC is a subsidiary of Perdue Farms, Inc. Perdue admits that Perdue Foods, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold turkey products in interstate commerce, during the purported Class Period, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

58.     Defendants Perdue Farms, Inc. and Perdue Farms LLC are collectively referred to as "Perdue."

**Answer to Paragraph 58**: Paragraph 58 contains Plaintiffs' explanation of a defined term, to which no response is required.

59.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. It wholly owns and controls two subsidiaries, Tyson Prepared Foods, Inc. and Tyson Fresh Meats Inc. that slaughter and sell turkey products. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 59**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59 and on this basis denies these allegations.

60.     Tyson Fresh Meats Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Fresh Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 60**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60 and on this basis denies these allegations.

61.     Tyson Prepared Foods, Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 61**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61 and on this basis denies these allegations.

62.     The Hillshire Brands Company (Hillshire Brands) is a Maryland corporation headquartered in Chicago, Illinois. Hillshire Brands operates as a subsidiary of Tyson Foods that

sells turkey products. During the Class Period, Hillshire Brands and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 62**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62 and on this basis denies these allegations.

63. Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc., and Hillshire Brands are collectively referred to as "Tyson."

**Answer to Paragraph 63**: Paragraph 63 contains Plaintiffs' explanation of a defined term, to which no response is required.

### C. Co-Conspirators

64. Co-Conspirator Circle S-Ranch, Inc. is a North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Circle S-Ranch and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 64**: Perdue denies the conspiracy alleged in the Complaint. Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 64 and on this basis denies these allegations.

65. Co-Conspirator Prestage Farms is a North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Prestage Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 65**: Perdue denies the conspiracy alleged in the Complaint. Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 65 and on this basis denies these allegations.

66. Co-Conspirator West Liberty Foods LLC (West Liberty) is an Iowa corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, West Liberty and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer to Paragraph 66**: Perdue denies the conspiracy alleged in the Complaint. Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66 and on this basis denies these allegations.

## IV.    FACTUAL ALLEGATIONS

67.     Starting no later than January 1, 2010, and continuing at least until January 1, 2017, defendants entered into an agreement to exchange information regarding their production and sale of turkey through Agri Stats. The information exchange through Agri Stats provided defendants an opportunity to obtain and monitor critical and competitively sensitive business information regarding each other's production and sales. The information exchange through Agri Stats had anticompetitive effects, as prices for turkey soared and defendants engaged in an industry-wide series of production cuts during the period. Notably, the information exchanged through Agri Stats was not available to purchasers of turkey, ensuring that the information exchange would not have procompetitive effects.

**Answer to Paragraph 67**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 67 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 67 that relate to other Defendants and/or third parties to this action, and on this basis denies these allegations. To the extent that the allegations purport to relate to Perdue, Perdue denies the remaining allegations in Paragraph 67.

**A. Agri Stats' information exchange services began in the broiler industry, where it has been used to facilitate widespread collusion.**

68.     Agri Stats has played a central role in other industries, including collusion in the broiler industry. [Footnote 6] As alleged in the *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill.) litigation, the broiler producers used Agri Stats as a part of their conspiracy to restrain production and inflate prices.

Complaint Footnote 6: Broilers are chickens raised to be slaughtered before the age of 13 weeks.

**Answer to Paragraph 68**: To the extent that the allegations in Paragraph 68 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any

characterization or description that is inconsistent therewith. To the extent that the allegations in

Paragraph 68 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge

or information sufficient to form a belief as to the truth of the allegations, and on this basis denies

these allegations. To the extent that the remaining allegations in Paragraph 68 purport to relate to

Perdue, Perdue denies these allegations. Footnote 6 contains Plaintiffs' explanation of a defined

term, to which no response is required.

69.     In the broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and the coconspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, Express Markets, Inc. or EMI. Agri Stats collected data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.

**Answer to Paragraph 69**: Perdue denies the conspiracy alleged in the Complaint. To the

extent that the allegations in Paragraph 69 characterize or describe documents or other sources,

such sources speak for themselves, and Perdue denies any characterization or description that is

inconsistent therewith. To the extent that the allegations in Paragraph 69 relate to other Defendants

and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief

as to the truth of the allegations, and on this basis denies these allegations. To the extent that the

allegations in Paragraph 69 purport to relate to Perdue, Perdue admits only that Agri Stats collects

information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes

reports from Agri Stats containing anonymized information regarding certain broiler complexes.

Perdue denies the remaining allegations in Paragraph 69.

70.     The detail of these reports ensured that competitors could quickly decode the information of their purported competitors. The *Broiler* complaints allege it was common knowledge among producers that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes. The broiler reports, in part, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

**Answer to Paragraph 70**: Perdue denies the conspiracy alleged in the Complaint. To the

extent that the allegations in Paragraph 70 characterize or describe documents or other sources,

such sources speak for themselves, and Perdue denies any characterization or description that is

inconsistent therewith. To the extent that the allegations in Paragraph 70 relate to other Defendants

and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief

as to the truth of the allegations, and on this basis denies these allegations. To the extent that the

allegations in Paragraph 70 purport to relate to Perdue, Perdue admits only that Agri Stats collects

information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes

reports from Agri Stats containing anonymized information regarding certain broiler complexes.

Perdue denies the remaining allegations in Paragraph 70.

71.     In the broiler industry, it is also alleged that Agri Stats – known to its co-conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the broiler industry facilitated the implementation of the agreement to restrict supply – where Agri Stats would transmit the intentions of the broiler producers to restrict supply.

**Answer to Paragraph 71**: Perdue denies the conspiracy alleged in the Complaint.

Paragraph 71 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which

no response is required. To the extent a response is required, and to the extent that the allegations

in Paragraph 71 characterize or describe documents or other sources, such sources speak for

themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 71 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on this basis denies these allegations. To the extent that the allegations in Paragraph 71 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain broiler complexes. Perdue denies the remaining allegations in Paragraph 71.

72.     In a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the broiler industry, it was reported:

> "Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "***That is what creates stability for a cartel.***"

**<u>Answer to Paragraph 72</u>**: To the extent that the allegations in Paragraph 72 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 72 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on this basis denies these allegations. To the extent that the allegations in Paragraph 72 purport to relate to Perdue,

Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain broiler complexes. Perdue denies the remaining allegations in Paragraph 72.

73.     The district court noted, in denying the motions to dismiss in the *In re Broiler Chicken Antitrust Litigation* that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which suggests high antitrust concerns. [Footnote 7]

Complaint Footnote 7: Memorandum Opinion and Order at 11, *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.

**Answer to Paragraph 73**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 73 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required.  To the extent a response is required, and to the extent that the allegations in Paragraph 73 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 73 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations, and on this basis denies these allegations. To the extent that the allegations in Paragraph 73 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain broiler complexes. Perdue denies the remaining allegations in Paragraph 73.

**B. Defendants entered into an agreement to exchange information through Agri Stats regarding their production and sales of turkey.**

74.     Each member of the conspiracy, including the integrator defendants and co-conspirators, were all Agri Stats subscribers. Agri Stats publicly stated that 95% of the turkey market used Agri Stats reports.

**Answer to Paragraph 74**: To the extent that the allegations in Paragraph 74 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 74 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 74.

75.     Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison and perform the monthly audits. Each company's financial data is reconciled to its general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations, so all company numbers are calculated the same way. CW2 stated that he was involved during the conspiracy period in the monthly transmission of cost data from Cooper Farms to Agri Stats.

**Answer to Paragraph 75**: To the extent that the allegations in Paragraph 75 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 75 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 75.

76.     Participants in the scheme received monthly detailed reports and graphs that allow them to compare their performance, sales prices, and costs to other participants. Agri Stats issues separate reports in the turkey industry to the integrator defendants regarding live operations, processing, further reprocessing, feed costs, and sales.

**Answer to Paragraph 76**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 76 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations

in Paragraph 76 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 76 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 76 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 76.

77.     Agri Stats provided the integrator defendants with an unparalleled ability to share critical and proprietary information concerning key business metrics, such as sales, production levels and short and long-term production capacity.

**Answer to Paragraph 77**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 77 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77 that relate to other Defendants and/or third parties to this action, and on this basis denies these allegations. To the extent that the allegations in Paragraph 77 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 77.

78.     Perhaps most egregiously, Agri Stats provided monthly sales reports to defendants. One of Agri Stats' subsidiaries is Express Markets, Inc. (aka, "EMI"). On EMI's publicly available webpage Amanda Martin, an Express Markets economist states that Agri Stats "audited turkey and broiler sales and product mix data, and worked with processing and further

reprocessing reports.'" On information and belief, the Agri Stats turkey sales reports contained sales data that was less than six weeks old.

**Answer to Paragraph 78**: To the extent that the allegations in Paragraph 78 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 78 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to their truth and on this basis denies these allegations. To the extent that the allegations in Paragraph 78 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 78.

79. As detailed in the recently filed amended complaint in the *Pork Antitrust Litigation*, No. 18-cv-1776 (JRT/HB) (D. Minn. Nov. 06, 2019), ECF No. 392, Agri Stats allowed subscribers to its pork sales reports to compare their prices for individual products against the national average net price, and against the national top 25 percent average price. Notably, Agri Stats identified opportunities for the Pork Integrators to raise prices. For instance, for each product, Agri Stats specifically broke out the variance between the company's price and the national average price, as well as the economic impact of the variance. This allowed coconspirators to see how much more they could charge if they charged either the national average price or the average of the top 25% national average price.

**Answer to Paragraph 79**: To the extent that the allegations in Paragraph 79 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 79, and on this basis denies these allegations.

80. Agri Stats provided similar services to the integrator defendants regarding their production and sale of turkey. According to CW1, Agri Stats ranked the integrator defendants in their reports based on the returns (i.e. prices) that the integrator defendants received.

**Answer to Paragraph 80**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 80 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 80 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 80 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 80 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 80.

81. As detailed in the *Pork* and *Broilers* complaints, for each of its reports, Agri Stats identified the list of participants who were contributing data or information to the reports. CW1 confirmed that the reports Agri Stats prepared for the integrator defendants identified the participants that provided data for each report, which allowed defendants to understand which of their competitors were participating for each report. CW2 confirmed that the Agri Stats reports identified each of the turkey production facilities that were participating in the reports.

**Answer to Paragraph 81**: To the extent that the allegations in Paragraph 81 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 81 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 81 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for

pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 81.

82.     One presentation from Agri Stats shows the level of detail provided to competitors regarding profits in the swine market. On information and belief, similar levels of detail were provided to defendants who received Agri Stats reports in the turkey market.

**Top 25% in Profit - Variances to Average Company - 2009-2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

35,001,089 Pigs Finished

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

30,785,319 Pigs finished

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |

22,306,500 Pigs finished

**<u>Answer to Paragraph 82</u>**: To the extent that the allegations in Paragraph 82 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 82 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 82 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized

information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 82.

83. The purpose of these reports was not to provide better prices to consumers or to lower the costs of production. Instead, the clear purpose was to improve the profitability of the co-conspirators. The particular Agri Stats report referenced above shows the ranking of each company in profitability and compares the company to its competitors by providing the variance from the average. The Agri Stats report actually circulated to competitors contained even further detail. This underlines that the purpose of these reports was not to allow consumers to save more money through lower prices and more efficient production – in fact, the opposite was true, the purpose was the profitability of the defendant companies and the impact was higher sales prices for consumers.

**Answer to Paragraph 83**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 83 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 83 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 83 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 83 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 83.

84. Much of the information shared by Agri Stats and the co-conspirators was unnecessary to achieve any benefits for consumers. Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.

**Answer to Paragraph 84**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 84 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which

no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84 that relate to other Defendants and/or third parties to this action, and on this basis denies these allegations. To the extent that the allegations in Paragraph 84 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 84.

85.     Agri Stats knew that it played a central role in facilitating this anticompetitive information exchange. One presentation from Agri Stats regarding the swine industry spoke directly on this point, pointing out to industry participants that they could not undertake such a detailed cost analysis between competitors without Agri Stats auditing and standardizing the data:

## Data Integrity

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



**Answer to Paragraph 85**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 85 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations

in Paragraph 85 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 85 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 85.

86.     Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine *tolerance and outlier status and enforce*," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, *"[e]ach participant has to commit."*

**Answer to Paragraph 86**:  To the extent that the allegations in Paragraph 86 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 86 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 86.

87.     According to CW1, Agri Stats gave live presentations to defendant integrators to explain to them how to use the reports that Agri Stats prepared on the turkey industry and how to compare themselves against their competitors: during the presentations, Agri Stats said, "if you are number one priced out of 13, that meant the return was so much versus the other companies."

**Answer to Paragraph 87**: Perdue denies the conspiracy alleged in the Complaint.  To the extent that the allegations in Paragraph 87 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 87 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the

allegations in Paragraph 87 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes. Perdue denies the remaining allegations in Paragraph 87.

88.     It is the standard policy of Agri Stats that it will only grant access to Agri Stats reports to similarly situated companies that themselves share data with Agri Stats. This ensures that data from Agri Stats is only available to one side of the market – the integrator defendants. The other side of the market, purchasers of turkey, is not allowed to access the Agri Stats data, and thus cannot use Agri Stats data to negotiate lower prices. Thus, Agri Stats reports function as a one-way ratchet that can be used for anticompetitive purposes by defendants but not for procompetitive purposes by purchasers.

**Answer to Paragraph 88**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 88 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88 that relate to other Defendants and/or third parties to this action, and on this basis denies these allegations. To the extent that the allegations in Paragraph 88 purport to relate to Perdue, Perdue admits only that Agri Stats collects information from Perdue, and that Perdue receives for pro-competitive benchmarking purposes reports from Agri Stats containing anonymized information regarding certain turkey complexes.  Perdue denies the remaining allegations in Paragraph 88.

C. **Defendants possess market power in the market for turkey and turkey is the type of product for which information exchange is particularly likely to have anticompetitive effects.**

1. **Defendants have market power in the market for turkey.**

89.     One tool that courts use to assess the competitive effects of concerted action is defining a relevant market – the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). The case concerns the sale of turkey for meat consumption in the United States.

**Answer to Paragraph 89**: Paragraph 89 contains Plaintiffs' characterizations of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue admits that Plaintiffs purport to bring a case that "concerns the sale of turkey for meat consumption in the United States." Perdue denies the remaining allegations in Paragraph 89.

90.     There is a single market for turkey for meat consumption. Prices for turkey sold in the United States are quoted generally in disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

**Answer to Paragraph 90**: Paragraph 90 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue admits that prices for turkey products depend upon a variety of factors and may depend on whether a bird is sold whole or in parts. Perdue otherwise denies the remaining allegations in Paragraph 90.

91.     The relevant geographic market is the United States.

**Answer to Paragraph 91**: Paragraph 91 contains Plaintiffs' characterizations of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 91.

## 2. There are high barriers to entry in the market for turkey for meat consumption.

92.     The existence of high barriers to entry is one factor which makes markets susceptible to collusion. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel. High barriers to entry in the turkey processing market exist, precluding other entrants or would-be competitors from entering the market for turkeys raised for consumption.

**Answer to Paragraph 92**: Paragraph 92 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 92.

93. During the Class Period and continuing today, substantial barriers impede entry into the turkey market. A new entrant into the market would face costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, equipment, energy, transportation. Distribution, infrastructure (aka "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, longstanding customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.

**Answer to Paragraph 93**: Paragraph 93 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 93.

94. The price of construction of a new integrated turkey processing complex is relatively high. For example, the cost for a current market participant, Virginia Poultry Growers Cooperative, to construct a new turkey processing in 2015 was $62 million. [Footnote 8]

Complaint Footnote 8: *Virginia Poultry Growers Cooperative Plans Turkey Processing Facility in Hinton*, Virginia, Area Development (July 22, 2015), *available at* https://www.areadevelopment.com/newsItems/7-22-2015/virginia-poultry-growers-cooperative-processing-facility-hinton-virginia565489.shtml.

**Answer to Paragraph 94**: To the extent that the allegations in Paragraph 94 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 94 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 94.

95. The turkey market has been subject to steadily increasing consolidation over the last several decades. In the 1970s, the turkey market was defined by competition among dozens of companies that worked with independent farmers. [Footnote 9] But now, just four corporations - Cargill, Hormel, Butterball, and Farbest - produce more than half of the turkey in the United States.

Complaint Footnote 9: Christopher Leonard, *That Turkey on Your Plate Could Use Some More Industry Competition*, The Washington Post (Nov. 22, 2013), *available at* https://www.washingtonpost.com/opinions/that-turkey-on-your-plate-could-use-some-more-industry-competition/2013/11/22/045fc470-5177-11e3-a7f0-b790929232e1_story.html.

**Answer to Paragraph 95**: Paragraph 95 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 95 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 95 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 95.

96.     The turkey market also has high levels of vertical integration that constitute a barrier to entry. The National Turkey Federation states that "turkey companies are vertically integrated, meaning they control or contract for all phases of production." [Footnote 10]

Complaint Footnote 10: *Industry Structure*, National Turkey Federation, https://www.eatturkey.org/industry-structure/ (last visited Dec. 16, 2019).

**Answer to Paragraph 96**: Paragraph 96 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 96 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 96 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 96.

97.     For example, Butterball has over 175 farms that they own, as well as contracts with numerous independent farmers. Jennie-O owns over 100 commercial growing farms. Cargill owns around 700 farms. Farbest has more than 200 contract growers.

**Answer to Paragraph 97**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97 and on this basis denies these allegations.

47

### 3. The defendants have market power in the market for turkey for meat consumption.

98.     The integrator defendants possess market power in the market for turkey for consumption. Defendants and their co-conspirators controlled an average of 77% of the market from 2010-2018.



Average Market Share of Processors (2010 - 2018)

**Answer to Paragraph 98**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 98 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the precise figures set forth in the second sentence of Paragraph 98 or the accompanying chart, and on that basis denies these allegations. To the extent that the allegations in Paragraph 98 or the accompanying chart characterize or describe documents

or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue denies the remaining allegations in Paragraph 98.

**D. The market for turkey is the type of market where the information exchanges orchestrated by Agri Stats are likely to harm competition.**

99.     Competition is likely to be harmed when competitors with market power in concentrated markets, such as the market at issue, directly exchange strategic information about current and forward-looking plans for prices and supply. The strategic information exchanged between the defendants was competitively sensitive and a material factor in negotiations. Price, capacity, supply and costs are crucial aspects of competition. When defendants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects of sales of turkey.

**Answer to Paragraph 99**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 99 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99 that relate to other Defendants and/or third parties to this action, and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 99.

100.     The information exchange took place in private settings and involved the exchange of confidential, non-public information.

**Answer to Paragraph 100**: Perdue denies the conspiracy alleged in the Complaint. To the extent that the allegations in Paragraph 100 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 100 purport to relate to Perdue, Perdue denies these allegations.

101.     The market for turkey is characterized by numerous attributes that mean the type of information exchange facilitated by Agri Stats are particularly likely to have anticompetitive effects. In particular, the market for turkey features relatively few sellers, a fungible product, price-based competition, inelastic demand, and a trend toward price uniformity.

**Answer to Paragraph 101**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 101 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 101.

### 1. The turkey market features few sellers.

102. The turkey market is concentrated, with relatively few sellers. The defendants and co-conspirators control approximately 80 percent of turkey production and processing. The presence of few companies supports the inference that a conspiracy to exchange information had the intended effect of restraining competition.

**Answer to Paragraph 102**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 102 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 102.

### 2. Turkey is a fungible market.

103. One of the distinct characteristics of the turkey industry is its fungibility, also known as the ability to be freely exchangeable or replaceable in whole or in part. Common sense indicates at Thanksgiving that a consumer can substitute a whole turkey produced by Butterball with a whole turkey produced by Cargill.

**Answer to Paragraph 103**: Paragraph 103 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103 that relate to other Defendants and/or third parties to this action, and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 103.

104. Indeed, the Agri Stats reports themselves show that turkey is fungible because they aggregate data across defendants for particular types of turkey products and allow defendants to compare detailed information on prices for the same fungible product. CW1 confirmed that the Agri Stats reports were organized by specific item of turkey product.

50

**Answer to Paragraph 104**: Paragraph 104 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 104 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 104 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. To the extent that the allegations in Paragraph 104 purport to relate to Perdue, Perdue denies these allegations.

### 3. The turkey market features price-based competition.

105.    Turkey is a commodity market that faces price-based competition.

**Answer to Paragraph 105**:  Paragraph 105 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 105.

### 4. Demand for turkey is relatively inelastic.

106.    Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price. [Footnote 11] A PED value between 0 and -1 indicates there is inelastic demand for the good or service – i.e., a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. The USDA has estimated that the average PED estimate for the turkey market is -0.58 – meaning the demand for turkey is inelastic. Indeed, most American consumers eat turkey at Thanksgiving, not pork or chicken, illustrating that there is no substitute for one of the key demand drivers of turkey.

Complaint Footnote 11: *See, e.g.*, Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson, et al., *Price Elasticity of Demand* (Nov. 13, 1997), https://scholar.harvard.edu/files/alada/files/price_elasticity_of_demand_handout.pdf;    Gadi Fibich, Arieh Gavious & Oded Lowengart, *The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects*, 33 J. Academy Mktg. Science 66-78 (2005), *available at* http://www.math.tau.ac.il/~fibich/Manuscripts/elasticity_JAMS.pdf.

**Answer to Paragraph 106**: Paragraph 106 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 106 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 106 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue lacks knowledge or information sufficient to form a belief as to the precise figures set forth in the second and third sentences of Paragraph 106, and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 106.

## 5. The turkey market features a trend towards price uniformity.

107. Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. For example, whole turkey products are produced on a commercial scale and sold in supermarkets. Whole turkeys are virtually indistinguishable, with similar nutritional values, branding and packaging.

**Answer to Paragraph 107**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 107 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 107.

## E. Industry-wide production cuts during the Conspiracy Period were facilitated through the information exchange conducted through Agri Stats.

108. As demonstrated in the following chart, the turkey integrators acted in a concerted way to decrease turkey supply in 2009, 2013, 2014, and 2015. Overall, industry supply decreased significantly from 2009 to 2015, before rebounding in 2016. The information exchange through Agri Stats facilitated the ability of defendants to monitor total industry levels of supply.

**Figure 1: U.S. Turkey Total Heads Slaughtered**



**Answer to Paragraph 108**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 108 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 108 or the accompanying chart (Figure 1) characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue admits that Plaintiffs purport to depict certain data in the chart accompanying Paragraph 108 (Figure 1), but Perdue denies that it accurately depicts Perdue's turkey production over the years identified. To the extent that the allegations in Paragraph 108 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations, and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 108.

**F. Abnormal pricing during the Class Period demonstrates the anticompetitive effects of the exchange of turkey information conducted through the Agri Stats sales reports.**

109. Beginning in 2010, the turkey industry showed abnormal price movements, *i.e.*, price increases for the average turkey whole price unexplained by increases in costs. All of these pricing measurements show a significant break between pricing prior to 2010 and pricing after 2010, supporting the plausibility of anticompetitive effects on the turkey market from the information exchange conducted through Agri Stats. Plaintiffs have measured the various abnormal pricing movements in a number of ways, including: (i) the average turkey price, (ii) the turkey integrators' margin during the Class Period; (iii) the variation between feed and turkey prices before and during the Class Period; and (iv) a regression analysis that models the relationship between turkey prices and feed prices.

**Answer to Paragraph 109**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 109 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 109 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 109 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations, and on this basis denies these allegations. Perdue admits that Plaintiffs purport to have measured "pricing movements in a number of ways," but Perdue otherwise denies the remaining allegations in Paragraph 109.

**1. The average turkey wholesale price experienced an unprecedented increase beginning in 2009.**

110. According to aggregate prices published by the USDA, the average wholesale price per pound for turkey hens was between $0.55 and $0.85 every year from 2000 to 2009, before steadily increasing to $1.15 by 2016. Following initiation of the *Broilers* litigation, the price of turkey then quickly returned to the price at which it was prior to the conspiracy. The following graph shows the unprecedented increase in turkey prices beginning in 2009, and staying elevated through the end of 2016.

**Figure 2: Average Turkey Wholesale Prices in Cents per lbs., 2000-2018**



**Answer to Paragraph 110**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 110 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 110 or the accompanying chart (Figure 2) characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue admits that Plaintiffs purport to depict certain data in the chart accompanying Paragraph 110 (Figure 2), but Perdue denies that it accurately depicts Perdue's pricing. To the extent that the allegations in Paragraph 110 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations, and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 110.

## 2. Beginning in 2009, defendants' revenues radically diverged from their costs.

111.     Plaintiffs' experts examined the spread between turkey revenue and turkey-related costs (costs of goods sold + operating costs) for Jennie-O Turkey, the only one of the three largest turkey integrator defendants with public earnings, as a proxy for measuring the spread between a defendant's price of wholesale turkey and their turkey costs. [Footnote 12] This measurement accounts for defendant-specific operating costs. This analysis confirms the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the Class Period in 2009.

Complaint Footnote 12: Hormel does not make any data publicly available on Jennie-O's costs. Therefore, plaintiffs have assumed for the purposes of this analysis that Jennie-O's costs are the same proportion to Hormel's overall costs as Jennie-O's revenues are to Hormel's overall revenues.

**<u>Answer to Paragraph 111</u>**: Perdue denies the conspiracy alleged in the Complaint.

Paragraph 111 contains Plaintiffs' characterization of their claims, allegations subject to proof by

expert testimony, and/or legal conclusions, to which no response is required. To the extent a

response is required, Perdue admits that Plaintiffs purport to engage in some analysis of cost and

revenue information identified in Paragraph 111 and Footnote 12. To the extent that the allegations

in Paragraph 111 and Footnote 12 characterize or describe documents or other sources, such

sources speak for themselves, and Perdue denies any characterization or description that is

inconsistent therewith. To the extent that the allegations in Paragraph 111 and Footnote 12 relate

to other Defendants and/or third parties to this action, Perdue lacks knowledge or information

sufficient to form a belief as to the truth of these allegations and on this basis denies these

allegations. Perdue denies the remaining allegations in Paragraph 111.

112.     The following chart shows a break in revenues and costs around the start of the Class Period in 2010 for Hormel's Jennie-O turkey brand:

**Figure 3: Jennie-O's Revenues vs Costs, March 2001 to March 2018**



**Answer to Paragraph 112**: Paragraph 112 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent that the allegations in Paragraph 112 or the accompanying chart (Figure 3) characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue otherwise lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations.

113.    The anticompetitive effect of defendants' information exchange is seen in the dramatic increase in Jennie-O Turkey's spread between revenue and costs after the start of the conspiracy period.

**Figure 4: Jennie-O's Turkey's spread: Revenue minus Cost 2001-2018**



**Answer to Paragraph 113**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 113 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 113 or the accompanying chart (Figure 4) characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 113 and the accompanying chart (Figure 4) relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 113.

114. These analyses of the spread between costs and prices confirm one essential fact – that rising costs do not explain the increases in price seen during the Class Period.

**Answer to Paragraph 114**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 114 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 114 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 114 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 114.

3. **During the conspiracy period, prices rose but production failed to rise to match demand, indicating an anticompetitive restraint on supply in the market for turkey facilitated by the information exchange through Agri Stats.**

115. In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should correspond to falling prices. However, in the turkey market during the conspiracy period, production, measured through USDA data, remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly. These observed price and output dynamics, shown in the below chart, are consistent with an anticompetitive effect on turkey output facilitated by the information exchange through Agri Stats.

59



**Answer to Paragraph 115**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 115 and the accompanying chart contain Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 115 or the accompanying chart characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue admits that Plaintiffs purport to depict certain data in the chart accompanying Paragraph 115, but Perdue denies that it accurately depicts Perdue's production or pricing. To the extent that the allegations in Paragraph 115 and the accompanying chart relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 115 and the accompanying chart.

### 4. During the conspiracy period, prices of turkey radically diverged from the costs of underlying feed.

116.    Feed is the primary driver of turkey costs, accounting for approximately 60-70% of the overall cost of raising turkeys for sale according to the New York Times. [Footnote 13] Prior to the conspiracy period, there was a tight relationship between the price of feed and the price of turkey, as would be expected in a competitive commodity market that was pricing its product based on its primary input cost. However, during the conspiracy period, the relationship between the price of feed and the price of turkey diverged dramatically, as would be expected as an anticompetitive effect of the information exchange that allowed the integrator defendants to charge more than was justified by their input costs. The divergence is illustrated in the below chart:



Complaint Footnote 13: Paul Sullivan, *In the Labyrinth of Turkey Pricing, a Reason Under Every Giblet*, *supra* note **Error! Bookmark not defined. (sic)**

<u>**Answer to Paragraph 116**</u>: Perdue denies the conspiracy alleged in the Complaint. Paragraph 116 and the accompanying charts contain Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 116 or the accompanying charts characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent

therewith. Perdue admits that Plaintiffs purport to depict certain data in the charts accompanying Paragraph 116, but Perdue denies that it accurately depicts Perdue's pricing or costs. To the extent that the allegations in Paragraph 116 and the accompanying charts relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 116 and the accompanying charts.

### 5. A regression model demonstrates the anticompetitive effects on the prices of turkey caused by the information exchange conducted through Agri Stats.

117.    To demonstrate the anticompetitive effects of defendants' information exchange on the market for turkey, plaintiffs' experts have done a regression model based on the relationship between the price of turkey hens and the price of turkey feed, which is the primary input cost for turkeys. The formula of the regression is the following: $(HenPrice)=a+_{f}3(FeedPrice)t+et$. As shown below, the regression shows a significant elevation in the prices of turkey during the conspiracy period, showing the effects of the information exchange through Agri Stats:



**Answer to Paragraph 117**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 117 contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 117 or the accompanying chart characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue admits that Plaintiffs purport to depict certain data in the chart accompanying Paragraph 117, but Perdue denies that it accurately depicts Perdue's pricing or costs. To the extent that the allegations in Paragraph 117 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 117.

### G. Defendants actively concealed the extent of their information exchange and plaintiffs did not and could not have discovered defendants' anticompetitive conduct.

118.    Plaintiffs and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this complaint. Defendants engaged in a secret information exchange that did not reveal facts that would put plaintiffs or the Class on inquiry notice that there was an anticompetitive agreement to exchange information regarding the market for turkey. Throughout the Class Period, defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from plaintiffs and class members.

**Answer to Paragraph 118**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 118 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 118 that relate

to other Defendants and/or third parties to this action, and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 118.

119.     In 2009, the President of Agri Stats, Bryan Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company. ***There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background***, and really our specialty is working directly with companies about their opportunities and so forth

**<u>Answer to Paragraph 119</u>**: Perdue denies the conspiracy alleged in the Complaint. To the extent that the allegations in Paragraph 119 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 119 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 119.

120.     At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidential[] nature of the information."

**<u>Answer to Paragraph 120</u>**: To the extent that the allegations in Paragraph 120 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue otherwise lacks knowledge or information sufficient to form a belief as to the truth of these allegations in Paragraph 120, and on this basis denies these allegations.

121.     Not until recently was the extent of the information exchange conducted through Agri Stats widely known or reported. Only after the filing of a February 7, 2018 Second Consolidated and Amended Complaint by the End User Plaintiff Class in the *In re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation

of the full scope of the confidential services that Agri Stats provides to its clients in the broiler industry.

**Answer to Paragraph 121**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 121 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 121 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue denies the remaining allegations in Paragraph 121.

122. The filing of that amended complaint collectively disclosed the likelihood that the turkey industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

**Answer to Paragraph 122**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 122 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, and to the extent that the allegations in Paragraph 122 characterize or describe documents or other sources, such sources speak for themselves, and Perdue denies any characterization or description that is inconsistent therewith. Perdue denies the remaining allegations in Paragraph 122.

123. Defendants concealed the extent of their information exchange through Agri Stats. Indeed, to this day, it is not publicly known the number of companies that receive Agri Stats reports regarding turkey. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of defendants' turkey prices before these recent events.

**Answer to Paragraph 123**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 123 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 123.

### H. Defendants had numerous opportunities to collude.

124.     Defendant integrators are members of several turkey-related trade associations and other forums, which they used to facilitate their conspiratorial conduct. Turkey producers have numerous regular events through which they can communicate in person with one another. Regular and frequent attendance by defendants' CEOs and top-level executives at trade-association meetings is the norm rather than the exception.

**Answer to Paragraph 124**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 124 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 124 that relate to other Defendants and/or third parties to this action, and on this basis denies these allegations. Perdue admits that at times it has been a member of certain legitimate trade associations, and that such associations have meetings from time to time. Perdue denies the remaining allegations in Paragraph 124.

125.     Nearly every defendant integrator's CEO has representatives on the board of directors or executive committee of these trade associations.

**Answer to Paragraph 125**: To the extent that the allegations in Paragraph 125 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations.  To the extent that the allegations in Paragraph 125 purport to relate to Perdue, Perdue admits that Perdue employees have at times held positions on the board of directors or executive committee of certain legitimate trade associations, but otherwise denies the allegations in Paragraph 125.

126.     The National Turkey Federation is a national advocate for turkey farmers and processors; members include growers, processors, hatchers, breeders, distributors, allied services, and state associations. High-ranking executives of Butterball, Jennie-O Turkey Store (Hormel), Cargill, Tyson, Farbest, and Perdue currently serve as officers or on the executive committee; and nearly all of the defendants have membership in this trade association. In addition to regular board

and executive committee meetings, the federation holds an annual convention in February and an annual leadership conference in July where these executives gather and discuss turkey-related information.

**Answer to Paragraph 126**: Perdue admits that at times it has been a member of certain legitimate trade associations, including the National Turkey Federation, and that such associations have meetings from time to time. Perdue admits that a Perdue employee is a member of the executive committee of the National Turkey Federation. To the extent that the allegations in Paragraph 126 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 126.

127. Upon information and belief, the top-level executives from defendants discuss topics with one another relating to pricing, production, and other non-public proprietary information outside of the National Turkey Federation's formal meetings. These regular, informal, and in-person opportunities to discuss pricing and production in the turkey industry gives CEOs and top-level executives comfort that their competitors remain committed to a plan to artificially restrict turkey production.

**Answer to Paragraph 127**: Perdue denies the conspiracy alleged in the Complaint. Paragraph 127 contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 127.

128. The United States Poultry & Egg Export Council (USAPEEC) has its home office in Stone Mountain, Georgia. Defendants are all members of the council. USAPEEC has a network of international offices and consultants in key export markets. The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world. The council has evolved into an advocate for the industry on trade-policy issues. USAPEEC has about 200 member companies and organizations. The council holds Board of Directors meetings quarterly and includes executives from all or nearly all defendants.

**Answer to Paragraph 128**: Perdue admits that at times it has been a member of certain legitimate trade associations, including the United States Poultry & Egg Export Council, and that such associations have meetings from time to time. To the extent that the allegations in Paragraph

128 relate to other Defendants and/or third parties to this action, Perdue lacks knowledge or information sufficient to form a belief as to the truth of these allegations and on this basis denies these allegations. Perdue denies the remaining allegations in Paragraph 128.

129.     The U.S. Poultry & Egg Association (U.S. Poultry) describes itself as the world's largest and most active poultry organization. U.S. Poultry's members include producers and processors of broilers, turkeys, ducks, eggs, and breeding stock, as well as allied companies. Many of the defendants are members of U.S. Poultry. U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall. Butterball, Cargill, Foster, Tyson, and Perdue have representation on the Board of Directors.

**Answer to Paragraph 129**: Perdue admits that at times it has been a member of certain legitimate trade associations, including the U.S. Poultry & Egg Association, and that such associations have meetings from time to time. Perdue admits that a Perdue employee is a member of the U.S. Poultry & Egg Association Board of Directors.  Perdue lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 129 and on this basis denies these allegations.

130.     The North American Meat Institute (NAMI) represents companies that process 95% of red meat and 70% of turkey products in the United States and their suppliers throughout the country. NAMI hosts the Meat Industry Summit in April each year. Additionally, it holds regular Board of Director meetings. Butterball, Cargill, Hormel, and Tyson have representation on the NAMI Board.

**Answer to Paragraph 130**: Perdue lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 130 and on this basis denies these allegations.

## V.     CLASS ACTION ALLEGATIONS

131.     Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking compensatory damages and injunctive relief pursuant to federal law on behalf of the members of the following class:

> All persons and entities who directly purchased turkey from Defendants or co-conspirators for personal use in the United States during the Class Period. Specifically excluded from this Class are the Defendants and co-conspirators; the officers, directors or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a

controlling interest; and any affiliate, legal representative, heir or assign of any Defendant or co-conspirator. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

**Answer to Paragraph 131**: Paragraph 131 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue admits that Plaintiffs purport to bring this action as a class action, but Perdue denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise, and denies the allegations in Paragraph 131.

132.    Class Identity: The above-defined class is readily identifiable and is one for which records should exist.

**Answer to Paragraph 132**: Paragraph 132 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise, and denies the allegations in Paragraph 132.

133.    Numerosity: Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of defendants, retailers, resellers and other entities in the supply chain of turkey. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

**Answer to Paragraph 133**: Paragraph 133 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise, and denies the allegations in Paragraph 133.

134.    Typicality: Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs purchased turkey directly from one or more of the defendants for personal use, and therefore plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

**Answer to Paragraph 134**: Paragraph 134 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise, and denies the allegations in Paragraph 134.

135.    <u>Common Questions Predominate</u>: There are questions of law and fact common to the Class, including, but not limited to:

<blockquote>

A.    Whether defendants and their co-conspirators engaged in an information exchange agreement that reduced or suppressed competition in the market for turkey;

B.    The identity of the participants of the alleged agreement;

C.    The duration of the agreement alleged herein and the acts performed by defendants and their co-conspirators in furtherance of the agreement;

D.    Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the plaintiffs and the other members of the Class;

E.    The effect of defendants' alleged conspiracy on the prices of turkey sold in the United States during the Class Period; and

F.    The appropriate class-wide measure of damages.

</blockquote>

These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

**Answer to Paragraph 135**: Paragraph 135 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise, and denies the allegations in Paragraph 135.

136.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class in that plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class who directly purchased turkey from defendants and plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

**Answer to Paragraph 136**: Paragraph 136 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue denies that this action can be properly maintained as a class action whether on

behalf of the purported class or otherwise. Perdue otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 136 and on this basis denies these allegations.

137.    Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive by a single court.

**Answer to Paragraph 137**: Paragraph 137 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise, and denies the allegations in Paragraph 137.

138.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

**Answer to Paragraph 138**: Paragraph 138 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise, and denies the allegations in Paragraph 138.

139.    Plaintiffs bring the action on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that directly purchased one or more turkey products that a defendant or co-conspirator produced during the respective class periods.

**Answer to Paragraph 139**: Paragraph 139 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is

required, Perdue denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise, and denies the allegations in Paragraph 139.

140.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**Answer to Paragraph 140**: Paragraph 140 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise, and denies that Plaintiffs are entitled to any relief. Perdue denies the remaining allegations in Paragraph 140.

## VI.     ANTITRUST INJURY

141.     Defendants' anticompetitive conduct had the following effects, among others:

A.     Price competition has been restrained or eliminated with respect to turkey;
B.     The prices of turkey have been fixed, raised, stabilized, or maintained at artificially inflated levels;
C.     Direct purchasers of turkey have been deprived of free and open competition; and
D.     Direct purchasers of turkey, including plaintiffs, paid artificially inflated prices.

**Answer to Paragraph 141**: Perdue denies the allegations in Paragraph 141.

142.     Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge paid by the direct purchasers. Thus, the economic harm to plaintiffs and the class members can be quantified.

**Answer to Paragraph 142**: Perdue denies the allegations in Paragraph 142.

143.     The purpose of the conspiratorial conduct of defendants and their co-conspirators was to raise, fix, or maintain the price of turkey and, as a direct and foreseeable result, plaintiffs and the Class paid supra-competitive prices for turkey during the Class Period.

**Answer to Paragraph 143**: Perdue denies the allegations in Paragraph 143.

144.     By reason of the alleged violations of the antitrust laws, plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for turkey than they

would have paid in the absence of defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

**Answer to Paragraph 144**: Perdue denies the allegations in Paragraph 144.

145.     This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**Answer to Paragraph 145**: Perdue denies the allegations in Paragraph 145.

## VII.    CAUSE OF ACTION
## VIOLATION OF THE SHERMAN ACT

### FIRST CLAIM FOR RELIEF
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR
### CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION
### 15 U.S.C. § 1
### (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND
### EQUITABLE RELIEF AND DAMAGES)

146.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 146**: Perdue incorporates by reference its answers to each

preceding and succeeding paragraph, as if fully set forth herein in response to Paragraph 146 of

the Complaint.

147.     Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 2010, and continuing at least until January 1, 2017, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer to Paragraph 147**: Perdue denies the allegations in Paragraph 147.

148.     Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of defendants' affairs.

**Answer to Paragraph 148**: Perdue denies the allegations in Paragraph 148.

149.    Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for turkey throughout the United States.

**Answer to Paragraph 149**: Perdue denies the allegations in Paragraph 149.

150.    The relevant product market is turkey and the relevant geographic market is the continental United States.

**Answer to Paragraph 150**: Perdue denies the allegations in Paragraph 150.

151.    Defendant integrators possess market power in the Relevant Market. Defendant integrators and their co-conspirators controlled approximately 80 percent of the Relevant Market. Defendant integrators' collective market power includes the power to artificially deflate the amount of turkey produced in the United States below competitive levels and to artificially inflate the price plaintiffs pay for turkey above competitive levels.

**Answer to Paragraph 151**: Perdue denies the allegations in Paragraph 151.

152.    Defendants could impose an increase in the price of turkey collectively without causing many consumers to switch their purchases to another product. Turkey constitutes a unique product market.

**Answer to Paragraph 152**: Perdue denies the allegations in Paragraph 152.

153.    Defendants view the turkey products as fungible. Turkey products are generally interchangeable, permitting defendant integrators to readily to compare and match each other's pricing.

**Answer to Paragraph 153**: Perdue denies the allegations in Paragraph 153.

154.    The information regularly exchanged by defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public information about current supply, production and pricing plans regarding turkey. The information exchanges specifically included the exchange through Agri Stats of weekly and monthly reports regarding defendants' turkey operations, including weekly sales data that allowed defendants to compare their prices with their competitors and raise prices that were lower.

**Answer to Paragraph 154**: Perdue denies the allegations in Paragraph 154.

155.    Defendants' regular information exchanges through Agri Stats reflected concerted action between horizontal competitors in the market for turkey.

**Answer to Paragraph 155**: Perdue denies the allegations in Paragraph 155.

156.     Each defendant integrator furnished competitively sensitive information to other defendant integrators with the understanding that it would be reciprocated. Agri Stats enforced this understanding by requiring defendants to share data in order to receive comparable data.

**Answer to Paragraph 156**: Perdue denies the allegations in Paragraph 156.

157.     The agreement to regularly exchange detailed and non-public information about current production, supply, and pricing suppressed competition between the defendants. Agri Stats specifically identified for defendants the instances where their pricing was lower than other defendants and where they could raise their prices to match.

**Answer to Paragraph 157**: Perdue denies the allegations in Paragraph 157.

158.     When defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly, defendants used the data obtained through Agri Stats to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the turkey market. This strategic information was a material factor in defendant integrators' decisions to inflate the prices that plaintiffs paid for turkey during the Class Period.

**Answer to Paragraph 158**: Perdue denies the allegations in Paragraph 158.

159.     Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

**Answer to Paragraph 159**: Perdue denies the allegations in Paragraph 159.

160.     The information-exchange agreement has had the effect of (1) reducing and suppressing competition among defendants in the market for turkey in the United States and (2) inflating the prices of turkey during the Class Period.

**Answer to Paragraph 160**: Perdue denies the allegations in Paragraph 160.

161.     As a result of defendants' unlawful conduct, plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for turkey.

**Answer to Paragraph 161**: Perdue denies the allegations in Paragraph 161.

162.     As a direct and proximate result of defendants' anticompetitive conduct, plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for turkey than they would have paid and will pay in the absence of the conspiracy.

**Answer to Paragraph 162**: Perdue denies the allegations in Paragraph 162.

163.     The alleged contract, combination, or conspiracy is also a *per se* violation of the federal antitrust laws.

**Answer to Paragraph 163**: Any claim for a *per se* violation of the federal antitrust laws has been dismissed by the Court (*see* ECF No. 173), and thus no response to the allegations in Paragraph 163 is required.  To the extent a response is required, Perdue denies the allegations in Paragraph 163.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully requests judgment against defendants as follows:

164.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

**Answer to Paragraph 164**: Paragraph 164 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 164, and denies that Plaintiffs are entitled to any of the relief requested in Paragraph 164.

165.     The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman;

**Answer to Paragraph 165**: Paragraph 165 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 165, and denies that Plaintiffs are entitled to any of the relief requested in Paragraph 165.

166.     Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgments in favor of plaintiffs and the members of the Class be entered against defendants in an amount to be trebled to the extent such laws permit;

**Answer to Paragraph 166**: Paragraph 166 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 166, and denies that Plaintiffs are entitled to any of the relief requested in Paragraph 166.

167.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

**Answer to Paragraph 167**: Paragraph 167 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 167, and denies that Plaintiffs are entitled to any of the relief requested in Paragraph 167.

168.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

**Answer to Paragraph 168**: Paragraph 168 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 168, and denies that Plaintiffs are entitled to any of the relief requested in Paragraph 168.

169.     Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

**Answer to Paragraph 169**: Paragraph 169 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is

required, Perdue denies the allegations in Paragraph 169, and denies that Plaintiffs are entitled to any of the relief requested in Paragraph 169.

170.    Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

**Answer to Paragraph 170**: Paragraph 170 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 170, and denies that Plaintiffs are entitled to any of the relief requested in Paragraph 170.

171.    Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

**Answer to Paragraph 171**: Paragraph 171 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue denies the allegations in Paragraph 171, and denies that Plaintiffs are entitled to any of the relief requested in Paragraph 171.

## IX.    JURY TRIAL DEMANDED

172.    Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**Answer to Paragraph 172**: Paragraph 172 contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Perdue also demands a jury trial as set forth below.

## ADDITIONAL ALLEGATIONS AND GENERAL DENIAL

Perdue denies all allegations in the Complaint unless Perdue has expressly admitted these allegations herein. Where an allegation in the Complaint is directed at another Defendant or a party unaffiliated with Perdue, except as otherwise expressly stated, Perdue denies the allegations set forth in the Complaint on the basis that it lacks the knowledge or information sufficient to form a

belief concerning the truth of such allegations. Further, unless otherwise expressly admitted, Perdue denies any allegations in the headings, footnotes or other places in the Complaint, to the extent that any such allegations require a response. Any headings, subheadings or similar text that Perdue has included in this Answer are for the convenience of the Court and the parties, and are not intended to be nor shall they be construed as an admission of any fact by Perdue.

## AFFIRMATIVE DEFENSES

Without assuming any burden that it otherwise would not bear, and reserving the right to assert additional defenses as those defenses become known during discovery, Perdue asserts the following separate and additional defenses. Perdue reserves all affirmative defenses under Federal Rule of Civil Procedure 8(c) and any other defenses at law or equity that may exist now or in the future. Perdue reserves the right to assert other defenses as this action proceeds up to and including the time of trial.

## GENERAL DEFENSES

## FIRST DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because Plaintiffs have not suffered any injury in fact and/or any injury cognizable under the antitrust laws, and, to the extent Plaintiffs have been damaged, the amount of damages that Plaintiffs allege to have suffered is too speculative to allow recovery, and such alleged damages cannot be allocated with reasonable certainty. Plaintiffs did not incur injury and did not incur damages based on allegations in the Complaint, and, in particular, have incurred no injury arising from any conduct alleged as to Perdue. Perdue incorporates by reference its Second, Third, Fourteenth, and Fifteenth Affirmative Defenses.

## SECOND DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because they lack standing to bring this action against Perdue. Among other reasons, Plaintiffs do not specifically allege from which entities they purchased turkey products, and thus have not established that they purchased turkey products directly from Perdue or any other Defendant during the alleged Class Period.

## THIRD DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because any alleged injuries and damages were not legally or proximately caused by any acts or omissions of Perdue or any other Defendant and/or were caused, if at all, solely and proximately by the conduct of Plaintiffs themselves and/or third parties to this action over which Perdue had no authority or control, including, without limitations, the prior, intervening or superseding conduct of such Plaintiffs or third parties. Perdue cannot be held liable for loss or damage caused by such third parties, whether or not they are parties to this action.

## FOURTH DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because Plaintiffs failed to exercise reasonable care to mitigate any damages they may have suffered. The precise set of facts Plaintiffs cite in support of their claims were made public more than four years ago. To the extent Plaintiffs contend that they were injured by Perdue or any other Defendant's alleged conduct, Plaintiffs had an obligation to mitigate their damages by seeking other sources of supply, including from other producers. Plaintiffs' failure to exercise reasonable care to mitigate damages was the complete or partial cause of any damages Plaintiffs may have suffered.

## FIFTH DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of waiver. The precise set of facts Plaintiffs cite in support of their claims were made public more than four years ago. Plaintiffs' conduct in continuing to purchase turkey products at what they now allege are inflated prices is evidence of an intention to waive any right to bring this suit and was inconsistent with any intention other than to waive their right to bring suit. Plaintiffs, by their actions, accepted the benefits of any ongoing relationship with Perdue or any other Defendant and relinquished their right to bring suit.

## SIXTH DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of estoppel. The precise set of facts Plaintiffs cite in support of their claims were made public more than four years ago. Perdue relied in good faith, and to its detriment, on Plaintiffs' actions in continuing to purchase turkey products without complaint. Plaintiffs' claims are therefore estopped.

## SEVENTH DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the equitable doctrine of laches. The laches doctrine dictates that "those who sleep on their rights, lose them." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999). Specifically, laches will bar relief in the face of: "(1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom." *Id.* (*citing Cannon v. Univ. of Health Sciences/Chi. Med. Sch.*, 710 F.2d 351, 359 (7th Cir. 1983)). Certain of the challenged conduct that underlies Plaintiffs' claims occurred nearly ten years before the Complaint was filed. Likewise, the specific facts Plaintiffs cite in support of their claims were publicly

available long ago. Yet, Plaintiffs sat on their allegations until December 2019. This unreasonable lack of diligence in raising their claims bars them now. Accordingly, the equitable principles embodied in the laches doctrine bar Plaintiffs from seeking relief at this delayed juncture.

## EIGHTH DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, based on the ratification of, and consent to, the conduct of Perdue. Plaintiffs' Complaint relies on publicly available information—much of which has been available for years—thereby demonstrating their long-standing ratification of and consent to the complained-of conduct. For example, Plaintiffs purport to rely on public statements from *more than a decade ago* that "about 95% of the turkey industry [was] participating" in Agri Stats as of 2009. *See* Compl. ¶ 7. Accordingly, because Plaintiffs have been aware for years of the very same conduct they now challenge—much of which has provided Plaintiffs a direct benefit—Plaintiffs' claims are barred by the doctrine of ratification.

## NINTH DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because the applicable statute of limitations has lapsed with respect to such claims. The statute of limitations for Plaintiffs' claims is four years. 15 U.S.C. § 15(b). Thus, their claims must be dismissed unless Plaintiffs can sufficiently allege that they could not have discovered the claimed offense within the limitations period exercising reasonable diligence. Plaintiffs cannot satisfy this burden: the challenged conduct occurred up to ten years ago. Moreover, the precise set of facts Plaintiffs cite in support of their claims—including, for example, participation in Agri Stats by Defendants—were publicly known more than four years ago. Plaintiffs' attempt to justify its delay by claiming fraudulent concealment fails—it simply recycles its underlying allegations and

conclusively asserts fraudulent concealment. Accordingly, Plaintiffs' Complaint is time-barred. Perdue further incorporates by reference the statute of limitations arguments presented in the Memorandum in Support of Certain Defendants' Joint Motion to Dismiss (ECF No. 145).

### TENTH DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, to the extent Plaintiffs seek to impose liability on Perdue based on the exercise of any person or entity's right to petition federal, state and local legislative bodies, because such conduct was immune under the *Noerr-Pennington* doctrine and/or privileged under the First Amendment to the U.S. Constitution. Protected activities include, without limitation, participation in trade associations seeking legislative and/or administrative remedies related to issues facing turkey producers.

### ELEVENTH DEFENSE

Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, to the extent the sales contracts pursuant to which Plaintiffs purchased turkey products contain arbitration clauses, clauses providing a different forum for the resolution of their claims, or contractual limitations periods during which they must have brought their claims but failed to do so. *See, e.g.*, *Cont'l Ins. Co. v. M/V Orsula*, 354 F.3d 603 (7th Cir. 2003); *West Shore Pipe Line Co. v. Associated Electric & Gas Ins. Services, Ltd.*, 791 F. Supp. 200 (N.D. Ill. 1992).

### TWEFLTH DEFENSE

Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by Perdue's right to set off any amounts paid to Plaintiffs by any

Defendants other than Perdue who have settled, or do settle, Plaintiffs' claims against them in this action.

## THIRTEENTH DEFENSE

Plaintiffs' claims and claims of any putative class members are barred, in whole or in part, to the extent they seek improper multiple damage awards, and damage awards duplicative of those sought in other actions, in violation of the Due Process guarantees of the Fifth and Fourteenth Amendments of the United States Constitution. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

## FOURTEENTH DEFENSE

Without admitting the existence of any contract, combination, or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs entered into cost-plus contracts with parties who purchased from Plaintiffs before Plaintiffs began paying any purported overcharge.

## FIFTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have failed to state a claim upon which relief can be granted for the reasons described in the Memorandum in Support of Certain Defendants' Joint Motion to Dismiss (ECF No. 145), which Perdue incorporates by reference.

## SIXTEENTH DEFENSE

Plaintiffs are not entitled to injunctive or other equitable relief because, to the extent they could prove their claims (which Perdue disputes), Plaintiffs have an adequate remedy at law and any injunctive relief would be improper. Moreover, Plaintiffs' own allegations purport to assert claims for alleged conduct through January 1, 2017, and thus no injunctive relief is appropriate.

## SEVENTEENTH DEFENSE

Perdue adopts and incorporates by reference any and all other defenses asserted by any other Defendant to the extent that the defense would apply to Perdue.

## PRAYER FOR RELIEF

WHEREFORE, Perdue respectfully requests that judgment be entered in favor of Perdue and the other Defendants and against Plaintiffs, dismissing the Complaint in its entirety with prejudice. Perdue further requests that this Court (i) award Perdue its costs and disbursements, and (ii) award such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to the Federal Rules of Civil Procedure 38, Perdue demands a trial by jury on all claims and defenses upon which it is entitled to a jury.

Dated: December 4, 2020                    Respectfully submitted,

*/s/ J. Douglas Baldridge*_____
J. Douglas Baldridge (#437678)
Lisa Jose Fales (admitted *pro hac vice*)
Danielle R. Foley (admitted *pro hac vice*)
Paul Feinstein (admitted *pro hac vice*)
Andrew T. Hernacki (admitted *pro hac vice*)
VENABLE LLP
600 Massachusetts Ave., NW
Washington, DC 20001
(202) 344-4000
jdbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com
pfeinstein@venable.com
athernacki@venable.com

Kirstin B. Ives
FALKENBERG IVES, LLP
30 N. LaSalle St., Suite 4020
Chicago, IL 60602
(312) 566-4803
kbi@falkenbergives.com

*Counsel for Perdue Farms, Inc.*
*and Perdue Foods, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 4, 2020, I served the foregoing document on all counsel of record using the Court's ECF system.

*/s/ J. Douglas Baldridge*
J. Douglas Baldridge
