**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

*IN RE TURKEY ANTITRUST LITIGATION*

This Document Relates To:


Direct Purchaser Plaintiff Action

No. 1:19-cv-08318


**SECOND AMENDED CLASS
ACTION COMPLAINT – PUBLIC
REDACTED VERSION**


**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....................................................................................................1

II. NATURE OF ACTION ..........................................................................................4

    A. The Defendants .........................................................................................4

    B. Defendants' actions to stabilize the price and supply of turkey are *per se* violations of the antitrust laws. ....................................................5

    C. Defendants' actions are also unlawful under a rule of reason analysis.....................................................................................................16

    D. Defendants' conspiracy was successful and caused anticompetitive effects in the form of restrained supply and supracompetitive prices ......................................................................................................19

III. JURISDICTION AND VENUE ...........................................................................24

IV. PARTIES ..............................................................................................................25

    A. Plaintiffs ..................................................................................................25

    B. Defendants ...............................................................................................25

    C. Co-Conspirators ......................................................................................30

V. FACTUAL ALLEGATIONS ................................................................................32

    A. Agri Stats lies at the center of an extensive conspiracy between Defendants. ..............................................................................................32

        1. Agri Stats Reports and Subscriptions by Defendants and their Co-Conspirators.....................................................................35

            a. Examples of Agri Stats Reports.................................................38

            b. Defendants subscribed to Agri Stats/EMI reports throughout the class period. ........................................................49

            c. The Co-Conspirators also participated in Agri Stats/EMI. ..................................................................................53

        2. Defendants relied on Agri Stats reports for every critical part of their operations. ..............................................................54

a.      Defendants Relied on Agri Stats Reports in Setting Prices and Identifying Opportunities to Raise Prices.......................................................................54

b.      Defendants Relied on Agri Stats Reports to Monitor Production. ..................................................................66

c.      Agri Stats Reports and Metrics Were Tremendously Important to Defendants and their Co-Conspirators.....................70

d.      Agri Stats Directly Facilitated the Exchange of Sensitive Information Through Meetings and Passing Information Between Defendants and Their Co-Conspirators. ............................................................72

e.      Certain Defendants Tied Compensation and Performance Reviews to their Agri Stats' Performance. ...................................................................77

3.      Defendants and Their Co-Conspirators regularly and easily reverse engineered Agri Stats reports. ........................................79

4.      Agri Stats was aware reports could be reverse engineered and helped facilitate reverse engineering....................................88

B.      ███████████████ provided a forum for coordination among the Defendants and their Co-Conspirators. ................................................91

C.      Defendants conspired to restrain competition in the market for turkey. ............................................................................................94

1.      Pre-Class Liability Period from 2008-2009: ███████████ ███████████████████████████████.................................94

a.      ██████████████████ In early 2008, Defendants begin to coordinate a series of industry cutbacks to restrain supply and stabilize prices. ................................................94

b.      ███████████████████████████████████████████████████████.................................95

c.      ████████████████████████



............................................................................109

d. ............................................................................113

e. ............................................................................116

2. ............................................................................121

3. ............................................................................128

4. ............................................................................131

5. ............................................................................137

6. ............................................................................143

7. ............................................................................149

a. ██████████████████████████
████████████████████████████
████████████████████████████
██████████████ .......................................................... 149

b. <u>Defendants and their Co-Conspirators</u> ███████
███████████████████ ............................... 162

8. ████████████████████████████
████████ ............................................................... 167

D. ████████████████████████████████
██████████████ ....................................................... 171

1. ████████████████████████████
████████████████████ ........................................ 171

2. ████████████████████████████
████████ .......................................................... 180

3. Opportunity contacts abounded between Defendants and
their Co-Conspirators and allowed them to maintain the
conspiracy. ............................................................... 186

a. Numerous Trade Association Events provided
ample opportunities to directly meet and collude. ...................... 186

(1) The United States Poultry & Egg Export
Council ....................................................................... 187

(2) U.S. Poultry & Egg Association ...................................... 188

(3) North American Meat Institute ...................................... 188

b. ████████████████████████████
████████████████████████ ██████
███████████ .......................................................... 189

c.        ██████████████████████████
..........................................................190

d.        ██████████████████████████
..................................191

e.        Collusion Between Defendants in Other, Related Industries Supports an Inference of Collusion............................193

E.      The structure of the turkey industry is conducive to conspiracy. ........................196

      1.      Defendants possess market power in the market for turkey. ..................196

           a.        There are high barriers to entry in the market for turkey for meat consumption. ......................................196

           b.        The Defendants have market power in the market for turkey for meat consumption..................................198

           c.        The market for turkey is the type of market conducive to collusion. ..............................................199

      2.      The market for turkey is the type of market where information exchanges and per se price-fixing behaviors are likely to harm competition. ..............................................199

           a.        The turkey market features few sellers. ......................................199

           b.        Turkey is a fungible product.......................................199

           c.        The turkey market features price-based competition..................200

           d.        Demand for turkey is relatively inelastic. ....................................201

           e.        The turkey market features a trend towards price uniformity. ..............................................................201

           f.        The turkey industry is highly vertically integrated. ....................201

F.      Abnormal pricing during the Class Period demonstrates the anticompetitive effects of the alleged conduct by Defendants and their Co-Conspirators.........................................................................202

      1.      The average turkey wholesale price experienced an unprecedented increase beginning in 2009. ............................203

2.     Beginning in 2009, Defendants' revenues diverged from their costs. ................................................................................204

3.     During the conspiracy period, prices rose but production failed to rise to match demand, indicating an anticompetitive restraint on supply in the market for turkey facilitated by the information exchange through Agri Stats and the per se exchange of pricing and supply information between Defendants. ................................................................206

4.     During the conspiracy period, prices of turkey radically diverged from the costs of underlying feed. ............................................207

5.     A regression model demonstrates the anticompetitive effects on the price of turkey caused by the information exchange conducted through Agri Stats as well as the direct exchange of pricing and supply information. ..........................................208

VI.     CLASS ACTION ALLEGATIONS ................................................................211

VII.     ANTITRUST INJURY ................................................................213

VIII.     CAUSES OF ACTION ................................................................214

FIRST CLAIM FOR RELIEF  VIOLATION OF THE SHERMAN ACT RULE OF REASON VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION 15 U.S.C. § 1 (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF AND DAMAGES) ................................................................214

SECOND CLAIM FOR RELIEF *PER SE* VIOLATION OF SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1 (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF AND DAMAGES) ................................................................217

REQUEST FOR RELIEF ................................................................220

JURY TRIAL DEMANDED ................................................................221

010737-11/1749929 V4

Plaintiffs bring this action on behalf of themselves individually and on behalf of a Plaintiff class consisting of all persons and entities who purchased turkey directly from a Defendant or Co-Conspirator in the United States beginning at least as early as January 1, 2010 through January 1, 2017 (Class Period).[1] Plaintiffs bring this action for treble damages and injunctive relief under Section 1 of the Sherman Act. Plaintiffs demand a trial by jury.

## I.  INTRODUCTION

1.  Plaintiffs have amended their complaint as follows:

- To re-plead a *per se* claim against Defendants, previously dismissed without prejudice, for an agreement to fix prices and restraint the supply of turkey during the Class Period, supported by substantial new factual allegations based on the discovery conducted to date;

- To add allegations in support of the *per se* claim that, 

- To add allegations that

- To add allegations that Defendants

---

[1] For purposes of this complaint, turkey includes turkey meat purchased fresh or frozen, and either uncooked or cooked.

[2] All emphasis has been added in this complaint unless otherwise noted.

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████

- To add allegations that Defendants ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

- To add allegations that Defendants ██████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████

- To add allegations that Defendants, ████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

- To add allegations that Defendants ██████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

- To add allegations that Defendants ██████████████████████████

████████████████████████████████████████████████

- 2 -

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

- To add allegations substantiating the specific statements of Confidential Witnesses from Butterball, Cooper Farms, and Cargill in the prior Complaint, including that ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

- To add allegations further substantiating that Defendants' agreement to exchange information is anticompetitive under a rule of reason analysis, including that Agri Stats reports contained detailed, current information on Defendants' production and pricing, that Defendants used Agri Stats reports to monitor each other's production and identify specific opportunities to raise prices, and that Defendants routinely reverse engineered Agri Stats reports;

- To name Prestage (comprised of Prestage Farms, Inc., Prestage Foods, Inc., Prestage Farms of South Carolina, LLC) as a Defendant based on allegations that Prestage ███████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████

- To name Norbest LLC (Norbest), Michigan Turkey Producers LLC d/b/a Michigan Turkey Producers Co-op (Michigan Turkey), and Kraft (comprised of Kraft Heinz Foods Company and Kraft Foods Group) as Co-Conspirators

based on evidence that each were members of Agri Stats during the relevant

time period ███████████████████████████

## II.    NATURE OF ACTION

### A.    The Defendants

2.      The United States is the world's largest turkey producer. The Turkey Integrators

are the leading suppliers of turkey in an industry with approximately $5 billion in annual

commerce. The turkey industry is highly concentrated, with a small number of large producers in

the United States controlling supply. Defendants and their Co-Conspirators collectively control

approximately 80 percent of the wholesale turkey market in the United States. The Defendant

Integrators are Butterball LLC (Butterball); Cargill Inc. and Cargill Protein – North America

f/k/a Cargill Meat Solutions Corporation, (together and separately, Cargill); Cooper Farms, Inc.

(Cooper Farms); Farbest Foods, Inc., (Farbest); Foster Farms LLC and Foster Poultry Farms

(together and separately, Foster Farms); Hormel Foods Corporation ( Hormel), Jennie-O Turkey

Store, Inc. (together and separately, Hormel); House of Raeford Farms, Inc., (House of Raeford);

Prestage Farms, Inc., Prestage Foods, Inc., Prestage Farms of South Carolina, LLC (together and

separately, Prestage); Perdue Farms, Inc. and Perdue Foods LLC (together and separately,

Perdue); Defendant Tyson Foods, Inc., The Hillshire Brands Company, Tyson Fresh Meats, Inc.

and Tyson Prepared Foods, Inc. (together and separately, Tyson) as well as Co-Conspirators,

Dakota Provisions, LLC d/b/a Dakota Provisions (Dakota Provisions); Kraft Heinz Foods

Company and Kraft Foods Group (together and separately, Kraft), Michigan Turkey Producers

LLC d/b/a Michigan Turkey Producers Co-op (Michigan Turkey), Norbest LLC (Norbest), and

West Liberty Foods LLC (West Liberty).

3.      Defendant Agri Stats, Inc. (Agri Stats) is a company that provides closely

guarded, non-public, subscription services to a variety of agricultural industries, including the

pork, chicken, and turkey industries. Agri Stats' mission is to improve the profitability of the Defendant companies, by providing participants with non-public and granular information on prices and costs. Agri Stats publicly represents that its services preserve the confidentiality of participating companies; however, the reality is far different. Express Markets Inc. (EMI) is a subsidiary of Agri Stats that provides forecasting services for various protein industries.

**B.    Defendants' actions to stabilize the price and supply of turkey are *per se* violations of the antitrust laws.**

4.      In early 2008, Defendants faced a problem. Rising grain prices had cut into their profits, and Defendants, in response, sought to coordinate on supply cuts that would raise turkey prices. It is well-established law that "an agreement to restrict the production [of a good] unquestionably is a price fixing arrangement. 'Price fixing' is a characterization which extends to all conspiracies designed to manipulate the price of goods."[3]

5.      To engage in this illegal form of price fixing, Defendants turned to Agri Stats. At the July 2008



(consisting almost exclusively of executives from Defendants and their Co-Conspirators) agreed.[4]

---

[3] *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 226 (7th Cir. 1978).

[4] The ████████████████ represents nearly 100% of commercial Turkey production in the United States, including allied industries. It is the only association representing the turkey industry exclusively in the United States. Throughout the conspiracy, Defendants dominated the

then approached Agri Stats executives to ask if Agri Stats could provide a quarterly survey of

"███████████████████████"

      6.     Agri Stats executives internally discussed the survey. They acknowledged that

████████████████████████████████████████████████████████

████████ They also noted that prior efforts by the industry to do an intention-type survey had

failed "████████████████████████████████" Nevertheless, Agri Stats agreed to

████████████████████████████████████████

████████████████████

      7.     Indeed, the industry had changed enough. ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████" In response to an

initial outline of the project, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

8. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

9. ██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

- 7 -



10.   In December 2008, ███████████████████████
███████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

010737-11/1749929 V4



11. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

12. ████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████

13.     In early 2009, Defendants escalated their coordination. ███████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

The following month, ████████████████████████████████████████████████

█████████████████████████████████

14.     Individuals from each Defendant served on the 2009 ███████████████████████

Executive Committee. At the February 2009 ██████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

15.     Defendants' coordination worked with remarkable speed. By May 2009, ████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████

16.     During this 2008-2009 period, Defendants' coordinated cutbacks worked

wonders. By the start of the class period, turkey prices were soaring as a result of ████████████

██████████████████████████████████████████



17.     Throughout 2010, Defendants enjoyed supracompetitive prices created by their anticompetitive conduct. In November 2010, just days before Thanksgiving, 

18.     Throughout 2010 and 2011, Defendants enjoyed high prices and strong profits as a result of their coordinated conduct. For example, in May 2011, █████████████

19.     In 2012, Defendants became concerned about rising future supply levels, so they began to ███████████████

- 11 -

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████.

20.    In early 2013, the cutbacks escalated as Defendants ██████████████████████

██████████████████████████████████ In January 2013, ██████████████████████

████████████████████████████████████████████████████

Over the following weeks, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

21.    In March 2013, ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████

22.    Defendants coordinated cutbacks again worked as prices quickly began to rise. In

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████ By December 2013, ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

23.    Defendants' coordinated cutbacks caused turkey prices to soar in ████████████████

████████████████████████████████████████████████████

24. Later in 2014, ████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████

25. Throughout the entire conspiracy, the Agri Stats reports acted as a lynchpin for coordination between Defendants. Each Defendant and Co-Conspirator received Agri Stats reports during the conspiracy period. Agri Stats reports are different from other, lawful industry benchmarking reports. As part of their subscription to Agri Stats, the Defendant Integrators and their Co-Conspirators received monthly reports containing current and forward-looking information such as breeder production, hatchery utilization, pricing, production volume, profit, sales, and slaughter information.

26. Agri Stats collects detailed data on almost every conceivable operating metric from its subscribers operating in the turkey industry. Agri Stats takes this data, standardizes it, and then uses the standardized data to create detailed reports showing how subscribers compare rank against each other for key operating metrics. On a weekly and monthly basis, Agri Stats produces these detailed comparative reports to its subscribers in the turkey industry using numeric codes for each subscriber in an attempt to keep the data anonymous.

27. Although Agri Stats reports are nominally anonymous, Defendant Integrators were often able to reverse engineer the reports to identify the data of specific companies based on their industry knowledge and the manner in which the information was presented. For

example, ████████████████████████████████████████████

████████████████████████████████████████

28.     Agri Stats senior executives were ██████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

29.     Throughout their entire conspiracy, Defendants relied on Agri Stats/EMI as a

crucial mechanism to effectuate and ensure the stability of their price fixing agreement. Notably

██████████████████████████████████████████████████████

███████████████████████████████████

30.     In 2014, Defendants, led by ███████████████████████████

█████████████████████████████████████████████████████

Defendants proclaimed that the ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

31.     Defendants developed ████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

32.     Apart from Defendants' usage of Agri Stats, numerous additional "plus factors" exist in the turkey industry during the class period that support the plausibility of Plaintiffs' allegations of a *per se* agreement between Defendants to restrain supply and fix prices.

33.     *First*, numerous Defendants and their Co-Conspirators belonged to ████████

████████████████████████████████████████████████████

████████████████ *Second*, █████████████████████████████████

████████████████████████████████ *Third*, the turkey industry provided, and continues to provide, numerous and repeated opportunities (*e.g.*, trade association meetings) for competitors to develop relationships with each other. *Fourth*, the turkey industry has multiple industry characteristics which facilitate collusion, such as a high level of vertical integration, high turkey industry consolidation and concentration, barriers to entry preventing competitors from coming into the market, inelastic demand for turkey, and homogeneity of

- 15 -

turkey as a product. [5] *Fifth*, Defendants had a motive to conspire to enter into the agreement to restrain supply and fix prices of turkey because  *Sixth*, Defendants engaged in

*Seventh*, Defendants, as documented in detail below,

In total, these recognized plus factors add plausibility to Plaintiffs' allegations of a *per se* agreement between Defendants.

## C. Defendants' actions are also unlawful under a rule of reason analysis.

34.     Defendants' agreement to exchange information through Agri Stats is, also, by itself, anticompetitive under a rule of reason analysis.

35.     The United States Supreme Court has long recognized that "[e]xchanges of current price information, of course, have the greatest potential for generating anticompetitive effects."[6] Agri Stats produced many reports for their customers, but their sales reports in particular prove the truth of the Supreme Court's maxim. Agri Stats prepared monthly reports for Defendants regarding their sales of turkey that identified, on a specific product by product level, the prices and returns that each Defendant was obtaining on its sales of turkey. These sales reports, unavailable to anybody besides Agri Stats subscribers, allowed the Defendant Integrators to

---

[5] Turkey is homogenous within cut type, *i.e.*, a ground turkey from Tyson and Cargill are virtually indistinguishable.

[6] *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).

██████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

36.     Each Defendant participated in the agreement to exchange information through Agri Stats. The information exchange administered by Agri Stats is exactly the type of information exchange that the Supreme Court has recognized is likely to have anticompetitive effects under a rule of reason analysis. *First*, the data is current and forward-looking – which courts consistently hold has "the greatest potential for generating anticompetitive effects."[7] *Second*, information contained in Agri Stats reports is specific to the turkey producers, including information on profits, prices, costs and production levels. *Third*, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the Defendant Integrators to pay hefty fees over the Class Period – far in excess of any other pricing and production indices – and to agree to volunteer their own data. "Public dissemination is a primary way for data exchange to realize its procompetitive potential."[8] Agri Stats ensured that its detailed, sensitive business information was available only to Defendants and their Co-Conspirators and not to any buyers in the market. For example, buyers in the market could not use Agri Stats data to negotiate lower prices; instead, only Defendants could use it as a way to identify opportunities to raise their prices.

37.     Indeed, Agri Stats specifically marketed itself to potential participants as a ████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[7] *Id.*

[8] *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001).

38.     Defendants routinely used the information contained in the Agri Stats sales reports to ███████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

39.     Agri Stats understood that Defendants used Agri Stats to ██████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

- 18 -

**D. Defendants' conspiracy was successful and caused anticompetitive effects in the form of restrained supply and supracompetitive prices**

40.     Throughout the conspiracy period, as a result of their anticompetitive conduct, Defendants collectively exercised extraordinary and unprecedented restraint in keeping the growth of turkey supply in check, causing turkey prices to rise. Defendants' anticompetitive restraint over their production is shown in the following chart that shows consistent, marked reductions in total heads slaughtered during the conspiracy period as compared to the prior period. With the **highest** total heads slaughtered in the conspiracy period (2012), roughly equal to the **lowest** total heads slaughtered in the pre-conspiracy period (2005).

**Figure 1: Total Heads Slaughtered from 2000–2018**



41.     In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should correspond to falling prices. However, in the turkey market during the conspiracy period, production, measured through United States Department of Agriculture (USDA) data, remained

- 19 -

artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly.

42.     Figure 2 below shows that prior to the class period, production levels followed changes in prices, a sign of supply keeping up with demand. This changed when the production cuts of 2009 to 2010 pushed prices up to new levels. After 2010, production levels remained constant, but prices were structurally higher. In contrast to the earlier period, production levels did not rise to meet these new prices. These observed price and output dynamics, shown in the below analyses, indicate that it was not falling demand that caused a decline in supply during the conspiracy period. Indeed, rising prices instead simply caused per capita expenditures to rise. But then, contrary to what would be predicted in a competitive market, per capita expenditures remained elevated because supply did not increase in response to the rising prices:

**Figure 2: Indexed Per Capita Expenditure v. Production (1999–2016)**

43.  Similarly, Figure 3 below shows a dramatic increase in the price of turkeys for the period 2011 through 2018:

**Figure 3: Average Yearly Wholesale Turkey Prices: Hens (2000–2019)**



44.  Defendants' conduct had anticompetitive effects on the market. Prior to the conspiracy, turkey prices closely tracked the underlying cost of feed, which is the primary input cost in the production of turkey. Beginning in 2009-2010, prices of turkey spiked to an unprecedented level. Remarkably, as demonstrated in the analysis performed by Plaintiffs' experts, shown in the below chart, prices of turkey quickly returned to match underlying feed costs after litigation was filed in late 2016 in the broiler industry that centered on the anticompetitive use of Agri Stats. Defendants scrambled to change their behavior after the commencement of the Broilers litigation. Defendant Tyson dismissed their CEO, Donnie Smith, in late 2016, shortly after the first civil lawsuits were filed.

**Figure 4: Regression Showing Relationship between Turkey Hen Prices/Lb. and Feed Prices/Lb. (2000–2019)**



45.     Feed accounts for approximately 60–70% of the cost of raising a turkey. Plaintiffs' experts constructed a regression model, based on the underlying feed cost, that models what the "but for" price of turkey would have been if the historical relationship between feed and turkey costs had continued during the conspiracy period. The model demonstrates that the anticompetitive information exchange of data regarding turkey production through Agri Stats caused anticompetitive effects in the market for turkey.

46.     To demonstrate the anticompetitive effects of Defendants' and their Co-Conspirators' conduct on the market for turkey, Plaintiffs' experts have done a regression model based on the relationship between the price of turkey hens and the price of turkey feed, which is the primary input cost for turkeys. The formula of the regression is the following:

$(HenPrice)=\alpha+\beta(FeedPrice)t+\varepsilon t$. As shown below, the regression shows a significant elevation in the prices of turkey during the conspiracy period:

**Figure 5: Regression Model Showing Relationship Between Price of Turkey Hens and Price of Turkey Feed**



47.     Defendants' anticompetitive conduct had the intended purpose and effect of increasing Turkey prices to Plaintiffs and the Class. Defendants knew and intended that their collusive conduct would artificially increase Turkey prices above the level they would have been absent the conduct alleged herein.

48.     As a result of Defendants' unlawful conduct, Plaintiffs and the Class were injured because they paid artificially inflated prices for turkey during the Class Period as a result of Defendants' anticompetitive conduct. Such prices exceeded the amount they would have paid if the price for turkey had been determined by a competitive market.

49.     Plaintiffs bring this complaint, alleging violations under both the rule of reason and *per se* standards for violations of federal antitrust law.

### III. JURISDICTION AND VENUE

50. Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure compensatory damages and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs seek to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct in restricting the supply of turkey and increasing the price of turkey. Plaintiffs seek damages in excess of $5,000,000. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

51. Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because Hillshire Brands are headquartered in the District, and one or more Defendants transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

52. This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of turkey throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

53. The activities of the Defendants and their Co-Conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

## IV. PARTIES

### A. Plaintiffs

54. Plaintiff John Gross and Company, Inc. (John Gross) is a full line food distributor located in Mechanicsburg, Pennsylvania. Founded in 1950, the company has been owned and operated by the Gross family for four generations. John Gross is a Pennsylvania corporation with its principal place of business in Mechanicsburg, Pennsylvania, and purchased turkey directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

55. Plaintiff Maplevale Farms, Inc. ("Maplevale") is a family-owned, broadline food service company located in Falconer, New York. The company was founded in 1951 and serves customers in Western New York, Northwestern Pennsylvania, and Eastern Ohio. Maplevale is a New York corporation with its principal place of business in Falconer, New York and purchased turkey directly from one or more of the Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

### B. Defendants

56. Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana. Throughout the Class Period, Agri Stats acted as a Co-Conspirator of the Defendant Integrators by facilitating the exchange of confidential, proprietary, and competitively sensitive data among Defendants and their Co-Conspirators.

57. Butterball, LLC is a privately held North Carolina corporation headquartered in Garner, North Carolina and engaged in the production of meat and food products, and the

marketing of these products. During the Class Period, Butterball and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

58.     Cargill, Inc. is a privately held Delaware corporation headquartered in Minnetonka, Minnesota. During the Class Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

59.     Cargill Protein – North America f/k/a Cargill Meat Solutions Corporation is a Delaware corporation headquartered in Wichita, Kansas that operates as a subsidiary of Cargill, Incorporated. During the Class Period, Cargill Meat Solutions and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

60.     Defendants Cargill, Inc. and Cargill Protein – North America f/k/a Cargill Meat Solutions are collectively referred to as "Cargill."

61.     Cooper Farms, Inc. is a privately held Ohio corporation headquartered in Oakwood, Ohio and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Cooper Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

62.     Farbest Foods, Inc. is a privately held Indiana corporation headquartered in Jasper, Indiana and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Farbest and/or its predecessors, wholly owned or

- 26 -

controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

63.     Foster Farms LLC is a privately held California corporation headquartered in Modesto, California. During the Class Period, Foster Farms LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

64.     Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms LLC. During the Class Period, Foster Poultry Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of turkey, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

65.     Defendants Foster Farms LLC and Foster Poultry Farms are collectively referred to as "Foster Farms."

66.     Hormel Foods Corporation is a Delaware corporation headquartered in Austin, Minnesota and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

67.     Jennie-O Turkey Store, Inc. ("Jennie-O") is a Minnesota corporation headquartered in Austin, Minnesota. Jennie-O Turkey Store, Inc. is a related entity of Hormel Foods Corporation. During the Class Period, Jennie-O Turkey Store, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution,

sale, pricing, and/or marketing of turkey, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

68.     Defendants Hormel Foods Corporation and Jennie-O Turkey Store, Inc. are collectively referred to as "Hormel."

69.     House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

70.     Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland. During the Class Period, Perdue Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

71.     Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

72.     Defendants Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to as "Perdue."

73.     Prestage Farms, Inc. is a North Carolina corporation headquartered in Clinton, North Carolina and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Prestage Farms and/or its predecessors, wholly owned

- 28 -

or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

74.     Prestage Foods, Inc. is a North Carolina corporation headquartered in St. Paul, North Carolina and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Prestage Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

75.     Prestage Farms of South Carolina, LLC is a South Carolina corporation headquartered in Camden, South Carolina and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Prestage Farms of South Carolina, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

76.     Defendants Prestage Farms, Inc., Prestage Foods, Inc., Prestage Farms of South Carolina, LLC are collectively referred to as "Prestage."

77.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. It wholly owns and controls two subsidiaries, Tyson Prepared Foods, Inc. and Tyson Fresh Meats Inc. that slaughter and sell turkey products. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

78.     Tyson Fresh Meats Inc. is a Delaware corporation headquartered in Dakota Dunes, South Dakota and that operates as a subsidiary of Tyson Foods, Inc. During the Class

Period, Tyson Fresh Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

79.     Tyson Prepared Foods, Inc. is a Delaware corporation headquartered in York, Nebraska that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

80.     The Hillshire Brands Company ("Hillshire Brands") is a Maryland corporation headquartered in Chicago, Illinois. Hillshire Brands operates as a subsidiary of Tyson Foods that sells turkey products. During the Class Period, Hillshire Brands and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

81.     Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc., and Hillshire Brands are collectively referred to as "Tyson."

C.     **Co-Conspirators**

82.     Co-Conspirator Dakota Provisions, LLC d/b/a Dakota Provisions (Dakota Provisions) is a South Dakota corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Dakota Provisions and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

83.     Co-Conspirator Kraft (comprised of Kraft Heinz Foods Company and Kraft Foods Group) is engaged in the production of meat and food products, and the marketing of these

products. Kraft Heinz Foods Company (Kraft Heinz), is an Illinois corporation with headquarters in Pittsburgh, Pennsylvania, and Chicago, Illinois, and Kraft Foods Group Brands LLC is an Illinois corporation. During the Class Period, Kraft and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

84.    Co-Conspirator Michigan Turkey Producers LLC d/b/a Michigan Turkey Producers Co-op (Michigan Turkey) is a Michigan corporation headquartered in Grand Rapids, Michigan, and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Michigan Turkey and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

85.    Co-Conspirator Norbest LLC (Norbest) is a Utah corporation headquartered in Moroni, Utah, and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Norbest and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Norbest is a related entity to Pitman Family Farms, a California corporation, engaged in the production of meat and food products, and the marketing of these products. Norbest was formerly known as Moroni Feed Company and Norbest Inc.

86.    Co-Conspirator West Liberty Foods LLC (West Liberty) is an Iowa corporation headquartered in West Liberty, Iowa, and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, West Liberty and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate

commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

## V.    FACTUAL ALLEGATIONS

**A.    Agri Stats lies at the center of an extensive conspiracy between Defendants.**

87.    Agri Stats is a company that provides closely guarded, non-public, subscription services to a variety of agricultural industries, including the pork, chicken, and turkey industries. Agri Stats' mission is to improve the profitability of participant companies through the provision of detailed and sensitive data gathered from competitors. Agri Stats presents itself as "kind of a quiet company" with a minimal public presence, but the company has silently and intentionally orchestrated a profound and anticompetitive impact on the supply and price of meat in this country.

88.    Agri Stats owns a number of subsidiaries, including Express Markets, Inc., that provide benchmarking services to the agricultural industries:



89.     As described previously, Agri Stats collects detailed data on almost every conceivable operating metric from its subscribers operating in the turkey industry. Agri Stats takes this data, standardizes it across Defendants and Co-Conspirators, and then creates detailed reports comparing the subscribers on key operating metrics. On a monthly basis, Agri Stats produces these detailed comparative data reports to its subscribers in the turkey industry using numeric codes for each subscriber in a purported attempt to keep the data anonymous. However, turkey industry subscribers can and do reverse engineer these reports with ease to identify their competitors.

90.     Agri Stats prepared monthly reports for Defendants regarding their sales of turkey that identified, on a specific product by product level, the prices, and returns that each Defendant was obtaining on their sales of turkey. These reports, unavailable to anybody besides Agri Stats subscribers, allowed the Defendant Integrators to easily identify potential opportunities where their prices for turkey products were significantly lower than their competitors.

91.     The information gathered by Agri Stats was not publicly available, or even available to industry participants equally. Agri Stats would **only** grant access to similarly situated companies that themselves share data with Agri Stats. That is, you had to be a Turkey integrator able to **produce** competitively sensitive information, to be able to **receive** the information. Agri Stats also does not provide data to USDA. This information asymmetry ensures that data from Agri Stats is only available to one side of the market – the Defendant Integrators. The other side of the market, purchasers of turkey, is not allowed to access the Agri Stats data, and thus cannot use Agri Stats data to negotiate lower prices. Thus, Agri Stats reports function as a one-way ratchet that can be used for anticompetitive purposes by Defendants but not for procompetitive purposes by purchasers.

010737-11/1749929 V4

92.     In the turkey industry, all else being equal, there is an inverse relationship between supply and price of turkey. Accordingly, the type of information available in these reports is not the type of information that competitors would provide each other in a normal, competitive market. In a competitive market, each competitor would act independently, making supply decisions unilaterally and pricing its goods to market. Indeed, in a competitive market, a commodity producer with a cost advantage would not share information with competitors that would allow them to achieve the same cost of manufacture. If a Turkey Integrator knew both it and its competitors have low supply, and/or knew that its competitors would not lower prices to attempt to gain market share, the normal competitive incentive to lower prices to better compete in the market is chilled, although customers remain unaware of this, by removing competitive uncertainty.

93.     In each situation, the anticompetitive effects are only amplified by the fact that customers do not have the confidential information exchanged among the Defendants, nor are they even aware of the fact that Defendants are exchanging that confidential information, putting them at a severe asymmetrical information disadvantage with respect to the pricing of turkey meat.

94.     The information exchange by the Defendant Integrators through Agri Stats is exactly the type of information exchange that the Supreme Court has recognized is likely to have anticompetitive effects under a rule of reason analysis. *First*, the data is current and forward-looking—which courts consistently hold has "the greatest potential for generating anticompetitive effects."[9] *Second*, information contained in Agri Stats reports is specific to the turkey producers, including information on profits, prices, costs, and production levels. *Third*,

---

[9] *U.S. Gypsum Co.*, 438 U.S. at 441 n.16.

none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the Defendant Integrators to pay hefty fees over the Class Period – far in excess of any other pricing and production indices – and to agree to volunteer their own data. Agri Stats ensured that its detailed, sensitive business information was available only to Defendants and their Co-Conspirators and not to any buyers in the market. Thus, for example, buyers on the market could not use Agri Stats data in Agri Stats sales reports to negotiate lower prices; instead, only Defendants could use it to identify opportunities to raise their prices. Indeed, Agri Stats specifically marketed itself to potential participants as a way that they could "improve profitability" rather than engage in competition through production increases. Agri Stats was good to its word; its sales reports specifically identified opportunities for Defendants where Defendants' products were lower than that of the industry average and where Defendants could consequently raise prices to meet that of their competitors.

95.     Furthermore, the exchange of information through Agri Stats at issue in this case is of a type and frequency that acts as a plus factor supporting an inference of a *per se* price-fixing agreement among Defendants.  As Justice Sotomayor held while serving on the Second Circuit, "[i]nformation exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement."[10]  This agreement had the intended purpose and effect of increasing turkey prices to Plaintiffs and the Class.

**1.     Agri Stats Reports and Subscriptions by Defendants and their Co-Conspirators.**

96.     Defendants' agreement was formed at least as early as 2008. Michael "Blair" Snyder, a senior executive at Agri Stats, publicly touted in 2009 that "about 95% of the turkey

---

[10] *Todd*, 275 F.3d at 198–99 (noting that information exchanges can both be evidence of a *per se* unlawful price fixing cartel and separately unlawful in and of themselves).

industry [is] participating" in Agri Stats, and that for "turkey participants, pretty much it's a list of who's who in the turkey business."

97. A 2010 presentation slide lists each of the Defendants and their Co-Conspirators by name: Defendants Butterball, Cargill, Cooper Farms, Farbest, Foster Farms, Hormel (listed as Jennie-O Turkey Store, the brand name for Hormel's turkey operations), Tyson (listed as Hillshire Brands), House of Raeford, Prestage Farms, and Perdue Farms, and Co-Conspirators Dakota Provisions and West Liberty Foods are all participants in Agri Stats' reports on turkey.



98. Participants in this scheme received monthly detailed reports and graphs that allow them to compare their performance, sales prices, and costs to other participants.

99. Agri Stats reports identified potential opportunities for its subscribers to raise prices for turkey products where their prices were lower than their competitors.

- 36 -

100. Agri Stats issues ███████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████





101.    Agri Stats also offered to provide "███████████████████████

████████████████████████████████████

102.    EMI (a subsidiary of Agri Stats) provided ████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████

     **a.**    ***Examples of Agri Stats Reports.***

103.    Some of the main offerings ██████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████



010737-11/1749929 V4



105.    Agri Stats also provided the same information for ████████████████

██████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

106.    Both the USDA and Urner Barry also provide some publicly available sales data.

However, the data that Agri Stats provides in its sales reports is ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

and "███████████████████████████████████████"

         █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

"████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ An example from 2014 is below:

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

010737-11/1749929 V4



010737-11/1749929 V4



110.    These reports were particularly helpful at indicating ████████████████████ ████████████████████████████████████████████████████████████████████████████No other reporting service, other than Agri Stats/EMI, provided the level of detail or content needed

- 44 -

to show the industry's production intentions. While the USDA provides reporting on some of the same metrics as Agri Stats does (though without the same level of detail nor as close-in-time), USDA does not report at all on ███████████████████████████ Agri Stats explained that ████████████████████████████████████████████ ████████████████████████████ Another benchmarking service, Urner Barry, provided reports on weekly turkey hatches, eggs set, poults placed, and poults destroyed. However, it did not ████████████████████████████████████ ███████████████████████████████████████████ Simply put, the data Agri Stats provided was ████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████ ████████████ Each of these metrics provide confidential information on participants' supply and capacity.

010737-11/1749929 V4



111.    Although Agri Stats has stated that "



112.    Additionally, Agri Stats'



010737-11/1749929 V4



114.    Each Agri Stats report listed ██████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████



**b.** ***Defendants subscribed to Agri Stats/EMI reports throughout the class period.***

115. Butterball states ██████████████████████████

████████████████████. Agri Stats' fee records show that ███████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

116.    Agri Stats' fee records show that ███████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████

117.    ████████████████████████████████████
███████████████████████████████████████ Agri Stats' fee records
show that ███████████████████████████████████████
█████████████████████████████████ They subscribed to the
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████

118.    ████████████████████████████████████
████████████████ Agri Stats' fee records show that ████████████████
████████████████████████████████████████████████
███████████████████████████████ They continued these subscriptions until at
least ████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

119. ████████████████████████████████████████████████

████████████████████████ Agri Stats' fee records show that █

███████████████████████████████████████████████████████

██████████████████████ They continued receiving the ███████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████

120. From January 1, 2008 through December 31, 2017, ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████

121. ██████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████ As early as August 2008, ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

- 51 -

████████████████████████████████████████████████████

████████████

122. ████████████████████████████████████████ Agri Stats'

fee records show that ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

123. Agri Stats' fee records show that ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

124. Agri Stats' fee records show that ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

### c. The Co-Conspirators also participated in Agri Stats/EMI.

125. Agri Stats' fee records show that █████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

126. Agri Stats' fee records show that █████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████

127. Agri Stats' fee records show that █████████████████████████
████████████████████████████████████████████████████
██████████████████

128. Agri Stats' fee records show that █████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████

129. Agri Stats' fee records show that █████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████

2.     **Defendants relied on Agri Stats reports for every critical part of their operations.**

130.     Industry participants relied on Agri Stats reports in nearly every facet of their business operations and strategy.

131.     For example, in January 2014, ███████████████████████████
███████████████████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

███████████████████████████████████████

a.     **Defendants Relied on Agri Stats Reports in Setting Prices and Identifying Opportunities to Raise Prices.**

132.     Defendants routinely and regularly used the Agri Stats sales reports to identify price-raising opportunities.

133.     Confidential Witness 1 (CW1) is a former sales executive at Butterball involved in the pricing of turkeys. CW1 was employed at Butterball during the entire Class Period. According to CW1, Agri Stats identified each participant in each report and ranked the integrator Defendants in their reports based on the returns (*i.e.*, prices) that the integrator Defendants received.

134.     As documented in preceding allegations, CW1's allegations are confirmed by the reports themselves. CW1 further stated that Butterball relied on the monthly reports issued by Agri Stats: "The company used the information to evaluate — by item, item group, price, distribution — where we stood against other turkey companies." CW1 stated that he and other

sales personnel looked at Agri Stats data to see how Butterball ranked against peers in the turkey industry. CW1 stated that he personally looked at the Agri Stats data to assess costs and returns. CW1 stated that costs were an important factor in determining how Butterball set its prices. Butterball's internal documents clearly show the importance of Agri Stats to Butterball.

135.    For example, a 2015 message from 

136.    Butterball regularly used data from Agri Stats to reduce supply and raise prices. For example, in August 2017, Butterball is shown again looking to Agri Stats data for

137.    Similarly, in 2010,

138.    Butterball executives regularly met and reviewed Agri Stats data for price raising opportunities. For example, in March 2011,

139.     At those meetings, █████████████████████████████████

140.     In a draft presentation for Butterball's ████████████████



141.    That same presentation also details ████████████████████
███████████████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████

142.    Cargill used Agri Stats to ████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

- 57 -

█████████" Cargill also used Agri Stats as a ██████████████████████████

██████████

143.    Cargill also used Agri Stats to ████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████" She also wrote "████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

144.    Cargill also uses its knowledge of ████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

145.    Cargill approached identifying ██████████████████████████████

████████████████████



146.     Confidential Witness 2 (CW2) is a former accountant at Cooper Farms. CW2
stated that Cooper Farms received monthly reports from Agri Stats. CW2 stated that Cooper
Farms submitted cost information to Agri Stats every month. CW2 explained that Agri Stats
reports grouped data into various types of turkey products, including deli meat and smoked meat.
As described above, this has been confirmed by the reports produced by Agri Stats.

147.     CW2 stated that the advice from Agri Stats helped Cooper Farms improve its
returns per pound. Documents confirm that Cooper Farms used Agri Stats reports to maintain
high profit margins. In May 2011, ■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

- 59 -

███████ In another email from the same month, ████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████

148.    As with the other Turkey Processors, Farbest also reviewed Agri Stats reports to

██████████████████████ One example occurred in June 2010 ███████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████

149.    Agri Stats also directly wrote to Farbest in order to identify ███████████

████████████████████ In October 2013, ███████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

- 60 -



150.    Foster Farms held regular meetings with Agri Stats regarding the sales reports, and used them to ██████████████████████ In January 2015, ██████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████ Similarly, in January 2017, ███████████

██████████████████████████████████████████████████████

████████████████████████

151.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

- 61 -

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████

152.    Hormel executives followed ████████████ instructions, using Agri Stats to

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████  In a July 2010 email, ██████████████████████

████████████████████████████████████████████

██████████████████████  She reports that for fresh breast, "█████████████████████

█████████████████████████████████████████

████████████████████████████████████████

█████████

153.    There are also examples of Hormel using Agri Stats data as reason, in part, to

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

- 62 -

154.    House of Raeford similarly used Agri Stats to ███████████████████████████

One example of this occurred in 2010, ████████████████████████████████████

155.    A June 2012 ████████████████████████████████████



156.     Prestage also worked with Agri Stats to ███████████████ In

December 2013, ███████████████████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████████

███████████████████████████



157. Agri Stats also provided ████ guidance for Defendants and their Co-Conspirators on a ████████████ **basis.** For example, ██████████████████ ████████████████████████████ Agri Stats provides information about ██████ ████████████████████████████████████████ ██████████████████████ Stacey Edwards of Agri Stats wrote, "████████ ██████████████████████████████████████ ████████████████" In essence, Agri Stats was telling Cargill the ████████████ ██████████████████████████████████ In a competitive market, sellers do not share such information, directly or indirectly, with each other.

158. Agri Stats also continued to ████████████████████████ ████████████████████████ In April 2013, ████████████ ████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

159.    Statements by Agri Stats employees show that they intended for Defendants and

their Co-Conspirators to ██████████████████████████████████████

█████████████████ In a February 2012 email thread where ████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

████████████████████████ In addition, in a June 2015 email thread, ███████████

███████████████████████████████████████████

██████████████████████████████████████

███████████

       **b.    Defendants Relied on Agri Stats Reports to Monitor Production.**

160.    Defendants routinely and regularly used the Agri Stats sales reports to ██████

███████████

161. Data in the Agri Stats ████████████████ reports and the EMI Analytics ████████████ allowed Defendants and their Co-Conspirators to ████ ███████████████████████████████████████████████████████████████

162. Butterball monitored ███████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████
████████████████████████████████████████
████████████
█████████████████
████████████████████

In reply, ██████████████████████████████████████████████ ████████████████████████████████

163. Similarly, conversations amongst executives at Cargill show that the data could be directly used to ████████████████████████ An April 2016 email from Cargill's ████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████████████████

164. After a Cargill executive attended ██████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████

165.    Cargill also monitored ████████████████████████████ In

September 2016, ████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

166.    Cargill also used information from Agri Stats to ████████████████████████

████████████████████████████ In a 2017 e-mail, ██████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████

167.    In September 2014, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

168.    In June 2017, ████████ wrote to Agri Stats to ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

169.    Farbest closely monitored ████████████████████████████

████ In January 2014, ████████████████████████████████████████

████████████████████████████████████████████████

This shows Farbest was closely monitoring production through the Agri Stats ████████████

reports.

170.    Hormel also used Agri Stats information ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

171.    Perdue used EMI data when ████████████████████ An August 2011

Perdue ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████

172.    ████████ of Tyson described Agri Stats' work with ████████████████████

███████████████████████████████████████████

████████



     **c.**     **Agri Stats Reports and Metrics Were Tremendously Important to Defendants and their Co-Conspirators.**

173.    Agri Stats was fully incorporated into Defendants' and their Co-Conspirators' business decision-making and Defendants emphasized the importance of using Agri Stats in their business operations.

010737-11/1749929 V4

174. For example, ███████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

175. Cargill prepared an ███████████████████████████████

████████████████████████████



176. Certain Defendants even ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████

     **d.** **Agri Stats Directly Facilitated the Exchange of Sensitive Information Through Meetings and Passing Information Between Defendants and Their Co-Conspirators.**

177. At times, employees of Agri Stats/EMI ████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████ Agri Stats was in a unique position to share information among Defendants and their Co-Conspirators.

178. In July 2013, █████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████ She wrote, "████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████"

179.    Agri Stats also offers ████████████████████████ two to four times a year where they ██████████████████████████████████████████ ████████████████████ Examples of Defendants' participation in such meetings is described below.

180.    According to CW1 (Butterball), Agri Stats gave live presentations to Defendant Integrators to explain to them how to use the reports that Agri Stats prepared on the turkey industry and how to compare themselves against their competitors: during the presentations, Agri Stats said, "if you are number one priced out of 13, that meant the return was so much versus the other companies." Butterball regularly participated in such meetings with Agri Stats. For example, in August 2013 ████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████"

181.    In an email thread describing ██████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████ Such meetings were ████████████████ ████████████████████████████



182.    Agri Stats also would ████████████████████████████ ██████ with Cargill executives.

183.    CW2 (Cooper Farms) stated that Cooper Farms executives met every six months with Agri Stats. The executives were from the Cooper Leadership Management Group, which included top management and executives from Cooper Farms. Documents confirm █████ ████████████████ between Cooper Farms executives and Agri Stats:



184.    CW2 (Cooper Farms) stated that "the upper group received advice" from Agri Stats. Documents confirm that Cooper Farms executives ███████████ with Agri Stats executives

- 74 -

and received ██████████████████████ For example, ██████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████

185.    Farbest also ██████████████████████████████ In September 2015,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

186.    Agri Stats meetings also provided ████████████████████████████

██████████████████████████████████████████████ For example, ██

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████



187.    After that Agri Stats presentation, █████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

188.    ███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

**e.** ***Certain Defendants Tied Compensation and Performance Reviews to their*** ████████████████

189.    Agri Stats was also used ██████████████████████████████
████████████

190.    In 2008, ██████████████████████████████
████████████████████████████████████████████
████████ In 2015, ███████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

191.    Proficiency and knowledge of Agri Stats was used as ████████████████████
████████████████████████████████

010737-11/1749929 V4



192.     In 2016, ███████████████████████████████████

████████████████████████████████████████████████

███████████████████ For example, █████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

193.     Cargill described Agri Stats as a ████████████████████████

██████████

194.    Hormel executives were █████████████████████████████████
███████████████████████████████████

195.    In 2011, ███████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
███████████████████████

### 3. Defendants and Their Co-Conspirators regularly and easily reverse engineered Agri Stats reports.

196.    Agri Stats publicly represents that its services preserve the confidentiality of participating companies; however, the reality is far different.

197.    Although Agri Stats reports are nominally anonymous, Defendant Integrators were often able to de-anonymize the reports to identify the data of specific companies based on their industry knowledge and the manner in which the information was presented. Agri Stats reports are so detailed that a reasonably informed Defendant can discern the identity of competitors' data due to the specific type of products each is known to produce or based on knowing the identity of Defendants' individual complexes.

198.    For each of its reports, Agri Stats identified the list of participants who were contributing data or information to the reports. The small number of individual companies providing data in a particular category or region revealed the identity of each participant. CW1 (Butterball) confirmed that the reports Agri Stats prepared for the Defendant Integrators identified the participants that provided data for each report, which allowed Defendants to understand which of their competitors were participating for each report. CW2 confirmed that the Agri Stats reports identified each of the turkey production facilities that were participating in the reports.

- 79 -

199.     Based on documents produced to date in this case, it is also now clear that Defendants were readily able to determine the identity of competitors and connect that to the detailed information supplied by Agri Stats.

200.     Due to the ability to reverse engineer Agri Stats reports, Defendants and their Co-Conspirators were able to benchmark their performance against specific competitors. In July 2011, ████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

201.     While each subscribing company receives a report that █████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

202.     One such executive was █████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

203.    For instance,



204.    Agri Stats assumed that "██████████████████████████████████
██████████████████████████ CW2 (Cooper Farms) stated that he could

determine the identity of companies for Cooper Farms in Agri Stats reports because "you could

usually figure out who was who because they have a certain cooked meat, or if they were

browning and running it through an oven." CW2 further stated that "we could sit there and

discuss it, because a lot of us knew what the other plants in the big areas, what they did." For

example, CW2 stated that one competitor company had five separate facilities included in the

Agri Stats reports, and that therefore, it was easy to determine the identity of that company.

205.    CW2's accounts of Cooper Farms' deanonymization are confirmed by documents.

For example, in July 2017, ████████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

010737-11/1749929 V4

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████

█████████

206.    Confidential Witness 3 (CW3), a former employee of Cargill during the conspiracy period, stated that Cargill received monthly reports from Agri Stats on turkey. The documents produced to date confirm that Cargill received Agri Stats reports.

207.    In a February 2012 presentation to ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ Moreover, the source of such information had been clearly labelled, ████████████████████████████████████████ which indicates this was a common and unremarkable happening:

- 83 -



208.    CW3 (Cargill) stated that the monthly Agri Stats turkey reports went directly to

Cargill finance executives. Cargill documents describe ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

- 84 -

209.    Examples of Cargill's reverse engineering work are included below:







210.    Hormel also ███████████████    For example, ██████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████

211.    Defendants were aware that ████████████████████████
████████████████████████████████████████████████    For example, on
████████████████████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████    Indeed, Butterball

did know, because ███████████████████████████████████████

████████████████████████



212.   ███████████████████████████████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████

213.    At times, Defendants even ████████████████████████████████

████████████████ In a February 2011 email between ████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████ True competitors would have no reason to provide

this type of sensitive business information to each other.

**4.    Agri Stats was aware reports could be reverse engineered and helped facilitate reverse engineering.**

214.    Agri Stats communicated frequently with ████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

215.    Agri Stats was aware that ████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

216.    In January 2009, ████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

- 88 -

217.    Agri Stats was aware that ████████████████████████ ████████ In July and August 2009, ████████████████████████

218.    Naysayers within Agri Stats were overruled. In April 2011, ████████████

███████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

219.    Agri Stats was aware of the overly specific nature of their service. ████████

█████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

220.    Relatedly, in December 2013 Agri Stats raised a concern about ██████████

██████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████

221.    Instead, the confidentiality of the data was preserved only as to the public and those unable to subscribe to Agri Stats. For example, in an email dated ██████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

222.    Even if a subscriber were not able to █████████████████████████

█████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████ In 2017, ███████████████████

█████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

223.    Agri Stats also regularly refined their reporting to ████████████████

███████████████████████████████████████████████

████████ This was in furtherance of the conspiracy as it made it easier for Defendants and

their Co-Conspirators to monitor each other's actions and to help inform long-term pricing

strategies.

224.    ███████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

**B.    █████████████████████ provided a forum for coordination among the
Defendants and their Co-Conspirators.**

225.    ████████████████████ is a national advocate for turkey farmers and

processors; members include growers, processors, hatchers, breeders, distributors, allied

services, and state associations.

226.    Nearly every Defendant Integrator's CEO has representatives on the board of

directors or executive committee of the ████████████████ . High-ranking executives of

Butterball, Hormel, Cargill, Tyson, Farbest, and Perdue currently serve as officers of the board

or on the executive committee. Executives from each Defendant served on the ████████ ████████ Executive Committee at various points during the conspiracy.

227.    For example, CW3 (Cargill) stated that senior Cargill executives attended ████████████████ meetings. Documents confirm that ████████████████████ ████████████████████████████████████████████████████ For example, ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

228.    CW2 (Cooper Farms) also stated that Cooper Farms leadership was involved in the ████████████████. As discussed in more detail below, Gary Cooper served on the ████████████ Executive Committee in 2014. During that time, as discussed in more detail below, ████████████████████████████████████████

229.    Notably, one Agri Stats employee who works for multiple meat industry clients commented upon her first time attending a ████████████████ meeting in 2011, ████

- 92 -

████████████████████████████████████████████████████

███████████

230.    In addition to regular board and executive committee meetings, the ████████ ████████████████ hosts two events throughout the year: the Annual Convention in February and the Leadership Conference in July. The Annual Convention is the largest event for the turkey industry nationwide and offers tremendous networking opportunities.

231.    Apart from board meetings, executive meetings and annual events, the ████████ ████████████████ also had a subgroup called the █████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

232.    Under the direction of █████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████

233.    Upon information and belief, the top-level executives from Defendants discussed

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████

**C.    Defendants conspired to restrain competition in the market for turkey.**

    **1.    Pre-Class Liability Period from 2008-2009:** ████████████████

███████████████████████████████████████████████████████████

234.    In the Pre-Class Liability Period, Defendants and their Co-Conspirators, through

both usage of Agri Stats/EMI and direct communications, ███████████████████

████████████████████████████████████████ In the spring and

summer of 2008, Defendants and their Co-Conspirators began ██████████████████

███████████████████████████████████████████"

    **a.**    ██████████████████████████████

        **In early 2008, Defendants begin to coordinate a series of industry
cutbacks to restrain supply and stabilize prices.**

235.    Feed prices, the primary cost for growing turkeys, began to rise rapidly in late

2006, continued to accelerate in 2007, and spiked in June/July 2008. These feed prices were

driven, in part, from the impact of a new market for corn created by U.S. renewables.

236.    These rising feed prices caused significant increased costs for turkey growers, and

provided them with a motive to conspire to restrain supply and restore profitability.

237.    By June 2008, with feed prices soaring, Defendants began discussing in detail the

potential for industry-wide cutbacks. ███████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

**b.** ████████████████████████████████████████
████████████████████████████

238. In July 2008, ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

239. At the July 2008 National Turkey Federation meeting, the National Turkey Federation Executive Committee decided to ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████

- 95 -

240. As a result of this discussion by the National Turkey Federation Executive Committee, ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

241. On July 10, 2008, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

242. ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

243. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ In 2008, the National Turkey

Federation Steering Committee consisted of ████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

244. On September 2, 2008, ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

245. On September 4, 2008, ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

██████████ In internal correspondence regarding the proposal, ██████████

████████████████████████████████████████████

█████████████████████████████████████

246. On September 9, 2008, ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

- 97 -

247.    On September 11, 2008, ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

248.    In reply, ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

249.    On September 12, 2008, ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

- 98 -

250. On September 16, 2008,

010737-11/1749929 V4

251.     Internal correspondence from Defendants indicates that ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

252.     ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

253.     On October 26, 2008, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

010737-11/1749929 V4



254.    E-mail correspondence from Agri Stats/EMI indicates that ███████

████████████████████████████████████████████████████

████████████████████████████████████████████ [11]

255.    At the meeting, there was significant internal debate about ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

256.    Following the meeting, ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[11] Plaintiffs have not yet been able to identify a copy of this draft of the 2008 Outlook Study in the materials that have been produced by Defendants.

████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

███

257.    On November 5, 2008, ██████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

258.    A version of the ████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

259.    ██████████████████████████████████████████████

█████████████████████████████████████████████████████

- 102 -



260.    The National Turkey Federation ██████████████████

████████████████████████████████████████

████████████████████████████



- 103 -

261.    On November 19, 2008, ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

262.    The Steering Committee ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████

263.    On December 19, 2008, █████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████ attended the conference call. █████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

- 104 -

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████ The committee also agreed that National Turkey Federation "███████████████████

███████████████████████████"

264.    In January 2009, ██████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████



010737-11/1749929 V4

265.    The presentation materials prepared by EMI in ██████████ also included the





266.  ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████

267.  ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████  In internal correspondence,  ████████████

███████████████████████████████████████

████████████████████████████████████████



268.

269.

c. "

270. Following initiation of the ████████████████████████

Defendants and their Co-Conspirators regularly ████████████████████

271. In June 2008, █████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████

272. In August 2008, Cooper Farms executives in internal correspondence confirmed
████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████

273. Defendants and their Co-Conspirators, ████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████████████████████████ For example, in August
2008, █████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████████████████████████████ A few minutes later, ████████████
█████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
███████████████████████████████████████████████

274. That same month, ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████████████████

275. In September 2008, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ In that email, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

276. Throughout the fall of 2008, ███████████████████████████████ In September 2008 ███████████████████████████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

277.    Defendants also █████████████████████████████████

████████████████████████████████████████████

████████ For example, Keith Shoemaker, then CEO of Butterball, publicly stated in November

2008 that the "**the industry will cut 6.5 percent to 7 percent of production, which reached

7.4 billion pounds last year.** But given the amount of turkey meat in storage, it will take until at

least April or May to get all that out of inventory."

278.    Along with Butterball's public statements, Butterball directly discussed ████

████████ with other Defendants. In November 2008, ███████████████████████████

████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████

████████████████████████████████████████████

279.    Defendants also coordinated ███████████████████████████
███████████████  In September 2008, █████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████████

████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████

        **d.**    ████████████████████████████████████████████
████████████████████████████████
████████████

280.    In a January 19, 2009 e-mail, █████████████████████████
████████████████████████████████████████████████████████
████████████████████████  In particular, ████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████

281.     ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

282.     Hormel heard the message loud and clear from ██████████████████

██████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████

283.     At approximately the same time, Cargill changed its conduct and also vigorously

joined the ████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

- 114 -

284.    An internal Cargill e-mail from January 2009 ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████,"

285.    A February 2009 Cargill presentation discussed the ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

286.    Around the same time, Cooper Farms executives also engaged in direct

communications with ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

287.    Defendants and their Co-Conspirators continued to ████████████████

████████████████████████████████████████████████████████████████

- 115 -

288.

e. "

289. Butterball's

---

[12] In 2009, the National Turkey Federation's Executive Committee consisted of

██████████████████████████████████████████

██████████████████████████████████████████

████████████

290.    In May 2009, Hormel's CEO confirmed on an earnings call that Hormel had engaged in increasing production cuts over the past year, stating, "We announced the production cuts last year and that production cut indeed is flowing through the system. We had announced 7 to 8% and then we added a little bit to the cut and so when all is said and done, we ended up in the low double-digit range of actual kind of meat being produced in the plants during the quarter." Hormel's CEO emphasized that the "production cuts going forward will still be in place."

291.    In May 2009, ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

████████████████████████

292.    On June 2, 2009, Hormel emphasized that it was ████████████████

██████████████████████████████████████

██████████████████████████████████████████

████████████

████████████████████████████████████████

293.    In July 2009, a Foster Farms executive wrote to ████████████████

294.    In July 2009, a Cargill ████████████████

295.    ████████████████

296.    To that end, ████████████████

297.    Perdue later prepared presentations describing ████████████████

- 118 -



010737-11/1749929 V4

298.    Butterball confirmed in an █████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████

299.    Additionally, Butterball noted in the "███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

300.    Agri Stats/EMI executives commented on ██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

301.    By November 2009, Defendants were beginning to ██████████████

████████████████████    On November 11, 2009, ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Similarly, Cargill █████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

302.     Despite ██████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

Farbest) ████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████

**2.**     "███████████████████████████████████████████
████████████████████████████████████████

303.     In 2010, Defendants and their Co-Conspirators began to ███████████

████████████████████████████████████████████████████████

304.     In January 2010, an internal Perdue ████████████████████████

████████████████████████████████████████████████



Later that same month,

The following month,

306.    A Perdue internal



307. In May 2010, House of Raeford █████████████████████████

308. By June 2010, supplies for turkey were tight ████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████" He asks ████████████████████
████████████████████████████████████ She responded that "████████
████████████████████████████████ She goes on to tell him that ████████
██████████████████████████

309. In August 2010, █████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████████████

- 123 -

310.    That same month, Hormel stated, "█████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

311.    And Cargill, again in the same month, prepared a presentation ████████

████████████████████████████████████████████



312.    Foster Farms ████████████████████████████████████

██████████████████████████████████



313.    In September 2010, Butterball ███████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ In internal
correspondence, Butterball executives stated ███████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████

314.    In an email from November 27, 2010, ████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████." Defendants' statements
matched their conduct, specifically with regard to ████████████████████████

315.    A "████████████████████ PowerPoint made by Perdue in ████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████" Perdue noted that the ████████████████████████████

316. In April 2011, ██████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████

317. Defendants and their Co-Conspirators represented that the turkey industry has
████████████████████████████████████████████████████████
██████ In May 2011, Cargill wrote that ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████ In September 26, 2011, ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

318. That same month, Hormel stated that the ████████████████████████████
████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

319.     Several months later, in August 2011, Hormel stated that the ████████████

████████████████████████████████████████████████

███████████████████████████████████ This statement is

notable because the chicken industry is currently the subject of multiple civil lawsuits as well as

a DOJ investigation of potential antitrust violations that occurred during the same period of time.

320.     Notably, throughout this period, despite ████████████, Defendants

collectively kept ███████████████████████████████

██████████████████████████████████████████████████

████████████

321.     During this period, Defendants also continued to ██████████████████

████████████████████████████ In January 2010, Farbest

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████

322.     In May 2011, ████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████

323.    High level executives at the Defendants also engaged in ███████████

███████████████████████████████ In October 2011, a ████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████

**3.**     ████████████████████████████████████████████
        ████████████████████████████████████████████████

324.    In early 2012, Defendants and their Co-Conspirators were still ██████████████

███████████████████████████████████ However, Defendants grew concerned

about ██████████████████████████████████████ In a February 2012 e-mail, █████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████" Defendants proceeded to respond with ██████████████████████████

325.    At the 2012 National Turkey Federation Convention in Tampa, ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████"

- 128 -

326.    While negotiating financing with ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████",

327.    In July 2012, ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

328.    Ultimately ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

329.    Defendants began to spread among themselves this message to ████████

████████████    In August 2012, █████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████" That same month, internal Cooper

Farms correspondence reported, ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

330.    Cargill's internal presentations also confirmed ████████████████████

████████████████████████████████████████████████

██████████████████████████████

331.    As cutbacks began, Defendants started to ███████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

332. By September 12, 2012, ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

**4.** ████████████████████████████████████████████

████████████████████████

333. As 2012 drew to a close, Defendants continued to communicate amongst each

other to ████████████████████████████

████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████

335. That exact same month, ████████████████████████████████

████████████████████████████████ In response ██████████████████

████████████████████████████████████████ In additional

e-mail correspondence, Farbest executives reported that ████████████████

████████████████████████████████████████████████████

██████████████████████████

336. By January 2013, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

- 131 -

337.    That same month, " ██████████████████████████████████████
████████████████████████████████████████████████████████

338.    The following month, █████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

339.    In March 2013, Hormel executives internally discussed ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

340.    Several months later, ████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████



341.    On January 31, 2013, an internal Cooper Farms email revealed that ████████ ████████████████████████████ In that email thread, ██████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████"

342.    This prompted █████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████"

343.  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

████████████████

344.  Hormel's own documents from around that time confirm that ██████████

███████████████████████████████████████████

███████████████████████████████████████

345.  After the National Turkey Federation Annual Convention on February 13–16,

notes from ████████████████████████████████████████

████████████████████████████████████████████

████████████



In response to that message, ███████████████████████████████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████,"

346.    On February 27, ███████████████████████████████████████

████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████

347.    The following day, internal emails within Farbest reflected ██████████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████████████

Similarly, internal Hormel documents from March 2013, show that Hormel ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

████████

348.    The wave of ██████████████████████████████████

█████  By March 21, 2013, Perdue was ██████████████████████████

███████████████████████████████████████████████



349.    At the end of March 2013, ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████  Later documents confirm they did so.

350.    In May 2013, public statements by Urner Barry's Vice President Russ Whitman signaled more projected cutbacks by stating "dramatic declines" in turkey production were imminent. "He cited the sharp year-to-date decline in egg sets as being the root of the anticipated contraction in production. So far in 2013, egg sets depict a retreat in year on year figures of 7% and poult placements are declining at an even more severe pace due to the numbers of them being destroyed. Whitman said that by projecting placements forward, we can ascertain that slaughter figures should start to show significant reductions in late June into early July."

010737-11/1749929 V4

351.    Notes from the Cooper Farms ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████"

**5.**    ███████████████████████████████████████

███████████████████████████████████

███████

352.    On May 30, 2013, ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████

353.    In June 2013, Hormel executives confirmed ███████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████" The notes also stated that "████████████████████████

████████████████████" That same month, Cooper Farms executives noted ████████████

██████████████████████████████████████████████

354.    On July 11, 2013, internal Cargill correspondence discussed ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████"

355. The Farbest Board of Directors Meeting Minutes from █████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████████████████████████ ████ ."

356. On July 23, 2013, ███████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ ."

357. In August 2013, Foster Farms was again evaluating whether █████████████████ ████████████████████████████████████████████████████████ █████████████████████ ."

358. Perdue prepared a presentation in August 2013 that █████████████ █████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████ In particular, it specified that "████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ ."

359. Despite rising prices, Hormel █████████████████████████████ ████████████████████████████████████████████████████████



360. The following month, Hormel

" In September 2013,

361. In September 2013, Cargill discussed the

████████████████████████████████████████████

███████████████████████████████████:



362.     Even as they worked to ████████████████████████████ ████████████████████████████████ Cargill, the same month as it planned to ████████████████████████ ████████████████████████████████████ hey ultimately decided ██████████████████ ██████████████████████████████" They emphasized that ██████████████████████████████ ████████████████████████████████████ ███████████████████

363.     That same month, ██████████████████████████ ████████████████████████████████████ ███████████

In the same document, ███████████

████████████████████████████████████████████

364.    Hormel executives subsequently discussed the need to ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

365.    By October 2013, Defendant Integrators were able to see that ███████████

███████████████████████████. In an October 9, 2013 email from ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

366.    That same month, executives at Hormel made ███████████

████████████████████████████████████████████

████████████████████████████████████████████ Another

Hormel executive raised ████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████

367.     Also in October 2013, Cooper Farms executives stated that ███████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

368.     The following month, Cooper Farms internally discussed ███████████████

███████████████████████████ Cooper Farms executives noted the "██████████████

████████████████" and estimated that Cooper Farms was responsible for ███████████

██████████████████████

369.     Thus, by the end of 2013, Defendants and their Co-Conspirators had used

███████████████████████████████████████████████████

███████████████████████████████████████████████████

- 142 -

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████

370.    On December 26, 2013, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

**6.**    ████████████████████████████████████████████
████████████████████████████████████████████

371.    Defendants' coordinated ██████████████████████████████

████████████████████.

372.    In January 2014, ███████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

373.    In January 2014, Cargill (internally) ████████████████████

████████████████████████████████████████████████

████████████████████████████████

374.    By March 24, 2014, these benefits were already measurable. In internal

correspondence from Butterball, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

375. Similarly, on April 23, 2014, ███████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████

376. After this, Hormel reported ████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████



010737-11/1749929 V4

377. In April 2014, █████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

378. In that same month, Cargill prepared a "████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████



New market baselines were established:



379. The following month, an internal presentation by Perdue, ████████████

████████████████████████████████████████████████████





380.    In May 2014, ██████████████████████ attended the Urner Barry ████████████████████████████████████████

████████████████████████████████████████████

██████████████████

381.    That same month, Foster Farms executives ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



382.    In June 2014, Cargill reported internally that "█████████

**7.**    "████████████████████

383.    Defendants worked closely with ████████████████

**a.**    "████████████████████

384.    In 2014, Defendants and their Co-Conspirators were enjoying record high profits, but they weren't satisfied with a one-time bump. So they came up with a longer-term solution in

the form of the ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

385.    They called their initiative "████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████

386.    As Gary Cooper explained in an email to an industry contact, the purpose of the

program was to "██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

███████  In a competitive market, commodity producers would respond individually to

fluctuations in demand such that the amount of turkey supplied would naturally closely track the

amount of turkey demanded. In that world, turkey prices are competitive and fair. Defendants'

proposal subverted this by having producers work together to make sure demand always

outstrips supply. In this world, turkey prices are pushed artificially high because supply always

lags demand.

387.    As part of this initiative, the 2014 ███████████████████ Executive

Committee formed a █████████████████████████████████████

████████████████████████████████████████████



388.   The 2014 ███████████████ Executive Committee consisted of ███

389. The original members of the ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████

390. ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████

391. In a March 16th e-mail, ████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████

392. ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████

- 152 -

393.     On March 27, 2014, the █████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

394.     Prior to the meeting, █████████████████████████████

████████████████████████████     To date, Plaintiffs have not located a copy of

the underlying "███████████████ in Defendants' production. At the subsequent in-person

████████████████████████████████████████████████████████

██████████████████████████████████

- 153 -



395.    Subsequent to the meeting, █████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

396.    As the goals of the ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

397.    On May 28, 2014, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

398.    On June 24, 2014, ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

- 155 -

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████

399.    Among those achievements, the ████████████████████ listed the creation of an online ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████ The report also states that ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████ In other words, ████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

400.    The following slides from an undated ████████████████████████ ███████████████████████████████████████████████████

███████████████



010737-11/1749929 V4

401. On June 25, 2014, ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ correspondence confirms that

the ████████████████ was designed to ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Coopetition indeed.

402. On June 25 and June 26, 2014, the ██████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

403. On June 27, 2014, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

404. A July 2014 ██████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████



405.    On or around October 21, 2014, the ▮▮▮▮▮▮▮▮▮ executive

committee met ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

406.    On October 22, 2014, ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- 160 -

407. ███████████████████████████████████

408.    On March 26, 2015, ████████████████████████

- 161 -

409.    In February 2015, ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████



    b.    **Defendants and their Co-Conspirators** ████████████████
████████████████

410.    At the same time that the ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

- 162 -

411.    Defendants had long encouraged █████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████

412.    Internally, EMI discussed ██████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████

413.    ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████

414.    In February 2013, EMI ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

- 163 -

415.    Throughout 2013, EMI continued to █████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

416.    Contemporaneously, EMI worked specifically to ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

417.    By December 2013, EMI had ███████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████



418.    In January 2014,

010737-11/1749929 V4

419. By March 2014, EMI was █████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

420. In April 2014, Cooper Farms agreed to ██████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████

421. As of July 2014, ██████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████

422.    Throughout its development in 2014, the EMI ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████

423.    Following full launch of the program at the end of 2014, Defendants began ██████

█████████████████████████████████████████████

█████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

8.    "████████████████████████████████████████████

████████████████████████████████████

424.    In November 2014, Perdue celebrated ██████████████████████

████████████████████████████████████████████████████████

425. On December 2, 2014, ███████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

426. Cuts resulting from the ████████████████████████

████████████████████████████████████ In September 2015,

executives at a Hormel ████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

427. In October 2015, documents show Hormel ████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

428.  The result of the ████████████████████████████████
████████████████████ On September 11, 2015, internal Foster Farms
correspondence stated that the ███████████████████████████████

- 169 -

429.    On November 6, 2015, 

430.    On December 17, 2015,

431.    On December 31, 2015,

432.    In the 2016 Cooper Farms'

stated that

433.    EMI reported that "

434.    There was an avian influenza outbreak in 2015. However, the avian influenza
outbreak does not explain the preceding supply reductions in 2013, or the record high price

increases in 2014. Moreover, the avian influenza does not fully explain the supply shortages and record prices in the United States for turkey in 2015 because the avian influenza led to turkey exports during this period being heavily restricted, leaving more supply for the domestic market, as shown by evidence indicating that total per capita U.S. consumption of turkey rose in 2015. In short, the 2015 Avian Flu outbreak, at most, simply exacerbated the supply shortages and record prices that were the purpose and effect of Defendants' conspiracy.

435.    Through the end of the Class Period, Defendants continued to ███████████ ███████████████████████████████████████████████████

**D.     Frequent, regular direct information exchanges regarding supply and pricing communications and social interactions between Defendants support an inference of collusion.**

**1.     Numerous Defendants and their Co-Conspirators belonged to an informal group known as the "███████████████ where they exchanged detailed, current production information and met in-person on an annual basis.**

436.    At the start of the conspiracy period, several Defendants and their Co-Conspirators (Farbest, Cooper Farms, Perdue, Michigan Turkey, and Dakota Provisions) belonged to an informal group of turkey integrators known as the ████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████████████ █████████████████████████████████████████"



437.    For the purported purpose of "█████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████



438.     In 2010, members of the ████████████ worked on updating the

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████

439.     Following internal meetings at Farbest, ████████████████████

████████████████████████████████████████████████████████

440. In August 2010, ███████████████████████████

███████████████████████████████████████████████

███████████████████████



441. In April 2014, ███████████████████████████

███████████████████████████████████████████████



010737-11/1749929 V4

442. At the in-person meeting, the group agreed that ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████

███████████████████████████████████████████████████████████

443. The group also made plans to extend invitations to ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████



444.    At the June 2014 meeting, the group agreed that each would



445.    Defendants and their Co-Conspirators in the ███████ subsequently prepared and circulated amongst themselves ███████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████



446.    Certain ████████ members, such as Cooper Farms, included ███████████ ██████████████████████████████████████████



447.    The ████████████ were subsequently compiled into ████████████ ███████████████████████████████████████



448.    The information shared through the ███████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████

449.    ████████ members also attempted to use ████████████ direct

communications regarding their business operations. A Norbest executive, over e-mail, asked

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████

450.    The ███████████████████████████████████████ In August 2017, the

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

2.    "████████████████████████: **Defendants regularly exchanged competitive pricing information with each other as part of their coordinated conduct.**

451.    Throughout the conspiracy period, Defendants regularly exchanged competitive pricing information with each other. These repeated exchanges of competitive pricing information further support a plausible inference of an agreement among Defendants to restrain supply and stabilize prices.

452.    For example, in January 2012, senior Hormel executive ████████ directly instructed ████████████████████████████████████████ ██████████████████████████████████



████ wrote to ██████:
   "████████████████████████████████████
   ████████████████████████████████████

████ forwards to ██████ writing:
   ████████████████████████████████████
   ████████████████████████████████████

████ replies to ██████:
   "████████████████████████████████████
   ████████████████████████████████████
   ██████████████████████

453.    Hormel continued to ██████████████████████████████ In December 2013, a Hormel executive reported that ████████████████████ ██████████████████████████████████████████████████

454.     Hormel executives specifically discussed ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

455.     In other emails, ███████████████████████████

███████████████████████████████

- 181 -

456. Throughout the conspiracy period, ██████████████████████████

███████████████████████████████████████████████ For example, in

July 2013, █████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████

457. Similarly, Butterball executives ████████████████████████

█████ in September 2012 that ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

458. ████████ frequently instructed █████████████████████████

██████████████████████ For example, in July 2014, ██████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████

459. Phone records produced to date in this litigation also show ██████████████

█████████████████████████████████████████████████████████████

460. Cargill also reported on competitive pricing information ████████████████

██████████ For example, █████████████████████████████████████████████████

461.    Apart from Hormel, Cargill, and Butterball (the 3 Defendants who collectively controlled a majority of the market), other Defendants also specifically worked to ████

462.    The regular communications between Defendants regarding their pricing continued ████████████████ In July 2016, █████████████████████████████

- 183 -

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████

463.     The frequent exchange of pricing information between competitors allowed them to coordinate on price increases. For example, ██████████████████████████ ████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

464.     Similarly, in February 2012, Hormel executives appeared to push price increases following a communication with Cargill, ██████████████████████████████ ███████████████████████████████████████████████████

█████████████████████████████████

465.     These types of information exchanges regarding pricing continued throughout the class period. In February 2014, as Hormel ████████████████████████████ ████████████████████████████████████████████

█████████████████████████████████

466.     Similarly, Cargill prepared ██████████████████████████████████ █████████████████████████████████████████



467.    These numerous direct communications also provided a ███████

010737-11/1749929 V4

███████████████████████████████████

███████████████████████████████████

### 3. Opportunity contacts abounded between Defendants and their Co-Conspirators and allowed them to maintain the conspiracy.

468. Defendant Integrators are members of several turkey-related trade associations and other forums, which they used to facilitate their conspiratorial conduct. Turkey producers have numerous regular events through which they can communicate in person with one another. Regular and frequent attendance by Defendants' CEOs and top-level executives at trade-association meetings is the norm rather than the exception. Each category of opportunity contact is discussed below.

#### a. Numerous Trade Association Events provided ample opportunities to directly meet and collude.

469. Repeated opportunities for contact at trade association meetings are critical for developing the relationships needed to implement a price-fixing conspiracy. For example, in the recent criminal trial *United States v. Penn*, et al. (the U.S. Department of Justice's ongoing trial against ten individuals for criminal price-fixing and bid-rigging of broiler chickens), one of the trial exhibits shows Defendant Jayson Penn on December 6, 2011 texting his colleague Bill Lovette stating "[t]he relationships I developed through the organization [USAPEEC] allowed me to pick up the phone any time and call multiple friends to flush out current and forward pricing from friendly competitors."[13]

470. Defendants are members of many trade associations that have afforded them opportunities to become familiar and comfortable with one another. Defendants plan months in

---

[13] *United States v. Penn, et al.*, No 20-cr-00152-PAB (D. Colo.), Government Exhibit 1.1 (ECF No. 448-2), filed Sept. 7, 2021, at 1.

advance to attend these conventions and to have the opportunity to meet privately for dinners and meetings to discuss the turkey industry. Some of the trade association conferences highly and frequently attended by Defendants include the National Turkey Federation (discussed extensively above), USA Poultry & Egg Export Council, the US Poultry & Egg Association, and the North American Meat Institute.

471.    A group of turkey integrator competitors known as "



472.    Year after year,

(1)    **The United States Poultry & Egg Export Council**

473.    The United States Poultry & Egg Export Council (USAPEEC) has its home office in Stone Mountain, Georgia. Defendants are all members of this council. USAPEEC has a network of international offices and consultants in key export markets. The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world. The council has evolved into an advocate for the industry on trade-policy issues. USAPEEC has about 200 member companies and organizations. The council holds Board of Directors meetings quarterly and includes executives from all or nearly all Defendants.

474.    In April 2014, Steve Lykken (Hormel) and Joel Coleman (Vice President of USAPEEC), organized the USAPEEC turkey subcommittee. The mission of the subcommittee was to establish a coordinated industry effort to pursue open market access and a unified approach to export issues affecting the turkey membership and create a unified approach to

turkey export issues affecting the turkey membership. The group met during all USAPEEC conferences and as otherwise necessary.

475.    Members, otherwise known as stakeholders, that supported the subcommittee included Ryan Downes (Farbest), Kent Puffenbarger (Prestage), Terry Chrismond (Tyson), Kathy Cline (Cooper Farms), Jay Simpson (Perdue), Joel Coleman (Butterball), Steve Lykken (Hormel), Jay Maxwell (Hormel), Rick Schaulis (Cargill), Rick Porter (West Liberty Foods) and Lauren Bartels (Foster Farms).

476.    The subcommittee that was initially organized to establish a coordinated industry effort soon became hesitant to allow other industry members to join as some members wanted to keep the group small and inaccessible to others.

### (2)    U.S. Poultry & Egg Association

477.    The U.S. Poultry & Egg Association (U.S. Poultry) describes itself as the world's largest and most active poultry organization. U.S. Poultry's members include producers and processors of broilers, turkeys, ducks, eggs, and breeding stock, as well as allied companies. Many of the Defendants are members of U.S. Poultry. U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall. Butterball, Cargill, Foster, Tyson, and Perdue have representation on the Board of Directors.

### (3)    North American Meat Institute

478.    The North American Meat Institute (NAMI) represents companies that process 95% of red meat and 70% of turkey products in the United States and their suppliers throughout the country. NAMI hosts the Meat Industry Summit in April each year. Additionally, it holds regular Board of Director meetings. Butterball, Cargill, Hormel, and Tyson have representation on the NAMI Board.

      b.     **A high degree of movement of employees permitted trusted former colleagues to have confidence exchanging pricing and supply information directly with one another.**

479.    On top of attending numerous conferences and meetings together, Defendants have permitted employees to regularly move between companies. Despite changing companies, Defendants have managed to keep their pre-existing ties with former colleagues. Some of these relationships have provided CEOs and other top-level executives with comfort and trust to discuss their specific marketing and sales plans. For example, ██████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████ is just an example of the type of relationships that have afforded CEOs and executives with the opportunity and comfort to share competitively sensitive information about their company's turkey business.

480.    Similarly, Neal Walsh, Perdue's former executive left the company to join Butterball in 2007 as the Director of Purchasing and became the Chief Operating Officer in 2020. Since ending his employment with Perdue, Walsh has managed to ███████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████

481.    Dean Lisenby served as Director of Supply Planning for Perdue, before moving to Butterball in 2008 to serve as Senior Director Supply Chain Planning. Similarly, Butterball's current Senior Vice President of Retail Sales, Chris Peach came from Perdue to Butterball in 2007. While at Perdue, Peach was the Director of Sales for 19 years before joining Butterball as their Vice President of Retail Sales.

- 189 -

482.    Lastly, Rhonda Murphy, House of Raeford's Director of Sales, was once before employed by House of Raeford before leaving to work for Butterball from 2009-2012 as their Corporate Accounts Manager. Ms. Murphy resigned from Butterball in April 2012 and returned to House of Raeford as their Director of Sales. Ms. Murphy has managed to ███████████ ████████████████████████████.

483.    Although the above-mentioned executives no longer work for the same employer, their relationships with former colleagues did not end. The connections shared ensured they remained in touch and allowed for opportunity, time and trust to have conversations where they could share confidentially sensitive information.

c.    **Defendants' frequent and unfettered opening up of their facilities to one another for plant tours and visits permitted extensive opportunities to share information with one another.**

484.    Defendants have found themselves on numerous occasions requesting and permitting visits and tours of their facilities to competitors. Plant tours and visits like many other private interactions have given Defendants the opportunities to gather, discuss and share competitively sensitive information.

485.    Throughout the relevant time period, several ███████████████████████ ████████████████████████████████████████. The relationship between the Defendant competitors has been strengthened throughout the years making it possible for personal conversations to take place.

486.    In October 2008, ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████████

- 190 -

███████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████

487.     During a 2015 visit to Cargill's facility ████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

488.     ████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

489.     These visits and many others have played a pivotal role in helping develop

relationships between Defendant competitors.

> **d.     Other informal events, such as sporting events and private dinners, permitted private and confidential opportunities for Defendants' employees to directly exchange pricing and supply information.**

490.     Defendants have organized and attended numerous sporting events together.

Many have even organized basketball games, golf outings, and private dinners. These events

took place both during formal conferences and some occurred outside that context.

491.     For example, ██████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

492.     Golf tournaments were used extensively for opportunities for senior executives to meet with one another. Examples of annual tournaments where executives met with one another include the ██████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████

493.     Attendees to one or more of the ██████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

494.     Attendees to one or more of ████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████

495.     Attendees to the ████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████

496.    Attendees to the 

497.    Many of the high-ranking executives at Defendants' and their Co-Conspirators'

organizations appeared to be close personal friends and would communicate frequently. On April

12, 2017,

**e.    Collusion Between Defendants in Other, Related Industries Supports
an Inference of Collusion.**

498.    Defendant Agri Stats has played a central role in other protein industries. As

alleged in the *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill.) litigation

and the *In re Pork Antitrust Litigation*, No. 18-cv-1776 (D. Minn.), Agri Stats colluded with

boiler and pork producers respectively to collect and disseminate competitively sensitive

information such as financial information (monthly operating profits, sales, and cost per live

pound), production volumes, capacity, slaughter information, inventory levels, sales data for

finished product form and type.

- 193 -

499. In the broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and Defendants and their Co-Conspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, EMI. Agri Stats collected data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.

500. The detail of these reports ensured that competitors could quickly decode the information of their purported competitors. The *Broiler* complaints allege it was common knowledge among producers that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes. The broiler reports, in part, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

501. In the broiler industry, it is also alleged that Agri Stats – known to its Co-Conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that furthered the purposes

of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the broiler industry facilitated the implementation of the agreement to restrict supply – where Agri Stats would transmit the intentions of the broiler producers to restrict supply.

502. In a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the broiler industry, it was reported:

> "Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows Co-Conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your Co-Conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "*That is what creates stability for a cartel*."

503. The district court noted, in denying the motions to dismiss in the *In re Broiler Chicken Antitrust Litigation* that given the nature of the Agri Stats reports, the Defendants are in fact sharing future anticipated production information with one another, which suggests high antitrust concerns.

504. The DOJ has investigated the broiler chicken industry and announced a grand jury investigation in 2019. Tyson subsequently publicly announced that it was cooperating with the DOJ Investigation. The DOJ subsequently brought criminal charges against employees at certain broiler chicken companies for collusive activities.

**E.     The structure of the turkey industry is conducive to conspiracy.**

**1.     Defendants possess market power in the market for turkey.**

505.     One tool that courts use to assess the competitive effects of concerted action is defining a relevant market—the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). This case concerns the sale of turkey for meat consumption in the United States.

506.     Turkey is the relevant product market and the geographic market is the continental United States. Defendants collectively possess market power in the market for turkey. Defendants and their Co-Conspirators collectively possessed approximately 80 percent of the overall market share for turkeys during the Class Period. There is a single market for turkey for meat consumption. Prices for turkey sold in the United States are quoted generally in disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

**a.     There are high barriers to entry in the market for turkey for meat consumption.**

507.     The existence of high barriers to entry is one factor which makes markets susceptible to collusion. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel. High barriers to entry in the turkey processing market exist, precluding other entrants or would-be competitors from entering the market for turkeys raised for consumption.

508.     During the Class Period and continuing today, substantial barriers impede entry into the turkey market. A new entrant into the market would face costly and lengthy start-up costs, including multimillion-dollar costs associated with research and development, equipment, energy, transportation. Distribution, infrastructure (aka "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, long-standing customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.

509.     The price of construction of a new integrated turkey processing complex is relatively high. For example, the cost for a current market participant, Virginia Poultry Growers Cooperative, to construct a new turkey processing in 2015 was $62 million.

510.     The turkey market has been subject to steadily increasing consolidation over the last several decades. In the 1970s, the turkey market was defined by competition among dozens of companies that worked with independent farmers.[14]  But now, just four corporations—Cargill, Hormel, Butterball, and Farbest—produce more than half of the turkey in the United States.

511.     The turkey market also has high levels of vertical integration that constitute a barrier to entry. The National Turkey Federation states that "turkey companies are vertically integrated, meaning they control or contract for all phases of production."[15]

---

[14] Christopher Leonard, *That Turkey on Your Plate Could Use Some More Industry Competition*, The Washington Post (Nov. 22, 2013), https://www.washingtonpost.com/opinions/that-turkey-on-your-plate-could-use-some-more-industry-competition/2013/11/22/045fc470-5177-11e3-a7f0-b790929232e1_story.html.

[15] *Industry Structure*, National Turkey Federation, https://web.archive.org/web/20190617083253/https://www.eatturkey.org/industry-structure/ (last visited Jan. 7. 2022).

512.    For example, Butterball has over 175 farms that they own, as well as contracts with numerous independent farmers. Hormel owns over 100 commercial growing farms. Cargill owns around 700 farms. Farbest has more than 200 contract growers.

**b.    The Defendants have market power in the market for turkey for meat consumption.**

513.    The Defendant Integrators possess market power in the market for turkey for consumption. Defendants and their Co-Conspirators controlled at least an average of 77% of the market from 2010–2018.

**Figure 6: Average Market Share of Defendants and Their Co-Conspirators (2010–2018)**



### c. The market for turkey is the type of market conducive to collusion.

514. Competition is likely to be harmed when competitors with market power in concentrated markets, such as the market at issue, directly exchange strategic information about current and forward-looking plans for prices and supply. The strategic information exchanged between the Defendants was a competitively sensitive and a material factor in negotiations. Price, capacity, supply and costs are crucial aspects of competition. When Defendants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects of sales of turkey.

515. The information exchange took place in private settings and involved the exchange of confidential, non-public information.

516. The market for turkey is characterized by numerous attributes that mean the type of information exchange facilitated by Agri Stats are particularly likely to have anticompetitive effects. In particular, the market for turkey features relatively few sellers, a fungible product, price-based competition, inelastic demand, and a trend toward price uniformity.

### 2. The market for turkey is the type of market where information exchanges and per se price-fixing behaviors are likely to harm competition.

### a. The turkey market features few sellers.

517. The turkey market is concentrated, with relatively few sellers. The Defendants and their Co-Conspirators control approximately 80 percent of turkey production and processing. The presence of few companies supports the inference that a conspiracy to exchange information had the intended effect of restraining competition.

### b. Turkey is a fungible product.

518. One of the distinct characteristics of the turkey industry is the fungibility of turkey products. Fungibility is also known as the ability to be freely exchangeable or replaceable

- 199 -

in whole or in part. Common sense indicates that at Thanksgiving a consumer can substitute a whole turkey produced by Butterball with a whole turkey produced by Cargill.

519.     Indeed, the Agri Stats reports themselves show that turkey is fungible because they aggregate data across Defendants for particular types of turkey products and allow Defendants to compare detailed information on prices for the same fungible product. CW1 (Butterball) confirmed that the Agri Stats reports were organized by specific item of turkey product. And, as shown above, the Agri Stats reports are broken out by specific types of turkey product.

### c.      The turkey market features price-based competition.

520.     Turkey is a commodity market that faces price-based competition. Turkey is a tangible, commodity product with little or no product differentiation based on the processors. Turkey produced by one Defendant is reasonably interchangeable with that from another Defendant. Defendants ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████ Production cuts—no matter where they originate—will affect the prices (and consequently profitability) of the entire turkey industry. No matter where the cuts originate, all turkey processing firms can expect to benefit.

### d. Demand for turkey is relatively inelastic.

521. Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[16] A PED value between 0 and -1 indicates there is inelastic demand for the good or service – i.e., a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. The USDA has estimated that the average PED estimate for the turkey market is -0.58 – meaning the demand for turkey is inelastic. Indeed, most American consumers eat turkey at Thanksgiving, not pork or chicken, illustrating that there is no substitute for one of the key demand drivers of turkey.

### e. The turkey market features a trend towards price uniformity.

522. Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. For example, whole turkey products are produced on a commercial scale and sold in supermarkets. Whole turkeys are virtually indistinguishable, with similar nutritional values, branding and packaging.

### f. The turkey industry is highly vertically integrated.

523. In the turkey industry, the phrase "vertically integrated" means that the turkey producing company owns or controls each aspect of breeding, hatching, rearing, feeding, basic processing, and selling of turkey. Many vertically integrated turkey producing companies also own further processing plants. The turkey industry is highly vertically integrated, with turkey-

---

[16] *See, e.g.*, Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson, et al., *Price Elasticity of Demand* (Nov. 13, 1997), https://scholar.harvard.edu/files/alada/files/price_elasticity_of_demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, *The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects*, 33 J. Academy Mktg. Science 66-78 (2005), *available at* http://www.math.tau.ac.il/~fibich/Manuscripts/elasticity_JAMS.pdf.

producing companies owning or tightly controlling almost all aspects of production, processing, and marketing turkey.

524.    The graphic below, taken from a Butterball PowerPoint presentation, ████████ ███████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ████████████████████████████████████



**F.      Abnormal pricing during the Class Period demonstrates the anticompetitive effects of the alleged conduct by Defendants and their Co-Conspirators.**

525.    Beginning in 2010, following the coordinated cutbacks described above, the turkey industry showed abnormal price movements, *i.e.*, price increases for whole turkeys that was unexplained by increases in costs. All of these pricing measurements show a significant

break between pricing prior to 2010 and pricing after 2010, supporting the plausibility of anticompetitive effects on the turkey market from the alleged anticompetitive conduct. Plaintiffs have measured the various abnormal pricing movements in a number of ways, including: (i) the average turkey price, (ii) the Defendant Integrators' margin during the Class Period;(iii) the variation between feed and turkey prices before and during the Class Period; and (iv) a regression analysis that models the relationship between turkey prices and feed prices.

**1. The average turkey wholesale price experienced an unprecedented increase beginning in 2009.**

526. According to aggregate prices published by the USDA, the average wholesale price per pound for turkey hens was between $0.55 and $0.85 every year from 2000 to 2009, before steadily increasing to $1.15 by 2016. Following initiation of the *Broilers* litigation, the price of turkey then quickly returned to the price at which it was prior to the conspiracy. The following graph shows the unprecedented increase in turkey prices beginning in 2009, and staying elevated through the end of 2016.

**Figure 7: Average Turkey Wholesale Prices in Cents per lbs., 2000-2018**



**2. Beginning in 2009, Defendants' revenues diverged from their costs.**

527.    Plaintiffs' experts examined the spread between turkey revenue and turkey-related costs (costs of goods sold + operating costs) for Hormel, the only one of the three largest turkey Defendant Integrators with public earnings, as a proxy for measuring the spread between a Defendant's price of wholesale turkey and their turkey costs. This measurement accounts for Defendant-specific operating costs.[17]  This analysis confirms the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the Class Period in 2009.

528.    The following chart shows a break in revenues and costs around the start of the Class Period in 2010 for Hormel's Jennie-O Turkey brand:

_____

[17] Hormel does not make any data publicly available on Jennie-O's costs. Therefore, Plaintiffs have assumed for the purposes of this analysis that Jennie-O's costs are the same proportion to Hormel's overall costs as Jennie-O's revenues are to Hormel's overall revenues.

**Figure 8: Jennie-O's Revenues vs Costs (March 2001 to March 2018)**



529.    The anticompetitive effect of Defendants' information exchange is seen in the dramatic increase in Jennie-O's spread between revenue and costs after the start of the conspiracy period.

**Figure 9: Jennie-O Turkey's spread: Revenue minus Cost 2001-2018**



530.     These analyses of the spread between costs and prices confirm one essential fact –

that rising costs do not explain the increases in price seen during the Class Period.

> **3.     During the conspiracy period, prices rose but production failed to rise to match demand, indicating an anticompetitive restraint on supply in the market for turkey facilitated by the information exchange through Agri Stats and the per se exchange of pricing and supply information between Defendants.**

531.     In a competitive market, production generally matches demand. More demand

will lead to more supply. Conversely, a drop in production caused by falling demand should

correspond to falling prices. However, in the turkey market during the conspiracy period,

production, measured through USDA data, remained artificially restrained even as demand,

captured by higher per capita expenditures on turkey, rose significantly. These observed price

and output dynamics, shown in the below chart, are consistent with an anticompetitive effect on

turkey output facilitated by the information exchange through Agri Stats.

010737-11/1749929 V4

**Figure 10: Indexed Per Capita Expenditure v. Production**



### 4. During the conspiracy period, prices of turkey radically diverged from the costs of underlying feed.

532. Feed is the primary driver of turkey costs, accounting for approximately 60-70% of the overall cost of raising turkeys for sale according to the New York Times.[18] Prior to the conspiracy period, there was a tight relationship between the price of feed and the price of turkey, as would be expected in a competitive commodity market that was pricing its product based on its primary input cost. However, during the conspiracy period, the relationship between the price of feed and the price of turkey diverged dramatically, as would be expected as an anticompetitive effect of the information exchange that allowed the Defendant Integrators to charge more than was justified by their input costs. The divergence is illustrated in the below chart:

---

[18] Paul Sullivan, *In the Labyrinth of Turkey Pricing, a Reason Under Every Giblet*. The New York Times (Nov. 18, 2011), https://www.nytimes.com/2011/11/19/your-money/a-primer-to-calculate-turkey-prices.html.

**Figure 11: Relationship Between Feed and Hen Prices**



5. **A regression model demonstrates the anticompetitive effects on the price of turkey caused by the information exchange conducted through Agri Stats as well as the direct exchange of pricing and supply information.**

533. To demonstrate the anticompetitive effects of Defendants' information exchange on the market for turkey, Plaintiffs' experts have done a regression model based on the relationship between the price of turkey hens and the price of turkey feed, which is the primary input cost for turkeys. The formula of the regression is the following:

$(HenPrice)=\alpha+\beta(FeedPrice)t+\varepsilon t$. As shown below, the regression shows a significant elevation in the prices of turkey during the conspiracy period, showing the effects of the information exchange through Agri Stats:

010737-11/1749929 V4

**Figure 12: Regression Model Showing Price of Hens and Feed (2000–2019)**



534.    Defendants actively concealed the extent of their information exchange and Plaintiffs did not and could not have discovered defendants' anticompetitive conduct.

535.    Plaintiffs and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this complaint. Defendants engaged in a secret information exchange that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was an anticompetitive agreement to exchange information regarding the market for turkey. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiffs and class members.

536.     In 2009, the President of Agri Stats, Blair Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company. There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background, and really our specialty is working directly with companies about their opportunities and so forth.

537.     At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidential[] nature of the information." Further, in response to a request for a report from a feed supplier, Agri Stats' Stacey Edwards declined, stating "we don't share data with those that don't provide data."

538.     Not until recently was the extent of the information exchange conducted through Agri Stats widely known or reported. Only after the filing of a February 7, 2018 Second Consolidated and Amended Complaint by the End User Plaintiff Class in the *In re* Broiler *Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the confidential services that Agri Stats provides to its clients in the broiler industry.

539.     The filing of that amended complaint collectively disclosed the likelihood that the turkey industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

540.     Defendants concealed the extent of their information exchange through Agri Stats. Indeed, to this day, it is not publicly known the number of companies that receive Agri Stats reports regarding turkey. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' turkey prices before these recent events.

- 210 -

## VI.    CLASS ACTION ALLEGATIONS

541.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking compensatory damages and injunctive relief pursuant to federal law on behalf of the members of the following class:

> All persons and entities who directly purchased turkey from Defendants or their Co-Conspirators in the United States during the Class Period. Specifically excluded from this Class are the Defendants and their Co-Conspirators; the officers, directors or employees of any Defendant or Co-Conspirator; any entity in which any Defendant or their Co-Conspirator has a controlling interest; any entity with an interest, controlling or non-controlling, in a Defendant or their Co-Conspirator; any (in whole or in part), affiliate, legal representative, heir or assign of any Defendant or their Co-Conspirator. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any Co-Conspirator identified in this action.

542.    Class Identity: The above-defined class is readily identifiable and is one for which records should exist.

543.    Numerosity: Based on records produced to date, Plaintiffs have identified approximately 2,776 potential unique class members that are geographically dispersed throughout the United States. Due to the nature of the trade and commerce involved, joinder of all class members is impracticable.

544.    Typicality: Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs purchased turkey directly from one or more of the Defendants for personal use, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

545.    Common Questions Predominate: There are questions of law and fact common to the Class, including, but not limited to:

    A.    Whether Defendants and their Co-Conspirators engaged in an information exchange agreement that reduced or suppressed competition in the market for turkey;

    B.    Whether Defendants and their Co-Conspirators engaged in a *per se* violation of the Sherman Act that resulted in higher prices in the market for turkey;

    C.    The identity of the participants of the alleged agreement;

    D.    The duration of the agreement alleged herein and the acts performed by Defendants and their Co-Conspirators in furtherance of the agreement;

    E.    Whether the conduct of Defendants and their Co-Conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and the other members of the Class;

    F.    The effect of Defendants' alleged conspiracy on the prices of turkey sold in the United States during the Class Period; and

    G.    The appropriate class-wide measure of damages.

    H.    These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

546.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class who directly purchased turkey from Defendants and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

010737-11/1749929 V4

547.    <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

548.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

549.    Plaintiffs bring the action on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that directly purchased one or more turkey products that a Defendant or Co-Conspirator produced during the respective class periods.

550.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VII.    ANTITRUST INJURY

551.    Defendants' anticompetitive conduct had the following effects, among others:

A.    Price competition has been restrained or eliminated with respect to turkey;

B.    The prices of turkey have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C.     Direct purchasers of turkey have been deprived of free and open competition; and

D.     Direct purchasers of turkey, including Plaintiffs, paid artificially inflated prices.

552.     Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge paid by the direct purchasers. Thus, the economic harm to Plaintiffs and the class members can be quantified.

553.     The purpose of the conspiratorial conduct of Defendants and their Co-Conspirators was to raise, fix, or maintain the price of turkey and, as a direct and foreseeable result, Plaintiffs and the Class paid supra-competitive prices for turkey during the Class Period.

554.     By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for turkey than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

555.     This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### VIOLATION OF THE SHERMAN ACT
### RULE OF REASON VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION 15 U.S.C. § 1 (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF AND DAMAGES)

556.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

010737-11/1749929 V4

557.     Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2010, and continuing at least until January 1, 2017, the exact dates being unknown to Plaintiffs, Defendants and their Co-Conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

558.     Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

559.     Defendants' anticompetitive acts involved United States domestic commerce and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for turkey throughout the United States.

560.     The relevant product market is turkey and the relevant geographic market is the continental United States.

561.     Defendant Integrators possess market power in the Relevant Market. Defendant Integrators and their Co-Conspirators controlled approximately 80 percent of the Relevant Market. Defendant Integrators' collective market power includes the power to artificially deflate the amount of turkey produced in the United States below competitive levels and to artificially inflate the price Plaintiffs pay for turkey above competitive levels.

562.     Defendants could impose an increase in the price of turkey collectively without causing many consumers to switch their purchases to another product. Turkey constitutes a unique product market.

563.     Defendants view the turkey products as fungible. Turkey products are generally interchangeable, permitting Defendant Integrators to readily to compare and match each other's pricing.

564.     The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public information about current supply, production and pricing plans regarding turkey. The information exchanges specifically included the exchange through Agri Stats of weekly and monthly reports regarding Defendants' turkey operations, including weekly sales data that allowed Defendants to compare their prices with their competitors and raise prices that were lower.

565.     Defendants' regular information exchanges through Agri Stats reflected concerted action between horizontal competitors in the market for turkey.

566.     Each Defendant Integrator furnished competitively sensitive information to other Defendant Integrators with the understanding that it would be reciprocated. Agri Stats enforced this understanding by requiring Defendants to share data in order to receive comparable data.

567.     The agreement to regularly exchange detailed and non-public information about current production, supply, and pricing suppressed competition between the Defendants. Agri Stats specifically identified for Defendants the instances where their pricing was lower than other Defendants and where they could raise their prices to match.

568.     When Defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly, Defendants used the data obtained through Agri Stats to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the turkey market.

This strategic information was a material factor in Defendant Integrators' decisions to inflate the prices that Plaintiffs paid for turkey during the Class Period.

569.     Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

570.     The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Defendants in the market for turkey in the United States and (2) inflating the prices of turkey during the Class Period.

571.     As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supra-competitive prices for turkey.

572.     As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for turkey than they would have paid and will pay in the absence of the conspiracy.

## SECOND CLAIM FOR RELIEF

### *PER SE* VIOLATION OF SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1 (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF AND DAMAGES)

573.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

574.     Defendants and all of their Co-Conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

575.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

576.    At least as early as January 1, 2010, and at least until January 1, 2017, the exact dates being unknown to Plaintiffs, Defendants and all of their Co-Conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for turkey, thereby creating anticompetitive effects.

577.    Defendants engaged in coordinated production cutbacks in 2008 and 2009, raised prices in 2010-2011, engaged in another round of coordinated production cutbacks in 2012 and 2013, and reaped record profits following their second round of cutbacks. Defendants coordinated through repeated direct communications regarding their production cutbacks and he retention of Agri Stats to provide current and forward forecasting, including the National Turkey Federation Outlook study in 2008 and the Turkey Demand Enhancement Team Demand Index in 2014. Numerous plus factors further support the inference of a per se agreement, including 1) direct information exchanges between Defendants regarding current production levels through their participation in the Midwestern Consortium; 2) frequent exchanges between Defendants of competitive pricing information; 3) numerous opportunity contacts through participation in trade associations and other social interactions; 4) a market structure conducive to collusion.

578.    Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for turkey throughout the United States.

579.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for turkey.

- 218 -

580.     As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supra-competitive prices for turkey.

581.     In formulating and carrying out their alleged agreement, understanding and conspiracy, Defendants and all of their Co-Conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

A.     Price competition in the market for turkey has been restrained, suppressed, and/or eliminated in the United States;

B.     Prices for turkey sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their Producer Co-Conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

C.     Plaintiffs and members of the Class who directly purchased turkey from Defendants, their divisions, subsidiaries, and affiliates, and all of their Co-Conspirators have been deprived of the benefits of free and open competition in the purchase of turkey.

582.     Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of turkey on the spot market to be higher than it would be but for Defendants' conduct. Defendants also knew and intended that such an artificial inflation of spot market prices would increase other turkey market prices, including those paid by Plaintiffs and members of the Class.

583.     As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for turkey than they would have paid and will pay in the absence of the conspiracy.

584. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully requests judgment against Defendants as follows:

585. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

A. The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

B. Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable laws, and that joint and several judgments in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

C. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

E.     Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

F.     Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

G.     Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

010737-11/1749929 V4

Dated: January 10, 2022

HAGENS BERMAN SOBOL SHAPIRO LLP

By:    *s/ Steve W. Berman*

    STEVE W. BERMAN
455 North Cityfront Plaza Drive, Suite 2410
Chicago, Illinois 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
steve@hbsslaw.com

Shana E. Scarlett (*pro hac vice*)
Rio S. Pierce (*pro hac vice*)
Abby R. Wolf (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
riop@hbsslaw.com
abbyw@hbsslaw.com

By:    *s/ Brian D. Clark*

    BRIAN D. CLARK (*pro hac vice*)

W. Joseph Bruckner (*pro hac vice*)
Simeon A. Morbey (*pro hac vice*)
Steve E. Serdikoff (*pro hac vice*)
Leona A. Ajavon (*pro hac vice*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
bdclark@locklaw.com
wjbruckner@locklaw.com
samorbey@locklaw.com
seserdikoff@locklaw.com
lajavon@locklaw.com

010737-11/1749929 V4