**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *IN RE TURKEY ANTITRUST LITIGATION* | No. 1:19-cv-08318 |
| This Document Relates To: | **THIRD AMENDED CLASS ACTION COMPLAINT - PUBLIC REDACTED VERSION** |
| COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS ACTION (1:20-cv-02295) | |
| | **DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

**Page**

I.     NATURE OF ACTION ......................................................................................1

II.    JURISDICTION AND VENUE ....................................................................14

III.   PARTIES .......................................................................................................15

     A.     Plaintiffs.............................................................................................15

     B.     Defendants .........................................................................................18

     C.     Co-Conspirators .................................................................................23

IV.   FACTUAL ALLEGATIONS ........................................................................24

     A.     Agri Stats lies at the center of an extensive conspiracy between
           Defendants. .........................................................................................24

           1.     Agri Stats Reports and Subscriptions by Defendants and
                   their Co-Conspirators.......................................................28

                a.     *Examples of Agri Stats Reports.*....................................31

                b.     *Defendants subscribed to Agri Stats/EMI reports throughout the
                      class period.* ..................................................................42

                c.     *The Co-Conspirators also participated in Agri Stats/EMI.* ...........46

           2.     Defendants relied on Agri Stats reports for every critical part
                   of their operations. .......................................................47

                 a.     *Defendants Relied on Agri Stats Reports in Setting Prices and
                      Identifying Opportunities to Raise Prices.*....................................47

                 b.     *Defendants Relied on Agri Stats Reports to Monitor Production*..59

                 c.     *Agri Stats Reports and Metrics Were Tremendously Important to
                      Defendants and their Co-Conspirators.*.........................................63

                 d.     *Agri Stats Directly Facilitated the Exchange of Sensitive
                      Information Through Meetings and Passing Information Between
                      Defendants and Their Co-Conspirators.* .......................................65

                 e.     *Certain Defendants Tied Compensation and Performance Reviews
                      to their Agri Stats' Performance.*..................................................70

i

3.   *Defendants and Their Co-Conspirators regularly and easily reverse engineered Agri Stats reports.* ........................................................72

4.   *Agri Stats was aware reports could be reverse engineered and helped facilitate reverse engineering.* ..................................................81

B.   ███████████████████████ provided a forum for coordination among the Defendants and their Co-Conspirators. ..................................84

C.   Defendants conspired to restrain competition in the market for turkey. ........................................................................................................87

1.   Pre-Class Liability Period from 2008-2009: ███████████ ███████████████████████████████████████████ ......................87

a.   ██████████ *In early 2008, Defendants begin to coordinate a series of industry cutbacks to restrain supply and stabilize prices.* .............87

b.   ███████████████████████████████████████████ ███████████████████████████████████ ..................................88

c.   ███████████████████████████████████████████ ████████████████████████████████████████ .................102

d.   ███████████████████████████████████████████ ██. ......................................................................................106

e.   ███████████████████████████████████████████ ████████████████████. ...............................................109

2.   ███████████████████████████████████████ ███. ..........................................................................................114

3.   ███████████████████████████████████████ ████████████. ..................................................................121



4. ...............124
5. ...............130
6. ...............136
7. ...............142
   a. ...............143
   b. *Defendants and their Co-Conspirators* ...............156
8. ...............162
D. ...............165
1. ...............165
2. ...............174

3.      Opportunity contacts abounded between Defendants and their Co-Conspirators and allowed them to maintain the conspiracy. ...........................................................180

     a.     *Numerous Trade Association Events provided ample opportunities to directly meet and collude.* ........................................180

          (1)     The United States Poultry & Egg Export Council ..........181

          (2)     U.S. Poultry & Egg Association ....................................182

          (3)     North American Meat Institute ......................................182

     b.     ████████████████████████████████████████████████ . ........................................183

     c.     ████████████████████████████████████████████████ . ................184

     d.     ████████████████████████████████████████████████ .185

     e.     *Collusion Between Defendants in Other, Related Industries Supports an Inference of Collusion.* .............................................187

E.     The structure of the turkey industry is conducive to conspiracy. ........................190

     1.     Defendants possess market power in the market for turkey. ...................190

          a.     *There are high barriers to entry in the market for turkey for meat consumption.* ..............................................................190

          b.     *The Defendants have market power in the market for turkey for meat consumption.* ....................................................192

          c.     *The market for turkey is the type of market conducive to collusion.* ....................................................................193

     2.     The market for turkey is the type of market where information exchanges and per se price-fixing behaviors are likely to harm competition. ....................................................193

          a.     *The turkey market features few sellers.* ........................193

          b.     *Turkey is a fungible product.* ........................................193

c.  *The turkey market features price-based competition.* ..................194

d.  *Demand for turkey is relatively inelastic.* ....................................194

e.  *The turkey market features a trend towards price uniformity.* ....195

f.  *The turkey industry is highly vertically integrated.* ....................195

F.  Abnormal pricing during the Class Period demonstrates the anticompetitive effects of the alleged conduct by Defendants and their Co-Conspirators. ............................................................................196

1.  The average turkey wholesale price experienced an unprecedented increase beginning in 2009. ...............................197

2.  Beginning in 2009, Defendants' revenues diverged from their costs. ..........................................................................................197

3.  During the conspiracy period, prices rose but production failed to rise to match demand, indicating an anticompetitive restraint on supply in the market for turkey facilitated by the information exchange through Agri Stats and the per se exchange of pricing and supply information between Defendants. ...............................................................................199

4.  During the conspiracy period, prices of turkey radically diverged from the costs of underlying feed. ............................200

5.  A regression model demonstrates the anticompetitive effects on the price of turkey caused by the information exchange conducted through Agri Stats as well as the direct exchange of pricing and supply information. ..........................................201

V.  DEFENDANTS ACTIVELY CONCEALED THE EXTENT OF THEIR INFORMATION EXCHANGE AND PLAINTIFFS DID NOT AND COULD NOT HAVE DISCOVERED DEFENDANTS' ANTICOMPETITIVE CONDUCT. ..................................................................202

VI.  CLASS ACTION ALLEGATIONS .........................................................204

VII.  ANTITRUST INJURY .............................................................................207

VIII.  CAUSES OF ACTION .............................................................................208

IX.  REQUEST FOR RELIEF .........................................................................281

X.  JURY TRIAL DEMANDED ....................................................................283

Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class consisting of all commercial and institutional indirect purchasers of turkey that purchased turkey other than directly from a defendant or co-conspirator in the United States beginning at least as early as January 1, 2010 through January 1, 2017 (Class Period).[1] Plaintiffs bring this action for damages, injunctive relief, and other relief pursuant to various federal and state antitrust laws and state unfair competition laws and unjust enrichment laws. Plaintiffs demand a trial by jury.[2]

## I.     NATURE OF ACTION

1.     The turkey integrator defendants are the leading suppliers of turkey in an industry with approximately $5 billion in annual commerce. The turkey industry is highly concentrated, with a small number of large producers in the United States controlling supply. Defendants and their co-conspirators collectively control approximately 80 percent of the wholesale turkey market in the United States. The turkey integrator defendants are Butterball LLC (Butterball); Cargill Inc. and Cargill Meat Solutions Corporation, (together and separately, Cargill); Cooper Farms, Inc. (Cooper Farms); Farbest Foods, Inc., (Farbest); Foster Farms LLC and Foster Poultry Farms (together and separately, Foster Farms); Hormel Foods Corporation and Jennie-O Turkey Store, Inc. (together and separately, Hormel); House of Raeford Farms, Inc., (House of Raeford); Prestage Farms, Inc., Prestage Foods, Inc., Prestage Farms of South Carolina, LLC (together and separately, Prestage); Perdue Farms, Inc. and Perdue Foods LLC (together and separately,

---

[1] For purposes of this complaint, turkey includes turkey meat purchased fresh or frozen, and either uncooked or cooked.

[2] Plaintiffs incorporate Plaintiffs' Motion for Leave to File Under Seal and Plaintiffs' Motion for Leave to File Amended Complaints filed concurrently with this pleading in *In Re Turkey Antitrust Litigation*, No. 19-cv-08318, Dkt. Nos. 369, 371 (Jan. 10, 2022).

Perdue); Tyson Foods, Inc., The Hillshire Brands Company, Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. (together and separately, Tyson).

2.      Defendant Agri Stats is a company that provides secretive information exchange services to companies in a variety of agricultural sectors, including pork, chicken, and turkey.

3.      The turkey integrator defendants each entered into an agreement from at least 2010 to January 1, 2017, to exchange sensitive information through Agri Stats regarding their production and sales of turkey.

4.      Agri Stats reports are far different from lawful industry reports. Agri Stats gathers detailed financial and production data from each of the turkey integrators, standardizes this information, and produces customized reports and graphs for the co-conspirators. On a monthly basis, Agri Stats provides the turkey integrators with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information).

5.      The United States Supreme Court has long recognized that "exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects."[3] Agri Stats' sales reports prove the truth of that maxim. Agri Stats prepared monthly reports for defendants regarding their sales of turkey that identified, on a specific product by product level, the prices and returns that each defendant was obtaining on their sales of turkey. These reports, unavailable to anybody besides Agri Stats subscribers, allowed the integrator defendants to easily identify potential opportunities where their prices for turkey products were significantly lower than their competitors.

6.      Turkey is the relevant product market and the geographic market is the continental United States. Defendants collectively possess market power in the market for

---

[3] *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 (1978).

turkey. Defendants and co-conspirators collectively possessed approximately 80 percent of the overall market share for turkeys during the Class Period.

7.      Blair Snyder, a senior executive at Agri Stats, publicly stated in 2009 that "about 95% of the turkey industry [is] participating" in Agri Stats, and that for "turkey participants, pretty much it's a list of who's who in the turkey business." This is a comparable portion to the percentage of broiler chicken industry participating in Agri Stats reports, with Mr. Snyder stating that "we've got high 90 percentage of both broilers and turkeys."

8.      Each one of the defendants and co-conspirators entered into an agreement to exchange information through Agri Stats. Each defendant's agreement to exchange information regarding turkey production is shown in the below 2010 excerpt from an Agri Stats presentation that lists the participants in Agri Stats' turkey reports.



9.     This 2010 presentation slide shows that each of the defendant integrator and Co-Conspirator Integrators entered into an agreement to exchange information regarding their turkey operations through Agri Stats during the conspiracy period. The document directly identifies defendants Butterball, Cargill, Cooper's, Farbest, Foster Farms, House of Raeford and Perdue Farms, as participants in Agri Stats's reports on turkey. The document directly identifies Co-Conspirators Circle-S Ranch, Prestage Farms, and West Liberty Foods as participants in Agri Stats' reports on turkey. Jennie-O is the brand name for Hormel's turkey operations and thus Hormel participated in Agri Stats' reports on turkey. The document also identifies Louis Rich, a Kraft Foods brand that produces turkey, as receiving Agri Stats reports, and thus Kraft Foods participated in Agri Stats' reports on turkey. Sara Lee's turkey operations, Hillshire Brands, was subsequently acquired by Tyson in 2014 and thus Tyson participated in Agri Stats' reports on turkey.

10.     The information exchange by the defendant integrators through Agri Stats is exactly the type of information exchange that the Supreme Court has recognized is likely to have anticompetitive effects under a rule of reason analysis. First, the data is current and forward-looking – which courts consistently hold has "the greatest potential for generating anticompetitive effects."[4] Second, information contained in Agri Stats reports is specific to the turkey producers, including information on profits, prices, costs and production levels. Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the defendant integrators to pay hefty fees over the Class Period – far in excess of any other pricing and production indices and to agree to volunteer their own data. "Public

---

[4] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

dissemination is a primary way for data exchange to realize its pro-competitive potential."[5] Agri

Stats ensured that its detailed, sensitive business information was available only to the co-

conspirators and not to any buyers in the market. Thus, for example, buyers on the market could

not use Agri Stats data in Agri Stats sales reports to negotiate lower prices; instead, only

defendants could use it as a way to identify opportunities to raise their prices.

11.    Indeed, Agri Stats specifically marketed itself to potential participants as a



12.    Industry participants relied on Agri Stats reports in their analysis of their business

operations. For example, Hormel, at its 2011 Investor Day, stated in its presentation that "

."

Hormel also touted that "

."

13.    Confidential Witness 1 (CW1) is a former sales executive at Butterball involved

in the pricing of turkeys. CW1 was employed at Butterball during the entire Class Period. CW1

stated that Butterball relied on the monthly reports issued by Agri Stats: "The company used the

information to evaluate — by item, item group, price, distribution — where we stood against

other turkey companies." CW1 stated that he and other sales personnel looked at Agri Stats data

to see how Butterball ranked against peers in the turkey industry. CW1 stated that he personally

---

[5] *Id.* at 213.

looked at the Agri Stats data to assess costs and returns. CW1 stated that costs were an important factor in determining how Butterball set its prices.

14.    Confidential Witness 2 (CW2) is a former accountant at Cooper Farms. CW2 stated that Cooper Farms received monthly reports from Agri Stats. In addition, Agri Stats representatives met with Cooper Farms executives every six months. CW2 stated that Cooper Farms submitted cost information to Agri Stats every month. CW2 explained that Agri Stats reports grouped data into various types of turkey products, including deli meat and smoked meat.

15.    CW2 stated that Agri Stats representatives regularly met with the Cooper Leadership Management Group, which included top management and executives from Cooper Farms. CW2 stated that "the upper group received advice" from Agri Stats. CW2 stated that the advice from Agri Stats helped Cooper Farms improve its returns per pound.

16.    Agri Stats reports also contained detailed information on industry-wide supply levels. For example, a job description of an Agri Stats employee stated that they analyzed Turkey ████████████████████████" as well as Turkey "████████████."

17.    Based on publicly available information filed in a February 7, 2018, complaint in the *Broiler Chicken Antitrust Litigation*, [6] Agri Stats data on growout flocks contained information such as the number of broilers placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (aka, "down time"), feed conversion rate (pounds of feed per pound of broiler), and average daily weight. On information and belief, the growout data that Agri Stats compiled for the turkey industry

---

[6] *In re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.) (ECF No. 710)

contained similar levels of data. This type of data allowed defendants to monitor industry-wide supply levels.

18.     Although Agri Stats reports are nominally anonymous, defendant integrators were often able to deanonymize the reports to identify the data of specific companies based on their industry knowledge. CW2 stated that he could determine the identity of companies in Agri Stats reports because "you could usually figure out who was who because they have a certain cooked meat, or if they were browning and running it through an oven." CW2 further stated that "we could sit there and discuss it, because a lot of us knew what the other plants in the big areas, what they did." For example, CW2 stated that one competitor company had five separate facilities included in the Agri Stats reports, and that therefore, it was easy to determine the identity of that company.

19.     Confidential Witness 3 (CW3) is a former employee of Cargill during the conspiracy period. CW3 stated that Cargill received monthly reports from Agri Stats on turkey. CW3 stated that the monthly Agri Stats turkey reports went directly to Cargill finance executives.

20.     Throughout the conspiracy period, defendant integrators were able to exercise a remarkable level of industry-wide restraint in keeping the growth of turkey supply in check, causing turkey prices to rise. Thus, Agri Stats had the anticompetitive effect of allowing defendants to engage in collusion to restrain the supply of turkey by facilitating information exchange about supply levels throughout the industry. The industry-wide cuts in turkey production during the conspiracy period are shown in the following chart:



21.    In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should correspond to falling prices. However, in the turkey market during the conspiracy period, production, measured through USDA data, remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly. These observed price and output dynamics, shown in the below analysis performed by experts, indicate that it was not falling demand that caused a decline in supply during the conspiracy period.



22.    In addition to their participation in Agri Stats, defendant integrators had frequent opportunities to communicate, in conjunction with formal meetings of various trade associations. In particular, the ████████████████████ each year held regular meetings, including the ████ ████████████████ and the ████████████████, which were widely attended by the defendant integrators. CW3 stated that senior Cargill executives, including Cargill's CEO and CFO, attended ████████████████ meetings. For example, CW2 stated that Cooper

Farms leadership were involved in the ██████████████, for example Cooper Farms COO Gary Cooper ████████████████████████████████.

23.     Collectively, Hormel, Cargill, and Butterball control approximately 50 percent of the turkey market. Hormel is the only publicly traded company among these three. In its earnings calls during the conspiracy period, Hormel repeatedly discussed the industry-wide success in executing production cuts and maintaining industry-wide production discipline during the Class Period.

24.     On June 2, 2009, Hormel emphasized that it was ███████████████████ ████████████████████████████████████ ████████████████████████████████████████ ███████:



25.     On August 20, 2010, Hormel stated, "██████████████████████████████ ████████████████████████████████████ ██████████████████████████████████."

26.     On May 25, 2011, ████████████████████████████████████ ████████████████████████████████████



."

27.     On August 25, 2011, Hormel stated █████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████.." This statement is notable because

the chicken industry is currently the subject of multiple civil lawsuits as well as a DOJ

investigation of potential antitrust violations during this period of time.

28.     Furthermore, the turkey market has all of the characteristics of a market where

information exchange is likely to have anticompetitive effects. Turkey is a fungible product, the

market for turkey has price-based competition, the demand for turkey is relatively inelastic, and

the turkey market features a trend towards price uniformity.

29.     The information exchange through Agri Stats did not have the kind of

characteristics that would produce procompetitive effects sufficient to outweigh the

anticompetitive harms. The information exchange involved current and forward-looking data.

Agri Stats regularly prepared monthly reports that contained data that was less than six weeks

old. Agri Stats also only allowed companies to access the data if they themselves shared the data,

thus ensuring that only defendants and other similarly situated turkey integrators who received

the Agri Stats reports were able to use the data.



30. During the conspiracy period, the price of turkey spiked dramatically, driven by the anticompetitive effects of the information exchange through Agri Stats regarding turkey production that helped facilitate defendants' restraint over the growth in the supply of turkey.

31. The information exchange through Agri Stats in fact had anticompetitive effects on the market. Prior to the conspiracy, turkey prices closely tracked the underlying cost of feed, which is the primary input cost in the production of turkey. Beginning in 2009-2010, prices of turkey spiked to an unprecedented level, showing the anticompetitive effects of defendants' information exchange through Agri Stats. Remarkably, as demonstrated in the analysis performed by experts, shown in the below chart, prices of turkey quickly returned to match underlying feed costs after litigation was filed in late 2016 in the broiler industry that centered on the anticompetitive use of Agri Stats. Defendants clearly changed their behavior after the commencement of the Broilers litigation, as Tyson dismissed their CEO, Donnie Smith, in late 2016, shortly after the first civil lawsuits were filed.



32.     Feed accounts for approximately 60-70% of the cost of raising a turkey. Experts constructed a regression model based on the underlying feed cost that models what the "but for" price of turkey would have been if the historical relationship between feed and turkey costs had continued during the conspiracy period. The model demonstrates that the anticompetitive information exchange of data regarding turkey production through Agri Stats caused anticompetitive effects in the market for turkey.



33.     As a result of defendants' unlawful conduct, plaintiffs and the Classes paid

artificially inflated prices for turkey during the Class Period. Such prices exceeded the amount

they would have paid if the price for turkey had been determined by a competitive market. Thus,

plaintiffs and class members were injured by defendants' agreement to exchange information

through Agri Stats regarding the turkey market.

## II.     JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction over the claims asserted in this litigation

under 28 U.S.C. § 1332 because the amount in controversy for each of the Classes exceeds

$5,000,000, there are more than 100 members in each of the Classes, and there are members of

each of the Classes who are citizens of different states than Defendants. This Court also has

subject matter jurisdiction under 28 U.S.C. § 1331 because plaintiffs are bringing a claim for

injunctive relief under federal law.

35.     Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d)

because Hillshire Brands is headquartered in the District, and one or more defendants transacted

business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

36. This Court has personal jurisdiction over each defendant because, inter alia, each defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of turkey throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

37. The activities of the defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

### III.  PARTIES

**A.  Plaintiffs**

38. Plaintiff Sandee's Bakery d/b/a Sandee's Catering Bakery & Deli is a bakery and deli located in Jamestown, New York. During the Class Period, Plaintiff purchased turkey in New York, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of turkey. The turkey purchased by Plaintiff was impacted by the conduct of one or more of the Defendants, constituting an antitrust violation as alleged herein, and plaintiff suffered monetary loss as a result of the antitrust violations alleged herein.

39. Plaintiff Gnemi, LLC d/b/a Logan Farms is a restaurant and deli located in Jackson, Mississippi. Gnemi, LLC has two members, both who are residents of Mississippi.

During the Class Period, Plaintiff purchased turkey in Mississippi, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of turkey. The turkey purchased by Plaintiff was impacted by the conduct of one or more of the Defendants, constituting an antitrust violation as alleged herein, and Plaintiff suffered monetary loss as a result of the antitrust violations alleged herein.

40.     Plaintiff Maquoketa Care Center is a senior living facility located in Maquoketa, Iowa. During the Class Period, Plaintiff purchased turkey in Iowa, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of turkey. The turkey purchased by Plaintiff was impacted by the conduct of one or more of the Defendants, constituting an antitrust violation as alleged herein, and Plaintiff suffered monetary loss as a result of the antitrust violations alleged herein.

41.     Plaintiff Thyme Cafe & Market is a café and market located in Santa Monica, California. During the Class Period, Plaintiff purchased turkey in California, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of turkey. The turkey purchased by Plaintiff was impacted by the conduct of one or more of the Defendants, constituting an antitrust violation as alleged herein, and Plaintiff suffered monetary loss as a result of the antitrust violations alleged herein.

42.     Plaintiff Bernie's LLC is a restaurant located in Chicago, Illinois. During the Class Period, Plaintiff purchased turkey in Illinois, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of turkey. The turkey purchased by Plaintiff was impacted by the conduct of one or more of the Defendants, constituting an antitrust violation as alleged herein, and Plaintiff suffered monetary loss as a result of the antitrust violations alleged herein.

43.    Plaintiff Liberty Holding Company d/b/a Liberty Tap Room and Grill owns and operates restaurants in North Carolina and South Carolina including restaurants which operated in Winston Salem, North Carolina and Mount Pleasant, South Carolina. During the Class Period, Plaintiff purchased turkey in North Carolina and South Carolina, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of turkey. The turkey purchased by Plaintiff was impacted by the conduct of one or more of the Defendants, constituting an antitrust violation as alleged herein, and Plaintiff suffered monetary loss as a result of the antitrust violations alleged herein.

44.    Plaintiff Music Matters, LLC d/b/a Stickyz Rock 'N' Roll Chicken Shack is a restaurant in Little Rock, Arkansas. During the Class Period, Plaintiff purchased turkey in Arkansas, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of turkey. The turkey purchased by Plaintiff was impacted by the conduct of one or more of the Defendants, constituting an antitrust violation as alleged herein, and Plaintiff suffered monetary loss as a result of the antitrust violations alleged herein.

45.    Plaintiff Martin's BBQ, LLC is a middle Tennessee restaurant chain headquartered in Nashville, Tennessee. During the Class Period, Plaintiff purchased turkey in Tennessee, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of turkey. The turkey purchased by Plaintiff was impacted by the conduct of one or more of the Defendants, constituting an antitrust violation as alleged herein, and Plaintiff suffered monetary loss as a result of the antitrust violations alleged herein.

46.    Plaintiff Social Kitchen is a restaurant located in Birmingham, Michigan. During the Class Period, Plaintiff purchased turkey in Michigan, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of turkey. The turkey

17

purchased by Plaintiff was impacted by the conduct of one or more of the Defendants, constituting an antitrust violation as alleged herein, and Plaintiff suffered monetary loss as a result of the antitrust violations alleged herein.

**B.    Defendants**

47.    Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana. Throughout the Class Period, Agri Stats acted as a co-conspirator of the turkey integrator defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among defendants and their co-conspirators.

48.    Butterball, LLC is a privately held North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Butterball and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

49.    Cargill, Inc. is a privately held Delaware corporation headquartered in Minnetonka, Minnesota. During the Class Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

50.    Cargill Meat Solutions Corporation is a Delaware corporation that operates as a subsidiary of Cargill, Incorporated. During the Class Period, Cargill Meat Solutions and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

51.    Defendants Cargill, Inc. and Cargill Meat Solutions are collectively referred to as "Cargill."

52.     Cooper Farms, Inc. is a privately held Ohio corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Cooper Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

53.     Farbest Foods, Inc. is a privately held Indiana corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Farbest and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

54.     Foster Farms LLC is a privately held California corporation headquartered in Modesto, California. During the Class Period, Foster Farms LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

55.     Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms LLC. During the Class Period, Foster Poultry Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of turkey, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

56.     Defendants Foster Farms LLC and Foster Poultry Farms are collectively referred to as "Foster Farms."

57.     Hormel Foods Corporation is a Delaware corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

58.     Jennie-O Turkey Store, Inc. ("Jennie-O") is a Minnesota corporation headquartered in Austin, Minnesota. Jennie-O Turkey Store, Inc. is a related entity of Hormel Foods Corporation. During the Class Period, Jennie-O Turkey Store, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of turkey, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

59.     House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. During the Class Period, House of Raeford operated in part through a division referred to as "Columbia Farms," which is a group of broiler facilities and operations originally named Columbia Farms, Inc. and Columbia Farms of Georgia, Inc. when purchased by House of Raeford in 1998. During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

60.     Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland. During the Class Period, Perdue Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

20

61.     Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

62.     Defendants Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to as "Perdue."

63.     Prestage Farms, Inc. is a North Carolina corporation headquartered in Clinton, North Carolina and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Prestage Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

64.     Prestage Foods, Inc. is a North Carolina corporation headquartered in St. Paul, North Carolina and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Prestage Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

65.     Prestage Farms of South Carolina, LLC is a South Carolina corporation headquartered in Camden, South Carolina and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Prestage Farms of South Carolina, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

66.     Defendants Prestage Farms, Inc., Prestage Foods, Inc., Prestage Farms of South Carolina, LLC are collectively referred to as "Prestage."

67.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. It wholly owns and controls two subsidiaries, Tyson Prepared Foods, Inc. and Tyson Fresh Meats Inc. that slaughter and sell turkey products. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

68.     Tyson Fresh Meats Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Fresh Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

69.     Tyson Prepared Foods, Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

70.     The Hillshire Brands Company (Hillshire Brands) is a Maryland corporation headquartered in Chicago, Illinois. Hillshire Brands operates as a subsidiary of Tyson Foods that sells turkey products. During the Class Period, Hillshire Brands and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

71.    Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc., and Hillshire Brands are collectively referred to as "Tyson."

**C.    Co-Conspirators**

72.    Co-Conspirator Circle S-Ranch, Inc. is a North Carolina corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Circle S-Ranch and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

73.    Co-Conspirator Dakota Provisions is a South Dakota corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Dakota Provisions and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

74.    Co-Conspirator Kraft (comprised of Kraft Heinz Foods Company and Kraft Foods Group) is engaged in the production of meat and food products, and the marketing of these products. Kraft Heinz Foods Company (Kraft Heinz), us an Illinois corporation with headquarters in Pittsburgh, Pennsylvania, and Chicago, Illinois, and Kraft Foods Group Brands LLC is an Illinois corporation. During the Class Period, Kraft and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

75.    Co-Conspirator Michigan Turkey Producers LLC d/b/a Michigan Turkey Producers Co-op (Michigan Turkey) is a Michigan corporation headquartered in Grand Rapids, Michigan, and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Michigan Turkey and/or its predecessors, wholly owned or

controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

76.     Co-Conspirator Norbest LLC (Norbest) is a Utah corporation headquartered in Moroni, Utah, and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Norbest and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Norbest is a related entity to Pitman Family Farms, a California corporation, engaged in the production of meat and food products, and the marketing of these products. Norbest was formerly known as Moroni Feed Company and Norbest Inc.

77.     Co-Conspirator West Liberty Foods LLC (West Liberty) is an Iowa corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, West Liberty and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

## IV.     FACTUAL ALLEGATIONS

### A.     Agri Stats lies at the center of an extensive conspiracy between Defendants.

78.     Agri Stats is a company that provides closely guarded, non-public, subscription services to a variety of agricultural industries, including the pork, chicken, and turkey industries. Agri Stats' mission is to improve the profitability of participant companies through the provision of detailed and sensitive data gathered from competitors. Agri Stats presents itself as "kind of a quiet company" with a minimal public presence, but the company has silently and intentionally orchestrated a profound and anticompetitive impact on the supply and price of meat in this country.

24

79.    Agri Stats owns a number of subsidiaries, including Express Markets, Inc., that provide benchmarking services to the agricultural industries:

## *The Companies of Agri Stats*













80.    As described previously, Agri Stats collects detailed data on almost every conceivable operating metric from its subscribers operating in the turkey industry. Agri Stats takes this data, standardizes it across Defendants and Co-Conspirators, and then creates detailed reports comparing the subscribers on key operating metrics. On a monthly basis, Agri Stats produces these detailed comparative data reports to its subscribers in the turkey industry using numeric codes for each subscriber in a purported attempt to keep the data anonymous. However, turkey industry subscribers can and do reverse engineer these reports with ease to identify their competitors.

81.    Agri Stats prepared monthly reports for Defendants regarding their sales of turkey that identified, on a specific product by product level, the prices, and returns that each Defendant was obtaining on their sales of turkey. These reports, unavailable to anybody besides Agri Stats

25

subscribers, allowed the Defendant Integrators to easily identify potential opportunities where their prices for turkey products were significantly lower than their competitors.

82.     The information gathered by Agri Stats was not publicly available, or even available to industry participants equally. Agri Stats would **only** grant access to similarly situated companies that themselves share data with Agri Stats. That is, you had to be a Turkey integrator able to **produce** competitively sensitive information, to be able to **receive** the information. Agri Stats also does not provide data to USDA. This information asymmetry ensures that data from Agri Stats is only available to one side of the market – the Defendant Integrators. The other side of the market, purchasers of turkey, is not allowed to access the Agri Stats data, and thus cannot use Agri Stats data to negotiate lower prices. Thus, Agri Stats reports function as a one-way ratchet that can be used for anticompetitive purposes by Defendants but not for procompetitive purposes by purchasers.

83.     In the turkey industry, all else being equal, there is an inverse relationship between supply and price of turkey. Accordingly, the type of information available in these reports is not the type of information that competitors would provide each other in a normal, competitive market. In a competitive market, each competitor would act independently, making supply decisions unilaterally and pricing its goods to market. Indeed, in a competitive market, a commodity producer with a cost advantage would not share information with competitors that would allow them to achieve the same cost of manufacture. If a Turkey Integrator knew both it and its competitors have low supply, and/or knew that its competitors would not lower prices to attempt to gain market share, the normal competitive incentive to lower prices to better compete in the market is chilled, although customers remain unaware of this, by removing competitive uncertainty.

26

84.     In each situation, the anticompetitive effects are only amplified by the fact that customers do not have the confidential information exchanged among the Defendants, nor are they even aware of the fact that Defendants are exchanging that confidential information, putting them at a severe asymmetrical information disadvantage with respect to the pricing of turkey meat.

85.     The information exchange by the Defendant Integrators through Agri Stats is exactly the type of information exchange that the Supreme Court has recognized is likely to have anticompetitive effects under a rule of reason analysis. *First*, the data is current and forward-looking—which courts consistently hold has "the greatest potential for generating anticompetitive effects."[7] *Second*, information contained in Agri Stats reports is specific to the turkey producers, including information on profits, prices, costs, and production levels. *Third*, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the Defendant Integrators to pay hefty fees over the Class Period – far in excess of any other pricing and production indices – and to agree to volunteer their own data. Agri Stats ensured that its detailed, sensitive business information was available only to Defendants and their Co-Conspirators and not to any buyers in the market. Thus, for example, buyers on the market could not use Agri Stats data in Agri Stats sales reports to negotiate lower prices; instead, only Defendants could use it to identify opportunities to raise their prices. Indeed, Agri Stats specifically marketed itself to potential participants as a way that they could "███████

███████" rather than engage in competition through production increases. Agri Stats was good to its word; its sales reports specifically identified opportunities for Defendants where

---

[7] *U.S. Gypsum Co.*, 438 U.S. at 441 n.16.

Defendants' products were lower than that of the industry average and where Defendants could consequently raise prices to meet that of their competitors.

86.     Furthermore, the exchange of information through Agri Stats at issue in this case is of a type and frequency that acts as a plus factor supporting an inference of a *per se* price-fixing agreement among Defendants.  As Justice Sotomayor held while serving on the Second Circuit, "[i]nformation exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement."[8]  This agreement had the intended purpose and effect of increasing turkey prices to Plaintiffs and the Class.

**1.      Agri Stats Reports and Subscriptions by Defendants and their Co-Conspirators.**

87.     Defendants' agreement was formed at least as early as 2008. Michael "Blair" Snyder, a senior executive at Agri Stats, publicly touted in 2009 that "about 95% of the turkey industry [is] participating" in Agri Stats, and that for "turkey participants, pretty much it's a list of who's who in the turkey business."

88.     A 2010 presentation slide lists each of the Defendants and their Co-Conspirators by name: Defendants █████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████.

---

[8] *Todd*, 275 F.3d at 198–99 (noting that information exchanges can both be evidence of a *per se* unlawful price fixing cartel and separately unlawful in and of themselves).



89.     Participants in this scheme received monthly detailed reports and graphs that allow them to compare their performance, sales prices, and costs to other participants.

90.     Agri Stats reports identified potential opportunities for its subscribers to raise prices for turkey products where their prices were lower than their competitors.

91.     Agri Stats issues ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████ :



92.     Agri Stats also offered to provide ████████████████████ ████████████████████████████████████ .

93.     EMI (a subsidiary of Agri Stats) provided ███████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

█████████████████████████████

         a.      *Examples of Agri Stats Reports.*

94.     Some of the main offerings ████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████

95.     ███████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████





96.     Agri Stats also provided the same information for 



97.     Both the USDA and Urner Barry also provide some publicly available sales data.

However, the data that Agri Stats provides in its sales reports is ██████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████." 

98.     ████████████████████████████████████





99. ███████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████:





100.  ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████.

101.  These reports were particularly helpful at indicating ████████████████████████

████████████████████████████████████████████████ No

other reporting service, other than Agri Stats/EMI, provided the level of detail or content needed

to show the industry's production intentions. While the USDA provides reporting on some of the

same metrics as Agri Stats does (though without the same level of detail nor as close-in-time),

USDA does not report at all on ██████████████████████████████ Agri Stats

explained that ██████████████████████████████████████

██████████████████████████████.  Another benchmarking service, Urner Barry,

provided reports on weekly turkey hatches, eggs set, poults placed, and poults destroyed.

However, it did not ████████████████████████████████████████

████████████████████████████████████████████████. Simply put,

the data Agri Stats provided was ████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

███████ ). Each of these metrics provide confidential information on participants' supply and capacity.



102.    Although Agri Stats has stated that █████████████████████ ████████████████████████████████████████████████████ ███████████████ :

103.    Additionally, Agri Stats' ███████████████████████████████:



104.    ██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████



105.    Each Agri Stats report listed ████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████



    b.    *Defendants subscribed to Agri Stats/EMI reports throughout the class period.*

106.    Butterball states ████████████████████████████████

████████████████████████████. Agri Stats' fee records show that ████████████

████████████████████████████████████████████████



107.    Agri Stats' fee records show that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

108.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Agri Stats' fee records show that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ They subscribed to the

109. ███████████████████████████████████████████████

███████████████. Agri Stats' fee records show that ████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████. They continued these subscriptions until at

least ██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

110. ████████████████████████████████████████

██████████████████████ Agri Stats' fee records show that ███████████████████████

████████████████████████████████████████████████████████

██████████████████████ They continued receiving the ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

111. From January 1, 2008 through December 31, 2017, ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

112. ████████████████████████████████████████████

████████████████████████████████████████████████████████



. As early as August 2008,

113.    . Agri Stats'

fee records show that

114.    Agri Stats' fee records show that

115.    Agri Stats' fee records show that

45

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████.

        **c.**     *The Co-Conspirators also participated in Agri Stats/EMI.*

116.    Agri Stats' fee records show that ███████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

117.    Agri Stats' fee records show that ███████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████

118.    Agri Stats' fee records show that ██████████████████████

█████████████████████████████████████████████

██████████████

119.    Agri Stats' fee records show that █████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████

120.    Agri Stats' fee records show that █████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

## 2.    Defendants relied on Agri Stats reports for every critical part of their operations.

121.    Industry participants relied on Agri Stats reports in nearly every facet of their

business operations and strategy.

122.    For example, in January 2014, ██████████████████████████

█████████████████████████████████████:

**[I]t it is imperative that we stay engaged and focused on Agristats results,**

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

### a.    *Defendants Relied on Agri Stats Reports in Setting Prices and Identifying Opportunities to Raise Prices.*

123.    Defendants routinely and regularly used the Agri Stats sales reports to identify

price-raising opportunities.

124.    Confidential Witness 1 (CW1) is a former sales executive at Butterball involved

in the pricing of turkeys. CW1 was employed at Butterball during the entire Class Period.

According to CW1, Agri Stats identified each participant in each report and ranked the integrator

Defendants in their reports based on the returns (*i.e.*, prices) that the integrator Defendants

received.

125. As documented in preceding allegations, CW1's allegations are confirmed by the reports themselves. CW1 further stated that Butterball relied on the monthly reports issued by Agri Stats: "The company used the information to evaluate — by item, item group, price, distribution — where we stood against other turkey companies." CW1 stated that he and other sales personnel looked at Agri Stats data to see how Butterball ranked against peers in the turkey industry. CW1 stated that he personally looked at the Agri Stats data to assess costs and returns. CW1 stated that costs were an important factor in determining how Butterball set its prices. Butterball's internal documents clearly show the importance of Agri Stats to Butterball.

126. For example, a 2015 message from ███████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████

127. Butterball regularly used data from Agri Stats to reduce supply and raise prices. For example, in August 2017, Butterball is shown again looking to Agri Stats data for ████████

█████████████████████████████████████████████████████

██████████████████████

128. Similarly, in 2010, ██████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

129.     Butterball executives regularly met and reviewed Agri Stats data for price raising

opportunities. For example, in March 2011, ██████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

130.     At those meetings, ██████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

131.    In a draft presentation for Butterball's " ██████████████████████

██████████████████████████████████████████████████████████████



132.    That same presentation also details ████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████

133.    Cargill used Agri Stats to ██████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████ Cargill also used Agri Stats as a █████████████████████

████████████

134.    Cargill also used Agri Stats to ████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ She also wrote ███████████████

███████████████████████████████████████████

███████████████████████████████████

135.    Cargill also uses its knowledge of █████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

136.    Cargill approached identifying ███████████████████████

████████████████████ :

51



137.    Confidential Witness 2 (CW2) is a former accountant at Cooper Farms. CW2 stated that Cooper Farms received monthly reports from Agri Stats. CW2 stated that Cooper Farms submitted cost information to Agri Stats every month. CW2 explained that Agri Stats reports grouped data into various types of turkey products, including deli meat and smoked meat. As described above, this has been confirmed by the reports produced by Agri Stats.

138.    CW2 stated that the advice from Agri Stats helped Cooper Farms improve its returns per pound. Documents confirm that Cooper Farms used Agri Stats reports to maintain high profit margins. In May 2011,

██████████." In another email from the same month, ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

██████

139.    As with the other Turkey Processors, Farbest also reviewed Agri Stats reports to

█████████████████████████████████. One example occurred in June 2010, ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████

140.    Agri Stats also directly wrote to Farbest in order to identify ████████████████

████████████████████████ In October 2013, ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████



141.    Foster Farms held regular meetings with Agri Stats regarding the sales reports, and used them to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In January 2015, ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Similarly, in January 2017, ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮.

142.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



143. Hormel executives followed ████████████ instructions, using Agri Stats to

████████████████████████████████████████████.” In a July 2010 email, ████████████████████████████

████████████████████████████. She reports that for fresh breast, ████████████████████████████

144. There are also examples of Hormel using Agri Stats data as reason, in part, to



145.   House of Raeford similarly used Agri Stats to ███████████████████
One example of this occurred in 2010, ██████████████████████

██████████████████████████
██████████████████████████
██████████████████████████
███████████████████████"
146.   A June 2012 ████████████████████████

██████████████████████████
██████████████████████████
█████████████████████



147.    Prestage also worked with Agri Stats to ███████████████.  In December 2013, ████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████



148.     Agri Stats also provided ███ guidance for Defendants and their Co-Conspirators on a █████████████ **basis.** For example, █████████████████ █████████████████████. Agri Stats provides information about █████ █████████████████████████████████ █████████████████ Stacey Edwards of Agri Stats wrote, █████████ █████████████████████████ In essence, Agri Stats was telling Cargill the ████████ █████████████████████████████. In a competitive market, sellers do not share such information, directly or indirectly, with each other.

149.     Agri Stats also continued to █████████████████████ ██████████████████████. In April 2013, ███████████ ███████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

150.      Statements by Agri Stats employees show that they intended for Defendants and

their Co-Conspirators to ████████████████████████████████████████████

████████████████. In a February 2012 email thread where ██████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

In addition, in a June 2015 email thread, ██████████████

████████████████████████████████████████████████

███████████████████████████████████████████

█████████

      **b.**      ***Defendants Relied on Agri Stats Reports to Monitor Production.***

151.      Defendants routinely and regularly used the Agri Stats sales reports to ████

█████

152. Data in the Agri Stats ███████████████████ reports and the EMI Analytics ███████████████ allowed Defendants and their Co-Conspirators to ███████ ████████████████████████████████████████████████████████████████

153. Butterball monitored ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████

████████████████████████████████ ████████████████████████ █████████████████ ███████████████████████████████

In reply, ████████████████████████████████████████████████ ███████████████████████████████

154. Similarly, conversations amongst executives at Cargill show that the data could be directly used to ██████████████████████████. An April 2016 email from Cargill's ████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████

155. After a Cargill executive attended ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

60

██████████████████████████████████████████████████████████████

███████████ ."

156.    Cargill also monitored ████████████████████████████. In September 2016, ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

████████

157.    Cargill also used information from Agri Stats to ████████████████████████████ ███████████████████████████████████████. In a 2017 e-mail, ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████

158.    In September 2014, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

159.    In June 2017, ██████ wrote to Agri Stats to ████████████████

███████████████████████████████████████████



160.    Farbest closely monitored the ██████████████████████

████. In January 2014, ████████████████████████████

████████████████████████████████████████████.

This shows Farbest was closely monitoring production through the Agri Stats ██████████

reports.

161.    Hormel also used Agri Stats information ██████████████████

████████████████████████████████

████████████████████████████████

█████████████████████████████████████

███████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

162.    Perdue used EMI data when ██████████████████████. An August 2011

Perdue ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

163.    ██████████ of Tyson described Agri Stats' work with ██████████████████

█████████████████████████████████████████████████

██████



c.    *Agri Stats Reports and Metrics Were Tremendously Important to Defendants and their Co-Conspirators.*

164.    Agri Stats was fully incorporated into Defendants' and their Co-Conspirators' business decision-making and Defendants emphasized the importance of using Agri Stats in their business operations.

165.    For example, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

166.    Cargill prepared an "███████████████████████████████████

████████████████████████████████



167.    Certain Defendants even ██████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████

        d.    *Agri Stats Directly Facilitated the Exchange of Sensitive Information Through Meetings and Passing Information Between Defendants and Their Co-Conspirators.*

168. At times, employees of Agri Stats/EMI ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████, Agri Stats was in a unique position to share information among Defendants and their Co-Conspirators.

169. In July 2013, ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ She wrote, ████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████



170.    Agri Stats also offers "███████████████████████" two to four times a year where they "████████████████████████████████████████████████████████████████████████████████████████ .

.        ." Examples of Defendants' participation in such meetings is described below.

171.    According to CW1, Agri Stats gave live presentations to Defendant Integrators to explain to them how to use the reports that Agri Stats prepared on the turkey industry and how to compare themselves against their competitors: during the presentations, Agri Stats said, "if you are number one priced out of 13, that meant the return was so much versus the other companies." Butterball regularly participated in such meetings with Agri Stats. For example, in August 2013

."

172.    In an email thread describing ████████████████████████████████████

Such meetings were ████████████████

66



173.    Agri Stats also would ████████████████████████████████

████████████████████

174.    CW2 stated that Cooper Farms executives met every six months with Agri Stats.

The executives were from the Cooper Leadership Management Group, which included top

management and executives from Cooper Farms. Documents confirm ████████████████

████████ between Cooper Farms executives and Agri Stats:



175.    CW2 stated that "the upper group received advice" from Agri Stats. Documents

confirm that Cooper Farms executives ████████████ with Agri Stats executives and received



. For example,

176.    Farbest also ███████████████████. In September 2015,

177.    Agri Stats meetings also provided ███████████████
█████████████████████. For example, █

68



178.    After that Agri Stats presentation, ████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████

179.    ████████████████████████████████████████████████████
████████████████████████████████████████████████████



    e.    ***Certain Defendants Tied Compensation and Performance Reviews to their*** ▓▓▓▓▓▓▓▓▓▓.

180.    Agri Stats was also used ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓

181.    In 2008, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓ In 2015, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓."

182.    Proficiency and knowledge of Agri Stats was used as ▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

183. In 2016, ████████████████████████████████████
████████████████████████████████████████████████████
███████████████████. For example, ████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

184. Cargill described Agri Stats as a ████████████████████
█████████████:



185. Hormel executives were ██████████████████████████████
████████████████████████████████████████

186. In 2011, ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████

3.     **Defendants and Their Co-Conspirators regularly and easily reverse engineered Agri Stats reports.**

187.     Agri Stats publicly represents that its services preserve the confidentiality of participating companies; however, the reality is far different.

188.     Although Agri Stats reports are nominally anonymous, Defendant Integrators were often able to de-anonymize the reports to identify the data of specific companies based on their industry knowledge and the manner in which the information was presented. Agri Stats reports are so detailed that a reasonably informed Defendant can discern the identity of competitors' data due to the specific type of products each is known to produce or based on knowing the identity of Defendants' individual complexes.

189.     For each of its reports, Agri Stats identified the list of participants who were contributing data or information to the reports. The small number of individual companies providing data in particular category or region revealed the identity of each participant. CW1 (Butterball) confirmed that the reports Agri Stats prepared for the Defendant Integrators identified the participants that provided data for each report, which allowed Defendants to understand which of their competitors were participating for each report. CW2 confirmed that the Agri Stats reports identified each of the turkey production facilities that were participating in the reports.

190.     Based on documents produced to date in this case, it is also now clear that Defendants were readily able to determine the identity of competitors and connect that to the detailed information supplied by Agri Stats.

191.     Due to the ability to reverse engineer Agri Stats reports, Defendants and their Co-Conspirators were able to benchmark their performance against specific competitors. In July 2011, ███████████████████████████████████████████████████████████████

192.    While each subscribing company receives a report that ███████████

193.    One such executive was ███████████████

████████████████████████████████████████████████

████████████████████████ ."

194.    For instance, ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████





195.    Agri Stats assumed that ████████████████████████████████████

████████████████████████.” CW2 stated that he could determine the identity of

companies for Cooper Farms in Agri Stats reports because "you could usually figure out who

was who because they have a certain cooked meat, or if they were browning and running it

through an oven." CW2 further stated that "we could sit there and discuss it, because a lot of us

knew what the other plants in the big areas, what they did." For example, CW2 stated that one

competitor company had five separate facilities included in the Agri Stats reports, and that

therefore, it was easy to determine the identity of that company.

196.    CW2's accounts of Cooper Farms' deanonymization are confirmed by documents.

For example, in July 2017, ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

75

███████████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████████████████████

████████████████████████████████

██████

197.    Confidential Witness 3 (CW3), a former employee of Cargill during the

conspiracy period, stated that Cargill received monthly reports from Agri Stats on turkey. The

documents produced to date confirm that Cargill received Agri Stats reports.

198.    In a February 2012 presentation to ██████████████████████

████████████████████████████████████████

████████████████████████. Moreover, the source of such information

had been clearly labelled, "███████████████████████████████,"

which indicates this was a common and unremarkable happening:



199.    CW3 stated that the monthly Agri Stats turkey reports went directly to Cargill

finance executives. Cargill documents describe ███████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████

200.    Examples of Cargill's reverse engineering work are included below:





201. Hormel also ████████████████████. For example, ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████

202. Defendants were aware that ████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████ Indeed, Butterball

did know, because ████████████████████████████████████████

████████████████████████████ :



203.  ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████

204.    At times, Defendants even █████████████████████████████████████████████

████████████████. In a February 2011 email between ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████ True competitors would have no reason to provide

this type of sensitive business information to each other.

**4.      Agri Stats was aware reports could be reverse engineered and helped facilitate reverse engineering.**

205.    Agri Stats communicated frequently with ████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████

206.    Agri Stats was aware that ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

207.    In January 2009, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

81

████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████

208.   Agri Stats was aware that █████████████████████████████████

████████████. In July and August 2009, █████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

209.   Naysayers within Agri Stats were overruled. In April 2011, ████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

210.    Agri Stats was aware of the overly specific nature of their service. ██████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████"

211.    Relatedly, in December 2013 Agri Stats raised a concern about ██████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████

212.    Instead, the confidentiality of the data was preserved only as to the public and

those unable to subscribe to Agri Stats. For example, in an email dated ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

213.    Even if a subscriber were not able to ██████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████ In 2017, ████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

214.    Agri Stats also regularly refined their reporting to "███████████████

████████████████████████████████████████████████

███████████ This was in furtherance of the conspiracy as it made it easier for Defendants and

their Co-Conspirators to monitor each other's actions and to help inform long-term pricing

strategies.

215.    ███████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

**B.**    ████████████████████ **provided a forum for coordination among the
Defendants and their Co-Conspirators.**

216.    ████████████████████ is a national advocate for turkey farmers and

processors; members include growers, processors, hatchers, breeders, distributors, allied

services, and state associations.

217.    Nearly every Defendant Integrator's CEO has representatives on the board of

directors or executive committee of the ████████████████ High-ranking executives of

Butterball, Hormel, Cargill, Tyson, Farbest, and Perdue currently serve as officers of the board

84

or on the executive committee. Executives from each Defendant served on the █████████ █████ Executive Committee at various points during the conspiracy.

218.    For example, CW3 stated that senior Cargill executives attended █████████ ████████ meetings. Documents confirm that ███████████████████████ ███████████████████████████████████. For example, ████ ████████████████████████████████████ ██████████████████████████████████████ ██████████████████████.



219.    CW2 also stated that Cooper Farms leadership was involved in the ██████ ████████████. As discussed in more detail below, Gary Cooper served on the ████████ █████████ Executive Committee in 2014. During that time, as discussed in more detail below, ███████████████████████████████████████.

220.    Notably, one Agri Stats employee who works for multiple meat industry clients commented upon her first time attending a ████████████████ meeting in 2011, "████

██████████████████████████████████████████

███████████

221.　In addition to regular board and executive committee meetings, the ███████

██████████████ hosts two events throughout the year: the Annual Convention in February and

the Leadership Conference in July. The Annual Convention is the largest events for the turkey

industry nationwide and offers tremendous networking opportunities.

222.　Apart from board meetings, executive meetings and annual events, the ████████

██████████████ also had a subgroup called the ████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

████████████████████████████

223.　Under the direction of ████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

███████████████

224. Upon information and belief, the top-level executives from Defendants discussed ███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████

**C.     Defendants conspired to restrain competition in the market for turkey.**

    **1.     Pre-Class Liability Period from 2008-2009:** █████████████████████ ██████████████████████████████████████████████████████████████

225. In the Pre-Class Liability Period, Defendants and their Co-Conspirators, through both usage of Agri Stats/EMI and direct communications, ████████████████████████ ████████████████████████████████████████████████ In the spring and summer of 2008, Defendants and their Co-Conspirators began ██████████████████████ █████████████████████████████████████████████

    **a.     "███████████████████████████████████████████": *In early 2008, Defendants begin to coordinate a series of industry cutbacks to restrain supply and stabilize prices.***

226. Feed prices, the primary cost for growing turkeys, began to rise rapidly in late 2006, continued to accelerate in 2007, and spiked in June/July 2008. These feed prices were driven, in part, from the impact of a new market for corn created by U.S. renewables.

227. These rising feed prices caused significant increased costs for turkey growers, and provided them with a motive to conspire to restrain supply and restore profitability.

228. By June 2008, with feed prices soaring, Defendants began discussing in detail the potential for industry-wide cutbacks. █████████████████████████████████████████████



229.    In July 2008, ████████████████████████████████████

230.    At the July 2008 ███████████████ meeting, the ████████
█████ Executive Committee decided to ████████████████████████

231.    As a result of this discussion by the ███████████████ Executive

Committee, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

232.    On July 10, 2008, ████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

233.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

234.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████. In 2008, the ████████████████

███████████ Steering Committee consisted of ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████████████er

235.    On September 2, 2008, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

236.    On September 4, 2008, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████." In internal correspondence regarding the proposal, ████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

237.    On September 9, 2008, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████.

238.    On September 11, 2008, 

239.    In reply,

240.    On September 12, 2008,

241.    On September 16, 2008,



242.    Internal correspondence from Defendants indicates that



243.

244. On October 26, 2008,



245.    E-mail correspondence from Agri Stats/EMI indicates ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

246.    At the meeting, there was significant internal debate about ████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

247.    Following the meeting, ██████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[9] Plaintiffs have not yet been able to identify a copy of this draft of the 2008 Outlook Study in the materials that have been produced by Defendants.



248.    On November 5, 2008,

249.    A version of the

250.



251. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

252.    On November 19, 2008, ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

253.    The Steering Committee ██████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████

254.    On December 19, 2008, ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ attended the conference call. ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████ The committee also agreed that ████████████████ ████████████████

██████████████████

    255.   In January 2009, █████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████:



256.     The presentation materials prepared by EMI in ████████ also included the





257.

258.

. In internal correspondence,



259. ████████████████████████████████

██████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████████████

████

260. ███████████████████████████

████████████████████████

███████████████████████

████████████████████████████

██████████████████████████

███████████████████████████

████████████████████████████

███████████████████████████

████████████████████████████

    **c.** ████████████████████

261. Following initiation of the ████████████████████████,

Defendants and their Co-Conspirators regularly ███████████████████

████████████████████████

262. In June 2008, ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

263. In August 2008, Cooper Farms executives in internal correspondence confirmed

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

264. Defendants and their Co-Conspirators, ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. For example, in August

2008, ██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████ A few minutes later, ██████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

265. That same month, ██████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████



266.    In September 2008,

In that email,

267.    Throughout the fall of 2008,

In September 2008,

268.     Defendants also ███████████████████████████████████████████

█████████████████████████████████████████████████████

███████ For example, Keith Shoemaker, then CEO of Butterball, publicly stated in November 2008 that the "**the industry will cut 6.5 percent to 7 percent of production, which reached 7.4 billion pounds last year.** But given the amount of turkey meat in storage, it will take until at least April or May to get all that out of inventory."

269.     Along with Butterball's public statements, Butterball directly discussed████████

████████ with other Defendants. In November 2008, ███████████████████████████

██████████████████████████████████████████████

████████████████████████████

270.    Defendants also coordinated ███████████████████████████████

██████████████    In September 2008, ████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████ .



    **d.**    ████████████████████████████████
    █████████████████████████
    ████████████████

271.    In a January 19, 2009 e-mail, ███████████████████████

████████████████████████████████████████████

██████████████████████ In particular, █████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████████

106

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████

272.  ████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

273.  Hormel heard the message loud and clear from ████████████████

███████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████████

274.  At approximately the same time, Cargill changed its conduct and also vigorously

joined the ████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

275. An internal Cargill e-mail from January 2009 ████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████"

276. A February 2009 Cargill presentation discussed the ████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████

277. Around the same time, Cooper Farms executives also engaged in direct

communications with ████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████

278. Defendants and their Co-Conspirators continued to ██████████████

███████████████████████████████████████████████████

279. ███████████████████████████████████

███████████████. In a February 2009 email, ███████████

████████████████████████████████████

███████████████████████████████████

██████████

        *e.* ███████████████████████████████

███████████████████████████.

280. Butterball's ████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████

---

[10] In 2009, the █████████████ Executive Committee consisted of ███

███████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████

281.     In May 2009, Hormel's CEO confirmed on an earnings call that Hormel had engaged in increasing production cuts over the past year, stating, "We announced the production cuts last year and that production cut indeed is flowing through the system. We had announced 7 to 8% and then we added a little bit to the cut and so when all is said and done, we ended up in the low double-digit range of actual kind of meat being produced in the plants during the quarter." Hormel's CEO emphasized that the "production cuts going forward will still be in place."

282.     In May 2009, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

283.     On June 2, 2009, Hormel emphasized that it was ██████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████ .

284.    In July 2009, a Foster Farms executive wrote to ████████████████████
███████████████████████████████████████████████
████████████████████████████

285.    In July 2009, a Cargill ██████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████

286.    ████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████ .”

287.    To that end, ████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████

288.    Perdue later prepared presentations describing ████████████████████
████████████████████████████████████████

111



289.    Butterball confirmed in an ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

290.    Additionally, Butterball noted in the "████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

291.    Agri Stats/EMI executives commented on ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

292.    By November 2009, Defendants were beginning to ████████████████

████████████████████    On November 11, 2009, ████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Similarly, Cargill ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

293.   Despite ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████,

Farbest) ███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

**2.**   ████████████████████████████████████████████
████████████████████████████████████

294.   In 2010, Defendants and their Co-Conspirators began to ████████

████████████████████████████████████████████████

295.   In January 2010, an internal Perdue ████████████████████████

████████████████████████████████████████████████



114

296.    In March 2010, 

Later that same month,

The following month,

297.    A Perdue internal



298.    In May 2010, House of Raeford ████████████████████████████

299.    By June 2010, supplies for turkey were tight. ████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████ He asks █████████████████████████████████
████████████████████████████████████. She responded that █████
████████████████████████████████ She goes on to tell him that ████████
████████████████████████.

300.    In August 2010, █████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████████████████

301.    That same month, Hormel stated, ███████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

302.    And Cargill, again in the same month, prepared a presentation ███████████

████████████████████████████████████████████████



303.    Foster Farms ███████████████████████████████████████

███████████████████████████████████



304.    In September 2010, Butterball ███████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████ In internal
correspondence, Butterball executives stated █████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████

305.    In an email from November 27, 2010, █████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████ Defendants' statements
matched their conduct, specifically with regard to ████████████████████.

306.    A "███████████████████" PowerPoint made by Perdue in ████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████ Perdue noted that the █████████████████████████████

118

307. In April 2011, ████████████████████████████████

308. Defendants and their Co-Conspirators represented that the turkey industry has

In May 2011, Cargill wrote that

In September 26, 2011,

309. That same month, Hormel stated that the

310.    Several months later, in August 2011, Hormel stated that the █████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ This statement is notable because the chicken industry is currently the subject of multiple civil lawsuits as well as a DOJ investigation of potential antitrust violations that occurred during the same period of time.

311.    Notably, throughout this period, despite ██████████████, Defendants collectively kept ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████

312.    During this period, Defendants also continued to ████████████ ████████████████████████████████████. In January 2010, Farbest ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████

313.    In May 2011, ██████████████████████████████████████████ ████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████

314.    High level executives at the Defendants also engaged in ████████████

████████████████████████████. In October 2011, ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

    **3.**    ████████████████████████████████████████████████

█████████████████████████████████████████████████████

315.    In early 2012, Defendants and their Co-Conspirators were still ████████████████

████████████████████████████████████. However, Defendants grew concerned

about ████████████████████████████████████. In a February 2012 e-mail, ████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████    Defendants proceeded to respond with ████████████████████████████

316.    At the 2012 ████████████████    Convention in Tampa, ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

121

317.    While negotiating financing with ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

318.    In July 2012, ████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████



319. Ultimately

320. Defendants began to spread among themselves this message to

. In August 2012,

That same month, internal Cooper Farms correspondence reported,

321. Cargill's internal presentations also confirmed

322. As cutbacks began, Defendants started to



323. By September 12, 2012, ██████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████

**4.** ██████████████████████████████████████████
████████████████████████████

324. As 2012 drew to a close, Defendants continued to communicate amongst each
other to ████████████████████████████

325. In November 2012, ██████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████

326. That exact same month, ██████████████████████████

███████████████████████████████. In response ████████████████████

█████████████████████████████████████████████ In additional

e-mail correspondence, Farbest executives reported that ████████████████████

██████████████████████████████████████████████████████

██████████████████████████

327. By January 2013, ██████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

124

328. That same month, ███████████████████████████████

████████████████████████████████████████████████

329. The following month, █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████.”

330. In March 2013, Hormel executives internally discussed ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████

331. Several months later, ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████:



332.    On January 31, 2013, an internal Cooper Farms email revealed that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In that email thread, ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

333.    This prompted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮

334. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████

335. Hormel's own documents from around that time confirm that ██████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

336. After the ████████████████ Annual Convention on February 13–16,

notes from ████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████ :





In response to that message, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

337.    On February 27, ████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

338.    The following day, internal emails within Farbest reflected ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Similarly, internal Hormel documents from March 2013, show that Hormel ████████████████



339.    The wave of ████████████████████████████████████████

████  By March 21, 2013, Perdue was ████████████████████████

████████████████████████████████████

340.    At the end of March 2013, ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ Later documents confirm they did so.

341.    In May 2013, public statements by Urner Barry's Vice President Russ Whitman signaled more projected cutbacks by stating "dramatic declines" in turkey production were imminent. "He cited the sharp year-to-date decline in egg sets as being the root of the anticipated contraction in production. So far in 2013, egg sets depict a retreat in year on year figures of 7% and poult placements are declining at an even more severe pace due to the numbers of them

being destroyed. Whitman said that by projecting placements forward, we can ascertain that slaughter figures should start to show significant reductions in late June into early July."

342.    Notes from the Cooper Farms ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████

**5.**    ████████████████████████████████████████████████
████████████████████████████████

343.    On May 30, 2013, ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

344.    In June 2013, Hormel executives confirmed ███████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████    The notes also stated that "████████████████████████████

███████████████████████."   That same month, Cooper Farms executives noted ██████████

████████████████████████████████████████████████████

345.    On July 11, 2013, internal Cargill correspondence discussed █████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

346.    The Farbest Board of Directors Meeting Minutes from ████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████

347.    On July 23, 2013, ████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████

348.    In August 2013, Foster Farms was again evaluating whether ███████████

██████████████████████████████████████████████████████████████████

████████████████████████████

349.    Perdue prepared a presentation in August 2013 that ███████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

In particular, it specified that "████████████████████████████████████████



350.    Despite rising prices, Hormel

351.    The following month, Hormel

In September 2013,

132

██████████████████████████████████████████████

██████████████████

352.     In September 2013, Cargill discussed the ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████



353.     Even as they worked to █████████████████████████

█████████████████████████████████████████████. Cargill, the same

month as it planned █████████████████████████████████████

████████████████████████████████████████████

███████████████████████████. They ultimately decided ███████████████████

████████████████████████████████████████" They

emphasized that █████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

354.    That same month, ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████

███████████████████████████████████████████████████████

In the same document, ██████████████████

███████████████████████████████████████████████████████

355.    Hormel executives subsequently discussed the need to ██████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

356.    By October 2013, Defendant Integrators were able to see that ██████████████

███████████████████████████████    In an October 9, 2013 email from ██████████████████

██████████████████████████████████████████████████████████

357.    That same month, executives at Hormel made ███████████████

██████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████ Another

Hormel executive raised ███████████████████████████

██████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

████████████

358.    Also in October 2013, Cooper Farms executives stated that ████████████

██████████████████████████████████████

███████████████████████████████████████████

████████████████████████

135

359.     The following month, Cooper Farms internally discussed ███████████

███████████████████. Cooper Farms executives noted the ████████████

████████████" and estimated that Cooper Farms was responsible for ████████████

███████████.

360.     Thus, by the end of 2013, Defendants and their Co-Conspirators had used

███████████████████████████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████████

███████████████████████

361.     On December 26, 2013, ████████████████████████

███████████████████████████████

███████████████████████████."

**6.**     ███████████████████████████████████

███████████████████████████████████

███████████████████

362.     Defendants' coordinated███████████████████████

███████████████.

363.     In January 2014, ████████████████████████

███████████████████████████████████

███████████████████████████████████

364.    In January 2014, Cargill (internally) ██████████████████████

████████████████████████████████████████████

████████████████████████████

365.    By March 24, 2014, these benefits were already measurable. In internal

correspondence from Butterball, ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

366.    Similarly, on April 23, 2014, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████

367.    After this, Hormel reported ████████████████████████

████████████████████████████████████

████████████████████████

- ████████████████████████████████

. . .

- ████████████████████████

. . .

- ████████████████████████████████

. . .



368.     In April 2014, ███████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████

369.     In that same month, Cargill prepared a ██████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████:



New market baselines were established:



370.    The following month, an internal presentation by Perdue, ███████████

███████████████████████████████████

███████████████████████████████████

███████████████





371. In May 2014, ████████████████████ attended the Urner Barry
conference. █████████████████████████████████████

███████████████████████████████████████

██████████████████

372. That same month, Foster Farms executives ██████████████████

███████████████████████████████████

██████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

█████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████

373. In June 2014, Cargill reported internally that "███████████████████

███████████████████████████████████████

███████████████████████████████

**7.** ████████████████████████████████████
█████████████████████████████████████
███████████████████████

374. Defendants worked closely with ████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

a. ████████████████████████████████

375. In 2014, Defendants and their Co-Conspirators were enjoying record high profits, but they weren't satisfied with a one-time bump. So they came up with a longer-term solution in the form of the ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

376. They called their initiative ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

377. As Gary Cooper explained in an email to an industry contact, the purpose of the program was to "████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

███████ In a competitive market, commodity producers would respond individually to fluctuations in demand such that the amount of turkey supplied would naturally closely track the amount of turkey demanded. In that world, turkey prices are competitive and fair. Defendants' proposal subverted this by having producers work together to make sure demand always outstrips supply. In this world, turkey prices are pushed artificially high because supply always lags demand.

378.    As part of this initiative, the 2014 ████████████████████ Executive Committee formed a ██████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

██████████████████



379. The 2014 ▮▮▮▮▮▮▮▮ Executive Committee consisted of ▮▮

380. The original members of the ▮▮▮▮▮▮▮▮▮▮



381. ███████████████████████

382. In a March 16th e-mail, ███████████████████████

383. ███████████████████████

384. On March 27, 2014, the ███████████████████████



385.    Prior to the meeting, ███████████████████████████████ ████████████████████████████. To date, Plaintiffs have not located a copy of the underlying "███████████" in Defendants' production. At the subsequent in-person



386.    Subsequent to the meeting,

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

387.     As the goals of the ██████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████

388.     On May 28, 2014, ██████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████.



389.     On June 24, 2014, ██████████████████████████

████████████████████████████████████████

390.     Among those achievements, the ████████████████ listed the creation of an online ████████████████

The report also states that ████████

In other words, ████████████████

391.     The following slides from an undated ████████████████

150


395.  A July 2014.



396.    On or around October 21, 2014, the ████████████ executive

committee met ███████████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████████████████████

██████████████████████

397.    On October 22, 2014, ███████████████████

████████████████████████████

██████████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████████████████████████████████

██████

398.    ██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

399.    On March 26, 2015, ████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████



400.    In February 2015, 

b.    ***Defendants and their Co-Conspirators create the***

401.    At the same time that the

402.     Defendants had long encouraged ██████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████

403.     Internally, EMI discussed ████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████

404.     ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████

405.     In February 2013, ████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████

406. Throughout 2013, EMI continued to 

407. Contemporaneously, EMI worked specifically to

158

408.     By December 2013, EMI had ██████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ :



409.     In January 2014, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

410.    By March 2014, EMI was ███████████████████████

411.    In April 2014, Cooper Farms agreed to ███████████████

412.    As of July 2014, ███████████████████████



413.    Throughout its development in 2014, the EMI

414.    Following full launch of the program at the end of 2014, Defendants began

**8.** ███████████████████████████████████████████████
██████████████████████████████

415.    In November 2014, Perdue celebrated ████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████████

416.    On December 2, 2014, ███████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████

417.    Cuts resulting from the ███████████████████████████
████████████████████████████████████  In September 2015,
executives at a Hormel █████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████

418.    In October 2015, documents show Hormel ████████████████
████████████████████████████████████████████
████████████████████████████████████████████

162

419.    The result of the ███████████████████████████████████

███████████████████████. On September 11, 2015, internal Foster Farms

correspondence stated that the ████████████████████████████████████

420.    On November 6, 2015, ███████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████

421.    On December 17, 2015, ███████████████████████████
█████████████████████████████████████████████████

422.    On December 31, 2015, ████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
█████████████████████████████

423.    In the 2016 Cooper Farms' ████████████████████████████
██████████████████████████████████████.

424.    EMI reported that "███████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

425.     There was an avian influenza outbreak in 2015. However, the avian influenza outbreak does not explain the preceding supply reductions in 2013, or the record high price increases in 2014. Moreover, the avian influenza does not fully explain the supply shortages and record prices in the United States for turkey in 2015 because the avian influenza led to turkey exports during this period being heavily restricted, leaving more supply for the domestic market, as shown by evidence indicating that total per capita U.S. consumption of turkey rose in 2015. In short, the 2015 Avian Flu outbreak, at most, simply exacerbated the supply shortages and record prices that were the purpose and effect of Defendants' conspiracy.

426.     Through the end of the Class Period, Defendants continued to ██████████████

██████████████████████████████████████████████

**D.      Frequent, regular direct information exchanges regarding supply and pricing communications and social interactions between Defendants support an inference of collusion.**

**1.      Numerous Defendants and their Co-Conspirators belonged to an informal group known as the "██████████████████" where they exchanged detailed, current production information and met in-person on an annual basis.**

427.     At the start of the conspiracy period, several Defendants and their Co-Conspirators (Farbest, Cooper Farms, Perdue, Michigan Turkey, and Dakota Provisions) belonged to an informal group of turkey integrators known as the ███████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████."



428.     For the purported purpose of ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████



429.    In 2010, members of the ████████████ worked on updating the

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████

430.    Following internal meetings at Farbest, ████████████████████

██████████████████████████████████████████████████████████



431.    In August 2010,

432.    In April 2014,



433.    At the in-person meeting, the group agreed that ███████████████████



434.    The group also made plans to extend invitations to ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████



435.   At the June 2014 meeting, the group agreed that each would ██████████

436.    Defendants and their Co-Conspirators in the ▮▮▮▮▮ subsequently prepared and circulated amongst themselves ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.



437.    Certain ▮▮▮▮▮ members, such as Cooper Farms, included ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

438.    The ▮▮▮▮▮▮▮▮ were subsequently compiled into ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



439. The information shared through the ███████████████████████

██████████████████████████████████████████████████████

████████████████████████████

440. ███████████ members also attempted to use ██████████ for direct communications regarding their business operations. A Norbest executive, over e-mail, asked

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

441. The ██████████████████████████████████ In August 2017, the

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

**2.** ███████████████████████████ **Defendants regularly exchanged competitive pricing information with each other as part of their coordinated conduct.**

442. Throughout the conspiracy period, Defendants regularly exchanged competitive pricing information with each other. These repeated exchanges of competitive pricing information further support a plausible inference of an agreement among Defendants to restrain supply and stabilize prices.

443. For example, in January 2012, senior Hormel executive █████████, directly instructed ████████████████████████████████████████

████████████████████████████████████



███ wrote to █████:

███████████████████████████████████████████
███████████████████████████████████

███████ forwards to ███████, writing:

███████████████████████████████████████████
█████████████████

███████ replies to ███████:

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████

444. Hormel continued to █████████████████████████. In December 2013, a Hormel executive reported that ███████████████████

████████████████████████████████████████

174

███████████████████████████████████████████████

████████████████████████████████████

445.    Hormel executives specifically discussed ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

446.    In other emails, ███████████████████████████████████

██████████████████████████████████:

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

447. Throughout the conspiracy period, ████████████████████
███████████████████████████████████████. For example, in
July 2013, ████████████████████████████████████████████████
██████████████████████████████████████████████████
███.

448. Similarly, Butterball executives █████████████████████
██████ in September 2012 that ████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████

449. ██████████, frequently instructed ███████████████████████
██████████████████████" For example, in July 2014, ████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████
████████████████

450. Phone records produced to date in this litigation also show ██████████████
█████████████████████████████████████████████████████████.

451. Cargill also reported on competitive pricing information █████████████████
██████. For example, ████████████████████████████████████

176

████████████████████████████████████████████████

████████████████████████

452.    Apart from Hormel, Cargill, and Butterball (the 3 Defendants who collectively

controlled a majority of the market), other Defendants also specifically worked to ██████

████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

453.    The regular communications between Defendants regarding their pricing

continued ████████████████████ In July 2016, ████████████████████████████

████████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

454.     The frequent exchange of pricing information between competitors allowed them to coordinate on price increases. For example, [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

455.     Similarly, in February 2012, Hormel executives appeared to push price increases following a communication with Cargill, [REDACTED]

[REDACTED]

[REDACTED]

456.     These types of information exchanges regarding pricing continued throughout the class period. In February 2014, as Hormel [REDACTED]

[REDACTED]

[REDACTED]

457. Similarly, Cargill prepared █████████████████████████████

████████████████████████████████████████████



458. These numerous direct communications also provided a █████████████

█████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

### 3. Opportunity contacts abounded between Defendants and their Co-Conspirators and allowed them to maintain the conspiracy.

459. Defendant Integrators are members of several turkey-related trade associations and other forums, which they used to facilitate their conspiratorial conduct. Turkey producers have numerous regular events through which they can communicate in person with one another. Regular and frequent attendance by Defendants' CEOs and top-level executives at trade-association meetings is the norm rather than the exception. Each category of opportunity contact is discussed below.

#### a. *Numerous Trade Association Events provided ample opportunities to directly meet and collude.*

460. Repeated opportunities for contact at trade association meetings are critical for developing the relationships needed to implement a price-fixing conspiracy. For example, in the recent criminal trial *United States v. Penn*, et al. (the U.S. Department of Justice's ongoing trial against ten individuals for criminal price-fixing and bid-rigging of broiler chickens), one of the trial exhibits shows Defendant Jayson Penn on December 6, 2011 texting his colleague Bill Lovette stating "[t]he relationships I developed through the organization [USAPEEC] allowed me to pick up the phone any time and call multiple friends to flush out current and forward pricing from friendly competitors."[11]

---

[11] *United States v. Penn, et al.*, No 20-cr-00152-PAB (D. Colo.), Government Exhibit 1.1 (ECF No. 448-2), filed Sept. 7, 2021, at 1.

461.     Defendants are members of many trade associations that have afforded them opportunities to become familiar and comfortable with one another. Defendants plan months in advance to attend these conventions and to have the opportunity to meet privately for dinners and meetings to discuss the turkey industry. Some of the trade association conferences highly and frequently attended by Defendants include the ████████████████ (discussed extensively above), USA Poultry & Egg Export Council, the US Poultry & Egg Association, and the North American Meat Institute.

462.     A group of turkey integrator competitors known as ████████████████
████████████████████████████████████████
████████████████████████████

463.     Year after year, ████████████████████████████
████████████████████████████████████████
████████████████████

### (1)     The United States Poultry & Egg Export Council

464.     The United States Poultry & Egg Export Council (USAPEEC) has its home office in Stone Mountain, Georgia. Defendants are all members of this council. USAPEEC has a network of international offices and consultants in key export markets. The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world. The council has evolved into an advocate for the industry on trade-policy issues. USAPEEC has about 200 member companies and organizations. The council holds Board of Directors meetings quarterly and includes executives from all or nearly all Defendants.

465.     In April 2014, Steve Lykken (Hormel) and Joel Coleman (Vice President of USAPEEC), organized the USAPEEC turkey subcommittee. The mission of the subcommittee was to establish a coordinated industry effort to pursue open market access and a unified

approach to export issues affecting the turkey membership and create a unified approach to turkey export issues affecting the turkey membership. The group met during all USAPEEC conferences and as otherwise necessary.

466.    Members, otherwise known as stakeholders, that supported the subcommittee included



467.    The subcommittee that was initially organized to establish a coordinated industry effort soon became hesitant to allow other industry members to join as some members wanted to keep the group small and inaccessible to others.

### (2)    U.S. Poultry & Egg Association

468.    The U.S. Poultry & Egg Association (U.S. Poultry) describes itself as the world's largest and most active poultry organization. U.S. Poultry's members include producers and processors of broilers, turkeys, ducks, eggs, and breeding stock, as well as allied companies. Many of the Defendants are members of U.S. Poultry. U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall. Butterball, Cargill, Foster, Tyson, and Perdue have representation on the Board of Directors.

### (3)    North American Meat Institute

469.    The North American Meat Institute (NAMI) represents companies that process 95% of red meat and 70% of turkey products in the United States and their suppliers throughout the country. NAMI hosts the Meat Industry Summit in April each year. Additionally, it holds regular Board of Director meetings. Butterball, Cargill, Hormel, and Tyson have representation on the NAMI Board.

b.    *A high degree of movement of employees permitted trusted former colleagues to have confidence exchanging pricing and supply information directly with one another.*

470.    On top of attending numerous conferences and meetings together, Defendants have permitted employees to regularly move between companies. Despite changing companies, Defendants have managed to keep their pre-existing ties with former colleagues. Some of these relationships have provided CEOs and other top-level executives with comfort and trust to discuss their specific marketing and sales plans. For example, ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ ████ is just an example of the type of relationships that have afforded CEOs and executives with the opportunity and comfort to share competitively sensitive information about their company's turkey business.

471.    Similarly, Neal Walsh, Perdue's former executive left the company to join Butterball in 2007 as the Director of Purchasing and became the Chief Operating Officer in 2020. Since ending his employment with Perdue, Walsh has managed to ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████

472.    Dean Lisenby served as Director of Supply Planning for Perdue, before moving to Butterball in 2008 to serve as Senior Director Supply Chain Planning. Similarly, Butterball's current Senior Vice President of Retail Sales, Chris Peach came from Perdue to Butterball in 2007. While at Perdue, Peach was the Director of Sales for 19 years before joining Butterball as their Vice President of Retail Sales.

473. Lastly, Rhonda Murphy, House of Raeford's Director of Sales, was once before employed by House of Raeford before leaving to work for Butterball from 2009-2012 as their Corporate Accounts Manager. Ms. Murphy resigned from Butterball in April 2012 and returned to House of Raeford as their Director of Sales. Ms. Murphy has managed to ████████████ ████████████████████████████████████.

474. Although the above-mentioned executives no longer work for the same employer, their relationships with former colleagues did not end. The connections shared ensured they remained in touch and allowed for opportunity, time and trust to have conversations where they could share confidentially sensitive information.

        c.    ***Defendants' frequent and unfettered opening up of their facilities to one another for plant tours and visits permitted extensive opportunities to share information with one another.***

475. Defendants have found themselves on numerous occasions requesting and permitting visits and tours of their facilities to competitors. Plant tours and visits like many other private interactions have given Defendants the opportunities to gather, discuss and share competitively sensitive information.

476. Throughout the relevant time period, several ███████████████████████████ ███████████████████████████████████████. The relationship between the Defendant competitors has been strengthened throughout the years making it possible for personal conversations to take place.

477. In October 2008, █████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████████

478. During a 2015 visit to Cargill's facility ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

479. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

480. These visits and many others have played a pivotal role in helping develop relationships between Defendant competitors.

> **d.** ***Other informal events, such as sporting events and private dinners, permitted private and confidential opportunities for Defendants' employees to directly exchange pricing and supply information.***

481. Defendants have organized and attended numerous sporting events together. Many have even organized basketball games, golf outings, and private dinners. These events took place both during formal conferences and some occurred outside that context.

482. For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

483.    Golf tournaments were used extensively for opportunities for senior executives to meet with one another. Examples of annual tournaments where executives met with one another include the ██████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

484.    Attendees to one or more of the ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████

485.    Attendees to one or more of ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

486.    Attendees to the ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

487.    Attendees to the 

488.    Many of the high-ranking executives at Defendants' and their Co-Conspirators' organizations appeared to be close personal friends and would communicate frequently. On April 12, 2017,

e.    ***Collusion Between Defendants in Other, Related Industries Supports an Inference of Collusion.***

489.    Defendant Agri Stats has played a central role in other protein industries. As alleged in the *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill.) litigation and the *In re Pork Antitrust Litigation*, No. 18-cv-1776 (D. Minn.), Agri Stats colluded with boiler and pork producers respectively to collect and disseminate competitively sensitive information such as financial information (monthly operating profits, sales, and cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type.

490. In the broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and Defendants and their Co-Conspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, EMI. Agri Stats collected data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.

491. The detail of these reports ensured that competitors could quickly decode the information of their purported competitors. The *Broiler* complaints allege it was common knowledge among producers that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes. The broiler reports, in part, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

492. In the broiler industry, it is also alleged that Agri Stats – known to its Co-Conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that furthered the purposes

of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the broiler industry facilitated the implementation of the agreement to restrict supply – where Agri Stats would transmit the intentions of the broiler producers to restrict supply.

493.    In a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the broiler industry, it was reported:

> "Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows Co-Conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your Co-Conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "*That is what creates stability for a cartel*."

494.    The district court noted, in denying the motions to dismiss in the *In re Broiler Chicken Antitrust Litigation* that given the nature of the Agri Stats reports, the Defendants are in fact sharing future anticipated production information with one another, which suggests high antitrust concerns.

495.    The DOJ has investigated the broiler chicken industry and announced a grand jury investigation in 2019. Tyson subsequently publicly announced that it was cooperating with the DOJ Investigation. The DOJ subsequently brought criminal charges against employees at certain broiler chicken companies for collusive activities.

**E.      The structure of the turkey industry is conducive to conspiracy.**

**1.      Defendants possess market power in the market for turkey.**

496.      One tool that courts use to assess the competitive effects of concerted action is defining a relevant market—the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). This case concerns the sale of turkey for meat consumption in the United States.

497.      Turkey is the relevant product market and the geographic market is the continental United States. Defendants collectively possess market power in the market for turkey. Defendants and their Co-Conspirators collectively possessed approximately 80 percent of the overall market share for turkeys during the Class Period. There is a single market for turkey for meat consumption. Prices for turkey sold in the United States are quoted generally in disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

**a.      *There are high barriers to entry in the market for turkey for meat consumption.***

498.      The existence of high barriers to entry is one factor which makes markets susceptible to collusion. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel. High barriers to entry in the turkey processing market exist, precluding other entrants or would-be competitors from entering the market for turkeys raised for consumption.

499.     During the Class Period and continuing today, substantial barriers impede entry into the turkey market. A new entrant into the market would face costly and lengthy start-up costs, including multimillion-dollar costs associated with research and development, equipment, energy, transportation. Distribution, infrastructure (aka "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, long-standing customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.

500.     The price of construction of a new integrated turkey processing complex is relatively high. For example, the cost for a current market participant, Virginia Poultry Growers Cooperative, to construct a new turkey processing in 2015 was $62 million.

501.     The turkey market has been subject to steadily increasing consolidation over the last several decades. In the 1970s, the turkey market was defined by competition among dozens of companies that worked with independent farmers.[12]  But now, just four corporations—Cargill, Hormel, Butterball, and Farbest—produce more than half of the turkey in the United States.

502.     The turkey market also has high levels of vertical integration that constitute a barrier to entry. The ████████████████ states that "turkey companies are vertically integrated, meaning they control or contract for all phases of production."[13]

---

[12] Christopher Leonard, *That Turkey on Your Plate Could Use Some More Industry Competition*, The Washington Post (Nov. 22, 2013), https://www.washingtonpost.com/opinions/that-turkey-on-your-plate-could-use-some-more-industry-competition/2013/11/22/045fc470-5177-11e3-a7f0-b790929232e1_story.html.

[13] *Industry Structure*, ████████████████, https://web.archive.org/web/20190617083253/https://www.eatturkey.org/industry-structure/ (last visited Jan. 7. 2022).

191

503. For example, Butterball has over 175 farms that they own, as well as contracts with numerous independent farmers. Hormel owns over 100 commercial growing farms. Cargill owns around 700 farms. Farbest has more than 200 contract growers.

**b.** ***The Defendants have market power in the market for turkey for meat consumption.***

504. The Defendant Integrators possess market power in the market for turkey for consumption. Defendants and their Co-Conspirators controlled at least an average of 77% of the market from 2010–2018.

**Figure 6: Average Market Share of Defendants and Their Co-Conspirators (2010–2018)**



### c.  *The market for turkey is the type of market conducive to collusion.*

505.    Competition is likely to be harmed when competitors with market power in concentrated markets, such as the market at issue, directly exchange strategic information about current and forward-looking plans for prices and supply. The strategic information exchanged between the Defendants was a competitively sensitive and a material factor in negotiations. Price, capacity, supply and costs are crucial aspects of competition. When Defendants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects of sales of turkey.

506.    The information exchange took place in private settings and involved the exchange of confidential, non-public information.

507.    The market for turkey is characterized by numerous attributes that mean the type of information exchange facilitated by Agri Stats are particularly likely to have anticompetitive effects. In particular, the market for turkey features relatively few sellers, a fungible product, price-based competition, inelastic demand, and a trend toward price uniformity.

### 2.  **The market for turkey is the type of market where information exchanges and per se price-fixing behaviors are likely to harm competition.**

### a.  *The turkey market features few sellers.*

508.    The turkey market is concentrated, with relatively few sellers. The Defendants and their Co-Conspirators control approximately 80 percent of turkey production and processing. The presence of few companies supports the inference that a conspiracy to exchange information had the intended effect of restraining competition.

### b.  *Turkey is a fungible product.*

509.    One of the distinct characteristics of the turkey industry is the fungibility of turkey products. Fungibility is also known as the ability to be freely exchangeable or replaceable

in whole or in part. Common sense indicates that at Thanksgiving a consumer can substitute a whole turkey produced by Butterball with a whole turkey produced by Cargill.

510.    Indeed, the Agri Stats reports themselves show that turkey is fungible because they aggregate data across Defendants for particular types of turkey products and allow Defendants to compare detailed information on prices for the same fungible product. CW1 confirmed that the Agri Stats reports were organized by specific item of turkey product. And, as shown above, the Agri Stats reports are broken out by specific types of turkey product.

<h4 style="text-align:center">c.    <em>The turkey market features price-based competition.</em></h4>

511.    Turkey is a commodity market that faces price-based competition. Turkey is a tangible, commodity product with little or no product differentiation based on the processors. Turkey produced by one Defendant is reasonably interchangeable with that from another Defendant. Defendants ██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████ Production cuts—no matter where they originate—will affect the prices (and consequently profitability) of the entire turkey industry. No matter where the cuts originate, all turkey processing firms can expect to benefit.

<h4 style="text-align:center">d.    <em>Demand for turkey is relatively inelastic.</em></h4>

512.    Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[14] A PED value

---

[14] <em>See, e.g.</em>, Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson, et al., <em>Price Elasticity of Demand</em> (Nov. 13, 1997), https://scholar.harvard.edu/files/alada/files/price_elasticity_of_demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, <em>The Dynamics of Price Elasticity of Demand in the</em>

between 0 and -1 indicates there is inelastic demand for the good or service – i.e., a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. The USDA has estimated that the average PED estimate for the turkey market is -0.58 – meaning the demand for turkey is inelastic. Indeed, most American consumers eat turkey at Thanksgiving, not pork or chicken, illustrating that there is no substitute for one of the key demand drivers of turkey.

### e.   *The turkey market features a trend towards price uniformity.*

513.    Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. For example, whole turkey products are produced on a commercial scale and sold in supermarkets. Whole turkeys are virtually indistinguishable, with similar nutritional values, branding and packaging.

### f.   *The turkey industry is highly vertically integrated.*

514.    In the turkey industry, the phrase "vertically integrated" means that the turkey producing company owns or controls each aspect of breeding, hatching, rearing, feeding, basic processing, and selling of turkey. Many vertically integrated turkey producing companies also own further processing plants. The turkey industry is highly vertically integrated, with turkey-producing companies owning or tightly controlling almost all aspects of production, processing, and marketing turkey.

515.    The graphic below, taken from a Butterball PowerPoint presentation. ████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

*Presence of Reference Price Effects*, 33 J. Academy Mktg. Science 66-78 (2005), *available at* http://www.math.tau.ac.il/~fibich/Manuscripts/elasticity_JAMS.pdf.



**F.     Abnormal pricing during the Class Period demonstrates the anticompetitive effects of the alleged conduct by Defendants and their Co-Conspirators.**

516.     Beginning in 2010, following the coordinated cutbacks described above, the turkey industry showed abnormal price movements, *i.e.*, price increases for whole turkeys that was unexplained by increases in costs. All of these pricing measurements show a significant break between pricing prior to 2010 and pricing after 2010, supporting the plausibility of anticompetitive effects on the turkey market from the alleged anticompetitive conduct. Plaintiffs have measured the various abnormal pricing movements in a number of ways, including: (i) the average turkey price, (ii) the Defendant Integrators' margin during the Class Period;(iii) the variation between feed and turkey prices before and during the Class Period; and (iv) a regression analysis that models the relationship between turkey prices and feed prices.

1. **The average turkey wholesale price experienced an unprecedented increase beginning in 2009.**

517. According to aggregate prices published by the USDA, the average wholesale price per pound for turkey hens was between $0.55 and $0.85 every year from 2000 to 2009, before steadily increasing to $1.15 by 2016. Following initiation of the *Broilers* litigation, the price of turkey then quickly returned to the price at which it was prior to the conspiracy. The following graph shows the unprecedented increase in turkey prices beginning in 2009, and staying elevated through the end of 2016.

**Figure 7: Average Turkey Wholesale Prices in Cents per lbs., 2000-2018**



2. **Beginning in 2009, Defendants' revenues diverged from their costs.**

518. Plaintiffs' experts examined the spread between turkey revenue and turkey-related costs (costs of goods sold + operating costs) for Hormel, the only one of the three largest turkey Defendant Integrators with public earnings, as a proxy for measuring the spread between a Defendant's price of wholesale turkey and their turkey costs. This measurement accounts for

197

Defendant-specific operating costs.[15] This analysis confirms the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the Class Period in 2009.

519.    The following chart shows a break in revenues and costs around the start of the Class Period in 2010 for Hormel's Jennie-O Turkey brand:

**Figure 8: Jennie-O's Revenues vs Costs (March 2001 to March 2018)**



520.    The anticompetitive effect of Defendants' information exchange is seen in the dramatic increase in Jennie-O's spread between revenue and costs after the start of the conspiracy period.

---

[15] Hormel does not make any data publicly available on Jennie-O's costs. Therefore, Plaintiffs have assumed for the purposes of this analysis that Jennie-O's costs are the same proportion to Hormel's overall costs as Jennie-O's revenues are to Hormel's overall revenues.

**Figure 9: Jennie-O Turkey's spread: Revenue minus Cost 2001-2018**



521.    These analyses of the spread between costs and prices confirm one essential fact –

that rising costs do not explain the increases in price seen during the Class Period.

> **3.    During the conspiracy period, prices rose but production failed to rise to match demand, indicating an anticompetitive restraint on supply in the market for turkey facilitated by the information exchange through Agri Stats and the per se exchange of pricing and supply information between Defendants.**

522.    In a competitive market, production generally matches demand. More demand

will lead to more supply. Conversely, a drop in production caused by falling demand should

correspond to falling prices. However, in the turkey market during the conspiracy period,

production, measured through USDA data, remained artificially restrained even as demand,

captured by higher per capita expenditures on turkey, rose significantly. These observed price

and output dynamics, shown in the below chart, are consistent with an anticompetitive effect on

turkey output facilitated by the information exchange through Agri Stats.

**Figure 10: Indexed Per Capita Expenditure v. Production**



4. **During the conspiracy period, prices of turkey radically diverged from the costs of underlying feed.**

523. Feed is the primary driver of turkey costs, accounting for approximately 60-70% of the overall cost of raising turkeys for sale according to the New York Times.[16] Prior to the conspiracy period, there was a tight relationship between the price of feed and the price of turkey, as would be expected in a competitive commodity market that was pricing its product based on its primary input cost. However, during the conspiracy period, the relationship between the price of feed and the price of turkey diverged dramatically, as would be expected as an anticompetitive effect of the information exchange that allowed the Defendant Integrators to charge more than was justified by their input costs. The divergence is illustrated in the below chart:

---

[16] Paul Sullivan, *In the Labyrinth of Turkey Pricing, a Reason Under Every Giblet*. The New York Times (Nov. 18, 2011), https://www.nytimes.com/2011/11/19/your-money/a-primer-to-calculate-turkey-prices.html.

**Figure 11: Relationship Between Feed and Hen Prices**



5.     **A regression model demonstrates the anticompetitive effects on the price of turkey caused by the information exchange conducted through Agri Stats as well as the direct exchange of pricing and supply information.**

524.     To demonstrate the anticompetitive effects of Defendants' information exchange on the market for turkey, Plaintiffs' experts have done a regression model based on the relationship between the price of turkey hens and the price of turkey feed, which is the primary input cost for turkeys. The formula of the regression is the following:

$(HenPrice)=\alpha+\beta(FeedPrice)t+\varepsilon t$. As shown below, the regression shows a significant elevation in the prices of turkey during the conspiracy period, showing the effects of the information exchange through Agri Stats:

**Figure 12: Regression Model Showing Price of Hens and Feed (2000–2019)**



## V. DEFENDANTS ACTIVELY CONCEALED THE EXTENT OF THEIR INFORMATION EXCHANGE AND PLAINTIFFS DID NOT AND COULD NOT HAVE DISCOVERED DEFENDANTS' ANTICOMPETITIVE CONDUCT.

525. Plaintiffs and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this complaint. Defendants engaged in a secret information exchange that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was an anticompetitive agreement to exchange information regarding the market for turkey. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiffs and class members.

526.     In 2009, the President of Agri Stats, Bryan Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company. **There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background**, and really our specialty is working directly with companies about their opportunities and so forth.

527.     At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidential[] nature of the information." Further, in response to a request for ███████████████, Agri Stats' Stacey Edwards declined, stating "███████████████████████████."

528.     Not until recently was the extent of the information exchange conducted through Agri Stats widely known or reported. Only after the filing of a February 7, 2018 Second Consolidated and Amended Complaint by the End User Plaintiff Class in the *In re* Broiler *Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the confidential services that Agri Stats provides to its clients in the broiler industry.

529.     The filing of that amended complaint collectively disclosed the likelihood that the turkey industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

530.     Defendants concealed the extent of their information exchange through Agri Stats. Indeed, to this day, it is not publicly known the number of companies that receive Agri Stats reports regarding turkey. Accordingly, a reasonable person under the circumstances would

not have been alerted to begin to investigate the legitimacy of Defendants' turkey prices before these recent events.

## VI.    CLASS ACTION ALLEGATIONS

531.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "Indirect Purchaser States")[17]  on behalf of the following Commercial and Institutional Indirect Purchasers Class:

> All commercial and institutional purchasers in the Indirect Purchaser States that purchased turkey, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of turkey from January 1, 2010 to January 1, 2017. Excluded from the Commercial and Institutional Indirect Purchasers Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

532.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief pursuant to the Sherman Act on behalf of the Commercial and Institutional Indirect Purchasers Class.

533.    Plaintiffs reserve the right to modify the class definitions at a later date.

534.    While Plaintiffs do not know the exact number of the members of the Class, there are likely thousands of class members.

---

[17] The Indirect Purchaser States include the following states (and territory):  Arizona, Arkansas, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

535.    Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of turkey in the United States;

(b)    Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached;

(c)    The identity of the participants of the alleged conspiracy;

(d)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(e)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(f)    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(g)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Class, thereby entitling Plaintiffs and the members of the Class to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(h)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Class;

(i)     The effect of the alleged conspiracy on the prices of turkey sold in the United States during the Class Period;

(j)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities to artificially inflate prices for turkey, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Class;

(k)     The appropriate injunctive and related equitable relief for the Commercial and Institutional Indirect Purchasers Class; and

(l)     The appropriate class-wide measure of damages for the Commercial and Institutional Indirect Purchasers Class.

536.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for turkey purchased indirectly. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.

537.     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

538.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

539.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiffs reserve the discretion to certify the Class as separate classes for each of the Indirect Purchaser States or as separate classes for certain groups of Indirect Purchaser States, should the Court's subsequent decisions in this case render that approach more efficient.

540.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII.    ANTITRUST INJURY

541.    Defendants' anticompetitive conduct had the following effects, among others:

A.    Price competition has been restrained or eliminated with respect to turkey;

B.    The prices of turkey have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C.    Commercial and institutional indirect purchasers of turkey have been deprived of free and open competition; and

D.  Commercial and institutional indirect purchasers of turkey, including plaintiffs, paid artificially inflated prices.

542.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge paid by the commercial and institutional indirect purchasers. Thus, the economic harm to plaintiffs and the class members can be quantified.

543.  The purpose of the conspiratorial conduct of defendants and their co-conspirators was to raise, fix, or maintain the price of turkey and, as a direct and foreseeable result, plaintiffs and the Class paid supra-competitive prices for turkey during the Class Period.

544.  By reason of the alleged violations of the antitrust laws, plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for turkey than they would have paid in the absence of defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

545.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.   CAUSES OF ACTION

### COUNT I
### Violation of Section 1 of the Sherman Act (15 U.S.C. §§ 1, 3)

#### Claim I
#### (Rule Of Reason Violation)

546.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

547.  Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 2010, and continuing at least until January 1, 2017, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement to regularly

exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

548. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of defendants' affairs.

549. Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for turkey throughout the United States.

550. The relevant product market is turkey and the relevant geographic market is the continental United States.

551. Defendant integrators possess market power in the Relevant Market. Defendant integrators and their co-conspirators controlled approximately 80 percent of the Relevant Market. Defendant integrators' collective market power includes the power to artificially deflate the amount of turkey produced in the United States below competitive levels and to artificially inflate the price plaintiffs pay for turkey above competitive levels.

552. Defendants could impose an increase in the price of turkey collectively without causing many consumers and businesses to switch their purchases to another product. Turkey constitutes a unique product market.

553. Defendants view the turkey products as fungible. Turkey products are generally interchangeable, permitting defendant integrators to readily to compare and match each other's pricing.

209

554.     The information regularly exchanged by defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public information about current supply, production and pricing plans regarding turkey. The information exchanges specifically included the exchange through Agri Stats of weekly and monthly reports regarding defendants' turkey operations, including weekly sales data that allowed defendants to compare their prices with their competitors and raise prices that were lower.

555.     Defendants' regular information exchanges through Agri Stats reflected concerted action between horizontal competitors in the market for turkey.

556.     Each defendant integrator furnished competitively sensitive information to other defendant integrators with the understanding that it would be reciprocated. Agri Stats enforced this understanding by requiring defendants to share data in order to receive comparable data.

557.     The agreement to regularly exchange detailed and non-public information about current production, supply, and pricing suppressed competition between the defendants. Agri Stats specifically identified for defendants the instances where their pricing was lower than other defendants and where they could raise their prices to match.

558.     When defendants that are competing for the same consumers and businesses exchange competitive information, it reduces the incentives to compete on price. Accordingly, defendants used the data obtained through Agri Stats to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the turkey market. This strategic information was a material factor in defendant integrators' decisions to inflate the prices that plaintiffs paid for turkey during the Class Period.

559.     Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive

purpose. The information exchanged between defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

560.     The information-exchange agreement has had the effect of (1) reducing and suppressing competition among defendants in the market for turkey in the United States and (2) inflating the prices of turkey during the Class Period. As a result of defendants' unlawful conduct, plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for turkey.

561.     As a direct and proximate result of defendants' anticompetitive conduct, plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for turkey than they would have paid and will pay in the absence of the conspiracy.

562.     Plaintiffs and members of the Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

### Claim II
### (*Per Se* Violation)

563.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

564.     Defendants and all of their Co-Conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

565.     Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

566.     At least as early as January 1, 2010, and at least until January 1, 2017, the exact dates being unknown to Plaintiffs, Defendants and all of their Co-Conspirators entered into a

continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for Turkey, thereby creating anticompetitive effects.

567.     Defendants engaged in coordinated production cutbacks in 2008 and 2009, raised prices in 2010-2011, engaged in another round of coordinated production cutbacks in 2012 and 2013, and reaped record profits following their second round of cutbacks. Defendants coordinated through repeated direct communications regarding their production cutbacks and he retention of Agri Stats to provide current and forward forecasting, including the ███████ ███████ Outlook study in 2008 and the Turkey Demand Enhancement Team Demand Index in 2014. Numerous plus factors further support the inference of a per se agreement, including 1) direct information exchanges between Defendants regarding current production levels through their participation in the Midwestern Consortium; 2) frequent exchanges between Defendants of competitive pricing information; 3) numerous opportunity contacts through participation in trade associations and other social interactions; 4) a market structure conducive to collusion.

568.     Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Turkey throughout the United States.

569.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for Turkey.

570.     As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supra-competitive prices for Turkey.

571.     In formulating and carrying out their alleged agreement, understanding and conspiracy, Defendants and all of their Co-Conspirators did those things that they combined and

conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

      A.     Price competition in the market for Turkey has been restrained, suppressed, and/or eliminated in the United States;

      B.     Prices for Turkey sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their Producer Co-Conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

      C.     Plaintiffs and members of the Class have been deprived of the benefits of free and open competition in the purchase of Turkey.

572.    Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of Turkey on the spot market to be higher than it would be but for Defendants' conduct. Defendants also knew and intended that such an artificial inflation of spot market prices would increase other Turkey market prices, including those paid by Plaintiffs and members of the Class.

573.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for Turkey than they would have paid and will pay in the absence of the conspiracy.

574.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

575.    Plaintiffs and members of the Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## COUNT II
## Rule of Reason and *Per Se* Violation of State Antitrust Statutes
## (on behalf of Plaintiffs and the Class)

576.     Plaintiffs repeat the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

577.     During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of turkey in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

578.     The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for turkey, including in the United States and its territories.

579.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including agreeing to fix, increase, inflate, maintain, or stabilize effective prices of turkey purchased by Plaintiffs and members of the Class; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

580.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of turkey. As a direct and proximate result, Plaintiffs and members of the Class were deprived of free and open competition and paid more for turkey than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of

the above states were designed to prevent and flows from that which makes Defendants' conduct

unlawful.

581.    In addition, Defendants have profited significantly from the conspiracy.

Defendants' profits derived from their anticompetitive conduct come at the expense and

detriment of Plaintiffs and the members of the Class.

582.    Accordingly, Plaintiffs and the members of the Class in each of the following

jurisdictions seek damages (including statutory damages where applicable), to be trebled or

otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit,

including reasonable attorneys' fees, to the extent permitted by the following state laws.

583.    Defendants' anticompetitive acts described above were knowing, willful and

constitute violations of the following state antitrust statutes.

584.    **Arizona:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in

paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful

agreement in restraint of trade in violation of Ariz. Rev. Stat. §44-1401, *et seq.* Defendants'

conspiracies had the following effects: (1) price competition for turkey was restrained,

suppressed, and eliminated throughout Arizona; (2) turkey prices were raised, fixed, maintained,

and stabilized at artificially high levels throughout Arizona. During the Class Period,

Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiffs

and members of the Class seek all forms of relief available under Ariz. Rev. Stat. §44-1401, *et

seq.* (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if

fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in

violation of Ariz. Rev. Stat. §44-1401, *et seq.* Defendants' conspiracies had the following

effects: (1) price competition for turkey was restrained, suppressed, and eliminated throughout

215

Arizona; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Ariz. Rev. Stat. §44-1401, *et seq*.

585.     **California:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code §16700, *et seq*.  During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code §16720.  Each defendant has acted in violation of Cal. Bus. & Prof. Code §16720 to fix, raise, stabilize, and maintain prices of turkey at supracompetitive levels.  The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of turkey.  For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of turkey.  The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for turkey has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for turkey provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased turkey indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open

216

competition. As a result of Defendants' violation of Cal. Bus. & Prof. Code §16720, Plaintiffs

and members of the Class seek treble damages and their cost of suit, including a reasonable

attorneys' fee, pursuant to Cal. Bus. & Prof. Code §16750(a). (B) *Per se* violation: Plaintiffs

repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have

entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code

§16700, *et seq*. During the Class Period, Defendants and their co-conspirators entered into and

engaged in a continuing unlawful trust in restraint of the trade and commerce described above in

violation of Cal. Bus. & Prof. Code §16720. Each defendant has acted in violation of Cal. Bus.

& Prof. Code §16720 to fix, raise, stabilize, and maintain prices of turkey at supracompetitive

levels. The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a

continuing unlawful trust and concert of action among Defendants and their co-conspirators, the

substantial terms of which were to fix, raise, maintain, and stabilize the prices of turkey. For the

purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators

have done those things which they combined and conspired to do, including, but not limited to,

the acts, practices and course of conduct set forth above, and creating a price floor, fixing,

raising, and stabilizing the price of turkey. The combination and conspiracy alleged herein has

had, *inter alia*, the following effects: (1) price competition for turkey has been restrained,

suppressed, and/or eliminated in the State of California; (2) prices for turkey provided by

Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at

artificially high, non-competitive levels in the State of California and throughout the United

States; and (3) those who purchased turkey indirectly from Defendants and their co-conspirators

have been deprived of the benefit of free and open competition. As a result of Defendants'

violation of Cal. Bus. & Prof. Code §16720, Plaintiffs and members of the Class seek treble

damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code §16750(a).

586. **District of Columbia:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code §28-4501, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Class, including those who resided in the District of Columbia and purchased turkey in the District of Columbia, paid supracompetitive, artificially inflated prices for turkey, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code §28-4501, *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under D.C. Code §28-4501, *et seq*. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code §28-4501, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Class, including those who resided in the District of Columbia and purchased turkey in the District of Columbia, paid supracompetitive, artificially inflated prices for turkey, including in the District of Columbia.

During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code §28-4501, *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under D.C. Code §28-4501, *et seq*.

587. **Illinois**: (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*. The Defendants' combinations or conspiracies had the following effects: (1) Turkey price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq*. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*. The Defendants' combinations or conspiracies had the following effects: (1) Turkey price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in

violation of 740 Illinois Compiled Statutes 10/1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq*.

588. **Iowa:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §553.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Iowa; (2) turkey prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §553.1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code §553.1, *et seq*. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §553.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Iowa; (2) turkey prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §553.1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code §553.1, *et seq*.

589. **Kansas:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful

agreement in restraint of trade in violation of Kan. Stat. §50-101, *et seq*. Defendants'
combinations or conspiracies had the following effects: (1) turkey price competition was
restrained, suppressed, and eliminated throughout Kansas; (2) turkey prices were raised, fixed,
maintained, and stabilized at artificially high levels throughout Kansas. During the Class Period,
Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiffs and
members of the Class seek all forms of relief available under Kan. Stat. §50-101, *et seq*. (B) *Per
se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth
herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of
Kan. Stat. §50-101, *et seq*. Defendants' combinations or conspiracies had the following effects:
(1) turkey price competition was restrained, suppressed, and eliminated throughout Kansas; (2)
turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout
Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas
commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available
under Kan. Stat. §50-101, *et seq*.

590. **Maine:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in
paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful
agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101. Defendants'
combinations or conspiracies had the following effects: (1) turkey price competition was
restrained, suppressed, and eliminated throughout Maine; (2) turkey prices were raised, fixed,
maintained, and stabilized at artificially high levels throughout Maine. During the Class Period,
Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiffs and
members of the Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1104. (B) *Per
se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth

herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Maine; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Me. Rev. Stat. Ann. Tit. 10, § 1104.

591. **Michigan:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws §445.771, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Michigan; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Mich. Comp. Laws §445.771, *et seq*. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws §445.771, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Michigan; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Mich. Comp. Laws §445.771, *et seq*.

592. **Minnesota:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §325D.49, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Minn. Stat. §325D.49, *et seq*. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §325D.49, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Minn. Stat. §325D.49, *et seq*.

593. **Mississippi:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code §75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

Accordingly, Plaintiffs and members of the Class seek all relief available under Miss. Code §75-21-1, *et seq*. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code §75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Miss. Code §75-21-1, *et seq*.

594. **Nebraska:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. §59-801, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Neb. Rev. Stat. §59-801, *et seq*. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. §59-801, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal

conduct substantially affected Nebraska commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Neb. Rev. Stat. §59-801, *et seq.*

595. **Nevada:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §598A.010, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Nevada; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Nev. Rev. Stat. Ann. §598A.010, *et seq.* (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §598A.010, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Nevada; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Nev. Rev. Stat. Ann. §598A.010, *et seq.*

596. **New Hampshire:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. §356:1. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) turkey

prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under New Hampshire Revised Statutes §356:1, *et seq*. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. §356:1. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under New Hampshire Revised Statutes §356:1, *et seq*.

597. **New Mexico:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, *et seq*. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1,

226

*et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, *et seq*.

598. **New York:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout New York; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, § 340, *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under New York General Business Laws § 340, *et seq.* (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout New York; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, § 340, *et seq.* Accordingly,

Plaintiffs and members of the Class seek all relief available under New York General Business Laws § 340, *et seq*.

599. **North Carolina:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under North Carolina General Statutes § 75-16, *et seq*. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under North Carolina General Statutes § 75-16, *et seq*.

600. **North Dakota:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code §51-08.1-01, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was

restrained, suppressed, and eliminated throughout North Dakota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota.  During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under N.D. Cent. Code §51-08.1-01, *et seq.* (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code §51-08.1-01, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota.  During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under N.D. Cent. Code §51-08.1-01, *et seq.*

601.    **Oregon:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed and eliminated throughout Oregon; (2) turkey prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.  Accordingly, Plaintiffs and members of the Class seek all relief available under Or. Rev. Stat. § 646.780, *et seq.* (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in

violation of Or. Rev. Stat. § 646.725, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed and eliminated throughout Oregon; (2) turkey prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Or. Rev. Stat. § 646.780, *et seq*.

602. **Rhode Island:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq*. The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Rhode Island General Laws § 6-36-11, *et seq*. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq*. The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial

effect on Rhode Island commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Rhode Island General Laws § 6-36-11, *et seq.*

603. **South Dakota:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under South Dakota Codified Laws § 37-1-3.1, *et seq.* (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under South Dakota Codified Laws § 37-1-3.1, *et seq.*

604. **Tennessee:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §47-25-101, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was

restrained, suppressed, and eliminated throughout Tennessee; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Tenn. Code Ann. §47-25-101, *et seq*. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §47-25-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Tenn. Code Ann. §47-25-101, *et seq*.

605. **Vermont:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Vermont; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under 9 V.S.A. § 2465, *et seq.* (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in

violation of 9 Vermont Stat. Ann. § 2453, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Vermont; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under 9 V.S.A. § 2465, *et seq.*

606. **West Virginia:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-3, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under West Virginia Code § 47-18-9, *et seq.* (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-3, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under West Virginia Code § 47-18-9, *et seq.*

607.    **Wisconsin:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. §133.01, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Wis. Stat. §133.01, *et seq*. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. §133.01, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Wis. Stat. §133.01, *et seq*.

## COUNT III
## Rule of Reason and *Per Se* Violation of State Consumer Protection Statutes
## (on Behalf of Plaintiffs and the Class)

608.     Plaintiffs repeat the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

609.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

610.     **California:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code §17200, *et seq.* During the Class Period, Defendants manufactured, marketed, sold, or distributed turkey in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code §17200, *et seq.*, by engaging in the acts and practices specified above. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code §17200, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code §17200. The acts, omissions, misrepresentations, practices and nondisclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of §1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code §16720, *et seq.*, set

forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code §16720, *et seq*., and whether or not concerted or independent acts, are otherwise unfair, unconscionable unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of turkey in the State of California within the meaning of Cal. Bus. & Prof. Code §17200 *et. seq.*; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code §17200, *et seq*. Plaintiffs and members of the Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Class to pay supracompetitive and artificially inflated prices for turkey. Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code §17200, *et seq*. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§17203 and 17204. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Cal. Bus. & Prof.

Code §17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed turkey in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code §17200, *et seq*., by engaging in the acts and practices specified above. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code §17200, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code §17200. The acts, omissions, misrepresentations, practices and nondisclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of §1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code §16720, *et seq*., set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code §16720, *et seq*., and whether or not concerted or independent acts, are otherwise unfair, unconscionable unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of turkey in the State of California within the meaning of Cal. Bus. & Prof. Code §17200 *et. seq.*; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code §17200, *et seq*. Plaintiffs and members of the Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as

described above, have caused and continue to cause Plaintiffs and the members of the Class to pay supracompetitive and artificially inflated prices for turkey. Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code §17200, *et seq*. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§17203 and 17204.

611. **Florida:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Florida; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Accordingly, Plaintiffs and members of the Class seek all relief available under Fla. Stat. §501.201, *et seq*. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) turkey price competition was

restrained, suppressed, and eliminated throughout Florida; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Accordingly, Plaintiffs and members of the Class seek all relief available under Fla. Stat. §501.201, *et seq.*

612. **Minnesota**: (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.* Defendants engaged in unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as purchasers of the Defendants' goods, and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs and the members of the Class. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and turkey purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.* Defendants engaged in unfair and deceptive trade practices during the

course of their business dealings, which significantly impacted Plaintiffs as purchasers of the Defendants' goods, and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs and the members of the Class. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and turkey purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

613. **Nebraska**: (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed turkey in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and turkey purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed turkey in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and turkey purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

614. **New Hampshire**: (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*. Defendants sold turkey in New Hampshire and deceived Plaintiffs and Class Members in New Hampshire into believing that the turkey were competitively priced. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Class, who resided in New Hampshire and/or purchased the turkey in New Hampshire were deprived of free and open competition in New Hampshire; and (4) Plaintiffs and members of the Class, who resided in New Hampshire and/or purchased turkey in New Hampshire paid supracompetitive, artificially inflated prices for turkey in New Hampshire. During the Class Period, Defendants marketed, sold, or distributed turkey in New Hampshire, and Defendants' illegal conduct substantially

affected New Hampshire commerce and turkey purchasers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*. Defendants sold turkey in New Hampshire and deceived Plaintiffs and Class Members in New Hampshire into believing that the turkey were competitively priced. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Class, who resided in New Hampshire and/or purchased the turkey in New Hampshire were deprived of free and open competition in New Hampshire; and (4) Plaintiffs and members of the Class, who resided in New Hampshire and/or purchased turkey in New Hampshire paid supracompetitive, artificially inflated prices for turkey in New Hampshire. During the Class Period, Defendants marketed, sold, or distributed turkey in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and turkey purchasers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

615. **New Mexico:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.* In New Mexico, price-fixing is actionable as an "unconscionable trade practice" under N.M. Stat. § 57-12-2(E) because it "takes advantage of the lack of knowledge … of a person to a grossly unfair degree" and also results in a "gross disparity between the value received by a person and the price paid." Defendants had the sole power to set that price, and Plaintiffs and members of the Class had no meaningful ability to negotiate a lower price from wholesalers. Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing turkey because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of turkey, including their illegal conspiracy to secretly fix the price of turkey at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed and eliminated throughout New Mexico; (2) turkey prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for turkey.  During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are

threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.* In New Mexico, price-fixing is actionable as an "unconscionable trade practice" under N.M. Stat. § 57-12-2(E) because it "takes advantage of the lack of knowledge … of a person to a grossly unfair degree" and also results in a "gross disparity between the value received by a person and the price paid." Defendants had the sole power to set that price, and Plaintiffs and members of the Class had no meaningful ability to negotiate a lower price from wholesalers. Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing turkey because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of turkey, including their illegal conspiracy to secretly fix the price of turkey at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed and eliminated throughout New Mexico; (2) turkey prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for turkey. During the

Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

616. **New York:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which turkey were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Class. Defendants and their co-conspirators made public statements about the prices of turkey that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for turkey; and Defendants alone possessed material information that was relevant to consumers and businesses, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased turkey were misled to believe that they were paying a fair price for turkey or the price increases for turkey were for valid business reasons; and similarly situated consumers and businesses were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing turkey would have an impact on New York consumers and businesses and not just Defendants' direct customers. Defendants knew that their unlawful trade

practices with respect to pricing turkey would have a broad impact, causing commercial and institutional indirect purchaser class members who indirectly purchased turkey to be injured by paying more for turkey than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of customers and commercial and institutional indirect purchasers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout New York; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for turkey. During the Class Period, Defendants marketed, sold, or distributed turkey in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed turkey in New York. Plaintiffs and members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h). (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which turkey were sold,

distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Class. Defendants and their co-conspirators made public statements about the prices of turkey that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for turkey; and Defendants alone possessed material information that was relevant to consumers and businesses, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased turkey were misled to believe that they were paying a fair price for turkey or the price increases for turkey were for valid business reasons; and similarly situated consumers and businesses were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing turkey would have an impact on New York consumers and businesses and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing turkey would have a broad impact, causing commercial and institutional indirect purchaser class members who indirectly purchased turkey to be injured by paying more for turkey than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of customers and commercial and institutional indirect purchasers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed, and eliminated throughout New York; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and

members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for turkey. During the Class Period, Defendants marketed, sold, or distributed turkey in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed turkey in New York. Plaintiffs and members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

617. **North Carolina:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which turkey were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and injury to commercial and institutional indirect purchasers along with broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers and

commercial and institutional indirect purchasers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) turkey price competition was restrained, suppressed and eliminated throughout North Carolina; (2) turkey prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for turkey. During the Class Period, Defendants marketed, sold, or distributed turkey in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed turkey in North Carolina. Plaintiffs and members of the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which turkey were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation,

implementation and maintenance of Defendants' price-fixing conspiracy.  Defendants committed

inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have

been aware.  Defendants and their co-conspirators publicly provided pretextual and false

justifications regarding their price increases.  The conduct of Defendants described herein

constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina

law, which resulted in consumer injury and injury to commercial and institutional indirect

purchasers along with broad adverse impact on the public at large, and harmed the public interest

of North Carolina consumers and commercial and institutional indirect purchasers in an honest

marketplace in which economic activity is conducted in a competitive manner.  Defendants'

unlawful conduct had the following effects: (1) turkey price competition was restrained,

suppressed and eliminated throughout North Carolina; (2) turkey prices were raised, fixed,

maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and

members of the Class were deprived of free and open competition; and (4) Plaintiffs and

members of the Class paid supracompetitive, artificially inflated prices for turkey.  During the

Class Period, Defendants marketed, sold, or distributed turkey in North Carolina, and

Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

During the Class Period, each of the Defendants named herein, directly, or indirectly and through

affiliates they dominated and controlled, manufactured, sold and/or distributed turkey in North

Carolina.  Plaintiffs and members of the Class seek actual damages for their injuries caused by

these violations in an amount to be determined at trial and are threatened with further injury.

Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

violation of N.C. Gen. Stat. §75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the

Class seek all relief available under that statute.

618.    **North Dakota**: (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which turkey was sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for turkey. Defendants misrepresented to all purchasers during the Class Period that Defendants' turkey prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for turkey was restrained, suppressed, and eliminated throughout North Dakota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and turkey purchasers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of turkey, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing turkey at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of

the Class seek all relief available under that statute. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which turkey was sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for turkey. Defendants misrepresented to all purchasers during the Class Period that Defendants' turkey prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for turkey was restrained, suppressed, and eliminated throughout North Dakota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and turkey purchasers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of turkey, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing turkey at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute

violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

619. **South Carolina:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-10 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed and eliminated throughout South Carolina; (2) turkey prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §39-5-10 *et seq*., and, accordingly, Plaintiffs and the members of the Class seek all relief available under that statute. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-10 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) turkey price competition was restrained, suppressed and eliminated throughout South Carolina; (2) turkey prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their

business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §39-5-10 *et seq.*, and, accordingly, Plaintiffs and the members of the Class seek all relief available under that statute.

620. **South Dakota**: (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which turkey was sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for turkey. Defendants misrepresented to all purchasers during the Class Period that Defendants' turkey prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for turkey was restrained, suppressed, and eliminated throughout South Dakota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and on those who purchased turkey in South Dakota. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative

misrepresentations and omissions concerning the price of turkey, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing turkey at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of turkey they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which turkey was sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for turkey. Defendants misrepresented to all purchasers during the Class Period that Defendants' turkey prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for turkey was restrained, suppressed, and eliminated throughout South Dakota; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and on those who purchased turkey in South Dakota. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and

deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of turkey, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing turkey at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of turkey they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

621.    **Vermont:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which turkey were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for turkey. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' turkey prices were competitive and fair. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and

deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of turkey, likely misled all commercial and institutional indirect purchasers acting reasonably under the circumstances to believe that they were purchasing turkey at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which turkey were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for turkey. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' turkey prices were competitive and fair. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception,

including their affirmative misrepresentations and omissions concerning the price of turkey,

likely misled all commercial and institutional indirect purchasers acting reasonably under the

circumstances to believe that they were purchasing turkey at prices set by a free and fair market.

Defendants' misleading conduct and unconscionable activities constitutes unfair competition or

unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly,

Plaintiffs and members of the Class seek all relief available under that statute.

622.    **Wisconsin**: (A) Rule of reason violation: Plaintiffs repeat the allegations set forth

in paragraphs 144-160 as if fully set forth herein. Defendants have engaged in unfair competition

or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer

Protection Statutes, Wisc. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in

restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing,

controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which

turkey was sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented

to all purchasers during the Class Period that Defendants' turkey prices were competitive and

fair. Defendants' unlawful conduct had the following effects: (1) price competition for the turkey

was restrained, suppressed, and eliminated throughout Wisconsin; (2) turkey prices were raised,

fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants'

illegal conduct substantially affected Wisconsin commerce and purchasers of turkey. As a direct

and proximate result of Defendants' violations of law, Plaintiffs and members of the Class

suffered an ascertainable loss of money or property as a result of Defendants' use or employment

of unconscionable and deceptive commercial practices as set forth above. That loss was caused

by Defendants' willful and deceptive conduct, as described herein. Defendants' deception,

including their affirmative misrepresentations concerning the price of turkey at issue, misled all

purchasers acting reasonably under the circumstances to believe that they were purchasing turkey at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Class as they related to the cost of turkey they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which turkey was sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' turkey prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the turkey was restrained, suppressed, and eliminated throughout Wisconsin; (2) turkey prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and purchasers of turkey. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of turkey at issue, misled all purchasers acting reasonably under the circumstances to

believe that they were purchasing turkey at prices set by a free and fair market. Defendants'

affirmative misrepresentations constitute information important to Plaintiffs and members of the

Class as they related to the cost of turkey they purchased. Defendants have engaged in unfair

competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*.,

and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNT IV**
**Rule of Reason and *Per Se* Violation of State Unjust Enrichment Law**
**(on behalf of Plaintiffs and the Class)**

623.    Plaintiffs incorporate by reference the allegations set forth above as if fully set

forth herein.

624.    To the extent required, this claim is pleaded in the alternative to the other claims

in this Complaint.

625.    Defendants have unlawfully benefited from their sales of turkey because of the

unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged

privately held commercial and institutional indirect purchasers, which purchased turkey at prices

that were more than they would have been but for Defendants' unlawful actions.

626.    Defendants' financial benefits resulting from their unlawful and inequitable acts

are traceable to overpayments by Plaintiffs and members of the Class.

627.    Plaintiffs and the Class have conferred upon Defendants an economic benefit, in

the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs

and the Class.

628.    Defendants have been enriched by revenue resulting from unlawful overcharges

for turkey while Plaintiffs and members of the Class has been impoverished by the overcharges

they paid for turkey imposed through Defendants' unlawful conduct. Defendants' enrichment and the impoverishment of Plaintiffs and members of the Class are connected.

629.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Class, because Plaintiffs and the Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

630.    Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

631.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of turkey.

632.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of turkey are ascertainable by review of sales records.

633.    It would be futile for Plaintiffs and the Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Class with respect to Defendants' sales of turkey.

634.    It would be futile for Plaintiffs and the Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased turkey, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Class for Defendants' unlawful conduct.

635.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for turkey is a direct and proximate result of Defendants' unlawful practices.

636.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Class, because Plaintiffs and the Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

637.    It would be inequitable under unjust enrichment principles under the law of the states where unjust enrichment claims are asserted below for Defendants to be permitted to retain any of the overcharges for turkey derived from Defendants' unlawful, unfair, and unconscionable methods, acts, and trade practices alleged in this Complaint.

638.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as turkey prices remain inflated above pre-conspiracy levels.

639.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Class all unlawful or inequitable proceeds they received from their sales of turkey.

640.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of turkey by Plaintiffs and the Class. Plaintiffs and the Class have no adequate remedy at law.

641.    **Arkansas:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Arkansas at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an

economic benefit upon Defendants, in the nature of revenue to which Defendants are not entitled resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants accepted and retain the benefit bestowed upon them by Plaintiffs and Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Arkansas at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue to which Defendants are not entitled resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants accepted and retain the benefit bestowed upon them by Plaintiffs and Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members.

642. **Arizona:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for turkey. Plaintiffs has been impoverished by the overcharges for turkey resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected. Defendants have paid no consideration to any other person for any benefits they received from Plaintiffs and Class Members. There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' impoverishment, because Plaintiffs paid supracompetitive prices that inured to Defendants' benefit, and it would

be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and Class Members have no remedy at law. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Arizona at prices that were more than they would have been but for Defendants' actions. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants have been enriched by revenue resulting from unlawful overcharges for turkey. Plaintiffs has been impoverished by the overcharges for turkey resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected. Defendants have paid no consideration to any other person for any benefits they received from Plaintiffs and Class Members. There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' impoverishment, because Plaintiffs paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and Class Members have no remedy at law.

643. **District of Columbia:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in the District of Columbia at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and Class Members. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth

herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in the District of Columbia at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and Class Members. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

644.    **Iowa:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Iowa at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for turkey, which revenue resulted from anticompetitive prices paid by Plaintiffs, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs and Class Members. It is unjust for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Iowa at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for turkey, which revenue resulted from anticompetitive prices paid by Plaintiffs, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs and Class Members. It is unjust for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

645. **Kansas:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Kansas at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and Class Members. Defendants were unjustly enriched at the expense of Plaintiffs and Class Members. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Kansas at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and Class Members. Defendants were unjustly enriched at the expense of Plaintiffs and Class Members.

646. **Maine:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Maine at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and Class

Members. Defendants were aware of and appreciated the benefit bestowed upon them by Plaintiffs and Class Members. Defendants were unjustly enriched at the expense of Plaintiffs and Class Members. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Maine at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and Class Members. Defendants were aware of and appreciated the benefit bestowed upon them by Plaintiffs and Class Members. Defendants were unjustly enriched at the expense of Plaintiffs and Class Members.

647.    **Michigan:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Michigan at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members to which Defendants are not entitled. Defendants accepted and retain the benefit bestowed upon them by Plaintiffs and Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Michigan at

prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members to which Defendants are not entitled. Defendants accepted and retain the benefit bestowed upon them by Plaintiffs and Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members.

648.    **Minnesota:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Minnesota at prices that were more than they would have been but for Defendants' actions. Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and Class Members. Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and Class Members. It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and Class Members. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Minnesota at prices that were more than they would have been but for Defendants' actions. Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and Class Members. Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and Class Members. It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and Class Members.

649.    **Mississippi:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged

members of Class, which made purchases of turkey in Mississippi at prices that were more than they would have been but for Defendants' actions. Defendants retain the benefit of overcharges received on the sales of turkey, which in equity and good conscience belong to Plaintiffs and Class Members on account of Defendants' anticompetitive conduct. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Mississippi at prices that were more than they would have been but for Defendants' actions. Defendants retain the benefit of overcharges received on the sales of turkey, which in equity and good conscience belong to Plaintiffs and Class Members on account of Defendants' anticompetitive conduct.

650. **Missouri:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Missouri at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants appreciated the benefit bestowed upon them by Plaintiffs and Class Members. Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and Class Members. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Missouri at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful

overcharges to the economic detriment of Plaintiffs and Class Members. Defendants appreciated the benefit bestowed upon them by Plaintiffs and Class Members. Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and Class Members.

651.    **Nebraska:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Nebraska at prices that were more than they would have been but for Defendants' actions. Defendants received money from Plaintiffs and Class Members as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and Class Members. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Nebraska at prices that were more than they would have been but for Defendants' actions. Defendants received money from Plaintiffs and Class Members as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and Class Members.

652.    **Nevada:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Nevada at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic

benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for turkey. Defendants appreciated the benefits bestowed upon them by Plaintiffs and Class Members, for which they have paid no consideration to any other person. Defendants have knowingly accepted and retained the benefits bestowed upon them by Plaintiffs and Class Members. The circumstances under which Defendants have accepted and retained the benefits bestowed upon them by Plaintiffs and Class Members are inequitable in that they result from Defendants' unlawful overcharges for turkey. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Nevada at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for turkey. Defendants appreciated the benefits bestowed upon them by Plaintiffs and Class Members, for which they have paid no consideration to any other person. Defendants have knowingly accepted and retained the benefits bestowed upon them by Plaintiffs and Class Members. The circumstances under which Defendants have accepted and retained the benefits bestowed upon them by Plaintiffs and Class Members are inequitable in that they result from Defendants' unlawful overcharges for turkey.

653.    **New Hampshire:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in New Hampshire at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Under the

circumstances, it would be unconscionable for Defendants to retain such benefits. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in New Hampshire at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

654.    **New Mexico:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in New Mexico at prices that were more than they would have been but for Defendants' actions. Defendants have knowingly benefitted at the expense of Plaintiffs and Class Members from revenue resulting from unlawful overcharges for turkey. To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in New Mexico at prices that were more than they would have been but for Defendants' actions. Defendants have knowingly benefitted at the expense of Plaintiffs and Class Members from revenue resulting from unlawful overcharges for turkey. To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to

Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

655. **New York:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged Plaintiffs and members of Class, which made purchases of turkey in New York at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for turkey, which revenue resulted from anticompetitive prices paid by Plaintiffs, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs and Class Members. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged Plaintiffs and members of Class, which made purchases of turkey in New York at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for turkey, which revenue resulted from anticompetitive prices paid by Plaintiffs, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs and Class Members. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

656. **North Carolina:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in North Carolina at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful

overcharges to the economic detriment of Plaintiffs and Class Members. Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from Defendants' anticompetitive conduct. The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records. Defendants consciously accepted the benefits and continue to do so. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in North Carolina at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from Defendants' anticompetitive conduct. The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records. Defendants consciously accepted the benefits and continue to do so.

657. **Oregon:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Oregon at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

economic detriment of Plaintiffs and Class Members. Defendants were aware of the benefit bestowed upon them by Plaintiffs and Class Members. It would be inequitable and unjust for Defendants to retain any of the overcharges for turkey derived from Defendants' unfair conduct without compensating Plaintiffs and Class Members. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Oregon at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants were aware of the benefit bestowed upon them by Plaintiffs and Class Members. It would be inequitable and unjust for Defendants to retain any of the overcharges for turkey derived from Defendants' unfair conduct without compensating Plaintiffs and Class Members.

658.     **Rhode Island:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Rhode Island at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants were aware of and/or recognized the benefit bestowed upon them by Plaintiffs and the Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Rhode Island at prices that were more

than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants were aware of and/or recognized the benefit bestowed upon them by Plaintiffs and the Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members.

659. **South Carolina:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in South Carolina at prices that were more than they would have been but for Defendants' actions. Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and Class Members. Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and Class Members. It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and Class Members. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in South Carolina at prices that were more than they would have been but for Defendants' actions. Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and Class Members. Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and Class Members. It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and Class Members.

660. **South Dakota:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged

members of Class, which made purchases of turkey in South Dakota at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants were aware of the benefit bestowed upon them by Plaintiffs and Class Members. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and Class Members. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in South Dakota at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants were aware of the benefit bestowed upon them by Plaintiffs and Class Members. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and Class Members.

661.     **Tennessee:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Tennessee at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without

compensating Plaintiffs and Class Members. It would be futile for Plaintiffs and Class Members to exhaust all remedies against the entities with which Plaintiffs and Class Members have privity of contract because Plaintiffs and Class Members did not purchase turkey directly from any Defendant. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Tennessee at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members. It would be futile for Plaintiffs and Class Members to exhaust all remedies against the entities with which Plaintiffs and Class Members have privity of contract because Plaintiffs and Class Members did not purchase turkey directly from any Defendant.

662.    **Utah:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Utah at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-

173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Utah at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members.

663.    **Vermont:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Vermont at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants accepted the benefit bestowed upon them by Plaintiffs and Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Vermont at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants accepted the benefit bestowed upon them

by Plaintiffs and Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members.

664.    **West Virginia:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in West Virginia at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in West Virginia at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members.

665.    **Wisconsin:** (A) Rule of reason violation: Plaintiffs repeat the allegations set forth in paragraphs 144-160 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Wisconsin at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an

economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants appreciated the benefit bestowed upon them by Plaintiffs and Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members. (B) *Per se* violation: Plaintiffs repeat the allegations set forth in paragraphs 161-173 as if fully set forth herein. Defendants unlawfully overcharged members of Class, which made purchases of turkey in Wisconsin at prices that were more than they would have been but for Defendants' actions. Plaintiffs and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members. Defendants appreciated the benefit bestowed upon them by Plaintiffs and Class Members. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members.

## IX.    REQUEST FOR RELIEF

WHEREFORE, plaintiffs, on behalf of itself and the Class of all others so similarly situated, respectfully requests judgment against defendants as follows:

666.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

667.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state

antitrust and unfair competition and consumer protection laws as set forth herein; or, alternatively, (d) acts of unjust enrichment by Defendants as set forth herein.

668.     Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of plaintiffs and the members of the Class be entered against defendants in an amount to be trebled to the extent such laws permit;

669.     Plaintiffs and members of the Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

670.     Plaintiffs and members of the Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Class may make claims on a *pro rata* basis;

671.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

672.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act

on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

673. Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

674. Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

675. Plaintiffs and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## X. JURY TRIAL DEMANDED

676. Plaintiffs demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: January 10, 2022                Respectfully submitted,

By: *Sterling Aldridge*
    Sterling Aldridge (admitted *pro hac vice*)
    John "Don" Barrett (admitted *pro hac vice*)
    David McMullan, Jr. (admitted *pro hac vice*)
    Katherine B. Riley (admitted *pro hac vice*)
    **BARRETT LAW GROUP, P.A.**
    404 Court Square
    Lexington, Mississippi 39095
    Telephone: (662) 834-2488
    Fax: (662) 834-2628
    saldridge@barrettlawgroup.com
    dbarrett@barrettlawgroup.com
    dmcmullan@barrettlawgroup.com
    kbriley@barrettlawgroup.com

    Jonathan W. Cuneo (*pro hac vice*)
    Blaine Finley (*pro hac vice*)
    **CUNEO GILBERT & LADUCA, LLP**
    4725 Wisconsin Ave., NW

Suite 200
Washington, DC 20016
Telephone:  (202) 789-3960
jonc@cuneolaw.com
bfinley@cuneolaw.com

Robert A. Clifford
Shannon M. McNulty
**CLIFFORD LAW OFFICES PC**
120 N. LaSalle Street, Suite 3100
Chicago, IL 60602
rac@cliffordlaw.com
smm@cliffordlaw.com
Telephone:  (312) 899-9090

Shawn M. Raiter (*pro hac vice* forthcoming)
**LARSON • KING, LLP**
30 East Seventh Street • Suite 2800
St. Paul, MN 55101
Direct: 651-312-6518
Fax: 651-312-6618
sraiter@larsonking.com

*Counsel for Plaintiffs and the Proposed Classes*