**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *IN RE TURKEY ANTITRUST LITIGATION*<br><br>JOHN GROSS AND COMPANY, INC., et al.,<br><br>                   Plaintiffs,<br>   v.<br><br>AGRI STATS, INC., et al.,<br><br>                 Defendants. | Case No. 19 C 8318<br><br>District Judge:  Virginia M. Kendall<br>Magistrate Judge:  Gabriel A. Fuentes |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the Court are two motions to quash third-party subpoenas for investigative materials generated at the direction of Plaintiffs' counsel, and a cross-motion by Defendants to compel compliance with those subpoenas.  These three motions are now docketed before this Court. (D.E. 275.)[1]  Together, the motions raise the question of whether the work-product doctrine, or other limits on civil discovery, applies to protect investigative work that one of Plaintiffs' counsel, the Hagens Berman firm, conducted through the third-party retained investigators shortly before the

---

[1] This matter is before the magistrate judge on referral for discovery supervision. (D.E. 267, 268.)  The two Rule 45 subpoenas in question contain identical document requests and are directed at Maine-based On Point Investigations, LLC ("On Point") and Seattle-based Lael Henterly ("Henterly"), who is On Point's lead investigator. *See* Defendants' Opposition to the Motions to Quash Investigator Subpoenas and Cross-Motion to Compel Pre-Client Investigative Materials ("Opp."; D.E. 275), Exh. 1 (D.E. 275-1). Plaintiffs' counsel at Hagens Berman Sobol Shapiro LLP ("Hagens Berman") and Lockridge Grindal Nauen PLLP ("Lockridge Grindal") are representing On Point and Henterly, and are co-movants with On Point and Henterly on the motions to quash the subpoenas, which were served on May 21, 2021. Hagens Berman, Lockridge Grindal, On Point and Henterly (the "Movants") filed the motion to quash in the District of Maine and the Western District of Washington in June 2021, and by agreement, the matters were ordered transferred to the Northern District of Illinois for decision. (No. 21 C 3551, D.E. 1, Exh. 1, and D.E. 9; No. 21 C 3763, D.E. 1, 4, 8). Defendants cross-moved to compel compliance with the subpoenas.  Opp. at 2. The motions, which include all motions to quash the subpoenas on On Point and Henterly, and Defendants' cross-motion to compel, also are before the magistrate judge by operation of the consolidation of the miscellaneous actions (Nos. 21 C 3551 and 21 C 3763) with No. 19 C 8318.

filing of this action and apparently before a named plaintiff engaged Hagens Berman to file the lawsuit.  Resolving the motions requires the Court to look at the Federal Rules of Civil Procedure as a whole, Rule 26(b)(3) governing work-product protection in particular, the origin and evolution of work-product protection in the federal courts, and the nature of the materials sought by the subpoenas.  To understand better the information the Movants are seeking to protect as attorney work product, the Court obtained from the Movants a sample of the materials responsive to the subpoenas for *in camera* review.  (D.E. 441.)

## BACKGROUND

This consolidated action is a civil antitrust lawsuit by two sets of plaintiffs seeking to represent classes of purchasers of turkeys and turkey products in the United States.  Plaintiffs John Gross and Co., Inc. ("John Gross"), and Maplevale Farms, Inc. ("Maplevale") (collectively "Plaintiffs") alleged in the Second Amended Complaint that they purchased turkey directly from one or more of the multiple defendant turkey producers (or "integrators," as they are called).  Second Amended Complaint (D.E. 387) ¶¶ 54-55.[2]  Plaintiffs seek to represent a class of Direct Purchaser Plaintiffs ("DPPs") who allege that the turkey integrator defendants, who are breeders, processors, and sellers of turkeys and turkey products, artificially inflated turkey prices through anti-competitive exchanges of information in reports created by another Defendant, Agri Stats, Inc. ("Agri Stats").  The turkey integrator Defendants are Butterball LLC ("Butterball"), Cargill Meat Solutions Corporation and Cargill, Inc. ("Cargill"), Cooper Farms, Inc. ("Cooper Farms"), Farbest Foods, Inc., Foster Farms, LLC, Foster Poultry Farms, Hormel Foods Corporation, House of Raeford Farms, Inc., Perdue Farms, Inc., Perdue Foods LLC, The Hillshire Brands Company,

---

[2] This matter (No. 19 C 8318) also is consolidated with separate DPP actions against the same defendants by plaintiffs Winn Dixie Stores, Inc. and Bi-Lo Holding, LLC (No. 21 C 4131), and by Amory Investments, LLC (No. 21 C 6600).

Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc., Jennie-O Turkey Store, Inc., Prestage Farms, Inc., Prestage Foods, Inc., Prestage Farms of South Carolina, LLC (collectively, with Agri Stats, "Defendants").[3]  Plaintiff Sandee's Bakery is one of nine entities (the Indirect Purchaser Plaintiffs, or "IPPs") alleging that their antitrust injuries stemmed from their indirect purchases of turkey or turkey products from the same turkey integrator Defendants, whom the IPPs have named along with Agri Stats as having artificially inflated turkey product pricing through the same alleged information exchanges.  Third Amended Complaint (D.E. 417).

The motions to quash the On Point and Henterly subpoenas, and Defendants' cross-motion to compel compliance with them, arise from the DPP action brought by Plaintiffs including John Gross, insofar as Defendants are seeking production of investigative files created after Hagens Berman retained On Point (which engaged Henterly) in November 2019, shortly before the filing of the DPP action in which John Gross was one of the initial class representatives.  Defendants assert that if the On Point/Henterly investigation occurred before John Gross formally became a client of Hagens Berman, no work-product protection exists under Rule 26(b)(3) for the related investigative documents, because in the words of Defendants, Hagens Berman was then "clientless," the materials concern a mere "pre-client" investigation, and the context in which On Point and Henterly did the investigative work was simply Hagens Berman's "business development" activity.  Opp. at 1.

Defendants maintain that under these circumstances, the investigative materials could not have been prepared "by or for" a "party" or its representative, as Defendants maintain is required to trigger work-product protection under Rule 26(b)(3), which they read as requiring that the

---

[3] The district court granted the DPPs' motion for final approval of settlement with Tyson on February 3, 2022. (D.E. 406.)  The three Prestage defendants were added to the DPP and IPP cases in the DPPs' Second Amended Complaint and the IPPs' Third Amended Complaint, filed on January 11, 2022.  (D.E. 380, 378.)

"party" for whom the materials are being prepared must be a party *to the litigation*. *Id.* at 5-14. If there was no attorney-client relationship between Hagens Berman and any of the named Plaintiffs at the time of the On Point/Henterly investigative work, Defendants assert, the work cannot have been performed by or for a party *to the litigation* and thus falls outside a literal reading of Rule 26(b)(3)'s protections for work product. *Id.* That is, Defendants are arguing that the Court should read Rule 26(b)(3) literally to determine that the work-product doctrine does not shield the On Point/Henterly investigative materials from discovery and are implying, at least, that Rule 26(b)(3) is the discovery rules' sole source of protection against Defendants' requested investigative discovery. Movants counter that calling the On Point/Henterly materials the mere product of Hagens Berman's "business development activity" is a reductionist canard, that the subpoenas on On Point and Henterly are attempts "to undermine the adversarial system by intruding into the protected sphere of opposing counsel's work," and that in any event, Hagens Berman caused the On Point/Henterly investigative file to be created "for" the eventual Plaintiffs. Reply in Support of Mot. to Quash ("Pl. Reply"; D.E. 282) at 4-7, 9.

By virtue of the consolidation of the multiple DPP and IPP matters (D.E. 310, 405), the Court considers all defendants in all of the consolidated matters to have joined in the opposition to the motions to quash and in the maintenance of the cross-motion to compel. *See* Stipulation Regarding Reassignment, Coordination and Consolidation of Direct Action Plaintiff Complaint (D.E. 393) ⁋ 7.

## FACTS

The Hagens Berman and Lockridge Grindal firms represent class Plaintiffs in two other antitrust actions involving food products: *In re Broiler Chicken ("Broilers") Antitrust Litig.*, No. 16 C 8637 (N.D. Ill.), and *In re Pork Antitrust Litig.*, No. 18-cv-1776 (D. Minn.). As early as

December 14, 2016, in *Broilers*, Hagens Berman was appointed as co-lead counsel for a class of indirect end-user consumer purchasers of broiler chickens. *Broilers,* No. 16 C 8637 (D.E. 248). John Gross, which is among the direct purchaser class representatives that Hagens Berman represents in this case, was represented by different counsel in *Broilers*. *Id.* Movants further have stated that John Gross and the two other entities that eventually became named direct purchaser plaintiffs in the instant case have been clients of Lockridge Grindal since at least 2016 (as to John Gross and Maplevale) and since 2018 (for Olean Wholesale Grocery Cooperative, Inc. ("Olean"), which since was dismissed from this matter). Pl. Reply, Exh. 1 ("Scarlett Decl."; D.E. 282-1) ¶ 4.

In mid-2018, Hagens Berman "began an active case investigation" on behalf of unnamed participants in the turkey market. *Id.* ¶ 3. Hagens Berman announced this investigation publicly on its website in July 2018, and on July 9, it set up a portal on its website and began receiving communications from unnamed potential plaintiffs about their possible participation in the turkey lawsuit. *Id.* From that time until the late 2019 filing of the initial turkey antitrust direct purchaser complaint in this matter, "dozens" of potential class representatives contacted Hagens Berman, which "discussed the investigation, purchases, and other relevant facts with potential class representatives regarding the turkey industry," and the firm's investigation "continued until the filing of the complaint in 2019." *Id.* On November 13, 2019, Hagens Berman retained On Point "to conduct a factual investigation into the turkey industry for use in potential litigation." *Id.* ¶ 6. The investigation conducted by On Point for Hagens Berman "was primarily performed" by Henterly, a licensed private investigator. No. 21 C 3551, Declaration of Rio S. Pierce (D.E. 1-1) ¶ 7.

The Court has reviewed the On Point retention agreement *in camera.* The agreement refers to the confidential and privileged nature of any communication that On Point might need to have

with "the Client" (not identified in the agreement, but plainly referencing the intended client of Hagens Berman, which was identified as "you") during On Point's investigative services "to assist" Hagens Berman in "litigation concerning Turkey Antitrust." The agreement also refers to how any confidential and privileged communications between On Point and "the Client" or between On Point and Hagens Berman were being made "solely for the purpose of assisting you [Hagens Berman] *in rendering legal advice to your Client, in connection with the litigation.*" (Emphasis added.)

As for the investigation itself, Movants have disclosed that it included interviews of "confidential witnesses" and communications with "counsel" (presumably at least Hagens Berman) regarding the investigation. Motion to Quash Filed in the Western District of Washington "Henterly Motion to Quash"; No. 21 C 3551 (D.E. 1)) at 2. As for the remainder of the Court's *in camera* review of the On Point/Henterly investigative materials sought by Defendants, the Court will be circumspect in describing the *in camera* materials as containing investigator work product developed largely between the November 2019 retention of On Point and the December 2019 filing of the initial complaint. This investigator work product related entirely to the Hagens Berman probe into whether antitrust violations could be asserted against participants in the turkey industry, was prepared entirely in preparation for litigation against such turkey industry participants, and is replete with (1) the ideas of attorneys and investigators about how to probe for antitrust violations, and (2) the information that actually was gathered between November 13, 2019 and Plaintiffs' initial filing date (in this action) of December 19, 2019.[4] With Movants already having disclosed

---

[4] The Court focused its *in camera* review on the materials created before the December 19, 2019 filing date. A small portion of the material was created afterward, at a time when Defendants' argument that the materials were not created "by or for" a party to the litigation does not apply. Those post-filing materials are, in the Court's view, unquestionably protected attorney work product, beyond the scope of Defendants' motion to compel (and opposition to the motions to quash the On Point and Henterly subpoenas), and not

that the On Point/Henterly investigation included interviews of confidential witnesses and communications with counsel about the investigation, the Court is not disclosing anything confidential about the investigative materials by adding that they included witness interview outlines, notes of interviews, and interview memoranda – the very type of material that, in the Court's judgment, an attorney directing a privileged, work-product investigation in preparation for litigation clearly would consider core mental-impression work product.

At some point in December 2019 (Movants have not said exactly when), John Gross and Olean signed formal retention agreements in the instant turkey antitrust litigation, but Movants state that these three named Plaintiffs "have had an ongoing attorney-client relationship with Lockridge Grindal since well before that time." Scarlett Decl. ¶ 4. With Movants not telling us exactly when John Gross and Olean formally retained Hagens Berman, the Court will assume, for purposes of this opinion, that On Point/Henterly generated at least some of its investigative materials *before* John Gross and Olean formally retained Hagens Berman. Lockridge Grindal and Hagens Berman were among the law firms that filed the initial complaint in this matter on behalf of named Plaintiffs John Gross and Olean on December 19, 2019. (D.E. 1.)

Accordingly, the public record before the Court does not indicate how much of the investigation by On Point and Henterly occurred before John Gross, Maplevale or Olean signed any formal retention agreement with Hagens Berman, but the record does include Movants' averments that by the time the complaint in this matter was filed on December 19, the complaint contained a substantial amount of information gathered by the On Point/Henterly investigation. Movants state that "[t]he subsequently filed complaint contained factual allegations based on the work performed by On Point and Henterly." Henterly Motion to Quash at 2. In addition, the

---

at issue in these motions. The Court is construing Defendants' cross-motion as not seeking compelled production of such post-filing material.

Court's *in camera* review of the On Point/Henterly investigative material confirmed that the bulk of the investigative work did occur between the November 13 On Point retention and the December 19 filing of the complaint. As for when precisely John Gross formally "retained" Hagens Berman, Movants have conceded implicitly that at least some of the investigation happened before such formal retention by John Gross and Olean because Movants argue that the precise retention date does not matter, as the On Point/Henterly investigation was prepared "for" the eventual named Plaintiffs and was necessary to "permit[] counsel to file a complaint for these Plaintiffs that satisfies Rule 11." Pl. Reply at 7.

The motions to quash do not state exactly which complaint allegations were based on the On Point/Henterly work, but the Court easily can infer that the allegations were those in which the DPPs' original Complaint (and its subsequent iterations) related the information that Movants obtained from On Point/Henterly concerning three "confidential witnesses" identified as CW1, CW2, and CW3. CW1 is stated to be a former sales executive at Defendant Butterball, and the complaints allege that according to CW1, Butterball relied on pricing data generated by Agri Stats to "evaluate … where we stood against other turkey companies." DPP Complaint ¶ 13; DPP Second Amended Complaint ¶¶ 133-34; IPP Third Amended Complaint ¶ 13. CW2 is stated to be a former accountant at Defendant Cooper Farms, and the complaints allege that according to CW2, Cooper Farms received monthly reports from Agri Stats, which grouped data by turkey product, and which advised Cooper Farms to help it "improve its returns per pound"; CW2 could determine the identity of other turkey producers from within the Agri Stats data. DPP Complaint ¶¶ 14-15, 18; DPP Second Amended Complaint ¶¶ 146-47; IPP Third Amended Complaint ¶¶ 14-15, 18. CW3 is stated to be a former employee of Defendant Cargill, and the complaints allege that according to CW3, Cargill finance executives directly received Agri Stats monthly data reports.

DPP Complaint ⁋ 19; DPP Second Amended Complaint ⁋ 206; IPP Third Amended Complaint ⁋ 19.

Although the three confidential witnesses are not named in the complaints, Movants have confirmed that they "identified" them for Defendants in Plaintiffs' Rule 26(a)(1) disclosures and confirmed that the "confidential witnesses" in the complaint were included in those disclosures. Hentarly Motion to Quash, Pierce Declaration (No. 21 C 3551 D.E. 1-1) ⁋ 8. A review of those discovery disclosures by the Court showed that although Plaintiffs disclosed multiple possible witnesses from each of the three companies for which the CWs formerly worked, only three of those named persons (one for each of the three companies) had titles that matched those that Plaintiffs used in the complaint to describe CW1, CW2 and CW3. Perhaps not surprisingly, the On Point and Hentarly subpoenas included document requests that appear to be directed at all three confidential witnesses. The On Point and Hentarly subpoenas seek the same information:

1. All retention agreements, contracts, or agreements between You and Counsel of Record concerning turkey, including documents sufficient to show the date of retention.

2. All documents relating to turkey.

3. All documents relating to [the person who apparently is CW1].

4. All documents relating to [the person who apparently is CW2].

5. All documents relating to the individual referred to as "Confidential Witness 3" or "CW 3" in the Complaints in this Action.

6. Documents sufficient to show the identity of all current or former employees of Defendants you communicated with concerning turkey, and the dates of communication.

7. All documents relating to Butterball, LLC, Cooper Farms, Inc., or Farbest Foods, Inc., concerning turkey.

8. All documents relating to Cargill, Inc., Cargill Meat Solutions Corporation, Foster Farms, LLC, Foster Poultry Farms, The Hillshire Brands Company, Hormel Foods Corporation, Hormel Foods, LLC, House of Raeford Farms, Inc., Perdue Foods, LLC,

Tyson Foods, Inc., Tyson Fresh Meats, Inc., and Tyson Prepared Foods, Inc. concerning turkey.

9. All communications with Plaintiffs' Counsel of Record relating to turkey.

10. All notes, memoranda, records, files, transcripts, audio recordings relating to, or reflecting, any discussion about turkey between you and one or more of the following: (i) Counsel of Record; (ii) Scott Singleton; (iii) Steve Hammon; (iv) the individual referred to as "Confidential Witness 3" or "CW 3" in the Complaints in this Action; (v) any current or former employee of any Defendant; and (vi) Plaintiffs' Counsel of Record.

*Id.*, Exh. A (No. 21 C 3551, D.E. 1-2); Motion to Quash Filed in Maine ("On Point Motion to Quash"; No. 21 C 3763 (D.E. 1)), Exh. A (D.E. 1-1).

The Court infers from the record that On Point and/or Henterly found and interviewed all three of the CWs, and nothing in the record suggests that any of the CWs is not equally available to Defendants for interview or deposition. Defendants, in moving to compel and in opposing the motions to quash, have not argued that any of these witnesses, or any potential witness identified in Plaintiffs' Rule 26(a)(1) disclosures, is not equally available to Defendants for the same purpose.

## ANALYSIS

Using the Court's subpoena power to obtain information about an adversary's "business development" activities, as Defendants say they seek to do, might strike some courts as odd. After all, per the 2015 amendments to the Federal Rules of Civil Procedure, civil discovery must be relevant to a claim or defense in the case, and it must be proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). Defendants' description of the On Point/Henterly investigative materials as reflecting Hagens Berman's "business development" activities plainly is a thinly disguised attempt to suggest that the materials fall outside the realm of protected attorney mental impressions because they are mere "business development." Defendants nonetheless suggest that minimally, the materials are relevant and proportional discovery. Defendants rely heavily on a decision from

10

this judicial district, *Castro v. Sanofi Pasteur Inc.*, No. 13 C 2086, 2013 WL 1707094 (N.D. Ill. Apr. 19, 2013), in which the plain relevancy of pre-filing interviews conducted by a law firm was whether the firm conspired with the defendant's competitor to cook up an antitrust case against the defendant, in which case the law firm investigator's interviews of the competitor's personnel might well be highly relevant. With the benefit of *in camera* review of the On Point/Henterly materials, we will discuss below whether such a theory of relevancy applies to the materials in this case. Defendants also rely on *Castro* for the proposition that Rule 26(b)(3)'s "codification" of the work-product doctrine means the rule must be construed narrowly so that only materials prepared "by or for" a party – and not just any party, but a party to the litigation – qualify for work-product protection. Defendants' Reply in Support of Their Cross-Motion to Compel Pre-Client Investigative Materials ("Def. Reply"; D.E. 284) at 8. The *Castro* court reasoned that in cabining the work-product doctrine to materials prepared "by or for" a party, Rule 26(b)(3) "means what it says." *Id.* This Court has no doubt that the Rule does mean what it says, although the Rule does not say that the "party" status triggering applicability of the doctrine must stem from a party "to the litigation." The words "to the litigation" do not appear after "party," or anywhere else, in the Rule. The three motions now pending before the Court call upon us to consider whether the work-product doctrine, as originally developed in the common law in *Hickman v. Taylor*, 329 U.S. 495, 507 (1947), can extend to investigative materials that class counsel prepared with class litigation in mind, although on behalf of named Plaintiffs who may not have formally retained class counsel until the investigation was under way, substantially completed, or even completed. If Defendants are correct that formal retention by an actual client is the trigger for work-product protection, even in class litigation such as this, then at least Rule 26(b)(3) would not shield the On Point/Henterly materials from civil discovery in this case – although other rules might – and Movants' theory

11

remains that the On Point/Henterly materials were prepared "for" the Plaintiffs even if they had not yet signed up as Hagens Berman clients. In deciding the pending motions, the magistrate judge operates within the broad discretion afforded him to manage discovery in civil matters. *Jones v. City of Elkhart, Ind.,* 737 F.3d 1107, 1115 (7th Cir. 2013).

## I.     The On Point/Henterly Materials Are Relevant to the Claims and Defenses in the Action, But Not in a Way That Diminishes Movants' Claims of Work-Product Protection.

Understanding the relevancy of the On Point/Henterly materials is key to understanding whether the materials might warrant work-product protection. The materials are relevant to claims or defenses in the action, but not in the same sense as in *Castro*. In *Castro*, an antitrust defendant sought to show that the plaintiffs' claim, namely that the defendant had foreclosed a competitor from a particular market, was manufactured by the competitor, in concert with the plaintiffs' law firm and its hired investigator, which conducted interviews of the competitor. 2013 WL 1707094, at *1. At the time of the interviews, no attorney-client relationship between the law firm and the eventual named plaintiff or plaintiffs had been formed. *Id.* The *Castro* court denied a motion to quash the subpoena, ruling that work-product protection could not extend to the investigator interviews because under Rule 26(b)(3), the doctrine can apply only where the investigation was done "by or for" a party to the litigation, and the court reasoned that such could not be the case where no plaintiff yet had retained the law firm, and where the attempt to discover the investigative materials was not an attempt to "piggy-back" off of opposing counsel's work, but rather an attempt to explore a substantive defense to the antitrust claims. *Id.* at *3. The *Castro* court went so far as to note that through its *in camera* review, the court confirmed that while the withheld documents contained "mental impressions and opinions of counsel and consultant," they were not pure opinion materials "but rather reflect … the nature of the relationship and endeavor" undertaken by

the plaintiff's law firm, its investigator, and the defendant's competitor. *Id.* As such, the *Castro* court agreed with the defendant (which was seeking disclosure of the investigative materials in that case) that "the documents have significance independent of their legal analysis because they may shed light on the nature and course of the relationship between the purported conspirators." *Id.* The *Castro* court's frank assessment of those materials was the predicate for its conclusion that the materials were not attorney work product, again, because the court accepted, after *in camera* review, the defendant's argument that it sought the investigative materials not to "piggyback" off the work of opposing counsel and not to intrude upon the "core interest served by Rule 26(b)(3)." *Id.*

This Court, after reviewing the On Point/Henterly materials *in camera*, reaches a very different factual conclusion, namely, that obtaining them would result in Defendants and their counsel "piggy-backing" off the interview work that Plaintiffs' counsel, through On Point and Henterly, performed to interview and learn facts from certain former employees of various Defendants. The Court finds, as a result of its *in camera* review, that unlike in *Castro*, the On Point/Henterly materials do not have a legal significance independent of defense counsel knowing what questions Plaintiffs' counsel wanted asked of former employees, and what answers those employees gave. Consequently, the On Point/Henterly materials are like any investigative material that defense counsel would surely love to obtain and review, to obtain a window into how Plaintiffs' counsel put together the case, to know the facts Plaintiffs were looking for, and to know the information that Plaintiffs' counsel thought was and was not valuable. The type of information that Defendants could gain, if the On Point and Henterly subpoenas were enforced, would give defense counsel a direct, behind-the-scenes view of Plaintiffs' counsel's mental impressions

formed in anticipation not just of any litigation, but of litigation against the Defendants in this action.

We therefore have established that the On Point/Henterly materials are indeed "relevant" for purposes of Rule 26(b)(1), but not because they reflect Plaintiffs' counsel's "business development" activities (if they even do). The Court doubts that defense counsel ever cared much about Hagens Berman's "business development," any more than Hagens Berman cared about how many turkey industry executives defense counsel took to lunch and whether they ordered the Baked Alaska. The relevance of the investigative materials to claims and defenses in the case stems from the revelations in the materials about exactly what Defendants' opposing counsel were thinking as they gathered facts to cite in support of their claims, and as they pleaded some of those facts into the complaint Hagens Berman filed, on behalf of John Gross and Olean, against Defendants (except for the Prestage defendants, who were added later) on December 19, 2019.

Having discussed the relevancy prong of Rule 26(b)(1) in the work-product context, we will examine, later in this opinion, Rule 26(b)(1) "proportionality" of this discovery. But for now, we must consider whether, if the factual guts of the On Point/Henterly materials sound in attorney work product, the attorney work-product doctrine itself actually shields them from discovery, particularly after the 1970 amendments to the Federal Rules of Civil Procedure produced the current iteration of Rule 26(b)(3). Hagens Berman and Lockridge Grindal, as the attorneys seeking to protect the mental impressions of themselves and their agent investigators, may assert the work-product doctrine to block Defendants' attempt to subpoena On Point and Henterly for work-product materials. *See Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir. 2006) ("the work-product privilege may be invoked by either the client or the attorney").

**II.    Rule 26(b)(3) Should Be Interpreted and Applied With the Realities of Litigation and the Doctrine As Set Forth in *Hickman v. Taylor* in Mind.**

Despite the outcome in *Castro*, and despite the authority behind the position that Rule 26(b)(3) shields only material prepared by or for "a party to the litigation," the Court believes enough is left of *Hickman* to protect against one party discovering opposing counsel's mental impressions formed in anticipation of the very litigation in which the discovery is sought.

**A.    The History of the 1970 Amendments to Rule 26(b)(3) Does Not Support the Notion that the Drafters Acted To Bar *Hickman's* Work-Product Protection from Being Available in Every Circumstance in Which Counsel Has Yet To Be Retained Formally.**

In examining the history of the work-product doctrine, we must begin with *Hickman*, in which the Supreme Court held that work-product materials are shielded from discovery when efforts to obtain them are:

> simply an attempt, without purported necessity or justification, to secure written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties. As such, it falls outside the arena of discovery and contravenes the public policy underlying the orderly prosecution and defense of legal claims. Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney.

329 U.S. at 510.  The words "prepared or formed by an adverse party's counsel" are not quite parallel with Rule 26(b)(3)'s language of "prepared … by or for another party or its representative" in anticipation of litigation.  The Advisory Committee notes to the 1970 amendments say nothing about any perceived need to limit the doctrine to work performed by or for actual parties to the litigation, in the sense that if an attorney was not formally retained by a client, no work-product protection could apply to materials containing the attorney's mental impressions formed in anticipation of litigation in the days or weeks immediately preceding formal retention.  Instead, the notes refer to the amended rule arising from a "reappraisal" of the need for a formal rule on work-product protection amid considerations including "confusion and disagreement as to the

scope of the *Hickman* work-product doctrine, particularly whether it extends beyond work actually performed by lawyers …."  Advisory Committee Notes to 1970 Amendments, Fed. R. Civ. P. 26(b)(3).  Nothing in those notes suggests that the drafters of the amendments thought that *Hickman*'s language of "prepared or formed by an adverse party's counsel" was overly broad, or that "by or for another or party or its representative" was a necessary correction.

**B.     The "Literal Language" of Rule 26(b)(3) Must Be Read Not in Isolation, But Against the Backdrop of *Hickman* and the Doctrine That Birthed the Rule.**

In *Grolier*, the Supreme Court considered the history of *Hickman*, its progeny, and Rule 26(b)(3) in a case in which the Court broadly construed an exemption under the Freedom of Information Act to allow a government agency to withhold documents the agency claimed were attorney work product, even though those documents were prepared in connection with separate agency litigation that had been terminated.  462 U.S. at 22, 28.  In reaching this result, the Supreme Court expressly stated that it was not relying "exclusively" on Rule 26(b)(3) and was instead construing the FOIA exemption under a different test, namely, "whether the documents would be routinely or normally disclosed upon a showing of relevance."  *Id*. at 26 (internal quotations omitted).  As for Rule 26(b)(3), the Supreme Court traced the history of the work-product doctrine back to *Hickman* and noted that before 1970, "few District Courts [and only one federal court of appeal] had addressed the question whether the work-product immunity extended beyond the litigation for which the documents at issue were prepared," and such courts "reached varying results."  *Id.* at 24.   Importantly, the Supreme Court noted that by 1970, "no consensus one way or the other had developed with respect to the temporal scope of the work-product privilege," and that the amended Rule 26(b)(3) itself "does not in so many words address the temporal scope of the work-product immunity *and a review of the Advisory Committee's comments reveals no express concern for that issue.*"  *Id.* at 25 (emphasis added).  But the Supreme Court went on to

discuss how Rule 26(b)(3) might intersect with the FOIA work-product exemption at issue in *Grolier* in the following dicta, which is sometimes cited as support for Defendants' position that Rule 26(b)(3) must be applied formalistically and literally to bar work-product protection in the absence of a formalized attorney-client relationship:

> But the literal language of the Rule protects materials prepared for *any* litigation or trial as long as they were prepared by or for a party to the subsequent litigation. See 8 J. Wright & A. Miller, *Federal Practice and Procedure* § 2024, at 201 (1970) (hereinafter Wright & Miller). Whatever problems such a construction of Rule 26(b)(3) may engender in the civil discovery area, *see id.,* at 201–202, it provides a satisfactory resolution to the question whether work-product documents are exempt under the FOIA. By its own terms, Exemption 5 requires reference to whether discovery would normally be required during litigation *with the agency.* Under a literal reading of Rule 26(b)(3), the work-product of agency attorneys would not be subject to discovery in subsequent litigation unless there was a showing of need and thus would fall within the scope of Exemption 5.

*Id.* at 25-26 (emphasis in original).

The *Grolier* decision's citation to Wright & Miller is not helpful in our effort to discover the source of Rule 26(b)(3)'s interpretation of "party" as "party to the litigation," and, as a matter of fact, the discussion in Wright & Miller about what the *Grolier* decision called the "problems such a construction of Rule 26(b)(3) might engender in the civil discovery area" is instructive. For Wright & Miller offered that "Rule 26(b)(3), literally read, seems to give insufficient protection to material prepared in connection with some other litigation" and noted that other rules such as Rule 26(c) (allowing protective orders under appropriate circumstances) may fill the gap by allowing courts to "vindicate the purposes of the work-product rule …." Wright, Miller & Marcus, *Federal Practice & Procedure* § 2024, at 356, cited in *In re Polypropylene Carpet Antitrust Litig.*, 181 F.R.D. 680, 691-92 (N.D. Ga. 1998) (invoking Rule 26(c) to extend work-product protection to federal Department of Justice documents where DOJ was not a party to the instant litigation, and

the materials were prepared in connection with a separate matter in which they would have been considered protectible work product).

This Court agrees with Wright & Miller and the *Polypropylene* court that an overly literal reading of Rule 26(b)(3) can indeed lead to civil discovery problems if the courts construe the Rule narrowly to force attorneys to fork over work-product materials that they prepared not just in some other litigation, but in anticipation of this litigation itself. Moreover, this Court does not accept the broad proposition that the 1970 amendment to Rule 26(b)(3) codified the work-product doctrine to such an extreme extent that the new rule effectively overruled anything in *Hickman* that could be construed to the contrary. The Court's view thus may be in tension with *Castro*'s articulation of the restrictive consequences, for application of the work-product doctrine, of the 1970 "codification" of Rule 26(b)(3). *See Castro*, 2013 WL 1707094, at *2 (noting that according to the Supreme Court dicta in *Grolier*, Rule 26(b)(3) now "governs the extent to which trial preparation materials are discoverable in federal courts.") (internal quotations omitted). Aside from the On Point/Henterly materials being core work product without the independent legal significance of the materials at issue in *Castro*, this Court is declining to find that in this case, Rule 26(b)(3) or the *Grolier* dicta commands that Hagens Berman's core attorney work product be disclosed to Defendants whom Hagens Berman sued on behalf of the named Plaintiffs in this case, simply because Hagens Berman retained the investigators or caused the materials to be generated before the named Plaintiffs signed a retention letter with Hagens Berman. To so find would be to undercut significantly the policies underpinning *Hickman*, which is still good law in the Seventh Circuit. *See Sandra T.E. v. South Berwyn Sch. Dist. 100*, 600 F.3d 612, 621-22 (7th Cir. 2010) (citing *Hickman* for the following: "Codified at Rule 26(b)(3) .... the work-product doctrine is designed to serve dual purposes: to protect an attorney's thought processes and mental impressions

against disclosure; and (2) to limit the circumstances in which attorneys may piggyback on the fact-finding investigation of their more diligent counterparts.")  Even where the Seventh Circuit has held that the doctrine does not protect documents that were prepared not in anticipation of litigation, but rather as a business precaution amid the mere contingency that litigation may result, our appeals court has referred to the "threshold determination" as being "whether the materials sought to be protected from disclosure were in fact prepared in anticipation of litigation."  *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir. 1983).  The Seventh Circuit also has counseled against an overly narrow application of discovery rules in derogation of the spirit and purpose of the Rules as a whole, including Rule 1's directive that courts promote "just" determinations of the actions before them – citing *Hickman* and Wright & Miller:

> We must remember that Rule 1 states, with unmistakable clarity, that the Federal Rules of Civil Procedure "shall be construed to secure the just, speedy, and inexpensive determination of every action." This language explicitly indicates that the federal rules are to be liberally construed. *Cf. Hickman v. Taylor,* 329 U.S. 495, 507, 67 S. Ct. 385, 392, 91 L. Ed. 451 (1947). There is no place in the federal civil procedural system for the proposition that rules having the force of statute, though in derogation of the common law, are to be strictly construed. C. Wright & A. Miller, Federal Practice and Procedure: *Civil 2d* § 1029 (1987). "[The] spirit, intent, and purpose [of Rule 16] is ... broadly remedial, allowing courts to actively manage the preparation of cases for trial." *In re Baker,* 744 F.2d 1438, 1440 (10th Cir.1984) (en banc), *cert. denied,* 471 U.S. 1014, 105 S. Ct. 2016, 85 L.Ed.2d 299 (1985).… The wording of the rule and the accompanying commentary make plain that the entire thrust of the amendment to Rule 16 was to urge judges to make wider use of their powers and to manage actively their dockets from an early stage. We therefore conclude that our interpretation of Rule 16 to allow district courts to order represented parties to appear at pretrial settlement conferences merely represents another application of a district judge's inherent authority to preserve the efficiency, and more importantly the integrity, of the judicial process.

*G. Heileman Brewing Co., Inc. v. Joseph Oat Corp.*, 871 F.2d 648, 652 (7th Cir. 1989).  Another way to look at Rule 26(b)(3), discussed further below, is that its "codification" of the work-product doctrine was not complete.  *See In re Student Fin. Corp.*, No. 06-MC-69, 2006 WL 3484387, at *10 (E.D. Pa. Nov. 29, 2006) ("The rule is only a partial codification of the work product privilege

… and therefore leaves room for the privilege to be asserted outside its terms in appropriate cases."), citing *Sporck v. Peil*, 759 F.3d 312, 316 (3d Cir. 1985). The Advisory Committee notes state that Rule 26(b)(3) was intended to add uniformity to federal courts' treatment of the work-product doctrine. But "nothing in the text of the rule or its history, or in the relevant advisory committee notes, suggests that it was intended to foreclose the application of the attorney work product privilege outside its terms *in appropriate cases*." *Id*. (emphasis added).

**B.** **_Hickman_ and "the Realities of Litigation" Support Extending Rule 26(b)(3) Beyond Its Literal Language in Appropriate Cases Such As This One.**

That takes us back to *Hickman* and the essence of its holding, which recognized the existence of work-product protection in the first place. The Supreme Court in *Hickman* was concerned that attorneys should "work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." 329 U.S. at 510. Fundamentally, lawyers prepare their clients' cases by gathering facts, sorting what the lawyers think are relevant facts from irrelevant ones, and preparing legal theories and strategies "without undue and needless interference." *Id.* at 511.

> That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed by the Circuit Court of Appeals in this case (153 F.2d 212, 223) as the 'Work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

*Id.* Five years after the 1970 amendments created Rule 26(b)(3), the Supreme Court confirmed that the work-product doctrine "is an intensely practical one, grounded in the realities of litigation

in our adversary system." *United States v. Nobles*, 422 U.S. 225, 238 (1975). *Nobles* made clear that the doctrine extended to protect materials created by investigators working for attorneys if the materials were created in anticipation of litigation. *Id.* at 238-39. *Nobles* did not present the question of whether "pre-client" (a term Defendants use to describe the On Point/Henterly investigation) materials might be protected by the work-product doctrine, but the practicality of the doctrine suggests that it ought to extend not only to the persons who prepared the materials but also to the goal or end for which they were prepared, in appropriate cases.

Just as the work of investigators and paralegals is a reality of litigation, so is the fact that counsel in a complex class action might become aware of the claims, or might need to investigate the claims, before the identities of the claimants are actually known by counsel. Since at least 1981, class counsel has not been categorically barred from communications with potential class members, and limits on communications with class members require a specific showing of abusive conduct. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100-01 (1981). (Plaintiffs' counsel here is not accused of abusively communicating with potential class members.) In the instant case, counsel had represented classes of purchasers of other commoditized protein-based food products such as chicken and pork, and Hagens Berman noted a "unifying" thread along which the work product from the pork and chicken cases "overlapp[ed]" with the memoranda sought by Defendants in the On Point/Henterly subpoenas: "the presence of Agri Stats, the dissemination of Agri Stats reports, and the use of Agri Stats by these industries to constrain supply and pricing." Pl. Reply at 2. The reality here is that the most effective way to learn about industry practices was not to interview the purchasers, but the participants in the turkey industry.

The Court's *in camera* review of the On Point/Henterly materials, it must be said, gave no hint of any abusive conduct. The On Point/Henterly investigation was simply that – an

investigation by which counsel found facts it later used to support a complaint on behalf of named class representatives who retained Hagens Berman either during or immediately after that pre-filing investigation. In fact, the *in camera* materials offer no transparency into how Hagens Berman did identify or select the named Plaintiffs for representation in this case. Instead, the materials reflect pure factual investigation and opinion (by either counsel or its agent investigators) based on that investigation. They reflect the pure reality that in a complex class action like this one, in which two other actions were being maintained against comparable industries, counsel concluded that they should investigate whether facts might support a similar action against turkey integrators. In this particular space, sought to be invaded by Defendants' On Point and Henterly subpoenas, resided the mental impressions of Defendants' opposing counsel in this very matter.

The cases Defendants cite to support their formalistic reading of Rule 26(b)(3) to limit the work-product doctrine to material prepared by or for the party to the litigation are completely unlike the instant case, where Defendants seek materials that opposing counsel prepared, or had prepared, relating directly to the case actually filed by opposing counsel; *i.e.*, materials that were prepared in anticipation of this very litigation. By contrast, *In re Calif. Public Utilities Comm'n*, 892 F.2d 778, 781 (9th Cir. 1989), a prime arrow in Defendants' quiver on their cross-motion to compel, held that a public agency's internal memorandum was discoverable *because the agency was not a party to the litigation*. Similarly, other courts that have found that Rule 26(b)(3) limits work-product protection only to materials prepared by or for a party to the litigation did not confront the circumstance here, in which a party sought the work-product materials of opposing counsel in the same litigation. *See Hill v. City of Chicago*, No. 13 C 4847, 2015 WL 12844948, at *1-2 (N.D. Ill. May 28, 2015) (finding the case files of criminal prosecutors in an earlier criminal prosecution of plaintiff were discoverable in plaintiff's ensuing civil rights litigation); *Hernandez*

*v. Longini*, No. 96 C 6203, 1997 WL 754041, at *2 (N.D. Ill. Nov. 13, 1997) ("Though the general rule against a non-party asserting the privilege is certainly susceptible to the discomforting situation of a less diligent attorney raiding the file of a previously diligent attorney, this danger is not present where the prior case was criminal and the subsequent civil.") (internal quotations and citations omitted).

That highly "discomforting" (as Judge Kocoras put it) element was missing from those cases, but it is not missing from this one: As the *in camera* review of the On Point/Henterly materials showed, the reality of Defendants' subpoenas is that they amount to a raid, by Defendants, of Hagens Berman's litigation files relating directly to this action. This reality puts into relief the powerful rationales, set forth in *Hickman*, for work-product protection where an attorney in a litigation matter wants to see the investigative files of opposing counsel in that very same litigation. Considering these realities, against the backdrop of *Hickman*, this Court cannot help but view the circumstances of the On Point/Henterly subpoenas as an "appropriate" case for coverage of the work-product doctrine, even if Rule 26(b)(3) codified *Hickman* in a way that facially limits work-product protection to parties to the litigation. *See In re Student Fin.*, 2006 WL 3484387, at *11 (holding that *Hickman* authorizes extending work-product protection "outside the terms" of Rule 26(b)(3) where subpoena was on a non-party but sought work-product materials prepared by that non-party in anticipation of being sued by the party that issued the subpoena, and where non-party was a creditor in an adversary bankruptcy action where the party subpoenaing it was the defendant).

*In re Student Finance* is one example of a court extending *Hickman*'s work-product protections beyond Rule 26(b)(3)'s confines of "party to the litigation" (words, that, again, do not appear in the Rule). Therefore, in recognizing that appropriate circumstances could exist for

extending the doctrine, based on *Hickman*, to circumstances outside the supposed terms of the Rule, this Court is not "the first" to do so, as Defendants suggest. *See* Def. Reply at 2. Movants provided other examples, insofar as Rule 26(b)(3)'s codification of the doctrine has been recognized as only "partial," leaving *Hickman*'s protections unscathed as applied to so-called "intangible" work protect such as "interviews." Pl. Reply at 10-11 & n.5 (citing *Walker v. White*, No. 16 CV 7024, 2019 WL 1953124, at \*4 (N.D. Ill. May 2, 2019) (noting that "established case law" confirms that "the work product doctrine extends to 'intangibles.'"); *Caremark, Inc. v. Affiliated Comput. Servs., Inc.*, 195 F.R.D. 610, 614 (N.D. Ill. 2000) (describing Rule 26(b)(3) as applying "only to tangibles and codif[ying] that portion of the *Hickman* opinion that relates to documents. *Hickman v. Taylor* and other common law developments also govern intangibles, such as interviews."); and *Adams v. Mem'l Hermann*, 973 F.3d 343, 349-50 (5th Cir. 2020) ("*Hickman* was later partially codified as Rule 26(b)(3) in the Federal Rules of Civil Procedure…. Despite the language of Rule 26, the work-product doctrine protects both 'tangible and intangible' work product.").

In response, Defendants insist that by subpoenaing the On Point/Henterly documents, they seek only the "tangible" investigative file documents, so that a partial codification of *Hickman* does not save Plaintiffs' argument. Def. Reply at 9. Again, Defendants are arguing that per *Castro* and the *Grolier* dicta, if the material sought in discovery is a "tangible" document, it falls outside the work-product protection of Rule 26(b)(3) if the attorneys cause the materials to be generated before they formally retained the client. *Id.* But we find this to be a distinction without a difference. "Intangible" work product encompasses attorney mental impressions. *DSM Desotech Inc. v. 3D Sys. Corp.*, No. 08 C 1531, 2011 WL 117048, at \*2 (Jan. 12, 2011), citing *United States v. Deloitte LLP*, 610 F.3d 129, 136 (D.C. Cir. 2010). *See also Hickman*, 329 U.S. at 510-11 ("This

24

work is reflected, of course, in interviews, statements, memoranda … and countless other tangible and intangible ways-aptly though roughly termed ... as the 'Work product of the lawyer.'"). Although the On Point/Henterly subpoenas seek production of tangible documents rather than an order that attorneys talk about or write out their mental impressions, discovery and disclosure of the attorney mental impressions about the witness interviews will inevitably result from compelled production of interview memoranda, outlines and notes under the subpoenas.

In addition, even where courts have held that certain materials were outside the work-product doctrine, they have suggested that the materials might well be within the doctrine if their discovery might upset the "competitive balance" in the litigation. *See Hill*, 2015 WL 12844948, at *3 (noting, in allowing discovery, that the prosecuting office invoking the work-product doctrine "has not argued that ordering it to produce its attorney impressions regarding the underlying criminal case would implicate the competitive balance between the litigants in this case"); *LG Electronics, Inc. v. Motorola, Inc.*, No. 10 CV 3179, 2010 WL 4513722, at *4 (N.D. Ill. Nov. 2, 2010) (granting discovery over work-product claims from a patent holder where the litigation involved only a subsequent holder of the patent, where court did not see the original patent holder's relationship with the subsequent patent holder as giving rise to a disruption of the "competitive balance" between the plaintiff and the subsequent patent holder, so that the court would not, in these circumstances, "ascrib[e] to it party-like status in reviewing its assertion of the work-product doctrine"). Hagens Berman's factual development of the turkey complaint at a time it had in mind the facts of the *Broiler Chickens* and *Pork* cases (and the alleged involvement of information exchanges of Agri Stats data), but almost immediately before the named Plaintiffs retained Hagens Berman amid the reality of the choices and decisions class counsel and named plaintiffs make in large class actions, adds a layer of complexity to determining whether Rule 26(b)(3) protects the

pre-filing (and pre-retention) investigative materials. Complex circumstances like these force courts to tackle the challenge of complexity and not rest on a formalistic application of language in a statute or rule.[5]

Tackling the challenge of complexity in this case teaches that if work-product protection does not apply to the On Point/Henterly investigation materials, the ability of putative class counsel in complex class actions to investigate, build and file class cases would be seriously hampered, for all of the reasons the Supreme Court mentioned as concerns in its 1947 opinion in *Hickman*. Class counsel would be unable to retain investigators without risking disclosure of the investigation materials. Investigative materials could not contain frank assessments of the fact finding. Counsel's ability to meet its Rule 11 obligations would suffer. Disincentivizing even rudimentary Rule 11 pre-filing investigations might leave class claims and class counsel even more vulnerable to Rule 11 motions asserting that the pre-filing investigation was too thin. The costs and risks of bringing class actions would increase substantially. The persons who would pay the greatest price would likely be individual class members whose claims are of such small value that they are not incentivized to bring individual actions, *see generally* Fed. R. Civ. P. 23, as well as the greater society, which would be less able to avail itself of Rule 23 to ensure that redress exists for greater wrongs that inflict just a little bit of damages on a large number of individuals. These outcomes

---

[5] As Judge Posner has written:

> At the root of the refusal of many judges to confront, even to recognize, the challenge of complexity is a professional mind-set that often includes – along with impartiality, conscientiousness, and other traditional attributes of a good judge – lack of curiosity, a feeling of intimidation by science and technology, and a lack of interest in obtaining an empirical rather than merely intuitive grounding for one's beliefs.

Richard A. Posner, *Reflections on Judging* 92 (Harvard 2013).

are in the heartland of precisely what *Hickman* warned against.[6] A result faithful to *Hickman* requires the Movants' work-product claim to be upheld under any common-sense application of Rule 26(b)(3) in the appropriate circumstances presented in this case.

### III. Rule 26(b)(3)'s Plain Language Ultimately Supports Granting the Motions To Quash Without Having To Extend the Rule Beyond Its Terms.

Even if a literal reading of Rule 26(b)(3) bars work-product protection of investigative materials created before formal client retention, the work-product doctrine shields the On Point/Henterly materials from discovery in this case because the plain language of Rule 26(b)(3) offers sufficient protection in any event, under the circumstances here. The plain language of Rule 26(b)(3) contains one important qualifier ("ordinarily"), and another important word ("for"), and we must apply both faithfully.

First, the sentence describing the newly "codified" work-product doctrine in 1970 begins with the qualifying word "[o]rdinarily." "Ordinarily" is an adverb describing an event having or taking its place according to customary occurrence or procedure, per the "usual" or "normal." Webster's Collegiate Dictionary 698 (5th ed. 1944). "Ordinary" also has been used to describe an event or action that is "commonplace, not distinguished." The Winston Dictionary, College Edition 683-84 (1939). More contemporary dictionary definitions of this word are not materially different. *See* Miriam Webster's Collegiate Dictionary 817 (10th ed. 2001) ("of a kind to be expected in the normal order of events"). In a circumstance in which a party to an action has not

---

[6] To say that all counsel need do is obtain a signed client engagement letter is too facile. The record before the Court does not disclose the specific circumstances surrounding the retention of Hagens Berman, by John Gross and Olean, to litigate the turkey antitrust claims. To delve further into that issue would strike deeply at privileged communications and at the attorneys' thought processes in determining what named plaintiffs might make the most suitable class representatives to pursue particular claims. *Hickman* and its progeny are supple enough to recognize work-product protection of intangible mental impressions amid the complex, fast-moving milieu in which other protein-related antitrust matters were up and running when Hagens Berman and Grindal Lockridge put together the initial turkey complaint in December 2019.

yet retained a lawyer, and the lawyer retains an investigator to examine the claim, even if we were to assume (or to determine upon an *in camera* review) that the lawyer's opposing counsel's subpoenas for the investigative files are not a competitively unbalanced raid on the adversary's file, we would not read the Rule as categorically foreclosing the applicability of the work-product doctrine in light of the drafters' use of the word "ordinarily." The Rule does not lend itself to crystal clarity about whether the drafters' inclusion of "ordinarily" simply means that work-product information is not discoverable unless the party seeking it meets the burden of establishing substantial need for the material. That is one possible interpretation. But another interpretation is that "ordinarily" modifies the entire sentence, and that under circumstances that are not commonplace or routine, the work-product doctrine is not as rigidly limited as Defendants contend. That latter interpretation is more faithful to the text of Rule 26(b)(3), and it is consistent with the command that courts construe the Rules broadly and remedially within our substantial discretion in managing civil discovery. *See G. Heileman*, 871 F.2d at 652; *Jones*, 737 F.3d at 1115. Applying this interpretation, the Court finds that here, amid the odor of one counsel's attempt to raid the other's file in the very same litigation, in the absence of any hint of champerty or other misdeeds, and where the client retention occurs within a very short time of the pre-retention investigation, the circumstances of this particular pre-retention investigation were not "ordinary." The plain language of Rule 26(b)(3) accommodates Hagens Berman's invocation of the work-product doctrine to bar discovery of the On Point/Henterly materials under these extraordinary circumstances.

Second, we agree with the Movants' argument (*see* Pl. Reply at 6-7) that even if John Gross or Olean had not formally retained Hagens Berman at the time of the On Point/Henterly investigation, that fact does not preclude this Court from finding that the materials still were

prepared "for" the named Plaintiffs, in the language of Rule 26(b)(3). Indisputably, On Point and Henterly performed their investigative services in furtherance of the Hagens Berman investigation into the turkey industry for purposes of Hagens Berman's bringing this litigation on behalf of some client to be identified later, as is clear from the On Point/Henterly engagement letter. The investigative interviews, or information from them, found their way into the complaint that Hagens Berman filed on behalf of the named Plaintiffs, even if Hagens Berman may not have known the precise identity of the named Plaintiffs (or had not been formally retained by them) at the time of the pre-filing investigation. As such, the Court finds that the On Point/Henterly investigation was performed "for" the named Plaintiffs John Gross and Olean, because without the pre-filing or pre-retention investigation, John Gross and Olean would have had far fewer (and possibly insufficient) facts to assert in support of their claims. The On Point/Henterly investigation developed facts which Hagens Berman considered and used to draft a complaint *for* the named Plaintiffs, and Hagens Berman filed that complaint *for* the named Plaintiffs almost immediately after the investigation concluded. "For" means "indicating the end with reference to which anything acts, serves or is done, as money *for* studying." Webster's Collegiate at 390 (emphasis in original). If a person, then, who aspires to be a lawyer, works in a restaurant for five years before she applies and is admitted to law school, and then spends her hard-earned savings to pay her tuition once she is admitted, the money she earned before she applied to or attended law school was *for* law school, according to a plain reading of the King's English. The gathering of facts to be used to support a lawsuit by a yet-to-be-identified or yet-to-be-signed-up class plaintiff was done in service of the end of Hagens Berman filing that lawsuit on the named Plaintiffs' behalf, and thus the investigation was "for" the named Plaintiffs (the parties to the litigation), even if those parties had not signed their engagement letters with Hagens Berman during the month or so during which the pre-filing

investigation was done. To the extent Defendants might argue that the investigative work cannot have been "for" the named Plaintiffs because of the temporal sequencing of the investigation occurring before formal retention, the Court disagrees. The drafters of Rule 26(b)(3) never settled on the restrictive temporal construction Defendants are advancing here. After all, according to the Supreme Court, "Rule 26(b)(3) does not in so many words address the temporal scope of the work-product immunity and a review of the Advisory Committee's comments reveals no express concern for that issue." *Grolier*, 462 U.S. at 25.

Consequently, even if Rule 26(b)(3) strictly applies to limit work-product assertions to materials prepared "by or for" a party to the litigation, and even if the Rule's use of the word "ordinarily" does not anticipate flexibility as this Court believes it does, On Point and Henterly still prepared their investigative materials "for" John Gross and Olean, and the On Point/Henterly subpoenas must be quashed.

## IV. Rules 26(c), 45(d) and 26(b)(1) Also Support Granting the Motions to Quash Under the Circumstances Presented in This Case.

Two of Defendants' leading authorities for limiting work-product protection to materials prepared in anticipation of litigation "by or for" *parties to the litigation* are the Ninth Circuit and Wright & Miller, both of which have said, in effect, that "by or for a party" means that party must already be in the litigation. But both of those authorities recognized that 26(b)(3) is not the only tool under the Rules to protect a party from discovery that it can persuade a court is oppressive. Rules 26(c), 45(d) and 26(b)(1) also are available and independently support quashing the On Point/Hentely subpoenas.

### A. Rule 26(c) Authorizes Quashing the On Point/Henterly Subpoenas.

The Ninth Circuit opinion in *In re Calif. Public Utilities Comm'n* supports Defendants' view that Rule 26(b)(3) extends work-product protection only to materials prepared (in

anticipation of litigation) by parties to the litigation, but it recognized that Rule 26(c) protective orders are available as a sort of safety valve for situations in which Rule 26(b)(3) inadequately protects attorney work product. 892 F.2d at 781 & n.2. Even while denying work-product protection under Rule 26(b)(3), the Ninth Circuit observed that the subpoenaed non-party public agency remained free to move for a protective order under Rule 26(c) on grounds of oppression. *Id.* The authorities on which the Ninth Circuit relied for that proposition included Wright & Miller, which had a similar view of the interplay between Rule 26(b)(1) and Rule 26(c) when attorney work-product materials are sought in discovery. *See id.* (citing Wright & Miller); 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2024 (3d ed.), Westlaw (database updated Apr. 2021) (describing Rule 26(b)(3)'s work-product protection as arguably giving "insufficient protection" to work-product materials but suggesting that Rule 26(c) offers an alternative route to "vindicat[ing] the purposes of the work-product rule ….") The text of Rule 26(c) allows a party to move the Court, on a showing of good cause, for an order protecting that party from "annoyance, embarrassment, oppression, or undue burden or expense …." Fed. R. Civ. P. 26(c). Movants here have invoked Rule 26(c) as an additional source of protection for the On Point/Henterly materials. Pl. Reply at 10.

The Court finds that the oppression and undue burden caused by the On Point/Henterly subpoenas, in the form of hindering the ability of Hagens Berman to prepare its case and gather facts without intrusion and interference by Defendants seeking to pry into opposing counsel's mental impressions formed in preparation for litigation, constitute good cause for a protective order under Rule 26(c) and an alternative ground for quashing the subpoenas. *See In re Polypropylene*, 181 F.R.D. at 692 (issuing a protective order under Rule 26(c) to protect third party documents that "would constitute attorney work product as defined by Rule 26(b)(3) if [the third

party] was a party to this litigation"); *Basinger v. Glacier Carriers, Inc.,* 107 F.R.D. 771, 772-73 (M.D. Pa. 1985) (quashing subpoena under Rule 26(c) as unduly burdensome and unjust where the subpoenaed entity, as a non-party, could not invoke Rule 26(b)(3) but would have had to produce work-product materials to a party that might subsequently sue it in the litigation); *In re Student Fin.*, 2006 WL 3484387, at *11 (citing *Basinger* and *In re Polypropylene* for the proposition that Rule 26(c)'s language "is sufficiently sweeping to authorize a protective order preventing the undue burden of disclosing third-party work product in appropriate cases").

**B.** **Rule 45(d) Authorizes Quashing the On Point/Henterly Subpoenas.**

The third-party Movants (On Point and Henterly) also have invoked Rule 45(d) as support for the motions to quash. Pl. Reply at 12-13. Rule 45(d) permits a third party to move to quash a subpoena that "requires disclosure of privileged or other protected matter" or "subjects a person to an undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii) and (iv).

> Rule 45 expressly provides that the court from which a subpoena has issued shall quash or modify the subpoena if it "requires disclosure of privileged or other protected matter and no exception or waiver applies." [Then] Rule 45(c)(3)(A)(iii). Rule 45 does not define what privileges and protections are to be enforced under its terms, but the language is broad enough to include protection against discovery of third-party work product in appropriate cases. Nothing in Rule 45's history or text indicates that it was intended to incorporate Rule 26(b)(3)'s restriction of work product to parties. The Advisory Committee Notes to the 1991 revisions to the rule indicate that the authority to issue protective orders under Rule 45 was intended to track the general protective order provisions of Rule 26(c), but do not mention the work product provisions of Rule 26(b).

*In re Student Fin.*, 2006 WL 3484387, at *11; *Carnes v. Crete Carrier Corp.*, 244 F.R.D. 694, 699 (N.D. Ga. 2007) ("Although the text of Rule 26(b)(3) appears to limit work product to parties, Rule 26(c), Rule 45, and *Hickman* suggest that the scope of protection should extend to a non-party … under the facts of this case.").

This Court concurs with *In re Student Finance* and *Carnes*, and finds that the On Point/Henterly subpoenas' would-be raid on the files of opposing counsel, in a manner that would

compel disclosure of attorney mental impressions formed in preparation for litigation against the very parties seeking to raid the files, presents an appropriate circumstance for issuance of a protective order under Rule 45(d)(3)(A)(iii) and (iv). Rule 45(d) thus offers another alternative basis for granting the motions to quash.

### C.      Rule 26(b)(1) Authorizes Quashing the On Point/Henterly Subpoenas.

Finally, Rule 26(b)(1), as amended in 2015, introduced the concept of proportionality into the scope of discovery. Discovery that is disproportional to the needs of the case is now within the district court's discretion to deny. For the very same reasons as set forth above, namely the burden that compelled disclosure of the mental impressions of Hagens Berman and its agents would impose on their ability to investigate and prosecute the complex class claims asserted here, the Court finds that the discovery sought by the On Point/Henterly subpoenas is disproportional to the needs of this case and must be denied. Nothing in the record suggests that Defendants do not have equal access to the third-party witnesses whom On Point and Henterly interviewed, including Confidential Witnesses 1, 2 and 3, whose identities are plain from the complaint allegations and Plaintiffs' Rule 26(b)(1) disclosures. The availability of the evidence from these witnesses themselves makes discovery of their interview materials from within the work-product files of Hagens Berman, On Point, and Henterly all the more disproportional to the needs of the case.

The Court's analysis of proportionality has included an assessment of burdens on the policies that underly particular rules or societal practices. *See Johnson v. Soo Line R.R. Co.,* No. 17 C 7828, 2019 WL 4037963, at *2-3 (N.D. Ill. Aug. 27, 2019) (applying Rule 26(b)(1) proportionality concept to assess burdens that compelled production of federal income tax returns in civil discovery could place on system of voluntary tax compliance); *Washtenaw County Employees' Ret. Sys. v. Walgreen Co.*, No. 15 C 3187, 2019 WL 6108220, at *5-6 (N.D. Ill. Nov.

15, 2019) (applying Rule 26(b)(1) proportionality concept to assess burden that compelled production of settlement-related materials could place on the social policies underlying Federal Rule of Evidence 408).

The Court, acting within its discretion, *Jones*, 737 F.3d at 115, sees the On Point/Henterly subpoenas' burden on the work-product protection articulated in *Hickman*, and on the ability of Defendants' opposing counsel to form mental impressions and gather facts in anticipation of the same litigation in which the subpoenas are issued, as a burden great enough to make the discovery disproportional under Rule 26(b)(1), which thus offers a third alternative basis for granting the motions to quash.

## CONCLUSION

For the foregoing reasons, the Court grants Movants' two motions to quash the On Point/Henterly subpoenas and denies Defendants' cross-motion to compel compliance with those subpoenas.

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: March 16, 2022**