**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *IN RE TURKEY ANTITRUST LITIGATION* | No. 1:19-cv-08318 |
| This Document Relates To: | Hon. Virginia M. Kendall |
| All Actions | Hon. Gabriel A. Fuentes |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' JOINT MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 3

    A.  Procedural History................................................................................................ 3

    B.  Factual Allegations............................................................................................... 4

LEGAL STANDARD ....................................................................................................... 6

ARGUMENT ................................................................................................................... 6

  I.   Despite Access To Extensive Discovery, Plaintiffs Have Not Alleged The Existence Of *Any* Direct Evidence Of A Price-Fixing Conspiracy.................................................................. 7

  II.  Plaintiffs Have Not Alleged Circumstantial Evidence Of A Price-Fixing Conspiracy. ...... 9

    A.  Plaintiffs do not allege parallel output reductions by Defendants. ............................... 10

      1.  Plaintiffs' allegations about industry production cuts are irrelevant. ........................ 11

      2.  Plaintiffs' individualized allegations do not show parallel activity. ......................... 12

    B.  Plaintiffs identify obvious alternative explanations for output reductions. ................... 15

      1.  Unprecedented feed prices provide an obvious alternative explanation. ................... 15

      2.  Oversupply of turkey provides an obvious alternative explanation. ......................... 18

      3.  Other industry factors provide obvious alternative explanations. ............................ 19

    C.  Plaintiffs' interdependence allegations are insufficient. ............................................ 20

    D.  Plaintiffs do not identify any other "plus factors" supporting a conspiracy. ................ 23

      1.  A motivation to increase "profits" is not a plus factor. ........................................ 23

      2.  Agri Stats is not a "plus factor." .................................................................... 24

      3.  Trade associations and other "opportunities" are not "plus factors." ....................... 26

      4.  Structural features of the turkey industry are not plus factors................................. 28

CONCLUSION................................................................................................................ 29

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Advanced Tech. Corp. v. Instron, Inc.*,
925 F. Supp. 2d 170 (D. Mass. 2013) ....................................................23

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) ...............................................................6

*Apex Oil Co. v. DiMauro*,
822 F.2d 246 (2d Cir. 1987).................................................................8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................5, 10

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999)...............................................................24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................. *passim*

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
691 F. App'x 389 (9th Cir. 2017) .......................................................11

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ..................................................20

*Burke v. 401 N. Wabash Venture, LLC*,
714 F.3d 501 (7th Cir. 2013) .............................................................21

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011)..........................................................14, 24

*In re Cattle Antitrust Litig.*,
2020 WL 5884676 (D. Minn. Sept. 29, 2020) ......................................11

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015)...............................................................29

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) ...........................................................28

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007).................................................................29

*Erie Cnty. v. Morton Salt, Inc.*,
  702 F.3d 860 (6th Cir. 2012) ................................................................28

*In re Fla. Cement & Concrete Antitrust Litig.*,
  746 F. Supp. 2d 1291 (S.D. Fla. 2010) ...........................................28, 29

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................................14

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ..................................................................8

*Hinds Cnty. v. Wachovia Bank N.A.*,
  620 F. Supp. 2d 499 (S.D.N.Y. 2009)....................................................9

*Hogan v. Pilgrim's Pride Corporation*, No. 16-cv-02611,
  2018 WL 1316979 (D. Colo. Mar. 14, 2018) .................................12, 13

*Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*,
  231 F. Supp. 2d 1253 (N.D. Ga. 2002), *aff'd*, 346 F.3d 1287 (11th Cir. 2003) .....................29

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)............................................................15, 20

*Kramer v. Pollock–Krasner Found.*,
  890 F. Supp. 250 (S.D.N.Y.1995) .........................................................15

*Lamers Dairy Inc. v. U.S. Dep't of Agr.*,
  379 F.3d 466 (7th Cir. 2004) ..................................................................8

*In re Late Fee & Over-Limit Fee Litig.*,
  528 F. Supp. 2d 953 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014) .........................28

*In re LTL Shipping Servs. Antitrust Litig.*,
  2009 WL 323219 (N.D. Ga. Jan. 28, 2009)......................................16, 28

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
  952 F.3d 832 (7th Cir. 2020) ..................................................................7

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013).................................................................23

*McCauley v. City of Chi.*,
  671 F.3d 611 (7th Cir. 2011) ...........................................................15, 25

*Missouri Pet Breeders Ass'n v. Cnty. of Cook*,
  106 F. Supp. 3d 908 (N.D. Ill. 2015) ......................................................8

*Moore v. Boating Indus. Ass'n,*
   819 F.2d 693 (7th Cir.1987) ................................................26

*In re Musical Instruments & Equip. Antitrust Litig.,*
   798 F.3d 1186 (9th Cir. 2015) ...............................16, 23, 26

*Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.,*
   No. 1:19-cv-8318, 2020 WL 6134982 (N.D. Ill. Oct. 19, 2020) ................................1, 3, 6, 24

*Omnicare, Inc. v. UnitedHealth Group, Inc.,*
   629 F.3d 697 (7th Cir. 2011) ...............................................8

*Park Irmat Drug Corp. v. Express Scripts Holding Co.,*
   911 F.3d 505 (8th Cir. 2018) ........................................11, 14

*In re Pilgrim's Pride Corp.,*
   728 F.3d 457 (5th Cir. 2013) ..............................................24

*In re Polyurethane Foam Antitrust Litig.,*
   152 F. Supp. 3d 968 (N.D. Ohio 2015) ...............................22

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.,*
   158 F. Supp. 3d 544 (E.D. La. 2016) ...................................16

*In re Pork Antitrust Litig.,*
   2019 WL 3752497 (D. Minn. Aug. 8, 2019) ....................11, 12

*Prosterman v. Am. Airlines, Inc.,*
   747 F. App'x 458 (9th Cir. 2018) ........................................19

*S. Collision & Restoration, LLC v. State Farm Mut. Auto Ins. Co.,*
   173 F. Supp. 3d 1293 (M.D. Fla. 2016) ................................23

*In re Text Messaging Antitrust Litig.,*
   630 F.3d 622 (7th Cir. 2010) ...........................8, 17, 20, 27

*In re Travel Agent Comm'n Antitrust Litig.,*
   583 F.3d 896 (6th Cir. 2009) ..............................................19

*United States Bd. of Oral Implantology v. Am. Bd. of Dental Specialties,*
   390 F. Supp. 3d 892 (N.D. Ill. 2019) ....................................7

*United States v. Standard Oil Co.,*
   316 F.2d 884 (7th Cir. 1963) ..............................................20

*United States v. U.S. Gypsum Co.,*
   438 U.S. 422 (1978) ...........................................................6

*Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
    No. 16-CV-10324, 2020 WL 1666454 (N.D. Ill. Apr. 3, 2020)....................................15, 26, 29

*Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ............................................................................. *passim*

*Williamson Oil Co v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) ............................................................................................14

**Statutes and Rules**

Energy Independence and Security Act, Pub. L. No. 110-140, 121 Stat. 1492
    (2007)......................................................................................................................................15, 16

Fed. R. Civ. P. 8.............................................................................................................................1

**Other Authorities**

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2021).................................20, 24

Richard A. Posner, *Antitrust Law* (2d ed. 2001)............................................................................8

Defendants[1] respectfully move to dismiss the *per se* price fixing claim in the amended complaints filed by the Direct Purchaser Plaintiffs, Dkt. 380; the Indirect Purchaser Plaintiffs, Dkt. 378; and direct action plaintiff Winn-Dixie, Dkt. 379 (collectively, "Plaintiffs").[2][3]

## INTRODUCTION

In October 2020, this Court dismissed Plaintiffs' perfunctory allegations that Defendants had entered into a *per se* price-fixing agreement, but allowed Plaintiffs to proceed on their claim that Defendants participated in an unlawful information exchange though Agri Stats. *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, No. 1:19-cv-8318, 2020 WL 6134982, at *8 (N.D. Ill. Oct. 19, 2020). Plaintiffs then engaged in expansive discovery, with Defendants collectively producing millions of pages of documents and communications and extensive transactional data about their turkey production and sales. Plaintiffs are now attempting to revive their dismissed *per se* price-fixing claim with cherry-picked snippets from that record. Not only does this pleading strategy invert the usual requirements of Rule 8, which demands plausible factual allegations to support a claim before discovery, *see* Fed. R. Civ. P. 8, it also fails on its own terms.

---

[1] Defendants are Agri Stats, Inc. ("Agri Stats")' Butterball, LLC ("Butterball")' Cargill Incorporated and Cargill Meat Solutions Corporation ("Cargill")' Cooper Farms, Inc. ("Cooper Farms"); Farbest Foods, Inc. ("Farbest"); Foster Farms, LLC and Foster Poultry Farms ("Foster Farms"); Hormel Foods Corporation and Jennie-O Turkey Store, Inc. ("Hormel"); House of Raeford Farms, Inc. ("House of Raeford"); Prestage Farms, Inc., Prestage Foods, Inc., Prestage Farms of South Carolina, LLC ("Prestage Farms"); Perdue Farms, Inc. and Perdue Foods LLC ("Perdue"); and Tyson Foods, Inc., The Hillshire Brands Company, Tyson Fresh Meats, Inc., and Tyson Prepared Foods, Inc. ("Tyson"). Tyson has settled with the Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs, *see* Dkt. 406, 433, and therefore joins this Motion as to the Winn-Dixie complaint only (Dkt. 379).

[2] Plaintiffs' three new complaints are materially identical, so for simplicity, this brief cites to the Direct Purchaser Plaintiffs' Second Amended Complaint ("SAC") throughout. Direct action plaintiff Amory Investments LLC ("Amory") has not asserted a *per se* price fixing claim. *See* Case No. 1:21-cv-06600, Dkt. 1. However, to the extent Amory is deemed to have asserted such a claim, Defendants seek dismissal for the same reasons noted herein.

[3] All references to "Ex. [●]" are exhibits to the Declaration of Britt M. Miller, filed herewith.

Even though Plaintiffs have combed through millions of pages of documents, their complaints do not identify a single instance in which two or more Defendants—let alone the more than a dozen Defendants and alleged co-conspirators—*agreed* to limit output or fix prices in any way. Instead, Plaintiffs identify a host of unilateral output and pricing decisions made by individual Defendants and producers and ask the Court to infer that these decisions reflect an ill-defined conspiracy. Plaintiffs offer no plausible basis for the Court to reach that conclusion.

Despite the benefit of extensive discovery, as well as three "confidential witnesses" recruited by Plaintiffs to support their claims, Plaintiffs allege no direct evidence of any conspiracy. Nor do Plaintiffs allege parallel conduct—essential for any *per se* claim based on circumstantial evidence. Plaintiffs also do not allege a single output reduction or price increase that was inconsistent with a Defendant's self-interest. To the contrary, the varied production decisions that Plaintiffs allege are entirely consistent with market trends during relevant periods. Plaintiffs' inability to point to direct evidence of a conspiracy—or at least indirect evidence of coordinated anticompetitive action rather than sporadic production decisions—is telling.

That some of the documents in the record (among the millions of pages produced in this case) suggest that some Defendants may have considered industry output and pricing when making their own judgments about these matters does nothing to make an *agreement* on price or output plausible. As the Seventh Circuit and many other courts have recognized, interdependence—even "conscious parallelism"—does not violate the antitrust laws.

Rather than direct the Court to evidence plausibly supporting a *per se* claim, Plaintiffs' new allegations simply add window dressing to their existing information-exchange claim. Accordingly, the Court should again dismiss the *per se* claim as inadequately pled.

## BACKGROUND

### A. Procedural History

In the initial complaint, Plaintiffs brought one cause of action for "conspiracy to exchange competitive information." Dkt. 1 ¶¶ 146-63. Plaintiffs alleged that "[e]ach one of the defendants and co-conspirators entered into an agreement to exchange information through Agri Stats," *id.* ¶ 8, that certain Defendants were able to "deanonymize" Agri Stats reports to identify other producers, *id.* ¶ 18, and that features of the turkey industry make it susceptible to anticompetitive effects from information exchange, *id.* ¶¶ 102-06. As a result, Plaintiffs claimed, the agreement to share information through Agri Stats violated Section 1 of the Sherman Act.

In its order on Defendants' motions to dismiss, the Court held that Plaintiffs had plausibly alleged a rule of reason claim based on Defendants' exchange of information through Agri Stats. *See Olean*, 2020 WL 6134982, at *6. But although Plaintiffs urged the Court to recognize an additional *per se* claim to fix prices based on these allegations, the Court held that Plaintiffs' "conclusory paragraph" alleging that the exchange of information supported a *per se* illegal agreement was "not a plausible allegation." *Id.* at *8. Plaintiffs did not immediately amend their complaint following the Court's order.

Since then, the parties conducted extensive discovery. Plaintiffs served dozens of requests for production and numerous interrogatories on each Defendant. Defendants produced approximately 1.6 million documents totaling more than 6.2 million pages, including structured data about turkey production and sales, and served written discovery responses. Plaintiffs also issued more than 100 subpoenas to third parties, who have produced more than 140,000

documents. Defendants made rolling document productions and substantially completed their document productions in November 2021. *See* Dkt. 210 at 2.[4]

In January 2022, Plaintiffs moved for leave to amend their complaints, principally to add allegations supporting their "original" *per se* claim that Defendants "formed an agreement to fix prices and restraint [sic] the supply of turkey during the Class Period." Dkt. 373 at 2. In addition, Plaintiffs claimed that the amendment would "strengthen" their information-exchange claim, and they sought to name Prestage Farms as a Defendant and several other non-defendant turkey producers as additional "co-conspirators." Defendants stipulated to Plaintiffs filing the amended complaints, subject to Defendants' right to challenge the sufficiency of their allegations. Dkt. 383.

### B.    Factual Allegations

Plaintiffs' kitchen-sink complaints are nearly 600 paragraphs long. Their allegations fall into four broad categories.

*First*, Plaintiffs allege a host of facts about Agri Stats—the benchmarking company that is the focus of the information-exchange claim that proceeded to discovery. SAC ¶¶ 87-224. Despite their numerosity, none of these allegations break new ground. Plaintiffs alleged in the original complaint that Defendants subscribed to Agri Stats services, received various Agri Stats reports, and used those reports in their business operations. Dkt. 1 ¶¶ 74-88.

*Second*, Plaintiffs allege that Defendants had opportunities to conspire through their participation in various trade associations, including the National Turkey Federation. SAC ¶¶ 225-32, 436-50. Again, these allegations are not fundamentally new. Plaintiffs previously alleged that National Turkey Federation and other "turkey-related trade associations" provided opportunities

---

[4] The Prestage Farms entities were added as defendants in January 2022 and written discovery has only recently commenced between them and Plaintiffs. Prestage Farms and Plaintiffs have stipulated that they will substantially complete document production in response to written discovery requests by June 1, 2022. Dkt. 440.

to collude. Dkt. 1 ¶¶ 124-30. And Plaintiffs acknowledge the obvious procompetitive purposes of these industry associations, such as promoting demand for turkey products or ensuring sufficient supply for the market in case of unforeseen emergencies. SAC ¶¶ 231-32, 436-37.

***Third***, Plaintiffs allege that the industry as a whole experienced periods of supply cuts and price increases before and during the class period. Specifically, Plaintiffs allege that from 2008-2009—as the country was experiencing a historic financial crisis and with the prices for turkey feed soaring to unprecedented levels—certain Defendants cut turkey production and production in the industry declined overall. SAC ¶¶ 270-302. Plaintiffs also allege that certain Defendants cut supply in 2012-2013, leading to an overall decline in aggregate industry production. *Id.* ¶¶ 324-70. While the dates related to these allegations differ, none are meaningfully different from Plaintiffs' previous allegations concerning industry-wide supply cuts and price increase during the class period. Dkt. 1 ¶¶ 109-15.

***Finally***, Plaintiffs allege miscellaneous facts that they claim make a conspiracy plausible, just as they did previously, *see* Dkt. 1 ¶¶ 99-107. For example, they contend that Defendants gathered market intelligence, that Defendants' employees "regularly moved between companies" and attended informal events with one another, and that the structure of the industry is conducive to conspiracy. SAC ¶¶ 436-526.

Based upon these allegations, Plaintiffs bring two claims. The first restates Plaintiffs' information-exchange theory. SAC ¶¶ 556-72. The second alleges a *per se* unlawful agreement to coordinate production cutbacks between Agri Stats, the ten named turkey producer Defendants and five unnamed "co-conspirators" (Dakota Provisions, Kraft, Michigan Turkey Producers, Norbest, and West Liberty Foods). *Id.* ¶¶ 2-3, 56-86, 573-84. That is, in the face of obvious economic explanations for production cuts (such as rising feed prices and the Great Recession),

Plaintiffs ask this Court to believe that it is plausible that there was a conspiracy among 16 companies lasting at least seven years with respect to thousands of disparate turkey products.

## LEGAL STANDARD

To survive a motion to dismiss, Plaintiffs must plead facts that, taken as true, state a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). But mere "follow-the-leader" activity by firms that "recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions"—what commentators sometimes call "conscious parallelism"—is not enough to make a conspiracy plausible. *Twombly*, 550 U.S. at 553-54. "[P]arallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.*

To raise a plausible inference of agreement, therefore, antitrust plaintiffs must allege conduct by each defendant that is not only parallel, but "that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Id.* at 556 n.4 (quoting Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1425). It is only when allegations of parallel conduct are "placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action," that the allegations state a claim that is plausible, not merely possible, under Rule 8. *Id.* at 557.

## ARGUMENT

Plaintiffs are attempting to revive their "original" *per se* price fixing claim after months of discovery because information-exchange claims are notoriously difficult to prove. Plaintiffs will need to demonstrate, at a minimum, that the exchange "cause[d] anti-competitive effects" in a

relevant market and that those anti-competitive effects "outweigh[ed] any pro-competitive benefits." *Olean*, 2020 WL 6134982, at *8 (citing *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012)). That will be a tall order given the recognition that such practices may "increase economic efficiency and render markets more, rather than less, competitive." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).

To state a *per se* claim based on output reductions, however, Plaintiffs must allege facts that make it plausible that there *was* an agreement—*i.e.*, that each Defendant reached a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 841 (7th Cir. 2020). Such an agreement "can be proven by either direct or circumstantial evidence," *United States Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 902 (N.D. Ill. 2019), but as explained below, despite access to extensive discovery, Plaintiffs have failed to allege any evidence (direct or circumstantial) for a *per se* claim. The Court should therefore dismiss the *per se* claim with prejudice.

## I. Despite Access To Extensive Discovery, Plaintiffs Have Not Alleged The Existence Of *Any* Direct Evidence Of A Price-Fixing Conspiracy.

Plaintiffs allege a "scheme" among at least 15 different turkey producers and Agri Stats to "fix" turkey prices by engaging in coordinated supply cuts from "[a]t least as early as January 1, 2010, and at least until January 1, 2017[.]" SAC ¶ 576. The supposed conspirators range from large companies who allegedly control 15% or more of the market to smaller operations with alleged market shares of 1%. *Id.* ¶ 513. Plaintiffs do not allege that Defendants agreed to target any particular output or focus on particular production levels. Nor do Plaintiffs allege how Defendants agreed which of them would reduce output or how Defendants would ensure compliance if one or more producers increased production (as the complaints acknowledge several Defendants in fact

did). According to Plaintiffs' own complaints, year-over-year turkey production, measured by total heads slaughtered, *rose* for much of the class period. *Id.* ¶ 40. Additionally, even though fewer heads were slaughtered in some years, the total weight of turkeys slaughtered in the United States—and hence the total amount of turkey available—increased nearly half a billion pounds during the purported conspiracy, from 7.06 billion pounds in 2010 to 7.469 billion pounds in 2017.[5]

Not only is Plaintiffs' theory facially implausible, but there is no alleged direct evidence to support it. Direct evidence is "tantamount to an acknowledgment of guilt," *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002), and requires no inferences to conclude that a conspiracy existed. *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 706 (7th Cir. 2011). In other words, it is a "smoking gun," such as "an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010).

Although Plaintiffs often do not have access to direct evidence at the outset of a case, Plaintiffs have now had ample opportunity to come up with documentary evidence that would exist if the massive conspiracy they allege had actually occurred. For example, search terms applied to Defendants' documents included broad searches for documents referencing other Defendant names and email domains, so email communications among Defendants have been produced.

---

[5]     USDA, *Poultry Slaughter 2017 Summary*, at 5 (Feb. 2018), https://downloads.usda.library.cornell.edu/usda-esmis/files/pg15bd88s/br86b638d/4f16c564f/PoulSlauSu-02-26-2018.pdf; USDA, *Poultry Slaughter 2010 Summary*, at 2 (Feb. 2011), https://downloads.usda.library.cornell.edu/usda-esmis/files/pg15bd88s/mc87ps966/j6731667w/PoulSlauSu-02-25-2011_errata.pdf. The Court may take judicial notice of these and other USDA documents on a motion to dismiss. *See Lamers Dairy Inc. v. U.S. Dep't of Agr.*, 379 F.3d 466, 471 (7th Cir. 2004) (taking judicial notice of USDA regulations); *Missouri Pet Breeders Ass'n v. Cnty. of Cook*, 106 F. Supp. 3d 908, 918 (N.D. Ill. 2015) (same for USDA publication).

Courts have recognized that conspiracies "concern[ing] long-term complex relationships among competitors," like the one alleged here, should be "more susceptible of direct proof." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987); *see also* Richard A. Posner, *Antitrust Law* 66 (2d ed. 2001) ("It is unlikely that a large number of firms could accomplish the complex and delicate task of effectively coordinating their pricing without generating abundant evidence of conspiracy."). Here—despite amending their complaints after receiving millions of pages of documents and communications from Defendants in discovery—Plaintiffs' allegations do not identify a single document that shows an explicit agreement on the terms of a conspiracy, let alone a conspiracy in which 16 separate companies agreed to "coordinate" and implement output restrictions for at least seven years.

Plaintiffs also claim that they have access to three confidential witnesses at three different Defendants. The first is a "former sales executive" at Butterball allegedly "involved in the pricing of turkeys." SAC ¶¶ 133, 180, 198, 519. The second is a former accountant at Cooper Farms with alleged knowledge of how Cooper Farms executives used Agri Stats and ███████████ ████████████████. *Id*. ¶¶ 146-47, 183-84, 198, 204, 228. The third is a former Cargill employee with alleged knowledge about Agri Stats and ████████████████████ ██████████████████ *Id*. ¶¶ 206, 208, 227. Yet despite access to these individuals, Plaintiffs do not allege that any confidential witness provided direct or even inferential support for a years-long, industry-wide price-fixing conspiracy.

## II. Plaintiffs Have Not Alleged Circumstantial Evidence Of A Price-Fixing Conspiracy.

Because Plaintiffs have not alleged any direct evidence of a conspiracy, they must allege circumstantial evidence that makes a conspiracy plausible. Plaintiffs fail to do so.

*First*, to raise a plausible inference that a large and disparate group of turkey producers agreed to coordinate reductions in output, a complaint must allege that all of the alleged

participants in the conspiracy actually acted in parallel. Plaintiffs, however, do not plausibly allege that Defendants and their alleged "co-conspirators" made parallel production cuts. Instead, the amended complaints recognize that some Defendants cut production; others expanded production; and others did both, at different times.

*Second*, even if Plaintiffs had pled parallel cuts, their conspiracy allegations still would not be plausible. As the Supreme Court has recognized, parallel conduct can be "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market" as with conspiracy. *Twombly*, 550 U.S. at 553-54. Plaintiffs' own complaints identify factors like soaring feed costs and oversupply that explain why some Defendants decided to reduce their output during certain periods. Given these obvious alternative explanations, it is not plausible to infer that Defendants were conspiring.

*Third*, Plaintiffs have cherry-picked documents from the discovery record showing that individual Defendants sometimes considered pricing and output decisions by other producers when forming their own strategies. But as explained above, so-called "conscious parallelism"—in which firms "recognize their shared economic interests and their interdependence with respect to price and output decisions"—is not suggestive of illegal conduct. *Id.*

*Finally*, Plaintiffs' efforts to plead "plus factors" in favor of conspiracy are unavailing. The factors Plaintiffs identify are either legally insufficient to establish a plausible conspiracy or have no probative value in this context. In short, at best Plaintiffs have pled facts that are "merely consistent" with conspiracy, which "stop[] short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678. These allegations are not enough to revive the dismissed *per se* claim.

### A. Plaintiffs do not allege parallel output reductions by Defendants.

Plaintiffs allege that Defendants "coordinate[d] their supply reductions" and "engaged in large, parallel cutbacks" in 2008-2009 and 2012-2013. SAC ¶¶ 1, 577. But although Defendants

produced documents, structured data, and internal company business plans related to turkey supply prior to Plaintiffs' amendments, the complaints do not support these conclusory allegations with factual allegations that show parallel conduct. *Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 837 (N.D. Ill. 2018) ("*Baxter I*") (dismissing allegations of parallel conduct in the face of "disparities in the magnitude and timing of the defendants' recalls"). That alone is sufficient to reject Plaintiffs' claims. *See Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018) ("Because Irmat fails to plausibly plead parallel conduct, no discussion of any 'plus factors' is necessary."); *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) ("'Plus factors' are relevant only if the complaint adequately alleges parallel conduct among the defendants.").

### 1. Plaintiffs' allegations about industry production cuts are irrelevant.

Courts have held repeatedly that generalized allegations of industry-wide conduct are insufficient to plead parallel conduct. *See In re Pork Antitrust Litig.*, 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019) (explaining that allegations about individual defendants are "vital to pleading parallel conduct"); *In re Cattle Antitrust Litig.*, 2020 WL 5884676, at *6 (D. Minn. Sept. 29, 2020) (concluding that plaintiffs had failed to plead parallel conduct when "[t]hey do little to allege how the individual Defendants acted and instead resort to group pleading, arguing that the market did this or that"). Although Plaintiffs had access to each Defendants' extensive individual production volumes through discovery, Plaintiffs continue to rely on industry-wide data concerning production cuts—which show nothing about each Defendant's *individual* conduct.

For instance, Plaintiffs allege that "Defendants' anticompetitive restraint over their production" is reflected by data concerning total heads of turkey slaughtered before and after the relevant time period and data showing increased turkey prices without a corresponding increase in turkey production. SAC ¶¶ 40-42. These allegations are supported by nonspecific allegations

concerning production cuts in "the turkey industry" generally.[6] These industry-wide allegations only invite the court to "speculat[e]" as to each Defendant's actions and are irrelevant to the issue of parallel conduct. *See Pork*, 2019 WL 3752497, at *8.

### 2. Plaintiffs' individualized allegations do not show parallel activity.

To the extent that Plaintiffs allege production cutbacks by certain individual Defendants, these allegations are also insufficient. Plaintiffs allege that producers were variously increasing, decreasing, or maintaining production sporadically during the alleged 2008-2009 and 2012-2013 cutback periods, thus undermining, rather than supporting, an inference of conspiracy.

**No parallel activity in 2008-2009.** Plaintiffs allege that only eight of the 15 alleged co-conspirator turkey producers cut any production in 2008 or 2009. *See* SAC ¶¶ 162, 271–74, 276, 280–83, 290, 292, 296, 298. Farbest, for instance, one of the four largest turkey producers in the United States, was increasing production in 2009. *Id.* ¶¶ 243, 287. Plaintiffs also allege that Cooper Farms, Perdue, and non-Defendant Willmar Poultry were increasing production around the same time. *Id.* ¶ 162.

In addition, Plaintiffs' nonspecific allegations of the amounts and methods of production cuts do not demonstrate that alleged cuts were parallel in service of a conspiracy. In *Hogan v. Pilgrim's Pride Corporation*, the court held that plaintiffs had failed to plead parallel production cuts when they failed to allege what each defendant did to cut production, the number of chicken eggs that were destroyed, and the impact of egg reductions on broiler production levels. No. 16-

---

[6] *See, e.g.*, SAC ¶¶ 12, 275 (



cv-02611, 2018 WL 1316979, at *7-8 (D. Colo. Mar. 14, 2018). "Moreover," the court wrote, "to the extent the complaint d[id] provide some detail about particular actions co-conspirators took to cut production," it showed the defendants taking different steps to do so, further undermining the inference that the defendants acted pursuant to a collective agreement. *Id.*

In June 2008, for instance, Plaintiffs allege that Butterball cut production by reducing poult placements by an unspecific amount at one specific plant. *See* SAC ¶ 271. Similarly, Hormel allegedly had ███████████████████████████████████ *id.* ¶ 274, but despite having Hormel's output data, Plaintiffs do not allege whether that plan was ever implemented.[7]

**No parallel activity in 2012-2013.** Plaintiffs' individualized allegations during the second period of alleged industry cutbacks are similarly disparate. Again, only ten of the 15 supposed co-conspirator turkey producers are alleged to have made any cuts between 2012 and 2013. *Id.* ¶¶ 19, 325, 327, 329, 331, 334, 337, 343-45, 347, 349, 353-54, 356, 359. In March 2013, both Tyson and Farbest allegedly *increased* production. *Id.* ¶¶ 21, 339, 347. House of Raeford did not cut production in either period—except for allegations of unspecified cuts in September 2012, months before House of Raeford shuttered its turkey operations entirely in 2013. *Id.* ¶¶ 331, 404.[8] The allegations about 2012-2013 are also bereft of allegations of the amounts and methods of production cuts. In June 2013, for example, Plaintiffs allege that ████████████████████████ ████████████████████████████████████ *id.* ¶ 353, but Plaintiffs do not allege actual cutbacks or describe the method of cutbacks.

---

[7] The underlying document cited in paragraph 274 makes clear that Hormel was engaged in independent decision-making. Ex. A ███████████████████████████████████████ ██████████████████████.

[8] *See also* USDA, *2013 Annual Report: Packers and Stockyards Program* 35 (Mar. 2014), https://www.ams.usda.gov/sites/default/files/media/2013_psp_annual_report.pdf ("House of Raeford Farms announced in March 2013 that it would close its Raeford, North Carolina turkey slaughter plant and turkey growing operations over a 4-6 month period.").

These disparate allegations are the opposite of a concerted conspiracy. Allegations that some producers cut production, others increased production, and others did not do either reflect a normally functioning market, not a secret agreement among a large group of producers to reduce output and raise prices. *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d Cir. 2011) (plaintiffs did not allege parallel conduct when defendants acted differently and "at different time periods"); *Park Irmat*, 911 F.3d at 516-17 (conduct "executed under dissimilar circumstances and separated by six months" did not permit an inference of parallel conduct); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) (three-month separation did not show parallel conduct).

**No consistent magnitude of cuts.** The lack of similarity in the extent of alleged production cuts by different Defendants further undermines the contention that there was a conspiracy. For example, Plaintiffs allege that Cargill reduced its poult placements in February 2009 by 8%—less than industry-wide cuts of 10% or 13%. *See* SAC ¶¶ 283-84. Other producers' cutbacks vary substantially in degree. Butterball, for instance, allegedly closed one outdated facility and, at different times, reduced production respectively by 5% and 14% at two other facilities, *see id.* ¶ 280; Plaintiffs allege that West Liberty made cuts around the same time, but do not allege the extent of them, *see id.* ¶ 281. In January 2013, Plaintiffs allege production cuts by other Defendants ranging from 4% to 15%.[9] These disparate alleged production cuts—by only some of Defendants, and not others—suggest independent business decisions rather than a broad price-fixing conspiracy. *See Williamson Oil Co v. Philip Morris USA*, 346 F.3d 1287, 1321 (11th Cir. 2003)

---

[9] *See* SAC ¶ 341 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

(alleged conspiracy that reduced some defendants' market shares significantly more than others' shares "makes little sense"); *Baxter I*, 328 F. Supp. 3d at 837 (dismissing allegations of parallel conduct in the face of "disparities in the magnitude and timing of the defendants' recalls").

### B.    Plaintiffs identify obvious alternative explanations for output reductions.

Even if Plaintiffs had alleged parallel production cuts by Defendants—and they have not—it is well-settled that mere parallelism will not support an inference of conspiracy. *See supra* at 10-11. Among other things, "allegations of conspiracy are deficient if there are 'obvious alternative explanation[s]' for the facts alleged." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322-23 (3d Cir. 2010) (quoting *Twombly*, 550 U.S. at 567); *see also McCauley v. City of Chi.*, 671 F.3d 611, 618 (7th Cir. 2011) (similar); *Kramer v. Pollock–Krasner Found.*, 890 F. Supp. 250, 256 (S.D.N.Y.1995) (dismissing complaint because, while the plaintiff "may believe the defendants conspired . . . , the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy"). Plaintiffs themselves identify several reasons why producers might have unilaterally reduced output during this period. Such "[s]elf-interested but not unlawful oligopolistic behavior supplies an 'obvious alternative explanation' for parallel conduct . . . that renders an inference of agreement implausible." *Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, No. 16-CV-10324, 2020 WL 1666454, at *7 (N.D. Ill. Apr. 3, 2020) ("*Baxter II*") (quoting *Twombly*, 550 U.S. at 567).

### 1.    Unprecedented feed prices provide an obvious alternative explanation.

Plaintiffs allege that "[f]eed prices, the primary cost for growing turkeys, began to rise rapidly in late 2006, continued to accelerate in 2007, and spiked in June/July 2008." SAC ¶ 235. These increases "were driven, in part, from the impact of a new market for corn created by U.S. renewables." *Id.* In December 2007, Congress enacted the Energy Independence and Security Act, Pub. L. No. 110-140, which among other things amended the federal Renewable Fuel Standard to

substantially increase domestic biofuel production, creating an unprecedented spike in the demand (and therefore the price) for corn, one of the primary ingredients of turkey feed. 121 Stat. 1492 (2007) (codified at 42 U.S.C. § 17001).

Although Plaintiffs contend that increased corn prices provided Defendants with "a motive to conspire to restrain supply and restore profitability," SAC ¶ 236, courts have recognized that just the opposite can be true. Rising production costs—particularly the unprecedented cost increases alleged here—provide an obvious alternative explanation for price increases or output reductions that render an inference of conspiracy implausible. *See, e.g.*, *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 158 F. Supp. 3d 544, 567 (E.D. La. 2016) ("a rise in raw material costs [i]s an 'independent explanation' for a price increase" (internal quotation marks and citation omitted)); *In re LTL Shipping Servs. Antitrust Litig.*, 2009 WL 323219, at *16 (N.D. Ga. Jan. 28, 2009) (rising fuel prices made it "highly plausible that each carrier faced a similar profit shortfall" and independently decided to increase prices); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (a "similar response" to "market pressure is a hallmark of independent parallel conduct—not collusion"). As courts have recognized, "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway." *Twombly*, 550 U.S. at 566. Indeed, in 2007, the USDA forecasted that rising prices for corn and other feed grains would lead to less poultry production, and it made similar predictions in 2009 and 2012.[10]

---

[10] *Review of the Impact of Feed Costs on the Livestock Industry* 110th Cong. 9 (2007) (statement of Hon. Chuck Conner, Deputy Sec'y, United States Dep't of Agriculture) ("With sustained higher feed costs, longer-term adjustments for beef, pork, and poultry are generally similar. Each production sector experiences a decline in returns as feed prices are not immediately offset by higher livestock product prices. Falling returns, of course, eventually lead to less production and a return to higher prices."); USDA, *USDA Agricultural Predictions to 2018*, at 44 (Feb. 2009), https://www.ers.usda.gov/publications/pub-details/?pubid=37796 (demand was likely to weaken "due to the domestic recession and global economic slowdown," and poultry production would "decline[] in 2009–10 while adjusting to high feed costs");

The allegations in this case thus stand in stark contrast to *In re Text Messaging Antitrust Litigation*, 630 F.3d 622 (7th Cir. 2010), favored by Plaintiffs. *See* Dkt. 373 at 12, 14. In *Text Messaging*, allegations of rapid changes in pricing structures, and a sharp and uniform price increase in the face of "steeply falling costs," sufficed to raise a plausible inference that the defendants had agreed to fix prices. 630 F.3d. at 628. Here, however, Plaintiffs allege that Defendants' production costs were steeply *rising* heading into 2009, and Plaintiffs point to no change in pricing structures. *See Baxter I*, 328 F. Supp. 3d at 842 (distinguishing *Text Messaging* because "there, not only did the sellers increase their prices, they also simultaneously shifted from 'heterogeneous and complex' pricing structures, to a single, uniform pricing structure at a heightened price point" (quoting *Text Messaging*, 630 F.3d at 632). There is no plausible reason to posit a conspiracy to explain changes in price and output driven by normal market forces. As predicted by the USDA, *see supra* note 10, to the extent any Defendant reduced production as alleged during this time of record high costs, Defendants simply reacted as any rational business would to changing market conditions.

Plaintiffs' own regression model reinforces this conclusion. Taken at face value, the model purports to show a near perfect relationship between turkey prices and feed prices during 2008-2009 and 2012-2013, when Defendants were allegedly reducing production pursuant to an unlawful agreement. That the model then purports to show a departure between feed costs and turkey prices after 2013 is hardly indicative of any conspiracy (much less the conspiracy Plaintiffs have pled beginning 2010 or earlier). *See* SAC ¶ 46, Fig. 5. For one thing, feed costs represent 60-70% of total costs for turkeys, but Plaintiffs make no effort to control for the remaining 30-40%

---

Rachel J. Johnson, Economic Research Serv., U.S. Dep't of Agriculture, *Livestock, Dairy, and Poultry Outlook*, at 1 (July 17, 2012), https://www.ers.usda.gov/webdocs/outlooks/37461/29105_ldpm217.pdf?v=2839.3 ("Rising grain prices are also expected to have a downward impact on turkey production.").

of total costs in their regression model. *Compare id. ¶ 45 with id. ¶ 46*. The period after 2013 also included a major outbreak of avian influenza in the United States, which decimated turkey flocks and caused prices to rise independent of feed costs. *Id.* ¶ 434.[11] And as with the earlier period, Plaintiffs have not alleged that pricing structure shifted after 2013 in a manner that suggests a conspiracy.

### 2. Oversupply of turkey provides an obvious alternative explanation.

In addition to rising costs, Plaintiffs' complaints reflect the fact that the industry faced a significant glut of unsold turkey in 2008 and 2009. This provides another obvious explanation for output reductions during this period. Plaintiffs themselves quote from numerous documents produced in discovery reflecting a significant "over supply" in which the "market price for breast meat is far less than the cost to produce it." SAC ¶ 278; *see also id.* ¶ 279 ("excess meat in the industry"); *id.* ¶ 292 (need to "work through . . . excess inventories").[12] For example, one email from which Plaintiffs selectively quote, *id.* ¶ 288, states that ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████ Ex. C. Turkey producers incur significant costs to raise and produce a perishable product, which must be kept in cold storage if not sold immediately. When production

---

[11] Plaintiffs allege that turkey exports decreased during this period as a result of the avian flu outbreak, which should have moderated prices. SAC ¶ 434. But USDA economists concluded that the outbreak had a significant net positive impact on U.S. turkey prices notwithstanding any offsetting effects on the export market. "Egg and turkey production decreased as a result of the large number of birds lost or destroyed during the outbreak, so despite export losses from restricted trade, egg and turkey prices rose." Sean Ramos *et al.*, Economic Research Serv., USDA, *Impacts of the 2014-2015 Highly Pathogenic Avian Influenza Outbreak on the U.S. Poultry Sector*, at 15 (Dec. 2017), https://www.ers.usda.gov/webdocs/outlooks/86282/ldpm-282-02.pdf?v=6699.9.

[12] The underlying document Plaintiffs cite at SAC ¶ 292 states that ████████████████████████ ██████ Ex. B.

costs actually *exceed* the market price, as the complaints allege was the case for turkey breast meat in early 2009, keeping production rates steady makes no economic sense.

### 3. Other industry factors provide obvious alternative explanations.

In February 2012, the USDA explained that "[o]ver the past several years, high feed prices, the economic recession, and drought in the Southern Plains of the United States have combined to reduce producer returns and lower production incentives in the livestock sector" and forecast that "[t]otal . . . poultry production is projected to fall in 2012 and 2013 in response to reduced producer returns over much of the past several years."[13] Again, Plaintiffs' complaints (and the documents they incorporate by reference) demonstrate that Defendants recognized these unilateral motivations irrespective of any conspiracy. For example, Plaintiffs cite industry analysis noting

███████████████████████████████████████████████████████

███████████████. SAC ¶ 348; *see also id.* ¶ 326 (noting ████████████

████████████). Indeed, House of Raeford entirely shuttered its turkey production facilities in early 2013, further demonstrating that bleak returns, not an unlawful agreement, was the cause of production cutbacks by some producers. *See supra* note 8.

Also significant, Plaintiffs do not plausibly allege that a single output reduction—in 2012-2013 or at any time—would have been against any Defendant's independent self-interest if not for the alleged conspiracy. For example, Plaintiffs do not allege that any output reductions by a particular Defendant made sense only if the Defendant cutting production believed that other Defendants would follow suit.[14] That the alleged output cuts before 2012-2013 were entirely

---

[13] USDA *Agricultural Predictions to 2021*, at 78 (Feb. 2012), https://www.ers.usda.gov/webdocs/outlooks/37720/13983_oce121_2_.pdf?v=361.2.

[14] *See In re Travel Agent Comm'n Antitrust Litig*., 583 F.3d 896, 909 (6th Cir. 2009) ("the plausibility of plaintiffs' conspiracy claim is inversely correlated to the magnitude of defendants' economic self-interest in making the cuts"); *Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 461 (9th Cir. 2018) ("While a company acting against self-interest can sometimes be a plus-factor, in an interdependent oligopoly it may

consistent with unilateral activity, as explained above, shows that subsequent alleged reductions could not have been "complex and historically unprecedented changes" of the sort that plausibly suggest collusion. *Twombly*, 550 U.S. at 556 n.4. Rather, they followed a cyclical pattern of turkey production ebbs and flows that naturally repeats every few years. *See* SAC ¶ 40.

### C. Plaintiffs' interdependence allegations are insufficient.

Plaintiffs spend much of their amended complaints citing internal emails or documents in which Defendants internally discuss information they had gathered about other turkey producers. *See generally* SAC ¶¶ 289-382, 451-67. As discussed above, none of these emails directly reflect an agreement to fix output or prices. Nor do they support an inference of such an agreement circumstantially. To the contrary, they are entirely consistent with unilateral activity.

As the Seventh Circuit has stated, "[c]ompetitors in concentrated markets watch each other like hawks." *Text Messaging*, 782 F.3d at 875. In competitive industries, it is inevitable that "any single firm's price and output decisions will have a noticeable impact on the market and on its rivals." *Ins. Brokerage*, 618 F.3d at 321 n.19; *cf. United States v. Standard Oil Co.*, 316 F.2d 884, 896 (7th Cir. 1963) ("any defendant which heard of Standard's price announcement was not thereby immobilized and precluded from acting in a normal fashion as its interests might dictate so long as it was not pursuant to an understanding or agreement"). Such behavior is "inevitable" because "any rational decision" in a concentrated market "*must* take into account the anticipated reaction" of other firms. Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1429a (4th ed. 2021) (emphasis added).

---

be in a company's interest to raise prices in the hope that its competitors play 'follow the leader.'"); *cf. In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 785, 788 (N.D. Ill. 2017) (finding conspiracy plausible where producers alleged cut supply in ways that hampered their ability to meet subsequent demand increases and purchased supply from competitors at higher cost).

In a failed attempt to suggest something more than lawful interdependence, Plaintiffs selectively excerpt scores of documents produced in discovery. But the full context of these documents—which the Court is entitled to consider at this stage[15]—shows how far Plaintiffs have stretched. The documents not only do not raise a plausible inference of conspiracy, but affirmatively undermine that inference. For example:



- Plaintiffs allege that House of Raeford communicated ████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ This communication is fully consistent with House of Raeford's impending shutdown of its turkey slaughter and live processing operations beginning in March 2013, *see supra* note 8, and does not suggest any coordinated conduct with other turkey producers.

- Plaintiffs cite an "internal presentation" from Cargill in November 2012 stating that ████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████.

- Plaintiffs allege that ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

- Plaintiffs allege that Foster Farms considered ████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████

---

[15] *See Twombly*, 550 U.S. at 568 n.13 ("the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn"); *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 505 (7th Cir. 2013).

- Plaintiffs allege that in 2013 

- Plaintiffs claim that in 2015,

This is merely a sampling of the complaints' numerous selective mischaracterizations.

Plaintiffs also rely on supposedly suspicious exchanges of "competitive pricing information." SAC ¶ 577. Plaintiffs ignore, however, that Defendants had many lawful reasons to communicate with each other, including about price and output, in the context of buy-sell relationships. *See In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 984 (N.D. Ohio 2015) ("context can be key" in evaluating the inferences to be drawn from competitor communications when the "communicating firms may wear two hats—they may compete in the sale of certain products, while at the same time carrying on a supplier-customer relationship or a joint venture with respect to other products"). There are many legitimate reasons why turkey producers would buy or sell turkey from one another: some may produce more hens than toms, or specialize in breast meat versus whole bird. *E.g.*, SAC ¶ 279 ( ).

Take the allegation that SAC ¶ 356.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

### D. Plaintiffs do not identify any other "plus factors" supporting a conspiracy.

Even if Plaintiffs plausibly alleged parallel conduct, they have not identified sufficient "plus factors" to plausibly allege a conspiracy. Some courts have described "plus factors" that, in certain contexts, can serve to strengthen the inference of a conspiracy based on parallel conduct. However, activity that may "just as easily turn out to have been rational business behavior" should not be regarded as a "plus factor." *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013). In addition, "[m]any so-called plus factors," at best, "simply 'demonstrate that a given market is chronically non-competitive,' without helping to explain whether agreement or conscious parallelism is the cause." *Advanced Tech. Corp. v. Instron, Inc.*, 925 F. Supp. 2d 170, 178 n.48 (D. Mass. 2013) (quoting *White v. R.M. Packer Co.*, 635 F.3d 571, 580-81 (1st Cir. 2011)).

Plaintiffs attempt to plead several overlapping plus factors. SAC ¶¶ 32-33. As shown below, however, all are fully consistent with lawful behavior.

#### 1. A motivation to increase "profits" is not a plus factor.

Plaintiffs contend that ████████████████████████████

██████████████████████████████████████████████

████████████████ SAC ¶ 33. But a desire to increase profits is not a "plus factor" as a matter of law. *See Musical Instruments*, 798 F.3d at 1194-95 ("alleging common motive to conspire simply restates that a market is interdependent (i.e., that the profitability of a firm's decisions regarding pricing depends on competitors' reactions)" (internal quotation marks

omitted)); *S. Collision & Restoration, LLC v. State Farm Mut. Auto Ins. Co.*, 173 F. Supp. 3d 1293, 1300 (M.D. Fla. 2016) ("If the existence of a profit motive was enough to make it plausible that the defendants had colluded to fix prices, then essentially every alleged price-fixing agreement would survive a motion to dismiss."). To the contrary, in a "free capitalistic society, all entrepreneurs have a legitimate understandable motive to increase profits." *Burch*, 662 F.3d at 229. It is not a "nefarious goal" for a producer to "hope" that prices will "respond to [an] output reduction by settling at a higher equilibrium." *In re Pilgrim's Pride Corp.*, 728 F.3d 457, 462-63 (5th Cir. 2013).

### 2. Agri Stats is not a "plus factor."

Plaintiffs call Agri Stats "a lynchpin" of coordination between Defendants. SAC ¶ 25; *see also* Dkt. 373 at 13 (calling Agri Stats a "plus factor" that "support[s] an inference of a *per se* agreement"). But, as the Court noted in rejecting Plaintiffs' previous attempt to plead a *per se* claim, "exchanges of information do not constitute a *per se* violation of the Sherman Act" and can often increase economic efficiency. *Olean*, 2020 WL 6134982, at *5 (citing *U.S. Gypsum Co.*, 438 U.S. at 441 n.16). Even direct, reciprocal exchanges of future pricing information among competitors are not *per se* unlawful in the absence of an underlying agreement to fix prices. *See, e.g.*, *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999).

To rely on an information exchange as a purported plus factor supporting a *per se* claim, plaintiffs must provide specific reasons why the exchange points to a price-fixing agreement. *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 1406c (4th ed. 2021) ("Significantly, however, even an agreement to exchange price information is not an agreement to fix prices, unless other circumstances so warrant."). Here, the complaints do little more than add examples of Agri Stats benchmarking reports to provide more detail about the nature of the information exchanged. *See, e.g.*, SAC ¶¶ 103-14. But these excerpted reports do nothing to suggest an explicit agreement to

restrict output or raise prices. In fact, the documents negate inferences of a conspiracy by demonstrating the reports' legitimate, efficiency-enhancing purposes. *See Twombly*, 550 U.S. at 567; *McCauley*, 671 F.3d at 618. For example, one of the Agri Stats reports excerpted in the complaints ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████ SAC ¶ 108.

Nothing about the mere fact that Defendants used the Agri Stats services supports the inference that a *per se* antitrust conspiracy exists. Indeed, it is striking that, despite the number of documents cited, Plaintiffs' allegations show only that Defendants used Agri Stats information to inform *individual* business judgments. At best, these allegations reflect Defendants making individual pricing decisions, not adhering to some unspecified price-fixing agreement.[16] Likewise, allegations that Agri Stats "share[d]" information among Defendants, SAC ¶¶ 177-88, show only that Agri Stats helped Defendants understand how to use its reports. *See id.* ¶¶ 180-81, 186.

Nor can the Plaintiffs' allegations about "deanonymizing" Agri Stats reports support the inference that Defendants had agreed to implement an underlying conspiratorial agreement. *Id.* ¶¶ 196-224. Plaintiffs do not allege that Defendants collectively decoded reports or had an agreement allowing them to do so. Instead, Plaintiffs allege only that a few Defendants attempted to deanonymize the data using their own assumptions and best guesses. *See, e.g.*, *id.* ¶¶ 202, 205, 208, 210. Further, although Plaintiffs offer vague allegations that Agri Stats functioned as a "monitoring" device, *see* SAC § V.A.2.b, they do not allege that any Defendant ever used an Agri Stats report to monitor another Defendant's production output or otherwise relied on Agri Stats information as evidence that another Defendant violated a conspiratorial agreement. Thus, even

---

[16] *See, e.g.*, SAC ¶ 138 (███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████).

with supposed confidential witnesses and expansive discovery regarding how each Defendant used Agri Stats, Plaintiffs are unable to allege any facts to show that Agri Stats reports plausibly functioned as the monitoring or enforcement mechanism for a conspiracy.

### 3. Trade associations and other "opportunities" are not "plus factors."

Plaintiffs next plead that Defendants' membership in various trade associations—in particular, the National Turkey Federation and the Midwest Consortium—and their employees participation in various events provide "plus factors" for inferring an agreement. SAC ¶¶ 33, 235-69, 384-409, 436-50, 468-97. However, courts reject the argument that trade associations are indicative of a conspiracy. *Twombly*, 550 U.S. at 567 n.12; *Baxter II*, 2020 WL 1666454, at *10; *Moore v. Boating Indus. Ass'n*, 819 F.2d 693, 712 (7th Cir. 1987). Trade associations "often serve legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services." *Musical Instruments*, 798 F.3d at 1196. Accordingly, "participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement." *Id.* Especially "[i]n an era in which global communications are instantaneous and inexpensive," the argument that "attendance at the same industry conferences . . . makes collusion more likel[y] is antiquated and unpersuasive." *Baxter II*, 2020 WL 1666454, at *10 n.12.

Even with their supposed confidential witnesses, *see supra* at 9, Plaintiffs do not plausibly connect attendance or participation in any trade associations with unlawful conduct. One of the main associations Plaintiffs challenge, for example, is ███████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████, SAC ¶¶ 436-37. ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ *Id.* ¶ 437.

Plaintiffs' allegations about the National Turkey Federation are equally implausible. Their principal attempt to tie the National Turkey Federation to some purportedly unlawful activity is t███████████████████████████████████████████████████████

███████████████████████████ SAC ¶ 245. ████████████████████████

██████████████████████████████████████████████████████████

████████████████████████ *Id.* ███████████████████████████████

████████████████████████████████████ *Id.* Yet Plaintiffs never allege how the ██████████ allowed Defendants to coordinate their production levels, much less that Defendants actually used it to do so. ████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████ *Id.* ¶ 241. Plaintiffs further admit that █████████████████████

████████████████████████████, *id.* ¶ 269, whose members include not only integrated turkey producers but also turkey farmers, distributors (who purchase turkey from integrated producers, including Defendants), allied services, and state associations. *Id.* ¶ 225. Finally, Plaintiffs themselves allege that ████████████████████████████████

████████████████████████████████████. *Id.* ¶¶ 247, 253. Those allegations reflect antitrust compliance; they do not plausibly suggest any unlawful conspiracy.

Plaintiffs have also tried to mimic the allegations in *Text Messaging* by highlighting the term "coopetition" in certain documents created by the National Turkey Federation's Turkey Demand Enhancement Team. SAC ¶¶ 387-96; *see also* Dkt. 373 at 13-14. But unlike in *Text*

*Messaging*, the documents Plaintiffs rely on explain on their face that "coopetition" pertained to a collective effort to increase consumer demand for turkey through public awareness and marketing campaigns. *See* Ex. J (referring to "coopetition" in the context of the National Turkey Federation's initiative to "[i]ncrease U.S. [t]urkey [c]onsumption to 20 [lbs. per person annually] by 2020"). Such joint efforts are facially procompetitive. *See In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999) ("promoting demand for products and services" is a "legitimate" function of trade associations that does not support an inference of conspiracy); *Baxter I*, 328 F. Supp. 3d at 843 (similar).

### 4. Structural features of the turkey industry are not plus factors.

Last, Plaintiffs claim that structural features of the turkey industry are conducive to conspiracy—for instance, barriers to entry, few sellers, inelastic demand, and price uniformity. SAC ¶¶ 505-24. Here too, however, "none of these features make conspiracy a more plausible explanation than mere interdependence." *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1317 (S.D. Fla. 2010); *see also Baxter I*, 328 F. Supp. 3d at 841 ("it cannot be the case that allegations that a market is oligopolistic and a product is homogeneous are sufficient to survive a motion to dismiss"). Descriptions of the market are not "allegations of anything the Defendants did," and therefore "do not give rise to an inference of unlawful agreement." *Erie Cnty. v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012); *see also In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) (allegations about market concentration do "not render the asserted conspiracy plausible"), *aff'd*, 741 F.3d 1022 (9th Cir. 2014); *LTL Shipping*, 2009 WL 323219, at *15 ("[s]ubstantial barriers to entry" meant all defendants "would be equally impacted by market variables" and "have the same incentive[s]" and thus did not render a conspiracy plausible).

Plaintiffs also claim that allegations of collusion in other animal protein industries supports an inference of collusion. SAC ¶¶ 498-504. But of course, allegations of collusion are just that— allegations. *See, e.g.*, *Hinds Cnty. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009) (citations to government investigations "do not constitute factual averments of a § 1 claim that would allow such a claim to survive a motion to dismiss"). Courts frequently reject the "if it happened there, it could have happened here" argument. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007); *see also Baxter I*, 328 F. Supp. 3d at 841-42 (stating that an "alleged history of anticompetitive conduct" by one of the defendants "adds nothing to the plausibility of the claim in this case"); *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1305 (N.D. Ga. 2002) (courts do not use "'history of collusion' . . . as a plus factor"), *aff'd*, 346 F.3d 1287 (11th Cir. 2003).

Similarly unavailing are allegations concerning "movement of employees," "plant tours and visits," and attendance at "informal events." SAC ¶¶ 479-97. Movement of employees among companies is not unlawful, nor are plant tours, particularly when firms have legitimate vertical and horizontal business relationships. *See supra* at 22. Evidence that "is essentially that the executives . . . were in the same place at the same time . . . is insufficient to support a reasonable inference of concerted activity." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 409 (3d Cir. 2015); *see also Baxter II*, 2020 WL 1666454, at *10 ("employee movement is just another example of normal and competitive activity in the corporate world"); *Fla. Cement*, 746 F. Supp. 2d at 1316 (allegations of "close business and personal relationships" through repeated dealings at trade and industry events "does not on its own or when paired with parallel conduct suggest Defendants entered an agreement to fix prices").

## CONCLUSION

The Court should dismiss Plaintiffs' *per se* price-fixing claim.

Dated: March 17, 2022                                    Respectfully submitted,

/s/ J. Douglas Baldridge                                /s/ William H. Stallings
J. Douglas Baldridge (#437678)                          Carmine R. Zarlenga
Lisa Jose Fales (admitted *pro hac vice*)               William H. Stallings
Danielle R. Foley (admitted *pro hac vice*)             Stephen M. Medlock
Paul Feinstein (admitted *pro hac vice*)                Oral Pottinger
Andrew T. Hernacki (admitted *pro hac vice*)            MAYER BROWN LLP
VENABLE LLP                                             1999 K Street NW
600 Massachusetts Avenue, NW                            Washington, DC  20006
Washington, DC  20001                                   Telephone: (202) 263-3000
Telephone: (202) 344-4000                               czarlenga@mayerbrown.com
jdbaldridge@venable.com                                 wstallings@mayerbrown.com
ljfales@venable.com                                     smedlock@mayerbrown.com
drfoley@venable.com                                     opottinger@mayerbrown.com
pfeinstein@venable.com
athernacki@venable.com                                  *Counsel for Foster Farms, LLC, and Foster*
                                                        *Poultry Farms, a California Corporation*
Kirstin B. Ives
FALKENBERG IVES, LLP                                    /s/ Jennifer A.L. Battle
30 N. LaSalle St., Suite 4020                           Daniel D. Birk
Chicago, Illinois  60602                                EIMER STAHL LLP
Telephone: (312) 566-4803                               224 South Michigan Avenue, Suite 1100
kbi@falkenbergives.com                                  Chicago, Illinois  60604
                                                        Telephone: (312) 660-7600
*Counsel for Perdue Farms, Inc. and*                    mmcluggage@eimerstahl.com
*Perdue Foods LLC*                                      dbirk@eimerstahl.com

/s/ Jordan Matthew Tank                                 Joshua Goldberg
Jordan Matthew Tank                                     CARPENTER, LIPPS & LELAND LLP
Sahrish Moyeed                                          180 North LaSalle Street, Suite 2105
LIPE LYONS MURPHY NAHRSTADT &                           Chicago, Illinois 60601
PONTIKIS                                                Telephone: (312) 777-4825
230 West Monroe Street, Suite 2260                      goldberg@carpenterlipps.com
Chicago, Illinois  60606
Telephone: (312) 702-0586
jmt@lipelyons.com
sm@lipelyons.com                                        Jennifer A.L. Battle
                                                        David J. Barthel
Tiffany Rider Rohrbaugh                                 Theodore M. Munsell
Rachel J. Adcox                                         Jill Rogers Spiker
Lindsey Strang Aberg                                    Joel E. Sechler
AXINN, VELTROP & HARKRIDER LLP                          CARPENTER, LIPPS & LELAND LLP
950 F Street, NW                                        280 North High Street, Suite 1300
Washington, DC 20004                                    Columbus, Ohio 43215
Telephone: (202) 469-3550                               Telephone: (614) 365-4100
                                                        battle@carpenterlipps.com

trider@axinn.com
radcox@axinn.com
lstrang@axinn.com

*Counsel for The Hillshire Brands Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc., and Tyson Prepared Foods*

*/s/ Marc E. Rosenthal*
Marc E. Rosenthal
PROSKAUER ROSE LLP
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone: (312) 962-3530
Mrosenthal@proskauer.com

Christopher E. Ondeck
Colin R. Kass
Stephen R. Chuk
Rucha A. Desai
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue NW, Suite 600
Washington, DC 20004
Telephone: (202) 416-6800
Condeck@proskauer.com
CKass@proskauer.com
SChuk@proskauer.com
RDesai@proskauer.com

*Counsel for Butterball LLC*

*/s/ Colby Anne Kingsbury*
Colby Anne Kingsbury
FAEGRE DRINKER BIDDLE & REATH LLP
311 South Wacker Drive, #4300
Chicago, IL 60606
(312) 212-6500
Colby.Kingsbury@faegredrinker.com

Richard A. Duncan
Craig S. Coleman
Emily E. Chow
Isaac B. Hall
FAEGRE DRINKER BIDDLE & REATH LLP
90 S. Seventh Street, Ste. 2200
Minneapolis, MN 55402

barthel@carpenterlipps.com
munsell@carpenterlipps.com
spiker@carpenterlipps.com
sechler@carpenterlipps.com

*Counsel for Cooper Farms, Inc.*

*/s/ Britt M. Miller*
Britt M. Miller
Robert E. Entwisle
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
bmiller@mayerbrown.com
rentwisle@mayerbrown.com
Sybil Dunlop
GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
Telephone: (612) 373-8346
sdunlop@greeneespel.com

*Counsel for Cargill, Incorporated and Cargill Meat Solutions Corporation*

*/s/ Michael K. Sciaccotta*
Michael K. Sciaccotta
DENTONS US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL 60606
Telephone: (312) 876-8000
michael.sciaccotta@dentons.com
Gaspare J. Bono
Leslie A. Barry
DENTONS US LLP
1900 K Street NW
Washington, DC 20006
Telephone: (202) 496-7500
gap.bono@dentons.com
leslie.barry@dentons.com

*Counsel for Farbest Foods, Inc.*

(612) 766-7000
Richard.Duncan@faegredrinker.com
Craig.Coleman@faegredrinker.com
Emily.Chow@faegredrinker.com
Isaac.Hall@faegredrinker.com

Christopher A. Kreuder
Robert Gallup
Stephanie Koltookian
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309
(515) 248-9000
Christopher.Kreuder@faegredrinker.com
Robert.Gallup@faegredrinker.com
Stephanie.Koltookian@faegredrinker.com

Jonathan H. Todt
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
(202) 230-5000
Jonathan.Todt@faegredrinker.com

*Counsel for Hormel Foods Corporation and Jennie-O Turkey Store, Inc.*

/s/ William S. Cherry III
Michael T. Medford, N.C. State Bar # 7227 (*pro hac vice*)
William S. Cherry III, N.C. State Bar # 33860 (*pro hac vice*)
J. Gray Wilson, N.C. State Bar # 46509 (*pro hac vice*)
MANNING, FULTON & SKINNER, P.A.
3605 Glenwood Avenue - Suite 500 (27612)
Post Office Box 20389
Raleigh, North Carolina 27619
Telephone: (919) 787-8880
Facsimile: (919) 325-4604 (Cherry)
E-mail: medford@manningfulton.com
cherry@manningfulton.com
wilson@manningfulton.com

Amy R. Paulus
Daniel P. Johnston

/s/ Gregory G. Wrobel
Gregory G. Wrobel, Bar No. 03122900
VEDDER PRICE P.C.
222 North LaSalle Street
Chicago, Illinois 60601
Telephone: (312) 609-7500
gwrobel@vedderprice.com

Henry W. Jones, Jr. (pro hac vice)
Jordan Price Wall Gray
Jones & CARLTON, PLLC
1951 Clark Avenue
Raleigh, NC 27605
Telephone: (919) 828-2501
hjones@jordanprice.com

*Counsel for House of Raeford Farms, Inc.*

/s/ Jacob D. Koering
Jacob D. Koering
MILLER, CANFIELD, PADDOCK & STONE, PLC
225 West Washington Avenue, Suite 2600
Chicago, IL 60606
Telephone: (312) 460-4272
koering@millercanfield.com

William L. Monts III (*pro hac vice pending*)
Justin W. Bernick (*pro hac vice pending*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
Telephone: (202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

*Counsel for Agri Stats, Inc.*

Davy H. Raistrick
Clausen Miller P.C.
10 South LaSalle Street, Suite 1600
Chicago, Illinois 60603
Telephone: (312) 855-1010
Facsimile: (312) 606-7777
E-Mail:  apaulus@clausen.com
djohnston@clausen.com
draistrick@clausen.com

*Counsel for Defendants Prestage Farms of
South Carolina, LLC, Prestage Farms, Inc.
and Prestage Foods, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on March 17, 2022, a true and correct copy of the foregoing was electronically filed by CM/ECF, which caused notice to be sent to all counsel of record.

By: /s/ *Britt M. Miller*
   Britt M. Miller