**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *IN RE TURKEY ANTITRUST LITIGATION* | No. 1:19-cv-08318 |
| | Hon. Virginia M. Kendall |
| | Hon. Gabriel A. Fuentes |
| This Document Relates To: | |
| All Direct Purchaser Plaintiff Actions and Commercial and Institutional Indirect Purchaser Actions | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND .................................................................................2

III.    LEGAL STANDARD ............................................................................................3

IV.    ARGUMENT .........................................................................................................5

       A.      Plaintiffs sufficiently allege parallel conduct by each Defendant. ...........5

       B.      Defendants' alternative explanations do not establish the conspiracy is implausible. ....................................................................11

       C.      The plus factors here, taken in combination, are strongly indicative of a conspiracy. ................................................................................15

             1.      Defendants engaged in repeated interfirm communication communications with each other regarding pricing and output. ......................................................................................16

             2.      Defendants' information exchanges through Agri Stats support the plausibility of a price-fixing agreement. ................................21

             3.      Defendants' used trade associations to facilitate the unlawful exchange of information in support of their price-fixing agreement. ........................................................................24

             4.      The turkey market is exactly the type of highly concentrated, commodity market that courts recognize as conducive to collusion. ..............................................................28

             5.      Defendants' anticompetitive conduct in adjacent protein markets supports a reasonable inference of anticompetitive conduct in the turkey market...................................................29

             6.      Actions taken against Defendants' independent economic self-interest also support the plausibility of the conspiracy......................30

V.      CONCLUSION....................................................................................................30

010737-11/1884569 V1

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)............................................................................ *passim*

*In re Brand Name Prescription Drugs Antitrust Litig.,*
   123 F.3d 599 (7th Cir. 1997).................................................................20

*In re Broiler Chicken Antitrust Litig.,*
   290 F. Supp. 3d 772 (N.D. Ill. 2017) ................................................ *passim*

*In re Cardizem CD Antitrust Litig.,*
   332 F.3d 896 (6th Cir. 2003) ...............................................................11

*In re Chocolate Confectionary Antitrust Litig.,*
   602 F.Supp.2d 538 (M.D. Pa. 2009).....................................................28

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
   370 U.S. 690 (1962)...............................................................................4

*Craftsmen Limousine, Inc. v. Ford Motor Co.,*
   363 F.3d 761 (8th Cir. 2004) .................................................................4

*In re Currency Conversion Fee Antitrust Litig.,*
   264 F.R.D. 100 (S.D.N.Y. 2010) ...........................................................5

*In re Domestic Airline Travel Antitrust Litig.,*
   221 F. Supp. 3d 46 (D.D.C. 2016)...................................................6, 28

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.,*
   681 F. Supp. 2d 141 (D. Conn. 2009)..............................................19, 21

*In re High Fructose Corn Syrup Antitrust Litig.,*
   295 F.3d 651 (7th Cir. 2002) ...............................................................20

*Hinds Cnty, Miss. v. Wachovia Bank N.A.,*
   620 F. Supp. 2d 499 (S.D.N.Y. 2009)..................................................29

*In re Ins. Brokerage Antitrust Litig.,*
   618 F.3d 300 (3d Cir. 2010)................................................................14

*In re Interest Rate Swaps Antitrust Litig.,*
   261 F. Supp. 3d 430 (S.D.N.Y. 2017)...................................................5

*Kleen Prods., LLC v. Packaging Corp. of Am.,*
   775 F. Supp. 2d 1071 (N.D. Ill. 2011) ...............................................................5, 13

*Kleen Prods., LLC v. Packaging Corp. of Am.,*
   276 F. Supp. 3d 811 (N.D. Ill. 2017) ......................................................................16

*Kramer v. Pollock-Krasner Found.,*
   890 F. Supp. 250 (S.D.N.Y. 1995) .........................................................................13

*In re Local TV Advert. Antitrust Litig.,*
   2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) ..............................................11, 24, 28

*In re LTL Shipping Servs. Antitrust Litig.,*
   2009 WL 323219 (N.D. Ga. Jan. 28, 2009) ............................................................14

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.,*
   709 F.3d 129 (2d Cir. 2013) ....................................................................................14

*In re Musical Instruments & Equip. Antitrust Litig.,*
   798 F.3d 1186 (9th Cir. 2015) ...........................................................................13, 14

*In re Packaged Ice Antitrust Litig.,*
   723 F. Supp. 2d 987 (E.D. Mich. 2010) ..................................................................29

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,*
   998 F.2d 1224 (3rd Cir. 1993) .................................................................................16

*In re Plasma-Derivative Protein Therapies Antitrust Litig.,*
   764 F. Supp. 2d. 991 (N.D. Ill. 2011) .................................................................5, 15

*In re Pool Prod. Distrib. Mkt. Antitrust Litig.,*
   158 F. Supp. 3d 544 (E.D. La. 2016) ......................................................................14

*In re Pork Antitrust Litig.,*
   2019 WL 3752497 (D. Minn. Aug. 8, 2019) ..............................................21, 28, 29

*In re Pork Antitrust Litig.,*
   495 F. Supp. 3d 753 (D. Minn. 2020) ...................................................................6, 7

*In re Processed Egg Prods. Antitrust Litig.,*
   821 F. Supp. 2d 709 (E.D. Penn. 2011) ....................................................................5

*SD3 LLC v. Black & Decker (U.S.) Inc.,*
   801 F.3d 412 (4th Cir. 2015) ..........................................................................5, 6, 15

*Standard Iron Works v. ArcelorMittal,*
   639 F. Supp. 2d 877 (N.D. Ill. 2009) ......................................................................21

*Starr v. Sony BMG Music Entm't,*
    592 F.3d 314 (2d Cir. 2010) ............................................................................28, 30

*In re Sulfuric Acid Antitrust Litig.,*
    743 F. Supp. 2d 827 (N.D. Ill. 2010) ...............................................................11, 12

*Swanson v. Citibank, N.A.,*
    614 F.3d 400 (7th Cir. 2010) ...............................................................................4, 13

*Tamayo v. Blagojevich,*
    526 F.3d 1074 (7th Cir. 2008) .....................................................................................3

*In re Text Messaging Antitrust Litig.,*
    630 F.3d 622 (7th Cir. 2010) ............................................................................. *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...................................................................16

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001) .......................................................................................18

*United States v. Gen. Motors Corp.,*
    384 U.S. 127 (1966) ....................................................................................................11

*Wash. Cty. Heath Care Auth. Inc. v. Baxter Int'l, Inc.,*
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ........................................................6, 14, 28

*Wash. Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.,*
    2020 WL 1666454 (N.D. Ill. Apr. 3, 2020) ........................................................14

*Williamson Oil Co., Inc. v. Philip Morris USA,*
    346 F.3d 1287 (11th Cir. 2003) ...................................................................................6

## OTHER AUTHORITIES

Phillip E.Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1435g ................................................17, 19, 23

## I.    INTRODUCTION

Discovery obtained to date has revealed a compelling basis for Plaintiffs to allege a *per se* claim based on Defendants' price-fixing agreement.[1] In particular, Plaintiffs' complaints contain new, detailed factual allegations that support a *per se* claim, including that ███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████.[2]

Multiple courts have allowed strikingly similar allegations of antitrust violations occurring in adjacent meat processing industries (*Broilers* and *Pork*) to proceed on a *per se* theory. As in those cases, Plaintiffs have sufficiently alleged a *per se* claim based on a combination of parallel conduct and plus factors. Though Defendants attempt to nitpick the allegations of parallel conduct, just like in *Broilers*, ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[1] The Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs are collectively referred to as Plaintiffs. Plaintiffs' new complaints are materially identical, so this brief cites to the Direct Purchaser Plaintiffs' Second Amended Class Action Complaint, ECF No. 380 (Jan. 11, 2022), throughout, as Defendants did in their motion. *See* Memo. in Support of Defs.' Joint Mot. to Dismiss, ECF No. 502 (Mar. 17, 2022) (Mot.), at 1 n.2. All complaint and ¶ __ references are to that complaint.

[2] Plaintiffs' complaints contain factual allegations of a pre-class liability period beginning in the summer of 2008. ¶¶ 234–302. Plaintiffs' class period begins in January 2010, when the results of the conspiratorial supply cuts began to translate into dramatic increases in the price of turkey. ¶¶ 303–15.

██████████████████████ But as the factual allegations show, those economic pressures provided Defendants with a motive to conspire, which is itself a plus factor.

There are numerous additional plus factors that "provide the further factual enhancement" necessary to create a plausible inference of a price-fixing agreement. First, Defendants engaged in extensive private interfirm communications whereby they encouraged and monitored each other's supply restraints and pricing. *See* § IV.C.1. Second, Defendants' information exchanges through Agri Stats faciliated the conspiracy by allowing them to closely monitor each other's production and sales—and systematically ratchet up prices. *See* § IV.C.2. Third, Defendants participated in trade association events in close proximity to conspiratorial acts. *See* § IV.C.3. Fourth, the turkey market is exactly the type of highly concentrated, commodity market that courts recognize as conducive to collusion. *See* § IV.C.4. Fifth, Defendants' anticompetitive conduct in adjacent protein markets also supports a reasonable inference of anticompetitive conduct in the turkey market. *See* § IV.C.5. Finally, each Defendant acted against self interest by keeping their own supply restrained, which further supports the plausibility of conspiracy. *See* § IV.C.6. Accordingly, Defendants' motion should be denied.

## II.     FACTUAL BACKGROUND





¶ 287. ████████

¶¶ 295, 303–23.

This was successful.

¶¶ 324–70.

¶¶ 371–82.

. ¶¶ 383–409.

¶¶ 436–450.

## III.    LEGAL STANDARD

To survive a motion to dismiss, a complaint need only include enough facts to state a plausible claim.[3] To be plausible, the complaint is not required to meet a probability requirement, and courts do not weigh alternative explanations for the challenged conduct provided by a defendant.[4] The complaint must simply raise the possibility of relief above the "speculative

---

[3] *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008). Internal citations and quotations omitted and emphasis added throughout, unless otherwise indicated.

[4] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

level."[5] In other words, plaintiffs must "nudge[] their claims across the line from conceivable to plausible."[6] Thus, at the pleading stage, the court is not "to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences."[7] And as the Supreme Court has cautioned, the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."[8]

Contrary to Defendants' contention, Plaintiffs may plausibly allege an antitrust conspiracy based on circumstantial allegations. Mot. at 7–9. Indeed, plaintiffs can (and almost always do) allege antitrust conspiracies without the smoking gun of direct evidence, because defendants "typically cannot be relied on to confess that they have entered into an unlawful agreement."[9] "Parallel behavior" of competitors following the same course of conduct "can be circumstantial evidence of an agreement not to compete."[10] But allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement."[11] Such "factual enhancement" is referred to as plus factors.[12] Therefore, Plaintiffs may successfully plead a *per se* claim by plausibly alleging both parallel conduct and the existence of plus factors.

---

[5] *Id.* at 555.

[6] *Id.* at 570.

[7] *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

[8] *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

[9] *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 771 (8th Cir. 2004); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("Direct evidence of conspiracy is not a sine qua non, however. Circumstantial evidence can establish an antitrust conspiracy.") (citing *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984)).

[10] *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 789 (N.D. Ill. 2017) (*Broilers*) (citing *Twombly*, 550 U.S. at 553).

[11] *Id*. (citing *Twombly*, 550 U.S. at 557).

[12] *Id.*

- 4 -

# IV.    ARGUMENT

## A.    Plaintiffs sufficiently allege parallel conduct by each Defendant.

"The Supreme Court has long held that simultaneous action is not a requirement to demonstrate parallel conduct."[13] Courts in this district have held, "[c]apacity reductions need not be simultaneous to demonstrate" parallelism rather, allegations of sequential conduct are "common."[14] So, parallel conduct exists when Defendants' supply cuts took place "gradually," because "*Twombly* does not require that a complaint include allegations of such an unnatural coincidence in the management of competitors' businesses."[15] Instead, "it is well settled that the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period."[16]

Thus, courts have rejected the arguments propounded by Defendants here that parallel conduct is not established when the "alleged production cuts are too varied in methods and amounts."[17] Indeed, Defendants' use of multiple methods to reduce supply is not only plausible,

---

[13] *Broilers*, 290 F. Supp. 3d at 791 (citing *Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939)).

[14] *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077 nn. 5,9 (N.D. Ill. 2011) (*Kleen I*).

[15] *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d. 991, 1000 (N.D. Ill. 2011); *see also In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 479 (S.D.N.Y. 2017) ("Unanimity of action . . . is not required."); *SD3 LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 429 (4th Cir. 2015) (rejecting the argument that parallel conduct requires that "defendants move in relative lockstep, achieving their common anticompetitive ends (exclusion) only by substantially identical means," because "[s]o far as we can tell, this standard finds no support in any existing authority").

[16] *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010).

[17] *Broilers*, 290 F. Supp. 3d at 791; *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 714–15 (E.D. Penn. 2011) (defendants' "supply adjustment" conspiracy utilized a series of egg supply reduction events including flock reductions, hatch reductions, cage species density guidelines, and exporting eggs); *Plasma-Derivative*, 764 F. Supp. 2d. at 996 (defendants conspired to limit the supply of plasma therapies using "a series of production cuts, strategic acquisitions, and plant closures"); *Kleen I*, 775 F. Supp. 2d at 1077, n.8 ("Variations in the size of capacity reductions do not disprove the existence of a conspiracy . . . .").

but "not surprising" as "[c]ommercially sophisticated parties like the defendants could well understand the red flags that would be raised" by simultaneous and identical conspiratorial acts.[18] So "Plaintiffs do not need to demonstrate that Defendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct."[19] As Judge Durkin recognized in *Broilers*, "[i]t is more than plausible that conspirators would leave the precise means of cutting production up to each conspirator, where multiple options would accomplish the intended goal," because "[p]ermitting flexibility, where possible, in the means of effectuating price increases, would enable a greater number of producers to participate in the conspiracy, and might help to conceal the collusive nature of their conduct."[20]

███████████████████████████████████████████

███████████████████████████████████████████

███████████  As in *Pork II*, these allegations regarding Defendants' participation in the conspiracy reveal that their supply reductions were grouped sufficiently close in time and in furtherance of their common and agreed-upon goal of achieving supra-competitive prices.[21] Indeed, Defendants' omission of this case in their brief is quite notable given their reliance on the *Pork I* decision. Mot. at 11.[22] Subsequent to that decision, in *Pork II*, the same court found

---

[18] *See SD3*, 801 F.3d at 427–28.

[19] *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 69 (D.D.C. 2016).

[20] 290 F. Supp. 3d at 792.

[21] *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 768–70 (D. Minn. 2020) (*Pork II*).

[22] Defendants' other cases were either decided at summary judgment, which applies a different, elevated standard, or the alleged parallel conduct had far greater differences in timing and magnitude. *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1299 (11th Cir. 2003) (summary judgment); *Wash. Cty. Heath Care Auth. Inc. v. Baxter Int'l, Inc.*, 328 F. Supp. 3d 824, 832, 836 (N.D. Ill. 2018) (*Baxter I*) (a "16-month delay" between purportedly collusive recalls, which for one defendant were eight times that of the other "despite roughly equal market share," and the plaintiffs failed to allege that the reasons for the recalls were false).

parallel conduct where the defendants participated in supply reductions over an eight-year period (from 2008 to 2016) with the "initial decrease com[ing] from … the first, second, and sixth largest producers."[23] ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████: Defendants engaged in a coordinated series of industry cutbacks using Agri Stats and frequent direct contacts:

- <u>Hormel:</u> ████████████████████████████████
  ████████████████████████████ ¶ 274. ██████████████████
  ████████████████████████████████ ¶ 276. ████████████████
  ████████████████ ¶ 282. ████████████████████████████████
  ████████████████████████████████████ ¶ 290.

- <u>Foster Farms:</u> ████████████████████████████████
  ████████████████ " ¶ 272; ████████████████████████████████
  ████████████████████████ ." ¶ 293.

- <u>House of Raeford:</u> ████████████████████████████
  ████████████████████████ ¶ 276.

- <u>Butterball:</u> ████████████████, Butterball reported that it had been ████████████
  ████████████████████████

---

[23] [495 F. Supp. 3d at 770](#). These included both specific and unspecific allegations of supply restraint, as here. *Id.* at 769–70. Defendants' reliance on *Hogan v. Pilgrims' Pride Corp.* is misplaced because in that securities fraud case, the district court held the underlying "antitrust allegations [] to the heightened PSLRA pleading standard." No. 16-cv-02611, 2018 WL 1316979, at *7 (D. Colo. Mar. 14, 2018). *See* Mot. at 12–13. And in each round of supply cuts here, multiple Defendants acted within the same month, distinguishing Defendants' cases. *See* Mot. at 14 (citing *Burch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011); *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505 (8th Cir. 2018); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007)).

███████████████████████████████████████████
████████████████████████████ ¶ 279. ████████████ Butterball
planned ██████████████████████████████████████████
████████████████████████████████. ¶ 280. █████████████
Butterball reported ███████████████████████████████████████
███████████████████████████████████. ¶ 289.

- <u>Farbest</u>: ███████████████████████████████ Farbest
  had ████████████████████████████████████████████
  ████████████████████████████████████ ¶ 291.

- <u>Cargill</u>: ██████████████ Cargill stated
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ███████████████████" ¶ 283, 285.

- <u>Cooper Farms</u>: █████████████ Cooper Farms had begun ████████████
  ████████████████████████████████████████
  ██████████████████████████████████. ¶ 162.

- <u>Prestage</u>: █████████████ Butterball also reported █████████████████
  ███████████████████████████████████ ¶ 162.

████████████████████████████████████████████
███████████████████████████████████████████████

- Perdue: ██████████████, Perdue prepared a presentation █████████
  █████████████████████████████████. ¶ 297. █
  ████████████████████████████████████████████
  █████████████████████████████████████
  ¶ 315.

- Hormel: █████████████████, Hormel announced █████████████
  ████████████████████████████████████████" ¶ 305.
  ████████████████████████████████████████
  ████████████████████████████████████ ¶ 310.

- Farbest: █████████████ Farbest stated
  ████████████████████████████████████████████ ¶ 314.
  █████████████████████████████ ¶ 316.

- <u>Cargill</u>: ███████, Cargill discussed ███████████████████ ████████████████████████████████████████████ ████████████████████████████████ ¶ 317.

- <u>Butterball</u>: ████████████ a Butterball executive wrote: ████████ ████████████████████████████████ ███████████ ¶ 317.

████████████████████████████████████████████

███████████████████████████████ ¶ 324. ████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████

- <u>Cooper Farms</u> ███████████, Cooper Farms discussed ████████ ████████████████████████████████ ███████████████████████████████ ¶ 327. ████████ Cooper Farms confirme █████████████████████████ ████████████ ¶¶ 329, 346.

- <u>Butterball</u>: ████████████ Butterball was ███████████████ ████████████████. ¶ 329.

- <u>House of Raeford</u>: ████████████████ House of Raeford stated ████████ ████████████ ¶ 331.

- <u>Cargill</u> ███████████████ Cargill reported ████████████████ ████████████████████ ¶ 334. ████████████, Cargill had ████████████████████████████ ██████████ ¶ 343. ████████████████ ¶ 345.

- <u>Perdue</u>: ████████████ Perdue planned █████████████ ████████████████████████████████ ██████████ ¶ 335. ████████████ ¶ 343.

- <u>Hormel</u>: ████████████ Hormel reported ████████████████ ██████████ ¶ 343; *see also* ¶¶ 344, 353. ███████████████, Hormel scheduled ██████████████ ¶ 359.

- <u>Foster Farms</u>: ████████████ Foster Farms discussed ████████████

- 9 -

███████████ ¶ 349; ████████████, Foster Farms further evaluated ██████████ ████████████████████████████████████ ¶ 357.

- <u>Farbest</u> ██████████ Farbest, in turn, told █████████████████ ████████████████████████ ¶ 365.

██████████████████████████████████████████████████████

██████████████████████████████ prices took off again, as is evident from

aggregate data, *see* ¶ 526, ███████████████████████████████████████

████████████████████████████████████

- <u>Cargill</u>: ██████████████, Cargill stated ██████████████████ ███████████████. ¶ 369. ███████████████████████████████████████ ██████████████████████████ ¶¶ 377–78. ██████████████ Cargill said ████████████████████████████████████████████████████████ ██████████████████████████████ ¶ 382.

- <u>Hormel</u>: ██████████ Hormel predicted █████████████████████████ ████████████████████ ¶ 372.

- <u>Butterball</u>: ███████████, it called the turkey market ███████████████ ████████████████████████████████████████ ¶ 374.

- <u>Farbest</u> ██████████ Farbest reported ██████████████████████ ███████████████████████████████████████████████████████ ██████████████████████ ¶ 375.

- <u>Perdue</u>: ██████████, Perdue said ████████████████████████████ █████████████████████████ ¶ 379.

- <u>Foster Farms</u>: In that same month, ████████████████████████████ ████████████████████████████ ¶ 381.

- <u>Cooper Farms</u>: ████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████ ¶ 380.

In *Broilers*, Judge Durkin found parallel conduct based on allegations of "two periods of production cuts of approximately one-two years each."[24] Here, Plaintiffs have sufficiently alleged parallel conduct based on similar, detailed allegations.

**B.    Defendants' alternative explanations do not establish the conspiracy is implausible.**

*Per se* violations of the Sherman Act, such as the claim advanced by Plaintiffs here, are presumed to be unlawful, regardless of the motives behind the conspiracy.[25] "[N]o consideration is given to the intent behind the restraint, to any claimed pro-competitive justifications, or to the restraint's actual effect on competition."[26]

Defendants attempt to explain the coordinated production cuts 

).[27] But rather than function as a viable alternate explanation for coordinated production restraints, economic pressure is instead actually a recognized plus factor because it provides a specific motive for Defendants to conspire.[28] As the court explained in *In re Sulfuric Acid Antitrust Litigation*, it is plausible that "producers could have colluded to reduce output and stabilize [product] prices precisely to salvage profit—indeed,

---

[24] *Broilers*, 290 F. Supp. 3d at 791.

[25] *United States v. Gen. Motors Corp.*, 384 U.S. 127, 146 (1966).

[26] *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 906 (6th Cir. 2003).

[27] ██████████████████████████████████████████████████████████. *See, e.g.*, Mot. at 18, n.11. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ¶ 434.

[28] *In re Local TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665, at *9 (N.D. Ill. Nov. 6, 2020) (*Local TV*); *see also In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 870 (N.D. Ill. 2010) (noting that poor economic performance bears on the existence of a conspiracy: "producers could have colluded to reduce output and stabilize acid prices precisely to salvage profit—indeed, stay in business—in a dire economic climate").

- 11 -

stay in business—in a dire economic climate," such as the Great Recession or rising feed prices.[29] The *Broilers* defendants offered the same basic justifications of economic pressure to explain their parallel conduct. But Judge Durkin recognized that "producers facing such economic conditions have an even greater incentive to conspire to fix prices" and, thus, the "circumstances underlying Defendants' alternative innocent explanation also serve to make a price-fixing conspiracy more likely."[30]

In short, Plaintiffs and Defendants agree that Defendants faced economic pressures ███ █████████████████ But the two roads diverge here. ███████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████. At the pleading stage, the Court should take Plaintiffs' road because, consistent with *Twombly*, Plaintiffs have provided the additional factual circumstances that support a plausible inference of a price-fixing agreement. In particular, Plaintiffs have specifically included detailed factual allegations showing that the economic pressures actually drove Defendants' efforts to coordinate production cutbacks:



- ████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████." ¶ 5.

- ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ ¶ 7.

---

[29] 743 F. Supp. 2d at 869–70.

[30] *Broilers*, 290 F. Supp. 3d at 802.

- ████████████████████████████████████████████████
  ████████ ¶ 324, ████████████████████████████████████
  ████████████████████████. ¶¶ 325–51.

Defendants' alternative explanations also do not explain ████████████████████

████████████████████████████████████████████████████████████████[31]

    The cases Defendants cite for their alternative explanation theory are also inapposite. As

the Seventh Circuit stated in *Swanson,* under *Twombly,* Plaintiffs must "present a story that holds

together."[32] Here, economic pressures are a key part of what holds Plaintiffs' story together—

namely, those economic pressures led Defendants to engage in the coordinated activity that was

reflected in parallel conduct. By contrast, Defendants' cited cases primarily involve

circumstances where an innocent, alternative explanation clearly showed the parallel conduct

was the result of independent conduct, rather than coordinated activity. In *Kramer v. Pollock-*

*Krasner Foundation*, the complaint "present[ed] no coherent theory of participation by Sotheby's

or Christie's," who "lack[ed] a rational motive to conspire" and instead had an "independent

interest in not selling forgeries because of potential damage to their reputations, not to mention

legal liability."[33] And in *In re Musical Instruments,* the plaintiffs alleged that "each manufacturer

was pressured by Guitar Center to adopt [Minimum Advertised Price] policies that were

advantageous to Guitar Center, and *the complaint concede[d]* that each manufacturer responded

to Guitar Center's pressure and coercion by adopting [Minimum Advertised Price] policies in

---

[31] *See Kleen I*, 775 F. Supp. 2d at 1079 (finding a plausible conspiracy where plaintiffs alleged "capacity reductions, at least in large part, took place when the industry foresaw rising demand"). Defendants' alternative explanations of economic pressure do not explain why production levels remained depressed below historical levels, even when the U.S. economy was no longer in recession and consumer demand was rising. ¶ 40 & F.1 (showing *highest* total heads slaughtered in the conspiracy period, in 2012, was roughly equal to the *lowest* total heads slaughtered in the pre-conspiracy period, in 2005).

[32] 614 F.3d at 404.

[33] 890 F. Supp. 250, 256 (S.D.N.Y. 1995).

exchange for Guitar Center's agreement to purchase large volumes of the manufacturer's product stock."[34] So the Ninth Circuit held that the "[m]anufacturers' decisions to heed similar demands made by a common, important customer do not suggest conspiracy or collusion."[35] In *Baxter I*, Plaintiffs failed to allege that the product recalls that were the alleged mechanism for the conspiracy were false; thus, leaving the obvious alternative explanation that the recalls were a genuine response to potential health hazards.[36] Defendants also cite distinguishable cases, at the pleading stage, where Plaintiffs had failed to include additional factual allegations, such as interfirm communications, to suggest that the parallel conduct was the result of agreement.[37] By contrast, Plaintiffs here have provided extensive factual allegations of plus factors that support an inference of agreement.

Importantly here, as explained in *Broilers*, "*Twombly* does not stand for the proposition that the mere existence of an alternative explanation for Defendants' conduct serves to destroy

---

[34] *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015).

[35] *Id.*

[36] 328 F. Supp. 3d at 834–35 ("According to the FDA, then, all of the recalled products posed health risks to the public, and some of the products posed grave risks . . . A complaint premised on a theory that the defendants intentionally manufactured a public health crisis by orchestrating bogus product recalls that would, despite the public health crisis and rigorous regulatory oversight of product recalls, escape the FDA's attention, lacks facial plausibility.) In *Baxter II*, also cited by Defendants, the Court subsequently dismissed Plaintiffs' amended complaint because they failed to allege parallel conduct. *Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, No. 16-CV-10324, 2020 WL 1666454, at *8 (N.D. Ill. Apr. 3, 2020) (*Baxter II*) ("There must, in short, be more than parallel conduct to plausibly infer antitrust conspiracy, but here the plaintiffs have not alleged even that much.")

[37] *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("Even reading the complaints in the light most favorable to the Plaintiffs, these statements do not provide any evidence of *interfirm* communications."); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 349 (3d Cir. 2010) ("While these allegations indicate that the brokers had an opportunity to conspire, they do not plausibly imply that each broker acted other than independently"); *In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895-WSD, 2009 WL 323219, at *14 (N.D. Ga. Jan. 28, 2009) ("there is no allegation that the Defendants attended the meetings, or that the Defendants had any other communications through which they might have established an agreement"); *see also In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, 158 F. Supp. 3d 544, 570 (E.D. La. 2016) (granting summary judgment where plaintiffs "have failed to demonstrate significant plus factors").

- 14 -

the plausibility of Plaintiffs' conspiracy claims. Furthermore, courts in this district recognize that "[i]t is not necessary that the factual allegations tend to exclude the alternative explanation offered by defendants" as that "is the standard appropriate for a summary judgment."[38] Thus, where "[b]oth Plaintiffs' allegation of a conspiracy, and Defendants' innocent explanations, could be described as plausible," by "asking the Court to choose its innocent explanations over Plaintiffs' claims," Defendants are also "asking the Court to undertake a weighing of evidence that is not appropriate at the pleading stage."[39] At the pleading stage, the existence of economic pressures enhances the plausibility of Plaintiffs' claim.

**C.    The plus factors here, taken in combination, are strongly indicative of a conspiracy.**

Plus factors are factual context that raise a "suggestion of a preceding agreement."[40] In addition to a motive to conspire, the complaint details numerous plus factors that courts recognize as supporting an inference of an agreement, including most significantly: (1) private interfirm communications between competitors regarding future production plans and pricing; (2) ████████████████████████████ (3) specific activities of trade associations that facilitated collusion; (4) multiple characteristics of the market for turkey processing, which is exactly the type of highly concentrated, commodity market with inelastic demand and high barriers to entry that courts recognize as particularly likely to produce collusion; (5) similar practices in the chicken and pork industries; and (6) actions against self-interest. Evaluated "holistically," as the Supreme Court requires, these plus factors strongly support the plausibility of the alleged conspiracy.[41]

---

[38] *Plasma-Derivative*, 764 F. Supp. 2d at 1002.

[39] *Broilers*, 290 F. Supp. 3d at 801.

[40] *Twombly*, 550 U.S. at 557.

[41] *Id.*; *SD3*, 801 F.3d at 424.

1.   **Defendants engaged in repeated interfirm communication communications with each other regarding pricing and output.**

Interfirm communications regarding output and pricing is widely recognized as a plus factor. "[O]ne participant expressly invit[ing] common action by the other" can show collusion.[42] For example, in *Kleen II*, the district court stated, at the summary judgment stage, that "if Defendants had crossed the line into encouraging their competitors to exercise discipline, then their talk would become actionable conduct (or at least indicate that a conspiracy was afoot."[43]

███████████████████████████████████████████████████████

███████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████ ¶ 280. ████████████

███████████████████████████████████████████████████████████

███████████████████ ¶ 281. Courts recognize that "responsive assurances and conduct" in response to an invitation to cut production supports an inference of a "conspiracy to fix prices."[44]

██████████████████████████████████████████████████████

███████████████████████████████████████ ¶ 290.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ ¶ 287. Over the following months, ████████████

█████████████████████████████████████████ ¶¶ 289–302. For example,

---

[42] *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1242 (3rd Cir. 1993).

[43] *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 840 (N.D. Ill. 2017) (*Kleen II*).

[44] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

¶ 289. That same month, ████████████████████████████████████████

██████████████████████████████████ ¶ 291.

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████ ¶ 347. ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████ ¶ 360. ████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████ ¶ 360.

Moreover, "a conspiracy is readily inferred when the acts have no business function other than to inform rivals."[45] ████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[45] Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1435g (4th ed. 2021).



███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████ ¶ 329. And that same month, ████

████████████████████████████████████████████." *Id.*

████████████████████████████████████████████

███████. ¶ 335. ████████████████████████████████

██████████████████. ¶¶ 337, 339. Likewise, at the ████████

████████████████████████████████████████████

██████████████ ¶ 345. ████████████████████████████

███████████████████████████████████████████████████

████████████████████

Finally, Defendants also repeatedly exchanged competitive pricing information. In *Text Messaging*, the Seventh Circuit described the exchange of price information as "a practice, not illegal in itself, that facilitates price fixing."[46] Contrary to Defendants' assertions ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████[47] For example, ██████████████████

███████████████████████████████████████████

███████ ¶ 463. ████████████████████████████████

---

[46] 630 F.3d 622, 628 (7th Cir. 2010); *see also* *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ("Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement.").

[47] *See, e.g.,* ¶ 455 ██████████████████████████████████ ███████l); ¶¶ 456–458, 462 █████████████████████████████████ ██████████████████████████; ¶ 465 █████████████████████████ █████████████████████████████████

██████████████████████████████████████████ In another document, ████████

███████████████████████████████████████████████████████████████████████

█████████████████████████████████████.” ¶ 467.

Defendants' primary response to these extensive factual allegations is a claim that the

turkey market is interdependent. Mot. at 22. Defendants are correct: the turkey market is

interdependent. But "the presence of interdependence means that there would be a motive for

conspiracy, that an agreement would benefit the alleged conspirators, and that an act could

offend the actor's self-interest unless its rivals act similarly…[interdependence] is a necessary

condition for inferring any conspiracy from parallelism alone."[48]

Once Defendants have helpfully acknowledged the presence of a necessary condition—

interdependence—for inferring conspiracy, they then flatly assert that Plaintiffs' allegations "are

entirely consistent with unilateral activity." Mot. at 26. Defendants appear to base that assertion

on their own self-serving parsing of a cherry-picked handful of allegations (six of almost 600).

*Id.* at 21–22. Weighing the competing plausible inferences regarding those specific documents is

not an appropriate exercise at the pleading stage, and each of the cited documents contain

plausible inferences that support Plaintiffs' allegations.[49]

---

[48] Areeda & Hovenkamp, *Antitrust Law* ¶ 1411; *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 170 (D. Conn. 2009) ("The "motive to conspire" plus factor—i.e., that the characteristics of the EPDM market make collusion feasible, thus establishing a motive to conspire—is a restatement of the "theory of interdependence"… even if evidence of this plus factor may not, by itself, be sufficient to defeat the DSM defendants' motion for summary judgment, it is a basis for inferring the existence of a horizontal price-fixing agreement.")

[49] *Compare* Mot. at 21–22 *with* ¶ 331 ████████████████████████



█████████████████████████████████████████████████

███████████████████████████); ¶ 334 ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████ ¶ 362 ████████████

But, more importantly, Defendants never even try to explain why Plaintiffs' key factual allegations regarding specific interfirm communications are "entirely consistent with unilateral activity." Mot. at 19–20. █████████████████████████████████████████████████

███████████████████████████. ¶¶ 333–49, 351.[50] ████████████████████████

████████████████████████████████████████████████████████████████████

███████████. ¶¶ 352–70. ██████████████████████████████████████

█████████████████████████████. ¶¶ 451–67.

Instead, ████████████████████████████████████████████████████████

████████████████████ that Courts have repeatedly held support an inference of a price-fixing conspiracy, both at the summary judgment and pleading stages.[51] Here, where inferences are

─────────────────────────

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████ (¶¶ 337,
345)); ¶ 357 ████████████████████████████████████████████████████████
████████████████████████████████████████████); *see* [Broilers, 290 F. Supp. 3d at 785](#) (crediting allegations that during the conspiracy, Tyson began to buy from competitors, rather than grow its own supply, which "(1) allow[ed] Tyson to cut its own production without losing customers; and (2) create[ed] a mechanism for Tyson to communicate production cut levels to its competitors"); ¶ 368, Mot. Ex. G. ████████████████████████████████████████████████████████████
████████████████████████████); ¶ 427 (
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████.

────

[50] [*Text Messaging*, 630 F.3d at 628](#) (describing defendants' meeting "with each other in an elite 'leadership council' within [a trade] association . . . [with the] stated mission [] to urge its members to substitute 'co-opetition' for competition" as a practice which facilitates price fixing.).

[51] [*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002)](#) (describing interfirm communications as plausible inferences that an agreement to fix prices existed); [*In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 614 (7th Cir. 1997)](#) (denying summary judgment where "the record discloses a number of instances in which officers of the defendant wholesalers urge manufacturers to hold the line against discounting to pharmacies and their buying groups, and pledge to adhere to the chargeback system. The defendants argue that each of these "smoking guns" is susceptible of an innocent interpretation. But the issue before us is not whether the wholesalers were in fact participants in the price fixing conspiracy; it is whether there is sufficient evidence of this to create a jury

- 20 -

drawn in Plaintiffs favor, these interfirm communications support a plausible inference of a price-fixing agreement.

### 2. Defendants' information exchanges through Agri Stats support the plausibility of a price-fixing agreement.

In *Broilers*, Judge Durkin recognized that the largely identical information exchanges through Agri Stats (there for chickens, here for turkey) constituted a plus factor that supported an inference of a price-fixing agreement.[52] Indeed, the court held that "the extent of information sharing through Agri Stats is unusual, and plausibly amounts to a method of communication."[53] Likewise, the district court in *Pork I* stated that the "central role that Agri Stats played in the alleged conspiracy" was an "undoubtedly strong" plus factor in support of the alleged price-fixing agreement.[54] And in *Haff Poultry v. Tyson*, another federal district court held that information exchanges through Agri Stats was a "facilitating practice" that was sufficient for plaintiffs' allegations of a scheme to suppress broiler grower compensation to survive the motion to dismiss.[55] So too here.

---

issue."); *Ethylene Propylene*, 681 F. Supp. 2d at 176–77 (denying summary judgment where "the plaintiffs' evidence of the frequent and friendly communications between the defendants and the secrecy of their meetings is sufficient to allow a reasonable jury to infer that the defendants participated in an unlawful price fixing conspiracy"); *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 895–96 (N.D. Ill. 2009) (denying a motion to dismiss where "the statements here—many of them trade meeting statements made directly to competing executives and encouraging industry production restraint—were followed closely by unprecedented industry-wide production cuts… the statements by Defendant executives at least provide circumstantial evidence of the alleged ongoing conspiracy.").

[52] 290 F. Supp. 3d at 781.

[53] *Id.* at 788.

[54] *In re Pork Antitrust Litig.*, No. 18-1776 (JRT/LIB), 2019 WL 3752497, at *7 (D. Minn. Aug. 8, 2019) (*Pork I*).

[55] Tr. of Proceedings, *Haff Poultry, Inc., et al. v. Tyson Foods, Inc.*, No. Civ-17-33-RJNS (E.D. Okla. Jan. 6, 2020), at *32, attached as Exhibit A to the Declaration of Shana E. Scarlett in Support of Plaintiffs' Opposition to Motion to Dismiss, concurrently filed herewith.

In their amended complaints, Plaintiffs have provided additional, detailed allegations confirming that (1) ███████████████████████████████████████████████████████ ██████████, ¶¶ 91, 94, 537; (2) ████████████████████████████████████████████, ¶ 90; (3) ███████████████████████████████████[56] Furthermore, ██████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████ ¶ 109. ███████████████████████████ ████████████████████████████████████████████████████████████ ████. ¶ 110. Indeed, ██████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████ ¶ 112.

Defendants' own documents also show ████████████████████████████████ ████████████████████████████████ ¶¶ 160–172. For example, ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ¶ 162. In 2016, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

---

[56] Defendants incorrectly claim that ████████████████████████████████████████ ███████████████████████████████ Mot. at 25. That is flat wrong. ██████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████ ¶ 202. ███████████████████████████████████████████████████" ¶ 204. ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ¶¶ 211, 213. ██████████████ ¶¶ 132–59, 160–172.

████████████████████████████████████████████████████████████████

████████ ¶ 165. █████████████████████████████████████████████

████████████████ ¶ 166.

████████████████████████████████████████████████

████████████████████████████████████████████████ ¶ 99. So

Defendants could and would ███████████████████████████████████████

██████████████████████████████████████████ ¶¶ 149, 154; *see also*

¶¶ 132–59. And in this manner, Defendants ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████ ¶ 148.

███████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

████ ¶ 149. ███████████████████████████████████

████████████████████████████████████████████████████████████████

---

[57] Areeda & Hovenkamp, *Antitrust Law* ¶ 1435g (discussing that the exchange of "[pricing] manuals with rivals" has "no function other than facilitating coordination" while distinguishing such an exchange from a firm that sends its pricing manual to customers.) █████████████████████████████████████████████████████████

████████████████████████████████████

- 23 -

███████████████████████████████████████ ¶ 135.

Therefore, just like in *Broilers*, *Pork*, and *Haff Poultry*, Defendants' usage of Agri Stats is a plus factor because Plaintiffs have plausibly alleged that Agri Stats was a "tool Defendants used to help implement their conspiracy."[58]

### 3. Defendants' used trade associations to facilitate the unlawful exchange of information in support of their price-fixing agreement.

As this Court previously recognized, "opportunities" to cooperate through trade associations "helps to 'plausibly fill-out the picture of an alleged conspiratorial agreement.'"[59] Here, Plaintiffs' allegations go far beyond "unspectacular" allegations that "defendants were members of the same trade organizations."[60] Rather, Plaintiffs have alleged ████████

████████████████████████████████████████

█████████████████████████.[61]

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

████████████████████████ ¶¶ 240–43. ████████████████

█████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████ ¶ 248. An Agri Stats employee warned that ████████████████████████████████

---

[58] *Broilers*, 290 F. Supp. 3d at 800.

[59] *Local TV*, 2020 WL 6557665, at *10.

[60] *Id.*

[61] *Id.*

██████████████████████████████████████████████ ¶ 241. ████████████████

██████████████████████████████████████████████████ ¶¶ 250–51. ██████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████ ¶ 253. █████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████. ¶¶ 258–59. ███████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████. ¶¶ 264–69.

Defendants offer their own inferences regarding ███████████████ which are inappropriate to resolve in Defendants' favor on the pleadings. But even at this early stage, the robust factual allegations of Plaintiffs' complaints reveal the hollowness of Defendants' suppositions. █████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████

- 25 -



Mot. at 27.[62]

¶¶ 253–61.

¶ 251.

¶ 383.

. And, in *Text Messaging*, the Seventh Circuit credited as a plus factor Defendants' participation in a trade association where they "urge[d] its members to substitute 'co-opetition' for competition"—exactly as here.[63]

Mot. at 28.

---

[62] The portions of Plaintiffs' complaints that Defendants cite on this point, Mot. at 27 (citing ¶ 247), also (confusingly) note that the approval by legal counsel was also conditioned on requirements that Plaintiffs allege Defendants do not appear to have followed (such as publishing the report publicly).

[63] 630 F.3d at 628. *See* ¶ 92.



¶ 386.

¶ 401.

. ¶¶ 426–33.

Plaintiffs have also alleged that numerous Defendants participated in a group

. ¶¶ 436–49. Defendants also made

. ¶ 450.

¶ 442.

." Mot. at 26.

¶ 444. As this Court has recognized,

whether "Defendants actually joined trade organizations for innocuous reasons is irrelevant at

this stage; all that matters is that Plaintiffs allege that the trade organizations facilitated the

unlawful exchange of information."[64] Plaintiffs have met this standard.

4.     **The turkey market is exactly the type of highly concentrated, commodity market that courts recognize as conducive to collusion.**

As Judge Posner stated in *Text Messaging*, "industry structure that facilitates collusion constitutes supporting evidence of collusion."[65] Indeed, numerous courts, consistent with Seventh Circuit precedent, have recognized that a market structure that facilitates collusion constitutes a plus factor.[66]As this Court has previously recognized, "market concentration" and "high barriers to entry" are characteristics of a market structure that "supports an inference of a price fixing conspiracy."[67]

Here, the turkey industry is highly concentrated, with substantial barriers to entry. Just four Defendants—Butterball, Hormel, Cargill, and Farbest—together controlled over 50 percent of the relevant market during the class period. ¶ 510. And Defendants and Co-Conspirators collectively "control[led] approximately 80 percent of turkey production and processing." ¶¶ 513, 517. And the turkey market features significant barriers to entry. The construction of a new turkey processing plant costs tens of millions of dollars. ¶¶ 507–12. Moreover, turkey is a commodity product featuring price-based competition and inelastic demand. ¶¶ 518–21. Thus, as

---

[64] *Local TV*, 2020 WL 6557665, at *10.

[65] 630 F.3d at 627–28. Despite this on-point precedent, Defendants rely on various authority from outside this circuit. *See* Mot. at 28. The only decision from this circuit acknowledges that "market structure can provide some evidence of an unlawful agreement," while also stating, unremarkably, that it "cannot sustain plaintiffs' complaint all on its own." *Baxter I*, 328 F. Supp. 3d at 841.

[66] *See, e.g.*, *Broilers*, 290 F. Supp. 3d at 796 ("It cannot be credibly disputed that 88.8% of the market acting in concert is sufficient to control it."); *Pork I*, 2019 WL 3752497, at *7; *Domestic Airline*, 221 F. Supp. 3d at 61 (collecting cases that partially relied on market structure as a factor in evaluating plausibility of conspiracy and stating that "this information is pertinent").

[67] *Local TV*, 2020 WL 6557665, at *10; *see also Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323 (2d Cir. 2010) (finding the defendants' combined 80% market share a persuasive plus factor); *In re Chocolate Confectionary Antitrust Litig.*, 602 F.Supp.2d 538, 551 (M.D. Pa. 2009) (describing as "material" the allegation of high barriers to entry).

*Broilers* stated, "[c]ommodity industries are particularly susceptible to agreements that violate antitrust laws."[68]

As Judge Shadur stated in *Kleen I*, industry features like "barriers to entry, . . . inelasticity of demand and commodity-like products" provide "some additional contextual support for the plausibility of a conspiracy."[69] The same reasoning holds true here.

### 5. Defendants' anticompetitive conduct in adjacent protein markets supports a reasonable inference of anticompetitive conduct in the turkey market.

Some Defendants' anticompetitive conduct in adjacent markets—that is, "markets not directly involved in the claims"—supports a reasonable inference of anticompetitive conduct in *this* market.[70] Indeed, the supply reduction and price fixing conspiracy in the broiler chicken and pork markets was facilitated by the use of Agri Stats, just as here. ¶¶ 498–504. Defendants claim that such "allegations of collusion" in other markets "are just that—allegations." Mot. at 29. But allegations are paramount at the pleading stage and those here inform the plausibility of conspiracy, including that "DOJ has investigated the broiler chicken industry and announced a grand jury investigation in 2019," that Tyson—a Defendant here— "subsequently publicly announced that it was cooperating with the DOJ Investigation," and that the "DOJ subsequently brought criminal charges against employees at certain broiler chicken companies for collusive activities." ¶ 504. This contrasts with the case on which Defendants rely where there was "no information . . . about the progress" of the investigations, such that it was "unknown" whether

---

[68] 290 F. Supp. 3d at 780.

[69] 775 F. Supp. 2d at 1081.

[70] *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1009 (E.D. Mich. 2010) (citing *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1133 (N.D. Cal. 2009)); *see also Pork I*, 2019 WL 3752497, at *7.

they would "result in indictments or nothing at all."[71] Here we know. *Id.*

**6. Actions taken against Defendants' independent economic self-interest also support the plausibility of the conspiracy.**

As alleged in Plaintiffs' complaints, ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████ ¶ 320. Actions that "would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals" is a plus factor that, coupled with allegations of parallel conduct, supports the plausibility of a conspiracy.[72] Particularly notable here is Defendants' actions in ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████ " ¶ 18.

███████████████████████████████████████

███████████████████ " ¶ 427.

In sum, Plaintiffs' copious allegations ██████████████████

███████████████████████████████████████

███████████ .

**V.    CONCLUSION**

Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

---

[71] *Hinds Cnty., v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009), and *Baxter I* involved allegation of a prior antitrust settlement—not a DOJ indictment, as here. *See* Mot. at 29.

[72] *Starr*, 592 F.3d at 327. *See also* Mot. at 19.

Dated: May 2, 2022

HAGENS BERMAN SOBOL SHAPIRO LLP


By:      /s/ *Shana E. Scarlett*
       Shana E. Scarlett (*pro hac vice*)
Rio S. Pierce (*pro hac vice*)
Abby R. Wolf (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
riop@hbsslaw.com
abbyw@hbsslaw.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, Illinois 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
steve@hbsslaw.com

W. Joseph Bruckner (*pro hac vice*)
Brian D. Clark (*pro hac vice*)
Simeon A. Morbey (*pro hac vice*)
Steve E. Serdikoff (*pro hac vice*)
Leona B. Ajavon (*pro hac vice*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com
seserdikoff@locklaw.com
lbajavon@locklaw.com

*Co-Lead Counsel for the Direct Purchaser Plaintiff Class*

By: ___/s/ *Blaine Finley*_____
        Blaine Finley
Jonathan W. Cuneo (*pro hac vice*)
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
bfinley@cuneolaw.com

Don Barrett (*pro hac vice*)
Katherine Barrett Riley (*pro hac vice*)
Sterling Aldridge (*pro hac vice*)
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square
Lexington, Mississippi 39095
Telephone: (662) 834-2488
dbarrett@barrettlawgroup.com
kbriley@barrettlawgroup.com
saldridge@barrettlawgroup.com

Robert A. Clifford
Shannon M. McNulty
CLIFFORD LAW OFFICES
120 N. LaSalle Street, Suite 3100
Chicago, Illinois 60602
Telephone: (312) 899-9090
rac@cliffordlaw.com
smm@cliffordlaw.com
Jon Tostrud (*pro hac vice*)
Anthony Carter (*pro hac vice*)
TOSTRUD LAW GROUP, PC
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 278-2600
jtostrud@tostrudlaw.com
acarter@tostrudlaw.com

***Counsel for Commercial and Institutional Indirect Purchaser Plaintiffs Sandee's Bakery and Gnemi LLC***

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned, an attorney, hereby certifies that on May 2, 2022, a true and correct copy of the foregoing was electronically filed by CM/ECF, which caused notice to be sent to all counsel of record.

By:    <u>/s/ *Shana Scarlett*                       </u>
                SHANA E. SCARLETT