**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
| IN RE TURKEY ANTITRUST | ) | No. 19 C 8318 |
| LITIGATION | ) |  |
|  | ) | Judge Virginia M. Kendall |
|  | ) |  |

**<u>MEMORANDUM OPINION AND ORDER</u>**

The consolidated antitrust litigation actions in this case allege a conspiracy in the turkey industry to exchange competitively sensitive information and fix prices through limiting supply of turkey products during two two-year periods. Before the Court is Defendants' Joint Motion to Dismiss the claims for per se violation of the Sherman Act in the amended complaints filed by the Direct Purchaser Plaintiffs (Dkt. 380); the Indirect Purchaser Plaintiffs (Dkt. 378); and the direct action plaintiff Winn-Dixie (Dkt. 379). For the reasons set forth below, the Defendants' Joint Motion to Dismiss (Dkt. 498) is denied.

**BACKGROUND**

Plaintiffs allege that Defendants entered into an agreement between 2010 and 2017 to exchange competitively sensitive information and to fix prices by restraining the supply of turkey products. Plaintiffs include the Direct Purchaser Plaintiffs (Dkt. 380); the Indirect Purchaser Plaintiffs (Dkt. 378); and Direct Action Plaintiff Winn-Dixie, collectively referred to as "Plaintiffs".[1] Winn-Dixie brings this action based on direct purchases of turkey from a Defendant or Co-Conspirator. (Dkt. 379 at 1). The Direct Purchaser Plaintiffs and Indirect Purchaser

---

[1] Plaintiffs' new complaints are regarded as materially identical by Defendants and by Plaintiffs. This opinion cites to the Direct Purchaser Plaintiffs' Second Amended Class Action Complaint (Dkt. 380) throughout as did Defendants' motion (Dkt. 502), Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs' response (Dkt. 528), and Plaintiff Winn-Dixie's joinder Exhibit 1 (Dkt. 545).

Plaintiffs bring this as purported class actions on behalf of all individuals and entities that purchased turkey directly or indirectly from a Defendant or Co-Conspirator in the United States during the purported class period of January 1, 2010, through January 1, 2017. (Dkt. 380 at 8; Dkt. 378 at 1).

Defendants in the case are Agri Stats, Inc. ("Agri Stats"), a company that provides subscription services to agricultural industries for non-public information on prices and costs, and ten industry turkey suppliers.[2] (Dkt. 380 ¶ 2). Plaintiffs also named five Co-Conspirator turkey suppliers.[3] Defendants and Co-Conspirators together control approximately eighty percent of the wholesale turkey market in the United States. (*Id*.). Defendants bring this joint motion to dismiss the per se price fixing claims in all three complaints. (Dkt. 498).

## I.    Procedural History

Direct Purchaser Plaintiffs filed an initial complaint in this action in December 2019 alleging one cause of action for "conspiracy to exchange competitive information." (Dkt. 1 ¶¶ 146–63). In the claim, Plaintiffs included a single paragraph stating, "The alleged contract, combination, or conspiracy is also a per se violation of the federal antitrust laws." (*Id*. at ¶ 163). This Court allowed Plaintiffs to proceed on their unlawful information exchange claim but

---

[2] Defendant turkey suppliers are Butterball LLC ("Butterball"); Cargill Inc. and Cargill Protein – North America f/k/a Cargill Meat Solutions Corporation (together and separately "Cargill"); Cooper Farms, Inc. ("Cooper Farms"); Farbest Foods, Inc. ("Farbest"); Foster Farms LLC and Foster Poultry Farms (together and separately "Foster Farms"); Hormel Foods Corporation and Jennie-O Turkey Store, Inc. (together and separately "Hormel"); House of Raeford Farms, Inc. ("House of Raeford"); Prestage Farms, Inc., Prestage Foods, Inc., and Prestage Farms of South Carolina, LLC (together and separately "Prestage"); Perdue Farms, Inc. and Perdue Farms LLC (together and separately "Perdue"); and Tysons Foods, Inc., The Hillshire Brands Company, Tyson Fresh Meats, Inc., and Tyson Prepared Foods, Inc. (together and separately "Tyson"). (Dkt. 380 ¶ 2). Tyson settled with the Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs. (Dkt. 406; Dkt. 433). Tyson joins the motion to dismiss only for the Winn-Dixie Complaint. (Dkt. 379). Direct action plaintiff Amory Investments LLC ("Amory") has not asserted a *per se* price fixing claim. (Case No. 1:21-cv-06600, Dkt. 1). However, to the extent Amory is deemed to have asserted such a claim, Defendants seek dismissal.

[3] The five named Co-Conspirators are Dakota Provisions, LLC d/b/a Dakota Provisions ("Dakota Provisions"); Kraft Heinz Foods Company and Kraft Foods Group (together and separately "Kraft"); Michigan Turkey Producers LLC d/b/a Michigan Turkey Producers Co-op ("Michigan Turkey"); Norbest LLC ("Norbest"); and West Liberty Foods LLC ("West Liberty"). (Dkt. 380 ¶ 2).

2

dismissed Plaintiffs' allegations of a per se price fixing agreement, stating that the single conclusory paragraph "is not a plausible allegation; courts evaluate information exchange claims under the rule of reason, so the per se allegation is dismissed without prejudice." *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, 2020 WL 6134982, at *8 (N.D. Ill. Oct. 19, 2020). Plaintiffs did not immediately amend their complaints but rather moved for leave to amend complaints in January 2022, over a year after the per se claim was originally dismissed. (Dkt. 373 at 2). This Court granted the motion and permitted Plaintiffs to file amended complaints. (Dkt. 377). In the Plaintiffs' amended complaints, they added allegations supporting the per se claim that Defendants "formed an agreement to fix prices and restraint [sic] the supply of turkey during the Class Period," named Prestage Farms as a Defendant, named several non-Defendant turkey producers as "Co-Conspirators," and provided additional allegations to strengthen their information exchange claim. (*Id.*). Defendants stipulated to Plaintiffs filing an amended complaint subject to maintaining a right to challenge the sufficiency of the allegations. (Dkt. 502; Dkt. 383).

## II.    Factual Allegations

On a motion to dismiss, the Court accepts the complaint's well-pleaded factual allegations, with all reasonable inferences drawn in the non-moving party's favor, but not its legal conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014). Unless otherwise noted, the following factual allegations are taken from Direct Purchaser Plaintiffs' Second Amended Complaint, (Dkt. 380) and are assumed true for purposes of Defendants' Joint Motion to Dismiss. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

Plaintiffs' amended complaint brings two claims in almost 600 paragraphs. The first alleges Defendants violated the Sherman Act rule of reason, for conspiracy to exchange competitive information, 15 U.S.C. § 1. (Dkt. 380 ¶¶ 556–72). The second claim is for a per se

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, based on Defendants engaging in a combination or conspiracy in unreasonable restraint of trade. (*Id*. at ¶¶ 573–84). Plaintiffs' factual allegations cover six main sections. First, "Agri Stats lies at the center of an extensive conspiracy between Defendants." (Dkt. 380 ¶¶ 87–224). Second, "[t]he National Turkey Federation provided a forum for coordination among the Defendants and their Co-Conspirators." (*Id*. at ¶¶ 225–33). Third, "Defendants conspired to restrain competition in the market for turkey. (*Id*. at ¶¶ 234–435). Fourth, "[f]requent, regular direct information exchanges regarding supply and pricing communications and social interactions between Defendants support an inference of collusion." (*Id*. at ¶¶ 436–504). Fifth, "[t]he structure of the turkey industry is conducive to conspiracy." (*Id*. at ¶¶ 505–24). Finally, "[a]bnormal pricing during the Class Period demonstrates the anticompetitive effects of the alleged conduct by Defendants and their Co-Conspirators." (*Id*. at ¶¶ 525–40).

Plaintiffs' amended complaint includes new allegations relating specifically to the per se claim, including that Defendants engaged in parallel conduct, including supply cuts between 2008–2009 and 2012–2013, directly encouraged each other to cut production in 2009, engaged in private communications about production cuts and pricing, actively used Agri Stats reports to monitor production levels, and used participation in trade associations to exchange current and forecasted production information. (Dkt. 528 at 6; Dkt. 380 at 1–3).

Agri Stats collects data on operating metrics from subscribers in the turkey industry, standardizes it, and produces detailed monthly data reports comparing the subscribers after anonymizing them. (Dkt. 380 ¶ 89). Each report lists the participants in the report. (*Id*. at ¶ 114). Turkey industry subscribers could and did reverse engineer the monthly data reports to identify which competitors corresponded with data sets and made pricing decisions based on the

information deduced from the Agri Stats reports. (*Id*. at ¶¶ 89; 132–159; 196–213). The reports included product level, prices, and returns on specific products in the sale of turkey and were unavailable to anyone outside of subscribers that had also produced the competitive data. (*Id*. at ¶¶ 90–91). Agri Stats reports also identified opportunities for subscribers to raise prices where they were lower than competitors. (*Id*. at ¶ 99). Each of the Defendants subscribed to the Agri Stats reports during the Class Period. (*Id*. at ¶¶ 115–124). Express Markets, Inc. ("EMI") provided forward-looking turkey price and production information to subscribers. (*Id*. at ¶ 102). The reports also included breeder reports that allowed Defendants to assess how many turkeys were being placed into production at any time. (*Id*. at ¶¶109–10). Defendants utilized the reports to monitor production and profitability of competitors. (*Id*. at ¶¶ 160–72). In addition to monthly reports, Agri Stats also offered "On-Site Live Review Presentations" two to four times each year to "ID opportunities & strengths[,] Targets, Action Plans, Strategies, Progress, Trend Analysis, Graphs." (*Id*. at ¶ 179).

Plaintiffs alleged that Defendants took part in trade associations as a forum for coordination of the price fixing conspiracy. Almost every Defendant's CEO had representatives on the board of directors or executive committee of the National Turkey Federation, a national advocate for turkey farmers and processors. (*Id*. at ¶¶ 225–26). The National Turkey Federation hosted regular board meetings and executive committee meetings as well as two annual events. (*Id*. at ¶ 230). Additionally, the National Turkey Federation formed a Turkey Demand Enhancement Team subgroup in 2014 "with the assistance of Agri Stats/EMI . . . to make sure we have increased demand before more production happens such that the industry will remain at historical proven profit levels over the next five years." (*Id*. at ¶ 231). The Team included the marketing and sales leaders from eight of the Defendants. (*Id*. at ¶ 232).

5

Defendants also participated in the "Midwest Consortium," an informal group created for "emergency preparedness," where they shared information on current production and capacity. (*Id*. at ¶¶ 435–50). The members included executives from Cooper Farms, Perdue, and Cargill. (*Id*. at ¶ 439). Prestage and Foster Farms participated in the Midwest Consortium in 2016 and 2017. (*Id*. at ¶ 443). In August 2010, the Midwest Consortium issued a revised mission statement that documents would "offer statistics on each participating company and [ ] be updated annually." (*Id*. at ¶ 440). Defendants also took part in the USA Poultry & Egg Export Council, the US Poultry & Egg Association, and the North American Meat Institute. (*Id*. at ¶ 470). Defendants had additional opportunities to exchange information directly, including through the regular movement of employees between companies (*Id*. at ¶¶ 479–83); frequent plant tours and visits amongst Defendants (*Id*. at ¶¶ 484–89); and attendance at informal events such as sporting events and dinners (*Id*. at ¶¶ 490–97).

In 2008, Defendants coordinated on industry-wide production cutbacks to restrain supply and inflate prices. (*Id*. at ¶¶ 234–69). Specifically, Defendants, through the National Turkey Federation, hired Agri Stats and EMI to conduct an outlook study determining future supply based on a belief that supply needed to be "right-sized." (*Id.*). The National Turkey Federation circulated draft reports and solicited feedback in various forms, including at an in-person meeting in October of 2008. The drafts included analysis of production and pricing expectations. (*Id*. at ¶¶ 234–69). The National Turkey Federation provided a final version, dated November 12, 2008, to the National Turkey Federation Executive Committee. (*Id*. at ¶ 262). Members ultimately received a revised version in July 2009, but there is no evidence that the initial October draft containing forecasts through 2010 was ever made public or provided to the broader membership. (*Id*. at ¶ 269).

In Fall 2008, Defendants regularly communicated internally and at times with one another regarding coordinated cutbacks in turkey production. (*Id.* at ¶¶ 270–79). At the start of 2009, Defendants directly communicated with each other to encourage additional cutbacks. (*Id.* at ¶¶ 280–88). For example, in a January 2009 email, a representative of Hormel presented industry plans for cutbacks gathered from direct communications with other Defendants and wrote about Butterball: "They have trimmed as much as they can, and if the industry needs further cutbacks, they will not be the ones to do it. Somebody else needs to step up to the plate." (*Id.* at ¶ 280). Executives at Cooper Farms indicated in internal correspondence in March 2009 that the President of Farbest "was so nervous at the [National Turkey Federation meeting]" and "was lobbying everybody to do something about prices/production." (*Id.* at ¶ 287). Farbest's President wrote in an email one month earlier, "I have been at the National Turkey Federation Convention all last week . . . The industry cutbacks are on the way, but I am afraid they are late and will not be enough to promote a huge rise in the breast revenue until next year." (*Id.* at ¶ 288). The industry evidenced cutbacks throughout 2009. (*Id.* at ¶¶ 289–302).

From 2010 through 2011, Defendants saw record high turkey prices. (*Id.* at ¶¶ 303–23). A senior executive at Hormel wrote in March 2010 "[t]his is unprecedented levels of cutbacks in the turkey industry, and they appear to be continuing" then subsequently suggested price increases. (*Id.* at ¶ 305). A "Communication of Results" PowerPoint made by Perdue in November 2010 stated, "Bottom Line: Accounts will scramble from Thanksgiving and Christmas . . . we need to push price up and say 'NO!'" (*Id.* at ¶ 315).

In 2012 and 2013, Defendants communicated about another round of industry production cuts. (*Id.* at ¶¶ 324–51). While at the 2012 National Turkey Federation Convention, a representative of Cooper Farms wrote, "I'm at a Turkey Federation convention. We have a plan

to reduce wing production by 50% starting in March." (*Id*. at ¶ 325). In internal communications in the Fall of 2012, Cargill and Farbest discussed expectations about the actions of other Defendants and the industry as a whole cutting back. (*Id*. at ¶¶ 334–35). In January 2013, a representative at Cargill told a commodity sales manager at Hormel that Cargill was planning to cutback significantly. (*Id*. at ¶ 337). In March 2013, Hormel executives discussed internally information directly from Tyson about planned cutbacks. (*Id*. at ¶ 339). In January 2013, a representative of Cooper Farms encouraged recipients of an internal email to "nose around and see what other cuts were being made." (*Id*. at ¶ 341).

In the Summer and Fall of 2013, the industry exhibited coordinated cutbacks. (*Id*. at ¶¶ 352–70). In June 2013, Hormel's Strategic Planning indicated, "it is encouraging to see the industry contraction on the supply side," and a Cooper Farms executive marked the potential for "improved turkey market commodity prices resulting from first half of 2013 cutbacks." (*Id*. at ¶ 353). In July 2013, a Tyson representative told Farbest, "[w]e have cut back some Turkey production just like everyone else in the industry." (*Id*. at ¶ 356). In September 2013, Cargill internally discussed messaging, stating, "Whatever we do, we [don't] want to signal any competitors we are reducing so they can just place more." (*Id*. at ¶ 362).

Prices for turkey increased in 2014. (*Id*. at ¶¶ 371–82). In March 2014, a Butterball representative wrote, "We don't always get supply, demand, cost, and industry discipline to line up like this. We need to do our part and bring home plan/ kill the incentive!" (*Id*. at ¶ 374). In April 2014, a Cargill representative reported, "everybody is getting a price increase." (*Id*. at ¶ 377). Cargill prepared a "Turkey Market Information" presentation the same month describing cutbacks, a "total supply chain decrease", and new market baselines, reporting that breast meat is "near record high! – Supply is short and pricing is continuing to rise." (*Id*. at ¶ 378). Perdue

8

produced an internal presentation the following month with slides reporting that hen price per pound were on a "steady climb to historic heights," and 2014 prices were "getting dizzy." (*Id.* at ¶ 379).

The 2014 National Turkey Federation Executive Committee included representatives from Cooper Farms, Tyson, Foster Farms, Hormel, Prestage, Cargill, Butterball, and Farbest. (*Id.* at ¶ 388). The Turkey Demand Enhancement Team set an initiative of "20 by 2020," a goal of increasing turkey consumption in the United States from sixteen pounds per capita to twenty pounds per capita by 2020. (*Id.* at ¶ 385). Gary Cooper, COO of Cooper Farms and Chairman of the 2014 National Turkey Federation Executive Committee, explained the program's goal as "mak[ing] sure that we have increased demand before more production happens such that the industry will remain at historical proven profit levels over the next five years." (*Id.* at ¶ 386). Defendants described the new initiative as reflecting a "coopetition" approach, combining cooperation and competition. (*Id.* at ¶¶ 383, 387). In March 2014, the Turkey Demand Enhancement Team tasked Agri Stats and EMI with creating a regularly updated "demand metric" initiative to "monitor production" and supply growth. (*Id.* at ¶¶ 383–409).

Also in early 2014, EMI worked with Defendants and Co-Conspirators to develop a "Turkey Price Discovery" program accessible through a website where subscribers could track "nearly real time pricing." (*Id.* at ¶ 410). In March 2014, EMI began issuing weekly price and variance reports to participants, and a representative explained that prices were "a 3 day moving average" and participants were "able to quickly see how your invoices stack up to the averages." (*Id.* at ¶ 419). In July 2014, subscribers, including Butterball, Cargill, Hormel, and Perdue, could access the website. (*Id.* at ¶ 421). In 2014 and 2015, supply remained constrained, and prices

stayed high.  (*Id*. at ¶¶ 426–33).  Representatives at Butterball and Cooper Farms recounted record profitability on certain products in 2015.  (*Id*. at ¶¶ 429, 432).

Defendants communicated with one another about pricing information during the Class Period as well.  (*Id*. at ¶¶ 451–67).  For example, in February 2014, one representative at Hormel wrote in discussions on pricing strategy, "I have Cargills deck and Butterballs pricing.  Cargills is telling the same story as we are in terms of supply and pricing."  (*Id*. at ¶ 465).  In February 2010, a Cooper Farms representative wrote the head of commodity sales at Butterball "was upset at [Hormel] for selling breast meat behind the market, just couldn't seem to understand why they would do that and let their feelings known to the [Hormel] folks."  (*Id*. at ¶ 467).

## LEGAL STANDARD

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint.  *Berger v. National Collegiate Athletic Association*, 843 F.3d 285, 289–90 (7th Cir. 2016).  When considering a motion to dismiss under Rule 12(b)(6), the Court must construe the complaint "in a light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in the non-moving party's favor."  *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016).  The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This statement must give the defendant fair notice of what the claim is and the grounds upon which it rests.  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).  A party need not plead "detailed factual allegations," but "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  A complaint must contain sufficient factual matter that when "accepted as true . . . 'state a claim to

10

relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570).

## DISCUSSION

### I.    Direct Action Plaintiffs Failure to Timely Respond

The Direct Purchaser Plaintiffs and the Indirect Purchaser Plaintiffs jointly filed a response to the motion to dismiss the three amended complaints.  (Dkt. 528).  Direct Action Plaintiff Winn-Dixie filed a notice of joinder to the response nearly a month past the response date agreed to in the joint stipulation for a briefing schedule.  (Dkt. 544; Dkt. 383).  The following day, Winn-Dixie filed an exhibit with corresponding citations between the response and Winn-Dixie's amended complaint.  (Dkt. 545).  Defendants argue the motion to dismiss as to the Direct Action Plaintiff Winn-Dixie should be granted as a matter of course, citing a case in the Southern District of California where a court declined to a consider a party's belated notice of joinder.  (Dkt. 548 at 2); *Tobin v. BC Bancorp*, 2010 WL 3341729, at *1 n.1 (S.D. Cal. Aug. 24, 2010).  In *Tobin*, the notice of joinder was filed nearly a week after the reply briefs were filed.  Here, the notice of joinder was filed a day before Defendants filed their reply and did not materially impact the response.  Defendants point out "the failure to oppose a motion forfeits a party's ability to challenge the validity of the arguments made within it."  *Robinson v. Potter*, 2009 WL 1904383, at *2 (N.D. Ill. July 1, 2009) (citing *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007)).

In punishing untimeliness with a dismissal, a judge should "consider the gravity of the misconduct, the prejudice if any to the defendant, and whether the suit has any possible merit . . . The touchstone is proportionality."  *Bolt v. Loy*, 227 F.3d 854, 856 (7th Cir. 2000) (considering dismissal of a case with prejudice when a response was almost three months overdue).  Because the Court is giving consideration to the arguments filed in the timely response joined by the Direct

Action Plaintiff Winn-Dixie, and Defendants were afforded the opportunity to respond to all arguments raised in a timely manner, the Court will not dismiss the per se violation claim asserted by Direct Action Plaintiff Winn-Dixie as a matter of course.

## II.     Circumstantial Evidence of Antitrust Conspiracy

Plaintiffs' amended complaints bring two claims for relief.  The first claim alleges Defendants violated the Sherman Act by engaging in a conspiracy to exchange competitive information.  (Dkt. 380 ¶¶ 556–72).  The competitive information exchange claim is not a subject of this motion to dismiss.  The second claim alleges that Defendants entered and engaged in a combination or conspiracy related to turkey production in unreasonable restraint of trade in violation of Section 1 of the Sherman Act to artificially raise prices.  (*Id*. at ¶¶ 573–84).

Plaintiffs must show either direct or circumstantial evidence of an illegal agreement to support a claim for a per se violation of the Sherman Act.  *In re Text Messaging Antitrust Litig*., 630 F.3d 622, 629 (7th Cir. 2010).  Direct evidence of an agreement "'is explicit and requires no inferences to establish the proposition or conclusion being asserted.'"  *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig*, 60 F. Supp. 3d 914, 950 (N.D. Ill. 2014) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d. Cir. 1999)).  Direct evidence is equivalent to a "smoking gun" and is rare.  *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 706 (7th Cir. 2011) (citing *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) ("an admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs")).  In contrast, circumstantial evidence consists of facts "from which the existence of such an agreement can be inferred."  *High Fructose Corn Syrup*, 295 F.3d at 654.  "[C]ircumstantial evidence is the lifeblood of antitrust law" since direct evidence is rarely available to prove the existence of a conspiracy to fix prices.  *City of Rockford v. Mallinckrodt ARD, Inc*., 360 F. Supp.

12

3d 730, 749 (N.D. Ill. 2019). Still, allegations of "parallel conduct," without more, do not "exclude the possibility of independent action," and are insufficient to support a claim of a price fixing conspiracy. *Twombly*, 550 U.S. at 554.

Defendants point out that no direct evidence of collusion exists. Plaintiffs do not dispute that their allegations are circumstantial in nature. Defendants argue the lack of direct evidence is particularly specious in this case considering the substantial completion of discovery for all Defendants except Prestage in November 2021. (Dkt. 210 at 2). Prestage was only added as a Defendant in the amended complaints. (Dkt. 380). While Defendants are right that Plaintiffs had access to more evidence at the filing of the amended complaints than many plaintiffs at the pleading stage, this point does not extinguish the reality that Plaintiffs amended complaints are considered under the standards for the pleading stage. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (advising that at the pleading stage, the court should not "stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences."). "Circumstantial evidence can establish an antitrust conspiracy." *Text Messaging*, 630 F.3d at 629. "Direct evidence of conspiracy is not a sine qua non." *Id.*

In considering whether sufficient circumstantial evidence of collusion exists at the pleading stage, the Court asks whether Plaintiffs alleged parallel conduct and additional factual circumstances or "plus factors," that are indicative of an agreement. *Twombly*, 550 U.S. at 556–57; *Text Messaging*, 630 F.3d at 628–29; *see also In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 790 (N.D. Ill. 2017). Sufficient circumstantial evidence may include "a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion." *U.S. Bd. of Oral Implantology v. Am Bd. of Dental Specialties*, 390 F. Supp. 3d 892,

902–03 (N.D. Ill. 2019) (citing *Text Messaging*, 630 F.3d at 627)). Parallel behaviors include those which "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," and "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement." *Id*. at 903.

### a. Parallel Conduct

Plaintiffs allege Defendants participated in parallel behavior during two periods of coordinated supply reductions (2008–2009; 2012–2013), followed by two periods of raising prices and maintaining supply restraints (2010–2011; 2014–2015). In both periods of supply reductions, eight of the ten Defendants allegedly participated, ultimately including every Defendant in at least one of the periods. Plaintiffs need not allege that Defendants acted at the exact same time. *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011) ("*Twombly* does not require that a complaint include allegations of such an unnatural coincidence in the management of competitors' businesses."); *see also Broiler*, 290 F. Supp. 3d at 792 ("[C]ourts in this district have not required such uniformity to allege parallel conduct."); *see also In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010) ("[I]t is well settled . . . that the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period.") (quoting *Masters v. Wilhelmina Model Agency, Inc.*, 2003 WL 145556, at *5 (S.D.N.Y. Jan. 17, 2003).

Simultaneous action is not a necessary element of parallel conduct. *Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939) ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."); *Text Messaging*, 630 F.3d at 628 (finding an allegation that defendants changed pricing structures all at

14

once for no other discernible reason is "parallel plus" behavior); *see also Kleen Prod., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077 n. 9 (N.D. Ill. 2011) ("Capacity reductions need not be simultaneous to demonstrate conscious parallelism.").

Along the same lines, Plaintiffs do not need to allege that Defendants restricted supply in an identical manner. *See Broiler*, 290 F. Supp. 3d at 792 ("It is more than plausible that conspirators would leave the precise means of cutting production up to each conspirator, where multiple options would accomplish the intended goal."); *see also In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 49 (D.D.C. 2016) ("Plaintiffs do not need to demonstrate that Defendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct.").

Plaintiffs outlined allegations of activity within at least one of the two-year periods where each Defendant reduced supply:

### Butterball

Butterball's December 2008 Results Review presentation noted: "We have been reducing production and had a dramatic 20% drop in December versus prior year that allowed us to finish the year 92% under last year's total production. These year to year cuts will continue into 2009 as we continue to do our part to reduce the excess meat in the industry that is driving the depressed markets." (Dkt. 380 ¶ 279). A representative from Hormel wrote internally that a Butterball representative directly communicated Butterball had "another cutback coming" and detailed the reductions, writing, "[t]otal cutbacks would be, compared to last year, about 159,000 head/week, 31,800/day. [The Butterball representative] says that these [February] cutbacks are as much as they can do, according to those above him. They have trimmed as much as they can, and if the

industry needs further cutbacks, they will not be the ones to do it. Somebody else needs to step up to the plate." (*Id*. at ¶ 280).

Butterball's monthly 2009 Results Reviews demonstrated further cutbacks. (*Id*. at ¶ 289). In February 2009, Butterball reported its kill volumes were down nine percent from the previous year, and in May 2009, Butterball reported its kill volumes were down 23 percent from the previous year. (*Id*.).

In August 2012, internal correspondence at Cooper Farms based on communications with the Virginia Poultry Growers Cooperative indicated that Butterball was in the process of making cuts. (*Id*. at ¶ 329).

## Cargill

Internal documents from Cargill in January and February 2009 indicated: "Cargill Turkey Production has cutback 8.0% on our weekly placements versus budget. Most of these are Big Toms. The Industry cutback is approximately 10% of the average weekly placements from 2007. Most of these are Big Toms." (*Id*. at ¶ 283).

In November 2012, an internal presentation at Cargill stated, "We believe industry supply reductions are beginning, led by Cargill." (*Id*. at ¶ 334). The presentation went on to outline cuts taking place and expected in the future. (*Id*.). Internal correspondence at Cooper Farms in January 2013 indicated "Cargill has cut production." (*Id*. at ¶ 343). In February 2013, following the National Turkey Federation Annual Convention, Cooper Farms internal notes summarized direct communications where a Cargill representative told him, "Cargill has made huge cutbacks in their placements of toms and hens." (*Id*. at ¶ 345).

### Cooper Farms

In September 2009, Butterball internal documents hypothesized from Agri Stats data that Cooper Farms "most recently have cutback."  (*Id*. at ¶ 162).

In August 2012, internal Cooper Farms correspondence reported that Cooper Farms was planning to make cuts.  (*Id*. at ¶ 329).  In February 2013, Cooper Farms representatives confirmed cutbacks and emphasized that cutting back was a "no brainer" to prioritize "taking advantage of current conditions . . . to help us through the tough times."  (*Id*. at ¶346).

### Hormel

In November 2008, a Cooper Farms "Turkey industry cutbacks report" showed specific cutbacks in poults placed by Hormel.  (*Id*. at ¶ 276).  In February 2009, the CEO of Hormel stated on an earnings call that Hormel would "continue to work aggressively to reduce production at [Hormel]."  (*Id*. at ¶ 282).  In May 2009, Hormel's CEO confirmed on an earnings call that Hormel had increased production cuts over the past year, saying, "We announced the production cuts last year and that production cut indeed is flowing through the system.  We had announced 7 to 8% and then we added a little bit to the cut and so when all is said and done, we ended up in the low double-digit range of actual kind of meat being produced in the plants during the quarter."  (*Id*. at ¶ 290).  The CEO of Hormel went on to say production cuts would continue moving forward.  (*Id*.).

In February 2013, a Hormel representative wrote in internal correspondence that Hormel "cut back approximately 3% for 2013."  (*Id*. at ¶ 344).  In August 2013, a Hormel representative wrote, "Current estimate is that the production will be cut back."  (*Id*. at ¶ 359).

### House of Raeford

In November 2008, a Cooper Farms "Turkey industry cutbacks report" showed specific cutbacks in poults placed by House of Raeford.  (*Id*. at ¶ 276).

In September 2012, House of Raeford sent an email to customers informing them that it had decided to cut back turkey production and could no longer service their account. (*Id*. at ¶ 331).

### Farbest

In January 2009, Cooper Farms reported that Farbest directly communicated it had frozen turkey breast meat. (*Id*. at ¶ 286).

### Foster Farms

In August 2008, Cooper Farms executives communicated internally that Foster Farms was "in the process of cutting their turkey production. They just haven't decided how to do it. Kill breeders, cut placements what ever [sic]." (*Id*. at ¶ 272).

In March 2013, an internal email amongst Foster Farms representatives indicated plans to consider the cost effects of "reducing bird production." (*Id*. at ¶ 349). In August 2013, Foster Farms again evaluated whether they "were producing too much meat" and should reduce internal supply. (*Id*. at ¶ 357).

### Perdue

In April 2012 communications on financing, Perdue presented, "we consciously decreased [both chicken and turkey] production and started walking away from bad business during the fourth quarter." (*Id*. at ¶ 326). In November 2012, Farbest executives reported that Perdue was planning to announce "a 5% reduction in placements, putting a hold on starting new barns, and destroying approximately 50,000 poults per week." (*Id*. at ¶ 335). In January 2013, a representative of Cooper Farms reported that a Perdue representative communicated that Perdue was "cutting back 5-10%." (*Id*. at ¶ 343).

**Prestage**

In September 2009, Butterball internal documents hypothesized from Agri Stats data that Prestage had cut back.  (*Id*. at ¶ 162).

**Tyson**

In January 2013, a Cooper Farms representative reported, "I heard growers have received a letter from [Tyson] saying they are to cut back 15% on their placements for the next year.  This starts in 60 days."  (*Id*. at ¶ 341).  In July 2013, a Tyson representative told Farbest, "[w]e have cut back some Turkey production just like everyone else in the industry."  (*Id*. at ¶ 356).

Plaintiffs have sufficiently pled allegations of production cutbacks against all Defendants except Prestage, where the only allegation in the Complaint is that Butterball believed Prestage had made cutbacks based on an attempt at reverse engineering data in Agri Stats.  This does not amount to a specific allegation that meets the standard for parallel conduct.  The allegations against House of Raeford in 2012 are similarly insufficient considering House of Raeford closed its turkey operations in 2013.  (Dkt. 502 at 13; Dkt. 380 at ¶ 404).  However, the allegation against House of Raeford in 2008 does meet the standard for parallel conduct.  When viewed as a whole, these allegations are sufficient to plausibly plead parallel conduct against the other nine Defendants. Other courts have found that allegations spanning similar periods of time as the facts in this case are sufficient to allege parallel conduct at the pleading stage.  *See Broiler*, 290 F. Supp. 3d at 791 (finding sufficient allegations of parallel conduct for "two periods of production cuts of approximately one-two years each, in 2008–09 and 2011–12."); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 769–70 (D. Minn. 2020) ("*Pork II*") (finding sufficient allegations of parallel conduct over a period of two years).

Defendants argue that cases such as *Broiler* and *Pork II* are unique due to a lack of discovery at the time of pleading, whereas in this case, all Defendants except Prestage substantially completed written discovery when Plaintiffs filed the amended complaints. However, the extent of discovery available to Plaintiffs in their pleadings cannot drive the Court's analysis. Again, regardless of the information available to Plaintiffs at the time of filing this amended complaint, the motion in front of the Court is subject to the standards of the pleading stage.

### b. Plus Factors

For a claim of per se violation of the Sherman Act to be plausible, allegations of parallel conduct must be "placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. "Absent additional 'factual enhancement' or a 'circumstance pointing toward a meeting of the minds,' an allegation of parallel conduct 'stops short of the line between possibility and plausibility.'" *Broiler*, 290 F. Supp. 3d at 790 (quoting *Twombly*, 550 U.S. at 557). "[A] complaint that merely alleges parallel behavior alleges facts that are equally consistent with an inference that the defendants are conspiring and an inference that the conditions of their market have enabled them to avoid competing without having to agree not to compete." *Text Messaging*, 630 F.3d at 627. "The complaint must establish a nonnegligible probability that the claim is valid; but the probability need not be as great as such terms as 'preponderance of the evidence' connote." *Id*. at 628.

Courts may consider such "plus factors" as "evidence of other circumstances giving rise to a less direct inference of conspiracy." *See Anderson News LLC v. American Media, Inc.*, 899 F.3d 87, 104 (2d Cir. 2018). Here, Plaintiffs allege four specific plus factors: "1) direct information exchanges between Defendants regarding current production levels through their participation in

the Midwestern Consortium; 2) frequent exchanges between Defendants of competitive pricing information; 3) numerous opportunity contacts through participation in trade associations and other social interactions; 4) a market structure conducive to collusion." (Dkt. 380 at ¶ 577). Motive to conspire may also be considered a plus factor, when as is the case here, supply reductions led to high prices for turkey products.

Plaintiffs plausibly alleged a claim for exchange of competitive information. Direct information exchange about production output and competitive pricing is a plus factor. *Omnicare, Inc.*, 629 F.3d at 709. In particular, Plaintiffs pled that on numerous occasions Defendants not only communicated about their intended price cuts but also encouraged one another to make cuts to supply in the turkey industry. (Dkt. 380 at ¶¶ 280–81, 287, 347). Plaintiffs also pled several instances where Defendants exchanged information on their pricing structures. (*Id.* at ¶¶ 455–56, 462–63, 465). The exchange of pricing information is "not illegal in itself," but facilitates price fixing. *Text Messaging*, 630 F.3d at 628.

Plaintiffs also point to the exchange of information through Agri Stats as a plus factor. As another court in this district found, "the extent of information sharing through Agri Stats is unusual, and plausibly amounts to a method of communication. This is all in the context of regular opportunities to collude at trade association meetings, plant tours, and the large number of other note opportunities that company executives had to interact." *Broiler*, 290 F. Supp. 3d at 788. Similarly, another district court pointed to the "central role that Agri Stats played in the alleged conspiracy" as a plus factor for an alleged conspiracy to fix prices. *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *7 (D. Minn. Aug. 8, 2019) ("*Pork I*"). Here, Plaintiffs sufficiently alleged that Defendants had access to otherwise private information on the production and prices of other Defendants and could reverse engineer the reports to identify which Defendant provided a given

21

data set.  (Dkt. 380 ¶¶ 160–72, 202, 204, 208, 211, 213).  Agri Stats reports also identified specific opportunities for Defendants to increase pricing after comparison with competitors' pricing.  (*Id.* at ¶ 99).

Plaintiffs point to Defendants' membership in trade associations as a plus factor in support of their price fixing conspiracy claim.  Although opportunities to cooperate in trade associations are not ipso facto evidence of a conspiracy, when one considers them in the broader context, evidence of these opportunities "plausibly help[s] to fill-out the picture" of an alleged conspiracy. *Broiler*, 290 F. Supp. 3d at 799–800.  Plaintiffs point to a series of allegations for the premise that the trade association memberships were not in fact typical, but rather a method for facilitating cooperation.  First, Defendants through the National Turkey Federation Executive Committee hired Agri Stats to report on future industry production expectations in 2008.  (Dkt. 380 at ¶¶ 240–43, 248).  In 2014, the National Turkey Federation created the Turkey Demand Enhancement Team, with certain Defendants as members, to lead an industry approach of "coopetition" to increase turkey consumption in the United States while maintaining historic profit levels.  (*Id.* at ¶¶ 383, 386).  When a trade association "urge[s] its members to substitute 'co-opetition' for competition," participation in the association may be a plus factor. *Text Messaging*, 630 F.3d at 628.

Plaintiffs also point to Defendants' membership in the Midwest Consortium where they shared information on production capacities and levels.  (Dkt. 380 at ¶¶ 436–49).  The original mission statement of the Midwest Consortium was to ensure continuity in case an emergency arose.  (*Id.*).  However, the reasoning behind Defendants' membership in such organizations is not pertinent at the pleading stage.  Rather, Plaintiffs must only allege that the trade organizations facilitated unlawful information exchanges, which Plaintiffs have done here.

"[I]ndustry structure that facilitates collusion constitutes supporting evidence of collusion." *Text Messaging*, 630 F.3d at 627–28; *see also Broiler*, 290 F. Supp. 3d at 796 ("It cannot be credibly disputed that 88.8% of the market acting in concert is sufficient to control it."). Defendants and the five named Co-Conspirators "control approximately 80 percent of turkey production and processing," with Butterball, Hormel, Cargill, and Farbest alone controlling over fifty percent of the market. (Dkt. 380 ¶¶ 510, 513, 517). There are also high barriers to enter the turkey industry, with construction of a new turkey plant costing tens of millions of dollars. (*Id.* at ¶¶ 507–12). Finally, turkey is a commodity product with inelastic demand and price-based competition. (*Id.* at ¶¶ 518–21). Such features in a market provide additional context that supports claims of a conspiracy to fix prices. *See Broiler*, 290 F. Supp. 3d at 780 ("Commodity industries are particularly susceptible to agreements that violate antitrust laws.") (citing *High Fructose Cory Syrup*, 295 F.3d at 658); *see also Kleen*, 775 F. Supp. 2d at 1081.

While Defendants present alternative explanations for the plus factors outlined, Plaintiffs are only required to allege plausibility at this point in the proceedings. *See, e.g. Kleen*, 775 F.Supp.2d at 1079 (finding that despite defendants' alternative explanations for price increases, at the motion to dismiss stage, plaintiffs' alleged explanation must satisfy only the plausibility test); *see also Broiler*, 290 F. Supp. 3d at 788. Plaintiffs alleged parallel conduct contextualized by plus factors. When the allegations are considered as a whole, Plaintiffs' claims give rise to an inference of a price-fixing conspiracy sufficient to state a claim and survive the motion to dismiss.

## CONCLUSION

For the foregoing reasons, the Court denies Defendants' Joint Motion to Dismiss [498], except as to Prestage.  Plaintiffs' claim of per se violation against Prestage is dismissed without prejudice.



Virginia M. Kendall
United States District Judge

Date: November 21, 2022