**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ***IN RE TURKEY ANTITRUST LITIGATION*** | No. 1:19-cv-08318 |
| This Document Relates To: | |
| Direct Purchaser Plaintiff Action | Hon. Virginia M. Kendall<br>Hon. Gabriel A. Fuentes |

**DEFENDANTS PRESTAGE FARMS, INC., PRESTAGE FOODS, INC., AND PRESTAGE FARMS OF SOUTH CAROLINA, LLC'S ANSWER TO THIRD AMENDED CLASS ACTION COMPLAINT**

Pursuant to Fed. R. Civ. P. 8(b)(3), Defendants Prestage Farms, Inc. ("Prestage Farms") Prestage Foods, Inc. ("Prestage Foods"), and Prestage Farms of South Carolina, LLC ("Prestage Farms of SC") (collectively herein at times "the Prestage Entities"), by and through undersigned counsel, hereby respond to the allegations of the Direct Purchaser Plaintiffs contained in the numbered paragraphs of the Third Amended Complaint (herein "Complaint") as follows.[1] Any allegations not specifically admitted or otherwise responded to are denied.

## I. INTRODUCTION

1. Plaintiffs have further amended their complaint as follows:

- To revise their class definition; and
- To re-plead a per se claim against Defendant Prestage, previously dismissed without prejudice, for an agreement to fix prices and restraint the supply of turkey during the Class Period, supported by new factual allegations regarding

[1] Footnote 1 in the Complaint appears before any paragraph allegations, and thus is not reproduced herein. The Prestage Entities do not believe a response is required to Footnote 1, but to the extent a response is required, any allegations contained in Footnote 1 related to the Prestage Entities are denied. The Prestage Entities understand Footnote 1 to be the Direct Purchaser Plaintiffs' definition of "turkey" for purposes of their Complaint and will respond to the numbered allegations in the Complaint with this understanding.

Prestage's parallel conduct based on the discovery conducted since the prior amendment.

**Answer:** In response to the allegations set forth in Paragraph 1, the Prestage Entities admit only that Plaintiffs have amended their Complaint, and that the Complaint adds and alters various allegations. The remaining allegations in Paragraph 1 contain only characterizations of the Complaint to which no response is required. To the extent a response is required, the Prestage Entities specifically deny any implication that any of them were engaged in an agreement to fix prices and restrain the supply of turkey, and further deny the allegations in Paragraph 1.

2. Plaintiffs have amended their complaint as follows:

- To re-plead a *per se* claim against Defendants, previously dismissed without prejudice, for an agreement to fix prices and restraint the supply of turkey during the Class Period, supported by substantial new factual allegations based on the discovery conducted to date;
- To add allegations in support of the *per se* claim that, [redacted]
- To add allegations that [redacted]
- To add allegations that Defendants [redacted]
- To add allegations that Defendants [redacted]

[2] All emphasis has been added in this complaint unless otherwise noted.

- To add allegations that Defendants [redacted]

- To add allegations that Defendants, [redacted]

- To add allegations that Defendants [redacted]

- To add allegations that Defendants [redacted]

- To add allegations substantiating the specific statements of Confidential Witnesses from Butterball, Cooper Farms, and Cargill in the prior Complaint, including that [redacted]

- To add allegations further substantiating that Defendants' agreement to exchange information is anticompetitive under a rule of reason analysis, including that Agri Stats reports contained detailed, current information on Defendants' production and pricing, that Defendants used Agri Stats reports to monitor each other's production and identify specific opportunities to raise prices, and that Defendants routinely reverse engineered Agri Stats reports;

- To name Prestage (comprised of Prestage Farms, Inc., Prestage Foods, Inc., Prestage Farms of South Carolina, LLC) as a Defendant based on allegations that Prestage [redacted]

[redacted]

- To name Norbest LLC (Norbest), Michigan Turkey Producers LLC d/b/a Michigan Turkey Producers Co-op (Michigan Turkey), and Kraft (comprised of Kraft Heinz Foods Company and Kraft Foods Group) as Co-Conspirators based on evidence that each were members of Agri Stats during the relevant time period [redacted]

**Answer:** In response to the allegations set forth in Paragraph 2, the Prestage Entities admit only that Plaintiffs have amended their Complaint, and that the Complaint adds various allegations and names the Prestage Entities as additional Defendants and names additional Co-Conspirators. The remaining allegations in Paragraph 2 contain only characterizations of the Complaint to which no response is required. To the extent a response is required, the Prestage Entities specifically deny any implication that they engaged in an agreement to fix prices and/or restrain the supply of turkey, and further deny the allegations in paragraph 2.

## II. NATURE OF ACTION

### A. The Defendants

3. The United States is the world's largest turkey producer. The Turkey Integrators are the leading suppliers of turkey in an industry with approximately $5 billion in annual commerce. The turkey industry is highly concentrated, with a small number of large producers in the United States controlling supply. Defendants and their Co-Conspirators collectively control approximately 80 percent of the wholesale turkey market in the United States. The Defendant Integrators are Butterball LLC (Butterball); Cargill Inc. and Cargill Protein – North America f/k/a Cargill Meat Solutions Corporation, (together and separately, Cargill); Cooper Farms, Inc. (Cooper Farms); Farbest Foods, Inc., (Farbest); Foster Farms LLC and Foster Poultry Farms (together and separately, Foster Farms); Hormel Foods Corporation ( Hormel), Jennie-O Turkey Store, Inc. (together and separately, Hormel); House of Raeford Farms, Inc., (House of Raeford); Prestage Farms, Inc., Prestage Foods, Inc., Prestage Farms of South Carolina, LLC (together and separately, Prestage); Perdue Farms, Inc. and Perdue Foods LLC (together and separately, Perdue); Defendant Tyson Foods, Inc., The Hillshire Brands Company, Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. (together and separately, Tyson) as well as Co-Conspirators, Dakota Provisions, LLC d/b/a Dakota Provisions (Dakota Provisions); Kraft Heinz Foods Company and Kraft Foods Group (together and separately, Kraft), Michigan Turkey Producers LLC d/b/a Michigan Turkey

Producers Co-op (Michigan Turkey), Norbest LLC (Norbest), and West Liberty Foods LLC (West Liberty).

**Answer:** In response to the allegations set forth in Paragraph 3, Prestage Foods admits only that it produces some, but not all, of the turkey products included by Direct Purchaser Plaintiffs in Footnote 1 of the Complaint. Prestage Farms and Prestage Farms of SC deny they are suppliers of "turkey" as that term is defined by Direct Purchaser Plaintiffs in Footnote 1 of the Complaint. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 3, and the same are therefore denied.

4. Defendant Agri Stats, Inc. (Agri Stats) is a company that provides closely guarded, non-public, subscription services to a variety of agricultural industries, including the pork, chicken, and turkey industries. Agri Stats' mission is to improve the profitability of the Defendant companies, by providing participants with non-public and granular information on prices and costs. Agri Stats publicly represents that its services preserve the confidentiality of participating companies; however, the reality is far different. Express Markets Inc. (EMI) is a subsidiary of Agri Stats that provides forecasting services for various protein industries.

**Answer:** In response to the allegations set forth in Paragraph 4, the Prestage Entities admit only that Agri Stats provided certain benchmarking services to them and other named Defendants, and upon information and belief provided certain benchmarking services in other agricultural sectors, including pork. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 4, and the same are therefore denied.

## B. Defendants' actions to stabilize the price and supply of turkey are per se violations of the antitrust laws.

5. In early 2008, Defendants faced a problem. Rising grain prices had cut into their profits, and Defendants, in response, sought to coordinate on supply cuts that would raise turkey prices. It is well-established law that "an agreement to restrict the production [of a good]

unquestionably is a price fixing arrangement. 'Price fixing' is a characterization which extends to all conspiracies designed to manipulate the price of goods."[3]

**Answer:** In response to the allegations set forth in Paragraph 5, the Prestage Entities admit that grain prices were rising in 2008 [redacted] To the extent Paragraph 5 states a legal conclusion no response is required. The Prestage Entities deny all remaining allegations of Paragraph 5 and deny that they "sought to coordinate supply cuts" or otherwise engaged in any alleged unlawful activity pursuant to any applicable law, including but not limited to any price fixing arrangement.

6. To engage in this illegal form of price fixing, Defendants turned to Agri Stats. At the July 2008 [redacted] suggested that the industry [redacted] The [redacted] Executive Committee (consisting almost exclusively of executives from Defendants and their Co-Conspirators) agreed.[4] [redacted] then approached Agri Stats executives to ask if Agri Stats could provide a quarterly survey of [redacted]

**Answer:** In response to the allegations set forth in Paragraph 6, the Prestage Entities admit that (i) at the [redacted]

[3] *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 226 (7th Cir. 1978). **Answer to Footnote 3:** No response is required. To the extent a response is required, the Prestage Entities deny they have violated any applicable law.

[4] The [redacted] represents nearly 100% of commercial Turkey production in the United States, including allied industries. It is the only association representing the turkey industry exclusively in the United States. Throughout the conspiracy, Defendants dominated the [redacted] **Answer to Footnote 4:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage Entities do not know [redacted] The Prestage Entities deny the remaining allegations of Footnote 4



[redacted] in a manner fully consistent with all antitrust and other competition laws and (ii) the [redacted] The Prestage Entities deny all allegations of Paragraph 6 except as expressly admitted.

7. Agri Stats executives internally discussed the survey. They acknowledged that [redacted] They also noted that prior efforts by the industry to do an intention-type survey had failed [redacted] Nevertheless, Agri Stats agreed to proceed with the project because "[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7, and the same are therefore denied.

8. Indeed, the industry had changed enough. [redacted] In response to an initial outline of the project, [redacted]

**Answer:** The Prestage Entities admit that [redacted] The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8 relating to allegations about [redacted], and the same are therefore denied. The Prestage Entities deny all remaining allegations of Paragraph 8, except as expressly admitted.

9. [redacted]



**Answer:** The Prestage Entities admit that

The Prestage Entities deny the allegations of Paragraph 9 except as expressly admitted.

10.





**Answer:** The Prestage Entities admit that

[redacted] The Prestage Entities deny the allegations of Paragraph 10 except as expressly admitted.

11. In December 2008, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11, and the same are therefore denied.

12. [redacted]

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12, and the same are therefore denied.

13. [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13 relating to [redacted] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 13.

14. In early 2009, Defendants escalated their coordination. [redacted] The following month, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14 relating to [redacted] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 14.

15. Individuals from each Defendant served on the 2009 [redacted] Executive Committee. At the February 2009 [redacted]



**Answer:** The Prestage Entities admit [REDACTED] The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 relating to [REDACTED] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 15.

16. Defendants' coordination worked with remarkable speed. By May 2009, [REDACTED]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 relating to [REDACTED] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 16.

17. During this 2008-2009 period, Defendants' coordinated cutbacks worked wonders. By the start of the class period, turkey prices were soaring as a result of [REDACTED]



**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 relating to [redacted] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 17.

18. Throughout 2010, Defendants enjoyed supracompetitive prices created by their anticompetitive conduct. In November 2010, just days before Thanksgiving, [redacted]

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 relating to [redacted] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 18.



19. Throughout 2010 and 2011, Defendants enjoyed high prices and strong profits as a result of their coordinated conduct. [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 relating to [redacted] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 19.

20. In 2012, Defendants became concerned about rising future supply levels, so they began to [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 relating to [redacted] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 20.

21. In early 2013, the cutbacks escalated as Defendants [redacted]. In January 2013, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 relating to [redacted] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 21.



22. In March 2013, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 relating to [redacted] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 22.

23. Defendants coordinated cutbacks again worked as prices quickly began to rise. [redacted] By December 2013, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 relating to [redacted] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 23.

24. Defendants' coordinated cutbacks caused turkey prices to soar in [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 relating to [redacted] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 24.

25. Later in 2014, [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 relating to [REDACTED] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 25.

26. Throughout the entire conspiracy, the Agri Stats reports acted as a lynchpin for coordination between Defendants. Each Defendant and Co-Conspirator received Agri Stats reports during the conspiracy period. Agri Stats reports are different from other, lawful industry benchmarking reports. As part of their subscription to Agri Stats, the Defendant Integrators and their Co-Conspirators received monthly reports containing current and forward-looking information such as breeder production, hatchery utilization, pricing, production volume, profit, sales, and slaughter information.

**Answer:** The Prestage Entities admit [REDACTED]. The Prestage Entities deny the allegations of Paragraph 26 except as expressly admitted.

27. Agri Stats collects detailed data on almost every conceivable operating metric from its subscribers operating in the turkey industry. Agri Stats takes this data, standardizes it, and then uses the standardized data to create detailed reports showing how subscribers compare rank against each other for key operating metrics. On a weekly and monthly basis, Agri Stats produces these detailed comparative reports to its subscribers in the turkey industry using numeric codes for each subscriber in an attempt to keep the data anonymous.

**Answer:** The Prestage Entities admit, upon information and belief, [REDACTED] The Prestage Entities lack knowledge or information sufficient to form a belief as to Agri Stats internal algorithms or processes and lack knowledge sufficient to form a belief as to the truth of the remaining allegations of Paragraph 27 and those allegations are therefore denied.

28. Although Agri Stats reports are nominally anonymous, Defendant Integrators were often able to reverse engineer the reports to identify the data of specific companies based on their industry knowledge and the manner in which the information was presented. For example, [REDACTED]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 relating to [REDACTED] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 28.

29. Agri Stats senior executives were [REDACTED]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 relating to [REDACTED] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 29.

30. Throughout their entire conspiracy, Defendants relied on Agri Stats/EMI as a crucial mechanism to effectuate and ensure the stability of their price fixing agreement. Notably [REDACTED]

**Answer:** The Prestage Entities deny the allegations of Paragraph 30.

31. In 2014, Defendants, led by [REDACTED] Defendants proclaimed that the [REDACTED]



**Answer:** The Prestage Entities admit that [redacted] The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31 relating to [redacted] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 31.

32. Defendants developed [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the allegations of Paragraph 32. [redacted] The Prestage Entities deny all allegations of Paragraph 32.

33. Apart from Defendants' usage of Agri Stats, numerous additional "plus factors" exist in the turkey industry during the class period that support the plausibility of Plaintiffs' allegations of a *per se* agreement between Defendants to restrain supply and fix prices.

**Answer:** The Prestage Entities deny the allegations of Paragraph 33.

34. *First*, numerous Defendants and their Co-Conspirators belonged to [redacted] *Second*, [redacted] *Third*, the turkey industry provided, and continues to provide, numerous and repeated opportunities (*e.g.*, trade association meetings) for competitors to develop relationships with each other. *Fourth*, the turkey industry has multiple industry characteristics which facilitate collusion, such as a high level of vertical integration, high turkey industry consolidation and concentration, barriers to entry preventing competitors from coming into the market, inelastic demand for turkey, and homogeneity of turkey as a product.[5] *Fifth*, Defendants had a motive to conspire to enter into the agreement to restrain

[5] Turkey is homogenous within cut type, i.e., a ground turkey from Tyson and Cargill are virtually indistinguishable. **Answer to Footnote 5:** The Prestage Entities deny the allegations in Footnote 5.

supply and fix prices of turkey because rising feed prices in 2008 greatly threatened Defendants' profitability. *Sixth*, Defendants engaged in [redacted] *Seventh*, Defendants, as documented in detail below, [redacted] In total, these recognized plus factors add plausibility to Plaintiffs' allegations of a *per se* agreement between Defendants.

**Answer:** The Prestage Entities deny the allegations of Paragraph 34.

**C. Defendants' actions are also unlawful under a rule of reason analysis.**

35. Defendants' agreement to exchange information through Agri Stats is, also, by itself, anticompetitive under a rule of reason analysis.

**Answer:** The Prestage Entities deny the allegations of Paragraph 35.

36. The United States Supreme Court has long recognized that "[e]xchanges of current price information, of course, have the greatest potential for generating anticompetitive effects."[6] Agri Stats produced many reports for their customers, but their sales reports in particular prove the truth of the Supreme Court's maxim. Agri Stats prepared monthly reports for Defendants regarding their sales of turkey that identified, on a specific product by product level, the prices and returns that each Defendant was obtaining on its sales of turkey. These sales reports, unavailable to anybody besides Agri Stats subscribers, allowed the Defendant Integrators to easily identify potential opportunities where their prices for turkey products were significantly lower than their competitors. Agri Stats also communicated frequently with Defendant Integrators to [redacted]

**Answer:** To the extent Paragraph 36 consists of arguments of counsel or states legal conclusions, no response is required and to the extent a response is required any allegation that the Prestage Entities acted in violation of applicable law is denied. The Prestage Entities admit that, through their subscription to Agri Stats' turkey reports, they received periodic turkey reports from Agri Stats. The Prestage Entities deny the allegations of Paragraph 36 except as expressly admitted and specifically deny that they participated in any alleged unlawful activity.

[6] *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).

37. Each Defendant participated in the agreement to exchange information through Agri Stats. The information exchange administered by Agri Stats is exactly the type of information exchange that the Supreme Court has recognized is likely to have anticompetitive effects under a rule of reason analysis. *First*, the data is current and forward-looking – which courts consistently hold has "the greatest potential for generating anticompetitive effects."[7] *Second*, information contained in Agri Stats reports is specific to the turkey producers, including information on profits, prices, costs and production levels. *Third*, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the Defendant Integrators to pay hefty fees over the Class Period – far in excess of any other pricing and production indices – and to agree to volunteer their own data. "Public dissemination is a primary way for data exchange to realize its procompetitive potential."[8] Agri Stats ensured that its detailed, sensitive business information was available only to Defendants and their Co-Conspirators and not to any buyers in the market. For example, buyers in the market could not use Agri Stats data to negotiate lower prices; instead, only Defendants could use it as a way to identify opportunities to raise their prices.

**Answer:** To the extent Paragraph 37 consists of arguments of counsel or states legal conclusions, no response is required and to the extent a response is required any allegation that the Prestage Entities acted in violation of applicable law is denied. The Prestage Entities admit that they paid for a subscription to Agri Stats' turkey reports. The Prestage Entities deny the allegations of Paragraph 37 except as expressly admitted and specifically deny that they participated in any alleged unlawful activity.

38. Indeed, Agri Stats specifically marketed itself to potential participants as a



**Answer:** Paragraph 38 purports to

The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 38, and the same are therefore denied.

---

[7] *Id.*

[8] *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001).

39. Defendants routinely used the information contained in the Agri Stats sales reports to [redacted]

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 relating to [redacted] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 39.

40. Agri Stats understood that Defendants used Agri Stats to [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 relating to [redacted]

[REDACTED] and therefore deny the same. The Prestage Entities deny the remaining allegations of Paragraph 40.

**D. Defendants' conspiracy was successful and caused anticompetitive effects in the form of restrained supply and supracompetitive prices**

41. Throughout the conspiracy period, as a result of their anticompetitive conduct, Defendants collectively exercised extraordinary and unprecedented restraint in keeping the growth of turkey supply in check, causing turkey prices to rise. Defendants' anticompetitive restraint over their production is shown in the following chart that shows consistent, marked reductions in total heads slaughtered during the conspiracy period as compared to the prior period. With the **highest** total heads slaughtered in the conspiracy period (2012), roughly equal to the **lowest** total heads slaughtered in the pre-conspiracy period (2005).

**Figure 1: Total Heads Slaughtered from 2000–2018**



**Answer:** The Prestage Entities deny the allegations in Paragraph 41.

42. In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should correspond to falling prices. However, in the turkey market during the conspiracy period, production, measured through United States Department of Agriculture (USDA) data, remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly.

**Answer:** The Prestage Entities deny the allegations in Paragraph 42.

43. Figure 2 below shows that prior to the class period, production levels followed changes in prices, a sign of supply keeping up with demand. This changed when the production cuts of 2009 to 2010 pushed prices up to new levels. After 2010, production levels remained constant, but prices were structurally higher. In contrast to the earlier period, production levels did not rise to meet these new prices. These observed price and output dynamics, shown in the below analyses, indicate that it was not falling demand that caused a decline in supply during the conspiracy period. Indeed, rising prices instead simply caused per capita expenditures to rise. But then, contrary to what would be predicted in a competitive market, per capita expenditures remained elevated because supply did not increase in response to the rising prices:

**Figure 2: Indexed Per Capita Expenditure v. Production (1999–2016)**




**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 43, and the same are therefore denied.

44. Similarly, Figure 3 below shows a dramatic increase in the price of turkeys for the period 2011 through 2018:

**Figure 3: Average Yearly Wholesale Turkey Prices: Hens (2000–2019)**




**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 44, and the same are therefore denied.

45. Defendants' conduct had anticompetitive effects on the market. Prior to the conspiracy, turkey prices closely tracked the underlying cost of feed, which is the primary input cost in the production of turkey. Beginning in 2009-2010, prices of turkey spiked to an unprecedented level. Remarkably, as demonstrated in the analysis performed by Plaintiffs' experts, shown in the below chart, prices of turkey quickly returned to match underlying feed costs after litigation was filed in late 2016 in the broiler industry that centered on the anticompetitive use of Agri Stats. Defendants scrambled to change their behavior after the commencement of the Broilers litigation. Defendant Tyson dismissed their CEO, Donnie Smith, in late 2016, shortly after the first civil lawsuits were filed.

**Figure 4: Regression Showing Relationship between Turkey Hen Prices/Lb. and Feed Prices/Lb. (2000–2019)**




**Answer:** The Prestage Entities deny the allegations of Paragraph 45.

46. Feed accounts for approximately 60–70% of the cost of raising a turkey. Plaintiffs' experts constructed a regression model, based on the underlying feed cost, that models what the "but for" price of turkey would have been if the historical relationship between feed and turkey costs had continued during the conspiracy period. The model demonstrates that the anticompetitive information exchange of data regarding turkey production through Agri Stats caused anticompetitive effects in the market for turkey.

**Answer:** The Prestage Entities deny the allegations of Paragraph 46.

47. To demonstrate the anticompetitive effects of Defendants' and their Co-Conspirators' conduct on the market for turkey, Plaintiffs' experts have done a regression model based on the relationship between the price of turkey hens and the price of turkey feed, which is the primary input cost for turkeys. The formula of the regression is the following: $(HenPrice)=a+\beta(FeedPrice)t+et$. As shown below, the regression shows a significant elevation in the prices of turkey during the conspiracy period:

**Figure 5: Regression Model Showing Relationship Between Price of Turkey Hens and Price of Turkey Feed**




**Answer:** The Prestage Entities deny the allegations of Paragraph 47.

48. Defendants' anticompetitive conduct had the intended purpose and effect of increasing Turkey prices to Plaintiffs and the Class. Defendants knew and intended that their collusive conduct would artificially increase Turkey prices above the level they would have been absent the conduct alleged herein.

**Answer:** The Prestage Entities deny the allegations of Paragraph 48.

49. As a result of Defendants' unlawful conduct, Plaintiffs and the Class were injured because they paid artificially inflated prices for turkey during the Class Period as a result of Defendants' anticompetitive conduct. Such prices exceeded the amount they would have paid if the price for turkey had been determined by a competitive market.

**Answer:** The Prestage Entities deny the allegations of Paragraph 49.

50. Plaintiffs bring this complaint, alleging violations under both the rule of reason and *per se* standards for violations of federal antitrust law.

**Answer:** Paragraph 50 contains characterizations of the Complaint to which no response is required. To the extent a response is required, the Prestage Entities deny the allegations set forth in Paragraph 50.

## III. JURISDICTION AND VENUE

51. Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure compensatory damages and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs seek to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct in restricting the supply of turkey and increasing the price of turkey. Plaintiffs seek damages in excess of $5,000,000. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

**Answer:** Paragraph 51 contains only conclusions of law and characterizations of the Complaint to which no response is required. To the extent a response is required, the Prestage Entities do not contest this Court's subject matter jurisdiction over this action at this time; the Prestage Entities deny that Plaintiffs have pleaded a valid claim under the statutes cited and deny that Plaintiffs have suffered any damages. The Prestage Entities deny the allegations of Paragraph 51 except as otherwise expressly stated.

52. Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because Hillshire Brands are headquartered in the District, and one or more Defendants transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

**Answer:** Paragraph 52 contains conclusions of law and characterizations of the Complaint to which no response is required. To the extent a response is required, the Prestage Entities do not contest venue in this District at this time. The Prestage Entities deny the allegations of Paragraph 52 except as otherwise expressly stated.

53. This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of turkey throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

**Answer:** Paragraph 53 contains only conclusions of law to which no response is required. To the extent a response is required, the Prestage Entities do not contest personal jurisdiction in this action at this time. The Prestage Entities deny the allegations of Paragraph 53 except as otherwise expressly stated.

54. The activities of the Defendants and their Co-Conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

**Answer:** The Prestage Entities deny the allegations of Paragraph 54.

## IV. PARTIES

### A. Plaintiffs

55. Plaintiff John Gross and Company, Inc. (John Gross) is a full line food distributor located in Mechanicsburg, Pennsylvania. Founded in 1950, the company has been owned and operated by the Gross family for four generations. John Gross is a Pennsylvania corporation with its principal place of business in Mechanicsburg, Pennsylvania, and purchased turkey directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**Answer:** The Prestage Entities specifically deny that Plaintiff John Gross and Company, Inc. ("John Gross") purchased turkey directly from any of them during the alleged Class Period, and further deny that John Gross suffered any antitrust injury. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 55, and the same are therefore denied.

56. Plaintiff Maplevale Farms, Inc. ("Maplevale") is a family-owned, broadline food service company located in Falconer, New York. The company was founded in 1951 and serves customers in Western New York, Northwestern Pennsylvania, and Eastern Ohio. Maplevale is a New York corporation with its principal place of business in Falconer, New York and purchased turkey directly from one or more of the Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**Answer:** The Prestage Entities specifically deny that Plaintiff Maplevale Farms, Inc. ("Maplevale") purchased turkey directly from any of them during the alleged Class Period, and

further deny that Maplevale suffered any antitrust injury. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 56, and the same are therefore denied.

**B. Defendants**

57. Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana. Throughout the Class Period, Agri Stats acted as a Co-Conspirator of the Defendant Integrators by facilitating the exchange of confidential, proprietary, and competitively sensitive data among Defendants and their Co-Conspirators.

**Answer:** The Prestage Entities specifically deny any implication that they participated in any alleged conspiracy because no such conspiracy exists. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 57, and the same are therefore denied.

58. Butterball, LLC is a privately held North Carolina corporation headquartered in Garner, North Carolina and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Butterball and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 58, and the same are therefore denied.

59. Cargill, Inc. is a privately held Delaware corporation headquartered in Minnetonka, Minnesota. During the Class Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 59, and the same are therefore denied.

60. Cargill Protein – North America f/k/a Cargill Meat Solutions Corporation is a Delaware corporation headquartered in Wichita, Kansas that operates as a subsidiary of Cargill, Incorporated. During the Class Period, Cargill Meat Solutions and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 60, and the same are therefore denied.

61. Defendants Cargill, Inc. and Cargill Protein – North America f/k/a Cargill Meat Solutions are collectively referred to as "Cargill."

**Answer:** Paragraph 61 fails to assert any allegations, and thus no response is required.

62. Cooper Farms, Inc. is a privately held Ohio corporation headquartered in Oakwood, Ohio and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Cooper Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 62, and the same are therefore denied.

63. Farbest Foods, Inc. is a privately held Indiana corporation headquartered in Jasper, Indiana and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Farbest and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 63, and the same are therefore denied.

64. Foster Farms LLC is a privately held California corporation headquartered in Modesto, California. During the Class Period, Foster Farms LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 64, and the same are therefore denied.

65. Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms LLC. During the Class Period, Foster Poultry Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of turkey, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 65, and the same are therefore denied.

66. Defendants Foster Farms LLC and Foster Poultry Farms are collectively referred to as "Foster Farms."

**Answer:** Paragraph 66 fails to assert any allegations, and thus no response is required.

67. Hormel Foods Corporation is a Delaware corporation headquartered in Austin, Minnesota and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 67, and the same are therefore denied.

68. Jennie-O Turkey Store, Inc. ("Jennie-O") is a Minnesota corporation headquartered in Austin, Minnesota. Jennie-O Turkey Store, Inc. is a related entity of Hormel Foods Corporation. During the Class Period, Jennie-O Turkey Store, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of turkey, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 68, and the same are therefore denied.

69. Defendants Hormel Foods Corporation and Jennie-O Turkey Store, Inc. are collectively referred to as "Hormel."

**Answer:** Paragraph 69 fails to assert any allegations, and thus no response is required.

70. House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 70, and the same are therefore denied.

71. Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland. During the Class Period, Perdue Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 71, and the same are therefore denied.

72. Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 72, and the same are therefore denied.

73. Defendants Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to as "Perdue."

**Answer:** Paragraph 73 fails to assert any allegations, and thus no response is required.

74. Prestage Farms, Inc. is a North Carolina corporation headquartered in Clinton, North Carolina and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Prestage Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities admit that Prestage Farms (i) is a North Carolina Corporation with a principal place of business in Clinton, North Carolina, (ii) is engaged in the business of hatching and growing live turkeys, (iii) provides live market turkeys to Prestage Foods and (iv) at times provides live market turkeys to Prestage Farms of SC. The Prestage Entities deny the allegations of Paragraph 74 except as expressly admitted.

75. Prestage Foods, Inc. is a North Carolina corporation headquartered in St. Paul, North Carolina and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Prestage Foods and/or its predecessors, wholly owned or

controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities admit that Prestage Foods (i) is a North Carolina corporation with a principal place of business in St. Pauls, North Carolina and (ii) is in the business of processing and marketing turkey for sale to other third parties. The Prestage Entities deny the allegations of Paragraph 75 except as expressly admitted.

76. Prestage Farms of South Carolina, LLC is a South Carolina corporation headquartered in Camden, South Carolina and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Prestage Farms of South Carolina, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities admit that Prestage Farms of SC (i) is a South Carolina limited liability company with a principal place of business in Camden, South Carolina and (ii) was at all relevant times solely in the business of growing live market turkeys for sale to Kraft. The Prestage Entities deny the allegation of Paragraph 76 except as expressly admitted.

77. Defendants Prestage Farms, Inc., Prestage Foods, Inc., Prestage Farms of South Carolina, LLC are collectively referred to as "Prestage."

**Answer:** Paragraph 77 contains no allegations, and thus no response is required.

78. Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. It wholly owns and controls two subsidiaries, Tyson Prepared Foods, Inc. and Tyson Fresh Meats Inc. that slaughter and sell turkey products. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 78, and the same are therefore denied.

79. Tyson Fresh Meats Inc. is a Delaware corporation headquartered in Dakota Dunes, South Dakota and that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson

Fresh Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 79, and the same are therefore denied.

80. Tyson Prepared Foods, Inc. is a Delaware corporation headquartered in York, Nebraska that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 80, and the same are therefore denied.

81. The Hillshire Brands Company ("Hillshire Brands") is a Maryland corporation headquartered in Chicago, Illinois. Hillshire Brands operates as a subsidiary of Tyson Foods that sells turkey products. During the Class Period, Hillshire Brands and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 81, and the same are therefore denied.

82. Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc., and Hillshire Brands are collectively referred to as "Tyson."

**Answer:** Paragraph 82 fails to assert any allegations, and thus no response is required.

**C. Co-Conspirators**

83. Co-Conspirator Dakota Provisions, LLC d/b/a Dakota Provisions (Dakota Provisions) is a South Dakota corporation engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Dakota Provisions and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 83, and the same are therefore denied.

84. Co-Conspirator Kraft (comprised of Kraft Heinz Foods Company and Kraft Foods Group) is engaged in the production of meat and food products, and the marketing of these products. Kraft Heinz Foods Company (Kraft Heinz), is an Illinois corporation with headquarters in Pittsburgh, Pennsylvania, and Chicago, Illinois, and Kraft Foods Group Brands LLC is an Illinois corporation. During the Class Period, Kraft and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 84, and the same are therefore denied.

85. Co-Conspirator Michigan Turkey Producers LLC d/b/a Michigan Turkey Producers Co-op (Michigan Turkey) is a Michigan corporation headquartered in Grand Rapids, Michigan, and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Michigan Turkey and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 85, and the same are therefore denied.

86. Co-Conspirator Norbest LLC (Norbest) is a Utah corporation headquartered in Moroni, Utah, and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, Norbest and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Norbest is a related entity to Pitman Family Farms, a California corporation, engaged in the production of meat and food products, and the marketing of these products. Norbest was formerly known as Moroni Feed Company and Norbest Inc.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 86, and the same are therefore denied.

87. Co-Conspirator West Liberty Foods LLC (West Liberty) is an Iowa corporation headquartered in West Liberty, Iowa, and engaged in the production of meat and food products, and the marketing of these products. During the Class Period, West Liberty and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 87, and the same are therefore denied.

## V. FACTUAL ALLEGATIONS

### A. Agri Stats lies at the center of an extensive conspiracy between Defendants.

88. Agri Stats is a company that provides closely guarded, non-public, subscription services to a variety of agricultural industries, including the pork, chicken, and turkey industries. Agri Stats' mission is to improve the profitability of participant companies through the provision of detailed and sensitive data gathered from competitors. Agri Stats presents itself as "kind of a quiet company" with a minimal public presence, but the company has silently and intentionally orchestrated a profound and anticompetitive impact on the supply and price of meat in this country.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 88, as stated, which pertain to Agri Stats, and the same are therefore denied.

89. Agri Stats owns a number of subsidiaries, including Express Markets, Inc., that provide benchmarking services to the agricultural industries:




**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 89, and the same are therefore denied.

90. As described previously, Agri Stats collects detailed data on almost every conceivable operating metric from its subscribers operating in the turkey industry. Agri Stats takes this data, standardizes it across Defendants and Co-Conspirators, and then creates detailed reports comparing the subscribers on key operating metrics. On a monthly basis, Agri Stats produces these detailed comparative data reports to its subscribers in the turkey industry using numeric codes for each subscriber in a purported attempt to keep the data anonymous. However, turkey industry subscribers can and do reverse engineer these reports with ease to identify their competitors.

**Answer**: The Prestage Entities admit, upon information and belief, that Agri Stats collects data from subscribers in the turkey industry and reports that data in anonymous reports to its subscribers. The Prestage Entities lack information or knowledge sufficient to form a belief as

to Agri Stats internal algorithms or processes and lack knowledge sufficient to form a belief as to the truth of the remaining allegations of Paragraph 90 and those allegations are denied.

91. Agri Stats prepared monthly reports for Defendants regarding their sales of turkey that identified, on a specific product by product level, the prices, and returns that each Defendant was obtaining on their sales of turkey. These reports, unavailable to anybody besides Agri Stats subscribers, allowed the Defendant Integrators to easily identify potential opportunities where their prices for turkey products were significantly lower than their competitors.



**Answer**: The Prestage Entities admit and that, upon information and belief, other turkey Agri Stats subscribers also received certain reports. The Prestage Entities deny the allegations of Paragraph 91 except as expressly admitted.

92. The information gathered by Agri Stats was not publicly available, or even available to industry participants equally. Agri Stats would only grant access to similarly situated companies that themselves share data with Agri Stats. That is, you had to be a Turkey integrator able to produce competitively sensitive information, to be able to receive the information. Agri Stats also does not provide data to USDA. This information asymmetry ensures that data from Agri Stats is only available to one side of the market – the Defendant Integrators. The other side of the market, purchasers of turkey, is not allowed to access the Agri Stats data, and thus cannot use Agri Stats data to negotiate lower prices. Thus, Agri Stats reports function as a one-way ratchet that can be used for anticompetitive purposes by Defendants but not for procompetitive purposes by purchasers.

**Answer**: The Prestage Entities deny, upon information and belief, the allegations of Paragraph 92.

93. In the turkey industry, all else being equal, there is an inverse relationship between supply and price of turkey. Accordingly, the type of information available in these reports is not the type of information that competitors would provide each other in a normal, competitive market. In a competitive market, each competitor would act independently, making supply decisions unilaterally and pricing its goods to market. Indeed, in a competitive market, a commodity producer with a cost advantage would not share information with competitors that would allow them to achieve the same cost of manufacture. If a Turkey Integrator knew both it and its competitors have low supply, and/or knew that its competitors would not lower prices to attempt to gain market share, the normal competitive incentive to lower prices to better compete in the market is chilled, although customers remain unaware of this, by removing competitive uncertainty.

**Answer**: The Prestage Entities deny the allegations of Paragraph 93.

94. In each situation, the anticompetitive effects are only amplified by the fact that customers do not have the confidential information exchanged among the Defendants, nor are they even aware of the fact that Defendants are exchanging that confidential information, putting them at a severe asymmetrical information disadvantage with respect to the pricing of turkey meat.

**Answer:** The Prestage Entities deny the allegations of Paragraph 94.

95. The information exchange by the Defendant Integrators through Agri Stats is exactly the type of information exchange that the Supreme Court has recognized is likely to have anticompetitive effects under a rule of reason analysis. *First, the data is current and forward-looking—which courts consistently hold has "the greatest potential for generating anticompetitive effects."*[9] *Second, information contained in Agri Stats reports is specific to the turkey producers, including information on profits, prices, costs, and production levels. Third*, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the Defendant Integrators to pay hefty fees over the Class Period – far in excess of any other pricing and production indices – and to agree to volunteer their own data. Agri Stats ensured that its detailed, sensitive business information was available only to Defendants and their Co-Conspirators and not to any buyers in the market. Thus, for example, buyers on the market could not use Agri Stats data in Agri Stats sales reports to negotiate lower prices; instead, only Defendants could use it to identify opportunities to raise their prices. Indeed, Agri Stats specifically marketed itself to potential participants as a way that they could " [redacted] rather than engage in competition through production increases. Agri Stats was good to its word; its sales reports specifically identified opportunities for Defendants where Defendants' products were lower than that of the industry average and where Defendants could consequently raise prices to meet that of their competitors.

**Answer:** The Prestage Entities deny the allegations of paragraph 95.

96. Furthermore, the exchange of information through Agri Stats at issue in this case is of a type and frequency that acts as a plus factor supporting an inference of a *per se* price-fixing agreement among Defendants. As Justice Sotomayor held while serving on the Second Circuit, "[i]nformation exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement."[10] This agreement had the intended purpose and effect of increasing turkey prices to Plaintiffs and the Class.

**Answer:** The Prestage Entities deny the allegations of Paragraph 96.

[9] *U.S. Gypsum Co.*, 438 U.S. at 441 n.16.

[10] *Todd*, 275 F.3d at 198–99 (noting that information exchanges can both be evidence of a per se unlawful price fixing cartel and separately unlawful in and of themselves). **Answer to Footnote 10:** This footnote does not require a response because it constitutes legal argument of counsel. To the extent a response is required, the paraphrase of the case is incomplete, taken out of context, and as phrased does not reflect the current state of the law.

***1. Agri Stats Reports and Subscriptions by Defendants and their Co-Conspirators.***

97. Defendants' agreement was formed at least as early as 2008. Michael "Blair" Snyder, a senior executive at Agri Stats, publicly touted in 2009 that "about 95% of the turkey industry [is] participating" in Agri Stats, and that for "turkey participants, pretty much it's a list of who's who in the turkey business."

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97 as they pertain to statements made by Agri Stats, and therefore deny the same. The Prestage Entities deny all other allegations in Paragraph 97 and expressly deny that they entered into an unlawful agreement with any other defendant or co-co-conspirator.

98. A 2010 presentation slide lists each of the Defendants and their Co-Conspirators



are all participants in Agri Stats' reports on turkey.



**Answer:** The Prestage Entities deny the allegations of Paragraph 98. The Prestage Entities further respond to the allegations in Paragraph 98 by stating that [REDACTED] The Prestage Entities do not know which companies participated in which Agri Stats reports, or which reports they received or for which periods of time.

99. Participants in this scheme received monthly detailed reports and graphs that allow them to compare their performance, sales prices, and costs to other participants.

**Answer:** The Prestage Entities admit they subscribed to and received certain turkey Agri Stats reports between the time period 2010 to 2017 and that, upon information and belief, other turkey Agri Stats subscribers also received certain reports. The Prestage Entities deny the allegations of Paragraph 99 except as expressly admitted.

100. Agri Stats reports identified potential opportunities for its subscribers to raise prices for turkey products where their prices were lower than their competitors.

**Answer:** The Prestage Entities deny the allegations of Paragraph 100.

101. Agri Stats issues





[redacted]

**Answer:** The Prestage Entities admit Agri Stats issues [redacted] The Prestage Entities deny the allegations of Paragraph 101 except as expressly admitted and specifically deny [redacted]

102. Agri Stats also offered to provide [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102, and the same are therefore denied.

103. EMI (a subsidiary of Agri Stats) provided [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 103 relating to [redacted] and the same are

therefore denied. The Prestage Entities specifically deny



**a.** Examples of Agri Stats Reports.

104. Some of the main offerings

**Answer:** The Prestage Entities admit The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 104, and the same are therefore denied. The Prestage Entities deny the allegations of Paragraph 104 except as expressly admitted and specifically deny





**Answer:** The Prestage Entities respond that [redacted] The Prestage Entities deny the allegations of Paragraph 105 except as expressly admitted.

*106.* Agri Stats also provided the same information for [redacted]



[redacted]

**Answer**: The Prestage Entities respond that [redacted] The Prestage Entities deny the allegations of Paragraph 106 except as expressly admitted.

107. Both the USDA and Urner Barry also provide some publicly available sales data. However, the data that Agri Stats provides in its sales reports is [redacted] and [redacted]

**Answer:** The Prestage Entities admit that (i) Urner Barry and the USDA provide some publicly available data regarding turkey and [redacted] The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 107, and the same are therefore denied. The Prestage Entities deny the allegations of Paragraph 107 except as expressly admitted.

[redacted] An example from 2014 is below:



[redacted]

**Answer:** The Prestage Entities respond that [redacted] The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of [redacted] The Prestage Entities deny the allegations of Paragraph 108 except as expressly admitted and specifically deny [redacted]

109. [redacted]







**Answer:** The Prestage Entities respond that [REDACTED] The Prestage Entities deny the allegations of Paragraph 109 except as expressly admitted.

**Answer:** The Prestage Entities respond that [REDACTED] The Prestage Entities deny the allegations of Paragraph 110 except as expressly admitted.

111. These reports were particularly helpful at indicating [redacted] No other reporting service, other than Agri Stats/EMI, provided the level of detail or content needed to show the industry's production intentions. While the USDA provides reporting on some of the same metrics as Agri Stats does (though without the same level of detail nor as close-in-time), USDA does not report at all on [redacted] Agri Stats explained that [redacted] Another benchmarking service, Urner Barry, provided reports [redacted]. Simply put, the data Agri Stats provided was [redacted] Each of these metrics provide confidential information on participants' supply and capacity.

[redacted]

**Answer:** The Prestage Entities respond that [redacted] The Prestage Entities deny the allegations of Paragraph 111 except as expressly admitted.

112. Although Agri Stats has stated that [redacted]

[redacted]

**Answer:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage Entities deny the allegations of Paragraph 112 except as expressly admitted.

113. Additionally, Agri Stats' [redacted]

[redacted]

**Answer:** The Prestage Entities admit, upon information and belief, that [redacted]

The Prestage Entities deny the allegations of Paragraph 113 except as expressly admitted.





[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 114, and the same are therefore denied. Prestage specifically responds that [redacted]

115. Each Agri Stats report listed [redacted]



[redacted]

**Answer:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage Entities further respond that [redacted] The Prestage Entities deny the allegations of Paragraph 115 except as expressly admitted.

**b. Defendants subscribed to Agri Stats/EMI reports throughout the class period.**

116. Butterball states [redacted] Agri Stats' fee records show that [redacted]

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 116, and the same are therefore denied.

117. Agri Stats' fee records show that [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 117, and the same are therefore denied.

118. [redacted]. Agri Stats' fee records show that [redacted] They subscribed to the [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 118, and the same are therefore denied.

119. [redacted] Agri Stats' fee records show that [redacted] They continued these subscriptions until at least [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 119, and the same are therefore denied.

120. [redacted] Agri Stats' fee records show that [redacted]



[redacted] They continued receiving the [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 120, and the same are therefore denied.

121. From January 1, 2008 through December 31, 2017, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 121, and the same are therefore denied.

122. [redacted] As early as August 2008, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 122, and the same are therefore denied.

123. [redacted] Agri Stats' fee records show that [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 123, and the same are therefore denied.

124. Agri Stats' fee records show that



**Answer:** The Prestage Entities admit they

The Prestage Entities deny the allegations of Paragraph 124 except as so admitted.

125. Agri Stats' fee records show that

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 125, and the same are therefore denied.

**c. The Co-Conspirators also participated in Agri Stats/EMI.**

126. Agri Stats' fee records show that



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 126, and the same are therefore denied.

127. Agri Stats' fee records show that

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 127, and the same are therefore denied.

128. Agri Stats' fee records show that [REDACTED].

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 128, and the same are therefore denied.

129. Agri Stats' fee records show that [REDACTED]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 129, and the same are therefore denied.

130. Agri Stats' fee records show that [REDACTED]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 130, and the same are therefore denied.

**2. Defendants relied on Agri Stats reports for every critical part of their operations.**

131. Industry participants relied on Agri Stats reports in nearly every facet of their business operations and strategy.

**Answer:** The Prestage Entities deny the allegations set forth in Paragraph 131.

132. For example, in January 2014, [REDACTED]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 132, and the same are therefore denied.

**a. Defendants Relied on Agri Stats Reports in Setting Prices and Identifying Opportunities to Raise Prices.**

133. Defendants routinely and regularly used the Agri Stats sales reports to identify price-raising opportunities.

**Answer:** The Prestage Entities deny the allegations set forth in Paragraph 133.

134. Confidential Witness 1 (CW1) is a former sales executive at Butterball involved in the pricing of turkeys. CW1 was employed at Butterball during the entire Class Period. According to CW1, Agri Stats identified each participant in each report and ranked the integrator Defendants in their reports based on the returns (*i.e.*, prices) that the integrator Defendants received.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 134, and the same are therefore denied.

135. As documented in preceding allegations, CW1's allegations are confirmed by the reports themselves. CW1 further stated that Butterball relied on the monthly reports issued by Agri Stats: "The company used the information to evaluate — by item, item group, price, distribution — where we stood against other turkey companies." CW1 stated that he and other sales personnel looked at Agri Stats data to see how Butterball ranked against peers in the turkey industry. CW1 stated that he personally looked at the Agri Stats data to assess costs and returns. CW1 stated that costs were an important factor in determining how Butterball set its prices. Butterball's internal documents clearly show the importance of Agri Stats to Butterball.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 135, and the same are therefore denied.

136. For example, a 2015 message [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 136, and the same are therefore denied.

137. Butterball regularly used data from Agri Stats to reduce supply and raise prices. For example, in August 2017, Butterball is shown again looking to Agri Stats data for [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 137, and the same are therefore denied.

138. Similarly, in 2010, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 138, and the same are therefore denied.

139. Butterball executives regularly met and reviewed Agri Stats data for price raising opportunities. For example, in March 2011, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 139, and the same are therefore denied.

140. At those meetings, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 140, and the same are therefore denied.

141. In a draft presentation for Butterball's



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 141, and the same are therefore denied.

142. That same presentation also details [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 142, and the same are therefore denied.

143. Cargill used Agri Stats to [redacted] Cargill also used Agri Stats as a [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 143, and the same are therefore denied.

144. Cargill also used Agri Stats to [redacted] She also wrote [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 144, and the same are therefore denied.

145. Cargill also uses its knowledge of [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 145, and the same are therefore denied.

146. Cargill approached identifying [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 146, and the same are therefore denied.

147. Confidential Witness 2 (CW2) is a former accountant at Cooper Farms. CW2 stated that Cooper Farms received monthly reports from Agri Stats. CW2 stated that Cooper Farms submitted cost information to Agri Stats every month. CW2 explained that Agri Stats reports grouped data into various types of turkey products, including deli meat and smoked meat. As described above, this has been confirmed by the reports produced by Agri Stats.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 147, and the same are therefore denied.

148. CW2 stated that the advice from Agri Stats helped Cooper Farms improve its returns per pound. Documents confirm that Cooper Farms used Agri Stats reports to maintain high profit margins. In May 2011, [redacted] In another email from the same month, [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 148, and the same are therefore denied.

149. As with the other Turkey Processors, Farbest also reviewed Agri Stats reports to . One example occurred in June 2010,

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 149, and the same are therefore denied.

150. Agri Stats also directly wrote to Farbest in order to identify In October 2013,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 150, and the same are therefore denied.

151. Foster Farms held regular meetings with Agri Stats regarding the sales reports, and used them to . In January 2015,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 151, and the same are therefore denied.

152.

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 152, and the same are therefore denied.

153. Hormel executives followed [redacted] instructions, using Agri Stats to [redacted] In a July 2010 email, [redacted] She reports that for fresh breast, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 153, and the same are therefore denied.

154. There are also examples of Hormel using Agri Stats data as reason, in part, to [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 154, and the same are therefore denied.

155. House of Raeford similarly used Agri Stats to [redacted] One example of this occurred in 2010, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 155, and the same are therefore denied.

156. A June 2012



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 156, and the same are therefore denied.

157. Prestage also worked with Agri Stats to . In December 2013,







[redacted]

**Answer:** The Prestage Entities respond that [redacted] The Prestage Entities further respond that the Plaintiffs' allegations in Paragraph 157 [redacted] The Prestage Entities deny all allegations of Paragraph 157.

158. Agri Stats also provided [redacted] guidance for Defendants and their Co-Conspirators on a [redacted] **basis.** For example, [redacted]. Agri Stats provides information about [redacted] Stacey Edwards of Agri Stats wrote, [redacted] In essence, Agri Stats was telling Cargill the [redacted] In a competitive market, sellers do not share such information, directly or indirectly, with each other.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 158, and the same are therefore denied.

159. Agri Stats also continued to



In April 2013,

**Answer:** The Prestage Entities respond that

The Prestage Entities further respond that the Plaintiffs' allegations in Paragraph 159

The Prestage Entities deny the allegations of Paragraph 159 except as expressly admitted.

160. Statements by Agri Stats employees show that they intended for Defendants and their Co-Conspirators to

In a February 2012 email thread where

In addition, in a June 2015 email thread,

**Answer:** In response to the allegations set forth in Paragraph 160, The Prestage Entities specifically deny any implication that they participated in any alleged conspiracy because no such conspiracy exists. The Prestage Entities lack knowledge or information sufficient to form

a belief as to the truth of the remaining allegations set forth in Paragraph 160, and the same are therefore denied.

### b. Defendants Relied on Agri Stats Reports to Monitor Production.

161. Defendants routinely and regularly used the Agri Stats sales reports to [redacted]

**Answer:** The Prestage Entities deny the allegations of Paragraph 161 and specifically deny any implication that they participated in any alleged conspiracy.

162. Data in the Agri Stats [redacted] reports and the EMI Analytics [redacted] allowed Defendants and their Co-Conspirators to [redacted]

**Answer:** The Prestage Entities deny the allegations of Paragraph 162.

163. Butterball [redacted]

In reply, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 163, and the same are therefore denied.

164. Similarly, conversations amongst executives at Cargill show that the data could be directly used to [redacted]. An April 2016 email from Cargill's [redacted]



[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 164, and the same are therefore denied.

165. After a Cargill executive attended [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 165, and the same are therefore denied.

166. Cargill also [redacted]. In September 2016, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 166, and the same are therefore denied.

167. Cargill also used information from Agri Stats to [redacted] In a 2017 e-mail, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 167, and the same are therefore denied.

168. In September 2014, [redacted]



[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 168, and the same are therefore denied.

169. In June 2017, [redacted] wrote to Agri Stats to [redacted]

[redacted]

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 169, and the same are therefore denied.

170. Farbest closely [redacted] January 2014, [redacted] This shows Farbest was closely monitoring production through the Agri Stats [redacted] reports.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 170, and the same are therefore denied.

171. Hormel also used Agri Stats information [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 171, and the same are therefore denied.

172. Perdue used EMI data when [redacted]. An August 2011 Perdue [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 172, and the same are therefore denied.

173. [redacted] of Tyson described Agri Stats' work with [redacted]

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 173, and the same are therefore denied.

**c. Agri Stats Reports and Metrics Were Tremendously Important to Defendants and their Co-Conspirators.**

174. Agri Stats was fully incorporated into Defendants' and their Co-Conspirators' business decision-making and Defendants emphasized the importance of using Agri Stats in their business operations.

**Answer:** The Prestage Entities deny the allegations of Paragraph 174 as they may relate to the Prestage Entities. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 174 as to any other Defendants or alleged Co-Conspirators, and the same are therefore denied.

175. For example,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 175, and the same are therefore denied.

176. Cargill prepared an



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 176, and the same are therefore denied.

177. Certain Defendants even



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 177, and the same are therefore denied.

**d. Agri Stats Directly Facilitated the Exchange of Sensitive Information**

178. At times, employees of Agri Stats/EMI

**Answer:** The Prestage Entities deny the allegations of Paragraph 178 as they may relate to the Prestage Entities. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 178 as to any other Defendants or alleged Co-Conspirators, and the same are therefore denied.

179. In July 2013,



She wrote,

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 179, and the same are therefore denied.

180. Agri Stats also offers [redacted] where they [redacted] Examples of Defendants' participation in such meetings is described below.

**Answer:** The Prestage Entities admit that [redacted] The Prestage Entities deny all allegations against them in Paragraph 180 except as expressly admitted. The Prestage Entities further respond that they lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 180 as to any other Defendants or alleged Co-Conspirators, and the same are therefore denied.

181. According to CW1 (Butterball), Agri Stats gave live presentations to Defendant Integrators to explain to them how to use the reports that Agri Stats prepared on the turkey industry and how to compare themselves against their competitors: during the presentations, Agri Stats said, "if you are number one priced out of 13, that meant the return was so much versus the other companies." Butterball regularly participated in such meetings with Agri Stats. For example, in August 2013 [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 181, and the same are therefore denied.

182. In an email thread describing [redacted] Such meetings were [redacted]



[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 182, and the same are therefore denied.

183. Agri Stats also would [redacted] with Cargill executives.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 183, and the same are therefore denied.

184. CW2 (Cooper Farms) stated that Cooper Farms executives met every six months with Agri Stats. The executives were from the Cooper Leadership Management Group, which included top management and executives from Cooper Farms. Documents confirm [redacted] between Cooper Farms executives and Agri Stats:

[redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 184, and the same are therefore denied.

185. CW2 (Cooper Farms) stated that "the upper group received advice" from Agri Stats. Documents confirm that Cooper Farms executives [redacted] with Agri Stats executives and received [redacted]. For example, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 185, and the same are therefore denied.

186. Farbest also [redacted]. In September 2015, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 186, and the same are therefore denied.

187. Agri Stats meetings also provided [redacted] For example, [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 187, and the same are therefore denied.

188. After that Agri Stats presentation,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 188, and the same are therefore denied.

189.



[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 189, and the same are therefore denied.

e. ***Certain Defendants Tied Compensation and Performance Reviews to their*** [redacted]

190. Agri Stats was also used [redacted]

**Answer:** The Prestage Entities deny the allegations of Paragraph 190, as stated, as they relate to the Prestage Entities. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 190 as to other Defendants and the same are therefore denied.

191. In 2008, [redacted] In 2015, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 191, and the same are therefore denied.

192. Proficiency and knowledge of Agri Stats was used as [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 192, and the same are therefore denied.

193. In 2016, For example,

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 193, and the same are therefore denied.

194. Cargill described Agri Stats as a o



[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 194, and the same are therefore denied.

195. Hormel executives were [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 195, and the same are therefore denied.

196. In 2011, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 196, and the same are therefore denied.

**3. *Defendants and Their Co-Conspirators regularly and easily reverse engineered Agri Stats reports.***

197. Agri Stats publicly represents that its services preserve the confidentiality of participating companies; however, the reality is far different.

**Answer:** The Prestage Entities admit, upon information and belief, that Agri Stats has represented that its services preserve the confidentiality of the participating companies. The Prestage Entities deny the allegations of Paragraph 197, except as expressly admitted.

198. Although Agri Stats reports are nominally anonymous, [REDACTED] Agri Stats reports are so detailed that a reasonably informed Defendant can discern the identity of competitors' data due to the specific type of products each is known to produce or based on knowing the identity of Defendants' individual complexes.

**Answer:** The Prestage Entities deny the allegations of Paragraph 198 as they may relate to the Prestage Entities. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 198 as to any other Defendants or alleged Co-Conspirators, and the same are therefore denied.

199. For each of its reports, [REDACTED] The small number of individual companies providing data in a particular category or region revealed the identity of each participant. CW1 (Butterball) confirmed that the reports Agri Stats prepared for the Defendant Integrators identified the participants that provided data for each report, which allowed Defendants to understand which of their competitors were participating for each report. CW2 confirmed that the Agri Stats reports identified each of the turkey production facilities that were participating in the reports.

**Answer:** The Prestage Entities admit that [REDACTED] The Prestage Entities deny all remaining allegations of Paragraph 199 as they may relate to the Prestage Entities. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 199 as to any other Defendants or alleged Co-Conspirators, and the same are therefore denied.

200. Based on documents produced to date in this case, [REDACTED]

**Answer:** The Prestage Entities deny the allegations of Paragraph 200 as they may relate to the Prestage Entities. The Prestage Entities lack knowledge or information sufficient to

form a belief as to the truth of the allegations set forth in Paragraph 200 as to any other Defendants, and the same are therefore denied.

201. [redacted] In July 2011, [redacted]

**Answer:** The Prestage Entities deny the allegations of Paragraph 201 as they may relate to the Prestage Entities. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 201 as to any other Defendants or alleged Co-Conspirators, and the same are therefore denied.

202. While each subscribing company receives a report that [redacted]

**Answer:** The Prestage Entities deny the allegations of Paragraph 202 as they may relate to the Prestage Entities and specifically deny [redacted] The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 202 as to any other Defendants or alleged Co-Conspirators, and the same are therefore denied.

203. One such executive was [redacted]





**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 203, and the same are therefore denied.

204. For instance,







**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 204, and the same are therefore denied.

205. Agri Stats assumed that CW2 (Cooper Farms) stated that he could determine the identity of companies for Cooper Farms in Agri Stats reports because "you could usually figure out who was who because they have a certain cooked meat, or if they were browning and running it through an oven." CW2 further stated that "we could sit there and discuss it, because a lot of us knew what the other plants in the big areas, what they did." For example, CW2 stated that one competitor company had five separate facilities included in the Agri Stats reports, and that therefore, it was easy to determine the identity of that company.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 205 and the same are therefore denied.

206. CW2's accounts of Cooper Farms' deanonymization are confirmed by documents. For example, in July 2017,

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 206, and the same are therefore denied.

207. Confidential Witness 3 (CW3), a former employee of Cargill during the conspiracy period, stated that Cargill received monthly reports from Agri Stats on turkey. The documents produced to date confirm that Cargill received Agri Stats reports.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 207, and the same are therefore denied.

208. In a February 2012 presentation to Moreover, the source of such information had been clearly labelled, which indicates this was a common and unremarkable happening:



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 208, and the same are therefore denied.

209. CW3 (Cargill) stated that the monthly Agri Stats turkey reports went directly to Cargill finance executives. Cargill documents describe

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 209, and the same are therefore denied.

210. Examples of Cargill's are included below:





**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 210, and the same are therefore denied.

211. Hormel also  . For example,

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 211, and the same are therefore denied.

212. Defendants were aware that  . For example, on Indeed, Butterball did know, because



**Answer:** The Prestage Entities deny the allegations of Paragraph 212 as they may relate to the Prestage Entities. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 212 as to any other Defendants or alleged Co-Conspirators, and the same are therefore denied.

213.



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 213, and the same are therefore denied.

214. At times, Defendants even [redacted] In a February 2011 email between [redacted] True competitors would have no reason to provide this type of sensitive business information to each other.

**Answer:** The Prestage Entities deny the allegations of Paragraph 214 as they may relate to the Prestage Entities. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 214 as to any other Defendants, and the same are therefore denied.

**4. Agri Stats was aware reports could be reverse engineered and helped facilitate reverse engineering.**

215. Agri Stats communicated frequently with [redacted]

**Answer:** The Prestage Entities admit [redacted] The Prestage Entities deny the allegations of Paragraph 215 except as expressly admitted and specifically deny that they participated in any alleged conspiracy.

216. Agri Stats was aware that [redacted]

**Answer:** The Prestage Entities deny the allegations of Paragraph 216 as they may relate to the Prestage Entities. The Prestage Entities lack knowledge or information sufficient to

form a belief as to the truth of the allegations set forth in Paragraph 216 as to any other Defendants, and the same are therefore denied.

217. In January 2009,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 217, and the same are therefore denied.

218. Agri Stats was aware that In July and August 2009,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 218, and the same are therefore denied.

219. Naysayers within Agri Stats were overruled. In April 2011,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 219, and the same are therefore denied.

220. Agri Stats was aware of the overly specific nature of their service. [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 220, and the same are therefore denied.

221. Relatedly, in December 2013 Agri Stats raised a concern about [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 221, and the same are therefore denied.

222. Instead, the confidentiality of the data was preserved only as to the public and those unable to subscribe to Agri Stats. For example, in an email dated [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 222, and the same are therefore denied.

223. Even if a subscriber were not able to [redacted]. In 2017, [redacted]

**Answer:** The Prestage Entities deny the allegations of Paragraph 223 as they may relate to the Prestage Entities. The Prestage Entities lack knowledge or information sufficient to

form a belief as to the truth of the allegations set forth in Paragraph 223 as to any other Defendants, and the same are therefore denied.

224. Agri Stats also regularly refined their reporting to [redacted] This was in furtherance of the conspiracy as it made it easier for Defendants and their Co-Conspirators to monitor each other's actions and to help inform long-term pricing strategies.

**Answer:** The Prestage Entities deny the allegations of Paragraph 224 as they may relate to the Prestage Entities. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 224 as to any other Defendants, and the same are therefore denied. The Prestage Entities specifically deny that they participated in any alleged conspiracy.

225. [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 225, and the same are therefore denied.

**B. [redacted] provided a forum for coordination among the Defendants and their Co-Conspirators.**

226. [redacted] is a national advocate for turkey farmers and processors; members include growers, processors, hatchers, breeders, distributors, allied services, and state associations.

**Answer:** The Prestage Entities admit the allegations of Paragraph 226.

227. Nearly every Defendant Integrator's CEO has representatives on the board of directors or executive committee of the [redacted]. High-ranking executives of Butterball, Hormel, Cargill, Tyson, Farbest, and Perdue currently serve as officers of the board or on the executive committee. Executives from each Defendant served on the [redacted]

[redacted] Executive Committee at various points during the conspiracy [redacted]

**Answer:** The Prestage Entities admit that it had a representative on the [redacted] board of directors and executive committee for a portion of the relevant time period. The Prestage Entities deny the allegations of Paragraph 227, except as expressly admitted.

228. For example, CW3 (Cargill) stated that senior Cargill executives attended [redacted] meetings. Documents confirm that [redacted] For example, [redacted]

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 228, and the same are therefore denied.

229. CW2 (Cooper Farms) also stated that Cooper Farms leadership was involved in the [redacted]. As discussed in more detail below, Gary Cooper served on the [redacted] Executive Committee in 2014. During that time, as discussed in more detail below, [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 229, and the same are therefore denied.

230. Notably, one Agri Stats employee who works for multiple meat industry clients commented upon her first time attending a [redacted] in 2011, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 230, and the same are therefore denied.

231. In addition to regular board and executive committee meetings, the [redacted] hosts two events throughout the year: the Annual Convention in February and the Leadership Conference in July. The Annual Convention is the largest event for the turkey industry nationwide and offers tremendous networking opportunities.

**Answer:** The Prestage Entities admit that the [redacted] holds board meetings, executive committee meetings, an Annual Convention and a Leadership Conference and networking opportunities exist at the Annual Convention. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 231, and the same are therefore denied.

232. Apart from board meetings, executive meetings and annual events, the [redacted] also had a subgroup called the [redacted]

**Answer:** The Prestage Entities admit that there existed a [redacted] The Prestage Entities lack knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 231, and the same are therefore denied.

233. Under the direction of



**Answer:** The Prestage Entities admit that The Prestage Entities deny the allegations of Paragraph 233, except as expressly admitted.

234. Upon information and belief, the top-level executives from Defendants discussed



**Answer:** The Prestage Entities deny the allegations of Paragraph 234.

**C. Defendants conspired to restrain competition in the market for turkey.**

**1. Pre-Class Liability Period from 2008-2009:**

235. In the Pre-Class Liability Period, Defendants and their Co-Conspirators, through both usage of Agri Stats/EMI and direct communications, In the spring and summer of 2008, Defendants and their Co-Conspirators began

**Answer:** The Prestage Entities deny the allegations of Paragraph 235.

**a.** [redacted] ***In early 2008, Defendants begin to coordinate a series of industry cutbacks to restrain supply and stabilize prices.***

236. Feed prices, the primary cost for growing turkeys, began to rise rapidly in late 2006, continued to accelerate in 2007, and spiked in June/July 2008. These feed prices were driven, in part, from the impact of a new market for corn created by U.S. renewables.

**Answer:** The Prestage Entities admit, upon information and belief, that feed prices rose rapidly in 2008 and into 2009 due, in part, to the impact on corn prices from new ethanol mandates. The Prestage Entities deny the allegations of Paragraph 236 except as expressly admitted.

237. These rising feed prices caused significant increased costs for turkey growers, and provided them with a motive to conspire to restrain supply and restore profitability.

**Answer:** The Prestage Entities admit that the rising feed prices resulted in increased costs for the Prestage Entities, [redacted] The Prestage Entities deny the allegations of Paragraph 237 except as expressly admitted.

238. By June 2008, with feed prices soaring, Defendants began discussing in detail the potential for industry-wide cutbacks. [redacted]

[redacted].

**Answer:** The Prestage Entities respond that to the extent the allegation in Paragraph 238 [redacted] The Prestage Entities deny the allegations of Paragraph 238.

**b.** [redacted]



239. In July 2008, [redacted]

**Answer:** The Prestage Entities admit that [redacted] The Prestage Entities deny the allegations of Paragraph 239 except as expressly admitted.

240. At the July 2008 [redacted] meeting, the [redacted] decided to [redacted]

**Answer:** The Prestage Entities admit that [redacted] The Prestage Entities deny all allegations of Paragraph 240 except as expressly admitted.

241. As a result of this discussion by the [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 241, and the same are therefore denied.

242. On July 10, 2008,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 242, and the same are therefore denied.

243.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 243, and the same are therefore denied.

244.



In 2008, the consisted of

**Answer:** The Prestage Entities admit that The Prestage Entities deny the allegations of Paragraph 244 except as expressly admitted.

245. On September 2, 2008,

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 245, and the same are therefore denied.

246. On September 4, 2008,



In internal correspondence regarding the proposal,

**Answer:** The Prestage Entities admit that on September 4, 2008

The Prestage Entities deny the allegations of Paragraph 246 except as expressly admitted.

247. On September 9, 2008,

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 247, and the same are therefore denied.

248. On September 11, 2008,



[redacted]

**Answer:** The Prestage Entities admit that [redacted] The Prestage Entities deny the allegations of Paragraph 248 except as expressly admitted.

249. In reply, [redacted]

**Answer:** The Prestage Entities admit that [redacted] The Prestage Entities deny the allegations of Paragraph 249 except as expressly admitted.

250. On September 12, 2008, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 250, and the same are therefore denied.

251. On September 16, 2008, [redacted]





**Answer:** The Prestage Entities admit that The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 251, and the same are therefore denied.

252. Internal correspondence from Defendants indicates that



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 252, and the same are therefore denied.

253. 

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 253, and the same are therefore denied.

254. On October 26, 2008,



**Answer:** The Presage Entities admit The Prestage Entities deny the allegations of Paragraph 254 except as expressly admitted.



255. E-mail correspondence from Agri Stats/EMI indicates that [redacted]

**Answer:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage Entities deny the allegations of Paragraph 255 except as expressly admitted.

256. At the meeting, there was significant internal debate about [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 256, and the same are therefore denied.

257. Following the meeting, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 257, and the same are therefore denied.

258. On November 5, 2008, [redacted]

[11] Plaintiffs have not yet been able to identify a copy of this draft of the [redacted] in the materials that have been produced by Defendants. **Answer to Footnote 11:** Footnote 11 does not make an allegation and no response is required. To the extent any allegations are made, they are denied.

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 258, and the same are therefore denied.

259. A version of the [redacted]

**Answer:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage entities deny the allegations of Paragraph 259 except as expressly admitted.

260. [redacted]

[redacted]



**Answer:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage Entities deny the allegations of Paragraph 260 except as expressly admitted.

261. The [redacted]

[redacted]

**Answer:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage Entities deny the allegations of Paragraph 261 except as expressly admitted.

262. On November 19, 2008, [redacted]



**Answer:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage Entities deny the allegations of Paragraph 262 except as expressly admitted.

263. The Steering Committee [redacted]

**Answer:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage Entities deny the allegations of Paragraph 263 except as expressly admitted.

264. On December 19, 2008, [redacted] attended the conference call. [redacted] *The committee also agreed that* [redacted]

**Answer:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage Entities lack

knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 264, and the same are therefore denied.

265. In January 2009,





**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 265, and the same are therefore denied.

266. The presentation materials prepared by EMI in [redacted] also included the [redacted]





**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 266, and the same are therefore denied.

267.



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 267, and the same are therefore denied.

268.



In internal correspondence,

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 268, and the same are therefore denied.

269. [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 269, and the same are therefore denied.

270. [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 270, and the same are therefore denied.

**c.** [redacted]

271. Following initiation of the [redacted] Defendants and their Co-Conspirators regularly [redacted]

**Answer:** The Prestage Entities deny the allegations of Paragraph 271.

272. In June 2008, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 272, and the same are therefore denied.

273. In July 2008,



**Answer:** The Prestage Entities admit that The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 273, and the same are therefore denied and they specifically deny was part of any conspiracy or collusion.

274. In August 2008, Cooper Farms executives in internal correspondence confirmed



**Answer:** The Prestage Entities admit that [redacted] The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 274, and the same are therefore denied and they specifically deny [redacted]

[redacted] was part of any conspiracy or collusion.

275. Defendants and their Co-Conspirators, [redacted] For example, in August 2008, [redacted] A few minutes later, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 275, and the same are therefore denied. The Prestage Entities specifically deny any allegations or implication in Paragraph 275 that [redacted] were part of any conspiracy or collusion.

276. That same month, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 276, and the same are therefore denied.

277. In September 2008,



In that email,

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 277, and the same are therefore denied.

278. Throughout the fall of 2008,

In September 2008,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 278, and the same are therefore denied.

279. Defendants also

For example, Keith Shoemaker, then CEO of Butterball, publicly stated in November 2008 that the "**the industry will cut 6.5 percent to 7 percent of production, which reached 7.4 billion pounds last year.** But given the amount of turkey meat in storage, it will take until at least April or May to get all that out of inventory."

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 279, and the same are therefore denied. The Prestage Entities specifically deny any allegations or implication in Paragraph 279 that

were part of any conspiracy or collusion.

280. Along with Butterball's public statements, Butterball directly discussed with other Defendants. In November 2008,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 280, and the same are therefore denied.

281. Defendants also coordinated In September 2008,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 281, and the same are therefore denied.

**d.**



282. In a January 19, 2009 e-mail, In particular,



[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 282, and the same are therefore denied.

283. [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 283, and the same are therefore denied.

284. Hormel heard the message loud and clear from [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 284, and the same are therefore denied.

285. At approximately the same time, Cargill changed its conduct and also vigorously joined the [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 285, and the same are therefore denied.

286. An internal Cargill e-mail from January 2009



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 286, and the same are therefore denied.

287. A February 2009 Cargill presentation discussed the

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 287, and the same are therefore denied.

288. Around the same time, Cooper Farms executives also engaged in direct communications with

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 288, and the same are therefore denied.

289. Defendants and their Co-Conspirators continued to

[12] In 2009, the consisted of



[redacted]

**Answer:** The Prestage Entities admit that [redacted] The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 289, and the same are therefore denied and specifically deny [redacted]

290. [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 290, and the same are therefore denied.

**e.** [redacted]

291. Butterball's [redacted]

[redacted] **Answer to Footnote 12:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage Entities deny the allegations of Footnote 12 except as expressly admitted.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 291, and the same are therefore denied.

292. In May 2009, Hormel's CEO confirmed on an earnings call that Hormel had engaged in increasing production cuts over the past year, stating, "We announced the production cuts last year and that production cut indeed is flowing through the system. We had announced 7 to 8% and then we added a little bit to the cut and so when all is said and done, we ended up in the low double-digit range of actual kind of meat being produced in the plants during the quarter." Hormel's CEO emphasized that the "production cuts going forward will still be in place."

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 292, and the same are therefore denied.

293. In May 2009,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 293, and the same are therefore denied.

294. On June 2, 2009, Hormel emphasized that it was



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 294, and the same are therefore denied.

295. In June 2009,



**Answer:** The Prestage Entities admit that [redacted] The Prestage Entities deny the allegations of Paragraph 295 except as expressly admitted and specifically deny that [redacted]



296.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 296, and the same are therefore denied

297.



**Answer:** The Prestage Entities admit that The Prestage Entities deny the allegations of Paragraph 297 except as expressly admitted and specifically deny



that [redacted]

298. [redacted]

[redacted]

**Answer:** The Prestage Entities admit that [redacted] The Prestage Entities deny the allegations of Paragraph 298 except as expressly admitted and specifically deny that [redacted]

299. In July 2009, a Foster Farms executive wrote to [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 299, and the same are therefore denied.

300. In July 2009, a Cargill [redacted]

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 300, and the same are therefore denied.

301. [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 301, and the same are therefore denied.

302. To that end, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 302, and the same are therefore denied.

303. Perdue later prepared presentations describing [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 303, and the same are therefore denied.

304. Butterball confirmed in an



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 304, and the same are therefore denied.

305. Additionally, Butterball noted in the

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 305, and the same are therefore denied.

306. Agri Stats/EMI executives commented on

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 306, and the same are therefore denied.

307. By November 2009, Defendants were beginning to On November 11, 2009, Similarly, Cargill



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 307, and the same are therefore denied.

308. Despite



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 308, and the same are therefore denied.

***2.***

309. In 2010, Defendants and their Co-Conspirators began to

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 309 which allegations are particularly vague as to The allegations of Paragraph 309 are denied in their entirety.

310. In January 2010, an internal Perdue



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 310, and the same are therefore denied.




**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 311, and the same are therefore denied.

312. [redacted]

[redacted]

**Answer:** The Prestage Entities admit that [redacted] The Prestage Entities deny the allegations of Paragraph 312 except as expressly admitted.

313.



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 313, and the same are therefore denied.

314. In May 2010, House of Raeford

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 314, and the same are therefore denied.

315. By June 2010, supplies for turkey were tight.



He asks She responded that She goes on to tell him that

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 315, and the same are therefore denied.

316. In August 2010,

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 316, and the same are therefore denied.

317. That same month, Hormel stated, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 317, and the same are therefore denied.

318. And Cargill, again in the same month, prepared a presentation [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 318, and the same are therefore denied.

319. Foster Farms



**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 319, and the same are therefore denied.

320. In September 2010, Butterball



In internal correspondence, Butterball executives stated

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 320, and the same are therefore denied.

321. In an email from November 27, 2010,



Defendants' statements matched their conduct, specifically with regard to

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 321, and the same are therefore denied.

322. A PowerPoint made by Perdue



Perdue noted that the

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 322, and the same are therefore denied.

323. In April 2011,

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 323, and the same are therefore denied.

324. Defendants and their Co-Conspirators represented that the turkey industry has

In May 2011, Cargill wrote that

In September 26, 2011,

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 324, and the same are therefore denied and the Prestage Entities specifically deny

325. That same month, Hormel stated that the

[redacted]

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 325, and the same are therefore denied.

326. Several months later, in August 2011, Hormel stated that the [redacted] This statement is notable because the chicken industry is currently the subject of multiple civil lawsuits as well as a DOJ investigation of potential antitrust violations that occurred during the same period of time.

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 326, and the same are therefore denied.

327. Notably, throughout this period, despite [redacted], Defendants collectively kept [redacted]

**Answer**: The Prestage Entities deny the allegations of Paragraph 327.

328. During this period, Defendants also continued to [redacted] In January 2010, [redacted]

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 328, and the same are therefore denied and they specifically deny any allegations or implication that they engaged in any conspiracy or collusion.

329. In May 2011, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 329, and the same are therefore denied.

330. High level executives at the Defendants also engaged in [redacted] In October 2011, a [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 330, and the same are therefore denied and the Prestage Entities specifically deny any allegations or implication that they engaged in any conspiracy or collusion.

**3.** [redacted]

331. In early 2012, Defendants and their Co-Conspirators were still [redacted] However, Defendants grew concerned about [redacted]. In a February 2012 e-mail, [redacted] Defendants proceeded to respond with [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 331, and the same are therefore denied.

332. At the 2012 [redacted] in Tampa, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 332, and the same are therefore denied.

333. While negotiating financing with



”

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 333, and the same are therefore denied.

334. In July 2012,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 334, and the same are therefore denied.

335. Ultimately



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 335, and the same are therefore denied.

336. Defendants began to spread among themselves this message to In August 2012, That same month, internal Cooper Farms correspondence reported,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 336, and the same are therefore denied and the Prestage Entities specifically deny any allegations or implication that they engaged in any conspiracy or collusion.

337. Cargill's internal presentations also confirmed

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 337, and the same are therefore denied.

338. As cutbacks began, Defendants started to

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 338, and the same are therefore denied and the Prestage Entities specifically deny any allegations or implication that they engaged in any conspiracy or collusion.

339. By September 12, 2012,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 339, and the same are therefore denied.

**4.** [redacted]

340. As 2012 drew to a close, Defendants continued to communicate amongst each other to [redacted]

**Answer:** The Prestage Entities deny the allegations of paragraph 340.

341. In September 2012, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 341 as they relate to [redacted]



[redacted] and the same are therefore denied. The Prestage Entities deny [redacted]

[redacted]

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 342, and the same are therefore denied.

343. That exact same month, [redacted] In response [redacted] In additional e-mail correspondence, Farbest executives reported that [redacted]

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 343, and the same are therefore denied.

344. By January 2013, [redacted]

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 344, and the same are therefore denied.

345. That same month, [redacted]

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 345, and the same are therefore denied.

346. The following month,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 346, and the same are therefore denied.

347. In March 2013, Hormel executives internally discussed



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 347, and the same are therefore denied.

348. Several months later,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 348, and the same are therefore denied.

349. On January 31, 2013, an internal Cooper Farms email revealed that  In that email thread,

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 349, and the same are therefore denied.

350. This prompted 

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 350, and the same are therefore denied.

351. [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 351, and the same are therefore denied.

352. Hormel's own documents from around that time confirm that [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 352, and the same are therefore denied.

353. After the [redacted] on February 13–16, notes from [redacted]

[redacted]

[redacted]

[redacted]



In response to that message,



**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 353, and the same are therefore denied.

354. On February 27,



**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 354, and the same are therefore denied.

355. The following day, internal emails within Farbest reflected



Similarly, internal Hormel documents from March 2013, show that Hormel

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 355, and the same are therefore denied.

356. The wave of . By March 21, 2013,



[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 356, and the same are therefore denied and the Prestage Entities specifically deny [redacted]

357. At the end of March 2013, [redacted] Later documents confirm they did so.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 357, and the same are therefore denied.

358. In May 2013, public statements by Urner Barry's Vice President Russ Whitman signaled more projected cutbacks by stating "dramatic declines" in turkey production were imminent. "He cited the sharp year-to-date decline in egg sets as being the root of the anticipated contraction in production. So far in 2013, egg sets depict a retreat in year on year figures of 7% and poult placements are declining at an even more severe pace due to the numbers of them being destroyed. Whitman said that by projecting placements forward, we can ascertain that slaughter figures should start to show significant reductions in late June into early July."

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 358, and the same are therefore denied.

359. Notes from the Cooper Farms [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 359, and the same are therefore denied.

**5.**



360. On May 30, 2013,

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 360, and the same are therefore denied.

361. In June 2013, Hormel executives confirmed



The notes also stated that

That same month, Cooper Farms executives noted

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 361, and the same are therefore denied.

362. On July 11, 2013, internal Cargill correspondence discussed



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 362, and the same are therefore denied.

363. The Farbest Board of Directors Meeting Minutes from



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 363, and the same are therefore denied.

364. On July 23, 2013, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 364, and the same are therefore denied.

365. In August 2013, Foster Farms was again evaluating whether [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 365, and the same are therefore denied.

366. Perdue prepared a presentation in August 2013 that [redacted] In particular, it specified that [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 366, and the same are therefore denied.

367. Despite rising prices, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 367, and the same are therefore denied.

368. The following month, [redacted]

In September 2013,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 368, and the same are therefore denied.

369. In September 2013, Cargill discussed the



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 369, and the same are therefore denied.

370. Even as they worked to Cargill, the same month as it planned to


[redacted] They ultimately decided [redacted] They emphasized that [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 370, and the same are therefore denied and the Prestage Entities specifically deny [redacted]

371. That same month, [redacted]

[redacted]

In the same document, [redacted]

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 371, and the same are therefore denied.

372. Hormel executives subsequently discussed the need to [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 372, and the same are therefore denied.

373. By October 2013, Defendant Integrators were able to see that In an October 9, 2013 email from

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 373, and the same are therefore denied and the Prestage Entities specifically deny any allegations or implication that they engaged in any conspiracy or collusion.

374. That same month, executives at Hormel made c Another Hormel executive raised



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 374, and the same are therefore denied.

375. Also in October 2013, Cooper Farms executives stated that

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 375, and the same are therefore denied.

376. The following month, Cooper Farms internally discussed that  Cooper Farms executives noted the and estimated that Cooper Farms was responsible for

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 376, and the same are therefore denied.

377. Thus, by the end of 2013, Defendants and their Co-Conspirators had used



**Answer:** The Prestage Entities specifically deny any implication that they participated in any alleged conspiracy because no such conspiracy exists. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 377, and the same are therefore denied.

378. On December 26, 2013,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 378, and the same are therefore denied.

**6.**



379. Defendants' coordinated supply

**Answer:** The Prestage Entities deny the allegations of Paragraph 379.

380. In January 2014, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 380, and the same are therefore denied.

381. In January 2014, Cargill (internally) [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 381, and the same are therefore denied.

382. By March 24, 2014, these benefits were already measurable. In internal [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 382, and the same are therefore denied.

383. Similarly, on April 23, 2014, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 383, and the same are therefore denied.

384. After this, Hormel reported [redacted]

[redacted]



**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 384, and the same are therefore denied.

385. In April 2014,



**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 385, and the same are therefore denied.

386. In that same month, Cargill prepared a





*New market baselines were established:*



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 386, and the same are therefore denied.

387. The following month, an internal presentation by Perdue,





**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 387, and the same are therefore denied.

388. In May 2014, attended the Urner Barry



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 388, and the same are therefore denied.

389. That same month, Foster Farms executives



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 389, and the same are therefore denied.

390. In June 2014, Cargill reported internally that



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 390, and the same are therefore denied.

**7.**



391. Defendants worked closely with



**Answer:** The Prestage Entities deny the allegations of Paragraph 391.

**a.**

392. In 2014, Defendants and their Co-Conspirators were enjoying record high profits, but they weren't satisfied with a one-time bump. So they came up with a longer-term solution in the form of the

**Answer:** The Prestage Entities deny the allegations of Paragraph 392.

393. They called their initiative [redacted]

**Answer:** The Prestage Entities deny the allegations of Paragraph 393.

394. As Gary Cooper explained in an email to an industry contact, the purpose of the program was to [redacted] In a competitive market, commodity producers would respond individually to fluctuations in demand such that the amount of turkey supplied would naturally closely track the amount of turkey demanded. In that world, turkey prices are competitive and fair. Defendants' proposal subverted this by having producers work together to make sure demand always outstrips supply. In this world, turkey prices are pushed artificially high because supply always lags demand.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 394, and the same are therefore denied and they specifically deny any allegations or implication that they engaged in any conspiracy or collusion.

395. As part of this initiative, the 2014 [redacted] Executive Committee formed a [redacted]





[redacted]

**Answer:** The Prestage Entities admit that [redacted] The Prestage Entities deny the allegations of Paragraph 395 except as expressly admitted.

396. The 2014 [redacted] Executive Committee consisted of [redacted]

**Answer:** The Prestage Entities admit [redacted] The Prestage Entities deny the allegations of Paragraph 396 except as expressly admitted.

397. The original members of the



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 397, and the same are therefore denied.

398.



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 398, and the same are therefore denied.

399. In a March 16th e-mail,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 399, and the same are therefore denied.

400.



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 400, and the same are therefore denied.

401. On March 27, 2014, the





[redacted]

**Answer:** The Prestage Entities admit that [redacted] The Prestage Entities deny the allegations of Paragraph 401 except as expressly admitted.

402. Prior to the meeting, [redacted]. To date, Plaintiffs have not located a copy of the underlying [redacted] in Defendants' production. At the subsequent in-person [redacted]



[redacted]

**Answer:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 402, and the same are therefore denied.

403. Subsequent to the meeting, [redacted]



[redacted]

**Answer:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 403, and the same are therefore denied.

404. As the goals of the [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 404, and the same are therefore denied.

405. On May 28, 2014, [redacted]





[redacted]

**Answer:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 405, and the same are therefore denied.

406. On June 24, 2014, [redacted]

**Answer:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 406, and the same are therefore denied.

407. Among those achievements, the [redacted] Team listed the creation of an online [redacted]

[redacted] The report also states that [redacted] In other words, [redacted]

**Answer:** The Prestage Entities respond that [redacted] The Prestage Entities deny the allegations of Paragraph 407 except as expressly admitted.

408. The following slides from an undated [redacted]

[redacted]





[redacted]

**Answer:** The Prestage Entities respond that [redacted] The Prestage Entities deny the allegations of Paragraph 408 except as expressly admitted.

409. On June 25, 2014, [redacted] correspondence confirms that the [redacted] was designed to [redacted] Coopetition indeed.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 409, and the same are therefore denied.

410. On June 25 and June 26, 2014, the



**Answer:** The Prestage Entities admit, upon information and belief, that

The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 410, and the same are therefore denied.

411. On June 27, 2014,





**Answer:** The Prestage Entities respond that The Prestage Entities deny the allegations of Paragraph 411 except as expressly admitted.

412. A July 2014





[redacted]

**Answer:** The Prestage Entities respond that [redacted] The Prestage Entities deny the allegations of Paragraph 412 except as expressly admitted.

413. On or around October 21, 2014, the [redacted] executive committee met [redacted]

**Answer:** The Prestage Entities admit, upon information and belief, that [redacted] The Prestage Entities deny the allegations of Paragraph 413 except as expressly admitted.

414. On October 22, 2014, [redacted]

**Answer:** The Prestage Entities respond that [redacted] The Prestage Entities deny the allegations of Paragraph 414 except as expressly admitted.

415. [redacted]

**Answer:** The Prestage Entities respond that [redacted] The Prestage Entities deny the allegations of Paragraph 415 except as expressly admitted.

416. On March 26, 2015, [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 416, and the same are therefore denied.

417. In February 2015,



**<u>Answer</u>:** The Prestage Entities respond that [redacted] The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 417, and the same are therefore denied.

**b.** [redacted]

418. At the same time that the [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 418, and the same are therefore denied. The Prestage Entities specifically deny [redacted]

419. Defendants had long encouraged [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 419, and the same are therefore denied. The Prestage Entities specifically deny [redacted]

420. Internally, EMI discussed [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 420, and the same are therefore denied.

421. [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 421, and the same are therefore denied.

422. In February 2013, [redacted]

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 422, and the same are therefore denied.

423. Throughout 2013, EMI continued to [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 423, and the same are therefore denied. The Prestage Entities specifically deny [redacted]

424. Contemporaneously, EMI worked specifically to [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 424, and the same are therefore denied.

425. By December 2013, EMI had [redacted]



[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 425, and the same are therefore denied. The Prestage Entities specifically deny [redacted]

426. In January 2014, [redacted]

[redacted]

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 426, and the same are therefore denied. The Prestage Entities specifically deny [redacted]

427. By March 2014, EMI was [redacted]

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 427, and the same are therefore denied.

428. In April 2014, Cooper Farms agreed to [redacted]

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 428, and the same are therefore denied.

429. As of July 2014, [redacted]

[redacted]

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 429, and the same are therefore denied. The Prestage Entities specifically deny [redacted]

430. Throughout its development in 2014, the EMI [redacted]

**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 430, and the same are therefore denied. The Prestage Entities specifically deny [redacted]

431. Following full launch of the program at the end of 2014, Defendants began [redacted]



[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 431, and the same are therefore denied. The Prestage Entities specifically deny [redacted]

**8.** [redacted]

432. In November 2014, Perdue celebrated [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 432, and the same are therefore denied.

433. On December 2, 2014, [redacted]

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 433, and the same are therefore denied.

434. Cuts resulting from the [redacted]. In September 2015, executives at a Hormel [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 434, and the same are therefore denied.

435. In October 2015, documents show Hormel [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 435, and the same are therefore denied.

436. The result of the [redacted] On September 11, 2015, internal Foster Farms correspondence stated that the [redacted]



[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 436, and the same are therefore denied.

437. On November 6, 2015, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 437, and the same are therefore denied.

438. On December 17, 2015, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 438, and the same are therefore denied.

439. On December 31, 2015, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 439, and the same are therefore denied.

440. In the 2016 Cooper Farms' [redacted] stated that [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 440, and the same are therefore denied.

441. EMI reported that



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 441, and the same are therefore denied.

442. There was an avian influenza outbreak in 2015. However, the avian influenza outbreak does not explain the preceding supply reductions in 2013, or the record high price increases in 2014. Moreover, the avian influenza does not fully explain the supply shortages and record prices in the United States for turkey in 2015 because the avian influenza led to turkey exports during this period being heavily restricted, leaving more supply for the domestic market, as shown by evidence indicating that total per capita U.S. consumption of turkey rose in 2015. In short, the 2015 Avian Flu outbreak, at most, simply exacerbated the supply shortages and record prices that were the purpose and effect of Defendants' conspiracy.

**Answer:** The Prestage Entities admit that there was an avian influenza outbreak in 2014–2015. The Prestage Entities deny the allegations of Paragraph 442 except as expressly admitted and specifically deny any implication that they participated in any alleged conspiracy or collusion.

443. Through the end of the Class Period, Defendants continued to

**Answer:** The Prestage Entities deny the allegations set forth in Paragraph 443.

**D.**

**1.**



444. At the start of the conspiracy period, several Defendants and their Co-Conspirators belonged to an informal group of turkey integrators known as the



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 444, and the same are therefore denied.

445. For the purported purpose of





**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 445, and the same are therefore denied.

446. In 2010, members of the worked on updating the



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 446, and the same are therefore denied.

447. Following internal meetings at Farbest,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 447, and the same are therefore denied.

448. In August 2010,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 448, and the same are therefore denied.

449. In April 2014,





**Answer**: The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 449 and the same are therefore denied.

450. At the in-person meeting, the group agreed that



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 450, and the same are therefore denied.

451. The group also made plans to extend invitations to



[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 451, and the same are therefore denied. The Prestage Entities specifically deny [redacted]

452. At the June 2014 meeting, the group agreed that each would [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 452, and the same are therefore denied.

453. Defendants and their Co-Conspirators in the subsequently prepared and circulated amongst themselves





**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 453, and the same are therefore denied.

454. Certain , such as Cooper Farms, included



[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 454, and the same are therefore denied.

455. The [redacted] were subsequently compiled into [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 455, and the same are therefore denied.

456. The information shared through the [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 456, and the same are therefore denied.

457. [redacted] members also attempted to use [redacted] direct communications regarding their business operations. A Norbest executive, over e-mail, asked [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 457, and the same are therefore denied.

458. The In August 2017, the



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 458, and the same are therefore denied.

**2.**

459. Throughout the conspiracy period, Defendants regularly exchanged competitive pricing information with each other. These repeated exchanges of competitive pricing information further support a plausible inference of an agreement among Defendants to restrain supply and stabilize prices.

**Answer:** The Prestage Entities deny the allegations of Paragraph 459.

460. For example, in January 2012, senior Hormel executive , directly instructed



wrote to :

forwards to writing:

[redacted] replies to [redacted]:

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 460, and the same are therefore denied.

461. Hormel continued to [redacted] In December 2013, a Hormel executive reported that [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 461, and the same are therefore denied.

462. Hormel executives specifically discussed [redacted]





**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 462, and the same are therefore denied.

463. In other emails,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 463, and the same are therefore denied.

464. Throughout the conspiracy period, For example, in July 2013,

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 464, and the same are therefore denied.

465. Similarly, Butterball executives [redacted] September 2012 that [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 465, and the same are therefore denied.

466. [redacted], frequently instructed [redacted] For example, in July 2014, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 466, and the same are therefore denied.

467. Phone records produced to date in this litigation also show [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 467, and the same are therefore denied.

468. Cargill also reported on competitive pricing information for [redacted]. For example, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 468, and the same are therefore denied.

469. Apart from Hormel, Cargill, and Butterball (the 3 Defendants who collectively controlled a majority of the market), other Defendants also specifically worked to [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 469, and the same are therefore denied, and the Prestage Entities specifically deny they participated in any alleged conspiracy or collusion.

470. The regular communications between Defendants regarding their pricing continued . In July 2016,

[redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 470, and the same are therefore denied, and they specifically deny the participated in any alleged conspiracy or collusion.

471. The frequent exchange of pricing information between competitors allowed them to coordinate on price increases. For example, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 471, and the same are therefore denied, and the Prestage Entities specifically deny they participated in any alleged conspiracy or collusion.

472. Similarly, in February 2012, Hormel executives appeared to push price increases following a communication with Cargill, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 472, and the same are therefore denied.

473. These types of information exchanges regarding pricing continued throughout the class period. In February 2014, as Hormel [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 473, and the same are therefore denied.

474. Similarly, Cargill prepared [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 474, and the same are therefore denied.

475. These numerous direct communications also provided a



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 475, and the same are therefore denied, and the Prestage Entities specifically deny they participated in any alleged conspiracy or collusion.

**3. Opportunity contacts abounded between Defendants and their Co-Conspirators and allowed them to maintain the conspiracy.**

476. Defendant Integrators are members of several turkey-related trade associations and other forums, which they used to facilitate their conspiratorial conduct. Turkey producers have numerous regular events through which they can communicate in person with one another. Regular and frequent attendance by Defendants' CEOs and top-level executives at trade-association meetings is the norm rather than the exception. Each category of opportunity contact is discussed below.

**Answer:** The Prestage Entities admit that that one or more of them were members of certain turkey-related trade associations during the relevant time period and that their executives at times attended trade association meetings. The Prestage Entities deny the allegations of Paragraph 476 except as expressly admitted.

**a. Numerous Trade Association Events provided ample opportunities to directly meet and collude.**

477. Repeated opportunities for contact at trade association meetings are critical for developing the relationships needed to implement a price-fixing conspiracy. For example, in the recent criminal trial *United States v. Penn*, et al. (the U.S. Department of Justice's ongoing trial against ten individuals for criminal price-fixing and bid-rigging of broiler chickens), one of the trial exhibits shows Defendant Jayson Penn on December 6, 2011 texting his colleague Bill Lovette stating "[t]he relationships I developed through the organization [USAPEEC] allowed me to pick up the phone any time and call multiple friends to flush out current and forward pricing from friendly competitors."[13]

**Answer:** In response to the allegations set forth in paragraph 477, The Prestage Entities state that they are not involved in the broiler-chicken industry, and did not employ any defendants in *United States v. Penn, et al.* The Prestage Entities specifically deny any implication

[13] *United States v. Penn, et al.*, No 20-cr-00152-PAB (D. Colo.), Government Exhibit 1.1 (ECF No. 448-2), filed Sept. 7, 2021, at 1.

that they participated in any alleged conspiracy. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 477, and the same are therefore denied.

478. Defendants are members of many trade associations that have afforded them opportunities to become familiar and comfortable with one another. Defendants plan months in advance to attend these conventions and to have the opportunity to meet privately for dinners and meetings to discuss the turkey industry. Some of the trade association conferences highly and frequently attended by Defendants include the [redacted] (discussed extensively above), USA Poultry & Egg Export Council, the US Poultry & Egg Association, and the North American Meat Institute.

**Answer:** The Prestage Entities admit that (i) one or more of them were members of certain trade associations during the relevant time period, (ii) they had to make plans to attend meetings of trade association meetings in advance of the actual meetings and (iii) they at times had dinner and meetings with other participants in the meetings. The Prestage Entities deny the allegations of Paragraph 478 except as expressly admitted.

479. A group of turkey integrator competitors known as [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 479, and the same are therefore denied.

480. Year after year, [redacted]

**Answer:** The Prestage Entities deny the allegations of Paragraph 480 as they may relate to the Prestage Entities and respond that they lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 480 as they relate to other Defendants, and the same are therefore denied.

### (1) The United States Poultry & Egg Export Council

481. The United States Poultry & Egg Export Council (USAPEEC) has its home office in Stone Mountain, Georgia. Defendants are all members of this council. USAPEEC has a network of international offices and consultants in key export markets. The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world. The council has evolved into an advocate for the industry on trade-policy issues. USAPEEC has about 200 member companies and organizations. The council holds Board of Directors meetings quarterly and includes executives from all or nearly all Defendants.

**Answer:** The Prestage Entities admit that they were, at relevant times, members of USAPEEC. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 481, and the same are therefore denied.

482. In April 2014, Steve Lykken (Hormel) and Joel Coleman (Vice President of USAPEEC), organized the USAPEEC turkey subcommittee. The mission of the subcommittee was to establish a coordinated industry effort to pursue open market access and a unified approach to export issues affecting the turkey membership and create a unified approach to turkey export issues affecting the turkey membership. The group met during all USAPEEC conferences and as otherwise necessary.

**Answer:** The Prestage Entities admit, upon information and belief, that a USAPEEC subcommittee was organized in 2014 and, upon information and belief, its mission statement is in writing and is the best evidence of its contents. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 482, and the same are therefore denied.

483. Members, otherwise known as stakeholders, that supported the subcommittee included [redacted]

**Answer:** The Prestage Entities admit that [redacted] The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 483, and the same are therefore denied.

484. The subcommittee that was initially organized to establish a coordinated industry effort soon became hesitant to allow other industry members to join as some members wanted to keep the group small and inaccessible to others.

**Answer:** The Prestage Entities deny the allegations of Paragraph 484, upon information and belief.

(2) **U.S. Poultry & Egg Association**

485. The U.S. Poultry & Egg Association (U.S. Poultry) describes itself as the world's largest and most active poultry organization. U.S. Poultry's members include producers and processors of broilers, turkeys, ducks, eggs, and breeding stock, as well as allied companies. Many of the Defendants are members of U.S. Poultry. U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall. Butterball, Cargill, Foster, Tyson, and Perdue have representation on the Board of Directors.

**Answer:** The Prestage Entities admit that one or more of them were, at relevant times, members of the U.S. Poultry & Egg Association. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 485, and the same are therefore denied.

(3) **North American Meat Institute**

486. The North American Meat Institute (NAMI) represents companies that process 95% of red meat and 70% of turkey products in the United States and their suppliers throughout the country. NAMI hosts the Meat Industry Summit in April each year. Additionally, it holds regular Board of Director meetings. Butterball, Cargill, Hormel, and Tyson have representation on the NAMI Board.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 486, and the same are therefore denied.

**b. A high degree of movement of employees permitted trusted former colleagues to have confidence exchanging pricing and supply information directly with one another.**

487. On top of attending numerous conferences and meetings together, Defendants have permitted employees to regularly move between companies. Despite changing companies, Defendants have managed to keep their pre-existing ties with former colleagues. Some of these

relationships have provided CEOs and other top-level executives with comfort and trust to discuss their specific marketing and sales plans. For example,



is just an example of the type of relationships that have afforded CEOs and executives with the opportunity and comfort to share competitively sensitive information about their company's turkey business.

**Answer:** The Prestage Entities admit, upon information and belief, that some Defendants have employed persons in their companies who have worked at previous times for other Defendants. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 487, and the same are therefore denied, and they specifically deny that they engaged in any alleged conspiracy or collusion.

488. Similarly, Neal Walsh, Perdue's former executive left the company to join Butterball in 2007 as the Director of Purchasing and became the Chief Operating Officer in 2020. Since ending his employment with Perdue, Walsh has managed to

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 488, and the same are therefore denied.

489. Dean Lisenby served as Director of Supply Planning for Perdue, before moving to Butterball in 2008 to serve as Senior Director Supply Chain Planning. Similarly, Butterball's current Senior Vice President of Retail Sales, Chris Peach came from Perdue to Butterball in 2007. While at Perdue, Peach was the Director of Sales for 19 years before joining Butterball as their Vice President of Retail Sales.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 489, and the same are therefore denied.

490. Lastly,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 490, and the same are therefore denied.

491. Although the above-mentioned executives no longer work for the same employer, their relationships with former colleagues did not end. The connections shared ensured they remained in touch and allowed for opportunity, time and trust to have conversations where they could share confidentially sensitive information.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 491, and the same are therefore denied.

**c. Defendants' frequent and unfettered opening up of their facilities to one another for plant tours and visits permitted extensive opportunities to share information with one another.**

492. Defendants have found themselves on numerous occasions requesting and permitting visits and tours of their facilities to competitors. Plant tours and visits like many other private interactions have given Defendants the opportunities to gather, discuss and share competitively sensitive information.

**Answer:** The Prestage Entities admit that their employees have at times visited the plants of other turkey processors. The allegations of Paragraph 492 are denied except as expressly admitted.

493. Throughout the relevant time period, several [redacted]. The relationship between the Defendant competitors has been strengthened throughout the years making it possible for personal conversations to take place.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 493, and the same are therefore denied.

494. In October 2008, [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 494, and the same are therefore denied.

495. During a 2015 visit to Cargill's facility [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 495, and the same are therefore denied.

496. [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 496, and the same are therefore denied.

497. These visits and many others have played a pivotal role in helping develop relationships between Defendant competitors.

**Answer:** The Prestage Entities deny the allegations of Paragraph 497 as they may be deemed to relate to the Prestage Entities. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 497, and the same are therefore denied.

**d. Other informal events, such as sporting events and private dinners, permitted private and confidential opportunities for Defendants' employees to directly exchange pricing and supply information.**

498. Defendants have organized and attended numerous sporting events together. Many have even organized basketball games, golf outings, and private dinners. These events took place both during formal conferences and some occurred outside that context.

**Answer:** The Prestage Entities admit that their employees have played golf and attended dinners with employees of other turkey producers. The Prestage Entities deny the allegations of Paragraph 498 except as expressly admitted.

499. For example,



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 499, and the same are therefore denied.

500. Golf tournaments were used extensively for opportunities for senior executives to meet with one another. Examples of annual tournaments where executives met with one another include the

**Answer:** The Prestage Entities deny the allegations of Paragraph 500 as they may be deemed to relate to the Prestage Entities. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 500, and the same are therefore denied.

501. Attendees to one or more of the



**Answer:** The Prestage Entities admit that

Except as expressly admitted, the Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 501, and the same are therefore denied.

502. Attendees to one or more of





**Answer:** The Prestage Entities admit that [redacted] Except as expressly admitted, the Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 502, and the same are therefore denied.

503. Attendees to the [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 503, and the same are therefore denied.

504. Attendees to the [redacted]

**Answer:** The Prestage Entities admit that [redacted] Except as expressly admitted, the Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 504, and the same are therefore denied.

505. Many of the high-ranking executives at Defendants' and their Co-Conspirators' organizations appeared to be close personal friends and would communicate frequently. On April 12, 2017, [redacted]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 505, and the same are therefore denied.

**e. Collusion Between Defendants in Other, Related Industries Supports an Inference of Collusion.**

506. Defendant Agri Stats has played a central role in other protein industries. As alleged in the *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill.) litigation and the *In re Pork Antitrust Litigation*, No. 18-cv-1776 (D. Minn.), Agri Stats colluded with boiler and pork producers respectively to collect and disseminate competitively sensitive information such as financial information (monthly operating profits, sales, and cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type.

**Answer:** In response to the allegations set forth in Paragraph 506, the Prestage Entities state that they are not involved in the broiler-chicken industry, nor are they a defendant in the *In re Broiler Chicken Antitrust Litigation*. The Prestage Entities specifically deny that they participated in any conspiracy or any conduct that was unlawful or had an anticompetitive effect. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 506, and the same are therefore denied.

507. In the broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and Defendants and their Co-Conspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, EMI. Agri Stats collected data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.

**Answer:** In response to the allegations set forth in Paragraph 507, the Prestage Entities state that they are not involved in the broiler-chicken industry, nor are they a defendant in the *In re Broiler Chicken Antitrust Litigation*. The Prestage Entities specifically deny that they participated in any conspiracy or any conduct that was unlawful or had an anticompetitive effect. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 507, and the same are therefore denied.

508. The detail of these reports ensured that competitors could quickly decode the information of their purported competitors. The *Broiler* complaints allege it was common knowledge among producers that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes. The broiler reports, in part, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

**Answer:** In response to the allegations set forth in Paragraph 508, the Prestage Entities state that they are not involved in the broiler-chicken industry, nor are they a defendant in the *In re Broiler Chicken Antitrust Litigation*. The Prestage Entities specifically deny that they participated in any conspiracy or any conduct that was unlawful or had an anticompetitive effect. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 508, and the same are therefore denied.

509. In the broiler industry, it is also alleged that Agri Stats – known to its Co-Conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the broiler industry facilitated the implementation of the agreement to restrict supply – where Agri Stats would transmit the intentions of the broiler producers to restrict supply.

**Answer:** In response to the allegations set forth in Paragraph 509, the Prestage Entities state that they are not involved in the broiler-chicken industry, nor are they a defendant in the *In re Broiler Chicken Antitrust Litigation*. The Prestage Entities specifically deny that they participated in any conspiracy or any conduct that was unlawful or had an anticompetitive effect. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 509, and the same are therefore denied.

510. In a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the broiler industry, it was reported:

> "Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows Co-Conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your Co-Conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "***That is what creates stability for a cartel***."

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 510, and the same are therefore denied.

511. The district court noted, in denying the motions to dismiss in the *In re Broiler Chicken Antitrust Litigation* that given the nature of the Agri Stats reports, the Defendants are in fact sharing future anticipated production information with one another, which suggests high antitrust concerns.

**Answer:** In response to the allegations set forth in Paragraph 511, the Prestage Entities state that they are not involved in the broiler-chicken industry, nor are they a defendant in the *In re Broiler Chicken Antitrust Litigation*. The Prestage Entities specifically deny that they participated in any conspiracy or any conduct that was unlawful or had an anticompetitive effect. The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 511, and the same are therefore denied.

512. The DOJ has investigated the broiler chicken industry and announced a grand jury investigation in 2019. Tyson subsequently publicly announced that it was cooperating with the DOJ Investigation. The DOJ subsequently brought criminal charges against employees at certain broiler chicken companies for collusive activities.

**Answer:** In response to the allegations set forth in paragraph 512, the Prestage Entities state that they are not involved in the broiler-chicken industry, nor are they a defendant in the *In re Broiler Chicken Antitrust Litigation*. The Prestage Entities specifically deny that they participated in any conspiracy or any conduct that was unlawful or had an anticompetitive effect.

The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 512, and the same are therefore denied.

**E. The structure of the turkey industry is conducive to conspiracy.**

**1. Defendants possess market power in the market for turkey.**

513. One tool that courts use to assess the competitive effects of concerted action is defining a relevant market—the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). This case concerns the sale of turkey for meat consumption in the United States.

**Answer:** The allegations of Paragraph 513 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

514. Turkey is the relevant product market and the geographic market is the United States. Defendants collectively possess market power in the market for turkey. Defendants and their Co-Conspirators collectively possessed approximately 80 percent of the overall market share for turkeys during the Class Period. There is a single market for turkey for meat consumption. Prices for turkey sold in the United States are quoted generally in disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

**Answer:** The allegations of Paragraph 514 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

**a. There are high barriers to entry in the market for turkey for meat consumption.**

515. The existence of high barriers to entry is one factor which makes markets susceptible to collusion. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

High barriers to entry in the turkey processing market exist, precluding other entrants or would-be competitors from entering the market for turkeys raised for consumption.

**Answer:** The allegations of Paragraph 515 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

516. During the Class Period and continuing today, substantial barriers impede entry into the turkey market. A new entrant into the market would face costly and lengthy start-up costs, including multimillion-dollar costs associated with research and development, equipment, energy, transportation. Distribution, infrastructure (aka "rolling stock"), skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, longstanding customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.

**Answer:** The allegations of Paragraph 516 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

517. The price of construction of a new integrated turkey processing complex is relatively high. For example, the cost for a current market participant, Virginia Poultry Growers Cooperative, to construct a new turkey processing in 2015 was $62 million.

**Answer:** The allegations of Paragraph 517 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations. The Prestage Entities further respond that they lack knowledge or information sufficient to form a belief as to the cost to Virginia Poultry Growers to construct a turkey processing plant, and allegations relating to the same are therefore denied.

518. The turkey market has been subject to steadily increasing consolidation over the last several decades. In the 1970s, the turkey market was defined by competition among dozens of

companies that worked with independent farmers.[14] But now, just four corporations—Cargill, Hormel, Butterball, and Farbest—produce more than half of the turkey in the United States.

**Answer:** The allegations of Paragraph 518 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

519. The turkey market also has high levels of vertical integration that constitute a barrier to entry. The [REDACTED] states that "turkey companies are vertically integrated, meaning they control or contract for all phases of production."[15]

**Answer:** The allegations of Paragraph 519 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

520. For example, Butterball has over 175 farms that they own, as well as contracts with numerous independent farmers. Hormel owns over 100 commercial growing farms. Cargill owns around 700 farms. Farbest has more than 200 contract growers.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 520, and the same are therefore denied.

**b. The Defendants have market power in the market for turkey for meat consumption.**

521. The Defendant Integrators possess market power in the market for turkey for consumption. Defendants and their Co-Conspirators controlled at least an average of 77% of the market from 2010–2018.

[14] Christopher Leonard, *That Turkey on Your Plate Could Use Some More Industry Competition*, The Washington Post (Nov. 22, 2013), https://www.washingtonpost.com/opinions/ that-turkey-on-your-plate-could-use-some-more-industry-competition/2013/11/22/045fc470-5177-11e3-a7f0-b790929232e1_story.html.

[15] *Industry Structure*, [REDACTED] [REDACTED] [REDACTED], https://web.archive.org/web/20190617083253/https://www.eatturkey.org/industry-structure/ (last visited Jan. 7. 2022).

**Figure 6: Average Market Share of Defendants and Their Co-Conspirators (2010–2018)**




**Answer:** The Prestage Entities deny the allegations of Paragraph 521 as they may be deemed to relate to the Prestage Entities. The Prestage Entities are not even included on the graph above because, upon information and belief, the Prestage Entities have a lower (and in some cases substantially lower) market share of the turkey processing industry than all, or nearly all, of the listed companies.

**c. The market for turkey is the type of market conducive to collusion.**

522. Competition is likely to be harmed when competitors with market power in concentrated markets, such as the market at issue, directly exchange strategic information about current and forward-looking plans for prices and supply. The strategic information exchanged between the Defendants was a competitively sensitive and a material factor in negotiations. Price, capacity, supply and costs are crucial aspects of competition. When Defendants that are competing

for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects of sales of turkey.

**Answer:** The allegations of Paragraph 522 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

523. The information exchange took place in private settings and involved the exchange of confidential, non-public information.

**Answer:** The Prestage Entities deny the allegations of Paragraph 523.

524. The market for turkey is characterized by numerous attributes that mean the type of information exchange facilitated by Agri Stats are particularly likely to have anticompetitive effects. In particular, the market for turkey features relatively few sellers, a fungible product, price-based competition, inelastic demand, and a trend toward price uniformity.

**Answer:** The allegations of Paragraph 524 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

**2. The market for turkey is the type of market where information exchanges and *per se* price-fixing behaviors are likely to harm competition.**

**a. The turkey market features few sellers.**

525. The turkey market is concentrated, with relatively few sellers. The Defendants and their Co-Conspirators control approximately 80 percent of turkey production and processing. The presence of few companies supports the inference that a conspiracy to exchange information had the intended effect of restraining competition.

**Answer:** The allegations of Paragraph 525 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

**b. Turkey is a fungible product.**

526. One of the distinct characteristics of the turkey industry is the fungibility of turkey products. Fungibility is also known as the ability to be freely exchangeable or replaceable in whole or in part. Common sense indicates that at Thanksgiving a consumer can substitute a whole turkey produced by Butterball with a whole turkey produced by Cargill.

**Answer:** The Prestage Entities deny the allegations of Paragraph 526.

527. Indeed, the Agri Stats reports themselves show that turkey is fungible because they aggregate data across Defendants for particular types of turkey products and allow Defendants to compare detailed information on prices for the same fungible product. CW1 (Butterball) confirmed that the Agri Stats reports were organized by specific item of turkey product. And, as shown above, the Agri Stats reports are broken out by specific types of turkey product.

**Answer:** The Prestage Entities deny the allegations of Paragraph 527.

**c. The turkey market features price-based competition.**

528. Turkey is a commodity market that faces price-based competition. Turkey is a tangible, commodity product with little or no product differentiation based on the processors. Turkey produced by one Defendant is reasonably interchangeable with that from another Defendant. Defendants [redacted] Production cuts—no matter where they originate—will affect the prices (and consequently profitability) of the entire turkey industry. No matter where the cuts originate, all turkey processing firms can expect to benefit.

**Answer:** The Prestage Entities deny the allegations of Paragraph 528.

**d. Demand for turkey is relatively inelastic.**

529. Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[16] A PED value between 0 and -1 indicates there is inelastic demand for the good or service – i.e., a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. The USDA has estimated that the average PED estimate for the turkey market is -0.58 – meaning the demand for turkey is inelastic.

[16] *See, e.g.*, Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson, et al., *Price Elasticity of Demand* (Nov. 13, 1997), https://scholar.harvard.edu/files/alada/files/price_elasticity_of_demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, *The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects*, 33 J. Academy Mktg. Science 66-78 (2005), *available at* http://www.math.tau.ac.il/~fibich/Manuscripts/elasticity_JAMS.pdf.

Indeed, most American consumers eat turkey at Thanksgiving, not pork or chicken, illustrating that there is no substitute for one of the key demand drivers of turkey.

**Answer:** The allegations of Paragraph 529 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

**e. The turkey market features a trend towards price uniformity.**

530. Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. For example, whole turkey products are produced on a commercial scale and sold in supermarkets. Whole turkeys are virtually indistinguishable, with similar nutritional values, branding and packaging.

**Answer:** The allegations of Paragraph 530 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

**f. The turkey industry is highly vertically integrated.**

531. In the turkey industry, the phrase "vertically integrated" means that the turkey producing company owns or controls each aspect of breeding, hatching, rearing, feeding, basic processing, and selling of turkey. Many vertically integrated turkey producing companies also own further processing plants. The turkey industry is highly vertically integrated, with turkey- producing companies owning or tightly controlling almost all aspects of production, processing, and marketing turkey.

**Answer:** The allegations of Paragraph 531 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

532. The graphic below, taken from a Butterball PowerPoint presentation, [redacted]



**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 532, and the same are therefore denied.

**F. Abnormal pricing during the Class Period demonstrates the anticompetitive effects of the alleged conduct by Defendants and their Co-Conspirators.**

533. Beginning in 2010, following the coordinated cutbacks described above, the turkey industry showed abnormal price movements, *i.e.*, price increases for whole turkeys that was unexplained by increases in costs. All of these pricing measurements show a significant break between pricing prior to 2010 and pricing after 2010, supporting the plausibility of anticompetitive effects on the turkey market from the alleged anticompetitive conduct. Plaintiffs have measured the various abnormal pricing movements in a number of ways, including: (i) the average turkey price, (ii) the Defendant Integrators' margin during the Class Period;(iii) the variation between feed and turkey prices before and during the Class Period; and (iv) a regression analysis that models the relationship between turkey prices and feed prices.

**Answer:** The allegations of Paragraph 533 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations. The Prestage Entities specifically deny they engaged in any "coordinated cutbacks."

**1. The average turkey wholesale price experienced an unprecedented increase beginning in 2009.**

534. According to aggregate prices published by the USDA, the average wholesale price per pound for turkey hens was between \$0.55 and \$0.85 every year from 2000 to 2009, before steadily increasing to \$1.15 by 2016. Following initiation of the *Broilers* litigation, the price of turkey then quickly returned to the price at which it was prior to the conspiracy. The following graph shows the unprecedented increase in turkey prices beginning in 2009, and staying elevated through the end of 2016.

**Figure 7: Average Turkey Wholesale Prices in Cents per lbs., 2000-2018**




**Answer:** The allegations of Paragraph 534 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To

the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

**2. Beginning in 2009, Defendants' revenues diverged from their costs.**

535. Plaintiffs' experts examined the spread between turkey revenue and turkey-related costs (costs of goods sold + operating costs) for Hormel, the only one of the three largest turkey Defendant Integrators with public earnings, as a proxy for measuring the spread between a Defendant's price of wholesale turkey and their turkey costs. This measurement accounts for Defendant-specific operating costs.[17] This analysis confirms the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the Class Period in 2009.

**Answer:** The allegations of Paragraph 535 appear to relate only to Hormel and contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

536. The following chart shows a break in revenues and costs around the start of the Class Period in 2010 for Hormel's Jennie-O Turkey brand:

**Figure 8: Jennie-O's Revenues vs Costs (March 2001 to March 2018)**

[17] Hormel does not make any data publicly available on Jennie-O's costs. Therefore, Plaintiffs have assumed for the purposes of this analysis that Jennie-O's costs are the same proportion to Hormel's overall costs as Jennie-O's revenues are to Hormel's overall revenues.




**Answer:** The allegations of Paragraph 536 appear to relate only to Hormel and contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

537. The anticompetitive effect of Defendants' information exchange is seen in the dramatic increase in Jennie-O's spread between revenue and costs after the start of the conspiracy period.

**Figure 9: Jennie-O Turkey's spread: Revenue minus Cost 2001-2018**




**Answer:** The allegations of Paragraph 537 appear to relate only to Hormel and contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

538. These analyses of the spread between costs and prices confirm one essential fact – that rising costs do not explain the increases in price seen during the Class Period.

**Answer:** The allegations of Paragraph 538 appear to relate only to Hormel and contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

**3. During the conspiracy period, prices rose but production failed to rise to match demand, indicating an anticompetitive restraint on supply in the market for turkey facilitated by the information exchange through Agri Stats and the *per se* exchange of pricing and supply information between Defendants.**

539. In a competitive market, production generally matches demand. More demand will lead to more supply. Conversely, a drop in production caused by falling demand should correspond to falling prices. However, in the turkey market during the conspiracy period, production, measured through USDA data, remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose significantly. These observed price and output dynamics, shown in the below chart, are consistent with an anticompetitive effect on turkey output facilitated by the information exchange through Agri Stats.

**Figure 10: Indexed Per Capita Expenditure v. Production**




**Answer**: The allegations of Paragraph 539 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

**4. During the conspiracy period, prices of turkey radically diverged from the costs of underlying feed.**

540. Feed is the primary driver of turkey costs, accounting for approximately 60-70% of the overall cost of raising turkeys for sale according to the New York Times.[18] Prior to the

[18] Paul Sullivan, *In the Labyrinth of Turkey Pricing, a Reason Under Every Giblet*. The New York Times (Nov. 18, 2011), https://www.nytimes.com/2011/11/19/your-money/a-primer-to-calculate-turkey-prices.html.

conspiracy period, there was a tight relationship between the price of feed and the price of turkey, as would be expected in a competitive commodity market that was pricing its product based on its primary input cost. However, during the conspiracy period, the relationship between the price of feed and the price of turkey diverged dramatically, as would be expected as an anticompetitive effect of the information exchange that allowed the Defendant Integrators to charge more than was justified by their input costs. The divergence is illustrated in the below chart:

**Figure 11: Relationship Between Feed and Hen Prices**




**<u>Answer</u>:** The allegations of Paragraph 540 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

**5. A regression model demonstrates the anticompetitive effects on the price of turkey caused by the information exchange conducted through Agri Stats as well as the direct exchange of pricing and supply information.**

541. To demonstrate the anticompetitive effects of Defendants' information exchange on the market for turkey, Plaintiffs' experts have done a regression model based on the relationship between the price of turkey hens and the price of turkey feed, which is the primary input cost for turkeys. The formula of the regression is the following: (*HenPrice*)=*a*+*f3*(*FeedPrice*)*t*+*et*. As shown below, the regression shows a significant elevation in the prices of turkey during the conspiracy period, showing the effects of the information exchange through Agri Stats:

**Figure 12: Regression Model Showing Price of Hens and Feed (2000–2019)**




**<u>Answer</u>:** The allegations of Paragraph 541 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

542. Defendants actively concealed the extent of their information exchange and Plaintiffs did not and could not have discovered defendants' anticompetitive conduct.

**<u>Answer</u>:** The Prestage Entities deny the allegations set forth in Paragraph 542.

543. Plaintiffs and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this complaint. Defendants engaged in a secret information exchange that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was an anticompetitive agreement to exchange information regarding the market for turkey. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiffs and class members.

**Answer:** The Prestage Entities deny the allegations set forth in Paragraph 543, upon information and belief.

544. In 2009, the President of Agri Stats, Blair Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company. There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background, and really our specialty is working directly with companies about their opportunities and so forth.

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 544, and the same are therefore denied.

545. At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidential[] nature of the information." Further, in response to a request [REDACTED], Agri Stats' Stacey Edwards declined, stating [REDACTED]

**Answer:** The Prestage Entities lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 545, and the same are therefore denied.

546. Not until recently was the extent of the information exchange conducted through Agri Stats widely known or reported. Only after the filing of a February 7, 2018 Second Consolidated and Amended Complaint by the End User Plaintiff Class in the *In re* Broiler *Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the confidential services that Agri Stats provides to its clients in the broiler industry.

**Answer:** The Prestage Entities deny the allegations of Paragraph 546.

547. The filing of that amended complaint collectively disclosed the likelihood that the turkey industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

**Answer:** The Prestage Entities deny the allegations of Paragraph 547.

548. Defendants concealed the extent of their information exchange through Agri Stats. Indeed, to this day, it is not publicly known the number of companies that receive Agri Stats reports regarding turkey. Accordingly, a reasonable person under the circumstances would not have been

alerted to begin to investigate the legitimacy of Defendants' turkey prices before these recent events.

**Answer:** The Prestage Entities deny the allegations of Paragraph 548.

## VI. CLASS ACTION ALLEGATIONS

549. Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking compensatory damages and injunctive relief pursuant to federal law on behalf of the members of the following class:

> All persons and entities who directly purchased fresh or frozen, uncooked turkey breast, ground turkey, or whole bird turkey products[19] from Defendants in the United States during the Class Period. Specifically excluded from this Class are the Defendants and their Co-Conspirators; the officers, directors or employees of any Defendant or Co-Conspirator; any entity in which any Defendant or their Co-Conspirator has a controlling interest; any entity with an interest, controlling or non-controlling, in a Defendant or their Co-Conspirator; any (in whole or in part), affiliate, legal representative, heir or assign of any Defendant or their Co-Conspirator. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any Co-Conspirator identified in this action.

**Answer:** The allegations of Paragraph 549 contain legal conclusions or Plaintiffs' own description of their claims to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions, descriptions and/or allegations.

550. Class Identity: The above-defined class is readily identifiable and is one for which records should exist.

**Answer:** The allegations of Paragraph 550 contain legal conclusions or Plaintiffs'

[19] Turkey breast products excludes: (1) turkey breasts used to make ground turkey, (2) turkey breast tenderloins, (3) organic turkey breast products, (4) NAE turkey breast products, and (5) cooked or RTE turkey breast products. Ground turkey products excludes: (1) ground turkey products made from turkey breasts, (2) ground turkey products made from turkey wings, (3) burgers, sausages, and patties, (4) organic ground turkey products, (5) NAE ground turkey products, and (6) cooked or RTE ground turkey products. Whole bird turkey products excludes: (1) organic turkey whole bird products, (2) NAE turkey whole bird products, and (3) cooked or RTE turkey whole bird products.

own description of their claims to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions, descriptions and/or allegations.

551. Numerosity: Based on records produced to date, Plaintiffs have identified approximately 2,776 potential unique class members that are geographically dispersed throughout the United States. Due to the nature of the trade and commerce involved, joinder of all class members is impracticable.

**Answer:** The allegations of Paragraph 551 contain legal conclusions or Plaintiffs' own description of their claims to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions, descriptions and/or allegations.

552. Typicality: Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs purchased turkey directly from one or more of the Defendants for personal use, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

**Answer**: The allegations of Paragraph 552 contain legal conclusions or Plaintiffs' own description of their claims to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions, descriptions and/or allegations.

553. Common Questions Predominate: There are questions of law and fact common to the Class, including, but not limited to:

A. Whether Defendants and their Co-Conspirators engaged in an information exchange agreement that reduced or suppressed competition in the market for turkey;

B. Whether Defendants and their Co-Conspirators engaged in a *per se* violation of the Sherman Act that resulted in higher prices in the market for turkey;

C. The identity of the participants of the alleged agreement;

D. The duration of the agreement alleged herein and the acts performed by Defendants and their Co-Conspirators in furtherance of the agreement;

E. Whether the conduct of Defendants and their Co-Conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and the other members of the Class;

F. The effect of Defendants' alleged conspiracy on the prices of turkey sold in the United States during the Class Period; and

G. The appropriate class-wide measure of damages.

H. These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

**Answer:** The allegations of Paragraph 553 contain legal conclusions or Plaintiffs' own description of their claims to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions, descriptions and/or allegations.

554. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class who directly purchased turkey from Defendants and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

**Answer:** The allegations of Paragraph 554 contain legal conclusions or Plaintiffs' own description of their claims to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions, descriptions and/or allegations.

555. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

**Answer:** The allegations of Paragraph 555 contain legal conclusions or Plaintiffs' own description of their claims to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions, descriptions and/or allegations.

556. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**Answer:** Paragraph 556 contains conclusions of law to which no response is required. To the extent a response is required, the Prestage Entities deny the allegations of Paragraph 556.

557. Plaintiffs bring the action on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that directly purchased one or more turkey products that a Defendant or Co-Conspirator produced during the respective class periods.

**Answer:** The allegations of Paragraph 557 contain legal conclusions or Plaintiffs' own description of their claims to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions, descriptions and/or allegations.

558. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**Answer:** The allegations of Paragraph 558 contain legal conclusions or Plaintiffs' own description of their claims to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions, descriptions and/or allegations.

## VII. ANTITRUST INJURY

559. Defendants' anticompetitive conduct had the following effects, among others:

A. Price competition has been restrained or eliminated with respect to turkey;

B. The prices of turkey have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C. Direct purchasers of turkey have been deprived of free and open competition; and

D. Direct purchasers of turkey, including Plaintiffs, paid artificially inflated prices.

**Answer:** The Prestage Entities deny the allegations of Paragraph 559.

560. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge paid by the direct purchasers. Thus, the economic harm to Plaintiffs and the class members can be quantified.

**Answer:** The Prestage Entities deny the allegations of Paragraph 560.

561. The purpose of the conspiratorial conduct of Defendants and their Co-Conspirators was to raise, fix, or maintain the price of turkey and, as a direct and foreseeable result, Plaintiffs and the Class paid supra-competitive prices for turkey during the Class Period.

**Answer:** The Prestage Entities deny the allegations of Paragraph 561.

562. By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for turkey than they

would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

**Answer:** The Prestage Entities deny the allegations of Paragraph 562.

563. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**Answer:** The Prestage Entities deny the allegations set forth in paragraph 563.

## VIII. CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

## VIOLATION OF THE SHERMAN ACT RULE OF REASON VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION 15 U.S.C. § 1 (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF AND DAMAGES)

564. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer:** The Prestage Entities incorporate and reassert, as though fully set forth herein, each and every response and answer set forth in the preceding paragraphs of this Answer.

565. Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2010, and continuing at least until December 31, 2016, the exact dates being unknown to Plaintiffs, Defendants and their Co-Conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer:** The Prestage Entities deny the allegations of Paragraph 565.

566. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

**Answer:** The Prestage Entities deny the allegations of Paragraph 566.

567. Defendants' anticompetitive acts involved United States domestic commerce and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for turkey throughout the United States.

**Answer:** The Prestage Entities deny the allegations of paragraph 567.

568. The relevant product market is turkey and the relevant geographic market is the United States.

**Answer:** The allegations of Paragraph 568 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

569. Defendant Integrators possess market power in the Relevant Market. Defendant Integrators and their Co-Conspirators controlled approximately 80 percent of the Relevant Market. Defendant Integrators' collective market power includes the power to artificially deflate the amount of turkey produced in the United States below competitive levels and to artificially inflate the price Plaintiffs pay for turkey above competitive levels.

**Answer:** The allegations of Paragraph 569 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

570. Defendants could impose an increase in the price of turkey collectively without causing many consumers to switch their purchases to another product. Turkey constitutes a unique product market.

**Answer:** The allegations of Paragraph 570 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

571. Defendants view the turkey products as fungible. Turkey products are generally interchangeable, permitting Defendant Integrators to readily to compare and match each other's pricing.

**Answer:** The allegations of Paragraph 571 contain legal conclusions and/or allegations subject to proof, including by expert testimony, to which no response is required. To

the extent a response is deemed required, the Prestage Entities deny such conclusions and/or allegations.

572. The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public information about current supply, production and pricing plans regarding turkey. The information exchanges specifically included the exchange through Agri Stats of weekly and monthly reports regarding Defendants' turkey operations, including weekly sales data that allowed Defendants to compare their prices with their competitors and raise prices that were lower.

**Answer:** The Prestage Entities deny the allegations of Paragraph 572.

573. Defendants' regular information exchanges through Agri Stats reflected concerted action between horizontal competitors in the market for turkey.

**Answer:** The Prestage Entities deny the allegations of Paragraph 573.

574. Each Defendant Integrator furnished competitively sensitive information to other Defendant Integrators with the understanding that it would be reciprocated. Agri Stats enforced this understanding by requiring Defendants to share data in order to receive comparable data.

**Answer:** The Prestage Entities deny the allegations of Paragraph 574.

575. The agreement to regularly exchange detailed and non-public information about current production, supply, and pricing suppressed competition between the Defendants. Agri Stats specifically identified for Defendants the instances where their pricing was lower than other Defendants and where they could raise their prices to match.

**Answer:** The Prestage Entities deny the allegations of Paragraph 575.

576. When Defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly, Defendants used the data obtained through Agri Stats to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the turkey market. This strategic information was a material factor in Defendant Integrators' decisions to inflate the prices that Plaintiffs paid for turkey during the Class Period.

**Answer:** The Prestage Entities deny the allegations of Paragraph 576.

577. Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

**Answer:** The Prestage Entities deny the allegations of Paragraph 577.

578. The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Defendants in the market for turkey in the United States and (2) inflating the prices of turkey during the Class Period.

**Answer:** The Prestage Entities deny the allegations of Paragraph 578.

579. As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supra-competitive prices for turkey.

**Answer:** The Prestage Entities deny the allegations of Paragraph 579.

580. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for turkey than they would have paid and will pay in the absence of the conspiracy.

**Answer:** The Prestage Entities deny the allegations of Paragraph 580.

**SECOND CLAIM FOR RELIEF**

***PER SE* VIOLATION OF SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1 (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF AND DAMAGES)**

581. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

**Answer:** The Prestage Entities incorporate and reassert, as though fully set forth herein, each and every response and answer set forth in the preceding paragraphs of this Answer.

582. Defendants and all of their Co-Conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer:** The Prestage Entities deny the allegations of Paragraph 582.

583. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

**Answer:** The Prestage Entities deny the allegations of Paragraph 583.

584. At least as early as January 1, 2010, and at least until December 31, 2016, the exact dates being unknown to Plaintiffs, Defendants and all of their Co-Conspirators entered into a

continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for turkey, thereby creating anticompetitive effects.

**Answer:** The Prestage Entities deny the allegations of Paragraph 584.

585. Defendants engaged in coordinated production cutbacks in 2008 and 2009, raised prices in 2010-2011, engaged in another round of coordinated production cutbacks in 2012 and 2013, and reaped record profits following their second round of cutbacks. Defendants coordinated through repeated direct communications regarding their production cutbacks and he retention of Agri Stats to provide current and forward forecasting, including the [REDACTED]

Numerous plus factors further support the inference of a *per se* agreement, including 1) direct information exchanges between Defendants regarding current production levels through their participation in the [REDACTED]; 2) frequent exchanges between Defendants of competitive pricing information; 3) numerous opportunity contacts through participation in trade associations and other social interactions; 4) a market structure conducive to collusion.

**Answer:** The Prestage Entities deny the allegations of Paragraph 585.

586. Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for turkey throughout the United States.

**Answer:** The Prestage Entities deny the allegations of Paragraph 586.

587. The conspiratorial acts and combinations have caused unreasonable restraints in the market for turkey.

**Answer:** The Prestage Entities deny the allegations of Paragraph 587.

588. As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supra-competitive prices for turkey.

**Answer:** The Prestage Entities deny the allegations of Paragraph 588.

589. In formulating and carrying out their alleged agreement, understanding and conspiracy, Defendants and all of their Co-Conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

A. Price competition in the market for turkey has been restrained, suppressed, and/or eliminated in the United States;

B. Prices for turkey sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their Producer Co-Conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

C. Plaintiffs and members of the Class who directly purchased turkey from Defendants, their divisions, subsidiaries, and affiliates, and all of their Co-Conspirators have been deprived of the benefits of free and open competition in the purchase of turkey.

**Answer:** The Prestage Entities deny the allegations of Paragraph 589.

590. Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of turkey on the spot market to be higher than it would be but for Defendants' conduct. Defendants also knew and intended that such an artificial inflation of spot market prices would increase other turkey market prices, including those paid by Plaintiffs and members of the Class.

**Answer:** The Prestage Entities deny the allegations of Paragraph 590.

591. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for turkey than they would have paid and will pay in the absence of the conspiracy.

**Answer:** The Prestage Entities deny the allegations of Paragraph 591.

592. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

**Answer:** The Prestage Entities deny the allegations of Paragraph 592.

**RESPONSE TO PLAINTIFFS' REQUEST FOR RELIEF**

In response to Plaintiffs' request for relief as set forth in Plaintiffs' Complaint (as amended), the Prestage Entities deny that Plaintiffs are entitled to any relief on any of their claims, and request that Plaintiffs take nothing from the Prestage Entities by this litigation

**JURY TRIAL DEMANDED**

The Prestage Entities demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**FIRST AFFIRMATIVE DEFENSE**

All allegations in the Complaint are denied except as otherwise expressly set forth herein and the Prestage Entities deny all allegations in the Complaint, whether direct or indirect, or by

implication or inference that the Prestage Entities, or any one of them, engaged in any conspiracy, collusion or any other conduct of any nature which would be considered anti-competitive in nature.

**SECOND AFFIRMATIVE DEFENSE**

Plaintiffs' claims against the Prestage Entities are barred on the grounds that the conduct of supply, pricing and other decisions by the Prestage Entities were pro-competitive, reasonable and based on independent, legitimate and self-interested business and economic justifications.

**THIRD AFFIRMATIVE DEFENSE**

Plaintiffs' claims against the Prestage Entities are barred by the applicable statute of limitations. Plaintiffs did not file any claims against the Prestage Entities until January 2022, more than six years after the alleged end of the conspiracy period and, in any event, more than four years after Plaintiffs knew, or reasonably should have known, of the alleged (but denied) unlawful conduct about which they complain in this matter.

**FOURTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims against the Prestage Entities are barred, in whole or in part, by the doctrines of estoppel, waiver and laches. Plaintiffs did not file any claim against the Prestage Entities until more than six years after the end of the class period and, upon information and belief, Plaintiffs knew about, or with the exercise of reasonable diligence should have known about the Defendants' use of Agri Stats, their participation in trade association meetings and other activity alleged in the lawsuit to be anti-competitive (which is denied), long before the lawsuit was filed against the Prestage Entities, and perhaps more than a decade ago.

**FIFTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims against the Prestage Entities are barred, in whole or in part, by the doctrine of offset to the extent Plaintiffs have settled with other Defendants or alleged Co-

Conspirators and have received payment from those entities.

**SIXTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims against the Presage Entities are barred, in whole or in part, on the grounds that the Prestage Entities do not have market power in the alleged relevant market, or any other potentially relevant market.

**SEVENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred, in whole or in part, on the grounds that Plaintiffs do not have standing, including but not limited to antitrust standing, to bring the claims raised in the Complaint.

**EIGHTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred to the extent they failed to mitigate their damages.

**NINTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims against the Prestage Entities are barred on the grounds that any alleged damages were not legally or proximately caused by the Prestage Entities and/or on the grounds that any alleged (but denied) damages suffered by Plaintiffs were as a result of the actions of other persons or entities over which the Prestage Entities had no authority or control.

**TENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred on the grounds that the action is not properly maintainable as a class action under the Federal Rules of Civil Procedure and any other applicable law.

**ELEVENTH AFFIRMATIVE DEFENSE**

The Prestage Entities incorporate by reference any and all other defenses asserted by other Defendants in this action.

**PRAYER FOR RELIEF**

Wherefore, the Prestage Entities request that Plaintiffs' Third Amended Complaint be

dismissed with prejudice, that the Court find that Plaintiffs are not entitled to any judgment or relief, that the Court enter judgment in favor of the Prestage Entities, and that the Court award the Prestage Entities their attorneys' fees, costs and expenses, pre-judgment interest, and such other further relief as the Court deems just and proper.

Dated: January 19, 2023.

Respectfully submitted,

/s/William S. Cherry III

Michael T. Medford, N.C. State Bar # 7227 (*pro hac vice*)
William S. Cherry III, N.C. State Bar # 33860 (*pro hac vice*)
J. Gray Wilson, N.C. State Bar # 46509 (*pro hac vice*)
MANNING, FULTON & SKINNER, P.A.
3605 Glenwood Avenue - Suite 500 (27612)
Post Office Box 20389
Raleigh, North Carolina 27619
Telephone: (919) 787-8880
Facsimile: (919) 325-4600
E-mail: medford@manningfulton.com
cherry@manningfulton.com
wilson@manningfulton.com

Amy R. Paulus
Daniel P. Johnston
Davy H. Raistrick
Clausen Miller P.C.
10 South LaSalle Street, Suite 1600
Chicago, Illinois 60603
Telephone: (312) 855-1010
Facsimile: (312) 606-7777
E-Mail: apaulus@clausen.com
djohnston@clausen.com
draistrick@clausen.com

*Counsel for Defendants Prestage Farms of South Carolina, LLC, Prestage Farms, Inc. and Prestage Foods, Inc.*