**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *IN RE TURKEY ANTITRUST LITIGATION* | No. 1:19-cv-08318 |
| This Document Relates To: | Hon. Virginia M. Kendall<br>Hon. Keri Holleb Hotaling |
| All Direct Purchaser Plaintiff Actions | |

## <u>DIRECT PURCHASER PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION</u>

**REDACTED PUBLIC VERSION**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ..................................................................................................1

II. CLASS DEFINITION ...........................................................................................6

III. PROFFER OF FACTS COMMON TO THE CLASS.............................................7

    A. In 2008, Processor Defendants initiated their conspiracy to restrain supply by hiring Agri Stats to perform a forward-looking production "outlook study for the US turkey industry."...........................................7

    B. Agri Stats was the lynchpin of Defendants' collusion throughout the class period.........................................................................................8

    C. Processor Defendants used Agri Stats reports to monitor each other, including competitors' production plans. ....................................10

    D. Defendants systematically relied on Agri Stats sales reports to raise prices. ...................................................................................................12

    E. Processor Defendants and Agri Stats coordinated on specific projects during the class period to further their collusive activities. ...................18

    F. Fueled by the coordination of Agri Stats, as well as direct communications, Defendants restrained production and inflated prices throughout the class period...........................................................20

IV. LEGAL STANDARD............................................................................................24

V. ARGUMENT .........................................................................................................25

    A. The elements of Rule 23(a) support certification. .................................25

        1. The class is sufficiently numerous............................................25

        2. Common questions of fact and law exist. .................................26

        3. The claims of the Named Plaintiffs are typical of the class claims. ........................................................................................26

        4. The Named Plaintiffs will adequately represent the class. ........................27

    B. The class satisfies Rule 23(b)(3).............................................................27

        1. Questions of law and fact predominate over any individual questions. ...................................................................................28

            a. Common questions as to Defendants' violations of antitrust law predominate.................................................29

i

b.  Antitrust impact will be proven through evidence that is common to the class. .........................................................30

   (1) Market structure evidence demonstrates that the turkey market was conducive to cartel pricing. ...............................................................31

   (2) Common evidence demonstrates that industry-wide market prices were a shared reference point for all transactions....................................34

   (3) Collectively, these market structure facts, in combination with the basic economic laws of supply and demand, support a finding of common impact....................................37

   (4) Regression analyses shows common impact in the form of higher prices...............................................39

   (5) Additional common econometric evidence demonstrates that all or nearly all direct purchasers suffered impact. ................................................41

 2. Damages can be measured using a common methodology. ....................41

 3. A class action is superior to any other alternative. ....................................42

 4. The class is ascertainable. ..........................................................................43

C. Class Counsel are adequate under Rule 23(g). ......................................................44

VI. CONCLUSION...............................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Column & Lumber Co. v. United States*,
  257 U.S. 377 (1921)................................................................9

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013)..............................................................25

*Arreola v. Godinez*,
  546 F.3d 788 (7th Cir. 2008) ...............................................24

*Beaton v. SpeedyPC Software*,
  907 F.3d 1018 (7th Cir. 2018) ..............................26, 28, 43

*In re Blood Reagents Antitrust Litig.*,
  2015 WL 6123211 (E.D. Pa. Oct. 19, 2015).......................36

*In re Broiler Chicken Antitrust Litig.*,
  2022 WL 1720468 (N.D. Ill. May 27, 2022) ......4, 6, 25, 26, 27, 29, 31, 34, 39, 40, 42, 43, 44

*In re Broiler Chicken Antitrust Litig.*,
  No. 22-8007 (7th Cir. July 18, 2022)......................................6

*In re Capacitors Antitrust Litig.*,
  2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ......................31

*Carnegie v. Household Int'l, Inc.*,
  376 F.3d 656 (7th Cir. 2004) ...............................................43

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)...................................................25, 41, 42

*Consumer Indirect Purchaser, v. Agri Stats, Inc.*,
  No. 23-8002 (8th Cir. May 19, 2023) .....................................6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)..............................................................28

*Fauley v. Drug Depot, Inc.*,
  323 F.R.D. 594 (N.D. Ill. 2018)...............................25, 26, 43

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
  744 F.2d 588 (7th Cir. 1984) ...............................................38

*Keele v. Wexler*,
149 F.3d 589 (7th Cir. 1998) ...........................................................26

*Kleen Prods. LLC v. Int'l Paper Co.*,
831 F.3d 919 (7th Cir. 2016) .........................................5, 24, 25, 28, 29, 31, 32, 33, 34, 39, 41

*Kleen Prods. v. Int'l Paper*,
306 F.R.D. 585 (N.D. Ill. 2015)........................................................30

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002)............................................................38

*Loeb Indus., Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002) ..........................................................42

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ................................................25, 28, 29, 30, 42

*Moehrl v. Nat'l Ass'n of Realtors*,
2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ..........................25, 29, 30, 40, 41, 42

*Mullins v. Direct Digital, LLC*,
795 F.3d 654 (7th Cir. 2015) ..................................................42, 43, 44

*In re Mushroom Direct Purchaser Antitrust Litig.*,
319 F.R.D. 158 (E.D. Pa. 2016)........................................................36

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods, LLC*,
31 F.4th 651 (9th Cir. 2022) .........................................5, 30, 31, 34, 39, 40, 41

*In re Pharm. Indus. Average Wholesale Price Litig.*,
582 F.3d 156 (1st Cir. 2009).........................................................42

*In re Pork Antitrust Litig.*,
2023 WL 2696497 (D. Minn. Mar. 29, 2023) ....................6, 29, 30, 31, 34, 37, 39, 40, 41, 42

*Riffey v. Rauner*,
910 F.3d 314 (7th Cir. 2018) ..........................................................24

*Ross v. Gossett*,
33 F.4th 433 (7th Cir. 2022) ..........................................................28

*Saltzman v. Pella Corp.*,
257 F.R.D. 471 (N.D. Ill. 2009).......................................................27

*In re Steel Antitrust Litig.*,
2015 WL 5304629 (N.D. Ill. Sept. 9, 2015) ...........................................28

*In re Sulfuric Acid Antitrust Litig.*,
  2007 WL 898600 (N.D. Ill. Mar. 21, 2007)............................................29

*In re Text Messaging Antitrust Litig.*,
  782 F.3d 867 (7th Cir. 2015) ...............................................................31

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001)....................................................................9

*Toys "R" Us v. Fed. Trade Comm'n*,
  221 F.3d 928 (7th Cir. 2000) ................................................................28

*In re Urethane Antitrust Litig.*,
  251 F.R.D. 629 (D. Kan. 2008)..............................................................30

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) .......................................................29, 30

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)..........................................................................24, 26

*In re Wholesale Grocery Prods. Antitrust Litig.*,
  2016 WL 4697338 (D. Minn. 2016) .....................................................27

*In re Workers' Comp.*,
  130 F.R.D. 99 (D. Minn. 1990).............................................................26

*Zarinebaf v. Champion Pet Foods USA, Inc.*,
  2023 WL 2561613 (N.D. Ill. Mar. 17, 2023).....................................28, 43

**Rules**

Fed. R. Civ. P. 23 ..............................................................24, 25, 28, 42

Fed. R. Civ. P. 23(a) ...........................................................4, 24, 25, 26

Fed. R. Civ. P. 23(a)(1).................................................................25

Fed. R. Civ. P. 23(a)(2).................................................................26

Fed. R. Civ. P. 23(a)(3).................................................................26

Fed. R. Civ. P. 23(a)(4).................................................................27

Fed. R. Civ. P. 23(b) ...................................................................24

Fed. R. Civ. P. 23(b)(3).............................................4, 27, 28, 29, 42, 43

Fed. R. Civ. P. 23(c) ...................................................................43

Fed. R. Civ. P. 23(d) ...............................................................................................................43

Fed. R. Civ. P. 23(g) ...............................................................................................................44

**Other Authorities**

Phillip E. Areeda & Herbert J. Hovenkamp,
  Antitrust Law §395 (4th ed. 2021).................................................................................40

Charles Alan Wright & Arthur R. Miller,
  Federal Practice & Procedure § 1781 (3d ed. 2020)......................................................29

Justice Department Withdraws Outdated Enforcement Policy Statements,
  U.S Department of Justice (Feb. 3, 2023),
  https://www.justice.gov/opa/pr/justice-department-withdraws-outdated-
  enforcement-policy-statements .........................................................................................9

| GLOSSARY OF INDUSTRY TERMS | |
|---|---|
| **Term** | **Definition** |
| breeder or breeder hen | Turkeys that produce the fertilized eggs that grow into turkey for human consumption. |
| breeder barn | A building that is used for raising poults prior to the grow-out house. |
| ground turkey | Turkey meat ground for human consumption. |
| grow out or grow-out barn | A building that is used for raising turkeys for human consumption. |
| hatchery | A facility for hatching eggs. Fertilized eggs are placed into an incubator that maintains conditions favorable for hatching. |
| hen | Female turkey. |
| NAE | An acronym for "No Antibiotics Ever." This refers to turkey that may be marketed or sold with the "no antibiotics ever" or "raised without antibiotics" or "antibiotics free" (ABF) labels. |
| NTF | National Turkey Federation. |
| poult | Young turkeys that have not grown large enough for human consumption. |
| ready-to-eat or RTE | Cooked turkey meat that is fit for sale to consumers. |
| ready-to-cook or RTC | Raw dressed turkey meat that is fit for sale to consumers. Ready-to-cook items include products like tray packs of ground turkey meat. |
| tom | Male turkey. |
| tray pack | Product packaged in a plastic tray within the case pack. Turkey is often sold to consumers in grocery stores in a tray pack format. |
| Urner Barry | A company reporting turkey prices. |
| USDA | The United States Department of Agriculture is the federal agency that proposes programs and implements policies and regulations related to American farming, forestry, ranching, food quality, and nutrition. |
| whole bird | A turkey sold as an entire bird. Hens are typically sold as whole birds. |

| TABLE OF ABBREVIATIONS | |
|---|---|
| **Short Cite Used** | **Full Citation** |
| Complaint | Direct Purchaser Plaintiffs' Third Amended Class Action Complaint, ECF No. 665 (Dec. 2, 2022) |
| Defendants | Agri Stats, Butterball, Cargill, Cooper Farms, Farbest, Foster Farms, Hormel, House of Raeford, Perdue, and Prestage (as defined below) |
| DPPs | Direct Purchaser Plaintiffs |
| Ex. | All exhibit references are to the Declaration of Shana E. Scarlett in Support of Direct Purchaser Plaintiffs' Motion for Class Certification |
| Named Plaintiffs | John Gross and Company, Inc. and Maplevale Farms, Inc. |
| Processor Defendants | Butterball, Cargill, Cooper Farms, Farbest, Foster Farms, Hormel, House of Raeford, Perdue, and Prestage (as defined below) |
| Williams | Expert Report of Michael A. Williams, Ph.D. (Dec. 2, 2022) |
| Williams Reply | Expert Reply Report of Michael A. Williams, Ph.D. (Mar. 31, 2023) |
| Williams Sur-Reply | Expert Sur-Reply Report of Michael A. Williams, Ph.D. (Jun. 28, 2023) |
| **Short Cite Used** | **Defendant and Co-Conspirator Names** |
| Agri Stats | Defendant Agri Stats, Inc. and Express Markets, Inc., Defendant Agri Stats's subsidiary |
| Butterball | Defendant Butterball, LLC |
| Cargill | Defendant Cargill Inc. and Cargill Protein – North America |
| Cooper Farms | Defendant Cooper Farms, Inc. |
| Farbest | Defendant Farbest Foods, Inc. |
| Foster Farms | Defendants Foster Farms, LLC, and Foster Poultry Farms |
| Hormel or Jennie-O or JOTS | Defendants Hormel Foods Corporation and Jennie-O Turkey Store, Inc. |
| House of Raeford | Defendant House of Raeford Farms, Inc. |
| Perdue | Defendants Perdue Farms, Inc. and Perdue Foods LLC |
| Prestage | Defendants Prestage Farms, Inc., Prestage Foods, Inc., and Prestage Farms of South Carolina, LLC |
| Tyson or Sara Lee | Settled Defendants Tyson Foods, Inc., The Hillshire Brands Company, Tyson Fresh Meats, Inc., and Tyson Prepared Foods, Inc. |
| Dakota Provisions | Co-Conspirator Dakota Provisions, LLC |
| Kraft | Co-Conspirators Kraft Heinz Foods Company and Kraft Foods Group |
| Michigan Turkey | Co-Conspirator Michigan Turkey Producers LLC |
| Norbest | Co-Conspirator Norbest LLC |
| West Liberty | Co-Conspirator West Liberty Foods LLC |

# I.    INTRODUCTION

Direct Purchaser Plaintiffs (DPPs)[1] move to certify a class of all persons and entities who purchased fresh or frozen uncooked turkey breast, ground turkey, or whole bird turkey products from Defendants during the period January 1, 2010, through December 31, 2016.[2] These class members have all suffered a common harm—being overcharged for turkey due to Defendants' anticompetitive conduct.

As set forth in the proffer, common evidence establishes Defendants' antitrust liability here. This conspiracy began in the summer of 2008. Defendants, who collectively control over █% of the turkey market, faced a significant problem: competition in the market had caused turkey production to soar from 2006 to 2008, causing decreasing profits for the industry, especially as feed costs rose in 2008. Defendants needed to collectively restrain production and turned to Agri Stats. Specifically, ███████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████[3]

Agri Stats employees understood that an ████████████████████████ ██████████████████████████████████[4] Agri Stats knew that prior attempts to ██ ████████████████████████████████████████████████████ ████████████████████ Indeed, this time, the plan worked. In ██████████████████

---

[1] The proposed class representatives bringing this motion on behalf of the DPP class are John Gross and Company, Inc. and Maplevale Farms, Inc. (Named Plaintiffs).

[2] DPPs have settled with Tyson, and the Court has certified that settlement class. This motion is brought against Butterball, Cargill, Cooper Farms, Farbest, Foster Farms, Hormel, House of Raeford, Perdue, and Prestage (Processor Defendants), as well as Agri Stats (collectively, Defendants).

[3] Ex. 4, FARBEST0001233314.

[4] Ex. 5, AGSTAT-T-03963596.

[5] *Id*.

██████████████████████████████████████

████████████████████████████ Agri Stats subsequently presented ████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████  ████████████████████████

███████████████████████ [7]



Defendants' plan worked and the market turned around. ███████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████████

[6] Ex. 6, NTF0000044755, at 756.
[7] Ex. 7, FARBEST0001373509; Ex. 8, FARBEST0001373510, at 524.

Moreover, Agri Stats remained at the center of the conspiracy. Throughout the entire class period, the Processor Defendants exchanged—through Agri Stats—competitively sensitive output and pricing data. Processor Defendants relied on that data to make both production and pricing decisions resulting in artificially increased turkey prices. In particular, Processor Defendants used ████████████████████████████████████████████████████ ████████████████████████ For example, ██████████████████████████████ █████████████████████████████████████████████████████████████

---

[8] Ex. 1, Williams, ¶ 184, fig. 24.

████████████████████████████████████████ [9] Likewise, ██████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ [10]

In 2016, however, after the filing of the *In re Broiler Chicken Antitrust Litig.* lawsuits, which included allegations of anticompetitive conduct centered on usage of Agri Stats, the conspiracy started to unravel. ████████████████████████████████████████

██████████████████████████████████████████ *See* Proffer, sections III.A-F.

DPPs seek certification of a class to recover their damages from Defendants' anticompetitive conduct. Just as the Honorable Judge Thomas M. Durkin held in *Broilers*, the four elements of Rule 23(a) "are easily met in this case."[11] The proposed class is sufficiently numerous. There are many common questions of law and fact, such as whether Defendants conspired to exchange competitive information and stabilize the supply and price of turkey, and whether this violates antitrust laws. The Named Plaintiffs have each suffered losses that make them typical of absent class members, and they are sufficiently committed to this litigation that they will adequately represent the class. *See* sections V.A.1-4.

DPPs also meet the requirements of Rule 23(b)(3), as common questions of fact and law predominate. DPPs present robust evidence, common to the class, of the Defendants' antitrust liability. And the existence of a relevant antitrust market for turkey, as well as Processor Defendants' market power, which are pertinent to the rule of reason claim, are supported by common evidence too, in the form of expert analysis by Dr. Michael A. Williams. *See* section V.B.1.a.

---

[9] Ex. 9, BB001523233.
[10] Ex. 10, CMS0000036854, at 855.
[11] *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *3 (N.D. Ill. May 27, 2022) (*Broilers*).

Common evidence is also capable of proving antitrust impact. First, as the Seventh Circuit found in the containerboard industry in *Kleen*, certain characteristics of the turkey industry—its high level of concentration, barriers to entry, absence of competition from imports, lack of substitutes, and commodity nature of the products—render it particularly susceptible to cartelization. Second, common evidence demonstrates that █████████████████████████ ████████████████████████████████████████ Third, Dr. Williams's regression models demonstrate the higher prices caused by this conspiracy. In fact, in recently certifying three plaintiff classes, the Ninth Circuit stated in *Tuna*—a case involving the same experts as here (Drs. Williams and Mangum)—that regression models are "widely accepted as a generally reliable econometric technique" to "isolate the impact of the alleged antitrust violations."[12] Fourth, additional common econometric evidence demonstrates that virtually all direct purchasers suffered impact. *See* sections V.B.1.b.(1)-(5). And Dr. Williams employs a common methodology to measure over $1.6 billion in damages to class members. *See* section V.B.2.

Finally, a class action is superior to any other available method to adjudicate this dispute, including proceeding by individual claims—or, most likely for many class members, not proceeding at all—because individual damages are far smaller than the resources required to litigate against some of the largest agribusiness companies in the country. *See* section V.B.3.

In short, the proposed DPP class should be certified. Indeed, that has been the consensus approach to handling similar lawsuits pending in other protein industries sharing Agri Stats data. In *Broilers*, Judge Durkin certified three plaintiff classes, and the Seventh Circuit denied the

---

[12] *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods, LLC*, 31 F.4th 651, 677 (9th Cir. 2022) (*Tuna*).  Throughout this document, internal citations and quotations are omitted, and emphasis is added, unless otherwise indicated.

defendants' 23(f) petition seeking review of that decision.[13] Likewise, in *Pork*, the Honorable

John R. Tunheim certified three plaintiff classes supported by the same experts as here (Drs.

Williams and Mangum), and the defendants' 23(f) petition was again denied, this time by the

Eighth Circuit.[14] DPPs respectfully request that the Court grant their class certification motion.

## II.    CLASS DEFINITION

DPPs propose to certify a direct purchaser class defined as follows:

> All persons and entities who directly purchased fresh or frozen, uncooked
> turkey breast, ground turkey, or whole bird turkey products[15] from
> Defendants in the United States during the Class Period.[16]

The Class Period is defined as January 1, 2010, through December 31, 2016. In addition, because



—but

—Dr. Williams's analysis also includes a ramp-up period from

July 2008 through December 2009, during which he

---

[13] *Broilers*, 2022 WL 1720468; *In re Broiler Chicken Antitrust Litig.*, No. 22-8007, ECF No. 25 (7th Cir. July 18, 2022).

[14] *In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT/JFD), 2023 WL 2696497 (D. Minn. Mar. 29, 2023) (*Pork*); *Consumer Indirect Purchaser, et. al v. Agri Stats, Inc., et. al.*, No. 23-8002, ID: 5278928 (8th Cir. May 19, 2023).

[15] Turkey breast products exclude: (1) turkey breasts used to make ground turkey; (2) turkey breast tenderloins; (3) organic turkey breast products; (4) NAE or ABF turkey breast products; and (5) cooked or RTE turkey breast products. Ground turkey products exclude: (1) ground turkey products made from turkey breasts; (2) ground turkey products made from turkey wings; (3) burgers, sausages, and patties; (4) organic ground turkey products; (5) NAE or ABF ground turkey products; and (6) cooked or RTE ground turkey products. Whole bird turkey products exclude: (1) organic turkey whole bird products; (2) NAE or ABF turkey whole bird products; and (3) cooked or RTE turkey whole bird products.

[16] Specifically excluded from this Class are the Defendants and their co-conspirators; the officers, directors or employees of any Defendant or co-conspirator; any entity in which any Defendant or their co-conspirator has a controlling interest; any entity with an interest, controlling or non-controlling, in a Defendant or their co-conspirator; any entity where an individual owner, trust, and/or holding company also had an interest in any Defendant (whether as an individual, member, trust, trustee, legal representative, heir or assign) of greater than 5% during any year of the Class Period; any (in whole or in part) affiliate, legal representative, heir, or assign of any Defendant or their co-conspirator. Also excluded from this Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

█████████████████████████████████████████████████████████ Ex. 2,

Williams Reply, ¶¶ 151-152, 155. The Class Period ends in 2016 with the filing of the *Broilers*

complaint and Processor Defendants canceling their Agri Stats subscriptions on various dates

beginning in 2017. *Id*., ¶ 156.

### III.  PROFFER OF FACTS COMMON TO THE CLASS

**A.  In 2008, Processor Defendants initiated their conspiracy to restrain supply by hiring Agri Stats to perform a forward-looking production "outlook study for the US turkey industry."**



In ██████, Processor Defendants led by ████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████[17] As ████████████

██████████████████████████████████████████

████████████████████[8] Although it was contrary to ████████████████████

███████████████████████[20]

██████████[1]

On ██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

[17] Ex. 11, AGSTAT-T-03962264; Ex. 12, COOPER0000201477; Ex. 13, AGSTAT-T-03945732███
██████████ Ex. 14, Williams Depo., 45:23-46:4.
[18] Ex. 15, Edwards Depo., 32:22-33:1, 33:14-15.
[19] ████████████████████████████████████ Ex. 16, Brandenberger Depo., 23:19-24:10.
[20] Ex. 17, Knapp Depo., Ex. 81.
[21] Ex. 13, AGSTAT-T-03945732; Ex. 16, Brandenberger Depo., Ex. 322 (Scholer Depo., Ex. 322).

[REDACTED] [22] Then, upon advice of [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] [5]

**B.    Agri Stats was the lynchpin of Defendants' collusion throughout the class period.**

[REDACTED]

[REDACTED] [6]



---

[22] *Id.*; Ex. 19, AGSTAT-T-03944136.
[23] Ex. 7, FARBEST0001373509; Ex. 8, FARBEST0001373510, at 510-539, 591-594, 619-627.
[24] Ex. 20, AGSTAT-T-03636493; Ex. 21, AGSTAT-T-03636494; Ex. 1, Williams, ¶¶ 267-278.
[25] Ex. 22, Wellman Depo., 43:1-6.
[26] Ex. 2, Williams Reply, ¶ 284 & TT.6, A3-A12 (Appx. V); *see also* Ex. 1, Williams, ¶¶ 174-175.



[28] Ex. 1, Williams, ¶¶ 147-160.

[9] And Processor Defendants

[30]

Instead, the [31]

Absent collusion, such information is not normally shared with competitors. Indeed, the

[2] And

[3] Processor Defendants routinely

---

■ Ex. 24, Demonstrative re Payments to Agri Stats.

[28] Ex. 25, BB001394151

*See Todd v. Exxon Corp.*, 275 F.3d 191, 211 (2d Cir. 2001) ("current data have greater potential to affect future prices and facilitate price conspiracies"); *American Column & Lumber Co. v. U.S.*, 257 U.S. 377, 410 (1921) ("Genuine competitors do not make daily, weekly and monthly reports of the minutest details of their business to their rivals."); Justice Department Withdraws Outdated Enforcement Policy Statements, U.S DEPARTMENT OF JUSTICE (Feb. 3, 2023), https://www.justice.gov/opa/pr/justice-department-withdraws-outdated-enforcement-policy-statements (withdrawing recognition of "safety zone" for information that is, inter alia, "more than three months old" as "overly permissive on certain subjects, such as information sharing").

[29] Ex. 15, Edwards Depo., 39:7-12.

[30] Ex. 26, CMS0000095297.

[31] Ex. 17, Knapp Depo., 102:12-14. *See also* Ex. 27, AGSTAT-T-03618467; Ex. 28, AGSTAT-T-03325661.

[32] Ex. 6, NTF0000044755, at 755-56.

[33] Ex. 29, Meath Depo., Ex. 816.

Indeed, Processor Defendants █████████████████████████████████████

████████████████████████████████████████████████████████

██████████ [4] ████████████████████████████ [5] And ████████████████████

████████████████████████████████████████████████████████

████████████████ [36]

**C.** **Processor Defendants used Agri Stats reports to monitor each other, including competitors' production plans.**

████████████████████████████████████████████████████████

█████████████████████████████ [7] ██████████████████████████

████████████████████████████████████████████████████████

████████████████ Indeed, ████████████████████████████████████

███████████████████████████ [38]

As a result, ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████

██████████████████

---

[34] Ex. 30, Bower Depo., 86:17-22.
[35] Ex. 31, Jackson Depo., 118:23 -119:3.
[36] Ex. 32, Stone Depo., 64:21-25.
[37] Ex. 33, Milton Depo., 172:5-14; Ex. 17, Knapp Depo., 206:12-207:2.
[38] Ex. 34, BB001951912.
[39] Ex. 35, BB001391778.

Similarly, ███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████



████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████[41]████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████[2]

---

[40] Ex. 36, CMS0000001603, at 668. *See also* Ex. 37, CMS0000054978 ████████████

████████████████████████████████████████████████

[41] Ex. 38, CMS0000091545.
[42] Ex. 39, CMS0000299330 █████████████████████████████

████████

█████████████████████████████████████████████████████

███████████ [3] He testified that █████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████[44] And one employee commented that

████████████████████████████████████ [5]

Indeed, ████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████ [6] And, when ████████████████████████

█████████████████████████████████████████████████████

█████████████████████████ [7]

**D.**     **Defendants systematically relied on Agri Stats sales reports to raise prices.**

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████ Ex. 1, Williams, ¶¶ 149-

151. ███████████████████████████████████████████████████

---

[43] Ex. 23, Leitch Depo., Exs. 794, 2415.  Throughout this document, Agri Stats is spelled, capitalized, and spaced as in the quoted exhibit or production document.
[44] *Id.* at 126:18-127:2, 127:11-22.
[45] Ex. 40, Maxwell Depo., 38:23-39:12, Ex. 2283.
[46] Ex. 41, PERDUETKY0000089814; Ex. 42, COOPER0000211767, at 768.
[47] Ex. 43, FARBEST0000642993, at 993-994. Agri Stats declined in this instance.

█████████████████████████████████████████████ [8] Thus, Processor Defendants ████

███████████████████████████████████████████████████

████████████████████████████████████

　　　For example, ████████████████████████████████████████████████

████████████ [49] In ██████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ [50] In

another email from ████████████████████████████████████████

██████████████████████████████████████████████ [1] He

continued, ██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ [52] ███████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████ [53]

[48] Ex. 44, McKay Depo., Ex. 1222.
[49] Ex. 45, BB000979833.
[50] Ex. 46, BB001827198, at 199; Ex. 47, BB001850464, at native 9.
[51] Ex. 48, BB000676402, at 403.
[52] *Id*.
[53] Ex. 47, BB001850464, at native 9.



Similarly, in a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ [5] And in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[54] Ex. 9, BB001523233 (emphasis added)
[55] Ex. 10, CMS0000036854, at 855.

██████████████ [56] She continued, ████████████████████████████████████

████████████████████████████████████████████████████ [57] Indeed,

internal ██████████████████████████████████████████████████████

██████████████████████ [58]



████████████████████████████████████████████████████████████

██████████ For instance, in a ████████████████████████████████████

So he told his team to ████████████████████████████████ [60] And in a ████████

██████████████████████████████████████████████████

---

[56] Ex. 49, CMS0000037767.
[57] *Id.*
[58] Ex. 50, CMS0000009460, at 484.
[59] Ex. 51, HRLTURKEY0000100480.
[60] Id.



██████████████████████████████████████████████████████████████

████████████████████████████████████████████████ [61] Another email

instructs: ████████████████████████████████████████████

████████████████████████████████ [2]

████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████ [63]

████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ [64] ████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████ [65]

██████████████████████████████████████ For instance, in

██████████████████████████████████████████████████████████████

[61] Ex. 52, HRLTURKEY0000057164.
[62] Ex. 53, HRLTURKEY0000024702.
[63] Ex. 54, COOPER0000175405, at 406.
[64] Ex. 55, FARBEST0000250226.
[65] Ex. 56, FARBEST0000604229.

█████████████████████████████████████████████████

███████████████████████████████████████████████ [6]

████████████████████████████████████████████

██ For example, ████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████ [7]

█████████████████████████████████████████████

███████████████████████████████████████████ [8] ██████

████████████████████████████████████████████████

█████████████ [9] And ████████████████████████████████

█████████████████████████████████████████████████

██████████ [70]

Finally, ███████████████████████████████████████

███████████ For example, in ██████████████████████████

████████████████████████████████████████████

█████████ [71] And █████████████████████████████████

████████████████████ [72]

---

[66] Ex. 57, FF-TKY-00067728, Ex. 58, FF-TKY-00067729, at 793-806.
[67] Ex. 59, HRF-Turkey_0000141473-474.
[68] Ex. 60, PERDUETKY0000090971-972.
[69] Ex. 61, PERDUETKY0000376345, at native 10.
[70] Ex. 44, McKay Depo., Ex. 1225.
[71] Ex. 62, AGSTAT-T-03331706.
[72] Ex. 63, AGSTAT-T-03331708, at 719.

In short, ███████████████████████████████████████████████

███████████████████████████████████████████████████████

██████ [73] and Processor Defendants used these ██████████ to increase prices industrywide.

**E.    Processor Defendants and Agri Stats coordinated on specific projects during the class period to further their collusive activities.**

The Processor Defendants turned to ████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████ Gary Cooper, explained that this new initiative

reflected the industry's strategy of "coopetition"—a portmanteau of cooperation and

competition—premised on the notion that a "rising tide lifts all boats."[74] He explained that the

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████ [75] As part of this goal, ██████████████████████████████████████

██████████████████████████████████████ [76] such that ████████████████

████████████████████████████████████████████ [77] ██████████

████████████████████████████████████████████████████████

██████████████ [78] Ultimately, ███████████████████████████████

████████████████████████████████████████████████████

---

[73] Ex. 56, FARBEST0000604229.
[74] Ex. 64, COOPER0000210407.
[75] Ex. 65, COOPER0000215873, at 874.
[76] Ex. 66, COOPER0000129910.
[77] Ex. 67, Martin Depo., Ex. 2023.
[78] *Id*.

- 18 -

████████████████████████████████████████████████████████
████████████ [79]

Second, Agri Stats/EMI worked solely with Processor Defendants to initially develop a *daily* "Turkey Price Discovery" system that would enable the producers to track real time, or near-real-time, pricing of turkey products.[80] By ████████████████████████████ ████████████ [1] ██████████████████████████████████████████

████████████████████████████████████████████████████

████ [2] which ████████████████████████████████████ [83]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ [84] For example, ████████████████████████

████████████████████████████████████████████████████

████████████████ [5] But ████████████████████████████████

████████████████████████████████████████ [86] and to ████████

████ , also noting that ████████████████████████████████ [7] █

████████████████████████████████████████████████████

████████████████████ [8] ████████████████████████████████

[79] *Id.*, Exs. 2024 & 2028.
[80] Ex. 68, COOPER0000192800.  *See also* Ex. 1, Williams, ¶¶ 164-169.
[81] Ex. 70, AGSTAT-T-03640715, at 716.
[82] Ex. 71, FF-TKY-00111712.
[83] Ex. 72, PERDUETKY0000095463, at 464.
[84] Ex. 73, AGSTAT-T-03877188, at native 6.
[85] Ex. 67, Martin Depo., 131:10-17.
[86] *Id.*, Ex. 2016.
[87] *Id.*, Ex. 2018.
[88] Ex. 74, AGSTAT-T-03961812, at 813.



[89] These

[0] As

[1]

### F. Fueled by the coordination of Agri Stats, as well as direct communications, Defendants restrained production and inflated prices throughout the class period.

[92]

Furthermore,

[3] Defendants

understood

[89] *See, e.g.*, Ex. 75, HRLTURKEY0000056980-985.
[90] Ex. 76, COOPER0000197556; Ex. 67, Martin Depo., 157:21-158:12.
[91] Ex. 40, Maxwell Depo., Ex. 2287 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See also* Ex. 1, Williams, ¶¶ 170-173; Ex. 2, Williams Reply, ¶¶ 280-282.
[92] By ▮▮▮ Ex. 77, HRLTURKEY0000072771. Likewise, in ▮▮▮ Ex. 78, COOPER0000230670. In ▮▮▮ Ex. 79, COOPER0000200665.
[93] Ex. 40, Maxwell Depo., Ex. 2295; *see also id.*, Ex. 2296

████████████████████████████████████████████████████████████

████████ [4]

     During this period, Defendants also ███████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████ [95] The following month ████████████

███████████████████████████████████████████████ [96] In █████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ [7]

Similarly, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ [8]

     By the ████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ [99] In ██████████████████████

████████████████████████████████████████████ [00] █████████████

████████████████████████████████████████████████████████████

[94] Ex. 80, BB000474409, at 411.
[95] Ex. 81, HRLTURKEY0000073000.
[96] Ex. 82, HRLTURKEY0000624593, at 593-594.
[97] Ex. 83, HRLTURKEY0000624561, at 564.
[98] Ex. 84, COOPER0000126933.
[99] Ex. 85, FARBEST0000080755.
[100] Ex. 86, AGSTAT-T-03712023. *See also* Ex. 1, Williams, ¶¶ 279-290.



[REDACTED]

[REDACTED] [101]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] [102] They did.

[REDACTED] [103] [REDACTED]

[REDACTED] [104] And in a

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] [105] Indeed,

[REDACTED]

[REDACTED]

[REDACTED] [106]

Defendants [REDACTED]

[REDACTED]

[REDACTED]

---

[101] Ex. 87, PERDUETKY0000401662, at native 40; *see also* Ex. 88, HRLTURKEY0000032708 [REDACTED]

[102] Ex. 89, HRLTURKEY0000624553, at 559.

[103] Ex. 90, FARBEST0001144320.

[104] Ex. 91, CMS0000001030.

[105] Ex. 92, BB001801741, at 741, 742. *See also* Ex. 1, Williams ¶¶ 293, 295-296, 308-311; Ex. 3, Williams Sur-Reply, ¶ 52 [REDACTED]

[106] Ex. 93, COOPER0000198356. *See also* Ex. 1, Williams, ¶¶ 291-296.



[107] That same month,

[108] And at

[109] On

[110] Following further communications

[11]

Unsurprisingly,

[112] By

---

[107] Ex. 94, COOPER0000127603, at 604.
[108] Ex. 95, HRLTURKEY0000170040, 41, at native 25.
[109] Ex. 96, COOPER0000236489, at 491
[110] Ex. 97, HRLTURKEY0000688284.
[111] Ex. 98, HRLTURKEY0000684418. *See also* Ex. 1, Williams, ¶¶ 297-307.
*See, e.g.,* Ex. 99, BB000676507
*See also* sections III.C-D, above.
[112] Ex. 100, BB001027981.



[113] In ███████████████████████████████████████████

███████████████████ [114]

But following the filing of *Broilers* in September 2016, Processor Defendants ████

███████████████████████████████████ [115] ███████████████████

██████████████████████ [16] and the ███████████████████

███████████████████████ [117] Indeed, ██████████████████████████

█████████████████████ [119] to 70% in September 2017, 50% in January

2018, and 27% in September 2018.[120] As ████████████████████████

██████████████████████████████████████████████

██████ [121] The gig was finally up.

## IV.    LEGAL STANDARD

A party seeking to certify a class action must show that the proposed class satisfies the

four prerequisites of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality,

and adequacy of representation, and one of the subsections of Rule 23(b).[122] District courts have

broad discretion in determining whether a proposed class satisfies Rule 23.[123]

---

[113] Ex. 101, CMS0000294928.
[114] Ex. 102, BB001942399; Ex. 103, COOPER0000219473, at 492. *See also* Ex. 1, Williams, ¶¶ 308-311.
[115] Ex. 2, Williams Reply, ¶ 156; Ex. 104, AGSTAT-T-03363548.
[116] Ex. 33, Milton Depo., 305:13-22.
[117] *Id*., 19:22-20:1, 20:23-21:3.
[118] Ex. 105, AGSTAT-T-03324511, 512, at native 4, 7.
[119] Ex. 106, AGSTAT-T-03356403, 404, at native 6 (turkey industry participation of 95% in 2016); *see also* Ex. 107, AGSTAT-T-03386398, 400, at native 5 (turkey industry participation of 85% in 2016).
[120] Ex. 108, PFI0001096, at native 3, 14.
[121] Ex. 33, Milton Depo., 305:23-306:4.
[122] *See Kleen Prods. LLC v. Int'l Paper Co*., 831 F.3d 919, 923 (7th Cir. 2016).
[123] *See, e.g., Riffey v. Rauner*, 910 F.3d 314, 318 (7th Cir. 2018) (citing *Arreola v. Godinez*, 546 F.3d 788 (7th Cir. 2008)); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 369 (2011) ("[M]ost issues arising under Rule 23 . . . [are] committed in the first instance to the discretion of the district court.").

Moreover, while DPPs "bear the burden of showing that a proposed class satisfies the Rule 23 requirements," it is "sufficient if each disputed requirement has been proven by a preponderance of evidence."[124] "If there are material factual disputes, the court must receive evidence and resolve the disputes before deciding whether to certify the class."[125] "Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim."[126] But merits questions may be considered "only to the extent" that they are "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[127] Importantly, "the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits," because this "runs the risk of supplanting the jury as the finder of fact."[128]

## V.  ARGUMENT

### A.  The elements of Rule 23(a) support certification.

As Judge Durkin held in *Broilers*, the four elements of Rule 23(a) "are easily met in this case."[129]

#### 1.  The class is sufficiently numerous.

The numerosity requirement of Rule 23(a)(1) is satisfied where joinder of all putative class members is "impracticable."[130] Courts consider a class of 40 sufficient.[131] So the proposed class of over 1,600 direct purchasers here clears this low bar. Ex. 1, Williams, ¶ 426, 1672.

---

[124] *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).
[125] *Id.*; *see also Kleen*, 831 F.3d at 928.
[126] *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013).
[127] *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013); *see also Kleen*, 831 F.3d at 928.
[128] *Messner*, 669 F.3d at 811, 823.
[129] 2022 WL 1720468, at *3; *see also Moehrl v. Nat'l Ass'n of Realtors*, No. 19-CV-01610, 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023).
[130] *Fauley v. Drug Depot, Inc.*, 323 F.R.D. 594, 599 (N.D. Ill. 2018) (Kendall, J.).
[131] *Id.*

### 2. Common questions of fact and law exist.

Commonality under Rule 23(a)(2) requires DPPs "to identify common questions of law or a nucleus of fact that are apt to drive the resolution of the litigation."[132] According to the Supreme Court, "even a single common question will do."[133] Here there are many.[134] For example, DPPs will use common evidence to establish whether Defendants conspired to restrict supply and stabilize the price of turkey.[135] And whether Defendants' conduct violates the Sherman Act presents classwide questions of law. As this Court held in *Fauley*, commonality is satisfied where the defendants engaged in "standardized conduct towards a proposed class" and the "claim stems from the same federal statute."[136]

### 3. The claims of the Named Plaintiffs are typical of the class claims.

Under Rule 23(a)(3), typicality is satisfied if the claims of the representative parties are typical of the claims of the class.[137] Where "claims stem from the same event, practice, or legal theory, they are said to be typical."[138] And the Seventh Circuit has explained that the claims "may feature some factual variations as long as they have the same essential characteristics."[139]

An "antitrust price fixing case generally will involve claims sufficiently similar to satisfy Rule 23(a)(3)."[140] If the class representatives must prove "a conspiracy, its effectuation, and damages therefrom—precisely what the absentees must prove to recover—the representative claims can hardly be considered atypical."[141] So too here. The Named Plaintiffs purchased turkey

---

[132] *Fauley*, 323 F.R.D. at 599.
[133] *Dukes*, 564 U.S. at 359; *Broilers*, 2022 WL 1720468, at *5.
[134] Complaint, ¶ 553.
[135] *See* Proffer of Common Evidence, section III, above.
[136] *Fauley*, 323 F.R.D. at 600.
[137] Fed. R. Civ. P. 23(a).
[138] *Fauley*, 323 F.R.D. at 600 (citing *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998)).
[139] *Beaton v. SpeedPC Software*, 907 F.3d 1018, 1026 (7th Cir. 2018).
[140] *In re Workers' Comp.*, 130 F.R.D. 99, 106 (D. Minn. 1990).
[141] *Id*.

directly from Processor Defendants for resale.[142] And Defendants' collusion gives rise to their antitrust claims for damages—just as it does for class members. Indeed, Judge Durkin rejected the argument that buyers "with varying degrees of bargaining power" undermined typicality, because "all participants in a commodity market exercise their bargaining power—regardless of strength—in the context of the market price."[143] Typicality is satisfied.

### 4. The Named Plaintiffs will adequately represent the class.

The adequacy requirement of Rule 23(a)(4) is satisfied where the class representatives have a "sufficient interest in the outcome of the case to ensure vigorous advocacy" and do not have interests "antagonistic to those of the class."[144] Here, the Named Plaintiffs have no material conflict with other class members. Instead, all are interested in establishing Defendants' liability and maximizing classwide damages. Moreover, "the proposed representatives have demonstrated their commitment to vigorously prosecute the interests of the classes by responding to interrogatories, producing documents, and being deposed."[145] Adequacy is satisfied.

## B. The class satisfies Rule 23(b)(3).

To satisfy Rule 23(b)(3), DPPs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[146] Each of these prongs is satisfied here.

---

[142] Complaint, ¶¶ 55-56.
[143] *Broilers*, 2022 WL 1720468, at *5.
[144] *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 480 (N.D. Ill. 2009).
[145] *In re Wholesale Grocery Prods. Antitrust Litig.*, No. 09-md-2009 ADM, 2016 WL 4697338, at *8 (D. Minn. 2016); Ex. 109, Maplevale Farms Decl. at ¶ 6; Ex. 110, John Gross & Co. Decl. at ¶ 6.
[146] Fed. R. Civ. P. 23(b)(3).

### 1. Questions of law and fact predominate over any individual questions.

Predominance occurs when "common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication."[147] "Individual questions need not be absent," because Rule 23 "requires only that those questions not predominate over the common questions affecting the class as a whole."[148] But this does not imply "a tally of common questions."[149] Instead, the district court "must consider their relative importance."[150] And courts "routinely" find "common questions predominate" where conduct is "widespread."[151]

Analysis of predominance under Rule 23(b)(3) "begins, of course, with the elements of the underlying cause of action.'"[152] The elements of DPPs' *per se* claim under section 1 of the Sherman Act are "(1) a violation of antitrust law; (2) individual injury, or impact, caused by that violation; and (3) measurable damages."[153] DPPs' rule of reason claim for information exchange contains the same three elements, as well as a requirement under the first element to establish anticompetitive effects either directly or indirectly by showing that Defendants exercised market power in a relevant market.[154] Each of these elements presents important classwide questions provable with common evidence.

---

[147] *Kleen*, 831 F.3d at 925 (affirming grant of class certification).

[148] *Messner*, 669 F.3d at 815 (finding predominance and vacating order denying class certification).

[149] *Beaton*, 907 F.3d at 1029 (affirming grant of class certification).

[150] *Id.*

[151] *Ross v. Gossett*, 33 F.4th 433, 439, 442 (7th Cir. 2022) (affirming grant of class certification: "court properly limited the inquiry here to whether a common question exists and predominates, not whether the plaintiffs would prevail as to that common question").

[152] *Zarinebaf v. Champion Pet Foods USA, Inc.*, No. 18 C 6951, 2023 WL 2561613, at *4 (Mar. 17, 2023) (Kendall, J.); *see also Messner*, 669 F.3d at 815 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011)).

[153] *In re Steel Antitrust Litig.*, No. 08 C 5214, 2015 WL 5304629, at *5 (N.D. Ill. Sept. 9, 2015).

[154] *Toys "R" Us v. Fed. Trade Comm'n*, 221 F.3d 928, 937 (7th Cir. 2000).

### a. Common questions as to Defendants' violations of antitrust law predominate.

In *Broilers*, Judge Durkin held that liability with respect to this "type of alleged conspiracy is the prototypical example of an issue where common questions predominate," because it can be "resolved for all members of a class in a single adjudication."[155] Indeed, the Seventh Circuit stated in *Kleen* that "the existence of the conspiracy could be (perhaps **had to be**) proven by evidence common to the class."[156] Here, as in other antitrust cases, DPPs will use common evidence, including Defendants' own documents and testimony, to prove that Defendants formed a *per se* illegal conspiracy.[157] *See* Proffer, section III, above. And, in support of DPPs' rule of reason claim, Dr. Williams offers testimony, common to the class, explaining that ███████████████████████████████████████████████████████ ████████████████████████████ Ex. 1, Williams, ¶¶ 127-264, 334-343, as well as economic evidence that ████████████████████████████████████████████████████████ *Id.* at ¶¶ 47-126. The common documentary evidence produced in this litigation supports these opinions. Because these dispositive liability questions are the "focus of the dispute here," they predominate over any individual questions.[158]

---

[155] 2022 WL 1720468, at *6-7; *see also Pork*, 2023 WL 2696497, at *20; *In re Sulfuric Acid Antitrust Litig.*, No. 03 C 4576, 2007 WL 898600, at *6 (N.D. Ill. Mar. 21, 2007) ("[T]he existence of a conspiracy is a common question that can be addressed at the class-wide level and need not be addressed again as a stumbling block for finding predominance."); 7 C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 1781 (3d ed. 2020) ("whether a conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3)").

[156] *Kleen*, 831 F.3d at 927 (affirming order granting class certification).

[157] *Moehrl*, 2023 WL 2683199, at *13 ("While the evidence might vary as to the nature of each Defendant's participation in the conspiracy, the same evidence will be relied upon by Plaintiffs and members of the class.").

[158] *Messner*, 669 F.3d at 816; *see also Kleen*, 831 F.3d at 929 (affirming ruling that "class issues predominated"); *Sulfuric Acid*, 2007 WL 898600, at *6; *see generally In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014) ("In price-fixing cases, courts have regarded the existence of a conspiracy as the overriding issue even when the market involves diversity in products, marketing, and prices.").

### b. Antitrust impact will be proven through evidence that is common to the class.

The second element of DPPs' claim is antitrust impact, or "fact of damage."[159] The legal inquiry for impact "is whether, as a result of defendants' alleged . . . conspiracy, the putative class plaintiffs paid a price that was artificially high."[160] DPPs' "burden at the class certification stage is not to prove the element of antitrust impact."[161] Instead, DPPs must "only [] demonstrate that the element of antitrust impact ***is capable of proof*** at trial through evidence that is common to the class rather than individual to its members."[162] "If it appears that plaintiffs may be able to prove at trial . . . the price range was affected generally, then the plaintiffs can show impact without a 'but-for' comparison, and this is so even if there are negotiated prices or a variety of prices."[163] Here, in addition to offering common evidence that Defendants' collusion inflated turkey prices above the competitive level, DPPs also offer common evidence that price increases *in fact* had a market-wide impact.

Similar to *Broilers* and *Pork*, DPPs offer common proof of *market-wide* overcharges based on (1) economic theory and evidence regarding the structure of the turkey market; (2) common evidence demonstrating that Urner Barry provided a market benchmark for collusive turkey sales; (3) a multiple regression model measuring impact on the class using

---

[159] *Messner*, 669 F.3d at 816.

[160] *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 634-36 (D. Kan. 2008). The "prevailing view" is that "price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated." *Kleen Prods. v. Int'l Paper*, 306 F.R.D. 585, 600 (N.D. Ill. 2015) (quoting *Urethane*, 768 F.3d at 1254). DPPs do not, however, rely on a mere presumption of impact.

[161] *Moehrl*, 2023 WL 2683199, at *14 (quoting *Messner*, 669 F.3d at 818).

[162] *Id.* (emphasis in original); *see also Messner*, 669 F.3d at 819 ("common evidence and common methodology to prove a class's claims is sufficient to support a finding of predominance on the issue of antitrust impact"); *Tuna*, 31 F.4th at 666-67 ("In determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial."), *cert. denied sub nom.*, 143 S. Ct. 424 (2022).

[163] *Kleen*, 306 F.R.D. at 595.

Defendants' data; and (4) additional econometric analysis, including a separate regression estimation by product category, various pricing correlations, and common impact regressions showing impact on 99.8% of direct purchasers.[164]

### (1) Market structure evidence demonstrates that the turkey market was conducive to cartel pricing.

The Seventh Circuit in *Kleen* recognized that to establish predominance DPPs may rely on evidence that the "structure of the [turkey] market was conducive to successful collusion" as "common proof that will establish antitrust injury (in the form of cartel pricing here) on a classwide basis."[165] Each of the market characteristics that the Seventh Circuit held were relevant in *Kleen* for showing common proof of injury are also present here: (1) a concentrated market; (2) vertical integration; (3) barriers to entry; (4) no competition from foreign imports; (5) lack of substitutes; and (6) a commodity product.[166] Thus, as Dr. Williams opines, the structure of the turkey industry ensured that any collusion would impact prices throughout the market. Ex. 1, Williams, ¶¶ 347-370.

**Concentration**: The market for turkey is highly concentrated.[167] As Dr. Williams shows, Processor Defendants collectively accounted for at least ██% of the total live pounds of turkey processed in the U.S. in the ██████████ with Defendants and co-conspirators collectively accounting for at least ███ . Ex. 1, Williams, ¶ 20 & T.1, 372.

---

[164] *Broilers*, 2022 WL 1720468, at *7-19 (finding predominance of common questions and certifying three antitrust classes); *Pork*, 2023 WL 2696497, at *20-25 (same).

[165] 831 F.3d at 927.

[166] *Id.* (citing *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 872 (7th Cir. 2015)); *see also Broilers*, 2022 WL 1720468, at *13; *Pork*, 2023 WL 2696497, at *20, 21; *Tuna*, 31 F.4th at 670, 673, 676.

[167] 831 F.3d at 924, 927 (defendants accounted for 74% of production); *see also In re Capacitors Antitrust Litig.*, No. 17-md-02801-JD, 2018 WL 5980139, at *8 (N.D. Cal. Nov. 14, 2018) (certifying class and noting that the plaintiffs' expert "provided considerable material about how the structure of the market for capacitors was conducive to price fixing, including evidence about the concentration of manufacturers").

**Barriers to Entry/Vertical Integration**: Barriers that "limit the entry of firms into a market," including high capital expenditure requirements and high levels of vertical integration, "tend to make that market more conducive to the formation and maintenance of a conspiracy." *Id.* at ¶ 361. As multiple Defendants testified, ███████████████████████████████ ███████████████████████████████████████████ *Id.* at ¶¶ 362-363. And the Seventh Circuit has held that a "capital-intensive manufacturing process (which affect[s] the pace and likelihood of new entry)" is a "well accepted characteristic[] of a market that is subject to cartelization."[168]

Moreover, Processor Defendants are ██████████████████████████ ██████████████████████████████████████ Ex. 1, Williams, ¶ 30 & n.21; *see also id.* at ¶¶ 31-41, 364-365.[169] Indeed, most of the turkeys in the U.S. are ██████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████ *Id.* at ¶ 32.

**No Competition from Imports**: Nor are foreign producers likely to threaten Defendants' control of the market.[170] USDA's Shagam testified that a very small amount of turkey is imported into the U.S.[171] Indeed, USDA data show that imports accounts for less than 1% of U.S. turkey consumption for every year in the period 2000-2021. Ex. 1, Williams, ¶ 366. As Dr. Williams explains, "only a select list of countries (Canada, Chile, Israel, Mexico, Poland) are

---

[168] *Kleen*, 831 F.3d at 927.
[169] *See also* Ex. 111, HRLTURKEY0000176429 (Jennie-O touting the "vertical coordination of our systems and the ability to process, market and sell the entire bird").
[170] *Kleen*, 831 F.3d at 927 (identifying "weak competition from import[s]" as characteristic of market conducive to collusion). *See also* Ex. 1, Williams, ¶¶ 46, 366-367.
[171] Ex. 112, Shagam Depo., 281:17-20.

- 32 -

listed by the USDA as eligible to export fresh or frozen turkey meat to the United States." *Id.* at ¶ 367.

**Lack of Substitutes**: Markets with "no good substitutes" and "low elasticity of demand" are "accepted characteristics of a market that is subject to cartelization."[172] Both apply to turkey. Defendants themselves acknowledge that ███████████████████████



████ Ex. 1, Williams, ¶¶ 89-96. For example, ████████████████████

████████████████████[73] and ████████████████████

████████████████████[74] Thus, according to USDA data, "turkey demand is inelastic," meaning that "consumers' propensity to substitute other proteins for turkey meat in response to price changes is limited." Ex. 1, Williams, ¶¶ 358-360.

**Commodity Product**: The market for turkey is also "subject to cartelization," because turkey is a "standardized, commodity product."[175] Processor Defendants acknowledge that ████

████████████████████

████████[76]████████████████[177]████

████████████████████

████████████████████

████████[78] So ████████████████████

---

[172] *Kleen*, 831 F.3d at 927. *See also* Ex. 1, Williams, ¶¶ 89-96, 104-106, 356-360.
[173] Ex. 113, BB000731815, at native 3.
[174] Ex. 114, PERDUETKY0000470250, at 254.
[175] *Kleen*, 831 F.3d at 927. *See also* Ex. 1, Williams, ¶¶ 348-355.
[176] Ex. 115, FARBEST0001212494.
[177] Ex. 116, BB000885272, at 277, 306.
[178] Ex. 117, Reese Depo., 77:1-78:5, 78:18-79:6, 80:5-12.

[black redaction bar] [179]

In sum, DPPs' evidence—including Dr. Williams's report—demonstrates that the structure of the turkey market was conducive to successful collusion and provides common proof that will establish antitrust injury on a classwide basis.[180]

**(2)    Common evidence demonstrates that industry-wide market prices were a shared reference point for all transactions**

As the Seventh Circuit stated in *Kleen*, "[e]ven for transactions where prices were negotiated individually," classwide impact follows where the "starting point for those negotiations would be higher if the market price for the product was artificially inflated."[181] Both Judge Durkin in *Broilers* and Judge Tunheim in *Pork* relied on evidence that individual negotiations "take place in the context of a 'market price'"[182] and that "market prices generally set the individual Defendants' prices" in finding a predominance of common questions as to impact.[183] The evidence shows that Defendants based their prices on common benchmarks here as well.

In particular, [black redaction bar]

[black redaction bar]

[black redaction bar]

[black redaction bar] [184] [black redaction bar]

[black redaction bar] [185] [black redaction bar]

---

[179] *Id*. at 267:2-8.
[180] *Kleen*, 831 F.3d at 927.
[181] 831 F.3d at 928-29; *see also Tuna*, 31 F.4th at 678 ("district court could reasonably conclude that price-fixing would have affected the entire market, raising the baseline prices for all buyers").
[182] *Broilers*, 2022 WL 1720468, at *15.
[183] *Pork*, 2023 WL 2696497, at *24.
[184] Ex. 118, Lightle Depo., 206:4-16.
[185] Ex. 119, Souders Depo., 236:10-14.



[86]

[87]

[188] Indeed,

[89]

Defendants also

For example,

[190] Similarly,

[191]

Moreover, Defendants confirmed

[192]

---

[186] Ex. 120, Taber Depo., 111:15-17, 113:2-4.
[187] Ex. 29, Meath Depo., 52:20-53:4.
[188] *Id.* at 102:19-22.
[189] Ex. 118, Lightle Depo., 124:8-10; *see also id.* at 210:6-9

Ex. 121, FARBEST0000031952.
[191] Ex. 122, PERDUETKY0000433871, at native 23.
[192] Ex. 123, HRLTURKEY0000101719, at 720.



[194]

so

[196] And in

[197]

Likewise,

[198] Similarly,

[199] Such record evidence is unquestionably "probative of whether common issues will predominate with respect to antitrust impact."[200]

Furthermore, this record evidence is confirmed by the extensive correlation analyses that Dr. Williams conducts, which show that prices move in synchronicity across products, Processor

[193] *Id.*
[194] Ex. 124, COOPER0000232517.
[195] Ex. 125, BB001836999.
[196] Ex. 126, FARBEST0001143649.
[197] Ex. 127, BB000956825, at 826.
[198] Ex. 128, FARBEST0001330031.
[199] Ex. 129, HRLTURKEY0000044216.
[200] *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 200 (E.D. Pa. 2016); *In re Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211, at *33 (E.D. Pa. Oct. 19, 2015) (finding that although the defendants' internal "documents, standing alone, would not suffice to prove impact," they "lend support to a finding of predominance").

Defendants, geographic locations, and customers.[201] This is consistent with the record evidence that market prices for turkey products acted as a reference point for prices across the industry. As those market prices changed, prices across the industry also changed. For example, as shown in the figure below, prices for turkey breast products all moved together throughout the class period, from the least expensive to the most expensive products.[202] Dr. Williams also finds the same results for the other class products—ground turkey and whole turkey.[203]



(3)    **Collectively, these market structure facts, in combination with the basic economic laws of supply and demand, support a finding of common impact.**

Examined holistically, the basic characteristics of the turkey market discussed above, in conjunction with fundamental economic theory, support the conclusion that Defendants'

---

[201] Ex. 1, Williams, ¶¶ 428-441; *see also Pork*, 2023 WL 2696497, at *21 ("Correlation analysis conducted by Dr. Mangum further bolsters that all DPPs would be impacted by the price increase.")
[202] Ex. 1, Williams, ¶ 434, fig. 31.
[203] *Id.*, ¶ 434, fig. 32 & 33.

collusion would cause higher prices for all or nearly all turkey products. As discussed above,



[204] Moreover,

[05] And a

[206]

[07] As a result, Ex. 1,

Williams, ¶¶ 375-376.[208] Defendants and other market participants

Ex. 1, Williams ¶¶ 377-379.

[09] And USDA's Shagam confirmed that one "would expect to see higher prices just

from a tighter supply of poultry."[210] Indeed, an internal

[211]

---

[204] Ex. 130, Cooper Depo., 43:6-14.
[205] Ex. 29, Meath Depo., 101:5-11.
[206] Ex. 131, Downes Depo., 261:8-16

[207] Ex. 29, Meath Depo., 98:20-99:1.
[208] *See also* *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984)
(explaining that when "firms restrict output directly, price will as mentioned rise") (Posner, J.); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 152 (3d Cir. 2002) ("A reduction in supply will cause prices to rise.").
[209] Ex. 18, Scholer Depo., 132:10-12.
[210] Ex. 112, Shagam Depo., 109:18-21.
[211] Ex. 132, HRLTURKEY0000169912, at native 2; Ex. 1, Williams, ¶ 379, fig. 27.



        **(4)**      **Regression analyses shows common impact in the form of higher prices.**

"In antitrust cases, regression models have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members."[212] Just as in *Broilers*, *Pork*, *Kleen*, and *Tuna*, here Dr. Williams performs a "regression analysis to determine whether factors other than a conspiracy could have caused the supply decrease by analyzing what [turkey] prices would have been 'but for' the conspiracy."[213] As Judge Durkin explained: "Plugging in known prices and market factor data from the class period and running the regression equation to solve for the dummy variable allows the experts to calculate the

---

[212] *See, e.g., Tuna*, 31 F.4th at 677.
[213] *Broilers*, 2022 WL 1720468, at *7; *see also Kleen*, 831 F.3d at 929; *Pork*, 2023 WL 2696497, at *20-21; *Tuna*, 31 F.4th at 676, 682-84. *See also* Ex. 1, Williams, ¶¶ 380-384.

portion of price not accounted for by the market factors."[214] And Dr. Williams did just that—*proving empirically* that Defendants' collusion caused higher prices.

Dr. Williams used an "overcharge regression based on a reduced form price equation" to "measure the relationship between market prices and fundamental factors that affect supply and demand." Ex. 1, Williams, ¶¶ 12, 380-384, 446. Using nearly ███ transactions representing $██ billion in commerce, Dr. Williams's econometric model determined the impact of Defendants' conduct by comparing the prices paid by direct purchasers during the conspiracy period to a benchmark period. *Id.* at ¶¶ 12, 385-402, 446. In his model, Dr. Williams controlled "supply-side factors such as dressed meat cost, avian influenza in 2015; demand-side factors such as population, disposable income per capita, 2011 food-borne pathogens, prices of substitute products; and factors that may affect both demand and supply such as inflation and the Great Recession." *Id.* at ¶¶ 12, 403-414, 446. After "accounting for demand and cost factors that may affect turkey product prices," he found that "Defendants' alleged conspiracy increased turkey product prices by ██%." *Id.* at ¶¶ 12, 415-417. Moreover, as an additional robustness check, Dr. Williams estimates his regression model separately by product category, finding statistically significant overcharges as to each of turkey breast, ground turkey, and whole turkey. *Id.* at ¶¶ 423-424.

On very similar evidence, classes were certified in *Broilers*, *Tuna*, and *Pork*.[215] As Judge Wood recently stated, Defendants' criticisms of "aspects of [the expert's] methodology should be presented to the jury and do not stand in the way of class certification."[216] So too here.

---

[214] *Broilers*, 2022 WL 1720468, at *12; *see also* 2 Phillip E. Areeda & Herbert J. Hovenkamp, Antitrust Law §395 (4th ed. 2021) ("coefficient on the dummy variable" is "an estimate of the collusive overcharge—that is, the increase in price due solely to the anticompetitive behavior").
[215] 2022 WL 1720468, at *7; *see also Pork*, 2023 WL 2696497, at *20-21; *Tuna*, 31 F.4th at 676, 682-84.
[216] *Moehrl*, 2023 WL 2683199, at *17.

### (5) Additional common econometric evidence demonstrates that all or nearly all direct purchasers suffered impact.

In concluding that the "anticompetitive effects of the alleged conspiracy were widespread across members of the proposed Class, causing harm to all or virtually all Class Members," Dr. Williams relies on additional econometrics besides his overcharge model and correlation analyses discussed above, determining that "all or almost all Class Members had at least one overcharge observation during the damages period." Ex. 1, Williams, ¶¶ 12, 419, 446. In a two-step approach, Dr. Williams uses the model underlying his common impact regression analysis, or true model, "to predict but-for prices and compare those prices to the actual prices for *each* observation of *each* consumer in the data for the damages period." Ex. 1, Williams, ¶ 425; Ex. 3, Williams Sur-Reply, ¶ 141 n.192. Importantly, he finds that 1,672 of 1,675 of the unique customers in the dataset—or approximately 99.8%—had at least one overcharge observation during the class period.[217] Ex. 1, Williams, ¶¶ 426-427. Thus, Dr. Williams opines that the "anticompetitive effects of the alleged conspiracy were widespread across members of the proposed Class, causing harm to all or virtually all Class Members." Ex. 1, Williams, ¶¶ 12, 446.

### 2. Damages can be measured using a common methodology.

At the class certification stage, "Plaintiffs simply need to show that 'there is a classwide method for proving damages'"[218] and that their damages theory "correspond[s] to the theory of liability" under *Comcast*.[219] It is "well established that the presence of individualized questions

---

[217] *See Tuna*, 31 F.4th at 672 ("comparison showed that 94.5 percent of the purchasers had at least one purchase above the predicted but-for price, which again provided further evidence that the conspiracy had a common impact on all or nearly all the members of the DPP class"); *Pork*, 2023 WL 2696497, at *21 (application of model to class members to "determine[] that over 99% of DPPs paid elevated prices at least once during the Class Period" was "type of market-wide economic analysis [that] has been accepted by many courts to show predominance as to antitrust impact").

[218] *Moehrl*, 2023 WL 2683199, at *20 (quoting *Kleen*, 831 F.3d at 929).

[219] *Kleen*, 831 F.3d at 929.

regarding damages does not prevent certification."[220] Indeed, the "use of aggregate damages calculations" is "implied by the very existence of the class action mechanism itself."[221] Moreover, the "Seventh Circuit has recognized that 'in complicated antitrust cases plaintiffs are permitted to use estimates . . . to calculate a reasonable approximation of their damages.'"[222]

DPPs here propose a valid methodology to calculate aggregate damages to the class. Based on his overcharge regression analysis, Dr. Williams quantifies classwide damages by comparing (1) prices direct purchasers paid for turkey products to (2) the estimated prices they would have paid but for Defendants' alleged conspiracy. Ex. 1, Williams, ¶¶ 14, 448. The resulting damages total $1.63 billion before trebling. *Id.* Moreover, "this analysis neatly fits the Plaintiffs' claims and theory of harm," such that "[t]here is no *Comcast* problem."[223]

### 3.    A class action is superior to any other alternative.

Rule 23(b)(3)'s superiority requirement "is comparative" as the "court must assess efficiency with an eye toward other available methods."[224] Rule 23 instructs that the matters pertinent to this inquiry include: (A) class members' interests in individually controlling the prosecution of separate actions; (B) whether other litigation exists concerning this controversy; (C) the desirability of concentrating the litigation in this forum; and (D) any likely difficulties in managing a class action.[225] Each of these factors supports certification.

Where the harm caused to any one individual class member is small, but the collective harm is great, the first three factors of Rule 23(b)(3) weigh heavily in favor of certification. The

---

[220] *Moehrl*, 2023 WL 2683199, at *20 (quoting *Messner*, 669 F.3d at 815).

[221] *E.g.*, *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197-98 (1st Cir. 2009).

[222] *Moehrl*, 2023 WL 2683199, at *20 (quoting *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 493 (7th Cir. 2002)); *see also Comcast*, 569 U.S. at 35 (damages "[c]alculations need not be exact").

[223] *Broilers*, 2022 WL 1720468, at *10; *see also id.* at *19; *see also Pork*, 2023 WL 2696497, at *7, 26.

[224] *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 664 (7th Cir. 2015).

[225] Fed. R. Civ. P. 23(b)(3).

Seventh Circuit has explained that "Rule 23(b)(3) was designed for situations such as this, in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate."[226] Class members purchased turkey for resale repeatedly throughout the class period.[227] While some direct purchasers—generally very large purchasers—have opted out in order to bring individual suits against Defendants, the vast majority of class members have not done so. Indeed, for most, individual damages are far smaller than the resources required to litigate against some of the largest agribusiness companies in the country.

Moreover, in assessing manageability, "the district court should always keep in mind that the superiority standard is comparative and that Rule 23(c) and (d) permit creative solutions to the administrative burdens of the class device."[228] As the Seventh Circuit has cautioned, "a class action has to be unwieldy indeed before it can be pronounced an inferior alternative . . . to no litigation at all."[229] Thus, as in *Broilers*, there is not "another available method to address Plaintiffs' claims that is superior to certifying a class."[230]

### 4.     The class is ascertainable.

The proposed class does not suffer from any of the "three common problems" tending to frustrate ascertainability: "vagueness, classes defined by subjective criteria, and classes defined in terms of success on the merits."[231] Instead, the class—direct purchasers of turkey products from Defendants during the class period—is ascertainable, because it is "defined clearly and

---

[226] *Beaton*, 907 F.3d at 1030; *see generally Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The **realistic** alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.") (emphasis in original.), *cert. denied*.

[227] Ex. 109, Maplevale Farms Decl. at ¶ 3; Ex. 110, John Gross & Co. Decl. at ¶ 3.

[228] *Mullins*, 795 F.3d at 672.

[229] *Id.* at 658.

[230] 2022 WL 1720468, at *20.

[231] *Fauley*, 323 F.R.D. at 601 (citing *Mullins*, 795 F.3d at 659-60); *see also Zarinebaf*, 2023 WL 2561613, at *2-3.

based on objective criteria."[232] The Seventh Circuit requires nothing more.[233]

**C.    Class Counsel are adequate under Rule 23(g).**

Two firms have litigated this case on behalf of the direct purchaser class for over three years. Each firm has devoted considerable time and resources to prosecute this action vigorously since its inception, and each is committed to continuing to do so through the course of this litigation. The firms have overseen case strategy, briefed and argued motions, coordinated and reviewed millions of documents from Defendants and third parties, taken and defended dozens of depositions, and retained experts. DPPs respectfully request that Hagens Berman Sobol Shapiro LLP and Lockridge Grindal Nauen P.L.L.P. be appointed to act as co-lead class counsel under Rule 23(g) for the Direct Purchaser class.

## VI.    CONCLUSION

DPPs respectfully request that the Court certify their proposed class.

---

[232] *Mullins*, 795 F.3d at 659.
[233] *Id.* at 657-58; *see also Broilers*, 2022 WL 1720468, at *21.

DATED: September 22, 2023

Respectfully submitted,

/s/ Shana E. Scarlett
Shana E. Scarlett
Rio S. Pierce
Abby R. Wolf
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
(510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com
abbyw@hbsslaw.com

Steve Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive
Suite 2410
Chicago, IL 60611
(708) 628-4949
steve@hbsslaw.com

Elaine T. Byszewski
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, CA 91101
(213) 330-7150
elaine@hbsslaw.com

/s/ Brian D. Clark
W. Joseph Bruckner (MN #147758)
Brian D. Clark (MN #0390069)
Simeon A. Morbey (MN #0391338)
Steve E. Serdikoff (PA #86773)
Stephen M. Owen (MN#0399370)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
wjbruckner@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com
seserdikoff@locklaw.com
smowen@locklaw.com

*Co-Lead Counsel for the Direct Purchaser Plaintiff Class*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on September 22, 2023, a true and correct copy of the foregoing was electronically filed by CM/ECF, which caused notice to be sent to all counsel of record.

/s/ *Shana E. Scarlett*

SHANA E. SCARLETT
