## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| *IN RE TURKEY ANTITRUST LITIGATION* | Case No. 1:19-cv-08318 |
| This Document Relates To:<br><br>COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFF ACTION (Case No. 1:20-cv-02295) | Honorable Virginia M. Kendall<br>Hon. Keri L. Holleb Hotaling |

## MEMORANDUM IN SUPPORT OF COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS' MOTION FOR <u>CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL</u>

### REDACTED

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

I.      Introduction ........................................................................................................... 1

II.     Statement of Facts ................................................................................................. 3

        A.      Defendants Conspired to Reduce the Supply of Turkey Products to Increase the Prices They Charged and Their Profits .................................................. 6

                1.      Defendants Concocted their Conspiracy via the National Turkey Federation ................................................................................................ 6

                2.      Defendants Began Implementing Initial Cuts in late 2008 and through 2009 ................................................................................................ 9

                3.      With Production Cuts Resulting in Increased Prices, Defendants Continued to Cut Production into 2012 and 2013 ....................................... 11

                4.      Production Cuts and Inflated Prices Continued into and beyond 2014 .... 14

        B.      The Conspiracy Broadly Impacted CIIPPs Throughout the Proposed Class ........ 17

        C.      Summary of Common Issues of Law and Fact ................................................... 18

III.    Standards for Class Certification ......................................................................... 19

IV.     Plaintiffs Satisfy Rule 23(a) ................................................................................ 21

        A.      Numerosity ........................................................................................................ 21

        B.      Commonality ..................................................................................................... 21

        C.      Typicality .......................................................................................................... 23

        D.      Adequacy of Representation .............................................................................. 24

        E.      The Class Is Properly Defined and Ascertainable ............................................ 25

V.      Plaintiffs Satisfy Rule 23(b)(2) ........................................................................... 26

VI.     Plaintiffs Satisfy Rule 23(b)(3) ........................................................................... 26

        A.      Common Questions Predominate ....................................................................... 26

                1.      Common Evidence Shows Actual Price Increases ................................... 28

                2.      Common Evidence Shows the Mechanism for Price Increases ............... 29

3.      Common Evidence Shows Conspirators' Communication Channels....... 29

4.      Common Evidence Shows Factors Suggesting Cartel Discipline Could Be Maintained ............................................................................................... 30

5.      Common Evidence Shows All or Nearly All Class Members Were Impacted by the Conspiracy ..................................................................................... 31

6.      CIIPPs Have Shown a Reliable Method of Calculating Damages ........... 41

7.      Any Remaining Individual Issues Are Easily Managed and Will Not Predominate Over Questions Common to the Class................................... 42

B.     A Class Action Is Superior to Alternative Means of Resolving CIIPPs' Claims . 44

VII.    The Court Should Appoint Class Counsel ........................................................................ 45

VIII.   Conclusion ...................................................................................................................... 45

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Al Haj v. Pfizer Inc.*, 338 F. Supp. 3d 741 (N.D. Ill. 2018) ........................................ 43

*Amgen v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013) ......................... 20, 27

*Arreola v. Godinez*, 546 F.3d 788 (7th Cir. 2008) ...................................................... 19

*Barnes v. Airline Pilots Ass'n, Int'l*, 310 F.R.D. 551 (N.D. Ill. 2015) ........................ 21

*Beaton v. Software*, No. 13-CV-08389, 2017 WL 4740628 (N.D. Ill. Oct. 19, 2017) ................ 25

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) ........................................................ 45

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598

   (2001) ........................................................................................................... 26

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) ................................ 45

*Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820 (D.N.J. 2015)......................... 32, 36

*Day v. Check Brokerage Corp.*, 240 F.R.D. 414 (N.D. Ill. 2007) ................................ 20

*De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225 (7th Cir. 1983)...................... 23

*East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395 (1977) .................. 24

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011)............................. 19

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014)................................................. 24

*Fond du Lac Bumper Exch., Inc. v. Jui Li Enter, Co.*, No. 09-cv-0852, 2016 WL 3579953 (E.D.

   Wis. June 24, 2016) ..................................................................................... 35

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147 (1982)...................................... 19, 21

*In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 JG VVP, 2014 WL 7882100

   (E.D.N.Y. Oct. 15, 2014) ............................................................................ 35, 40

*In re Allstate Corp. Sec. Litig.*, 966 F.3d 595 (7th Cir. 2020) ................................................. 27, 44

*In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018) ........................................................... 32

*In re Blood Reagents Antitrust Litig.*, MDL No. 09-2081, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) ........................................................................................................................................ 35

*In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022) ....................................................................................... 1, 20, 32, 35, 36, 40, 42, 43

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606 (N.D. Cal. 2015) ............... 20, 35

*In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200 (M.D. Penn. 2012) .................. 40

*In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029 (N.D. Ill. 2022) ........................ 42

*In re Domestic Drywall Antitrust Litig.*, 322 F.R.D 188 (E.D. Penn. 2017) ................................ 40

*In re High Fructose Corn Syrup Litig.*, 295 F.3d 651 (7th Cir. 2002) ........................................ 35

*In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167 (N.D. Cal. 2013) .............. 22, 27, 32

*In re Korean Ramen Antitrust Litig.*, 2017 WL 235052 (N.D. Cal. 2017) ................................... 40

*In re Linerboard Antitrust Litig.*, 203 F.R.D. 197 (E.D. Pa. 2001) ............................................. 20

*In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) .................................................... 35

*In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2016 WL 948874 (N.D. Cal. Mar. 14, 2016) .................................................................................................................................. 25

*In re NorthShore Univ. HealthSystem Antitrust Litig.*, No. 07-cv-4446, 2018 WL 2383098 (N.D. Ill. Mar. 31, 2018) ........................................................................................................................ 25

*In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ................................................................................................................................. 37

*In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308 (S.D. Cal. 2019) ................... 1, 40

*In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT/JFD), 2023 WL 2696497 (D. Minn. Mar. 29, 2023) ................................................................................ 1, 20, 36, 37, 40, 42, 43

*In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567-MD-W-GAF, 2021 WL 5632089 (W.D. Mo. Nov. 9, 2021) ................................................................................ 37

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619 (D.C. Cir. 2019) ................... 32

*In re Ready Mixed Concrete*, 261 F.R.D. 154 (S.D. Ind. 2009) .................................. 23

*In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005) ..................................... 20

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603 (N.D. Cal. 2009) 36

*In re Sulfuric Acid Antitrust Litig.*, No. 03 C 4576, 2007 WL 898600 (N.D. Ill. Mar. 21, 2007) 20, 23

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583 (N.D. Cal. 2010) .............. 20, 27, 45

*In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328 (D. Md. 2012) ...................................... 35

*In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108 (2d Cir. 2013) ..................................... 43

*In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014) ............................................ 42, 43

*In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002) ................................................... 42

*Keele v. Wexler*, 149 F.3d 589 (7th Cir. 1998) ............................................................................ 23

*Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004) ........................................................ 43, 44

*Kleen Prods. LLC v. Int'l Paper Co.* 831 F.3d 919 (7th Cir. 2016) .... 3, 20, 27, 28, 29, 30, 31, 33, 36, 42, 43

*Kleen Prods. LLC v. Int'l Paper Co.*, 306 F.R.D. 585 (N.D. Ill. 2015) ........................................ 22

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586 (N.D. Ill. 2009) ............................... 45

*Marcial v. Coronet Ins. Co.*, 880 F.2d 954 (7th Cir. 1989) ........................................................ 21

*MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983) ......... 42

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012) ......... 3

*Messner v. Northshore Univ. Health System*, 669 F.3d 802 (7th Cir. 2012) ........ 19, 20, 21, 25, 27

*Moehrl v. Nat'l Ass'n of Realtors*, No. 19-CV-01610, 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ...................................................................................................................................... 22, 23

*Moore v. Stellar Recovery, Inc.*, No. 13 C 2294, 2014 WL 3509729 (N.D. Ill. July 14, 2014) ... 45

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015) .................................................... 25

*Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849 (7th Cir. 2017) ..................................... 21

*Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270 (N.D. Cal. 2016).......................... 32

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022). 1, 20, 32, 43

*Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) ............................................................... 23

*Rand v. Monsanto Co.*, 926 F.2d 596 (7th Cir. 1991).................................................................. 24

*Randall v. Rolls-Royce Corp.*, 637 F.3d 818 (7th Cir. 2011) ..................................................... 26

*Saltzman v. Pella Corp.*, 257 F.R.D 471 (N.D. Ill. 2009)..................................................... 23, 43, 44

*Spano v. The Boeing Co.*, 633 F.3d 574 (7th Cir. 2011)............................................................... 24

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014)............................................... 21, 22

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) .................................................. 44

*Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001)............................................. 19

*Tatz v. Nanophase Techs. Corp.*, No. 01 C 8440, 2003 WL 21372471 (N.D. Ill. June 13, 2003) 23

*Tyson Foods v. Bouaphakeo*, 577 U.S. 442 (2016) ........................................................ 27, 30, 41

*Uhl v. Thoroughbred Technology and Telecomm.*, 309 F.3d 978 (7th Cir. 2002) ...................... 24

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978)............................................................... 4

*Wal-Mart v. Dukes*, 564 U.S. 338 (2011) .......................................................... 19, 20, 21, 22, 23

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100 (1969)......................................... 19, 32

**OTHER AUTHORITIES**

Hal J. Singer, *Economic Evidence of Common Impact for Class Certification in Antitrust Cases:*

    *A Two-Step Analysis*, 25 Antitrust 34, 34 (2011)...................................................................... 36

**RULES**

Fed. R. Civ. P. 23(a)(1)......................................................................................................... 21

Fed. R. Civ. P. 23(b)(2)..................................................................................................... 1, 26

Fed. R. Civ. P. 23(b)(3).......................................................................................... 1, 26, 44, 45

Fed. R. Civ. P. 23(g)(4).......................................................................................................... 45

**TREATISES**

Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure (3d ed. 2011) ........ 27, 41

## I. INTRODUCTION

Three times in recent years, courts in three different circuits have certified classes of commercial and institutional indirect purchasers who allege injuries from conspiracies to illegally inflate the price of commodity animal protein products.[1] Plaintiffs in this matter, Commercial and Institutional Indirect Purchasers of turkey products ("CIIPPs"), likewise seek to proceed as a class and respectfully request the certification of a class to pursue injunctive relief and damages pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3).

Like *Packaged Seafood*, *Broilers*, and *Pork Antitrust*, referenced above, this is a classic antitrust conspiracy case.[2] The principal Defendants, known as Integrators, are the nation's largest suppliers of turkey products. Collectively, they controlled nearly 90 percent of the market for turkey and accounted for approximately half a billion dollars in annual sales during the class period.[3]

---

[1] *See In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308 (S.D. Cal. 2019), *aff'd sub nom. Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (*en banc*), *cert. denied*, 143 S. Ct. 424 (2022); *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *1 (N.D. Ill. May 27, 2022), *pet. to appeal denied*, No. 22-8007 (7th Cir. Jul. 18, 2022); *In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT/JFD), 2023 WL 2696497 (D. Minn. Mar. 29, 2023), *pet. to appeal denied*, No. 23-8002 (8th Cir. May 19, 2023).

[2] For purposes of this motion, Defendants are Agri Stats, Inc. (Agri Stats"); Butterball LLC (Butterball); Cargill Inc. and Cargill Meat Solutions Corporation, (together and separately, Cargill); Cooper Farms, Inc. ("Cooper Farms"); Farbest Foods, Inc., ("Farbest"); Foster Farms LLC and Foster Poultry Farms ("Foster Farms"); Hormel Foods Corporation and Jennie-O Turkey Store, Inc. ("Hormel"); House of Raeford Farms, Inc., ("House of Raeford"); Prestage Farms, Inc., Prestage Foods, Inc., Prestage Farms of South Carolina, LLC ("Prestage"); Purdue Farms, Inc. and Perdue Foods LLC ("Perdue"); Tyson Foods, Inc., the Hillshire Brands Company, Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. ("Tyson").

[3] Declaration of Blaine Finley in Support of Commercial and Institutional Indirect Purchaser Plaintiffs' Motion for Class Certification and for Appointment of Class Counsel (hereinafter "Finley Decl."), Ex. 1, Expert Report and Associated Errata of Russell W. Mangum III, Ph.D. ¶ 117 (hereinafter "Mangum Rep."). Unless otherwise noted, exhibit references throughout refer to documents attached to the Finley Declaration filed concurrently herewith. Additional associated expert reports include: Declaration and Report of Lauren J. Stiroh, Ph.D., Ex. 2 to Finley Decl. (hereinafter "Stiroh Rep."); Expert Reply Report of Russell W. Mangum III, Ph.D., Ex. 3 to Finley Decl. (hereinafter "Mangum Reply"); Expert Reply Report of Lauren J. Stiroh, Ph.D., Ex. 4 to Finley Decl. (hereinafter "Stiroh Reply"); Expert Supplemental Reply Report of Russell W. Mangum III, Ph.D., Ex. 5 to Finley Decl. (hereinafter "Mangum Sup. Reply").

The Complaint[4] alleges that Defendants conspired to limit the supply and fix, raise, and maintain prices for turkey products in the United States from at least January 1, 2010, to at least December 31, 2016. Plaintiffs have brought *per se* and rule of reason claims based on that conduct. Defendants aimed to restrict the supply of turkey products in the United States and artificially inflate the prices paid by CIIPPs. It was implemented via multiple acts of anticompetitive conduct, allowing Defendants to reap increased profits at CIIPPs' expense.

CIIPPs consist of restaurants, caterers, and other institutional food service providers like private schools and company cafeterias that purchased turkey products indirectly from the conspiring Defendants for use in commercial food preparation. CIIPPs assert claims under the Sherman Act to secure injunctive relief for Class members in Indirect Purchaser States;[5] claims for violations of state antitrust laws to secure damages; and claims for unjust enrichment and violations of state consumer protection law predicated on Defendants' alleged antitrust violations. *See* Compl. ¶¶ 553-682.

The central elements of CIIPPs' claims can and will be proven through evidence common to all class members. CIIPPs have adduced substantial common evidence of the conspiracy and how it operated. They have, likewise, adduced substantial evidence that all or nearly all class members were injured by the conspiracy. CIIPPs' economic expert, Dr. Russell Mangum, analyzed the conspiracy's impact across the proposed Class using multiple tools of economic analysis and consistently found that all or nearly all members of the proposed Class were injured by the conspiracy. *See, e.g.*, Mangum Rep. ¶¶ 151, 157-75, 200-206, 214-32. This evidence, too, is

---

[4] The operative complaint, designated "Complaint" or "Compl.," is Commercial and Institutional Indirect Purchaser Plaintiffs' Fourth Amended Class Action Complaint, <u>ECF No. 666</u>.

[5] The Indirect Purchaser States are: Arizona, Arkansas, California, the District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Missouri, Mississippi, North Carolina, North Dakota, Nebraska, New Hampshire, New Mexico, Nevada, New York, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Wisconsin, and West Virginia.

common to the Class. Although Defendants' expert attempts to undermine Dr. Mangum's findings, her arguments are unpersuasive and premature. *See Kleen Prods. LLC v. Int'l Paper Co.* 831 F.3d 919, 927 (7th Cir. 2016). Finally, CIIPPs' common evidence shows the damages the Class suffered because of the conspiracy. Mangum Reply ¶ 201.[6]

"[C]lass action treatment is appropriate and is permitted by Rule 23 when the judicial economy from consolidation of separate claims outweighs any concern with possible inaccuracies from their being lumped together in a single proceeding for decision by a single judge or jury." *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012). As courts have repeatedly found in similarly complex matters, certifying the proposed class is the fairest and most efficient means of resolving CIIPPs' claims for serious violations of antitrust laws.

## II.    STATEMENT OF FACTS

The Integrator Defendants are the United States' leading suppliers of turkey products. The remaining Defendants, Agri Stats, Inc. ("Agri Stats") and its subsidiary Express Markets International, Inc. ("EMI"), provide nonpublic information exchange services to the Integrator Defendants.[7] Integrator Defendants control nearly 90 percent of the highly concentrated turkey integration market along with a small group of Co-conspirators.[8] ████████████████████

████████████████████████████████████████████████████

████████████████████.[9] ████████████████████████████████████████

---

[6] To avoid repetition, CIIPPs incorporate by reference the Direct Purchaser Plaintiffs memorandum in support of their motion of class certification and the documents filed therewith.

[7] Compl. ¶¶ 538, 209.

[8] The non-defendant Co-conspirators include Circle S-Ranch, Inc., Dakota Provisions, Kraft, Michigan Turkey Producers LLC, Norbest LLC, and West Liberty Foods LLC (together, the "Co-conspirators").

[9] ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ *See*, *e.g.*, Ex. 6, McKay Dep. 37:10-38:19. Live haul contractors are trained by

The Supreme Court has recognized that "exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). This, CIIPPs allege, is what happened here. The Integrator Defendants' exchange of highly sensitive, non-public information through Agri Stats and other channels enabled them to monitor and coordinate supply levels,[11] aiding a years-long conspiracy to inflate their profits.[12]

The information Defendants exchanged via Agri Stats gave them significant insight into one another's sensitive business decisions. ███████████████████████████████

██████████[13]████████████████████████[14]██████████████████████████████

████████████████████████████████████████████████████████████████████

---

the company in the proper handling of turkeys. *See, e.g.*, Ex. 7, *U.S. Turkey Business*, Cargill, https://www.cargill.com/meat-poultry/us-turkey-business (last visited Sep. 20, 2023). *See also* Ex. 8, Randick Dep. 231:21-23, Ex. 9, Lisenby Dep. 193:3-10, Ex. 10, Niemann Dep. 29:9-30:3, Ex. 11, PFI00072671.

[10] ████████████████████████████████████████████████████████████████████ Ex. 12, Taber Dep. 50:25-52:12, Ex. 13, Lykken Dep. 39:19-40:1.

[11] *See, e.g.*, Ex. 14, Leitch Dep. 337:18-340:3, Ex. 15, BB001410275, Ex. 16, HRLTURKEY0000642600, Ex. 17, COOPER0000201477. Ex. 18, HRLTURKEY0000057164; Ex. 19, Ehresmann Dep. 82:5-83:3; Ex. 20, CMS0000036846; Ex. 21, CMS0000036854; Ex. 22, Stone Dep. 110:6-116:22; 170:6-173:2; 182:13-22; 183:20-187:20; Ex. 23, HRLTURKEY0000024702; Ex. 24, BB000771859; and Ex. 25, HRLTURKEY0000100480.

[12] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████ Ex. 26, AGSTAT-T-03394758.

[13] Ex. 27, Pelletier Dep. 171:23-172:1.

[14] ████████████████████████████████████████████████████████████████ Ex. 28, Rutledge Dep. 34:12-35:1; Ex. 29, Morrison Dep. 144:10-13; Ex. 30, AGSTAT-T-03344197; Ex. 31, AGSTAT-T-03344203.

[15] Ex. 32, Prestage Dep. 154:22-25. ██████████████████████████████
█████████████████ Ex. 33, Edwards Dep. 39:7-12, Ex. 34, AGSTAT-T-03325661.



[16] Ex. 35, Snyder Dep. 20:18-22:23; Ex. 36, Knapp Dep. 26:9-17, Ex. 37, AGSTAT-T-03402051, Ex. 38, AGSTAT-T-03402053 at Slide 12

x. 18, HRLTURKEY0000057164.

Ex. 39, CMS0000009460 at 9466.

[17]

Ex. 40, FARBEST0000178588 at 8589.

Ex. 41, COOPER0000260330.

[18] See, e.g., Ex. 42, Stover Dep. 69:10-70:20.

Ex. 43, BB001951912.

[19] See, e.g., Ex. 22, Stone Dep. 70:11-72:21; Ex. 33, Edwards Dep. 24:18-29:11; Ex. 36, Knapp Dep. 210:9-211:18; Ex. 44, Milton Dep. 201:2-203:1

Ex. 45, AGSTAT-T-03963966.

set." Ex. 33, Edwards Dep. 24:18-25:50.

Ex. 46, Qualls Dep. 45:10-16

Ex. 47, AGSTAT-T-03334470.

Ex. 42, Stover Dep. 76:9-77:16.

. Ex. 48, AGSTAT-T-03327417, Ex. 49, AGSTAT-T-03327418. Ex. 35, Snyder Dep. 27:17-28:3.

[20]

Ex. 50, AGSTAT-T-03963596.

Ex. 51, AGSTAT-T-03929286, Ex. 52, AGSTAT-T-03929287.

**A.    Defendants Conspired to Reduce the Supply of Turkey Products to Increase the Prices They Charged and Their Profits**

Defendants implemented their conspiracy in at least two ways: (1) exchanging non-public, confidential turkey supply and pricing information through Agri Stats/EMI; and (2) engaging in repeated direct communications regarding the supply and price of turkey. ████████████████

████████████████████████████████████████████████████████████████████

████████████████████[21]████████████████████████████████

████████████████████████████████████.

**1.    Defendants Concocted their Conspiracy via the National Turkey Federation**

The National Turkey Federation ("NTF") is a trade association that describes itself as ████

████████████████████[22] and represents ████████████████████.[23] At the beginning of the conspiracy, ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████        ████████████

████████████████████[25]

████████████████████████████████████████████████

---

[21] Ex. 53, COOPER0000239744. ████████████████████████████████████

████████████████████████████████████████████████
         Ex. 54, HRLTURKEY0000673964.
[22] Ex. 55, RABOBANK0000026509. ████████████████████████████████████
████      Ex. 10, Niemann Dep. 78:9-13.
[23] Ex. 56, Brandenberger Dep. 172:7-173:1.
[24] Ex. 10, Niemann Dep. 223:21-225:18, Ex. 57, CMS0000286550 at 6551.
[25] Ex. 36, Knapp Dep. 46:10-16; 48:2-5.



---

[26] Ex. 17, COOPER0000201477.
[27] Ex. 50, AGSTAT-T-03963596.
[28] Ex. 58, FARBEST0001306188 (emphasis added).
[29] Ex. 59, FARBEST000123323 *Id.*
[30] Ex. 32, Prestage Dep. 95:18-96:16; Ex. 60, PFI00001740 ; Ex. 61, FARBEST0001371967.
[31] Ex. 62, FARBEST0001233314.
[32] Ex. 62, FARBEST0001233314.
[33] Ex. 63, AGSTAT-T-03963918; Ex. 64, Seger Dep. 76:18-77:14; Ex. 65, T. Seger Dep. 79:2-7.
[34] Ex. 50, AGSTAT-T-03963596 at 3597.



---

[35] Ex. 50, AGSTAT-T-03963596.
[36] Ex. 51, AGSTAT-T-03929286, Ex. 52, AGSTAT-T-03929287.
[37] Ex. 52, AGSTAT-T-03929287.
[38] Ex. 62, FARBEST0001233314 at 3315 (emphasis added).
[39] Ex. 66, AGSTAT-T-03777159 at 7162.
[40] *Id.* at 7184.
[41] Ex. 64, Seger Dep. 76:18-77:14; Ex. 63, AGSTAT-T-03963918.

## 2. Defendants Began Implementing Initial Cuts in late 2008 and through 2009

[REDACTED]

[REDACTED]

[REDACTED] [44]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[42] Ex. 62, FARBEST0001233314 at 3315.
[43] Ex. 63, AGSTAT-T-03963918.
[44] Ex. 17, COOPER0000201477; Ex. 67, COOPER0000230670; Ex. 68, COOPER0000197890; Ex. 69, FARBEST0000172106.
[45] Ex. 70, HRLTURKEY0000624593.
[46] *Id.*
[47] Ex. 71, BB001958181, Ex. 72, BB001958183 at 8185.
[48] Ex. 73, AGSTAT-T-03621750.
[49] *Id.*

[REDACTED] d.



---

[50] Ex. 74, AGSTAT-T-03906019.

[51] ███████████████████████████████████████████████████████████
███████████████████████████████████ Ex. 75, COOPER0000197889; Ex. 68,
COOPER0000197890.

[52] Ex. 69, FARBEST0000172106. ████████████████████████████████████████
██████████████████████████████████████████ *Id.*

[53] Ex. 76, HRLTURKEY0000073000.

[54] Ex. 77, PERDUETKY0000385867.

[55] Ex. 76, HRLTURKEY0000073000.



In no uncertain terms, the conspiracy was succeeding in reducing supply below competitive levels and opening the door to price increases.

### 3. With Production Cuts Resulting in Increased Prices, Defendants Continued to Cut Production into 2012 and 2013



---

[56] Ex. 78, COOPER0000126933.
[57] Ex. 79, FARBEST0000080755.
[58] Ex. 80, BB001392671.
[59] Ex. 81, BB001382331.



---

[60] Ex. 82, BB001828122.

[61] Ex. 83, BB000804857, Ex. 84, BB000804858 at 4860.

[62] Ex. 85, HRLTURKEY0000032798. *Id.*

[63] Ex. 86, HRLTURKEY0000101718.

[64] Ex. 87, CMS0000256146.

[65] Ex. 88, COOPER0000233161; Ex. 89, COOPER0000233162 at 3163.

[66] Ex. 90, COOPER0000235625.

[67] Ex. 91, FARBEST0000165918.



---
[68] Ex. 92, AGSTAT-T-03348571.
[69] Ex. 93, CMS0000256677 at 6681.
[70] Ex. 94, COOPER0000125478 at 5478.
[71] Ex. 95, CMS0000081500 at 1502.
[72] Id.
[73] Ex. 95, CMS0000081500.
[74] Ex. 96, COOPER0000175131.
[75] Ex. 97, COOPER0000175420.

[REDACTED] [76]

### 4.  Production Cuts and Inflated Prices Continued into and beyond 2014

[REDACTED] [77]

[REDACTED] [78]

[REDACTED]

[REDACTED] [79]

[REDACTED]

[REDACTED]

[REDACTED] [80]

[REDACTED]

[REDACTED] [81]

[REDACTED]

[REDACTED]

[REDACTED] [82]

[REDACTED]

---

[76] Ex. 98, AGSTAT-T-03894362.

[REDACTED] Ex. 99, PERDUETKY0000426467. [REDACTED] Ex. 100, BB001955465.

[78] Ex. 101, COOPER0000201313.

[79]  Ex.  102,  COOPER0000210407. [REDACTED]

[REDACTED] Ex. 103, COOPER0000230557.

[80] Ex. 104, COOPER0000239574.

[81] Ex. 53, COOPER0000239744.

[REDACTED] Ex. 105, FARMECON-0000001117 at 1120.

[82] Ex. 106, COOPER0000240009 at 0010 (emphasis added).



---

[83] Ex. 106, COOPER0000240009.
[84] Ex. 107, AGSTAT-T-03783381.
[85] Ex. 101, COOPER0000201313; Ex. 108, NTF0000071373; Ex. 109, AGSTAT-T-03638978.

Ex. 110, FARBEST0001310552.
[86] Ex. 111, AGSTAT-T-03639404; Ex. 112, NTF0000212718 at 2722.
[87] Ex. 111, AGSTAT-T-03639404.
[88] Ex. 112, NTF0000212718 at 2722.
[89] Ex. 112, NTF0000212718 at 2721.
[90] Ex. 113, FARBEST0001310904 ; Ex. 114, FARBEST0001310905 at 0907; Ex. 115, AGSTAT-T-03639505.



---

[91] Ex. 116, CMS0000126144 at 19.
[92] Ex. 117, CMS0000126703 at 6712.
[93] Ex. 118, FARBEST0001343064.
[94] Ex. 119, PERDUETKY0000097317 at 7318.
[95] Ex. 13, Lykken Dep. 212:9-16.
[96] Ex. 120, BB001817234.
[97] Ex. 121, FF-TKY-00128706.
[98] Ex. 122, FF-TKY-00126202; Ex. 123, FF-TKY-00126207.

**B.    The Conspiracy Broadly Impacted CIIPPs Throughout the Proposed Class**

█████████████████████████████████████████████████████████████

████████████████████████████████ [99] ████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████ [100] ████████████

█████████████████████████████████████████████████████████████

████████████████████████████████ [101] ██████████████████████

█████████████████████████████████████████████████ [102]

CIIPPs' economic expert, Dr. Russell Mangum, Ph.D., analyzed the turkey products market and confirmed that the alleged conspiracy broadly affected both direct purchasers and CIIPPs. ███████████████████████████████████████████████████████

████████████████████████████████████████ [103] Mangum Reply ¶ 199, fig. 24.

█████████████████████████████████████████████████████████████

██████████████████████████ Mangum Rep. ¶ 232 ███████████████

█████████████████████████████████████████████████████████████

---

[99] Ex. 124, CMS0000005537.
[100] Ex. 125, BB000697291.
[101] *Id.* (emphasis added).
[102] *Id.* (emphasis added). ███████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████ x. 100, BB001955465. ██████████████████
███████████████████████████████████████████████████ Ex. 99,
PERDUETKY0000426467. ████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████ Ex. 126, CMS0000083146; Ex. 127,
CMS0000083147 at page 11.
[103] ████████████████████████████████████████████

██████████████████████████████████████████████████ Mangum Reply ¶ 195. ████

████████████████████████████████████████████████ *Id.* ¶ 201.

Defendants retained an expert, Dr. Lauren Stiroh, Ph.D., to rebut Dr. Mangum's findings. *See* Stiroh Rep. Dr. Stiroh did not dispute Dr. Mangum's definition of the relevant market or his finding that Defendants dominated it. She did not rebut Dr. Mangum's determination that the structure of the turkey market was consistent with the conspiracy broadly affecting class members and that such effects were reflected in Defendants' internal financial analyses. She did not independently analyze *any* of the key issues in this case. Instead, she offered a lengthy critique of class experts' reports, focusing on the multiple regression models they used to calculate quantitative estimates of the conspiracy's impacts. She opines that, when those models are altered in ways she believes to be economically appropriate, they no longer show that all or nearly all CIIPPs were injured by the conspiracy. *See, e.g.*, Stiroh Rep. ¶¶ 15(i)-(ii).

As Dr. Mangum explains in his Reply Report and Supplemental Reply Report, Dr. Stiroh's criticisms are fundamentally flawed, and the modified versions of his models she proposes are designed to fail. *See generally* Mangum Reply; Mangum Sup. Reply. Moreover, despite the extensive exchange of expert views, Dr. Stiroh's criticisms have no substantial effect on Dr. Mangum's bottom-line findings. After completing two rounds of expert reports and responding in detail to Dr. Stiroh's criticisms, Dr. Mangum continued to find that the conspiracy affected all or nearly all CIIPPs. Mangum Reply ¶ 195. ██████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████ *Id.* ¶ 201.

C.      **Summary of Common Issues of Law and Fact**

The foregoing makes clear that CIIPPs' core liability case involves numerous issues that are common to the proposed Class. They include:

a) Whether the Defendants and their Co-conspirators engaged in a combination and conspiracy to fix, raise, maintain, or stabilize the prices of turkey products sold in the United States and each of the States noted in the Complaint;
b) The identity of the participants in the alleged conspiracy;
c) Whether Defendants' actions generally caused prices for turkey to increase above a competitive level during the Class period;
d) The amount of damages that the proposed Class incurred; and
e) The appropriate relief for the Class, including injunctive and equitable relief.

## III.    STANDARDS FOR CLASS CERTIFICATION

Rule 23 requires a "rigorous" analysis of whether the proposed Class should be certified. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982). The rule does not impose a "mere pleading standard" but requires the Court to determine whether the relevant standards for certification are in fact satisfied. *Wal-Mart v. Dukes*, 564 U.S. 338, 350 (2011). "If there are material factual disputes, the court must receive evidence . . . and resolve the disputes before deciding whether to certify the class." *Messner v. Northshore Univ. Health System*, 669 F.3d 802, 811 (7th Cir. 2012) (quoting *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)). Because it requires informed judgment about the course of future proceedings, "Rule 23 gives the district courts broad discretion to determine whether certification of a class-action lawsuit is appropriate," and properly supported decisions are reviewed "deferentially." *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008).

Rule 23 analysis is guided by "the elements of the underlying cause of action," *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011), here: (1) a violation of the antitrust laws, (2) antitrust "injury," and (3) damages. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n.9 (1969) (explaining that antitrust injury requires proving "the fact," as distinct from the "amount[,] . . . of damage"). Although Rule 23 findings may overlap with the merits, the

Court may analyze the merits "only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013); *Wal-Mart*, 564 U.S. at 351 n.6 (noting that a district court has no "authority to conduct a preliminary inquiry into the merits of a suit" at class certification except as needed "to determine the propriety of certification." (internal quotations omitted)).

Because violations of antitrust laws are apt to cause market-wide harms, courts have frequently recognized that class certification is favored in antitrust cases. *See, e.g.*, *Kleen*, 831 F.3d at 931; *Messner*, 669 F.3d at 808; *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 224 (E.D. Pa. 2001), *aff'd*, 305 F.3d 145 (3d Cir. 2002); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606 (N.D. Cal. 2015). *See also In re Sulfuric Acid Antitrust Litig.*, No. 03 C 4576, 2007 WL 898600, at *5 (N.D. Ill. Mar. 21, 2007) ("[S]ome courts have applied what is essentially a presumption of certification where the alleged class shares a common claim of price-fixing"). Federal courts routinely certify antitrust cases brought by indirect purchasers. *See, e.g.*, *Olean Wholesale Grocery*, 31 F.4th at 684; *In re Pork Antitrust Litig.*, 2023 WL 2696497; *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 592 (N.D. Cal. 2010) (hereinafter "*TFT-LCD I*") (quoting *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005)) ("Courts have stressed that price-fixing cases are appropriate for class certification.").

"Broad flexibility to modify an initial class ruling is built into Rule 23, so that courts have concluded that when any doubt exists concerning the propriety of class certification, it should be resolved in favor of upholding the class." *Day v. Check Brokerage Corp.*, 240 F.R.D. 414, 417 (N.D. Ill. 2007). *See also* Fed. R. Civ. P. 23(c)(5) (recognizing Court's authority to divide class into subclasses as appropriate). Any issues regarding the scope of a proposed Class should thus be

addressed "by refining the class definition rather than by flatly denying class certification on that basis." *Messner*, 669 F.3d at 825.

## IV. PLAINTIFFS SATISFY RULE 23(A)

As an initial matter, this case satisfies the prerequisites for class certification under Rule 23(a).

### A. Numerosity

Rule 23(a)(1) requires "the class [be] so numerous that joinder of all members is impracticable." Though no "magic number" is necessary to establish numerosity, courts often find forty members sufficient. *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017). "A plaintiff need not plead or prove the exact number of class members to establish numerosity under Rule 23(a)(1), *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989), and the court may make common sense assumptions to determine numerosity." *Barnes v. Airline Pilots Ass'n, Int'l*, 310 F.R.D. 551, 557 (N.D. Ill. 2015). The proposed CIIPP Class includes far more than forty members, so numerosity is easily satisfied. *See* Mangum Reply ¶ 195.

### B. Commonality

Rule 23(a)'s "commonality" and "typicality" requirements serve as "guideposts for determining . . . whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 158 n.13. The commonality inquiry focuses on whether plaintiffs' evidentiary presentation will "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (emphasis in original, citation omitted). "Neither Rule 23 nor any gloss that decided cases have added to it requires that *every* question be common." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). "For purposes of Rule 23(a)(2)'s requirement that there

be questions of law or fact common to the class, 'even a single common question will do.'" *Moehrl v. Nat'l Ass'n of Realtors*, No. 19-CV-01610, 2023 WL 2683199, at *11 (N.D. Ill. Mar. 29, 2023) (quoting *Wal-Mart*, 564 U.S. at 359). *See also Suchanek*, 764 F.3d at 756 ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question.").

"Where an antitrust conspiracy has been alleged, courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *Moehrl*, 2023 WL 2683199, at *11 (quoting *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013)).[104] *See also Kleen Prods. LLC v. Int'l Paper Co.*, 306 F.R.D. 585, 594 (N.D. Ill. 2015) (alleged conspiracy was "the prototypical example of an issue where common questions predominate, because it is much more efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence.").

Likewise, CIIPPs allege here that Defendants formed an illegal conspiracy to "[increase] turkey prices to Plaintiffs and the Class." Compl. ¶ 86-87. The object of the alleged conspiracy and how it operated did not vary from one class member to the next, but instead reflected Defendants' expectation that supply constraints would enable them to take supracompetitive prices from buyers throughout the market. *See infra* notes 100-102. Nor is the existence of the conspiracy the only common question. As CIIPPs detail below, the channels through which Defendants

---

[104] In *Moehrl*, for example, the district court found commonality when plaintiffs alleged that realtor defendants "conspired to artificially inflate the buyer-broker commissions paid by the class" by adopting contractual restraints that violated the antitrust laws. 2023 WL 2683199, at *11. The court reasoned that "because proof of the alleged conspiracy focuses on the defendants' standardized conduct as opposed to the conduct of individual class members, '[a]ntitrust liability alone constitutes a common question that 'will resolve an issue that is central to the validity' of each class member's claim 'in one stroke.'" *Id.* (quoting *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d at 1180, and *Wal-Mart*, 564 U.S. at 350)).

communicated, the mechanisms they used to monitor conspiracy compliance and enforce cartel discipline, price increases, and the damages the proposed Class suffered will be established through a common body of testimony, documentary evidence, and expert analysis. CIIPPs' liability case is therefore replete with common issues that will "drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350.

### C. Typicality

"The issue of typicality is closely related to commonality and should be liberally construed." *Saltzman v. Pella Corp.*, 257 F.R.D 471, 479 (N.D. Ill. 2009), *aff'd*, 606 F.3d 391 (7th Cir. 2010) (citing *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998)). "In the antitrust context, typicality 'will be established by plaintiffs and all class members alleging the same antitrust violation by the defendants.'" *Moehrl*, 2023 WL 2683199, at *12 (quoting *In re Ready Mixed Concrete*, 261 F.R.D. 154, 168 (S.D. Ind. 2009)). Perfect identity of claims is not required. *See In re Sulfuric Acid Antitrust Litig.*, No. 03 C 4576, 2007 WL 898600, at *4 (N.D. Ill. Mar. 21, 2007) ("'[F]actual distinctions between the claims of the named class members and those of other class members' do not necessarily defeat a finding of typicality." (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983))). Nor does Rule 23 "require that each member of a class suffer exactly the same injury as the named class representative." *Tatz v. Nanophase Techs. Corp.*, No. 01 C 8440, 2003 WL 21372471, at *6 (N.D. Ill. June 13, 2003).

Each proposed class representative claims to have been injured by Defendants' conspiracy to inflate prices above competitive levels. *See* Compl. ¶¶ 15-18. Each likewise seeks to secure injunctive and declaratory relief protecting them from future violations of antitrust laws and to recover damages for the supracompetitive prices that they paid due to the conspiracy. *See* Compl. ¶¶ 674-82. The typicality requirement is satisfied.

### D.    Adequacy of Representation

The certification of a class action gives rise to fiduciary duties running from class representatives and counsel to the class. *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014). Named plaintiffs and their counsel must vigorously pursue the class's interests, *see Rand v. Monsanto Co.*, 926 F.2d 596, 598 (7th Cir. 1991), free from conflicts of interest that compromise representation. *See Uhl v. Thoroughbred Technology and Telecomm.*, 309 F.3d 978, 985 (7th Cir. 2002) ("A class may not satisfy the requirements of Rule 23(a)(4) if the class representative does not 'possess the same interest and suffer the same injury as the class members.'" (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). "Although a representative plaintiff need not immerse himself in the case—small stakes imply large benefits from the division of labor, with lawyers handling details—the named plaintiff must have some commitment to the case, so that the representative in a class action is not a fictive concept." *Rand*, 926 F.2d at 598-99 (internal citation and quotations omitted).

Each proposed class representative is a member of the proposed Class and has participated actively in this case by, among other things, sitting for depositions, producing records, and conferring with class counsel. Finley Decl. ¶ 12. Class representatives are unaware of any conflicts of interest that would compromise their representation of the Class. *Id.* ¶ 13. Like each member of the proposed Class, they seek to maximize the Class's monetary recovery and secure declaratory and injunctive relief protecting them from future anticompetitive conduct. Named plaintiffs thus possess the identity of interests with the Class that is essential to a binding classwide judgment. *See Spano v. The Boeing Co.*, 633 F.3d 574, 584 (7th Cir. 2011).[105]

---

[105] In the event that the Court identifies deficiencies in named plaintiffs' ability to adequately represent the proposed Class, CIIPPs respectfully request the opportunity to identify alternative class members to serve as class representatives. *See, e.g., In re NorthShore Univ. HealthSystem Antitrust Litig.*, No. 07-cv-4446,

Proposed Class Counsel are ready, willing, and able to zealously represent the Class free of conflicts of interest that would compromise representation. Proposed co-lead counsel for the Commercial and Institutional Indirect Purchaser Plaintiffs are Sterling Aldridge of Barrett Law Group, P.A. and Blaine Finley of Cuneo Gilbert & LaDuca, LLP. They bring a wealth of experience in complex antitrust matters, have zealously advocated for CIIPPs' interests in this matter, and have been appointed lead counsel on behalf of CIIPPs in other matters where they have secured certification of multiple classes and significant monetary recoveries. *See* Finley Decl. ¶¶ 3-11.

In short, the Class will be ably represented if it is certified.

### E. The Class Is Properly Defined and Ascertainable

Finally, the proposed Class satisfies Rule 23's implicit prerequisites of a properly defined, ascertainable class. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015) (adhering to traditional view "that a class must be defined clearly and that membership be defined by objective criteria rather than by, for example, a class member's state of mind"). CIIPPs do not propose a fail-safe class that includes only entities with "a valid claim on the merits," *see Messner,* 669 F.3d at 825, or one defined by "subjective criteria, such as by a person's state of mind," *Mullins,* 795 F.3d at 660. Moreover, the records produced in discovery and analyzed by Dr. Mangum are replete with data about membership of the Class. *See* Mangum Rep., App. B. CIIPPs have thus carried their initial burden of "identif[ying] a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id.*[106]

---

2018 WL 2383098, at *1 (N.D. Ill. Mar. 31, 2018) (permitting substitution); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2016 WL 948874, at *4 (N.D. Cal. Mar. 14, 2016) (same).

[106] Should later developments require, the Court retains authority to refine the class definition as warranted. *See, e.g.*, *Beaton v. Software*, No. 13-CV-08389, 2017 WL 4740628, at *3 (N.D. Ill. Oct. 19, 2017) ("[N]othing prevents this Court from considering a revised definition or, indeed, sua sponte revising the definition of a proposed class").

## V.      PLAINTIFFS SATISFY RULE 23(B)(2)

A party seeking class certification must also show that a case satisfies requirements for one or more types of class actions recognized by Rule 23(b). Plaintiffs initially seek certification of a Rule 23(b)(2) class to pursue injunctive and declaratory relief protecting them from future anticompetitive conduct, and particularly, Defendants' continued sharing of competitively sensitive information via Agri Stats and other means.

All requirements for certification of a (b)(2) class are satisfied. The interests of proposed class representatives and class members are closely aligned. *See Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 826 (7th Cir. 2011). Defendants "act[ed] on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). Plaintiffs seek final injunctive relief that is not primarily monetary in nature against future anticompetitive conduct, a request that survives until Defendants establish that the alleged misconduct will not recur. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 609 (2001). And, because the conspiracy broadly impacted CIIPPs, injunctive relief will benefit "the class as a whole." Fed. R. Civ. P. 23(b)(2).

## VI.     PLAINTIFFS SATISFY RULE 23(B)(3)

Plaintiffs also seek certification of a Rule 23(b)(3) class to recover damages for economic injuries caused by the alleged conspiracy. To certify the (b)(3) class, the Court must find that (1) common questions predominate over questions affecting only individual members, (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3). Both requirements are satisfied.

### A.      Common Questions Predominate

"Rule 23(b)(3)'s predominance requirement is satisfied when 'common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a

single adjudication." *Messner*, 669 F.3d at 815 (quoting 7AA Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1778 (3d ed. 2011)). "If the same evidence will suffice for each member to make a prima facie showing, then [that issue] becomes a common question." *Id.* (internal quotation marks omitted).

Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof.'" *Amgen*, 568 U.S. at 469 (emphasis and brackets in original). *See also Kleen*, 831 F.3d at 922 ("[I]t remains true that Rule 23 does not demand that every issue be common;. classes are routinely certified under Rule 23(b)(3) where common questions exist and predominate, even though other individual issues will remain . . . ."); *Messner*, 669 F.3d at 815 ("Individual questions need not be absent."). The crucial question "is whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

The Supreme Court and Seventh Circuit have reiterated that the predominance requirement is "readily met" in antitrust cases. *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997); *Messner*, 669 F.3d 802, 815; *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020). If the Court finds that common proof of Defendants' antitrust conspiracy will be an important issue at trial, that alone "weighs in favor of a finding that common questions predominate." *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d at 1227; *see also TFT-LCD I*, 267 F.R.D. at 310 (certifying class based on finding that main questions in dispute involved "what defendants did, rather than what plaintiffs did.")

The Seventh Circuit addressed the specific showing necessary to establish predominance in an antitrust conspiracy in *Kleen*, which involved allegations that manufacturers of

containerboard conspired to restrict supply "by cutting capacity, slowing back production, taking downtime, idling plants, and tightly restricting inventory." 831 F.3d at 922. The court held that common issues predominate when common proof shows (1) "actual price increases," (2) "a mechanism for those increases," (3) "the communication channels the conspirators used," and (4) "factors suggesting that cartel discipline can be maintained." *Id.* at 928.

CIIPPs will prove these factors through evidence common to the Class. While that showing suffices to establish predominance as a matter of law, *see id.*, common evidence also shows all or nearly all class members were injured by the conspiracy and the Class's damages. To the extent that any individual issues remain after this classwide showing, they are easily managed and do not undermine predominance. This showing—going well beyond what *Kleen* found sufficient—makes clear that, as in many antitrust conspiracy cases, common issues predominate in this matter.

### 1. Common Evidence Shows Actual Price Increases

*Kleen* initially requires the proponent of class certification to show some "actual price increases" through proof common to the class. *Id.*



Mangum Rep. ¶ 197, fig. 39.

Mangum Reply ¶ 199, fig. 24.

Mangum Rep. ¶ 232, fig. 44.

*Id.* Although Dr Stiroh criticizes Dr. Mangum's methods, her criticisms

are flawed for reasons Dr. Mangum explains at length. Importantly, even Dr. Stiroh does not dispute the existence of actual overcharges. *See* Stiroh Rep. ¶ 153 ███████████████████████████████████████ ███████████████████████████████████████████████████████████. The first *Kleen* factor is thus undisputed.

### 2. Common Evidence Shows the Mechanism for Price Increases

Common evidence also shows the mechanisms through which Defendants artificially inflated the price of turkey products. *See Kleen*, 831 F.3d at 928. As described above, the evidence shows Defendants worked together to reduce industry-wide supply below competitive levels and to increase prices for Defendants' products. Defendants accomplished this by, for example, exchanging competitively sensitive information via Agri Stats/EMI, *see* Mangum Rep. ¶¶ 134-35; communicating their expectations for production levels through public and non-public channels, *see id*. ¶¶ 118-47; ████████████████████████████████ *see id*. ¶¶ 143-47; ███████████████████████████████████ *see id.* ¶ 123; and ███████████████ ████████████████████████████ *see id.* ¶ 122.

### 3. Common Evidence Shows Conspirators' Communication Channels

The same analysis applies with respect to Defendants' communication channels. *See Kleen, 831 F.3d at 928*. Common evidence shows Defendants had numerous opportunities to form, monitor, and enforce an agreement to limit supply of turkey products, *see, e.g.*, Mangum Rep. ¶¶ 118-35; █████████████████████████████████████ █████████████████████████, *see, e.g.*, *id.* ¶¶ 132-35; ████████████████ █████████████████████████████████████████████████████████ █████████████████████ *See id.* ¶ 134-35, 147. Again, this evidence will not vary from one

member of the class to the next, meaning Defendants' communication channels present another common question. *See Tyson*, 577 U.S. at 453.

### 4. Common Evidence Shows Factors Suggesting Cartel Discipline Could Be Maintained

The final showing required to establish predominance under *Kleen* "is factors suggesting that cartel discipline could be maintained." 831 F.3d at 928. ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████[107]████████████

████████████████████████████████████

████████████████████████████[108]████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██[109]████████████████████████████████

████████████████████████████████████

████████████████████████[110]████████

Beyond documentary evidence of Defendants' enforcement of cartel discipline, Dr.

---

[107] Ex. 77, PERDUETKY0000385867.
[108] Ex. 78, COOPER0000126933.
[109] Ex. 90, COOPER0000235625.
[110] Ex. 117, CMS0000126703 at 6712.

Mangum identified structural characteristics of the turkey market that helped to maintain the conspiracy.



*See* Mangum Rep. ¶ 96.

*See id.* ¶¶ 118-129.

*Id.*

[111]

[112]

### 5. Common Evidence Shows All or Nearly All Class Members Were Impacted by the Conspiracy

In *Kleen*, the Seventh Circuit held that proof of the four elements discussed above was sufficient to establish predominance. 831 F.3d at 927-28. There, defendants argued plaintiffs had a further "burden of showing that every class member [can] prove at least some impact from the alleged violation." *Id.* at 927. The Court of Appeals disagreed. It ruled that, while plaintiffs would have to prove "the fact of injury on a classwide basis" to prevail *at trial*, proof of "actual price increases, a mechanism for those increases, the communication channels the conspirators used, and factors suggesting that cartel discipline can be maintained [was] enough to support *class treatment* of the merits." *Id.* at 928 (emphasis added).

CIIPPs have shown those very elements through proof common to the Class. *See supra* Points VI.A.1-4. *Kleen* thus compels a finding that predominance is established. *See* 831 F.3d at 928 ("We are not saying that any of these points have been proven, of course, but we are saying

---

[111] Ex. 128, G. Cooper Dep. 177:15-20.
[112] Ex. 129, NTF0000045628.

that this evidence is enough to support class treatment of the merits."). Defendants may urge that courts outside this circuit have gone further and required district courts to make preliminary findings about the breadth of a conspiracy's impact in assessing predominance. *See, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623 (D.C. Cir. 2019); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53-54 (1st Cir. 2018). Even if the Court followed this more stringent approach, it would have no effect on the predominance analysis in this case. Plaintiff's expert, Dr. Russell Mangum, shows that the alleged conspiracy impacted all or nearly all members of the proposed Class. And nothing in Defendants' critiques of his analysis undermines that conclusion.

### a. Dr. Mangum's Widespread Impact Finding

An economic analysis of an antitrust conspiracy assesses how much prices rose due to the conspiracy (the *magnitude* of price impacts) and who paid more (their *breadth and widespread effect*). *See, e.g.*, *Olean Wholesale Grocery*, 31 F.4th at 670; *In re Broiler Chicken*, 2022 WL 1720468, at *12-13. Class wide impact involves the breadth and widespread nature of a conspiracy's impact. It is established when purchasers across the class paid any overcharge—even a penny. *See Zenith Radio Corp.*, 395 U.S. at 114 n.9. This two-step methodology for assessing impact has been widely accepted by courts.[113]

Dr. Mangum's analysis of classwide impact focused on two fundamental questions: (1) did the conspiracy affect a wide range of direct purchasers, and (2) if yes, did they transfer those extra charges to indirect purchasers? Contrary to Defendants' suggestion, Dr.'s Mangum's conclusion that all or nearly all class members were impacted by the conspiracy does not reflect the output of a single regression model. Instead, it reflects a comprehensive analysis of, *inter alia*, the relevant

---

[113] *See* *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d at 1206; *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847 (D.N.J. 2015); *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 297-98 (N.D. Cal. 2016).

geographic and product markets, the structure of the market for turkey products, the documentary record, correlations in turkey prices, and a series of carefully specified multiple-regression models. These analyses all reached a consistent conclusion. No matter how he analyzed the question, Dr. Mangum consistently found that the conspiracy impacted all or nearly all members of the proposed Class.

### i. Market Structure

Like the plaintiff's expert in *Kleen* (*see* [831 F.3d at 927](#)), Dr. Mangum began with the structure of the turkey market.



*See, e.g.*, Mangum Rep. ¶¶ 150-174, 198-224.

*Id.* ¶ 199.

*Id.* ¶ 158.

*Id.* ¶ 159.



*Id.* ¶ 160.

*Id.* ¶ 161.

*Id.* ¶ 164.

*Id.*

### ii. Documentary Evidence

Mangum Rep. ¶ 158-59.

*Id.* ¶ 164.

*See id.* ¶¶ 216-17.

*Id.* ¶ 220.

### iii.    Correlations in Turkey Prices

Dr. Mangum's analyses of the structure of the turkey market and documentary record are sufficient to find that the conspiracy affected all or nearly all class members. *See In re High Fructose Corn Syrup Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (crediting expert opinion that market structure was conducive to cartelization and widespread impact).[114] As is common in indirect purchaser cases, however, Dr. Mangum supplemented those analyses by conducting econometric analyses of pricing patterns while the alleged conspiracy proceeded.



Mangum Rep. ¶ 171, n.289.

*Id.* ¶¶ 167-174.

*Id.*; *see also In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *16

---

[114] *See also, e.g.*, *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 152 (3d Cir. 2002) ("The economic laws of supply and demand run in tandem with the tenets of logic. A reduction in supply will cause prices to rise."); *In re Blood Reagents Antitrust Litig.*, MDL No. 09-2081, 2015 WL 6123211, at *31 (E.D. Pa. Oct. 19, 2015) ("Many courts have accepted market-structure analyses in finding predominance with respect to antitrust impact."); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 JG VVP, 2014 WL 7882100, at *48 (E.D.N.Y. Oct. 15, 2014) (accepting industrial organization analysis of airfreight market and certifying proposed class); *Fond du Lac Bumper Exch., Inc. v. Jui Li Enter, Co.*, No. 09-cv-0852, 2016 WL 3579953 at *7, 10 (E.D. Wis. June 24, 2016) (finding that market structure analysis supported class certification); *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 341 (D. Md. 2012) (same); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. at 627 ("The Court's review of structural factors presented by [plaintiff's expert] Dr. Lietzinger shows, by a preponderance of the evidence, that structural issues could be shown at trial to have generated class impact.").

[REDACTED] Mangum Rep.
¶ 225, fig. 41, 42, n.361. [REDACTED]

[REDACTED]

[REDACTED] *Id.*

### iv. Multiple Regression Analyses

Dr. Mangum also employed a series of multiple-regression analyses in confirming widespread impact of the alleged conspiracy at both the direct and indirect purchaser levels of the supply chain. Courts across the country, including within the Seventh Circuit, have found multiple regression analyses such as Dr. Mangum's provide a reliable means of measuring impact and damages in antitrust class actions. *See, e.g.*, *Kleen*, 831 F.3d at 928; Mangum Rep. ¶ 185, n. 316.[115]

Dr. Mangum's first regression model estimated the magnitude and widespread nature of the conspiracy's impacts on direct purchasers.[116] [REDACTED]

[REDACTED]

[REDACTED]

---

[115] *See also, e.g.*. *In re Pork Antitrust Litig.*, 2023 WL 2696497, at *11 (finding that plaintiffs' experts "all employed widely-accepted regression methodology"); (rejecting Defendants' contentions that regression analysis masked individualized issues and relying on analysis in granting class certification); *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *12; *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847 (D.N.J. 2015) ; ("[C]ourts have accepted multiple regression and correlation analyses as means of proving antitrust injury and damages on a class-wide basis"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 616 (N.D. Cal. 2009) ("The economic principles and regression models relied upon by [Indirect Purchaser] Plaintiffs' experts . . . are solidly grounded in the academic literature."). *See generally* Hal J. Singer, *Economic Evidence of Common Impact for Class Certification in Antitrust Cases: A Two-Step Analysis*, 25 Antitrust 34, 34 (2011).

[116] [REDACTED]

[REDACTED] *See* Mangum Rep. ¶¶ 178-82.

[117] [REDACTED]

[REDACTED] *Id.* ¶ 187.



Mangum Reply ¶ 199, fig. 24.

*Id.* ¶ 227. *See, e.g.*, *In re Pork Antitrust Litig.*, 2023 WL 2696497, at \*22; *In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567-MD-W-GAF, 2021 WL 5632089, at \*6 (W.D. Mo. Nov. 9, 2021); *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2016 WL 467444, at \*7 (N.D. Cal. Feb. 8, 2016).

Mangum Rep. ¶ 227.[118]

*Id.* ¶ 232.

Mangum Reply ¶ 195.

**b.** **Dr. Stiroh's Criticisms of Dr. Mangum's Widespread Impact Finding Do Nothing to Undermine Predominance**

---

[118]

Mangum Rep. ¶ 227.

While offering a litany of technical objections and proposed modifications to Dr. Mangum's models, the analysis of Defendants' expert, Dr. Stiroh, boils down to two overarching misconceptions. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████ Stiroh Rep. ¶¶ 93-107, 156-60. ███████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ *See, e.g.*, *id.* at ¶¶ 109-10, 115, 117. These criticisms are meritless. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ *See* Mangum Reply ¶ 7; Mangum Sup. Rep. ¶ 4.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Mangum Reply ¶ 117. ████████████████████████████████████████

████████████████████████████████████████████████████████████

*See* Mangum Rep. ¶ 179.



*Id.* ¶¶ 183-96; Mangum Reply ¶ 96.

Mangum Reply ¶¶ 110-11.

*Id.* ¶ 113

*Id.* ¶ 140.

*Id.* ¶ 123; *see also id.* ¶ 194

[119] Dr. Stiroh's own findings, then, are completely consistent with widespread impact to direct purchasers.

---

[119]

Mangum Reply ¶ 122, n.149 (quoting Peter Kennedy, A Guide to Econometrics 366 (2008)).

*Id.*



. *Id.* ¶ 180.

*Id.*

*Id.* ¶ 187.

*See, e.g.*, *In re Pork*, 2023 WL 2696497, at **6-7, *22; *In re Broiler Chicken*, 2022 WL 1720468, at *18-19; *In re Packaged Seafood*, 332 F.R.D. at 332-33, 335.

Mangum Reply ¶ 195.[120]

---

[120] *See* *In re Air Cargo Shipping Servs. Antitrust Litig.*, MDL No. 1775, 2014 WL 7882100, at *55 (E.D.N.Y. Oct. 15, 2014) (observing that defendants did not even dispute that an analogous "'customer model' is methodologically capable of showing the percentage of class members impacted, nor do they dispute that 95.7% would be sufficiently 'classwide' for purposes of common proof"); *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 221 (M.D. Penn. 2012) (certifying class based on analogous customer impact model relying on sampling); *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D 188, 217 (E.D. Penn. 2017) (certifying class where similar econometric model showed 98% of class members impacted); *In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *6 (N.D. Cal. 2017) (certifying indirect purchaser class based, in part, on a multiple regression model confirming that 98% of direct purchasers were impacted and additional evidence from sampling of a high pass-through rate of those overcharges to indirect purchasers).



*Id.* ¶ 170.

*Id.*[121]

*Id.* ¶ 163.

Dr. Stiroh advances many other criticisms of Dr. Mangum's widespread impact finding, which he fully rebuts in his reply and rebuttal reports. But CIIPPs will not belabor the point. To the extent classwide impact is relevant, Dr. Mangum persuasively shows (and the Court should find) that it will be established through evidence common to the Class.

6.      **CIIPPs Have Shown a Reliable Method of Calculating Damages**

"When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.' *Tyson*, 577 U.S. at 453 (quoting 7AA Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1778, pp. 123-24 (3d ed. 2005)). While there is no hard-and-fast requirement that CIIPPs quantify the impact of the conspiracy beyond showing that it broadly impacted the Class, CIIPPs nonetheless offer "a classwide method for

---

[121]

angum Reply ¶ 170. In layman's terms, variables that are supposed to be independent of one another measure the same thing.

proving damages." *Kleen*, 831 F.3d at 929.

Damages in antitrust cases "may be determined by a just and reasonable estimate as long as the jury verdict is not the product of speculation or guess work." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1049 (N.D. Ill. 2022) (emphasis in original omitted and quoting *MCI Comm's Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983)). Here, CIIPPs have not merely proposed a methodology for calculating the aggregate Class damages; ████████████████████████████████████████████████████ ████████████████████████████████████ Mangum Reply ¶ 201. CIIPPs' ability to prove aggregate damages through common evidence confirms the predominance requirement is met.

7. **Any Remaining Individual Issues Are Easily Managed and Will Not Predominate Over Questions Common to the Class**

To the extent any individual issues remain following proof of CIIPPs' prima facie case, they do nothing to undermine predominance. Following the standard playbook in complex antitrust matters, Defendants will likely argue that the market for turkey products is too complicated, that the products and purchasers in it are too varied, or that Dr. Mangum failed to account for some variable or another that shows the alleged conspiracy's effects are too unpredictable for CIIPPs' claims to be adjudicated on a classwide basis. These likely arguments ignore courts' repeated certification of similarly complex antitrust cases, including in *Broilers* and *Pork*, which also involved conspiracies that made use of Agri Stats to share competitively sensitive information.[122]

---

[122] *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *5 (certifying classes were plaintiffs alleged "that Defendants fixed a market price that was the starting point for negotiations across the market, regardless of a purchaser's bargaining power"); *In re Pork*, 2023 WL 2696497 (similar); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014) (rejecting contention that pricing negotiations negate common impact and class certification); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 263 (D.D.C. 2002) (rejecting arguments that market was too complicated to model and certifying the class).

More fundamentally, sophisticated economic analysis is not needed to see that Defendants sell a commodity product in large quantities through standardized channels and pricing mechanisms and that their alleged scheme to reduce supply and inflate prices would broadly affect buyers throughout the distribution chain. As Judge Ikuta reasoned for the *en banc* Ninth Circuit in *Olean Wholesale Grocery*, "[i]t is not implausible to conclude that a conspiracy could have a class-wide impact, 'even when the market involves diversity in products, marketing, and prices . . . .'" 31 F.4th at 677 (quoting *In re Urethane*, 768 F.3d at 1254-55). *See also Kleen*, 831 F.3d at 925 (affirming certification of Rule 23(b)(3) class where district court found that even for individual negotiations and long term contracts, the "starting point for those negotiations would be higher if the market price for the product was artificially inflated").

Defendants are also likely to put forward a catalog of generalized differences in state laws in an attempt to show that a multi-state class is unmanageable. *See In re Pork*, 2023 WL 2696497, at *26 (rejecting this contention); *In re Broiler Chicken*, 2022 WL 1720468, at *20 (same). The argument is a red herring. Each state represented in the proposed Class has either enacted an antitrust statute that is construed in harmony with the Sherman Act or allows indirect purchasers to recover damages from a horizontal antitrust violation via the state's consumer protection or unjust enrichment law. *See id.*; Apps. A, B, C. CIIPPs' analysis of relevant state laws in the appendices to this memorandum, *see Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004), and the similarity of the showing required under those laws, s*ee Al Haj v. Pfizer Inc.*, 338 F. Supp. 3d 741, 757 (N.D. Ill. 2018); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013), confirm that common questions will predominate at trial.

Moreover, courts "have created subclasses to manage any potential conflicts among different state's laws." *Saltzman*, 257 F.R.D. at 477. Should the Court determine that subclassing

is appropriate, it may create subclasses based on the nature of class members' claims, including as proposed in the alternative in CIIPPs' Motion. The Court may also "group[] state laws and certify[] subclasses" of states with materially similar laws. *Id.* (citing *Klay*, 382 F.3d at 1262).[123] The Court's authority to adjust the class definition in this manner eliminates any risk that individual issues will predominate over common questions as the case moves toward resolution.

### B. A Class Action Is Superior to Alternative Means of Resolving CIIPPs' Claims

Certification of the proposed (b)(3) Class is also "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Class members have every interest in proceeding collectively, Fed. R. Civ. P. 23(b)(3)(A), as their claims turn on the jury's evaluation of a common body of evidence. *See* Points V, VII. The class action lawsuits before this Court represent the most significant efforts to obtain relief for the injuries caused by Defendants' alleged conspiracy. *See* Fed. R. Civ. P. 23(b)(3)(B).

A crucial factor showing the superiority of a class action is the desirability of "concentrating the litigation of the claims in [this] forum." Fed. R. Civ. P. 23(b)(3)(C). Defendants uniformly directed their conspiracy at thousands of Class members. If Class members filed individual actions, this Court would need to repeatedly determine, using much the same evidence CIIPPs rely on here, whether Defendants conspired to limit the supply of turkey products; whether their conspiracy caused antitrust impact; and the damages that the conspiracy caused. Such seriatim adjudication is at odds with both the Federal Rules and the objectives of the class action device. *See* Sullivan v. DB Investments, Inc., 667 F.3d 273, 340 (3d Cir. 2011) (Scirica, J., concurring) (observing that class certification facilitates "redress of injuries, procedural due

---

[123] Although CIIPPs do not believe state laws materially differ in any manner that necessitates subclassing, they respectfully request the opportunity to propose suitable representatives for any subclasses the Court deems appropriate. *See* In re Allstate Corp. Sec. Litig., 966 F.3d at 614.

process, efficiency, horizontal equity among injured claimants, and finality").[124]

Finally, "the likely difficulties in managing a class action" weigh in favor of certification. *See* Fed. R. Civ. P. 23(b)(3)(D). Any trial of CIIPPs' claims, whether involving a single Plaintiff or all Class members, will focus on the same questions and evidence. Either Defendants engaged in an antitrust conspiracy, or they did not; either they violated antitrust laws or they did not; either they inflated prices or they did not. As courts have repeatedly recognized, *see supra* Part III, adjudicating such issues on a classwide basis is the superior means of resolving them.

## VII.   THE COURT SHOULD APPOINT CLASS COUNSEL

When certifying a class action, the Court must appoint counsel who will "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). CIIPPs respectfully request that the Court appoint Blaine Finley of Cuneo Gilbert & LaDuca, LLP and Sterling Aldridge of Barrett Law Group, P.A. as CIIPP Class Counsel for the reasons set out above. *See, e.g.*, *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 602 (N.D. Ill. 2009).

## VIII.   CONCLUSION

For the foregoing reasons, CIIPPs' Motion for Class Certification and Appointment of Class Counsel should be granted.

---

[124] Serial litigation is equally at odds with the goals of antitrust laws. Class actions permit Class members to share the costs of that proof equitably among themselves, *see* *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980), whereas individual proceedings would doom many Class members' claims, as their damages, even trebled, are too small to warrant individual litigation. *TFT-LCD I*, 267 F.R.D. at 314–15. Courts have repeatedly recognized that class certification is warranted where a violation of the law "imposed costs on tens of thousands of consumers yet not a cost to any one of them large enough to justify the expense of an individual suit." *Moore v. Stellar Recovery, Inc.*, No. 13 C 2294, 2014 WL 3509729, at *3 (N.D. Ill. July 14, 2014). *Cf.* *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("[A] class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied—to no litigation at all.").

Dated: September 22, 2023

Respectfully submitted:

By: /s/ Blaine Finley
Blaine Finley (*pro hac vice*)
Cody McCracken (*pro hac vice*)
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave., NW
Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
bfinley@cuneolaw.com
cmccracken@cuneolaw.com

John "Don" Barrett (*pro hac vice*)
Katherine Barrett Riley (*pro hac vice*)
Sterling Aldridge (*pro hac vice*)
**BARRETT LAW GROUP, P.A.**
404 Court Square
Lexington, Mississippi 39095
Telephone: (662) 834-2488
Fax: (662) 834-2628
dbarrett@barrettlawgroup.com
kbriley@barrettlawgroup.com
saldridge@barrettlawgroup.com

Robert A. Clifford
Shannon M. McNulty
**CLIFFORD LAW OFFICES PC**
120 N. LaSalle Street, Suite 3100
Chicago, IL 60602
rac@cliffordlaw.com
smm@cliffordlaw.com
Telephone: (312) 899-9090

*Counsel for Commercial and Institutional*
*Indirect Purchaser Plaintiffs and the Proposed*
*Class*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on September 22, 2023, a copy of the foregoing was filed electronically with the Clerk of the Court using the Court's CM/ECF system, which will send notification of the filing to all counsel of record.

By: _/s/ Blaine Finley_
Blaine Finley