IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*IN RE TURKEY ANTITRUST LITIGATION*

This Document Relates To:

*Commercial and Institutional Indirect Purchaser Plaintiff Action* (Case No. 1:20-cv-02295)

No. 19-cv-08318

Hon. Virginia F. Kendall
Hon. Keri L. Holleb Hotaling

**DEFENDANTS' OPPOSITION TO COMMERCIAL AND INSTITUTIONAL
INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

HIGHLY CONFIDENTIAL – FILED UNDER SEAL

## TABLE OF CONTENTS

**Page**

I.   Introduction ................................................................................................. 1

II.  Factual Background ...................................................................................... 4

    A.   Sale and Distribution of Turkey Products is Complex and Differentiated ............ 4

    B.   Proposed CIIPP Class is Composed of Disparate Entities ....................................... 6

    C.   Defendants are Independent Decision Makers with Distinct Operations and Whose Turkey Production Did Not Move in Parallel ....................................... 8

    D.   CIIPPs Lack Evidence of Conspiracy and Ignore Relevant Economic Conditions ...................................................................................................... 10

        1.   Uncontrollable Industry-Wide Events Explain Deviations in Production Levels ............................................................................... 11

        2.   Agri Stats Offers Procompetitive Industry Benchmarking Services ........ 14

        3.   CIIPPs Misstate Evidence of Alleged Conspiracy ................................... 16

III. Legal Standard ........................................................................................... 22

IV.  Argument ................................................................................................... 23

    A.   CIIPPs Have Not Met Their Burden to Establish Predominance ......................... 24

        1.   CIIPPs Have Not Proposed a Valid Method of Proving Class-Wide Injury Using Common Proof .............................................................. 25

            a.   Dr. Mangum's Model Shows No Overcharge for Numerous Customers, Products, and Defendants ...................................... 26

            b.   CIIPPs Cannot Show That Overcharges Were Passed Through Using Common Proof ...................................................... 28

        2.   CIIPPs Have Failed to Show a Class-Wide Method for Proving Damages ...................................................................................... 31

            a.   Dr. Mangum's Damages Model Violates *Comcast* ..................... 32

            b.   Plaintiffs Fail to Provide a Reliable Method to Show Damages on a Class-Wide Basis and Individual Damages Determinations are Necessary ...................................................... 33

        3.   CIIPPs Cannot Show Predominance or Superiority Due to Variations in State Laws Governing Indirect-Purchaser Actions ............ 35

    B.   CIIPPs' Class Definition is Overbroad Given the Wide Variety of Distinct Entities and Complex Distribution Chain ............................................................. 39

    C.   Logan Farms is an Inadequate Class Representative ........................................... 41

V.   Conclusion ................................................................................................. 42

**TABLE OF AUTHORITIES**

**Cases**                                                                                                                       **Page(s)**

*In re Aluminum Warehousing Antitrust Litig.*,
    336 F.R.D. 5 (S.D.N.Y. 2020) ........................................................................26, 28

*Am. Express Co. v. Italian Colors Rest.*,
    570 U.S. 228 (2013)..................................................................................................22

*Arthur v. Microsoft Corp.*,
    696 N.W.2d 29 (Neb. 2004)......................................................................................37

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018)......................................................................................40

*BASF Corp. v. Cesare's Collision Repair & Towing, Inc.*,
    364 F. Supp. 3d 1115 (E.D. Cal. 2019)...................................................................38

*Bergstrom v. Noah*,
    974 P.2d 520 (Kan. 1999) ........................................................................................39

*In re Bridgestone/Firestone, Inc.*,
    288 F.3d 1012 (7th Cir. 2002) .................................................................................37

*In re Broiler Chicken Antitrust Litig.*,
    2022 WL 1720468 (N.D. Ill. May 27, 2022) ............................................2, 22, 31

*In re Broiler Chicken Antitrust Litig.*,
    2023 WL 4303476 (N.D. Ill. June 30, 2023) ..........................................................19

*In re Broiler Chicken Antitrust Litig.*,
    2023 WL 7220170 (N.D. Ill. Nov. 2, 2023) ..............................................14, 15, 16

*Bunker's Glass Co. v. Pilkington PLC*,
    75 P.3d 99 (Ariz. 2003).............................................................................................39

*Clayworth v. Pfizer, Inc.*,
    233 P.3d 1066 (Cal. 2010) ........................................................................................36

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)........................................................................................... *passim*

*Comes v. Microsoft Corp.*,
    646 N.W.2d 440 (Iowa 2002) ..................................................................................39

*Doster Lighting, Inc. v. E-Conolight, LLC*,
    No. 12-C-0023, 2015 WL 3776491 (E.D. Wis. June 17, 2015) ..............................36

*Dowling Family Partnership v. Midland Farms*,
   865 N.W.2d 854 (S.D. 2015) ................................................................................38

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
   No. 17-md-2785-DDC-TJJ, 2020 WL 1180550 (D. Kan. Mar. 10, 2020) .............37

*In re Fla. Cement and Concrete Antitrust Litig.*,
   278 F.R.D. 674 (S.D. Fla. 2012) ..........................................................................29

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
   174 F.R.D. 332 (D.N.J. 1997)........................................................................38, 39

*Freeman Indus., LLC v. Eastman Chem. Co.*,
   172 S.W.3d 512 (Tenn. 2005) ...............................................................................39

*Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*,
   29 F.4th 839 (7th Cir. 2022) .................................................................................24

*Graham v. Catamaran Health Solutions LLC*,
   940 F.3d 401 (8th Cir. 2017) ................................................................................38

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008)....................................................................26, 30

*Hale v. Emerson Elec. Co.*,
   942 F.3d 401 (8th Cir. 2019) ................................................................................36

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008)............................................................................11, 22

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019)...................................................................37

*Kleen Prods. LLC v. Int'l Paper Co.*,
   831 F.3d 919 (7th Cir. 2016) ..........................................................................25, 31

*Lilly v. Ford Motor Co.*,
   No. 00-C-7372, 2002 WL 507126 (N.D. Ill. Apr. 3, 2002)...................................37

*Messner v. Northshore Univ. Health Sys.*,
   669 F.3d 802 (7th Cir. 2012) .....................................................................24, 25, 40

*Muehlbauer v. Gen. Motors Corp.*,
   No. 05-C-2676, 2009 WL 874511 (N.D. Ill. Mar. 31, 2009) ................................38

*In re Pork Antitrust Litig.*,
   2023 WL 2696497 (D. Minn. Mar. 29, 2023) ...........................................2, 33, 40

*In re Processed Egg Prods. Antitrust Litig.*,
  312 F.R.D. 124 (E.D. Pa. 2015) ......................................................................26, 29, 36, 38

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  292 F. Supp. 3d 14 (D.D.C. 2017) ........................................................................................35

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  934 F.3d 619 (D.C. Cir. 2019) ...............................................................................................40

*Rapp v. Green Tree Servicing, LLC*,
  302 F.R.D. 505 (D. Minn. 2014) ............................................................................................38

*Reed v. Advocate Health Care*,
  268 F.R.D. 573 (N.D. Ill. 2009) ......................................................................................24, 28

*Retired Chicago Police Ass'n v. City of Chicago*,
  7 F.3d 584 (7th Cir. 1993) ..........................................................................................22, 41, 42

*Riffey v. Rauner*,
  910 F.3d 314 (7th Cir. 2018) .................................................................................................24

*Santiago v. City of Chicago*,
  19 F.4th 1010 (7th Cir. 2021) ...............................................................................................24

*Siegel v. Shell Oil Co.*,
  256 F.R.D. 580 (N.D. Ill. 2008) ...........................................................................................36

*Sperry v. Crompton Corp.*,
  863 N.E.2d 1012 (N.Y. 2007) .........................................................................................36, 39

*In re Steel Antitrust Litig.*,
  No. 08 C 5214, 2015 WL 5304629 (N.D. Ill. Sept. 9, 2015) ...........................................24, 25

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................................................................22

**Statutes, Rules & Regulations**

740 Ill. Comp. Stat. § 10/7(2) (1965) .......................................................................................36

9 Vt. Stat. § 2465(b) (1999) .......................................................................................................36

Ariz. Rev. Stat. § 44-1408(B) (2023) ........................................................................................36

Ark. Code § 4-88-115 (2020) .....................................................................................................38

Cal. Bus. & Prof. Code § 16750.1 (2011) .................................................................................38

Fed. R. Civ. P. 23 ............................................................................................................ *passim*

Fed. R. Civ. P. 23(a) .................................................................................................22

Fed. R. Civ. P. 23(b) .................................................................................................25

Fed. R. Civ. P. 23(b)(3) ...............................................................................22, 25, 36

Fed. R. Civ. P. 30(b)(6) ..............................................................................................41

Mich. Comp. Laws § 445.778(2) (1985) ...................................................................37

Minn. Stat. § 325D.57 (2023) ....................................................................................36

Miss. Code Ann. § 75-21-9 (2010) ............................................................................36

N.D. Cent. Code § 51-08.1-08(3) (2021) ..................................................................37

N.H. Rev. Stat. Ann. § 356:11(II) (2008) .................................................................37

N.M. Stat. § 57-12-2(E) (2019) .................................................................................37

N.Y. Gen. Bus. Law § 340(6) (2014) ........................................................................36

Neb. Rev. Stat. Ann. § 59-821 (2002) .......................................................................36

Neb. Rev. Stat. Ann. § 59-821.01(2) (2002) .............................................................36

R.I. Gen. Laws § 6-36-11(a) (2014) ..........................................................................36

S.D. Codified Laws § 37-1-33 (1991) .......................................................................36

Tenn. Code Ann. § 47-25-106 (2021) ........................................................................36

**Other Authorities**

*House of Raeford to Close Turkey Business*, Meat+Poultry (Mar. 14, 2013),
https://www.meatpoultry.com/articles/9628-house-of-raeford-to-close-turkey-business ...............................................................................................................10

*USDA Agricultural Projections to 2021*, United States Department of Agriculture,
Office of the Chief Economist (Feb. 2012) ..........................................................13

*USDA Agricultural Projections to 2022*, United States Department of Agriculture,
Office of the Chief Economist (Feb. 2013) ..........................................................13

The undersigned Defendants respectfully submit the following Opposition to the Commercial and Institutional Indirect Purchaser Plaintiffs' ("CIIPPs") Motion for Class Certification [Dkt. 836]. For the reasons below, the CIIPPs' Motion should be denied.

## I.    <u>Introduction</u>

Growing, selling, and distributing turkey products in the United States is complex and multifactorial.[1] The proposed CIIPP class purports to include numerous distinct and unrelated businesses in distinct and unrelated industries such as grocery stores, retail stores, restaurants, hospitals, universities, airlines, medical centers, and food-management companies.[2] By definition, members of the proposed CIIPP class do not buy turkey products directly from turkey producers. Instead, the distinct CIIPP entities buy varied turkey products, ranging from whole birds to breast meat to branded ground turkey, from different suppliers through different sales channels. The proposed class includes entities that vary widely in size, business model, and the type of customer they service—ranging from, for example, a caterer that carves turkey, to a restaurant that buys non-deli breast meat or makes turkey burgers, to retirement homes or hospitals that may occasionally include turkey in their meal planning. █████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████

---

[1] *See* CIIPPs' Ex. 2, Decl. and Report of Lauren J. Stiroh, Ph.D., Feb. 14, 2023 at ¶ 17 (hereinafter "Stiroh Report"), ECF No. 839-2. All exhibits previously attached to CIIPPs' Motion and Memorandum in Support are designated with the prefix "CIIPPs' Ex." Exhibits cited for the first time in this Opposition are designated with the prefix "Ex."

[2] CIIPPs' Ex. 1, Expert Report of Russell W. Mangum III, Ph.D. Regarding Class Certification, Dec. 2, 2022 at ¶¶ 207–209 (hereinafter "Mangum Report"), ECF No. 839-1.

Rather than engage with these realities, the CIIPPs and their expert, Dr. Mangum, gloss over them. In doing so, Dr. Mangum relies on *averaging* across the entire CIIPP class for all products sold by all Defendants. As demonstrated herein, by glossing over the complexities of the turkey industry and relying on Dr. Mangum's flawed analysis, the CIIPPs fundamentally undermine their class certification arguments.

In lieu of grappling with the complexities described above, the CIIPPs cite frequently to the class certification decisions in *Broilers* (*In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468 (N.D. Ill. May 27, 2022)) and *Pork* (*In re Pork Antitrust Litig.*, 2023 WL 2696497 (D. Minn. Mar. 29, 2023)) as proof of "courts' repeated certification of similarly complex antitrust cases," and suggest that the Court should ignore the deficiencies identified in this Opposition accordingly.[3] But not all antitrust cases concerning protein products are the same, and class certification must be decided on the specific facts and record before the Court. In *Broilers* and *Pork*, the courts credited the plaintiffs' arguments that pricing in those industries tended to move together regardless of the type or part of the animal in question, and thus would react uniformly in response to the alleged conspiracy. *Broilers*, 2022 WL 1720468, at *14–15; *Pork*, 2023 WL 2696497, at *23–24. CIIPPs cannot show the same here given the unique characteristics of turkey production, sale, and distribution. CIIPPs fail to satisfy the prerequisites for class certification under Rule 23 for *five* distinct reasons.

***First***, CIIPPs cannot establish predominance under Rule 23 because they cannot make a showing of class-wide harm. CIIPPs' expert, Dr. Mangum, offers an economic model that cannot show common injury among the disparate class members. To overcome the complexities of turkey

---

[3] Mem. in Supp. of Commercial and Institutional Indirect Purchaser Pls.' Mot. for Class Certification and Appointment of Class Counsel, ECF 838, at 42 (hereinafter "CIIPPs' Memorandum in Support").

production and distribution, as well as the differently situated buyers and sellers of turkey products, Dr. Mangum relies on sweeping averages and assumes, rather than proves, uniform injury across the entire class, all products, and all sales over the entire proposed class period. Indeed, he glosses over the individual issues of fact which predominate. As Defendants' expert, Dr. Lauren Stiroh, demonstrated, once these complexities are accounted for, Dr. Mangum's model shows that numerous parties and sales channels in the CIIPP supply chain suffered *no* harm. Indeed, when Dr. Mangum's overcharge models are applied to individual customers, they show no overcharges for ███ *of all class product sales to DPPs who resold to CIIPPs.*

**Second**, Dr. Mangum's analysis similarly fails to proffer a method of showing measurable class-wide damages through common proof. CIIPPs are required to tie each of their theories of antitrust liability to a theory for calculating damages, which they have fatally failed to do. Moreover, as with CIIPPs' failed attempt to show class-wide injury, individualized damages issues will also predominate.

**Third**, CIIPPs cannot show either the required predominance or superiority under Rule 23 due to material variations in state law governing indirect purchaser actions. CIIPPs bring their claims under 23 different state antitrust laws; 13 different state consumer-protection laws; and 24 different state unjust-enrichment laws, which contain numerous material differences with respect to, for example, statutory construction, proof requirements, statutes of limitations, and the availability of treble damages. These differences are not merely academic, and affect substantive legal issues with the underlying claims, such that class treatment is not the superior method for addressing them.

**Fourth**, the CIIPPs' class definition itself is fatally overbroad given the variation and differences in the types of commercial entities included, as well as the production and sale of

turkey products. The manner in which the different CIIPP class members—the number of which CIIPPs' expert does not even estimate—purchase turkey products is markedly different, and by attempting to combine such disparate entities into a single class, CIIPPs include an impermissible number of putative class members that have suffered no harm.

*Fifth*, certain named plaintiffs are inadequate to serve as class representatives of the proposed CIIPP class. In some instances, proposed class representatives had direct purchase agreements with the Defendants, which would make them a direct purchaser rather than an indirect purchaser and render them inadequate to represent the proposed CIIPP class.

## II.  Factual Background

### A.  Sale and Distribution of Turkey Products is Complex and Differentiated

The distribution and supply chain for turkey products is exceedingly complex from the breeder-hatchery stage through distribution to end-user customers.[4] As set forth in more detail in Defendants' Opposition to the Direct Purchaser Plaintiffs' Motion for Class Certification, the first step in the distribution chain includes sales of turkey products to distributors and larger entities that buy products directly from processors, such as large grocery or restaurant chains.[5] The CIIPP level of distribution occurs one level beyond the DPP level—including sales from DPPs to CIIPPs with varied business models.[6] To obtain class certification, CIIPPs must show common impact across this array of businesses in distinct and unrelated industries.

---

[4] CIIPPs' Ex. 2, Stiroh Report at ¶¶ 17–18, ECF No. 839-2.

[5] Defs.' Opp'n to Direct Purchaser Pls.' Mot. for Class Certification and Appointment of Class Counsel at 9–10 (hereinafter "DPP Opposition").

[6] CIIPPs' Ex. 1, Mangum Report at ¶¶ 207–209, ECF No. 839-1; CIIPPs' Ex. 2, Stiroh Report at ¶¶ 28–29, ECF No. 839-2.

Turkey distribution occurs in various ways at the CIIPP level. A variety of different entities—including distributors, redistributors, wholesalers, and grocery-supply companies—may purchase turkey products (directly or indirectly) from turkey producers and sell product to CIIPPs.[7] Distributors can be large, national brands such as U.S. Foods, or smaller entities serving regional or more local areas.[8] ███████████████████████████████████

████████████████████████████ ████████████████████████████████████████

████████████████████████████████████

Indeed, "turkey" itself, as CIIPPs have defined it, is comprised of many different products. For purposes of the present motion, the proposed class includes—and CIIPPs' expert analyzed—three broad categories: whole birds, breast meat, and ground turkey, whether fresh or frozen.[11] Although CIIPPs gerrymandered their class definition to exclude a number of other common turkey products—such as deli meat, bacon, legs, fully cooked breasts, sausage, and giblets[12]—the three categories of alleged class products included are themselves different in many ways. For instance, whole birds typically come from smaller hens, while breast meat, wings and ground turkey are typically created using heavy hens and toms, whose larger size results in more meat per bird for these products.[13] Moreover, the three categories of products implicate different sales

---

[7] CIIPPs' Ex. 2, Stiroh Report at ¶ 28, ECF No. 839-2.

[8] CIIPPs' Ex. 1, Mangum Report at ¶ 55, ECF No. 839-1.

[9] ████████████████████████████████████████████████████
██████████████████████████████████████████████████████
█ ██████████████

[11] CIIPPs' Ex. 1, Mangum Report at ¶ 9, ECF No. 839-1.

[12] CIIPPs' Ex. 1, Mangum Report at ¶ 9, ECF No. 839-1.

[13] CIIPPs' Ex. 2, Stiroh Report at ¶ 24, ECF No. 839-2.

channels, customers, and consumer preferences, and are thus impacted differently by economic forces. In fact, CIIPPs' expert found that American consumers vastly prefer turkey sandwiches (typically using breast meat) and burgers (using ground turkey) over other types of turkey meat.[14] Whole birds, by contrast, are consumed differently and are most popular around the Thanksgiving and year-end holidays.[15] ████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████

## B.  Proposed CIIPP Class is Composed of Disparate Entities

The proposed CIIPP class is comprised of all entities that indirectly purchase turkey products[18] from Defendants for use in commercial food preparation in 28 states and the District of Columbia.[19] By definition, to be in the class, these indirect purchasers must purchase turkey through one (or more) of hundreds of national and regional entities that act as intermediaries through which the turkey products pass through to commercial preparers,[20] and have no direct purchaser relationship with any of the producer Defendants.[21] The CIIPPs, through Dr. Mangum or otherwise, have not attempted to calculate the number of members comprising the proposed class.[22]

---

[14] CIIPPs' Ex. 1, Mangum Report at ¶ 35, ECF No. 839-1.

[15] CIIPPs' Ex. 1, Mangum Report at ¶ 33, ECF No. 839-1.

[16] CIIPPs' Ex. 1, Mangum Report at ¶ 208, ECF No. 839-1.

█ ████████████████████████████████████

[18] Defined as (1) uncooked turkey breast; (2) ground turkey; and (3) whole birds.

[19] CIIPPs' Memorandum in Support at 2, n.5, ECF 838; CIIPPs' Ex. 1, Mangum Report at ¶ 8, n.1, ECF No. 839-1.

[20] DPP Opposition at 18–21.

[21] CIIPPs' Ex. 1, Mangum Report at ¶ 210, ECF No. 839-1.

[22] Ex. 8, Mangum Dep. at 201:20–203:21.

Just as direct purchasers vary in terms of size and business model,[23] so too do the entities that comprise the proposed CIIPP class. Dr. Mangum states that the "majority of proposed CIIPP Class members are restaurants,"[24] but also identifies "hotels, airlines, casinos, private schools, cruise ships, and private hospitals,"[25] in addition to food-management companies, retail, and grocery stores (so long as they do not purchase directly from turkey producers).[26] Dr. Mangum makes no distinction based upon the size of the proposed CIIPP class member or the pricing mechanisms used by each class member to purchase turkey, despite the existence of vast differences among proposed class members in those areas. ███████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████ ████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████ Despite these differences, neither the CIIPPs nor



---

[23] DPP Opposition at 18–21.

[24] CIIPPs' Ex. 1, Mangum Report at ¶ 208, ECF No. 839-1.

[25] CIIPPs' Ex. 1, Mangum Report at ¶ 209, ECF No. 839-1.

[26] CIIPPs' Ex. 1, Mangum Report at ¶¶ 207, 209, ECF No. 839-1.

Dr. Mangum have even attempted to quantify the prevalence of the various types of pricing mechanisms utilized by CIIPPs for turkey purchases.[31]

### C. Defendants are Independent Decision Makers with Distinct Operations and Whose Turkey Production Did Not Move in Parallel

Defendants themselves likewise have numerous differences with respect to their operations and customer focuses.

---

[31] Ex. 8, Mangum Dep. 373:12–374:6, 378:8–379:6.



███████████████████████████████████████████████

███████████████████████████████████████████

Moreover, between 2010 and 2016, aggregate US turkey production grew by 2.9%[39]—again, contrary to how a conspiracy to restrict supply would be expected to act, and contrary to CIIPPs' own allegations that the goal of the so-called conspiracy was to reduce production in order to increase prices to supracompetitive levels.[40] Dr. Mangum acknowledges the growth of turkey production during the class period.[41] He did not analyze but-for production levels for any defendant or run a production regression to determine in his view what the level of turkey production should have been, absent the purported conspiracy among defendant producers and co-conspirators.[42] Likewise, he did not analyze production levels by product for all Defendants.[43]

**D.  CIIPPs Lack Evidence of Conspiracy and Ignore Relevant Economic Conditions**

CIIPPs broadly allege that "Defendants conspired to limit the supply and fix, raise, and maintain prices for turkey products" through coordinated production cutbacks, as well as the

---

███████████████████████████████████████████████
████████████████████████████████████████████

██ ███████████████████████████████████████

[39] CIIPPs' Ex. 2, Stiroh Report at ¶ 56, ECF No. 839-2.

[40] CIIPPs' Memorandum in Support at II.A, ECF 838.

[41] Ex. 8, Mangum Dep. 267:12–268:2 ███████████████████████
████████████████████████████████████████████
████████████████████████████████

[42] Ex. 8, Mangum Dep. 309:10–17; 310:13–311:2.

[43] Ex. 8, Mangum Dep. 279:3–280:5.

exchange of competitively sensitive information, specifically through Agri Stats.[44] However, Dr. Mangum did not analyze or form an opinion as to whether there was a conspiracy among Defendants— ███████████████████████████████████ As a result, in their Motion, CIIPPs rely on supposition and misstated documents and testimony to support their assertion that class treatment should be granted. While the Court need not assess at this juncture whether CIIPPs' offered evidence is sufficient to survive summary judgment or to find liability at trial, it is relevant to the assessment of whether the CIIPPs have established the elements of predominance. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2008) (requiring the court to undertake a "rigorous analysis" of "all of the relevant evidence"). Here, CIIPPs' offered evidence fails to establish concerted or common conduct that could be expected to produce anticompetitive effects experienced class-wide.

### 1. Uncontrollable Industry-Wide Events Explain Deviations in Production Levels

CIIPPs gloss over a number of significant industry-wide events outside the control of any individual Defendant that impacted turkey production. ████████████████████████████ ██████████████████████████████████████████████████—specifically, the Great Recession beginning in 2008, rising feed costs caused in large part by changes to federal ethanol mandates impacting the industry starting in 2008-2009, droughts and other weather events, and the 2014-2016 outbreak and impact of highly pathogenic avian influenza ("HPAI").[47] Dr. Mangum himself acknowledges that these non-conspiratorial factors impacted turkey production

---

[44] CIIPPs' Memorandum in Support at 2, ECF 838; CIIPPs' Fourth Class Action Compl. ¶¶ 554, 561, 573–574, ECF No. 666.

█ ████████████████████████

█████████████████████████████████████

[47] CIIPPs' Ex. 2, Stiroh Report at ¶¶ 38–48, ECF No. 839-2.

and caused reduced production at times,[48] ████████████ ██

████████████████████████████████████████████

████████████████████████████████████████

    The Great Recession beginning in 2008 caused a substantial reduction in demand for all meat products in the country, with away-from-home food expenditures not recovering until 2011 and at-home food expenditures not recovering until 2014.[51] Industry experts have found that poultry consumption is highly correlated with median income, and those income levels did not fully recover until 2012.[52] This reduction in demand is borne out by the record levels of inventory that turkey producers had in this period—a sign that consumer demand could not meet the pace of production.[53]

    The Great Recession also coincided with the beginning of an unprecedented rise in feed costs for meat producers (not just turkey producers), driven by new government regulations concerning ethanol.[54] The 2007 Renewable Fuel Standard Program increased the annual volume requirements for renewable fuels, and the resulting increases in ethanol production resulted in higher corn costs.[55] In other words, as demand for corn increased to produce more ethanol, turkey producers were required to pay more for the corn—a key ingredient to feed turkeys.[56] As a general

---

[48] CIIPPs' Ex. 1, Mangum Report at ¶¶ 189–194, ECF No. 839-1.

█ ████████████████████████████████████████████

█ ████████████████

█ ████████████████████

[51] CIIPPs' Ex. 2, Stiroh Report at ¶ 39, ECF No. 839-2.

[52] CIIPPs' Ex. 2, Stiroh Report at ¶ 39, ECF No. 839-2.

[53] CIIPPs' Ex. 2, Stiroh Report at ¶ 40, ECF No. 839-2.

[54] CIIPPs' Ex. 2, Stiroh Report at ¶ 41, ECF No. 839-2.

[55] CIIPPs' Ex. 2, Stiroh Report at ¶ 41, ECF No. 839-2.

[56] CIIPPs' Ex. 2, Stiroh Report at ¶ 41, ECF No. 839-2.

matter, higher costs can lead to decreased production.[57] In fact, USDA data shows that high feed

costs in 2008, 2012 and 2013 correspond with the periods of reduced turkey production alleged by

CIIPPs.[58] Dr. Mangum himself acknowledges that there were "large increases" in feed costs during

this period.[59]

In addition, the 2010 through 2013 period was marked by droughts and high heat events in

the Midwest and South. The USDA in fact predicted that red meat and poultry production would

contract in 2012 and 2013, in part because of "drought in the Southern Plains of the United States

(which extended through much of the middle of the country in 2012)."[60]

Finally, the devastating HPAI outbreak from 2014 through 2016 caused significant

reductions throughout the industry, as 7.4 million turkeys in the country (approximately 8% of

turkeys grown for meat) were mass-depopulated or died as a result of the disease.[61] The results

---

[57] CIIPPs' Ex. 2, Stiroh Report at ¶ 42, ECF No. 839-2.

[58] CIIPPs' Ex. 2, Stiroh Report at ¶ 41 & Figure 4, ECF No. 839-2.

[59] Ex. 8, Mangum Dep. 289:18–291:2.

[60] CIIPPs' Ex. 2, Stiroh Report at ¶ 44, ECF No. 839-2; *USDA Agricultural Projections to 2022*, United States Department of Agriculture, Office of the Chief Economist, at 82 (Feb. 2013), https://www.ers.usda.gov/webdocs/outlooks/37731/35047_oce131.pdf ("High feed prices, the economic recession, and drought in the Southern Plains of the United States (which extended through much of the middle of the country in 2012) have combined to reduce producer returns and lower production incentives in the livestock sector over the past several years."); *USDA Agricultural Projections to 2021*, United States Department of Agriculture, Office of the Chief Economist, at 78 (Feb. 2012), https://www.ers.usda.gov/webdocs/outlooks/37720/13983_oce121_2_.pdf ("Over the past several years, high feed prices, the economic recession, and drought in the Southern Plains of the United States have combined to reduce producer returns and lower production incentives in the livestock sector. As a result, total U.S. red meat and poultry production is projected to fall in 2012 and 2013.").

[61] CIIPPs' Ex. 2, Stiroh Report at ¶ 45, ECF No. 839-2.

were particularly dire in Midwest states where the disease was more common, particularly in Iowa

and Minnesota, and disproportionately affected producers based in those states.[62]

### 2. Agri Stats Offers Procompetitive Industry Benchmarking Services

Agri Stats is a reporting service that collected information from turkey producers and other

industry participants and created anonymized, aggregated reports related to turkey grow-out

operations, processing, and sales to facilitate competitive benchmarking among producers.



As Judge Durkin concluded after extensive discovery and summary judgment

briefing in *Broilers II*, "Agri Stats reports [about broiler chickens] did *not* reveal competitors'

production and pricing data." *In re Broiler Chicken Antitrust Litig.*, 2023 WL 7220170, *27 (N.D.

Ill. Nov. 2, 2023) (*Broilers II*) (emphasis added).

---

[62] CIIPPs' Ex. 2, Stiroh Report at ¶ 47, ECF No. 839-2.





Despite the above, CIIPPs claim that Defendants' use of Agri Stats "enabled them to monitor and coordinate supply levels."[69] Thus, like

[69] CIIPPs' Memorandum in Support at 4, ECF 838.

the Agri Stats broiler chicken reports,"[e]ven if Defendants deanonymized the reports, they would not have learned their competitors['] production and pricing data because it was not contained in the version of reports Agri Stats provide[d] to them." *Broilers II*, 2023 WL 7220170, at *27.

### 3. CIIPPs Misstate Evidence of Alleged Conspiracy

In addition to glossing over the plainly non-conspiratorial events described above that impacted turkey production, the CIIPPs repeatedly twist facts and misstate documents to imply the existence of a conspiracy where none existed. This includes, for instance, making inferential leaps unsupported by a document's text, or ignoring context necessary to fully understand what a document is indicating. While Defendants dispute all the allegations made by CIIPPs, a collection of some of the more egregious examples of CIIPPs' misstatements is explained below, in order to assist the Court with the "rigorous analysis" of the underlying facts required at the class certification stage. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).





There is nothing anticompetitive or improper about a study using aggregated, historical data.

CIIPPs' suggestion that efforts to comply with applicable laws equate to an acknowledgement that certain conduct would "potentially violate the antitrust laws" is incorrect and misleading.



███████████

███████████

███████████

███████████

███████████

███████████

█████████████ *See In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2023 WL 4303476, \*21 (N.D. Ill. June 30, 2023) ("To infer a supply reduction conspiracy that resulted in a production decrease in 2012 from a text message about pricing that was sent at the end of 2012 is an unreasonable inference.").

CIIPPs also repeatedly misstate or fail to provide context for numerous documents from individual Defendants. ████████████████

███████████

███████████

███████████

███████████

███████████

███████████

───────────────

███████████

███████████

███████████

███████████

███████████

███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

 CIIPPs further misstate the existence and purpose of other conversations between Defendants, misrepresenting that any such conversation is part of their alleged conspiracy regardless of content or context. ██████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ ███████████████

████████████████████████████████████████████████████████

█████████████████████████████████ ███████████████████████

████████████████████████████████████████████████████████

████████████████ ██████████████████████████████████████████

████████████████████████████████████████████████████████ ██

████████████████████████████████████████████

---

- ████████████████████
- ██████████████████████████████
- ████████████████████████████████████████
- ████████████████████████████████████████
- ███████████████████████████████
- ████████████████████████████████████

Even internal discussions and pricing discussions with customers are not immune to misrepresentation by CIIPPs.



### III.  **Legal Standard**

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citations omitted). Rule 23 "imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). CIIPPs bear "the burden of demonstrating that certification is appropriate" by a preponderance of the evidence. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). In turn, this Court must conduct a "rigorous analysis" to determine whether CIIPPs have met their burden through "evidentiary proof." *Comcast*, 569 U.S. at 33. This standard makes it inappropriate for Plaintiffs to seek to short-circuit review of the record simply by invoking class-certification decisions in cases involving other protein industries. *See Broilers*, 2022 WL 1720468, at *2. The evidentiary record before the Court is what must be rigorously analyzed.

Under Rule 23(a), CIIPPs must establish numerosity, commonality, typicality, and adequacy. Under Rule 23(b)(3) CIIPPs must prove "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods" for resolving this dispute.

Defendants have also filed a Motion to Exclude Expert Opinions of Dr. Russell Mangum ("Mangum Daubert Motion"), the CIIPPs' proposed class expert, due to serious flaws with his economic models. That Motion highlights the CIIPPs' inability to establish class-wide injury. The non-reliability of Dr. Mangum's models should inform the Court's class-certification analysis regardless of the Court's disposition of the Daubert motion. Even if that Motion is denied (and Dr. Mangum's expert opinions are deemed to pass the threshold for admissibility for the purposes of class certification), Dr. Mangum's models cannot meet the Rule 23 requirements for sufficient evidence of class-wide harm or individual injury. *See, e.g.*, *In re Hydrogen Peroxide*, 552 F.3d at

323 ("[O]pinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded under *Daubert* or for any other reason."). Whether considered in the context of Daubert or the "rigorous analysis" of "all relevant evidence" needed for class certification, *see id.*, CIIPPs' use of flawed economics is insufficient to certify a class.

## IV.    <u>Argument</u>

CIIPPs' Motion should be denied for five primary reasons. First, CIIPPs have not met their burden to show class-wide injury can be proven through common proof or a class-wide method. Their expert's model cannot show all or substantially all DPP class members were overcharged for their purchases of class products and that all or substantially all DPP class members passed on any alleged overcharge to CIIPPs.

Second, CIIPPs have failed to show that damages are capable of measurement on a class-wide basis because their expert's model shows there has been no overcharge for a significant portion of Defendants' sales that were resold to CIIPPs. In addition, their expert has failed to attribute damages specific to either of CIIPPs' theories of liability.

Third, even if CIIPPs were able to overcome these insurmountable hurdles, they have not presented a manageable way to address the material variations in the many state laws governing their claims in a single trial.

Fourth, CIIPPs seek to certify an overbroad class comprised of a wide variety of commercial entities, in distinct industries, who purchased a wide variety of different turkey products under myriad contractual arrangements. In doing so, CIIPPs include an impermissible number of putative class members that have suffered no harm.

Fifth, CIIPPs cannot show that proposed class representative Logan Farms is an adequate class representative when, by its own admission, it is a direct purchaser of turkey products from one of the Defendants. For all these reasons, CIIPPs' Motion should be denied.

### A.     CIIPPs Have Not Met Their Burden to Establish Predominance

CIIPPs cannot satisfy Rule 23's predominance requirement because individualized issues predominate as to both injury and damages. "The decision whether to certify a class is one that depends on a careful assessment of the facts, of potential differences among class members, of management challenges, and of the overall importance of the common issues of law or fact to the ultimate outcome." *Riffey v. Rauner*, 910 F.3d 314, 318 (7th Cir. 2018). "To obtain class certification, [CIIPPs] must show that common proof will predominate with respect to each … element[] of [CIIPPs'] claims," which include "individual injury, or impact" and "measurable damages." *Reed v. Advocate Health Care*, 268 F.R.D. 573, 581 (N.D. Ill. 2009) (citations omitted); *see also Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 815 (7th Cir. 2012). "If proof of the essential elements . . . requires individual treatment, then class certification is unsuitable." *Reed*, 268 F.3d at 581 (internal citations and quotations omitted).

CIIPPs "must affirmatively show how common evidence and a single, reliable methodology will prove an element on a simultaneous, class-wide basis." *In re Steel Antitrust Litig.*, No. 08 C 5214, 2015 WL 5304629, *5 (N.D. Ill. Sept. 9, 2015); *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 845 (7th Cir. 2022) (affirming denial of class certification where plaintiff failed to identify common evidence that could be used to conclusively resolve whether purported class members were injured). Courts must conduct a rigorous analysis and "[i]f there are material factual disputes, the court must 'receive evidence . . . and resolve the disputes before deciding whether to certify the class.'" *Messner*, 669 F.3d at 811 (citations omitted); *see also Santiago v. City of Chicago*, 19 F.4th 1010, 1016 (7th Cir. 2021) ("A class may only be

certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites for class certification have been met." (internal citations and quotations omitted)).

CIIPPs cannot satisfy the demanding criteria set forth in Rule 23(b)(3). *See Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016). First, as to antitrust injury, CIIPPs have failed to demonstrate that the alleged antitrust injury can be proven through evidence common to the class rather than through individualized inquiries. The limited data produced by CIIPPs shows there has not been an overcharge for a substantial number of customers, products, and Defendants. Second, as to class-wide damages, individualized inquiries predominate over any common questions.

### 1. CIIPPs Have Not Proposed a Valid Method of Proving Class-Wide Injury Using Common Proof

A Rule 23(b) predominance analysis for a Sherman Act Section 1 claim begins with an inquiry into whether there was a violation of antitrust law and whether there was class-wide injury or impact caused by the violation. *Messner*, 669 F.3d at 815; *Steel Antitrust*, 2015 WL 5304629, at *5. Even if CIIPPs could prove an antitrust violation (which they cannot),[103] CIIPPs must also prove class-wide antitrust injury flowing from that alleged violation with common evidence or with a common methodology. *Steel Antitrust*, 2015 WL 5304629, at *6.[104] This common methodology must provide a reliable means for determining injury. "[E]xpert testimony should never be 'uncritically accepted as establishing a Rule 23 requirement[]' . . . ." *Id.* at *7 (internal citations omitted); *see also id.* at *9 ("Rule 23 requires the court to take a hard look at the soundness

---

[103] *See supra* Sec. II.C.

[104] Defendants do not concede the existence of a conspiracy or that Plaintiffs have set forth class-wide evidence of a conspiracy. *See supra* at Part II.D.

of statistical models that purport to show predominance."). As described by a recent district court in a decision denying class certification for lack of common injury:

> A flawed model [preferred by an expert] may result in denial of class certification for failure reliably to establish the preponderance of common issues, whether because the model measures harm not attributable to the conspiracy, yields false positives, masks uninjured class members by using an "averaging" mechanism to allocate injury across the class, or otherwise fails to demonstrate with scientific rigor that classwide impact can be established through common proof.

*In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 49 (S.D.N.Y. 2020) (internal citations omitted). Here, CIIPPs rely on Dr. Mangum's overcharge model to prove antitrust injury for each member of the putative class through a common methodology, but Dr. Mangum's model cannot show class-wide impact warranting denial of class certification.

### a. Dr. Mangum's Model Shows No Overcharge for Numerous Customers, Products, and Defendants

In order to show injury, CIIPPs must first demonstrate the existence of an overcharge on all or substantially all DPPs who resold class products to the CIIPPs. *See In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 149–50 (E.D. Pa. 2015) (noting that indirect purchasers must demonstrate "two-levels of impact capable of proof using classwide evidence[,]" with the first being the existence of an overcharge) (*citing In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 502–04 (N.D. Cal. 2008)). Here, Dr. Mangum's model purports to show average impact across all DPPs, products, and Defendants, but cannot show whether all or even substantially all putative Class members paid higher prices for Class products. Dr. Stiroh applied Dr. Mangum's models to individual customers, products, and Defendants where sufficient data was available and found "that numerous purported Class members and products were not subject to any overcharge according to [Dr. Mangum's] own models."[105] In total, Dr. Stiroh found that

---

[105] CIIPPs' Ex. 2, Stiroh Report at ¶ 94, ECF No. 839-2.

"██████ of Defendants' sales that Dr. Mangum estimates are resold to CIIPPs were made to DPP resellers where *his own overcharge model finds no overcharge* for the given product category."[106] This means that for ██████ of Defendants' sales that were resold to CIIPPs—██████████—there was no overcharge to be passed-through to CIIPPs and therefore no injury. Consistent with this finding, when applying Dr. Mangum's overcharge model on the ██ DPP resellers identified by Dr. Mangum who resold class products to CIIPPs, there are no statistically significant overcharges for: (1) ███ of the DPPs who resold breast meat to CIIPPs; (2) ██ of the DPPs who resold ground turkey to CIIPPs; and (3) ██ of the DPPs who resold whole birds to CIIPPs.[107] ██████████████████████



Dr. Stiroh conducted a similar exercise for individual Class Products and Defendants that yielded similar results. As described in greater detail in the Mangum Daubert Motion, when

---

[106] CIIPPs' Ex. 2, Stiroh Report at ¶ 153, ECF No. 839-2 (emphasis added).

[107] CIIPPs' Ex. 2, Stiroh Report at ¶ 152, ECF No. 839-2. When applying Dr. Mangum's model to all individual DPPs using available data, including those who did not sell class products into the CIIPP supply chain, Dr. Stiroh found: (i) ██████████ with no statistically significant overcharges for their purchases of breast meat, which accounts for ███ of putative DPP class members that purchased breast meat; (ii) ██████████ with no statistically significant overcharges for their purchases of ground turkey, which accounts for ███ of putative DPP class members that purchased ground turkey; and (iii) ██████████ with no statistically significant overcharges for their purchases of whole birds, which accounts for ███ of putative DPP class members that purchased whole birds. CIIPPs' Ex. 2, Stiroh Report at ¶ 95(b), ECF No. 839-2. In total, Dr. Mangum's model shows that at least ███ of the putative DPP class did not have an overcharge for at least one class product. CIIPPs' Ex. 2, Stiroh Report at ¶ 95(b), ECF No. 839-2. ██████████████████████████

applying Dr. Mangum's model to individual products using available data, 

The same can be said for some Defendants, as well.

Dr. Mangum's model impermissibly masks all of these instances of no statistically significant overcharges by using an average impact across all customers, products, and Defendants. Without individualized inquiries, the precise magnitude of direct purchasers who paid no overcharge, or class products for which there was no overcharge, is unknown.[112] What is known, however, is that Dr. Mangum's use of average impact is not a reliable method for demonstrating injury on a class-wide basis. *See, e.g.*, *Reed*, 268 F.R.D. at 590–91 (rejecting model that relied on averages to establish class-wide impact because "[m]easuring average base wage suppression does not indicate whether each putative class member suffered harm from the alleged conspiracy"); *see also Aluminum Warehousing*, 336 F.R.D. at 62–63 (rejecting model that attempted to gloss over complexities in data through averaging). CIIPPs are unable to show class-wide impact as a result.

> **b.** **CIIPPs Cannot Show That Overcharges Were Passed Through Using Common Proof**

In order to show injury, CIIPPs must not only demonstrate the existence of an overcharge on DPPs, but CIIPPs must also demonstrate through common proof the overcharge was passed



---

[112] CIIPPs' Ex. 2, Stiroh Report at ¶ 95(b), ECF No. 839-2.

through to them by DPPs. *See In re Processed Egg Prods.*, 312 F.R.D. at 149–50, 160–61 (noting that "because the Plaintiffs are indirect purchasers, they must demonstrate that . . . all (or virtually all) retailers passed on the overcharge to the Plaintiffs" and denying class certification in part for Plaintiffs' failure to do so (citation omitted)); *In re Fla. Cement and Concrete Antitrust Litig.*, 278 F.R.D. 674, 683–84 (S.D. Fla. 2012) (denying class certification of indirect purchaser price fixing claims where Plaintiffs "fail[ed] to establish that an overcharge was passed down to all indirect purchasers included in the class"). The CIIPPs cannot do this because Dr. Mangum's pass-through analysis is unreliable and fatally flawed because it fails to account for variation of pass-through rates by DPP, by product, and by CIIPP.

In an attempt to show pass-through with common evidence, Dr. Mangum uses a regression model to estimate pass-through rates for just ▮▮▮▮▮▮ DPP resellers he identified in the CIIPP supply chain by purportedly measuring the relationship between those DPPs' input costs and output prices.[113] As explained in greater detail in the Mangum Daubert Motion, Dr. Mangum's pass-through model should be excluded as unreliable.[114] Dr. Mangum provides no rationale or methodology for selecting these ▮ DPP resellers or excluding the other ▮ DPP resellers, ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Nor does he provide evidence that these ▮ DPP resellers are representative of the resellers from which the named CIIPP class representatives or putative class purchased Class Products. An analysis of these ▮ DPP resellers shows that CIIPPs cannot demonstrate any alleged overcharge was passed on through common proof.

---

[113] CIIPPs' Ex. 1, Mangum Report at ¶ 229, ECF No. 839-1.

[114] Mangum Daubert Motion at 10–13.



In doing so, Dr. Mangum also ignores the variation of pass-through rates across DPP resellers across products, and across CIIPP class members. With respect to products, Dr. Stiroh examined the available data and found substantial variation of pass-through rates across different products, including those sold by the same DPP reseller.[117]

With respect to customers, Dr. Stiroh found that DPP resellers did not pass through the same amount of cost increases to their customers.

Dr. Mangum fails to account for these differences, rendering his pass-through estimates unreliable and warranting a denial of class certification. *See In re Graphics Processing*

---

[115] CIIPPs' Ex. 1, Mangum Report at ¶ 229, Figure 44, ECF No. 839-1.

[117] CIIPPs' Ex. 2, Stiroh Report at ¶ 159, ECF No. 839-2.

*Units*, 253 F.R.D. at 505 (class certification defeated where "plaintiff's method of proving pass-through requires a reseller-by-reseller analysis").

The record evidence also demonstrates that Dr. Mangum's average pass-through rate is inadequate to show injury to substantially all class members. ██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ *Cf. Broilers*, 2022 WL 1720468, at *18 (finding that indirect plaintiffs demonstrated pass-through, in part, "because representatives of the direct purchasers testified that they *always pass on costs*") (emphasis added). Here, CIIPPs seek to certify a class comprised of highly differentiated products purchased by disparate entities through individualized pricing and contracting mechanisms.[122] CIIPPs cannot demonstrate the overcharge was passed through to them by DPPs with common proof. Their Motion should be denied.

### 2. CIIPPs Have Failed to Show a Class-Wide Method for Proving Damages

Even if CIIPPs were able to prove antitrust injury with common evidence (which they cannot), CIIPPs have failed to proffer a method of showing measurable class-wide damages through common proof. As part of the predominance inquiry, a court "must see if there is a classwide method for proving damages, and if not, whether individual damage determinations will overwhelm the common questions on liability and impact." *Kleen*, 831 F.3d at 929. Critically, this includes determining whether each of the plaintiffs' theories of antitrust impact is tied to a calculation of damages. *Comcast*, 569 U.S. at 34–38. Here, CIIPPs have not demonstrated a class-

---

██
████████████████████████████████████████████████████
████████████████████████████████████████

[122] *See supra* Secs. II.A, B.

wide method for proving damages and their own expert has shown that individual damage determinations are necessary.

### a. Dr. Mangum's Damages Model Violates *Comcast*

Dr. Mangum's model—which purports to calculate overcharges broadly caused by Defendants' alleged conduct—fails to tie each of Plaintiffs' theories of antitrust impact to a calculation of damages, and thus cannot show that damages are capable of measurement on a class-wide basis. CIIPPs allege that putative class members suffered overcharges based on two different theories: (1) a "rule of reason" claim based on an alleged agreement to exchange competitively sensitive information, specifically through Agri Stats; and (2) a "*per se*" claim based on alleged coordinated production cutbacks.[123] Dr. Mangum purports to calculate total class damages of ███ ███ but does not attribute specific damages to either of CIIPPs' two theories.[124] As the Supreme Court recognized in *Comcast Corp. v. Behrend*, translating "the *legal theory of the harmful event* into an analysis of the economic impact *of that event*" is a foundational requirement for establishing that damages are capable of measurement on a class-wide basis. 569 U.S. at 38 (emphasis in original). In *Comcast*, the Court reversed a grant of class certification because the plaintiffs' expert's model failed to "isolate damages resulting from any one theory of antitrust impact." *Id.* at 32. In reversing, the Court discussed that the expert's model improperly purported to calculate "damages resulting from the alleged anticompetitive conduct as a whole." *Id.* at 36–37 (internal quotations omitted). Here, Dr. Mangum's model suffers from the same fundamental problem. ████████████████████████████████████████

████████████████████████████████████████

---

[123] *See* CIIPPs' Memorandum in Support at 2, ECF 838; CIIPPs Fourth Class Action Compl. ¶¶ 554, 561, 573–574, ECF No. 666.

[124] CIIPPs' Memorandum in Support at 42, ECF 838.

██████████████████████ In light of this failure, Dr. Mangum's model does not and cannot show that damages are capable of measurement on a class-wide basis—and CIIPPs are unable to do so as a result. *Comcast*, 569 U.S. at 34, 38.

        **b.**    **Plaintiffs Fail to Provide a Reliable Method to Show Damages on a Class-Wide Basis and Individual Damages Determinations are Necessary**

Plaintiffs also fail to provide a reliable method to show damages on a class-wide basis for the same reasons they cannot show common impact. As explained above, Dr. Mangum's model fails to reliably demonstrate a class-wide method for proving damages as it shows there has been no overcharge for a significant portion of Defendants' sales that he estimates were resold to CIIPPs.[126] Specifically, based on his own model, ████████████ of Defendants' sales that Dr. Mangum estimates are resold to CIIPPs were made to DPP resellers where his own overcharge



---

[126] CIIPPs' Ex. 2, Stiroh Report at ¶ 153, ECF No. 839-2.

model finds no overcharge for the given product category."[127] 

████████████████████████████████████████████████████████████

████████████████████████████████ ███████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ The same is true as to the numerous other

DPP resellers for which Dr. Mangum's model does not show an overcharge.[130]

████████████████████████, due to the varied nature of pricing formulas,

contracts, and purchasing power of buyers, common injury cannot be assumed, but rather,

individualized inquiries will be necessary. To undertake such an analysis would require

comprehensive data for each and every relevant transaction by each CIIPP class member sufficient

to establish the turkey product purchased, the identity of the producer, the identity of the seller,

the price paid and pricing mechanism, any rebates or discounts, the quantity purchased, and the

date of purchase.[131] Dr. Mangum made no such effort to do so, nor did he propose a common

methodology that could do so. Indeed, despite Defendants' discovery requests for such

information, not even all of the proposed CIIPP class representatives produced this level of

information to determine the existence or extent of any alleged injuries because it was not

---

[127] CIIPPs' Ex. 2, Stiroh Report at ¶ 153, ECF No. 839-2. CIIPPs point to this and claim that "Dr. Stiroh does not dispute the existence of actual overcharges." CIIPPs' Memorandum in Support at 29, ECF 838. This is false. Dr. Stiroh has opined that Dr. Mangum's overcharge regression model suffers from fatal flaws that cannot be used to establish the existence of overcharges. Even if these fatal flaws did not exist, however, Dr. Stiroh has demonstrated that this model is unreliable for any damages analysis, because it erroneously applies overcharge estimates to more than a third of DPP sales resold to CIIPPs when there was no overcharge in the first instance.

██ ████████████████████████████████████████

██ ████████████████████████████████████████

[130] CIIPPs' Ex. 2, Stiroh Report at ¶ 96, Ex. 7B–D, ECF No. 839-2.

[131] CIIPPs' Ex. 2, Stiroh Report at ¶ 153, ECF No. 839-2.

available.[132] As Dr. Stiroh explained, on this record, "[i]t is not possible to establish the extent to which, if at all, any CIIPP Class member was injured with information that has been produced in this matter."[133] For the putative class, even if such comprehensive data were available, individualized inquiries would be necessary to resolve any disputes and discrepancies with the data. CIIPPs have failed to proffer a class-wide method to do so without conducting individualized inquiries. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 144 (D.D.C. 2017) (denying class certification where plaintiffs failed to offer a reliable methodology for assessing damages on a class-wide basis "without requiring the Court or the jury to engage in individualized inquiries").

### 3. CIIPPs Cannot Show Predominance or Superiority Due to Variations in State Laws Governing Indirect-Purchaser Actions

In addition to their inability to show injury or damages on a class-wide basis using common proof, CIIPPs cannot establish predominance or superiority because of material variations in the many state laws governing their claims. In total, CIIPPs bring claims under the laws of 29 different jurisdictions, alleging violations of state antitrust statutes (23 states and Washington, D.C.);[134] consumer-protection statutes (13 states);[135] and common-law unjust-enrichment claims (24 states and Washington, D.C.).[136] "It is well established under Seventh Circuit case law . . . that if the

---

[132] CIIPPs' Ex. 2, Stiroh Report at ¶ 153, ECF No. 839-2.

[133] CIIPPs' Ex. 2, Stiroh Report at ¶ 154, ECF No. 839-2.

[134] Arizona, California, D.C., Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

[135] California, Florida, Minnesota, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Carolina, South Dakota, Vermont, and Wisconsin.

[136] Arkansas, Arizona, D.C., Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

states' laws differ, class certification is improper." *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 583 (N.D. Ill. 2008) (internal citations omitted); *see also Hale v. Emerson Elec. Co.*, 942 F.3d 401, 403 (8th Cir. 2019) ("Variations in state law may swamp any common issues and defeat class certification under Rule 23(b)(3).") (internal citations omitted). When seeking to certify classes that implicate the laws of many jurisdictions, Plaintiffs "must provide an extensive analysis of state law variations to address whether the differences in law pose insuperable obstacles." *Doster Lighting, Inc. v. E-Conolight, LLC*, No. 12-C-0023, 2015 WL 3776491, *15 (E.D. Wis. June 17, 2015) (internal citation omitted). CIIPPs have not done so here, which is fatal to their motion. *In re Processed Egg Prods.*, 312 F.R.D. at 143 (rejecting plaintiffs' attempt in an antitrust price-fixing case "to place 21 square pegs into a single round hole, asking the Court to envision 21 statewide classes under the antitrust laws of 21 states, the consumer protection laws of seven states, and the unjust enrichment laws of 17 states, all tried in a single proceeding as if it were a nationwide class under federal antitrust law").

Here, CIIPPs have not presented a manageable way to try their state antitrust claims in a single trial where some state antitrust statutes require courts to prevent duplicate liability,[137] some states provide for actual damages, but not enhanced damages,[138] and some states require additional proof for higher damages.[139] In addition, there is variation among the state antitrust laws as to

---

[137] *See, e.g.*, N.Y. Gen. Bus. Law § 340(6) (2014) (providing "in any action in which claims are asserted against a defendant by both direct and indirect purchasers, the court shall take all steps necessary to avoid duplicate liability"); R.I. Gen. Laws § 6-36-11(a) (2014) (similar); 9 Vt. Stat. § 2465(b) (1999) (similar); Minn. Stat. § 325D.57 (2023) (similar); Neb. Rev. Stat. § 59-821.01(2) (2002) (similar); S.D. Codified Laws § 37-1-33 (1991) (similar); *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1086 (Cal. 2010) (similar).

[138] *See, e.g.*, Miss. Code Ann. § 75-21-9 (2010); Neb. Rev. Stat. Ann. § 59-821 (2002); *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1017-18 (N.Y. 2007) (class actions cannot seek treble damages); Tenn. Code Ann. § 47-25-106 (2021).

[139] *See, e.g.*, Ariz. Rev. Stat. § 44-1408(B) (2023) (only for "flagrant" violation); 740 Ill. Comp. Stat. § 10/7(2) (1965) (only if injury is "due to a violation of subsections (1) or (4) of Section 3 of

whether the alleged conspiracy affects interstate commerce which would require application of differing legal standards in an individualized process. *Compare, e.g.*, *Arthur v. Microsoft Corp.*, 696 N.W.2d 29, 37 (Neb. 2004) (Nebraska antitrust law "provide[s] consumers with protection against unlawful practices in the conduct of any trade or commerce which directly or indirectly affects the people of Nebraska") *with In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 266–67 (S.D.N.Y. 2019) (noting that Mississippi law focuses on where the anticompetitive conduct occurred as opposed to the effects of the conduct).

As for CIIPPs' consumer-protection and unjust-enrichment claims, courts have found the variations in state common law and the individualized proof required to be unmanageable in a single class action. *Lilly v. Ford Motor Co.*, No. 00-C-7372, 2002 WL 507126, *2 (N.D. Ill. Apr. 3, 2002). "State consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002). These variations would require a jury attempting to decide liability to navigate multiple legal standards. *Compare* N.M. Stat. § 57-12-2(E) (2019) (In New Mexico, plaintiffs must show defendants' conduct "takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree" or "results in a gross disparity between the value received by a person and the price paid.") *with In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-md-2785-DDC-TJJ, 2020 WL 1180550, *55 (D. Kan. Mar. 10, 2020) (discussing that Florida, North Carolina, and Vermont "consider the following factors: (1) whether the practice offends public policy, the common law, or otherwise; (2) whether it is immoral, unethical, oppressive, or unscrupulous; or (3) whether it causes substantial injury to

---

this Act"); Mich. Comp. Laws § 445.778(2) (1985) (only for "flagrant violation"); N.H. Rev. Stat. Ann. § 356:11(II) (2008) (only for "willful or flagrant" violation); North Dakota: N.D. Cent. Code § 51-08.1-08(3) (2021) (only for "flagrant" violation).

consumers"). These differences create individualized issues that make class-wide adjudication unmanageable.

Unjust enrichment claims are not suitable for multi-state class treatment because states vary in how the elements of such claims are treated. *See Muehlbauer v. Gen. Motors Corp.*, No. 05-C-2676, 2009 WL 874511, *5 (N.D. Ill. Mar. 31, 2009) ("[T]he cases explain that multi-state class actions for unjust enrichment are inappropriate.); *In re Processed Egg Prods.*, 312 F.R.D. at 164 (denying class certification and explaining "courts have noted the extent to which unjust enrichment laws vary across states and found them unmanageable in a single class litigation"). For example, some states require a showing of "mistake, coercion, or request" while others do not. *Compare Dowling Family Partnership v. Midland Farms*, 865 N.W.2d 854, 864 (S.D. 2015), *with Rapp v. Green Tree Servicing, LLC*, 302 F.R.D. 505, 514 (D. Minn. 2014) (discussing different standards under state law). In addition, the jury would have to parse different limitations periods between the various states, and in some instances, between the various claims within a state.[140]

CIIPPs have not proffered a reasonable method to manage the differences between the various state laws and jurisdictions at issue here. *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 350 (D.N.J. 1997) ("[A] court cannot rely on assurances of counsel that any problems with predominance or superiority can be overcome.") (internal citation omitted). CIIPPs argue that the above variations are immaterial because "[e]ach state represented in the proposed Class has either enacted an antitrust statute that is construed in harmony with the

---

[140] *Compare, e.g.*, Ark. Code § 4-88-115 (2020) (five-year limitations period for deceptive-trade-practices claim), *with Graham v. Catamaran Health Solutions LLC*, 940 F.3d 401, 408 (8th Cir. 2017) (three-year limitations period for unjust enrichment under Arkansas law); Cal. Bus. & Prof. Code § 16750.1 (2011) (four-year period for antitrust claim), *with BASF Corp. v. Cesare's Collision Repair & Towing, Inc.*, 364 F. Supp. 3d 1115, 1122 (E.D. Cal. 2019) (three-year period for unjust enrichment based on fraud or mistake, and two years for claim based on quantum meruit).

Sherman Act or allows indirect purchasers to recover damages from a horizontal antitrust violation via the state's consumer protection or unjust enrichment law."[141] This argument does not overcome the widespread variability in state laws as courts in many states have found differences between federal and state antitrust laws. *See, e.g.*, *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 102 (Ariz. 2003); *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 446 (Iowa 2002); *Sperry*, 863 N.E.2d at 1018; *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 519 (Tenn. 2005); *Bergstrom v. Noah*, 974 P.2d 520, 530–31 (Kan. 1999). CIIPPs have not proffered a manageable trial plan that can reasonably accommodate the differences discussed above and contained throughout Appendices A, B, and C to their Motion. In reality, the jury would need separate instructions as to each variation by state and claim. A set of jury instructions or verdict form that attempts to address these nuances presents a significant risk of jury confusion when assessing liability and damages. *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. at 350 (denying class certification where plaintiffs failed to establish state law claims from varying states could be tried to a single jury in a way that "fairly represents the law of the fifty states while not overwhelming jurors with . . . a verdict form as large as an almanac"). Accordingly, CIIPPs have failed to meet their burden of proving predominance or superiority.

### B. CIIPPs' Class Definition is Overbroad Given the Wide Variety of Distinct Entities and Complex Distribution Chain

Not only is the proposed CIIPP class unable to prove claims through common evidence, the proposed class definition itself is overbroad. Notably, the proposed class includes all entities "that indirectly purchased fresh or frozen, uncooked turkey breast, ground turkey, or whole bird turkey products sold by Defendants . . . for their own use in commercial food preparation."[142] This

---

[141] CIIPPs' Memorandum in Support at 43, ECF 838.

[142] CIIPPs' Ex. 1, Mangum Report at ¶ 8, ECF No. 839-1.

definition incorporates a wide variety of commercial entities with few evident similarities beyond the act of food preparation—grocery stores, retail stores, restaurants, hospitals, universities, airlines, medical centers, casinos, cruise ships, and food management companies are among the disparate entities identified as part of this potential class.[143] Dr. Mangum does not (and likely, cannot) estimate the number of entities this broad class would entail.[144]

The distinctions among these entities, and the way they contract for turkey purchases with direct purchaser distributors, is important given the impact these differences have on the CIIPP class. Even under the analytical approach advocated by the CIIPPs' expert, there were no overcharges on *more than* ▮▮▮ of the volume of commerce sold by Defendants into the CIIPP supply chain.[145] The Seventh Circuit in *Messner*, a case cited liberally by CIIPPs in their brief, held that the potential that a mere 2.4% of a proposed class comprised of uninjured members was insufficient to deny class certification. 669 F.3d at 826. *Compare In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623–25 (D.C. Cir. 2019) (holding 12.7% of uninjured prospective class members indicated an overbroad class), and *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53–54 (1st Cir. 2018) (10% of the class uninjured constituted an overbroad class), *with Pork*, 2023 WL 2696497, at *24 (3.8% of uninjured class members was not deemed overbroad).[146] The proposed class here involve sales that far exceed any acceptable threshold for uninjured class members, which is an independent reason to deny class certification.

---

[143] CIIPPs' Ex. 1, Mangum Report at ¶¶ 207–209, ECF No. 839-1; *see supra* Sec. II.B.

[144] Ex. 8, Mangum Dep. 201:20–203:21.

[145] *See supra* Sec. IV.A.2.

[146] *See also* DPP Opposition at 43–46.

### C.     Logan Farms is an Inadequate Class Representative

In his report, CIIPPs' expert Dr. Mangum makes clear that, in order to be considered a member of the CIIPP class, "the indirect purchaser cannot have purchased the turkey product directly from the Defendant or alleged Co-Conspirator."[147] Perhaps because Dr. Mangum did not review any deposition transcripts of the named CIIPPs,[148] he was unable to identify that at least one named representative of the proposed CIIPP class, Logan Farms, fails to satisfy this requirement.



The adequacy of representation requirement "is composed of two parts: 'the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest' of the class members." *Retired Chi. Police Ass'n v. City*

---

[147] CIIPPs' Ex. 1, Mangum Report at ¶ 10, ECF No. 839-1.

[148] Ex. 8, Mangum Dep. 85:10–86:4.

*of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993). Here, Logan Farms is unable to adequately represent the unique interests of the proposed CIIPP class . Such a potential conflict between proposed class representatives and members of the class is impermissible and constitute a basis to deny class certification. *Id.*

## V. <u>Conclusion</u>

For the reasons stated above, CIIPPs' Motion for Class Certification and Appointment of Class Counsel should be denied.

Dated: January 26, 2024

Respectfully submitted,

/s/ William L. Monts III
Jacob D. Koering
MILLER, CANFIELD, PADDOCK &
STONE, PLC
227 West Monroe Street, Suite 3600
Chicago, IL 60606
Telephone: (312) 460-4272
koering@millercanfield.com

William L. Monts III
Justin W. Bernick
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
Telephone: (202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

**Counsel for Agri Stats, Inc.**

/s/ Jennifer A.L. Battle
Michael L. McCluggage
Daniel D. Birk
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
mmcluggage@eimerstahl.com
dbirk@eimerstahl.com

Joshua Goldberg
CARPENTER LIPPS LLP
180 North LaSalle Street, Suite 2105
Chicago, Illinois 60601
Telephone: (312) 777-4825
goldberg@carpenterlipps.com

Jennifer A.L. Battle (*pro hac vice*)
Theodore M. Munsell (*pro hac vice*)
Jill Rogers Spiker (*pro hac vice*)
Joel E. Sechler (*pro hac vice*)
CARPENTER LIPPS LLP
280 North High Street, Suite 1300
Columbus, OH 43215
Telephone: (614) 365-4100

/s/ Britt M. Miller
Britt M. Miller
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com

X. Kevin Zhao
Davida Williams
GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
Telephone: (612) 373-8346
kzhao@greeneespel.com
dwilliams@greeneespel.com

**Counsel for Cargill, Incorporated and Cargill
Meat Solutions Corporation**

/s/ Colin R. Kass
Christopher E. Ondeck
Colin R. Kass
Stephen R. Chuk
Erica T. Jones
Kelly B. Landers Hawthorne
Corey I. Rogoff
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue NW, Suite 600
Washington, DC 20004
Telephone: (202) 416-6800
condeck@proskauer.com
ckass@proskauer.com
dmunkittrick@proskauer.com
schuk@proskauer.com
ejones@proskauer.com
klandersshawthorne@proskauer.com
crogoff@proskauer.com

David A. Munkittrick
Reut N. Samuels
PROSKAUER ROSE LLP
Eleven Times Square

battle@carpenterlipps.com
munsell@carpenterlipps.com
spiker@carpenterlipps.com
sechler@carpenterlipps.com

**Counsel for Cooper Farms, Inc.**

/s/ Gregory G. Wrobel
Gregory G. Wrobel
VEDDER PRICE P.C.
222 North LaSalle Street
Chicago, IL 60601
Telephone: (312) 609-7500
gwrobel@vedderprice.com

Henry W. Jones, Jr. (pro hac vice)
JORDAN PRICE WALL GRAY JONES &
CARLTON, PLLC
1951 Clark Avenue
Raleigh, NC 27605
Telephone: (919) 828-2501
hjones@jordanprice.com

**Counsel for House of Raeford
Farms, Inc.**

/s/ Danielle R. Foley
Danielle R. Foley (pro hac vice)
Lisa Jose Fales (pro hac vice)
Paul Feinstein (pro hac vice)
Kirstin M. Koger (pro hac vice)
Andrew T. Hernacki (pro hac vice)
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 344-4000
drfoley@venable.com
ljfales@venable.com
pfeinstein@venable.com
kmkoger@venable.com
athernacki@venable.com

Kirstin B. Ives
FALKENBERG IVES, LLP
30 N. LaSalle St., Suite 4020
Chicago, IL 60602

New York, NY 10036-8299
(212) 969-3226
dmunkittrick@proskauer.com
rsamuels@proskauer.com

Todd J. Ohlms
PROSKAUER ROSE LLP
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone: (312) 962-3537
tohlms@proskauer.com

**Counsel for Butterball LLC**

/s/ Oral D. Pottinger
Carmine R. Zarlenga
William H. Stallings
Oral D. Pottinger
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
Telephone: (202) 263-3000
czarlenga@mayerbrown.com
wstallings@mayerbrown.com
opottinger@mayerbrown.com

**Counsel for Foster Farms, LLC, and Foster
Poultry Farms LLC**

/s/ Craig S. Coleman
Colby Anne Kingsbury
FAEGRE DRINKER BIDDLE & REATH
LLP
320 South Canal Street, #3300
Chicago, IL 60606
(312) 569-1000
Colby.Kingsbury@faegredrinker.com

Richard A. Duncan
Craig S. Coleman
Emily E. Chow
Anderson Tuggle
FAEGRE DRINKER BIDDLE & REATH
LLP
90 S. Seventh Street, Ste. 2200
Minneapolis, MN 55402

44

Telephone: (312) 566-4803
kbi@falkenbergives.com

***Counsel for Perdue Farms, Inc. and
Perdue Foods LLC***

*/s/ William S. Cherry III*
Michael T. Medford, N.C. State Bar # 7227
(*pro hac vice*)
William S. Cherry III, N.C. State Bar # 33860
(*pro hac vice*)
Lawrence D. Graham, Jr., N.C. State Bar
#57905 (*pro hac vice*)
MANNING, FULTON & SKINNER, P.A.
3605 Glenwood Avenue – Suite 500 (27612)
Post Office Box 20389
Raleigh, NC 27619
Telephone: (919) 787-8880
Facsimile: (919) 325-4600
medford@manningfulton.com
cherry@manningfulton.com
graham@manningfulton.com

Daniel P. Johnston
CLAUSEN MILLER P.C.
10 South LaSalle Street, Suite 1600
Chicago, IL 60603
Telephone: (312) 855-1010
Facsimile: (312) 606-7777
djohnston@clausen.com

***Counsel for Defendants Prestage Farms of
South Carolina, LLC, Prestage Farms, Inc.
and Prestage Foods, Inc.***

(612) 766-7000
Richard.Duncan@faegredrinker.com
Craig.Coleman@faegredrinker.com
Emily.Chow@faegredrinker.com
Anderson.Tuggle@faegredrinker.com

Jacob D. Bylund
Lance Lange
Robert Gallup
FAEGRE DRINKER BIDDLE & REATH
LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309
(515) 248-9000
Jacob.Bylund@faegredrinker.com
Lance.Lange@faegredrinker.com
Robert.Gallup@faegredrinker.com

Jonathan H. Todt
FAEGRE DRINKER BIDDLE & REATH
LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
(202) 230-5000
Jonathan.Todt@faegredrinker.com

John Yi
FAEGRE DRINKER BIDDLE & REATH
LLP
One Logan Square
Suite 2000
Philadelphia, PA 19103
(215) 988-2553
John.Yi@faegredrinker.com

***Counsel for Hormel Foods Corporation and
Hormel Foods, LLC***

*/s/ Gaspare J. Bono*
Gaspare J. Bono (*pro hac vice*)
Leslie A. Barry (*pro hac vice*)
DENTONS US LLP
1900 K Street NW
Washington, DC 20006
(202) 496-7500
gap.bono@dentons.com

leslie.barry@dentons.com

Adam J. Wallstein
DENTONS US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL 60606
(312) 876-8000
adam.wallstein@dentons.com

***Counsel for Farbest Foods, Inc.***

**<u>Certificate of Service</u>**

I hereby certify that on the 26th day of January, 2024, a copy of the foregoing Opposition was filed electronically with the Clerk of the Court using the Court's CM/ECF system, which sent a copy of the filing to all counsel of record.

<u>*/s/ Colby Anne Kingsbury*</u>
Colby Anne Kingsbury

47