**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ***In re Turkey Antitrust Litigation*** | No. 1:19-cv-08318 |
| This Document Relates To: | |
| *DIRECT PURCHASER PLAINTIFFS* | Hon. Virginia M. Kendall |
| | Hon. Keri L. Holleb Hotaling |
| | **[PUBLIC REDACTED VERSION]** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO**
**EXCLUDE THE OPINIONS OF MICHAEL A. WILLIAMS, PH.D.**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    DR. WILLIAMS' TRANSACTION-BY-TRANSACTION IMPACT OPINION
      SHOULD BE EXCLUDED.......................................................................................... 1

      A.     Dr. Williams Admits His Hypothetical "True Model" Is Impossible to
             Run. ....................................................................................................... 1

      B.     Dr. Williams Concedes This is Not a "Special Case" Where a
             Regression's Average Overcharge is Common to All Class Members. ................. 2

      C.     Dr. Williams' Attempt to Co-Opt the Regression's Error Term as a
             Measure of "Individual Impact" is Junk Science. .................................... 4

      D.     Dr. Williams' Error-Based Methodology Shows that Half of All Class
             Members Would Be Injured Even Absent Any Conspiracy. ................................ 6

III.   DR. WILLIAMS' CORRELATION ANALYSES SHOULD BE EXCLUDED.............. 8

IV.   DR. WILLIAMS' CAUSATION OPINIONS SHOULD BE EXCLUDED. ................... 12

V.    CONCLUSION.................................................................................................... 15

# TABLE OF AUTHORITIES[1]

**Page(s)**

CASES

*Attias v. CareFirst, Inc.*,
  344 F.R.D. 38 (D.D.C. 2023)...............................................................................7

*Castro v. Sanofi Pasteur Inc.*,
  134 F. Supp. 3d 820 (D.N.J. 2015) .......................................................................3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)..............................................................................................7

*In re Cathode Ray Tube Antitrust Litig.*,
  308 F.R.D. 606 (N.D. Cal. 2015)..........................................................................3

*In re E-Books Antitrust Litig.*,
  2014 WL 1282293 (S.D.N.Y. 2014)......................................................................3

*In re Flash Memory Antitrust Litig.*,
  2010 WL 2332081 (N.D. Cal. 2010) .....................................................................3

*In re High Tech-Employees Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) .................................................................3

*In re Lamictal Direct Purchaser Antitrust Litig.*,
  957 F.3d 184 (3d Cir. 2020)..................................................................................3

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  2021 WL 5632089 (W.D. Mo. 2021) .....................................................................5

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013)..............................................................................7

*In re Titanium Dioxide Antitrust Litig.*,
  284 F.R.D. 328 (D. Md. 2012)..............................................................................3

---

[1] Unless otherwise noted, all emphasis added, capitalizations conformed without brackets, and internal citations and quotation marks omitted.  "1st Rpt.", "2nd Rpt.", and "3rd Rpt." refer to the first (Dec. 2, 2022), second (Mar. 31, 2023), and third (June 28, 2023) reports, respectively, of Michael A. Williams, PhD.  "Tr." refers to the Sept. 7, 2023 transcript of Dr. Williams' deposition, attached as Exhibit 1.  Stiroh 1st Rpt. and 2nd Rpt. refer to the first (Feb. 14, 2023) and second (May 31, 2023) reports, respectively, of Lauren J. Stiroh, PhD.  Direct Purchaser Plaintiffs' Third Amended Class Action Complaint ("TAC"), ECF 665.

*Persian Gulf Inc. v. BP W. Coast Products LLC*,
    632 F. Supp. 3d 1108 (S.D. Cal. 2022)..................................................................13

*Polyurethane Foam Antitrust Litig.*,
    2014 WL  6461355 (N.D. Ohio 2014) ......................................................................3

**STATUTES**

Fed. R. Evid. 702 ......................................................................................................1

**OTHER AUTHORITIES**

ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical
    Issues* (2d ed. 2014) ...............................................................................................1

Federal Judicial Center, Reference Guide on Multiple Regression ("Reference
    Guide") (3d ed. 2012) .........................................................................................1, 4

# I.    INTRODUCTION

Plaintiffs proffer Dr. Williams as their sole expert to establish common impact. At issue in this motion are three of his opinions: his transaction-level impact analysis; his correlation analysis; and his causation opinion. All must be excluded under *Daubert*.

## II.    DR. WILLIAMS' TRANSACTION-BY-TRANSACTION IMPACT OPINION SHOULD BE EXCLUDED.

Dr. Williams opines that his overcharge model estimates a single, unvarying average overcharge for all direct purchases of turkey products. By definition, this unvarying number – constant across customers, defendants, products, and years – is the antithesis of individual impact.[2] Not even Dr. Williams contends that this number reflects the impact across all class members. Instead, he says he can use that same ████████████████████████████████████ ████████████████████████ basis. *See* 1st Rpt. ¶ 13; Tr. 275-77. But a regression is a statistical tool showing *average* impact, not *individual* impact.[3] Dr. Williams' opinion to the contrary – in which he co-opts the regression's *error* term[4] to generate transaction-specific impact estimates – is not a "reliable application of [regression] principles and methods." Fed. R. Evid. 702, 2023 Advisory Comm. Notes ("each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology").

### A.    Dr. Williams Admits His Hypothetical "True Model" Is Impossible to Run.

Given that Dr. Williams' model is incapable of showing individual impact across class members, he tries to justify that his model can be used to show that ████████████████████████

---

[2] ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues* (2d ed. 2014) (even a "correctly specified" regression can only "yield[] an estimate of *average* impact"); Federal Judicial Center, Reference Guide on Multiple Regression ("*Reference Guide*") (3d ed. 2012) at 334 ("Multiple regression ... is a method in which a regression line is used to relate the *average* of one variable—the dependent variable—to the values of other explanatory variables.").

[3] *Id.*

[4] *Reference Guide* at 336 (an error term "represents the collective *unobservable* influence of any omitted variables").

1

████████████████████████████████████████████████████████████ by ██████████

████████████████████████████████████████████████████████████████████████

██████████ 1st Rpt. ¶ 368; 2nd Rpt. ¶ 314; Tr. 279.  But his model does not include those variables

and he did not run any such regression.  Indeed, not only does Dr. Williams admit this "true"

regression exists only in his head and that he did not actually run it, he concedes that it is in fact

████████████████████████████████████████████████████████ Tr. 281-83.

**B.     Dr. Williams Concedes This is Not a "Special Case" Where a Regression's Average Overcharge is Common to All Class Members.**

Conceding that a regression measuring individual impact for each transaction (*i.e.,* the "true

model") ████████████ *see id.* at 281, Dr. Williams attempts to sidestep this issue by claiming

that his true model "reduces" to the actual model he ran because the injury for every individual is

assumed to be the same.  *Id.* at 283-84.  To support this, Dr. Williams posits a "special case," where,

by assumption, the ████████████████████████████ 2nd Rpt. ¶ 315.

The problem in invoking the special case here, however, is that for the "special case" to

hold, there must be evidence *independent of the regression model itself* supporting the assumption

that ██████████████████████████████ *Id.*  For example, where defendants

conspire to affect rigid price structures, e.g., to inflate "list prices," and every customer pays a pre-

determined discount off of that list, an average impact regression ***would*** show individual impact

because the pricing formula is "indeed uniform" and therefore the alleged overcharges would be

uniform across individuals.[5]  But, as in this case, where prices are individually negotiated, *see* Def.

Class Br. ████, the logical syllogism, in which the individual impact equals the average, breaks

---

[5] A simple example illustrates the flaw in his logic.  Say a regression implies a 1% overcharge, meaning the coefficient on the damages dummy variable is about 1.  That does not mean that every customer was injured by 1% – just that the average is 1%.  You could have nine customers with no overcharge, and one with a 10% overcharge.  The regression would mask that.  In contrast, in the hypothetical "special case" where all customers are *assumed* to be "uniformly injured," a 1% average overcharge would imply a 1% overcharge on all transactions and customers.

down. The individual impact is not "indeed uniform." That is why courts do not accept reliance on averages to demonstrate class-wide impact where there is evidence of individual negotiations as opposed to independent evidence of a "rigid price structure" that defendants manipulated or affected.[6]

Dr. Williams himself admits that the hypothetical "special case" does *not* apply in the turkey industry. Dr. Williams admitted he did not █████████████████████████████████ ████████████████████████████████ Tr. 284-286. He also admitted this case does █ ████████████████████████████████████████████████████████ ███████████████████████████████ *Id*. at 28-30, 35. He further admitted that there was no evidence of a conspiracy to inflate list prices or to ████████████████ ██████ *Id*. at 23-24, 27-28. Nor did he dispute that prices were individually negotiated or that different customers used ███████████████████ ██████████████████ ██████████████████████████████████ *Id*. at 41-46. In fact, Dr. Williams admitted that had he invoked the hypothetical "special case" to show individual impact here, he would be *assuming* – not proving – common impact.



---

[6] *Compare In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020) (averages are insufficient where "the market is characterized by individual negotiations."), *and In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *8 (N.D. Cal. 2010) (regression insufficient where pricing involved "negotiated transactions") *with Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 842 (D.N.J. 2015) (99.5% of class members paying the "standard … contract prices"); *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328 (D. Md. 2012) (*list prices* were the "starting point" of negotiations and affected each transaction); *In re E-Books Antitrust Litig.*, 2014 WL 1282293 (S.D.N.Y. 2014) (vast majority of prices within 1% of the conspiratorially-agreed price); *Polyurethane Foam Antitrust Litig.*, 2014 WL 6461355, at *20 (N.D. Ohio 2014) ("limit[ed] customer-specific deviation" on prices); *In re Cathode Ray Tube Antitrust Litig.*, 308 F.R.D. 606, 624, 627 (N.D. Cal. 2015) (where "wholesale purchases were rarely negotiated individually"); *In re High Tech-Employees Antitrust Litig.*, 985 F. Supp. 2d 1167, 1221 (N.D. Cal. 2013) (substantial documentary evidence (i) of a "rigid compensation structure," and (ii) that defendants would have made "structural preemptive or reactive changes" to that structure but-for the challenged conduct).

A. ████████████████████████████████████

Dr. Williams' response says it all. His model cannot show individual impact and he cannot save his model by claiming that his true model "reduces" to the actual model he ran by *assuming* the injury for every individual is the same. Such assumptions cannot be made where, as here, prices are individually negotiated such that any individual impact cannot be "indeed uniform."

### C. Dr. Williams' Attempt to Co-Opt the Regression's Error Term as a Measure of "Individual Impact" is Junk Science.

Although Dr. Williams did not run his "true model" or invoke the hypothetical "special case," he nonetheless claims his regression can show individual impact on a transaction-by-transaction basis. He claims he can do this by comparing the difference between the actual price for a given transaction and the "predicted but-for" price estimated by his regression. In other words, Dr. Williams opines that individual impact is equal to the average overcharge plus the "residual" of his regression, which is also known as the regression's error term. But if it is *impossible* to run a regression that contains variables designed to measure impact on a transaction-by-transaction basis, how could a regression show transaction-by-transaction injury without *any variable* to measure individual impact? It can't.[7]

The problem with Dr. Williams' approach is that the error term does not—and cannot—measure the alleged conspiracy's supposed effect; it measures "random effects."[8] Dr. Williams

---

[7] Dr. Williams concedes the "difference between the actual price and the predicted but-for price mathematically can be expressed as the estimated common component of overcharge plus the residual," or the regression's error term. 2nd Rpt. ¶ 190. The math is simple, according to Dr. Williams: ███████████████████████

████████████████████████████████████████  *See* Tr. 356:13-21
████████████████████████████████████████  *id*. at 291:2-12
████████████████████████████████████████

[8] *Reference Guide* at 336 ("Multiple regression is a procedure that separates the systematic effects (associated with the explanatory variables) from the *random effects (associated with the error term)*... The error term [is] the *collective unobservable* influence of any omitted variables.").

does nothing more than tack on ***random error*** to an *assumed* constant, average overcharge.  That is not evidence of individual impact.[9]  It just *masks* the fact that Dr. Williams ***assumed*** common impact, rather than proved it.  If Dr. Williams had just added a random number to his average overcharge estimate, there would be different numbers for each transaction, but no one would say that he measured individual impact on a transaction-by-transaction basis.  Stiroh 2nd Rpt. ¶ 38.

In response, Dr. Williams argues that the residual isn't random error, but that there is information ***hidden*** within it about the alleged conspiracy's individual impact.  Where else, he asks rhetorically, ███████████████████████████████████████  *See* 2nd Rpt. ¶ 193.  ██████████████████████████████████████  *Id*.  But the possibility that the residual may *include* the individual effect of the alleged conspiracy does not transform the residual into a *measure* of it.  Residuals are the sum total of *everything* that affects price not captured by the control variables in a regression.  So if, as just one example, the control variables do not fully capture the effect of grain futures, that difference will be thrown into the residual.  There are countless other reasons why actual price may not match the regression's predictions.  *See* Stiroh 1st Rpt. ¶ 126.  All those reasons combine to form a single undifferentiated residual, meaning the residual is *not* a standalone measure of impact.  Even Dr. Williams agreed that ██████████████████████████████████████████ Tr. 382, 377 ███ ████████████████████████████████████████████ ; 384 ██████████████ ████████████████████████████████ 10

---

[9] *In re Pre-Filled Propane Tank Antitrust Litig.*, 2021 WL 5632089, *9 (W.D. Mo. 2021) ("By using averages and estimating an average overcharge for all of Defendant's retail customers, Professor Ackerberg's regression masks such individualized evidence.  Overcharge models that rely on averaging of this sort can be problematic because, by design, they conceal variation in pricing and other individualized issues that may predominate.")

[10] Basic algebra disproves Dr. Williams' claim that the ████████████████████████ Tr. 357:15-22.  ██████████████████████████████ *Id*.

Nor did Dr. Williams ████████████████████████████████████████████████

████████████████████████████████████████████████████████████ *Id.* at 372; *see also*

*id*. at 303-04 ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

Indeed, it is *impossible* to use the regression to apportion the residual between conspiratorial and non-conspiratorial factors. By definition, the residual represents information the regression *cannot* explain. Even Dr. Williams admitted that there is *no statistical difference* between the residuals in the Class Period and the residuals in non-conspiracy periods. 2nd Rpt. ¶ 191, n. 154.

### D.    *Dr. Williams' Error-Based Methodology Shows that Half of All Class Members Would Be Injured Even Absent Any Conspiracy.*

Despite the impossibility of assessing what portion, if any, of the random residual is attributable to the conspiracy, Dr. Williams again tries to sidestep the issue of attributing *100%* of each residual to the alleged conspiracy, even though he acknowledges that doing so is wrong:



Dr. Williams' response reveals an even deeper flaw with his method: it shows injury on *half the transactions* even during the time when there is *no conspiracy alleged at all*. He says he can show individual injury just by comparing the "actual price" to the "predicted but-for price."[11] If that were right, then the actual and predicted price would be the same where there was no conspiracy. But they are not. Dr. Williams conceded that, even if there was no conspiracy, his

---

██████████████████████████ *Id*. at 332. ████████████████████████████████
██████████ But it does not—thus, disproving his contention.

[11] Tr. 357 ████████████████████████████████████████████████
██████████████████████████████

model would show that ███████████████████████████████████████████ █
████████████████████████████████████████████ Tr. 294-95. This is
also true during the benchmark period, where by Dr. Williams' and plaintiffs' own definition there
is no alleged conspiracy. Yet, Dr. Williams' method would find an "overcharge" on about half
the transactions because there would be a positive residual. *Id*.[12] As Dr. Williams concedes, █
████████████████████████████████ to use his method in those situations. *Id*. at 298.[13]

Though Dr. Williams' method makes no sense, he does not abandon it. Instead, he says he
can use it because his regression also shows an *average* impact. Tr. 379-83. However, as
discussed in the hypothetical above – where the regression shows a 1% average overcharge, but 9
out of 10 customers are uninjured – Dr. Williams' method would lead the court to erroneously find
that *at least* 5 of them (not just 1) were injured, because 5 would have positive residuals. That
alone means that Dr. Williams' method cannot reliably estimate impact and warrants exclusion.[14]

Dr. Williams' methodology also violates the cardinal rule that a scientific opinion must be
"falsifiable" or testable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993)
(the primary "criterion of the scientific status of a theory is its falsifiability…"). By saying his
methods can't be used where there is no common impact, Dr. Williams' opinion that his regression
shows common impact for every transaction becomes a self-fulfilling, non-falsifiable proposition.

---

[12] Tr. 291 ████████
███ *id*. at 374-75 ████████████████████████████████████████
████████████████████████████████████████████████████

[13] Indeed, Dr. Williams' approach is even more problematic. ████████████████████████
████████████████████████████████████████████ 1st Rpt. ¶ 13. If you flip a coin seven times, there is a
99% chance that it will turn up heads at least once. So too, the difference between the actual price and the predicted
but-for price will also be positive for such repeat customers with 99% probability *even if there were no conspiracy*.

[14] *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) (rejecting "methodology
[that] detects injury where none could exist"); *Attias v. CareFirst, Inc.*, 344 F.R.D. 38, 53 (D.D.C. 2023) (rejecting
model that "would also detect injury where none could exist").

## III.    DR. WILLIAMS' CORRELATION ANALYSES SHOULD BE EXCLUDED.

Dr. Williams' "correlation" analysis should also be excluded because it *cannot* show that the alleged conspiracy impacted any, let alone all, class members. Dr. Williams conducts a series of correlation analyses to show that certain turkey prices are correlated with each other over time. But none of these analyses purport to analyze the impact of the alleged conspiracy on prices. Nor do these analyses show that prices for all or substantially all class members move uniformly. For these reasons, Dr. Williams' correlation analyses should be excluded.

***Dr. Williams' Correlation Analysis Has Nothing to Do with the Alleged Conspiracy***. Dr. Williams admits his ███████████████████████████████████████████ ██████ 1st Rpt. ¶ 428. The reason is clear. Correlation analysis has nothing to do with *why* prices change – it does not account for, consider, or even relate to the alleged conspiracy in this case. Dr. Williams' correlation analyses are, therefore, *incapable* of answering the common impact question and thus fail *Daubert*'s "fit" requirement.

Instead, Dr. Williams uses correlation analysis for a different purpose: to show that different turkey prices are affected by the same unidentified market forces. *See* 1st Rpt. ¶ 428. But the unremarkable notion that turkey prices respond to "market forces" says nothing about whether the alleged conspiracy affected prices, let alone uniformly. As noted, Dr. Williams does not claim that *this* case involves the hypothetical special case in which all customers suffer a "uniform" injury because they all pay the same price, or a formulaic price established by a rigid price structure. 2nd Rpt. ¶ 315. Nor does he argue that this "market forces" correlation analysis is a substitute for showing that a rigid pricing structure governs all pricing in the market. The correlation analysis, by Dr. Williams' admission, does not identify the causal mechanism driving the supposed correlation. Thus, while he speculates that the alleged conspiracy *may* be a factor that contributes to the correlation, there is nothing but his *ipse dixit* to support that contention.

Indeed, macro-economic factors unconnected to the alleged conspiracy – such as seasonality (customers paying more for whole birds during the holidays), grain prices (accounting for 68% of production costs), and inflation over 20 years – likely explain the correlations. To understand whether the alleged *conspiracy* had any effect on prices, one would need to control for those factors, which Dr. Williams admits he did not do. *See* 1st Rpt. ¶ 428. Because his analysis has nothing to do with the alleged conduct, it is not a reliable tool for assessing common impact.

***Dr. Williams' Correlation Opinion is Not Falsifiable***. Dr. Williams' use of correlation analysis to support his opinion that ██████████████████████████████████████ ███████████████████████████████ is also not falsifiable. *Id.* ¶ 428. This is because his correlation analysis would show the same thing ***regardless*** of whether there is common impact.

A correlation analysis only detects whether two series move in the same ***direction***, not the relative ***magnitude*** of such movements. For example, if two numbers increase, there is perfect correlation even if one increases only by 0.001% and the other increases by 1,000%. And if one number decreases when the other increases, there is negative correlation, regardless of by how much. As Dr. Stiroh explained, this renders Dr. Williams' correlation analysis meaningless because if but-for prices are generally increasing (as they would over a 20-year time span), the correlation among customers will be positive. Stiroh 1st Rpt. ¶ 142. If there is no common impact, the injured customers' prices may increase faster or to a greater degree than uninjured customers, but this would be a matter of degree or magnitude, not of direction. So Dr. Williams' correlation statistic would be positive regardless of the presence or absence of class-wide impact.

Dr. Williams does not dispute this. Instead, he says there is *one* extreme hypothetical edge-case where it is *possible* that his correlation statistic may change based on a lack of common characteristics. Specifically, he posits a hypothetical scenario where ***every*** customer's but-for

prices are *declining*, **and** the conspiracy reverses this trend for impacted customers.  2nd Rpt. ¶ 278. In this Goldilocks scenario, there would be negative correlation.  But Dr. Williams cannot save his analysis by imagining a far-fetched hypothetical as the only scenario in which his approach *could* work.  *Daubert* requires that an analysis fit the facts of the case.  Here, Dr. Williams has not shown that (i) but-for prices for every customer were declining, or (ii) the alleged conspiracy would reverse this trend for all impacted.  His correlation analysis does not speak to common impact.

**Dr. Williams' "Decile" Correlation Analysis Does Not Show Customer Uniformity**.  Even if a correlation analysis showing prices generally respond to market forces could be relevant to the question of common impact (it cannot), Dr. Williams' analysis still fails *Daubert*.  His analysis does not show pricing uniformity because it does not analyze the correlation between individual customers.  Eschewing a standard customer-by-customer correlation analysis, in which correlations among individual customers are calculated, Dr. Williams implements his own novel jerry-rigged version to show a positive correlation, even where correlations among customers are *negative*.  It is not a reliable test of customer uniformity.



1st Rpt. ¶ 435.

It is yet another exercise in averaging that assumes away individualized differences between proposed class members.

Dr. Williams' correlation analysis thus does not **track** individual customers to analyze how their prices compare to others, or to the average.

A picture is worth 1,000 words. This chart is an overlay of two of Dr. Williams' own Exhibits: █████████████████████

██████████████████████████

████ ██████████████████████

██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████ ████████████

████████████████████████████████

A simple analogy shows why Dr. Williams' correlation analysis cannot show uniform customer pricing. Suppose a professor wants to track the progress of her students. She gives the top students an A, the bottom students an F. She then takes the average of all students within each letter-grade, with the average of the A's being about 95, the B's being 85, and so on. After the next exam, she again ranks her students *from scratch.* The professor does not track whether a student went from an A to F, or another from a C to B. When the professor averages all the A scores, she finds the average A is still about a 95, and the average B is still an 85. There is perfect correlation among the brackets – almost by design – but it says nothing about how individual students performed. That is what Dr. Williams did here. He says *nothing* about common impact. Nor is this just a question of masking. If all customers in Dr. Williams' bottom decile switched places with customers in the highest decile, there would be *negative* correlation among customers for 20% of the data set. **Yet, Dr. Williams' analysis would show perfect positive correlation.**

[15] ████████████████████████████████████████████████
████████████████████

Indeed, it would be virtually impossible for Dr. Williams' decile analysis to show negative correlation over time because his decile lines can never cross. By **construction**, the lowest prices in any period are in the bottom decile. The *highest* price in one decile can **never** be higher than the *lowest* price in the next decile. The lines cannot cross. And, if customers who are in the bottom decile begin paying more than others, then over time, they would just switch deciles, like Swift Foods did in the chart above. The deciles would not become negatively correlated, even if there is negative correlation among customers. Because positive correlation at the decile level is built into Dr. Williams' novel analysis *by construction*, it is not a reliable *test* of customer uniformity.

## IV.    DR. WILLIAMS' CAUSATION OPINIONS SHOULD BE EXCLUDED.

At its core, the question of common impact is one of causation: Did the alleged conduct *cause* injury to all or virtually all class members? The first step in determining common impact, therefore, is to identify a mechanism of harm that would uniformly impact all class members. If such a mechanism exists, the second step is to analyze whether it caused actual harm to each class member. Dr. Williams skips the first step, rendering his causation opinion nothing but *ipse dixit*.

In his initial report, Dr. Williams did not address the mechanism of harm at all. But much of the alleged conduct is unlikely to cause common injury. For example, plaintiffs allege defendants used Agri Stats sales reports to adjust *individual* prices that fell below the industry average. TAC ¶¶ 95, 105. But even if a producer changes its price for Big Grocer, that says nothing about any impact to a downstream purchaser like Joe's Bodega. And here, Dr. Williams does not even know whether defendants "changed any of their prices based on the Agri Stats sales reports" or whether that would translate into market-wide harm. Tr. 23-25 (acknowledging lack of **assumptions**); *id*. at 61-64 (lack of **opinions**); *id*. at 68-75 (lack of **evidence**).

When confronted with his failure to analyze the alleged mechanisms of harm, Dr. Williams offered an additional model for the first time in his reply report purporting to show a supply

reduction.  Decreased supply, however, does not support Dr. Williams' assumption of a ***uniform*** price impact.  ████████████████████████████████████████████████████████
████████████████████████████████████████  Tr. 50-51, 55-57.  But even if alleging a production reduction satisfied the first analytical step, Dr. Williams' production model fails the second because it does not reliably show a production reduction *attributed to the alleged conspiracy*.  This is for three reasons.

**Dr. Williams' Production Model Does Not Fit the Facts**.  Plaintiffs allege "Defendants engaged in coordinated production cutbacks in 2008 and 2009 [and] engaged in another round of coordinated production cutbacks in 2012 and 2013."  *See* TAC ¶ 5.  But despite saying that he "assumed the allegations in the Complaint are true," Dr. Williams did not actually model these two separate rounds of production reductions.  *See* 2nd Rpt. ¶¶ 4, 307.  If the alleged mechanism of harm involved two discrete production reductions four years apart, then a model with a single damages figure covering the entire period would not model the alleged conduct.

More importantly, Dr. Williams' production model *undermines* his *causation* opinion. █



---

[16] This crucial inconsistency illustrates how the analysis "is divorced from the reality of the case that Plaintiffs are actually trying to prove[.]"  *Persian Gulf Inc. v. BP W. Coast Products LLC,* 632 F. Supp. 3d 1108, 1167 (S.D. Cal. 2022).  *Daubert* requires the court to exclude it.  *Id.* (granting in part the motion to exclude ***Dr. Williams'*** testimony).



Tr. 178-179.

Because Dr. Williams' production model does not support his conclusion that the alleged conspiracy in 2008-09 caused a production reduction at that time, there is no support for his opinion that this production reduction caused a price increase in 2010-11, as alleged. His opinion – and his overcharge model – lacks the foundation needed to establish causation.

***Dr. Williams' Production Model Is Unreliable Because It Ignores Post-Conspiracy Data.*** Dr. Williams' production model ignores the substantial decrease in production occurring in the post-conspiracy period. Dr. Williams claims that production during the Class Period was below "but for levels," using a "before and after" benchmark period.

*id*. at 170-

---

[17]

[18] Dr. Williams repeatedly says that, unlike variables that support his opinions, variables that undermine them should be ignored. When confronted with this "heads-I-win, tails-you-lose" approach, Dr. Williams professed to not know what a "reliable regression" is. Tr. 199-200

71 █████████████████████████████████████████████

***Dr. Williams' Production Model Yields Absurd Results***.  The production model also yields

absurd results. ████████████████████████████████  But as Dr. Williams

concedes, ███████████████████████████████████ Tr. 234-35.  That

is, the coefficient on a regression's cost variable should be negative.  Yet Dr. Williams admitted

████████████████████████████████████████████████████████

████████████ Tr. 224-25.  This is no mere technicality.  Costs are a crucial determinant of price.

In the Great Recession, defendants lost tens of millions and some went out of business.  The

implication that producers should make even more when costs skyrocket is not rational or reliable.

Dr. Williams tried to save his model ███████████████████████████████

████████████████████████████ Tr. 229-30. █████████████████████

████████████████████████████████████████████████████

██ ███████████████████████████████████

██ ███████████████████████████████████

██ ████████████████████████████████████

██ ████████████

██ ███████████████████████████████████

██ ███████████████████████████████████

Dr. Williams' non-answer is just that: not an answer.  The regression should be excluded.

## V.  CONCLUSION

For the foregoing reasons, Dr. Williams' transaction-level impact opinion, his correlation

opinion, and his causation opinion should be excluded.

Dated: January 26, 2024

Respectfully submitted,

/s/ William L. Monts III
Jacob D. Koering
MILLER, CANFIELD, PADDOCK &
STONE, PLC
227 West Washington Avenue, Suite 2600
Chicago, IL 60606
Telephone: (312) 460-4272
koering@millercanfield.com

William L. Monts III
Justin W. Bernick
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
Telephone: (202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

*Counsel for Agri Stats, Inc.*

/s/ Jennifer A.L. Battle
Michael L. McCluggage
Daniel D. Birk
EIMER STAHL LLP
224 South Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
mmcluggage@eimerstahl.com
dbirk@eimerstahl.com

Joshua Goldberg
CARPENTER LIPPS LLP
180 North LaSalle Street, Suite 2105
Chicago, IL 60601
Telephone: (312) 777-4825
goldberg@carpenterlipps.com

Jennifer A.L. Battle
David J. Barthel
Theodore M. Munsell
Jill Rogers Spiker
Joel E. Sechler
CARPENTER LIPPS LLP
280 North High Street

/s/ Colin R. Kass
Christopher E. Ondeck
Colin R. Kass
Stephen R. Chuk
Erica T. Jones
Kelly B. Landers Hawthorne
Corey I. Rogoff
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue NW, Suite 600
Washington, DC 20004
Telephone: (202) 416-6800
condeck@proskauer.com
ckass@proskauer.com
schuk@proskauer.com
ejones@proskauer.com
klandershawthorne@proskauer.com
crogoff@proskauer.com

David A. Munkittrick
Reut N. Samuels
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
(212) 969-3226
dmunkittrick@proskauer.com
rsamuels@proskauer.com

Todd J. Ohlms
PROSKAUER ROSE LLP
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone: (312) 962-3537
tohlms@proskauer.com

*Counsel for Butterball LLC*

/s/ Britt M. Miller
Britt M. Miller
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
bmiller@mayerbrown.com

Suite 1300
Columbus, OH 43215
Telephone: (614) 365-4100
battle@carpenterlipps.com
barthel@carpenterlipps.com
munsell@carpenterlipps.com
spiker@carpenterlipps.com
sechler@carpenterlipps.com

**Counsel for Cooper Farms, Inc.**

*/s/ Gregory G. Wrobel*
Gregory G. Wrobel
VEDDER PRICE P.C.
222 North LaSalle Street
Chicago, Illinois 60601
Telephone: (312) 609-7500
gwrobel@vedderprice.com

Henry W. Jones, Jr. (*pro hac vice*)
JORDAN PRICE WALL GRAY JONES &
CARLTON, PLLC
1951 Clark Avenue
Raleigh, NC 27605
Telephone: (919) 828-2501
hjones@jordanprice.com

**Counsel for House of Raeford Farms, Inc.**

*/s/ Danielle R. Foley*
Danielle R. Foley (*pro hac vice*)
Lisa Jose Fales (*pro hac vice*)
Paul Feinstein (*pro hac vice*)
Kristin M. Koger (*pro hac vice*)
Andrew T. Hernacki (*pro hac vice*)
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20004
Telephone: (202) 344-4000
drfoley@venable.com
ljfales@venable.com
pfeinstein@venable.com
kmkoger@venable.com
athernacki@venable.com

Kirstin B. Ives
FALKENBERG IVES, LLP

mprovance@mayerbrown.com
X. Kevin Zhao
Davida S. Williams
GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
Telephone: (612) 373-0830
kzhao@greeneespel.com
dwilliams@greeneespel.com

**Counsel for Cargill Incorporated and
Cargill Meat Solutions Corporation**

*/s/ Oral Pottinger*
Carmine R. Zarlenga
William H. Stallings
Oral Pottinger
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
czarlenga@mayerbrown.com
wstallings@mayerbrown.com
opottinger@mayerbrown.com

**Counsel for Foster Farms, LLC, and Foster
Poultry Farms LLC**

*/s/ Craig S. Coleman*
Colby Anne Kingsbury
FAEGRE DRINKER BIDDLE & REATH
LLP
311 South Wacker Drive, #4300
Chicago, IL 60606
(312) 212-6500
Colby.Kingsbury@faegredrinker.com

Richard A. Duncan
Craig S. Coleman
Emily E. Chow
Anderson Tuggle
FAEGRE DRINKER BIDDLE & REATH
LLP
90 S. Seventh Street, Ste. 2200
Minneapolis, MN 55402
(612) 766-7000
Richard.Duncan@faegredrinker.com
Craig.Coleman@faegredrinker.com

17

30 N. LaSalle St., Suite 4020
Chicago, IL 60602
Telephone: (312) 566-4803
kbi@falkenbergives.com

**Counsel for Perdue Farms, Inc. and Perdue Foods LLC**

*/s/ William S. Cherry III*
Michael T. Medford, N.C. State Bar # 7227
(*pro hac vice*)
William S. Cherry III, N.C. State Bar # 33860
(*pro hac vice*)
Lawrence D. Graham, Jr., N.C. State Bar
#57905 (*pro hac vice*) (
MANNING, FULTON & SKINNER, P.A.
3605 Glenwood Avenue – Suite 500 (27612)
Post Office Box 20389
Raleigh, North Carolina 27619
Telephone: (919) 787-8880
Facsimile: (919) 325-4604 (Cherry)
medford@manningfulton.com
cherry@manningfulton.com
graham@manningfulton.com

Daniel P. Johnston
Clausen Miller P.C.
10 South LaSalle Street, Suite 1600
Chicago, Illinois 60603
Telephone: (312) 855-1010
Facsimile: (312) 606-7777
djohnston@clausen.com

**Counsel for Defendants Prestage Farms of South Carolina LLC, Prestage Farms, Inc. and Prestage Foods, Inc.**

Emily.Chow@faegredrinker.com
Anderson.Tuggle@faegredrinker.com

Jacob D. Bylund
Lance Lange
Robert Gallup
FAEGRE DRINKER BIDDLE & REATH
LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309
(515) 248-9000
Jacob.Bylund@faegredrinker.com
Lance.Lange@faegredrinker.com
Robert.Gallup@faegredrinker.com

Jonathan H. Todt
FAEGRE DRINKER BIDDLE & REATH
LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
(202) 230-5000
Jonathan.Todt@faegredrinker.com

John Yi
FAEGRE DRINKER BIDDLE & REATH
LLP
One Logan Square
Suite 2000
Philadelphia, PA 19103
(215) 988-2553
John.Yi@faegredrinker.com

**Counsel for Hormel Foods Corporation and Hormel Foods, LLC**

*/s/ Gaspare J. Bono*
Gaspare J. Bono (*pro hac vice*)
Leslie A. Barry (*pro hac vice*)
DENTONS US LLP
1900 K Street NW
Washington, DC 20006
(202) 496-7500
gap.bono@dentons.com
leslie.barry@dentons.com

Adam J. Wallstein
DENTONS US LLP

233 S. Wacker Drive, Suite 5900
Chicago, IL 60606
(312) 876-8000
Adam.wallstein@dentons.com

***Counsel for Farbest Foods, Inc.***

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on January 26, 2024, a true and correct copy of the foregoing redacted document was electronically filed by CM/ECF, which caused notice to be sent to all counsel of record.

/s/ *Colin R. Kass*

Colin R. Kass