IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|   |   |
|---|---|
| IN RE TURKEY ANTITRUST LITIGATION | ) ) ) ) ) ) ) No. 19 C 8318  Judge Virginia M. Kendall |

### MEMORANDUM OPINION AND ORDER

Amory Investments, LLC is not a typical plaintiff. It is an investment vehicle, owned and controlled by a litigation funder Burford Capital, LLC, that bought a federal antitrust claim from a bankrupted national food distributor. Defendants, a group of turkey processors, move for summary judgment to dismiss Amory from this suit, invoking the ancient doctrine of champerty to argue that state law prohibits this transaction. Amory retorts that state law holds no sway on who may bring a federal claim and urges the Court to apply federal common law. For the following reasons, the Court denies Defendants' motion for summary judgment [800].

### BACKGROUND

On December 19, 2019, direct purchasers of turkeys filed an antitrust class action complaint, alleging a widespread conspiracy among several turkey processors (collectively, "Defendants") to artificially suppress turkey productions and increase turkey prices. (Dkt. 1; Dkt. 813-1 ¶ 14). Maines Paper & Food Services, a national food distributor, is part of the direct-purchasers class, but before it could see this litigation through, the company filed for bankruptcy. (Dkt. 813-1 ¶ 15). The bankruptcy court confirmed a liquidation plan for the liquidation trustee to dispose of Maines Paper's assets, including all "Causes of Action the Debtors hold or may hold against any Entity." (Dkt. 820-1 ¶¶ 3–4). During the liquidation, Amory Investments, LLC

1

purchased Maines Paper's antitrust claims. (Dkt. 813-1 ¶ 16; *see* Dkt. 813-4). The purchase included an assignment agreement that explicitly references the transfer and assignment of Maines Paper's cause of action under *Olean Wholesale Grocery Cooperative v. Agri States, Inc.* to Amory. (Dkt. 813-4 at 20–23).[1] Afterward, Amory opted out of the direct-purchasers class and proceeded to file a separate Complaint. (Dkt. 813-1 ¶ 20).

Amory has never purchased turkey products from any of the Defendants. (*Id.* at ¶ 22). Rather, it is a special purpose vehicle used to hold investments, like antitrust claims, for Burford Capital, LLC, a litigation funder. (*Id.* at ¶¶ 4, 10–11). Pursuant to the limited liability company agreement that formed the vehicle, Burford owns 100% of Amory and "has exclusive and complete authority" to manage the operations and make decisions on Amory's behalf. (*Id.* at ¶¶ 9, 12). Amory's lack of independence is corroborated by the lack of any Amory employees—Burford employees make the strategic decisions on investments and case management. (*Id.* at ¶¶ 13, 25–35).

## LEGAL STANDARD

Summary judgment is proper when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). The Court's role is not to evaluate the weight of the evidence, to judge the

---

[1] Defendants argue that Amory should not be able to rely on the asset purchase agreement because Amory failed to produce the document during discovery. Amory only references the asset purchase agreement to argue that New York law applies to the assignment agreement. But because the Court believes federal common law applies to the assignment, any reliance on the asset purchase agreement is moot.

credibility of the witness, or to determine the ultimate truth of the case, but simply to determine whether there exists a genuine issue of material fact. *South v. Ill. Envtl. Prot. Agency*, 495 F.3d 747, 751 (7th Cir. 2007). A genuine issue of material fact exists when there is "sufficient evidence" for a jury to return a verdict in favor of the party opposing summary judgment. *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022).

## DISCUSSION

### I. Federal Common Law Governs Assignability of Federal Antitrust Claims

The dispositive issue is whether the assignment agreement transferring the federal antitrust claim to Amory is valid. To answer that question, the Court must determine which set of laws governs the assignability. According to Defendants, "[a]ssignment agreements are contracts, so their validity is judged by state law." (Dkt. 801 at 6). And under state law, either Illinois's or Delaware's,[2] the assignment agreement between Amory and Maines Paper's liquidation trustee is champertous and thus, invalid. Champerty refers to an agreement under which a third-party, an intermeddler, maintains or supports an individual's lawsuit in exchange for a portion of the proceeds. 14 Am. Jur. 2d Champerty, Maintenance, Etc. § 1 (2020). Amory, however, counters that federal common law governs the assignability agreement because the assigned rights are federal claims. And under federal common law, there is no champerty prohibition.

This legal question is not settled. Neither party has cited to, and the Court has not found, a binding precedent on this issue. Courts in this District have disagreed on which law to apply. *Compare Koehler v. NationsBank Corp.*, 1997 WL 112836, at *1 (N.D. Ill. Mar. 10, 1997) ("[T]he validity of a particular assignment of a federal cause of action is governed by the state law that the appropriate conflict of laws principles dictate should control the contract." (quoting *Nicolls*

---

[2] Defendants argue that under the choice-of-law analysis, Delaware, not Illinois, law governs the assignment contract. Regardless, Defendants contend that Delaware and Illinois both prohibit champerty.

*Pointing Coulson, Ltd. v. Transp. Underwriters of La., Inc.*, 777 F. Supp. 493, 496 (E.D. La. 1991))) *with In re Opana ER Antritrust Litig.*, 2016 WL 738596, at *5 (N.D. Ill. Feb. 25, 2016) ("The validity of assignments under the Sherman and Clayton Acts is a matter of federal common law." (citing *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 437 (3d Cir. 1993))).

But the Court is not left adrift—both the Fifth and Third Circuits have weighed in and arrived at different outcomes. In *Martin v. Morgan Drive Away, Inc.*, the Fifth Circuit opined that while federal antitrust claims were assignable under federal law, the concern was "not with the substance of assignable claims, but with the form in which the claim may be assigned." 665 F.2d 598, 604 (5th Cir. 1982). For assistance, the *Martin* court relied on *Sampliner v. Motion Picture Patents Co.*, where the Second Circuit noted that even though antitrust claims were assignable, the validity of the assignment agreement, a contract, was a matter of state law. 255 F. 242, 246, 250 (2d Cir. 1918). Since the assignment was made in Ohio, the assignor and assignee were domiciled in Ohio, and the parties intended to litigate the suit in Ohio, Ohio law dictated whether the assignment was invalid for champerty. *Id.* at 250. Following *Sampliner*, the *Martin* court applied the laws of Louisiana, where the assignment was made and would be executed and performed. *Martin*, 665 F.2d at 604–05. But the Fifth Circuit acknowledged that *Sampliner*'s decision, and transitively, its own decision, was in tension with various Third and Ninth Circuits' opinions that held "the validity of a release of antitrust claims" was governed by federal law. *Martin*, 665 F.2d at 605.

This tension is displayed in the Third Circuit's *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp*. There, a defendant argued that Gulfstream III Associates was not a proper plaintiff because it transferred its federal antitrust cause of action to a third party as part of

4

a general assignment. *Gulfstream III Assocs., Inc.*, 995 F.2d. at 437. The Third Circuit disagreed and held that antitrust claims could only be transferred via express assignment. *Id.* In arriving at its conclusion, the *Gulfstream* court made clear that "the validity of the assignment of an antitrust claim is a matter of federal common law." *Id.* Federal common law was necessary to ensure the issue of assignment was in harmony with the "overall purposes of the antitrust statutes" and not undermined by a patchwork of "possibly differing state law standards." *Id.* at 438.

After reviewing the legal landscape, the Court finds the Third Circuit's reasoning to be more persuasive. To start, there is no doubt that states have the authority to dictate how *state* claims are transferred and assigned to parties. But "it would be intolerable to permit the states to determine the transferability, and thus the value, of interests created by federal law." *Lowry v. Baltimore & Ohio R. Co.*, 707 F.2d 721, 739 (3d Cir. 1983) (Gibbons, J., dissenting). Application of federal law comports with general choice-of-law principles where "the jurisdiction's law that governs whether a cause of action exists will also be the jurisdiction that decides whether that cause of action can be assigned." *DNAML Pty, Ltd. v. Apple Inc.*, 2015 WL 9077075, at *3 (S.D.N.Y. Dec. 16, 2015); *see also Clover Cmtys. Beavercreek, LLC v. Mussachio Architects P.C.*, 2024 WL 325378, at *4 (N.D.N.Y. Jan. 29, 2024) ("Federal law governs the assignability of claims created by federal statute."); *Cooper v. Credit Mgmt., LP*, 2022 WL 17995551, at *2 n.6 (N.D. Tex. Dec. 29, 2022) ("It is well settled that '[w]here a claim for relief is created by a federal statute, federal law governs the assignability of the claim.'" (quoting *In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Secs. Litig.*, 636 F. Supp. 1138, 1152 (C.D. Cal. 1986))).

Nor is fashioning federal common law inappropriate here. Courts have long assumed that they have the power to create "'interstitial' federal common law to govern issues closely interwoven with a broad scheme of federal statutory regulation." *Gulfstream III Assocs.*, 995 F.2d

5

at 438. Such power is evident in federal antitrust laws, where the Sherman Act's legislative history makes clear that Congress authorized courts to fashion and shape the statute's broad mandate "by drawing on common-law tradition." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 643 (1981) (citation omitted). The Supreme Court previously fashioned a federal common law to resolve a statute-of-limitations question in *American Pipe & Constr. Co. v. Utah. Gulfstream III Assocs.*, 995 F.2d at 438. There, the Supreme Court created a provision that tolled the limitation statute for the Clayton Act because "tolling the limitation…is consonant with the legislative scheme." 414 U.S. 538, 558 (1974). The judicial creation was appropriate because "it furthered the Clayton Act limitation period's purposes of balancing a finite end of litigation against fair opportunity for injured parties to assert meritorious antitrust claims." *Gulfstream III Assocs.*, 995 F.2d at 438. The Third Circuit further reasoned that the determination of an assignment's validity is similarly related to the "broader questions of antitrust injury and standing" that existed in *American Pipe*. *Id.*; *see also Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990) (stating that the discovery rule governing antitrust actions is a federal common law rule that "postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured").

Moreover, the question of assignability, at its core, implicates a significant federal interest in who can bring an antitrust claim. The Supreme Court has emphasized that antitrust violations can cause particularly pernicious and pervasive harm that ripples across our economy. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 476 (1982). "Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress." *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 (1972). "This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation." *Id.* That

6

is why Congress champions vigorous private enforcement of antitrust laws. *See id.*; *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 129 (1986) ("Effective enforcement of the antitrust laws has always depended largely on the work of private attorney generals…" (Stevens, J. dissenting)); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745 (1977). Thus, the goal is to facilitate access to federal courts rather than place hurdles when plaintiffs bring their antitrust claims. Applying a patchwork of differing state laws on champerty, which then impacts whether a party can enforce a federal antitrust claim, does nothing to advance this policy.

## II.     Federal Common Law Does Not Recognize the Champerty Doctrine

But the inquiry does not end there. Deciding that federal common law governs the assignability question does not resolve whether federal common law prohibits champertous agreements.[3]

Defendants assert that federal common law still prohibits champerty "regarding assignments of federal causes of actions." (Dkt. 819 at 5). For support, they cite to several cases in the District of Columbia. *See Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co.*, 1985 WL 25746, at *6 (D.D.C. Oct. 18, 1985); *Koro Co. v. Bristol-Myers Co.*, 568 F. Supp. 280, 287 (D.D.C. 1983). Both cases rely on an older federal District of Columbia case *District Distributions, Inc. v. Heublein, Inc.*, where the court, without referencing federal common law, stated that the assignee suffered no injury and had no relationship with the assignor, so the assignment was champertous and therefore, invalid. 1971 WL 559, at *3–4 (D.D.C. May 28, 1971). The dearth of analysis leaves much to be desired, so the Court looks elsewhere.

---

[3] The other method to resolve this issue is to determine whether the assignment agreement is, indeed, champertous. But that is not Amory's position. Amory argues that federal common law does not recognize champerty, regardless of whether the specific assignment agreement here is champertous. Thus, for this opinion, the Court will assume the assignment agreement is champertous.

The Court will start by reviewing the Restatement of Contracts. As *prima facie* a "correct statement of what may be termed the general common law of the United States," Restatement (First) of Contracts, Introduction (1932), it has been relied upon by courts as a persuasive source of law and guidance. *Wallach v. Eaton Corp.*, 837 F.3d 356, 367 (3d Cir. 2016); *cf. Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 780 (7th Cir. 2011) (noting that Restatement (Second) of Torts is a common reference point for considering a case "arising under federal common law").

The Restatement (Second) of Contracts is quiet on champertous transactions. It only comments that the historic common-law rule banning the assignment of cause of actions has largely disappeared. Restatement (Second) of Contracts § 317 cmt. c (1981).[4] To the extent it still applies, the rule is limited to claims involving personal injuries. *Id.* But the Restatement (First) of Contracts discusses the doctrine in greater depth. It defines champerty as "the division of the proceeds of litigation between the owner of the litigated claim and a party supporting or enforcing the litigation." Restatement (First) of Contracts § 540(2) (1932). Under § 542(1), the Restatement states that a bargain to enforce a claim in exchange for a promise of a share of proceeds, or any other fee contingent on success, is illegal if the bargain also includes (a) "the party seeking to enforce the claim shall pay the expenses incident thereto, or that" (b) "the owner of the claim shall not settle or discharge it." *Id.* at § 542(1).

Upon review, that section does not prohibit the type of agreement that Amory has entered. First, as Defendants noted, this is not a traditional litigation funding arrangement where a third-party agrees to fund a litigation in exchange for a contingent fee upon success. Amory bought the antitrust claim wholesale from Maines Paper's liquidation trustee. The trustee received

---

[4] Section 317(2)(a) states a contractual right can be assigned unless the assignment is "forbidden by statute or is otherwise inoperative on grounds of public policy." *Id.* at § 317(2)(a). This section is inapplicable because (1) there is no federal statute on assignments and (2) as discussed below, the public policy motivations behind banning champerty have fallen out of step with our modern legal system.

8

compensation regardless of whether Amory can recover from this suit. In other words, there is no "division of the proceeds of litigation" contingent on some success. *Id.* at § 540(2). Moreover, in purchasing the right, Amory is the owner of the claim, so there are no concerns of strong-arming a party to not settle or discharge the litigation.

The other possibly applicable section, § 547, states:

> "(1) An assignment of a claim against a third person or a bargain to assign such a claim is illegal and ineffective if the claim is for
> (a) the salary or pay, not yet due, of a public officer or employee, or
> (b) a pension granted in consideration at least in part of continuing future services, or
> (c) alimony, judicially awarded, and either not yet due or still subject to modification by the court, or
> (d) damages for an injury the gist of which is to the person rather than to property, unless the claim has been reduced to judgment.
> (2) An assignment of a claim against a third person for land, goods, or other property interests, or for any money damages that can be effectively assigned, or a bargain to assign such a claim, is not rendered illegal by the fact that the claim is being litigated, or that litigation is necessary for its collection; nor is such an assignment or bargain rendered illegal by the further fact that the assignee promises to endeavor to enforce the claim at his own expense and to pay the assignor a share of the proceeds, unless the assignee gives no other substantial consideration."

*Id.* at § 547. Again, nothing within this section contemplates prohibiting an assignee (Amory) from purchasing the entire claim from the assignor (the liquidation trustee) and proceeding to litigate that claim at its own expense.

Another method—Defendants' preferred one—is to borrow from readymade state law to fashion a decisional rule here. *United States v. Crown Equip. Corp.*, 86 F.3d 700, 706–07 (7th Cir. 1996). But "[w]hether state law is to be borrowed to supply the federal rule of decision is a question of federal policy, affecting not only the federal judicial establishment but also Government's legal interests and relations." *Id.* at 706 (quoting *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 595 (1973)) (cleaned up). Courts are instructed to look at the need for a nationally uniform body of law and whether state law would "frustrate specific objectives of the federal programs."

*Id.* (quoting *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979)). Upon reviewing these factors, the Court recognizes that adopting state law would frustrate federal antitrust policies.

As discussed, there is a strong federal interest in encouraging vigorous private enforcement of federal antitrust statutes. In *Wallach*, the Third Circuit considered whether an assignment of a federal antitrust claim required consideration. 837 F.3d at 366. Ultimately, the *Wallach* court answered no, reasoning that to require consideration "could discourage private enforcement of the antitrust laws in derogation of *Illinois Brick*." *Id.* at 369–70. "Part of creating incentives for private antitrust suits is making federal courts a welcome forum for such litigation, and erecting the barrier of consideration threatens to shut out otherwise meritorious suits from resolution." *Id.* at 370.

The treble-damages provision is another example—a plaintiff can recover three times the amount of their actual damages caused by anticompetitive conduct. This remedy is not only to punish—a severe punishment for a severe injury—but also to encourage and reward plaintiffs for their enforcement. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130–31 (1969). The question of assignability is closely related to "the broader questions of antitrust injury and standing," which implicates who may bring an antitrust claim to court. *Gulfstream III Assocs.*, 995 F.2d at 438. Applying the state law of where the assignment is made, or where it will be executed, results in fragmented enforcement with otherwise meritorious claims falling through the cracks. And with meritorious claims unprosecuted, the federal regime to punish anticompetitive conduct is undermined. That outcome cannot possibly be "in harmony with the overall purposes of the antitrust statutes." *Id.* Indeed, applying state law to govern what federal antitrust claims can be pursued may lead to worse externalities—absurd contract constructions and gamesmanship to avoid unfavorable states.

10

Defendants rebut that champerty does not conflict with federal antitrust policy because Congress never contemplated a party like Amory, who has no injury or interest outside the assignment, to be within the group of private attorney generals created to enforce antitrust laws. But nothing in Defendants' cited case law suggests that assertion to be true. The Supreme Court has recognized types of plaintiffs who cannot sustain an antitrust claim. In *Hawaii v. Standard Oil*, the Supreme Court held that Clayton Act § 4 did not allow states to sue for damages for injury to its general economy from antitrust violations. 405 U.S. at 264. Similarly, in *Illinois Brick*, the Supreme Court held that indirect purchasers were precluded from bringing an antitrust claim based on overcharges passed on to them by direct purchasers because their sustained injuries were too remote to give standing. 431 U.S. at 747; *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1525 (2019) (Gorsuch, J., dissenting) (noting that "an antitrust plaintiff can't sue a defendant for overcharging someone else who might (or might not) have passed on all (or some) of the overcharge to him"). But the motivations behind those decisions were to prevent duplicative recovery engendered by allowing every person on the supply chain to claim damages for a single antitrust violation and to avoid burdening courts with "'massive evidence and complicated theories,' where the consequences would be to discourage vigorous enforcement of the antitrust laws by private suits." *McCready*, 457 U.S. at 474, n.11.

There are no such concerns here. As Maines Paper relinquished its antitrust claim, there is only one point of recovery. And the assignment agreement is straightforward; it in no way adds to the complexity of Maines Paper's antitrust claim. Moreover, the focus on injury and interest in this case is irrelevant. When an assignor "assigns, transfers, or sets over" "all the rights, title and interest" of a claim to the assignee, that assignment includes transferring the "injury." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286 (2008); *id.* at 285 (explaining that

"courts—both before and after the founding—have always permitted the party with legal title alone to bring suit"). Defendants can dispute whether Maines Paper's injury is too speculative for recovery, but they cannot deny that Amory has the legal title, right, and interest to be present in this litigation.

The last method to determine whether federal common law prohibits champerty is to survey the fifty states and apply the most "common" law. *See Wallach*, 837 F.3d at 366. Such an endeavor is impractical, but there is merit in reviewing how states and federal courts have interpreted the doctrine over time and determining whether the motivations behind its adoption are still relevant today. And upon review, the Court finds that champerty is an antiquated doctrine that, at this point, its usefulness is outweighed by its hinderance to the federal interests of antitrust enforcement.

To start, a quick history lesson: discussions of a third-party's role in litigation date back to at least medieval England, where claims and rights were not freely assignable and litigation was viewed "as a sign of belligerent, vexatious spirit, counter to Christian teaching," regardless of the suit's merit. *See Osprey, Inc. v. Cabana Ltd. P'ship*, 532 S.E.2d 269, 273–74 (S.C. 2000); Jason Lyons, *Revolution in Progress: Third-Party Funding of American Litigation*, 58 U.C.L.A. L. REV. 571, 580–81 (2010). Champertors would avoid these assignability impediments by officiously intermeddling and financing suits, in part to get wealthier, but also to harass and inflict financial or political injury to their enemies. *Osprey, Inc.*, 532 S.E.2d at 274; Lyons, *supra*, 581. Champerty was morphed into a form where "powerful men aggrandized their estates and the background was unquestionably that of private war." Max Radin, *Maintenance by Champerty*, 24 CAL. L. REV. 48, 58–64 (1935). As William Blackstone commented, the third-party maintenance of a lawsuit "is an offense against public justice, as it keeps alive strife and contention, and perverts the remedial process of the law into an engine of oppression." 4 WILLIAM BLACKSTONE, COMMENTARIES at

1354. To that end, the Crown declared champerty a crime to protect against the evils of speculation in lawsuits, engaging in frivolous litigation, and "financial overreaching by a party of superior bargaining position." *Saladini v. Righellis*, 687 N.E.2d 1224, 1226 (Mass. 1997); Lyons, *supra*, at 581.

Although champerty found its way to the early days of American common law, the doctrine has fallen out of favor, with "[t]he consistent trend across the country is toward limiting, not expanding, champerty's reach." *Del Webb Cmtys., Inc. v. Partington*, 652 F.3d 1145, 1156 (9th Cir. 2011); *see also* Lyons*, supra*, at 581 (noting that by 1935, champerty was "in practice largely dead and certainly out of step with American thinking about litigation"). Its decline can be explained by the fact that the motivations behind the doctrine no longer comport with the modern legal system. Litigation is now seen as a powerful tool "for changing the *status quo*, for challenging the powerful, for rearranging the economic and political landscape, for…achieving social change." Stephen C. Yeazell, *Brown, The Civil Rights Movement, and the Silent Litigation Revolution*, 57 VAND. L. REV. 1975, 2000–01 (2004). Assignment of causes of actions are accepted in courts. The problems that banning champerty seek to address are also better remedied by various modern rules of civil procedure and other areas of law. The Federal Rules of Civil Procedure, federal statutes, and rules of professional responsibility can better root out frivolous lawsuits and sanction parties who engage in litigation solely to harass the other side. There are federal and state laws that scrutinize excessive contingent fees without relying on the champerty doctrine. And doctrines of unconscionability, duress, and good faith "establish standards of fair dealing between opposing parties." *Saladini*, 687 N.E.2d at 1227; *see, e.g.*, *Maslowski v. Prospect Funding Partners LLC*, 944 N.W.2d 235, 239–40 (Minn. 2020); *Osprey, Inc.*, 532 S.E.2d at 276–78; *see also*, *Del Webb*

*Cmtys.*, 652 F.3d at 1156 (noting that legal reforms such as statute of frauds and statute of limitations have "contributed to prevent groundless and vexatious litigation" (citations omitted)).

Federal courts have similarly downplayed the importance of champerty in our legal system. "The purchasing of claims, whether before or after suit has been brought upon them, for the purpose of turning a profit is nonetheless not categorically forbidden." *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 103 (2d Cir. 2007). One rationale, the Second Circuit posits, is that assignment allows claims owners "to transfer the risk of loss to someone better able or more willing to pursue the claim or to undertake the risk." *Id.* In this sense, assignability resembles the insurance industry where, in the event of an accident, the insurance company provides the insured with an upfront payment and then the insured shifts to the company, via subrogation, the cause of action so it may pursue the claim. The Seventh Circuit has also noted that the champerty doctrine has been "abrogated and diluted in many states." *Carhart v. Carhart-Halaska Int'l, LLC*, 788 F.3d 687, 691 (7th Cir. 2015). "Today 'trolldom'—the seeking of financial advantage by buying or otherwise obtaining a legal claim (as distinct from filing a legal claim in order to seek redress for injury)—thrives." *Id.* The commonest example is patent trolling, where an individual "acquires by purchase or application to the Patent and Trademark Office a patent that he uses not to protect an invention but to obtain a license fee from, or legal judgment against, an alleged infringer." *Id.* Surely, if Amory's assignment agreement offends the spirit of champerty, then so must patent trolling. Yet, that practice, while frowned upon, is legal.

Thus, the Court finds that, under federal common law, this assignment agreement—between two sophisticated entities—is not void as champertous because the assigned cause of action arises from federal antitrust statutes.[5]

---

[5] Federal common law also requires that "any assignment of antitrust claims, as a matter of federal common law, must be an express assignment; general assignments, without specific reference to antitrust claims, cannot validly transfer

14

The Court will quickly dispense of Defendants' final argument: regardless of whether the assignment agreement is champertous, the prosecution itself is champertous and against public policy. First, Defendants contend that courts have upheld litigation funding agreements only where the cases involved (1) a bona fide plaintiff (2) who maintained control over the litigation. (*See* Dkt. 801 at 11–15). Here, as the argument goes, neither condition exists because Burford, a litigation fund, controls the litigation, but Amory, the special purpose vehicle, owns the federal claim. Second, Defendants believe that by condoning such an arrangement, the Court's decision will open a floodgate of litigation funders to purchase claims and prosecute them for profit. (Dkt. 819 at 15). Accordingly, this type of speculation and commercialization of lawsuits for financial gain is an affront to our legal system.

Despite the ominous tone, the Court finds neither public policy reason persuasive. There is no doubt that a party with "legal title alone" can bring suits before courts. *Sprint Comms.*, 554 U.S. at 285. Here, the liquidation trustee transferred its legal rights and interests in this federal antitrust claim to Amory. For all intents and purposes, Amory is a bona fide plaintiff. Moreover, Defendants' position that public policy forbids litigation funders from controlling the litigation is misleading without context. Courts are against third-party financiers—with no relation to the plaintiffs or the case—from dictating how litigation or settlement should proceed. The fear, understandably, is that these third parties will flex their financial power to bully plaintiffs, who own the legal right to the claim, into pursuing a course of action adverse to plaintiffs' interests. In other words, a litigation funder should be a silent partner, and the plaintiff calls the shots. But

---

the right to pursue those claims." *Gulfstream*, 995 F.2d at 440; *see also DNAML Pty,* 2015 WL 9077075, at *4; *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 305 (E.D. Mich. 2001). Here, neither party disputes that the assignment was express. In the assignment agreement, Maines Paper's liquidation trustee assigned all of its "right, title, and interest" in the Transferred Rights to Amory. (Dkt. 813-4 at 20). The Transferred Rights are defined as "all claims and causes of action…arising out of allegations of anticompetitive conduct" and lists the *Olean Wholesale Grocery Cooperative v. Agri Stats, Inc.* litigation as one of these claims. (*Id.* at 22–23).

Burford is not an arms-length third party who is only financing the litigation. Burford owns 100% of Amory—Amory's claims are Burford's claims. The fears of undue influence or manipulation by an overreaching litigation funder are not present here because Amory's and Burford's interests are united. Finally, Defendants' stance as a champion of lofty legal principles is a peculiar one. They attack the Burford-Amory relationship as improper speculation and commercialization but clarify that they are not challenging "litigation funding generally." (Dkt. 801 at 9–10). The Court fails to see why the former is demonized, yet the latter is spared the same criticism. Both involve speculation—whether the fund's suit will triumph. And presumably, even under traditional litigation funding, the financier expects a profit from their investment. In truth, the Burford-Amory relationship is a variation of, but suffers from the same flaws as, traditional litigation funding. Regardless, the Court is not concerned with the doomsday future painted by Defendants because the Court's holding today is narrowly crafted to fit the facts of this case.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [800] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: March 28, 2024