### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

*IN RE TURKEY ANTITRUST LITIGATION*

Case No. 19 C 8318

Judge Sunil R. Harjani

## <u>MEMORANDUM OPINION AND ORDER</u>

This is an antitrust action against the nation's largest turkey processors, who collectively control over 80% of the market for turkey products. The purchasers of these turkey products allege that from January 1, 2010 through December 31, 2016, the Processor Defendants[1] and their co-conspirators entered into an agreement to exchange competitively sensitive and non-public information about production plans and pricing data through Defendant Agri Stats and Express Markets International, Inc. (EMI)[2] to limit supply and increase prices in the turkey market.[3] Plaintiffs contend the exchange of information through Agri Stats/EMI and other channels was an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, resulting in restrained supply and unlawfully stabilized or increased prices for the turkey products at issue. The two sets of Plaintiffs—the Direct Purchaser Plaintiffs (DPPs) and the Commercial and

---

[1] For purposes of this opinion, the Processor Defendants are Butterball, Cargill, Cooper Farms, Farbest, Foster Farms, Hormel, House of Raeford, Perdue, and Prestage. On January 15, 2025, the Direct Purchaser Plaintiffs filed a motion for preliminary approval of their settlement agreement with Cargill, which is set for a hearing on January 30, 2025. Doc. 1098. The Direct Purchaser Plaintiffs and Commercial and Institutional Indirect Purchaser Plaintiffs previously settled with Tyson, and the prior district judge assigned to this case certified these settlement classes. *See* Docs. 265, 433.

[2] Defendant Agri Stats provided information exchange services to the Processor Defendants for a subscription fee. EMI is a wholly-owned Agri Stats subsidiary.

[3] This litigation consists of five consolidated antitrust lawsuits. A sixth lawsuit, *Carina Ventures LLC v. Agri Stats, Inc.*, No. 23 C 16948 (N.D. Ill), has been found related to this litigation pursuant to Local Rule 40.4 and assigned to this Court but has not been consolidated with this case.

Institutional Indirect Purchasers (CIIPPs)—allege that the challenged conduct is a *per se* violation of the Sherman Act as well as unlawful under a rule of reason analysis. The CIIPPs also bring claims under various state laws for the same conduct.

Pursuant to Federal Rule of Civil Procedure 23, these two groups of turkey purchasers now seek class certification. Both sets of Plaintiffs rely on expert opinions in support of their class certification motions. The DPPs offer opinions from Dr. Michael A. Wiliams, and the CIIPPs offer Dr. Russell W. Mangum III's opinions. In response, Defendants move to exclude Williams' transaction-level impact opinion, his correlation opinion, and his causation opinion and Mangum's overcharge and pass-through opinions. Defendants offer the opinions of their own expert, Dr. Lauren Stiroh, and Plaintiffs request exclusion of two of her opinions. The Court heard testimony from these experts on October 9 and 10, 2024 and oral argument by counsel on October 28, 2024. In this opinion, the Court addresses both class certification motions and the parties' motions to exclude expert testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[4]

What follows is a lengthy discussion and resolution of the parties' myriad arguments on these issues. But, at a more general level, the Court finds Defendants' objections to Williams' and Mangum's analyses go to the weight, not the admissibility, of the evidence and that these are issues that must be resolved by the trier of fact, not through a *Daubert* motion. It is important to note that *Daubert* requires only a reliable methodology, and not a perfect one. For the Court to reject Dr. Williams' and Mangum's proposed regression analyses, which appear to follow well-accepted

---

[4] DPPs also move to strike exhibits 81 and 123-125 submitted by Defendants in support of their opposition to DPPs' class certification motion, or in the alternative, request to submit responding exhibits set forth in exhibits 171 and 185 in support of DPPs' class certification reply brief [941]. The motion to strike Defendants' exhibits 81 and 123-125 is denied. The Court grants DPPs' request to file exhibits 171 and 185 as unopposed.

regression methodology, would be inappropriate at this juncture. Stated simply, Defendants' criticisms do not preclude the Court from considering Williams' and Mangum's conclusions when deciding whether to allow this litigation to proceed as a class action. Furthermore, Defendants' primary challenge to certification is on the predominance requirement of Rule 23(b)(3), and they contend that Plaintiffs have failed to demonstrate that their regression models, along with other expert evidence, are capable of showing that the alleged price-fixing conspiracy caused class-wide impact. However, in short, the Court concludes that Williams' and Mangum's opinions support class certification because they offer a sufficiently plausible class-wide methodology to prove antitrust impact. In other words, Plaintiffs have demonstrated that it is possible to use common evidence that, if believed, would show that all or nearly all class members suffered antitrust injury as a result of the alleged conspiracy. For current purposes, "that is all that is necessary to show predominance for purposes of Rule 23(b)(3)." *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 818 (7th Cir. 2012). And even if a trier of fact were to ultimately reject Williams' and Mangum's analyses because of their alleged flaws, that would not be a basis for rejecting class certification because "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459 (2013).

## DISCUSSION

To certify a class, Plaintiffs must satisfy the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one of the Rule 23(b) subsections. *Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 923 (7th Cir. 2016). As Rule 23 "does not set forth a mere pleading standard," plaintiffs must "satisfy through evidentiary proof" each of Rule 23's elements. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "[T]he court must satisfy itself

with a 'rigorous analysis' that the prerequisites of certification are met, even if that analysis 'has some overlap with the merits of the plaintiff's underlying claim.'" *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1005 (7th Cir. 2019) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011)). But "[i]n conducting [the Rule 23] analysis, the court should not turn the class certification proceedings into a dress rehearsal for trial on the merits." *Messner*, 669 F.3d at 811; *Dancel*, 949 F.3d at 1005 (the class analysis involves "a peek at the merits that is limited to those aspects of the merits that affect the decisions essential under Rule 23.") (internal quotes and citation omitted). Plaintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements by a preponderance of the evidence. *Messner*, 669 F.3d at 811. Finally, district courts have broad discretion in determining whether a proposed class satisfies Rule 23. *Jacks v. DirectSat USA, LLC*, 118 F.4th 888, 894 (7th Cir. 2024).

DPPs propose to certify a direct purchaser class defined as follows:

> All persons and entities who directly purchased fresh or frozen, uncooked turkey breast, ground turkey, or whole bird turkey products (the "Class Products") from Defendants in the United States during the Class Period.

Doc. 830 at 10. CIIPPs seek to certify the following class for injunctive relief under Rule 23(b)(2) and monetary damages under Rule 23(b)(3):[5]

> All entities in the Indirect Purchaser States that indirectly purchased fresh or frozen, uncooked turkey breast, ground turkey, or whole bird turkey products sold by Defendants in the United States during the Class Period for their own use in commercial food preparation.[6]

---

[5] CIIPPs assert claims under the Sherman Act to secure injunctive relief for Class members in Indirect Purchaser States; claims for violations of state antitrust laws to secure damages; and claims for unjust enrichment and violations of state consumer protection law predicated on Defendants' alleged antitrust violations. The Indirect Purchaser States are: Arizona, Arkansas, California, the District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Missouri, Mississippi, North Carolina, North Dakota, Nebraska, New Hampshire, New Mexico, Nevada, New York, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Wisconsin, and West Virginia.

[6] Specifically excluded from this Class are the Defendants and their alleged Co-Conspirators; the officers, directors or employees of any Defendant or alleged Co-Conspirator; any entity in which any Defendant or

4

Doc. 828 at 2. The Class Period for both proposed classes is January 1, 2010 through December 31, 2016.

## I. Rule 23(a) Requirements

### A. Numerosity

Rule 23(a) requires the class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Seventh Circuit has recognized that "a forty-member class is often regarded as sufficient to meet the numerosity requirement." *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021). Defendants do not contest that both classes satisfy this requirement. DPPs contain 1,675 customers that purchased turkey directly from Defendants. Doc. 830-2, Williams Report ¶ 426. CIIPPs consist of restaurants, caterers, and other institutional food service providers, such as private schools and company cafeterias, that purchased turkey products indirectly from the Processor Defendants for use in commercial food preparation. It is indisputable that this class is also numerous, as CIIPPs' expert used a data set of 234,171 customers for his analysis. Doc. 839-3 Mangum Reply ¶ 195. Of course, joinder of this many potential class members is impracticable, and numerosity is easily met.

### B. Commonality

To demonstrate commonality under Rule 23(a)(2), a plaintiff must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). For purposes of Rule 23(a)(2), "even a single common question will do." *Wal-Mart Stores, Inc.*, 564 U.S. at 359.

---

their alleged Co-Conspirator has a controlling interest; any entity with an interest, controlling or non-controlling, in a Defendant or their alleged Co-Conspirator; any (in whole or in part), affiliate, legal representative, heir or assign of any Defendant or their alleged Co-Conspirator. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any alleged Co-Conspirator identified in this action.

"Where an antitrust conspiracy has been alleged, courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *11 (N.D. Ill. Mar. 29, 2023) (internal quotes and citation omitted). Here, the existence of the alleged conspiracy, how it operated, whether the conspiracy caused the price increases, and the appropriate measure of damages are all questions that will be common to all class members and satisfy the commonality requirement. *Id.* ("[B]ecause proof of the alleged conspiracy focuses on the defendants' standardized conduct as opposed to the conduct of individual class members, antitrust liability alone constitutes a common question that will resolve an issue that is central to the validity of each class member's claim in one stroke.") (internal quotes and citation omitted); *see also In re Broiler Chicken Antitrust Litig.* 2022 WL 1720468, at *5 (N.D. Ill. May 27, 2022) ("*Broilers*"). As a result, Plaintiffs satisfy the commonality requirement.

### C. Typicality

Rule 23(a)(3) is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "As a general matter, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 605 (7th Cir. 2021) (internal quotes and citation omitted). For purposes of the typicality requirement, "[t]he individual claims may feature some factual variations as long as they have the same essential characteristics." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1026 (7th Cir. 2018) (internal quotes and citation omitted). "The logic behind the typicality requirement is that a class representative will adequately pursue her own claims, and if those claims are typical of those of the rest of the class, then her pursuit of her own

6

interest will necessarily benefit the class as well." *Howard*, 989 F.3d at 605 (internal quotes and citation omitted).

An "antitrust price fixing case generally will involve claims sufficiently similar to satisfy Rule 23(a)(3)." *In re Workers' Compensation*, 130 F.R.D. 99, 106 (D. Minn. 1990). If the class representatives must prove "a conspiracy, its effectuation, and damages therefrom—precisely what the absentees must prove to recover—the representative claims can hardly be considered atypical." *Id*. (internal quotes and citation omitted); *Moehrl*, 2023 WL 2683199, at *12 (in the antitrust context, "typicality will be established by plaintiffs and all class members alleging the same antitrust violation by the defendants."). Similarly here, typicality is met because each proposed class representative claims that Defendants conspired to restrict supply and inflate turkey prices above competitive levels.

On this issue, Defendants argue DPPs fail to satisfy typicality because "[n]amed Plaintiffs John Gross and Maplevale purchased Class Products at non-negotiated prices and in relatively small volumes, making them different from many putative class members."[7] Doc. 877 at 68-69. Factually, this appears to be incorrect as to named Plaintiffs' negotiating abilities based on the record evidence. Maplevale's merchandising manager Julie Dunderdale testified that she would "negotiate with its turkey suppliers on things like price" on "larger volume items like raw commodity breasts [and] full turkeys." Doc. 938-50, Dunderdale 30(b)(6) Dep. 173:8-174:1. Likewise, John Gross' Vice President Scott Wagner testified that he would negotiate when purchasing turkey based on market prices. Doc. 938-51, Wagner Dep. 221:21-222:19. But more importantly, this very argument regarding negotiating abilities and purchase volume disparities was rejected under analogous circumstances in *Broilers*, a similar antitrust action alleging price

---

[7] Defendant do not contest that the CIIPPs satisfy the typicality requirement.

7

fixing in the chicken industry. For simplicity and to avoid repetition, the Court agrees with and adopts the reasoning of the district court in *Broilers* on this issue. *Broilers*, 2022 WL 1720468, at *5 ("differences in bargaining power do not undermine typicality"); *see also In re Pork Antitrust Litig.*, 665 F. Supp.3d 967, 998 (D. Minn. 2023) ("*Pork*"). As a result, the Court finds that typicality is established.

### D. Adequacy of Representation

Finally, Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This inquiry 'serves to uncover conflicts of interest between named parties and the class they seek to represent.'" *Howard*, 989 F.3d at 609 (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). In assessing adequacy, the court evaluates "the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests," and "the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011); *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) ("A class is not fairly and adequately represented if class members have antagonistic or conflicting claims.").

Defendants again take issue with the named Plaintiffs John Gross and Maplevale for the DPPs. Defendants argue these named Plaintiffs are inadequate DPP representatives because they passed on 100% or more of the alleged overcharge to their own customers. Consequently, Defendants contend there is a fundamental conflict between John Gross and Maplevale on the one hand and putative class members who did not pass on at least 100% of the alleged overcharge. As primary support for this argument, Defendants cite *Pork*, 665 F. Supp.3d at 999, and *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181 (11th Cir. 2003) (the only case on which *Pork* relied). But the Supreme Court has held that "antitrust injury is considered complete when the direct

purchaser pays an illegal overcharge and whether he was able to pass through the overcharge to indirect purchasers is irrelevant to the inquiry." *Meijer, Inc. v. Warner Chilcott Holdings Co.*, 246 F.R.D. 293, 303, 305 (D.D.C. 2007) (citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 489 (1968), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 724-25 (1977)). Moreover, one district court has observed that *Valley Drug* "has been met with almost universal criticism" as courts "adhere instead to the principles announced in *Hannover Shoe* and *Illinois Brick*." *In re Glumetza Antitrust Litig.*, 2020 WL 3498067, at *12, 14 (N.D. Cal. June 29, 2020) (collecting cases) (rejecting request for downstream data discovery purportedly relevant to adequacy). The Third Circuit has similarly held that "requiring plaintiffs to show that no class member benefited from the challenged conduct in the form of greater profits is contrary to the Supreme Court's decision in *Hanover Shoe*." *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 223 (3d Cir. 2012), *judgment vacated on other grounds,* 570 U.S. 913 (2013). The Court is further persuaded by the reasoning of the Third Circuit, which noted that "because *Hanover Shoe* sets the amount of the overcharge as plaintiffs' damages, all of the class members have the same financial incentive for purposes of the litigation—*i.e.* proving that they were overcharged and recovering damages based on that overcharge." *Id*; *see also In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, 2008 WL 1946848, at *6 (E.D. Pa. May 2, 2008) (declining to follow the "conflict" rationale adopted in *Valley Drug* "[b]ecause all class members have the right to pursue overcharge damages, and there is no conflict among class members allegedly harmed by the same violation."). Accordingly, the Court finds that Defendants' conflict argument fails to demonstrate that John Gross and Maplevale are inadequate representatives for the DPPs.[8]

---

[8] Defendants assert the same argument in response to DPPs' motion to exclude as irrelevant Stiroh's opinion that some DPPs have not suffered economic injury because they may have passed through some, or all, of the overcharge resulting from the alleged conspiracy by reselling turkey meat to their customers. Once again, under *Illinois Brick*, "a [direct] purchaser is entitled to the full value of the damages stemming from

Defendants also object that Logan Farms is an inadequate class representative for the CIIPP class because it made direct purchases of turkey breast products from Cargill in the fourth quarter of most years. According to Defendants, these direct purchases show that Logan Farms is "unable to adequately represent unique interests of the proposed CIIPP class." Doc. 888 at 48. However, Defendants do not contest Logan Farms purchased most of its turkey products via distributors. And the CIIPP class definition does not exclude an indirect purchaser that also purchased turkey product directly from a Defendant. Nor do Defendants explain how these direct purchases from Cargill make Logan Farms adverse to CIIPPs' interests. Standing alone, Logan Farms' direct purchases do not indicate that its interests are "antagonistic or conflicting" with those of the CIIPP class's interests. Rather, as far as the Court can tell, Logan Farms shares the same interest of maximizing the recovery that indirect purchasers obtain. Consequently, the Court rejects Defendants' challenge to Logan Farms as a class representative. *See Broilers*, 2022 WL 1720468, at *4 (rejecting defendants' argument that End Users' class representatives were inadequate and finding that "while these individuals may have sometimes made purchases of chicken products outside the class definition, the End Users have presented evidence that they all also made purchases that are within the class definition."); *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enterprise Co.*, 2016 WL 3579953, at *4 (E.D. Wis. June 24, 2016) ("The class representatives []

---

the overcharge, even if it passed on some or all of the overcharge to downstream purchasers and consequently mitigated the damage it suffered." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 838 (7th Cir. 2020); *see also Hanover Shoe, Inc.*, 392 U.S. at 489. Because Defendants cannot use the potential pass-through of an overcharge by direct purchasers as purported lack of economic injury, Stiroh's economic injury opinions are not relevant to adequacy. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp.3d 1029, 1063 (N.D. Ill. 2022) (excluding expert opinion that was contrary to *Illinois Brick* as "[e]xpert opinions that are contrary to law are inadmissible."). DPPs' motion to exclude [833] Stiroh's opinion that some DPPs have not suffered economic injury because they may have passed through some, or all, of the overcharge resulting from alleged conspiracy to their customers is therefore granted for purposes of the pending motion for class certification.

made direct purchases from defendants, and defendants do not explain how the existence of other purchases creates antagonism with class members, and I fail to see how they would.").

The Court further concludes, and Defendants do not contest, that class counsel have demonstrated their adequacy. *See* Fed. R. Civ. P. 23(g). Plaintiffs therefore meet the requirements of Rule 23(a)(4).

## II. Rule 23(b)(2) Requirements

Having concluded that both classes satisfy the Rule 23(a) factors, the Court turns to Rule 23(b)'s requirements. CIIPPs initially seek certification of a Rule 23(b)(2) class to pursue injunctive and declaratory relief. Rule 23(b)(2) permits certification when a defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "If the Rule 23(a) requirements are met and the plaintiffs seek injunctive or declaratory relief, certification under Rule 23(b)(2) is generally appropriate." *Pork*, 665 F. Supp. 3d at 1010. Moreover, the "Seventh Circuit has indicated its approval of separate damages and injunctive relief classes." *Moehrl*, 2023 WL 2683199, at *23.

CIIPPs argue that they satisfy the requirements of Rule 23(b)(2) because they seek injunctive and declaratory relief protecting them from anticompetitive conduct, and particularly, Defendants continued sharing of competitively sensitive information via Agri Stats and other means. Given that CIIPPs have satisfied Rule 23(a) and they seek a single injunction and declaratory judgment that applies generally to the class, the Court finds that certification under Rule 23(b)(2) is proper.[9] *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 443 (7th Cir. 2015) ("A Rule 23(b)(2) class is appropriate if "a single injunction or

---

[9] Defendants do not challenge the propriety of certifying an injunctive and declaratory class under Rule 23(b)(2).

declaratory judgment would provide relief to each member of the class.") (quoting *Wal-Mart*, 564 U.S. at 360).

### III.  Rule 23(b)(3) Requirements

To qualify for certification under Rule 23(b)(3), a damages class must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Defendants primarily focus their fire on the issue of predominance, by seeking to exclude Plaintiffs' experts under *Daubert* and then challenging their opinions with a defense expert.  The remainder of this opinion resolves Defendants' challenges under Rule 23(b)(3).

### A.  Predominance

"Predominance is satisfied when common questions represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication." *Kleen*, 831 F.3d at 925 (internal quotes and citation omitted).  In analyzing predominance, "courts [] give careful scrutiny to the relation between common and individuals questions." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).  "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* (internal quotes and citation omitted). "[C]ommon questions predominate where the case claims the existence of a widespread or uniform practice." *Ross v. Gossett*, 33 F.th 433, 439 (7th Cir. 2022).  The Supreme Court has noted that the predominance standard for Rule 23(b)(3) is "more demanding" than the commonality requirement of Rule 23(a). *Comcast*, 569 U.S. at 34.  However, it has also noted that "[p]redominance is a test

12

readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods., Inc.*, 521 U.S. at 625.

When making the predominance determination under Rule 23(b)(3), the Court begins "with the elements of the underlying cause of action." *Messner*, 669 F.3d at 815 (internal quotes and citation omitted). Here, Plaintiffs bring two Sherman Act claims both for violation of Section 1: a rule-of-reason claim, based on Defendants' use of Agri Stats/EMI, and a *per se* conspiracy claim.[10] Each claim requires proof of (1) "a violation of antitrust law," (2) "individual injury, or impact, caused by that violation," and (3) "measurable damages." *Reed v. Advoc. Health Care*, 268 F.R.D. 573, 581 (N.D. Ill. 2009).[11] To obtain class certification, plaintiffs must show that common proof will predominate with respect to each of these elements of their claims—not that the class will prevail as to those common questions. *Id*; *Ross*, 33 F.4th at 442.

### 1. Antitrust Conspiracy

On the first element of Plaintiffs' antitrust claims, DPPs argue that common evidence, including Defendants' own documents and testimony, will be used to prove that Defendants formed a *per se* illegal conspiracy. Further, in support of DPPs' rule of reason claim, Williams will offer testimony, common to the class, explaining that Defendants' data exchanges through Agri Stats and EMI were consistent with collusion and had anticompetitive effects as well as economic

---

[10] "Under a Rule of Reason analysis, the plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area." *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012). In contrast, the *per se* rule "is employed when a practice appears to be one that would always or almost always tend to restrict competition and decrease output." *Id*. at 336 (internal quotes and citation omitted). "Horizontal price fixing and output limitation are classic examples of behavior that is considered anticompetitive per se." *Id*.

[11] DPPs' rule of reason claim for information exchange also contains a requirement under the first element to establish anticompetitive effects either directly or indirectly by showing that Defendants exercised market power in a relevant market. *Toys "R" Us v. Fed. Trade Comm'n*, 221 F.3d 928, 937 (7th Cir. 2000).

evidence that Defendants occupy a relevant antitrust market and collectively wielded power in that market. In response to DPPs' class certification motion, Defendants do no dispute that common evidence can be used to establish the existence of the alleged antitrust conspiracy and these liability questions predominate over any individual questions. Doc. 877 at 42. Caselaw supports this point. *Kleen*, 831 F.3d at 927 ("Defendants do not contest that the existence of the conspiracy could be (perhaps *had to be*) proven by evidence common to the class.") (emphasis added); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *11 (N.D. Ill. July 22, 2024) ("Given the importance of the conspiracy element to an antitrust action, courts and commentators regularly accept that common questions here will predominate over individual questions."); *Broilers*, 2022 WL 1720468, at *7 (this "type of alleged conspiracy is the prototypical example of an issue where common questions predominate" because it can be "resolved for all members of a class in a single adjudication.") (internal quotes and citations omitted).

As to CIIPPs' motion, Defendants nonetheless "do not concede" that Plaintiffs have set forth class-wide evidence of a conspiracy. Doc. 888 at 31 n.104. Defendants insist CIIPPs lack evidence of a conspiracy, largely attacking various aspects of the evidence CIIPPs rely on and pointing to various non-conspiratorial factors that impacted turkey production. *Id*. at 16-27. In doing so, Defendants improperly merge the analysis of whether they engaged in a conspiracy with the need for individualized inquiries. *See Moehrl*, 2023 WL 2683199, at *13 ("Defendants' arguments bear more on whether a conspiracy existed; they are merits arguments that might entitle them to summary judgment or a verdict in their favor but are inapplicable at the class certification stage.") (internal quotes and citation omitted). Defendants also fail to raise any issues specific to individual class members that preclude a finding of predominance. At issue in this litigation is whether Defendants conspired to reduce the supply of turkey products in order to increase the

14

prices they charged for those products and unlawfully inflate their profits. As in *Kleen*, plaintiffs "tendered extensive evidence that, if believed, would be enough to prove the existence of the alleged conspiracy." *Kleen*, 831 F.3d at 927. In support, CIIPPs' evidence includes Defendants' allegedly exchanging competitively sensitive information through Agri Stats reports, direct communications among Defendants regarding turkey prices and supplies, and evidence of the mechanisms Defendants used to allegedly monitor conspiracy compliance. Based on this evidence, Defendants either engaged in a conspiracy or they did not. There is no conspiracy alleged that existed as to only some class members. In other words, the evidence CIIPPs presented regarding Defendants' conduct is common across the class, and the existence of the alleged conspiracy will be a predominate issue in the case. *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 594 (N.D. Ill. 2015), *aff'd*, 831 F.3d 919 (7th Cir. 2016) (at the class certification stage, the relevant issue is whether "the evidence either proving or disproving a conspiracy will be common to the entire class").

### 2. Antitrust Impact

The second element of Plaintiffs' Sherman Act claims is antitrust impact or "fact of damage." *Messner*, 669 F.3d at 816. The predominance inquiry with respect to antitrust impact asks whether the plaintiffs can "show that it [is] possible to use common evidence to prove that [Defendants' alleged antitrust violation] injured the members of the proposed class." *Id*. Again, plaintiffs' "burden at the class certification stage [is] not to prove the element of antitrust impact." *Moehrl*, 2023 WL 2683199, at *14 (quoting *Messner*, 669 F.3d at 818). Instead, plaintiffs need "only . . . demonstrate that the element of antitrust impact *is capable of proof at trial* through evidence that is common to the class rather than individual to its members." *Messner*, 669 F.3d at 818 (internal quotes and citations omitted) (emphasis in original). As common evidence of class-

wide impact, Plaintiffs rely on the expert opinions of Williams and Mangum. In response, Defendants contend DPPs cannot establish common proof of antitrust impact (and damages) without Williams' price overcharge regression model and his analysis is fundamentally flawed. Defendants similarly argue that Mangum's overcharge and pass-through regression models are flawed, which is allegedly fatal to CIIPPs' showing of class-wide impact (and damages) using common proof.

Defendants also move to exclude certain opinions of both experts. Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal court. *Anderson v. Raymond Corp.*, 61 F.4th 505, 508 (7th Cir. 2023). In *Daubert*, 509 U.S. 579 (1993), the Supreme Court interpreted Rule 702 to require "the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017) (internal quotes and citation omitted). To determine whether expert testimony is admissible, the district court performs a three-step analysis, evaluating: "(1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Id*. at 779 (emphasis in original). "[R]eliability is primarily a question of the validity of the *methodology* employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower*, *Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). The Court's role is not to determine whether an expert's testimony is correct, but only whether it falls "outside the range where experts might reasonably differ." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999). If an expert's principles and methodologies are reliable, then the way to attack "shaky but admissible" evidence is through use of cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431

(7th Cir. 2013). The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *See* Fed. R. Evid. 702; *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019). When the "expert's report or testimony is critical to class certification," the district court "must make the necessary factual and legal inquiries and decide all relevant contested issues prior to certification." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815, 817 (7th Cir. 2010). An expert's testimony is critical if it is "important to an issue decisive for the motion for class certification." *Messner*, 669 F.3d at 812.

In this case, Williams' and Mangum's opinions are critical to the issue of whether common questions predominate concerning antitrust impact and damages, so the Court must decide the *Daubert* motions first. On that matter, Defendants do not challenge Williams' or Mangum's credentials or qualifications.[12] Instead, Defendants challenge the reliability and relevance of analyses Williams and Mangum used to show common impact and damages. Thus, the Court's analysis focuses on the final two steps of the *Daubert* analysis that are relevant to the predominance requirement.

### *Williams' Impact Analysis*

The Court now proceeds to a discussion of Williams' expert opinions and Defendants' bases for seeking to exclude them under *Daubert* and Rule 702. DPPs use Williams' report to demonstrate evidence of common impact. Williams first made findings regarding the structure of

---

[12] Williams earned his M.A. and Ph.D. degrees in economics from the University of Chicago and is a Managing Director at Berkeley Research Group, LLC, where he specializes in analyses involving antitrust, industrial organization, and regulation. He is a former economist with the United States Department of Justice, Antitrust Division. Mangum has master's and doctoral degrees in economics from the University of Southern California and is Executive Vice President at Cirque Analytics, an economic consulting firm. He has been an economist for over 25 years and previously served as a staff economist at the United States Federal Trade Commission, in the Antitrust Division of the Bureau of Economics. Williams and Mangum are well-qualified to analyze the effects of the alleged conspiracy. *See Broilers*, 2022 WL 1720468, at *7; *Pork*, 665 F. Supp.3d at 989.

the turkey market, which Williams found was conducive to successful collusion. Doc. 830-2, Williams Report ¶¶ 347-370.  This evidence includes the highly concentrated market for turkey (*id.* ¶ 20); the barriers to entry including high capital expenditure requirements and high levels of vertical integration (*id.* ¶¶ 361-365); the lack of competition from imports (*id.* ¶¶ 366-367); the lack of substitutes and low elasticity of demand (*id.* ¶¶ 358-360); and the fact that turkey is a commodity product (*id.* ¶¶ 348-355).  Williams found that the market structure for turkey products supports a conclusion that all or nearly all consumers would have paid artificially inflated prices as a result of the alleged conspiracy. *Id.* ¶ 368.  According to Williams, basic economic theory "demonstrates that, all else equal, a decrease in the market supply for a product will lead to an increase in its prices." *Id.* ¶¶ 375-376.  He noted that Defendants and other market participants confirmed the operation of this basic economic theory in the turkey industry. *Id.* ¶¶ 377-379.

Williams also performed regression models and conducted correlation analyses. "Regression analysis permits the comparison between an outcome (called the dependent variable) and one or more factors (called independent variables) that may be related to that outcome." *Manpower, Inc.*, 732 F.3d at 808; *Broilers*, 2022 WL 1720468, at *10 ("Regression analysis is a statistical method by which data is organized as dependent and independent variables—e.g., price changes over time—and is boiled down to a straight line such that predictions can be made about scenarios outside the data—e.g., what prices will be in the future.").

Williams first performed an overcharge regression analysis.  Using nearly 600,000 transactions in the turkey industry representing $26.9 billion in commerce, Williams performed an overcharge regression to determine the impact of Defendants' alleged conduct by comparing the prices paid by direct purchasers during the conspiracy period to a benchmark period. Doc. 830-2, Williams Report ¶¶ 12, 385-402, 446.  In his model, Williams controlled "supply-side factors such

as dressed meat cost, avian influenza in 2015; demand-side factors such as population, disposable income per capita, 2011 food-borne pathogens, prices of substitute products; and factors that may affect both demand and supply such as inflation and the Great Recession." *Id*. ¶¶ 12, 403-414, 446. After "accounting for demand and cost factors that may affect turkey product prices," including the cost of grain, Williams found that "Defendants' alleged conspiracy increased turkey product prices by 11.3%." *Id*. ¶¶ 12, 415-417. That estimate was statistically significant at the 0.1% level, meaning "there is a less than 0.1% chance that Defendants' conspiracy had no price effects." *Id*. ¶¶ 417, 421. Moreover, Williams estimated his overcharge regression model separately by product category, finding statistically significant overcharges as to each of turkey breast, ground turkey, and whole turkey in the amounts of 14.8%, 5.2%, and 13.9%, respectively. *Id*. ¶¶ 423-424.

Williams then performed an in-sample prediction comparing the price that each direct purchaser actually paid on a particular transaction to the but-for price they would have paid absent the conspiracy. Doc. 830-2, Williams Report ¶¶ 425-427; Doc. 830-4, Williams Sur-Reply, ¶ 141 n.192. Using the model underlying his common impact regression analysis, he compared predicted "transaction-specific but-for prices" to "actual prices for *each* observation of *each* consumer in the data for the damages period." Doc. 830-2, Williams Report ¶ 425; Doc. 830-4, Williams Sur-Reply ¶¶ 138, 141 n.192 (emphasis in original). Williams found that 1,672 of 1,675 of the unique customers in the dataset—or approximately 99.8%—had at least one overcharge observation during the Class Period. Doc. 830-2, Williams Report ¶¶ 426-427. Thus, Williams opined that the "anticompetitive effects of the alleged conspiracy were widespread across members of the proposed [DPP] Class, causing harm to all or virtually all Class Members." *Id*. ¶¶ 12, 446.

Williams also conducted price correlation analyses, which show that turkey product prices are parallel and highly correlated across products, Processor Defendants, geographic locations, and

customers. Doc. 830-2, Williams Report ¶¶ 428-441. Although correlation analysis alone does not prove common impact across class members, combined with Williams' overcharge regression analysis, high price correlations provide further evidence supporting that the alleged conspiracy caused all or virtually all class members to pay artificially inflated turkey prices. *Id*. ¶ 428.

As additional evidence, Williams performed a production regression. Williams' production regression found that "turkey production in the actual world is statistically significantly lower than production but-for the alleged conspiracy by 4.6% to 5.5% in the Class Period." Doc. 830-3, Williams Reply ¶ 123. As in his overcharge regression analysis, Williams controlled for demand and costs factors that may affect turkey production by applying the standard dummy variable regression methodology. *Id*. ¶ 122. Williams also found that turkey production in the actual world is statistically significantly lower than production but-for the alleged conspiracy for each year in the damages period when letting the production effect vary by year, regardless of whether he used total supply or domestic supply as the dependent variable and regardless of whether he included or excluded turkey-product category-specific variables. *Id*. ¶ 311 (Table A2). As a further robustness analysis, Williams then included the year 2009 as part of the damages period "to account for potential supply-restraint effects in 2009." Doc. 830-4, Williams Sur-Reply ¶ 43; Doc. 830-3, Williams Reply ¶ 310. In doing so, he found that "turkey production in the actual world is statistically significantly lower than production but-for the alleged conspiracy by 4.7% to 5.2%" in that redefined damages period including the year 2009. *Id*.

### *Defendants' Objections to Williams' Impact Opinions*

**In-Sample Prediction Method:** Defendants advance a series of arguments for excluding Williams' impact opinions based on the results of his regression and correlation analyses. Defendants first argue that Williams' overcharge regression cannot be used to show transaction-

level impact because a regression shows average impact, not individual impact. According to Defendants, Williams' overcharge regression's average overcharge is not a permissible method of showing individual impact because turkey prices are individually negotiated as opposed to a rigid price structure or manipulation of list prices or indices existing in the sale of turkey.

The Court disagrees that Williams' transaction-level impact opinion and any common impact opinions based on it should be excluded. Here, because overcharges varied across class members, Williams examined the overcharges at the transaction level. This was done by Williams' in-sample prediction approach that "allows overcharges to vary by individual, but it does not indicate that overcharges must vary across individuals." Doc. 830-3, Williams Reply ¶ 315 (Appendix IV). Williams found that 99.8% of customers had at least one overcharge observation. Doc. 830-2, Williams Report ¶ 426. Williams' in-sample prediction approach is the "type of market-wide economic analysis [that] has been accepted by many courts to show predominance as to antitrust impact." *In re Pork*, 665 F. Supp.3d at 1003 (application of expert's model to class members demonstrated that "over 99% of DPPs paid elevated prices at least once during the Class Period."); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 672 (9th Cir. 2022) (en banc) ("*Tuna*") (explaining that plaintiffs' expert's comparison of but-for prices to the actual prices paid by the DPP class "showed that 94.5 percent of the purchasers had at least one purchase above the predicted but-for price," which "provided further evidence that the conspiracy had a common impact on all or nearly all the members of the DPP class."); *Broilers*, 2022 WL 1720468, at *13 (explaining the direct purchaser plaintiffs' expert "compared actual prices from the class period to the calculated but-for market price and found that 97.1% of customers paid an actual price that exceeded the but-for price at least once.").

Contrary to Defendants' argument, Williams' finding that 99.8% of customers had a least one overcharge observation can serve as common evidence for all class members despite the diverse, individually-negotiated mechanisms to set turkey prices. Indeed, the Seventh Circuit has explained that "[e]ven for transactions where prices were negotiated individually or a longer term contact existed" class-wide impact follows where "the starting point for those negotiations would be higher if the market price for the product was artificially inflated." *Kleen*, 831 F.3d at 928-29. This same argument by Defendants was rejected in *Broilers* and in *Pork* where the "evidence show[ed] that those [individual] negotiations took place in the context of a 'market price.'" *Broilers*, 2022 WL 1720468, at *15; *Pork*, 665 F. Supp. 3d at 1006 (relying on evidence that "market prices generally set the individual Defendants' prices" in finding predominance of common questions as to impact). Similarly here, significant evidence demonstrates that the Processor Defendants negotiated turkey sales in the context of a well understood market price. *See* Doc. 830 at 34-35; Doc. 938 at 20-25.[13] The record further indicates that the Processor Defendants engaged in "across the board" pricing in response to market conditions, which is consistent with the injury to 99.8% of class members that Williams found. *See* Doc. 830 at 35-36.

The Court does not accept Defendants' additional arguments, crediting Williams' explanation that Stiroh's one-step approach does not undermine his estimation of individualized overcharges and demonstration of common impact using a two-step approach. Doc. 830-3, Williams Reply ¶¶ 313-326 (Appendix IV); Doc. 830-4, Williams Sur-Reply, ¶¶ 136-137. The Court also credits Williams' explanation that Defendants mistakenly use error term and residual

---

[13] As just two of many examples of the Processor Defendants using the market price as a starting point for negotiations, DPPs cite Hormel's Chuck Meath's testimony that "the market price reflected in the Urner Barry [a market index reporting service] [was] a reference point for the entire industry." Doc. 938 at 21. And Hormel's 30(b)(6) designee testified that even "fixed price" agreements were "based on where you think Urner Barry/USDA information is going to be." *Id.* at 22.

interchangeably and therefore, their arguments in this regard do not undermine the reliability of his in-sample prediction method. Doc. 1074, Oct. 9, 2024 Hearing Tr., at 51:6-52:10; Doc. 830-3, Williams Reply ¶¶ 190, 313-332 (Appendix IV). Defendants further challenge the validity of Williams' method because they claim it would show injury on half the transactions in the benchmark period even when there was no conspiracy. But notably, Stiroh (as opposed to counsel) does not indicate that this indicates 50 percent false positives. The Court credits Williams' explanation that the residual is interpreted differently in the damages period than the benchmark period because there is no impact in the benchmark period. Doc. 1074, Oct. 9, 2024 Hearing Tr., at 130:10-134:17. Moreover, Williams shows that 99.8% of DPPs were overcharged at least once during the Class Period. On balance, DPPs have demonstrated that Williams' transaction-level impact opinion is sufficiently reliable evidence of proof common to the class.

**Correlation Analyses:** Moving on to Williams' correlation analyses, Defendants argue: (1) his correlation analysis "has nothing to do with the alleged conspiracy"; (2) his correlation opinion is not falsifiable; and (3) his "decile" correlation analysis does not show customer uniformity. Doc. 895 at 12-16. None of these arguments provides a ground for excluding Williams' correlation analyses as unreliable or irrelevant.

As to the first argument, Defendants identify factors unconnected to the alleged conspiracy, such as seasonality (customers paying more for whole birds during the holiday), grain prices, and inflation, as likely explaining the correlations. According to Defendants, by failing to control for either market forces or the alleged conduct, there is no way to determine what is driving the correlation or whether the alleged conduct is one of the factors that impacts every customer or only some of them. It is true that "correlation analysis alone does not prove common impact across Class Members." Doc. 830-2, Williams Report ¶ 428. However, courts faced with similar

correlation analyses have found that they could serve as reliable evidence in conjunction with overcharge regressions. *See Tuna*, 31 F.3d at 671 (plaintiff's expert "performed a pricing correlation test, which demonstrated that the prices of the Tuna Suppliers' products moved up or down together regardless of product or customer type, and thus supported the proposition that the Tuna Suppliers' collusion had a common, supra-competitive impact on their prices."); *Pork*, 665 F. Supp.3d at 992 n. 13 (While "correlation analysis may not be common evidence of class-wide injury on its own," an expert may "use his correlation analysis merely to supplement his robust regression analysis."); *see also In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 629 (N.D. Cal. 2015) (finding that expert's "use of regression and correlation analysis is well established as a means of providing classwide proof of antitrust injury and damages"). The district court in *Pork* concluded that "[c]orrelation analysis conducted by [the plaintiffs' expert] further bolsters that all DPPs would be impacted by the price increase," as it is evidence that "all DPPs were impacted because DPPs would not have been able to avoid the impact of the alleged conspiracy by switching from one Defendant to another." *Pork*, 665 F. Supp.3d at 1003 (internal quotes omitted). Similarly here, there is no reliability problem simply because Williams' correlation analysis alone does not identify the causal mechanism driving the correlation. Consequently, Williams' correlation analyses provide further reliable evidence of class-wide pricing impact.

The Court also dismisses Defendants' argument that a correlation analysis is irrelevant to the claims in his case because Plaintiffs have not alleged a rigid pricing structure. In *Pork*, this type of correlation analysis was accepted to show common impact where, like here, there was evidence that defendants generally set their prices based on market price with adjustments. *Pork*, 665 F. Supp.3d at 1003.

Relying on Stiroh's opinion, Defendants next argue that Williams' correlation analysis is insufficient to establish common impact because if but-for prices are generally increasing (as they would over a 20-year time span), the correlation among customers will be positive. Doc. 833-3, Stiroh Report ¶ 142. And so, Defendants argue, Williams' correlation statistic is not falsifiable because it would be positive regardless of the presence or absence of class-wide impact. This criticism does not render Williams' correlation analysis irrelevant to common impact. Stiroh's hypothetical in her report assumes that the prices of all products can only increase over time. Doc. 820-3, Williams Reply ¶ 278. As Williams explains, however, "[a]ctual turkey prices fluctuate and the data generally have more than two periods. As a result, price correlations are neither positive 100 percent nor negative 100 percent." *Id*. Moreover, the relevant point of Williams' analysis is "that, all else equal, correlations would be systematically lower if only some customers/products were overcharged, and systematically higher if overcharges are more widespread." *Id*. The actual results of Williams' analysis shows consistently high, positive levels of pricing correlation— generally between 80 to 99 percent for whole turkeys, ground turkey, and turkey breast. Doc. 820-2, Williams Report ¶ 433.

Defendants also take issue with Williams' decile correlation analysis, arguing it is not a reliable test of customer pricing uniformity because he does not analyze the correlation between individual customers, and positive correlation at the decile level is built into Williams' analysis. Doc. 830-2, Willaims Report ¶¶ 432-435. However, Williams' decile correlation analysis was not designed to analyze price correlations of specific customers—that is done by his customer correlation analysis. Williams performed a separate customer correlation analysis which demonstrates that prices are correlated across customers. *Id*. ¶¶ 440-441. Specifically, Williams' customer correlation analysis showed prices across customers are "generally highly correlated,

with 100% of the correlations higher than 0.6 and 82%-100% correlations higher than 0.8." *Id.* ¶ 441.

Moreover, in his decile analysis, Williams found that different deciles of transaction prices, product prices, and customer prices are parallel with each other and highly correlated. Doc. 830-2, Willaims Report ¶¶ 432-435. Correlations of prices at different levels can provide insights into whether both expensive and cheap products would be affected by the alleged conspiracy and whether both customers who paid lower and higher prices would be affected by the alleged conspiracy. *Id.* ¶ 432. Williams used the results of his decile analysis "as further common evidence supporting [his] findings based on the overcharge regression analysis that the anticompetitive price increases caused by the alleged conspiracy had a widespread effect on Class Members, causing all or virtually all of them to pay higher prices." *Id.* ¶ 435. While it is correct that the decile lines can never cross to show a negative correlation because they are measuring different deciles, the Court is not persuaded that this renders Williams' model unreliable for measuring the degree of the positive price correlation coefficients and thus, common impact. Doc. 1074, Oct. 9, 2024 Hearing Tr. 16:14-20:9, 162:11-163:8. The decile correlation analyzes the correlation of each decile with the mean. And Williams found the price correlations of each decile with the mean were very high. Doc. 830-2, Willaims Report ¶ 433 (turkey breast correlations range from 0.80 to 0.99; ground turkey correlations range from 0.86 to 0.99; and whole turkey correlations range from 0.96 to 0.99). Accordingly, the Court finds that Defendants have failed to show that Williams' decile analysis is unreliable on these bases.

**Production Regression:**[14] Defendants' next challenge relates to Williams' production regression analysis. Defendants insist that Williams' production regression model does not reliably

---

[14] Williams' Reply report refers to these models as production regressions. Doc. 830-3, Williams Reply, Section IV.D. At the evidentiary hearing, Williams testified that he should have called these models supply

show a production reduction *attributed to the alleged conspiracy* for three reasons: (1) his production model does not fit the facts of the case; (2) his production model ignores post-conspiracy data; and (3) his production model yields absurd results. None of Defendants' arguments demonstrate that Williams' testimony is unreliable. First, Defendants dispute whether the proposed production model matches the DPPs' theory of liability. In Defendants' view, Williams' production model does not fit the case because DPPs' claims are predicated on two production cutbacks by the Processor Defendants in 2008-2009 and 2012-2013 and he did not separately model the effects of production cutbacks in 2008-2009 and 2012-2013. But while DPPs allege that the Processor Defendants each participated in production cuts in 2008-2009 and/or 2012-2013, production cuts are not the only way to restrain turkey output below what it would have been. As Stiroh recognized, besides production cuts, "another separate way that a cartel could restrain production would be by keeping production levels flat rather than growing them as they would have occurred in the but-for world." Doc. 938-5, Stiroh Dep. 202:10-203:3. Similarly, Stiroh agreed that a "decision by a cartel to expand, but to expand less than they would in the but-for world, would also be a production restraint." *Id*. at 203:14-18. DPPs have presented evidence common to the class that the Processor Defendants also engaged in production restraint throughout the Class Period and production cuts take time to affect the supply of turkey meat. *See* Doc. 938 at 12-17; Doc. 940 at 21-22; *see also* Doc. 665, DPPs' Third Amended Class Action Cmplt. ¶¶ 17, 19, 310, 324, 388. Because Williams' production regression analysis relates to the factual situation at hand, there is a "fit" between his conclusion and the facts of the case.

Defendants further question the reliability of Williams' production model, arguing that it does not show effects from the conspiracy in 2008-2009 and thus, it cannot support his conclusion

---

regressions. Doc. 1074, Oct. 9, 2024 Hearing Tr. 166:11-21. For ease of reference, the Court will refer to these models as production regressions as in Williams' Reply.

that there was a pricing effect from the alleged conduct in 2010. Williams responds to this criticism in two ways. First, he notes that the suggestion that his production regression model must find supply restraint outside the Class Period contradicts DPPs' allegations, the facts indicating it takes time for cuts to make their way through the production system and be reflected in turkey pricing as well as for existing inventory to be depleted, and his analysis of Processor Defendants' production data. Doc. 830-4, Williams Sur-Reply ¶¶ 46-51, 54-59. Second, Williams notes that his production regression model was designed to estimate the supply-restraint effect in the Class Period, not but-for production during the ramp-up period. *Id*. ¶ 59. Williams also gave a persuasive reason for why the coefficient on the ramp-up variable does not capture the total supply restraint, if any, in the ramp-up period. As Williams points out, in this case, the ramp-up period of July 2008 through December 2009 largely overlaps with the Great Recession period of January 2008 through June 2009. *Id*. As a result, Williams states to determine the total supply-restraint effect in the ramp-up period, it is inappropriate to base it on the statistical significance of the estimated coefficient on the ramp-up variable in Williams' model, as Stiroh does. *Id*. All of this indicates to the Court that Williams' production regression matches the theory of liability in this case.

Defendants next challenge Williams' robustness check which included the year 2009 as part of the damages period because it did not include a separate variable for 2009 to measure the effects of the conspiracy in that year. Rather, Williams redefined his damages period from seven to eight years. Defendants argue this only averaged the effects during the entire period and did not isolate the effects of the ramp-up period. In Defendants' view, Williams' robustness check undermines DPPs' argument that there was an impact in 2009. But Williams' inclusion of a robustness analysis does not itself warrant exclusion of the primary regression, particularly where the results still demonstrate "turkey production in the actual world is statistically significantly

lower than production but-for the alleged conspiracy by 4.7% to 5.2%."  Doc. 830-4, Williams Sur-Reply, ¶ 43; Doc. 830-3, Williams Reply, ¶ 310.  Defendants' critique is that Williams' own results show that by adding 2009 to his damages period, the estimated production reduction decreased from 5.1% to 4.7%, which is consistent with the alleged conspiracy having no adverse impact on production during 2009.  However, Defendants focus only on the differences between results when Williams used total supply as the dependent variable and excluded three turkey-product-category-specific variables, not the other results produced by Williams. Doc. 830-3, Williams Reply, ¶¶ 122-23 (Table 2), 310 (Table A1); Doc. 830-4, Williams Sur-Reply, ¶ 43 (Table 2).  In contrast, Williams tested the robustness of his production regression model by running four different versions: by comparing the results including and excluding turkey-product-category-specific variables and by defining total production as either total supply or domestic supply. *Id*. Again, a broader view of Williams' results shows that when including the year 2009 as part of the damages model, the estimated production reduction in the actual world is statistically significantly lower than production but-for the alleged conspiracy by 4.7% to 5.2%. Doc. 830-3, Williams Reply, ¶ 310 (Table A1); Doc. 830-4, Williams Sur-Reply, ¶ 43 (Table 2).  Williams' model is not therefore flawed.  That Williams did not include a separate variable for 2009 or limit his analysis to "total supply" excluding the three turkey-product-category-specific variables may undercut the weight of his opinion, but it does not make his opinion unreliable.  Regardless of whether it is the best method, Williams' results are sufficiently reliable.  Defendants' criticism is really a dispute as to Williams' ultimate conclusion that there was an impact in 2009, and this critique does not make Williams' opinion non-admissible under *Daubert*. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined

by the trier of fact, or, where appropriate, on summary judgment."). The Court therefore declines to exclude Williams' original production analysis and robustness analysis on this ground.

Beyond this, Defendants raise a concern that Williams' production model is unreliable because it ignores post-conspiracy data from 2019-2021, which shows that production declined after the 2018 cut-off period. According to Defendants, Williams chose the 2018 cut off for his "after" period because Class Period production was below 2018 levels, but above 2021 levels. Though DPPs argue that Williams did not have Defendants' data through 2020 because Defendants objected to its production, this argument is not persuasive. Williams testified that his production regression is based on quarterly USDA data, not Defendants' data. Doc. 1074, Oct. 9, 2024 Hearing Tr. 167:20-168:7, 174:7-175:9. Moreover, Mangum also used quarterly USDA data in his turkey production analysis in this case. *See* Doc. 839-1, Mangum Report ¶ 71, Figure 13. But in any case, this disagreement over the post-conspiracy time period goes to the evidentiary weight and persuasiveness of Williams' testimony, rather than its reliability. *In re Allstate Corp. Sec. Litig.*, 2022 WL 842737, at *9 (N.D. Ill. Jan. 10, 2022), *report and recommendation adopted*, 2022 WL 17683310 (N.D. Ill. Feb. 22, 2022) ("disagreements over which time period to use . . . reflect a classic dispute among experts over the choice of inputs, which is inappropriate to resolve at this *Daubert* juncture."); *see also Moehrl*, 2023 WL 2683199, at *9 (rejecting *Daubert* challenge because "arguments concern[ing] the factual underpinnings of [expert]'s analysis and the quality of his conclusions . . . implicate the probative weight of his opinions not their admissibility"). Moreover, Defendants have not shown how the additional data from 2019 through 2021 would have had an impact on Williams' results. *See Morgan v. United Parcel Serv. of America, Inc.*, 380 F.3d 459, 468-69 (8th Cir. 2004) ("when a defendant attacks a plaintiff's regression, he must

typically do more than point out the flaws in his opponent's analysis" and instead "must show that the omission had an impact on the result.").

As a final argument in support of exclusion, Defendants assert Williams' production model produces absurd results because it purportedly shows that "if costs increase, then production also increases." Doc. 895 at 19. Defendants argue that the "implication that producers should make even more when costs skyrocket is not rational or reliable." *Id*. But Defendants do not point to any criticism raised by Stiroh in her rebuttal report supporting their argument. Furthermore, Williams disagrees with the conclusion that the positive sign on the dress meat cost variable is an indication of an econometric issue with the production regression. Williams testified this is a mistaken view of reduced form regressions and what the coefficients on the control variables mean. Grounded in economic theory, Williams explained at both his deposition and the hearing that it is very common for there to be unexpected signs in reduced form regressions, but it does not change the unbiased estimate of the variable of interest. Doc. 1074, Oct. 9, 2024 Hearing Tr. 179:15-182:2; Doc. 938-42, Ex. 177, Williams Dep. 224:20-225:22, 233:4-236:22. Defendants make no persuasive attempt to rebut Williams' explanation. While Defendants' counsel argues that the production regression is unreliable in predicting the effects of the alleged conspiracy because it does not reliably predict the effects of costs on production, they have provided no actual evidence (as opposed to argument) from which the Court can conclude that Williams' production analysis leads to an absurd result. All in all, Defendants have not shown that the supposed absurdity of Williams' cost variable undermines the reliability of the methodology for measuring class-wide impact. Like much of their objections' to Williams' opinions, Defendants are actually contesting the relative weight of Williams' production model, which they are free to challenge at trial.

### *DPPs' Common Proof of Impact*

Returning to the merits of the class certification motion, DPPs have pointed to several types of common proof that will establish antitrust impact on a class-wide basis. First, Williams showed that the structure of the turkey industry was conductive to successful collusion, which provides common proof that will establish antitrust impact on a class-wide basis. As the Seventh Circuit has recognized, plaintiffs may rely on evidence that the "structure of the [relevant] market was conducive to successful collusion" as "common proof that will establish antitrust injury (in the form of cartel pricing here) on a classwide basis." *Kleen*, 831 F.3d at 927; *see also Tuna*, 31 F.4th at 675 ("other evidence in the record, including [] market characteristics, showed that class members suffered common impact."). Moreover, common evidence demonstrates that Urner Barry served as a market reference point when pricing turkey. *See Broilers*, 2022 WL 1720468, at *15; *Pork*, 665 F.Supp.3d at 1006. Given these characteristics of the turkey market, Williams also relied on textbook economic principles and record testimony about the well-established relationship between the supply and price of turkey meat. Doc. 830-2, Williams Report ¶¶ 375-379 375. This evidence in conjunction with fundamental economic theory is all common evidence that collusion would cause higher prices for all or nearly all turkey products.

DPPs provided additional common evidence in the form of multiple economic analyses capable of proving that the alleged conspiracy among Defendants caused the price of turkey products to increase: (1) Williams' overcharge regression establishing that Defendants' alleged conduct resulted in statistically significant overcharges for each of turkey breast, ground turkey, and whole turkey throughout the Class Period; (2) Williams' customer-level in-sample prediction methodology demonstrating that 99.8% of class members had at least one overcharge observation during the Class Period; and (3) Williams' correlation analyses showing that prices move together

within the turkey product categories, among Processor Defendants, and across different customers and geographic locations. DPPs also presented common evidence that Agri Stats/EMI provided a mechanism by which Processor Defendants exchanged production and pricing information. Finally, Williams performed a production regression and based on common evidence, he found that Defendants restrained industry supply throughout the Class Period. As the Seventh Circuit has explained, this does not mean "that any of these points have been proven, of course, but [the Court] is saying that this evidence is enough to support class treatment." *Kleen*, 831 F.3d at 928.

### *Defendants' Impact Arguments*

This leads to Defendants' challenges to the sufficiency of DPPs' common proof of antitrust impact. Defendants argue that Williams' overcharge regression analysis is insufficient as common proof because: (1) his model measures average price effects and a single average percentage overcharge is improper when an industry has non-uniform prices; (2) his model does not fit DPPs' allegations; and (3) his model demonstrates that a great many putative class members are uninjured. The Court will address each of Defendants' arguments in turn, but finds them to be unavailing.

To begin, Defendants' first argument largely mirrors their earlier *Daubert* challenge to Williams' in-sample prediction approach, which the Court rejected. For purposes of class certification, individual pricing negotiations and different pricing mechanisms in the turkey industry do not preclude the use of pooled regression models to show common impact. In *Kleen*, the Seventh Circuit considered "whether the common evidence could show the fact of injury on a classwide basis" and stated that, "[a]t base, Defendants argue that it is not enough for Purchasers to prove aggregate injury and one aggregate overcharge." *Kleen*, 831 F.3d at 927. *Kleen* rejected

this argument and affirmed class certification with the plaintiff's expert "calculat[ing] an average overcharge of 2.92%." *Id.* at 929.[15]

Additionally, the use of aggregate results of regression analyses using pooled data has been accepted as evidence capable of showing common impact in other protein industry antitrust cases where defendants priced their products in reference to market prices. The *Broilers* court stated that "[c]ourts have held that pooled regression analysis can be an appropriate tool to demonstrate class-wide impact even when the market involved diversity in products, marketing, and prices." *Broilers*, 2022 WL 1720468, at *12 (internal quotes and citation omitted). The district court rejected the argument that plaintiffs' proof of injury was improperly based on an expert's calculation of a "but for" "average" price which failed to account for individual price negotiations. *Id.* at *15. As the *Broilers* court correctly explained, the "experts' opinions in this case [] are not merely based on 'averages' of individually negotiated sales." *Id.* Rather, individual price negotiations "take place in the context of a 'market price,'" which is the "starting point" for negotiations. *Id*; *see also Pork*, 665 F. Supp.3d at 1006. This is consistent with "prevailing view" that "price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated." *Kleen*, 306 F.R.D. at 600 (internal quotes and citation omitted). As discussed above in connection with Defendants' objections to Williams' in-sample prediction model, common evidence here demonstrates that the Processor Defendants negotiated

---

[15] *See also Tuna*, 31 F.4th at 677-78 (rejecting the categorical argument that "pooled regression models involve improper 'averaging assumptions'" and therefore are inherently unreliable when used to analyze complex markets" because "[i]n antitrust cases, regression models have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members.").

turkey sales in reference to market price, such that cuts in production could uniformly affect all relevant products.[16]

Defendants also point out that turkey prices were established through a variety of pricing mechanisms, including fixed-price contracts, cost-plus contracts, and contracts based on grain costs, which they argue insulated some DPPs from any effects of the conspiracy and preclude use of a single, average overcharge to measure antitrust injury. This argument is unpersuasive to support lack of common impact and predominance. Like the chicken industry at issue in *Broilers*, market price is a reasonable way to demonstrate common impact of an alleged conspiracy to reduce turkey supply because "[e]ven prices that are not explicitly based on Urner Barry . . . will still be influenced by the same market factors because the prices associated with fixed price contracts and the margins associated with cost-plus contracts will be negotiated in reference to market price." *See Broilers*, 2022 WL 1720468, at *14. Moreover, while Defendants point to a few grain-based contracts, these contracts do not change the fact that there is common evidence that Processor Defendants generally used market price as a reference when pricing turkey.

Additionally, Defendants note that unlike in *Broilers* and *Pork*, turkey products (such as breast, wings, thighs, etc.) are not priced based on a single "cutout" value of the entire bird, so a

---

[16] Relatedly, the Court considers Plaintiffs' request to exclude Stiroh's opinion that a single overcharge regression cannot be a reliable measure of common impact in this kind of antitrust case. *See* Doc. 833 at 11-19. Plaintiffs assert that Stiroh's opinion in this regard is unreliable because the use of common impact regression methodology is a well-established econometric practice used to show antitrust injury, particularly in price-fixing cases. It is true that single overcharges "have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members." *Pork*, 665 F. Supp.3d at 1005-06 (quoting *Tuna*, 31 F.3d at 677 and citing *Broilers*, 2022 WL 1720468). However, as Defendants' Opposition makes clear, Stiroh did not opine that an overcharge regression model can never be used; rather, Stiroh simply opined that Plaintiffs' overcharge regression models in this case are not reliable proof of common impact as to these putative classes. Doc. 881 at 9-10. As such, Plaintiffs have failed to show that Stiroh's critiques of Williams' and Mangum's overcharge regression models as proof of antitrust impact are so unreliable that any of them should be excluded on *Daubert* grounds. With Defendants' clarification, Plaintiffs' motion on this issue is denied.

reduction in turkey production could not affect the supply (and price) of all turkey products uniformly. It is true that different types of turkey products have different pricing movement patterns, which is to be expected because whole bird pricing is cyclical as a result of its popularity during the Thanksgiving holiday. But as DPPs point out, there are different published market prices for different turkey products. *See* Doc. 938 at 24. Moreover, plotting the Urner Barry data for 2009-2019 shows that Urner Barry prices for a given product category are highly correlated. Doc. 938 at 24-25. Williams also performed overcharge regression analyses of the price of turkey by product category. Doc. 830-2, Williams Report ¶ 423. He found overcharges during the Class Period for turkey breast, ground turkey, and whole turkey. *Id*. ¶ 424. And Williams' correlation analyses showed that Defendants' prices for turkey breast, ground turkey, and whole turkey products were highly correlated during the Class Period, *i.e.*, they moved in a parallel manner during the Class Period. *Id*., Section V.D.iii. To the extent that Processor Defendants' failure to make production and pricing decisions based on the whole bird value limits the ability of the alleged conspiracy to affect prices of all turkey products uniformly, this is a question for the trier of fact to be examined later and not a reason to deny class certification now.

Second, Defendants assert that Williams' overcharge regression model does not fit DPPs' allegations. Defendants repeat many of the same arguments that failed in their *Daubert* motion. *See* Doc. 877 at 51-52. Defendants also rehash their argument that Williams' production regression model is flawed because: (1) he finds no statistically significant effect of the alleged conspiracy during the first period of alleged coordinated production cuts in 2008 and 2009; (2) he ignores production data post-Class (2019-2021) when turkey production decreased; and (3) his model provides absurd results by showing a positive correlation between production and production costs. To begin with, DPPs are correct that *Kleen* specifically rejected the argument that antitrust

plaintiffs must even perform a separate production regression "of a hypothetical market free of any anticompetitive restraint, to which the actual market can be compared." *Kleen*, 831 F.3d at 927. Instead, "[w]hat is essential" for impact is common proof of "cartel pricing" on a class-wide basis, as provided by overcharge regressions and market structure analysis. *Id*. That said, the Court adopts its previous analysis here and finds the issues raised by Defendants are not fatal to class certification.[17]

The one new issue raised by Defendants, which concerns cold turkey inventory, does not cause the Court to question Williams' method. Stiroh asserts that Williams should not have included cold turkey inventory as part of supply in his production regression. Doc. 839-4, Stiroh

---

[17] Defendants also rely on Stiroh's opinion to argue that Williams' overcharge estimate "is not tied to the alleged supply restriction" because he estimates an unvarying overcharge over the entire Class Period with no variation to account for the fact that the "alleged supply restrictions occurred during two specific periods of time [2008-2009 and 2012-2013]." Doc. 839-2, Stiroh Report ¶ 75. Defendants further rely on Stiroh's finding that there is no price impact in the 2008-2009 or 2012-2013 subperiods. Doc. 839-4, Stiroh Rebuttal Report ¶¶ 10-14. But, as previously discussed, this approach does not fit the evidence in the record indicating that Processor Defendants engaged in production restraint throughout the Class Period and it can take months-if not years-for production cuts to take effect. Doc. 938 at 13-15; Doc. 830-4, Williams Sur-Reply ¶¶ 46-51. Moreover, Stiroh's analysis does not necessarily undermine Williams' results. When Williams modified his overcharge regression model to allow the estimated overcharge to vary by year, he found that "estimated overcharges are positive and statistically significant for every year in the damages period." Doc. 830-3, Williams Reply, ¶¶ 248-249 & T. 5. Similarly, with respect to the production model, Williams also "allow[ed] the supply restraint effect to vary by each year in the damages period, which is more flexible and captures differences in supply-restraint effects across years that Dr. Stiroh's regressions, by design, cannot capture." Doc. 830-4, Williams Sur-Reply ¶ 36. Williams found that "turkey production in the actual world is statistically significantly lower than production but-for the alleged conspiracy for each year in the damages period when letting the production effect vary by year." *Id*. ¶ 36 & T. 1. And as just explained, Williams' production model treated 2008-2009 as a ramp-up period because, among other things, the evidence suggests that production restraints take time to affect supply. Doc. 830-4, Williams Sur-Reply ¶¶ 44-58. So the model was not designed to test for an anticompetitive effect in the years before Williams had an economic expectation of such effects. *Id*. ¶ 59; Doc. 938-42, Ex. 177, Williams Depo. at 188:15-22. Rather, his model was set up to test for effects within the Class Period. Again, as a further robustness analysis, Williams included the year 2009 as part of the damages period "to account for potential supply-restraint effects in 2009" and found that "turkey production in the actual world is statistically significantly lower than production but-for the alleged conspiracy by 4.7% to 5.2%" in that redefined damages period. Doc. 830-4, Williams Sur-Reply, ¶ 43, Doc. 830-3, Williams Reply, ¶ 310. Ultimately, Defendants' argument, based on Stiroh's opinions, is a factual dispute to be resolved at summary judgment or trial. It is not a reason to exclude Williams' overcharge estimate or a predominance-based reason to deny class certification.

Rebuttal Report ¶ 15. In rebuttal, Williams explains that inventory is part of overall supply, so Processor Defendants must consider their inventory levels when making their production decisions in order to restrain overall supply. Doc. 830-4, Williams Sur-Reply ¶¶ 61-64. According to Williams, "supply including inventory is the correct dependent variable to use in analyzing the supply-restraint effect of the alleged conspiracy." *Id*. ¶ 61. Williams gave persuasive reasons for why a model that uses supply including inventory is the correct dependent variable. *Id*. ¶¶ 61-64.[18] In other words, Williams relies on a reliable methodology which, based on his explanations and responses to Stiroh's criticism, he has more likely than not reliably applied to the facts in this case. His choice to include cold turkey inventory as part of supply in his production regression goes to the weight of his testimony rather than its admissibility. *Ploss v. Kraft Foods Group, Inc.*, 637 F. Supp.3d 561, 576 (N.D. Ill. 2022) ("As the Supreme Court and Seventh Circuit have confirmed on a number of occasions, the selection of the variables to include in a regression analysis is normally a question that goes to the probative weight of the analysis rather than to its admissibility.) (internal quotes and citations omitted).

The third part of Defendants' overcharge regression model challenge goes to uninjured class members. Defendants maintain that Williams' model cannot serve as common evidence of antitrust impact because, even under his own analysis, a great many class members were not injured. The Seventh Circuit has explained that "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009); *Messner*, 669 F.3d at 825

---

[18] Williams also notes that even if inventory were excluded from supply in the dependent variable, Stiroh's regressions excluding inventory from the dependent variable suffer from methodological errors that, when corrected, confirm the robustness of his findings that turkey supply was restrained in the Class Period. Doc. 830-4, Williams Sur-Reply ¶¶ 61, 73, 75, 78.

("There is no precise measure for 'a great many.'"). However, Plaintiffs need not offer common evidence showing impact to every single class member at the class certification stage. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014) ("If the court thought that no class can be certified until proof exists that every member has been harmed, it was wrong."). Here, Williams found that 1,672 of 1,675 of the unique customers in the dataset, or approximately 99.8%, had a least one overcharge observation during the Class Period. Stiroh believes the proper analysis is to run Williams' price overcharge regression on the purchases individually of the 532 DPPs with sufficient number of transactions. Doc. 839-2, Stiroh Report ¶ 95.[19] When she runs Williams' model as to each of these 532 customers individually, she finds that 186—or 35% of the sample analyzed—have no statistically significant overcharges. *Id*. These 186 uninjured DPPs constitute 11% of the entire putative class, and Defendants believe that 11% figure defeats class certification.

According to Williams, when applying regression models to only a subgroup of data, "the number of observations per grouping declines as transactions are divided into more and more subgroups, coefficients become less precise, which makes a test of coefficient stability or robustness less reliable" and "estimated coefficients may make little economic sense." Doc. 830-3, Williams Reply ¶¶ 203-204. Though Stiroh believes that her methodology shows no statistically significant positive overcharges for 186 customers, Williams explains none of these customers account for more than 0.4% of observations in the data. *Id*. ¶ 201. Thus, Stiroh discards at least 99.6% of the observations in the data for each of these 186 customer-specific regressions. *Id*. Williams further points out that even under Stiroh's analysis, all of the top 50 customers and 97 of the top 100 customers (by number of observations) have positive and significant overcharges. *Id*. ¶ 206. And the customers Stiroh does find to have statistically significant overcharges represent

---

[19] Stiroh defines sufficient observations as more than 100 observations, including over 30 observations in both the benchmark period and alleged Class Period. Doc. 839-2, Stiroh Report ¶ 95(a) n. 217.

95% of all transactions. *Id*. DPPs argue that the fact that Stiroh's customer-specific regressions find fewer overcharges for smaller customers who are less likely to have the ability to resist overcharges makes little economic sense. *See also id*. ¶¶ 209-217.

At bottom, Williams' argument that Stiroh's application of his overcharge regression model is a flawed methodology that creates artificially small sample sizes is a classic battle of the experts about the proper approach to the regression analysis that must be left for the factfinder to resolve. It is not a reason to reject Williams' overcharge regression model at the class certification stage. *Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009) ("[C]lassic battle of the experts . . . called upon the factfinder to determine what weight and credibility to give the testimony of each expert[.]"). As a result, Stiroh's critique is inadequate as a basis to conclude that Williams' approach is insufficient evidence to demonstrate class-wide impact. *Broilers*, 2022 WL 1720468, at *16 (Based on their expert's "unpooled" regression analysis, "Defendants merely disagreed with Plaintiff's perspective" and "such a dispute is factual and is resolved at summary judgment or trial. It is not a reason to exclude either perspective or deny class certification."). Moreover, Stiroh did not offer her own affirmative model to show the number of unimpacted class members among the DPPs. Doc. 938-5, Stiroh Dep. 10:11-14, 11:16-23; *see also Tuna*, 31 F.3d at 680 (noting defendants' expert "did not make a factual finding that 28 percent of the DPP class or 169 class members were uninjured," but aimed to "undermin[e] confidence in Dr. Mangum's pooled regression model," which "[a]t most" supports the "more attenuated argument that Dr. Mangum's model is unreliable, or would be unpersuasive to a jury.").

Defendants advance a further argument that Williams' overcharge regression model creates false positive results of injury of 3.6% when Stiroh applied it to a "clean damages period." Doc.

839-2, Stiroh Report ¶ 133.[20]  Defendants contend that these false positives show that Williams' model likely includes numerous members who have not been injured by the alleged conspiracy and thus, the model cannot serve as sound common proof of class-wide injury.  Williams responds that Stiroh's analysis is incorrect.  Williams explains that Stiroh's false positive tests suffers from a fundamental design flaw that generates false positive results where there are none. Doc. 830-3, Williams Reply ¶¶ 169-179.  According to Williams, a standard false positive test only utilizes data from the clean benchmark period because otherwise the test offers "no insights regarding whether the results are due to errors in the model or that part of the benchmark period is affected by the alleged conspiracy." *Id*. ¶¶ 172, 176.  Williams notes that Stiroh treated the damages period from Williams' model as part of her benchmark period. *Id*. ¶¶ 169, 179.  Correcting for the treatment of the damages period (2010-2016) as part of the benchmark period, Williams found an average "overcharge" of "virtually zero at -0.03% and statistically insignificant, confirming that [his] overcharge regression model does not produce false positive results." *Id*. ¶¶ 179-182.  While Defendants are free to challenge the possible false positives in the clean damages period that Williams' overcharge regression creates, his analysis is still sufficient to establish common impact for purposes of certifying a class.  Put another way, Defendants have not shown that the supposed false positives undermine the overcharge regression model's finding of class-wide impact.

In conclusion, the Court determines that the evidence put forward by the DPPs, including Williams' market structure analysis, overcharge regression model, supplemented by the in-sample prediction method, robustness checks on the overcharge regression analysis, correlation analyses,

---

[20] For her "clean damages period," Stiroh changed the alleged impact period indicator from January 2010 to December 2016 to January 2005 to December 2007, the two-year period with available transaction data and pre-dating the alleged conduct period. Doc. 839-2, Stiroh Report ¶ 133.

production regression, and record evidence, when combined, is sufficient to show common questions predominate as to common impact. *Kleen*, 831 F.3d at 925.

### *Mangum's Impact Analysis*

The Court turns next to whether CIIPPs can meet their predominance burden as to antitrust injury. CIIPPs rely on the expert report of Mangum to demonstrate that antitrust impact can be established through the presentation of common evidence. Mangum analyzed the alleged conspiracy's impact across the proposed CIIPPs class using multiple tools of economic analysis. Like the plaintiffs' expert in *Kleen*, 831 F.3d at 927, Mangum began by analyzing the structure of the turkey market. He considered the dominant share of the turkey market the Processor Defendants control, the high barriers to entry into the turkey market, the commodity-like nature of the turkey products at issue, the relatively inelastic nature of the demand for turkey, and the Processor Defendants' opportunities to form and enforce a conspiracy. Doc. 839-1, Mangum Report ¶¶ 95-101, 104-147. After considering the foregoing, he concluded that the structure and characteristics of the turkey industry made it conducive to the formation and maintenance of the alleged collusion, which would have made it difficult for any customer to avoid the impact of the alleged collusion. *Id*. ¶ 150. Mangum also found the widespread use of market-based formulas in setting prices in the turkey industry, which is consistent with widespread impact. *Id*. ¶¶ 158-159.

Mangum then conducted correlation analyses to evaluate pricing patterns. He examined the extent to which the Processor Defendants' prices for whole birds, breast products, and ground turkey products moved together. Doc. 839-1, Mangum Report ¶ 171, n.289. Mangum found that "transaction prices within a part category move together across Defendants; that prices within a part category move together across geographic locations; and finally, that prices within a part category move together across individual customers." *Id*. ¶¶ 167-174. The high degree of price

correlations across Defendants, geographic locations, and direct purchasers was "evidence that no individual direct purchaser could have avoided the impact of the alleged collusion." *Id.* ¶ 167.

In addition, Mangum conducted a direct purchaser overcharge regression analysis to estimate the amount by which the prices of turkey products were artificially inflated above competitive levels. Mangum specified a model that used January 2004 to June 2008 and January 2017 to December 2018 as its benchmark period and controlled for turkey production costs, product and customer characteristics, seasonal effects (*i.e.*, demand cyclicality), the cost of competing proteins, real disposable personal income, and an outbreak of avian influenza that the USDA believed impacted turkey production from May 2015 to December 2015. Doc. 839-1, Mangum Report ¶¶ 176-197. He included a separate variable for prices paid on direct purchases of Class Products during the alleged "ramp up" period (July 2008 - December 2009). *Id.* ¶ 187. Mangum estimated separate regression models for whole birds, turkey breast meat, and ground turkey. Each model found positive, statistically significant overcharges. Mangum estimated that direct purchasers paid overcharges ranging from a low of 6.6 percent for breast meat to a high of 10.8 percent for whole birds. Doc. 839-3, Mangum Reply ¶ 199, Fig. 24. Based on this analysis, Mangum opines that "[c]ommon evidence demonstrates that all, or nearly all, direct purchasers in the relevant supply chain paid artificially inflated prices on purchases of turkey." Doc. 839-1, Mangum Report ¶ 30.

Mangum then analyzed whether direct purchasers generally passed on price increases to buyers in the CIIPPs supply chain and all or nearly all CIIPPs paid an overcharge during the conspiracy. To conduct this analysis, Mangum used third-party distributor sales and purchase data and found that the prices charged by resellers follows the price resellers paid to Defendant producers, indicating distributors pass-through of Defendant turkey price charges. Doc. 839-1,

Mangum Report ¶ 225, Figs. 41, 42, 43. He found the competitive environment distributors operate in, distributors' own discussions of pass-through, third-party data, and basic principles of economics support pass-through of overcharges. *Id*. ¶¶ 200-225. Mangum also found low average price to cost ratios—or, low profit margins—which are consistent with a highly competitive market. *Id*. ¶ 225.

Mangum used a regression model to estimate what percentage of overcharges were passed on to CIIPPs and the breadth of those impacts across the proposed class using a sample of direct purchasers' purchase and sales data. Doc. 839-1, Mangum Report ¶¶ 226-232. The sample consisted of data originating from 20 of the 160 direct purchaser resellers who resold Class Products to the CIIPPs, and accounting for about 47 percent of Defendants' sales into the CIIPP supply chain. *Id*. ¶ 227. He explained that the third-party data "cover[ed] a range of distributor types that includes large broadline foodservice distributors, smaller foodservice and retail suppliers, wholesales, re-distributors, and cash and carry establishments." Doc. 839-3, Mangum's Reply ¶ 185. Their data "collectively spans over 17 years, from January 2005 through August 2022, and totals over $2 billion in sales for relevant turkey products" and amounts to 4.8 million observations. *Id*; Doc. 1074, Oct. 9, 2024 Hearing Tr. 226:25-227:1.

Controlling for differences in price across different product types as well as individual customers Defendants sold to, Mangum found distributors passed through about 100% of overcharges. Doc. 839-1, Mangum Report ¶ 232. For the 20 direct purchaser resellers who resold Class Products to the CIIPPs, Mangum found that individual pass-through estimates ranged from 89% to 131% for a weighted average pass-through rate for these 20 individual entities of 99.9%. *Id*. ¶ 232, Fig. 44. While the data available to Mangum did not include every single reseller who purchased from Defendants or sold to CIIPPs, he noted that "the estimated pass-through rates are

quite consistent across a wide range of third party distributors, including different types of companies, different geographic areas, and different levels in the supply chain." *Id*. ¶ 232. By applying his direct overcharge model to the third-party distributor sales data and systematically testing for impact at the customer level, Mangum found that over 99.9 percent of CIIPPs (234,006 of 234,171 customers), have at least one impacted transaction. Doc. 839-3, Mangum Reply ¶ 195.

### Defendants' Objections to Mangum's Impact Opinions

**Overcharge Regression:** Defendants raise a number of challenges to the admissibility of Mangum's overcharge regression analysis and conclusions. Defendants first argue that Mangum's overcharge regression model is unreliable and fails to fit the case because it cannot show overcharges on a substantial portion of Class Product sales to the direct purchaser resellers who resold Class Products to the CIIPPs. CIIPPs purchased turkey products from a wide variety of direct purchaser resellers instead of directly from the Processor Defendants. Doc. 839-1, Mangum Report ¶ 207, Fig. 40. Thus, CIIPPs must first prove that direct purchaser resellers who resold Class Products to the CIIPPs paid an overcharge on those products, and then prove that overcharge was passed through to the CIIPPs. *See Broilers*, 2022 WL 1720468, at *18 ("In addition to showing that direct purchasers paid increased market prices, the Indirects must show that these increased prices were passed on to them."); *see also* Doc. 839-1, Mangum Report ¶ 198.

In support of their challenge to Mangum's overcharge regression model, Defendants have submitted Stiroh's expert report. Citing Stiroh's report, Defendants argue that Mangum improperly relies on averaging techniques which disregard variations in the price, identity of the buyer, identity of the seller, contractual arrangement, and economic circumstances under which each transaction occurred. As an initial matter, the Seventh Circuit has recognized that courts afford wide "[l]atitude . . . to [experts] employing regression analysis, a proven statistical

methodology used in a wide variety of contexts[.]." *Manpower*, 732 F.3d at 808; *Broilers*, 2022 WL 1720468, at *10 ("Regression analysis is a widely accepted method, often used as evidence in litigation, and is commonly used in price-fixing cases."). Moreover, this is one of the same arguments Defendants raised in opposition to Williams' in-sample prediction approach. The reasoning above for why the Court rejected that argument applies with equal force here. In short, the Court concurs with the other protein antitrust cases and finds that "averaging methodologies are not inherently unreliable" and are permissible in circumstances where "individual negotiations and contracts took place within the greater context of the market [price] that was allegedly manipulated through collusive supply reduction." *Pork*, 665 F. Supp.3d at 992, 1006 (citing *Broilers*, 2022 WL 1720468, at *15); *see also Tuna*, 31 F.4th at 677. The *Pork* court rejected defendant pork processors' argument that "Class Plaintiffs cannot show classwide impact because their models use an averaging approach that masks individualized differences between class members" and found that "differences between negotiations and transactions do not disrupt the fact that the Defendants' conspiracy, if true, would cause all prices to increase." *Pork*, 665 F. Supp.3d at 1006. The same conclusion applies to this case. Indeed, Mangum contends that with a sufficiently large supply of data, what Defendants describe as improper "averaging" in fact increases the model's ability to generate reliable results. Doc. 839-3, Mangum Reply ¶¶ 119, 126. Despite the superficial appeal of Defendants' argument that the overcharge regression model used by Mangum impermissibly masks the variation present in the turkey industry by using an averaging approach to allocate injury across the class, under the precedent described above, the pooled overcharge regression model is a reliable method to prove class-wide antitrust impact.

Defendants also criticize Mangum for improperly assuming that the impact of the alleged conspiracy was constant throughout the alleged Class Period. Defendants argue that CIIPPs only

claim that supply reductions occurred in 2008-2009 and 2012-2013. However, Defendants' argument is undercut by the fact that CIIPPs' claims in this case are not limited to the two alleged periods of supply cuts identified above. CIIPPs also allege that Defendants conspired to raise, fix, or maintain the price of turkey products throughout the Class Period. *See* Doc. 666, CIIPPs' Fourth Amended Class Action Cmplt.

Using Stiroh's findings, Defendants dispute that Mangum's overcharge model can show overcharges to a substantial portion of the direct purchaser resellers who resold Class Products to the CIIPPs. To demonstrate this alleged deficiency in Mangum's analysis, Stiroh applied Mangum's overcharge models to specific direct purchasers, products, and every Defendant-product combination. Stiroh claims her regressions, based on Mangum's models, cannot show overcharges for 38.5% of all Class Product sales to DPP resellers who sold to CIIPPS and thus, there is no overcharge on those sales to pass through to the CIIPPs. Doc. 839-2, Stiroh Report ¶ 153. Defendants highlight Stiroh's overcharge regressions showing no statistically significant overcharges on any Class Products sold to Costco, whole bird turkey products sold to Gordon Food Service, or breast meat sold to Sam's Club. Doc. 890 at 12. And they stress that when Stiroh applies Mangum's overcharge model to Foster Farms' Frozen Ground Turkeys, Jennie-O Grand Champion Raw Boneless Roast with Foil, Skin-On, and all ground turkey sales by Cooper Farms, Farbest, and Prestage, it fails to show an overcharge. *Id*. at 13.

While it is true that there are many customers who do not have a statistically significant overcharge in Stiroh's hundreds of regressions, CIIPPs and Mangum argue those results are due to her use of narrow portions of data that do not contain enough observations to generate statistically significant results. Doc. 839-3, Mangum Reply ¶¶ 121, 126-17; Doc. 934 at 11-14. According to Mangum, "Stiroh's own econometric results are flawed and unreliable—her customer-specific,

product-specific, and Defendant-specific regression results are all plagued by small-sample issues that Dr. Stiroh fails to disclose, let alone discuss or address in any way." Doc. 839-3, Mangum Reply ¶ 7.[21]   As Mangum explains, "even a well-specified regression model will, if weakened through disaggregation into ever-smaller samples of data, eventually generate results that lack precision or fail or (in an antitrust context) indicate a supposed lack of impact." *Id*. ¶ 193; *see also id* ¶ 117.  Mangum states that Stiroh's customer-by-customer sub-regressions rely on small samples to assess impact across direct purchasers when plentiful data is available, "engineering the statistical significance problem she then complains about." *Id*. ¶¶ 121-127.  Mangum notes that in her product-by-product regressions, "Stiroh chooses to estimate over 850 separate regressions— one for each customer-turkey part pair." *Id*. ¶ 119.  In addition, Mangum testified that Stiroh's overcharge sub-regressions did not use 99 percent of the data he used in his analysis. Doc. 1074, Oct. 10, 2024 Hearing Tr. at 533, 536, 538.  CIIPPs conclude that all of Stiroh's models and all of Defendants' examples suffer from the same data size problem: they disaggregate data "into increasingly small samples of data that make it increasingly difficult for regression models to reliably answer the questions being posed." Doc. 839-3, Mangum Reply ¶ 138.[22]

Though Defendants believe Stiroh's models show that "any CIIPP class member that purchases any Class Product from Costco, whole birds from Gordon Food Service, or breast

---

[21] Mangun notes that Stiroh's approach also finds that other critical variables—such as cost, GDP, seasonal effects, and the HPAI outbreak—also routinely register as statistically insignificant, which undermines the credibility of her interpretation of statistically insignificant overcharge coefficients. Doc. 839-3, Mangum Reply ¶ 127; *see also id*. ¶ 83 ("slicing and dicing the data up into hundreds and thousands of small samples leads to results that lack statistical significance in many important explanatory variables and are broadly invalid as a basis for drawing conclusions.").

[22] In response, Defendants point out that Stiroh limited her testing to only situations "with sufficient observations in the alleged benchmark periods and Class Period to determine if [Mangum's] model[] produce[s] an overcharge for individual DPPs." Doc. 963 at 8; *see* Doc. 839-2, Stiroh Report ¶ 95, ¶ 95(b). Stiroh defines sufficient observations as more than 100 observations, including over 30 observations in both the benchmark period and alleged Class Period in Mangum's data. Doc. 839-2, Stiroh Report ¶ 95, ¶ 95(b).

products from Sam's Club would not have paid any overcharge on those purchases," Mangum explains Defendants' interpretation is misleading. Doc. 890 at 12; Doc. 839-2, Stiroh Report ¶ 153. Mangum notes: "What Dr. Stiroh fails to mention is that in neither of her part category estimates for Costco, Sam's Club or Gordon Food Services does she find a negative and statistically significant overcharge." Doc. 839-3, Mangum Reply ¶ 194. As Mangum also explains, "[w]hen a regression model estimates a coefficient for a variable that fails a test of statistical significance, that does not necessarily mean that the variable being tested has no impact on the dependent variable." *Id*. ¶ 122. The lack of statistically significant results "is not proving the absence of an overcharge; rather, it is failing to provide clear evidence on way or the other." *Id*. ¶ 123. In other words, Stiroh cannot say with sufficient confidence that her results were not the result of random chance. *Id*. ¶ 122.

The Court is satisfied that Mangum's overcharge methodology can show predominance as to impact, particularly where most of Stiroh's sub-regressions show statistically significant results and virtually all of the statistically significant results were positive and point toward a finding of common impact. Doc. 839-3, Mangum Reply ¶ 123.[23] Under these circumstances, the Court is unconvinced that Mangum's overcharge regression results should be excluded due to individual sub-regressions that returned statistically insignificant results for some customers based on small data sets. The Court's finding is in line with the *Broilers* court which reasoned that defendants' proposal to "unpool" the data Mangum analyzed in that case "d[id] not show that Plaintiffs'

---

[23] Of the 862 total customer-specific regressions Stiroh ran, 490 have statistically significant coefficients and 466 (over 95 percent) of those were positive. Doc. 839-3, Mangum Reply ¶ 123. Further, 740 of the 862 customer specific regressions (about 86%) have positive coefficients (including statistically significant and insignificant). *Id*; *see also id*. ¶ 194 (of the 137 [customer-part] regressions that delivered any statistically significant result, over 97.8 percent are positive."); *see Tuna*, 332 F.R.D. at 324 (Mangum noting that "looking at only the statistically significant results, 98% of the DPPs showed positive overcharges. And, looking at all customers that produced any type of result in [defendants'] model—statistically significant or not—94% had positive overcharges.").

experts' models are so unreliable that any of them should be excluded from the case." *Broilers*, 2022 WL 1720468, at *18. Here, the structure of the turkey market, the documentary record, and basic principles of economics presented by CIIPPs show that there is evidence that the alleged conspiracy broadly affected direct purchasers of turkey products. Considering this evidence and Mangum's explanations about small sample sizes set forth above, Defendants' arguments go to the probative value, rather than the admissibility, of Mangum's overcharge regression results. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *4 (challenges as to the admissibility of expert's merits opinions "amounted to a battle of the experts that must be left for the factfinder to resolve."). Stiroh's criticisms, which boil down to an insistence that she appropriately applied Mangum's model to the 862 direct purchasers with sufficient data, does not alter this conclusion. As in *Broilers*, the best estimate of the overcharge for any direct purchaser is a "factual" issue to be "resolved at summary judgment or trial . . . not a reason to exclude either perspective or deny class certification." *Id.* at *16. Accordingly, Mangum's overcharge regression results are sufficiently reliable for use as common impact evidence. *Kleen*, 831 F.3d at 928, 929 (finding multiple regression analyses provided a reliable means of measuring common impact and damages in an antitrust class action).

**Pass-Through Regression:** Next, Defendants advance a series of arguments for excluding Mangum's pass-through model. Defendants assert that Mangum's pass-through model is unreliable and does not fit the case because it cannot show that any purported overcharge paid by the direct purchaser resellers who resold Class Products to the CIIPPs was passed through to all or nearly all CIIPP class members. To start, Defendants argue that Mangum failed to explain how he chose his data and contend this resulted in his use of an unrepresentative sample. They also observe that Mangum did not calculate the pass-through rates of each direct purchaser reseller who

resold Class Products to the CIIPPs. Rather, he calculated the average pass-through rate for 20 direct purchaser resellers and then applied it to all 160 direct purchaser resellers who resold Class Products to the CIIPPs. Defendants suggest that because direct purchaser resellers passed through overcharges at different rates, Mangum's use of a weighted average improperly "masks" the substantial variation he calculates for individual pass-through rates of direct purchaser resellers who resold to the CIIPPs.

These arguments miss the mark. Mangum thoroughly described the third-party data that his pass-through models analyze. Doc. 839-1 Mangum Report ¶¶ 227-229 & App. C. Mangum also used all of the usable data that Defendants and third-party distributors produced in this litigation, without performing any sampling. Doc. 1074, Oct. 9, 2024 Hearing Tr. 226:1-7. The data Mangum analyzed covered a wide range of distributor types, spanned over 17 years, and totaled over $2 billion in sales for relevant turkey products. Doc. 839-1 Mangum Report ¶ 227. At the hearing, Mangum explained that, in his experience of gathering information to do surveys or empirical results, 47 percent of the third-party data is substantial and a "very, very large" sample. Doc. 1074, Oct. 9, 2024 Hearing Tr. 225:16-22. Given the breadth and diversity of this data, Mangum concluded that his analysis of the CIIPP supply chain was sufficiently representative of the relevant time period, types of market participants, and class commerce. Doc. 839-3, Mangum Reply ¶ 185; Doc. 1074, Oct. 9, 2024 Hearing Tr. 226:9-227:1. Mangum also emphasizes that "[a]s a matter of economics, prices paid by CIIPP Class members do not need to be measured across every conceivable supply chain combination, since the prices charged by any supplier to commercial preparers are formed in the same market." Doc. 839-3, Mangum Reply ¶ 185. This opinion is based on the highly competitive nature of the foodservice distributor market and Defendants' documents and third-party statements supporting pass-through. Doc. 839-1, Mangum

Report ¶¶ 215-24.[24] Mangum explains that "basic economic principles dictate that pass through is not only expected but is necessary for distributors to remain in business." Doc. 839-3, Mangum Reply ¶ 178. Further, Mangum persuasively notes that the consistently high estimates of pass-through on representative class commerce demonstrates that his analysis is robust and a reliable measure of the overcharge that has been passed through to all or nearly all CIIPPs. *Id*. ¶ 185.

Moreover, it is unnecessary for Mangum to have calculated a pass-through rate for each direct purchaser reseller who resold Class Products to the CIIPPs to reliably show common impact. The appropriateness of extrapolating pass-through results from a sample of direct purchaser resellers to all indirect purchasers was properly upheld in other protein cases. *See Broilers*, 2022 WL 1720468, at \*19 (pass-through estimates based on 22 of 540 direct purchasers accounting for 65% of sales); *Pork*, 665 F. Supp. 3d at 1003–04 (granting Consumer Indirect Purchaser Plaintiffs' motion for class certification based in part on pass-through analysis "using data submitted by thirty-nine industry participants, who represent a variety of resellers in the pork supply chain"); *In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308, 332, 335 (S.D. Cal. 2019) ("*Tuna*"), aff'd sub nom., *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (granting indirect Commercial Food Preparer Plaintiffs' class certification motion based in part on pass-through estimate analyzing "data sets produced by Bumble Bee, COSI, StarKist/Del Monte, Costco, Dot Foods, Sam's Club, Sysco, US Foods, and Walmart"). Although Mangum's pass-through regression model's reliance on 46.3% of the market purchases is not as robust as his pass-through regression model's reliance on 65% of the sales found reliable in *Broilers*, the Court declines to finds an expert's use of 46.3% of market purchase data is by itself adequate justification

---

[24] *See also Pork*, 665 F. Supp.3d at 1004 (very competitive pork distribution market "means that there are small profit margins and it is more likely that overcharges would be passed through because distributors cannot absorb those losses."); *Tuna*, 332 F.R.D. at 333 ("basic economic theory demonstrates that the more competitive an industry, the higher the pass-through rate becomes.").

to find his pass-through methodology unreliable at the class certification level. Mangum's explanation of the economic principles of pass-through, the competitive environment in which third-party distributors operate, and Defendants' documents and third-party statements, when combined, provide support for his opinion that the data he used is sufficiently representative. Defendants' and Stiroh's criticisms may be relevant to the evidentiary weight of Mangum's pass-through testimony, but it is not a reason to question the reliability of his method. Defendants remain free to challenge the representativeness of the 20 direct purchaser resellers through cross-examination or presentation of contrary evidence at trial.

Defendants' contention that Mangum's regression models inappropriately used a weighted average in his pass-through calculation is equally unavailing. According to Defendants, Mangum's pass-through model is unreliable because he calculates individual pass-through rates that vary significantly (ranging from 89% to 131%) and then masks the 42% variation by using a weighted average pass-through rate of 99.9% for all 160 direct purchaser resellers who resold Class Products to the CIIPPs. In the class certification context, other protein cases have accepted the use of average pass-through rates to show impact in indirect purchaser cases. *Broilers*, 2022 WL 1720468, at *19 (relying on Mangum's pass-through analysis that showed an average pass-through rate of 96% and rejecting defendants' arguments that "unpooling" or disaggregating the analysis prevented it from demonstrating pass-through); *Pork*, 665 F. Supp.3d at 994, 1004 (Commercial IIPPs' expert's analysis found average pass-through of approximately 100% based on average pass-through rates between 95.5% and 100.2%). While Defendants characterize the range of pass-through rates as a "substantial variation," Mangum explains the level of variation as "relatively modest." Doc. 839-3, Mangum Reply ¶ 180. Moreover, all of the specific pass-through rates Defendants highlight are positive. Doc. 888 at 36. At most, the variation Defendants cite shows

that distributors absorbed some of the alleged supra-competitive prices while passing on a portion of the overcharges to downstream purchasers. Defendants have thus not shown that any significant number of class members have been unharmed. In short, Defendants' challenge to the variation among individual pass-through rates and Mangum's use of averaging as part of his pass-through analysis clearly goes to the persuasiveness of Mangum's opinion, not its admissibility. *Broilers*, 2022 WL 1720468, at *19 (finding to the extent defendants' expert's "unpooling" pass-through analysis was sound, the 39% variation among pass-through rates of direct purchaser resellers was still sufficiently significant to demonstrate damages).

Defendants next assert Mangum's pass-through model is unreliable because some distributors marked up their prices and their pass-through rates were higher than 100%. Of the 20 direct purchaser resellers, 12 show a pass-through rate greater than 100%. Mangum explains that "[w]hen resellers rely on constant percentage markups, the pass-through rate will be 100 percent plus the constant markup percentage." Doc. 839-1, Mangum Report ¶ 200. Defendants observe that by including pass-through rates above 100%, Mangum's "average pass-through" includes constant markups imposed by direct purchaser resellers independent of any purported overcharge that was supposedly passed through to a CIIPP class member. They argue that this also skews Mangum's "average pass-through" that he applies to all 160 direct purchaser resellers who resold Class Products to the CIIPPs. But a pass-through rate above 100% is consistent with Mangum's finding that distributors pass through overcharges. Moreover, because Defendants do not contend that pass-through rates above 100% did not harm CIIPP class members, their argument does not suggest that some CIIPPs escaped the effects of the conspiracy. Defendants have thus not shown that the inclusion of such markups in the average pass-through rate compels a conclusion that Mangum's pass-through model is so lacking in reliability at this point in the litigation.

### CIIPPs' Common Proof of Impact

The next issue is whether CIIPPs can rely on common evidence to prove antitrust impact. CIIPPs have provided expert evidence that demonstrates they are capable of showing class-wide impact with common evidence. Mangum conducted a comprehensive economic analysis of the geographic and product markets, the structure of those markets, the documentary record, correlations in turkey prices, and multiple-regression models that analyzed the alleged conspiracy's price effects. *See* Doc. 839 at 39-44. Mangum's multiple regression models separately estimate both the breadth and magnitude of the conspiracy's effects on direct purchasers and CIIPPs. His analyses show that: (1) the conspiracy broadly affected direct purchasers of turkey products by causing them to pay supra-competitive prices, and (2) direct purchaser distributors always passed through some overcharges to CIIPPs and, on average, tended to pass through about 100% of the overcharges. Based on these findings, Mangum found that all or nearly all class members suffered some antitrust injury, which he confirmed by testing for impact at the individual class member level using a customer-specific regression methodology. The Court is satisfied that, for class certification purposes, Mangum's regression analyses are common proof that all or nearly all direct purchasers paid overcharges because of the conspiracy and passed those overcharges to the CIIPPs. *See Broilers*, 2022 WL 1720468, at *16; *Pork*, 665 F. Supp.3d at 1004.

### Defendants' Impact Arguments

Defendants contend that CIIPPs have failed to demonstrate that common proof can be used to establish that all or nearly all DPP class members were overcharged for their purchases of Class Products and that all or substantially all DPP class members passed on any alleged overcharge to CIIPPs. Defendants attack Mangum's methodologies on many of the same grounds as in their *Daubert* motion. They contend CIIPPs have failed to show a class-wide method of proving injury using common proof because: Mangum's overcharge model shows no overcharge for a significant

portion (38.5%) of all Class Product sales to direct purchaser resellers who resold to CIIPPs, Doc. 888 at 32-34; Mangum did not establish that his pass-through regression model used a representative sample, *id*. at 35; and Mangum's use of a weighted average in his pass-through calculations ignores the variation among individual pass-through rates, *id*. at 36-37.[25]  As previously discussed, Defendants' evidence and arguments do not show that Mangum's models are so unreliable that any of them should be excluded from the case at this time, and Mangum's overcharge and pass-through regression models are sufficient evidence regarding impact common to the class.[26]  In sum, the issues raised by Defendants do not undermine CIIPPs' showing that class-wide impact may be established through common proof. *Messner*, 669 F.3d at 819 ("common evidence and common methodology to prove a class's claims is sufficient to support a finding of predominance on the issue of antitrust impact.").  The Court finds CIIPPs have satisfied the predominance requirement as to antitrust impact and proceeds to consider antitrust damages.

---

[25] Defendants cite Sysco as an example of how Mangum's average pass-through rate is inadequate to show injury to substantially all class members.  Defendants state that record evidence demonstrates that Sysco does not "always" pass through costs increases from suppliers to customers, yet Mangum's model assumes a 99.9% pass-through rate for all Sysco sales to CIIPPs. Doc. 888 at 37.  This issue does not defeat class certification.  Sysco's data is consistent with Mangum's conclusion that "all or nearly all CIIPP Class Members" sustained impact. Doc. 839-1, Mangum Report ¶ 199.  Moreover, Mangum persuasively explains that "[w]hile 100 percent pass-through is how distributors generally operated, there are a number of reasons why one may not necessarily expect to see 100 percent pass-through across the board, including slight delays in implementing price adjustments or differences across third parties in that timing." *Id*. ¶ 232. Further, Mangum's finding that Sysco had a pass-through rate of 96% is strong evidence to support Mangum's opinion that pass-through was commonplace in the CIIPPs' supply chain.

[26] In addition, Defendants assert that the CIIPP class definition is fatally overbroad because it incorporates a wide variety of commercial entities and the proposed class "involve[s] sales that far exceed any acceptable threshold for uninjured class members." Doc. 888 at 46. In support, Defendants again claim that under Mangum's approach, there are no overcharges on more than 38% of the Defendants' sales into the CIIPP supply chain.  The Court rejects this argument for the same reasons discussed above concerning Defendants' *Daubert* challenge to Mangum's overcharge methodology.

### 3. Antitrust Damages

The parties dispute whether Plaintiffs' damages models demonstrate that damages are susceptible to common proof, so as to satisfy the predominance requirement. As for DPPs, Defendants argue that calculating damages for each DPP would devolve into individualized fact issues and predominate over issues to the class. Plaintiffs must show that "damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35. DPPs rely on Williams' testimony to show estimated damages for the proposed DPP class. Based on his overcharge regression analysis, Williams quantifies class-wide damages by comparing (1) prices direct purchasers paid for turkey products to (2) the estimated prices they would have paid but for the conspiracy. Doc. 830-2, Williams Report ¶¶ 14, 448. Similar to the arguments in support of their challenge to Williams' underlying overcharge regression showing impact predominance, Defendants again assert that (1) Williams' regression model "inappropriately relies on averages for an industry that lacks uniformity" and (2) Stiroh's customer-specific, product-specific, and Defendant-product-category-specific regressions show Williams would assign damages to transactions where putative class members did not pay an overcharge. Doc. 877 at 58-59. For the reasons already discussed in relation to Defendants' impact predominance arguments, these arguments fail to undermine DPPs' contention that their damages theory is susceptible to common proof such that class certification would be improper.

Further, on the issue of averages, "multiple regression analysis, by definition, makes use of average to identify underlying trends in a particular industry or data series, . . . and is generally considered an appropriate tool for estimating antitrust damages on a class-wide basis." *In re Steel Antitrust Litig.*, 2015 WL 5304629, at * 11 (N.D. Ill. Sept. 9, 2015); *see also In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *15 ("The fact remains that courts handling antitrust class actions routinely endorse the practice of using regression models to estimate an average

overcharge that can establish injury and measure damages on a classwide basis, so long as the regression analysis is based on a rigorous application of economic theory."). Here, any individual questions as to damages do not *predominat*e over the common ones. DPPs propose a common method for determining aggregate damages based on Defendants' actual sales and each DPP can be allocated a *pro rata* share of any recovery based on their volume of purchases.

Defendants present another argument to challenge DPPs' demonstration of damages using common proof. Defendants argue that individualized proof is necessary to determine that certain products DPPs purchased were Class Products at all, highlighting ground turkey sold by Cargill as an example. Defendants point out that over $1 billion in ground turkey sold by Cargill alone may have included breast or wing meat and therefore should be excluded from Class Product sales.[27] Doc. 877 at 60. But this kind of contention does not defeat class certification and determining whether a particular product falls into the Class Products definition does not need to be decided now. As the Seventh Circuit explained in *Kleen*, "Rule 23 does not demand that *every* issue be common; classes are routinely certified under Rule 23(b)(3) where common questions exists and predominate, even though individual issues will remain after the class phase." *Kleen*, 831 F.3d at 922 (emphasis in original); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015) ("It has long been recognized that the need for individual damages determinations at [a] later stage of the litigation does not itself justify the denial of certification."); *Messner*, 669 F.3d at 815 ("It is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)."). The key common questions posed by DPPs relating to antitrust conspiracy, impact, and aggregate damages predominate over any individualized

---

[27] Expressly excluded from DPPs' Class Products definition are "ground turkey products made from turkey breasts," "ground turkey products made from turkey wings," "organic ground turkey products," and "[no antibiotics ever] ground turkey products." Doc. 665, DPPs' Third Amended Class Action Cmplt. at 1, n.1.

questions of damages related to determinations about whether certain products fall into the Class Products definition. *See Tyson Foods*, 577 U.S. at 453 ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages . . . .'"). Having considered Defendants' objections to predominance as to DPPs' damages, the Court is satisfied that any individualized damages issues will not overwhelm the questions of law and fact that are common to the class.

This leads to a consideration of Defendants' challenges to CIIPPs' aggregate damages model. "The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself." *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009). Moreover, as the Seventh Circuit recognized in *Kleen*, the "determination of the aggregate classwide damages is something that can be handled most efficiently as a class action, and the allocation of that total sum among the class members can be managed individually, should the case ever reach that point." *Kleen*, 831 F.3d at 929; *see also Broilers*, 2022 WL 1720468, at *19.

CIIPPs rely on expert testimony from Mangum to show estimated damages for the alleged CIIPP class. To calculate the aggregate damages the proposed class suffered, Mangum estimated the portion of sales to direct purchasers that ultimately were resold to nationwide commercial food preparers, then estimated the portion of these relevant nationwide direct purchaser sales purchases that were made in Class States. Doc. 839-1, Mangum Report ¶ 234. Mangum next applied the relevant overcharge and the pass-through rate to the relevant sales, accounting for different overcharges for different time periods and different part categories. *Id.* ¶ 240. Defendants assert CIIPPs fail to provide a reliable method to show damage on a class-wide basis and individualized

inquires will be necessary for the same reasons they cannot show common impact, namely that Mangum's overcharge model shows no statistically significant overcharge for 38.5% of Defendants' sales that he estimates were resold to CIIPPs. Defendants' criticisms of Mangum's direct purchaser regressions fail for the reasons that the Court has already explained. CIIPPs have offered "a classwide method of proving damages," and Rule 23(b)(3)'s predominance requirement is thus satisfied with respect to the damages element. *Kleen*, 831 F.3d at 929; *see also Pork*, 665 F. Supp. 3d at 1008; *Broilers*, 2022 WL 1720468, at *19.

Defendants also insist that Mangum's damages model violates *Comcast* because he offers no analysis to separately measure the effect resulting from Defendants' alleged information sharing through Agri Stats (the basis of CIIPPs' "rule of reason" claim) versus Defendants' alleged coordinated production cuts (the basis of their "*per se*" claim). Doc. 888 at 38. Defendants criticize Williams' overcharge methodology on the same ground. *See* Doc. 877 at 67-68. As will be discussed below, there is no *Comcast* problem here.

### 4. Rule of Reason Violation

Turning to the next issue, Defendants maintain that DPPs' rule of reason claim lacks predominance because DPPs have not established that there is a single relevant product market. The rule of reason standard applies to DPPs' claim that Defendants improperly used Agri Stats. "Under a Rule of Reason analysis, the plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area." *Agnew*, 683 F.3d at 335. This requires plaintiffs to "identify a relevant product and geographic market in which [defendants] have or were dangerously likely to obtain monopoly power." *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020). Under the Sherman Act, a

relevant market consists of "commodities reasonably interchangeable by consumers for the same purposes." *Id.*

Williams opines that "the market for turkey meat produced in the United States is a relevant antitrust market." Doc. 830-2, Williams Report ¶ 9. According to market research, the "top three turkey cut types are ground turkey, whole bird, and turkey breast as measured by dollar sales in the U.S. in 2021." *Id*. ¶ 29. These are the three Class Products. Defendants do not challenge the geographic scope of the relevant market. Defendants primarily contend that the product market is too broad because whole birds are not in the same market as breast and ground turkey.

As a threshold matter, DPPs argue that they do not need to establish a relevant antitrust market because they have presented direct evidence of anticompetitive effects—namely, Williams' overcharge regression analysis. *See Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004) (noting that "there are some circumstances where to establish a violation of antitrust laws it is unnecessary to prove that defendant wielded market power in a properly defined product and geographic market, and may rely instead on direct evidence of anticompetitive effects."). DPPs additionally respond that they will use common evidence to prove that turkey is the relevant product market. Because DPPs have presented sufficient common evidence capable of proving a relevant product market, the Court need not resolve at this time whether DPPs may rely on Williams' analysis as direct evidence of anticompetitive effects. For example, Williams offers class-wide evidence demonstrating that the alleged cartel could profitably impose a Small but Significant and Non-transitory Increase in Price (a SSNIP) over the competitive price level for turkey products.[28] Doc. 830-2, Williams Report ¶¶ 112-123. Williams also reaches his conclusion

---

[28] Williams explains that a "hypothetical monopolist" test is a widely accepted, standard econometric methodology for defining a relevant antitrust market. Doc. 830-2, Williams Report ¶ 9. That test asks whether a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present

that turkey meat constitutes a relevant product market by considering common evidence that: (1) industry participants and consumers consider it a unique market, *id*. ¶¶ 52-63; (2) turkey products have different characteristics and uses than other meat products, *id*. ¶¶ 64-76; (3) turkey has unique production facilities, *id*. ¶¶ 77-88; (4) demand for turkey is inelastic with no close demand substitutes, *id*. ¶¶ 89-96, 104-106; (5) turkey has a distinct pricing structure compared to other meat categories, *id*. ¶¶ 97-103; and (6) buyers of turkey utilize specialized vendors, *id*. ¶¶ 107-110; *see also* Doc. 938 at 46-48.

Defendants' position that DPPs cannot establish predominance because whole birds are not in the same market as breast and ground turkey is not persuasive at this stage. For purposes of class certification, the relevant question is whether common evidence can be used to define the relevant product market. Whether DPPs have correctly defined the relevant product market is a question which applies to the claims of all class members and the scope of the relevant product market is not an issue that affects different class members differently. Williams' opinion is sufficiently supported to allow a finding that DPPs have met their burden to show that evidence common to the class is capable of answering the question of whether the relevant product market is turkey meat. Thus, the Court finds that Williams demonstrates that DPPs' rule of reason claim is capable of proof through common evidence.

Defendants argue that DPPs' rule of reason claim suffers from an additional problem that precludes a finding or predominance. They maintain that Williams' overcharge regression model does not measure the purported effect on turkey prices, if any, attributed to Defendants' subscriptions to Agri Stats and EMI. Defendants further claim that DDPs' inability to certify a class on their rule-of-reason claim on this basis means their *per se* claim cannot be certified under

---

and future seller of a product or products likely would impose at least a SSNIP on at least one of the products. *Id*.

*Comcast* because Williams' overcharge regression does not attempt to disaggregate the alleged price effects specific to that claim.

But the same conduct underlies both DPPs' *per se* and rule of reason claims. As alleged in the Complaint, DPPs' first claim for violation of Section 1 of the Sherman Act under a rule of reason analysis is based on Defendants' alleged unlawful agreement to exchange production and pricing information via Agri Stats, which artificially inflated the price of turkey. And DPPs' second claim for violation of Section 1 of the Sherman Act under a *per se* analysis is based on that same conduct, as well as additional evidence, *e.g.*, direct communications among Defendants, providing proof of a horizonal agreement to artificially inflate turkey prices. As the *Broilers* court explained, "rule of reason claims are premised on the allegation that Defendants' sharing of information through Agri Stats had a substantial anticompetitive effect," and the "per se claim is also based, in part, on the same information sharing allegation," as "sharing Agri Stats reports was one of the primary means by which Defendants facilitated the alleged price fixing agreement." *Broilers*, 2023 WL 6366777, at *1 (N.D. Ill. Sept. 25, 2023). "In other words, the per se and rule of reason claims are not separate claims, but merely different theories of liability for the same defendant conduct." *Id*; *see also Pork*, 665 F. Supp. 3d at 996 n.14 ("Technically, rule of reason and *per se* are not separate claims, but rather ways to analyze an antitrust claim.").

In *Kleen*, the Seventh Circuit rejected defendants' challenge based on *Comcast*, explaining that the "plaintiffs' damages expert in *Comcast* had estimated harm based on the assumption that all four theories of liability that plaintiffs offered had been established," while the class certified by the district court "was limited to only one of those theories," such that plaintiffs were "without a theory of loss that matched the theory of liability." *Kleen*, 831 F.3d at 926, 929. "All *Comcast* said" is that "the damages theory must correspond to the theory of liability." *Kleen*, 831 F.3d at

929. The *Kleen* court affirmed class certification where plaintiffs' expert modeled damages that corresponded to the theory of liability by "control[ling] for other influences on price" and "isolat[ing] the impact of the conspiracy" using a "dummy variable." *Id*. at 929.

This case is unlike *Comcast* as both of DPPs' theories remain in the case. *Pork*, 665 F. Supp.3d at 988. Moreover, as in *Kleen*—and *Tuna*, *Broilers*, and *Pork*—Williams (and Mangum for CIIPPs) performed an overcharge regression analysis to determine "prices that would have prevailed" but for the conspiracy. Doc. 830-2, Williams Report ¶¶ 347-370. By "[p]lugging in known prices and market factor data from the class period and running the regression equation to solve for the dummy variable," Williams "calculate[d] the portion of price not accounted for by the market factors." *Broilers*, 2022 WL 1720468, at *12. That method can be used to provide a measure of damages for Defendants' alleged price-fixing in violation of Section 1 of the Sherman Act, whether analyzed under *per se* or rule of reason theories. As Williams explains, "[t]he dummy variable regression methodology does not require separate control variables for specific alleged actions taken by the Defendants in formulating and carrying out the challenged conduct in order to reliably estimate the total effect of the challenged conduct." Doc. 830-3, Williams Reply ¶ 168; Doc. 938-42, Williams Dep. 100:17-101:1. In short, DPPs' *per se* and rule-of-reason claims do not involve different damages theories which require separate damages models. *See In re VHS of Michigan, Inc.*, 601 F. App'x 342, 343-44 (6th Cir. 2015) (Because expert's damages calculation applied to either theory of anticompetitive conduct—the per se wage fixing claim and the rule of reason claim—damages were not improperly aggregated under *Comcast*). Lastly and contrary to Defendants' contention, Williams' overcharge regression model's ramp-up and benchmark periods align with the basis for the DPPs' rule of reason theory. *See* Doc. 938 at 50; Doc. 830-3, Williams Reply ¶ 130. Accordingly, the Court finds that Williams' overcharge regression model is capable

of measuring the effects of the alleged conspiracy and consistent with DPPs' rule of reason theory.[29]

### 5. State Law Claims

Moving on to CIIPPs' state law claims, CIIPPs bring claims under the antitrust laws of 23 states, the consumer protection statutes of 13 states, and common law unjust enrichment claims under 24 states and Washington D.C. Defendants argue class-wide treatment is inappropriate because the relevant state laws governing their conduct vary greatly. "[T]he Seventh Circuit has upheld decisions to certify a nationwide class so long as 'the central questions in the litigation are the same for all class members.'" *Al Haj v. Pfizer Inc.*, 338 F. Supp.3d 741, 757 (N.D. Ill. 2018) (quoting *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010)). Although class certification will sometimes "be inappropriate" when recovery "depends on law that varies materially from state to state," plaintiffs can avoid this problem: "[b]y relying principally on federal substantive law, the representative plaintiffs [may] follow[] the pattern of antitrust and securities litigation, where nationwide classes are certified routinely even though every state has its own antitrust and securities law, and even though these state laws may differ in ways that could prevent class treatment if they supplied the principal theories of recovery." *In re Mexico Money Transfer Litigation*, 267 F.3d 743, 746-47 (7th Cir. 2001). Moreover, in other indirect purchaser protein cases, courts have found that the need to apply multiple states' laws did not preclude certification of CIIPPs' claims. *Pork*, 665 F. Supp.3d at 1009-10 ("discrepancies in state law are not material" and "will not confuse the jury"); *Broilers*, 2022 WL 1720468, at *20; *Tuna*, 332 F.R.D. at 346

---

[29] For the same reasons, the Court likewise rejects Defendants' argument that Mangum's damages model violates *Comcast* because he offers no analysis to separately measure the price effect resulting from Defendants' alleged information sharing through Agri Stats versus Defendants' alleged coordinated production cuts.

(certifying thirty-two individual statewide classes under the antitrust and consumer protection laws of those states).

Defendants contend that CIIPPs cannot establish predominance or superiority because they have not presented a manageable way to address the material variations in the many state laws governing their claims. Defendants note that an extensive analysis of state law variations is required by CIIPPS to address whether differences in state law may swamp any common issues. For their part, CIIPPs contend that the purported variations in state law are not material to their claims and can easily be managed. Plaintiff have provided an analysis of the state antitrust statutes that are construed in harmony with the Sherman Act and authority that allows indirect purchasers to recover damages from a horizontal antitrust violation via the state's consumer protection or unjust enrichment law. *See* Docs. 838-1, 838-2, 838-3.

Any variation among states regarding antitrust, consumer protection, and unjust enrichment laws does not preclude a finding of predominance here. First, Defendants argue that CIIPPs have not presented a manageable way to try their state antitrust claims in a single trial where some state antitrust statutes require courts to prevent duplicate liability, some states provide for actual damages, but not enhanced damages, and some states require additional proof for higher damages (such as flagrant or willful conduct). Regarding duplicative liability, CIIPPs' review of the state antitrust statutes confirms that they contain parallel language concerning the avoidance of duplicative liability. *See* Doc. 838-1; Doc. 929-1; *see also Pork*, 665 F. Supp.3d at 1009 (finding "any differences in antitrust duplicative liability provisions are not material because most states have such provision, and the states' antitrust laws are harmonious with the Sherman Act."). Moreover, even if the state laws differed, there is no risk of duplicative liability in connection with CIIPPs' claims because there is no other class that could potentially claim duplicative damage. No

66

other class claims damages for meals sold by the restaurants and entities that make up the proposed CIIPPs class.

Further, the differences in the availability of statutory damages and the showing required to recover them do not present an obstacle to class certification. Mangum calculated the volume of commerce for each state in the proposed class. Doc. 839-1, Mangum Report ¶ 239, Fig. 47. This state-by-state calculation allows Mangum to easily calculate the damages due to class members for every state in the class pursuant to any *in limine* rulings the Court enters regarding the availability of enhanced damages. The Court is also satisfied that some states' requirement of a "flagrant" or "willful" antitrust violation to recover statutory damages will not create manageability problems. The required proof can be handled through a special verdict form to ascertain whether the alleged conspiracy rose to the level of a flagrant or willful violation. *In re HIV Antitrust Litig.*, 2022 WL 22609107, at *16 (N.D. Cal. Sept. 27, 2022) (concluding that some states' antitrust laws limiting damages to actual damage or only allowing for enhanced damages based on a higher showing of flagrant or willful conduct is a "relatively minor variation and does not overwhelm the common issues on liability"). Accordingly, the potential damages issues Defendants raise do not overwhelm the common issues and make class treatment inappropriate. *Tyson*, 577 U.S. at 453.

The Court also dismisses Defendants' argument that there is variation among the state antitrust laws as to their treatment of in-state versus out-of-state commerce which would require application of differing legal standards in an individualized process. Given the fact that Plaintiffs allege that the conspiracy made use of Agri Stats to share competitively sensitive information and Agri Stats accounted for about 95% of the turkey industry, CIIPPs will likely prove some intrastate activity in each of the states where Defendants operate. *See Broilers*, 2022 WL 1720468, at *20

67

(finding some states' requirement of intrastate activity in addition to interstate activity did not preclude finding that class action was superior method of resolving the plaintiffs' claims). Thus, differences in state antitrust laws involving treatment of in-state versus out-of-state commerce do not render a multi-state class action unmanageable in this matter. Lastly, Defendants' string cite of cases, accompanied by the statement that "courts in many states have found differences between federal and state antitrust laws," does not demonstrate that any differences in state law are material and relevant to CIIPPs' claims. *See* Doc. 888 at 44-45; Doc. 930 at 25 n.18.

In addition to state antitrust laws, Defendants argue that variations in states' consumer-protection and unjust-enrichment laws would require a jury deciding liability to navigate multiple legal standards and different elements. The Court is not convinced that the differences in laws are material here where CIIIPs premise their state consumer protection and unjust enrichment claims on proof of an antecedent violation of federal antitrust law. *See Pork*, 665 F. Supp.3d at 1010 ("[D]ifferences that typically defeat class certification in other cases are not material in this matter because unjust enrichment claims are nearly identical in the antitrust context."); *Broilers*, 2022 WL 1720468, at * 20 (finding "differences in consumer protection law concerning reliance and intent are simply not relevant to a price-fixing claim. Similarly, any state where the unjust enrichment claim is the primary basis for recovery will be satisfied by proof of a Sherman Act violation"). Defendants also raise the issue of different limitations periods between the various states, and in some instances, between the various claims within a state. But "[a]s long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)." *In re Linerboard Antitrust Litig.,* 305 F.3d 145, 162 (3d Cir. 2002). Here, Defendants have not shown that differences in applicable limitations periods are significant and

unmanageable. *See Broilers*, 2022 WL 1720468, at *20 (finding "the effect of different states' varying statutes of limitations" "is only relevant to the extent of damages and can be easily addressed by excluding sales outside the relevant periods."); *Tuna*, 332 F.R.D. at 337-38 (same); *In re HIV Antitrust Litig.*, 2022 WL 22609107, at *15 ("differences in limitations periods can be managed at trial via jury instructions and verdict form.").

In the end, it is clear that the trial will primarily focus on common proof of Defendants' alleged anticompetitive conduct, CIIPPs' expert economic evidence, and Defendants' effort to rebut that evidence. Plaintiffs have made a sufficient showing at this point that class certification will not present insuperable state law obstacles. As the case moves forward, if material variations in state laws impose manageability problems that are not yet evident at this stage of the proceedings, the Court has the authority to adjust the class definition including through creating subclasses as appropriate. *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 477 (N.D. Ill. 2009), *aff'd* 606 F.3d 301 (7th Cir. 2010) ("Courts have created subclasses to manage any potential conflicts among different state's laws."). Further, the Court may "group[] state laws and certify[] subclasses" of states with materially similar laws. *Id*; *Thomas v. UBS AG*, 706 F.3d 846, 849 (7th Cir. 2013) ("The problem of choice of law created by a nationwide class action governed by laws of different states or other jurisdictions is usually solved by the district court's certifying a different subclass for class members in each jurisdiction whose law differs in some relevant respect from that of the other jurisdictions in which members of the class reside or the allegedly unlawful acts were committed."). The Court also retains discretion to narrow or decertify the class if the task of construing the various state laws becomes unmanageable. Fed. R. Civ. P. 23(c)(1)(C).

### B. Superiority

In addition to predominance, Rule 23(b)(3) requires that the Court determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23(b)(3). "When a court finds that common questions predominate, they generally also find that superiority is also met." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *16; *Moehrl*, 2023 WL 2683199, at *22 ("[T]he predominance and superiority inquiry are intertwined: generally, the more that common issues predominate, the more likely that a class action is the superior vehicle for deciding the controversy.") (internal quotes and citations omitted). "Superiority will be found when a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *16 (internal quotes and citation omitted).

Defendants do not dispute that a class action is the superior method for the DPP class to bring their claims. Given that the vast majority of class members have not opted out and for most class members, the individual damages are smaller than the resources required to litigate individual suits, a class action is a superior vehicle for deciding DPPs' case. Other than their argument above regarding variations in state laws governing indirect purchaser actions, Defendants do not make any additional arguments about whether a class action is the superior means of resolving the CIIPPs' claims. Multiple lawsuits by the large number of DPP and CIIPP class members allegedly injured by Defendants' antitrust violations would be costly and inefficient. Moreover, the Court's findings as to predominance support a finding that a class action is superior method to address Plaintiffs' claims. Because the same alleged illegal anticompetitive conduct by Defendants gives rise to each class member's injury, adjudicating this issue on a class-wide basis is the superior method of resolving Plaintiffs' claims. *Tuna*, 332 F.R.D. at 329, 336 (S.D. Cal. 2019) ("Any trial— whether it involves a single plaintiff or a class—will involve the same legal questions and evidence regarding Defendants' conduct."). As in *Broilers*, there is not "another available method to address

Plaintiffs' claims that is superior to certifying a class." *Broilers*, 2022 WL 1720468, at *20. Accordingly, Plaintiffs satisfy Rule 23(b)(3)'s requirement that a class action is the superior method of resolving the injuries caused by Defendants' alleged conspiracy.

## IV. Ascertainability

"Aside from the textual requirements provided for in Rule 23, the Seventh Circuit also requires plaintiffs to prove that the proposed class is ascertainable." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *8. Defendants do not challenge the ascertainability of the DPP class or CIIPP class. The Court finds that both classes are ascertainable because they are "defined clearly and based on objective criteria." *Mullins*, 795 F.3d at 659. The classes in this case do not suffer from any of the "three common problems" that have caused unascertainable classes: vagueness, classes defined by subjective criteria, and classes defined in terms of success on the merits. *Id*. at 659-60. Both classes are therefore sufficiently ascertainable for certification.

## CONCLUSION

For the reason stated above, and after conducting the required rigorous analysis, Plaintiffs' motions for class certification [828, 836] are granted. Defendants' motions to exclude the expert opinions of Dr. Russell Mangum and Michael A. Williams, Ph.D. [887, 893] are denied. Plaintiffs' motion to exclude expert testimony of Lauren Stiroh [831] is granted in part and denied in part. Direct Purchaser Plaintiffs' motion to strike [941] is granted in part and denied in part. Pursuant to Rule 23(g), the Court appoints: (1) Hagens Berman Sobol Shapiro LLP and Lockridge Grindal Nauen P.L.L.P., which the Court previously appointed as interim co-lead class counsel (Doc. 143), to serve as co-lead class counsel for the DPP class and (2) Michael J. Flannery of Cuneo Gilbert & LaDuca, LLP and Sterling Aldridge of Barrett Law Group, P.A., whom the Court previously appointed as interim co-lead counsel, to serve as CIIPP Class Counsel (Docs. 433, 950).

**SO ORDERED.**

Dated:  January 22, 2025

_____

Sunil R. Harjani
United States District Judge