**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

*IN RE TURKEY ANTITRUST LITIGATION*

Case No. 19 C 8318

Judge Sunil R. Harjani

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendants[1] move for summary judgment on Plaintiff Carina Ventures LLC's Amended Complaint. This litigation involves allegations of a widespread conspiracy among turkey processors to artificially suppress turkey production and increase turkey prices. Carina, however, has never purchased any turkey products. Instead, Sysco Corporation, a wholesale distributor of food and other products, assigned 100% of its claims in this case to Carina as part of a settlement with its litigation funder, Burford Capital, LLC. Carina is simply an investment vehicle created for the sole purpose of prosecuting the antitrust claims against Defendants. Defendants oppose this arrangement and seek the application of a public policy prohibiting litigation funders from litigating an antitrust claim after receiving that claim through assignment. As such a policy does not exist at common law, in a federal statute, or any federal rule, Defendants try to will it into existence by weaving together a tapestry of existing legal doctrines about third-party intervenors and litigation funders.

---

[1] Defendants bringing this motion are: Perdue Farms, Inc. and Perdue Foods LLC; Farbest Foods, Inc.; Cargill Incorporated and Cargill Meat Solutions Corporation; Butterball LLC; Foster Farms, LLC, and Foster Poultry Farms LLC; Cooper Farms, Inc.; Hormel Foods Corporation and Jennie-O Turkey Store, Inc.; House of Raeford Farms, Inc.; Prestage Farms of South Carolina LLC, Prestage Farms, Inc. and Prestage Foods, Inc.; Agri Stats, Inc. and Express Markets, Inc.; Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc., and The Hillshire Brands Company.

Defendants' policy arguments admittedly have some appeal. Our federal judicial system exists to remedy the wrongs of individuals and companies through litigation. Its purpose is not to act as a market for investment vehicles to buy claims from the allegedly injured for a price, and then seek to make a return on that investment through federal litigation. That is exactly what Carina hopes to do, as the original turkey purchaser (Sysco) is long gone, and Carina's only interest is maximizing a settlement amount or a verdict in its favor to make a profit for its investors. To its credit, it is not shy about this objective.

But this Court is not the proper branch of government for Defendants' complaints and doomsday scenarios. Federal judges are not in the business of creating public policy for new developments in litigation that might be disfavored. That role falls to Congress, whose job it is to write the statutes and rules that govern federal litigation. Congress has not yet spoken on the matter. For the reasons discussed below, the Court denies Defendants' motion for summary judgment. [1125].

## BACKGROUND

As the present motion for summary judgment does not address the merits of the underlying antitrust allegations, the Court need not recount that background here. Instead, to understand Defendants' motion, the relevant facts recounted here are narrowly focused on the actions and relationships between Sysco, Burford, and Carina.[2] Sysco, notably not a party to this lawsuit, is a

---

[2] The motion briefing and exhibits were all filed under seal with the parties also providing redacted versions. If the Court refers to a sealed document, it attempts to do so without revealing any information that could be reasonably deemed confidential. Nonetheless, if the Court discusses confidential information, it has done so because it is necessary to explain the path of its reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").

wholesale distributor of food and brought antitrust claims in several large protein-related antitrust actions concerning the chicken and pork industries. [1167] ¶¶ 22, 24, 25.

In September 2019, Burford approached Sysco to invest in Sysco's *Broilers* antitrust claims, which involved the chicken industry. *Id.* ¶ 24. Burford invested in *Broilers* in October 2019, followed by the *Pork* antitrust case in June 2020. *Id.* ¶¶ 24, 25. In December 2020, a litigation funding agreement between Sysco and various wholly-owned Burford subsidiaries was reached for Burford to finance Sysco's claims in *Sysco Corp. v. Tyson Foods, Inc.,* No. 18-cv-00700 (N.D. Ill.) ("*Broilers*"); *Sysco Corp. v. Agri Stats, Inc. et al.*, No. 21-cv-01374 (D. Minn.) ("*Pork*"); *Sysco Corp. v. Cargill Inc. et al.*, No. 22-cv-01750 (D. Minn.) ("*Beef*"); *Olean Wholesale Grocery Coop. v. Agri Stats, Inc. et al.*, No. 19-cv-8318 (N.D. Ill.) ("*Turkey*"); and *In re Keurig Green Mountain Single Serve Coffee Antitrust Litig.*, No. 14-md-2542 (S.D.N.Y.) ("*Keurig*").[3] *Id.* ¶¶ 26–29. Per this agreement, Burford invested more than $140 million in Sysco's antitrust claims. *Id.* ¶¶ 30, 31.

On March 31, 2022, the funding agreement between Sysco and the Burford subsidiaries was amended to include language that required Sysco to provide written notice of settlement offers to the Burford subsidiaries, and provided that Sysco "shall not accept a settlement offer without the [Burford subsidiaries'] prior written consent, which shall not be unreasonably withheld, provided however, that the [Burford subsidiaries] shall have no right to exercise control over the independent professional judgment of its Nominated Lawyers and shall not seek to impose a commercially unreasonable result with respect to settlement." *Id.* ¶ 34.

---

[3] Collectively, the antitrust cases brought against protein processors as a result of the Agri Stats claims are referred to colloquially by the parties as the *protein* cases or *protein* litigations. *See* [1130] at 16; [1166] at 7, 8; [1191] at 11. The Court will do the same.

Sysco then negotiated settlements with certain defendants in the *Beef*, *Pork*, and *Broilers* cases. *Id.* ¶ 37. Burford withheld its consent for these settlements because it thought the amounts were too low. *Id.* This spawned an arbitration in September 2022 that resulted in litigation in New York and Illinois federal courts in March 2023 between Sysco and Burford about whether Burford could enjoin Sysco from executing the settlements in *Beef*, *Pork*, and *Broilers*. *Id.* ¶¶ 40–42, 44. On June 28, 2023, Sysco and Burford entered into a settlement agreement to resolve their disputes, which included Sysco assigning its claims in the *Keurig*, *Beef*, *Pork*, *Broilers*, and *Turkey* antitrust litigations to Carina. *Id.* ¶¶ 52, 53. Carina is a wholly owned and controlled special purpose vehicle of Burford, which holds Burford's ownership interest in claims assigned to it by Sysco. *Id.* ¶¶ 4, 5, 8, 10, 20. Despite Defendants' sensational characterization of events, entirely absent are facts showing Burford manipulated or coerced Sysco into this agreement. The undisputed facts show Sysco and Burford fought over Burford's rights and abilities under the funding agreement. That dispute resulted in letters and legal briefs where Sysco stated it did not need Burford's approval to settle its antitrust claims. That debate was eventually settled to both parties' mutual satisfaction.

An astute reader may have noticed that the conduct in this *Turkey* case and the turkey producers and purchasers are largely uninvolved in the events that form the basis of this motion—the relationship between Burford and Sysco. This case was first filed on December 19, 2019, by a class of direct purchaser plaintiffs. [1]. The direct-action claims at issue in this motion were filed by Carina on July 21, 2023,[4] after the assignment of Sysco's claims to Burford, and consolidated into this action in July 2024. [1015]. Thus, Sysco never brought any claims itself in this litigation; Carina initiated and has litigated this case from the very beginning.

---

[4] *See Carina Ventures LLC v. Agri Stats, Inc. et al*, 1:23-cv-16948 (N.D. Ill.) for the record prior to consolidation.

## DISCUSSION

Defendants seek to convince this Court that there is an existing public policy that bars litigation funders from directly litigating cases through an assignment. The Court sees it differently. The most discussed and potentially applicable doctrine in this area—champerty—is not at issue in Defendants' motion. The other doctrines invoked are not directly on point. Thus, in the Court's view, Defendants essentially ask the Court to expand the common law by introducing a new public policy barring litigation funders from being assigned claims and prosecuting those claims independent from the assignor.

## I. Carina's Standing

Before reaching the merits of the arguments, the Court must address Defendants' contention that Carina lacks standing to bring these claims. [1130] at 19. But this argument can be swiftly dispatched with as Carina, through assignment, has legal and proper title of Sysco's antitrust claims. The Supreme Court has held "that where assignment is at issue, courts—both before and after the founding—have always permitted the party with legal title alone to bring suit[.]" *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 285 (2008). Further, district courts that have addressed Burford's subsidiaries standing in the *protein* cases have universally held that the subsidiary obtained both Article III and antitrust standing through assignment. *See In re Turkey Antitrust Litig.*, 727 F. Supp. 3d 756, 764–65 (N.D. Ill. 2024), *motion to certify appeal denied*, 2024 WL 5440057 (N.D. Ill. Oct. 16, 2024) (finding Amory had standing through Maines' assignment of its antitrust claim); *In re Broiler Chicken Antitrust Litig.*, 2024 WL 1214568, at *1 (N.D. Ill. Mar. 21, 2024) ("[T]here is no question that the assignment gives Carina standing."); *In re Pork Antitrust Litig.*, 2024 WL 511890, at *11 (D. Minn. Feb. 9, 2024), *aff'd*, 2024 WL 2819438

(D. Minn. June 3, 2024) ("[A]ntitrust standing, like Article III standing, can be obtained via an assignment[.]").

Contrary to Defendants' contention, the court's decision in *Pork* does not provide support to strip Carina of its antitrust standing. The issue in *Pork* was whether the court should, within its discretion under Federal Rule of Civil Procedure 25(c), substitute Carina as plaintiff for Sysco. The court found that when comparing Sysco and Carina, as a matter of public policy, Sysco was the better party to continue the litigation rather than allowing Carina to be substituted, but that they both had Article III and antitrust standing. *In re Pork Antitrust Litig.*, 2024 WL 511890, at *11. The question here is simpler; whether Carina has standing through assignment. Well-settled case law establishes that it does.

## II. A New Public Policy

Defendants effectively seek to establish a new public policy under which litigation funders cannot litigate claims they receive through assignment, and they do so by weaving threads of existing policies together so either individually or in combination, these policies would prohibit Carina from bringing these claims.

However, there is a notable public policy excluded from Defendants' arguments. Champerty is an ancient doctrine at common law that barred a third-party intermeddler from agreeing to fund a party to a lawsuit in exchange for proceeds of the action. *See* 14 Am. Jur. 2d Champerty, Maintenance, Etc. § 1. Defendants emphatically assert that they are not raising champerty. [1191] at 8, 16; [1231] at 2. This is likely because two district judges in the Northern District of Illinois have both rejected requests to dismiss a litigation funder based on champerty under similar circumstances.

Of principle importance to this discussion is Judge Kendall's prior opinion in this matter, referred to herein as the *Amory* matter.[5] *In re Turkey Antitrust Litig.*, 727 F. Supp. 3d at 758. Like Carina, Amory is an investment vehicle owned and controlled by Burford that never purchased turkey products from Defendants. Amory purchased Maines Paper & Food Services' antitrust claims from the liquidation trustee as part of Maines' bankruptcy, which included an assignment of its claims against turkey producers. The defendants[6] moved for summary judgment to dismiss Amory from the *Turkey* litigation because the doctrine of champerty prohibited it.

On March 28, 2024, Judge Kendall issued her decision. She first held that federal common law, not state laws on champerty, governs the assignability of federal antitrust claims. *Id.* at 761–62. Reasoning that while state law can decide the transferability of state claims, applying that principle to federal antitrust claims would be intolerable. *Id.* at 760. Since the question of assignability implicated the federal interest in who can bring an antitrust claim and that "Congress champions vigorous private enforcement of antitrust laws", the court held that applying a patchwork of differing state laws would not advance that policy. *Id.* at 761. Therefore, the assignability of federal antitrust claims must be based on federal law.

After establishing that federal law applied to the assignability of the claims, the court turned to the issue of whether champerty is prohibited by federal common law. Judge Kendall considered a number of avenues by which a federal policy in favor of champerty could be found, but rejected

---

[5] This case was initially assigned to Judge Kendall who oversaw this case until it was reassigned to the initial calendar of Judge Harjani on April 2, 2024. [917].

[6] The defendants who brought this motion were: Agri Stats, Inc.; Farbest Foods, Inc.; Cargill, Incorporated and Cargill Meat Solutions Corporation; Cooper Farms, Inc; Butterball LLC; Foster Farms, LLC, and Foster Poultry Farms, a California Corporation; House of Raeford Farms, Inc.; Perdue Farms, Inc. and Perdue Foods LLC; Hormel Foods Corporation, Hormel Foods, LLC, and Jennie-O Turkey Store, Inc.; The Hillshire Brands Company, Tyson Foods, Inc., Tyson Fresh Meats, Inc., and Tyson Prepared Foods. [800]

them all.[7]  In the end, Judge Kendall found that although champerty existed in the early days of American common law, at this point it "is an antiquated doctrine [that's] usefulness is outweighed by its hinderance to the federal interests of antitrust enforcement." *Id.* at 765.  As a trend in American common law, Judge Kendall noted that champerty has fallen out of favor with courts limiting rather than expanding its reach, with federal courts downplaying its importance. *Id.* at 765–66.  Thus, the court found that under federal law the "assignment agreement—between two sophisticated entities—is not void as champertous because the assigned cause of action arises from federal antitrust statutes." *Id.* at 766.

Judge Kendall also rejected defendants' argument that the prosecution itself was champertous and against public policy, finding that Amory, as assignee with legal title, was the bona fide plaintiff and that defendants' "fears of undue influence or manipulation by an overreaching litigation funder are not present here because Amory's and Burford's interests are

---

[7] First, Judge Kendall considered whether champerty was barred under federal common law and referred to the Restatement of Contracts for guidance.  While the Restatement (Second) of Contracts limits its comments to how the historic common-law approach to champerty has largely disappeared, the Restatement (First) of Contracts § 542 discussed the doctrine in more detail, stating a bargain for a share of the proceeds of a claim is illegal if the "bargain also includes (a) 'the party seeking to enforce the claim shall pay the expenses incident thereto, or that' (b) 'the owner of the claim shall not settle or discharge it.'" *Id.* at 762 (quoting Restatement (First) of Contracts § 542(1) (1932)).  Judge Kendall found that because Amory paid the trustee for the claims, regardless of whether Amory recovers from this suit, it owns the entire claim, so there is no division of proceeds.  Thus, the Restatement did not prohibit Amory's conduct. *Id.* at 763.

Judge Kendall also rejected the idea of fashioning a federal champerty policy by borrowing from state law—for the same reason that assignment itself should be evaluated under federal law—because of the "strong federal interest in encouraging vigorous private enforcement of federal antitrust statutes." *Id.*  Thus, applying state law would lead to fragmented enforcement and "otherwise meritorious claims falling through the cracks." *Id.* at 764.  Such fragmented enforcement would be untenable as a federal policy.

Next, Judge Kendall considered whether Amory was the type of plaintiff who is allowed to bring an antitrust claim. *Id.*  In cases where a plaintiff was found to not have antitrust standing, the Supreme Court was motivated by concerns about duplicative recovery if every person on a supply chain was able to claim damages for the same antitrust violation. *Id.*  As Maines relinquished its claim, this alleviated the concerns of duplicative recovery. *Id.*  Since there was only one party entitled to Maines' recovery after the assignment, Amory was not the type of plaintiff previously found to be unable to sustain an antitrust claim.  Thus, there was no issue with Amory bringing this claim.

united." *Id.* at 767. While noting that courts generally frown on third-party litigation financiers dictating how a litigation or settlement proceeds, that is not an issue when Burford is the owner of Amory, rather than a third-party. *Id.* Despite defendants' "ominous tone," that "condoning such an arrangement" would "open a floodgate of litigation funders[,]" the court was "not concerned with the doomsday future painted by Defendants" based on the facts in that case. *Id.* Thus, Judge Kendall dispatched with defendants' concerns about allowing a special purpose vehicle like Amory to continue with this litigation.

Also relevant to the champerty argument is Judge Durkin's decision in *Broiler*s about the same assignment from Sysco to Carina at issue here. The question before the court in *Broilers* was whether to allow the substitution of Carina for Sysco after the assignment. The defendants argued that the assignment was champertous and should not be allowed. *In re Broiler Chicken Antitrust Litig.*, 2024 WL 1214568, at *1. The court found the defendants lacked standing to bring this argument because, in Illinois the champerty defense can only be raised by a party to the contract. *Id.* Further, the court found that even if the defendants had standing, "Sysco is a sophisticated and large corporation" and not an "ordinary individual who is vulnerable to the temptation of a 'wicked' non-party[.]" *Id.* at *2. The court rejected the defendants' "melodramatic language" about their concerns for champerty as irrelevant to the "sophisticated funding agreement and related assignment of claims" between Sysco and Carina. *Id.*[8]

---

[8] There are several implications of these cases and Defendants assertion that they are not raising champerty on Carina's claims. [1191] at 8, 16; [1231] at 2. First, certain arguments raised by Carina can be swiftly addressed. Carina contends that Defendants lack standing to raise a champerty argument about an agreement between Carina and Sysco, because Defendants are not a party to that contract. [1166] at 14. Since Carina's standing argument focused on Defendant's inability to raise a champerty defense, which Defendants state they are not raising, this argument is moot. Likewise, Defendants assert that they are not re-raising the issues raised before Judge Kendall in the *Amory* decision, and thus the Court need not address the parties' collateral estoppel and law of the case arguments. [1191] at 14–15.

Were it as simple as Defendants not arguing champerty, these cases need not be addressed at such length. But, as will be discussed further below, while emphatically asserting they are not raising champerty, Defendants cite to champerty cases and other research material, including *Amory*, and the Restatement (First) of Contracts § 542, *When a Bargain for Champerty or a Contingent Fee Is Illegal*, and 7 Williston on Contracts § 15:4, *Maintenance and champerty— Status of particular agreements to encourage litigation*, (4th ed.), without naming them as champerty-based sources. [1130] at 15; [1191] at 8. Merely excising the word champerty from the argument in its memorandum does not make it a different argument. So, to the extent that Defendants are attempting to rely on a champerty argument without using that name, the Court will ignore those assertions and rather accept Defendants' unequivocal claim that they are not raising champerty. [1191] at 8, 16; [1231] at 2.

With that framework, the Court turns to the arguments Defendants do raise. Defendants seek to establish a policy prohibiting litigation funders from obtaining and independently prosecuting claims through assignment. Doing so would require the expansion of courts' existing hesitation to allow plaintiffs to cede control of decisions in litigation to litigation funders. Defendants attempt this expansion by implementing champerty principles to encompass the facts here, namely Burford's alleged control over Sysco before the direct action claim was filed. Under Defendants' theory, Burford exercised improper control over Sysco before this claim was brought by Carina. As this control infects the settlement and the assignment of claims to Carina, Defendants contend the assignment is unenforceable, and this litigation should be dismissed. Defendants also seek to have the assignment thrown out because of the alleged undue influence Burford had over Sysco when they settled. Carina responds that Defendants' arguments are baseless and largely focused on champerty principles which are not found in federal law.

10

Traditionally, courts have scrutinized litigation funders' control over the plaintiff's litigation because of a fear of undue influence or manipulation by an overreaching litigation funder whose only relation to the case is as a financer. *In re Turkey Antitrust Litig.*, 727 F. Supp. 3d at 767 ("Courts are against third-party financiers—with no relation to the plaintiffs or the case—from dictating how litigation or settlement should proceed."); *In re Pork Antitrust Litig.*, 2024 WL 2819438, at *4 (D. Minn. June 3, 2024) (disallowing the substitution mid-litigation of a litigation funder for its client when it only has an investment interest). That is not at issue here.

While Burford is a litigation funder, and previously provided Sysco with funding for these and other antitrust claims, Burford is *not* acting as a litigation funder for this case. Burford and Sysco were in a multijurisdictional dispute over actions taken pursuant to their funding agreement, which resulted in a global settlement where, as part of the settlement, Burford, through Carina, received an assignment of Sysco's claims in this case. Carina, not Sysco, is the Plaintiff in this case. Carina is a wholly owned subsidiary of Amory, which is a wholly owned subsidiary of Burford. [1167] ¶ 20. Therefore, although Burford controls the litigation strategy, it is not as a third-party litigation funder, but the parent company directing its wholly-owned subsidiary. Any policy against litigation funders is not relevant to Burford's relationship with Carina. Put another way, Burford could be a toy manufacturer, for example, and Carina could be its subsidiary prosecuting this case through assignment. Its business model is not relevant to the analysis in this particular case.

As Defendants cannot attack Burford's control of Carina, instead, they argue that it is Burford's nebulous "control of this litigation" that is objectionable. [1191] at 9. But when courts have considered a litigation funder's control of a litigation, it has been their control of the plaintiff's actions within that litigation. The idea is that the litigation funder should not exert

excessive control over major decisions in the litigation, such as about settlement. Defendants, however, seek to expand the prohibition to include all control and influence exerted by a litigation funder at any point in a claim's lifecycle, including before a litigation begins. But Defendants failed to identify any precedent to support this expansion.

For example, Defendants assert that courts regularly reject litigation funding agreements that give the funder control over key decisions in the litigation, citing *In re Nat'l Prescription Opiate Litig.*, 2018 WL 2127807, at *1 (N.D. Ohio May 7, 2018). [1130] at 13. In *In re Nat'l Prescription Opiate Litig.*, the court ordered that any litigant from recently transferred cases added to the multidistrict litigation using a third-party funder had to obtain from a sworn affidavit from counsel and lender that the financing did not "give to the lender any control over litigation strategy or settlement decisions, or [] affect party control of settlement." 2018 WL 2127807, at *1. The court stated that it would "deem unenforceable any [third-party contingent litigation financing] agreements that" did not comply with its order. *Id.* This case, however, only dealt with litigation financing agreements that funded plaintiffs. That does not apply here, as the arrangement between Burford and Carina, is not that of a litigation funder.

Similarly, Defendants rely on *In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prods. Liab. Litig.*, 405 F. Supp. 3d 612, 615–16 (D.N.J. 2019), to support the proposition that a court would find untoward circumstances where a third-party made ultimate settlement or litigation discissions. [1130] at 13. The court in *Valsartan* denied the defendants' request for discovery into the plaintiffs' litigation funding agreement, as it was not relevant to the litigation. 405 F. Supp. 3d at 615. However, the court noted that the discovery could be relevant "where there is a showing that something untoward occurred" but the defendants "parade of horribles" about what "could or may arise from litigation funding agreements" was insufficient.

*Id.* at 615–16. This case does not support Defendants' attempt to reach the Burford-Sysco relationship. First, unlike here, the litigation funders in *Valsartan* were funding the plaintiffs in that litigation. Further, even if the court were to consider what occurred between Burford and Sysco, like in *Valsartan*, Defendants do nothing more than raise theories about what undue things could have occurred, which is not enough. The absence of evidence is more acute here than in *Valsartan*. Defendants were granted discovery into Carina's assignment by this Court. But they have put forth *no evidence* to support their claims of misconduct—not from Burford, Carina, or Sysco.

Defendants' reliance on *Amory* to expand this policy is likewise unavailing as Judge Kendall found that Burford was "not an arms-length third party who is only financing the litigation" and instead that because it "owns 100% of Amory—Amory's claims are Burford's claims." *In re Turkey Antitrust Litig.*, 727 F. Supp. 3d at 767. Thus the "fears of undue influence or manipulation by an overreaching litigation funder are not present here because Amory's and Burford's interests are united." *Id.* The same ownership structure is present here with Burford wholly-owning Carina, so their fears are again not present.

To expand the bounds of the present common law involving litigation funders, Defendants turn to cases where courts used the champerty doctrine to void assignments. In essence, they are asking the Court to apply the ideas underlying the champerty doctrine—the prohibition of a third-party officious intermeddler—onto the conduct between Burford and Sysco, and use that as the basis to find the assignment to Carina unenforceable. As an example, Defendants rely on *Boling v. Prospect Funding Holdings, LLC*, 771 F. App'x 562, 579 (6th Cir. 2019), to support their ability to have the litigation funding agreement deemed unenforceable. [1130] at 13. In *Boling*, a borrower filed suit against a lender seeking a declaratory judgment that their litigation-funding

agreement was void and unenforceable under Kentucky's statute prohibiting champerty. The Sixth Circuit reviewed Kentucky's champerty law and Kentucky's policy against assignment of proceeds in personal-injury cases because it invites speculation on an individual's pain and suffering. 771 F. App'x at 577–82. The court then found that the terms of the funding agreement gave the lender substantial control over the plaintiff's personal injury litigation, in violation of Kentucky's champerty statute and public policy. *Id.* at 582.[9] But here, Defendants expressly assert that they are not raising champerty. [1191] at 8, 16; [1231] at 2. So champerty cannot be the basis to disregard the assignment.

With the champerty argument itself off the table, Defendants use the ideas underlying champerty to establish a method to reach back to attack the assignment using public policy. In essence, Defendants contend they should be able to attack the assignment based on their theorized policy against litigation funders, in the same manner that other defendants use champerty. While an intriguing concept, it fails for several reasons. First, while some courts have allowed a defendant, who is not a party to the assignment to argue champerty as a defense, it has been disallowed by courts in this district. *Compare Birner v. Gen. Motors Corp.*, 2007 WL 269847, at *3 (C.D. Ill. Jan. 26, 2007) (allowing GM to challenge the assignment based on champerty), *with In re Broiler Chicken Antitrust Litig.*, 2024 WL 1214568, at *1 (finding "champerty is only

---

[9] Defendants rely on several cases that reject assignments because of the champerty doctrine. *See Koro Co. v. Bristol-Myers Co.*, 568 F. Supp. 280, 288 (D.D.C. 1983) (finding the assignment was champertous under New York law and therefore null and void); *In re DesignLine Corp.*, 565 B.R. 341, 349 (Bankr. W.D.N.C. 2017) (barring a liquidating trustee from selling a portion of proceeds from three adversary proceedings under North Carolina champerty law); *Dist. Distributors, Inc. v. Heublein, Inc.*, 1971 WL 559, at *3 (D.D.C. May 28, 1971) (finding an assignment was invalid because it was not granted by someone with the proper authority, was granted without consideration, and effected a champertous action); *Hall v. State*, 655 A.2d 827, 829–30 (Del. Super. Ct. 1994) (found that an assignment of a claim from one prisoner to another to prosecute *pro se* in exchange for $1 was champertous under Delaware law); *Birner v. Gen. Motors Corp.*, 2007 WL 269847, at *3 (C.D. Ill. Jan. 26, 2007) (found an assignment in exchange for $1.00 to be evidence of champerty under Illinois law).

available as a defense by a party to a contract."). Even if the Court were to consider this the same way it would consider champerty, Defendants lack the ability to raise it.

Second, while champerty existed at common law, Defendants' proposed policy against litigation funders did not, and Defendants identified no precedent, statute, or rule that creates a public policy against litigation funders obtaining claims through assignment. Thus, even if the Court were to look back at the assignment, there is no basis on which to find it unenforceable. Instead, Defendants' argument is that *if* a policy against litigation funders existed in the manner Defendants propose, *then* it can be used defensively by third parties to dismiss claims brought by assignees in the same manner that some—but not all—courts allow defendants to use champerty. But that leaves unresolved the absence of a public policy against litigation funders obtaining claims through assignment.

Defendants also assert the assignment should be void because an underlying principle of the champerty doctrine is that a third party should not be able to bring a claim the original plaintiff would not bring.[10] According to Defendants, Sysco refused to bring this suit, so Burford, through Carina, is bringing litigation that would otherwise not have been brought. [1130] at 16–17. This is an incorrect interpretation of the facts before the Court. While it is true that Sysco did not file a direct action claim in this case before the assignment to Burford, Defendants' view that Sysco refused to bring that claim is unmerited. Although the Court granted Defendants' discovery into the nature of the assignment, Defendants provide *no statements* from Sysco that it was not intending to bring suit. Instead, Defendants rely on Sysco's arguments and expert's testimony in its litigation against Burford about the settlements in other *protein* cases, where Sysco argued that

---

[10] To establish that principle, Defendants rely on *Puckett v. Empire Stove Co.*, where the court, when asked to consider champerty, found that the plaintiff was not promoting litigation which would not have otherwise been maintained and instead had a "direct and immediate" interest in the cause of action, so the assignment was not against any public policy. 539 N.E.2d 420, 427 (Ill. Ct. App. 1989).

Burford did not have the authority to veto its settlements, and which do not reference the *Turkey* litigation. [1130] at 9, 12; [1132] Exs. 16, 17, 19. Carina and Defendants agree that Sysco had directed counsel to stop working on the *Turkey* complaint, and that Sysco stated to Burford: "Burford demands that Sysco file new claims and initiate new litigation against its suppliers of Turkey. The timing of any such filing is a strategic decision that belongs to the plaintiff, and is made in consultation with outside counsel." [1167] ¶¶ 50, 51. However, this letter does not state that Sysco never intended to file a complaint against Defendants, as opposed to being a member of the class, but rather that it declined to follow Burford's demands on the timing of such action. These acts do not establish that Sysco would never bring an action against Defendants, particularly given that Sysco had an agreement with Burford to fund its *protein* antitrust litigation, including in this case, for $140 million in upfront capital collateral. *Id.* ¶¶ 26–31.

Returning to first principles, the fundamental concerns behind why a court may scrutinize a litigation funding agreement are also not present here.[11] Defendants focus on the idea that Burford coerced Sysco into the settlement by withholding settlement approval under the funding agreement, which Defendants argue was unlawful.[12] But other than Defendants' insinuations that there is something improper about the settlement agreement, there are no facts which show anything untoward occurred. Sysco is not an easily manipulated or pressured party. Far from caving to Burford's demands, the undisputed facts in the record show that Sysco repeatedly took

---

[11] As an aside, Defendants also reference a policy in favor of settlement. This is irrelevant as there was never a settlement between Sysco and Defendants. Further, while federal courts have the authority and can encourage parties to settle, "they have no authority to force a settlement." *Goss Graphics Sys., Inc. v. DEV Indus., Inc.*, 267 F.3d 624, 627 (7th Cir. 2001). "If parties want to duke it out, that's their privilege." *Id.* So the fact that Carina may be more difficult for Defendants to settle with than Sysco might is not a matter for the Court to consider.

[12] Further to establish a claim for coercion requires evidence that Sysco had no alternative to signing the agreement. *Washington v. Chicago Bd. of Educ.*, 786 F. App'x 602, 607 (7th Cir. 2019). There is no such evidence in the record.

actions contrary to Burford's requests—not filing a direct action in *Turkey* when they originally agreed to and negotiating and agreeing to settlements Burford did not approve of. [1167] ¶¶ 32, 37. None of that is evidence of caving to a powerful third-party. Sysco is a large and sophisticated corporation, who has not complained about the settlement and assignment. [1192] ¶ 6. It does not need Defendants or the Court second-guessing its business or litigation decisions, particularly when, despite Defendants being granted discovery, there is no evidence in the record that Sysco was manipulated or coerced into the settlement to assign its claims to Carina. Further, the hostility towards litigation funders exercising control over plaintiffs in litigation is based on the fears about competing interests when both the plaintiff and the litigation funder are involved in the lawsuit. Here, Carina was assigned the entire claim, so there is no ongoing concern of a clash with Sysco. This is simply not a scenario in which courts scrutinize a litigation funding agreement.

Taking another step back, much of Defendants' briefing is spent discussing not the assignment, but the funding agreement between Burford and Sysco. [1130] at 16–17. Defendants posit that the funding agreement between Burford and Sysco violated public policy and should be deemed unenforceable, and as such, Carina should not be able to bring this suit because the assignment was obtained as a result of Burford extracting a settlement using an unenforceable contract. This argument has several holes, the first of which is that the funding agreement between Burford and Sysco is not at issue in this litigation. Sysco assigned its rights to Carina not through the funding agreement containing the language Defendants object to, but through a separate settlement agreement between Sysco and Burford. When laid bare, Defendants' argument is that because they believe the funding agreement between Sysco and Burford violated public policy— which no court analyzing that contract has found—it gave Burford undue influence over Sysco

which forced Sysco into the assignment, therefore this Court should find that the assignment agreement contained within a settlement between those parties is void.[13]

This novel approach is unsupported by the precedent on which Defendants rely. For example, Defendants rely on *Walton v. Jennings Comm. Hosp.*, where as part of the surgeon's settlement agreement with the hospital, he resigned from his position in exchange for the hospital dropping its investigation into sexual harassment allegations against him and not disclosing that investigation to his future employers. 875 F.2d 1317, 1318–19 (7th Cir. 1989). When a potential future employer inquired about plaintiff's record, an administrator informed them about the sexual assault investigation, and that he was asked to resign. *Id.* at 1319. The plaintiff then sued for breach of contract. *Id.* The Seventh Circuit found that the contract requiring the hospital to mislead the surgeon's future employers "violated Indiana's express public policy in favor of full disclosure to peer review committees." *Id.* at 1322. Therefore, since the underlying contract was against public policy, the claim for breach of contract failed. *Id.* at 1323. This case is easily distinguishable from the facts here. First, the contract found to be unenforceable formed the basis for the breach of contract claim being litigated; unlike here where the antitrust claim is not based on a breach of either the assignment or funding agreements. Second, the parties to the contract in *Walton* were also the parties in the case, unlike here where the Defendants have no connection to either of the contracts they object to. Third, there was an existing public policy which made the contract between the surgeon and the hospital in *Walton* unenforceable, but here there is no policy that

---

[13] The claim that the assignment from Sysco was unusual was already rejected in *Broilers*, which was one of the cases with a settlement at issue in the Burford-Sysco litigation. *In re Broiler Chicken Antitrust Litig.*, 2024 WL 1214568, at *1. The court found that both litigation funding agreements and assignments "are a fact of modern litigation." *Id.* The court was likewise unmoved by the argument that the assignment would extend the time of an already lengthy case. *Id.* Similarly, the court in *Pork* declined to rule on the validity of the assignment from Sysco to Carina when denying Carina's substitution as plaintiff. *In re Pork Antitrust Litig.*, 2024 WL 2819438, at *4.

voids the assignment from Sysco to Carina. While *Walton* stands for the proposition that a plaintiff cannot sue for breach of an unenforceable contract, it does not provide a basis to deem the assignment here void.

Defendants also try to support this theory by arguing that suits based on unenforceable assignments must be dismissed. [1130] at 17–18. But that principle relies on there being a basis to deem the assignment unenforceable. As an example, the assignment of claims in *Todd v. Franklin Collection Serv., Inc.*, was deemed void as against public policy because the plaintiff was using the assignment to engage in the unauthorized practice of law. 694 F.3d 849, 851 (7th Cir. 2012). This violated Illinois public policy which "forbids the assignment of legal claims to non-attorneys in order to litigate without a license." *Id.* Therefore, it did not matter if the claims would otherwise be assignable under Illinois law, because the assignment was a guise through which the plaintiff sought to practice law without a license. *Id.* at 852. But here there is no principle to deem the assignment unenforceable.

The cornerstone of these cases is the existence of a public policy which makes the underlying contract unenforceable. Defendants are missing that critical piece. Without it, the argument collapses.[14]

The Court also cannot invent the public policy Defendants request using its judicial discretion, in the way that the court in *Pork* could refuse the substitution of Carina for Sysco under its discretion pursuant to Federal Rule of Civil Procedure 25(c). In *Pork*, the court considered whether to allow for the substitution of Carina as plaintiff pursuant to Rule 25(c). The magistrate

---

[14] Moreover, Defendants lack standing to challenge the assignment and the settlement agreement as it has not caused them to suffer an injury in fact or a plain legal prejudice. *See Liu v. T & H Mach., Inc.*, 191 F.3d 790, 797 (7th Cir. 1999) (finding the defendant "lacks standing to attack any problems with the reassignment."); *Quad/Graphics, Inc. v. Fass*, 724 F.2d 1230, 1233 (7th Cir. 1983) ("[A] non-settling party must demonstrate plain legal prejudice in order to have standing to challenge a partial settlement.); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

judge weighed factors including Carina's standing and the public policy implications of allowing the substitution and ultimately decided that, although Carina had standing, as a matter of discretion not to allow the substitution. *In re Pork Antitrust Litig.*, 2024 WL 511890, at \*12. The district judge affirmed the decision, finding that the discretionary denial of the substitution of parties was based on valid policy concerns and therefore not clearly erroneous. *In re Pork Antitrust Litig.*, 2024 WL 2819438, at \*4. The question before this Court is not a discretionary one of weighing who would be the better party, Sysco or Carina, to bring these claims, but rather if a public policy exists that would *prohibit* Carina from bringing those claims and leading to a judgment for defendant. The Court finds it does not.

This is not to imply an endorsement of litigation funders activities in all scenarios. To date, the fears Defendants extol have not yet come to pass with there being almost no examples outside the *protein* antitrust cases where there has been 100% assignment of claims to a litigation funder. As litigation funders continue to be involved in the legal system, the bounds of their viability will be tested. There are certainly merits to allowing litigation funders to support claimants who could not otherwise afford to bring a lawsuit, and conversely, justly raised concerns about the implications of their involvement, particularly on using the federal courts as a means to generate investment profits. But it is not the place of federal courts to decree the wisdom of such a policy. Such policy decisions are generally best left to the legislature, who enact the will of the people.[15]

---

[15] *See Chicago, B. & Q.R. Co. v. McGuire*, 219 U.S. 549, 569 (1911) ("The scope of judicial inquiry in deciding the question of *power* is not to be confused with the scope of legislative considerations in dealing with the matter of *policy*.") (emphasis in original); *Gregg v. Georgia*, 428 U.S. 153, 175 (1976) ("(I)n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.") (quoting *Furman v. Georgia*, 408 U.S. 238, 383 (1972) (Burger, C. J., dissenting)); *Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rts. & Fight for Equal. By Any Means Necessary*, 572 U.S. 291, 314 (2014) (holding that absent authority in the Constitution or precedents the judiciary's role is not to set aside policy determinations made by voters); *Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711, 742 (N.D. Ill. 2014) ("But questions of societal value are generally for the Legislature, and a judge ought not 'succumb to the temptation to substitute his own "incandescent

The Court addresses only the issues before it on the facts presented by the parties based on the law as it stands today.  Broad public policy decisions about the appropriate scope of litigation funders' access to the courts reaches beyond the purview of the federal judiciary.

## <u>CONCLUSION</u>

For the reasons stated above, Defendants' motion for summary judgment [1125] is denied.

**SO ORDERED.**

Dated:  June 30, 2025

_____

Sunil R. Harjani
United States District Judge

---

conscience" for the will of the legislature.'") (quoting H. Shanks, The Art and Craft of Judging: The Decisions of Judge Learned Hand 13 (1968)); *Hunt v. Chicago Hous. Auth.*, 1985 WL 2927, at *2 (N.D. Ill. Sept. 26, 1985) ("It is a fundamental tenet of our judicial system that the law-making function is vested in the legislative branch.").