**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE TURKEY ANTITRUST LITIGATION | Case No. 19 C 8318 |
| | Judge Sunil R. Harjani |

## <u>MEMORANDUM OPINION AND ORDER</u>

**Table of Contents**

Introduction ……………………...…………………………………………………………………..1

Legal Standard …………………...………………………………………………………………..2

Analysis ..………………………………………………………………………………………….2

I.   *Per Se* Claim................................................................................................................... 3

   a.   Economic Evidence of an Agreement........................................................................ 4

   b.   Noneconomic Evidence/Plus Factors of an Agreement............................................ 6

      i.   Butterball.............................................................................................................. 14

      ii.   JOTS ................................................................................................................... 17

      iii.   Prestage ............................................................................................................. 19

      iv.   Foster.................................................................................................................. 21

      v.   Perdue ................................................................................................................. 24

   c.   Hub-and-Spoke Theory of Liability.......................................................................... 27

II.   Rule of Reason Claim.................................................................................................... 29

III.   Hormel Defendants' Liability....................................................................................... 34

IV.   Prestage Defendants' Additional Arguments............................................................... 35

   a.   Time Bar ................................................................................................................... 35

   b.   Prestage Farms of South Carolina, LLC .................................................................. 36

V.   Conclusion..................................................................................................................... 37

**Introduction**

This case involves an allegation that the nation's largest turkey processors engaged in a widespread conspiracy to reduce supply and increase turkey meat prices. The plaintiffs who bring these claims are direct purchasers of turkey products, such as national grocery stores, and indirect purchasers of turkey, such as restaurant chains.[1] The defendants are turkey producers, some widely known, such as Butterball and Jennie-O, and a benchmarking company, Agri Stats, that collected data on the turkey industry.[2] Plaintiffs claim that from January 1, 2010, through December 31, 2016, these defendants conspired to raise turkey prices by coordinating a supply restriction in violation of Section 1 of the Sherman Act. The coordinated production cuts at issue occurred from 2008 to 2009 and from 2012 to 2013, resulting in increased prices in the following years. Defendants purportedly arranged these cuts through direct communications with each other, and using the Agri Stats benchmarking reports and the National Turkey Federation's 2008 Outlook Report, all of which form the basis of their *per se* Section 1 claim. Plaintiffs also allege that Defendants' exchange of information through Agri Stats is an independent violation under the rule of reason theory.

Defendants move for summary judgment on all claims.[3] In this opinion, the Court addresses the motions raised by Defendants Butterball, JOTS, Prestage, Foster, and Perdue. For the reasons stated below, Butterball's motion for summary judgment [1560], JOTS' motion for summary judgment [1533], and Prestage's motion for summary judgment [1551] are granted in part on the rule of reason claims and denied on the *per se* claims. JOTS' motion for summary judgment [1533] is also granted for Hormel Foods, LLC, and Prestage's motion [1551] is granted for Prestage Farms of South Carolina, LLC. Foster's motion [1556] and Perdue's motion [1586] for summary judgment are granted in full. Accordingly, Butterball, JOTS, and Prestage will proceed to trial on Plaintiffs' Section 1 *per se* claim.

---

[1] There are three groups of Plaintiffs: Direct Purchaser Plaintiffs (DPPs), the Commercial and Institutional Indirect Purchaser Plaintiffs (CIIPPs), and Direct Action Plaintiffs (DAPs). The DAPs for the purposes of this Opinion are Winn-Dixie, Bi-Lo, Aramark, Carina, and Amory. As relevant to the motions before the Court, the Plaintiffs' claims are substantially similar and will be addressed jointly.

[2] The turkey processor defendants are Butterball LLC (Butterball); Cargill Inc. and Cargill Protein – North America f/k/a Cargill Meat Solutions Corporation (Cargill); Cooper Farms, Inc. (Cooper Farms); Farbest Foods, Inc. (Farbest); Foster Farms LLC and Foster Poultry Farms (Foster); Hormel Foods Corporation, Hormel Foods, LLC, and Jennie-O Turkey Store, Inc. (JOTS); House of Raeford Farms, Inc. (Raeford); Prestage Farms, Inc., Prestage Foods, Inc., and Prestage Farms of South Carolina, LLC (Prestage); Perdue Farms, Inc. and Perdue Farms LLC (Perdue); and Tysons Foods, Inc., The Hillshire Brands Company, Tyson Fresh Meats, Inc., and Tyson Prepared Foods, Inc. (Tyson). The other defendants are benchmarking company Defendant Agri Stats, Inc., and its subsidiary Express Markets, Inc. (Agri Stats). Cargill has settled with all Plaintiffs involved in the pending motions for summary judgment. Cooper Farms, Farbest, Raeford, Tyson, and Agri Stats have settled with the DPPs and CIIPPs. Direct Action Plaintiffs Winn-Dixie Stores, Inc., Bi-Lo Holdings, LLC, and Aramark Food settled and dismissed with prejudice their claims against Prestage. Direct Action Plaintiffs Winn-Dixie Stores, Inc. and Bi-Lo Holdings settled and dismissed with prejudice their claims against Tyson.

[3] The Court reserves ruling on all other motions, claims, and arguments pending, including the CIIPPs' state law claims, certain DAPs' additional theories of liability against other Defendants, and Defendants' arguments that certain DAPs' claims are time barred.

**Legal Standard**

Section 1 of the Sherman Act outlaws "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States[.]" 15 U.S.C. § 1. However, it has long been understood that Section 1 was only intended to outlaw "unreasonable restraints." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). Restraints on trade can be deemed unreasonable in one of two ways. First, a "small group of restraints are unreasonable *per se* because they 'always or almost always tend to restrict competition and decrease output.'" *Id.* (quoting *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723 (1988)). Second, restraints that are not unreasonable *per se* are judged under the rule of reason test. *Id.* at 541. Under the rule of reason, courts conduct a fact-specific assessment of defendants' market power and the market structure to assess the restraint's actual effect on competition, to distinguish between restraints with anticompetitive effects that harm consumers and restraints which stimulate competition that are in the consumer's best interest. *Id.* (quoting *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)).

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court does not "weigh the evidence and determine the truth of the matter" but rather determines whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255.

"Antitrust plaintiffs do not face a heightened burden to defeat summary judgment." *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 934 (7th Cir. 2018) (citing *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 707 (7th Cir. 2011)). Defendants do not win if they enunciate "any economic theory supporting" their behavior, but at the same time, plaintiffs' theory must be based on reasonable inferences. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468 (1992). "In deciding whether there is enough evidence of price fixing to create a jury issue," courts do not weigh conflicting evidence, and instead must ask whether, given the evidence as a whole, could the jury decide "it was more likely that the defendants had conspired to fix prices than that they had not conspired to fix prices." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655–56 (7th Cir. 2002). As part of this, Plaintiffs "'must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed' it." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 720 (7th Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). The Seventh Circuit has also cautioned district courts "to distinguish between the existence of a conspiracy and its efficacy[,]" as a conspiracy may still exist even if it was not very effective. *Fructose*, 295 F.3d at 656. Finally, at summary judgment, the court may not make credibility determinations, as that is within "the 'province of the jury.'" *Omnicare*, 629 F.3d at 704–05 (citing *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007)).

**Analysis**

With these principles in mind, the Court turns to the summary judgment motions filed by Defendants Butterball, JOTS, Prestage, Foster, and Perdue, who seek summary judgment on

2

Plaintiffs' *per se* and rule of reason claims.[4] The JOTS Defendants also request that Hormel Foods Corporation and Hormel Foods LLC be dismissed from this case because they are not involved in the conduct underlying Plaintiffs' allegations. [1581] at 7–9. Similarly, the Prestage Defendants argue that Prestage South Carolina should be dismissed from this case and that all claims against Prestage are time-barred. [1583] at 11–16.[5]

## I. *Per Se* Claim

Starting with Plaintiffs' *per se* claim,[6] Plaintiffs allege that Defendants conspired to reduce the market supply of turkey as a method of price fixing. Price fixing, including through a restraint on supply, is a *per se* violation of the Sherman Act. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002). As such, evidence about defendants' admission that they agreed to fix prices is all that plaintiffs need to prove their case. *Id.* But there is no such evidence here. Absent such an admission, plaintiffs "must present evidence from which the existence of such an agreement can be inferred[.]" *Id.* Like most price-fixing antitrust violation cases, Plaintiffs' claims are constructed from a collection of ambiguous statements and other circumstantial evidence, from which they contend an agreement can be inferred. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (quoting *Fructose*, 295 F.3d at 662).

Plaintiffs may rely on two types of evidence: economic and noneconomic. *Fructose*, 295 F.3d at 655. Economic evidence suggests that the defendants were not, in fact, competing, while noneconomic evidence suggests they were not competing because they agreed not to compete. *Id.* Within the first category, there are generally two types of economic evidence: evidence that the market was structured to make secret price-fixing feasible, and evidence that the market behaved in a noncompetitive manner. *Id.* "Neither form of economic evidence is strictly necessary, since price-fixing agreements are illegal even if the parties were completely unrealistic in supposing

---

[4] As the Court cautioned the parties in the Order Concerning Summary Judgment Proceedings, the Court required strict compliance with Local Rule 56.1. [1426]; *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). The Court reviewed and considered the parties' statements of facts and statements of additional facts and enforced all the rules provided in the Court's prior Order. As previously advised, the failure to provide support for a statement of fact resulted in that alleged "fact" being disregarded and the failure to provide support for an alleged fact dispute resulted in the fact being deemed admitted. L.R. 56.1(d), (e); *Friend v. Valley View Community Unit School Dist. 365U*, 789 F.3d 707, 710–11 (7th Cir. 2015); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218–19 (7th Cir. 2015).

[5] The parties filed under seal certain exhibits to their summary judgment briefs. If the Court refers to sealed material, it attempts to do so without revealing any information that could be reasonably deemed confidential. Nonetheless, if the Court discusses confidential information, it has done so because it is necessary to explain the path of its reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").

[6] Plaintiffs' *per se* claims are as follows: (1) DPPs – Claim II [665] ¶¶ 581–92; (2) CIIPPs – Claim II [666] ¶¶ 570–82; (3) Winn-Dixie and Bi-Lo – Claim II [379] ¶¶ 541–52; (4) Aramark – Claim II (*Aramark Food & Support Servs. Grp., Inc. v. Agri Stats, Inc., et al.*, No. 23-cv-4404, [7] ¶¶ 533–44); (5) Carina – Claim I (*Carina Ventures LLC v. Agri Stats, Inc., et al.*, No. 23-cv-16948, [112] ¶¶ 251–73 (Carina does not indicate whether this claim is brought under a *per se* or rule of reason theory)).

they could influence the market price." *Id.* (internal citation omitted). The question is whether the evidence as a whole is sufficient to defeat summary judgment. *Id.* at 661. This is judged on a sliding scale, requiring more evidence when the charge of collusive conduct is less plausible. *Id.*

a.　　　**Economic Evidence of an Agreement**

Central to Plaintiffs' theory of this case is that Defendants reduced supply from 2008 to 2009 and again from 2012 to 2013. Whether these cuts occurred, to what extent, and who participated in the production restrictions are vigorously contested. The parties submitted competing economic expert reports with conflicting empirical analyses. Plaintiffs contend that their economic experts' regression analysis shows Defendants engaged in parallel production constraints. Defendants respond that they did not uniformly cut production during those periods and that Plaintiffs cannot show parallel conduct.

To begin, while the year-over-year production data does not show that all Defendants reduced production in both periods, it does show that a majority did so in each period. Defendants' own experts concluded that several Defendants cut production from 2008 to 2009 and from 2012 to 2013. Specifically, Dr. Stiroh and Mr. Cooper determined that Butterball, Cooper Farms, Foster Farms, JOTS, Prestage, and Tyson cut the number of live pounds processed from 2008 to 2009. [1505-1] ¶ 51 & fig.3.1; [1505-13] fig.14. From 2012 to 2013, Dr. Stiroh and Mr. Cooper determined that Cargill, Cooper Farms, Foster Farms, JOTS, and Prestage cut production. [1505-1] ¶ 51 & fig.3.1; [1505-13] fig.14.

Defendants argue that Plaintiffs' claims fail because they cannot show all Defendants participating in parallel production reductions and price increases. [1580] at 30. According to Defendants, the economic evidence shows that their production and prices moved in different directions, by different amounts, at different times. *Id.* But "unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Cir. v. United States*, 306 U.S. 208, 227 (1939). Plaintiffs can prove a conspiracy without economic evidence of parallel production cuts by the processors, as price fixing is illegal even if the parties were wrong about their ability to influence the market. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002) ("Neither form of economic evidence is strictly necessary, *see United States v. Andreas*, 216 F.3d 645, 666 (7th Cir. 2000), since price-fixing agreements are illegal even if the parties were completely unrealistic in supposing they could influence the market price."); *see also In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 658 (N.D. Ill. 2023) ("It is possible to prove a conspiracy without evidence of parallel noncompetitive conduct.").

Beyond the actual production data, Plaintiffs provide sufficient alternate evidence for a reasonable jury to find Defendants decreased production in parallel. While antitrust law does not require Defendants to produce the maximum amount possible, it allows for Plaintiffs to argue that production increased at a slower rate than it otherwise would have if not for the conspiracy. *In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 806–07 (D. Minn. 2025) (finding the plaintiffs presented sufficient evidence to show a conspiracy existed, despite defendants' evidence of expansions during the class period). Plaintiffs contend that considering only the actual changes in production year-over-year is an inadequate representation of the production restraints because a processor can restrain production by producing less than they otherwise would have, even if their actual production level increased. Plaintiffs' experts' regression analysis found that, when controlling for all other factors, Defendants' production levels were lower than they would have been but for the alleged conspiracy. [1643-3] ¶ 301. Dr. Williams performed a regression analysis that controlled

4

for demand and cost factors, including: (1) dressed meat cost, (2) consumer price index, (3) population, (4) disposable income per capita, (5) a dummy variable for Avian influenza in 2015, (6) a dummy for food-borne pathogens in 2011, and (7) a dummy for recession. *Id.* ¶¶ 299, 429. The results of Dr. Williams' regression analysis show that, but-for the alleged conspiracy, the level of turkey production in the industry would have been higher during the class period. *Id.* ¶ 301, fig.19, fig.A27. According to Dr. Williams, each of the processors' actual production during the class period was lower than it would have been but-for the alleged conspiracy:



FIGURE 35
CHANGES IN AVERAGE ANNUAL PRODUCTION OF CLASS PRODUCTS BY DEFENDANT
FROM 2008-2009 TO 2010-2016
WITH COMPARISON TO BUT-FOR PRODUCTION CHANGES

[1643-4] ¶¶ 331–32, fig.35. While Defendants argue that their conduct can be alternatively explained by the 2008 Great Recession and their reactions to shifts in the market, Dr. Williams controlled for demand and cost factors to address those shifts in the regressions. [1643-3] ¶ 429; [1643-4] ¶¶ 153–54. Therefore, Plaintiffs provided an econometric regression model showing that Defendants produced less than they otherwise would have if not for the alleged conspiracy.

Plaintiffs also rely on additional evidence to support their argument that Defendants restricted production. Several of the Defendants, including Butterball, Cooper Farms, Foster, JOTS, and Prestage, admitted to cutting production. [1757] ¶ 5; [1742] ¶¶ 26–28, 33. Plaintiffs also identified documents that show Defendants restraining production. For example, Plaintiffs identified evidence showing Butterball was unable to meet its customers' supply expectations in late 2012. [1651-18]. The record also shows that Perdue informed its growers that it was cutting production in 2009 and in December 2012. [1640-7]; [1643-114]. In a presentation from January 2010, Perdue discussed how its November 2009 production was down 10% in both head count and live weight compared to 2008 production levels. [1643-113].

Here, the economic evidence, both expert analysis and evidence of parallel conduct, suggests an agreement. But the mere suggestion of an agreement is insufficient to prove a Sherman Act violation by a preponderance of the evidence, as evidence that the defendants were not competing does not establish a manifest agreement not to compete. *Fructose*, 295 F.3d at 661. Instead, the more plausible the charge of collusive conduct is based on the economic evidence, the less noneconomic evidence is necessary. *Id.* Here, while there is evidence of production cuts and restrictions, the evidence is not particularly strong, as actual production levels increased for some

5

Defendants, and the economic evidence showing parallel supply cuts is based on the but-for-world regressions—models that Defendants' experts vigorously challenge. So, Plaintiffs must identify noneconomic evidence that indicates the existence of an express agreement to meet their burden to show a reasonable jury could find by a preponderance of the evidence that Defendants agreed to restrain turkey production or increase prices.

#### b. Noneconomic Evidence/Plus Factors of an Agreement

The second, and more important, factor in determining whether a plaintiff has met their burden at summary judgment in an antitrust case is whether there is evidence of an explicit agreement. The question before the Court is whether this evidence, when taken in combination with the economic evidence, is sufficient to defeat summary judgment. *Fructose*, 295 F.3d at 661.

There is no smoking gun in this case. There is not a single witness who will testify that they were involved in or had knowledge of an agreement to restrict supply. Nor is there a document that explicitly outlines the participants in and terms of the agreement. Plaintiffs' noneconomic evidence is a combination of email statements between Defendants about supply cuts, internal emails within the defendant companies about competitors' conduct and their discussions with those competitors, and evidence related to suspicious statements and conduct involving Defendants' participation with the National Turkey Federation and the 2008 Outlook Report. All of Plaintiffs' evidence is circumstantial and requires an inference that an agreement exists. This leaves open the Defendants' ability to argue that there were alternative and independent reasons for their actions. The Court's role is not to weigh the conflicting evidence, but to determine if, when the evidence is considered as a whole, a reasonable jury could find that it is more likely that the Defendants conspired than that they did not conspire. *Fructose*, 295 F.3d at 655–56.

The parties submitted hundreds of pages of briefing and thousands of exhibits in support of their positions, which the Court has reviewed and considered. The following analysis does not recount all the evidence relevant to the summary judgment decision. Instead, the Court only addresses the evidence sufficient to grant or deny summary judgment for Defendants Butterball, JOTS, Prestage, Foster, and Perdue. Based on the noneconomic evidence, the Court finds that a reasonable jury could determine that an agreement existed among at least some of the Defendants to restrict supply, including, at a minimum, Butterball, JOTS, and Prestage.[7] However, Plaintiffs fail to show that a reasonable jury could find that Foster and Perdue agreed to restrict supply. Before addressing the individual Defendants, the Court begins with the evidence that establishes the existence of an agreement, and then turns to each Defendant's participation in that agreement.

**Evidence Concerning the National Turkey Federation Conferences.** The National Turkey Federation (NTF) is the turkey industry's trade association; it has served the industry since 1940 and seeks to promote demand, awareness, and innovative uses for turkey. [1680] ¶ 20. Defendants Butterball, Cargill, Cooper Farms, Farbest, Foster, JOTS, Perdue, Prestage, and Tyson were members of the NTF and the NTF's Executive Committee. [1742] ¶ 4. The NTF held various meetings and conferences for its members throughout the relevant time period.

---

[7] The Court makes no determinations about the involvement of Cargill, Cooper Farms, Farbest, Raeford, Tyson, and Agri Stats in the scheme at this time, although their conduct may be discussed as it relates to evidence against the defendants discussed here—Butterball, JOTS, Prestage, Foster, and Perdue. An opinion relating to the remaining defendants will be issued separately at a later time.

Plaintiffs argue that Defendants discussed and agreed to coordinate their production at the NTF conferences. To support this contention, Plaintiffs identified evidence showing that Defendants exchanged their plans for production cuts at NTF conferences. For example, on July 16, 2008, Gary Cooper, of Cooper Farms, wrote a "quick 'trip report' from the summer NTF legislative conference in DC held one week ago[.]" [1643-54]. This report included information from several of the Defendants, including:

> Steve Williardsen, Cargill, mentioned to me that he wasn't sure that Cargill was particulary [sic] 'happy' with the timing of the purchase of Willowbrook, relative to the input costs, but he said if they would have waited until 'good times', they would have had to pay a lot more for it or not buy it at all. Steve mentioned again how he appreciated us hosting his live production team and that they were looking forward to our guys visiting them this fall.

> Gator, Butterball, said they were/are making heavy production cuts, with placements stopping at Longmont as of about July 1st. He also asked if we were now out of our commodity position gains as he 'knew' we were leading the way in the Agristats report with being number one…..I played stupid, which was easy.

> Ron Prestage, Prestage Farms, said they produce something a bit more than ONE BILLION POUNDS of combined turkey and hogs annually. From 2006, to presently, it is costing them about $318 million more in corn, meal and grease costs (only). He suggested (to our EC BOD) that our industry hire Agristats or EMI to survey all turkey companies on a regular basis to assess and evaluate the pounds intended to be marketed, to get a better idea of when this market will change around. I talked with Rob and Tom, from Agristats about this idea and of course, they were very interested.

> …

> Ted Seger, Farbest, was staying fairly quiet about their production increases, while everyone else was talking about reductions. He also mentioned that their full truck CO2ing, was working great and they were glad they built a whole new CO2 building away from their plant. A meeting with them for a new poult agreement, complete with a grain matrix and parent breeder costs, is being held on 8/14 with Ron, John and Jim attending in Indy.

> Mike Tolbert, JOTS, made a point of thanking me for our reciprocal visits and how he met our managers at their plant in MN and was impressed with how his mgmt. team complimented our guys and company. We agreed to do the same reciprocal live production visits and his Rahn Annis will be calling Terry or Carl to set this up.[8]

The Defendants' openness and willingness to provide information about their production plans is evident from the level of detail Gary Cooper was able to report back. This evidence supports an inference that not only was Cooper discussing production plans with the other Defendants, but that

---

[8] [1643-54].

these were open discussions amongst Defendants during the conference about turkey production levels.[9]

This pattern of production discussions at the NTF conferences continued. On October 1, 2012, Cooper reported back from the NTF Executive Committee meeting that he "heard these tidbits of industry info... mostly direct from the 'horse's mouth' and some second hand[.]" [1643-59]. Cooper then lists information about production cuts at MI Turkey, Sara Lee, JOTS, Cargill, Butterball, Perdue, and WilMar. *Id.* Cooper reported that "Sara Lee is cutting out the lower tiered contract growers[,]" JOTS "is reducing by 2 million toms[,]" and "Cargill is stopping second shift at CalMo as of October 1st[.]" *Id.* Cooper also wrote that "the word here is that Butterball" was not cutting its numbers, which he could not confirm at the meeting, but that other staff could at their upcoming visit to Butterball. *Id.* Similarly, for Perdue, Cooper stated that "Perdue is planning a production cut, but Jim isn't here for this meeting, so didn't hear exactly how much[.]" *Id.*

While evidence of participation in industry trade association meetings is not, on its own, sufficient to support an inference that the meetings were used to plot prices or production, it can be sufficient if there is evidence that such communications occurred. *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 938 (7th Cir. 2018). Based on this evidence, a reasonable jury could infer that Defendants were discussing their production plans at the NTF Executive Committee meetings as part of an agreement to restrain production, as without an agreement, a reasonable jury could conclude that there is no other reason why a processor would tell its competitor its plans to cut production, enabling the competitor to capture that market.[10] Evidence of executives exchanging pricing or production information is probative as to the existence of a conspiracy. *Id.*; *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 663–64 (N.D. Ill. 2023) (finding sharing production information with competitors supported the inference that several of the defendants participated in the conspiracy).

**Evidence Concerning the 2008 Outlook Report.** The idea for the 2008 Outlook Report was first raised at the July 8, 2008, NTF Executive Committee meeting. [1643-75]. The meeting minutes reflect that Ron Prestage stated, "he believes the current economic situation necessitates some type of discussion about industry production plans" and that while he recognized that such a report would need to comply with federal antitrust laws, "some type of informational report could be useful." *Id.* The meeting minutes note that other Executive Committee "members agreed that development of a detailed, industry-wide informational report on production trends would be most useful." *Id.* Gary Cooper then "suggested that the report be prepared as soon as possible." *Id.* According to the NTF Chairman's report on the meeting:

> The [Executive Committee] discussed at length what NTF could do to provide industry leaders with information that would help them make decisions in the current economic environment. Antitrust laws limit these types of discussions, but

---

[9] Toms are adult male turkeys, hens are adult female turkeys, and poults are young turkeys.

[10] In some of their briefs, Plaintiffs argue that the NTF's work with Agri Stats to create a demand index as part of the Turkey Demand Enhancement Team (TDET) in 2014 was also evidence of the agreement. However, beyond the occasional argument that this existed, Plaintiffs failed to articulate how this index or team contributed to or was evidence of the alleged scheme.

> as Ron Prestage pointed out, the industry would benefit from having as thorough an examination as the law allows.
>
> [Executive Committee] members directed staff to prepare a report that would look at a variety of economic factors, including production trends.[11]

Following the NTF Executive Committee meeting, Gary Cooper, on behalf of the Executive Committee, requested that Agri Stats prepare "industry production intentions" using data Agri Stats had already collected from its participants. [1643-26] at 4. At this time and throughout the class period, Agri Stats provided benchmarking services to turkey processors by preparing a series of reports on industry-wide turkey production levels, costs, and pricing, based on confidential information it collected from them. [1680] ¶¶ 61–64, 72. All information in the Agri Stats reports was anonymized, except for the processor's own data. *Id.* ¶ 62. The reports, discussed in more detail below, could be categorized into two groups. The first group of reports provided information on Defendants' production process, while the second group provided information on profit and pricing.

After approving the commission of the Outlook Report, a subset of the NTF Executive Committee was chosen to direct its creation. On July 28, 2008, Joel Brandenberger (NTF President) emailed Walter Pelletier (Butterball), Mike Tolbert (JOTS), Steven Willardsen (Cargill), Ron Prestage (Prestage), and Ted Seger (Farbest) to form a "steering committee" from members of the NTF Executive Committee to "identify fairly quickly the exact types of information that would be most beneficial to the industry." [1643-205]. On August 4, 2008, in an email thread with the Steering Committee about the proposed report, Ted Seger wrote that "we want to hear the answer to the question of what level of production will the industry need to be at in the future to cover the projected costs, of course all the information being based upon the historical trend of price elasticity." [1564-7]. On September 11, 2008, Ted Seger asked the NTF Steering Committee if the report would discuss "in detail the question of what level of future production should the industry target to be profitable at today's costs? Many parts of the proposal dance around this question, but I would think we want to make sure it is answered." [1643-70]. In this thread, the Steering Committee was also informed that the NTF's legal counsel advised that the report must be publicly released to the entire industry. [1643-70]. These comments support the inference that one goal in creating the Outlook Report was to inform industry production levels.

The initial draft of the 2008 Outlook Report was presented to the NTF Executive Committee on October 26, 2008.[12] [1643-77]. The report's primary objective was "to identify the recent trends in turkey industry production, cost structure, and markets over a five year time frame, and to provide quantitative analysis and forecasts for production, costs, and markets through 2010." *Id.* at 6. The report stated that it contained "projections for 2008-2010" and noted that for "2010, the outlook assumes that turkey production will begin to increase in late 2009 to ultimately replace the cutbacks now underway." *Id.* at 6, 32. The projections included poult placements, turkey slaughter, average live weights, and total turkey production, as well as items such as feed

---

[11] [1643-75] at 4.

[12] According to the meeting minutes, the NTF Executive Board members in attendance were: Chairman Paul Hill; Vice Chairman Walter Pelletier; Secretary-Treasurer Yubert Envia; Immediate Past Chairman Ted Seger; John Burkel; Gary Cooper; Randy Day; Jihad Douglas; Rick Huisinga; Ron Prestage; Mike Tolbert; Steve Willardsen; and Carl Wittenburg. [1643-108].

and freight costs. *Id.* at 6. On a copy of this report, Ted Seger wrote, "Need a profitability matrix showing what level of production would reasonably lead to profits at the new higher cost levels." *Id.* at 4. The NTF Executive Committee discussed the report for almost four hours and identified several areas of concern, leading Agri Stats to withdraw the report and issue a revised one in four to six weeks. [1643-108] at 3.

On November 19, 2008, NTF president Joel Brandenberger emailed the Steering Committee a revised copy of the Outlook Report for their review and approval before sending it to the full Executive Committee. [1643-76]. This version of the report, dated November 12, 2008, changed its primary objective to include forecasts through 2009 instead of 2010. [1643-76].

On December 19, 2008, the NTF conducted a conference call to discuss the revised Outlook Report and associated slides.[13] [1643-129]. During this call, Ted Seger requested two slides—"Chart of Total Revenue against Live Weight" and "Chart of Net Margin against Live Weight"—which the Executive Committee agreed "would be the focus at the NTF Annual Meeting in Orlando, FL and would only be presented at the Board Meeting, not the general session." *Id.* As noted above, simply attending trade association meetings does not, without more, create an inference that the competitors are conspiring. *Kleen*, 910 F.3d at 938. However, the evidence Plaintiffs presented supports the inference that Defendants were discussing the industry-wide output restrictions contained within the Outlook Report over several NTC Executive Committee meetings.

In an attempt to dispel this inference, Defendants assert that at many of these meetings, the NTF and its legal counsel referenced the NTF's Anti-Trust Compliance Policy and the need to comply with all applicable laws. [1643-75]; [1640-1]. But the presence of counsel and antitrust policies do not negate the possibility of an antitrust violation when the evidence shows a violation may have occurred. Indeed, Plaintiffs contend that because Defendants were aware of the antitrust risks, they minimized the written record of their conduct. For example, on September 12, 2008, the NTF President alerted Agri Stats to his concerns about the legal issues arising from this report and "cautioned about the email trail and possibly having comments made in writing by producers that could be taken out of context." [1643-28]. Agri Stats noted that they "may not want to solicit written emails from producers with their opinions of what should be included in the project." *Id.*

Further undercutting Defendants' argument and supporting Plaintiffs' inference is the repeated evidence in the record about data in the report withheld from the public or the NTF's general membership, but shown to the Executive Committee or certain Defendants. [1643-21]; [1643-25]; [1643-129]. When the NTF's legal counsel requested certain graphs be removed from the Agri Stats presentation on the report, internally Agri Stats employees commented that these graphs were "specifically requested by Ted Seger" and that "the data is already in the report, but not displayed in this format." [1643-21]. The Agri Stats employees later proposed that they could "use these with Ted one-on-one, at or after the meeting," which a jury could infer meant the evidence counsel wanted removed from the report was still there and that Agri Stats remained willing to provide the data if asked by a defendant. [1643-21]. There is also evidence that by February 9, 2009, the NTF had not posted the report to its website yet. [1643-126]. The presence

---

[13] In attendance on this call: Gator Pelletier (Butterball), Yubert Envia (Foster), Carl Wittenburg (Protein Alliance), Ted Seger (Farbest), Paul Hill (West Liberty), Jihad Douglas (Aviagen), Gary Cooper (Cooper Farms), John Burkel, Ron Prestage (Prestage), Rick Huesinga (Willmar Poultry), Petri Papinho (JOTS), Phil Olsson, Joel Brandenberger (NTF), Michael Rybolt (NTF). [1643-129].

of legal counsel and the acknowledgment of antitrust risks could reasonably be inferred by a jury either as evidence that the processors followed these policies or as evidence of an awareness that they were crossing the line. But at summary judgment, the Court must view the evidence in the light most favorable to the Plaintiffs, which supports an inference that the Defendants knew there was a possible antitrust violation and, as a result, decided to minimize their written records about their conduct.

**Evidence About Communications Between Defendants**. More importantly, throughout the relevant period, Defendants engaged in significant communication regarding their production plans. These communications, when considered with the other evidence, are sufficient for a reasonable jury to find that an agreement existed among Defendants to reduce supply.

Beyond the NTF conferences, Plaintiffs identified several examples of Defendants communicating about production cuts, which could support an inference that Defendants had an agreement to restrain supply. On July 15, 2008, in an internal email thread, JOTS employees discussed a conversation they had with Kent Puffenbarger of Prestage about Prestage's reduction in turkey slaughter and its conversations with Butterball and Cargill about their production levels and operational plans. [1643-97]. On August 6, 2008, Jim Cooper wrote to Gary Cooper that he "talked to Terry Butler a couple of days ago. Fosters is in the process of cutting their turkey production. They just haven't decided how to do it." [1643-57].

Then in late August 2008, Cooper Farms was discussing the information it had about its competitors' production cuts, including that JOTS had already begun a 6.5% cut, Butterball was reducing both tom and hen placements, Prestage had made cuts, Raeford planned for no hatching of poults in September 2008, and that Foster was considering cuts but was unsure about when or how many. [1651-38]; [1578-23]; [1578-24]. Cooper Farms also noted that Farbest and Sara Lee were expanding. [1651-38]; [1578-23]; [1578-24]. Jim Cooper commented that he would "make a few calls today and try to get additional info on some of these companies." [1651-38]. The fact that Cooper Farms was able to amass so much information about several of its competitors' production plans supports the inference of active coordination.

Plaintiffs also provided evidence of communications about pricing plans. On October 27, 2008, Gary Martin of Butterball emailed Roger Wellman, Director of Marketing at Cooper Farms, asking for Cooper Farms' forecasting on the price of breast meat "for the balance of 2008 and into 2009." [1643-163]. Jim Cooper and Gary Cooper were copied on Wellman's email, showing that the leadership at Cooper Farms was aware of the request. Wellman responded on November 6, 2008, with forecasts about both supply and price estimates for the end of 2008 and into 2009. *Id.* This direct exchange of price and supply estimates between competitors, along with the willingness to both request and provide such information, lends further support to the existence of an agreement.

In the same vein, Cooper Farms also had a spreadsheet from November 2008 that reported monthly production changes from September 2008 through August 2009 for many of its competitors, including Butterball, Raeford, JOTS, and Farbest. [1744] ¶ 20; [1578-22]. This document reflects Cooper Farms' knowledge of future production cuts at Butterball, Raeford, and JOTS, and increases at Farbest. [1578-22]. This level of in-depth knowledge of its competitors' production plans supports the inference that the competitors agreed to share production information.

The evidence of communication between Defendants continued into 2009. In January 2009, JOTS discussed information it had received from Cargill and Butterball, including information that Butterball was undergoing another round of cutbacks. [1643-88]. As part of this discussion, the Butterball employee said:

> that these Feb. cutbacks are as much as they can do, according to those above him. They have trimmed as much as they can, and if the industry needs further cutbacks, they will not be the ones to do it. Somebody else needs to step up to the plate.[14]

On March 25, 2009, JOTS discussed what Prestage said about its plans to reduce both hens and toms over the summer, as well as what Prestage learned from Butterball about its 2009 production plans. [1641-32]. There is also evidence that Farbest planned to confirm rumors with Prestage about whether Prestage was cutting production in April 2009. [1641-39]. In May 2009, JOTS and Prestage discussed Prestage's shift cuts and what it knew about Raeford's and Butterball's production plans. [1641-33]; [1641-35]. Later, in August 2009, Cooper and Prestage began directly sharing their production information, with Gary Cooper explaining to Cooper Farms employees:

> We are now swapping production results, in confidence, with Prestage Farms. This one attached is their one tom operation.[15]

This evidence shows that in 2009, when Plaintiffs assert Defendants were conspiring to cut production, Defendants were in regular communication about their planned production cuts. The evidence also includes comments inferring coordination, such as "[s]omebody else needs to step up to the plate." [1643-88].

JOTS continued to share and gather information about production cuts in 2012. In January 2012, JOTS discussed obtaining production information and the status of their meat supply from Butterball and Cargill. [1649-38]. Then, in September, Prestage informed JOTS that it would be "cutting back between 5-7%" in 2013 and only running four days a week in January and February. [1643-99]. These emails show communication between JOTS and several other Defendants about future production plans, which supports an inference that the agreement continued into the second time period of the alleged conspiracy.

The communications in 2012 extended beyond just JOTS. On June 28, 2012, in a Farbest internal email thread, Jay Houchin reported that Sara Lee was "throttling" back expansion[,]" Butterball was "destroying Tom poults to get Hen poults for Fresh mkt. Still have not sold the 'excess' poults that they offered us[,]" and Cargill was "Cutting 10,000 Tom placements / wk. now." [1651-11]. However, Houchin ended his email with a comment: "Who knows how accurate all of this is but usually when I start to hear talk there is something going on." *Id.* The manner in which this information is presented and the references therein support an inference that the information was shared collectively. Similarly, in September 2012, Cooper employees reported hearing about cuts at JOTS, Cargill, Butterball, and Raeford. [1651-12]. While these emails do not necessarily establish direct communication between Defendants, they support the general

---

[14] [1643-88].

[15] [1641-38].

inference that information about Defendants' production plans was regularly discussed and exchanged.

Defendants' communications continued throughout 2013. After hearing that other processors were cutting production in 2013, Cooper Farms met with JOTS, which informed them of its plan to cut production by 4%. [1643-44]. In March 2013, JOTS discussed Hillshire's plans to cut slaughter in 2014 directly with Hillshire. [1643-86]. On November 22, 2013, a Butterball employee emailed a Tyson employee to catch up on "the state of our industry" the next time he is in Charlotte. [1651-161]. This evidence of direct communication about planned production cuts in 2013 supports the inference that Defendants were coordinating their actions.

There is also evidence that Defendants were exchanging production information past the periods of the alleged cuts. Plaintiffs provided evidence that supports the inference that Prestage continued to share its production plans with its competitors into 2015 and 2016. [1641-41]; [1641-42]. In June 2015, Cooper Farms was discussing a visit to Butterball's corporate headquarters, where Butterball's President/CEO, Kerry Doughty, "said they are passing up new (good) business left and right, due to a shortage of meat, so they are deleting all small skus as well as any customer under 300,000 pounds per year. ( or something along those lines)[.]" [1651-5]. Then, on August 12, 2016, Butterball's President/CEO sent an email to a group including JOTS and Tyson, with a picture of a turkey sandwich and the statement: "If we all do our part it builds." [1643-137]. This evidence supports the inference that Defendants continued to exchange production information and viewed their roles and actions as working towards a collective good, with each processor doing their part to achieve their goal. *Fructose*, 295 F.3d at 662 (finding that statements reflecting a shared understanding in an industry support an inference that an express agreement amongst competitors exists).

As the evidence above shows, these communications were between many of the Defendants, who are direct competitors, and included a wide-ranging exchange of highly confidential business information about their turkey production plans. The breadth of the information shared between and among the Defendants is sufficient for a reasonable jury to infer by a preponderance of the evidence that an agreement existed among the Defendants. *See In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 822–24 (D. Minn. 2025) (finding the evidence of interfirm communications about production plans tipped in favor of the existence of a conspiracy). Further, some Defendants even acknowledged that the information they received about other processors' production plans was not public. [1641-30] at 90:19–25.

Having established that the economic and noneconomic evidence support an inference that there was an agreement to cut production, the Court turns to whether the evidence is sufficient for a reasonable jury to find by a preponderance of the evidence that each defendant joined the agreement. This analysis does not document every fact identified in support of or opposing summary judgment. The Court only addresses the evidence sufficient to deny summary judgment or necessary to support granting summary judgment. The question before the Court at summary judgment is whether, when the evidence is taken in the light most favorable to Plaintiffs, a reasonable jury could find the existence of an agreement to restrict supply or increase price by a preponderance of the evidence, and that this evidence also allows a reasonable jury to exclude the possibility of independent action. *Fructose*, 295 F.3d at 655.

13

### i. Butterball

Starting with the economic evidence against Butterball, the evidence that Butterball cut production in 2009 is strong, with Defendants' own experts showing a year-over-year production cut. [1505-1] ¶ 51 & fig.3.1; [1505-13] fig.14. Further, Butterball admitted to cutting production in 2009. [1757] ¶ 5. However, the evidence for Plaintiffs' second time period, between 2012 and 2013, is weaker. Defendants' experts show that Butterball increased production from 2012 to 2013. [1505-1] ¶ 51 & fig.3.1; [1505-13] fig.14. Although Plaintiffs acknowledge that Butterball's production increased from 2012 to 2013, they argue that Butterball's actual production in 2013 was lower than its production would have been, but-for the alleged conspiracy. [1669] ¶¶ 6, 18. In support of this, Plaintiffs rely on Dr. Williams' regression analysis, where he determined that turkey supply was lower than it would have been in the class period, excluding turkey-product-category-specific variables. [1643-3] ¶ 301 & fig. A30. Plaintiffs also identified evidence showing Butterball was unable to produce the products its customers expected in late 2012. On November 20, 2012, a customer emailed Butterball asking why it was "unable to produce the quantities originally communicated (741 cases/day)?" [1651-18]. This supports the inference that, while Butterball may not have cut its actual production year-over-year, it was supplying less than it had otherwise planned. Therefore, a reasonable jury could find that Butterball engaged in production restrictions in 2009 and 2013.

With the economic evidence of Butterball restricting production established, the Court turns to whether there is sufficient evidence that Butterball joined the agreement to reduce production. Crucial to the alleged scheme, Butterball was not only a member of the NTF Executive Committee but also a member of the Steering Committee that led the creation of the 2008 Outlook Report. As discussed above, the evidence indicates that the NTF Executive Committee was aware of the antitrust risks posed by the 2008 Outlook Report and that nonpublic data compiled by Agri Stats was used in the report. Through its participation on the Steering Committee, Butterball was actively involved with the creation and content of the Outlook Report, which included production forecasts and questions raised about industry production levels. When viewed in the light most favorable to Plaintiffs, Butterball's action with other Defendants to jointly create a report containing production forecasts to be circulated among Defendants through the NTF can be reasonably viewed as joining an agreement about those production levels. *Kleen*, 910 F.3d at 938 (although attendance at industry meetings alone is insufficient, it can be bolstered by evidence that information was actually exchanged).

In addition to Butterball's involvement with the 2008 Outlook Report, it was also communicating with its competitors about its planned production cuts. For example, Butterball was communicating with Prestage about its plans to close a plant and cut placements in 2008. [1643-97]. Plaintiffs also identified evidence of Butterball discussing its production plans with its competitors at the NTF meetings. [1643-54]. Butterball requested and received price and production forecasts from Cooper Farms in late 2008. [1643-163]. In November 2008, Cooper Farms also had information on Butterball's monthly production cuts from September 2008 through May 2009. [1578-22]. Additionally, there are several emails between an employee at Butterball and an employee at Raeford exchanging pricing information in 2009. [1651-164]; [1651-147]. The evidence that Butterball shared production plans with its competitors supports the inference that there was an agreement on production levels; a jury could infer that, otherwise, it would not have shared the data. *See Broiler Chicken*, 702 F. Supp. 3d at 663–64 (finding sharing production

14

information with competitors supported the inference that defendants participated in the conspiracy).

Further, Butterball viewed and communicated that the need to restrain supply was a joint effort by processors. According to an internal JOTS email, Butterball reported that another cut was coming in February 2009, but that was "as much as they can do, according to those above him. They have trimmed as much as they can, and if the industry needs further cutbacks, they will not be the ones to do it. Somebody else needs to step up to the plate." [1643-88]. This supports the inference that Butterball was reducing production as part of a larger agreement among processors to improve their economic positions.

Butterball also used joint industry action language in its internal documents. A Butterball Results Review for February 2009 included a comment, "We continue to reduce our kill volumes and versus last February we are down 9%. These cuts will continue throughout 2009 as we do our part to reduce the excess meat in the industry that is driving the depressed markets." [1651-15] at 4. Butterball made similar notes in the result reviews in March and April 2009. [1651-16]; [1651-17]. The use of the phrase "as we do our part" supports an inference that Butterball considered there to be a joint and active effort among the industry participants to reduce production levels. *Fructose*, 295 F.3d at 662 (finding references to a joint understanding among competitors was evidence in support of the existence of an agreement).

Further, while Butterball did not cut its year-over-year production in 2013, it was aware of, and communicated with, other Defendants about the production cuts. A Raeford employee emailed a Butterball employee, "how about us closing that turkey slaughter plant? I bet that helps you guys." [1643-212]. The record evidence also shows that Butterball knew of the industry cuts and sought to take advantage of them. [1651-13]. On November 22, 2013, a Butterball employee attempted to schedule meetings to discuss "the state of our industry" with a competitor's employee. [1651-161]. This supports the inference that Butterball continued to participate in industry-wide decision-making in 2013.

Butterball's view of the industry's actions as a joint, coordinated effort persisted in 2014 and beyond. On March 24, 2014, Chris Peach wrote to the sales team, "that the turkey market is RED HOT!" … "With the contraction of supply in our industry and stout demand - we are in excellent position for a great year and we have every right to be Highly Confident in selling prices this year! Get the penny where you can and sell with confidence! We don't always get supply, demand, cost and industry discipline to line up like this." [1651-49]. Note the use of the word "industry discipline" supports the inference of joint agreed actions. Then, in June 2015, Butterball's CEO discussed with Cooper Farms employees, during their visit to Butterball's corporate headquarters, how Butterball was passing on sales due to the meat shortage. [1651-5]. On August 12, 2016, Butterball's President/CEO Kerry Doughty sent an email to a group, including JOTS and Tyson, a picture of a turkey sandwich with this text:

15

| From: | Kerry Doughty |
|---|---|
| Sent: | Friday, August 12, 2016 1:33 PM |
| To: | John Reicks; grleitch@j-ots.com; Walter Pelletier; Keith Williams; Joel Brandenberger; Matt Cook; Alice Johnson; Bill Klump; carl@proteinalliance.com; Joe Nalley |
| Subject: | 20-20 |
| Attachments: | IMG_3912.JPG; ATT00001.txt |

If we all do our part it builds. This is at my club in Raleigh. A deli breast , cut like a steak and grilled on charbroiler.
Awesome
Have a great weekend.
KerryD

[1643-137].[16] Once again, note the use of the word "we" and the reference to a collective objective in the phrase "our part." All of this supports the inference that Butterball remained part of the conspiracy throughout this period because of its willingness to continue sharing production information with its competitors. *Fructose*, 295 F.3d at 662.

However, not all of the evidence supports an inference that Butterball joined an agreement. Plaintiffs also argue that Butterball's deanonymization of the Agri Stats reports is evidence of the agreement. While there is some evidence that Butterball deanonymized the Agri Stats reports to determine whether its competitors were making cuts, there is no evidence supporting the inference that doing so was part of an agreement between Butterball and the other Defendants. [1643-31]. As discussed below, Plaintiffs' theory about how the Agri Stats reports could have been used to exchange information is not supported by evidence about how Defendants actually used the reports.[17] The evidence identified by Plaintiffs shows Butterball unilaterally and internally attempted to deanonymize and use the Agri Stats reports, which is insufficient to show an agreement among the Defendants to use the reports to restrain supply. Further, while Butterball attempted to discuss the Agri Stats data it deanonymized with the other processors, they did not engage in the discussion. [1643-54].

Butterball argues that it acted independently, as evidenced by its production increasing every year from 2010 to 2015. [1592] at 9. According to Butterball, it expanded its production capacity from 2011 to 2013 and purchased a new facility in 2015. *Id.* at 10–11. This, Butterball asserts, contradicts Plaintiffs' theory of coordinated cuts, because Butterball was not making cuts. Butterball also points to evidence that it attempted to capitalize on its competitors' shortfalls during the 2015 HPAI outbreak, which led many of them to lose turkeys. *Id.* at 11–12. As to its 2008 and 2009 cuts, Butterball attributes those decisions to the Great Recession and increased corn prices. *Id.* at 13. However, Plaintiffs' experts accounted for market-wide factors, and the evidence taken as a whole on summary judgment, with all reasonable inferences in Plaintiffs' favor, results in a conclusion that a reasonable jury could exclude Butterball's theory of independent action.

Therefore, even without the Agri Stats reports and considering Butterball's alternate explanations for its conduct, the evidence of documented communications and Butterball's involvement with the NTF Steering Committee and the 2008 Outlook report is sufficient for a

---

[16] The highlighting was done by Plaintiffs to both the sealed and unsealed versions of this document. [1643-137]; [1702-136].

[17] For the same reasons, Plaintiffs' argument that the Agri Stats reports were used to monitor and enforce compliance with an alleged agreement fails.

16

reasonable jury to find by a preponderance of the evidence that Butterball joined a conspiracy with its competitors to reduce supply and increase prices. *Kleen*, 910 F.3d at 940 (finding a defendant's plausible explanation for supply restrictions would not overcome the inference of conspiracy when the defendant made cuts that could not easily be undone, its vice president wrote about the company having done its part, and company emails stated that restricting supply would help raise prices). Therefore, summary judgment on Plaintiffs' *per se* claim against Butterball is denied.

### ii. JOTS

Starting with the economic evidence, JOTS admits that its pounds processed decreased year over year in 2009 and 2013. [1742] ¶ 26. This is consistent with Defendants' own experts' findings. [1505-1] ¶ 51 & fig.3.1; [1505-13] fig.14. Since JOTS' production cuts during the time period are undisputed, the Court turns to whether Plaintiffs' evidence shows a reasonable jury could find the existence of an agreement between JOTS and the other Defendants by a preponderance of the evidence.

Like Butterball, JOTS was not only on the NTF Executive Committee that requested and received the 2008 Outlook Report, but it was also a member of the Steering Committee that directed the report's development and received drafts before the NTF Executive Committee. As discussed above, this report included forecasts for future production levels and was provided to Defendants. JOTS' direct involvement in the report's creation supports the inference that JOTS was part of the 2009 agreement to reduce supply.

JOTS also appeared to share its production information at NTF Executive Committee meetings. After the July 2008 meeting, Gary Cooper of Cooper Farms reported that he spoke with Mike Tolbert at JOTS about reciprocal plant visits. [1643-54]. Then on October 1, 2012, Cooper reported back from the NTF Executive Committee meeting that he "heard these tidbits of industry info... mostly direct from the 'horse's mouth' and some second hand[.]" [1643-59]. In his list, Cooper wrote that JOTS "is reducing by 2 million toms[.]" [1643-59]. Further, JOTS participated in reciprocal plant visits with Cooper Farms and discussed those visits during NTF conferences. [1643-54]. While JOTS' attendance at NTF meetings alone would not support an inference of collusion, this evidence shows JOTS communicated specifically about its production plans, moving the inference that the competitors were discussing their plans beyond the realm of mere speculation. *Kleen*, 910 F.3d at 938 (plaintiffs must offer more than mere speculation about the content of the information exchanged at industry conferences for the evidence to weigh in favor of the existence of a conspiracy).

As discussed above, the evidence throughout the period shows JOTS was communicating with its competitors about their production plans, leading to an inference of coordination. For example, JOTS had several discussions with Prestage about its plans to reduce production, and what Prestage knew about Butterball's and Cargill's production plans. [1643-97]; [1641-32]; [1641-33]. These communications continued into the second period of alleged production cuts, during which, in 2012, Prestage reported to JOTS that it planned a 5-7% reduction in 2013. [1643-99]. JOTS was also discussing production cuts with Butterball. In 2009, Jay Maxwell, JOTS export sales manager, had a discussion with Butterball in which Butterball reported that another cut was coming in February, but that was "as much as they can, and if the industry needs further cutbacks, they will not be the ones to do it. Somebody else needs to step up to the plate." [1643-88]. JOTS also sought out information about their production levels from Butterball and Cargill in January 2012. [1649-38]. Their communications support an inference of an agreement between JOTS and

17

other Defendants to share production information to coordinate cuts. *Broiler Chicken*, 702 F. Supp. 3d at 663–64 (finding that communications between competitors about production plans, when combined with other factors like a CEO's confidence about the predicted production cuts, were sufficient for a reasonable jury to infer by a preponderance of the evidence a conspiracy to reduce supply).

The communications continued past 2012. In March and April 2013, JOTS discussed Hillshire's plans to cut slaughter in 2014 with Hillshire. [1643-86]; [1649-29]. In April 2013, JOTS was aware of Farbest's plan to increase production and that other processors would need to offset it. [1649-30]. In September 2015, JOTS' competitor reported that JOTS was telling its competitors it would "show *on paper*" different results than its actual production plans. [1643-82] (emphasis in original). In 2016, JOTS reported that it had been with a "Good group to get info out of[,]" referencing a group including employees from Farbest and Prestage, and included information about their and other Defendants' production status and plans. [1649-42]. And recall that JOTS president Glenn Leitch was the one who received Butterball's President/CEO's email on August 12, 2016, with a picture of a turkey sandwich and the comment, "If we all do our part it builds." [1643-137]. All of this evidence shows that throughout the class period, JOTS was in regular communication with its competitors about their production plans, which supports the inference that JOTS joined the conspiracy to reduce production.

Plaintiffs also identified evidence of internal discussions at JOTS acknowledging an industry-wide agreement about discipline on production levels. On September 4, 2013, Hormel CEO Jeff Ettinger (Hormel is a parent company of JOTS) wrote to Glenn Leitch, president of JOTS, when discussing a production increase in 2014:

> I think it is only fair to tell you that I am not "sold" on the concept that we should expand production by 4 1/2% in 2014. This would represent a rapid reversal of the tightening we achieved over the past couple of years, and could signal an abandonment of "discipline" by the player who has exhibited the most discipline (and benefited therefrom) in the industry.

[1643-89]. Leitch responded that:

> The 4.5% might be 2 years worth of growth in one year, based on bird availability. As I mentioned, the window I believe is narrow. I also believe that this approach shows good industry discipline, as it shows expansion through existing turkey pounds, versus building our own barns.

*Id.* In the ensuing discussion, Ettinger and Leitch discuss whether JOTS will "be able to state that we are maintaining industry discipline by taking on existing pounds" and that they will need a "basis to say that these pounds won't be replaced in their current system[.]"*Id.* Leitch responds by explaining that Hillshire and Dakota would not be able to replace the pounds in the near term. *Id.* This evidence supports the inference that JOTS was aware of and participating in the supply cuts. It also shows that it was an active participant in an agreement to restrain supply and wanted to continue participating by ensuring it did not increase production that would violate it. *Fructose*, 295 F.3d at 662 (finding that statements reflecting a shared understanding not to cut prices support an inference that an express agreement amongst competitors exists).

Turning to evidence in addition to internal and external communications, Plaintiffs argue that JOTS used the Agri Stats reports to exchange information about pricing and production planning. As with Butterball, there is evidence that JOTS used the Agri Stats reports. [1513-6] at 148:16–149:16. Specifically, JOTS used the reports to determine when it was behind the industry average on pricing. [1643-91]; [1649-72]; [1649-60]. While Plaintiffs identified a few instances in which JOTS attempted to identify the other processors on the reports, such as with Butterball, there is no evidence that this was anything other than an independent effort. [1649-88]; [1649-80]; [1649-85]; [1649-89]; [1649-81]. Unlike in *Broiler Chicken*, where there were examples of the defendants exchanging their Agri Stats reports, here Defendants were not exchanging their Agri Stats reports as a form of data sharing. 702 F. Supp. 3d at 650 (discussing the evidence that some defendants exchanged the reports). Instead, all Plaintiffs have shown is that some Defendants made independent attempts to deanonymize the data based on their knowledge of the market. Further, as discussed in detail below, there is no evidence that JOTS was in an agreement with the other Defendants to use the Agri Stats reports in any particular way.

Lastly, JOTS argues that summary judgment should be granted because Plaintiffs failed to rule out the possibility that JOTS acted independently when it cut production. According to JOTS, its 2009 production cuts were the result of its then-president Mike Tolbert's 2008 bet on a long-range expansion in the turkey market by 100 million additional pounds, but Tolbert was "not a turkey guy," and this bet was contrary to the realities facing the industry. [1581] at 15. JOTS then replaced Tolbert as president in December of 2008, and JOTS started cutting production. *Id.*; [1684] ¶ 21. JOTS also asserts that two of its farms were destroyed by a tornado in 2008, resulting in a 27-million-pound deficit in its 2009 output, but this accounts for only about a third of JOTS' production decline in 2009. [1581] at 16; [1684] ¶ 25. As to the 2013 cuts, JOTS argues it was reacting to corn and grain prices. [1581] at 17.

While the reasons provided by JOTS as the basis for its actions have some merit, when considering the totality of the evidence against JOTS, there is sufficient evidence at summary judgment to tend to rule out the possibility that JOTS was acting independently. Thus, the evidence of JOTS' involvement with the 2008 Outlook Report, the NTF Executive Committee, and its communications with its competitors about production cuts, in context with the economic evidence, is sufficient for a reasonable jury to conclude by a preponderance of the evidence that JOTS agreed with Defendants to reduce the supply of turkey to increase the price. *Fructose*, 295 F.3d at 663 (denying summary judgment after finding there was enough evidence for a reasonable jury to infer an agreement). Therefore, summary judgment on Plaintiffs' *per se* claim against JOTS is denied.

### iii.    Prestage

Starting again with the economic evidence, the data shows Prestage reduced production in 2009 and 2013. Prestage admits that it cut production from 2008 to 2010 and reduced the volume of live turkey it processed from 2012 to 2013. [1742] ¶ 33; [1672] ¶ 20. Defendants' experts found that Prestage cut production in both 2009 and 2013. [1505-1] ¶ 51 & fig.3.1; [1505-13] fig.14. With the economic evidence of cuts established, the next inquiry is whether Plaintiffs' evidence shows a reasonable jury could find the existence of an agreement between Prestage and the other Defendants by a preponderance of the evidence.

As with Butterball and JOTS, Prestage was a member of the NTF Executive Committee and the Steering Committee for the 2008 Outlook Report. Beyond its membership on those

19

committees, Ron Prestage suggested creating the Outlook Report to the NTF Executive Committee. [1552-5]. In proposing the Outlook Report, Ron Prestage said, "he believes the current economic situation necessitates some type of discussion about industry production plans." *Id.* at 9. However, Prestage noted that "he recognizes that any such discussion must be in strict accordance with all federal antitrust laws. He thought some type of informational report could be useful." *Id.* Gary Cooper described Ron Prestage's suggestion to the NTF Executive Committee as having "our industry hire Agristats or EMI to survey all turkey companies on a regular basis to assess and evaluate the pounds intended to be marketed, to get a better idea of when this market will change around." [1643-54]. The evidence of Prestage's proposal of and involvement with the creation of the Outlook Report, which contained production forecasts for use by the Defendants, supports a reasonable inference that Prestage was part of the agreement to reduce supply. *Kleen*, 910 F.3d at 938 (plaintiffs must offer more than mere speculation about the content of the information exchanged at industry conferences for the evidence to weigh in favor of the existence of a conspiracy).

Further, as discussed above, Plaintiffs have offered evidence that Prestage discussed its production plans with its competitors at the NTF meetings. [1643-54]. Prestage appears to have directly communicated with its competitors about its production plans. Prestage discussed both its plans and its communications with Butterball, Cargill, and Raeford about their production plans, with JOTS in 2008, 2009, and 2012. [1643-97]; [1641-32]; [1641-33]; [1641-35]; [1643-99]. As an example, on July 15, 2008, a Prestage representative told JOTS about Prestage's production cuts and about what Cargill and Butterball were doing. [1643-97]. In September 2012, a Prestage employee informed JOTS that Prestage would cut "between 5-7%" in 2013. [1643-99]. Prestage continued to share its production plans with its competitors in 2015 and 2016. [1641-41]; [1641-42].

In addition to its conversations with other processors about production plans, Prestage began "swapping" its production information with Cooper Farms in August 2009. [1641-38]. On August 28, 2009, Ron Prestage emailed Cooper Farms Prestage's production results for its tom operation. *Id.* Gary Cooper circulated this report at Cooper Farms and informed them that they were "now swapping production results, in confidence, with Prestage Farms." *Id.* After swapping and reviewing the reports, Prestage and Cooper Farms planned to arrange reciprocal visits. *Id.*

As with Butterball and JOTS, there is some evidence that Prestage reviewed pricing data in the Agri Stats reports to see how its prices compared with the national average. [1643-12]; [1643-117]. But as discussed further below, Plaintiffs have not identified evidence to support the concept that Prestage agreed with Defendants to use the Agri Stats reports to restrain production. Further, Prestage did not subscribe to the Bottom Line Report, which ranked the processors by profits per pound. [1583] at 21; [1672] ¶ 26. Nor have Plaintiffs provided any evidence that Prestage attempted to deanonymize the Agri Stats reports it received. [1583] at 21; [1680] ¶ 75.

Like the other Defendants, Prestage argues that it acted independently in making production cuts in 2009 and 2013. Prestage asserts that it eliminated its second shift in 2009 to be more flexible and because it was incurring losses. [1583] at 19. Prestage also began purchasing turkey parts from other suppliers and shifting its product mix toward higher-margin value-added products. *Id.* at 20; [1672] ¶ 19. But when considered holistically, and given the evidence of Prestage's direct communications about production plans, Plaintiffs presented evidence that tends to exclude the possibility that Prestage acted independently. The evidence is not conclusive, but it

20

is highly suggestive of an explicit, albeit covert, agreement to fix prices. *Fructose*, 295 F.3d at 663. The documentary evidence of Prestage's involvement with the creation of the Outlook Report and its communications with its competitors about production plans, when combined with the economic evidence, is sufficient for a reasonable jury to find by a preponderance of the evidence that Prestage joined the conspiracy to cut production with the other Defendants. *See Broiler Chicken*, 702 F. Supp. 3d at 666 (finding evidence of direct communications with competitors about production plans plus evidence of discussion at industry conferences was sufficient non-economic evidence of agreement to survive summary judgment). Therefore, summary judgment on Plaintiffs' *per se* claim against Prestage is denied.

### iv. Foster

Beginning with the alleged reductions, Foster Farms admits, and the economic evidence shows, Foster cut production from 2008 to 2009 and from 2012 to 2013. [1742] ¶ 28; [1505-1] ¶ 51 & fig.3.1; [1505-13] fig.14. With the economic evidence established, the question turns on whether Foster's production cuts were part of an agreement with the other Defendants to cut production.

Like the other Defendants, Foster was a member of the NTF and attended the July 8, 2008, NTF meeting at which the 2008 Outlook Report was proposed, the October 26, 2008, meeting at which the initial draft was presented, and the December 19, 2008, conference call. [1747] ¶¶ 2, 3; [1674] ¶ 33; [1643-129]. However, beyond Foster's attendance at these meetings, there is no indication of its direct involvement in the creation of the 2008 Outlook Report. Foster's attendance at these meetings provided an opportunity to conspire, but is insufficient on its own to support an inference of an agreement. *Kleen*, 910 F.3d at 938 (finding communications between executives and attendance at trade associations without evidence that "moves beyond speculation about the content of what was conveyed" was insufficient to create a trial issue for the jury). Absent direct evidence of an agreement, there must be some evidence that Foster took an action that supports an inference that an agreement to restrict production occurred.

The evidence is weak. Plaintiffs' primary evidence is not a discussion between competitors, but rather only internal communications within Foster about its competitors' prices. [1646-3]. Plaintiffs identify evidence showing Foster discussing its competitors' prices internally, but that evidence, without more, is not sufficient to establish an agreement. While there is an email showing Cooper Farms internally discussing Foster cutting production in August 2008, it is not evident that this information came directly from Foster rather than from another source. [1643-57]. It therefore cannot be inferred from the text of Cooper's email that he was discussing or coordinating with Foster.

Plaintiffs also point to evidence that in 2013 and 2014, Foster was aware of other processors' pricing when discussing how to price their own products, but that alone does not support an inference that Foster had an agreement to conspire with those Defendants. [1646-3]; [1646-68]. While the January 2013 email Plaintiffs rely on includes comments about Prestage's and Butterball's prices, the email thread does not support the inference that Foster learned those prices from its competitors. [1646-3]. In an April 2014 email thread about a price increase for a customer, Foster's employees discussed the "word on the street" about competitors' pricing. [1646-68]. But again, discussion internally about what they think their competitors are charging is not evidence that they had an agreement with those competitors; it is not even evidence that Foster

21

was directly communicating with them. A processor's speculation about its competitors' pricing while determining its own pricing does not show that the competitors had an agreement. Indeed, taking into consideration a competitor's prices when setting a company's own pricing is typical business practice. Nor does evidence that Foster sought to take advantage of the higher prices in 2014 when finalizing a deal indicate that it had an agreement with the other Defendants to induce those prices. [1646-65]. Given the limited substance of the email communications offered, there cannot be a reasonable inference allowing a finding that Foster agreed to cut production with other Defendants.

While Plaintiffs have some evidence showing direct communication between competitors, it does not coincide with the timing of Plaintiffs' alleged industry-wide cuts. Plaintiffs identified evidence that Foster was communicating with JOTS in September of 2015 about JOTS' production plans. [1643-82]; [1646-15]. But this evidence does not overlap with the cuts Plaintiffs argue form the basis of the alleged conspiracy in 2009 or 2013. Likewise, an email from June 2016 about a visit by Foster employees to Perdue to discuss a prior process implementation at Foster does not establish an agreement to cut production retroactively in 2009 or 2013. [1646-26]. The economic evidence in this case involves a conspiracy to reduce production in 2009 and 2013; inferring a supply reduction in that period from communications in 2015 and 2016 is an unreasonable inference.

Further, one of the key emails Plaintiffs rely on is taken out of context—Foster's employee's comment that "I think we are all aligned." [1643-82]. This is an email thread among Foster employees discussing their sales requests, in which one employee references a conversation he had with someone at JOTS. The response, "I agree the answer to all new fresh request for thanksgiving or Christmas need to be NO THANK YOU so I think we are all aligned[,]" was a comment on how to handle new bookings and that the Foster employees were aligned on that subject, not that Foster agreed to be aligned with JOTS. *Id.* While Plaintiffs are entitled to the evidence being viewed in their favor, the inferences from that evidence must be reasonable, and here it is not. Similarly, Foster's Vice President of Turkey Yubert Envia's remarks at the NTF's annual convention on February 13, 2010, are used out of context. In his speech, Envia said, "I'd like to commend you (Gator) and the N-T-F staff for planning and executing such a successful convention. Once again, during tough times this industry gets together and finds ways to collaborate and coordinate, making us an even better industry."[18] [1646-34]. He later stated, "I've already alluded to the fact that we just lived through one of the toughest years. I guess I could say that I am somewhat optimistic about our future profitability, but I don't think we should be relying on production as an indicator, but more on capturing a larger share of the consumer's interest in the variety of turkey products in the marketplace." *Id.* The rest of the speech was about the NTF's plans to address regulatory, legislative, and environmental issues facing the industry. Thus, when read in context as part of the introduction to a speech, the comments identified by Plaintiffs do not support a reasonable inference of a secretive agreement to restrict production. Rather, the comments about coordination were more generally about holding an industry-wide conference to discuss myriad industry issues. Further, Yubert's comments about future profitability specifically note that they are not looking at production but at the industry's attempts to gain a larger market

---

[18] Walter "Gator" Pelletier was the CEO of Butterball and represented Butterball on the NTF Executive Committee. [1742] ¶ 4. Pelletier was the NTF chairman the prior year.

share of customers' purchases, which also does not support an inference of an agreement to reduce production.

Plaintiffs also argue that Foster's involvement with the NTF's Turkey Demand Enhancement Team is evidence of their agreement to the scheme. According to Plaintiffs, the Demand Enhancement Team restricted supply to increase production of profitable turkey pounds rather than overall turkey production. [1682] at 11. While the turkey processors frame the initiative as aimed at increasing demand before increasing production, Plaintiffs assert that it is a demand restriction. Gary Cooper discussed the initiative as "20 by 2020" with a theme of combining competition and cooperation to become "Coopetition" to promote turkey. [1643-55]. But beyond identifying a few statements from Gary Cooper about the plan, Plaintiffs have not put forward evidence of Foster's agreement to the ideas promoted by Cooper. Given the limited substance of the documents, too many inferences are required to find that Foster agreed to cut production with other Defendants.

As with the other Defendants, Plaintiffs contend that Foster's receipt and use of the Agri Stats reports is evidence of Foster joining the agreement. [1682] at 16–18. While it is undisputed that Foster received some of the Agri Stat Reports during this period, simply receiving the reports is not evidence of an agreement to use them in a particular way. [1747] ¶ 8. Instead, Plaintiffs argue that their expert determined that the metrics contained in the Agri Stat Live/Growout Reports "could be used to forecast output." [1682] at 16–17. But Plaintiffs have not put forth evidence showing that Foster actually used the reports this way, let alone had an agreement with the other Defendants to use the reports in that manner. The mere opportunity to collude is insufficient to show actual participation in a conspiracy.

Plaintiffs' argument that the Agri Stats reports were used to identify the average price for various products and then to identify opportunities for Defendants to increase prices when they fell below the average also does not move the needle. In an August 28, 2014, email, a Foster employee wrote: "Attached is a recap from the latest Agristats book, this should be used as a guide to see if we are close in pricing." [1643-177]. Then, in January 2015, Foster employees were instructed to "put together an action plan on how we can address the gaps" when Foster was "under on commodity prices." [1643-81]; *see also* [1646-47]. But standing alone, the fact that Foster compared the Agri Stats price averages with their own prices does not support the inference that Foster was part of an agreement to cut production. Wanting to know if competitors are charging more for a commodity product is a normal business activity and alone is insufficient to infer that Foster was acting as part of any agreement with its competitors.

Plaintiffs also identify an email from December 2013 where Foster employees were discussing Agri Stats data and a future discussion with Costco, and wrote: "Be sure NOT to send this file." [1646-9]. Plaintiffs assert that this email supports their argument that "Foster knew not to mention its use of Agri Stats to Costco" and was seeking to hide its use of Agri Stats data from Costco. [1682] at 18. But that inference is not reasonable when read in the context of the entire email thread. The email chain begins with a Foster employee writing, "Attached is the feed model we reviewed today. The first tab contains the details for internal use only. The second tab was changed to provide only the industry average Agristats data and an overall yield from a WOG to finished product rather than the detailed steps in between." [1646-9]. Then Foster's Senior Vice President of Sales responds, "Let's discuss again prior to showing to Costco. Be sure NOT to send this file." *Id.* Therefore, the comment about not sending the file, when read in context, did not

23

mean that Foster would never discuss the Agri Stats feed model data with Costco, but rather that a document containing a separate tab labeled "details for internal use only" should not be sent to a customer. Contrary to Plaintiffs' argument, this does not support an inference that Foster was concealing the existence of Agri Stats as part of a conspiracy.

Plaintiffs also contend that Foster's inability to meet its production commitments to Costco is evidence of the agreement. [1682] at 14–15. Plaintiffs identified internal Foster emails from June and November 2013 in which employees discuss how to handle Foster's inability to meet its commitments to Costco. [1646-8]; [1646-67]. The inference to be drawn is that Foster failed to meet its planned production target. However, these emails do not show Foster seeking to increase its prices as a result of the production losses, nor do they indicate that Foster had agreed with other processors to make cuts.

Foster also argues that the evidence shows it acted independently. First, Foster points out that it is based in California, which differentiates it from the largely Midwest-focused turkey industry. [1579] at 7. This geographical distinction meant Foster faced higher feed costs because it had to ship supplies across the country, and it focused on West Coast customers. *Id.* at 7, 14. Foster also made a strategic shift towards premium organic and antibiotic-free products, which were a higher-margin market segment. *Id.* at 14; [1674] ¶ 11. While Plaintiffs argue that these facts do not matter to the analysis, they do not dispute them.

Having discussed each piece of evidence separately, the Court now considers the evidence against Foster in its totality to determine whether it is sufficient to defeat summary judgment. *Fructose*, 295 F.3d at 663. While the economic evidence shows that Foster had the opportunity and incentive to conspire, unlike Butterball, JOTS, and Prestage, there is insufficient evidence that Foster communicated with its competitors to support a reasonable inference of an agreement. *Kleen*, 910 F.3d at 941 (finding that although the purchasers offered some evidence of suspicious activity, it was not enough to permit a trier of fact to find impermissible conduct). The evidence Plaintiffs put forward is inadequate for a reasonable jury to conclude that they meet their burden by a preponderance of the evidence, and summary judgment must be granted for Foster on the Plaintiffs' *per se* claims.

### v. Perdue

The economic evidence that Perdue joined the conspiracy to reduce production is also weak. Perdue argues that its turkey production increased by four percent from 2008 to 2016 and that it increased during both periods. Plaintiffs allege coordinated cuts occurred from 2008 to 2009 and from 2012 to 2013. [1596] at 5. Defendants' experts' analysis concluded that Perdue's production increased year-over-year from 2008 to 2009 and from 2012 to 2013. [1505-1] ¶ 51 & fig.3.1; [1505-13] fig.14. Plaintiffs respond that Perdue's cuts need not be identical to the other Defendants for them to act in parallel to restrict turkey production and that there is other evidence that Perdue was cutting production.

Plaintiffs largely rely on documentary evidence to show that Perdue engaged in turkey production cuts and restrictions. For example, Plaintiffs identify Perdue's internal forecast presentations which noted that its November 2009 year-to-date production was "down close to 10% in both head count and live weight" compared to 2008. [1643-113]. Then on April 21, 2009, in a message to its turkey growers, Perdue wrote, "Our competitors have made cutbacks, but it appears that additional cuts will be required on behalf of the industry. Perdue Farms has made

24

modest reductions over the past year, and we will continue to evaluate options as we move forward into the fiscal year." [1643-114]; [1762] ¶ 12. Similarly, in both 2012 and 2013, Perdue sent letters to its turkey growers referencing production cuts. In its Director's Message on November 26, 2012, Perdue wrote: "Effective with late December placements, Perdue will take a modest 5% reduction in placements of both toms and hens." [1640-7]; [1762] ¶ 15. Perdue also noted that its "housing building program and expanding the poult exchange program will be put on hold until the business climate becomes more favorable" and instructed its growers to contact them if they had concerns about how the reductions would impact their facilities. [1640-7]. Then in his 2013 message, Tom Schaffer acknowledged that "cycles have been very tight over the past two years[.]" [1640-8]. According to Plaintiffs, this contemporaneous documentation shows that Perdue was restricting production in 2009 and 2013.

Plaintiffs also rely on their expert's analysis, which showed that in a but-for world where the alleged conspiracy did not occur, Perdue would have produced more turkey. [1643-3] fig.A43. This regression has some value, as companies may agree to smaller increases in production as part of a conspiracy. But unlike the other Defendants, the economic evidence that Perdue reduced production is not as strong, given the evidence above. But that does not end the analysis, as the Court must still consider whether Perdue joined the agreement.

As discussed above, Perdue was a member of the NTF Executive Committee when the 2008 Outlook Report was voted on and discussed. Randy Day attended the NTF Executive Committee meetings on behalf of Perdue, including the one on October 26, 2008, when the draft 2008 Outlook Report was presented. [1640-4]; [1640-13] at 160:20–161:9; [1643-77]. Perdue also allowed for its data to be used in the Outlook Report. [1640-3]. However, beyond attendance at the NTF Executive Committee meetings at which the report was discussed, the evidence does not show that Perdue was involved in planning or creating the Outlook Report. Nor does Perdue's mere attendance at the NTF meetings establish that it joined the agreement, without evidence of communications with the other Defendants. As with Foster, this attendance indicates only that Perdue had the *opportunity* to collude, not that it joined the agreement. *Kleen*, 910 F.3d at 938 (finding frequent contacts between company executives and attendance at trade association meetings merely offer "the *opportunity* to conspire" but that "does not necessarily imply that wrongdoing *occurred*.") (emphasis in original).

While Perdue is referenced occasionally in the other Defendants' emails as planning production cuts, the evidence does not support an inference that Perdue shared the information as part of an agreement to cut production. When Perdue is referenced, it is in the context of the other processors having heard things about Perdue, but the information itself was not directly from Perdue. Instead, these statements are framed as being from "pretty good sources" or that Perdue is making a cut, "but Jim isn't here for this meeting" so the amount could not be confirmed. [1590-34]; [1643-59]. Evidence that Perdue's competitors were speculating about Perdue cutting production is insufficient to show that Perdue discussed plans to cut production with its competitors.

Plaintiffs rely on a single email from 2013 in which a Cooper Farms employee describes a phone call he had with Tom Schaeffer at Perdue, during which Schaeffer tried "to sell some eggs because they are cutting back 5-10%." [1643-42]. But an inference that Perdue joined a conspiracy to reduce supply because it once offered to sell eggs to another processor is too attenuated an inference to satisfy Plaintiffs' burden at summary judgment. While Perdue was aware of the

cutbacks happening in the industry in 2009 and was taking advantage of the resulting price increases, that is merely evidence of tacit collusion. [1640-6] at 42.

Similarly, while there is evidence from 2014 that Perdue recognized the high per-pound price of turkey, that does not, on its own, show that Perdue was part of an agreement to conspire to raise prices to that level. [1643-197] at 11. A company celebrating high prices and the resulting higher profits does not inherently lead to an inference of anticompetitive collusive behavior.

Plaintiffs next argue that Perdue's use of the Agri Stats reports is evidence that it joined the agreement. The record shows that Perdue possessed the Agri Stats reports and used them to compare its prices to the industry averages. [1643-196]. Perdue's Director of Financial Planning and Analysis testified that the sales team used the Agri Stats reports "to identify possible opportunities to increase profitability." [1640-15] at 149:25–150:6. In a January 2015 presentation, Perdue used Agri Stats data to identify that its bone-in turkey parts pricing was below its competitors' and that it was going to increase its retail price. [1640-18]. In an August 17–19, 2015, Strategic Plan Update, Perdue used Agri Stats averages to track its profit performance improvement over the prior year and noted that it had gone from last to competitive. [1640-24]. But even if Perdue was using Agri Stats data to identify products on which it was pricing below average and then trying to increase its prices on those products, that does not support a reasonable inference that Perdue joined a conspiracy with its competitors.

Plaintiffs also contend that Perdue's awareness that the reports could be deanonymized was evidence that Perdue was part of the agreement. In support of this, Plaintiffs rely on an email in which Perdue employees speculated that Butterball may have determined it was number one in the rankings in August 2015. [1640-11]. There is also one email in which Perdue employees discuss that an Agri Stats employee told them that the number-one processor on the Operations Profit Report was not on the Bottom Line report, so, by default, it had to be Norbest or West Liberty, neither of whom is a defendant in this lawsuit. [1590-37]. However, this is not evidence that Perdue was attempting to deanonymize the reports, nor does it support an inference that Perdue suspected a widespread practice by other processors of deanonymizing reports. Nor does it show any agreement to do so. Therefore, the inference Plaintiffs are asking for—that Perdue joined the agreement because it would be irrational for them to continue to participate in Agri Stats data collection if they knew the reports could be deanonymized—is too attenuated to be reasonable.

Perdue also argues that it acted independently by shifting towards no-antibiotics-ever turkey products. [1596] at 7, 15. Perdue asserts that it did this because the shift had been successful in its chicken business. [1596] at 7; [1678] ¶ 15. This shift led to higher costs and ultimately failed to improve Perdue's profitability. [1596] at 8; [1678] ¶¶ 19, 20, 22. As with Foster, although Plaintiffs dispute the importance of this information, they do not dispute these facts.

After considering all the evidence presented by Plaintiffs, the Court finds that they have failed to meet their burden of proving that a reasonable jury could find, by a preponderance of the evidence, that Perdue was part of an agreement. While it is possible that a processor who knows about the conspiracy would want to join the conspiracy, it is equally possible that a processor would instead opt to sit on the sidelines while reaping the benefits of the conspiracy without ever joining it. Evidence showing that Perdue was aware of, and even benefited from, the other Defendants' agreement does not show that Perdue joined that agreement. Nor does the evidence exclude the possibility that Perdue was acting in a self-interested but permissible way. *Kleen*, 910 F.3d at 939 (finding the purchasers' economic and noneconomic proof failed to exclude the

possibility that the defendant acted in a permissible, self-interested way). As with Foster, none of this evidence indicates that Perdue acted to join the conspiracy. Therefore, no reasonable jury could find that Perdue conspired with its competitors. Thus, summary judgment on Plaintiffs' *per se* claim against Perdue is granted.

### c. Hub-and-Spoke Theory of Liability

Certain DAPs also argue that the Defendants' exchange of information through the Agri Stats reports violated the Sherman Act under a hub-and-spoke conspiracy theory, with Agri Stats as the hub and the processor Defendants as the spokes. Before addressing the arguments raised by the parties, it is important to understand the case law on the hub-and-spoke theory and how it differs from other theories of liability under the Sherman Act. This *per se* theory requires both vertical agreements—the spokes—between the central defendant and each of the other defendants and horizontal agreements—the rim—between each of the other defendants. The premise of the hub-and-spoke theory is most clearly articulated in *Interstate Circuit v. United States*, 306 U.S. 208 (1939), and *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928 (7th Cir. 2000).

Starting with the Supreme Court's decision in *Interstate Circuit v. United States*, the evidence showed that a motion picture exhibitor sent a letter to the distributor defendants proposing to increase their movie prices uniformly. 306 U.S. 208, 215–17 (1939). The agreements between the exhibitor and each distributor were vertical. The court then considered whether the circumstantial evidence supported the existence of horizontal agreements between the distributors. The letter was addressed to all eight distributors, so they knew from the beginning that the proposal was being considered by their competitors. *Id.* at 222. As they were in active competition, without substantial unanimous action, there was a risk of a substantial loss of business. *Id.* Therefore, they had a strong motive to take concerted action given the prospect of increased profits. *Id.* Further, the proposal involved a radical departure from the prior business practices and a dramatic increase in prices. *Id.* The court found that this evidence was sufficient to infer that a horizontal agreement existed between the distributors. *Id.* at 226–27.

The other leading and binding precedent on the hub and spoke theory of liability is *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928 (7th Cir. 2000) (*TRU*). Toys "R" Us was a giant in the retail toy industry, but faced with the changing landscape brought on by the advent of club warehouses, Toys "R" Us sought to change its contracts with some of its manufacturers. *Id.* at 930–31. Toys "R" Us met individually with each of its manufacturers and negotiated agreements stipulating that they would sell only highly differentiated products to the warehouse clubs. *Id.* at 932. But Toys "R" Us was not content with stopping at these vertical agreements, so it orchestrated horizontal agreements among its key manufacturers to boycott the warehouse clubs, to alleviate their concerns that if one manufacturer broke ranks and sold to the clubs, it would gain sales at its competitors' expense. *Id.* The Seventh Circuit found that the manufacturers' "sudden adoption of measures under which they decreased sales to the clubs ran against their independent economic self-interest." *Id.* Importantly, the manufacturers stated that they accepted the terms of the agreements because they were assured by Toys "R" Us that their competitors were doing the same. *Id.* at 932–33. The Seventh Circuit found that the manufacturers' abrupt shift from their past actions and their suspicious decision to deprive themselves of a profitable sales outlet, together with evidence of direct communication, was sufficient to establish horizontal agreements. *Id.* at 935–36. The evidence showed that the manufacturers feared their competitors would cheat and sell to the clubs, so the only way they would agree to Toys "R" Us' demands was if they could be sure

27

their competitors were doing the same. *Id.* at 936. In essence, Toys "R" Us asked the manufacturers to reduce their output, which they were only willing to do if Toys "R" Us could protect them against their competitors cheating. *Id.* Therefore, the Seventh Circuit found that Toys "R" Us sought to disadvantage the warehouse clubs by coercing manufacturers to deny them products and inducing them to collude rather than compete. *Id.*

With the basics of what constitutes a hub-and-spoke theory of liability established, the Court turns to its application in this case. [19] Defendants contend that the DAPs failed to establish a horizontal agreement among the processor Defendants because they did not identify any evidence that Defendants agreed to use the Agri Stats reports to increase prices or restrict turkey supply. [1580] at 49. The DAPs respond that they do not have to show evidence of communication between the processor Defendants and that they have shown a years-long scheme existed to exchange confidential pricing information through the Agri Stats reports. [1691] at 9. The DAPs argue that because the Agri Stats reports listed the participants, showed the variance between participants' prices and the average national price, and marked products where a processor was below the average as opportunities, this establishes that there was an agreement between Defendants. The DAPs' argument is meritless. [20]

Unlike *TRU* and *Interstate Circuit*, there was no communication between Agri Stats and the processor Defendants instructing them to raise their prices. At most, the evidence shows that Agri Stats identified products where a processor was selling at prices below the national average. Still, unlike in *Interstate Circuit*, there was no demand by Agri Stats that the processor raise its prices. There is also no evidence that Agri Stats ever discussed, let alone assured, the processor Defendants that their competitors agreed to raise prices. Unlike in *TRU*, there is no evidence that Agri Stats communicated to the processors that it would protect them and prevent their competitors

---

[19] While the parties focus their arguments on whether the DAPs provided sufficient evidence to show a horizontal conspiracy between the processor Defendants, there remains the issue of whether vertical agreements existed between Agri Stats and the processor Defendants as Agri Stats is not a participant in the distribution of turkey products in a traditional sense. Agri Stats' position in the turkey industry was fundamentally different from that of the hubs in *Interstate Circuit* and *TRU*. In those cases, the hubs—the exhibitor and Toys "R" Us—were participants in the industry and stood to gain financially from the terms they proposed to their distributors and suppliers. But here, Agri Stats was not a vertically integrated participant in the turkey industry. Instead, it was a third-party selling benchmarking reports to industry participants. Unlike in *TRU*, Plaintiffs have not put forward evidence that Agri Stats benefited from vertical agreements—one that runs between a supplier/manufacturer and the purchaser/retailer—in the way that Toys "R" Us sought to eliminate the competitive threat posed by the warehouse clubs through its agreements with its manufacturers. *TRU*, 221 F.3d at 932. But the parties failed to sufficiently address this issue, so the Court will not delve further.

[20] The DAPs repeatedly reference Judge Tunheim's decision in *Pork* and imply that it supported their position on the hub-and-spoke theory. [1691] at 16–17. However, the DAPs misstate and misquote the court's findings in *Pork*, which ultimately rejected the DAPs' argument that this theory could apply to the Agri Stats reports used in the pork industry. Perhaps most egregiously, the DAPs argue the Judge Tunheim "concluded that 'the DAPs' had 'put forth ample evidence of a hub-and-spoke agreement.'" [1691] at 16. However, this misquotes the court, as the sentence did not end after the word "agreement" and instead the court continued on to find that such evidence was "insufficient—on its own without corresponding evidence of parallel conduct—to establish a per se violation of § 1." *In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 800 (D. Minn. 2025).

from 'cheating' on the alleged agreement to increase prices. Agri Stats simply provided the processor Defendants with the information they paid for; what they did with it was up to the processors. The fact that the Agri Stats reports listed the participants without more does not establish an agreement among the Defendants to do anything, much less a horizontal agreement to increase prices. Further, in *TRU* and *Interstate Circuit*, the inference of a horizontal agreement was based on evidence of drastic and otherwise illogical shifts from past practices. The DAPs failed to offer any evidence of such a drastic or illogical shift in the processor Defendants' actions.

With their hub-and-spoke theory, the DAPs are attempting to fit a square peg into a round hole. Based on the evidence before the Court, Agri Stats' conduct was not analogous to how Toys "R" Us responded to the threat of warehouse clubs. Instead, when pruned to its core elements, the DAPs' hub-and-spoke argument is nothing more than a reframing of their information exchange theory, which, for the reasons discussed below, also fails.[21]

Therefore, the DAPs have failed to present evidence to support their hub-and-spoke theory of liability.[22] As such, summary judgment is granted to Defendants Butterball, JOTS, Prestage, Foster, and Perdue on this argument, and the DAPs may not proceed with a hub-and-spoke theory at trial.

## II. Rule of Reason Claim

In addition to their theory that Defendants agreed to restrict supply as a *per se* violation of the Sherman Act, Plaintiffs alleged that Defendants violated the rule of reason by agreeing to exchange competitively sensitive information through Agri Stats.[23] An information exchange claim is not a *per se* violation of the Sherman Act, but it can be an independent violation under the rule of reason. *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001). The rule of reason requires courts to conduct a fact-specific assessment to determine the restraint's actual effect on trade. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). As such, Plaintiffs' information exchange claim is tested using the rule of reason's three-step burden-shifting framework. First, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* Next, if the plaintiff carries its burden on the first step, "the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* Finally, if the defendant shows a procompetitive rationale, "the burden shifts back to the plaintiff

---

[21] On this point, because the DAPs failed to establish a horizontal agreement between Defendants to use the Agri Stats reports to increase prices, the Court does not address in this section the DAPs' arguments about Defendants deanonymizing various reports or how the reports were used. These arguments are addressed below in the discussion of the rule of reason claim.

[22] The parties also dispute whether the DAPs are required to establish parallel conduct and plus factors for their hub-and-spoke theory. The Court does not reach this issue because DAPs failed to show there was an agreement between Defendants to use the Agri Stats reports to increase prices.

[23] Plaintiffs' rule of reason claims are as follows: (1) DPPs – Claim I [665] ¶¶ 564–80; (2) CIIPPs – Claim I [666] ¶¶ 553–69; (3) Winn-Dixie and Bi-Lo – Claim I [379] ¶¶ 524–40; (4) Aramark – Claim I (Aramark's Amended Complaint, *Aramark Food & Support Servs. Grp., Inc. v. Agri Stats, Inc., et al.*, No. 23-cv-4404, [7] ¶¶ 516–32); (5) Carina – Claim I (*Carina Ventures LLC v. Agri Stats, Inc., et al.*, No. 23-cv-16948, [112] ¶¶ 251–73 (Carina does not indicate whether this claim is brought under a *per se* or rule of reason theory)); (6) Amory – Claim I (*Amory Investments LLC v. Agri Stats, Inc., et al.*, No. 21-cv-006600, [1] ¶¶ 132–49).

to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542.

Plaintiffs bear the initial burden of proving that Defendants' exchange of information through Agri Stats reports had a substantial anticompetitive effect that harmed the relevant market.[24] Plaintiffs can make the initial showing through either direct or indirect evidence. *Id.* "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* (cleaned up) (internal quotations omitted). "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.* Plaintiffs argue that they have provided direct and indirect evidence, but as they refer to the same evidence in both categories, the Court considers them together.[25] Under an information exchange theory, the question of whether there is a substantial anticompetitive effect turns on the nature of the information exchanged. *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).

Plaintiffs have two contentions about how Defendants used the Agri Stats reports in their information exchange claim.[26] First, Plaintiffs argue that Defendants could use flock and breeder data on certain Agri Stats reports to monitor compliance with the scheme. [1690] at 58–63. Second, Plaintiffs contend that Defendants could use other Agri Stats reports to identify "opportunities" to increase their prices. [1690] at 36–43, 63. As a basis for both theories, Plaintiffs argue that Defendants deanonymized the Agri Stats reports. Before considering either theory, it is important to revisit the nature of the Agri Stats reports—what data they contained and which ones Defendants deanonymized.

The Agri Stats reports referred to in this litigation are a collection of seven monthly reports and books published by Agri Stats that cover various stages of the production process and the standalone Bottom Line Report. [1680] ¶¶ 62, 63. All information in the Agri Stats reports was anonymized, except for the processor's own data. *Id.* ¶ 62.[27] The first group of reports provided information on Defendants' production process and costs. These reports included the Turkey Breeder Report, Turkey Growout Report, the Turkey Processing Book, and the Turkey Further Processing Book, which provided information on the costs of breeding, raising, and slaughtering

---

[24] The parties do not contest the scope of the relevant market. It is undisputed that during the class period, Agri Stats supplied reports to between 80-95% of the turkey industry. [1742] ¶ 9.

[25] To the extent Plaintiffs seek to rely solely on their expert analysis as direct evidence to show that the Agri Stats reports had a substantial anticompetitive effect, they have failed to make that case. While it may be possible for the same expert analysis to underlie both the *per se* and rule of reason claims, Plaintiffs do not explain how their experts' regressions apply to their rule of reason claim, which is limited to only the information exchanged on the Agri Stats reports and not all the other evidence underlying the *per se* claim. It is not the role of the Court to make Plaintiffs' arguments for them, and therefore, how the experts' regressions could separately apply to the rule of reason claim will not be considered.

[26] Plaintiffs' rule of reason argument in their joint brief is sparse and undeveloped. In their sixty-page brief, Plaintiffs devote a total of five pages to this theory.

[27] Plaintiffs dispute the description of the data on the report as anonymized because they argue that certain processors could deanonymize it. [1680] ¶ 62. But the reports as provided to the processors were anonymized.

30

turkeys, along with certain flock and conversion information. *Id.* The second group of reports provided profit and pricing information. The Turkey Operations Profit Book provided the operation profit for each facility. *Id.* The Turkey Express Sales Book contained a facility-by-facility comparison of the prices of all products produced at each facility against the national average for a similar bundle of products. *Id.* This report also ranked the facilities and provided both a national average of similar products and the 25th upper percentile of sale prices. *Id.* The Turkey Customer Sales Book was like the Express Sales Book, but without a ranking by facility; instead, it compared a processor's products sold to a particular customer against a national average. *Id.* The standalone Bottom Line Report provided a summary table of industry-wide birds, live pounds, and averages for live weight and profit per pound, followed by information ranking subscribers by profit per pound. *Id.* ¶ 63; [1512-2].

Plaintiffs' sweeping contention that Defendants were deanonymizing the reports is unsupported by the evidence. For the five Defendants discussed here, the majority were not even attempting, let alone successfully deanonymizing, most, if any, of the Agri Stats reports. Plaintiffs argue that Butterball deanonymized the Turkey Breeder Report and the Bottom Line Report, and that Butterball once deanonymized the Turkey Express Sales Book to identify Cargill's pricing. [1680] ¶ 62; [1643-29]; [1643-37]. Similarly, there is limited evidence that JOTS attempted to identify competitors' prices in the Agri Stats reports by using outside information and comparing its profit levels to competitors based on who it believed the competitors were in the Agri Stats reports. [1649-88]; [1649-80]; [1649-85]; [1649-89]; [1649-81]. However, the evidence of deanonymization ends there. For Perdue, Plaintiffs point to a single email in which Perdue determined that the number-one processor on an Operations Profit Report was either Norbest or West Liberty, based on something an Agri Stats employee said, but there was no other evidence that Perdue was attempting to deanonymize the reports. [1590-37]. And Plaintiffs failed to identify any attempts by Prestage or Foster to deanonymize the Agri Stats reports. [1680] ¶ 75.[28] The limited evidence showing that a few Defendants deanonymized some reports is insufficient to infer that all Defendants deanonymized all reports to monitor and enforce an agreement to increase prices and reduce supply. This distinguishes the facts here from those in *Pork*, where there was evidence that the defendants attempted to deanonymize the reports with an estimated 60% success rate. *In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 870 (D. Minn. 2025).

Compounding the problem for Plaintiffs is that, even setting aside the limited evidence of deanonymization, there is no evidence that Defendants used the Agri Stats reports as Plaintiffs propose. While Plaintiffs' experts offered methods by which a processor could have mathematically reverse-engineered a competitor's price from the Express Sales Book, Plaintiffs failed to identify evidence showing that Defendants actually did that. [1680] ¶ 62. Similarly, although Plaintiffs argue that Defendants could theoretically use the reports to monitor their competitors' future production levels to ensure compliance with the alleged scheme, Plaintiffs failed to identify any evidence that Defendants did so. In fact, Plaintiffs have identified only one defendant, Butterball, attempting to deanonymize those reports. [1690] at 59. Plaintiffs' theories of how the reports could be used, without evidence showing how they were actually used, cannot support a reasonable inference that exchanging that information had a substantial anticompetitive effect on the market.

---

[28] Plaintiffs admitted that they have not identified any evidence of efforts by Farbest, Foster, Raeford, Prestage, and Tyson to deanonymize the Agri Stats Reports. [1680] ¶ 75.

31

Finally, the Court considers whether the evidence provided to the processor Defendants about their competitors' prices in the Turkey Express Sales Book and the Turkey Customer Sales Book is of the type that courts view as creating substantial anticompetitive effects. The Turkey Express Sales Book provided anonymized price mixes by facility, and the Turkey Customer Sales Book provided a processor's prices for a customer, broken out by product and compared to a national average.

Generally, price exchanges that provide details about particular parties, transactions, and prices are considered to have a higher potential for anticompetitive effects than exchanges of aggregated data. *Todd*, 275 F.3d at 212. In *Maple Flooring Mfrs.' Ass'n v. United States*, the Supreme Court considered how to address an information exchange claim when the defendants reported to the association weekly the "dates of sales made by the reporting member, the quantity, the thickness and face, the grade, the kind of wood, the delivery, the prices at which sold, the average freight rate to destination, and the rate of commission paid, if any." 268 U.S. 563, 573 (1925). The association compiled data and promptly reported back to the membership statistics, including "the identifying numbers of the mills making the reports, and information as to quantities, grades, prices, freight rates, etc., with respect to each sale." *Id.* The Supreme Court noted that this type of compiled information is widely available and did not differ substantially from information publicly disseminated, and it ultimately found the exchange to be lawful. *Id.* at 574. At the other end of the spectrum are situations in which competitors directly exchange sensitive information. For example, as in *Am. Column & Lumber v. United States*, the Supreme Court found that regular updates about minute details of their business, along with the submission of a company's books to inspections by a competitor and the details of their business to a jointly employed expert, was sufficient to show a rule of reason anticompetitive claim to restrict production or increase prices. 257 U.S. 377, 410 (1921).

Given those parameters, the Court finds that, based on the evidence presented by Plaintiffs, they have failed to show that Defendants' exchange of information through Agri Stats reports had a substantial anticompetitive effect. Here, although Defendants submitted their detailed production and pricing information to Agri Stats, that information was not given verbatim to their competitors. Instead, the pricing information was given to Agri Stats, a third party, which compiled all of Defendants' data and provided it to the processors as national averages, rather than each processor's individual prices. [1680] ¶ 62. This third-party compilation and aggregation make the exchange unlike the one discussed in *United States v. Container Corp. of America*, where the defendants requested their competitors' most recent price charged or quoted, which the Supreme Court found sufficient to allege an information exchange claim. 393 U.S. 333, 335 (1969). The exchange here is far more similar to the association's gathering and dissemination of data in *Maple*. 268 U.S. at 573. Although Plaintiffs argue that the national averages on the Agri Stats reports were not real national averages because sometimes the pool used to create the average was only two companies, and that exchange of aggregated pricing data can still have anticompetitive impacts, as discussed above, Plaintiffs have not shown that Defendants actually relied on the reports that way.

Plaintiffs also nominally argue that the averaged national pricing data aggregated by Agri Stats on its own is a sufficient type of information to form a basis of an information exchange claim because it can still have anticompetitive effects. This argument, while not fleshed out in the Plaintiffs' briefs, appears to be taken from the *Pork* summary judgment decision, in which it was part of the basis for the district court's denial of summary judgment on the rule-of-reason claim.

32

In Plaintiffs' joint response brief, they included a single sentence on this point, followed by a footnote which cites *Pork* and copies the cases and, nearly verbatim, the parentheticals used in *Pork*. [1690] at 65; *see Pork*, 781 F. Supp. 3d at 871. But this is insufficient to raise an argument properly, and thus is waived. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[P]erfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived."). Further, to the extent Plaintiffs raised the argument that aggregated data can be considered for an information exchange claim, Plaintiffs failed to offer evidence that Defendants exchanged the aggregated data in a manner that could result in substantial anticompetitive effects. While Plaintiffs' experts theorized that it would be possible to determine a competitor's pricing information on certain reports when the national average was limited to two companies and Plaintiffs argue that some products on certain reports had pools of only two companies' prices, once again, they fail to present evidence to support that argument or evidence that Defendants used the reports in that manner. [1690] at 64–65.[29]

A similar claim was also rejected at summary judgment in the *Broiler Chicken* litigation. The court in *Broiler Chicken* considered whether the nature of the information exchanged by the broiler chicken industry's use of Agri Stats reports was sufficient for the exchange to have a substantial anticompetitive effect. 702 F. Supp. 3d at 678. The court determined that the *Broiler Chicken* plaintiffs could not meet their burden under the rule of reason test. The court found that the data was not sufficiently current to have anticompetitive effects and that even if the defendants could deanonymize the reports, "they would not have learned their competitors' production and pricing data because it was not contained in the version of reports Agri Stats provide to them." *Id.* Further, the court in *Broiler Chicken* found there was "scant evidence that the information Agri Stats itself provided to each individual producer was used in a manner that had an anticompetitive effect." *Id.* at 679. Similarly here, Plaintiffs failed to provide evidence that the information contained in the Agri Stats reports was used in a manner that had anticompetitive effects.

In sum, there is little evidence that Defendants used the Agri Stats reports to create a substantial anticompetitive effect, such that they can form the basis of an information exchange violation under the rule of reason. As no genuine dispute of material fact exists such that a reasonable jury could return a verdict for the nonmoving party, summary judgment is granted on the rule of reason claims.

---

[29] This is not to say that other cases in which aggregated data is exchanged could not be found to have a substantial anticompetitive effect, or even that other cases involving the exchanging of Agri Stats data may not have that effect. For example, in *Pork*, the plaintiffs showed that the defendants successfully deanonymized the reports with a 60% success rate, making the information exchanged far more susceptible to anticompetitive effects. 781 F. Supp. 3d at 870. But Plaintiffs here failed to provide evidence that Defendants exchanged information through the Agri Stats reports in a manner that resulted in substantial anticompetitive effects. Further, Plaintiffs rely on *Todd*, in which the plaintiffs alleged that the aggregated data sets were used by each defendant to determine whether its competitors implemented their announced budget cuts to coordinate salaries. 275 F.3d at 212. There, the Second Circuit found that allegations that the aggregated data distributed by a third party containing as few as three companies were sufficient to survive a motion to dismiss on an information exchange claim. *Id.* However, here, Plaintiffs are at summary judgment, and they must provide evidence to support their allegations, which they have failed to do.

### III. Hormel Defendants' Liability

The JOTS Defendants argue that certain related corporate entities should be dismissed from this litigation. The JOTS Defendants include Jennie-O Turkey Store, Inc., Hormel Foods Corporation, and Hormel Foods, LLC. Hormel Foods Corporation is the parent company of JOTS, and Hormel Foods, LLC is a holding company. JOTS argues that Hormel Foods Corporation and Hormel Foods, LLC should be dismissed from the litigation because they had no direct involvement in the actions underlying Plaintiffs' claims. Plaintiffs contend that Hormel Foods Corporation is liable because of its own conduct.

A general principle of corporate law is that a parent corporation is not liable for the acts of its subsidiaries. *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). However, a parent company can be held liable when it is directly involved in a subsidiary's wrongful conduct. *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 771 (7th Cir. 2007). In an antitrust case, a parent's direct involvement can be shown when it directed, controlled, or encouraged its subsidiaries' participation in the scheme. *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022). In cases where a parent directs the subsidiary to engage in anticompetitive conduct, or engages in such conduct itself, that is sufficient to show direct involvement by the parent. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 6629250, at *7 (N.D. Ill. Oct. 22, 2018).

Here, disputed facts about Hormel Foods Corporation's involvement preclude summary judgment. While JOTS argues that Hormel Foods Corporation was not involved in production, sale, or pricing decisions, Plaintiffs presented evidence that creates a material dispute about Hormel Foods Corporation's CEO, Jeff Ettinger's involvement. In a September 2013 email, Ettinger wrote to Glenn Leitch, president of JOTS, "I am not 'sold' on the concept that we should expand production by 4 1/2% in 2014. This would represent a rapid reversal of the tightening we achieved over the past couple of years, and could signal an abandonment of 'discipline' by the player who has exhibited the most discipline (and benefited therefrom) in the industry." [1643-89]. Later in the thread, Ettinger replies, "OK, we will discuss after you return and learn more. If we are going to be able to state that we are maintaining industry discipline by taking on existing pounds, we will also have to have a basis to say that these pounds won't be replaced in their current system (be it Hillshire, Dakota or Turkey Valley). Do we know that?" *Id.* Drawing inferences in favor of Plaintiffs implies that Hormel Foods Corporation was involved in production decisions, was aware, and expressed an interest in continuing the industry discipline. As this is reasonably inferred to be a reference to the agreement to restrict production, it places Hormel Foods Corporation's conduct within the scope of Plaintiffs' allegations. Thus, summary judgment is denied as to Hormel Foods Corporation.

The same cannot be said for Hormel Foods, LLC. Plaintiffs do not respond to JOTS' argument that Hormel Foods, LLC, was uninvolved in the conspiracy. [1687].[30] Plaintiffs' failure to respond to JOTS' argument is a basis for granting relief. *See In re GT Automation Grp., Inc.*, 828 F.3d 602, 605 (7th Cir. 2016) ("An argument not responded to is ordinarily deemed waived."). Further, Plaintiffs failed to dispute the fact that Hormel Foods, LLC had no operations relevant to this litigation. [1684] ¶ 3. Therefore, that fact is deemed admitted. Thus, summary judgment is granted in part as to Hormel Foods, LLC.

---

[30] Plaintiffs' response brief does not acknowledge Hormel Foods, LLC as a defendant and only refers to Hormel Foods Corporation. [1687].

34

## IV. Prestage Defendants' Additional Arguments

Lastly, Prestage makes two additional arguments in its individual motion as to why it should be granted summary judgment. First, Prestage argues that the claims against it are time-barred because it was not added as a defendant until the second amended complaint in 2022. Second, Prestage argues that Prestage South Carolina, one of three Prestage entities in this lawsuit, is not a proper defendant.

### a. Time Bar

Sherman Act claims are subject to a four-year statute of limitations.[31] In antitrust cases, the general rule is that a claim accrues "when the plaintiff discovers that he has been injured and who caused the injury." *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006) (internal quotations omitted). Plaintiffs added Prestage as a defendant in the second amended complaint, filed on January 10, 2022, meaning the claims are barred if Plaintiffs discovered they had an injury and who injured them before January 10, 2018. Here, there are disputed material facts about when Plaintiffs knew or, with diligent inquiry, should have known that Prestage injured them.

Prestage argues that Plaintiffs knew or should have known about their claims no later than November 20, 2017, when the order on the motion to dismiss in *Broiler Chicken* described those plaintiffs' allegations of an alleged agreement to use Agri Stats reports to reduce chicken supply. [1583] at 14. However, unlike other Defendants in this case, Prestage did not sell broiler chickens and was not part of the *Broiler Chicken* litigation. Further, Prestage does not explain why an opinion in a different case involving a product they do not sell would put the Plaintiffs here on notice of their claims against Prestage. While Plaintiffs admit that they were aware Prestage subscribed to Agri Stats when they filed their first complaint, they assert that they were unaware of the extent of its involvement with the conspiracy or Ron Prestage's role in the 2008 Outlook Report. [1685] at 22. Further, as discussed above, Plaintiffs' claims that solely rely on their theory that Defendants were exchanging information through Agri Stats are insufficient to survive summary judgment, so Plaintiffs' knowledge that Prestage received the Agri Stats reports would not put them on notice of the claims that survive summary judgment. Therefore, the *Broiler Chicken* order did not put the Plaintiffs on notice of their claims against Prestage.

Prestage also argues that the Supreme Court's decision in *Rotkiske v. Klemm*, 589 U.S. 8 (2019), holds that the discovery rule does not apply to Sherman Act violations, reversing long-held Seventh Circuit precedent. *Copper*, 436 F.3d at 789 (absent a contrary directive from Congress, the discovery rule applies to Sherman Act antitrust violations); *see, e.g.*, *Vasquez v. Indiana Univ. Health, Inc.*, 40 F.4th 582, 588 (7th Cir. 2022) (applying the discovery rule to antitrust claims after the Supreme Court's decision in *Rotkiske*). However, this argument overstates *Rotkiske*'s holding. In *Rotkiske*, the Supreme Court held that the language of the Fair Debt Collection Practices Act (FDCPA) was clear that an action may be brought "within one year from the date on which the violation occurs[,]" which "unambiguously sets the date of the violation as the event that starts the one-year limitations period." 589 U.S. at 13. Therefore, the "FDCPA limitations period begins to run on the date the alleged FDCPA violation actually happened." *Id.* But unlike the FDCPA, the Sherman Act limits a cause of action unless it is "commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. This language makes the Sherman Act, unlike the FDCPA, accrual-based. The Supreme Court in *Rotkiske* did not address how the discovery rule should apply

---

[31] Antitrust claims are governed by the Clayton Act's limitations provision. 15 U.S.C. § 15b.

to accrual-based statutes. Therefore, there is no basis to depart from the Seventh Circuit's binding precedent on this Court that the discovery rule applies to antitrust claims. As the discovery rule applies and the *Broiler Chicken* order did not put the Plaintiffs on notice of their claims against Prestage, there are disputed facts that prevent summary judgment as to when Plaintiffs knew that Prestage caused the alleged injury.

Lastly, Prestage argues equitable tolling should not apply here. Plaintiffs respond that if the statute of limitations started to run, they are entitled to equitable tolling under a fraudulent concealment theory. [32] "Fraudulent concealment 'presupposes that the plaintiff has discovered, or, as required by the discovery rule, should have discovered, that the defendant injured him, and denotes efforts by the defendant—above and beyond the wrongdoing upon which the plaintiff's claim is founded—to prevent the plaintiff from suing in time.'" *Copper*, 436 F.3d at 791 (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990)). To succeed on this theory, a plaintiff must show "that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195 (1997). Here, taken in the light most favorable to the Plaintiffs, they have put forth evidence that the NTF sought to minimize evidence about the Outlook Report during its creation, and therefore, they were unable to determine Prestage's role in the conspiracy. So, to the extent that equitable tolling is necessary, there are also disputed facts about when Plaintiffs knew or should have known about Prestage's role in the conspiracy. Therefore, Prestage's motion for summary judgment on this basis is denied.

### b.      Prestage Farms of South Carolina, LLC

Finally, Plaintiffs brought claims against three Prestage entities in this case: Prestage Farms, Inc., Prestage Foods, Inc., and Prestage Farms of South Carolina, LLC (Prestage South Carolina). Prestage argues that Plaintiffs failed to establish a claim against Prestage South Carolina because it did not sell the products at issue in this litigation and instead sold live turkeys it received from Prestage Farms primarily to Kraft at a cost-plus basis. [1583] at 15–16.

There are no disputed material facts about Prestage South Carolina's alleged involvement with this scheme. [33] Plaintiffs do not dispute that Prestage South Carolina did not sell the products at issue in this litigation, nor have they provided any evidence that Prestage South Carolina was involved in the alleged scheme to reduce supply. [1672] ¶ 6. Instead, Plaintiffs argued that if Prestage Farms produced fewer turkeys, then Prestage South Carolina would receive fewer turkeys. [1685] at 19. But that does not establish that Prestage South Carolina was independently part of the scheme to reduce production, but rather that, because of Prestage Farm's cuts, Prestage South Carolina would receive fewer live turkeys to grow. Plaintiffs also argue that the Prestage entities had a joint contract with Agri Stats, and that Prestage South Carolina used the Agri Stats Growout reports in connection with its Kraft contract. But, for the reasons discussed above, the Agri Stats reports do not establish a Sherman Act violation, so Prestage South Carolina's use of

---

[32] Prestage also argued that Plaintiffs' claims cannot relate back under Rule 15(c)(1)(C)(ii), but Plaintiffs assert they are not arguing that the failure to initially name Prestage as a defendant was due to mistaken identity, so Rule 15(c)(1)(C)(ii) does not apply. [1583] at 11; [1685] at 23. As Plaintiffs contend this is not the argument they are making, the Court does not address it.

[33] Plaintiffs also state that the Prestage entities are a family business and that Ron Prestage formed Prestage South Carolina in 1994, and that he served on the NTF Executive Committee on behalf of all the Prestage entities, but they fail to articulate a reason why that would establish liability for Prestage South Carolina.

36

one of the reports would not connect it to the alleged scheme. Thus, as there are no material facts disputed about Prestage South Carolina's lack of involvement in the conduct underlying the claims in this case, the Court finds that no reasonable jury could return a verdict against Prestage South Carolina. Therefore, summary judgment is granted for Prestage South Carolina.

## V. Conclusion

For the reasons stated above, Butterball's motion for summary judgment [1560], JOTS' motion for summary judgment [1533], and Prestage's motion for summary judgment [1551] are granted in part and denied in part, and Foster's motion [1556] and Perdue's motion [1586] for summary judgment are granted. Starting October 8, 2026, the DPPs will proceed to a jury trial on the *per se* claims against the Butterball, JOTS, and Prestage entities that have survived summary judgment. The CIIPPs and remaining DAPs[34] will separately proceed to a jury trial on their *per se* claims against the Butterball, JOTS, and Prestage entities at a later date.[35]

Recall that this Opinion only addresses the arguments and claims raised by the DPPs, the CIIPPs, and the DAPs against Butterball, JOTS, Prestage, Foster, and Perdue.[36] Cooper Farms, Farbest, Raeford, Tyson, and Agri Stats have settled with the DPPs and CIIPPs. Cargill has settled with all Plaintiffs involved in the pending motions for summary judgment. A ruling on the DAPs' remaining claims against Cooper Farms, Farbest, Raeford, Tyson, and Agri Stats is reserved for a future opinion.[37] The Court enters summary judgment for Foster and Perdue against the DPPs, CIIPPs, and DAPs on all claims. The Court enters partial summary judgment for Butterball, JOTS, and Prestage against the DPPs, CIIPPS, and DAPs on their rule of reason claims.[38] Judgment is also entered for Hormel Foods, LLC and Prestage Farms of South Carolina, LLC.

While the Court finds that a reasonable jury could return a verdict in Plaintiffs' favor on the *per se* claim against Butterball, JOTS, and Prestage, the evidence is far from overwhelming. At trial, Plaintiffs' case will be based on email communications and expert witness testimony about a supply restriction agreement, which will be evaluated against complete denials from all the Defendants' witnesses that there was any agreement to reduce supply, along with their own, competing expert testimony about independent action. So, when viewed in the light most favorable to Plaintiffs, while the evidence is sufficient for some of Plaintiffs' claims to survive a summary

---

[34] This Opinion only addresses the arguments raised by the original DAPs: Winn-Dixie, Bi-Lo, Aramark, Carina, and Amory. It does not reach the seven new Mintz DAPs who filed their claims after the briefing on the present summary judgment motions was complete. The Mintz DAPs are currently in discovery.

[35] As noted above, the Court reserves ruling on Defendants' contention that certain DAPs' claims are time-barred. [1580] at 67–72.

[36] DAPs Winn-Dixie Stores, Inc., Bi-Lo Holdings, and Aramark Food, dismissed with prejudice their claims against Prestage.

[37] DAPs Winn-Dixie Stores, Inc. and Bi-Lo Holdings dismissed with prejudice their claims against Tyson.

[38] As DAP Amory only brought a rule of reason claim against Defendants, it has no remaining claims against Butterball, JOTS, Prestage, Foster, or Perdue. *Amory Investments LLC v. Agri Stats, Inc., et al.*, No. 21-cv-006600, [1] ¶¶ 132–49.

judgment motion, Defendants may very well be able to persuade the trier of fact to support the non-collusive version of events. That decision is left in the hands of the jury.


**SO ORDERED.**

Dated:  July 7, 2026

_____
Sunil R. Harjani
United States District Judge