**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE TURKEY ANTITRUST LITIGATION | Case No. 19 C 8318<br><br>Judge Sunil R. Harjani |

# MEMORANDUM OPINION AND ORDER

## Table of Contents

Introduction ....................................................................................... 1

Analysis ............................................................................................. 2

I. *Per Se* Claim ..................................................................................... 2

a. Cooper Farms ..................................................................................... 5

b. Farbest ............................................................................................. 8

c. Raeford ............................................................................................ 12

d. Tyson .............................................................................................. 16

e. Agri Stats ......................................................................................... 20

f. Hub-and-Spoke Theory of Liability .............................................................. 26

II. Rule of Reason Claim ............................................................................ 29

III. Time Bar ......................................................................................... 30

IV. Conclusion ....................................................................................... 33

## Introduction

This opinion continues the summary judgment opinion previously issued in this case. *See In re Turkey Antitrust Litig.*, 2026 WL 1960792 (N.D. Ill. July 7, 2026). In the prior opinion, the Court detailed the background facts and economic and noneconomic evidence establishing sufficient evidence of an agreement to restrain trade in the turkey market at summary judgment, and that analysis applies with equal force here. The Court will not repeat them here, nor will it recite the general legal standards applicable in Sherman Act Section 1 claims.[1] Instead, this opinion will focus on the Direct Action Plaintiffs' claims against the remaining Defendants.[2]

The Court has thoroughly reviewed the evidence presented by the parties. Once again, as with the prior opinion, there is no smoking gun evidence in this case. Not one witness will testify about an agreement to restrict supply or increase price. Indeed, it appears all will deny that such an agreement existed. There is no document that memorializes such an agreement. Nor is there any witness or document to demonstrate that Defendants agreed to deanonymize or use the Agri Stats reports to further the conspiracy. Rather, through a series of inferences from email communications and expert opinions, Plaintiffs seek to build a circumstantial case to overcome the summary judgment hurdle on their *per se* and rule of reason claims. This was successful in some cases, but not so much for others.

Before the Court are the seven remaining motions for summary judgment brought by Defendants Cargill, Cooper Farms, Farbest, Raeford, Tyson, and Agri

---

[1] For reference, the turkey processor defendants are Butterball LLC (Butterball); Cargill Inc. and Cargill Protein – North America f/k/a Cargill Meat Solutions Corporation (Cargill); Cooper Farms, Inc. (Cooper Farms); Farbest Foods, Inc. (Farbest); Foster Farms LLC and Foster Poultry Farms (Foster); Hormel Foods Corporation, Hormel Foods, LLC, and Jennie-O Turkey Store, Inc. (JOTS); House of Raeford Farms, Inc. (Raeford); Prestage Farms, Inc., Prestage Foods, Inc., and Prestage Farms of South Carolina, LLC (Prestage); Perdue Farms, Inc. and Perdue Farms LLC (Perdue); and Tysons Foods, Inc., The Hillshire Brands Company, Tyson Fresh Meats, Inc., and Tyson Prepared Foods, Inc. (Tyson). The other defendants are benchmarking company Defendant Agri Stats, Inc., and its subsidiary Express Markets, Inc. (Agri Stats).

[2] Cooper Farms, Farbest, Raeford, Tyson, and Agri Stats have settled with the Direct Purchaser Plaintiffs (DPPs) and the Commercial and Institutional Indirect Purchaser Plaintiffs (CIIPPs), so the only remaining claims are those brought by the Direct Action Plaintiffs (DAPs). DAPs Winn-Dixie Stores, Inc. and Bi-Lo Holdings settled and dismissed with prejudice their claims against Tyson. DAP Aramark did not bring a claim against Tyson. As with the prior opinion, this opinion only addresses the arguments raised by the original DAPs: Winn-Dixie, Bi-Lo, Aramark, Carina, and Amory. It does not reach the seven new Mintz DAPs who filed their claims after the briefing on the present summary judgment motions was complete. The Mintz DAPs are currently in discovery.

Stats, along with the joint motion brought by all Defendants.[3] After filing its motion, Cargill settled with all Plaintiffs involved; therefore, Cargill's motion for summary judgment [1544] is stricken as moot. Cooper Farms' motion for summary judgment [1538] and Tyson's motion for summary judgment [1569] are granted in part and denied in part. Farbest's motion [1542], Raeford's motion [1554], and Agri Stats' motion [1549] are granted. Defendants' joint motion for summary judgment [1504] is granted in part and denied in part for the reasons stated in this opinion and the preceding opinion.[4] Simply put, the Direct Action Plaintiffs will continue their case against Cooper Farms and Tyson, but their case against Farbest, Raeford, and Agri Stats is over.

## Analysis

Defendants seek summary judgment on Plaintiffs' *per se* and rule of reason claims.[5] Defendants also argue that certain claims are subject to a time bar. Each of these three arguments is evaluated below.

### I. *Per Se* Claim

The Court first addresses Plaintiffs' *per se* claims.[6] Aramark, Winn-Dixie, and Bi-Lo allege that from as early as January 1, 2010, and at least until January 1, 2017,

---

[3] The prior opinion addressed the evidence about the existence of an agreement and also the specific summary judgment arguments made by Defendants Butterball, Foster, JOTS, Perdue, and Prestage. *See Turkey*, 2026 WL 1960792.

[4] For clarity, the Court's citations in this opinion and the prior opinion are not inclusive of all locations in the briefing where an argument was made or evidence was submitted. There were 36 briefs filed as part of this group of summary judgment motions, which often made duplicative arguments and cited the same or similar evidence. The Court reviewed and considered all arguments raised and evidence submitted by the parties. A citation to a specific brief or piece of evidence in this opinion or the prior opinion does not indicate it was the only source the Court considered. Rather, the Court cites to one occasion where an argument was made, and an example of the evidence supporting the argument, to conserve judicial resources, rather than citing all related briefing or evidence.

[5] The Court refers to the Direct Action Plaintiffs (DAPs) as the Plaintiffs throughout this opinion.

[6] Plaintiffs' *per se* claims for this opinion are: (1) Winn-Dixie and Bi-Lo – Claim II [379] ¶¶ 541–52; (2) Aramark – Claim II (*Aramark Food & Support Servs. Grp., Inc. v. Agri Stats, Inc., et al.*, No. 23-cv-4404, [7] ¶¶ 533–44); (3) Carina – Claim I (*Carina Ventures LLC v. Agri Stats, Inc., et al.*, No. 23-cv-16948, [112] ¶¶ 251–73 (Carina does not indicate whether this claim is brought under a *per se* or rule of reason theory)). Amory does not bring a claim under this theory. Amory brings a single claim in its complaint for "VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION 15 U.S.C. § 1" under which Amory alleges an information exchange theory. *See Amory Investments LLC v. Agri Stats, Inc., et al.*, No. 21-cv-6600, [1] ¶¶ 132–49. This is

Defendants and their coconspirators engaged in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.[7] According to them, Defendants engaged in coordinated production cutbacks in 2008 and 2009, raised prices in 2010 to 2011, and then undertook another round of cutbacks in 2012 and 2013.[8] Aramark, Winn-Dixie, and Bi-Lo argue that Defendants coordinated their production reductions through direct communications, the Agri Stats reports and other forecasting metrics such as the 2008 Outlook Report and the Turkey Demand Enhancement Team Demand Index, and their contacts at trade associations.[9]

Similarly, Carina alleges that beginning around 2008 and continuing through at least 2016, Defendants agreed to restrain the production and coordinate pricing of turkey. *Carina Ventures LLC v. Agri Stats, Inc., et al.*, No. 23-cv-16948, [112] ¶ 255. Carina alleges that, under this agreement, Defendants exchanged competitively sensitive information about turkey sold in the United States, coordinated production levels, and agreed to restrict turkey supply, as well as increase prices. *Id.* ¶¶ 256, 257. Like Aramark, Winn-Dixie, and Bi-Lo, Carina contends that numerous factors support the inference of an agreement, including Defendants' frequent information

---

not a *per se* claim nor can it be viewed as pleading facts that could support a *per se* theory under Section 1 of the Sherman Act. Amory alleged that from 2010 to 2017, Defendants "entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations." *Id.* ¶ 133. Amory's factual allegations focused on Defendants' information exchange through the Agri Stats reports. The Supreme Court, however, has unequivocally held that information exchanges are subject to the rule of reason. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.16 (1978). Any plain reading of the complaint shows that Amory's complaint, drafted by former counsel, alleges an information exchange. Amory's complaint lacks allegations that could be viewed as supporting a *per se* theory of liability. While Amory was not required to plead a legal theory, it is well settled in the Seventh Circuit that a plaintiff cannot amend a complaint through legal arguments presented in a brief. *Whitaker v. Milwaukee Cnty., Wisconsin*, 772 F.3d 802, 807–08 (7th Cir. 2014). Here, Amory only pled facts supporting an information exchange claim, and not facts that would support a *per se* theory. Further, Amory has been on notice that the Court viewed its complaint as not asserting a *per se* price fixing claim since at least November 21, 2022. *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 716 n.2 (N.D. Ill. 2022) ("Direct action plaintiff Amory Investments LLC ('Amory') has not asserted a *per se* price fixing claim."). Whether Amory could have successfully moved to amend its complaint to add these factual allegations is not before the Court on the pending motions; here, the Court only considers the complaints and summary judgment motions before it.

[7] Winn-Dixie and Bi-Lo – Claim II [379] ¶ 544; *Aramark Food & Support Servs. Grp., Inc. v. Agri Stats, Inc., et al.*, No. 23-cv-4404, [7] ¶ 536.

[8] Winn-Dixie and Bi-Lo – Claim II [379] ¶ 545; *Aramark Food & Support Servs. Grp., Inc. v. Agri Stats, Inc., et al.*, No. 23-cv-4404, [7] ¶ 537.

[9] Winn-Dixie and Bi-Lo – Claim II [379] ¶ 545; *Aramark Food & Support Servs. Grp., Inc. v. Agri Stats, Inc., et al.*, No. 23-cv-4404, [7] ¶ 537.

exchanges and the opportunities posed by the market structure and trade associations. *Id.* ¶ 264.

The Court previously determined that economic evidence presented by Plaintiffs indicates an agreement to restrain trade. *Turkey*, 2026 WL 1960792, at *4. Likewise, the Court conducted a detailed analysis of the noneconomic evidence and determined that it supported the inference that there was an agreement to restrain trade. *Id.* at *4–12. The Court will not repeat that analysis here.

However, the Court will take a moment to address the economic evidence of DAPs Carina and Amory's expert. Dr. Jacobs conducted a price dispersion analysis—a comparison of how much more expensive the high-priced products are compared to the low-priced products at a given point in time, on average—before, during, and after the conduct period. [1505-36] ¶¶ 572–612. Dr. Jacobs determined that the average dispersion rate declined during the period, meaning that on average the cost difference between a higher-priced item and a lower-priced item during the conduct period was smaller than it was before the conduct period. *Id.* ¶ 599. Dr. Jacobs then observed that if one compared the overall pattern of prices of products that had prices above or equal to the top 25th percentile price reported by Agri Stats with the pattern of products that had prices below the top 25th percentile, the lower-priced products increased at a faster rate than the higher-priced products for some of the conduct period. *Id.* ¶¶ 604–06, fig.VII.14. Dr. Jacobs also asserted that both high- and low-priced products experienced a 25% price increase from Q4 2008 to 2015, but that the prices dropped back down in 2016. *Id.* ¶¶ 611–12, fig.VII.18. Similarly, in assessing damages, Dr. Jacobs determined that the Processor Defendants were able to increase prices across all products on average by 6.7%. *Id.* ¶ 641. However, as Defendants contend, this data does not show when the prices increased, which products were increased, or that the prices increased in parallel. While parallel economic evidence is not required, it would be stronger evidence of the existence of a conspiracy. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002); *see also In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 658 (N.D. Ill. 2023). Although this shows some evidence of a generalized price increase for part of the period, it is a single percentage covering all defendants and products over a seven-year time period, and therefore provides limited economic evidence that the Processor Defendants were colluding on price.

After reviewing Dr. Jacobs' report and testimony, the Court finds his price dispersion analysis has some value, but overall, is weak economic evidence. The narrowing of the price dispersion alone does not support a finding of collusion here. [1506-15] at 69:2–70:4; 242:15–17. As Dr. Jacobs noted, while price dispersion shows the difference in prices, it cannot show why the difference in prices decreased over the conduct period or eliminate innocent explanations such as contract terms, product attributes, or market changes. *Id.*at 239:5–240:3; 242:3–4; 260:22–261:19. Thus, the price dispersion could be just as consistent with independent, innocent conduct. Nor does it show that the Processor Defendants used the Agri Stats reports to increase prices. *Id.* at 260:22–261:19. Further, a lower price dispersion does not inherently

mean raising prices, either on average or for any individual processor or product; it could also occur when prices are falling. *Id.* at 270:21–24. Dr. Jacobs testified that he cannot provide a specific reason for the changes in price dispersion over the period and that the mere existence of price dispersion is not anticompetitive. *Id.* at 242:3–4; 242:15–17. Dr. Jacobs' price dispersion analysis also found that in 2015 turkey price dispersion began increasing, showing that there was inconsistent conduct during the period. [1742] ¶ 77. Moreover, this analysis says nothing about how the individual Processor Defendants acted, as it aggregates data across processors and products into a standardized value. Thus, while the Court considers Dr. Jacobs' analysis, it provides minimal support for Plaintiffs' argument that there is economic evidence of price increases.

With the economic evidence established, the Court must determine whether each Defendant joined the agreement. After reviewing and analyzing all the parties' arguments and evidence, the Court finds there is sufficient evidence against Cooper Farms and Tyson for a reasonable jury to find by a preponderance of the evidence that they agreed to restrict supply and increase prices. Below, the Court addresses the evidence sufficient to decide the summary judgment motions, rather than discussing every fact identified in the parties' briefing. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) ("District courts are also not bound to discuss in detail every single factual allegation put forth at the summary judgment stage.").

**a. Cooper Farms**

Starting with the economic evidence against Cooper Farms, Defendants' own experts found that Cooper Farms cut production from 2008 to 2009 and from 2012 to 2013. [1505-1] ¶ 51 & fig.3.1; [1505-13] fig.14. While Cooper Farms argues that these cuts were minimal, it nevertheless admits that they occurred. [1665] ¶¶ 13, 17. Because Cooper Farms' production cuts during the period are undisputed, the Court turns to whether Plaintiffs' evidence shows a reasonable jury could find, by a preponderance of the evidence, that Cooper Farms and the other Defendants had an agreement.

As discussed in the prior opinion, Cooper Farms routinely communicated with its competitors. *Turkey*, 2026 WL 1960792, at *6–8, *10–12. In August 2008, in an email, Cooper Farms discussed information it had obtained about its competitors' production cuts, including that Cargill was cutting 20-25,000 tom poult placements, JOTS had begun a 6.5% cut, Butterball reduced both tom and hen placements, Prestage made cuts, Raeford planned for no hatching of poults in September 2008, and Foster was considering cuts but was unsure of the details; it also referenced production expansions at Farbest and Sara Lee. [1651-38]; [1578-23]; [1578-24]. Jim Cooper commented that he would "make a few calls today and try to get additional info on some of these companies." [1651-38]. Similarly, Cooper Farms possessed a spreadsheet detailing monthly production changes from September 2008 through August 2009 for many of its competitors, including future production cuts at

Butterball, Raeford, and JOTS, and increases at Farbest. [1744] ¶ 20; [1578-22]. This evidence shows in-depth knowledge of its competitors' production plans, supporting an inference that the competitors agreed to share production information.

Further, ample evidence shows Cooper Farms directly communicated with its competitors about production details throughout the period. Evidence shows that in November 2008, Cooper Farms provided Butterball with supply forecasts and price estimates for the end of 2008 and into 2009. [1643-163]. Then, in August 2009, the record shows that Cooper Farms and Prestage began directly swapping production information, and that this exchange continued for years. [1641-38]; [1744] ¶ 14. These communications were not isolated incidents; evidence shows Cooper Farms discussed cuts with Perdue and JOTS in January 2013. [1643-44]. This evidence of direct communication of production plans and information between Cooper Farms and its competitors supports an inference that Cooper Farms joined the agreement. *See In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 663 (N.D. Ill. 2023) (finding that evidence of communications between competitors provides a sufficient basis for a reasonable jury to find a defendant joined in the conspiracy).

Moreover, the evidence shows that Cooper Farms discussed production plans with its competitors at several National Turkey Federation (NTF) conferences. For example, after the July 2008 NTF conference, Gary Cooper, of Cooper Farms, wrote a "quick 'trip report' from the summer NTF legislative conference" which included details of discussions with Butterball, Cargill, Prestage, Farbest, and JOTS about their production plans.[10] [1643-54]. Cooper similarly reported about the NTF Executive Committee meeting on October 1, 2012, that he heard "tidbits of industry info... mostly direct from the 'horse's mouth' and some second hand" about production cuts at MI Turkey, Sara Lee, JOTS, Cargill, Butterball, Perdue, and WilMar. [1643-59]. Specifically, Cooper reported that "Sara Lee is cutting out the lower tiered contract growers[,]" JOTS "is reducing by 2 million toms[,]" and "Cargill is stopping second shift at CalMo as of October 1st[.]" *Id.* Cooper also noted that he had heard about production plans for Butterball and Perdue but could not confirm the information. *Id.* This pattern of sharing production information at NTF Executive Committee Meetings continued as Gary Cooper reported on February 19, 2013, that "John Reicks, President of the Sara Lee division that includes their turkeys .... Sits on the EC NTF board with me- John said their cutbacks are not due to the market, they are purposely balancing their production to their cooked meat sales. He basically said that their cuts are permanent!!" [1647-32] (cleaned up).

Another factor supporting the inference that Cooper Farms joined the agreement was its participation in, and leadership within, the NTF. Cooper Farms was on the NTF Executive Committee when the 2008 Outlook Report was discussed, but it was not a member of the Steering Committee which directed its creation. However, Gary Cooper contacted Agri Stats on behalf of the NTF Executive

[10] The text of this email can be found in the prior opinion. *See Turkey*, 2026 WL 1960792, at *6–7.

Committee after the July 2008 meeting to say that the Executive Committee "would like to see if Agri Stats could provide them with 'industry production intentions' on a" quarterly basis. [1643-26]. Gary Cooper then attended the October and December 2008 NTF Executive Committee meetings, where the Outlook Report was discussed. [1643-108]; [1643-129]. Further, Gary Cooper chaired the NTF in 2014, when he pushed for hiring EMI to create a "demand metric" and introduced the concept of "coopetition" to NTF members. [1647-39]; [1643-56]; [1647-13]; [1643-216]; [1643-17]; [1643-16]; [1647-22]. True, mere attendance at trade association events is insufficient to establish collusion, as it provides an opportunity to conspire but not evidence of actual wrongdoing. Here, however, Plaintiffs provided evidence that Cooper Farms took advantage of opportunities to engage its competitors in discussions about production plans and acted on them. *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 938 (7th Cir. 2018). Thus, Cooper Farms' involvement with the NTF and its communications with competitors at NTF meetings support an inference that it participated in the conspiracy.

Not all of Plaintiffs' evidence supports an inference that Cooper Farms joined an agreement to restrain trade. It is undisputed that Cooper Farms subscribed to Agri Stats during the period and used the Agri Stats reports to compare its profitability with its competitors. [1665] ¶¶ 35, 37. Plaintiffs argue that Cooper Farms' receipt and use of the monthly Agri Stats reports shows that it had an agreement to raise prices and reduce production with the other Processor Defendants and Agri Stats. [1694] at 9–13. However, for the reasons discussed in the prior opinion and expounded further below, this evidence does not show an agreement between Defendants to increase prices or reduce production. *See Turkey*, 2026 WL 1960792, at *25–29. Similarly, while some evidence shows that Cooper Farms employees attempted to identify the companies on some of the Agri Stats reports, no evidence supports the inference that this was part of an agreed-upon scheme to increase prices or reduce production. [1744] ¶ 8.

In response to evidence that it joined the agreement, Cooper Farms contends that it gathered information about its competitors for pro-competitive purposes and that it increased production overall from 2008 to 2016, with only a few years of minimal year-over-year decreases. [1589] at 14–20. Cooper Farms also argues that joining the conspiracy made no economic sense because it was a smaller player in the market. *Id.* at 20–21.

While Cooper Farms offered some basis for why its actions were independent of any alleged agreement, the totality of the evidence is sufficient to rule out the possibility that Cooper Farms acted independently. Cooper Farms' involvement with the NTF Executive Committee and its communications with competitors about prices and production cuts, combined with the economic evidence, is sufficient for a reasonable jury to conclude, by a preponderance of the evidence, that Cooper Farms joined the agreement. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663 (7th Cir. 2002) (denying summary judgment after finding there was enough

evidence for a reasonable jury to infer an agreement). Therefore, summary judgment on Plaintiffs' *per se* claim against Cooper Farms is denied.

**b. Farbest**

Before discussing the economic and noneconomic evidence specific to Farbest, it is important to understand the undisputed facts about Farbest's business structure and sales contract with Boar's Head. Farbest is a privately held turkey producer located in Indiana. [1664] ¶¶ 2, 3. Three individuals with an ownership interest in Boar's Head own 60% of Farbest. [1745] ¶ 1. Farbest does not operate its own hatcheries or breeder farms and instead purchased tom poults during the class period. [1664] ¶ 4. Farbest sells its turkey products to industrial customers such as Boar's Head and other Defendants in this litigation, including Cargill, Perdue, Butterball, Prestage, JOTS, Foster, Tyson, Raeford, and Cooper Farms. *Id.* ¶ 14. Between 2010 and 2016, Farbest sold most of its turkey product to Boar's Head under a cost-plus margin contract. *Id.* ¶ 28. When Boar's Head does not need all of Farbest's breast meat, Farbest sells it to other customers, and Boar's Head receives either a credit or a charge for the price difference. *Id.* ¶ 7. Boar's Head also receives a credit for non-breast turkey products Farbest sells. *Id.* ¶ 8. From 2006 to 2016, under this arrangement, Farbest sold breast meat to Boar's Head at below-market prices, saving Boar's Head $548 million. *Id.* ¶ 34.

Having established Farbest's business structure, the Court considers the economic evidence against it. Unlike the other processor defendants, Farbest increased production year over year throughout the alleged conspiracy. [1505-1] ¶ 51 & fig.3.1; [1505-13] fig.14. It is undisputed that Farbest's expansion was driven by increased demand from Boar's Head. [1664] ¶¶ 18, 27. To address this growth, in December 2010, Farbest began planning to expand by building or acquiring an additional processing plant. *Id.* ¶ 18. Farbest ultimately built a new plant and feed mill that opened in 2013, nearly doubling its capacity. *Id.* ¶¶ 18, 20. Farbest argues this shows it was not acting in parallel with the other processor defendants. [1582] at 12–16. In response to this evidence of production increases, Plaintiffs argue that other evidence shows Farbest's participation in production restraints.

First, Plaintiffs contend Farbest was "attentive" to the supply changes and trends in the market. [1688] at 14–15. But observing market activity does not show that Farbest restrained production. Plaintiffs also assert that Farbest considered purchasing a production facility from Purdue, which would enable it to increase production without increasing overall market supply. *Id.* at 15; [1648-34]. However, this has little evidentiary value, as Farbest ultimately built a new facility instead of purchasing Purdue's, thereby increasing the amount of turkey in the market. Plaintiffs also argue that Farbest operated below maximum capacity and could have increased capacity sooner to increase facility utilization. [1688] at 15. But operating at all times at maximum capacity is not required to avoid an antitrust violation. *Kleen*, 910 F.3d at 938 (finding that underusing machines does not necessarily point to a defendant having a role in the conspiracy).

Additionally, Plaintiffs maintain that Farbest's production increase should not count because Boar's Head's increased demand for turkey drove it. Plaintiffs contend that sales to Boar's Head were internal transfers, not the result of an arm's-length negotiation, due to the overlap in ownership between Boar's Head and Farbest. [1688] at 20–21. Plaintiffs provide no legal precedent to support this argument, and it is logically inconsistent with the overall increase in supply. Boar's Head was a turkey purchaser whose need for turkey increased. It chose to buy turkey from Farbest, causing Farbest to increase its turkey production and thereby increasing total turkey production in the market. If Boar's Head had not bought from Farbest, it would have bought elsewhere. Thus, there is no reason to exclude Farbest's increased sales to Boar's Head from its production levels. For Farbest, the economic evidence about a supply reduction is weak.

Plaintiffs next argue that Farbest used the Agri Stats reports to increase prices. *Id.* at 15–17. First, it is undisputed that Farbest subscribed to the Agri Stats reports from approximately February 2002 until the summer of 2019. [1664] ¶ 29. Plaintiffs then contend that two email exchanges and their expert's analysis show Farbest actually used the Agri Stats reports to increase prices. [1688] at 16–17. Starting with the communications, in an October 7, 2013, email, Stacey Edwards, an Agri Stats employee, noted that Farbest's most disadvantaged category is fresh tenders, as they are routinely 12 cents behind the national average, and that Plumrose was the customer who posed the greatest opportunity to increase prices as of August. [1648-2]. Plaintiffs then argue that their expert, Dr. Jacobs, found that Farbest raised its price for fresh tenders in August and September 2013. [1688] at 17; [1505-9] ¶ 535. However, Farbest credibly responds that it did not and could not use this information because of its long-term contract with Plumrose. [1751] at 9; [1745] ¶ 32. Moreover, this explanation does not work chronologically, as an October 2013 email with commentary about Farbest's fresh tenders prices in August cannot form the basis for Farbest's decision to increase prices on fresh tenders in August and September 2013. Therefore, this email does not display Farbest using Agri Stats reports or advice to increase prices. In the second email, an internal Farbest email from June 2010, one employee summarizes his thoughts after reviewing the "RED" book, including where Farbest is close to the industry average on price and where it could improve. [1543-34]. Ryan Downes, Farbest Sales Manager, responds that he thinks Farbest is the only company reporting on one of the areas flagged for improvement and asked where he saw "in the book that the rest of the industry is getting a better price than us on this product?" *Id.* While this email shows Farbest employees discussing the Agri Stats reports, Plaintiffs failed to provide sufficient evidence to create a genuine dispute of fact that Farbest increased prices on the products discussed in the email.

Second, Plaintiffs argue that their expert, Dr. Jacobs, determined that the information in the Agri Stats reports was more than a company needs to benchmark against competitors efficiently. [1688] at 16. Thus, Plaintiffs argue that the excess information implies the Processor Defendants used it to increase prices or reduce

production. But an expert's opinion on what is necessary for benchmarking is weak evidence that Farbest actually used the reports to increase prices. Plaintiffs also argue that Dr. Jacobs' price dispersion and overcharge analysis shows coordinated pricing effects. [1688] at 17. Dr. Jacobs ran a regression and found an estimated overcharge of 6.7% during the period and evidence of a reduced price dispersion. [1505-36] ¶¶ 602, 641. But the analysis cited by Plaintiffs does not address how Farbest acted during the period or whether Farbest raised prices on any turkey products because of the Agri Stats reports or an agreement in general. [1745] ¶ 33; [1505-36] ¶¶ 583, 602, 640–41. Given the lack of economic evidence that Farbest joined the agreement, the sliding scale requires more evidence, as the charge of collusive conduct is less plausible. *Fructose*, 295 F.3d at 661.

Much of Plaintiffs' argument focuses on Farbest's President, Ted Seger's involvement with the NTF Executive Committee and his comments during the creation of the 2008 Outlook Report. [1688] at 9–10. Seger served on the Steering Committee for the 2008 Outlook Report and asked questions during its creation, including what level of production would be needed to cover projected future costs. [1564-7]. Seger also asked if the report would discuss "in detail the question of what level of future production should the industry target to be profitable at today's costs? Many parts of the proposal dance around this question, but I would think we want to make sure it is answered." [1643-70]. He also wrote on his copy of the October 2008 draft of the report: "Need a profitability matrix showing what level of production would reasonably lead to profits at the new higher cost levels." [1643-77] at 4. Seger later asked for specific graphs to be included in the Report, which legal counsel ultimately excluded. [1643-21]. But Seger's commentary, while suspect, is insufficient to show Farbest joined the agreement without evidence of corresponding actions by Farbest.

Beyond the 2008 Outlook Report, Plaintiffs rely on Farbest's subscription to the Agri Stats reports as evidence that it joined the agreement. Plaintiffs argue that without an agreement to collude, the Processor Defendants' decision to provide sensitive production and pricing information to Agri Stats makes no sense. [1688] at 11. They also argue that providing information when Farbest knew it could be deanonymized is evidence of an agreement. *Id.* at 18. But Plaintiffs admit they have not identified any evidence showing Farbest deanonymized the reports. [1680] ¶ 75. They also have not identified any evidence that Farbest knew others were attempting to deanonymize the reports. On the contrary, Farbest gave an independent business reason for providing information to and using Agri Stats reports: it got a bonus from Boar's Head for having lower costs. [1664] ¶ 33. Given its cost-plus margin contract with Boar's Head, it is plausible that Farbest and Boar's Head would want to know how Farbest's costs compared to its competitors. Moreover, despite the extensive discovery and amount of ink spilled on this issue, Plaintiffs provided only one example of a time they claim Farbest increased prices based on Agri Stats' advice; and as explained above, it is impossible for an October email to cause a price increase in August. Further, for the reasons discussed in the prior opinion and below,

Defendants' mere use of the Agri Stats reports does not support an inference that they joined an agreement to restrain production.

Next, Plaintiffs identify a few incidents where Farbest was aware of its competitors' plans or general industry trends towards cutting production. [1648-17]; [1648-12]; [1648-14]; [1648-37]; [1648-29]; [1648-28]. But awareness of a competitor's plans, or even a larger scheme, does not independently show that Farbest joined the agreement. Tacit agreement is insufficient for an antitrust claim. *Fructose*, 295 F.3d at 661. Plaintiffs also identified an email from January 10, 2011, where Seger wrote, "Remember, Perdue is a good customer of ours on turkey meat and a cooperative competitor of ours for turkey growers in this area." [1648-18]. But this does not support an inference that Perdue and Farbest were colluding because the reference to "cooperative competitor" is about access to turkey growers, not for production planning or pricing. Plaintiffs also rely on evidence showing that Farbest was communicating with Cooper Farms about joint congressional lobbying efforts on issues related to the turkey industry in 2008, but this does not support an inference of collusion on production restraints. [1648-36]. Based on the evidence presented, it is far more likely that Farbest sat on the sidelines as other processors cut production, and then it reaped the benefit of the resulting increased prices without risking the legal peril of joining the agreement. *Broiler Chicken*, 702 F. Supp. 3d at 673. Further evidence of other processors' internal comments about Farbest's expansion and Farbest's internal comments about how its competitors would react negatively to the news of its expansion supports the inference that Farbest was not acting in alignment with the other processors. [1647-32]; [1643-54]; [1643-166]; [1648-28].

Finally, Plaintiffs argue that Farbest should be denied summary judgment because the court in *Pork* denied summary judgment to defendant Clemens even though it also expanded capacity by opening a new plant during the period. [1688] at 20. However, Clemens' actions in *Pork* are substantially distinguishable from those of Farbest. First, in *Pork*, the court found that plaintiffs put forward evidence that for the first six years of the conspiracy, Clemens produced less pork than it had in the benchmarking period and that it only expanded production very late in the relevant period. *In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 835 (D. Minn. 2025). Further, there was evidence that Clemens announced at industry meetings that the processors had to work together and that Clemens routinely communicated with its codefendants about cutbacks, pricing, and plant downtime. *Id.* at 836. Here, Plaintiffs failed to provide sufficient evidence to create a genuine dispute of fact that Farbest communicated pricing or production plans with its competitors, or that the industry had to act in a united way. Also, the district court found there was evidence of Clemens using Agri Stats to identify pricing opportunities and to raise prices, which Plaintiffs have not done here. *Id.* at 836–37.

After considering all the evidence presented by Plaintiffs, the Court finds that they have failed to meet their burden of proving that a reasonable jury could find, by a preponderance of the evidence, that Farbest joined the agreement. While Plaintiffs provided evidence that Seger was involved in the creation of the 2008 Outlook report

and that Farbest was aware of its competitors' cuts, this is insufficient to show that Farbest joined the agreement to restrain production or increase prices given Farbest's expansion during the period and the lack of communications between Farbest and its competitors. *Kleen*, 910 F.3d at 941 (finding that while there was some evidence of suspicious activity, it was insufficient to permit a trier of fact to find impermissible conduct). This is even more true in light of the extraordinarily weak economic evidence for Farbest. Thus, summary judgment on Plaintiffs' *per se* claim against Farbest is granted.

**c. Raeford**

Raeford is unique among the defendants as it exited the turkey industry during the conduct period. Before leaving the turkey industry, Raeford suffered consistent losses. Between January 2008 and March 2013, Raeford's business suffered losses for 53 out of 62 months, and its turkey operation lost $88 million from 2010 to May 2013. [1661] ¶¶ 4, 15. It is undisputed that Raeford's board decided to discontinue its operations as a turkey producer and exit the live turkey business in 2013 when it shut down its slaughter plant. *Id.* ¶ 18. From July 2013 through December 2014, Raeford continued its further processed turkey operations by sourcing raw turkey from third parties. *Id.* ¶ 19. Then, in early 2015, Raeford sold its turkey processing plant to Butterball and was no longer a turkey processor. *Id.* ¶ 22.

The economic evidence against Raeford is limited. Plaintiffs' argument focuses on Raeford's production cuts before leaving the turkey industry. Plaintiffs' expert, Dr. Williams, determined that Raeford's actual production during the period was lower than it otherwise would have been. [1643-4] ¶¶ 331–32, fig.35. Plaintiffs also rely on Dr. Jacobs' price dispersion analysis to show that during the conspiracy period, the spread between prices on turkey products decreased. However, as discussed above, his analysis is not specific to Raeford, nor does he explain how or why Raeford's prices changed during the period. [1505-36] ¶¶ 592–612. Therefore, this fails to show how Raeford's conduct changed during the period. Plaintiffs also rely on Cooper Farms' internal statements about its expectations that Raeford would cut production and its later determination that those cuts occurred. [1683] at 13–14. Plaintiffs also contend that leadership at Raeford disagreed about closing the poult rearing and hatchery operations and outsourcing to another company. *Id.* at 14; [1514-3] at 91:3–92:17. But that disagreement does not show a cut in Raeford's total production, only that Raeford changed its source for poults. Plaintiffs argue that Raeford notified its customers in late 2012 and early 2013 that it was reducing production, before the company decided to exit the turkey business. [1683] at 14. Plaintiffs also assert that Raeford increased its prices in 2010 and 2011, which Raeford does not dispute. [1749] ¶¶ 22, 26. But Plaintiffs fail to connect this to any coordinated conduct with the other Processor Defendants. Raeford's decision to raise prices is not an antitrust violation unless it was done in agreement with the other processors. Taken as a whole, Plaintiffs' economic evidence that Raeford joined the conspiracy is not strong, which, while not fatal to their case, does require more noneconomic evidence to meet their burden.

Plaintiffs provide sparse evidence of Raeford communicating with its competitors. Instead, Plaintiffs identified co-defendants' internal emails and documents where they discuss what they have heard about Raeford. [1578-24]; [1578-22]; [1578-25]. At least one such email was nothing more than Cooper Farms commenting on news articles discussing Raeford. [1643-166]. Plaintiffs also reference a few emails between a Butterball and a Raeford employee speculating about Raeford closing its turkey slaughter and cook plants and how that would be good for Butterball. [1643-212]; [1645-11]. But these emails do not show Raeford communicating about its production or pricing plans with its competitors.

While Plaintiffs offered a few of Raeford's internal emails as evidence, they are insufficient to show communications between competitors. For example, in an internal email from Raeford's Vice President, Sales & Marketing, he asks, "Where is our competition priced?" [1578-28]. Then a Raeford sales assistant asks the director of sales to send "any competitive pricing you may have?" *Id.* But this email thread does not show communication between competitors. Plaintiffs also identified one spreadsheet where Raeford listed its own prices for products; then it had a tab listing various products by product code, along with codes from Michigan Turkey, Foster, Sara Lee, JOTS, Boar's Head, and Cooper Farms for some products, and then it had price lists from Butterball and Michigan Turkey. [1578-27].[11] Without context, this document does not support an inference that Raeford joined the conspiracy; rather, it is simply a document showing competitors' prices for their products.

Plaintiffs also argue that Raeford's decisions when exiting the industry show it joined the agreement. First, Plaintiffs argue that by closing its hatchery and slaughter plants instead of selling them, and by selling its further processing plant to Butterball, Raeford continued the agreement. Plaintiffs assert that Raeford should have instead sold to a foreign investor who had offered at least $100 million for the facilities. [1683] at 7–8. While there is evidence that a foreign company expressed interest in acquiring the facilities in July 2014, the only evidence that Plaintiffs provide that a deal may have existed is a bank employee commenting in February 2015 after seeing the news about Butterball purchasing the plant: "Interesting!! They were almost done with a Chinese company buying the plant. Remember the investigations we did!!!" [1645-47]; [1645-46]. But a Raeford employee testified at his deposition that no such deal existed and that the third-party email Plaintiffs cite to show the deal was "almost done" was not correct. [1516-4] at 47:8–48:2; 61:13–63:7.

[11] Plaintiffs also point to a June 2014 email that Bob Wright, former General Manager of Turkey Operations at Raeford, sent to Gary Cooper and NTF staff after he left Raeford where Wright compliments Cooper's efforts with the NTF. [1683] at 15; [1645-18]. But Plaintiffs fail to provide a basis to impute Wright's statements on Raeford after he was no longer an employee. Further, even when viewed in Plaintiffs' favor, Wright's statements are nothing more than a general sentiment that volume growth in consumption may not always be profitable and that he "applaud[s] anything the industry can do in unison to help improve true demand for our products." [1645-18]. These statements do not support an inference of collusive conduct.

Given the lack of evidence that such a deal existed, Raeford's decision to accept the Butterball deal instead does not support an inference of collusion.

Another aspect differentiating Raeford from the other Defendants is that it was not a major participant in the NTF. Plaintiffs have not identified evidence showing Raeford was involved with the NTF. Plaintiffs admit that Raeford was not present at the NTF meeting where the Outlook Report was planned or commissioned. [1661] ¶ 40.

Much of Plaintiffs' argument for Raeford's participation in the scheme focuses on Raeford's subscription to and use of the Agri Stats reports. [1683] at 9–15. First, Plaintiffs argue that Agri Stats invited Raeford and the other Processor Defendants to exchange information in the same vein that was found improper in *American Column*. *Id.* at 9–11. For the reasons discussed in the Court's prior opinion and expanded on below, this argument is unpersuasive and does not weigh in favor of a finding against Raeford on the *per se* claims. *See Turkey*, 2026 WL 1960792, at *25–29.

Plaintiffs also make several Raeford-specific arguments about how Raeford used the Agri Stats reports to increase prices and restrain production. First, Plaintiffs assert that Raeford used the Agri Stats reports to obtain their competitors' prices and then used that knowledge to raise its own prices. [1683] at 11. However, while Raeford subscribed to several Agri Stats reports until it closed its turkey business, Plaintiffs identified no evidence that Raeford attempted to deanonymize those reports. [1680] ¶ 75. This weakens Plaintiffs' argument that Raeford used the reports to identify its competitors to monitor their conduct on pricing and production. Instead, to support this argument, Plaintiffs cite evidence of testimony from Raeford employees that the Agri Stats reports contained averages and that Raeford's CFO hoped subscribing to Agri Stats would make Raeford more profitable.[12] [1683] at 11–12; [1749] ¶ 10; [1578-19] at 16:20–25. But these statements merely show that Raeford employees used Agri Stats reports to understand how efficient and cost-effective their breeding process was. [1578-19] at 29:25–32:9; [1516-4] at 151:7–19. Even when viewed in the light most favorable to Plaintiffs, these statements are insufficient to support an inference that they used those reports to conspire on industry-wide output levels or raise prices, as monitoring for and improving efficiency and cost-effectiveness does not inherently result in increased prices or reduced production. Thus, these statements do not show Raeford using any of the Agri Stats data to reduce production or increase prices.[13]

---

[12] Raeford's CFO, Ken Qualls, was a former Agri Stats account manager. In their response brief, Plaintiffs quote from sections of Qualls' deposition where he was discussing his role at Agri Stats and not his role at Raeford. [1683] at 11–12; [1514-3] at 263:6–265:5. So, this does not support an inference of how Raeford used the Agri Stats reports.

[13] Plaintiffs also rely on Dr. Jacobs' price dispersion analysis to argue that Raeford used the Agri Stats reports to increase prices, but this argument fails for the reasons discussed above.

Plaintiffs also argued in their joint brief that Michael Teachey, Raeford's Food Division General Manager, used the Agri Stats reports to reject a customer's proposed prices. Plaintiffs provided one email where Teachey wrote, "I suggest we approve[,] except for the requested pricing on turkey bacon. AgriStats tells us we are under priced on this item, therefore, I would not offer such a huge deviation especially for 150 cases. I suggest we price bacon at a minimum of $2.70." [1643-83]. But this does not show a price increase to the Agri Stats average; it shows only a refusal to discount one product on a list to the amount the customer requested. Further, after reviewing the pricing details in the email attachment, Teachey's suggested price is still a discount from the list price. Thus, this does not show Raeford using the Agri Stats report to increase prices to a certain amount.

Next, Plaintiffs argue that Raeford used the Agri Stats reports to restrain production. In support of this, Plaintiffs identified a single email thread in October 2008 between a Raeford employee and an EMI employee where EMI provided Raeford with forecasts for turkey and chicken and wrote that "I can tell you just about everyone feels under the gun right now, with contract negotiations for 2009, and the financial situation. Both of those generate lots of questions from inside and outside the producing companies." [1645-8]. But this does not show Agri Stats providing inside information only to processors; rather, it shows that EMI answered questions from anyone in the industry, including processors, about their forecasts as the companies entered contract negotiations for 2009. Plaintiffs also argued that Raeford's former president, CFO, and COO, Donald Taber's testimony about reviewing the breeder, hatchery, processing plant, and further processing reports was evidence of a supply restraint conspiracy. [1683] at 13. However, Taber testified that he used these reports as a benchmark to identify "areas of our operation were out of compliance or noncompetitive with the rest of the industry." [1516-4] at 151:7–19. This aligns with how Raeford contends it used the reports and does not support an inference that it used them to coordinate supply cuts.

Plaintiffs also assert that the Agri Stats data was important to Raeford, because Raeford gave Prestage its Agri Stats data as part of its negotiations to sell its production facilities. [1683] at 13. Plaintiffs contend that this exchange shows Raeford confiding in its coconspirator with its Agri Stats data. But the email's context indicates that Raeford was explaining why the Agri Stats data, unlike its internal accounting records, excludes chicken products and would best reflect the plant's activities relevant to Prestage's purchase. [1578-20]. Therefore, this email is insufficient to support an inference that Raeford used the Agri Stats reports as part of the alleged scheme rather than selling its business.

After considering all the evidence Plaintiffs presented, the Court finds that they failed to create a genuine dispute of fact and demonstrate that a reasonable jury could find, by a preponderance of the evidence, that Raeford joined the agreement to increase prices or reduce production. The evidence presented does not exclude the possibility that Raeford was acting in a self-interested but permissible way when it raised prices and ultimately left the turkey industry. *Kleen*, 910 F.3d at 939 (finding

the purchasers' economic and noneconomic proof failed to exclude the possibility that the defendant acted in a permissible, self-interested way). As with Farbest, on balance the evidence does not indicate that Raeford joined the conspiracy. The economic and noneconomic evidence are both weak. Thus, no reasonable jury could find that Raeford conspired with the other Defendants. Therefore, summary judgment is granted on Plaintiffs' *per se* claims against Raeford.[14]

**d. Tyson**

Before addressing the evidence related to Tyson, it is necessary to understand how Tyson became a turkey processor and thus involved in this litigation.[15] Sara Lee operated a first-level turkey processing facility in Storm Lake, Iowa, for 25 years, until 2012, when it split into two companies and transferred its meat business to Hillshire.[16] [1668] ¶ 3. Tyson acquired Hillshire in 2014. *Id.* ¶ 4. Before acquiring Hillshire, Tyson did not have a first-level turkey processing facility. *Id.* ¶ 5. During the conspiracy period, Sara Lee (2008–2012), Hillshire (2012–2014), and Tyson (2014–2017) used approximately 70 to 75 percent of the turkey parts produced annually at Storm Lake as inputs for their further-processed goods, and sold any remaining parts. *Id.* ¶¶ 8, 9. Tyson also purchased turkey parts from other processors to meet their needs. *Id.* ¶ 10. Tyson did not sell or process whole turkeys during the conspiracy period. *Id.* ¶ 7.

With the history of Tyson's turkey processing established, the Court turns to the economic evidence. Defendants' experts used year-over-year data to find that Tyson's production slightly decreased in 2009 but increased in 2013. [1505-1] ¶ 51 & fig. 3.1; [1505-13] fig. 14. Plaintiffs respond that, when breaking down the year-over-year data into year-over-year changes in quarterly production, it shows that Tyson cut production in Q4 in both 2009 and 2013. [1505-8] ¶ 125 & figs.7–8. Plaintiffs also rely on Carina and Amory's expert regression analysis of the impact of Agri Stats reports on prices. [1695] at 13. According to Dr. Jacobs, the average price dispersion rate decreased in the alleged conspiracy period. [1505-36] ¶ 599. However, this does not explain how Tyson's prices changed during the period. Further, merely noting a change in a product's price spread does not show industry-wide price increases. However, Dr. Jacobs also conducted an overcharge analysis in his reply brief where he found that Tyson had an overcharge coefficient of 6.6% during the conduct period.

---

[14] As the Court grants summary judgment on Plaintiffs' *per se* claims, it does not reach the parties' contentions about the time bar and the related arguments.

[15] Since the briefing was completed on the present summary judgment motions, Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC filed an agreed stipulation of dismissal with Tyson, and their claims against Tyson were dismissed. [1860]; [1861]. DAP Aramark did not name Tyson in its complaint.

[16] For clarity, when discussing the evidence, the Court uses whatever entity existed or is referenced in the document rather than always referring to it as Tyson. But when addressing the arguments, the entities are jointly referred to as Tyson.

[1505-9] ¶ 520. Further, a Hillshire document from December 2012 discusses sending "letters to Independent Growers to cut poult placements by 15%[,]" which could support an inference that Hillshire restrained production in 2013. [1652-85]. Therefore, some economic evidence shows Tyson cutting production and increasing prices during the conspiracy period.

Next, Plaintiffs offered evidence of communications between Tyson and its competitors. For example, a March 20, 2013, email shows JOTS employees discussing what Hillshire told them about its production plans. Meghan Konold, JOTS Commodity Sales Manager, wrote to the JOTS SVP of Supply Chain, "Talked to Tom [Stumo] at Hillshire today. He said they are planning cutbacks in slaughter in 2014. The latest WATT report shows them increasing in 2013. Based on what Tom said, we will see them decrease in 2014."[17] [1652-54]. Later in April 2013, JOTS reported internally that "Confidentially, [Tom] Stumo told Meghan they are pulling back placements 6-7%, thus they won't have excess drum supply." [1652-59]. Plaintiffs also identified an email thread between Farbest and Hillshire discussing whether Hillshire would be buying turkey from Farbest in 2014 given the expected tight market for supply. [1732-6]. Evidence also shows Hillshire communicating with Farbest in 2012 about purchasing turkey from them in 2013. [1570-20]. Moreover, Tyson received an email from Butterball in 2016 that said, "If we all do our part it builds." [1643-137].[18] This evidence supports an inference that Tyson communicated its production plans to competitors. *Broiler Chicken*, 702 F. Supp. 3d at 663–64 (finding that sharing production information with competitors supported the inference that a defendant participated in the conspiracy).

However, Plaintiffs provided minimal evidence of Tyson's involvement with the NTF. First, Plaintiffs admit that neither Tyson nor Hillshire were on the NTF Executive Committee when EMI was retained to conduct the 2008 Outlook Report. [1668] ¶ 27. While Sara Lee provided information for the Report, the evidence presented at summary judgment does not show it receiving a copy of the Outlook Report until July 2009. [1570-45]; [1570-46]; [1643-20]; [1508-1]; [1570-47]. Plaintiffs also have not identified any evidence showing Sara Lee attended the NTF meetings where the Outlook Report was discussed. [1640-1]; [1643-108]; [1643-129]. But Tyson's involvement with the NTF increased over time. In a February 19, 2013, email update about a recent NTF conference, Gary Cooper wrote that "John Reicks, President of the Sara Lee division that includes their turkeys .... Sits on the EC NTF board with me- John said their cutbacks are not due to the market, they are purposely balancing their production to their cooked meat sales. He basically said that their cuts are permanent!!" [1652-49] (cleaned up). This supports an inference that by 2013, Tyson was discussing its production plans with its competitors at NTF conferences.

---

[17] Tom Stumo was Sr. Mgr. Poultry Procurement for Hillshire.

[18] An image of this email was included in the prior opinion. *See Turkey*, 2026 WL 1960792, at *14.

Plaintiffs also identified evidence showing Tyson's involvement with the NTF's Turkey Demand Enhancement Team in 2014. [1652-62]; [1652-18].

Turning to Tyson's use of the Agri Stats reports, Plaintiffs articulated several theories under which they argue Tyson conspired with the other Processor Defendants. However, for the reasons discussed below and in the prior opinion, the Court finds that merely subscribing to the Agri Stats reports does not show that a processor joined the agreement. Plaintiffs admit they have not identified any deanonymization efforts by Tyson in the turkey industry. [1680] ¶ 75. Instead, Plaintiffs argue that Agri Stats communicated with Sara Lee and Hillshire and that Tyson had a close relationship with Agri Stats to support their theory.

Plaintiffs identified evidence that Agri Stats and EMI were attempting to set meetings and promote their services to Sara Lee in 2011 and 2012, but there is limited evidence showing Sara Lee responding to those inquiries. [1652-5]; [1652-3]; [1652-4]; [1652-23]; [1652-29]; [1652-8]. An example where Plaintiffs identify Agri Stats sharing sensitive production and pricing data with Hillshire is an August 2013 email about how its "head to head pricing advantage . . . is diminishing." [1652-13]. However, in this email thread, Agri Stats states that Hillshire is not paying them and has not responded to their emails. *Id.* Therefore, this is insufficient to support an inference that Hillshire agreed to join a conspiracy to use this data. Plaintiffs also identify an October 2013 email as evidence of Agri Stats identifying an opportunity for Hillshire to raise prices, but the email does not recommend a price increase but rather explains that Hillshire is doing worse than its competitors because its sales mix more heavily favors lower-priced products. [1652-9].

While Plaintiffs contend that Tyson had a close relationship with Agri Stats and EMI in 2008 through 2010, that conduct cannot be related to being a first-level turkey processor. [1695] at 11–12; [1652-21]; [1652-19]; [1652-30]. Tyson was not a first-level turkey processor in 2008, 2009, or 2010, and would not become a processor of live turkeys until it purchased Hillshire in 2014. Further, to the extent Tyson was in contact with EMI at this time about turkey, it was as a purchaser of turkey or as a further-processor, not as a first-level processor of turkey.[19]

---

[19] Plaintiffs' opposition brief often conflates the conduct of the three entities, Sara Lee, Hillshire, and Tyson, by referring to the actions as being taken by Tyson. However, a clear record of who did what and when is necessary for any given action. This is particularly important for claims against Tyson, whose position in the turkey market materially changed after purchasing Hillshire and thus acquiring the Storm Lake first-level processing plant. Before that acquisition, Tyson was only a further processor of turkey products. However, Plaintiffs' brief does not distinguish these roles, especially when referencing Tyson's relationship with Agri Stats from 2008 to 2014. Tyson's ability to participate in the conspiracy, by either restraining production or increasing prices, was different before and after its acquisition of Storm Lake. What Tyson employees did and said about Agri Stats before becoming a first-level processor of turkey is of limited value and could relate only to its conduct as a purchaser of raw turkey or a further processor, not to Sara Lee's conduct as

Next, Plaintiffs seek to use evidence of Tyson's conduct in the *Broiler Chicken* and *Pork* litigation as evidence that it was acting similarly in the turkey industry. In particular, the district court's findings about how Tyson used the Agri Stats reports in the *Pork* antitrust litigation. [1695] at 11, 20–21. But the evidence presented here is not the same as the evidence in *Broiler Chicken* or *Pork*, where there was significantly more evidence of Tyson's use of the Agri Stats reports and its participation in an agreement to restrain production. *Broiler Chicken*, 702 F. Supp. 3d at 661–62 (finding evidence of communications that Tyson accepted an invitation to join its competitors in the conspiracy); *Pork*, 781 F. Supp. 3d at 857–61 (finding Tyson was openly supportive of the conspiracy's objective, that it had extensive communications with its competitors and instructed employees to destroy such communications, and its use and comprehensive deanonymization of the Agri Stats reports were sufficient for a reasonable jury to conclude Tyson knowingly joined the conspiracy). Beyond listing the overlapping defendants in the cases and stating that all three involve allegations of using Agri Stats reports, Plaintiffs failed to adequately link Tyson's conduct in the broiler chicken and pork industries to its conduct in the turkey industry. Therefore, Plaintiffs' argument is unpersuasive and does not move the needle.

Tyson argues that it acted independently when it cut production in 2013, 2014, and 2015. According to Tyson, its cuts in 2013 were part of an internal consensus-driven process to reduce poult placements by 15 percent because of unplanned overproduction, softening demand, delayed approval from the U.S. Department of Agriculture (USDA) to increase its processing speed, and projections that it would be more cost-effective to purchase turkey parts than to process them internally. [1601] at 13. Then, in March 2014, a fire at the Storm Lake facility shut down operations for several months. [1668] ¶ 20; [1680] ¶ 57. Tyson contracted with other processors to process turkeys during this time. [1668] ¶ 21. Tyson also lost 1.363 million toms due to the HPAI outbreak in December 2014 through 2015. [1668] ¶ 24. However, Plaintiffs' experts assert that they accounted for these items when conducting their analysis. Thus, taking the evidence as a whole on summary judgment, with all reasonable inferences in Plaintiffs' favor, leads to the conclusion that a reasonable jury could exclude Tyson's theory of independent action.

Therefore, the Court finds that while Tyson's reasons may have some merit, the totality of the evidence at summary judgment is sufficient to rule out the possibility that Tyson acted independently. The evidence of Tyson's communications with its competitors about production cuts, when combined with the economic evidence, is sufficient for a reasonable jury to conclude by a preponderance of the evidence that Tyson agreed with Defendants to reduce the supply of turkey and increase the price. *Fructose*, 295 F.3d at 663 (denying summary judgment after

---

a turkey processor. Plaintiffs failed to clearly articulate that distinction. However, even considering the evidence Plaintiffs present about Tyson's relationship with Agri Stats before 2012, for the reasons discussed further below, there is insufficient evidence for the claims against Tyson to proceed for that time period.

finding there was enough evidence for a reasonable jury to infer an agreement). However, even viewing the evidence in the light most favorable to Plaintiffs, they failed to present sufficient evidence to create a genuine dispute of fact that Tyson's pre-2012 conduct showed it joined an agreement.[20] Plaintiffs failed to provide evidence of direct communications between Tyson and its competitors about production levels or pricing. Unlike the other Defendants, Tyson was not involved in the NTF or the 2008 Outlook Report in a way that could show it joined the scheme in 2008. Therefore, the Court grants in part and denies in part Tyson's motion for summary judgment on Plaintiffs' *per se* claims. The Court grants the motion as to conduct pre-2012, but denies it for the remainder of the period.

**e. Agri Stats**

As an initial matter, Agri Stats is not a turkey processor and does not sell turkey. [1693] ¶¶ 3, 12; [1680] ¶ 2. Instead, Agri Stats provides data reporting and benchmarking services to turkey processors. As Agri Stats' president put it, Agri Stats' mission is to "improve the bottom line profitability for our participants … by providing accurate and timely comparative data." [1689-7] at 17. Agri Stats began portions of its turkey reporting program in 2001. [1693] ¶ 5. Processors had to provide their data as a subscriber to receive reports. [1760] ¶ 13. The processors paid Agri Stats more than $5 million during the conduct period for its services, but Agri Stats' fees were not dependent on the processors' profits. *Id.* ¶ 7. Therefore, unlike the Processor Defendants, Agri Stats did not stand to gain from higher turkey product prices because it did not sell turkey products. While Agri Stats certainly sought to maintain and grow its customer base by selling subscriptions to its reports, that alone does not suggest, without more, that Agri Stats joined an agreement to cut production and increase prices.[21] Further, while EMI was a subsidiary of Agri Stats, it provided different reports to its subscribers, who were largely purchasers of protein products rather than processors. [1693] ¶ 18.

Before addressing the Agri Stats reports themselves, the Court considers the evidence Plaintiffs presented about Agri Stats' work for the Processor Defendants beyond the monthly reports. [1701] at 9–11. It is undisputed that Agri Stats drafted the 2008 Outlook Report which contained publicly available data and data collected from the processors. [1680] ¶ 46. Plaintiffs discuss Agri Stats' role in preparing the 2008 Outlook Report, but they fail to articulate any argument as to how this makes Agri Stats a participant in the alleged agreement. Agri Stats was not a turkey

[20] When exactly Tyson joined the agreement in 2012 or 2013 is left for the fact finder to determine.

[21] Plaintiffs state without citation that "it would not have been in Agri Stats' interest to encourage genuine and robust competition, because it might affect Agri Stats' bottom line if competition drove a customer out of business." [1701] at 15. This argument is undercut by the evidence that Raeford exited the turkey industry during the period. Also, it is equally likely that Agri Stats would benefit from a highly competitive market, as processors would be incentivized to obtain information that could improve their operations.

processor or a member of the NTF; it was a third-party hired to prepare a requested report using publicly available data and data provided by the NTF's turkey processors. Agri Stats' opportunity to impress new and existing clients does not automatically indicate agreement with a larger scheme to reduce production or increase prices. [1760] ¶ 38; [1643-22]. Similarly, Plaintiffs reference the NTF's Turkey Demand Enhancement Team's (TDET) hiring of Agri Stats to assist with its initiatives. [1701] at 10–11. Still, they do not articulate how these facts support their Sherman Act conspiracy argument. *Id.*; [1760] ¶ 39. The evidence Plaintiffs cite references the NTF's comments about the TDET and what the processors wanted to use it for, not statements from Agri Stats that could imply that it joined the agreement.

However, most of Plaintiffs' argument that Agri Stats was involved in this conspiracy turns on its anonymized monthly reports for the Processor Defendants.[22] Despite the parties' general disagreements about the reports, they agree to some of the basic elements. Agri Stats admits that its reports included participant lists and that processors would ask about changes to those lists. [1760] ¶ 10. Agri Stats also admits that it developed a price variance report that allowed a subscriber to compare its own sales data against publicly available average data from either USDA or EMI. *Id.* ¶ 30. Meanwhile, Plaintiffs admit that the reports did not include a total pounds-by-producer or total pounds-by-facility data point in any report. [1680] ¶ 66.

With the agreed facts established, the Court turns to the parties' arguments about how the Processor Defendants used the Agri Stats reports. Plaintiffs argue the Processor Defendants used the reports as a mechanism to collude to increase prices and to monitor and enforce their agreement to restrain production. Underlying both of these theories of how the reports were used is Plaintiffs' argument that the Processor Defendants routinely reverse-engineered the reports (because they were anonymized) and that Agri Stats was aware of this and failed to prevent it—thereby establishing Agri Stats' consent to join the agreement and a common understanding of how the reports were to be used. Because whether the evidence shows the Processor Defendants regularly reverse-engineered the Agri Stats reports underpins much of the Plaintiffs' argument, the Court begins there.

The first part of Plaintiffs' argument that the Agri Stats reports were reverse-engineered is their claim that the Processor Defendants were widely deanonymizing the reports. After review of the record, that argument is unsupported. Plaintiffs admit that they have not identified any deanonymization efforts by Farbest, Foster, Raeford, Prestage, and Tyson. [1680] ¶ 75.[23] Plaintiffs provide some evidence that Butterball was attempting to deanonymize some of the reports, and would

[22] The hub-and-spoke section below contains a more detailed breakdown of the types of Agri Stats reports.

[23] Moreover, as discussed in the prior opinion, the evidence that Perdue was attempting to deanonymize the Agri Stats reports is weak. *Turkey*, 2026 WL 1960792, at *27.

occasionally reference that it knew about another processor's performance to them. [1689-50]; [1643-31]; [1643-29]; [1689-51]; [1643-37]; [1643-122] at 69:10–72:20. But the evidence does not show that this was anything beyond an independent effort taken by Butterball.[24] Even taking Butterball's comments to other processors about their performance on the Agri Stats reports at face value, they are insufficient to support an inference that the Agri Stats reports were used to monitor or enforce an agreement. Further, while there is limited evidence of attempts by the other Defendants, taken as a whole, it does not rise to the level of a regular activity.[25] So, although some processors attempted to deanonymize some of the reports, these independent efforts by individual defendants do not show that Agri Stats participated in an agreement to conspire to increase prices or cut production. *Broiler Chicken*, 702 F. Supp. 3d at 676 (finding that evidence that producer defendants were using the Agri Stats reports to make educated guesses about their competitors' plans was not a basis to find that Agri Stats itself joined the agreement). Therefore, this does not support Plaintiffs' theory that Defendants reverse-engineered the Agri Stats reports to monitor and enforce an agreement on price or production levels. Further, although Plaintiffs argue that Agri Stats failed to prevent the processors from deanonymizing the reports, given the lack of evidence that deanonymization was a widespread problem, even assuming that Agri Stats failed to prevent it, that failure does not support an inference that they joined an agreement to restrain trade.

Plaintiffs next contend that Agri Stats disclosed to processors who certain competitors were on the reports. [1701] at 22. But Plaintiffs' example to support this shows an Agri Stats employee answering a question from Cooper Farms about the location of a company, not the name of a competitor. [1689-62]. Plaintiffs also identified an email in which Cargill asks Agri Stats what various abbreviations mean on the Bottom Line Report and states, "Trying to figure out what happened to Butterball to have earnings double ours this month!" [1689-47]. Agri Stats responds only with what the abbreviations stand for and states, "[w]e went back and checked the data and all agrees with what was submitted." *Id.* While this may support an inference that Agri Stats knew Cargill could determine who Butterball was on the Bottom Line Report, that report provided only profit information by producer, not data on production volumes or prices. [1512-2]. It also shows that Agri Stats did not engage with Cargill's speculations about Butterball. Rather, the evidence shows Agri Stats repeatedly declining to provide processors with information about their competitors. [1689-47]; [1689-38]; [1689-48]. Thus, these exchanges are insufficient evidence to support an inference that Agri Stats joined the agreement.

---

[24] Moreover, while Plaintiffs' expert claims that Butterball was successful in deanonymizing the Agri Stats reports, the only example Dr. Jacobs' provides is an email where Butterball deanonymized the Bottomline report's profit ranking, but that report does not provide information on turkey product pricing or production plans. [1782-10] ¶ 126.

[25] A discussion of the evidence of each processor's efforts to deanonymize the report can be found in the section describing their conduct either above or in the prior opinion.

As discussed in the prior opinion, while the Plaintiffs have an elaborate theory about how the Agri Stats reports could have been used to further a conspiracy between the turkey processors, they have failed to put forward evidence to create a genuine dispute of fact that such conduct occurred. *Turkey*, 2026 WL 1960792, at *23–29. Simply providing the benchmarking reports, even if they include pricing information, does not establish a *per se* violation. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 709 (7th Cir. 2011). Evidence that a few of the processors occasionally attempted to deanonymize some of the reports independently is not evidence that Agri Stats agreed to restrict production. Nor is Plaintiffs' expert's testimony that, in a specific circumstance where an Express Sales Report contains only two processors' data, a processor could—although there is no evidence showing that they did—mathematically determine a competitor's price. The record offers scant evidence to support Plaintiffs' allegations that the Processor Defendants used the Agri Stats reports to monitor compliance with the alleged scheme, enforce the scheme, or that Agri Stats assisted in the scheme. Further, while Plaintiffs argue that several instances involved a SKU applying to only two processors, thereby enabling them to determine their competitors' prices mathematically, Plaintiffs identified one example—where their expert, not the defendants, found a SKU with only two processors and mathematically determined the other processor's price. [1701] at 18 (citing [1643-1] ¶ 123).

Next, while Plaintiffs argue that Agri Stats recommended Defendants increase their product prices, there is a lack of evidence supporting this beyond the reports' existence and Agri Stats answering customer questions about them. [1701] at 18. By contrast, an email shows Agri Stats confirming to Cargill that its prices are higher than its competitors for a customer, which would ultimately push Cargill's price down rather than up if Cargill wanted to compete for that customer. [1689-2]. Evidence that an EMI employee provided industry-wide forecasts to processors about expected price cuts, based on a USDA report that prices decreased and that production cuts will continue, does not support the inference that Agri Stats told turkey processors to cut production or raise prices. [1643-140]. There is also evidence that Agri Stats refused to answer client questions about whether they raised their "prices enough" when the market was raising prices. [1689-38]. Nor do one-off emails providing feedback to Agri Stats employees, which include some positive remarks, establish that Agri Stats was anything beyond a third-party provider of services to the turkey processors. [1689-37]. Similarly, comments from Agri Stats employees about how the reports are structured and that customers will look at the national prices over twelve months are not sufficient to support an inference that Agri Stats joined an agreement to collude. [1643-14].

Given the minimal evidence of deanonymization or attempts by the Processor Defendants to reverse engineer the reports, Plaintiffs also argue that by providing an average and a top 25th percentile price, Agri Stats gave the processors "focal points" to aim for when pricing products. [1701] at 18. While it is true that the Express Sales Report contained information on the national average, the top 25th percentile price,

and the processor's price for a given product, the mere existence of that data on the report is not Agri Stats' suggesting a processor raise its price for that product. [1512-1]. According to Plaintiffs, because these Sales Reports contained an "Economic Impact" column showing the difference between the processor's price and the national price for the current number of pounds produced, Agri Stats recommended that processors increase their prices. *Id.* But a column for this basic equation does not turn the presentation of aggregated and averaged data into Agri Stats' recommendation that processors increase prices. Moreover, as with Plaintiffs' other arguments about the use of the reports, there is a lack of evidence showing that Agri Stats ever made such a recommendation or, more importantly, that the processors acted on it. Plaintiffs contend that their expert found over thirty instances of Defendants raising their prices because of an Agri Stats report. [1782-10] ¶¶ 156–67 & App. A. However, these findings show no clear pattern of increased prices. Sometimes the price went up; other times it went down or stayed the same; and sometimes the pricing data showed no clear pattern. *Id.* App. A. This does not show a pattern of conduct on pricing decisions, nor does it support an inference of reliance by the Processor Defendants on the Agri Stats reports to increase prices. Therefore, it cannot be used to infer that Agri Stats joined the conspiracy by providing this information to the Processor Defendants.

Plaintiffs also argue that the Agri Stats reports could be used to restrain supply. [1701] at 19–20. However, the examples Plaintiffs give of how the various reports could be used do not indicate a restraint on supply. Plaintiffs argue that the breeder and hatchery sections of the Live/Growout report provided information that was "useful for gauging future industry supply." *Id.* at 19. But helpful data is not the same as providing actual information about production cuts, particularly when the data is also anonymized. Plaintiffs also argue that their expert determined that processing reports could be used to determine if production was increasing by showing if plant hours, birds per man-hour, or line efficiency increased. *Id.* at 20. But as with the other Agri Stats reports, Plaintiffs are merely speculating on how the processors could have theoretically used the reports to monitor their competitors. Similarly, Plaintiffs argue the Bottom Line and profit report would enable the processors to monitor each other because increased production would lower profits per pound. Plaintiffs have not put forward evidence that the Processor Defendants used the reports that way; much less that Agri Stats was aware of or encouraged the Processor Defendants to use the reports that way. Instead, at most, Plaintiff's evidence shows Butterball using the report as a basis to congratulate other processors on their performance. [1689-50]; [1689-51]. Plaintiffs also contend that the lack of evidence that Processor Defendants enforced or punished defectors is because no defections occurred. Still, as discussed above and in the prior opinion, the processors were not always united in cutting production and increasing prices, so this argument also fails.

Finally, Plaintiffs assert that Agri Stats enabled an information exchange because it listed the participants on the report, allowing the Processor Defendants to

see who was submitting data and whether a competitor stopped providing data. [1701] at 15. Agri Stats admitted that its reports included participant lists and that processors would ask about changes to those lists. [1760] ¶¶ 10, 24. So, Plaintiffs seek to analogize this conduct to that of *Interstate Circuit v. United States*, 306 U.S. 208 (1939). In *Interstate Circuit*, the exhibitor sent a letter to eight branch managers of the distributor defendants, addressed to all defendants, and it contained two demands about pricing as a condition of continuing the exhibition of the distributors' films. 306 U.S. at 215–17. There, the Supreme Court found that by naming the eight distributors in the same document containing their demand, each was aware of the others' involvement and that substantially unanimous action with respect to the restrictions would be required to achieve increased profits. *Id.* at 222. Moreover, compliance with the demand "involved a radical departure from the previous business practices of the industry and a drastic increase in admission prices of most of the subsequent-run theatres." *Id.* Thus, it would tax "credulity [to] believe that the several distributors would, in the circumstances, have accepted and put into operation with substantial unanimity such far-reaching changes in their business methods without some understanding that all were to join[.]" *Id.* at 223. However, the evidence of agreement presented here is substantially less than what existed in *Interstate Circuit*, starting with the fact that the Agri Stats reports did not contain any demands that the Processor Defendants increase prices. The Agri Stats reports merely provided data, which Plaintiffs' experts contend *could have been used* to deduce competitor prices and thus to increase prices. That is a far cry from the outright demand to increase prices or risk losing the ability to continue showing films in *Interstate Circuit*. So, although the Agri Stats reports contained the names of the processors who submitted data for that report, that fact alone is insufficient to establish that an agreement existed.

Finally, while Plaintiffs' experts assert that the processors could have used the reports to track their competitors, that does not establish an agreement to do so. [1707] at 19–22. Plaintiffs' argument boils down to a request that the Court adopt their experts' interpretations of how data on the Agri Stats reports could be used by processors to infer what their competitors actually did in the future. Plaintiffs seek the inference first that because it was possible—although there is scant evidence of any of the processors trying to deanonymize the reports, let alone track the data the way Plaintiffs argue it could be used—the processors were doing all of this, and second that they did this because they had an agreement to do so as a way to restrict production and increase prices. That is several logical leaps too many for Plaintiffs to request at summary judgment. The Court is not required to draw such speculative inferences. *Omnicare*, 629 F.3d at 704 ("[C]ourts are not required to draw every requested inference; they must only draw reasonable ones that are supported by the record.").

Despite the voluminous record before the Court, Plaintiffs have not provided evidence sufficient for a reasonable jury to find, by a preponderance of the evidence, that Agri Stats joined an agreement with the Processor Defendants to restrain trade.

Plaintiffs' fatal flaw is that they offer only a theory of how a conspiracy could have happened, not evidence sufficient to create a material disputed fact that it did.[26] This is not enough to survive summary judgment. The mere existence of the Agri Stats reports does not create the inference of an agreement. While Plaintiffs have theorized how various data points could be used, they lack evidence that the reports were used that way. After considering the totality of Plaintiffs' evidence, both separately and holistically, the Court does not find that it would permit a reasonable jury to dismiss the inference that Agri Stats was acting in its independent interest. Therefore, the Court grants summary judgment as to Plaintiffs' *per se* claims against Agri Stats.

#### f. Hub-and-Spoke Theory of Liability

Next, the Court considers Carina's and Amory's (Certain DAPs) argument that Defendants exchanged information using Agri Stats in violation of the Sherman Act under a hub-and-spoke theory of liability. The Court previously evaluated and ultimately rejected this argument in the prior summary judgment opinion and incorporates that reasoning here. *See Turkey*, 2026 WL 1960792, at *23–25. The Court also incorporates the discussion of why the *per se* claim against Agri Stats fails, discussed above, and the rule of reason claim fails, discussed later in this opinion. Despite Certain DAPs' attempts to analogize their evidence to that in *Interstate Circuit*, as explained above, the facts differ significantly, and Agri Stats' conduct is distinguishable from that of the exhibitor. Similarly, for the reasons discussed in the rule of reason section below, the information circulated by the association in *American Column & Lumber v. United States*, 257 U.S. 377 (1921), was far more specific and detailed about each participant in the scheme than the Agri Stats reports provided. Recall also that it was deanonymized data that was provided to the spokes in *American Column*, unlike here, which involved anonymous and aggregated data reports.

Central to why Agri Stats was not a hub under this theory is understanding what data was contained within the Agri Stats reports. The Agri Stats reports referenced in this litigation were a collection of seven monthly reports that cover various stages of the production process and the standalone Bottom Line Report. [1680] ¶¶ 62, 63.[27] The Turkey Breeder Report contained anonymized cost analysis of breeder and hatchery performance, poult placements and replacements, costs to raise turkeys, and hatching facility costs by flock, company, and breed. [1680] ¶ 62; [1511-4]. The Turkey Growout Report provided firm-by-firm anonymized information about live production costs. [1680] ¶ 62; [1511-5]. The Turkey Processing Book

[26] The Court makes this determination based on the evidence presented about the turkey industry at summary judgment. This is not a reflection on how Agri Stats may have acted in any other industry.

[27] Plaintiffs dispute the description of the data on these reports as anonymized because they argue that certain processors could deanonymize them. [1680] ¶ 62. But the reports as provided to the processors were anonymized.

provided anonymized information about plant-level processing costs and efficiencies without information about pounds or number of birds slaughtered. [1680] ¶ 62; [1511-7]. The Turkey Further Processing Book provided anonymized firm-by-firm information about further processing costs. [1680] ¶ 62; [1511-8]. The Turkey Operations Profit Book provided anonymized information about the operations profit for each participating facility. [1680] ¶ 62; [1511-9]. The Turkey Express Sales Book contained a facility-by-facility comparison of the prices of all products produced at each facility against the national average for a similar bundle of products.[1680] ¶ 62; [1512-1]. This report also ranked the facilities and provided both a national average of similar products and the 25th upper percentile of sale prices. [1680] ¶ 62. The Turkey Customer Sales Book was like the Express Sales Book, but without a ranking by facility; instead, it compared a processor's products sold to a particular customer against a national average. [1680] ¶ 62; [1512]. The Bottom Line Report included a summary table of industry-wide birds, live pounds, and averages for live weight and profit per pound, followed by information ranking subscribers by profit per pound. *Id.* ¶ 63; [1512-2]. While these reports listed who the participating processors were, they each provided different anonymized data, often by a different comparison type (i.e., firm, facility, or product). So while the parties and the Court refer to them as a unit as the Agri Stats reports, they were in fact a series of anonymized reports that provided categorically different information and had different uses, and only two of which had a sales price metric that compared anonymized processor prices against the national average.

The fact that Agri Stats was not acting as a hub for this conspiracy is further evidenced by the dearth of communications showing Agri Stats communicating with Defendants about increasing prices, or communications showing Agri Stats encouraging the Processor Defendants to increase prices.[28] Unlike both *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928 (7th Cir. 2000) (*TRU*) and *Interstate Circuit*, where the hubs set forth clear instructions, here Agri Stats provided data and left it to the processors to use that information as they saw fit.

To be clear, the Court is not suggesting that a clear demand from the hub is always necessary. But here, there is a lack of evidence of a request or pressure from Agri Stats for the Processor Defendants to increase prices, unlike in *American Column*, where the reports gave "significant suggestions as to both future prices and production[,]" among other details such as the views of each member on market conditions, production numbers for each member for the next two months, and opportunities for future meetings to exchange views. *American Column*, 257 U.S. at 398–99. The Agri Stats reports themselves contain no such suggestions, and the one-off emails Certain DAPs cite showing communications between Agri Stats and the processors do not provide sufficient evidence to create a genuine dispute of fact that Agri Stats and the Defendant Processors had a coordinated plan to increase prices or reduce production. Nor is this case like *Kraft Foods Global, Inc. v. United Egg*

[28] See discussion above about the evidence of communications about the Agri Stats reports.

*Producers, Inc.*, where the Court found that the hub "encouraged" and "promoted" efforts to make coordinated production restrictions, took "aggressive" efforts to recruit members to adopt their strategy, and undertook "concerted" efforts to restrict supply. 2023 WL 6065308, at *7–8 (N.D. Ill. Sept. 18, 2023). Indeed, the district court found that the hub entity "aggressively and expressly promoted those recommendations as methods of reducing the market supply of eggs." *Id.* at *8. The record does not establish that kind of conduct here. While Agri Stats provided the Processor Defendants with various data points, there is insufficient evidence to establish a genuine dispute of fact that Agri Stats was promoting efforts to restrain trade or that Processor Defendants acted on any such suggestion.

And what about the rim? There must be sufficient evidence of agreement among the spokes in a hub-and-spoke conspiracy. Even when viewing the inferences in Certain DAPs' favor, on the Agri Stats reports, there is insufficient evidence of communication among Processor Defendants (the spokes) that they jointly agreed to use the Agri Stats reports to reduce output or raise prices, as discussed in the prior opinion and further below, to defeat summary judgment.[29] Tellingly, in this Court's opinions, among the detailed discussion about the numerous emails showing an agreement, those communications concerned information about matters *other than* the Agri Stats reports. On summary judgment, the Court is reviewing evidence about what Defendants actually did, not theories and expert opinions about how things might be used.

Further, the Court finds Certain DAPs reliance on statements made by Greg Bilbrey, a former Agri Stats employee, does not move the needle. Bilbrey worked on the swine side of Agri Stats' business and merely oversaw the employees handling the turkey business. [1505-28] at 20:21–21:13. Bilbrey's references to the Agri Stats reports providing an "apples-to-apples" comparison were references to how it enabled the comparison of costs and performance, which does not relate to Certain DAPs' proposed scheme. *Id.* at 25:15–27:10. Further, Bilbrey's use of the term "hub" to describe Agri Stats, was him using a phrase the questioner had used earlier. *Id.* at 226:5–227:17. Moreover, his terminology in a deposition does not change the legal analysis conducted by the Court. Whether or not a lay employee at Agri Stats viewed its role as being hub-like does not establish a hub-and-spoke antitrust conspiracy.

In summary, Plaintiffs (including Certain DAPs) only provided evidence that the Agri Stats reports existed and then theorized how those reports could be used to

[29] To the extent Certain DAPs seek to rely on other district courts' findings about Agri Stats' conduct in other industries, in particular the findings in *Pork*, those findings are not binding or persuasive. The evidence presented in *Pork* about the use of the Agri Stats reports was different and more substantial than the evidence here. The Court need not reach the second part of the DAPs' argument, which was rejected in *Pork*, that a hub-and-spoke agreement alone is sufficient to establish a Sherman Act violation without a showing of parallel conduct or plus factors.

increase prices or reduce production.[30] The mere existence of the Agri Stats reports with anonymized data is not sufficient to create a genuine dispute of fact for a *per se* violation. *Omnicare*, 629 F.3d at 709. The fact that a third party created and circulated these Agri Stats reports does not make them unlawful and does not turn that entity automatically into a hub. That is not the law in this Circuit under *TRU* and *Interstate Circuit*. As such, summary judgment is granted to Defendants Cooper Farms, Tyson, Farbest, Raeford, and Agri Stats on this argument, and Certain DAPs may not proceed with a hub-and-spoke theory at trial.

## II. Rule of Reason Claim

Next, the Court turns to Plaintiffs' information exchange claims under a rule of reason theory.[31] As discussed in the prior opinion, courts evaluate information exchange claims using the rule of reason's three-step burden-shifting framework. *Turkey*, 2026 WL 1960792, at *25. Plaintiffs bear the initial burden of proving that the challenged restraint—the information exchanged—had a substantial anticompetitive effect that harms consumers.[32] *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). The Court previously determined that Plaintiffs failed to meet their burden under the first prong to show that Agri Stats reports had a substantial anticompetitive effect that harmed the relevant market. *Turkey*, 2026 WL 1960792, at *26–29. That reasoning also applies here, and the Court adopts and incorporates it into this opinion.

As discussed in the prior opinion, this case is unlike *American Column & Lumber v. United States*, 257 U.S. 377 (1921), where the Supreme Court found that the regularity and detailed nature of the exchange along with the submission of their books to inspection by a competitor was sufficient for a rule of reason claim. Notably, it was not the disclosure of the information to a third party that caused the violation, as the disclosures "would be valueless, unless communicated to the members in a condensed and interpreted form[.]" *Id.* at 396. Instead, the violation hinged on the detailed nature of the information provided to each member, which included: (1) a monthly summary of each members production for the prior month "subdivided as to grade, kind, thickness[,]" (2) weekly reports of all sales including each sale and the price, and the name of the purchaser, (3) weekly reports about each members' shipments, (4) monthly reports showing available stock and a summary of all sold

---

[30] Discussed further in the rule of reason section below.

[31] Plaintiffs' rule of reason claims for this opinion are as follows: (1) Winn-Dixie and Bi-Lo – Claim I [379] ¶¶ 524–40; (2) Aramark – Claim I (*Aramark Food & Support Servs. Grp., Inc. v. Agri Stats, Inc., et al.*, No. 23-cv-4404, [7] ¶¶ 516–32); (3) Carina – Claim I (*Carina Ventures LLC v. Agri Stats, Inc., et al.*, No. 23-cv-16948, [112] ¶¶ 251–73 (Carina does not indicate whether this claim is brought under a *per se* or rule of reason theory)); (4) Amory – Claim I (*Amory Investments LLC v. Agri Stats, Inc., et al.*, No. 21-cv-6600, [1] ¶¶ 132–49).

[32] The parties only briefed the traditional rule of reason framework and not the abbreviated "quick look" framework, so the Court only addressed the traditional framework.

and unsold stock, (5) monthly pricelists which included the asking price for each member and a requirement that any changes "be immediately transmitted to all the members[,]" and (6) a market report that notes an changes in production and consumption conditions and a comparison of production and sales with an analysis of the market conditions. *Id.* at 396. The association also met once a month to provide members the opportunity to discuss "all subjects of interest to the members." *Id.* at 396–97. The extent and detailed nature of the reports regularly provided to the members in *American Column* stand in stark contrast to the information provided in the Agri Stats reports. The Agri Stats reports provided aggregated and anonymized data, and under limited circumstances, according to Plaintiffs' experts, the possibility for a processor to determine its competitor's price on a specific product.[33] Even considering Plaintiffs' experts' views on how the production data could have been used to gauge a competitor's possible changes in the production plans, that is not comparable to the detailed information actually provided in *American Column*. Nothing provided in the Agri Stats reports was equivalent to receiving production summaries, weekly sales reports detailing sales and price, the name of the purchaser, and monthly price lists. Further, unlike in *American Column*, Agri Stats did not arrange monthly meetings for Processor Defendants to discuss this information. Thus, the information provided to the members in *American Column* was substantially more detailed and specific than what the Agri Stats reports provided to the Processor Defendants.

Therefore, for the reasons discussed above and in the prior opinion, there is minimal evidence that the type of information exchanged or the Defendants' use of the information contained within the Agri Stats reports created a substantial anticompetitive effect. As no genuine dispute of material fact exists such that a reasonable jury could return a verdict for the nonmoving party, summary judgment is granted on the rule of reason claims.

## III. Time Bar

Finally, Defendants argue that Carina's and Winn-Dixie's[34] claims should be dismissed, either in whole or in part, as time-barred. [1580] at 67. Carina seeks damages for turkey products its assignor, Sysco, purchased between 2008 and 2016. Winn-Dixie seeks damages for purchases between January 2010 and 2017. Carina filed its original complaint on July 21, 2023, and Winn-Dixie filed its original complaint on August 3, 2021. The Sherman Act has a four-year statute of limitations, so unless tolling applies, Carina's claims are limited to purchases after July 21, 2019, and Winn-Dixie's claims are limited to its purchases after August 3, 2017.

Carina and Winn-Dixie argue that their claims are tolled under the discovery rule and *American Pipe*. [1690] at 66–67. Carina and Winn-Dixie assert that they

---

[33] *See* discussion above about the contents and uses of the Agri Stats reports. *See also Turkey*, 2026 WL 1960792, at *26.

[34] Winn-Dixie and Bi-Lo filed a joint complaint, so all references to Winn-Dixie include Bi-Lo.

could not have discovered Defendants' internal emails showing their use of the Agri Stats reports, or Defendants' exchange of production information. *Id.* at 67. Carina also contends that Defendants put forward no evidence that Sysco could have discovered the conspiracy with a diligent inquiry into information in the public domain and that the Agri Stats reports and how they were used were never disclosed to Sysco. *Id.* at 67–68. Carina also argues that Sysco did not use the data in EMI's Turkey Price Discovery Report and that the data was aggregated and would not have alerted Sysco to the scheme. *Id.* at 68. Finally, Carina asserts that Sysco's involvement at EMI conferences and presentations was an attempt by EMI to get Sysco to use EMI's services instead of Urner Barry and that EMI did not advertise the cartel. *Id.* Similarly, Winn-Dixie contends that Defendants identified no evidence that Winn-Dixie subscribed to or used Agri Stats or EMI, or that Winn-Dixie was aware of how Defendants used those reports. Winn-Dixie further argues that Defendants provided no evidence that it knew of Defendants' communications about their production plans.

In response, Defendants contend that Winn-Dixie cannot argue *American Pipe* tolling applies because it was not pled in its complaint.[35] "In *American Pipe*, the Supreme Court held that the timely filing of a class action tolls the applicable statutes of limitations for all persons within the scope of the class alleged in the complaint." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 615 (7th Cir. 2020). The tolling of claims begins at "the commencement of a class action" and "suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974). The initial class action complaint in this case was filed on December 19, 2019. However, a plaintiff need not be aware of the class action to have their claims tolled under *American Pipe*. "The filing of a class action tolls the statute of limitations as to all asserted members of the class[.]" *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983) (internal quotations omitted); *In re WorldCom Sec. Litig.*, 496 F.3d 245, 253 (2d Cir. 2007) ("Just as class members need not actively participate in order to profit from the class action's eventual outcome, they may also benefit passively from the suit's tolling effect on the statute of limitations."). Defendants supply no authority to support their position that *American Pipe* tolling must be alleged in the complaint. Accordingly, nothing prohibits Winn-Dixie from raising *American Pipe* tolling at this stage.

Moreover, Defendants fail to provide a basis for why *American Pipe* tolling would not apply. Both Carina and Winn-Dixie were members of the class with federal antitrust claims covered by *American Pipe*; therefore, they are entitled to *American*

[35] Defendants do not argue that *American Pipe* does not apply to Carina's claims; instead, they assert that it does not salvage the claims because most of the purchases occurred before December 2015. [1580] at 71.

*Pipe* tolling.[36] The purpose of the statute of limitations is to put defendants on notice of claims against them and prevent plaintiffs from sleeping on their rights. *Crown*, 462 U.S. at 352. Here, because of the class action, Defendants were aware of the claims against them, and Carina and Winn-Dixie cannot be accused of sleeping on their rights while the class certification was pending. *Id.* Allowing tolling here does not create a potential for unfair surprise to Defendants. Further, this Court has previously held that *American Pipe* tolling applied to DAP Aramark. *In re Turkey Antitrust Litig.*, 2024 WL 3848560, at *5 (N.D. Ill. Aug. 16, 2024).

Because *American Pipe* tolling protects claims dating back to December 2015, the question remains whether to allow Carina and Winn-Dixie's earlier claims. As discussed in the Court's prior summary judgment decision, based on Seventh Circuit precedent, the discovery rule applies in antitrust cases. Defendants argue that the Supreme Court's recent decision in *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024), limits the application of the discovery rule in this case. In *Corner Post*, the Supreme Court reaffirmed that "accrue" has a well-settled meaning and that it has repeatedly recognized the "standard rule that the limitations period commences when the plaintiff has a complete and present cause of action." 603 U.S. at 811 (quoting *Graham County Soil & Water Conservation Dist. v. United States*, 545 U.S. 409, 418 (2005)). The Court, conversely, rejected "the possibility that a 'limitations period commences at a time when the [plaintiff] could not yet file suit' as 'inconsistent with basic limitations principles.'" *Corner Post*, 603 U.S. at 811 (quoting *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 200 (1997)). But nothing in *Corner Post* establishes a basis to overturn the Seventh Circuit's long-held precedent of applying the discovery rule to federal antitrust cases. Moreover, Defendants did not raise this argument until their reply brief, so it is waived. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021). Therefore, as with the other Plaintiffs, Carina and Winn-Dixie's claims accrued when they discovered they had been injured and who caused the injury.

Defendants largely rely on evidence related to their awareness of the Agri Stats reports to show when Carina and Winn-Dixie discovered, or reasonably could have discovered, they had been injured, and who caused the injury. [1580] at 69–72. Carina and Winn-Dixie argue that they could not have discovered the inter-firm communications sharing production data and production plans. Further, they were not at the NTF Executive Committee or Steering Committee meetings where the 2008 Outlook report was discussed. As in the prior summary judgment opinion, since the information exchange claims do not survive summary judgment, Carina and Winn-Dixie's knowledge of the existence of the Agri Stats reports would not establish that they should have been able to discover their injury or who injured them, and the time

[36] As *American Pipe* tolling applies, Defendants' argument that the decision in *Broiler Chicken* put the DAPs on notice of their claims is moot because that decision was issued within four years of the DPPs filing their complaint. Further, the Court discussed in the prior opinion why the order on the motion to dismiss in *Broiler Chicken* did not put the plaintiffs in this case on notice of their claims. *Turkey*, 2026 WL 1960792, at *30.

bar does not apply. To the extent the parties contest when Carina and Winn-Dixie did, or could have with reasonable diligence, discovered their injury and who injured them using non-Agri Stats-related evidence, disputed material facts exist preventing summary judgment. *See Turkey*, 2026 WL 1960792, at *30–31.

## IV. Conclusion

For the reasons stated above, Cargill's motion for summary judgment [1544] is stricken as moot. Cooper Farms' motion for summary judgment [1538] and Tyson's motion for summary judgment [1569] are granted in part and denied in part. Farbest's motion [1542], Raeford's motion [1554], and Agri Stats' motion [1549] are granted. Defendants' joint motion for summary judgment [1504] is granted in part and denied in part for the reasons stated in this opinion and the preceding opinion.[37]

The Court enters summary judgment for Farbest, Raeford, and Agri Stats against the DAPs on all claims. The Court enters partial summary judgment for Cooper Farms and Tyson against the DAPs on their remaining rule of reason claims and for Tyson on the *per se* claim for pre-2012 conduct.[38]

As with the prior opinion, while the Court finds that a reasonable jury could return a verdict in Plaintiffs' favor on the *per se* claims against Cooper Farms and Tyson, the evidence is not overwhelming. At trial, the jury will have to weigh competing expert testimony about the economic evidence with the evidence of communications during the period and the Defendants' employees' testimony that no agreement existed. Therefore, although, when viewing the evidence in the light most favorable to Plaintiffs, summary judgment cannot be granted on those claims, Defendants may be able to persuade a jury of their non-collusive version of events. The Court will set a trial date for a consolidated trial of all the DAPs' remaining claims in the near future.

**SO ORDERED.**

Dated: October 19, 2026

Sunil R. Harjani
United States District Judge

[37] As DAP Amory only brought a rule of reason claim against Defendants, it has no remaining claims against Defendants Cooper Farms, Tyson, Farbest, Raeford, and Agri Stats. *See supra* note 6.

[38] DAPs Winn-Dixie Stores, Inc. and Bi-Lo Holdings dismissed with prejudice their claims against Tyson.